Nos. 3:21-cv-167-DJN (Lead Case), 3:21-cv-166 & 3:21-CV-00205(Consolidated)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

In re RETAIL GROUP INC, *et al.*, Debtors.

JOEL PATTERSON, *et al*. & JOHN P. FITZGERALD, III,
ACTING UNITED STATES TRUSTEE FOR REGION 4, Appellants,
v.
MAHWAH BERGEN RETAIL GROUP, INC., Appellee.

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Jointly Administered Bankruptcy Case No. 20-33113-KRH

## OPENING BRIEF OF APPELLANTS
## JOEL PATTERSON AND MICHAELLA CORPORATION

Michael Etkin (*pro hac vice* pending)
Andrew Behlmann (*pro hac vice*)
John Schneider (*pro hac vice*)
LOWENSTEIN SANDLER LLP
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500
metkin@lowenstein.com
abehlmann@lowenstein.com
jschneider@lowenstein.com

Ronald A. Page, Jr.
Virginia Bar No. 71343
RONALD PAGE, PLC
P.O. Box 73087
N. Chesterfield, Virginia 23235
(804) 562-8704
rpage@rpagelaw.com

*Counsel to Appellants Joel Patterson and Michaella Corporation*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Appellant Joel Patterson is a natural person.  Appellant Michaella Corporation has no parent corporation, and no publicly held corporation owns an interest of ten percent or more in Appellant Michaella Corporation.

# **TABLE OF CONTENTS**

**PAGES**

TABLE OF AUTHORITIES ...................................................................iv

INTRODUCTION ...........................................................................1

PRELIMINARY STATEMENT .............................................................3

STATEMENT OF JURISDICTION
AND STANDARD OF REVIEW  .........................................................6

ISSUES PRESENTED........................................................................7

SUMMARY OF THE ARGUMENT .......................................................9

STATEMENT OF THE CASE................................................................15

    A.    The Securities Litigation ..................................................15

    B.    The Debtors' Chapter 11 Cases............................................16

        i.    The Plan and Third-Party Release ............................16

        ii.    Approval of the Disclosure Statement ......................19

        iii.    The Class Claim and Rule 7023 Motion...................23

        iv.    Amended Plans and Repeated Adjournment of Confirmation ......................................................24

        v.    Confirmation of the Plan and Approval of the Third-Party Release of the Individual Defendants.............................29

ARGUMENT ...............................................................................31

I.    THE BANKRUPTCY COURT LACKED SUBJECT MATTER JURISDICTION AND CONSTITUTIONAL ADJUDICATORY AUTHORITY TO APPROVE THE THIRD-PARTY RELEASE OF CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS. ...................................................31

    A.    Subject Matter Jurisdiction..................................................31

B.     Constitutional Adjudicatory Authority ...............................................36

     i     Stern v. Marshall .....................................................................37

     ii    Stern as applied to the Securities Claims ...................................41

II.     APPELLANTS HAD STANDING TO OBJECT TO APPROVAL OF THE THIRD-PARTY RELEASE. ....................................46

III.    THE THIRD-PARTY RELEASE WAS NOT CONSENSUAL. .................49

     A.     Contract law principles dictate that the opt-out mechanism did not result in consent to the Third-Party Release by Class members..........................49

     B.     The Third-Party Release was nonconsensual. .......................................................................53

     C.     Analogous Bankruptcy Code provisions demonstrate that silence cannot be deemed consent. ........................................................................58

IV.    THE DEBTORS FAILED TO PROVIDE ACTUAL NOTICE OF THE THIRD-PARTY RELEASE TO MEMBERS OF THE CLASS. ................................................................................................61

     A.     The Debtors' method of delivering the Opt-Out Documents to members of the Class was constitutionally deficient. ...............................................62

     B.     The Opt-Out Documents themselves were constitutionally deficient. ...............................................68

V.     THE DEBTORS FAILED TO SATISFY THE BEHRMANN STANDARD FOR APPROVAL OF A THIRD-PARTY RELEASE. ........................................................................................73

     A.     The Debtors failed to satisfy any of the Behrmann factors............................................................74

VI.    APPELLANTS HAD AUTHORITY TO OPT OUT OF THE THIRD-PARTY RELEASE ON BEHALF OF THE CLASS. .....................82

VII.   THE BANKRUPTCY COURT ERRED WHEN IT DECLINED
        TO INVOKE BANKRUPTCY RULE 7023 OR CONSIDER
        CERTIFYING THE CLASS FOR A LIMITED PURPOSE. .......................84

CONCLUSION ......................................................................................................86

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acevedo v. Van Dorn Plastic Mach. Co.*,
    68 B.R. 495 (Bankr. E.D.N.Y. 1986) ....................................................71

*Acosta v. Trans Union, LLC*,
    243 F.R.D. 377 (C.D. Cal. 2007)........................................................71

*In re Agriprocessors, Inc.*,
    465 B.R. 822 (Bankr. N.D. Iowa 2012)............................................70

*Ali v. Federal Bureau of Prisons*,
    552 U.S. 214 (2008)........................................................................59

*In re Alpha Nat. Res. Inc.*,
    544 B.R. 848 (Bankr. E.D. Va. 2016)...........................................47, 48

*Am. Bank & Trust Co. v. Jardine Ins. Servs. Tex., Inc.*,
    104 F.3d 1241 (10th Cir. 1997) ......................................................63

*In re American Computer and Telecommunications Corp.*,
    24 B.R. 150 (Bankr. E.D. Va. 1982)................................................36

*Anderson v. Bessemer City*,
    470 U.S. 564 (1985)..........................................................................6

*In re Baby Prods. Antitrust Litig.*,
    708 F.3d 163 (3d Cir. 2013) ...........................................................69

*In re Banks*,
    299 F.3d 296 (4th Cir. 2002) .........................................................62

*Bastian v. Petren Resources Corp.*,
    892 F.2d 680 (1990).......................................................................45

*Behrmann v. National Heritage Foundation*,
    663 F.3d 704 (4th Cir. 2011) ...................................................passim

*In re Bellingham Ins. Agency, Inc.*,
    702 F.3d 553 (9th Cir. 2012) .........................................................43

*Bosiger v. U.S. Airways,*
    510 F. 3d 442 (4th Cir. 2007) ...............................................................................67

*In re Buffalo Coal Co., Inc.,*
    418 B.R. 878 (Bankr. N.D.W. Va. 2009) ....................................................51, 52

*In re Chassix Holdings, Inc.,*
    533 B.R. 64 (Bankr. S.D.N.Y. 2015)......................................................55, 57, 58

*Chemetron Corp. v. Jones,*
    72 F.3d 341 (3d Cir. 1995) ...................................................................................63

*Chi. Cable Commc'ns v. Chi. Cable Comm'n,*
    879 F.2d 1540 (7th Cir. 1989) .............................................................................68

*Childs v. United Life. Ins. Co.,*
    No. 10-CV-23-PJC, 2012 WL 1857163 (N.D. Okla. May 21, 2012) ...............66

*In re Circuit City Stores, Inc.,*
    439 B.R. 652 (E.D. Va. 2010) .............................................................................64

*In re City Homes III LLC,*
    564 B.R. 827 (Bankr. D. Md. 2017) ....................................................................58

*In re City of Detroit,*
    524 B.R. 147 (Bankr. E.D. Mich. 2014)..............................................................81

*In re Combustion Eng'g, Inc.,*
    391 F.3d 190 (3d Cir. 2004) .........................................................................34, 35

*COMM 2013 CCRE12 Crossings Mall Rd., LLC v. Tara Retail Grp.,*
    *LLC,*
    591 B.R. 640 (N.D. W.Va. 2018) .......................................................................46

*In re Comput. Learning Ctrs., Inc.,*
    344 B.R. 79 (Bankr. E.D. Va. 2006)....................................................................84

*In re Conseco, Inc.,*
    301 B.R. 525 (Bankr. N.D. Ill. 2003) .................................................................54

*In re Coudert Bros. LLP,*
    No. 11-2785 CM, 2011 WL 5593147 (S.D.N.Y. Sept. 23, 2011)......................43

*Craddock v. LeClair Ryan, P.C.*,
No. 3:16-CV-11, 2016 WL 1464562 (E.D. Va. Apr. 12, 2016) ........................ 50

*In re DBSD North America, Inc.*,
419 B.R. 179 (Bankr. S.D.N.Y. 2009) ................................................................ 54

*In re Digital Impact, Inc.*,
223 B.R. 1 (Bankr. N.D. Okla. 1998) ................................................................. 42

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
871 F. Supp. 2d 143 (E.D.N.Y. 2012) ........................................................ passim

*In re Drs. Hosp. of Hyde Park, Inc.*,
507 B.R. 558 (Bankr. N.D. Ill. 2013) ................................................................ 36

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005) ...................................................................................... 44, 45

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974) ........................................................................................... 67

*In re Emerge Energy Services LP*,
No. 19-11563 (KBO), 2019 WL 7634308 (Bankr. D. Del. Dec. 5,
2019) ............................................................................................................ 51, 53

*Eubank v. Pella Corp.*,
753 F.3d 718 (7th Cir. 2014) ............................................................................. 82

*In re Excel Storage Products, L.P.*,
175, 181 (Bankr. M.D. Pa. 2011) ...................................................................... 32

*In re Exide Technologies*,
303 B.R. 48 (Bankr. D. Del. 2003) .................................................................... 54

*In re Flour City Bagels, LLC*,
557 B.R. 53 (Bankr. W.D.N.Y. 2016) ............................................................... 60

*Fogel v. Zell*,
221 F.3d 955 (7th Cir. 2000) ............................................................................. 61

*In re Foos*,
405 B.R. 604 (Bankr. N.D. Ohio 2009) ............................................................ 59

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*,
  7 N.Y.3d 96 (2006) ............................................................51

*Gentry v. Siegel*,
  668 F.3d 83 (4th Cir. 2012) ......................................84, 85

*Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*,
  80 F.3d 895 (4th Cir. 1996) ....................................7

*In re Global Indus. Technologies, Inc.*,
  645 F.3d 201 (3d Cir. 2011) ..................................46

*In re Golden Inv. Acquisitions, LLC*,
  508 B.R. 381 (Bankr. N.D. W. Va. 2014) ....................33

*Granfinanciera, S.A. v. Nordberg*,
  492 U.S. 33 (1989) ..............................................39

*In re Harford Sands, Inc.*,
  372 F.3d 637 (4th Cir. 2004) ..................................6

*Hobart Corp. v. Dayton Power & Light Co.*,
  No. 3:13-CV-115, 2014 WL 12842525 (S.D. Ohio Sept. 26, 2014) ...............62

*Hoffman v. Hoffman*,
  157 B.R. 580 (E.D.N.C. 1992), aff'd, 998 F.2d 1009 (4th Cir. 1993) ......................................61, 62

*In re Indianapolis Downs, LLC*,
  486 B.R. 286 (Bankr. D. Del. 2013) ..........................54

*In re J.A. Jones, Inc.*,
  492 F.3d 242 (4th Cir. 2007) ................................62, 64

*Jacobson v. Persolve, LLC*,
  No. 14-CV-00735-LHK, 2015 WL 3523696 (N.D. Cal. June 4, 2015) ............................................71

*Johnston v. Valley Credit Servs.*,
  No. 05-6288, 2007 WL 1166017 (Bankr. N.D. W.Va. Apr. 12, 2007) ..............................................33

*Katchen v. Landy*,
  382 U.S. 323 (1966)....................................................................................40

*In re Kirwan Offices S.a.r.l.*,
  592 B.R. 489 (Bankr. S.D.N.Y. 2018)......................................................33, 37

*Langerkamp v. Culp*,
  498 U.S. 42 (1990) (per curiam)................................................................40

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
  523 U.S. 26 (1998)....................................................................................59

*Lucas v. Dynegy Inc.*,
  770 F.3d 1064 (2d Cir. 2014) ....................................................................82

*Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
  784 F.3d 78 (2d Cir. 2015) ...................................................................51, 52

*Meekins v. Lakeview Loan Servicing, LLC*,
  No. 3:19CV501 (DJN), 2020 WL 1922765 (E.D. Va. Apr. 21, 2020) .......................................................................................................51

*In re Metromedia Fiber Network, Inc.*,
  416 F.3d 136 (2d Cir. 2005) ........................................................37, 56, 58

*In re Midway Gold US, Inc.*,
  575 B.R. 475 (Bankr. D. Colo. 2017)....................................................31, 32, 36

*In re Millennium Lab Holdings II, LLC*,
  242 F. Supp. 3d 322 (D. Del. 2017)............................................................36

*In re Mosko*,
  515 F.3d 319 (4th Cir. 2008) ......................................................................6

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950)..................................................................................63

*In re Murphy*,
  626 B.R. 625 (M.D. Fla. 2021)....................................................................70

*Nat. Res. Def. Council, Inc. v. Muszynski*,
  268 F.3d 91 (2d Cir. 2001) ........................................................................59

*In re National Heritage Foundation, Inc.*,
  478 B.R. 216 (Bankr. E.D. Va. 2012)...............................................................77

*National Heritage Foundation, Inc. v. Highbourne Foundation*,
  760 F.3d 344 (4th Cir. 2014) ...............................................................75, 79, 80

*In re Neogenix Oncology, Inc.*,
  No. 12-23557-TJC, 2015 WL 5786345 (Bankr. D.Md. Sept. 30,
  2015) ................................................................................................49, 73, 79

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
  458 U.S. 50, 90 (1982).............................................................................38, 44

*In re Partsearch Technologies, Inc.*,
  453 B.R. 84 (Bankr. S.D.N.Y. 2011)..................................................................67

*People v. Medina*,
  41 Cal. 4th 685 (2007) .......................................................................................59

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985)..........................................................................................69

*In re Porter*,
  511 B.R. 785 (Bankr. E.D. La. 2014) ...............................................................43

*Power Plant Entm't Casino Resort Ind., LLC v. Mangano*,
  484 B.R. 290 (Bankr. D. Md. 2012) .................................................................32

*In re Quincy Medical Center, Inc.*,
  No. 11-16394-MSH, 2011 WL 5592907 (Bankr. D. Mass. Nov. 16,
  2011) .................................................................................................................76

*In re RailWorks Corp.*,
  621 B.R. 335 (Bankr. D. Md. 2020) ...........................................................64, 78

*In re Rebel Rents, Inc.*,
  307 B.R. 171 (Bankr. C.D. Cal. 2004) ..............................................................60

*In re Renewable Energy Dev. Corp.*,
  792 F.3d 1274 (10th Cir. 2015) ........................................................................43

*Republic Supply Co. v. Shoaf*,
  815 F.2d 1046 (5th Cir. 1987) ..........................................................................42

*In re Rounds*,
    229 B.R. 758 (Bankr. W.D. Ark. 1999) .............................................................70

*In re Ruffalo*,
    390 U.S. 544 (1968) ........................................................................................68

*Sanchez v. Nw. Airlines, Inc.*,
    659 F.3d 671 (8th Cir. 2011) ..........................................................................61

*Securities Investor Protection Corp. v. Bernard L. Madoff Investment*
    *Securities, LLC*,
    490 B.R. 46 (S.D.N.Y. 2013) ....................................................................43, 45

*In re Smith*,
    357 B.R. 60 (Bankr. M.D.N.C. 2006) ............................................................60

*Snider Int'l Corp. v. Town of Forest Heights, Md.*,
    739 F.3d 140 (4th Cir. 2014) ..........................................................................67

*In re Southeastern Materials, Inc.*,
    467 B.R. 337 (Bankr. M.D.N.C. 2012) ..........................................................33

*State v. McDaniel*,
    292 Kan. 443 (2011) .......................................................................................59

*In re Stearns Holdings, LLC*,
    607 B.R. 781 (Bankr. S.D.N.Y. 2019) ...........................................................31

*Stern v. Marshall*,
    564 U.S. 462 (2011) ..................................................................................passim

*Stinnie v. Holcomb*,
    355 F. Supp. 3d 514 (W.D. Va. 2018) ............................................................61

*In re Sunbridge Capital, Inc.*,
    454 B.R. 166 (Bankr. D. Kan. 2011) ..............................................................32

*In re SunEdison, Inc.*,
    576 B.R. 453 (Bankr. S.D.N.Y. 2017) .....................................................passim

*In re Sunterra Corp.*,
    361 F.3d 257 (4th Cir. 2004) ..........................................................................60

*Matter of Swift Air, L.L.C.*,
   624 B.R. 694 (Bankr. D. Ariz. 2020)....................................................................43

*In re Teligent, Inc.*,
   282 B.R. 765 (Bankr. S.D.N.Y. 2002)...............................................................50

*United States v. Hanover Insurance Co.*,
   No. 2:15-CV-127, 2015 WL 9665679 (E.D. Va. Dec. 8, 2015)........................50

