IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

JOEL PATTERSON, *et al.*,
    Appellants,

v.                                      Civil No. 3:21cv167 (DJN)

MAHWAH BERGEN RETAIL GROUP, INC.
    Appellee.

## MEMORANDUM OPINION

This case arises out of the bankruptcy cases commenced by Retail Group, Inc. (f/k/a

Ascena Retail Group, Inc.) ("Ascena") and sixty-three of its affiliates (collectively, the

"Debtors"). The United States Bankruptcy Court for the Eastern District of Virginia

("Bankruptcy Court") confirmed the Plan set forth by the parties in interest, and the United

States Trustee ("Trustee") filed a notice of appeal of that confirmation to this Court. The Trustee

now seeks a stay of the confirmation pending the resolution of his appeal. This matter comes

before the Court on the Motion for Limited Stay Pending Appeal by Appellant, John P.

Fitzgerald, III, Acting United States Trustee, Region 4 ("Stay Motion" (ECF No. 18)). For the

reasons that follow, the Trustee's Stay Motion will be denied.

### I.    FACTUAL BACKGROUND[1]

Ascena provided specialty retail apparel for women and girls. Debtors operated a

portfolio of recognizable brands, including Ann Taylor, LOFT, Lane Bryant, Catherines, Justice,

Lou & Grey and Cacique. Debtors operated approximately 2,800 stores in the United States,

---

[1]    Unless otherwise cited, the Court takes these facts from the Bankruptcy Court's Opinion ("Bankr. Stay Op.") denying the Trustee's Motion to Stay below, found at pages USTAPP184-211 of the Trustee's Appendix.

Canada and Puerto Rico, serving more than 12.5 million customers and employing nearly 40,000 employees.

Beginning in March 2020, Debtors had to temporarily close all of their retail stores due to the COVID-19 pandemic. Debtors furloughed nearly all of their store-level workforce as well as a substantial portion of their corporate workforce. Facing dire circumstances, on July 23, 2020, Debtors commenced the Bankruptcy Cases that ultimately were consolidated into Case No. 20bk33113 in the Bankruptcy Court. On February 25, 2021, the Bankruptcy Court conducted an evidentiary hearing to consider Debtors' Amended Joint Chapter 11 Plan of Reorganization of Mahwah Bergan Retail Group, Inc. and Its Debtor Affiliates (the "Plan") in addition to the unresolved objections filed by the United States Securities and Exchange Commission ("SEC"), the Trustee, as well as Joel Patterson and Michaella Corporation, the lead plaintiffs in a securities fraud action against Ascena pending in the United States District Court for the District of New Jersey (the "Security Litigation Lead Plaintiffs"). The Bankruptcy Court overruled the objections and confirmed the Plan and, on February 25, 2021, entered the Confirmation Order confirming the Plan. Then, on March 9, 2021, the Bankruptcy Court entered its Memorandum Opinion ("Bankr. Conf. Op." (USTAPP144-183)) to supplement its findings of facts and conclusions of law in the Confirmation Order.

Before confirming the Plan, the Bankruptcy Court had to first approve a Disclosure Statement that would supply creditors and interest holders with information about the proposed plan as a critical part of the solicitation process. Accordingly, on September 10, 2020, the Bankruptcy Court held a hearing regarding the Disclosure Statement. In response to objections by the SEC, the Bankruptcy Court required Debtors to amend the Disclosure Statement to include language recommended by the SEC, so that the notice would clearly convey information

to non-voting equity holders about the provisions of the Plan, including the inclusion of Third-Party Releases, the right of each non-voting equity holder to opt out of the Third-Party Releases and the process for doing so. Additionally, in response to objections by the Securities Litigation Lead Plaintiffs, the Bankruptcy Court adopted additional steps to effectuate notice of the Disclosure Statement. However, the Bankruptcy Court overruled the Trustee's objections, which closely resembled the issues that he raises in this appeal.

Ultimately, the Plan provided for the sale of Debtors' brands for a total of $651.8 million in three separate transactions. This allowed the Ascena brands to live on under new ownership and brought significant proceeds into Debtors' estate for the benefit of creditors. By allowing the brands to live on, it preserved tens of thousands of jobs and hundreds of commercial leases during the COVID-19 pandemic. Debtors' term lenders and the Creditors' Committee endorsed the Plan. The Plan provided for certain payment structures to Debtors' creditors. The unsecured creditors also received a waiver of any avoidance actions that Debtors' estate could bring against them. The holders of equity interest in Ascena were not projected to receive any distribution and, therefore, were deemed to reject the Plan.

As part of the holistic structure of the Plan, the major stakeholders negotiated and included certain releases and exculpation provisions. Specifically, the Plan provides for the following Debtors' Releases:

> [E]ach Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates . . . from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors . . . based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, . . . or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence

3

(in each case, related to any of the foregoing) taking place on or before the Effective Date.

The Plan further provides for the following Third-Party Releases:

> [E]ach Releasing Party . . . is deemed to have released and discharged each Debtor, Reorganized Debtor, and each other Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors . . . based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, . . . or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Effective Date.