*United States v. Johnson*,
   617 F.3d 286 (4th Cir. 2010) .............................................................................7

*Virginia ex rel. Integra REC LLC v. Countrywide Securities Corp.*,
   92 F. Supp. 3d 469 (Bankr. E.D. Va. 2015) .....................................................34

*Waldman v. Stone*,
   698 F.3d 910 (6th Cir. 2012) ...........................................................................44

*In re Washington Mut., Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011).......................................................50, 53, 76

*Yohn v. Love*,
   887 F. Supp. 773 (E.D. Pa. 1995).....................................................................69

*In re Zenith Electronics Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999)...................................................................54

**STATUTES**

11 U.S.C. § 510(b) ...............................................................................................3, 16

11 U.S.C. § 523(a)(19).............................................................................................60

11 U.S.C. § 524(g) ...................................................................................................58

11 U.S.C. § 1109(b) .....................................................................................10, 46, 47

11 U.S.C. § 1128(b) .................................................................................................46

15 U.S.C. § 78j(b) ....................................................................................................16

15 U.S.C. § 78t(a) ....................................................................................................16

15 U.S.C. § 78u-4(a)(3)(B)(i) ..................................................................................82

28 U.S.C. § 158(a) ...................................................................................................6

28 U.S.C. § 1334(b) ...............................................................................................31

Securities Act of 1933 ............................................................................................44

**RULES**

Fed. R. Bankr. P. 7023 ....................................................................................passim

Fed. R. Bankr. P. 9014 ...........................................................................................84

Fed. R. Civ. P. 4(c)(1) ............................................................................................69

Fed. R. Civ. P. 8(a) .................................................................................................69

Fed. R. Civ. P. 23 ..............................................................................10, 24, 83, 84

**REGULATIONS**

17 C.F.R. § 240.10b-5 ..................................................................................16, 44, 45

**OTHER AUTHORITIES**

1 Thomas Lee Hazen, LAW OF SECURITIES REGULATION § 1.14 ............................44

BLACK'S LAW DICTIONARY (11th ed. 2019) ...........................................................47

REST. 2D CONTRACTS § 19 (1981) ...................................................................50, 51

## **INTRODUCTION**

1.      Appellants Joel Patterson and Michaella Corporation ("**Appellants**"), court-appointed lead plaintiffs in the securities fraud class action captioned as *In re Ascena Retail Group, Inc. Securities Litigation*, Case No. 2:19-cv-13529-KM-JBC (the "**Securities Litigation**"), pending in the United States District Court for the District of New Jersey (the "**New Jersey District Court**"), for themselves and the putative class they seek to represent (the "**Class**"), respectfully submit this brief in support of their appeals (the "**Appeals**") from:

A.      the order (the "**Confirmation Order**"), A00007337 – A00007479,[1] entered by the United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**"), Hon. Kevin R. Huennekens, United States Bankruptcy Judge, on February 25, 2021, and the accompanying Memorandum Opinion (the "**Confirmation Opinion**"), A00007660 – A00007699, dated March 9, 2021, confirming the chapter 11 plan of liquidation (the "**Plan**"), A00007217 – A00007336, of Mahwah Bergen Retail Group, Inc. ("**Appellee**") and its debtor affiliates (collectively with Appellee, the "**Debtors**"); and

B.      the Bankruptcy Court Order (the "**Rule 7023 Order**"), A00007644, and accompanying Memorandum Opinion (the "**Rule 7023 Opinion**"),

---

[1]    Citations to pages of Appellants' Appendix are referenced as "A0000___."

A00007645 – A00007659, each entered March 5, 2021, denying Appellants' motion (the "**Rule 7023 Motion**"), A00005002 – A00005026, for entry of an order authorizing Appellants to opt out of the third-party release contained in the Plan (together with any related provisions of the Confirmation Order, the "**Third-Party Release**") on behalf of the Class or, in the alternative, invoking Bankruptcy Rule 7023 and certifying the Class for the limited purpose of enabling Appellants to opt out of the Third-Party Release on behalf of the Class.

2.     Appellants do not seek reversal of the Confirmation Order in its entirety or wholesale removal of the Third-Party Release.  Rather, Appellants seek review of the Confirmation Order and Confirmation Opinion solely to the extent that they impact the claims of the Class against the two non-debtor defendants in the Securities Litigation (the "**Securities Claims**"), Messrs. David Jaffe and Robert Giammatteo (the "**Individual Defendants**"), both of whom had left Appellee's employ well before the Debtors filed for bankruptcy protection and who thus did not have any involvement in, or provide any contribution to, the Debtors' efforts to reorganize or their eventual sale and wind-down.

## PRELIMINARY STATEMENT[2]

3.      Because the claims of Appellants and the Class against Appellee are subordinated pursuant to section 510(b) of the Bankruptcy Code, they will receive no distribution under the Plan.  That leaves their Securities Claims against the Individual Defendants – claims that are covered by substantial D&O insurance – as their only possible source of recovery for the wrongdoing underlying the Securities Litigation.  However, through the Third-Party Release (which the Bankruptcy Court lacked subject-matter jurisdiction and constitutional adjudicatory authority to approve, at least with respect to the Individual Defendants), the Plan and Confirmation Order extinguished the Securities Claims through a supposedly consensual mechanism that was anything but.

4.      To create the fiction of consent where none had been given, Appellee proposed, and the Bankruptcy Court rubber-stamped, a process that saddled members of the Class – defrauded investors who were to receive nothing whatsoever under the Plan – with the burden of affirmatively opting out of the Third-Party Release.  However, just to understand the potential impact of the Third-Party Release, Class members (who likely were not even aware of the Securities Litigation or the Chapter 11 Cases before receiving the dense, arcane Opt-Out Documents and

---

[2]     Capitalized terms not defined in this Preliminary Statement have the meanings given thereto elsewhere herein.

otherwise had no reason to care about the Plan) had to locate and interpret a number of complicated Plan provisions, a substantial task even for experienced bankruptcy counsel.   The peril for Class members who predictably did not take on that substantial and daunting task and affirmatively opt out in writing?  Being artificially deemed to have "consented" to release their Securities Claims against the Individual Defendants.  In essence, in the view of Appellee and the Bankruptcy Court, members of the Class made an informed, conscious choice not to opt out of the Third-Party Release, and thereby deliberately forfeited their valuable claims against the Individual Defendants, and any chance for a recovery in the Securities Litigation, in exchange for absolutely nothing.  The absurdity of that position is evident on its face.

5.     If, alternatively, the Plan had required members of the Class to opt *in* to the Third-Party Release and forfeit their Securities Claims against the Individual Defendants in exchange for absolutely nothing, no rational, fully informed Class member would have done so.   Yet, through the legal fiction of the opt-out mechanism, the Bankruptcy Court below decided that substantially all members of the Class effectively did just that.  The opt-out mechanism was nothing more than a means of creating the illusion of consent where none existed.  As a result, the Third-Party Release can only be characterized as a nonconsensual release imposed upon unwitting members of the Class.

6.     The  Third-Party  Release  of  Class  members'  claims  against  the

Individual Defendants does not meet the extraordinary circumstances required for approval a nonconsensual third-party release in this Circuit.   The Individual Defendants left the Debtors' employ well before the bankruptcy filing, played no role in the Debtors' efforts to restructure or the eventual sale of their business and wind-down of their estates, and provided no funding or other consideration in support of the liquidating Plan.   Not only were the Individual Defendants not essential to the Debtors' reorganization, they were not even relevant.   Nevertheless, through the Third-Party Release, the Plan stripped members of the Class – who received nothing under the Plan – of their claims against the Individual Defendants. Under the applicable legal standard for nonconsensual third-party releases in this Circuit, there was simply no justification for the utterly gratuitous release of Class members' Securities Claims against the Individual Defendants.   That is particularly true where the Individual Defendants – as a matter of law – would be precluded from obtaining a discharge of the Securities Claims if they filed their own bankruptcy cases.

7.      The Bankruptcy Court also erred in finding that Appellants did not have authority to opt out on behalf of the entire Class or, alternatively, abused its discretion in declining to even consider certifying the Class for the limited purpose of enabling Appellants to opt out on behalf of the entire Class.

8.      Simply put, the Bankruptcy Court got it wrong, and its errors have

created a dangerous and fundamentally unfair precedent.  The Debtors sought a particular result – the gratuitous release of two former senior executives, both of whom had left the Debtors' employ well before the Petition Date – and the Bankruptcy Court tailored its ruling to that result.  The foundation for the wholesale eradication of thousands of Class members' claims against the Individual Defendants rests entirely on a contrived "consent" mechanism and repeated due process failures.  As discussed more fully below, the Debtors' efforts to trample the rights of the Class through the defective Third-Party Release for the exclusive benefit of two of the Debtors' former insiders must fail under this Court's critical review of the record below and applicable law.

## STATEMENT OF JURISDICTION<br>AND STANDARD OF REVIEW

9.      On March 11, 2021, Appellants timely filed notices of appeal from the Confirmation Order and Confirmation Opinion, A00007700 – A00007904, and the Rule 7023 Order and Rule 7023 Opinion, A00007905 – A00007942.  This Court has appellate jurisdiction over the Appeals under 28 U.S.C. § 158(a).

10.     This Court reviews the Bankruptcy Court's legal conclusions *de novo* and its factual findings for clear error.  *In re Harford Sands, Inc.*, 372 F.3d 637, 639 (4th Cir. 2004).  A finding of fact is clearly erroneous if this Court, when considering all of the evidence, "is left with the definite and firm conviction that a mistake has been committed."  *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985); *In re*

*Mosko*, 515 F.3d 319, 324 (4th Cir. 2008).  For mixed questions of law and fact, this Court reviews the factual portion of the inquiry for clear error and legal conclusions *de novo*.  *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*, 80 F.3d 895, 905 (4th Cir. 1996).  With respect to discretionary decisions, the Bankruptcy Court abused its discretion if its "decision [was] guided by erroneous legal principles or rests upon a clearly erroneous factual finding."  *See United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010) (internal quotation marks omitted).

## ISSUES PRESENTED

11.    Whether the Bankruptcy Court lacked constitutional adjudicatory authority to approve the Third-Party Release, solely to the extent that the Third-Party Release relates to and impacts the claims and causes of action asserted, or that could be asserted, in the Securities Litigation by or on behalf of Appellants and members of the Class against the Individual Defendants.

12.    Whether the Bankruptcy Court lacked subject matter jurisdiction to approve the Third-Party Release, solely to the extent the Third-Party Release relates to and impacts the claims and causes of action asserted, or that could be asserted, in the Securities Litigation by or on behalf of Appellants and members of the Class against the Individual Defendants.

13.    Whether the Bankruptcy Court erred in holding that Appellants do not have standing to object to the Third-Party Release.

14.     Whether the Bankruptcy Court erred in finding that the "opt-out" Third-Party Release was consensual with respect to members of the Class.

15.     Whether the Bankruptcy Court erred in finding that the Debtors provided members of the Class adequate information to allow them to make an informed decision concerning the Third-Party Release.

16.     Whether the Bankruptcy Court erred in finding that the Debtors properly and adequately served and provided constitutionally adequate notice of the Opt-Out Documents (each as defined below) on members of the Class.

17.     Whether the Bankruptcy Court erred in finding that "any and all persons who did not want to be bound by the Third-Party Release[] were able to effectively opt-out[,]" solely with respect to members of the Class.

18.     Whether the Bankruptcy Court erred in holding that the factors set forth by the Fourth Circuit in *Behrmann* were satisfied.

19.     Whether the Bankruptcy Court erred in holding that Appellants do not have inherent authority to opt out of the Third-Party Release on behalf of all members of the Class.

20.     Whether the Bankruptcy Court erred in declining to apply Fed. R. Bankr. P. 7023 to the contested matters created by the Rule 7023 Motion and confirmation of the Plan.

## SUMMARY OF THE ARGUMENT

21.     The crux of these Appeals is simple:  There was no legal or factual basis for the approval of the Third-Party Release to the extent it released the Securities Claims, which are direct, non-bankruptcy claims of Appellants and the Class against the Individual Defendants.  Applicable law and the record below required the Bankruptcy Court to deny approval of the Third-Party Release as applied to the Securities Claims or, alternatively, to permit Appellants to opt out of the Third-Party Release on behalf of the Class.  In finding otherwise, the Bankruptcy Court committed a number of critical errors.

22.     First, the Bankruptcy Court lacked constitutional adjudicatory authority to approve the Third-Party Release, to the extent it released the Securities Claims against the Individual Defendants.  The federal securities laws underlying the Securities Claims against the Individual Defendants are rooted in traditional actions at common law, and the Securities Claims arose well before, and independent of, the Debtors' bankruptcy filing.  Moreover, the Securities Claims against the Individual Defendants are direct claims against third parties that, by definition, would not and *cannot* be resolved through the proof of claim process.  Finally, because the Securities Claims, at their core, arise from direct injury to Class members and involve private rights, as opposed to public rights, the Securities Claims against the Individual Defendants constitutionally could not be adjudicated by the Bankruptcy

Court.   Consequently, the Bankruptcy Court lacked constitutional adjudicatory authority under *Stern v. Marshall* and its progeny to approve the Third-Party Release to the extent it released claims against the Individual Defendants.

23.   Second, the Bankruptcy Court lacked subject matter jurisdiction to release claims against the Individual Defendants.   The Securities Claims are in no way related to, and had no conceivable effect on, the Debtors' bankruptcy estates. Neither of the Individual Defendants contributed in any way to the Debtors' attempt to reorganize or their eventual sale and wind-down through the Plan.   The Debtors gratuitously assumed their existing indemnification obligations to the Individual Defendants through the Plan as a pretext for asserting that the Securities Claims could impact their bankruptcy estate, but that supposed impact is illusory because (a) the Debtors did not reorganize as a going concern, (b) the Individual Defendants are covered by substantial D&O liability insurance, and (c) the Plan could have been confirmed without releasing the Securities Claims against the Individual Defendants.   Therefore, the Bankruptcy Court lacked subject matter jurisdiction to approve the Third-Party Release and confirm the Plan.

24.   Third, the Bankruptcy Court erred in holding that Appellants lacked standing to object to the Plan's Third-Party Release on behalf of members of the Class.   Appellants, as parties in interest under section § 1109(b) of the Bankruptcy Code, had the right to raise, appear, and be heard on any issue in the Chapter 11

Cases. In addition, the Third-Party Release potentially impacted not only Appellants' own Claims against the Individual Defendants, but also the Securities Claims, which Federal Rule of Civil Procedure 23 ("**Rule 23**") and applicable case law unequivocally give Appellants, as fiduciaries for the Class, the ability – and indeed, the duty – to protect.

25. Fourth, the Bankruptcy Court erred in holding that the Third-Party Release was consensual as to members of the Class. Even if all members of the Class received the Opt-Out Form (which the record below failed to establish), they had no duty to respond in order to avoid being gratuitously stripped of their Securities Claims against the Individual Defendants. Silence by members of the Class, who were slated to receive nothing under the Plan and were not entitled to vote, was insufficient to demonstrate that Class members knowingly and voluntarily forfeited their claims against the Individual Defendants, their only potential source of recovery for the losses underlying the Securities Litigation. Because the Third-Party Release was nonconsensual as to the Class, it could not be approved absent satisfaction of all the factors adopted by the Fourth Circuit in *Behrmann*, a burden the Debtors failed to meet. As a result, the Bankruptcy Court erred in approving the Third-Party Release with respect to claims against the Individual Defendants.

26. Fifth, even assuming, solely for the sake of argument, that the Third-Party Release was consensual, the Bankruptcy Court erred when it held that the

Debtors provided constitutionally adequate notice of the Third-Party Release and its perils to all Class members merely by bulk-mailing the Opt-Out Documents to the nominee brokers that held Appellee's securities in street name for Class members (collectively, "**Nominees**") and mailing agents with "instructions" to forward them to Class members, but without a court order requiring the Nominees or mailing agents to do anything.  As known creditors, members of the Class were entitled to actual, direct notice of the Third-Party Release and its potential impact on their Securities Claims against the Individual Defendants.  The Debtors' service efforts, particularly in the absence of a court order directing the Nominees or mailing agents to act, did not comport with fundamental notions of due process.  This is especially true given the lack of any evidence in the record below that the Opt-Out Documents were in fact served on all (or even any meaningful subset of all) Class members.  As a result, the Bankruptcy Court's approval of the Third-Party Release, as applied to the Securities Claims against the Individual Defendants, violated Class members' due process rights.