The Plan defines "Releasing Party" to include, but is not limited to, all holders of claims and interests who do not timely opt out of or object to the Third-Party Releases. "Released Party" includes, but is not limited to, Debtors and certain of their current and former managers, directors and officers. Finally, the Plan provides for the following Exculpation Provision:

> [N]o Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action or any claim arising from the Petition Date through the Effective Date related to any act or omission in connection with, relating to or arising out of, the Chapter 11 Cases . . . except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

The Plan defines "Exculpated Parties" to include, but is not limited to, Debtors and certain of their non-estate fiduciaries who played a critical role in the Bankruptcy Cases.

Debtors appointed a special committee ("Special Committee") of disinterested directors to investigate the propriety of these provisions and any claims or causes of actions that may exist. The Special Committee did not identify any material claims in favor of Debtors worth pursuing. Nor did they find any colorable causes of action against Debtors or anyone subject to the Third-Party Releases. Even if such claims did exist, the Special Committee determined that they would not likely result in any net recovery due to the mutual indemnification obligations

4

with Debtors. Further, the Special Committee focused on the securities action brought by the Securities Litigation Lead Plaintiffs, concluding that the claims asserted would fail and had no material value. Finally, as consideration for the Third-Party Releases, Debtors waived any avoidance action held by the bankruptcy estates against any holder of a general unsecured claim who did not choose to opt-out.

The Bankruptcy Court required a Notice of Non-Voting Status to be sent to both current and former shareholders of Ascena during the Putative Class Period. The Notice of Non-Voting Status informed the recipients that they could opt out of the Third-Party Releases by returning an enclosed form no later than November 15, 2020. The Notice of Non-Voting Status stated in bold and underlined text that, under Debtors' Plan, "**you will be deemed to have released whatever claims you may have against many other people and entities (including company officers and directors) unless you return the enclosed 'Release Opt-Out Form'.**" The recipient could return a hardcopy form in the pre-addressed, pre-paid envelope or electronically through an online portal. The Release Opt-Out Form did not require the recipients to supply any information other than their identity. Simply timely returning the form effectuated the opt-out. Debtors provided notice of the Third-Party Releases and the opt-out procedure to 300,000 notice parties. As of November 18, 2020, Debtors had received approximately 596 Release Opt-Out Forms.

## II.    PROCEDURAL HISTORY

On March 26, 2021, the Trustee filed a notice of appeal of the Confirmation Order to this Court.[2] The Court consolidated the Trustee's appeal with other pending appeals into this case

---

[2]      The Trustee's notice of appeal initiated Case No. 3:21cv205, which the Court then consolidated into this action.

and set a briefing schedule. (ECF Nos. 11, 15.) In his appeal, the Trustee argues that the

Bankruptcy Court erred by approving the Third-Party Releases and Exculpation Provisions

contained in the Plan and approved by the Confirmation Order. After filing the appeal, the

Trustee filed a motion to stay in the Bankruptcy Court, asking the Bankruptcy Court to stay the

application of the Plan's exculpation and release provisions pending the adjudication of this

appeal. On May 13, 2021, the Bankruptcy Court conducted a hearing on the stay motion below.

Then, on May 28, 2021, the Bankruptcy Court denied the Trustee's stay motion and entered a

Memorandum Opinion ("Bankr. Stay. Op." (USTAPP184-211)) setting forth its finding of facts

and conclusions of law.

On June 2, 2021, the Trustee filed the current Stay Motion in this Court. In the Stay

Motion, the Trustee argues that he has a likelihood of success on the merits of the appeal for

several reasons. First, the Trustee argues that the Bankruptcy Court erred by not conducting the

seven-factor test for approving third-party releases set forth by the Fourth Circuit in *Behrmann v.*

*Nat'l Heritage Found.*, 663 F.3d 704 (4th Cir. 2011). (Stay Mot. at 15.) The Trustee further

argues that even if the *Behrmann* analysis only applies to nonconsensual releases, the

Bankruptcy Court erred by finding that the parties consented to the releases. (Stay Mot. at 16-

18.) Additionally, the Trustee argues that a stay will avoid irreparable harm, because it will

prevent parties from having their causes of action lapse during the pendency of the appeal. (Stay

Mot. at 18.) Continuing, the Trustee argues that the releases at issue and similar releases entered

in other bankruptcy proceedings harm the integrity of the bankruptcy court, warranting a stay to

protect the public interest. (Stay Mot. at 18-19.) Finally, the Trustee argues that no other parties

will suffer harm as a result of the stay. (Stay Mot. at 19-20.)

On June 11, 2021, Debtors opposed the Stay Motion. ("Appellee Mem." (ECF No. 27).) On June 15, 2021, the Trustee filed his reply. (ECF No. 28.) Also on June 15, 2021, the Securities Litigation Lead Plaintiffs filed their Limited Joinder of Lead Plaintiffs to the Stay Motion (ECF No. 29), indicating their support for the Stay Motion. This matter is now ripe for review. The Court dispenses with oral argument, because the materials before it adequately present the facts and legal contentions, and argument would not aid in the decisional process.