27.     Sixth, again assuming, solely for the sake of argument, that the Third-Party Release was consensual, the Bankruptcy Court erred when it held that the Opt-Out Documents provided constitutionally adequate notice to all Class members of the potential impact of the Third-Party Release on their Claims.  Instead, the Opt-Out Documents merely disclosed that all unknown and unidentified claims held by

members of the Class against a generalized list of categories of non-debtor third parties would be released, unless they returned the Opt-Out Form.  The Opt-Out Documents did not comport with even the most basic notions of due process, which required that the Debtors disclose the nature of the Securities Claims so as to afford Class members – most of whom likely did not even know about the Chapter 11 Cases – with "an opportunity to present their objections" to the Third-Party Release of their claims.  As a result, the Bankruptcy Court's approval of the Third-Party Release with respect to Securities Claims against the Individual Defendants violated Class members' due process rights.

28.     Seventh, because the Third-Party Release was not consensual with respect to the Class, the Debtors were obligated to demonstrate that the factors adopted by the Fourth Circuit in *Behrmann* for the approval of a non-debtor, third-party release had been satisfied.  They failed to do so.  All six substantive *Behrmann* factors weighed heavily against approval of the Third-Party Release of the Securities Claims.  As a result, the Bankruptcy Court erred in approving the Third-Party Release of the Securities Claims against the Individual Defendants.

29.     Eighth, the Bankruptcy Court erred in holding that Appellants lack inherent authority to opt out of the Third-Party Release on behalf of all Class members.  Appellants, as lead plaintiffs appointed by the New Jersey District Court, are fiduciaries tasked with protecting the rights of absent members of the Class.

Consistent with the inherent powers they possess as fiduciaries, Appellants were *obligated* to prevent the gratuitous evisceration of Class members' Claims against the Individual Defendants through the Third-Party Release.  Appellants did not seek to expand their rights or powers, nor did they seek a determination on the merits of the Securities Claims.  The practical effect of the Third-Party Release was the *de facto* dismissal of the Securities Claims against the Individual Defendants.  No rational party would ever assert that the court-appointed lead plaintiffs in a federal securities class action lack the authority to defend against a motion to dismiss on behalf of the entire class.  Yet, that is effectively what Appellants asserted below, and what the Bankruptcy Court found in holding that Appellants did not have the ability to opt out of the Third-Party Release on behalf of absent Class members.  The Bankruptcy Court erred in determining that Appellants, who are fiduciaries tasked with protecting the rights of absent Class members, lacked the ability to opt out of the Third-Party Release on behalf of the Class.

30.     Finally, the Bankruptcy Court abused its discretion by declining to apply Federal Rule of Bankruptcy Procedure 7023 ("**Bankruptcy Rule 7023**") or to consider certifying the Class for the limited purpose of enabling Appellants to opt out of the Third-Party Release on behalf of the Class.  Even assuming, solely for the sake of argument, that the opt-out mechanism was legally permissible, the Debtors' disclosures and method of service of the Opt-Out Documents nevertheless failed to

notify Class members of the Third-Party Release, their ability to opt out, or the impact of the Third-Party Release on their Securities Claims.  The Debtors' efforts to inform Class members of their right to opt out of the Third-Party Release were not only unfair and inadequate, they were constitutionally deficient.  Because the Debtors failed to afford Class members an opportunity to protect their rights by opting out (a mechanism that was improper in any event), it was necessary for the Bankruptcy Court to apply Bankruptcy Rule 7023 for the limited purposes of allowing Appellants to opt out of the Third-Party Release on behalf of the entire Class, whose rights Appellants have a duty to protect.  In refusing to do so, the Bankruptcy Court abused its discretion.

## STATEMENT OF THE CASE

### A.    *The Securities Litigation*

31.    The Securities Litigation is a federal securities class action filed in June 2019.  By order entered August 23, 2019, the New Jersey District Court appointed Appellants as lead plaintiffs and Robbins Geller Rudman & Dowd LLP and Pomerantz LLP as lead counsel ("**Lead Counsel**") in the Securities Litigation. A00005004 (¶ 4).

32.    Appellants filed their Consolidated Amended Complaint for Violations of the Federal Securities Laws (the "**Amended Complaint**") on November 21, 2019, against Appellee and the Individual Defendants (collectively, the "**Defendants**").

The Individual Defendants are Appellee's former CEO and CFO.  A00005004 (¶ 5). The Class is comprised of all persons, other than the Defendants, who purchased or otherwise acquired Appellee's common stock between December 1, 2015 and May 17, 2017.  A00005004 (¶ 5).

33.    The Amended Complaint asserts claims against the Defendants (including the Securities Claims against the Individual Defendants) under the Securities Exchange Act of 1934 (the "**Exchange Act**") and generally alleges that the Defendants engaged in a deceptive scheme and made false and misleading statements and omissions of material fact, which artificially inflated and/or maintained artificial inflation in the price of Appellee's common stock between December 1, 2015 and May 17, 2017 (the "**Class Period**"), in violation of Sections 10(b) and/or 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("**Rule 10b-5**").  A00005004 (¶ 6).

**B.    *The Debtors' Chapter 11 Cases***

**i.    The Plan and Third-Party Release**

34.    On July 23, 2020 (the "**Petition Date**") the Debtors commenced voluntary chapter 11 cases (the "**Chapter 11 Cases**").   A0001 – A000018. Approximately one week later, the Debtors filed their first version of the Plan and the accompanying disclosure statement (as amended thereafter, the "**Disclosure**

-16-

**Statement**").  A000019 – A000065; A000066 – A0000399.

35.    The claims against Appellee arise from Class members' purchases of securities of Appellee and thus are subject to subordination pursuant to section 510(b) of the Bankruptcy Code.  Subordinated claims were included within the definition of "Interest" in the Plan, A00007231 (Art. I.A.99), and were classified in Class 8.  Interests in Class 8, including the claims asserted by Appellants and the Class against Appellee, were "cancelled, released, and extinguished without any distribution[]" under the Plan, rendering Appellee's common stock worthless. A00007243 (Art. III.B.8).

36.    The initial version (and all subsequent versions) of the Plan contained a deemed release (the "**Third-Party Release**") of claims by numerous non-debtor "Releasing Parties" against the Debtors and myriad other third parties.  A00007268 (Art. VIII.F). The "Releasing Parties" deemed to grant the Third-Party Release included, among a vast array of others:

> . . . (o) all holders of Impaired Claims who abstained from voting on the Plan or voted to reject the Plan but did not timely opt out of or object to the applicable release . . . (q) all holders of Interests . . . provided that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation[.]

A00007234 (Art. I.A.129).

37.    Consequently, pursuant to the initial version (and all subsequent

-17-

versions) of the Plan, holders of claims in impaired, non-voting classes, including members of the Class, would be deemed to grant the Third-Party Release unless they took affirmative steps to opt out – even though they were receiving nothing under the Plan, were not entitled to vote, and were deemed to reject the Plan.  A00007234 (Art. I.A.129); A00007268 (Art. VIII.F).

38.    The "Released Parties" benefitting from the Third-Party Release comprised a sweeping universe including, among numerous others, the Debtors, their current and former affiliates, and the Debtors' and their affiliates' current and former directors, managers, officers, equity holders, and employees.  A00007234 (Art. I.A.128).   Through a convoluted web of interconnected provisions that a creditor or interest holder was compelled to navigate and the lists of categories of parties, related parties, and related parties' related parties that the Plan defined as a Released Party, each of the Individual Defendants was a Released Party deemed to be released by the Releasing Parties from "any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors . . . based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any Security of the Debtors . . . or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Effective Date."

A00007268 (Art. VIII.F).

39.    The Plan also contained an injunction barring, among other things, "(i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action" against any Released Party by "all Entities that held, hold, or may hold claims or interests or Causes of Action" (the "**Plan Injunction**"). A00007269 (Art. VIII.H).

### ii.    Approval of the Disclosure Statement

40.    On August 26, 2020, the Office of the United States Trustee (the "**US Trustee**") objected to approval of the Disclosure Statement because the Plan it described was patently unconfirmable.  Among other things, the US Trustee argued that (i) the Plan's opt-out mechanism was insufficient to demonstrate "consent" by creditors or interest holders to the Third-Party Release, and (ii) the Third-Party Release was overly broad and did not satisfy the factors adopted by the Fourth Circuit in *Behrmann* in determining whether a plan's proposed third-party releases are appropriate under the circumstances.

41.    On August 28, 2020, the U.S. Securities and Exchange Commission (the "**SEC**") objected to approval of the Debtors' Disclosure Statement, contending that (i) the Plan's Third-Party Release was impermissible as a matter of law, (ii) the Plan's opt-out mechanism was an inappropriate means to demonstrate a sufficient

manifestation of "consent" by members of the Class to the Third-Party Release, and (iii) the proposed notice to Class members of the Third-Party Release was inadequate and insufficient.  A0000645 – A0000654 (*see* ¶¶ 5 -14).

42.    That same day, Appellants filed their *Objection to Approval of the Disclosure Statement and Solicitation and Ballot Procedures Relating to the Joint Chapter 11 Plan of Ascena Retail Group, Inc. and its Debtor Affiliates* (the "**Disclosure Statement Objection**"), and argued that the Disclosure Statement could not be approved because the Plan it described was patently unconfirmable. Appellants argued, among other things, that (i) the Disclosure Statement provided no meaningful description of the Securities Litigation to members of the Class, who were likely unaware of the Securities Litigation, which was still at the motion to dismiss stage, or of the Chapter 11 Cases, (ii) the Bankruptcy Court lacked constitutional and statutory adjudicatory authority to release claims of Class members against the Individual Defendants, (iii) the Third-Party Release was impermissible as a matter of law and satisfied none of the substantive *Behrmann* factors, and (iv) the opt-out procedures were fundamentally inequitable, unjustifiable, and legally impermissible.  A0000655 – A0000838 (*see* ¶¶ 1-2, 16-45, 51-55).

43.    On September 11, 2020, the Debtors filed the first amended versions of the Plan and Disclosure Statement.   A00002120 – A00002723; A00002724 –

A00002776.

44.     The following day, a hearing was held and the Bankruptcy Court overruled Appellants' Disclosure Statement Objection and similar objections by the SEC and US Trustee.  The Bankruptcy Court ultimately overruled the objections of Appellants, the US Trustee, and the SEC, and entered an order dated September 11, 2020 approving the Disclosure Statement and proposed solicitation procedures for the Plan (the "**Solicitation Procedures Order**").  A00001517 – A00002119.  The Solicitation Procedures Order included as exhibits, among other things, a *Notice of Non-Voting Status to Holders of Interests Deemed to Reject the Plan and of Third Party Release Under the Plan* (the "**Non-Voting Notice**") and an election form annexed thereto (the "**Opt-Out Form**" and together with the Non-Voting Notice, the "**Opt-Out Documents**") A00002077 – A00002085.

45.     The Opt-Out Documents made no mention of the Class, the Securities Litigation, or of the Securities Claims.  Instead, the Opt-Out Form disclosed the Opt-Out Election Procedures and the Plan's vague and convoluted definitions of the Third-Party Release, Releasing Parties, and Released Parties, while the Non-Voting Notice included the following vague, generalized language regarding the Third-Party Release:

**PLEASE READ – YOUR RESPONSE IS REQUIRED BY <u>OCTOBER 13, 2020</u>**

- You are receiving this notice because you are a current or former shareholder of Ascena Retail Group, Inc., which filed for chapter 11 bankruptcy.

- You will not receive any distribution in the bankruptcy case and your shares will be canceled.

- In addition, <u>**you will be deemed to have released whatever claims you may have against many other people and entities (including company officers and directors) unless you return the enclosed "Release Opt-Out Form" by October 13, 2020, at 5:00 P.M**</u>. prevailing Eastern Time.

- There will be no harm to you under the Plan if you return the Opt-Out Form; however, you will not receive a release.

- For more specific information and instructions, please read the Release Opt-Out Form enclosed at the end of this notice as <u>Exhibit A</u>.

---

**<u>ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.F CONTAINS A THIRD-PARTY RELEASE. ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT OBJECT OR OPT OUT OF THE RELEASE AS DESCRIBED BELOW WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.</u>**

IF YOU ELECT TO OPT OUT OF THE RELEASES, PLEASE COMPLETE, SIGN, AND DATE THE RELEASE OPT OUT FORM ATTACHED AS **<u>EXHIBIT A</u>** AND RETURN IT PROMPTLY TO THE NOTICE AND CLAIMS AGENT ACCORDING TO THE INSTRUCTIONS SET FORTH ON THE RELEASE OPT OUT FORM. THE RELEASE OPT OUT FORM MUST BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT BY **OCTOBER 13, 2020, AT 5:00 P.M. PREVAILING EASTERN TIME (THE "<u>VOTING DEADLINE</u>").**

YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT**

---

A00002078; A00002081.

46.     Recipients of the Non-Voting Notice were not provided with copies of the Disclosure Statement or Plan, but were instead instructed to request these

important documents from Prime Clerk LLC ("**Prime Clerk**"), the notice and claims agent retained by the Debtors in the Chapter 11 Cases. A00002081. If any members of the Class actually received the Non-Voting Notice (which is impossible to ascertain from the record below), they likely learned of the Chapter 11 Cases for the very first time *through* the Non-Voting Notice and still may not know of the Securities Litigation at all.

### iii.    The Class Claim and Rule 7023 Motion

47.    On September 30, 2020, Appellants timely filed a proof of claim (the "**Class Claim**") asserting claims against Appellant on behalf of themselves and the Class. A00007943 – A00007954 (Claim No. 3543). The Class Claim was asserted in addition to, and not in lieu of, any and all other claims that Appellants and each member of the Class may have against the Defendants.

48.    On October 2, 2020, Appellants filed the Rule 7023 Motion, requesting entry of an order by the Bankruptcy Court authorizing Appellants (or confirming their inherent authority) to opt out of the Third-Party Release on behalf of the Class. A00005002 – A00005026.

49.    On October 16, 2020, the Debtors objected to Appellants' Rule 7023 Motion, arguing that Appellants had failed to (a) articulate any legitimate reason why class certification for purposes of opting out would be superior to allowing members of the Class to individually opt out and (b) establish the legal requirements

-23-

for proceeding as a class under Rule 23.  A00005303 – A00005326 (*see* ¶¶ 2-7, 19-49).  The hearing on the Rule 7023 Motion was initially scheduled for October 23, 2020 (the "**Rule 7023 Hearing**").

### iv.   Amended Plans and Repeated Adjournment of Confirmation

50.    On September 11, 2020, the Debtors filed their first amended version of the Disclosure Statement and first amended version of the Plan. A00002120 – A00002723; A00002724 – A00002776.  The hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") was initially scheduled for October 23, 2020, the same date as the Rule 7023 Hearing.  A00001520.

51.    On October 5, 2020, the US Trustee objected to confirmation of the Plan, contending, *inter alia,* that the Third-Party Release contained in the Plan was non-consensual, overly broad, and inconsistent with Fourth Circuit precedent. A00005071 – A00005084 (*see* pg. 1-2, 7). The US Trustee has appealed from the Confirmation Order on that same basis, which is a significantly broader challenge than these Appeals.

52.    On October 13, 2020, the SEC objected to confirmation of the Plan, arguing that (a) the Third-Party Release was proscribed by the Fourth Circuit's *Behrmann* factors, and (b) the opt-out mechanism utilized by the Debtors to demonstrate "consent" by members of the Class to the Third-Party Release was impermissible under relevant case law and analogous Bankruptcy Code provisions,

which both evince that manifestation of consent requires an affirmative act, not mere silence.  A00005164 – A00005172 (*see* ¶¶ 5 – 11).

53.     That same day, Appellants filed their initial objection to confirmation of the Plan (the "**Initial Plan Objection**"), arguing that (i) the Third-Party Release contained in the Plan was illegal and impermissible because the six substantive factors adopted by the Fourth Circuit in *Behrmann* overwhelmingly militated against the Third-Party Release of the Individual Defendants, (b) the opt-out mechanism was impermissible as a matter of law, and nothing more than a means of manufacturing illusory "consent" by members of the Class to the Third-Party Release, and (c) the Debtors' method of delivery and the contents of the Opt-Out Documents violated Class members' constitutional due process rights.  A00005173 – A00005207 (*see* ¶¶ 1, 17-43).

54.     On October 20, 2020, the Debtors adjourned the Confirmation Hearing to November 5, 2020.  A00005333 – A00005334.  After discussions with the Debtors, Appellants agreed to adjourn the Rule 7023 Hearing as well, keeping both matters on the same track.  A00005335 – A00005348.

55.     On November 3, 2020, the Debtors adjourned the Confirmation Hearing a second time to November 17, 2020.  A00005489 – A00005490.  The following day, Appellants adjourned the Rule 7023 Hearing so that both matters could be heard on the same date, remaining optimistic that they could consensually

resolve the Rule 7023 Motion.  A00005491 – A00005518.

56.    On November 13, 2020, the Debtors adjourned the Confirmation Hearing a third time to November 23, 2020.  A00005724 – A00005725.  The next day, Appellants again followed suit and adjourned the Rule 7023 Hearing. A00005726 – A00005739.