### III.    STANDARD OF REVIEW

"A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly, is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder*, 556 U.S. 418, 427 (2009). In analyzing a motion for a stay pending appeal, the Court applies the same standard as a request for a preliminary injunction. *BDC Cap., Inc. v. Thoburn Ltd. P'ship*, 508 B.R. 633, 636-37 (E.D. Va. 2014). As with a preliminary injunction, the movant bears the burden of making a "clear showing" that the Court should grant such an "extraordinary remedy." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Nken*, 556 U.S. at 434.

To meet the burden required for a stay, a movant must establish four factors: (1) he has made a strong showing that he is likely to succeed on the merits; (2) the movant will suffer irreparable injury absent a stay; (3) the balance of equities tips in the movant's favor; and (4) the public interest weighs in favor of a stay. *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970); *see Winter*, 555 U.S. at 22 (2008) (delineating factors for considering a request for a preliminary injunction); *Farkas v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 861 F. Supp. 2d 716, 723 (E.D. Va. 2012) ("In considering whether a stay is appropriate pending the outcome of an appeal, the Court must use the factors announced in *Winter*[.]"). "The first two factors are the most

7

important." *Realvirt, LLC v. Lee*, 220 F. Supp. 3d 704, 706 (E.D. Va. 2016). Still, the movant must satisfy all four requirements. *The Real Truth About Obama, Inc. v. F.E.C.*, 607 F.3d 355, 355 (4th Cir. 2010) (reissuing *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009)). Therefore, the Court will examine these four factors in turn to determine whether the Trustee has met his burden to justify a stay.

## IV.    ANALYSIS

Federal Rule of Bankruptcy Procedure 8005 requires that "a motion for a stay of the judgment, order, or decree of a bankruptcy judge . . . pending appeal must be presented to the bankruptcy judge in the first instance." F.R. Bankr. P. 8005. The Trustee previously filed a motion to stay the instant appeal in the Bankruptcy Court and, therefore, the Court may consider his instant request to stay the Confirmation Order pending the outcome of this appeal.

### A.    The Trustee Has Not Made a Strong Showing That He Will Succeed on The Merits.

A party seeking a stay must make a strong showing that he likely will prevail on the merits of the appeal. *Long*, 432 F.2d at 979. The parties dispute the burden that the Trustee must meet in satisfying this factor. Consequently, before addressing whether the Trustee can meet his burden with respect to this factor, the Court must ascertain that burden.

#### i.    *The Standard for the Likelihood of Success Factor.*

The Trustee urges the Court to find this factor satisfied when a movant presents an issue "that could be rationally resolved in favor of the party seeking the stay" or when the appeal raises a "substantial legal question." (Trustee's Mem. at 14 (citing *Realvirt*, 220 F. Supp. 3d at 706; *Washington Speakers Bureau v. Leading Auths., Inc.*, 49 F. Supp. 2d 496, 499 (E.D. Va. 2016)). Conversely, Appellee states that the Trustee must show that it "is likely to prevail on appeal." (Appellee's Mem. at 10.) The Court agrees with Appellee.

8

The Court notes that authority exists for the Trustee's position. The Court has previously held that "the question with respect to the first factor is whether the issues presented on appeal could be rationally resolved in favor of the party seeking the stay." *Realvirt*, 220 F. Supp. 3d at 706. There, however, the Court considered a request for a stay of one of its *own* orders pending review by an appellate court. *Id.* at 705. In holding the movant to a lower standard on the likelihood of success factor, the Court expressed its concern that a higher bar would prove effectively insurmountable: "it would be the relatively rare case in which a court would conclude that a judgment that it had reached carefully after thorough consideration would likely be erroneous." *Id.* at 706. The Trustee's request does not implicate this concern. Here, the Trustee's appeal does not ask the Court to find its own judgment erroneous. Rather, he asks this Court to find the Bankruptcy Court's judgment erroneous. Accordingly, the Court need not lower the standard for the likelihood of success factor as the Trustee urges.

Indeed, the Supreme Court has cautioned against defanging the likelihood of success factor, stating that "[i]t is not enough that the chance of success on the merits be 'better than negligible,'" and, indeed, "more than a mere possibility of relief is required." *Nken*, 556 U.S. at 434 (internal citations omitted). To that end, the Court has held in this same procedural posture — a movant asking a district court to stay a bankruptcy court's order — that the movant "has the burden to show that it is *likely to succeed* as compared to being just as likely to succeed as the other parties." *BDC Capital*, 508 B.R. at 638 (emphasis in original). Even asking whether the movant has a likelihood of success that merely equals (rather than exceeds) that of the other parties requires more than the "rationally resolved" standard urged by the Trustee. Applying a "rationally resolved" standard risks rendering a stay the default result rather than the exception, which would contravene the Supreme Court's characterization of such relief as an "intrusion into

the ordinary processes of administration and judicial review." *Nken*, 556 U.S. at 427.