57.    On November 23, 2020, the Debtors filed their second amended version of the Plan.  A00006025 – A00006137.

58.    The Debtors, with Appellants' consent, subsequently adjourned the Confirmation Hearing and Rule 7023 Hearing an additional four times to January 14, 2021.  A00006300 – A00006301; A00006302 – A00006303; A00006304 - A00006305; A00006554 – A00006555.  It remained Appellants' hope that the concerns raised in the Initial Plan Objection could be resolved amicably.

59.    In late November 2020, the Debtors announced that they no longer intended to reorganize, but rather, planned to sell their remaining brands and related assets and liquidate.  To that end, on December 30, 2020, the Debtors filed the third amended version of the Plan, providing for the liquidation of the Debtors' remaining assets.    A00006556 – A00006679.    Despite this pivot from reorganization to liquidation, the Debtors remained unfazed in their effort to confirm a Plan containing the Third-Party Release.

60.    On December 30, 2020, the Debtors, with Appellants' consent,

adjourned the Confirmation Hearing and Rule 7023 Hearing to February 25, 2020.
A00006680 – A00006681.

61.     Given the Debtors' continued refusal to resolve the concerns raised by
the SEC, US Trustee, and Appellants with respect to the Third-Party Release and
opt-out mechanism, on February 4, 2021, Appellants filed their *Supplemental
Objection to Confirmation of the Third Amended Joint Chapter 11 Plan of
Reorganization of Ascena Retail Group, Inc. and its Debtor Affiliates* (the
"**Supplemental Plan Objection**"), arguing that the Plan was patently unconfirmable
for a variety of reasons, including that (a) the Third-Party Release was illegal and
fundamentally unjust, and the substantive factors adopted by the Fourth Circuit in
*Behrmann* overwhelmingly weighed against approval of the Third-Party Release of
the Securities Claims against the Individual Defendants, (b) the opt-out mechanism
was impermissible and designed solely to engineer deemed "consent" that no
rational, fully informed member of the Class would ever voluntarily give, (c) the
opt-out mechanism was illegal under federal statutory law, which requires that any
release of the Securities Claims must be "knowing and voluntary," (d) the
Bankruptcy Court lacked statutory and constitutional adjudicatory authority to
approve the Third-Party Release on a non-consensual basis, (e) the Debtors' chosen
method of delivery had not provided actual notice of the Third-Party Release and
the Opt-Out Documents to members of the Class, and (f) the Opt-Out Documents

-27-

failed to satisfy the constitutional due process rights of members of the Class because these documents lacked any disclosure whatsoever of the Class, the Securities Litigation, the Securities Claims, or the fact that the Third-Party Release was intended to release claims of the Class against the Individual Defendants in the Securities Litigation.  A00006682 – A00006727 (*see* ¶¶ 1-5, 22-59).

62.     On February 16, 2021, the US Trustee filed a second objection to the Plan, again reiterating its position that the Third-Party Release contained in the Plan was non-consensual, overly broad, and inconsistent with Fourth Circuit precedence. A00006728 – A00006731 (*see* pg. 1 – 3).

63.     On February 22, 2021, the Debtors filed the fourth amended version of the Plan. A00006914 – A00007036. The Debtors also filed declarations by Gary D. Begeman, A00007037 – A00007042, Carrie W. Teffner, A00007043 - A00007060, and William Kosturos, A00007061 - A00007066, as well as their *Memorandum of Law in Support of Confirmation of the Amended Joint Chapter 11 Plan (Technical Modifications) of Mahwah Bergen Retail Group, Inc. (f/k/a Ascena Retail Group, Inc.) and its Debtor Affiliates* (the "**Confirmation Brief**"), A00007067 - A00007140, in support of Plan confirmation.

64.     Through the Confirmation Brief, the Debtors argued in relevant part that (i) the Third-Party Release was consensual with respect to members of the Class who failed to return the Opt-Out Form, and (ii) even if the Third-Party Release was

-28-

deemed nonconsensual, each of the *Behrmann* factors were satisfied and supported approval of the Third-Party Release and confirmation of the Plan.  A00007067 – A00007140 (*see* ¶¶ 6, 96 – 114).

65.     On February 24, 2021, the Debtors filed the final version of the Plan, which was subsequently confirmed.  A00007217 – A00007336.

> **v.     Confirmation of the Plan and Approval of the Third-Party Release of the Individual Defendants**

66.     On February 25, 2021, the Bankruptcy Court conducted the Confirmation Hearing and entered the Confirmation Order confirming the Debtors' Plan and approving the Third-Party Release over Appellants' Initial Plan Objection and Supplemental Plan Objection, as well as similar objections by the SEC and US Trustee.  A00007337 – A00007479.  After conclusion of the Confirmation Hearing, the Bankruptcy Court conducted the Rule 7023 Hearing and indicated that it would issue a ruling on the Rule 7023 Motion at a later date.  A00007480 – A00007643 (*see* 136:19 – 137:13).

67.     On March 5, 2021, the Bankruptcy Court entered the Rule 7023 Order denying Appellants' Rule 7023 Motion.  A00007644. The Bankruptcy Court also issued its Rule 7023 Opinion (a) finding that Appellants' designation as lead plaintiffs in the Securities Litigation did not confer the requisite authority to represent the Class in the Chapter 11 Cases and (b) declining to apply Bankruptcy Rule 7023 to certify a class for purposes of electing to opt-out of the Third-Party

Release on behalf of the Class because it held that Appellants had presented no evidence that class certification would be a superior method than the Debtors' efforts to provide notice of the Third-Party Release and opt-out mechanism to members of the Class. A00007645 – A00007659 (*see* pg. 8-15).

68. On March 8, 2021, the Bankruptcy Court entered the Confirmation Opinion, supplementing its findings of fact and conclusions of law set forth in the Confirmation Order, and concluding, among other things, that (a) the Third-Party Release was consensual in light of the opt-out mechanism, (b) the Debtors provided sufficient notice to all parties of the opportunity to opt out of the Third-Party Release, (c) the Debtors' use of Nominees and mailing agents for purposes of forwarding the Opt-Out Documents to members of the Class was reasonable under the facts and circumstances of the Chapter 11 Cases, and provided actual notice of the Third-Party Release and opt-out procedures to Class members, (d) the Opt-Out Documents clearly, unambiguously, and conspicuously provided members of the Class with adequate information to allow them to make an informed decision concerning the Third-Party Release, and (e) Appellants lacked requisite standing to challenge the Third-Party Release. A00007660 – A00007699 (*see* pg. 30-38). The Bankruptcy Court found that it had subject matter jurisdiction over the Chapter 11 Cases, but did not address whether it had constitutional adjudicatory authority or subject matter jurisdiction to approve the Third-Party Release and extinguish the non-bankruptcy

Securities Claims of the non-debtor Class members against the non-debtor

Individual Defendants.  A00007661.

## ARGUMENT

## I.  THE BANKRUPTCY COURT LACKED SUBJECT MATTER JURISDICTION AND CONSTITUTIONAL ADJUDICATORY AUTHORITY TO APPROVE THE THIRD-PARTY RELEASE OF CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS.

69.     Federal courts are courts of limited jurisdiction.  A federal court may

adjudicate a case or controversy "only if there is both Constitutional authority and

statutory authority for federal jurisdiction."  *In re Midway Gold US, Inc.*, 575 B.R.

475, 517 (Bankr. D. Colo. 2017) (citation omitted).  With respect to the Third-Party

Release of the Securities Claims against the Individual Defendants, the Bankruptcy

Court had neither.

### A.     *Subject Matter Jurisdiction*

70.     In order to approve a release, through a Chapter 11 plan, of claims of

non-debtors against other non-debtors, such as the Third-Party Release, "a

bankruptcy court must have subject matter jurisdiction ***over the released claims***[.]"

*In re Stearns Holdings, LLC*, 607 B.R. 781, 787 (Bankr. S.D.N.Y. 2019) (emphasis

added).  Section 1334(b) of title 28 of the U.S. Code provides that "the district courts

shall have original but not exclusive jurisdiction of all civil proceedings arising

under title 11, or arising in or related to cases under title 11."  This Court, in turn,

has referred all proceedings arising under the Bankruptcy Code, or arising in or

related to a case under the Bankruptcy Code, to the Bankruptcy Court, pursuant to the *Standing Order of Reference*, effective August 14, 1984.

71.    The terms "arising under," "arising in," and "related to" are terms of art. *In re Excel Storage Products, L.P.*, 175, 181 (Bankr. M.D. Pa. 2011).  A proceeding "arises under" the Bankruptcy Code "if it asserts a cause of action created by the Code," such as the various causes of action created by chapter 5.  *In re Sunbridge Capital, Inc.*, 454 B.R. 166, 169 (Bankr. D. Kan. 2011) (citation omitted). Proceedings "arising in" a bankruptcy case are those that could not exist outside of the bankruptcy case but are not causes of action created by the Bankruptcy Code itself.  *Midway Gold US*, 575 B.R. at 517 (citation omitted).  The Securities Claims against the Individual Defendants arose neither under nor in the Chapter 11 Cases.

72.    The third category of proceedings over which bankruptcy courts may have jurisdiction – proceedings "related to" the bankruptcy case – are proceedings whose outcome "could conceivably have any effect on the estate being administered in bankruptcy."  *Power Plant Entm't Casino Resort Ind., LLC v. Mangano*, 484 B.R. 290, 295 (Bankr. D. Md. 2012) (citation omitted).  The party asserting that a bankruptcy court has subject matter jurisdiction over a matter bears the burden of proving by a preponderance of the evidence that jurisdiction exists.  *In re SunEdison, Inc.*, 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017).

73.    A proceeding solely between non-debtor parties based on non-

bankruptcy law, such as the Securities Litigation, can never fall within a bankruptcy court's "arising under" or "arising in" jurisdiction. Instead, it can only lie within a bankruptcy court's "related to" jurisdiction, and even then, only if the outcome "could alter the debtor's rights, liabilities, options, or freedom of action[.]" *In re Golden Inv. Acquisitions, LLC*, 508 B.R. 381, 385 (Bankr. N.D. W. Va. 2014). A nonbankruptcy cause of action is not related to a bankruptcy case when "win, lose or draw, there would be no effect on the bankruptcy estate." *Johnston v. Valley Credit Servs.*, No. 05-6288, 2007 WL 1166017, at *5–6 (Bankr. N.D. W.Va. Apr. 12, 2007). Indeed, "[i]t *surely would be improper for a bankruptcy court to confirm a plan releasing third-party, non-debtor claims that were unrelated (or even only tangentially related) to the debtor or the bankruptcy case*." *In re Kirwan Offices S.a.r.l.*, 592 B.R. 489, 505–06 (Bankr. S.D.N.Y. 2018) (emphasis added). If the proceeding in question is not related to a bankruptcy case, "the bankruptcy court has no jurisdiction to hear the matter at all." *In re Southeastern Materials, Inc.*, 467 B.R. 337, 346 (Bankr. M.D.N.C. 2012) (citation omitted).

74.     There are two limited situations in which bankruptcy courts may have "related to" jurisdiction to release claims of non-debtors against other non-debtors. Such jurisdiction can exist where (a) the lawsuit between non-debtors would trigger an indemnification obligation that is automatic and immediate (i.e., where no separate action is necessary to seek indemnification) on the part of the debtor, *see*

*Virginia ex rel. Integra REC LLC v. Countrywide Securities Corp.*, 92 F. Supp. 3d 469, 473 (Bankr. E.D. Va. 2015) (citation omitted), or (b) the released non-debtor is making an essential financial contribution to facilitate the debtor's reorganization, *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 228 (3d Cir. 2004).  In the former situation, any indemnification claims against a debtor that "would require the intervention of another lawsuit to affect the bankruptcy estate . . . cannot provide a basis for 'related to' jurisdiction[.]" *Combustion Eng'g*, 391 F.3d at 232.  Neither jurisdictional predicate exists here.

75.    There are at least three reasons why the Debtors have no automatic, immediate indemnification obligations to the Individual Defendants that could affect their estates.  First, the Individual Defendants are *former* officers and directors. Although the Debtors purport to have gratuitously assumed their prepetition indemnification obligations, if any, to the Individual Defendants (which they appear to have done solely as a pretext for the Third-Party Release), they have never identified what automatic, immediate indemnification rights, if any, actually exist. The Debtors also provided no evidence below that they had actually indemnified the Individual Defendants.  Second, even assuming the Individual Defendants were entitled to indemnification, which they are not, any claims by the Individual Defendants against the Debtors would necessarily require the intervention of another lawsuit, and therefore would not be automatic – a result that cannot provide a basis

for "related to" jurisdiction.   Third, the Debtors assumed their numerous D&O liability insurance policies through the Plan, preserving substantial insurance coverage for the benefit of the Individual Defendants, for both defense costs and any settlement or judgment that may result from the Securities Litigation.  Consequently, the Securities Claims will never affect the Debtors' estates at all, whether through indemnification obligations or otherwise.

76.    The second criterion is easily dispatched:  The Individual Defendants, who left the Debtors' employ well before the Petition Date, contributed nothing – financially or otherwise – to the Debtors' attempted reorganization or eventual liquidation.  Because the Securities Claims against the Individual Defendants in the Securities Litigation cannot affect the Debtors' estates, and because the Individual Defendants made no financial contribution whatsoever to the Debtors' liquidation, the Bankruptcy Court lacked "related to" jurisdiction to release, enjoin, or otherwise impact the non-bankruptcy Securities Claims of the non-debtor Class members against the non-debtor Individual Defendants.

77.    Even assuming, solely for the sake of argument, that the Bankruptcy Court found that failure to return the Out-Out Form somehow demonstrated consent by members of the Class to the Bankruptcy Court's jurisdiction, subject-matter jurisdiction cannot be conferred by the consent of the parties.  *Combustion Eng'g*, 391 F.3d at 228 ("Where a court lacks subject matter jurisdiction over a dispute, the

parties cannot create it by agreement even in a plan of reorganization.") (citation omitted); *see also Midway Gold US*, 575 B.R. at 521–22 ("The Court cannot adjudicate matters outside its jurisdiction, even if the parties consent, because jurisdiction cannot be created by consent.  Nor . . . can section 105(a) be used to create jurisdiction where it does not exist under some independent statutory basis.").[3]

78.    The Bankruptcy Court lacked "related to" subject matter jurisdiction to grant any relief with respect to the Securities Claims, including releasing the Securities Claims.  Because the Bankruptcy Court lacked subject-matter jurisdiction in the first instance, and because members of the Class did not (nor could they, as a matter of law) consent to its jurisdiction, the Bankruptcy Court erred in approving the Third-Party Release of Class members' Securities Claims against the Individual Defendants.

### B.    *Constitutional Adjudicatory Authority*

79.    Subject-matter jurisdiction is not the end of the inquiry, as a bankruptcy court also must have the constitutional authority to grant relief.  *In re Millennium Lab Holdings II, LLC*, 242 F. Supp. 3d 322, 338 (D. Del. 2017); *see also In re Drs.*

---

[3]    Even if this Court were to hold that subject matter jurisdiction could be created by consent, members of the Class who failed to return the Opt-Out Form did not affirmatively consent to anything by doing so.  Where, as here, a third party does not *affirmatively* consent to the jurisdiction of a bankruptcy court and no assets of the debtor would be involved in the proceedings, the bankruptcy court lacks subject matter jurisdiction over the third party's claims.  *In re American Computer and Telecommunications Corp.*, 24 B.R. 150, 151 (Bankr. E.D. Va. 1982).

-36-

*Hosp. of Hyde Park, Inc*., 507 B.R. 558, 586 (Bankr. N.D. Ill. 2013) (a bankruptcy court "may not simply rely on whether a matter is 'core' under § 157 but must also examine the matter to determine whether there is also constitutional authority to enter final judgment.").   As Article I courts, bankruptcy courts do not have the authority to enter final orders on matters "that are not integral to the restructuring of the debtor-creditor relationship." *Kirwan*, 592 B.R. at 510 (internal quotations omitted).   Practically speaking, "resolving claims *against a debtor* will nearly always be integral to resolving a bankruptcy process, while claims *against third parties* will be integral only in 'rare cases.'" *Id.* at 511 (quoting *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005)) (emphasis added).

### i       *Stern v. Marshall*

80.      In *Stern v. Marshall*, the Supreme Court held that, as an Article I court, a bankruptcy court lacked the constitutional power to enter a final judgment on a state law tortious interference counterclaim the debtor asserted in an adversary proceeding "that is not resolved in the process of ruling on [the counterclaim defendant's] proof of claim," even though the bankruptcy court had statutory power to adjudicate that counterclaim as a "core" proceeding.   564 U.S. 462, 503 (2011). The Supreme Court grounded its holding in Article III of the Constitution, which provides that the "judicial Power of the United States, shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and

establish." U.S. Const. Art. III. 1.