Accordingly, the Court will determine whether the Trustee has made a clear showing that he is more likely to succeed on the merits than the other parties.

### ii.    *The Trustee's Likelihood of Success on the Merits.*

The Trustee argues that he will succeed on the merits of the appeal, because the Court will find that the Bankruptcy Court erred by approving the non-debtor releases. (Stay Mot. at 15.) Specifically, the Trustee claims that the Bankruptcy Court failed to engage in the seven-factor test for approving non-debtor releases set forth in *Behrmann.* (Stay Mot. at 15.) The Trustee contends that consent to the releases does not obviate the need for the Bankruptcy Court to engage in the *Behrmann* analysis and, in any event, the parties did not consent "given the breadth of parties deemed to have released, and be released of, those rights." (Stay Mot. at 16.)

Appellee responds that the Bankruptcy Court did not need to engage in the *Behrmann* analysis, because that test applies only to nonconsensual third-party releases. (Appellee Mem. at 11.) And, according to Appellee, the Bankruptcy Court correctly determined that the non-debtors consented to the releases, and such consensual third-party releases regularly occur in bankruptcy cases. (Appellee Mem. at 12.) Indeed, the Bankruptcy Court determined that it need not conduct the *Behrmann* analysis for these consensual non-party releases, because *Behrmann* applies only to nonconsensual releases.

Thus, the merits of the Trustee's appeal boils down to two questions: (1) whether the Bankruptcy Court erred by finding the releases consensual, and (2) whether the Bankruptcy Court erred by failing to conduct the seven-factor *Behrmann* analysis. The second question encompasses yet another question: even if the Bankruptcy Court properly deemed the releases consensual, did it nevertheless err by failing to conduct the *Behrmann* analysis? If the

10

Bankruptcy Court erred by finding the releases consensual, then it necessarily erred by failing to conduct a proper *Behrmann* analysis, as the parties do not dispute that, at a minimum, *Behrmann* applies to nonconsensual third-party releases.[3] The Court will first address whether the Trustee has made a strong showing that he likely will succeed on the question of whether the Bankruptcy Court erred by determining that *Behrmann* applies only to nonconsensual releases. Then, the Court will turn to whether the Trustee has made a strong showing that he likely will succeed in demonstrating that the Bankruptcy Court erred by finding the releases nonconsensual.

> a. **The Trustee Has Not Shown a Likelihood of Success on the Merits on the Question of Whether *Behrmann* Applies to Consensual Releases.**

The Trustee first argues that the Bankruptcy Court erred by failing to conduct the *Behrmann* analysis, regardless of whether the third parties consented to the release. (Stay Mot. at 15.) In short, the Trustee argues that *Behrmann* applies to any third-party release and consent does not obviate the need to conduct the seven-factor analysis.

In *Behrmann*, the Fourth Circuit confirmed that it had previously "rejected the notion that 11 U.S.C. § 524(e ) forecloses bankruptcy courts from releasing and enjoining causes of action against nondebtors." 663 F.3d at 710 (citing *Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694 (4th Cir. 1989)). It noted that it had "declined to retreat from this holding" in a subsequent opinion and then, again, rejected as "without merit" the "blanket assertion that equitable relief in the form of nondebtor releases is never permissible under the Bankruptcy

---

[3] Appellee claims that the Bankruptcy Court conducted the necessary *Behrmann* analysis when it concluded in a footnote that "the *Behrmann* factors would be satisfied for the reasons stated in the debtor's memorandum of law supporting its plan." (Appellee Mem. at 12 (citing BK Stay Op. at 38 n.28).) However, the Fourth Circuit requires specific factual findings supporting each *Behrmann* factor. *Behrmann*, 663 F.3d at 712-13. The Bankruptcy Court's footnote would fall far short of the required factual findings. Therefore, if it had needed to conduct a *Behrmann* analysis, its footnote would not suffice.

Code." *Id.* In rejecting this blanket assertion, the Fourth Circuit adopted the Sixth Circuit's test

for approving nondebtor releases outlined in *Class Five Nev. Claimants v. Dow Corning Corp.*

*(In re Dow Corning Corp.)*, 280 F.3d 648 (6th Cir. 2002). The Fourth Circuit quoted in full from

*In re Dow Corning Corp.*:

> We hold that when the following seven factors are present, the bankruptcy court
> may enjoin a *non-consenting* creditor's claims against a non-debtor: (1) There is
> an identity of interests between the debtor and the third party, usually an
> indemnity relationship, such that a suit against the non-debtor is, in essence, a suit
> against the debtor or will deplete the assets of the estate; (2) The non-debtor has
> contributed substantial assets to the reorganization; (3) The injunction is essential
> to reorganization, namely, the reorganization hinges on the debtor being free from
> indirect suits against parties who would have indemnity or contribution claims
> against the debtor; (4) The impacted class, or classes, has overwhelmingly voted
> to accept the plan; (5) The plan provides a mechanism to pay for all, or
> substantially all, of the class or classes affected by the injunction; (6) The plan
> provides an opportunity for those claimants who choose not to settle to recover in
> full and; (7) The bankruptcy court made a record of specific factual findings that
> support its conclusions.