81.     As a foundational element of the Constitution's separation of powers among the federal government's three branches, Article III helps both to protect each branch from undue interference by the other two branches and to secure individual liberty. *Stern*, 564 U.S. at 483. It achieves these objectives by appointing Article III judges to serve for life and insulating them against diminution of their salaries, thereby ensuring that they will render decisions "with the 'clear heads . . . and honest hearts' deemed 'essential to good judges.'" *Id.* at 484 (quotations omitted).

82.     The Supreme Court has "long recognized that, in general, Congress may not withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity or admiralty.'" *Stern*, 564 U.S. at 484 (citation omitted). More precisely, "[w]hen a suit is made of 'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789,' and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts." *Id.* (quoting *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982) (Rehnquist, J., concurring in judgment)).

83.     The Supreme Court in *Stern* rejected each of the debtor's arguments for why the bankruptcy court's entry of final judgment on her state law counterclaim was constitutional. As a claim by one private party against another that arose from

state law, the counterclaim was not a "public right" that could constitutionally be assigned for adjudication to an Article I tribunal.  564 U.S. at 488–95; *see also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 54–55 (1989) (holding that fraudulent conveyance action filed on behalf of a bankruptcy estate was a "private right" and explaining "[i]f a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, and if that right neither belongs to nor exists against the Federal Government, then it must be adjudicated by an Article III court.").  To the contrary, the Supreme Court explained:

> [w]hat is plain here is that this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment *by a court* with broad substantive jurisdiction, on a common law cause of action, when the action neither derives from nor depends upon any agency regulatory regime.  If such an exercise of judicial power may nonetheless be taken from the Article III Judiciary simply by deeming it part of some amorphous "public right," then Article III would be transformed from the guardian of individual liberty and separation of powers we have long recognized into mere wishful thinking.

*Stern*, 564 U.S. at 494–95 (emphasis in original).  In short, the "'experts' in the federal system at resolving common law counterclaims . . . are the Article III courts, and it is with those courts that [such claims] must stay."  *Id.* at 494.

84.     Even the fact that the counterclaim defendant had filed a proof of claim against the debtor's estate did not confer constitutional authority on the bankruptcy court to adjudicate the debtor's state-law counterclaim.  *Id.* at 495–500.  The

Supreme Court construed its precedents in this area as authorizing the entry of a final judgment by a bankruptcy court only where the process of ruling on the creditor's proof of claim "would necessarily result in resolution" of the debtor's counterclaim. *Id.* at 496–98; *cf. Katchen v. Landy*, 382 U.S. 323, 336 (1966) (holding that because preference action would be resolved as part of process of allowing or disallowing creditor's claim against the debtor, the creditor could not insist that the preference action be adjudicated before an Article III court); *Langerkamp v. Culp*, 498 U.S. 42, 45 (1990) (per curiam) (holding that preference action against creditor who filed proof of claim against the estate was triable by the bankruptcy court without a Seventh Amendment jury trial right).  But in *Stern,* "there was never any reason to believe that the process of adjudicating [the counterclaim defendant's] proof of claim would necessarily resolve [the debtor's state-law] counterclaim."  564 U.S. at 497.  The issues that would need to be decided to resolve each of these claims were different and the counterclaim did not in any way derive from, or depend upon, federal bankruptcy law.  *Id.* at 499.

85.    In the Supreme Court's view, "Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue [1] *stems from the bankruptcy itself or* [2] *would necessarily be resolved in the claims allowance process.*"  *Id.* (emphasis added).  Because the debtor's tortious interference counterclaim did not satisfy either

of these disjunctive criteria, the Supreme Court determined that the bankruptcy court had no constitutional authority to adjudicate it.  *Id.*

ii      ***Stern* as applied to the Securities Claims**

86.    Application of *Stern's* principles here is straightforward and even more compelling.  The Securities Claims against the Individual Defendants for monetary damages stemming from false statements and omissions of material fact and violations of the Exchange Act – a statutory extension of common law fraud principles – certainly are "made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," and were brought "within the bounds of federal jurisdiction" when Appellants commenced the Securities Litigation in the New Jersey District Court.  The Securities Claims against the Individual Defendants arose well before, and are wholly independent of, the Debtors' bankruptcy filing, and thus do not "stem from the bankruptcy itself."  Nor would they "necessarily" – or ever – be resolved in the process for allowing claims against the Debtors.  Rather, they are direct, non-bankruptcy causes of action, belonging to the non-debtor Class members who invested in Appellee's now worthless common stock during the Class Period, against the non-debtor Individual Defendants.  The Securities Claims against the Individual Defendants could never, under any circumstances, be resolved in the bankruptcy proof of claim process.  And because the Securities Claims at their core are private claims for damages, the "public rights" exception does not apply.

-41-

Accordingly, "the responsibility for deciding" the Securities Claims "rests with Article III judges in Article III courts." *Stern*, 564 U.S. at 484.

87. By approving the Third-Party Release and the accompanying Plan Injunction, the Bankruptcy Court essentially entered a final judgment with the same substantive effect as an order dismissing the Securities Claims against the Individual Defendants with prejudice, without the protections of due process. A confirmation order containing a third-party release operates as a judgment that extinguishes the released claims as a matter of law. *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1053 (5th Cir. 1987) (holding that order confirming plan that released creditor's claims against guarantor was a final judgment on the merits of those claims); *In re Digital Impact, Inc.*, 223 B.R. 1, 12, 13 n. 6 (Bankr. N.D. Okla. 1998) ("A release, or permanent injunction, contained in a confirmed plan . . . has the effect of a judgment – a judgment against the claimant and in favor of the non-debtor, accomplished without due process. Neither the non-debtor, nor the claimant, have *an opportunity* to present their claims or defenses to the court for determination . . . .") (emphasis in original). Because the Bankruptcy Court lacked the authority to enter such a judgment, approval of the Third-Party Release of the Securities Claims violated Article III of the Constitution.

88. Moreover, the Securities Claims are not "public rights" that could constitutionally be adjudicated by the Bankruptcy Court. *Stern*, 564 U.S. at 488–95.

-42-

What makes a right "public" rather than private "is that the right is integrally related to particular federal government action." *Id.* at 490–91. Public rights include "claims against the federal government," as well as "claims deriving from a federal regulatory scheme," or in which "resolution of the claim by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority." *In re Porter*, 511 B.R. 785, 803 (Bankr. E.D. La. 2014) (citation omitted). Of course, "[n]ot every statutory scheme qualifies as a federal regulatory scheme[,]" *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities, LLC*, 490 B.R. 46, 53 (S.D.N.Y. 2013), and just because a claim arises under federal law does not mean that it is a public right. *Matter of Swift Air, L.L.C.*, 624 B.R. 694, 702 (Bankr. D. Ariz. 2020) (citing *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 564 (9th Cir. 2012)). "[E]ven with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of [Article III] courts." *In re Coudert Bros. LLP*, No. 11-2785 CM, 2011 WL 5593147, at *7 (S.D.N.Y. Sept. 23, 2011) (citation omitted).

89. In contrast, a private right, such as the Securities Claims, is a right that arises from "the liability of one individual to another under the law." *Swift Air*, 624 B.R. at 700. Quintessential private disputes involve common law rights "affecting personal life, liberty, or property." *In re Renewable Energy Dev. Corp.*, 792 F.3d 1274, 1280 (10th Cir. 2015) (citation omitted). Private rights include such things as

-43-

claims for damages stemming from breach of contract and misrepresentation, *Marathon*, 458 U.S. at 84 (Rehnquist, J., concurring in judgment), or those based on fraudulent conduct.  *Waldman v. Stone*, 698 F.3d 910, 921 (6th Cir. 2012).

90.    The Securities Claims are textbook private rights.  Appellants and the Class seek monetary damages from the Individual Defendants for their deceptive scheme and false and misleading statements and omissions of fact.  Securities regulations protecting investors date back to seventeenth-century England.  In the United States, securities regulations were within the dominion of the individual states decades before the federal securities laws came into existence.[4]  The Securities Claims arise from *private* rights of action under the Exchange Act.  Indeed, "Rule 10b-5 is not a complete scheme for remedying securities fraud . . . it is just a

---

[4]    According to one leading treatise cited approvingly by the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 342 (2005):

Regulation of securities brokers dates back to the thirteenth century. This early regulation authorized licensing securities brokers in London. Stock exchange dealings, with speculation subject to alternate booms and panics, became a part of the English markets in the latter part of the seventeenth century. Trading in shares of stock led to periods of speculation and wild fluctuations in the market. This was followed by English legislation by the end of the seventeenth century, which was enacted to protect investors against unscrupulous manipulation by stock jobbers and stock brokers.

…

[S]ecurites regulation in the United States began with the states.  This was followed twenty-six years later with the enactment of this nation's first federal regulation of securities transactions.  The first federal securities regulation was contained in the Securities Act of 1933 which grew out of the New Deal . . ..

1 Thomas Lee Hazen, Law of Securities Regulation § 1.14 (7th ed. 2016)

declaration that securities fraud is unlawful" – and that declaration has its origins in traditional common law.  *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683 (1990).  Naturally, "rules that have evolved over many years to establish the contours of common law actions for fraud and other intentional torts" are applicable to suits under Rule 10b-5.  *Id.* (citation omitted); *see also Dura*, 544 U.S. at 344–45 (observing the "common-law roots of the securities fraud action").

91.     Given that courts examine "the historical nature of a claim to determine whether it asserts a private or a public right," it is evident that the manner in which a securities fraud claim is pursued "matters little."  *Madoff*, 490 B.R. at 52.  Whether proceeding under common law or via the federal securities laws, a securities fraud action "is not a matter that can be pursued only by grace of the other branches . . . or one that historically could have been determined exclusively by those branches."  *Stern*, 564 U.S. at 493 (citations and internal quotation marks omitted).  It is abundantly clear that the Securities Claims seek only to enforce private rights of Appellants and the Class, with historical roots in common-law causes of action.

92.     The Confirmation Order extinguishing the Securities Claims against the Individual Defendants was effectively a final judgment dismissing the Securities Claims with prejudice.  However, because the Securities Claims against the Individual Defendants did not arise under the Bankruptcy Code or arise in the Chapter 11 Cases and could never have been resolved in the bankruptcy claims

allowance process, and because the "public rights" exception is inapplicable to the Securities Claims as purely private rights, the Bankruptcy Court lacked constitutional adjudicatory authority to approve the Third-Party Release of the Securities Claims.

## II.   APPELLANTS HAD STANDING TO OBJECT TO APPROVAL OF THE THIRD-PARTY RELEASE.

93.   The Bankruptcy Court erred when it held that Appellants lacked standing to challenge the Third-Party Release.  Standing to object to confirmation of a debtor's chapter 11 plan, including releases contained therein, is governed by section 1128(b) of the Bankruptcy Code, which provides that "part[ies] in interest may object to confirmation of a plan."  11 U.S.C. § 1128(b).  Section 1109(b) provides a non-exclusive list of those "part[ies] in interest [who] . . . may raise and may appear and be heard on any issue in a case under [chapter 11]."  11 U.S.C. § 1109(b).  *See also In re Global Indus. Technologies, Inc.*, 645 F.3d 201, 210 (3d Cir. 2011) ("The list of potential parties in interest in § 1109(b) is not exclusive.  On the contrary, that section has been construed to create a broad right of participation in Chapter 11 cases.") (internal quotations omitted).

94.   Although the Bankruptcy Code does not define "party in interest," the term is generally understood to include "all persons whose pecuniary interests are directly affected by the bankruptcy proceedings."  *COMM 2013 CCRE12 Crossings Mall Rd., LLC v. Tara Retail Grp., LLC*, 591 B.R. 640, 646 (N.D. W.Va. 2018)

(citations omitted).   In legal parlance, a "pecuniary interest" is "[a]n interest involving money or its equivalent[.]"   *Pecuniary Interest*, BLACK'S LAW DICTIONARY (11th ed. 2019).   As a result, section 1109(b) "is to be construed broadly, in order to allow parties affected by a chapter 11 case to appear and be heard."   *In re Alpha Nat. Res. Inc.*, 544 B.R. 848, 854 (Bankr. E.D. Va. 2016) (citations omitted).

95.   In contravention of section 1109(b)'s broad construction, the Bankruptcy Court availed itself of the standing doctrine to reject Appellants' challenge of the Third-Party Release.   The Bankruptcy Court observed that Appellants had timely objected to the Third-Party Release but, based on a death trap provision contained in the Plan, were therefore not a "Releasing Party" bound by the Third-Party Release and thus lacked standing to object to it.   A00007695 – A00007697.   Because the Bankruptcy Court incorrectly believed the Third-Party Release had no effect on Appellants' personal interests, it found Appellants were without standing to challenge the Third-Party Release on behalf of the Class. A00007696.   Yet, in reaching this conclusion, the Bankruptcy Court ignored the basic framework of the standing doctrine.   In *Kane v. Johns-Manville Corp.*, the Second Circuit considered at length the applicability of the standing doctrine to bankruptcy proceedings:

> Generally, litigants in federal court are barred from asserting the constitutional and statutory rights of others in

an effort to obtain relief for injury to themselves. . . . In *Singleton* [*v. Wulff*, 428 U.S. 106 (1976)], the Supreme Court articulated two important policies justifying such a limitation: "first, the courts should not adjudicate [third-party] rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not. Second, third parties themselves usually will be the best proponents of their own rights." [*Id.*, 428 U.S. at 113–14.] The Supreme Court has recognized that under some special circumstances these concerns are not present. Thus, where the litigant's interests are closely allied with those of the third parties, standing is permitted because the litigant is likely to be as effective a proponent of the third-party rights as the third parties themselves. Furthermore, where third parties are unable to assert their own rights, current litigants are allowed to assert third-party claims that might otherwise remain unvindicated.

843 F.2d at 643–44 (2d Cir. 1988).

96.     Any recovery by the Class in the Securities Litigation is entirely dependent upon the preservation of the Securities Claims against the Individual Defendants.  The larger the Class, the greater the potential dollar amount of the Securities Claims, and the better position Appellants will be in, on behalf of the Class, to fashion a resolution of the Securities Claims.  By enjoining and forever barring members of the Class (or Appellants, acting on their behalf) from prosecuting the Securities Claims, Appellants' responsibility as court-appointed lead plaintiffs and their own pecuniary interests are directly and adversely affected by the Third-Party Release of the Securities Claims.

-48-

97.    The Bankruptcy Court also ignored the effect of Appellants' appointment as lead plaintiffs in the Securities Litigation and thus their status as fiduciaries for the Class, which conferred on them not only the right to defend the Securities Claims of the Class against de facto dismissal through the Third-Party Release, but the *obligation* to do so.  (*See* ¶¶ 157-160 below).

98.    Because Appellants and all members of the Class share common injuries flowing from the Individual Defendants' illegal conduct during the Class Period, it is clear that the interests of Appellants are "closely allied" with the Class members whose interests they represent in the Securities Litigation.   If Class members were even aware that they *had* rights against the Individual Defendants, which is unlikely, they were nevertheless unable to assert their own rights, which would be completely eviscerated absent Appellants' objection to the Third-Party Release. Appellants sought only to *preserve* the opportunity for Class members to see any recovery on their Securities Claims.  Consequently, Appellants had standing to challenge the Third-Party Release and the Bankruptcy Court erred in finding otherwise.

## III.    THE THIRD-PARTY RELEASE WAS NOT CONSENSUAL.

### A.    *Contract law principles dictate that the opt-out mechanism did not result in consent to the Third-Party Release by Class members.*

99.    Bankruptcy courts generally apply contract principles in deciding whether a creditor has consented to a third-party release.  *See, e.g.*, *SunEdison*, 576

B.R. at 458; *In re Neogenix Oncology, Inc.*, No. 12-23557-TJC, 2015 WL 5786345, at *5 (Bankr. D.Md. Sept. 30, 2015); *In re Washington Mut., Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011).  Under these principles, consent may be express or manifested by conduct.  *SunEdison*, 576 B.R. at 458 (citing REST. 2D CONTRACTS § 19 (1981) (the "**Restatement**")).  Parties must "objectively manifest their acceptance and intent to be bound by a contract[.]"  *Craddock v. LeClair Ryan, P.C.*, No. 3:16-CV-11, 2016 WL 1464562, at *8 (E.D. Va. Apr. 12, 2016).  Conduct only manifests assent if the party in question "intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." Restatement § 19(2).

100.    Absent a duty to speak, silence or inaction cannot constitute consent. *SunEdison*, 576 B.R. at 458, 461; *see also United States v. Hanover Insurance Co.*, No. 2:15-CV-127, 2015 WL 9665679, at *4 (E.D. Va. Dec. 8, 2015) ("A court is to ascertain whether a party assented to the terms of a contract from that party's words or acts, not from his or her unexpressed state of mind.") (citation omitted); *In re Teligent, Inc.*, 282 B.R. 765, 771 (Bankr. S.D.N.Y. 2002) (". . . an offeror cannot treat silence or inaction as acceptance . . . he cannot ordinarily force the other party into a contract by saying 'if I do not hear from you by next Tuesday, I shall assume you accept.'") (citations omitted).