*Behrmann*, 663 F.3d at 711-12 (quoting *In re Dow Corning Corp.*, 280 F.3d at 658) (emphasis

added). Thus, these factors clearly apply to nonconsensual third-party releases. But, the

question of whether these factors apply to consensual releases lacks the same clarity.

Aside from adopting the Sixth Circuit's approach for nonconsensual releases, the Fourth

Circuit has not spoken directly on whether the *Behrmann* analysis applies to consensual releases.

The Trustee argues that the Fourth Circuit has never held that consent obviates the need to

conduct a *Behrmann* analysis. (Stay Mot. at 15.) Yet, the Trustee points to no cases wherein the

Fourth Circuit held that consent cannot obviate the need for a *Behrmann* analysis.

Several courts have found that a party can consent to a third-party release and eliminate

the need for a *Behrmann* analysis. For example, the Seventh Circuit has noted approvingly that

"courts have found releases that are consensual and non-coercive to be in accord with the

strictures of the Bankruptcy Code." *Matter of Specialty Equip. Companies, Inc.*, 3 F.3d 1043,

1047 (7th Cir. 1993). Likewise, the United States Bankruptcy Court for the District of Maryland distinguished consensual releases from those requiring a *Behrmann* analysis, because "[i]t is well recognized that, where the application of the *Dow Corning* or other applicable factors leads to the conclusion that the third party releases should not be approved, the court can nevertheless approve the releases with the consent of the releasing parties." *In re Neogenix Oncology, Inc.*, 508 B.R. 345, 361 (Bankr. D. Md. 2014). The Second Circuit has also indicated that "[n]ondebtor releases may also be tolerated if the affected creditors consent." *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005). Similarly, the Northern District of Texas has noted that "[m]ost courts allow consensual nondebtor releases to be included in a plan." *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007).

The Trustee argues that consent cannot obviate the need to conduct a *Behrmann*, because the *Behrmann* analysis contemplates consent. (Stay Mot. at 16.) The Trustee points to the factor of whether "the impacted class, or classes, has overwhelmingly voted to accept the plan" as implicating consent and demonstrating that consent alone does not absolve the Bankruptcy Court of the need to conduct a *Behrmann* analysis. But, this factor does not hinge on consent. For example, a small continency of an impacted class could opt-out but the class can still overwhelmingly approve the plan, demonstrating that the two are not codependent. Without more support that this element encompasses consent, the Court rejects this argument at this stage.

Moreover, as the Trustee notes, the Bankruptcy Court has confirmed plans that include similar releases on at least eleven other occasions. (Stay Mot. at 2, n.3.) And, the Trustee does not identify any instances of this Court or the Fourth Circuit overturning any of these confirmations. Although this judicial pattern does not by itself prove the propriety of approving

13

consensual releases without undertaking a *Behrmann* analysis, it becomes more difficult for the Trustee to demonstrate that he will likely succeed on his quest to overturn the confirmation.

The Trustee has the burden to demonstrate his likelihood of success. A statement that "the Fourth Circuit would not hold that consent alone is sufficient" to approve such releases will not help the Trustee meet his burden absent any support in the caselaw for that statement. Combined with the dearth of Fourth Circuit caselaw invalidating such releases and the existence of persuasive caselaw allowing consensual third-party releases without a *Behrmann* analysis, the Trustee has failed to make a strong showing that he likely will succeed on the merits. *See BDC Capital, Inc.*, 508 B.R. at 637-38 (finding that the party requesting a stay of a confirmation order pending appeal had "not offered any case law or any other authority to support its contention that the Bankruptcy Court erred or abused its discretion" and, therefore, had not shown a likelihood of success on the merits).

        **b.    The Trustee Has Not Made a Strong Showing that He Likely Will Succeed on the Merits of His Claim That the Bankruptcy Court Erred by Finding the Releases Consensual.**

The Trustee also claims that, even if a court need not conduct a *Behrmann* analysis for consensual third-party releases, the Bankruptcy Court erred by finding the Third-Party Releases consensual. (Stay Mot. at 16.) The Trustee has a two-fold burden on this question in that he seeks to establish that the Bankruptcy Court erred by determining that: (1) notice and the opportunity to opt-out constitutes consent, and (2) the parties in this case consented. The Court will first address the Trustee's contention regarding implied consent not constituting consent before turning to his argument that the Bankruptcy Court erred by finding that the parties impliedly consented to the releases at issue.

14

## 1.    The Sufficiency of Implied Consent.

The Trustee argues that the Bankruptcy Court erred by finding that the parties consented to a release by failing to return an opt-out form. (Stay Mot. at 17.) Again, the Trustee fails to identify any binding precedent from the Fourth Circuit that supports his position. The Fourth Circuit does not appear to have spoken on the issue. *See In re Neogenix Oncology, Inc.*, 2015 WL 5786345, at *5 (Bankr. D.Md. 2015) ("The Fourth Circuit has not expressly faced the issue presented here, whether a 'consensual' third party release must be express or whether implied consent can be sufficient."). Other courts have split on whether implied consent can suffice for a release. The Trustee correctly notes that persuasive (though not binding) authority supports his argument. (Stay Mot. at 17-18.) Yet, other persuasive (though not binding) authority contradicts his position.