101.    For a bankruptcy court to infer consent from nonresponsive parties, a

debtor must demonstrate, under basic contract principles, that (i) the nonresponsive parties accepted a benefit knowing that the debtors, as offerors, expected compensation, (ii) the debtors gave the nonresponsive parties reason to understand that assent may be manifested by silence or inaction, and the nonresponsive parties remained silent and inactive intending to accept the offer, and (iii) acceptance can be presumed due to previous dealings between the parties. *In re Emerge Energy Services LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (citations omitted). Courts should "sparingly apply the acceptance-by-silence rule in exceptional circumstances and only with all three requirements met." *Meekins v. Lakeview Loan Servicing, LLC*, No. 3:19CV501 (DJN), 2020 WL 1922765, at *4 (E.D. Va. Apr. 21, 2020). However, the "mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." *Id.* (quoting Restatement § 69 (comment (a)).

102.   By the same token, a legal right may be waived only if it is "knowingly, voluntarily and intentionally abandoned." *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015) (quoting *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006) (applying New York law)); *see also In re Buffalo Coal Co., Inc.*, 418 B.R. 878, 890 (Bankr. N.D.W. Va. 2009) ("Waiver is the voluntary, intentional abandonment of a known legal right, advantage, or privilege.") (applying Virginia

law).  Waiver "should not be lightly presumed[,]" and must instead be based on "a clear manifestation of intent to relinquish a contractual protection." *Luitpold Pharm*, 784 F.3d at 95 (citation omitted).  "Waiver must be express, or, if it is to be implied, the intention to waive a right must be established by clear and convincing evidence." *Buffalo Coal.*, 418 B.R. at 890 (applying Virginia law).  "Mere silence, oversight or thoughtlessness in failing to object is insufficient to support an inference of waiver." *Luitpold Pharm*, 784 F.3d at 95 (citation omitted).

103.   Here, the failure of any member of the Class to return the Opt-Out Form would not and could not render the Third-Party Release consensual.  Assuming Class members were even aware of the Securities Litigation or the Chapter 11 Cases or understood the convoluted Plan provisions comprising the Third-Party Release, none of the three "acceptance-by-silence rule" requirements were met: (a) the Debtors did not demonstrate that members of the Class received any benefit by remaining silent (and indeed, members of the Class received only severe prejudice and no benefit); (b) if members of the Class actually received the Opt-Out Documents, which Appellants dispute, they nevertheless had no duty speak, or even any reason to understand that silence would be construed as consent to the gratuitous forfeiture of their Securities Claims against the Individual Defendants in the Securities Litigation; and (iii) there were no previous dealings between the Debtors and members of the Class from which consent could be presumed.

104.   Taken to an extreme, the position advanced by Appellee and endorsed by the Bankruptcy Court below is that the Plan could have imposed virtually any obligation on Class members on mere negative notice – for instance, a provision requiring Class members to convey other valuable personal assets to the Individual Defendants – and their nonresponse would be deemed "consent."  That position is absurd and legally unfounded.  The Opt-Out Form, if Class members received it at all, was nothing more than an unsolicited offer, to which members of the Class had absolutely no duty to respond.  Silence by members of the Class did not and could not constitute consent to the Third-Party Release, nor was silence sufficient to demonstrate that members of the Class knowingly, voluntarily, and intentionally abandoned their valuable Securities Claims against the Individual Defendants in exchange for absolutely nothing.

105.   The Third-Party Release was nonconsensual under basic principles of contract law because Class members had no duty to speak in response to the Opt-Out Documents.  The Bankruptcy Court erred in finding that the Third-Party Release was consensual as to Class members.

### B.     The Third-Party Release was nonconsensual.

106.   Many courts have held that silence or inaction cannot be deemed a manifestation of consent to such releases.  *See, e.g.*, *Emerge Energy*, 2019 WL 7634308, at *18 (holding that failure to return an opt-out form is not a manifestation

of intent to provide a release); *Washington Mutual*, 442 B.R. at 355 ("Failing to return a ballot is not a sufficient manifestation of consent to a third party release."); *In re Exide Technologies*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) (consent found only with respect to creditors who voted to accept the plan); *In re Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (finding that release had to be modified to apply only to those who voted in favor of the plan).[5]   That rule is particularly appropriate here, where Class members stood to receive nothing under the Plan and thus were deemed to reject the Plan, and where the Individual Defendants had no involvement whatsoever in the Debtors' efforts to reorganize or their eventual sale and wind-down and did not provide any consideration whatsoever for the benefit of the Class.

107.   Inverting the means of manifesting consent is the clearest possible demonstration that the opt-out mechanism was nothing more than a trap for the unwary.  If the Third-Party Release had instead required Class members to opt *in* (*i.e.*, to mail the Debtors a form affirmatively indicating their consent to the release),

---

[5]   There is a split of authority on the issue of whether "opt-out" mechanisms for non-debtor third-party releases are a permissible manner for deeming whether a creditor or interest holder has consented to such a release. *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013); *In re DBSD North America, Inc.*, 419 B.R. 179 (Bankr. S.D.N.Y. 2009); *In re Conseco, Inc.*, 301 B.R. 525 (Bankr. N.D. Ill. 2003). However, Appellants have not found, and the Debtors have never identified, any instance where a court approved opt-out mechanisms over an objection based on the basic contract law principles discussed above.  The most appropriate analysis of the Third-Party Release is through the lens of contract law principles, which unequivocally establish that absent a duty to speak (which did not exist here), silence cannot constitute consent.

no reasonable, fully informed Class member would ever do so, because no reasonable, fully informed investor would ever deliberately forfeit valuable Securities Claims against the solvent, insured Individual Defendants in exchange for absolutely nothing.  *See, e.g.*, *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015).  The *Chassix* court observed that:

> The purpose of the "opt-out" and "deemed consent" voting rules that the Debtors proposed was to aid the parties in compiling a broader set of third party releases than might be obtained if a different, "affirmative consent" approach were adopted. The proposed procedures would have done so by ***deeming "consent" to exist in situations where no affirmative consent had actually been manifested. Finding "consent" in these circumstances is to some extent a legal fiction. We know from experience that many creditors and interest holders who receive disclosure statements and solicitation materials simply will not respond to them, either because they elect not to read them at all or for other reasons. . . .*** The point is that inattentiveness, inaction and mistake are a known and expected part of the voting process.

*Id.* at 78 (emphasis added); *see also SunEdison*, 576 B.R. at 460 (Bankr. S.D.N.Y. 2017); *In re Aegean Marine Petroleum Network Inc.*, Case No. 18-13374-mew (Bankr. S.D.N.Y.), Transcript of Hearing Held Feb. 14, 2019 (the "**Aegean Transcript**"), A00007955 – A00007959.

108.   The *Aegean* court criticized the impropriety of a similar effort to use an opt-out mechanism to fabricate deemed consent to a third-party release by, among others, holders of securities fraud claims:

This is all about consent and what consent means, right? So you're basically urging me to say that you need me to manufacture consent for you because we know, we know in every one of these cases, there are people who are going to get this big package and they're not going to open it, or even if they open it, they're not going to understand it, and they're not going to respond. We know that. ***So all that this opt-out approach does is it seeks to manufacture judicial deemed consent without an actual thought process on behalf of the person whose consent is being sought.***

As I said in Chassix, there are times in the law when policies put that burden on people. The law supports class actions. It supports it for the purpose of judicial efficiency. And so it puts on people the burden of opting out, otherwise, they're included. There is no such policy in favor of releases. In fact, the policy is the opposite. What I'm told [in] *Metromedia* is that they ought to be rare . . .

If we're going to seek consent, it ought to be real consent, and it should be on an opt-in basis, not an opt-out basis.

Aegean Transcript, A00007955 – A00007959 (*see* 28:1 – 29:6).  The *SunEdison*

court similarly observed that:

The Debtors' argument that the Non-Voting Releasors' silence should be deemed their consent to the Release is not persuasive because ***the Debtors have not identified the source of their duty to speak***.  The Debtors do not contend that an ongoing course of conduct with their creditors gave rise to a duty to speak. . . .

Instead, the Debtors essentially contend that the warning in the Disclosure Statement and the ballots regarding the potential effect of silence gave rise to a duty to speak, and the Non-Voting Releasors' failure to object to or reject the Plan should be treated as their deemed consent to the Release. Indeed, this appears to be the unspoken rationale of the authorities cited by the Debtors.  The Debtors have

> failed, however, to show that the Non-Voting Releasors' silence was misleading or that it signified their consent to the Release. ***There are other plausible inferences that support the opposite inference. For example, the meager recoveries (here, less than 3% for the unsecured creditors) may explain their inaction without regard to the Release.***

576 B.R. at 460–61 (emphasis added).

109.    The circumstances here are even more egregious.  In *SunEdison*, unsecured creditors were at least receiving *something* under the plan, yet the court noted that their miniscule recovery, not a spirit of generosity motivating them to grant a gratuitous third-party release, was a plausible explanation for the fact that they did not vote and thus did not opt out.  In *Chassix*, unsecured creditors faced the possibility of losing their distributions if their class did not accept the plan – but if their class did accept the plan, they stood to receive meaningful distributions.

110.    By contrast, the Class received absolutely nothing under the Plan under any circumstance and were not even entitled to vote, and Appellee's common stock is now worthless.   The opt-out mechanism served no purpose other than manufacturing "consent" that no rational, fully informed member of the Class would ever voluntarily give if provided the opportunity to affirmatively do so.  Members of the Class – to the extent they were even aware of the Chapter 11 Cases or the Plan at all – had little reason even to read the Opt-Out Documents or the Disclosure Statement, much less review and decipher the convoluted Third-Party Release

language contained therein, an exercise requiring sophisticated bankruptcy counsel to fully understand. By ratifying the opt-out mechanism, the Bankruptcy Court approved the same "Court-endorsed trap for the careless or inattentive creditor" the *Chassix* court decried. 533 B.R. at 79. "If . . . a Bankruptcy Court should be wary of imposing third party releases on creditors, then a Bankruptcy Court should be equally wary of approving voting procedures that effectively would impose those same releases on creditors who have not affirmatively manifested their consent to them." *Id.*

111. The Bankruptcy Court erred in finding that the Third-Party Release was consensual with respect to the Securities Claims against the Individual Defendants.

### C. *Analogous Bankruptcy Code provisions demonstrate that silence cannot be deemed consent.*

112. The Bankruptcy Code only provides for the release of non-debtor third parties under one circumstance: in asbestos cases, under certain narrow conditions. 11 U.S.C. § 524(g); *Metromedia*, 416 F.3d at 142. Appellants do not dispute the Fourth Circuit's view that bankruptcy courts, only under extraordinary circumstances, can approve consensual third-party releases pursuant to their equitable powers under section 105(a). However, nothing in the text, legislative history, or underlying policies of the Bankruptcy Code demonstrate that Congress intended for bankruptcy courts to treat silence as consent, as the Bankruptcy Court below did. *See In re City Homes III LLC*, 564 B.R. 827, 865 (Bankr. D. Md. 2017).

In any event, the extraordinary circumstances necessary to justify a third-party release were not present here with respect to the Securities Claims against the Individual Defendants.

113.   In the absence of a clear Congressional directive, it is appropriate to turn to canons of statutory construction for guidance.  *See, e.g.*, *Nat. Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 98 (2d Cir. 2001) (where the statute at issue is susceptible to two or more reasonable meanings or is otherwise ambiguous, "a court may resort to the canons of statutory construction.") (citation omitted).

114.   The doctrine of *pari materia* holds that "all parts of a statute should be construed together, and that different statutes should be construed together" when the statutes relate to the same thing "or have the same purpose or object." *In re Foos*, 405 B.R. 604, 609 (Bankr. N.D. Ohio 2009) (citation omitted); *see also State v. McDaniel*, 292 Kan. 443 (2011) (statutory provisions are regarded as in *pari materia* where they are parts of the same act).  A court's construction of a statute must, to the extent possible, ensure that the statutory scheme is coherent and consistent. *Ali v. Federal Bureau of Prisons*, 552 U.S. 214 (2008).  Hence, all parts of an act of Congress should be considered, and construed together, so as to produce a harmonious whole. *See, e.g.*, *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998) ("reading the statute whole" is the job of the court); *People v. Medina*, 41 Cal. 4th 685 (2007) ("A statute is passed as a whole and not in

parts or sections and is animated by one general purpose and intent . . . [and], each part or section should be construed in connection with every other part or section so as to produce a harmonious whole.") (citation omitted).

115.   It is well established under analogous sections of the Bankruptcy Code that silence by a creditor does not constitute consent.  For example: (a) under section 1126, silence by a creditor does not equate to acceptance of a chapter 11 plan, *In re Smith*, 357 B.R. 60 (Bankr. M.D.N.C. 2006); (b) under section 365(c)(1), a debtor may not assign an executory contract if applicable law excuses the counterparty from accepting or rendering performance to someone other than the debtor, and the counterparty does not affirmatively consent to the assignment, *In re Sunterra Corp.*, 361 F.3d 257 (4th Cir. 2004); (c) under section 365(c)(1), a debtor may not use a secured creditor's cash collateral even when the creditor fails to object to such use, or where the creditor has not given its affirmative, express consent, *In re Rebel Rents, Inc.*, 307 B.R. 171, 183 (Bankr. C.D. Cal. 2004); and (d) under section 363(f)(2), the failure of a secured creditor to object to a debtor's motion to sell property free and clear of the creditor's interest in such property does not confer the consent necessary to consummate the sale, *In re Flour City Bagels, LLC*, 557 B.R. 53 (Bankr. W.D.N.Y. 2016).  Perhaps most tellingly, the Individual Defendants – as a matter of law – could not have obtained relief with the same effect as the Third-Party Release *even if they filed bankruptcy themselves*.  *See* 11 U.S.C. § 523(a)(19) (rendering

claims based upon violations of federal securities laws nondischargeable).

116.   Canons of statutory construction dictate that silence or inaction by an interest holder may not be construed as consent under the Bankruptcy Code, including with respect to a third-party release.  Consequently, the Bankruptcy Court erred in finding that the Third-Party Release was consensual as to the Securities Claims.

## IV.   THE DEBTORS FAILED TO PROVIDE ACTUAL NOTICE OF THE THIRD-PARTY RELEASE TO MEMBERS OF THE CLASS.

117.   Proceedings under the Bankruptcy Code are subject to due process constraints.  *Sanchez v. Nw. Airlines, Inc.*, 659 F.3d 671, 675 (8th Cir. 2011) (citations omitted).  The discharge of a creditor's claim "without reasonable notice and an opportunity to be heard" violates that creditor's Fifth Amendment due process rights.  *Hoffman v. Hoffman*, 157 B.R. 580, 584 (E.D.N.C. 1992), aff'd, 998 F.2d 1009 (4th Cir. 1993).  "Reasonable notice" has two basic elements: delivery and content.  *Fogel v. Zell*, 221 F.3d 955, 962–63 (7th Cir. 2000) (citations omitted). Unless the party charged with giving notice can prove that a notice was actually received, notice is inadequate absent a showing that the method employed to deliver it was reasonable.  *Id.* at 963 (citations omitted).

118.   However, even actual delivery cannot cure a notice that itself is inadequate.  *Id.* ("If the notice is unclear, the fact that it was received will not make it adequate.") (citations omitted).  As an overarching principle, a debtor must provide

-61-

notice "in a manner that would be employed by one who was desirous of actually informing the affected party of the pending deprivation of property." *Stinnie v. Holcomb*, 355 F. Supp. 3d 514, 528 (W.D. Va. 2018) (internal quotations and citation omitted).   At all times, the burden of demonstrating constitutionally sufficient notice rests with the debtor.  *Hoffman*, 157 B.R. at 584.

119.   Even if the opt-out mechanism was an appropriate means of obtaining consent, which it was not, the contents and method of delivery of the Opt-Out Documents were constitutionally inadequate and violated Class members' due process rights.

### A.   *The Debtors' method of delivering the Opt-Out Documents to members of the Class was constitutionally deficient.*

120.   Before a claim can be discharged under the Bankruptcy Code, "a debtor's creditors must be afforded notice of the debtor's bankruptcy case, as well as the deadline for asserting any pre-petition claims against the debtor, so as to provide the creditors an adequate opportunity to assert any claims they may have against the debtor's estate." *In re J.A. Jones, Inc.*, 492 F.3d 242, 249 (4th Cir. 2007) (citations omitted); *see also Hobart Corp. v. Dayton Power & Light Co.,* No. 3:13-CV-115, 2014 WL 12842525, at *3 (S.D. Ohio Sept. 26, 2014) (same).  This basic requirement is of crucial importance where the claim at issue is not even a claim against the debtor.