Some courts, like the District of New Jersey, look to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent. For example, in *In re Congoleum Corp.*, the court determined that a creditor must have "unambiguously manifested assent to the release of the non-debtor from liability on its debt." 362 B.R. 167, 194 (Bankr. D.N.J. 2007). Likewise, in *In re Arrowmill Development Corp.*, the court held that it was "not enough for a creditor to abstain from voting for a plan, or even to simply vote 'yes' to a plan." 211 B.R. 497, 507 (Bankr. D.N.J. 1997).

Other courts have found that a creditor must individually consent by voting in favor of the plan. In *In re Coram Healthcare Corp.*, the court stated that "to the extent creditors or shareholders voted in favor of the Trustee's Plan, which provides for the release of claims they may have against the Noteholders, they are bound by that." 315 B.R. 321, 336 (Bankr. D.Del. 2004). Likewise, in *In re Washington Mutual Inc.,* the court found the opt-out mechanism in the

15

plan insufficient to support the third-party releases with respect to the parties who did not return a ballot. 442 B.R. 314, 355 (Bankr. D.Del. 2011).

However, other courts have determined that failure to return a ballot constitutes consent to a third-party release when the creditor received notice of implications of releasing parties. For example, in *In re Indianapolis Downs, LLC*, the court found that providing an opportunity to opt-out along with detailed instructions for how to opt-out warranted approval of the releases. 486 B.R. 286, 305-06 (Bankr. D.Del. 2013). Likewise, in *In re Sponsion*, the court found that parties who had accepted the plan and not opted-out would be bound by the release. 426 B.R. 114, 144 (Bankr. D.Del. 2010).

Still, other courts have allowed implied consent releases. In *In re DBSD North America, Inc.*, the court allowed third-party releases when the releasing parties received adequate notice of the release and they had an opportunity to opt-out of the release. 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009); *see also In re Calpine Corp.*, 2007 WL 4565223 (Bankr. S.D.N.Y. 2007) (parties "choosing not to opt out of the releases were given due and adequate notice that they would be granting the releases by acting in such a manner"). Similarly, in *In re U.S. Fidelis, Inc.*, the court found that impaired creditors who did not opt out had impliedly consented to the releases. 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003).

As the above demonstrates, courts have varied widely in their willingness to accept implied consent when approving third-party releases. However, as with the general allowance of consensual third-party releases, the Fourth Circuit has not spoken on the issue. Although the Trustee may ultimately prevail on this issue, a complete paucity of binding authority and a split of persuasive authority leaves him short of meeting his burden of making a strong showing of a likelihood of success on the merits.

## 2. The Parties' Consent to the Third-Party Releases.

In addition to the Trustee's claim that the Bankruptcy Court erred by allowing implied consent to bind the parties, he also claims that the Bankruptcy Court erred by making the factual determination that the parties here had impliedly consented to the releases. (Stay Mot. at 16-17.) In making this claim, the Trustee lodges an attack on the factual findings of the Bankruptcy Court. Importantly, in deciding the Trustee's appeal, these "[f]indings of fact are not to be set aside unless clearly erroneous." *Fuentes v. Stackhouse*, 182 B.R. 438, 440 (E.D.Va. 1995) (citing *In re Johnson*, 960 F.2d 396, 399 (4th Cir. 1992)).

The Bankruptcy Court made extensive factual findings with respect to the Third-Party Releases. First, the Bankruptcy Court determined that "[b]y the plain language of the Plan, the Third-Party Releases only apply to parties who did not opt out or object to the Plan, regardless of whether they were entitled to vote on the Plan." (Bankr. Conf. Op. at 31.) Likewise, contrary to the Trustee's contention, the Bankruptcy Court determined that the "Debtors provided sufficient notice to all parties of the opportunity to opt-out." (Bankr. Conf. Op. at 31.) In all, "the Debtors provided notice of the Third-Party Releases and the opt-out procedure to 300,000 notice parties, including all equity holders." (Bankr. Stay Op. at 10.) Importantly, no parties objected to the sufficiency of notice afforded to any class of claims. (Bankr. Conf. Op. at 31-32.)