121.   While a chapter 11 plan confirmation order generally is afforded

preclusive effect, a court "cannot defer to such an order if it would result in denial of due process in violation of the Fifth Amendment[.]" *In re Banks*, 299 F.3d 296, 302 (4th Cir. 2002) (footnote omitted). "[A] creditor's claim is not subject to a confirmed bankruptcy plan when the creditor is denied due process because of inadequate notice." *Am. Bank & Trust Co. v. Jardine Ins. Servs. Tex., Inc.*, 104 F.3d 1241, 1245 (10th Cir. 1997). The same is true of a plan provision purporting to release or enjoin claims a creditor holds against parties other than a debtor. As the Supreme Court stated in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950):

> [a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

*Id.* at 314 (citations omitted).

122. The appropriate form of notice from a due process standpoint depends on whether a creditor is known or unknown to the debtor. *Id.* (citations omitted). As the Third Circuit explained:

> If claimants were "known" creditors, then due process entitled them to actual notice of the bankruptcy proceedings. Absent such notice, their suit may proceed. If claimants were "unknown" creditors, however, then notice by publication was sufficient to satisfy the requirements of due process and their claims are barred, absent some other basis for relief[.]

*Chemetron Corp. v. Jones*, 72 F.3d 341, 345–46 (3d Cir. 1995).

123.   An unknown creditor is "a claimant whose identity or claim is wholly conjectural or whose interests or whereabouts could not with due diligence be ascertained by the debtor."  *In re RailWorks Corp.*, 621 B.R. 335, 650 (Bankr. D. Md. 2020) (citation and internal quotations omitted).  Unknown creditors are the only parties for whom constructive notice can ever be constitutionally adequate.  *See In re Circuit City Stores, Inc.*, 439 B.R. 652, 660 (E.D. Va. 2010) (citation omitted); *J.A. Jones*, 492 F.3d at 249.

124.   Conversely, a known creditor is one whose claims and identity are actually known or "reasonably ascertainable" by the debtor.  *J.A. Jones*, 492 F.3d at 250 (citations omitted).  Known creditors are entitled to actual notice.  *Id.* at 249.  A creditor is reasonably ascertainable if the debtor can uncover the identity of that creditor through "reasonably diligent efforts."  *Id.* at 250.  Stated differently, claimants who are "identifiable through a diligent search" are reasonably ascertainable and hence are known creditors.  *Id.*

125.   Given the pendency of the Securities Litigation, as well as Appellants' filing of the Initial Objection, Supplemental Objection, and Rule 7023 Motion, the Debtors were clearly aware of the existence of the Class and the Securities Claims held by members of the Class.  Class members' identities were readily ascertainable through the nominee brokers that held the securities purchased by Class members in

street name, without resorting to a "vast, open-ended investigation." *Id.* (citation omitted).  The Bankruptcy Court recognized this, as did the Debtors, as evidenced by the Debtors' use of Prime Clerk's "comprehensive proprietary list" of Nominees and mailing agents, A00007671 – A00007672, to attempt to serve the Opt-Out Documents on Class members.  Consequently, individual members of the Class were known creditors entitled to actual notice of the Third-Party Release and its potential impact on their Securities Claims against the Individual Defendants.

126.   However, instead of serving the Opt-Out Documents (which were themselves deficient, as discussed below) directly on Class members, the Debtors instead served these documents only on Nominees, "with instructions to forward the materials" to Class Members.  A00007671 – A00007672. The instructions provided Nominees with the option to either (a) request additional copies of the Opt-Out Documents from Prime Clerk for the purpose of forwarding such materials to members of the Class or (b) to provide a list of members of the Class directly to Prime Clerk with instructions for Prime Clerk to serve the members directly.

127.   What the Debtors failed to do was obtain a Bankruptcy Court order *directing* the Nominees to do anything with the Opt-Out Documents.  That failure is evident from the response to the Opt-Out Documents:  Despite facing the loss of their valuable Securities Claims against the Individual Defendants by not returning the Opt-Out Form, only 596 potential Class members returned Opt-Out Forms out

of the approximately 300,000 that were distributed.  A00007672.

128.   The Bankruptcy Court's determination that this procedure provided Class members "a meaningful, informed, and convenient opportunity" to opt out was fanciful at best.  A00007672.  Prime Clerk's bulk mailing of the Opt-Out Documents to Nominees did not and could not comport with basic notions of due process.  *See Childs v. United Life. Ins. Co.*, No. 10-CV-23-PJC, 2012 WL 1857163, at *4 (N.D. Okla. May 21, 2012) (holding that the mailing of documents in bulk to third parties "does not comport with due process because there is no evidence that the potential Class Members ever actually received [notice]").  When relying on third parties to effectuate individual notice, "[t]he risk of nondelivery is simply too great and once the bulk envelopes are delivered to the [third parties], there is no way of determining whether the notice was *actually* delivered to the individual [class members]." *Id.* at *3 (emphasis in original).  The Debtors presented no such evidence below.

129.   Even if the Debtors' bulk-mailing efforts and forwarding instructions could conceivably comport with notions of due process, which they did not, there is absolutely nothing in the record below from which the Bankruptcy Court could have found that the Debtors served the Opt-Out Documents on all or even any meaningful subset of the Class members.  The only evidence in the record below in that respect, other than the identities of a small universe of directly registered shareholders, consisted of approximate numbers of Opt-Out Documents sent to Nominees and

other third parties, ostensibly for further distribution to Class members.  The glaring lack of evidence that the Opt-Out Documents were actually served on Class members is even more troublesome given the absence of an order by the Bankruptcy Court explicitly directing Nominees to forward the Opt-Out Documents to Class members.

130.   Where the identities of interested parties are reasonably ascertainable, "a serious effort must be made to inform them personally of the action, at least by ordinary mail to the record addresses." *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 146 (4th Cir. 2014).  At a minimum, the Debtors were obligated to mail the Opt-Out Documents to individual members of the Class.  *See, e.g.*, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175 (1974) (noting that "individual notice to identifiable class members is not a discretionary consideration to be waived in a particular case."); *Bosiger v. U.S. Airways*, 510 F. 3d 442, 452 (4th Cir. 2007) (mailing of notice *to individual* on two separate occasions was sufficient to satisfy due process requirements); *In re Partsearch Technologies, Inc.*, 453 B.R. 84, 97–98 (Bankr. S.D.N.Y. 2011) (finding manner of service satisfied due process requirements where notice of proposed settlement of state and federal WARN Act claims was sent "by first class mail, postage prepaid, to the last known address of each Class Member[.]").

131.   Because members of the Class were known creditors entitled to actual,

direct notice of the Third-Party Release and its potential impact on their Securities Claims against the Individual Defendant, which the Debtors failed to provide, the Bankruptcy Court erred when it held "that any and all persons who did not want to be bound by the Third-Party Releases were able to effectively opt-out." A00007694.

### B.    The Opt-Out Documents themselves were constitutionally deficient.

132.   Even if the opt-out mechanism was appropriate, and even if the Debtors had properly served the Opt-Out Documents, the documents themselves nevertheless failed to disclose the Securities Litigation, the Class, the Class Period, the identity of the two Individual Defendants, the fact that Class members hold Securities Claims against the Individual Defendants through the Securities Litigation, the fact that the Securities Claims were Class members' only remaining source of recovery for the damages alleged in the Securities Litigation because the Debtors had filed bankruptcy, or the fact that the Third-Party Release was intended to completely release the Securities Claims in exchange for absolutely nothing.  The Opt-Out Documents spoke only in vague, categorical terms.

133.   As a general matter, due process requires notice "not just that there is a pending case or hearing, but of the nature of the charges or claims that will be adjudicated." *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 871 F. Supp. 2d 143, 155 (E.D.N.Y. 2012) (citing *In re Ruffalo*, 390 U.S. 544, 551 (1968) (failure to notify party of issues to be raised at hearing was a "procedural violation of due

process [that] would never pass muster in any normal civil or criminal litigation") (internal quotations and citation omitted)); *cf. Chi. Cable Commc'ns v. Chi. Cable Comm'n*, 879 F.2d 1540, 1546 (7th Cir. 1989) ("Parties must be notified of the precise issues to be raised at the hearing . . .."). Adequate notice includes the dual safeguards of disclosure of the issues to be addressed and sufficient time for preparation. *Yohn v. Love*, 887 F. Supp. 773, 787 (E.D. Pa. 1995).

134. For example, the federal government could not simply inform a criminal defendant that his guilt or innocence with respect to any conceivable crime he may have committed will be determined at a particular time and place. *DPWN Holdings*, 871 F. Supp. 2d at 155. Similarly, an absent class member cannot merely be notified that he is a member of a class whose unspecified claims are to be settled on a given date. *Id.* (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (due process requires that notice to absent class members "describe the action and the plaintiffs' rights in it")); *see also In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 180 (3d Cir. 2013) (notice of proposed settlement of class claims "should contain sufficient information to enable class members to make informed decisions on whether they should take steps to protect their rights[.]"). And in an ordinary civil action, a plaintiff cannot merely serve a bare summons directing the defendant to appear in court to answer all claims the plaintiff may have against it, but must instead provide fair notice of the particular claims being asserted. *Baby Prods.*, 708

F.3d at 180 (citing Fed. R. Civ. P. 4(c)(1), 8(a)).

135.    Applying these general principles in the bankruptcy context, "[t]he constitutional component of notice is based upon a recognition that creditors have a right to adequate notice and the opportunity to participate in a meaningful way in the course of bankruptcy proceedings." *In re Rounds*, 229 B.R. 758, 765 (Bankr. W.D. Ark. 1999) (citation omitted).  "Adequate notice" and an "opportunity to participate" includes providing known creditors "not only with generalized notice of the event in question, but also the specifics of it[.]"  *In re Agriprocessors, Inc.*, 465 B.R. 822, 832 (Bankr. N.D. Iowa 2012) (citations omitted).  For notice to be effective, it must inform the affected party of what "critical issue" will be determined at the hearing. *In re Murphy*, 626 B.R. 625 (M.D. Fla. 2021) (citation omitted).  *See generally* Transcript of Confirmation Hearing, *In re Westinghouse Elec. Co. LLC*, No. 17-10751 (MEW) (Bankr. S.D.N.Y. Mar. 27, 2018) (the "**Westinghouse Transcript**"), A00007960 – A00008004.

136.    Addressing the release of unspecified third-party claims specifically, the *Westinghouse* court stated:

> . . . *the notion that you're taking away somebody else's property* without additional compensation for it, *without identification to what the claims – specific claims are,* without an explanation of why those specific claims can fairly be extinguished, without a proper assessment as to what the actual value of those claims might be, *that's extremely troubling to me.*

Westinghouse Transcript, (*see* 39:4–39:10) (emphasis added).  As in *Westinghouse*, the level of disclosure needed to satisfy due process was drastically heightened below, where the Third-Party Release threatened to extinguish the Securities Claims against the Individual Defendants, the only hope Class members had for a recovery in the Securities Litigation.

137.   The Debtors were keenly aware of the Securities Litigation and the Securities Claims against the Individual Defendants.  By contrast, members of the Class were unlikely to even be aware of these Chapter 11 Cases, the Securities Litigation, or the Securities Claims themselves, given that the Securities Litigation was at an early stage.  *See, e.g.*, *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 388–89 (C.D. Cal. 2007) (considering approval of class action settlement, and noting that "a considerable number of class members are likely unaware, through no fault of their own, that they even have viable claims"); *Jacobson v. Persolve, LLC*, No. 14-CV-00735-LHK, 2015 WL 3523696, at *9 (N.D. Cal. June 4, 2015) (in FDCPA class action, finding "probability that most individual plaintiffs are unaware of their claims").

138.   Under these circumstances, discharge of the Securities Claims could satisfy due process, if at all, only if the Debtors "provided sufficient information" to apprise Class members of "the nature of the claim to be discharged" – a very heavy disclosure burden.  *DPWN Holdings*, 871 F.Supp.2d at 157 (citing *Acevedo v. Van*

*Dorn Plastic Mach. Co.*, 68 B.R. 495, 499 (Bankr. E.D.N.Y. 1986) ("[D]ue process should . . . require that a debtor notify a creditor of his claim when the creditor is unlikely to know about the claim otherwise.").  Of course, requiring the Debtors to notify unsuspecting Class members of the nature of the Securities Claims to satisfy their due process obligations would not impose any burdens on the Debtors "that are materially greater than what is already required under the Bankruptcy Code and Rules." *DPWN*, 871 F.Supp.2d at 158.

139.   Nevertheless, the contents of the Opt-Out Documents fell woefully short of providing members of the Class with adequate notice of the dire threat posed by the Third-Party Release.   Instead, the Non-Voting Notice advised Class members that they "will be deemed to have released whatever claims you may have against many other people and entities (including company officers and directors)" unless they returned the Opt-Out Form, which itself contained only a verbatim recitation of Plan definitions for the "Third-Party Release" and "Releasing Parties."  A00002082 – A00002085.  The Opt-Out Documents – which provided absolutely no information from which Class members could infer that they potentially held valuable Securities Claims against the Individual Defendants, or that failing to return the Opt-Out Form could extinguish their Securities Claims in a bankruptcy case of someone other than the Individual Defendants (who could not even obtain such relief if they filed bankruptcy themselves) – were nothing more than a "meaningless gesture, not notice

reasonably calculated" to afford Class members "an opportunity to present their objections" to the Third-Party Release and gratuitous discharge of the Securities Claims. *DPWN*, 871 F.Supp.2d at 158 (citations omitted). As a result, the Bankruptcy Court erred in finding that the Opt-Out Documents provided Class members with reasonable notice of the potential impact of the Third-Party Release on their Claims against the Individual Defendants.

## V. THE DEBTORS FAILED TO SATISFY THE *BEHRMANN* STANDARD FOR APPROVAL OF A THIRD-PARTY RELEASE.

140. As discussed above, the Third-Party Release was not consensual with respect to members of the Class. Even if the Third-Party Release were consensual, implied consent is not a basis for approving a third-party release. At least one court in this Circuit has held that while affirmative consent, standing alone, may support a third-party release, a debtor must satisfy the factors set forth by the Fourth Circuit in *Behrmann v. National Heritage Foundation*, 663 F.3d 704 (4th Cir. 2011) with respect to a third-party release that relies on implied consent. *See In re Neogenix Oncology, Inc.*, 2015 WL 5786345 at *6 (Bankr. D. Md. 2015). Appellants respectfully submit that regardless of whether the Third-Party Release was consensual, the Debtors were required to satisfy the *Behrmann* factors before the Bankruptcy Court could approve the Third-Party Release.

141. Yet, the Bankruptcy Court held that the *Behrmann* factors were inapplicable because it had determined that the Third-Party Release was consensual.

-73-

And even if it had applied the *Behrmann* factors, the Bankruptcy Court, without making any factual or legal findings whatsoever, stated in dicta that it would find the *Behrmann* factors had been satisfied for the reasons set forth in the Debtors' Confirmation Brief.  A00007697 (*see* pg. 38, n. 28).

142.   Contrary to the Bankruptcy Court's unsubstantiated dicta, the six substantive *Behrmann* factors overwhelmingly militated against approval of the Third-Party Release of the Securities Claims against the Individual Defendants.

### A.   *The Debtors failed to satisfy any of the Behrmann factors.*

143.   The Fourth Circuit established the standard for approving a third-party release in *Behrmann*.  The *Behrmann* court considered the propriety of a third-party release included in the debtor's plan of reorganization.  663 F.3d at 706.  In analyzing the bankruptcy court's decision to confirm a plan containing a third-party release, the Fourth Circuit began its analysis from the well-settled principle that non-debtor releases in a plan of reorganization are a "unique" and "dramatic measure" that should be "granted cautiously and infrequently."  *Id.* at 711 (citations and quotations omitted).  The court adopted the analysis established by the Sixth Circuit in *Dow Corning*, 280 F.3d 648 (6th Cir. 2002), which set forth seven factors for courts to evaluate in discerning whether a third-party release should be approved, as follows:

> (i)   there is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor

is, in essence, a suit against the debtor or will deplete the assets of the estate;

(ii)    the non-debtor has contributed substantial assets to the reorganization;

(iii)    the injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;

(iv)    the impacted class, or classes, has overwhelmingly voted to accept the plan;

(v)    the plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;

(vi)    the plan provides an opportunity for those claimants who choose not to settle to recover in full; and

(vii)    the bankruptcy court made a record of specific factual findings that support its conclusions.

*Behrmann*, 663 F.3d at 711–12.  None of the *Behrmann* factors were satisfied with respect to the Third-Party Release.