Instead, the objections to the releases focused on the notice afforded to Debtors' equity security holders. (Bankr. Conf. Op. at 32.) The equity security holders included both registered and unregistered shareholders (also known as beneficial holders).[4] The Bankruptcy Court carefully examined the notice afforded to both the registered shareholders and the beneficial

---

[4]     "The evidence reflected that not all shares of Ascena stock were held by registered holders. It is not uncommon for shareholders to hold stock as beneficial holders through a Nominee." (Bankr. Conf. Op. at 32.)

holders. With respect to the registered shareholders, the Bankruptcy Court reviewed the process to provide them notice and found "that this process was sufficient to provide actual notice of the opt-out procedures to these registered shareholders." (Bankr. Conf. Op. at 32.) Likewise, the Bankruptcy Court reviewed the process for notifying the beneficial holders and determined "that the Debtors employed all reasonable efforts to provide notice to Ascena equity security holders and that service was sufficient under Bankruptcy Rules 2002(m), 7004, and 7005." (Bankr. Conf. Op. at 33, n.24.) Moreover, this "procedure complied exactly with those suggested by the Securities Litigation Lead Plaintiffs." (Bankr. Conf. Op. at 33.) With respect to the substance of the notice provided, the Bankruptcy Court found "that this language clearly, unambiguously, and conspicuously provided current and former Ascena equity security holders adequate information to allow them to make an informed decision concerning the Third-Party Releases." (Bankr. Conf. Op. 34-35.) Ultimately, the Bankruptcy Court "concluded that the Third-Party Releases were entirely voluntary." (Bankr. Stay Op. at 12.)

The Court's review of the record at this stage does not reveal that the Trustee has made a strong showing that he will succeed in demonstrating that the Bankruptcy Court clearly erred with respect to these factual findings. The Bankruptcy Court conducted an exhaustive analysis of the Third-Party Releases and the notice sent to the parties before ultimately concluding that all parties in interest had received notice. The Trustee has pointed to no specific evidence in the record that would demonstrate clear error on the part of the Bankruptcy Court. Accordingly, the Trustee has not met his burden of making a strong showing that he likely will succeed on the merits of his claim that the Bankruptcy Court erred by concluding that the parties had impliedly consented to the releases.

In sum, the Trustee has not met his burden of making a strong showing of a likelihood of success on any of the arguments that he raises with respect to the Third-Party Releases. The Court notes that this determination does not foreclose the possibility that the Trustee ultimately will succeed on the merits of these issues. After the parties have fully briefed the issues, the Court may yet agree with the Trustee that the Bankruptcy Court erred by finding the releases consensual. Or, it may agree with the Trustee that the Bankruptcy Court erred by failing to conduct a *Behrmann* analysis even in the face of consensual releases. However, the Trustee has not identified any controlling caselaw to strongly demonstrate that he will succeed on the merits. Given the lack of controlling caselaw and the variety of persuasive caselaw, at best the Trustee has shown that the appeal could rationally be resolved in his favor. If that showing could meet his burden, then this factor would still only marginally favor a stay. However, the Trustee has simply failed to offer enough support for his position at this stage to meet his burden that he likely will succeed on the merits of his appeal.

### c. The Exculpation Provisions.

In addition to the Third-Party Releases, the Trustee seeks to stay the Exculpation Provisions. However, most of his arguments address the Exculpation Provision in conjunction with the Third-Party Releases. Accordingly, the above analysis applies with equal force to both provisions. However, the Trustee makes one argument that solely targets the Exculpation Provision — *i.e.*, that the parties did not have an opportunity to opt-out of the Exculpation Provision. This argument lacks merit, as exculpation provisions differ from releases.

Exculpation provisions do not release parties, but instead raise the liability standard of fiduciaries for their conduct during their case. *In re Health Diagnostic Laboratory Inc.*, 551 B.R. 218, 232 (Bankr. E.D. Va. 2016). Exculpation provisions "generally are permissible, so long as

19

they are properly limited and not overly broad." *In re Nat'l Heritage Found., Inc.*, 478 B.R. 216, 233 (Bankr. E.D. Va. 2012). To that end, courts will approve an exculpation provision "so long as it is limited to those parties who have served the debtor, is narrowly tailored and complies with the applicable standards." *In re Alpha Nat. Res., Inc.*, 556 B.R. 249, 260 (Bankr. E.D. Va. 2016).

Here, the Trustee has not made a strong showing that he likely will succeed in demonstrating that the Exculpation Provisions lack the proper limitations. In fact, he has made no effort to support such a contention. Accordingly, he has not met his burden on the first factor with respect to the Exculpation Provisions.

Therefore, the Trustee has not met his burden on the first factor with respect to any of the issues that he raises in the appeal. Even if the Trustee could meet his burden of showing a likelihood of success on the merits, he would still need to meet his burden with respect to the other three factors to warrant a stay. As described below, he fails on all three.

## B. The Trustee Has Not Identified Any Irreparable Harm That Will Result Absent a Stay.

A party seeking a stay "must show that it will suffer irreparable harm absent a stay." *Brea Union Plaza I, LLC v. Toys "R" Us, Inc.*, 2018 WL 3543056, at *5 (E.D. Va. July 23, 2018). Speculation will not suffice, as "simply showing some 'possibility of irreparable injury' fails to satisfy the second factor." *Nken*, 556 U.S. at 434-35.