144.    **_Factor I_** – Under the first *Behrmann* factor, the Bankruptcy Court was required to consider "whether there is an identity of interests – usually an indemnity obligation – between the debtor and the released parties."  A non-debtor release "may be appropriate in such circumstances because a suit against the non-debtor may, in essence, be a suit against the debtor that risks depleting the assets of the estate."  *National Heritage Foundation, Inc. v. Highbourne Foundation*, 760 F.3d 344, 348 (4th Cir. 2014) (citation omitted).

-75-

145.   The Debtors contended in their Confirmation Brief that there was an identity of interests between themselves and the numerous parties released through the Third-Party Release, including the Individual Defendants, because the Debtors were required to indemnify certain released parties under various corporate organizational documents and other agreements.  A00007123 – A00007124.  Yet, an identity of interests arising from the Debtors' obligation to indemnify the Individual Defendants by itself was insufficient to justify the Third-Party Release. *See In re Quincy Medical Center, Inc.*, No. 11-16394-MSH, 2011 WL 5592907, at *3 (Bankr. D. Mass. Nov. 16, 2011) ("While there appears to be an identity of interests between and among the debtors and their directors and officers arising from the debtors' obligation to indemnify them . . . such an identity of interests by itself is insufficient to justify releases.") (citing *Washington Mutual*, 442 B.R. at 349–50).

146.   As discussed above, no such identity of interest exists here because (a) the Debtors did not reorganize, but rather, are liquidating, and (b) the Securities Claims against the Individual Defendants are covered by substantial D&O liability insurance.  (*See* ¶¶ 3, 23, 75 above).  As a result, the Securities Claims would not – indeed, could not – affect the Debtors' estates at all, notwithstanding the Debtors' gratuitous assumption of their indemnification obligations, if any, to the Individual Defendants.  A00007252 - A00007253 (Art. IV.O). As a result, this factor clearly weighed against approval of the Third-Party Release with respect to the Individual

Defendants.

147.   ***Factor II*** – Under the second *Behrmann* factor, the Bankruptcy Court was tasked with considering whether the Individual Defendants made a substantial contribution of assets to the Debtors' reorganization efforts.  In their Confirmation Brief, the Debtors asserted that the expenditure of significant time analyzing and negotiating issues presented by the Debtors' capital structure, claims, the COVID-19 pandemic, material barriers to a global resolution, and negotiating the terms of the Plan qualified as a substantial contribution warranting approval of the Third-Party Release. A00007124 - A00007125.

148.   There is one slight problem with the Debtors' assertions about the efforts of the various released parties:   the Individual Defendants had left the Debtors' employ well before the Petition Date, and had *no role whatsoever* in the Debtors' attempt to reorganize or their eventual liquidation, facts that the Debtors conceded on cross-examination below.  Even if the Individual Defendants had been employed by the Debtors or otherwise somehow played a role in the Debtors' abandoned effort to reorganize, that would not be enough to satisfy this *Behrmann* factor.  The Fourth Circuit requires a beneficiary of a third-party release to provide a substantial *financial* contribution to the reorganization – not just that an employee continue to perform his or her job duties.  *See In re National Heritage Foundation, Inc.*, 478 B.R. 216, 229 (Bankr. E.D. Va. 2012) (finding that the performance by

directors and officers of duties consistent with their preexisting fiduciary duties and job responsibilities, without having made any financial contribution, is insufficient to demonstrate a substantial contribution warranting approval of third-party release). Because the Individual Defendants provided no contribution whatsoever – much less a "substantial financial contribution" – this factor weighed against approval of the Third-Party Release with respect to the Individual Defendants.

149.   ***Factor III*** – Under the third *Behrmann* factor, the Bankruptcy Court was obligated to consider whether the Debtors demonstrated that the Third-Party Release of the Individual Defendants was "essential to reorganization," such that the Debtors' reorganization hinged on the Individual Defendants, neither of whom had anything to do with the Debtors' reorganization efforts, being relieved of direct claims against them.   In their Confirmation Brief, the Debtors argued that the released parties generally – without specifically referencing the Individual Defendants – would not have agreed to contribute to the Debtors' restructuring or the concessions embodied in the Plan if they were not provided the certainty of the Third-Party Release.   A00007125 - A00007126.

150.   The Debtors' conclusory assertion missed the mark for several reasons. First, the Individual Defendants contributed nothing to the Debtors' attempted restructuring and provided no concessions through the Plan.   Second, the Third-Party Release was not part of any reorganization effort by the Debtors because the Plan

-78-

was a liquidating plan. *See Railworks*, 345 B.R. at 536 (a bankruptcy court may release the liabilities of non-debtors only "in certain circumstances," and where the injunction "is essential to a workable *reorganization*") (citation omitted; emphasis added). Therefore, the Third-Party Release could not be essential to a reorganization. *Neogenix*, 508 B.R. at 359 ("The Plan is a liquidating plan; the Debtor is not reorganizing. All of the Debtor's assets have been sold (other than litigation claims) and the Plan will not affect the operation of those assets or any reorganization effort. Thus, the [third-party] Release Provision is not essential to the Debtor's reorganization."). Third, the Plan expressly provides that, should a court determine that "any term or provision of the Plan" is invalid, void, or unenforceable, the remainder of the Plan remains in effect. A00007276 (Art. XII.J). As the Fourth Circuit recognized in *Highbourne*, the presence of a severability clause "suggests that [a] plan would remain viable absent the release provision." 760 F.3d at 349.

151. Because (a) the Plan was a liquidating plan, (b) the Third-Party Release of the Individual Defendants was not essential to the Debtors' reorganization efforts or their eventual liquidation (and the Debtors presented no evidence that it was), and (c) the Plan contained a severability clause providing for the remainder of the Plan to remain intact even if one provision were later stricken or modified by a court, this factor weighed against the Bankruptcy Court's approval of the Third-Party Release

with respect to the Individual Defendants.

152.   ***Factor IV*** – Under the fourth *Behrmann* factor, the Bankruptcy Court was required to confirm that each class affected by the Third-Party Release "overwhelmingly voted in favor of the Plan."  The Debtors could not satisfy this factor with respect to members of the Class (whose claims against Appellee were classified in Class 8 under the Plan), because Class 8 was deemed to reject the Plan and thus was unable to vote in favor of or against the Plan at all.  Therefore, this factor weighed against the Bankruptcy Court's approval of the Third-Party Release with respect to the Individual Defendants.

153.   ***Factor V*** – Under the fifth *Behrmann* factor, the Bankruptcy Court was required to determine whether the Plan provided a mechanism to consider and pay all or substantially all members of the Class affected by the Third-Party Release.  As the Fourth Circuit made clear in *Highbourne*, "the absence of such a mechanism can weigh against the validity of a non-debtor release, especially when the result is that the impacted class's claims are extinguished entirely."  *Id.* at 351.  That controlling precedent squarely applies here.

154.   Class 8 received nothing under the Plan, leaving the Class with their Securities Claims against the Individual Defendants as their only potential source of recovery in the Securities Litigation.  However, the Third-Party Release stripped the Class of the Securities Claims for no cognizable reason and with no compensation.

-80-

This factor weighed against approval of the Third-Party Release with respect to the Individual Defendants.

155.   ***Factor VI*** – Under the final substantive *Behrmann* factor,[6] the Bankruptcy Court was obligated to consider whether the Plan provided an opportunity for those Class members who did not grant the Third-Party Release to recover in full.  Stated differently, the Plan must "provide an opportunity for non-consenting creditors to recover in full." *In re City of Detroit*, 524 B.R. 147, 175 (Bankr. E.D. Mich. 2014).  Through the Third-Party Release, the Plan did the exact opposite, depriving the Class of *any* opportunity to recover at all.  This factor weighed against approval of the Third-Party Release of the Individual Defendants.

156.   All six substantive *Behrmann* factors weighed heavily against approval of the Third-Party Release of the Individual Defendants.  This is even more apparent when considering that the Bankruptcy Court did not make a record of specific factual findings that supported its conclusion, as required by the seventh factor.  Given the Debtors' failure to satisfy any of the *Behrmann* factors, and in light of the Fourth Circuit's directive that non-debtor releases should be "granted cautiously and infrequently," *Behrmann*, 663 F.3d at 711, the Bankruptcy Court erred when it approved the Third-Party Release of the Securities Claims.

---

[6]   The seventh *Behrmann* factor requires bankruptcy courts to make detailed findings regarding the six substantive factors.  The Bankruptcy Court below failed to do so.

## VI.   APPELLANTS HAD AUTHORITY TO OPT OUT OF THE THIRD-PARTY RELEASE ON BEHALF OF THE CLASS.

157.   The Bankruptcy Court erred when it held that Appellants lacked inherent authority to exercise the Third-Party Release Opt-Out Election on behalf of all members of the Class.   Finding the Second Circuit decision in *Lucas v. Dynegy Inc.*, 770 F.3d 1064 (2d Cir. 2014) instructive, the Bankruptcy Court determined that the New Jersey District Court order appointing Appellants as lead plaintiffs in the Securities Litigation did not confer upon Appellants any status in the Chapter 11 Cases.  A00007653 – A00007654.  However, the *Dynegy* ruling – the lone decision by any Court of Appeals on the issue, and a decision that appears to have been wrongly decided – was fundamentally inconsistent with Appellants' inherent powers and duties as fiduciaries for the Class and is not suggestive of how courts within the Fourth Circuit (or anywhere) should rule on the issue.[7]

158.   Appellants were appointed as lead plaintiffs in the Securities Litigation because they are "most capable of adequately representing the interests of [C]lass members."  15 U.S.C. § 78u-4(a)(3)(B)(i).  Like all class representatives in federal class-action litigation, Appellants are fiduciaries for all absent Class members. *Eubank v. Pella Corp.*, 753 F.3d 718, 723–24 (7th Cir. 2014).   As fiduciaries,

---

[7]   The third-party release at issue in *Dynegy*, unlike the Third-Party Release here, carved out claims for fraud, willful misconduct, and gross negligence, a critical distinction.  Had Appellee done the same in the Third-Party Release, Appellants may not have needed to bring these Appeals at all.

Appellants have not only the ability to take necessary actions to protect the rights of absent Class members, but also an affirmative obligation to do so. The same duty applies to Lead Counsel, which "must fairly and adequately represent the interests of the [C]lass." Fed. R. Civ. P. 23(g)(4).

159.   Nowhere were Appellants' duties as lead plaintiffs more essential than in connection with the Third-Party Release, which, just like a motion to dismiss, threatened to eviscerate the Securities Claims.  No rational party would ever assert that a lead plaintiff in a federal securities class action lacks authority to defend against a motion to dismiss.  Changing the form and venue of the proceeding does not change that substantive reality.

160.   To enable Appellants to fulfill their fiduciary duties and prevent the Debtors from summarily extinguishing Class members' Securities Claims against the Individual Defendants in the Securities Litigation,[8] Appellants sought confirmation by the Bankruptcy Court that they had inherent authority to opt out of the Third-Party Release on behalf of the Class.  Appellants did not seek to expand their rights in any way – instead, they simply sought to preserve rights that absent Class members were in no position to protect and probably did not even know they had.  Appellants did not seek a determination on the merits of the Securities Claims,

---

[8]   For example, Appellants may amend the Amended Complaint, defend against dispositive motions, and take and defend discovery, all without the Class being certified.

or to bind members of the Class to any result in the Securities Litigation – instead, they simply sought to preserve Class members' rights so that they may decide for themselves whether to participate in the Securities Litigation.

161.   Consequently, the Bankruptcy Court erred when it held that Appellants lacked authority in their capacity as court-appointed lead plaintiffs in the Securities Litigation to opt out of the Third-Party Release on behalf of the Class.

## VII.   THE BANKRUPTCY COURT ERRED WHEN IT DECLINED TO INVOKE BANKRUPTCY RULE 7023 OR CONSIDER CERTIFYING THE CLASS FOR A LIMITED PURPOSE.

162.   The Bankruptcy Court abused its discretion when declining to apply Bankruptcy Rule 7023 to the contested matters created by the Rule 7023 Motion and confirmation of the Debtors' Plan for the limited purpose of enabling Appellants to opt out of the Third-Party Release on behalf of the Class.  Class certification is governed by Rule 23, made applicable in bankruptcy by Bankruptcy Rule 7023.  By its terms, Bankruptcy Rule 7023 only makes Rule 23 applicable to adversary proceedings.  Bankruptcy Rule 9014 authorizes bankruptcy courts to direct that certain other Bankruptcy Rules, including Rule 7023, apply to a contested matter. *Gentry v. Siegel*, 668 F.3d 83, 92 (4th Cir. 2012) (citations omitted).

163.   Under the Bankruptcy Rule 7023 framework, "[t]wo decisions must be made: (1) [w]hether Rule 7023 should be made applicable . . . and (2) whether a class should be certified under Rule 23." *In re Comput. Learning Ctrs., Inc.*, 344

B.R. 79, 86 (Bankr. E.D. Va. 2006).  With respect to the first step, a bankruptcy court has "broad discretion" in deciding whether to apply Bankruptcy Rule 7023. *Gentry*, 668 F.3d at 92 (citations omitted). "Each bankruptcy case must be assessed on a case-by-case basis to determine whether allowing a class action to proceed would be superior to using the bankruptcy . . . process." *Id.* at 94.

164.   Appellants submit that the Bankruptcy Court abused its discretion when it declined to apply Bankruptcy Rule 7023 to the contested matters created by the Rule 7023 Motion and Plan confirmation because it based its decision on the clearly erroneous assumptions that the Debtors' "Court-approved efforts to identify, notify, and allow the putative class members to opt out of the Third-Party Releases, was both fair and adequate[,]" and that "all known current and former equity holders in the Putative Class Period were provided with the Court-approved form of notice" and opportunity to respond.  A00007656; A00007658.  As discussed above, the Debtors' disclosures and method of service of the Opt-Out Documents failed to notify Class members of their ability to opt out of the Third-Party Release or the impact of the Third-Party Release on their Securities Claims, in violation of Class members' due process rights.  *See* ¶¶ 117-39 above.

165.   Under the facts and circumstances of these Chapter 11 Cases, and in the interests of affording due process and fundamental fairness to Class members, the prudent and proper decision was for the Bankruptcy Court to apply Bankruptcy Rule

7023 and to certify the Class for the limited purpose of enabling Appellants to opt out of the Third-Party Release on behalf of the Class.  By failing to do so, the Bankruptcy Court abused its discretion.

## <u>CONCLUSION</u>

166.   For the reasons set forth above, (a) the Bankruptcy Court lacked constitutional adjudicatory authority and subject matter jurisdiction to approve the Third-Party Release of Class members' Securities Claims against the Individual Defendants, (b) Appellants possessed standing to object to the Third-Party Release on behalf of the Class, (c) the opt-out mechanism in the Third-Party Release was a legally impermissible manner of obtaining Class members' consent to the Third-Party Release, (d)  the manner of service of the Opt-Out Documents, as well as the disclosures contained therein, failed to provide members of the Class with constitutionally required notice of the impact of the Third-Party Release on their Securities Claims, and (e) the Debtors were required, yet failed, to satisfy any of the *Behrmann* factors for approval of the Third-Party Release of the Securities Claims.

167.   Moreover, Appellants had inherent authority to opt out of the Third-Party Release on behalf of the Class and, even if they did not, the Bankruptcy Court abused its discretion when it declined to apply Bankruptcy Rule 7023 for the limited purpose of permitting Appellants to opt out of the Third-Party Release on behalf of the Class.

WHEREFORE, for the reasons set forth above, Appellants respectfully request that the Court remand this matter to the Bankruptcy Court with instructions to enter an order excluding the Securities Claims against the Individual Defendants from the effects of the Third-Party Release.

Dated: June 28, 2021                        Respectfully submitted,

Michael Etkin (pro hac vice pending)        /s/ Ronald A. Page, Jr.
Andrew Behlmann (pro hac vice)              Ronald A. Page, Jr.
John Schneider (pro hac vice)               Virginia Bar No. 71343
**LOWENSTEIN SANDLER LLP**                  **RONALD PAGE, PLC**
One Lowenstein Drive                        P.O. Box 73087
Roseland, New Jersey 07068                  N. Chesterfield, Virginia 23235
(973) 597-2500                              (804) 562-8704
metkin@lowenstein.com                       rpage@rpagelaw.com
abehlmann@lowenstein.com
jschneider@lowenstein.com

*Counsel to Appellants Joel Patterson and Michaella Corporation*

## <u>CERTIFICATE OF COMPLIANCE</u>

The foregoing compiles with the type-volume limitations applicable under Fed. R. Bankr. P. 8015 and this Court's *Order (Setting Briefing Schedule)* entered on May 10, 2021 because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), it contains 20,503 words as counted by Microsoft Word.

I further certify that the foregoing complies with the typeface and type style requirements because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

By   <u>/s/ Ronald A. Page, Jr.</u>
Counsel

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 28, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Virginia by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By    <u>/s/ Ronald A. Page, Jr.   </u>
          Counsel