The Trustee has offered only speculation as to the harm that will result from a denial of the stay. With respect to the harm that any party will suffer from these particular releases during the appeal, the Trustee offers one sentence — and only one sentence: "Should this stay be denied, parties who unknowingly had their causes of action extinguished will be irreparably harmed if the statute of limitations applicable to their cause of action expires during the

20

pendency of the appeal." (Stay Mot. at 18.) He does not identify these particular parties or what particular causes of action they may have. Nor does he indicate when they may have accrued, such that the statute of limitations could run during the pendency of the appeal. Indeed, the Trustee conceded below "that he is unaware whether any such unknown third parties exist and whether any such claims exist, and further admitted that it is entirely possible that no such claims exist." (Bankr. Stay Op. at 20.) Such speculation does not help the Trustee meet his burden.

In fact, a previous investigation revealed no such claims. A special committee thoroughly investigated "potential claims that might be held by and against the Debtors and the third parties covered by the releases proposed in the Plan." (Bankr. Stay Op. at 10.) This investigation revealed no "colorable causes of action against the Debtors or their affiliates' managers, directors, directors, or officers subject to the Third-Party Releases." (Bankr. Stay Op. at 10.) Of course, this conclusion does not foreclose the possibility that some unknown parties possess some unknown colorable causes of action, but it underscores that the Trustee can only speculate as to any harm that may arise absent a stay.

The Trustee raises additional arguments regarding harm, including that these type of third-party releases (in this case and others) undermine the integrity of the bankruptcy proceedings and, accordingly, public confidence in bankruptcy proceedings. Although the Court understands the seriousness of these allegations, they do not implicate the time period during which the Court decides the appeal. Should the Trustee prevail on appeal, the integrity of the bankruptcy process will not have suffered irreparable harm.

Accordingly, the Trustee has failed to meet the second factor of the analysis, because he has not identified any specific harm — irreparable or otherwise — that will result if the Court does not grant the motion to stay. As such, the Trustee has failed to meet his burden on the two

most important factors. Although the Court could end its analysis here, the Court will briefly address how the Trustee has failed to meet his burden on the other two factors as well.

## C. The Balance of Equities Does Not Favor a Stay.

If the movant satisfies the first two factors, the third factor calls for the Court to balance the equities. "In determining whether the balance of equities tips in favor of the movant, the Court must balance the likelihood of irreparable harm to [the movant] against the likelihood of substantial harm to the non-movants." *BDC Capital, Inc.*, 508 B.R. at 640. This factor does not favor a stay.

As described above, the Trustee has not identified any irreparable harm against which to balance the likelihood of substantial harm to the non-moving parties. Conversely, a stay could substantially harm the non-moving parties. The Trustee seeks to put on hold the implementation of the Plan that has already taken effect. The Trustee claims that he mitigates this harm by seeking only a limited stay of the release provisions. (Stay Mot. at 19.) However, as the Bankruptcy Court noted, the release provisions form integral pieces of the Plan and cannot be extricated. (Bankr. Stay Op. at 23.) The language of the Plan supports this, as it describes the releases as non-severable. (Bankr. Stay Op. at 23.) Moreover, harm to the Debtor's estate could result from costly litigation that the releases would otherwise prevent. Therefore, the Trustee has not met his burden of demonstrating that the balance of equities tip in favor of a stay.

## D. Denying a Stay Better Serves the Public Interest.

Similarly, a stay would not serve the public interest. When assessing the public interest factor, "courts consider and balance the goal of efficient case administration and the right to a meaningful review on appeal." *Brea Union Plaza I, LLC*, 2018 WL 3543056, at *6.

Efficient case management favors denying a stay, even though the Trustee argues that he seeks only a limited stay of the releases. However, as the Bankruptcy Court noted, the releases form an integral, bargained-for part of the agreement, such that severing them could disrupt the implementation of the entire Plan. Although the appeal may ultimately result in this disruption, such a drastic result should occur only after full consideration of the Trustee's appeal, rather than before briefing.

The only public interest that the Trustee identifies arises from his argument that these releases jeopardize public confidence in bankruptcy proceedings. However, as discussed above, this argument does not implicate the time period between now and when the Court decides the appeal. Accordingly, the Court finds that the Trustee has not met his burden of demonstrating that a stay would best serve the public interest.

## V. CONCLUSION

The Trustee has failed to carry his burden on each of the four stay factors.[5] He does not show that he likely will prevail on the appeal or that irreparable harm would result from denying the Stay Motion. The balance of equities do not tip in favor of a stay and the public interest likewise counsels against staying the appeal. However, the Court's decision to deny the Stay Motion does not narrow the possibility that the Trustee may ultimately prevail in this appeal. Rather, it reflects the standards governing the Stay Motion and the Trustee's failure to carry his burden in requesting this extraordinary remedy. Accordingly, the Stay Motion will be denied.

An appropriate order shall issue.

The Clerk is directed to file this Memorandum Opinion electronically, notify all counsel of record and forward a copy to the chambers of United States Bankruptcy Judge Kevin R. Huennekens.

It is so ORDERED.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date: June 28, 2021

---

[5]     Because the Court finds that the Trustee has not met his burden in requesting a stay, it need not address Debtors' equitable mootness argument.