Nos. 3:21-cv-167-DJN (Lead Case), 3:21-cv-166 & 3:21-CV-00205 (Consolidated)

---

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA

---

In re RETAIL GROUP INC., *et al.*, Debtors.

---

JOEL PATTERSON, *et al.* & JOHN P. FITZGERALD, III,
ACTING UNITED STATES TRUSTEE FOR REGION 4, Appellants,
v.
MAHWAH BERGEN RETAIL GROUP, INC., Appellee.

---

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

---

## APPENDIX TO
## BRIEF OF APPELLEE JOHN P. FITZGERALD, III,
## ACTING UNITED STATES TRUSTEE FOR REGION 4
### (Volume 1 – Pages 0001-1852)

---

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
SUMI SAKATA
Trial Attorney

Department of Justice
Executive Office for
 United States Trustees
441 G Street, NW,
Suite 6150
Washington, DC 20530
Tel: (202) 307-1399
E-mail: sumi.sakata@usdoj.gov

JOHN P. FITZGERALD, III
Acting United States Trustee for Region 4
KATHRYN R. MONTGOMERY
Assistant United States Trustee
HUGH M. BERNSTEIN
Trial Attorney

Department of Justice
Office of the United States Trustee
1725 Duke Street, Suite 650
Alexandria, Virginia 22314
Tel: (703) 557-7176
Fax: (703) 557-7279
kathryn.montgomery@usdoj.gov
hugh.m.bernstein@usdoj.gov

TABLE OF CONTENTS

Volume 1

1.    Petition ....................................................................................................0001

2.    Declaration of Carrie Teffner in Support of First Day Motions ...............................0019

3.    Order (i) Directing Joint Administration of Chapter 11 Cases
      and Granting Related Relief.....................................................................0293

4.    Joint Chapter 11 Plan of Reorganization of Ascena Retail Group,
      Inc. and its Debtor Affiliates...................................................................0312

5.    Disclosure Statement for the Joint Chapter 11 Plan of Reorganization
      of Ascena Retail Group, Inc. and its Debtor Affiliates.............................................0359

6.    United States Trustee's Objection to Disclosure Statement for the Joint
      Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. and
      its Debtor Affiliates................................................................................0693

7.    Securities Exchange Commission's Objection to Disclosure Statement
      for the Joint Chapter 11 Plan of Reorganization of Ascena Retail Group,
      Inc. and its Debtor Affiliates...................................................................0719

8.    Securities Plaintiffs' Objection to Disclosure Statement for the Joint
      Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. and
      its Debtor Affiliates................................................................................0729

9.    Transcripts of Disclosure Statement Hearing ............................................0913

10.   Order Approving Disclosure Statement...................................................0980


Volume 2

11.   Disclosure Statement for the Amended Joint Chapter 11 Plan of
      Reorganization of Ascena Retail Group, Inc. and its Debtor Affiliates ...................1583

12.   United States Trustee's Objection to Confirmation of Amended
      Joint Chapter 11 Plan ............................................................................2201

13.   Securities Exchange Commission's Objection to Confirmation of
      Amended Joint Chapter 11 Plan ...........................................................2215

14.   Securities Plaintiffs' Objection to Confirmation of Amended
      Joint Chapter 11 Plan ............................................................................2224

<u>Volume 3</u>

15.    Report of Sale (Catherines Assets) ............................................................2259

16.    Report of Sale (Justice Assets) ...............................................................2262

17.    Report of Sale (Purchased Assets)...........................................................2265

18.    Securities Plaintiffs' Supplemental Objection to Confirmation of
Amended Joint Chapter 11 Plan ..............................................................2268

19.    United States Trustee's Objection to Confirmation of
Amended Joint Chapter 11 Plan ..............................................................2314

20.    Declaration of Carrie Teffner in Support of Confirmation of
Amended Joint Chapter 11 Plan ..............................................................2318

21.    Debtor's Memorandum of Law in Support of Confirmation of
Amended Joint Chapter 11 Plan ..............................................................2336

22.    Amended Joint Chapter 11 Plan ..............................................................2410

23.    Order Confirming Amended Joint Chapter 11 Plan ..................................2530

24.    Transcript of Confirmation Hearing ........................................................2673

25.    Memorandum Opinion Confirming Amended Joint Chapter 11 Plan ......................2837

26.    Memorandum Opinion Denying Stay Pending Appeal ............................................2877

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case:</strong></td></tr>
<tr><td colspan="2">United States Bankruptcy Court for the:<br><br>                    Eastern District of Virginia<br>                         (State)</td></tr>
<tr><td>Case number <em>(if known)</em>: _____</td><td>Chapter    11</td></tr>
</table>

☐ Check if this is an amended filing

<u>Official Form 201</u>

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

04/20

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | | |
|---|---|---|
| 1. | **Debtor's Name** | **Ascena Retail Group, Inc.** |
| 2. | **All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names, and *doing business as* names | **N/A** |
| 3. | **Debtor's federal Employer Identification Number (EIN)** | <u>**30-0641353**</u> |

4. **Debtor's address**

| **Principal place of business** | **Mailing address, if different from principal place of business** |
|---|---|
| **933 MacArthur Boulevard** | |
| Number      Street | Number      Street |
| | P.O. Box |
| **Mahwah**      **NJ**      **07430** | |
| City      State      Zip Code | City      State      Zip Code |
| | **Location of principal assets, if different from principal place of business** |
| **Bergen County** | |
| County | Number      Street |
| | City      State      Zip Code |

| | | |
|---|---|---|
| 5. | **Debtor's website** (URL) | **https://www.ascenaretail.com/** |
| 6. | **Type of debtor** | ☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))<br><br>☐ Partnership (excluding LLP)<br><br>☐ Other. Specify: _____ |

UST-0001

| Debtor | **Ascena Retail Group, Inc.** | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

**7. Describe debtor's business**

A. *Check One:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☒ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

**4481 (Clothing Stores)**

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check One:*

☐ Chapter 7

☐ Chapter 9

☒ Chapter 11. *Check all that apply:*

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,725,625. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1). Its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000 **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☒ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form**.**

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☒ No

☐ Yes.

| | District | | When | | Case number | |
|---|---|---|---|---|---|---|
| | District | _____ | When | _____ MM/DD/YYYY | Case number | _____ |
| | | _____ | | _____ MM/DD/YYYY | | _____ |

UST-0002

| Debtor | **Ascena Retail Group, Inc.** | | Case number *(if known)* | |
|---|---|---|---|---|
| | Name | | | |

| | | | | | |
|---|---|---|---|---|---|
| **10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?** | ☐ No<br>☒ Yes. | Debtor | **See Rider 1** | Relationship | **Affiliate** |
| List all cases. If more than 1, attach a separate list. | | District | **Eastern District of Virginia** | When | **07/23/2020** |
| | | | | | MM / DD / YYYY |
| | | Case number, if known | | | |

**11. Why is the case filed in *this* district?**

*Check all that apply:*

☐ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☒ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No
☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?**

| | | |
|---|---|---|
| | Number | Street |
| | | |
| City | State | Zip Code |

**Is the property insured?**

☐ No

☐ Yes. Insurance agency _____

Contact name _____

Phone _____

| | **Statistical and administrative information** |
|---|---|

**13. Debtor's estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.
☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors[1]**

| | | | | | |
|---|---|---|---|---|---|
| ☐ | 1-49 | ☐ | 1,000-5,000 | ☐ | 25,001-50,000 |
| ☐ | 50-99 | ☐ | 5,001-10,000 | ☐ | 50,001-100,000 |
| ☐ | 100-199 | ☐ | 10,001-25,000 | ☒ | More than 100,000 |
| ☐ | 200-999 | | | | |

---

[1] The Debtors' estimated number of creditors noted here are provided on a consolidated basis.

UST-0003

| Debtor | **Ascena Retail Group, Inc.** | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

| **15. Estimated assets** | ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000-$1 billion |
|---|---|---|---|
| | ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| | ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☒ $10,000,000,001-$50 billion |
| | ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

| **16. Estimated liabilities** | ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000-$1 billion |
|---|---|---|---|
| | ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| | ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☒ $10,000,000,001-$50 billion |
| | ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

## Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **07/23/2020**
           MM/ DD / YYYY

✗   **/s/ Carrie W. Teffner**          **Carrie W. Teffner**
    Signature of authorized representative of debtor     Printed name

Title   **Authorized Signatory**

**18. Signature of attorney**

✗   **/s/ Cullen D. Speckhart**    Date   **07/23/2020**
    Signature of attorney for debtor           MM/DD/YYYY

**Cullen D. Speckhart**
Printed name

**Cooley LLP**
Firm name

**1299 Pennsylvania Avenue, NW, Suite 700**
Number          Street

| **Washington** | **DC** | **20004-2400** |
|---|---|---|
| City | State | ZIP Code |

| **(202) 842-7800** | **cspeckhart@cooley.com** |
|---|---|
| Contact phone | Email address |

| **79096** | **Virginia** |
|---|---|
| Bar number | State |

*(Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar)*

UST-0004

Official Form 201A (12/15)

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCENA RETAIL GROUP, INC., | ) | Case No. 20-_____(___) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

### Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11

1.  If any of the debtor's securities are registered under Section 12 of the Securities Exchange Act of 1934, the SEC file number is   **0-11736**

2.  The following financial data is the latest available information and refers to the debtor's condition on **The Most Recent 10Q was filed on March 9, 2020, which reflected data as of February 1, 2020.**

(a)  Total assets                                                                        $   **13,690,710,379.40**

(b)  Total debts (including debts listed in 2.c., below)                      $   **12,516,261,149.25**

(c)  Debt securities held by more than 500 holders                      **N/A**

| | | | | | | Approximate number of holders: |
|---|---|---|---|---|---|---|
| secured ☐ | unsecured ☐ | subordinated ☐ | $ | | | |
| secured ☐ | unsecured ☐ | subordinated ☐ | $ | | | |
| secured ☐ | unsecured ☐ | subordinated ☐ | $ | | | |
| secured ☐ | unsecured ☐ | subordinated ☐ | $ | | | |
| secured ☐ | unsecured ☐ | subordinated ☐ | $ | | | |

(d)  Number of shares of preferred stock                                      **0 issued**

(e)  Number of shares of common stock                                        **Approximately 10,000,000 issued shares**

Comments, if any:   **Ascena Retail Group, Inc. does not and cannot know the precise number of beneficial holders of any of the debt securities it has issued and does not believe that any such securities are held by more than 500 holders.**

3.  Brief description of debtor's business:   **Ascena Retail Group, Inc. (Nasdaq: ASNA) is a national specialty retailer offering apparel, shoes, and accessories for women under the Premium Fashion segment (Ann Taylor, LOFT, and Lou & Grey), Plus Fashion segment (Lane Bryant, Catherines, and Cacique) and for tween girls under the Kids Fashion Segment (Justice).  Ascena Retail Group, Inc. through its retail brands operates e-commerce websites and approximately 2,800 stores throughout the United States, Canada, and Puerto Rico.**

4.  List the names of any person who directly or indirectly owns, controls, or holds, with power to vote, 5% or more of the voting securities of debtor:
**Stadium Capital Management LLC; Charles Schwab Investment Management, Inc.; Dimensional Fund Advisors LP; BlackRock Fund Advisors; Renaissance Technologies LLC; David R. Jaffe; Elise Jaffe.**

UST-0005

| Fill in this information to identify the case: |
| --- |
| United States Bankruptcy Court for the: |
| Eastern District of Virginia |
| (State) |
| Case number *(if known)*: _____ Chapter __11__ |

☐ Check if this is an
amended filing

## Rider 1
## Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor

On the date hereof, each of the entities listed below (collectively, the "Debtors") filed a petition in the United States Bankruptcy Court for the Eastern District of Virginia for relief under chapter 11 of title 11 of the United States Code. The Debtors have moved for joint administration of these cases under the case number assigned to the chapter 11 case of Ascena Retail Group, Inc.

- Ascena Retail Group, Inc.
- 933 Inspiration LLC
- Ann Card Services, Inc.
- Ann, Inc.
- AnnCo, Inc.
- AnnTaylor Distribution Services, Inc.
- AnnTaylor of Puerto Rico, Inc.
- AnnTaylor Retail, Inc.
- AnnTaylor, Inc.
- Ascena Retail Holdings, Inc.
- Ascena Trade Services, LLC
- ASNA Plus Fashion, Inc.
- ASNA Value Fashion LLC
- BackingBrands Buying Agent, LLC
- BackingBrands Solutions, LLC
- C.S.F. Corp.
- Catalog Receivables LLC
- Catalog Seller LLC
- Catherines #5124, Inc.
- Catherines #5147, Inc.
- Catherines Stores Corporation
- Catherines, Inc.
- CCTM, Inc.
- Charming Sales Co. Four, Inc.
- Charming Sales Co. One, Inc.
- Charming Sales Co Three, Inc.
- Charming Sales Co. Two, Inc.
- Charming Shoppes of Delaware, Inc.
- Charming Shoppes Receivables Corp.
- Charming Shoppes Seller, Inc.
- Charming Shoppes Street, Inc.
- Charming Shoppes, Inc.

- Chestnut Acquisition Sub Inc.
- Crosstown Traders, Inc.
- CS HoldCo II Inc.
- CSGC, Inc.
- CSI Industries, Inc.
- CSPE, LLC
- DBCM Holdings, LLC
- DBI Holdings, Inc.
- DBX, Inc.
- Duluth Real Estate LLC
- Etna Retail DC, LLC
- Fashion Apparel Sourcing LLC
- Fashion Service Fulfillment Corporation
- Fashion Service LLC
- GC Fulfillment, LLC
- Lane Bryant #6243, Inc.
- Lane Bryant of Pennsylvania, Inc.
- Lane Bryant Outlet 4106, Inc.
- Lane Bryant Purchasing Corp.
- Lane Bryant, Inc.
- PSTM, Inc.
- Sonsi, Inc.
- Spirit of America, Inc.
- Too GC, LLC
- Tween Brands Agency, Inc.
- Tween Brands Direct Services Inc.
- Tween Brands Investment, LLC
- Tween Brands Marketing, Inc.
- Tween Brands Service Co.
- Tween Brands, Inc.
- Winks Lane, Inc.
- Worldwide Retail Holdings, Inc.

UST-0006

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ASCENA RETAIL GROUP, INC., | ) Case No. 20-_____(___) |
| | ) |
| Debtor. | ) |

### LIST OF EQUITY SECURITY HOLDERS[1]

| Debtor | Equity Holders | Address of Equity Holder | Percentage Held |
|---|---|---|---|
| Ascena Retail Group, Inc. | Stadium Capital Management LLC | 199 Elm Street New Canaan, CT 06840-5321 | 9.6% |
| | Charles Schwab Investment Management, Inc. | 211 Main Street San Francisco, CA 94105-1905 | 9.4% |
| | Dimensional Fund Advisors LP | 1299 Ocean Ave. Santa Monica, CA 90401-1038 | 7.0% |
| | David R Jaffe | [Redacted] | 6.0% |
| | BlackRock Fund Advisors | 400 Howard St. San Francisco, CA 94105-2618 | 5.9% |
| | Renaissance Technologies LLC | 600 Route 25 A East Setauket, NY 11733-1235 | 5.5% |
| | Elise Jaffe | [Redacted] | 5.1% |

[1] This list reflects holders of five percent or more of Ascena Retail Group, Inc.'s common stock. This list serves as the disclosure required to be made by the debtor pursuant to rule 1007 of the Federal Rules of Bankruptcy Procedure. By the *Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules and Statements of Financial Affairs (II) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (III) Authorizing the Debtors to File a Consolidated List of the Debtors' 50 Largest Unsecured Creditors, (IV) Authorizing the Debtors to Redact Certain Personal Identification Information, (V) Waiving the Requirement to File a List of Equity Security Holders, and (VI) Granting Related Relief* filed contemporaneously herewith, the Debtor is requesting a waiver of the requirement under Bankruptcy Rule 1007 to file a list of all of its equity security holders.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCENA RETAIL GROUP, INC., | ) | Case No. 20-_____(___) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**CORPORATE OWNERSHIP STATEMENT**

Pursuant to rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the following are corporations, other than a government unit, that directly or indirectly own 10% or more of any class of the debtor's equity interest:

| Shareholder | Approximate Percentage of Shares Held |
|---|---|
| N/A | N/A |

UST-0008

<table>
<tr><td colspan="2">Fill in this information to identify the case:</td></tr>
<tr><td colspan="2">Debtor name   Ascena Retail Group, Inc., et al.</td></tr>
<tr><td colspan="2">United States Bankruptcy Court for the: Eastern District of Virginia</td></tr>
<tr><td colspan="2">Case number (If known): _____</td></tr>
</table>

☐ Check if this is an
amended filing

## Official Form 204

# Chapter 11 or Chapter 9 Cases: Consolidated List of Creditors Who Have the 50 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 50 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 50 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | SIMON PROPERTY GROUP ATTN: DAVID SIMON CHIEF EXECUTIVE OFFICER SIMON PROPERTY GROUP, INC. 225 WEST WASHINGTON STREET INDIANAPOLIS, IN  46204 | DAVID SIMON EMAIL - PHONE - 317-636-1600 FAX - | TRADE PAYABLE | C | | | $31,664,060 |
| 2 | BROOKFIELD PROPERTIES ATTN: STACIE L. HERRON EXECUTIVE VICE PRESIDENT, GENERAL COUNSEL AND SECRETARY BROOKFIELD PLACE NEW YORK 250 VESEY STREET, 15TH FLOOR NEW YORK, NY  10281 | STACIE L. HERRON EMAIL - STACIE.HERRON@BROOKFIELDPROPERTIES RETAIL.COM; LINDSAY.KAHN@BROOKFIELDPROPERTIES RETAIL.COM; ANDREW.BRENT@BROOKFIELDPROPERTIES .COM PHONE - 212-417-7000 | TRADE PAYABLE | C | | | $16,619,835 |
| 3 | BOSTON PROPERTIES LIMITED PARTNERSHIP ATTN: DOUGLAS T. LINDE PRESIDENT 800 BOYLSTON STREET AT THE PRUDENTIAL CENTER BOSTON, MA  02199-8103 | DOUGLAS T. LINDE EMAIL - PHONE - 617-236-3300 FAX - 617-536-5087 | TRADE PAYABLE | C | | | $8,809,477 |
| 4 | TANGER PROPERTIES, LP ATTN: STEVEN B. TANGER CHIEF EXECUTIVE OFFICER 3200 NORTHLINE AVENUE SUITE 360 GREENSBORO, NC  27408 | STEVEN B. TANGER EMAIL - SBTANGER@TANGEROUTLET.COM PHONE - 336-292-3010 FAX - 336-852-2096 | TRADE PAYABLE | C | | | $7,228,481 |

UST-0009

Debtor  Ascena Retail Group, Inc., et al.
        Name

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 5  PAN PACIFIC CO LTD ATTN: SUK-WON LIM CHIEF EXECUTIVE OFFICER (08380) 12 DIGITAL-RO 31-GIL GURO-GU SEOUL, GURO-DONG,  197-21 KOREA | SUK-WON LIM EMAIL - PANPACIFIC@PANPACIFIC.CO.KR PHONE - +82-2-3494-9000 FAX - +82-2-830-1011 | TRADE PAYABLE | | | | $6,831,314 |
| 6  MGF SOURCING ATTN: JAMES SCHWARTZ CHIEF EXECUTIVE OFFICER 4200 REGENT STREET SUITE 205 COLUMBUS, OH  43219 | JAMES SCHWARTZ EMAIL - JAMES.SCHWARTZ@MGFSOURCING.COM PHONE - 614-904-3269 FAX - 614-415-7242 | TRADE PAYABLE | | | | $6,726,982 |
| 7  SAE A TRADING CO. LTD ATTN: WOONG-KI KIM CHAIRMAN SAE-A BLDG. 429 YEONGDONG-DAERO GANGNAM-GU SEOUL, KOREA | WOONG-KI KIM EMAIL - PHONE -  +82 2 6252 7000 FAX - +82-2-6252-7005 | TRADE PAYABLE | | | | $6,347,041 |
| 8  ORIENT CRAFT ATTN: SUDHIR DHINGRA CHIEF EXECUTIVE OFFICER PLOT NO. 80P SECTOR-34 NEAR HERO HONDA CHOWK GURGAON,  122001 INDIA | SUDHIR DHINGRA EMAIL - SUDHIR.DHINGRA@ORIENTCRAFT.COM PHONE - +0124-4511300 FAX - +0124-4511330 | TRADE PAYABLE | | | | $5,309,190 |
| 9  THE MACERICH COMPANY ATTN: ANN C. MENARD SENIOR EXECUTIVE VICE PRESIDENT, CHIEF LEGAL OFFICER AND SECRETARY 401 WILSHIRE BOULEVARD, SUITE 700 SANTA MONICA, CA  90401 | ANN C. MENARD EMAIL - ANN.MENARD@MACERICH.COM PHONE - 310-394-6000; 424-229-3575 FAX - 310-395-2791 | TRADE PAYABLE | C | | | $5,252,749 |
| 10  HIP SING CHINA INDUSTRIAL LIMITED ATTN: ADA LAU UNIT B5, 6/F BLK 2, CAMELPAINT BLDG 62 HOI YUEN ROAD KWUN TONG, KOWLOON, HONG KONG | ADA LAU EMAIL - PHONE - +852-23905128 FAX - +852-23915128 | TRADE PAYABLE | | | | $5,075,819 |

UST-0010

Debtor  Ascena Retail Group, Inc., et al.
Name

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 11 | PT. ERATEX (HONG KONG) LTD ATTN: MR. MANIWANEN PRESIDENT SPAZIO BUILDING 3RD FLOOR UNIT.319-321 GRAHA FESTIVAL KAV.3 – GRAHA FAMILY JL. MAYJEND YONO SOEWOYO SURABAYA,  60226 INDONESIA | MR. MANIWANEN EMAIL - PHONE - +62-31-99001101 FAX - +62-31-99001115 | TRADE PAYABLE | | | | $5,026,842 |
| 12 | THE TAUBMAN COMPANY ATTN: CHRIS HEAPHY EXECUTIVE VICE PRESIDENT, GENERAL COUNSEL & SECRETARY 200 E. LONG LAKE ROAD, SUITE 300 BLOOMFIELD HILLS, MI  48304-2324 | CHRIS HEAPHY EMAIL - CHEAPHY@TAUBMAN.COM; RHURREN@TAUBMAN.COM; MMAINVILLE@TAUBMAN.COM PHONE - 248-258-6800 FAX - | TRADE PAYABLE | C | | | $4,550,301 |
| 13 | POONGIN TRADING CO.LTD ATTN: PAUL PARK CHIEF EXECUTIVE OFFICER 18F–20F ACE HIGH TECH CITY  B/D 2 DONG, GYEONGLN-RO YEONGDEUNGPO-GU SEOUL,  755 KOREA | PAUL PARK EMAIL - PHONE - +82-2-549-8313 FAX - +82-2-549-8310 | TRADE PAYABLE | | | | $4,507,327 |
| 14 | TAINAN ENTERPRISES CO. LTD ATTN: CHING-HON YANG CHAIRMAN 5-1, SECTION 1 HANGZHOU SOUTH ROAD ZHONGZHENG DISTRICT TAIPEI CITY,  100 TAIWAN | CHING-HON YANG EMAIL - PHONE -  +886 2 2391 6421 FAX -  +886 2 2397 1413 | TRADE PAYABLE | | | | $4,402,392 |
| 15 | CBL & ASSOCIATES, INC. ATTN: STEPHEN D. LEBOVITZ CHIEF EXECUTIVE OFFICER CBL CENTER, SUITE 500 2030 HAMILTON PLACE BLVD. CHATTANOOGA, TN  37421 | STEPHEN D. LEBOVITZ EMAIL - PHONE - 432-855-0001 FAX - | TRADE PAYABLE | C | | | $4,244,203 |
| 16 | ORACLE AMERICA INC ATTN: DORIAN DALEY GENERAL COUNSEL REDWOOD SHORES ORACLE CORPORATION 500 ORACLE PARKWAY REDWOOD SHORES, CA  94065 | DORIAN DALEY EMAIL - DORIAN.DALEY@ORACLE.COM PHONE - 650-506-7000 FAX - 650-633-1813 | TRADE PAYABLE | | | | $4,158,303 |

Case 20-11134-KBO  Doc 375  Filed 07/23/20  Page 12 of 18

Debtor  Ascena Retail Group, Inc., et al.                                                      Case Number (if known)
        Name

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 17 | CHOI & SHIN'S CO.,LTD ATTN: PRESIDENT OR GENERAL COUNSEL 61 BUKCHON-RO, JONGNO-GU SEOUL, 110260 SOUTH KOREA | PRESIDENT OR GENERAL COUNSEL EMAIL - PHONE - +82-232947200 FAX - | TRADE PAYABLE | | | | $3,973,814 |
| 18 | CRYSTAL ELEGANCE INDUSTRIAL LIMITED ATTN: LAM ANTHONY VICE PRESIDENT 71 HOW MING STREET KWUN TONG, KOWLOON, HONG KONG | LAM ANTHONY EMAIL - INFO@CRYSTALGROUP.COM PHONE - FAX - | TRADE PAYABLE | | | | $3,916,508 |
| 19 | SNOGEN GREEN CO.,LTD ATTN: JUNGKU HONG CHIEF EXECUTIVE OFFICER 12, GWANGPYEONG-RO 56-GIL GANGNAM-GU SEOUL, KOREA | JUNGKU HONG EMAIL - PHONE - +02-6496-6400 FAX - +02-6496-6501 | TRADE PAYABLE | | | | $3,671,183 |
| 20 | UBASE INTERNATIONAL INC ATTN: YONG HOE KIM CHIEF EXECUTIVE OFFICER 345, TTUKSEOM-RO SEONGDONG-GU SEOUL (SEONGSU-DONG), 04780 KOREA | YONG HOE KIM EMAIL - CONTACTUS@UBASEINTERNATIONAL.COM PHONE - +82 2-420-0001 FAX - +82 2-421-8787 | TRADE PAYABLE | | | | $3,628,175 |
| 21 | TEX WORLD PTE LTD ATTN: PRESIDENT OR GENERAL COUNSEL PRESIDENT 610, ATL CORPORATE PARK SAKI VIHAR ROAD, POWAI MUMBAI, MAHARASHTRA 400072 INDIA | PRESIDENT OR GENERAL COUNSEL EMAIL - INFO@TEXWORLD.CO PHONE - +91-22-42293542 FAX - | TRADE PAYABLE | | | | $3,506,978 |
| 22 | WESTFIELD CORPORATION, INC. ATTN: PETER SCHWARTZ GENERAL COUNSEL 2049 CENTURY PARK EAST, 40TH FLOOR CENTURY CITY, CA 90067 | PETER SCHWARTZ EMAIL - PHONE - 310-478-4456 FAX - 310-478-1267 | TRADE PAYABLE | C | | | $3,448,669 |

Debtor  Ascena Retail Group, Inc., et al.                                                                 Case Number (if known)
        Name

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 23 KYUNG SEUNG  CO. LTD.<br>ATTN: J. J. PARK<br>CHIEF EXECUTIVE OFFICER<br>408 SAMSEOUNG-RO<br>GYEONGSEUNG<br>BUILDING GANGNAM-GU<br>SEOUL,<br>KOREA | J. J. PARK<br>EMAIL -<br>PHONE - +82-2-550-1414<br>FAX - +82-2-566-6867 | TRADE PAYABLE | | | | $3,255,132 |
| 24 LAKONTRA INTERNATIONAL MERCHANDISING CORP<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>MERCHANDISING CORP NO.186 SEC.4<br>NANKINGE. RD<br>TAIPEI,<br>TAIWAN | PRESIDENT OR GENERAL COUNSEL<br>EMAIL -<br>PHONE -<br>FAX - | TRADE PAYABLE | | | | $3,031,988 |
| 25 MTL SOURCING DMCC<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>HDS BUSINESS CENTRE<br>JUMAIRA LAKE TOWERS<br>DUBAI,<br>UNITED ARAB EMIRATES | PRESIDENT OR GENERAL COUNSEL<br>EMAIL -<br>PHONE -<br>FAX - | TRADE PAYABLE | | | | $3,024,427 |
| 26 RICHA GLOBAL EXPORTS PVT LTD<br>ATTN: VIRENDER UPPAL<br>CHAIRMAN<br>219, UDYOG VIHAR PHASE-I GURGAON<br>HARYANA,  122001<br>INDIA | VIRENDER UPPAL<br>EMAIL - INFO@RICHAGLOBAL.COM<br>PHONE - +91-124-4314000<br>FAX - | TRADE PAYABLE | | | | $3,020,253 |
| 27 IBM CORPORATION<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>1 NEW ORCHARD ROAD<br>ARMONK, NY  10504-1722 | PRESIDENT OR GENERAL COUNSEL<br>EMAIL - ARVIND.KRISHNA@IBM.COM<br>PHONE - 914-499-1900<br>FAX - 914-765-4190 | TRADE PAYABLE | | | | $2,952,280 |
| 28 BUSANA APPAREL PTE LTD<br>ATTN: MR. MANIWANEN<br>CHAIRMAN<br>AXA TOWER 41ST & 43RD FLOOR<br>KUNINGAN CITY<br>JALAN PROF. DR. SATRIO KAV. 18<br>KUNINGAN, SETIABUDI,  JAKARTA 12940<br>INDONESIA | MR. MANIWANEN<br>EMAIL -<br>PHONE - +6221-522-9344<br>FAX - +6221-3005-6052 | TRADE PAYABLE | | | | $2,847,689 |

UST-0013

Case 20-11835-KJC Doc Doc 1 Filed 07/23/20 Entered 07/23/20 05:57:30 Desc Main
Document 405 Page 14 of 18

Debtor  Ascena Retail Group, Inc., et al.                                    Case Number (if known)
Name

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 29 | WASHINGTON PRIME GROUP, INC. ATTN: ROBERT P. DEMCHAK, ESQ. EXECUTIVE VICE PRESIDENT, GENERAL COUNSEL AND CORPORATE SECRETARY 180 EAST BROAD STREET COLUMBUS, OH  43215 | ROBERT P. DEMCHAK, ESQ. EMAIL - WPGINFO@WASHINGTONPRIME.COM PHONE - 614-621-9000 FAX - | TRADE PAYABLE | C | | | $2,726,248 |
| 30 | MOLAX TRADING LIMITED ATTN: PRESIDENT OR GENERAL COUNSEL 75-95, SEOSOMUN-DONG 8RD FLOOR, YOUONE BUILDING CHUNG-KU SEOUL,  100-110 KOREA | PRESIDENT OR GENERAL COUNSEL EMAIL - ADMIN@MOLAXTRADING.COM PHONE - 02-773-3601 FAX - 02-757-2044 | TRADE PAYABLE | | | | $2,656,298 |
| 31 | GUANGDONG SINGWEAR GARMENTS CO LTD ATTN: PRESIDENT OR GENERAL COUNSEL XIANGANG INDUSTRIAL PARK SIMAPU TOWN, CHAONAN DISTRICT GUANGDONG PROVINCE SHANTOU CITY, CHINA | PRESIDENT OR GENERAL COUNSEL EMAIL - PHONE - +86-0754-82201270 FAX - +86-754-87715720 | TRADE PAYABLE | | | | $2,650,820 |
| 32 | ASMARA INTERNATIONAL LIMITED ATTN: VENKY NAGAN CHIEF EXECUTIVE OFFICER UNIT 8B, TONG YUEN FACTORY BUILDING 505 CASTLE PEAK ROAD LAI CHI KOK, KOWLOON, HONG KONG | VENKY NAGAN EMAIL - CONTACT@ASMARAGROUP.COM PHONE - +852-27442255 FAX - +852-27442244 | TRADE PAYABLE | | | | $2,604,654 |
| 33 | ANANTA SPORTSWEAR LIMITED ATTN: AMIN KHAN PRESIDENT 2071, N. COLLINS BLVD. STE 201 RICHARDSON, TX  75080 | AMIN KHAN EMAIL - AMIN@BIMPEX.COM; SAJED@ANANTA.COM.BD PHONE - 972-759 0732 FAX - 972-692-8826 | TRADE PAYABLE | | | | $2,595,148 |
| 34 | ACCENTURE LLP ATTN: JULIE SWEET CHIEF EXECUTIVE OFFICER 1 GRAND CANAL SQUARE DUBLIN,  D02 P820 IRELAND | JULIE SWEET EMAIL - JULIE.SWEET@ACCENTURE.COM PHONE - +353-1646-2000 FAX - +353-1646-2020 | TRADE PAYABLE | | | | $2,555,866 |

Debtor  Ascena Retail Group, Inc., et al.
        Name

Case Number (if known)

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 35 | INTERNATIONAL TRADING SERVICES LTD ATTN: PRESIDENT OR GENERAL COUNSEL VICTORIA LANE INDUSTRIAL PARK 7620 VICTORIA CT BROWNSVILLE, TX  78521 | PRESIDENT OR GENERAL COUNSEL EMAIL - PHONE - 956-831-2740 FAX - | TRADE PAYABLE | | | | $2,520,994 |
| 36 | JIANGSU GUOTAI GUOSHENG CO LTD ATTN: PRESIDENT OR GENERAL COUNSEL 7-22/F GUOTAI NEW CENTURY PLAZA NO.125 MIDDLE RENMIN RD ZHANGJIAGANG JIANGSU,  215600 CHINA | PRESIDENT OR GENERAL COUNSEL EMAIL - HUASHENG@GTHS.CN PHONE - +0512-58988898 FAX - +0512-58686837 | TRADE PAYABLE | | | | $2,465,288 |
| 37 | HANGZHOU LINGXIU KNITTING CO LTD ATTN: JARED LU 418 HENGFU ROAD HENGCUN TOWN TONGLU COUNTY ZHEJIANG, CHINA | JARED LU EMAIL - JARED_LU@LINXIU.COM PHONE -  +86-571-64673088 FAX - | TRADE PAYABLE | | | | $2,458,758 |
| 38 | JOHN GALLIN & SON, INC. ATTN: CHRISTOPHER GALLIN PRESIDENT 102 MADISON AVENUE 9TH FLOOR NEW YORK, NY  10016 | CHRISTOPHER GALLIN EMAIL - CHRISG@GALLIN.COM PHONE - 212-252-8900 FAX - 212-252-8910 | TRADE PAYABLE | | | | $2,437,642 |
| 39 | JONES LANG LASALLE AMERICAS, INC. ATTN: ALAN TSE GLOBAL CHIEF LEGAL OFFICER AND CORPORATE SECRETARY 200 EAST RANDOLPH DRIVE CHICAGO, IL  60601 | ALAN TSE EMAIL - ALAN.TSE@JLL.COM PHONE - 312-228-2808 FAX - | TRADE PAYABLE | C | | | $2,364,445 |
| 40 | LEE & CO. ATTN: ARLEN LEE CHIEF EXECUTIVE OFFICER 1278 INDIANA ST SUITE 101 SAN FRANCISCO, CA  94107 | ARLEN LEE EMAIL - HELLO@LEEANDCO.COM PHONE - 415-475-9029 FAX - | TRADE PAYABLE | | | | $2,354,770 |

UST-0015

Case 20-11134-KBO Doc 175 Filed 07/23/20 Entered 07/23/20 05:57:30 Desc Main
Document 40 Page 16 of 18

Debtor   Ascena Retail Group, Inc., et al.                                                    Case Number (if known)
         Name

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 41 AJG INC<br>ATTN: J. PATRICK GALLAGHER JR.<br>CHIEF EXECUTIVE OFFICER<br>2850 GOLF ROAD<br>ROLLING MEADOWS, IL 60008 | J. PATRICK GALLAGHER JR.<br>EMAIL -<br>PHONE - 630-773-3800<br>FAX - 630-285-4000 | TRADE PAYABLE | | | | $2,258,832 |
| 42 WS TRADING LIMITED<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>50 TRADESTON STREET<br>GLASGOW, SCOTLAND, G5 8BH<br>UNITED KINGDOM | PRESIDENT OR GENERAL COUNSEL<br>EMAIL -<br>PHONE -<br>FAX - | TRADE PAYABLE | | | | $2,248,644 |
| 43 SOLVE IT CO., LTD<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>3/F 556 CHEONHO-DAERO<br>GWANGJIN-GU SEOUL, 143847<br>SOUTH KOREA | PRESIDENT OR GENERAL COUNSEL<br>EMAIL -<br>PHONE - +82-24536868<br>FAX - | TRADE PAYABLE | | | | $2,098,603 |
| 44 TISHMAN SPEYER PROPERTIES<br>ATTN: MICHAEL B. BENNER<br>SENIOR MANAGING DIRECTOR AND GENERAL COUNSEL<br>ROCKEFELLER CENTER, 45 ROCKEFELLER PLAZA<br>NEW YORK, NY 10111 | MICHAEL B. BENNER<br>EMAIL - NY@TISHMANSPEYER.COM<br>PHONE - 212-715-0300<br>FAX - 212-319-1745 | TRADE PAYABLE | C | | | $2,026,953 |
| 45 MODINDIA EXIM PRIVATE LTD<br>ATTN: GAGAN GULATI<br>DIRECTOR<br>B-57 OKHLA INDUSTRIAL AREA, PHASE-I<br>NEW DELHI, 110020<br>INDIA | GAGAN GULATI<br>EMAIL - INFO@MODELAMAEXPORTS.COM<br>PHONE -<br>FAX - | TRADE PAYABLE | | | | $2,015,483 |
| 46 SOUTH ASIA KNITTING FTY LTD (NEW)<br>ATTN: PRESIDENT OR GENERAL COUNSEL<br>17/F, SOUTH ASIA BUILDING<br>108 HOW MING STREET<br>KWUN TONG<br>KOWLOON,<br>HONG KONG | PRESIDENT OR GENERAL COUNSEL<br>EMAIL - LEOYEUNG@SOUTHASIAGROUP.COM<br>PHONE - 852-2345-0261<br>FAX - 852-2343-3666 | TRADE PAYABLE | | | | $1,936,284 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 47 MEENU CREATION LLP ATTN: PRESIDENT OR GENERAL COUNSEL A-33. SECTOR - 64 NOIDA DISTT GAUTAM BUDH NAGAR,   UP-201301 INDIA | PRESIDENT OR GENERAL COUNSEL EMAIL - ED@MEENUCREATION.COM PHONE - 91-120-4080200 FAX - 91-120-4080200 | TRADE PAYABLE | | | | $1,876,239 |
| 48 THE FORBES COMPANY ATTN: PRESIDENT OR GENERAL COUNSEL 100 GALLERIA OFFICENTRE, SUITE 427 SOUTHFIELD, MI  48034 | PRESIDENT OR GENERAL COUNSEL EMAIL - NFORBES@THEFORBESCOMPANY.COM PHONE - 248-827-4600 FAX - | TRADE PAYABLE | C | | | $1,830,041 |
| 49 GAURAV INTERNATIONAL ATTN: ANJU SACHDEVA PD MANAGER 198, UDYOG VIHAR PHASE 1 UDYOG VIHAR, SECTOR 20 GURUGRAM, HARYANA,  122001 INDIA | ANJU SACHDEVA EMAIL - GINTL@RICHAGROUP.COM PHONE -  +91 124 480 3900 FAX -  +91 124 2439710 | TRADE PAYABLE | | | | $1,820,631 |
| 50 CHRISTINE CLARK AND OTHER SIMILARLY SITUATED INDIVIDUALS ATTN: WILLIAM B. SULLIVAN, ERIC K. YAECKEL, AND ANDREA TORRES-FIGUEROA ATTORNEYS FOR PLAINTIFFS SULLIVAN LAW GROUP, APC 2330 THIRD AVENUE SAN DIEGO, CA  92101 | WILLIAM B. SULLIVAN, ERIC K. YAECKEL, AND ANDREA TORRES-FIGUEROA EMAIL - HELEN@SULLIVANLAWGROUPAPC.COM, YAECKEL@SULLIVANLAWGROUPAPC.COM, ATORRES@SULLIVANLAWGROUPAPC.COM PHONE - 619-702-6760 FAX - 619-702-6761 | LITIGATION SETTLEMENT | C | | | Undetermined |

Fill in this information to identify the case and this filing:

Debtor Name        Ascena Retail Group, Inc.

United States Bankruptcy Court for the:        Eastern District of Virginia

                                                                                        (State)

Case number (If known):

## Official Form 202
## Declaration Under Penalty of Perjury for Non-Individual Debtors        12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐  *Schedule A/B: Assets-Real and Personal Property (Official Form 206A/B)*

☐  *Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)*

☐  *Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)*

☐  *Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)*

☐  *Schedule H: Codebtors (Official Form 206H)*

☐  *Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)*

☐  Amended Schedule

☒  *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 50 Largest Unsecured Claims and Are Not Insiders (Official Form 204)*

☒  Other document that requires a declaration_____**List of Equity Security Holders and Corporate Ownership Statement**_____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on

| | |
|---|---|
| **07/23/2020** | ☒ */s/ Carrie W. Teffner* |
| MM/ DD/YYYY | Signature of individual signing on behalf of debtor |
| | **Carrie W. Teffner** |
| | Printed name |
| | **Authorized Signatory** |
| | Position or relationship to debtor |

Official Form 202                Declaration Under Penalty of Perjury for Non-Individual Debtors

UST-0018

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

-and-

John R. Luze (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:     (202) 842-7800
Facsimile:     (202) 842-7899

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF CARRIE W. TEFFNER, INTERIM
## EXECUTIVE CHAIR OF ASCENA RETAIL GROUP, INC., IN
## SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Carrie W. Teffner, hereby declare under penalty of perjury:

1.      I have served as a director on the board of directors (the "Board") for Ascena Retail Group, Inc. (together with the other above-captioned debtors and debtors in possession, the "Debtors," and, together with their non-Debtor affiliates, "Ascena" or the "Company") since 2018 and as Interim Executive Chair since May 2019.  Prior to joining Ascena, I served in Chief

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

Financial Officer roles for nearly a decade at Crocs (from 2015 to 2018), PetSmart (from 2013 to 2015), Weber Stephen Products (from 2011 to 2013), and The Timberland Company (from 2009 to 2011). Prior to these roles, I spent more than 21 years with Sara Lee Corporation serving in various domestic and international positions, including divisional and segment Chief Financial Officer and Corporate Treasurer.

2. Each of the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>") with the United States Bankruptcy Court for the Eastern District of Virginia (the "<u>Court</u>") on July 22, 2020. To minimize the adverse effects on their business, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "<u>First Day Motions</u>").

3. I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I submit this declaration to assist the Court and parties in interest in understanding the circumstances leading to the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and First Day Motions filed today.

4. Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge, input by the Debtors' management team, employees, and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based on my experience and knowledge. I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

**<u>Introduction</u>**

5. Ascena is a leading specialty retailer for women and girls. Tracing its roots back to a single Dressbarn store built in 1962, today Ascena operates a portfolio of recognizable brands, including Ann Taylor, LOFT, Lane Bryant, Catherines, Justice, Lou & Grey, and Cacique, with

UST-0020

approximately 2,800 stores in the United States, Canada, and Puerto Rico, more than 12.5 million active customers, and nearly 40,000 employees. As of the date hereof, the Ascena has approximately $1.60 billion in funded debt obligations, including approximately $330 million in outstanding obligations under the its $500 million senior secured asset based lending facility (the "ABL Facility," and the lender thereunder, the "ABL Lenders") and approximately $1.27 billion in senior secured term loan obligations (the "Term Loans," and the lenders thereunder, the "Term Lenders").

6.     As is the case with brick and mortar retailers across the United States and the rest of the world, Ascena's businesses have been drastically affected by the COVID-19 pandemic. On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. As global markets grappled with the escalating spread of the virus, national, state, and local governments across the United States and throughout the world imposed curfews, social distancing protocols, and shelter-in-place orders. In compliance with these mandates, and to protect the health and safety of Ascena's customers and employees, on March 17, 2020, Ascena implemented temporary closures of all retail stores, which then necessitated the difficult decision to furlough nearly all of its store-level workforce and a substantial portion of its corporate workforce. Notwithstanding Ascena's efforts to preserve liquidity over the past several months, these circumstances, coupled with the Company's already highly leveraged balance sheet, accelerated the need for a long-term strategic solution—a solution the Company ultimately determined to implement through these chapter 11 cases.

7.     Over the past several years, Ascena has been proactive in developing structural and strategic transformations to refine the Company's operating model to center on key customer segments, implement initiatives designed to optimize product flow through the Company's

UST-0021

distribution channels, and to optimize its store fleet by reducing the number of underperforming stores and obtaining rent relief. In doing so, Ascena has realized significant costs savings. Among other things, over the past several months, Ascena has taken decisive action to address its capital structure and implement a strategic plan (the "Strategic Plan") aimed at rationalizing Ascena's brand and store fleet portfolio, realigning distribution capabilities, and implementing various other cost-saving measures. The Strategic Plan represents a continuation of already existing initiatives, described herein, to address the existing macro-economic challenges of the brick and mortar retail industry.

8. Moreover, to proactively address the August 21, 2022 maturity of the Term Loans, the Board, including a special committee of disinterested directors (the "Special Committee"), began reviewing strategic alternatives to address the Company's capital structure in Fall 2019. But the effects of the COVID-19 pandemic on Ascena's businesses has accelerated the need to realize the benefits of these strategies and settle on the necessary path forward.

9. Accordingly, over the past several months, Ascena has been actively exploring financing and other alternatives and has been engaged with an ad hoc group of Term Lenders. After an extensive review, the Board and Special Committee ultimately determined that there were no financing or other out-of-court alternatives that provided a viable path forward. Through extensive negotiations, though, Ascena and its secured lenders have agreed to the terms of a crucial and comprehensive recapitalization, the terms of which are embodied in the Restructuring Support Agreement (such agreement, the "Restructuring Support Agreement"), dated as of July 23, 2020 and attached hereto as **Exhibit A**. The Restructuring Support Agreement is supported by approximately 68% of the Term Lenders and will be implemented through a chapter 11 plan of reorganization (the "Plan").

UST-0022

10.     Under the terms of the Restructuring Support Agreement and Plan, certain of the

Term Lenders have agreed to substantially equitize the Term Loans and fully backstop $150

million in new money financing (the "New Term Loan Financing") to fund the Strategic Plan and

the Debtors' emergence from these chapter 11 cases.  More specifically, the Restructuring Support

Agreement and Plan provide that:

- all Term Lenders will receive the opportunity to participate in the $75 million
  New Term Loan Financing, which will be funded initially in the form of a
  debtor-in-possession financing facility to be syndicated following the "first
  day" hearing in these chapter 11 cases and that the Debtors will seek approval
  of at the "second day" hearing;

- the Term Lenders that have agreed to backstop the New Term Loan Financing
  will fund the remaining $75 million of the New Term Loan Financing on the
  same economic terms;

- all Term Lenders that participate in the New Term Loan Financing will:
  (a) have certain of their prepetition Term Loans rolled up into the debtor-in-
  possession financing, and the aggregate $311.8 million in loans (including the
  $150 million in new money loans) will be converted to a new first-out term loan
  facility upon emergence from these chapter 11 cases; and (b) receive their pro
  rata share of 44.9% of the equity in reorganized Ascena upon emergence from
  these chapter 11 cases;

- all Term Lenders will also receive their pro rata share of: (a) 55.1% of the equity
  in reorganized Ascena; and (b) $88.2 million in new second-out term loans;

- the ABL Lenders will be paid in full from cash on hand or proceeds from a new
  asset-based lending exit credit facility (the "ABL Exit Facility");

- holders of general unsecured claims will receive their pro rata share of
  $500,000, provided that holders of general unsecured claims vote as a class;
  and

- existing common equity in Ascena will be cancelled.

11.     Additionally, the Debtors are in discussions with the ABL Lenders regarding

providing a $400 million ABL Exit Facility, which may be made available as part of a debtor-in-

possession financing facility that would automatically convert to a $400 million ABL Exit Facility

UST-0023

upon satisfaction of certain conditions and emergence from these chapter 11 cases or, in any event, ahead of emergence from these chapter 11 cases.

12.    After many months of reviewing alternatives both before and after the COVID-19 pandemic, the Debtors determined that the Restructuring Support Agreement represents the best option available to the Debtors.   The commitment of the Term Lenders to the transactions embodied in the Restructuring Support Agreement, including funding the New Term Loan Financing, provide Ascena with substantial certainty that it will have the liquidity necessary to continue to provide a best-in-class experience for its customers and achieve its Strategic Plan both during and after emergence from these chapter 11 cases.   Implementing the transactions contemplated by the Restructuring Support Agreement will also substantially deleverage the Debtors' balance sheet, positioning Ascena for long-term success.

13.    To preserve the benefits of the Restructuring Support Agreement, the Debtors must move swiftly through these chapter 11 cases.  The Restructuring Support Agreement includes, among other milestones, a 110-day milestone to achieve confirmation of the Plan and a 130-day milestone to emerge from these chapter 11 cases.

14.    To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this declaration into five sections.  The *first* section provides background information on the Debtors' corporate history and operations.  The *second* section offers detailed information on the Debtors' prepetition capital structure.  The *third* section describes the circumstances leading to the filing of these chapter 11 cases.  The *fourth* section describes the Debtors' Restructuring Support Agreement.  The *fifth* section summarizes the relief requested in, and the legal and factual basis supporting, the First Day Motions.

UST-0024

I.      **Corporate History and Operations.**

   A.      **Corporate History.**

15.      An entrepreneur and innovator, Roslyn S. Jaffe saw the opportunity to provide wear-to-work dresses and clothing for the working woman during the sixties—a time in the United States when women were entering the workforce in greater numbers, with few options available for buying more stylish and affordable workplace women's clothing.  Roslyn, alongside her husband Elliot, opened the first "Dressbarn" store in 1962.  What started as a family-run, single-store retailer quickly transformed into a nationally-recognized, publicly-traded specialty retailer for fashion apparel and accessories for women.  Following its public listing in 1982, The Dressbarn, Inc. ("Dressbarn") grew rapidly to over 800 stores across 49 states by the early-2000s.

16.      Over the years, Ascena has grown its portfolio of retail brands through synergistic and selective acquisition, broadening its specialty offerings and expanding its retail footprint throughout North America.



UST-0025

17.     In 2004, Dressbarn acquired Maurices Incorporated ("Maurices") for $320 million (the "Maurices Acquisition").  Maurices, a specialty retailer offering a broad assortment of fashionable, high quality apparel and accessories to women and men ages 17 to 34, broadened Dressbarn's demographic reach and diversified its retail base (Maurices subsequently exited men's apparel).  The Maurices Acquisition added 464 stores across 38 states, located in strip centers and malls, and reflected a combined enterprise with sales exceeding $1.1 billion.  In 2009, Dressbarn expanded into the girls' clothing market by purchasing Tween Brands, Inc., the owner of the Justice chain, a leading retailer of trendy and value fashion for tween girls between ages seven and fourteen (the "Tween Acquisition").  In a stock-swap deal valued at $157 million, the Tween Acquisition expanded Ascena's addressable market for clothing to young and teenage girls, adding 908 Justice stores.  The combined enterprise encompassed 2,465 locations, with expected sales to reach $2.4 billion.

18.     On January 1, 2011, to reflect its broader holdings and provide the Company with strategic, operational, and financial flexibility, Elliot and Roslyn Jaffee reorganized Dressbarn as a new Delaware corporation under the name "Ascena Retail Group, Inc.," with each of its retail operating brands becoming wholly-owned subsidiaries of Ascena.  In conjunction with this, on January 3, 2011, shares of Ascena's common stock commenced trading on the NASDAQ under the ticker symbol "ASNA."

19.     Following the reorganization, Ascena continued its growth through selective and accretive acquisitions.  In 2012, Ascena ventured into the plus-sized women's clothing market by acquiring Charming Shoppes Inc. ("Charming Shoppes"), the parent company of three distinct brands: Lane Bryant, Inc. ("Lane Bryant"), Catherines Plus Sizes ("Catherines"), and Fashion Bug, for approximately $890 million (the "Charming Shoppes Acquisition").  The acquisition added

8

UST-0026

approximately 1,800 retail stores across 48 states. With Charming Shoppes now operating as an independent, wholly-owned subsidiary of Ascena, the combined enterprise operated approximately 3,800 locations. Shortly following the Charming Shoppes Acquisition, Ascena ceased operations of the Fashion Bug business, closing 124 stores.

20.     In 2015, in perhaps the most significant transaction since its inception, Ascena acquired ANN INC. ("ANN"), the parent company of retail brands Ann Taylor, LOFT, and Lou & Grey, for approximately $2.16 billion (the "ANN Acquisition"). To finance the ANN Acquisition, Ascena raised new secured debt through a first lien term loan facility in the aggregate amount of $1.8 billion (approximately $1.27 billion of which are the Term Loans outstanding today). Through the ANN Acquisition, Ascena added two of the leading women's specialty retail fashion brands in North America and solidified itself as one of nation's largest and most diversified specialty apparel retailers. The ANN Acquisition added more than 1,000 store locations across 47 states, the District of Columbia, Puerto Rico, and Canada. Further, the Ann Taylor and LOFT brands enhanced the Company's "omnichannel" presence by providing two store-related e-commerce websites that were available online in more than 100 countries. Following the ANN Acquisition, the store fleet of the Ascena enterprise totaled 4,930 stores, a number significantly reduced in the following years as part of the Company's rationalization efforts.

**B.     Business Operations.**

21.     Today, Ascena operates through seven well-known brands with approximately 2,800 stores in 49 states, Canada, and Puerto Rico and revenues surpassing $5.5 billion annually. The Company's operations consist of its direct channel operations, wholesale

UST-0027

operations, retail store locations, and franchised store locations. The Company's brands are organized into three reportable segments: (i) Premium Fashion; (ii) Plus Fashion; and (iii) Kids Fashion.

22. ***Premium Fashion***. The Premium Fashion segment consists of the Ann Taylor, LOFT, and Lou & Grey brands. Ann Taylor has 291 specialty retail and outlet locations and direct channel operations, accounted for approximately $752 million in fiscal year 2019 sales, and has approximately three million active customers. LOFT has 666 specialty retail and outlet stores, accounted for approximately $1.7 billion in fiscal year 2019 sales, and has approximately 6.7 million active customers. Lou & Grey operates out of certain specialty retail and outlet stores with direct channel operations as well. As of the Petition Date, the Premium Fashion segment accounts for approximately 51 percent of the enterprise's gross sales, and operated out of 957 store locations.

23. ***Plus Fashion***. The Debtors' Plus Fashion segment consists of the Lane Bryant and Catherines brands. Lane Bryant has 688 specialty retail and outlet stores, accounted for approximately $969 million in fiscal year 2019 sales, and has approximately 4.1 million active customers. Catherines includes 320 specialty retail stores. As of the Petition Date, the Plus Fashion segment accounts for 26 percent of the enterprise's gross sales, and operated out of 1,008 store locations

24. ***Kids Fashion***. The Debtors' Kids Fashion segment consists of the Justice brand, and includes 826 specialty retail and outlet stores. As of the Petition Date, the Kids Fashion segment accounts for 23 percent of the enterprise's gross sales

    **C.**    **The Debtors' Sourcing, Procurement, and Distribution Procedures.**

25. The Debtors maintain control over each of their brands by designing and merchandising in-house to drive sales, margin, and traffic. The design and merchandising process

UST-0028

operates on a ten-month design-to-store cycle to allow management to create and source the best quality at the lowest cost, while also providing ample time for development and execution of product strategy, concept, costs, product review, inventory strategy, and logistics, among others.

26.     The Debtors' brands source products through one of three channels:  (i) an internal sourcing group; (ii) third-party buying agents; or (iii) direct from market vendors.   Various factors affect the selection of sourcing channels, including cost, speed to market, merchandise selection, vendor capacity, and fashion trends.  Operating through offices located in Hong Kong, South Korea, China, India, and Bangladesh, the Debtors maintain direct relationships with manufacturing partners, which enables desired product quality control and speed to market, along with favorable pricing as compared to market vendors.  The Debtors purchase merchandise from many domestic and foreign suppliers.  The Debtors do not maintain long-term contracts or arrangements with suppliers and typically transact business on an order-by-order basis.

27.     Ascena owns and maintains a fulfillment center in Greencastle, Indiana, which serves as the Debtors' primary direct channel fulfillment center, a distribution center in Etna, Ohio, serving as the primary brick-and-mortar store distribution center, and a distribution center in Riverside, California which serves as the west coast distribution hub for the Debtors' merchandise sourced from Asia as well as an additional brick-and-mortar store distribution and e-commerce distribution center.  Taken together, the Debtors maintain integrated distribution systems and inventory across more than 2.3 million square feet of distribution capacity, shipping nearly 300 million units annually.

### D.     Recent Corporate and Brand Initiatives.

#### 1.     Customer First Approach.

28.     The Debtors operate a multi-faceted marketing and advertising strategy to reach the target audience for each brand.  Over the past decade, the Debtors have expanded from in-store

UST-0029

only marketing to direct mail, partnerships, print, digital, and social platforms. The Debtors' current marketing strategy marks a shift toward an integrated, more advanced advertising structure, which taps into online prospecting to supplement grassroots, social networking, and blogger outreach programs, while continuing to capitalize on the Debtors' historical marketing strategies. The Debtors' customer insights team is constantly engaging with customers to obtain feedback on products and experiences that drive brand and product strategy. By leveraging their unique data analytics capabilities to understand customers, the Debtors are able to implement targeted Facebook and Instagram campaigns and deliver more personalized and seamless end-to-end experiences within the portfolio of brands. The Debtors focus on customer engagement is best reflected by their highly personalized shopping experience, illustrated in the below "journey map."

<u>**Customer Journey Map**</u>



2.      **The Debtors' Omni-Channel Strategy.**

29.      The goal of the Debtors' omnichannel strategy is to optimize Ascena's customer experience across all possible brand interactions through technology, whether the customer is in store or online. Through integration of online and in-store technology-enabled initiatives, Ascena services customers with a single, channel-agnostic view of inventory and customer-specific preference.

12

UST-0030

30.     Over 50 percent of Ascena's customers prefer to shop online or through multiple channels.  Ascena's omnichannel capabilities are wide-ranging, including:  (i) in-store demand and out-of-stock fulfillment; (ii) online purchasing with in-store returns as well as in-store and curbside pick-up; (iii) online demand and ship-from-store fulfillment; (iv) alternative payments allow one-click checkout; (v) private label credit card and loyalty programs; (vi) cross-channel returns; (vii) online find in store; (viii) fit prediction technology; (ix) clienteling applications; and (x) responsive and adaptive mobile design and store detail pages.  The Debtors' omnichannel platform ensures that customers can buy and return product anywhere and at any time.

31.     The Debtors continue to invest in initiatives to support their omnichannel platform. Over the last several years, the Debtors continued to develop technological solutions to enable their brands to provide customers a seamless omnichannel shopping experience in-store and online, and to integrate marketing efforts to drive in-store and online traffic.  The Debtors have committed to enhancing product availability and fulfillment efficiency as well as their capability to analyze transaction data to support strategic decisions.  These efforts have increased the Debtors' ecommerce penetration from 19 percent in 2016 to 44 percent in 2020, and expected to grow to 60 percent by 2024.

### 3.     Exiting the Value Fashion Segment.

32.     In response to the challenges facing the retail industry over the past several years, in early 2019, Ascena determined to exit its underperforming value fashion segment.  This ultimately include the going concern sale of the Maurices business and complete wind down of the Dressbarn business.

33.     ***Sale of Maurices***.  On March 25, 2019, Ascena announced the sale of a majority interest in the Maurices business (the "Maurices Sale") to a third party purchaser, which, at the time, represented 15 percent of the enterprise's overall revenue and had generated substantial

UST-0031

losses over the past two fiscal years. Valued at about $300 million, Ascena received $210 million in cash and an approximately 49.6 percent stake in the new ownership vehicle. The proceeds from the Maurices Sale were used to purchase inventory and reinvest in incremental business initiatives. Ascena continues to support the Maurices brand through a management services agreement, including support for IT, supply chain, sourcing, and certain back office functions. The sale of Maurices, which had reported declining EBITDA numbers and net sales number since 2016, allowed Ascena to focus on its core brands and promised a leaner operating model with significant anticipated cost-savings.

34. ***Dressbarn Wind Down***. In conjunction with the Maurices Sale, and in an effort to restructure the enterprise along its most profitable brands, in May 2019, Ascena commenced a wind down of its Dressbarn brand (the "Dressbarn Wind Down"). The Dressbarn Wind Down included the eventual closure of approximately 660 Dressbarn locations. The Dressbarn Wind Down was completed in the second quarter of 2020, with all store closures effectuated in or about January of 2020. Through the liquidation, Ascena shed over $300 million of lease liability and sold the e-commerce rights of Dressbarn to a third-party purchaser for approximately $5 million.

## II.    The Company's Prepetition Corporate and Capital Structure.

35. The Company's current corporate structure reflects the various strategic acquisitions that Ascena has executed over the years, including, most recently, the ANN Acquisition. The corporate structure is reflected in the corporate organizational chart attached hereto as **Exhibit B**. Each Debtor is a direct or indirectly wholly-owned subsidiary of Ascena Retail Group, Inc. As of the Petition Date, the Debtors have approximately $1.60 billion in total funded debt obligations, consisting of approximately $1.27 billion in Term Loans and $330 million outstanding under the ABL Facility. The following table depicts the Debtors' prepetition capital structure, exclusive of accrued but unpaid interest and fees:

14

UST-0032

| Debt Instrument | Maturity | Rate | Outstanding Amount |
|---|---|---|---|
| ABL Facility | February 2023 | L + 1.25% | $333.0 million[2] |
| Term Loan Facility | August 2022 | L + 4.50% | $1.27 billion |
| **Total Funded Debt:** | | | **$1.60 billion** |

### A.   ABL Facility.

36.     Ascena Retail Group, Inc., as parent borrower, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto, the issuing banks party thereto, and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacities, the "ABL Administrative Agent") and swingline lender, are parties to that certain Amended and Restated Credit Agreement, dated as of January 3, 2011, as amended and restated by the Second Restatement Agreement dated as of June 14, 2012, by the Third Restatement Agreement dated as of March 13, 2013, by the Fourth Restatement Agreement dated as of July 24, 2015, by the Fifth Restatement Agreement dated as of February 27, 2018, and as may otherwise be amended, restated, supplemented, or otherwise modified from time to time (the "ABL Credit Agreement").[3]   The ABL Credit Agreement provides for a senior secured asset-based revolving credit facility, with a maximum availability of $500 million, subject to a borrowing base. As of the Petition Date, the aggregate borrowing base (i.e., the effective maximum availability) was $500 million.   The obligations under the ABL Facility are secured, subject to certain exceptions, by a first priority lien on certain of the Debtors' assets, including, without limitation, accounts receivable, inventory, cash, cash equivalents, and a second priority lien on the Debtors' real property, capital stock, and other personal property, including the Debtors' intellectual

---

[2]     This total includes approximately $103 million in outstanding letters of credit issued under the ABL Facility.

[3]     The guarantors under the ABL Revolver Facility are Ascena's domestic subsidiaries, subject to customary exclusions and exceptions (collectively, the "ABL Guarantors").

UST-0033

property and investment contracts.  As of the Petition Date, approximately $230 million in borrowings and approximately $103 million of letters of credit are outstanding under the ABL Facility.

### B.  Term Loan Facility.

37.  In connection with the ANN Acquisition, on August 21, 2015, Ascena Retail Group, Inc., AnnTaylor Retail Inc., as subsidiary borrower, lenders party thereto, and Goldman Sachs Bank USA, as administrative agent (in such capacity, the "Term Loan Agent") entered into that certain Term Credit Agreement (as may be amended, restated, supplemented, or otherwise modified from time to time, the "Term Credit Agreement").  The Term Credit Agreement provides for a senior secured term loan facility, issued in the original aggregate principal amount of $1.8 billion at an interest rate based on either the alternate base rate or the adjusted LIBO rate plus a margin (the "Term Loan Facility").  The Term Loan Facility matures on August 21, 2022, and requires quarterly repayments of $4.5 million prior to the first half of the 2017 fiscal year and $22.5 million thereafter, with a remaining balloon payment of approximately $1.26 billion at maturity.  In 2018, the Company made repayments totaling $225 million of which $180 million was applied to future quarterly scheduled payments, extending the next required quarterly payment of $22.5 million to November 2020.

38.  The obligations under the Term Loan Facility are secured, subject to certain exceptions, by a first priority lien on the Debtors' real property, capital stock, and other personal property, including the Debtors' intellectual property and investment contracts, and a second priority lien on certain of the Debtors' assets, including, without limitation, accounts receivable, inventory, cash, and cash equivalents.  As of the Petition Date, approximately $1.27 billion in aggregate principal amount remained outstanding under the Term Loan Facility.

UST-0034

### C. Common Stock.

39.     Shares of Ascena Retail Group, Inc.'s common stock have traded on the New York

Stock Exchange under the symbol "ASNA."  As of the Petition Date, approximately 9,986,423

shares of voting common shares were outstanding.

## III. Events Leading to these Chapter 11 Cases and Restructuring Initiatives.

### A. Challenging Operating Environment.

40.     In addition to the effects of the COVID-19 pandemic, Ascena faces the same

macro-trends that have crippled many apparel and retail companies in recent years.  These factors

include the general downturn in the retail industry and the marked shift away from

brick-and-mortar retail to online channels.  Given the Debtors' substantial brick-and-mortar

presence and associated expenses, the Debtors' businesses have been heavily dependent on store

traffic and resulting sales conversions to meet sales and profitability targets.  The retail apparel

industry, however, has undergone a permanent shift towards a more online-centric format, in

which retailers sell more product through company websites or larger online retailers.

Recognizing this, in recent years the Debtors have implemented a series of cost-saving and cash

conservation initiatives to grow their profit margins and address their debt obligations and have

made significant investment into their omnichannel strategy to fuel online sales growth.

### B. COVID-19, Store Closures, Furlough Program, and Liquidity Preservation.

41.     Beginning in March 2020, as a result of the COVID-19 pandemic,

government-mandated lockdowns, and the subsequent shuttering of the global economy, Ascena,

like the rest of the retail world, experienced a significant and precipitous decline in already-

challenged store traffic and related consumer spending.  Following the recommendations and

mandates of state and local governments, on March 17, 2020, Ascena temporarily closed all

Company-operated retail stores indefinitely, while distributions centers remained open, operating

UST-0035

at limited capacity.  Store closures have significantly contributed to missed sales targets, unsold inventory, and depressed profit margins.

42.     In response, Ascena took decisive action to preserve liquidity, evaluating all options available to conserve cash and maintain ongoing operations.  To that end, the Company materially reduced costs, capital expenditures, inventory commitments, and modified vendor payment terms. Moreover, on March 30, 2020, the Debtors announced the implementation of temporary salary reductions and furloughs affecting all store associates and nearly half of its corporate associate workforce (the "Furlough Program").  In addition to the Furlough Program, the Debtors implemented temporary reductions in the base salaries of all corporate associates, excluding Distributions Center associates,  above a certain threshold, and reduced the base salaries of certain senior management positions by 50 percent.  Reductions for other executives and corporate associates above a certain threshold ranged from 10 percent to 45 percent depending on base pay.

43.     Recently, in accordance with state and local orders, the Company has reopened stores in a phased approach, with a sharp focus on employee and customer safety.  As of the Petition Date, substantially all of the Company's stores had reopened.  The Company is taking exceptional measures to ensure that its associates and customers remain safe in its stores. Specifically, the Company is performing diligent nightly cleaning of its stores, offering contact-free curbside pickup, providing training to its associates on safety practices, and provides masks to each associate, among other measures.

44.     Even with stores open, the brick and mortar retail operating environment continues to be challenging and uncertain.  Certain states have implemented or indicated they are considering social distancing measures that may require that Ascena re-close certain of its stores.  Moreover, it is unclear when store traffic will return to pre-COVID-19 levels.  In light of this uncertainty, the

UST-0036

Company has determined to implement the Strategic Plan to ensure that Ascena's operating model appropriately reflects current operating conditions.

### C. Development of Revised Strategic Business Plan.

45. The effects of COVID-19, taken together with the macroeconomic trends already affecting the retail industry, accelerated the need for Ascena to reassess its go-forward business model. In the months preceding the COVID-19 outbreak, the Debtors' management team ("Management"), the Special Committee, and the Board had been developing a revised, comprehensive transformation strategy focused on addressing the following: (i) closure of under-performing brands; (ii) right-sizing the store fleet for go-forward brands to ensure remaining stores deliver healthy EBITDA results; (iii) simplifying the organizational structure and operating model to drive aggressive cost reduction; (iv) rationalizing real estate portfolio; and (v) rationalizing go-forward supply chain. In light of the effects of COVID-19, Management, the Special Committee, and the Board accelerated and refocused these efforts to build a plan that would allow the Company to remain viable in the new COVID-19 operating environment.

46. ***Brand Portfolio Rationalization***. As part of the revised strategy, Ascena determined that it is in the best interests of the Company to implement the wind down of certain under-performing brands while retaining and focusing on core brands that drive customer engagement and loyalty. The Company, with the help of its advisors, determined that a challenging M&A market coupled with recent brand performance and associated liabilities meant that a going-concern sale was not viable. Accordingly, during these chapter 11 cases, Ascena intends to wind down the brick-and mortar operations of Catherines, and Lou & Grey, and restructure Justice, including winding down the majority, or all, of the brick and mortar operations. Ascena intends to transition Justice to a primarily online platform and continue Lou & Grey within go-forward LOFT stores. At the conclusion of the wind-down of the Catherines brick and mortar stores,

UST-0037

Ascena intends to complete a sale of the Catherines-related intellectual property in accordance with the related motion filed contemporaneously herewith. The aggregate effect will be an elimination of approximately 1,000 store locations.

47. *Real Estate Rationalization*. The Debtors plan to continue their real estate rationalization efforts by closing unprofitable and marginally profitable stores, and attaining rent relief through renegotiations. By the conclusion of these chapter 11 cases, the Debtors intend to reduce their store fleet from approximately 2,800 stores to approximately 1,200 stores, representing a 56 percent reduction in the total store fleet. This is the culmination of a comprehensive, store-by-store performance analysis to identify stores not delivering adequate levels of profitability to justify keeping the store in the Company's real estate portfolio. Approximately 1,000 of the closing stores are related to the Catherines and Justice brands, but the Debtors intend to exit certain stores related to the core, go-forward brands as well, pending discussions with landlords regarding rent concessions, through which discussions the Debtors expect to achieve significant rent savings.

**D. Exploration of Strategic Alternatives.**

48. Recognizing the need to explore strategic alternatives to address Ascena's 2022 term loan maturity, in July 2019, the Debtors retained Kirkland & Ellis LLP, as legal advisor, and Guggenheim Partners, LLC, as investment banker. Together, the Debtors and their advisors analyzed the Debtors' capital structure and potential out-of-court strategies to extend runway. On September 30, 2019, in connection with the Board's ongoing review of strategic alternatives, the Board appointed two independent and disinterested directors, Gary D. Begeman and Paul Keglevic, who together comprise the Special Committee. The Board delegated to the new directors the authority to, among other things, review and act upon strategic transactions.

UST-0038

49.     In the midst of the Board's and Special Committee's review of strategic alternatives, the COVID-19 pandemic hit.  The Board's focus immediately shifted to protecting Ascena's business, preserving liquidity, and ensuring the safety of Ascena's employees and customers.  In parallel with stabilizing Ascena's business and cash position, the Board and Special Committee focused on addressing the effect of COVID-19 on Ascena's business, including refining and accelerating certain actions in the Company's existing business plan, ultimately embodied in the Strategic Plan, and exploration of options to extend runway.  The Board explored the viability of a number of out-of-court alternatives, including various out-of-court financing structures, the sale of all or a portion of the business, and other alternatives.  Eventually it became clear that the out-of-court alternatives reviewed by the Board and short-term liquidity saving measures implemented by the Company would not be sufficient to address the effects of the COVID-19 pandemic.

50.     In addition to an already highly leveraged balance sheet, to weather the storm caused by the COVID-19 pandemic, the Company was forced to accumulate additional obligations to preserve cash, including additional drawings under the ABL Facility and vendor and landlord facing claims.  The accumulation of these additional obligations, coupled with the challenging market conditions, made it impossible to structure an out-of-court transaction that would allow Ascena to achieve its long-term strategic plan.  In April 2020, Ascena retained Alvarez & Marsal North America, LLC as restructuring advisor to assist in Ascena's review of strategic alternatives.

51.     To facilitate a restructuring transaction to address the Company's capital structure and other outstanding liabilities in a more comprehensive manner, in early 2020, the Company began engagement with the ad hoc group of term lenders and the administrative agent under the ABL Facility.  Several months of discussions and negotiations ultimately resulted in the

UST-0039

Restructuring Support Agreement, which contemplates a transformative restructuring and is supported by more than 68% of the Term Lenders. The Company is also in continuing discussions with its ABL Lenders to provide the ABL Exit Financing, and expects to secure a commitment in the near term.

52.     The decision to enter into the Restructuring Support Agreement and commence these chapter 11 cases is the culmination of nearly a year of strategic review, including weekly meetings of the Board and weekly meetings of the Special Committee since August 2019. Ultimately, the Board and Special Committee determined that the Restructuring Support Agreement and these chapter 11 cases represent the value-maximizing path forward. On July 23, 2020, the Board authorized entry into the Restructuring Support Agreement and the Debtors commenced these chapter 11 cases shortly thereafter.

## IV.     The Restructuring Support Agreement, Chapter 11 Plan, and New Financing.

53.     The Restructuring Support Agreement contemplates a comprehensive reorganization that will be implemented through a chapter 11 plan of reorganization and that will result in a substantial deleveraging of the Debtors' balance sheet and an infusion of new capital to fund the Strategic Plan and Ascena's emergence from these chapter 11 cases. Under the Restructuring Support Agreement, certain of the Term Lenders have agreed to backstop a $150 million new money investment and substantially equitize the $1.27 billion in outstanding Term Loans. Upon emergence from chapter 11, in addition to any outstanding borrowings under the Exit ABL Facility, the Company's secured term loan obligations will be reduced to $400 million and the Company will have discharged substantial unsecured obligations that have accumulated (in significant part) as a result of the COVID-19 pandemic (and that the Company would not have otherwise been able to address on an out-of-court basis).

UST-0040

54.     To effectuate this comprehensive restructuring, and ensure the Debtors' emergence

from chapter 11, it is imperative that the Debtors meet the following milestones contained in the

Restructuring Support Agreement:

- no later than three business days from the Petition Date, the Court shall have entered an interim order approving the Company's use of cash collateral;

- no later than thirty-five business days from the Petition Date, the Court shall have entered into a final order approving the DIP Facility;

- no later than sixty  days from the Petition Date, the Court shall have approved the Disclosure Statement;

- no later than 110 days after the Petition Date, the Court shall have confirmed the Plan; and

- no later than 130 days after the Petition Date, the effective date of the Plan shall have occurred.

55.     The New Money Term Loan Financing will be funded initially as a debtor-in-

possession financing, $75 million of which the Company will make available to all Term Lenders

through a syndication process to be completed prior to the second day hearing in these chapter 11

cases.  The remaining $75 million of the New Money Term Loan Financing will be funded by the

initial Term Lenders party to the Restructuring Support Agreement (which lenders are also

backstopping the syndicated portion of the New Money Term Loan Financing).  Provided that

certain conditions are satisfied, the New Money Term Loan Financing will (along with

$161.8 million in rolled up Term Loans) automatically convert to a "first out" exit term loan.

56.     In addition to the New Money Term Loan Financing, as of the Petition Date, the

company has approximately $433.7 million in cash on hand.  As set forth in the *Debtors' Motion

for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition

Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and

Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the*

UST-0041

*Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, the Debtors, the Term Lenders, and the ABL Lenders have agreed to the terms of consensual use of cash collateral to help fund these chapter 11 cases. Finally, the Debtors are in continuing discussions with the ABL Lenders regarding providing a new asset-based lending facility that would be funded initially as a $400 million debtor-in-possession financing and, upon the satisfaction of certain conditions, convert to the Exit ABL Facility. All of this taken together will provide the Company will substantial liquidity to administer these chapter 11 cases and continue to meet their ongoing operational obligations, thereby providing certainty to and maximizing value for all stakeholders.

57. Implementation of the transactions contemplated by the Restructuring Support Agreement will position Ascena for long-term success, save thousands of jobs, and ensure that the Company's key landlords and vendors continue to have a viable go-forward business partner. Without the certainty of outcome provided by the Restructuring Support Agreement, it is unlikely that the Company would be able to secure favorable (if any) trade terms, which would have a substantial, deteriorative effect on the company. Moreover, without the clear path to emergence from chapter 11 provided by the Restructuring Support Agreement, certain of the Company's key counterparties may decline to transact with Ascena altogether. After an extensive review process, the Restructuring Support Agreement is the only viable path forward that results in Ascena's business continuing as a going concern. For these reasons and the other reasons described in this declaration I believe that the Restructuring Support Agreement represents the value-maximizing path forward.

UST-0042

## V.    Evidentiary Support for First Day Motions.

### A.    Debtor-in-Possession Financing and Cash Collateral Use.[4]

58.    I am familiar with the DIP Facilities, the material terms thereof, as well as the Debtors' liquidity needs.  The Debtors request approval of the DIP Facilities on a final basis only and approval of consensual use of Cash Collateral (with the support of the Debtors' secured lenders).  The use of Cash Collateral during the interim period will be critical to the Debtors' ability to continue operating and to restructure successfully.  As of the Petition Date, the Debtors have approximately $433.7 million of cash on hand.  Without the authority to use Cash Collateral, the Debtors would not have access to sufficient cash to fund their day-to-day operations, including purchase new inventory, honor employee wages and benefits, fund operational expenses, or maintain valuable long-term relationships with their vendors, suppliers, employees, and customers. I believe that restricted access to this Cash Collateral would result in irreparable harm to the Debtors and their reorganization efforts.

59.    The DIP Facilities also provide material value to the Debtors' chapter 11 estates by sending a strong message to the Debtors' stakeholder that the Debtors will have sufficient liquidity to meet their cash needs and will continue to have sufficient access to capital after emergence from chapter 11 in light of the automatic exit conversion feature contained in the DIP Facilities.

60.    The Debtors, with the assistance of A&M, evaluated the amount of funding that the Debtors will require in these chapter 11 cases and prepared a 13-week budget (the "Budget").  The amount was derived from a cash-flow projection that the Debtors' and A&M developed from an

---

[4]    Defined terms used but not defined in this subsection have the meanings given to them in *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion"), filed contemporaneously herewith.

UST-0043

analysis of the Debtors' receipts and disbursements. I have reviewed the Budget and concluded that it is reasonable in light of the Debtors' circumstances. I have further concluded that the amounts available under the DIP Facilities, together with the Debtors' cash on hand and revenue from the operation of their business, are sufficient to fund all payments contemplated by the First Day Motions and fund the Debtors' postpetition operating and restructuring-related expenses. Accordingly, the Debtors should have sufficient available liquidity at the end of the Budget projection period in the form of both cash on hand and availability under the DIP Facilities to fund ongoing operations after the payment of all amounts contemplated by the First Day Motions. Based on my experience and extensive discussions with the Debtors' management team and advisors, I believe the Budget presents a reasonable estimate of the Debtors' cash sources and needs during these chapter 11 cases.

61. The DIP Facilities would provide the Debtors sufficient liquidity to demonstrate to the market that they will be able to meet their operating obligations during these chapter 11 cases, as the Debtors implement the restructuring contemplated by the Restructuring Support Agreement. The DIP Facilities would also provide a reasonable liquidity buffer to the Debtors in the event they underperform their projections, or in case the restructuring takes longer than anticipated.

62. Moreover, demonstrating that the Debtors have access to financing will allow them to maintain favorable trade terms with vendors. Loss of trade terms (whether on account of demands for cash in advance, cash on delivery, or otherwise) would materially impair the value of the Debtors' estates. Finally, increased liquidity will send positive signals to the Debtors' other stakeholders, including landlords, customers, and employees, that the Debtors' business is on the path to improved operational results, encouraging them to work cooperatively with the Debtors

UST-0044

through the restructuring. Accordingly, on behalf of the Debtors, I respectfully submit the Court should grant the relief requested in the DIP Motion.

### B. Other First Day Motions.

63. Contemporaneously herewith, the Debtors filed a number of First Day Motions and is seeking orders granting various forms of relief intended to stabilize Ascena's business operations and facilitate the efficient administration of these chapter 11 cases. The First Day Motions seek authority to, among other things, ensure sufficient liquidity to run Ascena's business, ensure the continuation of Ascena's cash management systems, and allow for other business operations without interruption. I believe that the relief requested in the First Day Motions is necessary to give Ascena an opportunity to work towards successful chapter 11 cases that will benefit all of Ascena's stakeholders.

64. The First Day Motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, Ascena has narrowly tailored its requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to Ascena and its estates. Other relief will be deferred for consideration at a later hearing.

65. I am familiar with the content and substance of the First Day Motions. The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable Ascena to operate in chapter 11 with minimal disruption to its business operations and constitutes a critical

UST-0045

element in successfully implementing a chapter 11 strategy.  A description of the relief requested

and the facts supporting each of the First Day Motions is detailed in **<u>Exhibit C</u>**.


*[Remainder of Page Left Intentionally Blank]*

UST-0046

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 23, 2020

*/s/ Carrie W. Teffner*
_____
Carrie W. Teffner
Interim Executive Chair
Ascena Retail Group, Inc.

**Exhibit A**

**Restructuring Support Agreement**

UST-0048

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

## *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 13.03, this "**Agreement**") is made and entered into as of July 23, 2020 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) and (ii) of this preamble, collectively, the "**Parties**"):[1]

    i.    Ascena Retail Group, Inc. a company incorporated under the Laws of the State of Delaware ("**Ascena Topco**"), and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**"); and

    ii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting Stakeholders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the Restructuring Term Sheet (such transactions as described in this Agreement, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**");

**WHEREAS**, certain of the Consenting Stakeholders or their affiliates that are parties to that certain Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Facility

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings given to them in Section 1 of this Agreement or the Restructuring Term Sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**").

UST-0049

Backstop Commitment Letter attached as **Exhibit C** hereto (the "**Backstop Commitment Letter**") have agreed to provide the DIP Term Loans on the terms set forth in the Backstop Commitment Letter;

> **WHEREAS**, the DIP Term Loans will be converted into loans under the First Out Exit Term Loan Facility on the Plan Effective Date on the terms set forth in the Restructuring Term Sheet and that certain exit facility term sheet attached as **Exhibit D** hereto (the "**Exit Facility Term Sheet**"); and

> **WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Plan;

> **NOW, THEREFORE**, in consideration of the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

<div align="center">*AGREEMENT*</div>

**Section 1.**   *Definitions and Interpretation*.

> 1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**ABL Claims**" means any Claims arising under, related to, or on account of the ABL Credit Agreement.

"**ABL Credit Agreement**" means that certain Amended and Restated Credit Agreement dated as of January 3, 2011, as amended and restated by the Second Restatement Agreement dated as of June 14, 2012, by the Third Restatement Agreement dated as of March 13, 2013, by the Fourth Restatement Agreement dated as of July 24, 2015, by the Fifth Amendment and Restatement Agreement dated as of February 27, 2018 and as may otherwise be amended, restated, supplemented or otherwise modified, among Ascena TopCo, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto, the issuing banks party thereto, and JPMorgan Chase Bank, N.A., as administrative agent and swingline lender.

"**Agent**" or "**Agents**" means, individually or collectively, any administrative agent, collateral agent, or similar Entity under the ABL Credit Agreement and/or the Term Credit Agreement, including any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 13.03 (including the Restructuring Term Sheet, the Exit Facility Term Sheet and the Backstop Commitment Letter).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

UST-0050

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Ascena Topco**" has the meaning set forth in the preamble to this Agreement.

"**Backstop Commitment Letter**" has the meaning set forth in the preamble to this Agreement.

"**Bankruptcy Code**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cash Collateral Order**" means any order of the Bankruptcy Court granting the authorization to use cash collateral on an interim basis on terms acceptable to the Company Parties and the Required Consenting Stakeholders.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning given to it in section 101(5) of the Bankruptcy Code with respect to a Debtor.

"**Company Claims/Interests**" means any Claim or Equity Interest, including the ABL Claims, the Term Loan Claims, the DIP ABL Facility Claims, the Backstop Commitments, and the DIP Term Facility Claims.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

UST-0051

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**DIP Financing Order**" means the order entered by the Bankruptcy Court setting forth the terms of and approving the DIP ABL Facility, the DIP Term Facility, and the Backstop Commitment Letter on terms acceptable to the Company Parties and the Majority Backstop Commitment Parties (as defined in the Backstop Commitment Letter).

"**Disclosed Interests**" has the meaning set forth in Section 9(a).

"**Disclosure Statement**" means the disclosure statement with respect to the Plan.

"**Disclosure Statement Order**" means the order entered by the Bankruptcy Court approving the Disclosure Statement

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" or "**Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file upon the commencement of the Chapter 11 Cases.

"**Greenhill**" means Greenhill & Co., LLC, as financial advisor to the Lender Group.

"**Initial Consenting Stakeholders**" means Consenting Stakeholders that have that have executed and delivered counterpart signature pages to this Agreement to counsel to the Company Parties as of the Execution Date.

"**Insider**" has the meaning set forth in section 101(31) of the Bankruptcy Code.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit E**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

UST-0052

"**Lender Group**" means the ad hoc group or committee of Consenting Stakeholders represented by Greenhill and Milbank.

"**Loyens**" means Loyens & Loeff Luxembourg S.à.r.l., as Luxembourg counsel to the Lender Group.

"**LuxCo Entities**" means, collectively, AnnTaylor Loft GP Lux S.à.r.l. and AnnTaylor Loft Borrower Lux SCS.

"**Milbank**" means Milbank LLP, as counsel to the Lender Group.

"**New Corporate Governance Documents**" means the form of certificate or articles of incorporation, bylaws, limited liability company agreement, partnership agreement, or such other applicable formation documents (if any) of Reorganized Ascena, including any certificates of designation, each of which shall be included in the Plan Supplement.

"**Outside Date**" means the date that is six (6) months after the Petition Date.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the chapter 11 plan of reorganization to be filed by the Debtors in the Chapter 11 Cases consistent with this Agreement and the Restructuring Term Sheet and otherwise as reasonably acceptable to the Company Parties and the Required Consenting Stakeholders, including any and all exhibits annexes and schedules thereto.

"**Plan Effective Date**" means the date of the occurrence of the "Effective Date" of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Post-Emergence Incentive Plan Documents**" means all documentation with respect to any post-emergence management incentive plan, including the Management Incentive Plan, which, for the avoidance of doubt, does not include the Employee Benefits Programs (as defined in the Restructuring Term Sheet).

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

UST-0053

"**Rent Deferral Motion**" means a motion seeking an order from the Bankruptcy Court extending the time for performance of the Debtors' obligations arising under unexpired non-residential real property leases to the date that is at least sixty (60) days after the Petition Date.

"**Reorganized Ascena**" means either (a) Ascena Topco, or any successor thereto, as reorganized pursuant to and under the Plan or (b) a new corporation or limited liability company that may be formed or caused to be formed by the Debtors to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Common Stock to be distributed or sold pursuant to the Plan.

"**Required Consenting Stakeholders**" means, as of the relevant date, Initial Consenting Stakeholders holding at least 50.01% of the aggregate outstanding principal amount of the Term Loan Claims that are held by the Initial Consenting Stakeholders.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means any materials related to the solicitation of votes for the Plan pursuant to sections 1123, 1126, and 1143 of the Bankruptcy Code.

"**Term Loan Claims**" means any Claims arising under, related to, or on account of the Term Loan Credit Agreement.

"**Term Loan Credit Agreement**" means the Term Credit Agreement, dated as of August 21, 2015, as it may be amended, restated, supplemented or otherwise modified, among Ascena TopCo, AnnTaylor Retail, Inc., the lenders party thereto, and Goldman Sachs Bank USA, as administrative agent.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, 11.04 or 11.05.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit F**.

"**Whiteford Taylor**" means Whiteford, Taylor & Preston LLP, as local counsel to the Lender Group.

1.02.   Interpretation.  For purposes of this Agreement:

UST-0054

(a)     in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)     capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)     unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)     unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)     unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)     the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)     captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)     the use of "include" or "including" is without limitation, whether stated or not; and

(j)     the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 13.11 other than counsel to the Company Parties.

**Section 2.**     *Effectiveness of this Agreement*.  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

UST-0055

(b)     holders of at least two-thirds of the aggregate outstanding principal amount of the Term Loan Claims shall have executed and delivered counterpart signature pages of this Agreement; and

(c)     counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 13.11 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred, which notice shall be promptly following the occurrence of such other conditions.

**Section 3.**     *Definitive Documents*.

3.01.     The Definitive Documents governing the Restructuring Transactions shall include the following:  (A) the Plan; (B) the Confirmation Order; (C) the Disclosure Statement; (D) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (E) the Plan Supplement; (F) the Cash Collateral Order; (G) the DIP Financing Order; (H) the Exit Facility Documents; (I) the New Corporate Governance Documents; (J) the Post-Emergence Incentive Plan Documents; (K) any new employee incentive plan or employee retention plan entered into by the Company Parties after the Agreement Effective Date; (L) any new material employment, consulting, or similar agreements entered into by the Company Parties after the Agreement Effective Date; (M) any disclosure documents related to the issuance of the New Common Stock; and (N) all material pleadings filed by the Company Parties in connection with the Chapter 11 Cases (or related orders), including the First Day Pleadings and all orders sought pursuant thereto.

3.02.     The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12.  Further, subject to and without limiting any additional consent or approval rights of the Parties specified elsewhere in this Agreement, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders; *provided* that the New Corporate Governance Documents and Post-Emergence Incentive Plan Documents shall be acceptable to the Required Consenting Stakeholders and reasonably acceptable to the Company Parties.

**Section 4.**     *Commitments of the Consenting Stakeholders*.

4.01.     <u>General Commitments, Forbearances, and Waivers</u>.

(a)     During the Agreement Effective Period, subject to Section 4.03 of this Agreement, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, to:

(i)     support the Restructuring Transactions as contemplated by this Agreement and use commercially reasonable efforts to vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or

UST-0056

approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)     support use of cash collateral by the Debtors during the pendency of the Chapter 11 Cases on the terms set forth in the Cash Collateral Order or the DIP Financing Order;

(iii)    support entry into the DIP ABL Facility on the terms set forth in the ABL Commitment Letter;

(iv)     support entry into the DIP Term Facility on the terms set forth in the Backstop Commitment Letter and take all other applicable actions required by the Backstop Commitment Letter, including the funding of any backstop commitments on the terms set forth therein;

(v)      support entry into the Exit Facilities on the terms set forth in the Exit Facility Term Sheet and take all other applicable actions required by the Exit Facility Term Sheet;

(vi)     use commercially reasonable efforts to cooperate with the Company Parties, subject to applicable Laws and at the Company Parties' sole cost and expense, in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(vii)    give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions; and

(viii)   negotiate in good faith and use commercially reasonable efforts to execute and implement, as applicable, the Definitive Documents that are consistent with this Agreement to which it is required to be a party or for which its consent is required.

(b)     During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)      object to, delay, impede, or take any other action that is reasonably likely to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)     object to, delay, impede, or take any other action that is reasonably likely to interfere with use of cash collateral by the Debtors during the pendency of the Chapter 11 Cases on the terms set forth in the Cash Collateral Order, entry into or performance under the DIP ABL Facility on the terms set forth in the ABL Commitment Letter, or entry into, performance under, or syndication of the DIP Term Facility on the terms set forth in the Backstop Commitment Letter;

(iii)    propose, file, support, solicit, or vote for any Alternative Restructuring Proposal; *provided*, for the avoidance of doubt, that nothing in this Section 4.01(b)(iii) shall limit the consultation and approval rights of Consenting Stakeholders set forth in Section 6.01(k) of this Agreement; *provided*, *further*, that a Consenting Stakeholder may propose an Alternative Restructuring Proposal to the Company Parties in connection with Section 6.01(k) of this Agreement if such Consenting Stakeholder provides notice of its intent to propose such Alternative

UST-0057

Restructuring Proposal (including the terms thereof) to each Initial Consenting Stakeholder at least five (5) Business Days in advance of such proposal;

(iv)     file or have filed on its behalf any motion, pleading, or other document (including any modifications or amendments thereof) with the Bankruptcy Court or any other court that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(v)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind against any Company Party or the other Parties in violation of this Agreement with respect to the Chapter 11 Cases, this Agreement, or the Restructuring Transactions other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; *provided* that any Consenting Stakeholder may file motions, pleadings or other documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) with respect to its or their rights under any Definitive Document and relating to or arising from matters and rights not specifically set forth in this Agreement, including the Restructuring Term Sheet;

(vi)     exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Claim or Interest; or

(vii)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay under section 362 of the Bankruptcy Code.

4.02.   <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)     During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder of the Solicitation Materials, whether before or after the commencement of the Chapter 11 Cases:

(i)     vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)     to the extent it is permitted to elect whether to opt out of any of the releases set forth in the Plan, elect not to opt out of such releases by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)     not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above; *provided* that nothing in this Agreement shall prevent any Consenting Stakeholder from changing, withholding, amending, or revoking (or causing the same) its vote, election, or consent with respect to the Plan if this Agreement has been terminated in accordance with its terms.

(b)     During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action in violation of this Agreement reasonably likely to interfere

10

UST-0058

with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

4.03.   Notwithstanding the foregoing, nothing in this Agreement shall:  (a) require any Consenting Stakeholder to incur any expenses, liabilities or other obligations that are not expressly subject to reimbursement by the Company Parties pursuant to this Agreement, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities, or other obligations to any Consenting Stakeholder or its Affiliates that such Consenting Stakeholder reasonably believes may not be reimbursed by the Company Parties pursuant to this Agreement; (b) require any Consenting Stakeholder to provide any information that it reasonably determines to be sensitive or confidential; *provided* that, for the avoidance of doubt, each Consenting Stakeholder shall include its holdings on its signature page to this Agreement, which signature page will be delivered to (i) other Consenting Stakeholders in a redacted form that removes such Consenting Stakeholder's holdings and (ii) the Company Parties and Milbank in an unredacted form (to be hold by the Company Parties on a confidential basis and by Milbank on a professionals' eyes only basis); or (c) limit the right of any Party to exercise any right or remedy provided under this Agreement, the Confirmation Order, or any other Definitive Document.  Notwithstanding the immediately preceding sentence, nothing in this Section 4.03 shall serve to limit, alter, or modify any Consenting Stakeholder's express obligations under the terms of this Agreement.

**Section 5.      *Additional Provisions Regarding the Consenting Stakeholders' Commitments*.**
Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (c) prevent any Consenting Stakeholder from enforcing this Agreement or from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 6.      *Commitments of the Company Parties*.**

6.01.   <u>Affirmative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a)      support and take all steps reasonably necessary or desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)      support and take all steps reasonably necessary and desirable to obtain entry of the Cash Collateral Order, the DIP Financing Order, the Disclosure Statement Order, and the Confirmation Order;

(c)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, take all steps reasonably necessary or desirable to address any such impediment;

UST-0059

(d)     use commercially reasonable efforts to obtain any and all required governmental, regulatory and/or third-party approvals for the Restructuring Transactions;

(e)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(f)     use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(g)     (i) to the extent reasonably practicable, provide counsel to the Consenting Stakeholders draft copies of (x) all First Day Pleadings three (3) Business Days in advance of the Petition Date and (y) any other motions, documents and other pleadings materially affecting any Consenting Stakeholders that the Company Parties intend to file with the Bankruptcy Court, as applicable, three (3) Business Days in advance of the filing thereof and, (ii) without limiting any approval rights set forth in this Agreement, consult in good faith with counsel to the Consenting Stakeholders regarding any comments to draft copies provided pursuant to sub-clause (i);

(h)     pay in full and in cash all of the accrued reasonable and documented fees, costs, and expenses of the professionals and other advisors retained by the Lender Group, including such fees, costs, and expenses of (i) Greenhill, (ii) Milbank, (iii) Whiteford Taylor, and (iv) Loyens, and continue to pay such amounts as they come due and seek to pay such ongoing fees, costs, and expenses in connection with the Cash Collateral Order, DIP Financing Order, or other such appropriate order;

(i)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases, or (iv) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Term Loan Claims, or asserting any other cause of action against and/or with respect or relating to such Term Loan Claims or the prepetition liens securing such Term Loan Claims;

(j)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(k)     (i) solicit, consider, respond to, and facilitate Alternative Restructuring Proposals in consultation with the Required Consenting Stakeholders and (ii) pursue a Alternative Restructuring Proposal if (A) the Required Consenting Stakeholders determine that such Alternative Restructuring Proposal is a higher or better transaction than the Restructuring Transactions and (B) the Alternative Restructuring Proposal is implemented under, or without modification to the Company Parties' and the Required Consenting Stakeholders' obligations under this Agreement to pursue and implement, a Plan as modified to implement or allow for such Alternative Restructuring Proposal; *provided* that the structure of such Alternative Restructuring Proposal will not preclude any Initial Consenting Stakeholder from participating in such

12

UST-0060

Alternative Restructuring Proposal on a pro rata basis on substantially the same terms as any other Initial Consenting Stakeholder; and

(l)     reasonably consult with the Required Consenting Stakeholders regarding (i) the assumption or rejection of any executory contracts or unexpired leases, (ii) entry into any agreement, settlement, or other arrangement with any of the landlords under the Debtors' unexpired leases waiving, deferring, or modifying the rent payments or rent structure under such leases, and (iii) any payments of prepetition Claims (including Claims pursuant to section 503(b)(9) of the Bankruptcy Code and lien Claims) of or agreements with the Company Parties' vendors and provide notice and reasonably acceptable reporting to Milbank and Greenhill regarding any of the foregoing actions, which consultation and reporting shall include weekly calls regarding the status of the actions described in this Section 6.01(l) among the relevant employees, advisors and consultants of the Company Parties, Milbank, Greenhill and one or more Initial Consenting Stakeholders.

6.02.    <u>Negative Commitments</u>.  Except as set forth in Section 7 or with the prior written consent of the Required Consenting Stakeholders, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly, and shall cause their respective subsidiaries not to:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions or the Plan;

(c)     modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in any material respect;

(d)     file any motion, pleading, or Definitive Documents (including any modifications or amendments thereof) with the Bankruptcy Court or any other court that, in whole or in part, is not materially consistent with this Agreement (including the consent rights of the Consenting Stakeholders set forth in in this Agreement as to the form and substance of such motion, pleading, or other Definitive Document) or the Plan;

(e)     except with respect to any transaction contemplated by the First Day Motions (on the terms set forth in such First Day Motion and any agreement or form of agreement attached thereto) or otherwise consented to in writing by the Initial Consenting Stakeholders prior to the Agreement Effective Date: (i) sell (including any sale leaseback transaction), lease, mortgage, pledge, grant, or incur any encumbrance on, or otherwise Transfer, any material properties or material assets of the Company Parties, including any Equity Interests, other than in the ordinary course of business; (ii) purchase, lease, or otherwise acquire (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) any material assets or material properties, other than in the ordinary course of business; or (iii) commence any liquidation or wind down process with respect to any of the Company Parties' businesses or enter into any agreement or arrangement, or modification to any agreement or arrangement, in connection therewith;

13

UST-0061

(f)       (i) enter into or amend, adopt, restate, supplement, or otherwise modify any employee benefit, deferred compensation, incentive, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans or agreements, including offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements with or for the benefit of any of its employees that are a senior vice president or more senior, (ii) increase the base salary, target bonus opportunity, or other benefits payable by the Company Parties or to any of their executive officers, or (iii) make any payment to any former Insider (as of the Agreement Effective Date) of any post-employment, retirement or similar plan or program, severance agreement, or similar arrangement;

(g)       assume, assume and assign, or reject executory contracts or unexpired leases; *provided* that the consent of the Required Consenting Stakeholders shall not be unreasonably withheld; *provided*, *further*, that the Company Parties shall provide four (4) Business Days' prior written notice of any assumption, assumption and assignment, or rejection of any executory contract or unexpired lease, which notice shall include the analysis underlying the Company Parties' decision to assume, assume and assign, or reject such executory contract or unexpired lease, including adequate information supporting such analysis and decision, and, absent written notification during that period from Milbank or Greenhill to the Company Parties that the Required Consenting Stakeholders do not consent, the Required Consenting Stakeholders shall be deemed to have consented to any such assumption, assumption and assignment, or rejection;

(h)       enter in any agreement, settlement, or other arrangement with any of the landlords under the Debtors' leases waiving, deferring, or modifying the rent payments or rent structure under such leases; *provided* that the consent of the Required Consenting Stakeholders shall not be unreasonably withheld; *provided*, *further*, that the Company Parties shall provide four (4) Business Days' prior written notice of any such agreement, settlement, or other arrangement, which notice shall include the analysis underlying the Company Parties' decision to enter into such agreement, settlement, or other arrangement, including adequate information supporting such analysis and decision, and, absent written notification during that period from Milbank or Greenhill to the Company Parties that the Required Consenting Stakeholders do not consent, the Required Consenting Stakeholder shall be deemed to have consented to any such agreement, settlement, or other arrangement; or

(i)       pay any prepetition Claim (including Claims pursuant to section 503(b)(9) of the Bankruptcy Code and lien Claims) held by any of the Company Parties' vendors except in compliance with the First Day Motions and only to the extent that the Company Parties have (i) made commercially reasonable efforts to require such vendor to execute a trade agreement providing for the continuity of goods and services to the Debtors or Reorganized Debtors, as applicable, on terms reasonably acceptable to the Required Consenting Stakeholders (as determined in accordance with the consultation, notice, and consent procedures referenced in the following clause (ii)), and (ii) provided notice of such payment to one or more Initial Consenting Stakeholders pursuant to consultation, notice, and consent procedures to be agreed between the Company Parties and the Required Consenting Stakeholders.

6.03.   Except with the prior written consent of the Required Consenting Stakeholders, during the Agreement Effective Period, neither of the LuxCo Entities shall incur any material

14

UST-0062

obligations to any third party or otherwise lease, mortgage, pledge, grant, or incur any encumbrance on, or otherwise Transfer, any material asset.

**Section 7.** *Additional Provisions Regarding Company Parties' Commitments.*

7.01.  Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement (other than a failure to comply with this Section 7); *provided* that the Company Parties shall notify counsel to the Consenting Stakeholders in writing promptly in the event of any such determination (and in any event no later than two (2) Business Days following such determination).

7.02.  Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims or Equity Interests (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals; *provided* that the Company Parties shall (x) provide a copy of any written Alternative Restructuring Proposal (and notice of, and a written summary of, any oral Alternative Restructuring Proposal) within two (2) Business Days of the Company Parties' or their advisors' receipt of such Alternative Restructuring Proposal to Greenhill and Milbank and (y) provide such information to Milbank as reasonably requested by the Lender Group or as necessary to keep the Lender Group reasonably informed as to the status and substance of such discussions.

7.03.  Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.** *Transfer of Interests and Securities.*

8.01.  During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) of any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

15

UST-0063

(a)      such Transfer is made on or prior to the date that is at least two (2) Business Days prior to the Plan Effective Date;

(b)      prior to the funding of the DIP Term Facility, in the case of a Transfer (other than by participation) of Term Loan Claims by a Consenting Stakeholder with a commitment to fund New Money DIP Loans (as defined in the Backstop Commitment Letter), such Consenting Stakeholder retains Term Loan Claims in an amount equal to or greater than its allocation of Roll-Up DIP Loans (as defined in the Backstop Commitment Letter); and

(c)      (i) the transferee executes and delivers to counsel to the Company Parties and Milbank, at or before the time of the proposed Transfer, a Transfer Agreement; (ii) the transferee is a Consenting Stakeholder; or (iii) the transferee is an entity that is acting in its capacity as a Qualified Marketmaker, *provided* that (x) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such Company Claims/Interests is to a transferee that is or becomes a Consenting Stakeholder at the time of such Transfer and (y) the Qualified Marketmaker complies with Section 8.05 hereof.

8.02.   Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.   This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; *provided* that such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the other Consenting Stakeholders).

8.04.   This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreement.

8.05.   Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 8.01; and (iii) the Transfer otherwise is a Permitted Transfer under Section 8.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment,

UST-0064

participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.    Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

8.07.    The Company Parties will provide notice of any Transfer Agreement received pursuant to Section 8.01(c)(i) (which notice shall include the amount and type of Company Claims/Interests Transferred pursuant to such Transfer Agreement) to Milbank by the later of (i) close of business on the second Business Day following the effective date of such Transfer Agreement and (ii) the close of business on the second Business Day after the Company Parties receive notice of any such Transfer Agreement.

8.08.    Each Consenting Stakeholder shall promptly provide Milbank and/or the Company Parties with information concerning its then-current holdings upon reasonable request from Milbank or the Company Parties.

**Section 9.    *Representations and Warranties of Consenting Stakeholders*.**  Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it is (or upon the settlement of unsettled trades, will be) the beneficial or record owner of the face amount of the Company Claims/Interests reflected in such Consenting Stakeholder's signature page to this Agreement, Joinder, or Transfer Agreement, as applicable (as may be updated pursuant to Section 8) (the "**Disclosed Interests**") or is the nominee, investment manager, or advisor for beneficial holders of the Disclosed Interests;

(b)    it has (or upon the settlement of unsettled trades, will have) the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)    such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially and adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)    it has (or upon the settlement of unsettled trades, will have) the full power to vote, approve changes to, and transfer all of its Company Claims/Interests as contemplated by this Agreement subject to applicable Law; and

(e)    solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor

17

UST-0065

(as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 10.** *Mutual Representations, Warranties, and Covenants*. Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement and as of the Plan Effective Date:

(a)     it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)     the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)     except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties that have not been disclosed to all Parties.

**Section 11.** *Termination Events*.

11.01.  Consenting Stakeholder Termination Events.  This Agreement may be terminated by the Required Consenting Stakeholders by the delivery to the Company Parties of a written notice in accordance with Section 13.11 hereof upon the occurrence of the following events:

(a)     the Petition Date has not occurred by 11:59 p.m. (Eastern Time) on July 23, 2020;

(b)     the Debtors have not filed the Rent Deferral Motion with the Bankruptcy Court by the date that is three (3) calendar days after the Petition Date

(c)     the Bankruptcy Court has not entered the Cash Collateral Order on an interim basis by the date that is five (5) Business Days after the Petition Date;

18

UST-0066

(d)      the Bankruptcy Court has not entered the DIP Financing Order on a final basis by the date that is thirty-five (35) calendar days after the Petition Date;

(e)      the Bankruptcy Court has not entered the Disclosure Statement Order by the date that is sixty (60) calendar days after the Petition Date;

(f)      solicitation of the Plan has not commenced by the date that is seventy (70) calendar days after the Petition Date;

(g)      the Bankruptcy Court has not entered the Confirmation Order by the date that is one hundred ten (110) calendar days after the Petition Date;

(h)      the Plan Effective Date has not occurred by the date that is one hundred thirty (130) calendar days after the Petition Date;

(i)      the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (ii) remains uncured for ten (10) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 13.11 hereof detailing any such breach;

(j)      the DIP ABL Facility (as applicable) is terminated and accelerated in accordance with its terms;

(k)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, including the Bankruptcy Court, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 13.11 hereof detailing any such issuance; *provided* that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(l)      the Bankruptcy Court enters an order denying confirmation of the Plan or the Confirmation Order is reversed or vacated;

(m)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders, not to be unreasonably withheld), (i) dismissing any of the Chapter 11 Cases, (ii) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (iii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases;

(n)      any Company Party (i) files, waives, amends or modifies, or files a pleading seeking approval of any Definitive Document or authority to waive, amend or modify any Definitive Document (including any waiver of any term or condition therein) in a manner that is materially inconsistent with, or constitutes a material breach of, this Agreement (including with respect to the

19

UST-0067

consent rights afforded the Consenting Stakeholders under this Agreement), without the prior written consent of the Required Consenting Stakeholders, (ii) withdraws the Plan without the prior consent of the Required Consenting Stakeholders, or (iii) publicly announces its intention to take any such acts listed in the foregoing clause (i) or (ii), in the case of each of the foregoing clauses (i) through (iii), which remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 15.10 of this Agreement detailing any of the foregoing;

(o)      any Company Party files or supports another party in filing (i) a motion or pleading challenging the amount, validity, or priority of any claims held by any Consenting Stakeholder against the Company Parties (or any liens securing such claims) or (ii) a motion or pleading asserting (or seeking standing to assert) any purported claims or causes of action against any of the Consenting Stakeholders;

(p)      the Bankruptcy Court grants relief that is materially inconsistent with this Agreement or the Plan (in each case, with such amendments and modifications as have been effected in accordance with the terms hereof);

(q)      any Company Party files, proposes, or otherwise supports any plan of liquidation, asset sale of all or substantially all of a Company Party's assets or plan of reorganization other than the Plan;

(r)      the Bankruptcy Court enters an order terminating the Debtors' exclusive right to file or solicit acceptances of a plan of reorganization (including the Plan); or

(s)      any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable.

11.02.   <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 13.11 hereof upon the occurrence of any of the following events:

(a)      the breach in any material respect by one or more of the Consenting Stakeholders of any provision set forth in this Agreement and (i) such breach remains uncured for a period of fifteen (15) Business Days after the receipt by the Consenting Stakeholders of notice of such breach and (ii) the non-breaching Consenting Stakeholders no longer collectively beneficially own or control at least two-thirds of the aggregate principal amount of Term Loan Claims;

(b)      the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, including the Bankruptcy Court, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after the terminating

UST-0068

Company Party transmits a written notice in accordance with Section 13.11 hereof detailing any such issuance; *provided* that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)     the Bankruptcy Court enters an order denying confirmation of the Plan.

11.03.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Stakeholders; and (b) each Company Party.

11.04.  Individual Termination.  Any individual Consenting Stakeholder may terminate this Agreement, as to itself only, by the delivery to the Company Parties of a written notice in accordance with Section 13.11 hereof if (a) the Plan Effective Date has not occurred by the Outside Date or (b) Section 11.01(o) is breached by any Company Party with respect to such Consenting Stakeholder.

11.05.  Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

11.06.  Effect of Termination.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents, agreements, undertakings, waivers, forbearances, votes or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; *provided* any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 11.06 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 11.06 or otherwise if the Party seeking to terminate

UST-0069

this Agreement is in material breach of this Agreement, except a termination pursuant to Section 11.02(b) or Section 11.02(d). Nothing in this Section 11.06 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(b).

**Section 12.** *Amendments and Waivers*.

(a)  This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)  This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by: (a) each Company Party and (b) the Required Consenting Stakeholders; *provided* that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement; *provided*, *further*, that (i) any modification, amendment, or supplement to the definition of "Outside Date" shall not be binding on any Consenting Stakeholder that has not provided its prior written consent to such amendment, (ii) any modification, amendment, or supplement to the definition of "Required Consenting Stakeholders" shall require the prior written consent of each Consenting Stakeholder, (iii) any modification, amendment, or supplement to Section 11.04 hereof shall require the prior written consent of each Consenting Stakeholder, (iv) any modification, amendment, or supplement to Section 4.03 shall not be binding on any Consenting Stakeholder that has not provided its prior written consent to such amendment, and (v) any modification, amendment or supplement to this Section 12 shall require the prior written consent of each Consenting Stakeholder.

(c)  Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d)  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.** *Miscellaneous*.

13.01.  <u>Acknowledgement</u>. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

UST-0070

13.02.  <u>Tax Matters</u>.  The Parties will work together in good faith to structure and implement the Restructuring Transactions in a tax efficient manner; *provided* that such tax structure shall be reasonably acceptable to the Required Consenting Stakeholders and the Company Parties.

13.03.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

13.04.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

13.05.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

13.06.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  EXCEPT TO THE EXTENT SUPERSEDED BY FEDERAL BANKRUPTCY LAW, THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

13.07.  <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.08.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

UST-0071

13.09.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

13.10.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

13.11.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to a Company Party, to:

Ascena Retail Group, Inc.
933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attn:   Michael Veitenheimer
Email: michael.veitenheimer@ascenaretail.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attn:   Steven N. Serajeddini
Email: steven.serajeddini@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attn:   John R. Luze
        Jeff Michalik
Email: john.luze@kirkland.com
        jeff.michalik@kirkland.com

(b)    if to a Consenting Stakeholder, to:

Milbank LLP
55 Hudson Yards

UST-0072

New York, NY 10001-2163
Attn:  Evan R. Fleck
        Abigail L. Debold
Email: efleck@milbank.com
        adebold@milbank.com

Any notice given by delivery, mail, or courier shall be effective when received.

13.12.  <u>Fees and Expenses</u>. The Company Parties shall pay and reimburse all reasonable and documented fees and expenses when due (including travel costs and expenses) and all outstanding and unpaid amounts incurred in connection with the Restructuring Transactions (including, for the avoidance of doubt, all reasonable and documented fees and expenses incurred prior to the date hereof) of the attorneys, accountants, other professionals, advisors, and consultants of the Lender Group (whether incurred directly or on their behalf and regardless of whether such fees and expenses are incurred before or after the Petition Date), including the fees and expenses of Greenhill, Milbank, Whiteford Taylor, and Loyens, including all amounts payable or reimbursable under applicable fee or engagement letters (including any success or transaction fees when earned) with the Company Parties (which agreements shall not be terminated by the Company Parties before the termination of this Agreement).

13.13.  <u>Reservation of Rights</u>. After the termination of this Agreement pursuant to Section 11, the Parties each fully reserve any and all of their respective rights, remedies, claims, and interests, subject to Section 11 in the case of any claim for breach of this Agreement. Further, nothing in herein shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and the Plan and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring Transactions.

13.14.  <u>Independent Due Diligence and Decision Making</u>. Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties, and without reliance on any statement of any other Party or Entity (other than such express representations or warranties of the Company Parties contained herein).

13.15.  <u>Enforceability of Agreement</u>. Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

13.16.  <u>Waiver</u>. If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any

UST-0073

proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

13.17. <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

13.18. <u>Several, Not Joint, Claims</u>. Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

13.19. <u>Severability and Construction</u>. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

13.20. <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.21. <u>Capacities of Consenting Stakeholders</u>. Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

13.22. <u>Relationship Among Consenting Stakeholders and the Company Parties</u>. None of the Consenting Stakeholders shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Consenting Stakeholder, the Company Parties, or any of the Company Parties' creditors or other stakeholders, and, other than as expressly set forth herein, there are no commitments among or between the Consenting Stakeholders. It is understood and agreed that any Consenting Stakeholder may trade in any debt or equity securities of the Company Parties without the consent of the Company Parties or any other Consenting Stakeholder, subject to applicable securities laws and this Agreement, including Section 8 hereof. No prior history, pattern or practice of sharing confidences among or between any of the Consenting Stakeholders and/or the Company Parties shall in any way affect or negate this understanding and agreement.

13.23. <u>Direction to the Agent</u>. By their signatures to this Agreement, the Initial Consenting Stakeholders signatory thereto, constituting Required Lenders under the Term Loan Credit Agreement hereby direct and authorize the Administrative Agent (or any of its Affiliates) to (i) consent to the entry of the Cash Collateral Order (each of the Initial Consenting Stakeholders hereby authorizes Milbank, LLP, as counsel for the Initial Consenting Stakeholders, to direct the

UST-0074

administrative agent under the Term Loan Credit Agreement to consent to the entry of the Cash Collateral Order), (ii) to execute an acknowledgement to the supplement to the existing security agreement in respect of the equity held by the Loan Parties (as defined in the Term Loan Credit Agreement) in the LuxCo Entities as contemplated by this Agreement and (iii) to execute any documentation deemed reasonably necessary by the Administrative Agent or its Affiliates to evidence such consent or acknowledgment, as applicable (the direction by the Required Lenders hereunder to the Administrative Agent to grant such consent and acknowledgment, as applicable, and to take actions deemed reasonably necessary by it to evidence such consent or acknowledgment, as applicable, is hereinafter referred to as the "Direction"). For the avoidance of doubt, the Initial Consenting Stakeholders agree that the consents and acknowledgments granted, and the actions taken, by the Administrative Agent and its Affiliates pursuant to and arising out of the Direction are indemnified actions covered by the indemnification provisions of Section 9.03 of the Term Loan Credit Agreement. This Direction shall be governed by, and construed in accordance with, the laws of the State of New York. Notwithstanding Section 13.10, the Administrative Agent is a third party beneficiary to this Section 13.23 and is relying thereon in taking action in accordance with the Direction.

13.24. Email Consents. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 12, or otherwise, including a written approval by the Company Parties or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

13.25. Publicity. The Company Parties will submit to Milbank all press releases, public filings, or public announcements, in each case, to be made by any of the Company Parties announcing entry into this Agreement or the transactions contemplated hereby in advance of release and will reasonably consult with Milbank with respect to such communications. Except as required by law or regulation or by any governmental or regulatory (including self-regulatory) authority, no Party or its advisors shall (a) use the name of any Consenting Stakeholder in any public manner (including in any press release) or (b) disclose to any Person (including, for the avoidance of doubt, any other Consenting Stakeholder), other than legal, accounting, financial and other advisors to the Company Parties, the principal amount or percentage of Term Loan Claims, in each case, without such Consenting Stakeholder's prior written consent; provided that (i) if such disclosure is required by law, subpoena, or other legal process or regulation or by any governmental or regulatory (including self-regulatory) authority, the disclosing Party shall afford the relevant Consenting Stakeholder a reasonable opportunity to review and comment in advance of such disclosure if reasonably practicable and permitted by applicable law and shall take all reasonable measures to limit such disclosure to the extent permitted by applicable law and (ii) the foregoing shall not prohibit the public disclosure, including in connection with the Chapter 11 Cases, of the aggregate percentage or aggregate principal amount of Claims held by all the Consenting Stakeholders collectively. Notwithstanding the foregoing, (x) any Party hereto may disclose the identities of the Parties hereto in any action to enforce this Agreement or in an action for damages as a result of any breaches hereof and (y) any Party hereto may disclose, to the extent expressly consented to in writing by a Consenting Stakeholder, such Consenting Stakeholder's identity and individual holdings.

UST-0075

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

*[Signature pages follow.]*

28

UST-0076

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**ASCENA RETAIL GROUP, INC.
AND THE OTHER COMPANY PARTIES**

By: _C. Teffner_____
DocuSigned by:
A612CD5F749F470...

Name: Carrie W. Teffner

Authorized Signatory

UST-0077

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**ANNTAYLOR LOFT GP LUX S.À R.L.**

By: _Marc Crawford_
B3D63F8C32E5472
Name: Marc Crawford
Title:   authorised signatory

**ANNTAYLOR LOFT BORROWER LUX
SCS**

By: _Marc Crawford_
B3D63F8G32E5472
Name: Marc Crawford
Title:   authorised signatory

UST-0078

[*Signature pages of the Consenting Stakeholders on file with the Company*]

UST-0079

# EXHIBIT A

## Company Parties

UST-0080

## EXHIBIT A

### Company Parties

Ascena Retail Group, Inc.
933 Inspiration LLC
ANN Card Services, Inc.
ANN, Inc.
AnnCo, Inc.
AnnTaylor Distribution Services, Inc.
AnnTaylor of Puerto Rico, Inc.
AnnTaylor Retail, Inc.
AnnTaylor, Inc.
AnnTaylor Loft Borrower Lux SCS
AnnTaylor Loft GP Lux S.À R.L.
Ascena Retail Holdings, Inc.
Ascena Trade Services, LLC
ASNA Plus Fashion, Inc.
ASNA Value Fashion LLC
BackingBrands Buying Agent, LLC
BackingBrands Solutions, LLC
C.S.F. Corp.
Catalog Receivables LLC
Catalog Seller LLC
Catherines #5124, Inc.
Catherines #5147, Inc.
Catherines Stores Corporation
Catherines, Inc.
CCTM, Inc.
Charming Sales Co. Four, Inc.
Charming Sales Co. One, Inc.
Charming Sales Co. Three, Inc.
Charming Sales Co. Two, Inc.
Charming Shoppes of Delaware, Inc.
Charming Shoppes Receivables Corp.
Charming Shoppes Seller, Inc.
Charming Shoppes Street, Inc.
Charming Shoppes, Inc.
Chestnut Acquisition Sub Inc.
Crosstown Traders, Inc.
CS Holdco II Inc.
CSGC, Inc.
CSI Industries, Inc.
CSPE, LLC
DBI Holdings, Inc.
DBCM Holdings, LLC
DBX, Inc.

UST-0081

Duluth Real Estate LLC
Etna Retail DC, LLC
Fashion Apparel Sourcing LLC
Fashion Service Fulfillment Corporation
Fashion Service LLC
GC Fulfillment, LLC
Lane Bryant #6243, Inc.
Lane Bryant of Pennsylvania, Inc.
Lane Bryant Outlet 4106, Inc.
Lane Bryant Purchasing Corp.
Lane Bryant, Inc.
PSTM, Inc.
Sponsi, Inc.
Spirit of America, Inc.
Too GC, LLC
Tween Brands Agency, Inc.
Tween Brands Direct Services Inc.
Tween Brands Investment, LLC
Tween Brands Marketing, Inc.
Tween Brands Service Co.
Tween Brands, Inc.
Winks Lane, Inc.
Worldwide Retail Holdings, Inc.

UST-0082

## **EXHIBIT B**

**Restructuring Term Sheet**

UST-0083

*Execution Version*

---

### ASCENA RETAIL GROUP, INC., ET AL.

### RESTRUCTURING TERM SHEET[1]

---

This term sheet (the "Restructuring Term Sheet") sets forth the principal terms of the Restructuring Transactions. The Restructuring Transactions will be consummated through cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court") and as otherwise set forth in the Restructuring Support Agreement. This Restructuring Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documentation governing the Restructuring Transactions, which shall be subject to the applicable consent and approval rights of the Parties as set forth in the Restructuring Support Agreement.

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE STATUTES, RULES, AND LAWS.

UNLESS OTHERWISE SET FORTH HEREIN, TO THE EXTENT THAT ANY PROVISION OF THIS RESTRUCTURING TERM SHEET IS INCONSISTENT WITH ANOTHER PROVISION OF THE RESTRUCTURING SUPPORT AGREEMENT, THE TERMS OF THIS RESTRUCTURING TERM SHEET WITH RESPECT TO SUCH PROVISION SHALL CONTROL.

| OVERVIEW | |
|---|---|
| **Implementation** | The Debtors will effectuate the Restructuring Transactions through the filing of the Chapter 11 Cases and confirmation of the Plan, which shall be consistent with this Restructuring Term Sheet, subject to the terms and conditions set forth in the Restructuring Support Agreement. As further described herein and in the Restructuring Support Agreement, including the Backstop Commitment Letter, the Restructuring Transactions shall be funded through: (i) the consensual use of cash collateral under the Cash Collateral Order and the DIP Financing Order; (ii) a DIP Term Facility including $150 million in New Money DIP Loans and $161.8 million in Roll-Up DIP Loans; (iii) as applicable, a DIP ABL Facility; and (iv) the Exit Facilities. |
| | The Plan will constitute a separate chapter 11 plan of reorganization for each Debtor. For the avoidance of doubt, any action required to be taken by the Debtors on the Plan Effective Date pursuant to this Restructuring Term Sheet may be taken on the Plan Effective Date or as soon as is reasonably practicable thereafter. |
| **FINANCING** | |
| **DIP ABL Facility** | The Debtors may obtain a commitment from certain ABL Lenders to provide an up to $400 million senior secured asset-based revolving debtor-in-possession credit facility (the "DIP ABL Facility"), pursuant to which the commitments and loans of the ABL Lenders under the ABL Facility will |

---

[1]   Capitalized terms used but not defined in this Restructuring Term Sheet have the meanings ascribed to them in (i) the Restructuring Support Agreement, dated as of July 23, 2020 (the "Restructuring Support Agreement"), to which this Restructuring Term Sheet is attached as Exhibit B or (ii) Annex I hereto.

UST-0084

| | convert into the DIP ABL Facility during the Chapter 11 Cases pursuant to the DIP Financing Order, and will obtain a commitment from certain lenders to provide the Exit ABL Facility in an amount not less than $400 million subject to the conditions set forth in the ABL Commitment Letter. |
|---|---|
| **DIP Term Facility** | Certain Prepetition Term Lenders (as defined in the Backstop Commitment Letter) and/or their affiliates (in their capacities as such, the "<u>Backstop Commitment Parties</u>") have committed to provide the Debtors with an up to $311.8 million superpriority senior secured debtor-in-possession term loan credit facility (the "<u>DIP Term Facility</u>") consisting of (a) $150 million in new money term loans (the "<u>New Money DIP Loans</u>") and (b) $161.8 million of term loans (the "<u>Roll-Up DIP Loans</u>" and, together with the New Money DIP Loans, the "<u>DIP Term Loans</u>") rolling Term Loan Claims held by the DIP Term Lenders that provide New Money DIP Loans on the terms and conditions set forth in the Backstop Commitment Letter and the DIP Financing Order. Prepetition Term Lenders (including, for the avoidance of doubt, the Backstop Commitment Parties) will have the right to commit to their ratable share of 50% of the DIP Term Facility up to the date that is expected to be 10 business days after distribution of the Syndication Materials, which is estimated to occur within 5 business days after the Petition Date, by executing the Restructuring Support Agreement and taking such other actions as specified in the Syndication Materials. For the avoidance of doubt, participation in the DIP Term Facility shall include a commitment to convert the DIP Term Loans into First Out Exit Term Loans on the Plan Effective Date if certain conditions as set forth in the DIP Term Agreement and Exit Facility Term Sheet attached as <u>Exhibit D</u> to the Restructuring Support Agreement are satisfied |
| | The Cash Collateral Order and DIP Financing Order will include customary adequate protection for the Term Lenders, including, without limitation, and as acceptable to the Majority Backstop Commitment Parties: |
| | i. superpriority adequate protection claims and adequate protection liens to the extent of any diminution in value in the collateral securing the Term Loan Claims, which adequate protection liens shall include liens on all unencumbered assets of the Debtors (excluding any assets that qualify as ABL Priority Collateral (as defined in the ABL Credit Agreement) and including the funding account for the DIP Term Facility and 100% of the equity interests in the LuxCo Entities); |
| | ii. payment of the fees and expenses of the Lender Group's advisors; and |
| | iii. the reporting and milestones described below. |
| | Material terms for the DIP Term Loans include, without limitation and as set forth in the Form DIP Credit Agreement: |
| | a. <u>Maturity</u>: Earlier of (i) 6 months after the Effective Date of the DIP Term Agreement, (ii) conversion into the First Out Term Loan Facility, (iii) dismissal of the Chapter 11 Cases, (iv) acceleration, (v) a sale of all or substantially all of the Debtors' assets, and (vi) the Plan Effective Date |
| | b. <u>Coupon</u>: L+1,175 bps |
| | c. <u>LIBOR Floor</u>: 1.00% |
| | d. <u>Commitment Payment</u>: 250 bps payable in cash on the principal amount of New Money DIP Loans to all DIP Term Lenders that |

UST-0085

provide New Money DIP Loans (including the Backstop Commitment Parties)

e. Seasoning/Fronting: Fees to be paid by the Company Parties (in addition to the Backstop Premium and Commitment Payment)

f. Mechanics: Full amount of the New Money DIP Term Loans may be drawn after entry of the DIP Financing Order, subject to the terms and conditions set forth in the DIP Credit Agreement

g. Ratings Covenant: Commercially reasonable efforts to obtain a rating by each of S&P and Moody's within 15 days of the entry of the DIP Financing Order

h. Milestones: Consistent with the milestones contained in sections 11.01(a) through 11.01(g) of the Restructuring Support Agreement.

i. Events of Default: Customary debtor-in-possession facility "Events of Default"

j. Covenants: Customary covenants for similarly sized debtor-in-possession facilities

k. Reporting: Monthly, quarterly and annual Financial Statements; weekly reports of liquidity and line-item receipts and disbursements (including professional fees); weekly advisor and lender steering committee calls

l. Variance Reporting: Delivered weekly, with written explanations for variances above 15% of actual receipts or actual operating disbursements (unless the dollar amount corresponding to such percentage variance is less than $1 million)

m. Budget: Delivered monthly, subject to approval of the Required Lenders

n. Permitted Variance: 20%, tested on a cumulative basis, tested weekly on a 4-week rolling basis, of total net cash flow to projected net cash flow, applicable only when Liquidity (as defined in the Form DIP Credit Agreement) is less than $150 million

o. Liquidity Covenant: Minimum Liquidity of $100 million

p. Collateral: First priority on all collateral securing the Term Loan Claims and all unencumbered assets (excluding any assets that qualify as ABL Priority Collateral, which shall be subject to a second priority lien), including, for the avoidance of doubt, a first priority interest in the funding account for the DIP Term Facility and 100% of the equity interests in the LuxCo Entities

q. Use of Proceeds: To be used in accordance with the approved budget for (i) transaction expenses, (ii) adequate protection payments, (iii) fund Carve Out and (iv) general corporate purposes. Up to $50 million of the proceeds of the DIP Term Loans may be used to repay any DIP ABL Facility Claims in cash

The DIP Term Loans will be repaid in cash on their stated maturity date; *provided* that, if certain conditions as set forth in the DIP Term Agreement and Exit Facility Term Sheet attached as Exhibit D to the Restructuring Support Agreement are satisfied, on the Conversion Date (as defined in the DIP Term Agreement), the DIP Term Loans held as of the date that is 2 Business Days prior to the Plan Effective Date will be converted to loans under the First Out

UST-0086

| | Term Loan Facility (the "<u>First Out Exit Term Loans</u>") on the terms and conditions set forth in the DIP Term Agreement and the Exit Facility Term Sheet; *provided* that upon certain events described in the DIP Term Agreement and if the Conversion Date has not occurred, each DIP Term Loan shall be repaid with a non-refundable aggregate premium in an amount equal to 11.23% of the DIP Term Loans so repaid in cash on the date on which such DIP Term Loans are repaid, and shall be subject to the withholding provisions set forth in Section 2.15 of the DIP Term Agreement. |
|---|---|
| **Backstop Commitment** | Pursuant to the Backstop Commitment Letter, the Backstop Commitment Parties will, in the allocations set forth on Schedule 1 thereto, (a) provide 50% of the DIP Term Loans and First Out Exit Term Loans and (b) provide any DIP Term Loans and First Out Exit Term Loans not provided by other Prepetition Term Lenders in accordance with the syndication process described above. |
| | As consideration for the Backstop Commitments and agreements of the Backstop Commitment Parties under the Restructuring Support Agreement, Ascena Topco will pay (or cause to be paid) to the Backstop Commitment Parties (or, at any Backstop Commitment Party's option and upon such Related Lender's designation (which may be provided by electronic communication), its Related Lender), a non-refundable backstop premium equal to $7.5 million (the "<u>Backstop Premium</u>"),[2] which shall be allocated to each Backstop Commitment Party, in an amount equal to (1) its percentage set forth on Schedule 2 to the Backstop Commitment Letter (the "<u>Backstop Percentage</u>"), *multiplied by* (2) the Backstop Premium, which shall be fully earned, nonrefundable and non-avoidable on the execution of the Backstop Commitment Letter and payable, free and clear of any withholding tax, in cash upon the funding of the New Money DIP Loans. |
| | If (a) a Termination Date occurs prior to the funding of the DIP Term Facility or (b) the DIP Term Facility has been funded and the Conversion Date does not occur, a non-refundable aggregate premium in an amount equal to $7.5 million shall be payable, free and clear of any withholding tax, in cash (the "<u>Termination Premium</u>") on the Termination Date, in the case of clause (a), or the date on which the DIP Term Loans are repaid in full in cash, in the case of clause (b), which shall be allocated to each Backstop Commitment Party in an amount equal to (1) its Backstop Percentage, *multiplied by* (2) the Termination Premium. |
| **Definitive Documents** | Any documents, including any Definitive Documents, that remain the subject of negotiation as of the Agreement Effective Date shall be subject to the rights and obligations set forth in the Restructuring Support Agreement. Failure to reference such rights and obligations as it relates to any document referenced in this Restructuring Term Sheet shall not impair such rights and obligations. |

---

[2] For tax purposes, unless otherwise required by a change in applicable tax law or contrary determination (as defined in Section 1313(a) of the Internal Revenue Code of 1986, as amended), the Company Parties and the Backstop Commitment Parties will (i) treat the Backstop Premium and the Termination Premium as premiums paid by Ascena Topco to the Backstop Commitment Parties in exchange for the issuance of a put right to Ascena Topco with respect to the DIP Term Facility and (ii) not take any tax position inconsistent with the tax treatment described in clause (i).

UST-0087

| TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN | |
|---|---|
| **DIP ABL Facility Claims** | To the extent the Debtors obtain a commitment for a DIP ABL Facility that is funded prior to the Plan Effective Date, the Plan shall provide as follows: |
| | i.  If those certain conversion conditions set forth in the DIP ABL Agreement remain unsatisfied as of the Plan Effective Date, on the Plan Effective Date, each holder of an allowed DIP ABL Facility Claim shall receive, unless such holder agrees to less favorable treatment, cash in an amount equal to its allowed DIP ABL Facility Claim in full and final satisfaction, release, and discharge of, and in exchange for, such allowed DIP ABL Facility Claim. |
| | ii.  If those certain conversion conditions as set forth in the DIP ABL Agreement are fully satisfied as of the Plan Effective Date, on the Plan Effective Date, each holder of an allowed DIP ABL Facility Claim shall receive, unless such holder agrees to less favorable treatment, its pro rata share of participation in the Exit ABL Facility. |
| **DIP Term Facility Claims** | On the Plan Effective Date, each holder of an allowed DIP Term Facility Claim shall receive, unless such holder agrees to less favorable treatment and subject to the terms and conditions of the DIP Term Facility and the Exit Facility Term Sheet, cash in an amount equal to its allowed DIP Term Facility Claim; *provided* that, if certain conditions as set forth in the DIP Term Agreement and Exit Facility Term Sheet are satisfied, each holder of an allowed DIP Term Facility Claim shall receive (i) loans arising under the First Out Exit Term Loan Facility in an amount equal to such holder's allowed DIP Term Facility Claim and (ii) cash on account of accrued and unpaid interest and other charges payable through the Plan Effective Date, in full and final satisfaction, release, and discharge of, and in exchange for, such allowed DIP Term Facility Claim. |
| **Administrative Claims** | On the Plan Effective Date, each holder of an allowed Administrative Claim shall receive payment in full in cash. |
| **Priority Tax Claims** | On the Plan Effective Date, each holder of an allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. |
| **Other Secured Claims** | Each holder of an allowed Other Secured Claim shall receive, at the option of the applicable Debtor: |
| | i.  payment in full in cash; |
| | ii.  delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; |
| | iii.  reinstatement of such Claim; or |
| | iv.  other treatment rendering such Claim unimpaired. |
| **Other Priority Claims** | Each holder of an Other Priority Claim shall receive payment in full in cash or other treatment rendering such Claim unimpaired. |
| **ABL Claims** | To the extent any allowed ABL Claims remain outstanding on the Plan Effective Date, each holder of an allowed ABL Claim shall receive: |
| | i.  payment in full in cash of its allowed ABL Claim; |
| | ii.  the collateral securing its allowed ABL Claim; |
| | iii.  reinstatement of its allowed ABL Claim under the Exit ABL |

UST-0088

| | Facility; or |
|---|---|
| | iv. such other treatment that renders its allowed ABL Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| **Term Loan Claims** | Each holder of an allowed Term Loan Claim shall receive its pro rata share of: |
| | i. $88.2 million of Last Out Term Loans, which shall include the terms set forth in the Exit Facility Term Sheet; and |
| | ii. 55.1% of the common shares of Reorganized Ascena (such shares, the "New Common Stock") less the percentage of New Common Stock distributed as the Equity Premium (as defined below), subject to dilution on account of the Management Incentive Plan. |
| **General Unsecured Claims** | i. *If holders of allowed General Unsecured Claims vote as a class to accept the Plan,* each holder of an allowed General Unsecured Claim shall receive its pro rata share of cash in an aggregate amount equal to $500,000, as determined by the Debtors and the Required Consenting Stakeholders. |
| | ii. *If holders of allowed General Unsecured Claims vote as a class to reject the Plan,* each holder of an allowed General Unsecured Claim shall receive treatment consistent with section 1129(a)(7) of the Bankruptcy Code, as determined by the Debtors and the Required Consenting Stakeholders. |
| **Intercompany Claims** | Each allowed Intercompany Claim shall be reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Reorganized Debtors. |
| **Intercompany Interests** | Intercompany Interests shall receive no recovery or distribution and be reinstated solely to the extent necessary to maintain the Debtors' corporate structure. |
| **Interests in Ascena** | Each holder of an allowed Interest in Ascena shall have such Interest cancelled, released, and extinguished without any distribution. |
| **CHAPTER 11 PLAN RELEASES, EXCULPATION, AND INJUNCTION PROVISIONS** | |
| **Discharge of Claims and Termination of Interests** | Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Plan Effective Date by the Reorganized Debtors), Interests, and Causes of Action against any Debtor of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any liability (including withdrawal liability) to the extent such Claims or Causes of Action accrued before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim based upon such debt or right |

UST-0089

| | is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Plan Effective Date. Unless expressly provided in the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Plan Effective Date occurring. |
|---|---|
| **Releases by the Debtors** | Effective as of the Plan Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Plan Effective Date. |
| **Releases by Holders of Claims and Interests** | Effective as of the Plan Effective Date, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of |

- 7 -

UST-0090

| | any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Plan Effective Date. |
|---|---|
| **Exculpation** | Notwithstanding anything contained in the Plan to the contrary, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action or any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Exit Facilities, the Backstop Commitment Letter, the DIP Financing Order, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing |

UST-0091

| | the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
|---|---|
| **Injunction** | Except with respect to the obligations arising under the Plan, the DIP Financing Order, or the Confirmation Order, and except as otherwise expressly provided in the Plan, the DIP Financing Order, or the Confirmation Order, all Entities that held, hold, or may hold claims or interests or Causes of Action that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Reorganized Debtors or the other Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action released or settled or subject to exculpation pursuant to the Plan. |
| | **OTHER TERMS OF THE RESTRUCTURING TRANSACTIONS** |
| **Equity Allocation** | On the Plan Effective Date, each Consenting Stakeholder shall receive (a) its pro rata share (the numerator being such party's holdings of First Out Exit Term Loans (including through any of its Related Parties) and the denominator being the aggregate outstanding amount of all First Out Exit Term Loans) of 44.9% of the New Common Stock, which will be subject to dilution from the Management Incentive Plan, and (b) its pro rata share (based on such party's Backstop Percentage (including through any of its Related Parties)) of an amount of New Common Stock equal to $7.5 million, calculated assuming a total equity value of Reorganized Ascena to be agreed by the Company Parties and the Required Consenting Stakeholders (such pro rata share, the "Equity Premium"), which will be subject to dilution from the Management Incentive Plan.[3] |

---

[3] For tax purposes, unless otherwise required by a change in applicable tax law or contrary determination (as defined in Section 1313(a) of the Internal Revenue Code of 1986, as amended), (i) the Company Parties and the Consenting Stakeholders as of the Petition Date will treat the Equity Premium as acquired by such Consenting Stakeholders at the Plan Effective Date in exchange for participation in the Restructuring Transactions and for tax purposes more specifically as a put premium and (ii) not take any tax position inconsistent with the tax treatment described in clause (i).

UST-0092

| | |
|---|---|
| **Critical Vendors** | The Debtors will seek the Bankruptcy Court's approval to use up to $50 million in the aggregate to pay the prepetition claims of certain foreign and critical vendors, subject to the consent and consultation rights in the Restructuring Support Agreement. |
| **LuxCo Entities** | On the Execution Date, all of the previously unencumbered equity held by the Loan Parties (as defined in the Term Loan Credit Agreement) in the LuxCo Entities will be pledged as Collateral (as defined in the Term Loan Credit Agreement). |
| **New Board** | The initial board of directors, members, or managers, as applicable (each, a "<u>Director</u>"), of Reorganized Ascena (the "<u>New Board</u>") will consist of 7 Directors, including, subject to the terms of the New Corporate Governance Documents:<br><br>i. Carrie W. Teffner;<br><br>ii. the CEO of Reorganized Ascena;<br><br>iii. 1 Director determined by Bain Capital Credit, LP ("<u>Bain</u>");<br><br>iv. 1 Director determined by Monarch Alternative Capital LP ("<u>Monarch</u>");<br><br>v. 1 Director determined collectively by Bain, Eaton Vance Management, Lion Point Capital, LP, and Monarch; and<br><br>vi. 2 Directors determined by the Backstop Commitment Parties. |
| **Management Incentive Plan** | The Reorganized Debtors will reserve a pool of up to 10% of the New Common Stock for a post-emergence management incentive plan (the "<u>Management Incentive Plan</u>") for management employees of the Reorganized Debtors, which will contain terms and conditions (including, without limitation, with respect to participants, form, allocation, structure, duration and timing and extent of issuance and vesting) as determined at the discretion of the New Board after the Plan Effective Date. |
| **Tax Structure** | The Parties will work together in good faith to structure and implement the Restructuring Transactions in a tax efficient manner; *provided* that such tax structure shall be reasonably acceptable to the Required Consenting Stakeholders and the Company Parties. |
| **Executory Contracts and Unexpired Leases** | The Plan will provide that the executory contracts and unexpired leases that are not rejected as of the Plan Effective Date (either pursuant to the Plan or a separate motion) will be deemed assumed pursuant to section 365 of the Bankruptcy Code. |
| **Employment Obligations** | Pursuant to the Restructuring Support Agreement and this Restructuring Term Sheet, the Consenting Stakeholders consent to the continuation and assumption of all of the Debtors' wages, compensation, and employee benefits programs according to existing terms and practices, including executive and Insider compensation and benefits programs, Insider and non-Insider severance programs, Insider and non-Insider incentive programs, and Insider and non-Insider retention programs, in each case as are in effect as of the Agreement Effective Date and have been disclosed to counsel for the Required Consenting Stakeholders, including any modifications agreed between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement (collectively, the "<u>Employee Benefits Programs</u>"), and any motions in the Bankruptcy Court for approval thereof; provided, however, that Employee Benefits Programs shall not include (x) any compensation, post-employment, separation or retirement arrangement with any former Insider (as of the Agreement Effective Date) or (y) any non-qualified |

UST-0093

|  | deferred compensation plan or supplemental retirement plan, solely to the extent and such plan would benefit any former Insider (as of the Agreement Effective Date), in each case without the consent of the Required Consenting Stakeholders following the Petition Date. On the Plan Effective Date, pursuant to the Plan, the Debtors shall assume all obligations related to all Employee Benefits Programs (as agreed to be modified between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement, as applicable) and assume all employment agreements or letters, indemnification agreements, or other agreements entered into with current and former employees (as agreed to be modified between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement, as applicable) unless such employees agree to enter into new agreements on terms and conditions acceptable to the Reorganized Debtors, the Required Consenting Stakeholders and such employee. Notwithstanding the foregoing, no (x) compensation, post-employment, separation or retirement arrangement with any former Insider (as of the Agreement Effective Date) or (y) non-qualified deferred compensation plan or supplemental retirement plan, solely to the extent any such plan would benefit any former Insider (as of the Plan Effective Date), will be assumed on the Plan Effective Date, in each case without the prior consent of the Required Consenting Stakeholders. |
|---|---|
| **Indemnification Obligations** | Consistent with applicable law, all indemnification provisions in place as of the Plan Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring Transactions on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Plan Effective Date. |
| **Subordination** | The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |
| **Restructuring Transactions** | The Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan and the Restructuring Transactions therein. On the Plan Effective Date, the Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in this Restructuring Term Sheet or the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled, and the Debtors' obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Retention of Jurisdiction** | The Plan will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters. |

- 11 -

UST-0094

| | |
|---|---|
| **Retained Causes of Action** | The Reorganized Debtors, as applicable, shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action that the Debtors have released pursuant to the release and exculpation provisions of the Plan. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from SEC registration under applicable law.  On the Plan Effective Date, Reorganized Ascena will cease to be a public reporting company. |
| **Conditions Precedent to the Plan Effective Date** | The following, among others as agreed by the Debtors and the Required Consenting Stakeholders, shall be conditions to the Plan Effective Date:<br><br>1. The Bankruptcy Court shall have entered the Confirmation Order, which shall:<br><br>    a. be in form and substance consistent with the Restructuring Support Agreement;<br><br>    b. authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;<br><br>    c. decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;<br><br>    d. authorize the Debtors, as applicable/necessary, to:  (a) implement the Restructuring Transactions; (b) issue the New Common Stock pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (c) make all distributions and issuances as required under the Plan, including cash and the New Common Stock; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Exit Facilities;<br><br>    e. authorize the implementation of the Plan in accordance with its terms; and<br><br>    f. provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;<br><br>2. the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Restructuring Support Agreement and the Plan;<br><br>3. the Restructuring Support Agreement shall remain in full force and effect and shall not be terminated;<br><br>4. the documentation related to the Exit Facilities shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Plan Effective Date) to the effectiveness of the Exit Facilities shall have been satisfied or duly waived in writing in accordance with the terms of each of the Exit Facilities and the closing of the Exit Facilities shall have |

UST-0095

|  | occurred; |
|---|---|
|  | 5. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring; |
|  | 6. all actions, documents, certificates, and agreements necessary to implement the Plan (including any documents contained in the Plan Supplement) shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units, in accordance with applicable laws; |
|  | 7. all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses; |
|  | 8. all professional fees and expenses and of the advisors to the Consenting Stakeholders shall have been paid in full in accordance with the Restructuring Support Agreement; and |
|  | 9. the Debtors shall have implemented the Restructuring Transactions in a manner consistent with the Restructuring Support Agreement and this Plan. |
| **Waiver of Conditions Precedent to the Plan Effective Date** | The Debtors, with the prior consent of the Required Consenting Stakeholders, may waive any one or more of the Conditions Precedent to the Plan Effective Date. |

UST-0096

*Execution Version*

<u>ANNEX I</u>

**DEFINITIONS**

| Term | Definition |
|------|------------|
| **ABL Commitment Letter** | The letter committing certain ABL Lenders to provide the DIP ABL Facility and Exit ABL Facility on terms acceptable to the Required Consenting Stakeholders. |
| **ABL Facility** | The credit facility established by the ABL Credit Agreement. |
| **ABL Lenders** | Each of the lenders from time to time party to the ABL Credit Agreement. |
| **Administrative Claim** | A Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan Effective Date of preserving the Estates and operating the Debtors' businesses; and (b) allowed Professional Fee Claims. |
| **Causes of Action** | Any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim |
| **DIP ABL Agreement** | The debtor-in-possession senior secured asset-based revolving credit agreement establishing the DIP ABL Facility on terms acceptable to the Required Consenting Stakeholders. |
| **DIP ABL Facility Claim** | Any Claim derived from, based upon, or secured pursuant to the DIP ABL Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP ABL Facility. |
| **DIP Term Agreement** | The Superpriority Senior Secured Debtor-In-Possession Credit Agreement in the form of the Form DIP Credit Agreement and otherwise acceptable to the Majority Backstop Commitment Parties. |
| **DIP Term Facility Claim** | Any Claim derived from, based upon, or secured pursuant to the DIP Term Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Term Facility. |
| **DIP Term Lenders** | The lenders under the DIP Term Agreement. |

UST-0097

| Term | Definition |
|------|-----------|
| **Estate** | As to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 upon the commencement of the applicable Debtor's Chapter 11 Case. |
| **Exculpated Parties** | Collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) any statutory committees appointed in the Chapter 11 Cases and each of their respective members; (e) each current and former Affiliate of each Entity in clause (a) through the following clause (f); and (f) each Related Party of each Entity in clause (a) through this clause (e). |
| **Exit ABL Facility** | The senior secured asset-based revolving credit facility in an aggregate amount up to $400 million and otherwise on the terms set forth in the ABL Commitment Letter and pursuant to definitive documentation acceptable to the Required Consenting Stakeholders. |
| **Exit Facilities** | Collectively, the Exit ABL Facility, the First Out Term Loan Facility, and the Last Out Term Loan Facility. |
| **General Unsecured Claim** | Any Claim that is not secured and is not (a) an Administrative Claim, (b) an Other Secured Claim, (c) a Priority Tax Claim, (d) an Other Priority Claim, (e) an ABL Claim, (f) a Term Loan Claim, or (g) an Intercompany Claim. |
| **Intercompany Claim** | Any Claim held by a Debtor or a Debtor's affiliate against a Debtor or a Debtor's affiliate. |
| **Intercompany Interests** | Other than an Interest in Ascena Topco, an Interest in one Debtor held by another Debtor or a Debtor's affiliate. |
| **Lien** | Has the meaning set forth in section 101(37) of the Bankruptcy Code. |
| **Other Priority Claim** | Any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than: (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases. |
| **Other Secured Claim** | Any secured Claim, other than (a) an ABL Claim, (b) a DIP ABL Facility Claim, (c) a Term Loan Claim, or (d) a DIP Term Facility Claim. |
| **Priority Tax Claim** | Any Claim of a Governmental Unit (as set forth in section 101(27) of the Bankruptcy Code) of the kind specified in section 507(a)(8) of the Bankruptcy Code. |
| **Professional** | An Entity retained in the Chapter 11 Cases pursuant to a final order in accordance with sections 327, 363, and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Plan Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code. |
| **Professional Fee Claims** | All Claims for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the date on which the Confirmation Order is entered that the Bankruptcy Court has not denied by final order. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a final order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims. |

UST-0098

| Term | Definition |
|------|------------|
| **Proof of Claim** | A proof of Claim filed in the Chapter 11 Cases. |
| **Related Party** | With respect to any person or Entity, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special or other committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors of such person or Entity, and any such Person's or Entity's respective heirs, executors, estates, and nominees. |
| **Released Party** | Collectively, each of the following in their capacity as such:  (a) each of the Debtors;  (b)  the  Reorganized  Debtors;  (c) each  of  the  Consenting Stakeholders; (d) the ABL Agent; (e) the Term Loan Agent; (f) each of the lenders and administrative agents under the Exit Facilities; (g) the Backstop Parties; (h) the DIP ABL Agent; (i) the DIP ABL Lenders; (j) the DIP Term Agent; (k) the DIP Term Lenders;  (l) each current and former Affiliate of each Entity in the foregoing clause (a) through the following clause (m); and (m) each Related Party of each Entity in the foregoing clause (a) through this clause (m). |
| **Releasing Party** | Collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the ABL  Agent;  (e)  the  Term  Loan  Agent;  (f) each  of  the  lenders  and administrative agents under the Exit Facilities; (g) the Backstop Parties; (h) the DIP ABL Agent; (i) the DIP ABL Lenders; (j) the DIP Term Agent; (k) the DIP Term Lenders; (l) all holders of Claims; (m) all holders of Interests; (n) each current and former Affiliate of each Entity in foregoing clause (a) through the following clause (o); and (o) each Related Party of each Entity in the foregoing clause (a) through this clause (o); *provided* that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation; *provided further* that any such Entity shall be identified by name as a non-Releasing Party in the Confirmation Order. |
| **Reorganized Debtors** | Reorganized Ascena and each of the other Debtors, or any successor thereto, as reorganized pursuant to and under the Plan. |
| **Term Lenders** | Each of the lenders from time to time party to the Term Loan Credit Agreement. |

UST-0099

# EXHIBIT C

## Backstop Commitment Letter

UST-0100

July 23, 2020

<u>PERSONAL AND CONFIDENTIAL</u>
Ascena Retail Group, Inc.
933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attention: Dan Lamadrid

<div align="center">

Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Facility
Backstop Commitment Letter

</div>

Ladies and Gentlemen:

Ascena Retail Group, Inc. ("<u>Ascena TopCo</u>", "<u>you</u>" or "<u>your</u>") has (i) advised the parties listed on the signature pages hereto as Backstop Commitment Parties (each, a "<u>Backstop Commitment Party</u>" and, collectively, the "<u>Backstop Commitment Parties</u>", "<u>we</u>", "<u>us</u>" or "<u>our</u>"), that Ascena Topco and certain of its subsidiaries (the "<u>Subsidiary Debtors</u>" and, collectively with Ascena Topco, the "<u>Debtors</u>"), are considering filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et seq.</u> (as amended, the "<u>Bankruptcy Code</u>"), and, in connection with the foregoing, (ii) requested that the Backstop Commitment Parties agree to commit to provide a superpriority senior secured debtor-in-possession term loan credit facility for Ascena Topco under Sections 364(c) and 364(d) of the Bankruptcy Code (the "<u>DIP Facility</u>") consisting of (x) new money term loans (the "<u>New Money DIP Loans</u>") in an aggregate principal amount of $150 million and (y) term loans (the "<u>Roll-Up DIP Loans</u>" and, together with the New Money DIP Loans, the "<u>DIP Loans</u>") resulting from the conversion of the Prepetition Term Loans (as defined below) of the Prepetition Term Lenders (as defined below) that provide (themselves or through their affiliates) New Money DIP Loans in an aggregate amount equal to $161.8 million on the Effective Date, or as otherwise set forth in the Form DIP Credit Agreement. The DIP Facility shall convert on a dollar-for-dollar basis into an exit facility (the "<u>Exit Conversion</u>", such converted loans, the "<u>Exit Term Loans</u>", and the financing provided by the Exit Term Loans, the "<u>Exit Facility</u>") substantially on the terms set forth in this letter (including all exhibits, annexes, and schedules hereto, the "<u>Backstop Commitment Letter</u>"), as well as the form Senior Secured Super-Priority Debtor-In-Possession Term Credit Agreement attached hereto as **Exhibit A** (the "<u>Form DIP Credit Agreement</u>") and the Exit Facility Term Sheet attached hereto as **Exhibit B** (the "<u>Exit Facility Term Sheet</u>"), which terms will be memorialized in a credit agreement that will govern the Exit Facility (the "<u>Exit Facility Credit Agreement</u>"), subject solely to the conditions set forth in the sections of Article IV of the Form DIP Credit Agreement and the "Conditions to Borrower" set forth in the Exit Facility Term Sheet, in each case, that are applicable to the relevant borrowing. Unless otherwise specified herein, all references to "$" shall refer to U.S. dollars. Capitalized terms used herein without definition shall have the meaning assigned thereto in the Form DIP Credit Agreement or the Exit Facility Term Sheet, as applicable.

1.  <u>Backstop Commitment</u>.

To provide assurance that the DIP Facility and the Exit Facility shall be available on the terms and conditions set forth herein, in the Form DIP Credit Agreement and the Exit Facility Term Sheet, as applicable, each Backstop Commitment Party is pleased to advise Ascena Topco of its several and not joint commitment (the "<u>Backstop Commitment</u>") to provide, itself or through one or more funds managed by such Backstop Commitment Party, the amount of the DIP Loans and Exit Term Loans, each as set forth on **Schedule 1** hereto (as updated from time to time prior to the date that is two business days prior to the Effective Date) on the terms set forth in the Backstop Commitment Letter, subject solely to the conditions set forth in the sections of Article IV of the Form DIP Credit Agreement and the "Conditions to Borrowing" set forth in the Exit Facility Term Sheet that are applicable to the relevant borrowing. Each Backstop

<div align="center">1</div>

UST-0101

Commitment Party may, at its option, arrange for the Form DIP Credit Agreement or the Exit Facility Credit Agreement, if applicable, to be executed by one or more financial institutions selected by the applicable Backstop Commitment Party and reasonably acceptable to Ascena Topco (the "Fronting Lender(s)"), to act as an initial lender and to fund some or all of the Backstop Commitment Party's Backstop Commitment, in which case the applicable Backstop Commitment Party will acquire its shares of the DIP Facility and/or Exit Facility, as applicable, by assignment from the Fronting Lender(s) in accordance with the assignment provisions of the Form DIP Credit Agreement and the Exit Facility Credit Agreement, as applicable.

It is understood and agreed that the aggregate commitments under this Backstop Commitment Letter in respect of New Money DIP Loans (and the automatic conversion thereof to Exit Term Loans on the Conversion Date) are $150 million in total, subject to the Initial Allocation, as set forth in Section 2 hereof and each Backstop Commitment Party hereby agrees and commits to such automatic conversion of the New Money DIP Loans to Exit Term Loans on the Conversion Date.

2. Initial Allocation.

Each Lender (as defined in the Prepetition Term Loan Credit Agreement, a "Prepetition Term Lender") as of the Syndication End Date (as defined below) (including the Backstop Commitment Parties) shall have the right to participate (the "Opportunity") in 50.0% of the DIP Facility and the Exit Facility, in each case based on its Pro Rata Share (as defined below). The Opportunity will be conducted on the terms and conditions set forth in syndication procedures and related documentation, which procedures and documentation shall be reasonably acceptable to the Debtors and the Backstop Commitment Parties (the "Syndication Procedures"); provided that, the Backstop Commitment Parties shall use commercially reasonable efforts to cause the Syndication Procedures to be distributed by no later than 10:00 am New York Time on the fifth Business Day following the Petition Date (or such later date as agreed by you and the Majority Backstop Commitment Parties (as defined below)). Pursuant to the Syndication Procedures, each Prepetition Term Lender electing to participate in the Opportunity shall, among other things (i) provide written notification of such election to the Ad Hoc Committee Advisors by no later than the date that is 10 Business Days after the Syndication Procedures are distributed to the Prepetition Term Lenders (the "Syndication End Date") (or such later time as reasonably agreed by the Majority Backstop Commitment Parties and you) and (ii) execute a joinder to the Restructuring Support Agreement, dated as of the date hereof (the "Restructuring Support Agreement"), by and among Ascena Topco and certain of its subsidiaries and certain Prepetition Term Lenders prior to the Syndication End Date (or such later time as reasonably agreed by the Majority Backstop Commitment Parties and you) (the "Initial Allocation"); provided, that, any Backstop Commitment Party that is a Prepetition Term Lender shall (unless it elects otherwise) be deemed to have provided such notice of election to participate in the DIP Facility and the Exit Facility in respect of such holdings upon executing this Backstop Commitment Letter and the Restructuring Support Agreement. Each Prepetition Term Lender that elects to participate in the DIP Facility shall be obligated to participate in its ratable portion of the Exit Term Loans and the commitments under the Exit Facility will be "stapled to" the DIP Facility and traded in equal percentage.

"Pro Rata Share" means with respect to each Prepetition Term Lender (x) the aggregate principal amount of Loans (as defined in the Prepetition Term Loan Credit Agreement, the "Prepetition Term Loans") held by such Prepetition Term Lender, as set forth in the register for the Prepetition Term Loan Credit Agreement on the Syndication End Date divided by (y) the aggregate principal amount of Prepetition Term Loans held by all Prepetition Term Lenders outstanding under the Prepetition Term Loan Credit Agreement at such time.

UST-0102

"<u>Majority Backstop Commitment Parties</u>" means, at any time, Backstop Commitment Parties having Backstop Commitments outstanding that, taken together, represent at least 50.01% of the sum of all Backstop Commitments outstanding at such time.

Each Backstop Commitment Party shall have the right to assign its Commitments under the DIP Facility and the Exit Facility to participating Lenders in accordance with the Initial Allocation; provided that, notwithstanding the Initial Allocation, (i) no Backstop Commitment Party shall be relieved, released or novated from its obligations hereunder (including its obligation to fund the DIP Facility on the Effective Date, subject to the satisfaction (or waiver) of the conditions set forth in Article IV of the Form DIP Credit Agreement and its obligation to convert into the Exit Facility on the Conversion Date, subject to the satisfaction (or waiver) of the conditions set forth in the Exit Facility Term Sheet) in connection with the Initial Allocation, including its Backstop Commitments, until after the Initial Allocation Date has occurred, (ii) no allocation shall become effective as between you and such Backstop Commitment Party with respect to all or any portion of such Backstop Commitment Party's Backstop Commitments in respect of the DIP Facility and the Exit Facility until after the occurrence of the Initial Allocation Date, and (iii) unless you otherwise agree in writing, each Backstop Commitment Party shall retain exclusive control over all rights and obligations with respect to its Backstop Commitments in respect of the DIP Facility and the Exit Facility, including all rights with respect to consents, modifications, supplements, waivers and amendments, until the Initial Allocation Date has occurred. Any unsubscribed portion of the Opportunity as of the Syndication End Date shall be automatically allocated to, and funded by (if applicable), the Backstop Commitment Parties based on their respective percentages set forth on <u>Schedule 2</u> hereto.

Each of the parties hereto agrees to use its respective commercially reasonable efforts to assist the Administrative Agent in connection with the Initial Allocation. The Backstop Commitment Parties agree that, following the Initial Allocation, Ascena Topco and its subsidiaries and the Administrative Agent may conclusively rely on the schedule of "Post-Initial Allocation Term Loan Commitments" provided to Ascena Topco by the financial advisor for the Backstop Commitment Parties, Greenhill & Co., LLC, including the Lenders listed therein and their respective Commitments. None of Ascena Topco nor any of its affiliates nor any of their respective advisors shall be liable with respect to such schedule.

You acknowledge and agree that nothing in this Backstop Commitment Letter or the nature of our services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between any Backstop Commitment Party, the Administrative Agent or its affiliates, on the one hand, and you, your equity holders or your affiliates, on the other hand, and you waive, to the fullest extent permitted by law, any claims you may have against any Backstop Commitment Party, the Administrative Agent or its affiliates for breach of fiduciary duty or alleged breach of fiduciary duty in connection with this Backstop Commitment Letter or the transactions contemplated hereby, and agree that no Backstop Commitment Party, the Administrative Agent or affiliates of any of the foregoing will have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including your equity holders, employees or creditors. You acknowledge that the transactions contemplated hereby (including the exercise of rights and remedies hereunder) are arms'-length commercial transactions and that we and the Administrative Agent are acting as principal and in our own respective best interests. You are relying on your own experts and advisors to determine whether the transactions contemplated hereby are in your best interests and are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated hereby. In addition, you acknowledge that we and the Administrative Agent may employ the services of our respective affiliates in providing certain services hereunder and may exchange with such affiliates information concerning Ascena Topco and other companies that may be the subject of the transactions contemplated hereby and such affiliates will be entitled to the benefits afforded to us and the Agents hereunder; provided, that any such affiliates receiving information concerning Ascena Topco and other companies in accordance with this paragraph shall be subject to the same confidentiality

3

UST-0103

obligations provided for in this Backstop Commitment Letter (with each Backstop Commitment Party responsible for its affiliates' compliance with this paragraph).

3.   <u>Information</u>.

You hereby represent and warrant that (a) all written information concerning you and your subsidiaries and your and their respective business (other than financial projections, estimates, forecasts and budgets and other forward-looking information (collectively, the "<u>Projections</u>") and information of a general economic or industry specific nature) (the "<u>Information</u>") that has been or will be made available to us or any of our respective affiliates by or on behalf of you is or will be, when furnished and to the best of your knowledge, complete and correct in all material respects, when taken as a whole, and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to the updates provided for in the penultimate sentence of this Section 3) and (b) the Projections that have been or will be made available to us or any of our affiliates by or on behalf of you or any of your representatives have been or will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made and at the time the related Projections are made available to us or any of our affiliates (it being acknowledged that (i) such Projections are merely a prediction as to future events and are not to be viewed as facts, (ii) such Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, (iii) the actual results during the period or periods covered by any such Projections may differ significantly from the projected results, and (iv) no guarantee or assurance can be given that the projected results will be realized).  In particular, where Projections expressly or implicitly take into account  the  current  market volatility and widespread impact of the COVID-19 outbreak, the extent of the impact of these developments on the Debtors' and their subsidiaries' operational and financial performance will depend on future developments, including the duration and spread of the outbreak and related governmental advisories and restrictions, and the impact of the COVID-19 outbreak on overall demand for the Debtors' and their subsidiaries' products and services, all of which are outside of the control of the Debtors or their subsidiaries, highly uncertain and cannot be predicted.  You agree that if, at any time prior to the entry of the Order approving the DIP Facility, any of the representations, warranties and covenants in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations, warranties and covenants were being made, at such subsequent time, then you will promptly supplement the Information and the Projections so that such representations, warranties and covenants would be correct in material respects; provided, for the avoidance of doubt, there will be no requirement to update previously delivered Projections to reflect new assumptions so long as the assumptions were reasonable at the time made and made available to us or any of our affiliates.  The accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the obligations of the Backstop Commitment Parties hereunder or the availability of the DIP Facility.

4.   <u>Premium</u>.

As consideration for the Backstop Commitments and agreements of the Backstop Commitment Parties hereunder and under the Restructuring Support Agreement, Ascena Topco agrees to pay (or cause to be paid) to the  Backstop Commitment Parties, (or, at any Backstop Commitment Party's option and upon such Related Lender's designation (which may be provided by electronic communication), its Related Lender), a non-refundable backstop premium equal to $7.5 million (the "<u>Backstop Commitment Premium</u>"), which shall be allocated to each Backstop Commitment Party, in an amount equal to (1) its percentage set forth on <u>Schedule 2</u> hereto (the "<u>Backstop Percentage</u>"), *multiplied by* (2) the Backstop Commitment Premium, which shall be fully earned, nonrefundable and non-avoidable on the execution of this Backstop Commitment Letter and payable in cash free and clear of any withholding tax upon the

UST-0104

funding of the New Money DIP Loans on the Funding Date. Notwithstanding the foregoing, at the option of the Lenders, any or all of the Backstop Commitment Premium may instead be effected in the form of original issue discount with respect to the DIP Facility.

If a Termination Date occurs prior to the funding of the DIP Term Facility, a non-refundable aggregate premium in an amount equal to $7.5 million shall be payable in cash free and clear of any withholding tax (the "Termination Premium") on the Termination Date, which shall be allocated to each Backstop Commitment Party in an amount equal to (1) its Backstop Percentage, multiplied by (2) the Termination Premium.

5.    Payments and Fees

Without duplication of any amounts payable pursuant to Section 2.10 of the Form DIP Credit Agreement, the New Money DIP Loans will be subject to a commitment payment for each Lender participating in the DIP Facility in an amount of up to 2.50% of the principal amount of such Lender's New Money DIP Loans as of the Funding Date, earned upon entry of the Order and due and payable upon the Funding Date (the payment described in this sentence, the "DIP Commitment Payment"). For the avoidance of doubt, the entirety of the DIP Commitment Payment shall be treated as original issue discount with respect to the DIP Facility, and shall be subject to the withholding provisions set forth in Section 2.15 of the Form DIP Credit Agreement.

The Debtors agree to pay the fees, costs and expenses (collectively, the "Fronting Expenses") incurred in connection with the initial funding of the New Money DIP Loans by the Fronting Lender(s) and any assignments made by such Fronting Lender(s) to the Backstop Commitment Parties in connection therewith; provided that such Fronting Expenses shall not exceed 0.50% of such Fronting Lender(s)' New Money DIP Loans so funded.

6.    Conditions.

The Backstop Commitment Parties' Backstop Commitments and agreements hereunder in respect of the DIP Facility are subject solely to the satisfaction (or waiver) of the conditions precedent set forth in the sections of Article IV of the Form DIP Credit Agreement that are applicable to the relevant borrowing. Subject to the Order, there are no conditions (implied or otherwise) to the Backstop Commitments hereunder in respect of the DIP Facility, and there will be no conditions (implied or otherwise) to the availability of the DIP Facility on the Effective Date or the funding of the New DIP Term Loans on the Funding Date, including compliance with the terms of this Backstop Commitment Letter or the Form DIP Credit Agreement, other than those that are expressly stated in the applicable sections of Article IV of the Form DIP Credit Agreement relevant to the availability of the DIP Facility on the Effective Date or the Funding Date, as applicable. The Backstop Commitment Parties' commitment in respect of the Exit Facility are subject to the satisfaction or waiver of the conditions precedent set forth in "Conditions to Borrowing" in the Exit Facility Term Sheet. Subject to the Order, there are no conditions (implied or otherwise) to the Backstop Commitments hereunder in respect of the Exit Facility, and there will be no conditions (implied or otherwise) to the conversion of the Exit Facility on the Conversion Date, including compliance with the terms of this Backstop Commitment Letter or the Form DIP Credit Agreement, other than those that are expressly stated in the "Conditions to Borrowing" in the Exit Facility Term Sheet.

7.    Indemnification and Expenses.

You agree to (a) indemnify and hold harmless each Backstop Commitment Party and the Administrative Agent, their respective affiliates and their and their affiliates' officers, directors, employees, agents, attorneys, accountants, advisors (including investment managers and advisers),

UST-0105

consultants, representatives, controlling persons, members and permitted successors and assigns (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("Losses") to which any such Indemnified Person may become subject arising out of or in connection with this Backstop Commitment Letter, the DIP Facility, the Exit Facility the use of proceeds thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing, and to (b) reimburse each Backstop Commitment Party from time to time within five (5) Business Days of receipt of their reasonable demand by presentation of a summary statement for any reasonable and documented out-of-pocket legal or other expenses incurred in connection with the Cases, the DIP Facility, the Exit Facility, the enforcement of this Backstop Commitment Letter, the definitive documentation for the DIP Facility, the Exit Facility, and, in each case any ancillary documents and security arrangements in connection therewith, but no other third-party financial advisors (other than Greenhill & Co., LLC as financial advisor for the Backstop Commitment Parties) without your prior written consent; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses to the extent (a) they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's (i) gross negligence, bad faith, fraud or willful misconduct or (ii) material breach of its obligations under this Backstop Commitment Letter, or (b) they relate to a dispute solely among Indemnified Persons and not arising out of any act or omission of the Debtors or any of their respective subsidiaries (other than any claim, litigation, investigation or proceeding against the Administrative Agent in its capacity or in fulfilling its role as such).

None of you, the other Debtors, any of your or their respective subsidiaries, we nor any other Indemnified Person will be responsible or liable to one another for any indirect, special, punitive or consequential damages which may be alleged as a result of or arising out of, or in any way related to, the DIP Facility, the Exit Facility, the enforcement of this Backstop Commitment Letter, the definitive documentation for the DIP Facility or the Exit Facility, or any ancillary documents and security arrangements in connection therewith; provided that your indemnity and reimbursement obligations under this Section 6 shall not be limited by this sentence.

8.    Assignments, Amendments.

This Backstop Commitment Letter shall not be assignable by you or us without the prior written consent of the other parties hereto (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto, the Indemnified Persons and with respect to Section 2, Section 6 and this Section 7, the Administrative Agent, and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto, the Indemnified Persons and with respect to Section 2 and Section 6 and this Section 7, the Administrative Agent. Notwithstanding anything set forth in this Section 8 to the contrary, each Backstop Commitment Party (i) shall assign all or a portion of its Backstop Commitment to other banks, financial institutions, or institutional lenders and investors solely in connection with the Initial Allocation pursuant to Section 2 above (subject to the terms and conditions set forth therein) and (ii) may assign its respective Backstop Commitment, in whole or in part, to any Related Lender, or to any other Backstop Commitment Party. This Backstop Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by the Backstop Commitment Parties and you.

This Backstop Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Backstop Commitment Letter by facsimile or other electronic transmission (including E-Signature) shall be effective as delivery of a manually executed counterpart hereof. Section headings used herein are for convenience of reference only, are not part of this Backstop Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Backstop Commitment Letter. You acknowledge that information and documents

UST-0106

relating to the DIP Facility and/or Exit Facility may be transmitted through the internet, e-mail or similar electronic transmission systems and that neither any Backstop Commitment Party nor any Agent, nor any of their respective affiliates, shall be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner.

This Backstop Commitment Letter supersedes all prior understandings, whether written or oral, between us with respect to the DIP Facility and the Exit Facility.

9.      Governing Law, Etc.; Jurisdiction.

THIS BACKSTOP COMMITMENT LETTER AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS BACKSTOP COMMITMENT LETTER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF THE DOMESTIC SUBSTANTIVE LAWS OF ANY OTHER STATE).

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the non-exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan in New York City, and any appellate court from any thereof and the Bankruptcy Court, in any suit, action or proceeding arising out of or relating to this Backstop Commitment Letter or the DIP Facility, and agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court, or, to the extent applicable, the Bankruptcy Court; *provided* that suit for the recognition or enforcement of any judgment obtained in any such court may be brought in any other court of competent jurisdiction, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Backstop Commitment Letter or the DIP Facility in any New York State court, in any such Federal court or in Bankruptcy Court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court, and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

You hereby agree that you shall not bring any suit, action, proceeding, claim or counterclaim under this Backstop Commitment Letter or with respect to the transactions contemplated hereby in any court other than such New York State court or Federal Court of the United States of America sitting in the Borough of Manhattan in New York City.  Service of any process, summons, notice or document by registered mail addressed to you at the address above shall be effective service of process against you for any suit, action or proceeding brought in any such court.

10.     Waiver of Jury Trial.

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS BACKSTOP COMMITMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

UST-0107

11.  <u>Confidentiality</u>.

       This Backstop Commitment Letter is delivered to Ascena Topco on the understanding that neither this Backstop Commitment Letter nor any of its terms or substance shall be disclosed, directly or indirectly, to any other person or entity except (a) you and your officers, directors, employees, legal counsel, accountants, auditors, financial advisors, existing and prospective holders of indebtedness and their respective affiliates, representatives, officers, directors and legal counsel, in each case, who are involved in the consideration of the financing transactions contemplated hereby who have been informed by you of the confidential nature of this Backstop Commitment Letter and have agreed to treat such information confidentially, (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent not prohibited by law, to inform Backstop Commitment Parties promptly in advance thereof), (c) the office of the U.S. Trustee, any *ad-hoc* or statutorily appointed committee of unsecured creditors, and their respective representatives and professional advisors on a confidential and "need to know" basis, (d) to the Bankruptcy Court, in a redacted manner in form and substance reasonably satisfactory to the Backstop Commitment Parties, to the extent required to obtain Bankruptcy Court approval in connection with any acts or obligations to be taken pursuant to this Backstop Commitment Letter or the transactions contemplated hereby and (e) you may disclose the aggregate fee amounts contained herein, as part of pro forma information or a generic disclosure of aggregate sources and uses related to fee amounts related to the Transactions to the extent customary or required in offering or marketing materials or in any public or regulatory filing relating to the Transactions.

       Each Backstop Commitment Party agrees to keep confidential, and not to publish, disclose or otherwise divulge, confidential information with respect to the transactions contemplated hereby or obtained from or on behalf of you or your respective affiliates in the course of the transactions contemplated hereby, except that the Backstop Commitment Parties shall be permitted to disclose such confidential information (a) to their affiliates and their and their affiliates' respective directors, officers, agents, employees, attorneys, accountants, auditors and advisors involved in the transactions contemplated hereby on a "need to know" basis and who are made aware of and agree to comply with the provisions of this paragraph, in each case on a confidential basis (with the Backstop Commitment Party responsible for such persons' compliance with this paragraph), (b) on a confidential basis to any bona fide prospective Lender, prospective participant or swap counterparty (in accordance with the terms of the Form DIP Credit Agreement) that agrees to keep such information confidential in accordance with (x) the provisions of this paragraph (or language substantially similar to this paragraph that is reasonably acceptable to you) for your benefit or (y) other customary confidentiality language in a "click-through" arrangement, (c) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case you agree, to the extent not prohibited by law, to inform Backstop Commitment Parties promptly in advance thereof), (d) to the extent such information: (i) becomes publicly available other than as a result of a breach of this Backstop Commitment Letter or other confidentiality obligation owed by such Backstop Commitment Party to you or your affiliates or (ii) becomes available to the Backstop Commitment Parties on a non-confidential basis from a source other than you or on your behalf that, to such Backstop Commitment Party's knowledge, is not in violation of any confidentiality obligation owed to you or your affiliates, (e) to the extent you shall have consented to such disclosure in writing (which may include through electronic means), (f) as is necessary in protecting and enforcing the Backstop Commitment Parties' rights with respect to this Backstop Commitment Letter and/or the DIP Facility, (g) to the extent independently developed by such Backstop Commitment Party or its affiliates without reliance on confidential information, (h) with respect to the existence and contents of the Form DIP Credit Agreement, in consultation with you, to the rating agencies or (i) with respect to the existence and contents of the Backstop Commitment Letter and the DIP Facility, to market data collectors or similar service providers in connection with the arrangement, administration or management of the DIP Facility and to industry

UST-0108

trade organizations where such information with respect to the DIP Facility is customarily included in league table measurements. The Backstop Commitment Parties' and their respective affiliates', if any, obligations under this paragraph shall terminate automatically to the extent superseded by the confidentiality provision in the Form DIP Credit Agreement upon the effectiveness thereof and, in any event, will terminate one year from the date hereof.

12.     <u>Miscellaneous</u>.

The Backstop Commitment Parties hereby notify Ascena Topco that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "<u>PATRIOT Act</u>"), it and its affiliates are required to obtain, verify and record information that identifies Ascena Topco, each other Debtor, which information includes names, addresses, tax identification numbers and other information that will allow Backstop Commitment Parties and its affiliates to identify Ascena Topco and each other Debtor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for Backstop Commitment Parties and its affiliates.

Absent a change in applicable tax law or a contrary determination (as defined in Section 1313(a) of the Internal Revenue Code of 1986, as amended), each of the parties hereto agrees (i) the Backstop Commitment Premium and the Termination Premium shall be treated as premiums paid by the Debtors to the relevant Backstop Commitment Party in exchange for the issuance of a put right to Ascena Topco with respect to the DIP Facility and (ii) to not take any tax position inconsistent with the tax treatment described in clause (i).

Each of the parties hereto agrees that this Backstop Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein, including an agreement to negotiate in good faith the definitive documentation for the DIP Facility and the Exit Facility by the parties hereto in a manner consistent with this Backstop Commitment Letter, it being acknowledged and agreed that the availability of the DIP Facility and Exit Facility is subject to the conditions precedent expressly set forth in <u>Section 5</u> hereof.

If the foregoing correctly sets forth our agreement, please indicate Ascena Topco's acceptance of the terms of this Backstop Commitment Letter by returning to the Backstop Commitment Parties executed counterparts of this Backstop Commitment Letter not later than 11:59 p.m., New York City time, on July 23, 2020. This offer will automatically expire at such time if the Backstop Commitment Parties have not received such executed counterparts in accordance with the preceding sentence. This Backstop Commitment Letter and the Backstop Commitments and agreements hereunder shall automatically terminate on the earlier of (i) July 26, 2020, unless the Petition Date has occurred by such date, (ii) the date that is 36 calendar days after the Petition Date, unless prior to such time the DIP Financing Order (as defined in the Restructuring Support Agreement) shall have been entered by the Bankruptcy Court, (iii) five Business Days after the Termination Date (as defined in the Restructuring Support Agreement) or the Restructuring Support Agreement otherwise ceases to be in full force and effect or (iv) five Business Days after the Outside Date (as defined in the Restructuring Support Agreement), unless prior to such time the Exit Conversion shall have occurred, in each case unless extended by agreement of you and the Majority Backstop Commitment Parties (which agreement may be evidenced by email of counsel). Notwithstanding the immediately preceding sentence, Section 4 above, as well as the indemnification and expenses, confidentiality, Initial Allocation, information, jurisdiction, governing law and waiver of jury trial provisions contained herein shall remain in full force and effect in accordance with their terms notwithstanding the termination of this Backstop Commitment Letter or the Backstop Commitment Parties' Backstop Commitments hereunder; *provided* that your obligations under this Commitment Letter, other than those pursuant to Section 4 and with respect to the Initial Allocation and confidentiality, shall

UST-0109

automatically terminate and be superseded by the applicable provisions in the Form DIP Credit Agreement and the Exit Facility Credit Agreement, in each case, to the extent covered thereby, upon the initial funding on the Effective Date or the occurrence of the Exit Conversion, and you shall be released from all liability in connection therewith at such time.

[Signature Pages follow.]

UST-0110

[*Signature pages of the Backstop Commitment Parties on file with the Company*]

UST-0111

Accepted and agreed to as of July 23, 2020:

ASCENA RETAIL GROUP, INC.

By: _Dan Lamadrid_____
Name: Dan Lamadrid
Title:  Executive Vice President and
        Chief Financial Officer

UST-0112

**Schedule 1**

[*On file with the Company*]

UST-0113

**Schedule 2**

[*On file with the Company*]

UST-0114

**Exhibit A**

See Attached.

UST-0115

$311,800,000

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
TERM CREDIT AGREEMENT

dated as of

[  ], 2020,

among

ASCENA RETAIL GROUP, INC.,
as Parent Borrower

ANNTAYLOR RETAIL, INC.,
as Subsidiary Borrower

The LENDERS Party Hereto

and

ALTER DOMUS (US) LLC,
as Administrative Agent

UST-0116

# TABLE OF CONTENTS

**Page**

## ARTICLE I

### Definitions

SECTION 1.01.    Defined Terms ....................................................................................2
SECTION 1.02.    Classification of Loans and Borrowings ....................................34
SECTION 1.03.    Terms Generally .............................................................................34
SECTION 1.04.    Accounting Terms; GAAP ...........................................................35
SECTION 1.05.    Classification of Actions ..............................................................35
SECTION 1.06.    Divisions .........................................................................................35

## ARTICLE II

### The Credits

SECTION 2.01.    Commitments ..................................................................................36
SECTION 2.02.    Loans and Borrowings ..................................................................36
SECTION 2.03.    Requests for Borrowings ...............................................................37
SECTION 2.04.    Funding of Borrowings .................................................................37
SECTION 2.05.    Interest Elections ...........................................................................38
SECTION 2.06.    Termination of Commitments .......................................................39
SECTION 2.07.    Repayment of Loans; Evidence of Debt ......................................39
SECTION 2.08.    Amortization of Term Loans .........................................................40
SECTION 2.09.    Prepayment of Loans .....................................................................40
SECTION 2.10.    Fees .................................................................................................42
SECTION 2.11.    Interest ............................................................................................42
SECTION 2.12.    Alternate Rate of Interest ..............................................................43
SECTION 2.13.    Increased Costs ..............................................................................44
SECTION 2.14.    Break Funding Payments ..............................................................45
SECTION 2.15.    Taxes ...............................................................................................46
SECTION 2.16.    Payments Generally; Pro Rata Treatment; Sharing of Set-offs ................50
SECTION 2.17.    Mitigation Obligations; Replacement of Lenders ......................52
SECTION 2.18.    [Reserved] .......................................................................................53
SECTION 2.19.    [Reserved] .......................................................................................53
SECTION 2.20.    Joint and Several Liability of the Borrowers .............................53
SECTION 2.21.    Super-Priority Nature of Obligations and Administrative Agent's
Liens; Payment of Obligations ...................................................54
SECTION 2.22.    Conversion to Exit Facility Agreement ......................................55

## ARTICLE III

### Representations and Warranties

SECTION 3.01.    Organization; Powers ....................................................................56

i

UST-0117

SECTION 3.02.   Authorization; Enforceability; Benefit to Loan Parties ............................56
SECTION 3.03.   Governmental Approvals; No Conflicts .....................................................56
SECTION 3.04.   Financial Condition; No Material Adverse Change.....................................57
SECTION 3.05.   Properties ........................................................................................................57
SECTION 3.06.   Litigation and Environmental Matters ......................................................57
SECTION 3.07.   Compliance with Laws and Agreements ...................................................58
SECTION 3.08.   Investment Company Status .......................................................................58
SECTION 3.09.   Taxes ...............................................................................................................58
SECTION 3.10.   ERISA; Labor Matters ..................................................................................59
SECTION 3.11.   [Reserved] .......................................................................................................59
SECTION 3.12.   Subsidiaries and Joint Ventures .................................................................59
SECTION 3.13.   Insurance .........................................................................................................60
SECTION 3.14.   Federal Reserve Regulations........................................................................60
SECTION 3.15.   [Reserved] .......................................................................................................60
SECTION 3.16.   Collateral Matters ..........................................................................................60
SECTION 3.17.   Use of Proceeds ..............................................................................................60
SECTION 3.18.   Approved Budget ...........................................................................................61
SECTION 3.19.   Chapter 11 Cases ...........................................................................................61

## ARTICLE IV

### Conditions

SECTION 4.01.   Conditions to Effective Date and Availability of the Term Loans ...........62
SECTION 4.02    Conditions to the New Money Loan. .........................................................63

## ARTICLE V

### Affirmative Covenants

SECTION 5.01.   Financial Statements and Other Information .............................................64
SECTION 5.02.   Notices of Material Events............................................................................67
SECTION 5.03.   Collateral Obligations; Additional Subsidiaries ......................................68
SECTION 5.04.   Information Regarding Collateral ...............................................................68
SECTION 5.05.   Existence; Conduct of Business....................................................................69
SECTION 5.06.   Payment of Obligations.................................................................................70
SECTION 5.07.   Maintenance of Properties ...........................................................................70
SECTION 5.08.   Insurance ..........................................................................................................70
SECTION 5.09.   Books and Records; Inspection and Rights ...............................................70
SECTION 5.10.   Compliance with Laws ..................................................................................71
SECTION 5.11.   Bankruptcy Matters.......................................................................................71
SECTION 5.12.   Maintenance of Ratings ................................................................................72
SECTION 5.13.   Certain Post-Closing Collateral Obligations.............................................72
SECTION 5.14.   Reserved............................................................................................................72
SECTION 5.15.   Conference Calls..............................................................................................72

ii

UST-0118

## ARTICLE VI

### Negative Covenants

SECTION 6.01.    Indebtedness; Certain Equity Securities ...................................................73
SECTION 6.02.    Liens....................................................................................................74
SECTION 6.03.    Fundamental Changes; Business Activities ...........................................76
SECTION 6.04.    Investments, Loans, Advances, Guarantees and Acquisitions..................76
SECTION 6.05.    Asset Sales ..........................................................................................78
SECTION 6.06.    Sale/Leaseback Transactions ................................................................79
SECTION 6.07.    Swap Agreements ................................................................................79
SECTION 6.08.    Restricted Payments; Certain Payments of Indebtedness ........................79
SECTION 6.09.    Transactions with Affiliates .................................................................81
SECTION 6.10.    Restrictive Agreements ........................................................................81
SECTION 6.11.    Amendment of Organizational Documents .............................................82
SECTION 6.12.    Financial Covenants............................................................................82
SECTION 6.13.    Accounting Changes ...........................................................................83
SECTION 6.14.    Sanctions ...........................................................................................83
SECTION 6.15.    Anti-Corruption Laws ........................................................................83

## ARTICLE VII

### Events of Default

## ARTICLE VIII

### The Administrative Agent

## ARTICLE IX

### Miscellaneous

SECTION 9.01.    Notices ...............................................................................................93
SECTION 9.02.    Waivers; Amendments.........................................................................95
SECTION 9.03.    Expenses; Indemnity; Damage Waiver...................................................97
SECTION 9.04.    Successors and Assigns........................................................................99
SECTION 9.05.    Survival ............................................................................................103
SECTION 9.06.    Counterparts; Integration; Effectiveness; Electronic Execution..............104
SECTION 9.07.    Severability ......................................................................................104
SECTION 9.08.    Right of Setoff...................................................................................104
SECTION 9.09.    Governing Law; Jurisdiction; Consent to Service of Process.................105
SECTION 9.10.    WAIVER OF JURY TRIAL..............................................................105
SECTION 9.11.    Headings ...........................................................................................106
SECTION 9.12.    Confidentiality ..................................................................................106
SECTION 9.13.    Several Obligations; Nonreliance; Violation of Law..............................106
SECTION 9.14.    USA Patriot Act Notice .....................................................................106
SECTION 9.15.    Interest Rate Limitation .....................................................................107

UST-0119

SECTION 9.16.    Release of Liens and Guarantees ...........................................................107

SECTION 9.17.    No Fiduciary Relationship ...................................................................107

SECTION 9.18.    Non-Public Information .......................................................................108

SECTION 9.19.    Intercreditor Agreement .....................................................................108

SECTION 9.20.    Acknowledgement and Consent to Bail-In of EEA Financial Institutions ...........................................................................................109

<u>SCHEDULE</u>:

Schedule 2.01    —    Commitments

Schedule 3.05    —    Real Property

Schedule 3.06    —    Disclosed Matters

Schedule 3.12    —    Subsidiaries and Joint Ventures

Schedule 3.13    —    Insurance

Schedule 5.11    —    Required Milestones

Schedule 6.01    —    Pre-Petition Indebtedness

Schedule 6.02    —    Liens

Schedule 6.04    —    Investments

Schedule 6.09    —    Transactions with Affiliates

Schedule 6.10    —    Restrictive Agreements

<u>EXHIBITS</u>:

Exhibit A    —    Form of Assignment and Assumption

Exhibit B    —    Form of Borrowing Request

Exhibit C    —    Form of Guarantee and Collateral Agreement

Exhibit D    —    Form of Compliance Certificate

Exhibit E    —    Form of Interest Election Request

Exhibit F    —    [Reserved]

Exhibit G    —    Form of Exit Facility Term Sheet

Exhibit H-1    —    Form of U.S. Tax Certificate for Non-U.S. Lenders that are not Partnerships for U.S. Federal Income Tax Purposes

Exhibit H-2    —    Form of U.S. Tax Certificate for Non-U.S. Lenders that are Partnerships for U.S. Federal Income Tax Purposes

Exhibit H-3    —    Form of U.S. Tax Certificate for Non-U.S. Participants that are not Partnerships for U.S. Federal Income Tax Purposes

Exhibit H-4    —    Form of U.S. Tax Certificate for Non-U.S. Participants that are Partnerships for U.S. Federal Income Tax Purposes

Exhibit I    —    [Reserved]

Exhibit J    —    Form of Variance Report

Exhibit K    —    Form of Note

Annex A    —    Approved Budget

iv

UST-0120

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION TERM CREDIT AGREEMENT, dated as of [  ], 2020, among ASCENA RETAIL GROUP, INC., a Delaware corporation, as debtor and debtor-in-possession (the "Parent Borrower"), ANNTAYLOR RETAIL, INC., a Florida corporation as debtor and debtor-in-possession (the "Subsidiary Borrower" and, together with the Parent Borrower, the "Borrowers" and each, a "Borrower"), the LENDERS party hereto and Alter Domus (US) LLC ("Alter Domus"), as Administrative Agent.

On July 23, 2020 (the "Petition Date"), the Borrowers and the other Loan Parties (collectively, the "Debtors", and each individually, a "Debtor") commenced voluntary cases (collectively, the "Cases" and each individually, a "Case") in the United States Bankruptcy Court for the Eastern District of Virginia Richmond Division (the "Court"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

Prior to the Petition Date, the Lenders provided financing to the Borrowers pursuant to that certain Term Credit Agreement dated as of August 21, 2015, among the Borrowers, the other Loan Parties, the Pre-Petition Lenders and Goldman Sachs Bank USA, as the Pre-Petition Agent and the other parties thereto (as amended, amended and restated, supplemented or otherwise modified from time to time through the date hereof, the "Pre-Petition Credit Agreement").

As of the Petition Date, the Pre-Petition Lenders under the Pre-Petition Credit Agreement were owed approximately $1,271,597,089 in Loans (as defined in the Pre-Petition Credit Agreement), plus interest, fees, costs and expenses and all other Pre-Petition Lender Obligations under the Pre-Petition Credit Agreement.

The Loan Document Obligations under and as defined in the Pre-Petition Credit Agreement are secured by a security interest in substantially all of the existing and after-acquired assets of the Borrowers and the other Loan Parties as more fully set forth in the Pre-Petition Loan Documents, and such security interest is perfected and, with certain exceptions, as described in the Pre-Petition Loan Documents, has priority over other security interests.

The Borrowers have requested, and, upon the terms set forth in this Agreement, the Lenders have agreed to make or be deemed to have made available to the Borrowers, a senior secured super priority term credit facility of up to $311,800,000 in the aggregate that is automatically convertible into a secured exit facility upon the satisfaction (or waiver) of certain conditions in the form of a term facility to be made available to the Borrowers at any time until the Maturity Date subject to the terms and conditions set forth herein (the "Term Credit Facility").

The Borrowers and other Loan Parties have agreed to secure all of their Loan Document Obligations under the Loan Documents by granting to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, a security interest in and lien upon all of their existing and after-acquired personal and real property, subject to the Intercreditor Agreement and the limitations and priorities contained in the Loan Documents and the Order.

UST-0121

Accordingly, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

<div align="center">ARTICLE I</div>

<div align="center">Definitions</div>

SECTION 1.01.   Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABL Agent" means the Person acting as agent under the ABL Credit Agreement, in its individual capacity, and its successors.

"ABL Credit Agreement" means the Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, dated the Funding Date, among the Parent Borrower, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto and the ABL Agent, as administrative agent, as amended, restated, supplemented, modified, renewed, refunded, replaced or refinanced from time to time through the date hereof.

"ABL Lenders" means the lenders under the ABL Credit Agreement.

"ABL Priority Collateral" has the meaning set forth in the Intercreditor Agreement.

"ABR," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bears interest at a rate determined by reference to the Alternate Base Rate.

"Acceptable Plan" means a Plan of Reorganization that is consistent with the RSA and otherwise satisfactory to the Required Lenders  and the Loan Parties in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof); it being agreed that the Plan (as defined in the RSA) is an "Acceptable Plan" to the Required Lenders.

"Actual Net Cash Flow Amount" means the actual net cash flows of the Loan Parties during the relevant period of determination which corresponds to each of the Budgeted Net Cash Flow Amounts described in the line item contained in the Approved Budget across from the heading "Unlevered Operating Cash Flow, Including Restructuring".

"Ad Hoc Committee" means the ad hoc committee of Consenting Stakeholders (as defined in the RSA).

"Ad Hoc Committee Advisors" means Greenhill Partners and Milbank LLP, the advisors of the Ad Hoc Committee.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded to the nearest 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate; provided that,

<div align="center">2</div>

UST-0122

notwithstanding the foregoing, in the case of the Term Loans, the Adjusted LIBO Rate shall at no time be less than 1.00% per annum.

"Administrative Agent" means Alter Domus (US) LLC, in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Administrative Agent Fee Letter" means that certain Fee Letter dated as of even date herewith between the Borrowers and Alter Domus.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" means this Senior Secured Super-Priority Debtor-In-Possession Term Credit Agreement, as modified, supplemented, amended or restated from time to time.

"Alter Domus" has the meaning set forth in the introductory paragraph hereto.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% per annum and (c) the Adjusted LIBO Rate on such day (or if such day is not a Business Day, the immediately preceding Business Day) for a deposit in dollars with a maturity of one month plus 1% per annum; provided that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the Screen Rate (or the Interpolated Screen Rate, as applicable) at approximately 11:00 a.m., London time, on such day for a deposit in dollars with a maturity of one month. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively. Notwithstanding the foregoing, in the case of the Term Loans, the Alternate Base Rate shall at no time be less than 2.00% per annum.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Parent Borrower and its Subsidiaries from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 and the UK Bribery Act 2010.

"Applicable Rate" means, for any day, with respect to any Term Loan, (i) 11.75% in the case Eurodollar Term Loans and (ii) 10.75% in the case of ABR Term Loans.

"Approved Budget" means the budget prepared by the Parent Borrower in form and substance reasonably satisfactory to the Ad Hoc Committee Advisors, it being understood and agreed that the budget in the form of Annex A and initially furnished to the Administrative Agent on or prior to the Effective Date is deemed reasonably satisfactory to the Ad Hoc Committee Advisors, as the same may be updated, modified or supplemented from time to time as provided in Section 5.01. The initial Approved Budget shall depict, on a weekly and line item

UST-0123

basis, (i) projected cash receipts, (ii) projected cash disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Loan Parties' professionals and advisors), asset sales and any other fees and expenses relating to the Loan Documents), (iii) net cash flows, (iv) Liquidity and (v) professional fees and disbursements with respect to the Loan Parties' professionals, in each case for the first thirteen (13) week period from the Effective Date, and such initial Approved Budget shall be approved by, and in form and substance reasonably satisfactory to, the Administrative Agent and the Required Lenders in their sole discretion (it being acknowledged and agreed that the initial Approved Budget attached hereto as <u>Annex A</u> is approved by and reasonably satisfactory to the Administrative Agent and the Required Lenders)[1].

"<u>Approved Fund</u>" means any Person (other than a natural person that is engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"<u>Asset Sale</u>" has the meaning set forth in Section 6.05.

"<u>Asset Sale Escrow Account</u>" [_____][2].

"<u>Assignment and Assumption</u>" means an assignment and assumption entered into by a Lender and an Eligible Assignee, with the consent of any Person whose consent is required by Section 9.04, and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"<u>Automatic Stay</u>" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"<u>Backstop Lender</u>" means each Lender who is party to the Commitment Letter.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of such EEA Financial Institution.

"<u>Bail-In Legislation</u>" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"<u>Bankruptcy Code</u>" means the Bankruptcy Reform Act of 1978, as codified at 11 U.S.C. §§ 101 et seq.

---

[1] Subject to review of initial Approved Budget.

[2] Escrow mechanics to be confirmed.

UST-0124

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Cases.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrowers" has the meaning set forth in the introductory paragraph hereto.

"Borrowing" means Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrowers for a Borrowing in accordance with Section 2.03, which shall be, in the case of any such written request, in the form of Exhibit B or any other form approved by the Administrative Agent.

"Budgeted Net Cash Flow Amount" means the amount described in the line item contained in the Approved Budget across from the heading "Unlevered Operating Cash Flow Including Restructuring", during the relevant period of determination.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP (as in effect on December 31, 2018, notwithstanding any modification or interpretative change thereto after such date and excluding the effect to any treatment of lease under Accounting Standards Codification 842 (or any other Accounting Standards Codification or Financial Accounting Standard have a similar result or effect)), the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve Out" has the meaning set forth in the Order.

"Cases" has the meaning set forth in the Recitals.

"Cash Equivalents" means:

(a) marketable direct obligations issued or unconditionally guaranteed by the United States Government, the Government of Canada, or the UK government, or issued by an agency thereof and backed by the full faith and credit of the United States Government, the Government of Canada, or the UK government, as the case may be, in each case maturing within two years after the date of acquisition thereof;

5

UST-0125

(b)      marketable direct obligations issued by any state of the United States of America or any province of Canada, or any member of the European Union or any political subdivision of any such state or province or any public instrumentality thereof, in each case maturing within two years after the date of acquisition thereof and, at the time of acquisition, having a rating of at least A by S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then from such other nationally recognized rating services acceptable to the Administrative Agent);

(c)      commercial paper maturing no more than one year after the date of creation thereof and, at the time of acquisition, having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then the highest rating from such other nationally recognized rating services acceptable to the Administrative Agent);

(d)      certificates of deposit or bankers acceptances denominated in US Dollars, Canadian Dollars, Sterling or Euro and maturing within one year after the date of acquisition thereof issued by any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(e)      repurchase agreements of any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(f)      overnight investments with any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(g)      other readily marketable instruments issued or sold by any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(h)      shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (a) through (g) above;

(i)      funds invested in brokerage accounts with nationally recognized brokerage houses or money market accounts; and

(j)      in the case of investments by any Foreign Subsidiary or investments made in a country outside the United States, other customarily utilized high quality investments

LA\4104335.13

UST-0126

in the country where such Foreign Subsidiary is located or in which such investment is made that would customarily constitute "cash equivalents".

"Cash Management Order" means the order of the Court entered in the Cases after the "first day" hearing on a final basis, together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Required Lenders, which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements (as set forth in the Pre-Petition Credit Agreement) or such other arrangements as shall be reasonably acceptable to the Required Lenders in all material respects

"CFC" means (a) any Person that is a "controlled foreign corporation" within the meaning of Section 957(a) of the Code and (b) each subsidiary of any Person described in clause (a).

"CFC Holdco" means a Subsidiary with no material assets other than equity interests of one or more Foreign Subsidiaries that are CFCs.

"Change in Control" means during any period of 12 consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Parent Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any rule, regulation, treaty or other law, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted, promulgated or issued.

"Charges" has the meaning set forth in Section 9.15.

"Claim" means any (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an

UST-0127

equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means (a) means, collectively, all of the real, personal and mixed property (including Equity Interests) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Loan Document Obligations, and (b) the ["DIP Collateral"][3] referred to in the Order, it being understood that "Collateral" shall include all such "DIP Collateral" irrespective of whether any such property was excluded pursuant to the Pre-Petition Loan Documents.

"Collateral Agreement" means the Guarantee and Collateral Agreement among the Borrowers, the other Loan Parties and the Administrative Agent, substantially in the form of Exhibit C, together with all supplements thereto.

"Collateral and Guarantee Requirement" means, at any time, the requirement that:

     (a)     the Administrative Agent shall have received from the Borrowers and each Designated Subsidiary (a) either (i) a counterpart of the Collateral Agreement, duly executed and delivered on behalf of such Person, or (ii) in the case of any Person that becomes a Designated Subsidiary after the Effective Date, a supplement to the Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Person, together with such documents with respect to such Designated Subsidiary as may reasonably be requested by the Administrative Agent and (b) an Intercreditor Acknowledgement in the form referred to in the Intercreditor Agreement, duly executed and delivered on behalf of such Person;

     (b)     all Equity Interests owned by or on behalf of any Loan Party shall have been pledged pursuant to, and to the extent required by, the Collateral Agreement, including Equity Interests in any Luxembourg IP Subsidiary and any first-tier CFC or CFC Holdco, and the Administrative Agent shall, to the extent required by the Collateral Agreement, have received certificates or other instruments representing all such certificated Equity Interests, together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

     (c)     all other assets, to the extent not constituting Excluded Property, shall have been pledged pursuant to, and to the extent required by, the Collateral Agreement;

     (d)     all documents and instruments, including UCC financing statements, required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded to perfect the Liens intended to be created by the Collateral Documents with the priority required by the Collateral Documents shall have been filed,

---

[3] Subject to Final Order.

LA\4104335.13

UST-0128

registered or recorded or delivered to the Administrative Agent for filing, registration or recording;

(e)     each Loan Party shall have obtained all material consents and approvals required in connection with the execution and delivery of all Collateral Documents to which it is a party and the performance of its obligations thereunder; and

(f)     the Loan Document Obligations shall at all times be secured by a valid, binding, continuing, enforceable perfected first priority Lien on the DIP Accounts and the proceeds thereof and, on the Effective Date (or such later date as the Required Lenders may agree in its sole discretion), the Borrowers must obtain Control Agreement for the DIP Accounts.

Notwithstanding the foregoing, any Designated Subsidiary formed or acquired after the Effective Date shall not be required to comply with the foregoing requirements prior to the time specified in Section 5.03.  The foregoing definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance or, subject to the requirements of applicable law, flood insurance, legal opinions, appraisals, surveys or other deliverables with respect to, particular assets of the Loan Parties, or the provision of Guarantees by any Restricted Subsidiary, if and for so long as the Administrative Agent (acting at the direction of the Required Lenders), in consultation with the Borrowers, reasonably determines that the cost of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance or flood insurance, legal opinions, appraisals, surveys or other deliverables in respect of such assets, or providing such Guarantees, shall be excessive in view of the benefits to be obtained by the Lenders therefrom.  The Required Lenders may in their sole discretion, grant extensions of time for the creation and perfection of security interests in (including delivery of promissory notes as required by clause (c) above) or the obtaining of title insurance or, subject to the requirements of applicable law, flood insurance, legal opinions, appraisals, surveys or other deliverables with respect to particular assets or the provision of any Guarantee by any Designated Subsidiary where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Collateral Documents.

"Collateral Documents" means the Order, Collateral Agreement, and each other document granting a Lien upon any assets of any Loan Party as security for payment of the Loan Document Obligations.

"Commitment" means, with respect to each Lender, such Lender's New Money Commitment and such Lender's Roll-Up Loans Commitment.

"Commitment Letter" means the Commitment Letter dated July 23, 2020, among the Ad Hoc Committee and the Parent Borrower.

"Committee" means an official committee of unsecured creditors appointed in any of the Cases by the U.S. Trustee.

"Communications" means, collectively, any written notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to

UST-0129

any Loan Document or the transactions contemplated therein that is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to Section 9.01, including through the Platform.

"Compliance Certificate" means a Compliance Certificate in the form of Exhibit D or any other form approved by the Administrative Agent.

"Confirmation Order" means an order of the Court entered in the Cases pursuant to section 1129 of the Bankruptcy Code, which order (x) shall confirm an Acceptable Plan, be a final Order and otherwise be in form and substance reasonably satisfactory to  the Required Lenders, together with all extensions, modifications, and amendments thereto, also in form and substance reasonably satisfactory to the Required Lenders and (y) (i) if the Term Credit Facility converts to the Exit Facility, shall authorize and approve the extensions of credit under the Exit Facility Credit Agreement and the performance of the Borrowers' (or the entities assuming and/or acquiring directly or indirectly the operations and assets of the Borrowers in the Acceptable Plan) and Guarantors' obligations thereunder, authorize a pro forma capital structure that satisfies the conditions precedent to the occurrence of the Conversion Date and otherwise satisfies all other conditions to the Conversion Date or (ii) if the Term Credit Facility is to be repaid in cash, shall authorize and approve such repayment, any financing the proceeds of which will be used to fund such repayment, and the termination in full of all outstanding obligations under the Term Credit Facility.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means, with respect to any deposit account or securities account maintained by any Loan Party, a control agreement in form and substance reasonably satisfactory to the Administrative Agent, duly executed and delivered by such Loan Party and the depositary bank or the securities intermediary, as the case may be, with which such account is maintained.

"Conversion Date" means the date upon which each of the conditions precedent to effectiveness of the Exit Facility Agreement set forth in the Exit Facility Term Sheet shall have been satisfied or waived.

"Court" has the meaning set forth in the Recitals.

"Cumulative Four-Week Period" means the four-week period up to and through the Saturday of the week most recently ended prior to the applicable Variance Report Date, or if a four-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Saturday of the most recent week then ended.

"Debtor" has the meaning set forth in the Recitals.

"Debtors' Investment Banker" means Guggenheim Securities, LLC.

"Declined Proceeds" has the meaning set forth in Section 2.09(d).

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" means (i) in the case of overdue principal of any Loan, 2.0% per annum plus the rate otherwise applicable to such Loan as provided in Section 2.11 or (ii) in the case of any other overdue amount, 2.0% per annum plus the rate applicable to ABR Term Loans as provided in Section 2.11(a).

"Deposit Account" has the meaning set forth in the Collateral Agreement.

"Designated Jurisdiction" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"Designated Persons" means any person or entity listed on a Sanctions list.

"Designated Subsidiary" means each Subsidiary other than an Excluded Subsidiary.

"DIP Accounts" means the DIP Funding Account and the Asset Sale Escrow Account.

"DIP Funding Account" means a Deposit Account in the name of the Parent Borrower subject to a blocked Control Agreement in favor of the Administrative Agent, on behalf of the Secured Parties, in which the proceeds of the Loans shall be deposited and held on the Funding Date and used solely for the purposes set forth in Section 3.17.

"DIP Superpriority Claim" means allowed superpriority expense claims pursuant to Bankruptcy Code Sections 364(c)(1), 503 and 507 granted by the Order.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 3.06.

"Disqualified Stock" means any Equity Interests which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case at any time on or prior to the date that is 91 days after the latest Maturity Date (determined as of the date of issuance thereof or, in the case of any such Equity Interests outstanding on the date hereof, the date hereof), or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) cash, (ii) debt or (iii) any Equity Interests referred to in (a) above, in each case at any time prior to the date that is 91 days after the latest Maturity Date (determined as of the date of issuance thereof or, in the case of any such Equity Interests outstanding on the date hereof, the date hereof).  Notwithstanding the foregoing, any Equity Interests that would constitute Disqualified Stock solely because holders of the Equity Interests have the right to require the issuer of such Equity Interests to repurchase such Equity Interests upon the occurrence of a change in control or an asset sale will not constitute Disqualified Stock if the terms of such Equity Interests provide that the issuer may not repurchase or redeem any such

11

UST-0131

Equity Interests pursuant to such provisions unless such repurchase or redemption is permitted under the terms of this Agreement.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary of the Parent Borrower that is organized under the laws of the United States, any state of the United States or the District of Columbia, except for a Subsidiary directly or indirectly owned by a CFC.

"EEA Financial Institution" means (a) any financial institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any member state of the European Union, Iceland, Liechtenstein and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02), which date is [  ], 2020[4].

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person, other than, in each case, a natural person or the Parent Borrower, any Subsidiary or any other Affiliate of the Parent Borrower.

"Environment" means ambient air, indoor air, surface water, groundwater, drinking water, land surface and subsurface strata, and natural resources such as wetlands, flora and fauna.

"Environmental Laws" means all applicable federal, state, and local laws (including common law), regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and binding agreements with any Governmental Authority in each case, relating to pollution or protection of the Environment, human health and safety (to the extent related to exposure to Hazardous Materials), or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

---

[4] To be the date the Order is approved.

LA\4104335.13

UST-0132

"Environmental Liability" means any liability, claim, action, suit, agreement, judgment or order arising under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, including those arising from or relating to: (a) compliance or non-compliance with any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threat of Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest (other than, prior to the date of such conversion, any Indebtedness that is convertible into any such Equity Interests).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414(m) or 414(o) of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived), (b) any failure by any Plan to satisfy the minimum funding requirements of Section 412 or 430 of the Code or Section 302 or 303 of ERISA with respect to such Plan, in each case whether or not waived, or any failure by any Loan Party or any ERISA Affiliate to make a required contribution to a Multiemployer Plan, (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) a determination that any Plan is in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code), (e) the incurrence by any Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA (other than PBGC premiums due but not delinquent under Section 4007 of ERISA), (f) the receipt by any Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Section 4042 of ERISA, (g) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan; (h) a complete withdrawal or partial withdrawal by any Loan Party or any ERISA Affiliate from any Plan or Multiemployer Plan, (i) the receipt by any Loan Party or any ERISA Affiliate of any notice concerning the imposition of Withdrawal Liability, or a determination that a Multiemployer Plan is insolvent, within the meaning of Title IV of ERISA, or in "endangered" or "critical" status, within the meaning of Section 305 of ERISA or Section 432 of the Code, (j) a failure by any Loan Party or any ERISA Affiliate to pay when due (after expiration of any applicable grace period) any installment payment with respect to Withdrawal Liability, (k) the imposition of a Lien upon any Loan Party or any ERISA

13

UST-0133

Affiliate pursuant to Section 430(k) of the Code or Section 303(k) of ERISA, (l) the occurrence of a non-exempt "prohibited transaction" (as defined in Section 4975 of the Code or Section 406 of ERISA) with respect to which any Loan Party or any ERISA Affiliate is a "disqualified person" (within the meaning of Section 4975 of the Code) or a "party in interest" (within the meaning of Section 406 of ERISA) or could otherwise reasonably be expected to be liable or (m) any event with respect to any Foreign Plan which could reasonably be expected to result in liability to any Loan Party similar to the liability that could arise with respect to an event described in clauses (a) through (l) above.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Events of Default" has the meaning set forth in Article VII.

"Exchange Act" means the United States Securities Exchange Act of 1934.

"Excluded Deposit Account" means (a) [reserved], (b) any Deposit Account that is a zero balance disbursement account the funds in which are used solely for the payment of salaries and wages, (c) any Deposit Account that is a zero balance disbursement account the funds in which are used solely for payment of medical or insurance reimbursement, workers' compensation and similar expenses, (d) any escrow account to the extent the creation of a security interest therein would violate any agreement with a Person other than the Parent Borrower or a Subsidiary, and (e) any fiduciary or trust account.

"Excluded Property" the collective reference to:

(A)     any licenses, franchises, charters and authorizations of a Governmental Authority to the extent a security interest therein under the Loan Documents is prohibited by or would require the consent, license or approval of any Governmental Authority (except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition);

(B)     any asset if the granting of a security interest under the Loan Documents in such asset would be prohibited by any (x) law, treaty, rule or regulation (including all applicable regulations and laws regarding assignments of and security interests in, government receivables) or a court or other Governmental Authority or would require the consent, license or approval of any Governmental Authority (other than proceeds thereof, to the extent the assignment of such proceeds is effective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition and the assignment of such proceeds is not prohibited by applicable law and does not require the consent, license or approval of any Governmental Authority) or (y) contractual obligation (only to the extent such restriction is binding on such asset (i) on the Petition Date or (ii) on the date of the acquisition thereof and not entered into in contemplation thereof) (except to the extent such prohibition or restriction is

14

UST-0134

ineffective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition);

(C)     any lease, license or other agreement to the extent that a grant of a security interest therein under the Loan Documents would violate or invalidate such lease, license or agreement (except any such lease, license or agreement among Parent Borrower and its wholly-owned Subsidiaries and except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition);

(D)     Equity Interests  in any Person that is not a Subsidiary, in partnerships, in joint ventures and in non-wholly owned Subsidiaries to the extent the pledge or other granting of a security interest under the Loan Documents in such Equity Interests would be prohibited by, or require a consent or approval of unaffiliated third parties or are not permitted under, organizational or governance documents or shareholders' or similar agreements of or with respect to such Person (except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order, or other applicable law notwithstanding such prohibition);

(E)     to the extent applicable law requires that a Subsidiary issue directors' qualifying shares, nominee shares or similar shares which are required by applicable law to be held by persons other than a Loan Party, such qualifying shares, nominee shares or similar shares held by Persons other than a Loan Party;

(F)     any United States intent-to-use application for registration of a trademark or service mark prior to the acceptance by the United States Patent and Trademark Office of a statement of use or an amendment to allege use, to the extent and for so long as the grant of a security interest therein would impair the validity or enforceability of, or render void or voidable or result in the cancellation of, a Loan Party's right, title or interest therein or any trademark or service mark registration issued therefrom;

(G)     "margin stock" within the meaning of Regulation U;

(H)     Excluded Deposit Accounts; and

(I)     proceeds in an amount not to exceed the Carve Out, if applicable, under the Order.

provided that (a) in the case of clauses 2(y), (3) and (5), such exclusion shall not apply (i) to the extent the prohibition or restriction is ineffective under Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code, the Bankruptcy Code or other applicable law or (ii) to proceeds of the assets referred to in such clause, the assignment of which is expressly deemed effective under Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code, the Bankruptcy Code or other applicable law and (b) assets described above shall no longer be "Excluded Property" upon termination of the applicable prohibition or restriction described above that caused such assets to be treated as "Excluded Property".

15

UST-0135

"Excluded Subsidiary" means (a) [reserved], (b) any Foreign Subsidiary of the Parent Borrower, (c) any Subsidiary that is a direct or indirect Subsidiary of a Foreign Subsidiary of the Parent Borrower that is a CFC, (d) any CFC Holdco, (e) any Subsidiary that is prohibited or restricted by applicable law, rule or regulation or contractual obligation in existence on the Petition Date from providing a Guarantee of the Loan Document Obligations (solely for so long as such prohibition or restriction remains in existence) or if such Guarantee would require governmental (including regulatory) consent, approval, license or authorization unless such consent, approval, license or authorization has been received (but without obligation to seek the same), (f) [reserved], (g) [reserved], (h) [reserved], and (i) any other Restricted Subsidiary with respect to which, in the reasonable judgment of the Required Lenders (confirmed in writing by notice to the Parent Borrower), the cost or other consequences of becoming a Guarantor shall be excessive in view of the benefits to be obtained by the Lenders therefrom. In no event shall (i) the Subsidiary Borrower be an Excluded Subsidiary or (ii) any Subsidiary of the Parent Borrower that is a "Subsidiary Loan Party" (under and as defined in the ABL Credit Agreement to the extent applicable) or that is otherwise a guarantor of, or has otherwise provided security for, the obligations under the ABL Credit Agreement(to the extent applicable) be an Excluded Subsidiary.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by such Recipient's net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed by a jurisdiction as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, such jurisdiction (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the applicable Loan or Commitment (other than an assignee pursuant to an assignment request by the Borrowers under Section 2.17(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.15, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in such Loan or Commitment or to such Lender immediately before it changed its lending office, (c) any Taxes attributable to a Lender's failure to comply with Section 2.15(e) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Exit Conversion" has the meaning set forth in Section 2.22.

"Exit Facility Agreement" means the credit agreement that is approved by the Confirmation Order and entered into on the Conversion Date consistent in all material respects with the terms set forth in the Exit Facility Term Sheet and any related schedules and exhibits attached thereto; *provided*, that such credit agreement shall have been made available to the Administrative Agent and all Lenders; provided, further, that upon the satisfaction of waiver of the conditions contemplated by Section 2.22, each Lender hereunder that is a Lender on the Conversion Date hereby authorizes the Administrative Agent to use its executed signature page to this Agreement as an executed signature page to the Exit Facility Agreement without any further action on the part of any such Lender or any other Person.

16

UST-0136

"<u>Exit Facility Term Sheet</u>" means the term sheet attached as Exhibit G hereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury regulations or other official administrative interpretations thereof, any agreements entered into pursuant to current Section 1471(b) of the Code (or any amended or successor version described above), and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement between a non-U.S. jurisdiction and the United States of America.

"<u>Federal Funds Effective Rate</u>" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"<u>Financial Officer</u>" means, with respect to any Person, the chief financial officer, principal accounting officer, treasurer, assistant treasurer, chief restructuring officer or controller of such Person.

"<u>Foreign Lender</u>" means a Lender that is not a U.S. Person.

"<u>Foreign Plan</u>" means any defined benefit pension plan, benefit plan, fund (including any superannuation fund) or other similar program that, under the requirements of law of any jurisdiction other than the United States, is required to be funded through a trust or other funding vehicle (other than a trust or funding vehicle or any of the foregoing sponsored or maintained exclusively by a Governmental Authority) and is directly sponsored and maintained by a Loan Party primarily for the benefit of its employees who are employed and residing outside the United States.

"<u>Foreign Subsidiary</u>" means any Subsidiary of the Parent Borrower, other than a Domestic Subsidiary.

"<u>Funding Date</u>" means the date on which the conditions specified in Section 4.02 are satisfied (or waived in accordance with Section 9.02).

"<u>GAAP</u>" means generally accepted accounting principles in the United States of America, applied in accordance with the consistency requirements thereof.

"<u>Governmental Authority</u>" means the government of the United States of America, any other nation or any political subdivision thereof, whether state, local, county, provincial or otherwise, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers

17

UST-0137

or functions of or pertaining to government (including any supra-national body exercising such powers or functions, such as the European Union or the European Central Bank).

"GS Bank" means Goldman Sachs Bank USA, in its individual capacity, and its successors.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The amount, as of any date of determination, of any Guarantee shall be the principal amount outstanding on such date of Indebtedness or other obligation guaranteed thereby (or, in the case of (i) any Guarantee the terms of which limit the monetary exposure of the guarantor or (ii) any Guarantee of an obligation that does not have a principal amount, the maximum monetary exposure as of such date of the guarantor under such Guarantee (as determined, in the case of clause (i), pursuant to such terms or, in the case of clause (ii), reasonably and in good faith by a Financial Officer of the Parent Borrower)).

"Guarantors" means each Subsidiary of the Parent Borrower (other than any Excluded Subsidiary), in each case, until any such Subsidiary (other than the Subsidiary Borrower) is released as a Guarantor in accordance with the Loan Documents.

"Hazardous Materials" means any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any applicable Environmental Law, including, without limitation, any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos-containing materials, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances or mold.

 "Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person (excluding trade accounts payable incurred in the ordinary course of business), (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (i) current accounts payable incurred in the ordinary course of business, (ii) deferred compensation payable to directors, officers or employees of the Parent Borrower or any Restricted Subsidiary and (iii) any purchase price adjustment or earnout incurred in connection with an acquisition, except to the extent that the amount payable pursuant

18

UST-0138

to such purchase price adjustment or earnout is, or becomes, a liability on the balance sheet of the Parent Borrower in accordance with GAAP), (e) all Capital Lease Obligations and Synthetic Lease Obligations of such Person, (f) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (g) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (h) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed by such Person (but only to the extent of the lesser of (x) the amount of such Indebtedness and (y) the fair market value of such property, if such Indebtedness has not been assumed by such Person), (i) net payments that would have to be made in the event of an early termination in respect of any outstanding Swap Agreement, (j) all obligations of such Persons with respect to the redemption, repayment or repurchase of Disqualified Stock (excluding accrued dividends) and (k) all Guarantees by such Person of Indebtedness of others. The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor by contract, as a matter of law or otherwise as a result of such Person's ownership interest in or other relationship with such other Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. It is acknowledged and agreed that private label and corporate letters of credit issued by the Parent Borrower or any Subsidiary for the making of payment for the purchase of inventory in the ordinary course of business (and in respect of which no financial institution is an issuer thereof or has any disbursement obligations thereunder) do not constitute Indebtedness of the Parent Borrower or such Subsidiary.

"Indemnified Taxes" means (a) all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), all Other Taxes.

"Indemnitee" has the meaning set forth in Section 9.03(b).

"Information" has the meaning set forth in Section 9.12.

"Intercreditor Acknowledgment" means that certain Acknowledgment and Agreement, dated as of the Funding Date, by and among the Administrative Agent, the Pre-Petition Agent, the ABL Agent and the Pre-Petition ABL Agent, and acknowledged by the Loan Parties.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of August 21, 2015, among the Pre-Petition Agent, as term collateral agent, the Pre-Petition ABL Agent, as ABL collateral agent, and acknowledged by the Loan Parties, as may be supplemented and modified by the Intercreditor Acknowledgment, and as may be further amended, amended and restated, supplemented or otherwise modified and in effect from time to time.

"Interest Election Request" means a request by the Borrowers to convert or continue a Borrowing in accordance with Section 2.05, which shall be, in the case of any such written request, in the form of Exhibit E or any other form approved by the Administrative Agent.

19

UST-0139

"Interest Payment Date" means (a) with respect to any ABR Loan, the first Business Day of each calendar quarter and the Maturity Date applicable to such ABR Loan and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, such day or days prior to the last day of such Interest Period as shall occur at intervals of three months' duration after the first day of such Interest Period and the Maturity Date applicable to such Eurodollar Loan.

"Interest Period" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months (or, with the consent of each Lender participating therein, twelve months) thereafter, as the Borrowers may elect; provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing. For the avoidance of doubt, no Interest Period shall extend beyond the Maturity Date.

"Interpolated Screen Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, a rate *per annum* which results from interpolating on a linear basis between (a) the Screen Rate for the longest maturity for which a Screen Rate is available that is shorter than such Interest Period and (b) the Screen Rate for the shortest maturity for which a Screen Rate is available that is longer than such Interest Period, in each case at 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"Investment" means, with respect to a specified Person, any direct or indirect acquisition or investment by such Person in any other Person, in the form of (a) the purchase or other acquisition (including without limitation by merger or otherwise) of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person  or (c) the purchase or other acquisition (in one transaction or a series of transactions, including without limitation by merger or otherwise) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, division, product or line of business of such Person.  For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made), without adjustment for subsequent changes in the value of such Investment, net of any cash return representing a return of capital with respect to such Investment.

"IRS" means the United States Internal Revenue Service.

UST-0140

"Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that shall have ceased to be a party hereto pursuant to an Assignment and Assumption.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, a rate *per annum* equal to the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for deposits in dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period as displayed on the applicable Bloomberg screen page that displays such rate (or, in the event such rate does not appear the applicable Bloomberg screen page, on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion) at 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period (the "Screen Rate"). If no Screen Rate shall be available for a particular Interest Period but Screen Rates shall be available for maturities both longer and shorter than such Interest Period, then the LIBO Rate for such Interest Period shall be the Interpolated Screen Rate. Notwithstanding the foregoing, if the LIBO Rate, determined as provided above in this definition, would be less than zero, the LIBO Rate shall for all purposes of this Agreement be zero.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, charge, security interest or other encumbrance in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"Liquidity" means, at any time, the sum of, without duplication, (a) Availability (as defined in the Pre-Petition ABL Credit Agreement as in effect on the date hereof or, to the extent applicable, the ABL Credit Agreement as in effect on the Funding Date), (b) unrestricted cash and cash equivalents of the Parent Borrower and its Restricted Subsidiaries that would be reflected on a consolidated balance sheet of the Parent Borrower in accordance with GAAP on such date (other than the cash proceeds of any Indebtedness being incurred on such date) and (c) cash and cash equivalents of the Parent Borrower and its Restricted Subsidiaries (excluding, for the avoidance of doubt, Eligible Pledged Cash (as defined in the Pre-Petition ABL Credit Agreement as in effect on the date hereof or, to the extent applicable, the ABL Credit Agreement, as in effect on the Funding Date) to the extent duplicative) that are restricted in favor of the Administrative Agent or any Lender (or, the Pre-Petition ABL Agent or, to the extent applicable, the ABL Agent, for the benefit of the Administrative Agent pursuant to the Intercreditor Agreement) (which cash and cash equivalents may also secure other Indebtedness together with the Loan Document Obligations).

"Loan Document Obligations" means all unpaid principal of and accrued and unpaid interest on the Loans, all accrued and unpaid fees, premiums (including the Redemption Premium, if any) and all expenses, reimbursements, indemnities and other obligations of the Loan Parties to any Lender, the Administrative Agent, or any Indemnitee arising under the Loan Documents, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees,

UST-0141

premiums (including the Redemption Premium, if any), costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any bankruptcy or insolvency laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, premiums (including the Redemption Premium, if any), costs, expenses and indemnities are allowed claims in such proceeding.

"Loan Documents" means this Agreement, the Commitment Letter, the Collateral Agreement, the Control Agreement with respect to the DIP Accounts, the other Collateral Documents, the Intercreditor Agreement, the Intercreditor Acknowledgment, the Administrative Agent Fee Letter, the Order and, except for purposes of Section 9.02, any promissory notes delivered pursuant to Section 2.07(e).

"Loan Parties" means the Borrowers and the Guarantors.

"Loans" means the loans made by the Lenders to the Borrowers pursuant to this Agreement.

"Luxembourg IP Subsidiary" means each of (i) AnnTaylor Loft GP Lux S.à.rl. and (ii) AnnTaylor Loft Borrower Lux SCS.

"Material Adverse Effect" means a material adverse effect on (a) the results of operations, assets, business or financial condition of the Parent Borrower and the Restricted Subsidiaries, taken as a whole, excluding in any event (i) the effect of filing the Cases, the events and conditions leading up to and customarily resulting from the commencement and continuation of the Cases, the effects thereof and any action required to be taken under the Loan Documents or the Order and the Cases themselves, (ii) any matters publicly disclosed prior to the filing of the Cases and (iii) any matters or transactions disclosed, contemplated or required to be taken in any "first day" or "second day" orders, motions related thereto or in any supporting declarations thereof, (b) the ability of the Loan Parties to perform any of their monetary obligations under the Loan Documents to which it is a party or (c) the rights of or benefits available to the Administrative Agent or the Lenders under the Loan Documents; provided that in determining whether a "material adverse effect" has occurred or exists under clause (a) hereof, the impacts of COVID-19 on the results of operations, assets, business or financial condition of the Parent Borrower and the Restricted Subsidiaries will be disregarded (provided that this exception shall not apply to the extent that it is materially disproportionately adverse to the Parent Borrower and its Restricted Subsidiaries, taken as a whole, as compared to other companies in the same industry in which the Parent Borrower and its Restricted Subsidiaries operate).

"Material Indebtedness" means Indebtedness (other than the Loans and Guarantees under the Loan Documents), or obligations in respect of one or more Swap Agreements, of any one or more of the Parent Borrower and the Subsidiaries in an aggregate principal amount exceeding $10,000,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Parent Borrower or any Restricted Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Parent Borrower or such Restricted Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

UST-0142

"Maturity Date" means the date that is the earliest of (i) six months after the Effective
Date, (ii) the date of the substantial consummation (as defined in Section 1101(2) of the
Bankruptcy Code) of an Acceptable Plan, (iii) the date the Court converts any of the Cases to a
Chapter 7 case, (iv) the date the Court dismisses any of the Cases, (v) the date on which the Loan
Parties consummate a sale of all or substantially all of the assets of the Loan Parties pursuant to
section 363 of the Bankruptcy Code or otherwise, and (vi) such earlier date on which the Loans
shall become due and payable by acceleration or otherwise in accordance with the terms of this
Agreement and the other Loan Documents.

"Maximum Rate" has the meaning set forth in Section 9.15.

"MNPI" means material information concerning the Parent Borrower, any Subsidiary or
any Affiliate of any of the foregoing or their securities that has not been disseminated in a
manner making it available to investors generally, within the meaning of Regulation FD under
the Securities Act and the Exchange Act. For purposes of this definition, "material information"
means information concerning the Parent Borrower or its Subsidiaries, or any of their respective
securities, that would reasonably be expected to be material for purposes of the United States
federal and state securities laws.

"Moody's" means Moody's Investors Service, Inc., and any successor to its rating agency
business.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of
ERISA that is or was, during the past six years, maintained or sponsored by any Loan Party or
ERISA Affiliate or to which any Loan Party or any ERISA Affiliate makes or is obligated to
make contributions, or during the past six years has made or been obligated to make
contributions, in each case, if a liability to a Loan Party remains outstanding.

"Net Proceeds" means, with respect to any event, (a) the cash (which term, for purposes
of this definition, shall include Cash Equivalents) proceeds (including, in the case of any
casualty, condemnation or similar proceeding, insurance, condemnation or similar proceeds)
received in respect of such event, including any cash received in respect of any noncash
proceeds, but only as and when received, net of (b) the sum, without duplication, of (i) all actual
fees and out-of-pocket expenses paid in connection with such event by the Parent Borrower and
the Restricted Subsidiaries to Persons that are not Affiliates of the Parent Borrower or any
Restricted Subsidiary, (ii) in the case of a sale, transfer or other disposition (including pursuant
to a Sale/Leaseback Transaction or a casualty or a condemnation or similar proceeding) of an
asset, the amount of all payments required to be made by the Parent Borrower and the Restricted
Subsidiaries as a result of such event to repay Indebtedness (other than Loans and Indebtedness
under the ABL Credit Agreement) secured by such asset on a basis prior to the Liens, if any, on
such assets securing the Loan Document Obligations and (iii) the amount of all taxes paid (or
reasonably estimated to be payable) by the Parent Borrower and the Restricted Subsidiaries, and
the amount of any reserves established by the Parent Borrower and the Restricted Subsidiaries in
accordance with GAAP to fund purchase price adjustment, indemnification and similar
contingent liabilities (other than any earnout obligations) reasonably estimated to be payable, in
each case during the year that such event occurred or the next succeeding year and that are
directly attributable to the occurrence of such event (as determined reasonably and in good faith

UST-0143

by the chief financial officer of the Parent Borrower).  For purposes of this definition, in the event any contingent liability reserve established with respect to any event as described in clause (b)(iii) above shall be reduced, the amount of such reduction shall, except to the extent such reduction is made as a result of a payment having been made in respect of the contingent liabilities with respect to which such reserve has been established, be deemed to be receipt, on the date of such reduction, of cash proceeds in respect of such event.

"New Money Commitment" means as to each Lender, its obligation to make a New Money Loan to Borrowers hereunder, expressed as an amount representing the maximum principal amount of New Money Loans to be made by such Lender under this Agreement, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption substantially in the form of Exhibit A hereto.  The amount of each Lender's New Money Commitment is set forth on Schedule 2.01 under the caption "New Money Loans" or, otherwise, in the Assignment and Assumption pursuant to which such Lender shall have assumed its New Money Commitment, as the case may be.  The aggregate amount of the New Money Commitments on the date hereof is $150 million.

"New Money Loans" means the loans made pursuant to Section 2.01(a).

"OFAC" means the United States Treasury Department Office of Foreign Assets Control.

"Order" means the order of the Court entered in the Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Court, which order shall be satisfactory in form and substance to the Required Lenders, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless Administrative Agent waives such requirement), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Required Lenders, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the Administrative Agent's and the Lenders' claims.

"Other Connection Taxes"  means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under , engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, excluding any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.17).

UST-0144

"Parent Borrower" has the meaning set forth in the introductory paragraph hereto.

"Participant Register" has the meaning set forth in Section 9.04(c)(ii).

"Participants" has the meaning set forth in Section 9.04(c)(i).

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub.L. No. 107-56 (signed into law October 26, 2001)).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"Permitted Encumbrances" means:

(a)     Liens imposed by law for Taxes that are not yet delinquent or are being contested in compliance with Section 5.06;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law (other than any Lien imposed pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code), arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.06;

(c)     pledges and deposits made (i) in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations and (ii) in respect of letters of credit, bank guarantees or similar instruments issued for the account of the Parent Borrower or any Restricted Subsidiary in the ordinary course of business supporting obligations of the type set forth in clause (i) above or reimbursement or indemnification obligations to insurance carriers providing property, casualty or liability insurance to the Parent Borrower and its Restricted Subsidiaries;

(d)     pledges and deposits made to secure the performance of bids, trade contracts (other than Indebtedness for borrowed money), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)     judgment liens in respect of judgments that do not constitute an Event of Default under clause (k) of Article VII;

(f)     easements, zoning restrictions, rights-of-way, site plan agreements, development agreements, operating agreements, cross-easement agreements, reciprocal easement agreements and other encumbrances and exceptions to title on real property that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Parent Borrower or any Restricted Subsidiary or the ordinary operation of such real property;

25

UST-0145

(g)     customary rights of setoff upon deposits of cash in favor of banks and other depository institutions and Liens of a collecting bank arising under the UCC in respect of payment items in the course of collection;

(h)     Liens arising from precautionary UCC financing statement filings (or similar filings under applicable law) regarding operating leases or consignments, in each case arising in the ordinary course of business;

(i)     Liens representing any interest or title of a licensor, lessor or sublicensor or sublessor, or a licensee, lessee or sublicensee or sublessee, in the property subject to any lease (other than Capital Lease Obligations), license or sublicense or concession agreement permitted by this Agreement;

(j)     Liens arising in the ordinary course of business in favor of custom and forwarding agents and similar Persons in respect of imported goods and merchandise in the custody of such Persons;

(k)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(l)     Liens or rights of setoff against credit balances of the Parent Borrower or any Restricted Subsidiary with credit card issuers or credit card processors to secure obligations of the Parent Borrower or such Restricted Subsidiary, as the case may be, to any such credit card issuer or credit card processor incurred in the ordinary course of business as a result of fees and chargebacks;

(m)     Liens on Equity Interests of any joint venture (i) securing obligations of such joint venture or (ii) pursuant to the relevant joint venture agreement, in each case in existence on or prior to the Petition Date; and

(n)     other Liens that are contractual rights of set-off;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness, other than Liens referred to in clause (c) above securing letters of credit, bank guarantees or similar instruments.

"Permitted Variance" means, any variance that does not violate Section 6.12(b).

"Person" or "person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the Recitals.

"Plan" means any "employee pension benefit plan," as defined in Section 3(2) of ERISA (other than a Multiemployer Plan or Foreign Plan), (a) that is subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and (b) (i) in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA

26

UST-0146

and/or (ii) that is or was, within the past six years, maintained or sponsored by any Loan Party or ERISA Affiliate or to which any Loan Party or ERISA Affiliate makes or is obligated to make contributions, or during the past six years, has made or been obligated to make contributions, in each case of (ii) if a liability to a Loan Party remains outstanding.

"Plan of Reorganization" means a plan of reorganization with respect to the Loan Parties and their Subsidiaries pursuant to the Cases.

"Platform" has the meaning set forth in Section 9.01(d).

"Pre-Petition ABL Agent" means JPMorgan Chase Bank, N.A., as administrative agent under the Pre-Petition ABL Credit Agreement.

"Pre-Petition ABL Credit Agreement" means the Amended and Restated ABL Credit Agreement, dated as of August 21, 2015, among the Parent Borrower, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto and the Pre-Petition ABL Agent, as amended, restated, supplemented, modified, renewed, refunded, replaced (whether at maturity or thereafter) or refinanced from time to time in one or more agreements (in each case with the same or new agents, lenders or institutional investors), including any agreement adding or changing the borrower or any guarantor or extending the maturity thereof or otherwise restructuring all or any portion of the Indebtedness thereunder or increasing the amount loaned or issued thereunder or altering the maturity thereof, in each case, through the Petition Date.

"Pre-Petition Agent" means GS Bank, in its capacity as administrative agent under any of the Pre-Petition Loan Documents.

"Pre-Petition Credit Agreement" has the meaning assigned to such term in the Recitals.

"Pre-Petition Indebtedness" means the Indebtedness of the Loan Parties existing prior to the Petition Date and set forth on Schedule 6.01.

"Pre-Petition Lenders" means the lenders under the Pre-Petition Credit Agreement.

"Pre-Petition Lender Obligations" means all "Loan Document Obligations" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Loan Documents" means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Loans" means Pre-Petition Lender Obligations in respect of principal of "Loans" under, and as defined in, the Pre-Petition Credit Agreement and interest, expenses, fees, premium and other sums payable in respect thereof under the Pre-Petition Loan Documents.

"Prepayment Event" means:

UST-0147

(a)   any Asset Sale of the type described in clauses (j) and (k) of Section 6.05 unless such disposition results in aggregate Net Proceeds not exceeding $500,000 for any individual transactions or series of related transactions;

(b)   any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any asset of the Parent Borrower or any Restricted Subsidiary resulting in aggregate Net Proceeds exceeding $500,000; or

(c)   the incurrence by the Parent Borrower or any Restricted Subsidiary of any Indebtedness, other than any Indebtedness permitted to be incurred by Section 6.01.

"Prime Rate" means the rate of interest per annum published by The Wall Street Journal, Money Rates Section as the "Prime Rate", as in effect from time to time.  Each change in the Prime Rate shall be effective from and including the date such change is published. If the Wall Street Journal ceases publication of such rate, in such other nationally recognized financial publication of general circulation as the Administrative Agent may designate based on the Administrative Agent's reasonable determination that the rate so published is comparable to the "Prime" rate published in the Wall Street Journal.

"Private Side Lender Representatives" means, with respect to any Lender, representatives of such Lender that are not Public Side Lender Representatives.

"Public Side Lender Representatives" means, with respect to any Lender, representatives of such Lender that do not wish to receive MNPI.

"Recipient" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document.

"Redemption Premium" has the meaning set forth in Section 2.09(e).

"Register" has the meaning set forth in Section 9.04(b)(v).

"Related Lender" means with respect to any Person, an Affiliate or any fund, account or investment vehicle that is controlled, managed, advised or sub-advised by such Person, an Affiliate or the same investment manager, advisor or sub-advisor as such Person or an Affiliate of such investment manager, advisor or sub-advisor.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and of such Person's Affiliates.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the Environment or within or upon any building, structure, facility or fixture.

LA\4104335.13

UST-0148

"Required Lenders" means, at any time, Lenders having aggregate Loans (or, prior to the borrowing hereunder on the date hereof, Commitments) representing more than 50.01% of the aggregate principal amount of the Loans (or, prior to the borrowing hereunder on the date hereof, the aggregate Commitments) at such time.

"Required Milestones" means the covenants set forth on Schedule 5.11.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Parent Borrower or any Restricted Subsidiary, or any payment or distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, exchange, conversion, cancellation or termination of any Equity Interests in the Parent Borrower or any Restricted Subsidiary.

"Restricted Subsidiary" means any Subsidiary of the Parent Borrower.

"Restructuring Support Agreement" or "RSA" means that certain Restructuring Support Agreement, dated as of July 23, 2020, executed and delivered by the Loan Parties and the other parties thereto, as such agreement may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Roll-up Loans" are the loans made pursuant to Section 2.01(b).

"Roll-up Loans Commitment" means, as to each Lender, its obligation to make a Loan to the Borrower pursuant to Section 2.01(b) in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 (as updated from time to time within [ ] days of the Effective Date) under the caption "Roll-up Loans Commitment", as applicable. The aggregate amount of the Roll-up Loans Commitment on the date hereof is $161.8 million, which amount shall (i) comprise a roll-up and refinancing of the Prepetition Loans approved pursuant to the Order and (ii) be deemed funded by the Lenders pursuant to Section 2.01.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"Sale/Leaseback Transaction" means an arrangement relating to property owned by the Parent Borrower or any Restricted Subsidiary whereby the Parent Borrower or such Restricted Subsidiary sells or transfers such property to any Person and the Parent Borrower or any Restricted Subsidiary leases such property, or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, from such Person or its Affiliates.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of Designated Persons maintained by OFAC, the U.S. Department of State, or by the United Nations Security Council, the European Union or any EU member state, (b) any Person

29

UST-0149

operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any Person or Persons described in the preceding clauses (a) and (b).

"<u>Sanctions</u>" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"<u>Screen Rate</u>" has the meaning assigned to it in the definition of "LIBO Rate."

"<u>SEC</u>" means the United States Securities and Exchange Commission.

"<u>Secured Parties</u>" means (a) the Administrative Agent, (b) [reserved], (c) the Lenders, (d) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (e) the permitted successors and assigns of the foregoing.

"<u>Securities Act</u>" means the United States Securities Act of 1933.

"<u>Specified Dispositions</u>" means (i) the closure, sale, transfer or disposition of the Loan Parties' or their Subsidiaries' stores, leases, warehouses, distribution centers and other real property (and all fixtures and equipment in each case in connection therewith), (ii) bulk sales or other dispositions of inventory or equipment of the Loan Parties' or their Subsidiaries' and (iii) termination of leases, licenses, subleases or sublicenses, in each case, in connection therewith; provided that such Specified Dispositions are identified in writing by the Parent Borrower to the Required Lenders and agreed to by the Required Lenders, in their reasonable discretion on or prior to the Effective Date and as may be updated, supplemented or modified from time to time, as agreed to by the Required Lenders in their reasonable discretion.

"<u>Specified Indebtedness</u>" means any Subordinated Indebtedness and any unsecured Indebtedness or any secured Indebtedness that is not secured on a pari passu basis with the Loan Document Obligations; provided that, Indebtedness under the ABL Credit Agreement, to the extent applicable, shall constitute Specified Indebtedness solely for purposes of Section 6.08(c).

"<u>Statutory Reserve Rate</u>" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves), expressed as a decimal, established by the Board of Governors to which the Administrative Agent is subject for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board of Governors). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"<u>Subordinated Indebtedness</u>" of a Person means any Indebtedness of such Person which is subordinated in right of payment to the Loan Document Obligations.

UST-0150

"subsidiary" means, with respect to any Person (the "parent") at any date, (a) any Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date and (b) any other Person (i) of which Equity Interests representing more than 50% of the equity value or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (ii) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any direct or indirect subsidiary of the Parent Borrower (including, for the avoidance of doubt, the Subsidiary Borrower).

"Subsidiary Borrower" has the meaning set forth in the introductory paragraph hereto.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Parent Borrower or any Subsidiary shall be a Swap Agreement.

"Synthetic Lease" means, as to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for US federal income tax purposes, other than any such lease under which such Person is the lessor.

"Synthetic Lease Obligations" means, as to any Person, an amount equal to the sum, without duplication, of (a) the obligations of such Person to pay rent or other amounts under any Synthetic Lease which are attributable to principal and (b) the amount of any purchase price payment under any Synthetic Lease assuming the lessee exercises the option to purchase the leased property at the end of the lease term. For purposes of Section 6.02, a Synthetic Lease Obligation shall be deemed to be secured by a Lien on the property being leased and such property shall be deemed to be owned by the lessee.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Credit Facility" has the meaning set forth in the Recitals.

"Term Lender" means a Lender with a Commitment or an outstanding Term Loan.

"Term Loan" means a Loan made pursuant to Section 2.01.

"Term Priority Collateral" has the meaning set forth in the Intercreditor Agreement.

UST-0151

"Transactions" means (a) the execution, delivery and performance by the Loan Parties of this Agreement, the borrowing of the Term Loans and the use of the proceeds thereof, (b) to the extent applicable, the execution, delivery and performance by the Loan Parties of the ABL Credit Agreement, (c) the creation and perfection of the security interests provided for in the Collateral Documents, and (d) the payment of all fees, commissions, costs and expenses in connection with the foregoing.

"Type" when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the perfection of security interests created by the Collateral Documents.

"U.S. Person" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning set forth in Section 2.15(e)(ii)(B)(3).

"U.S. Trustee" means the United States Trustee applicable in the Cases.

"Variance Report" shall have the meaning assigned to such term in Section 5.01(g).

"Variance Report Date" shall have the meaning assigned to such term in Section 5.01(g).

"Variance Testing Period" shall mean the four-week calendar period up to and through the Saturday of the week most recently ended prior to the applicable Variance Report Date (provided that, the first Variance Testing Period shall include the entire period from the Petition Date through the Saturday of the week most recently ended prior to the applicable Variance Testing Period).

"wholly-owned" when used in reference to a subsidiary of any Person, means that all the Equity Interests in such subsidiary (other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable law) are owned, beneficially and of record, by such Person, another wholly-owned subsidiary of such Person or any combination thereof.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

LA\4104335.13

UST-0152

SECTION 1.02.   Classification of Loans and Borrowings.  For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Type.

SECTION 1.03.   Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all real and personal, tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply), and all judgments, orders, writs and decrees, of all Governmental Authorities.  Except as otherwise provided herein and unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document (including this Agreement and the other Loan Documents) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), and all references to any statute shall be construed as referring to all rules, regulations, rulings and official interpretations promulgated or issued thereunder, (c) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof and (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement.

SECTION 1.04.   Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature used herein shall be construed in accordance with GAAP as in effect from time to time; provided that (a) if the Parent Borrower notifies the Administrative Agent in writing (including via e-mail) that the Borrowers request an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrowers that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith; provided that the Borrowers, on the one hand, and the Lenders, on the other hand, agree to negotiate in good faith with respect to any proposed amendment to eliminate or adjust for the effect of any such change in GAAP; and (b) notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed,

33

UST-0153

and all computations of amounts and ratios referred to herein shall be made, without giving effect to (i) any election under Statement of Financial Accounting Standards 159, The Fair Value Option for Financial Assets and Financial Liabilities, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of the Parent Borrower or any Restricted Subsidiary at "fair value," as defined therein, and (ii) any change in GAAP occurring after July 24, 2015 as a result of the adoption of any proposals set forth in the Proposed Accounting Standards Update, Leases (Topic 840), issued by the Financial Accounting Standards Board on August 17, 2010, or any other proposals issued by the Financial Accounting Standards Board in connection therewith, in each case if such change would require treating any lease (or similar arrangement conveying the right to use) as a capital lease where such lease (or similar arrangement) was not required to be so treated under GAAP as in effect on July 24, 2015.

SECTION 1.05.   Classification of Actions.  For purposes of determining compliance at any time with the covenants set forth in Section 6.01 and Section 6.02 (or, in each case, any defined terms used therein), in the event that the subject transaction meets the criteria of more than one of the categories of transactions permitted pursuant to the Sections (or related defined terms) in Section 6.01 and Section 6.02, the Borrowers may, in their sole discretion, classify the applicable transaction (or any portion thereof) under such Section (or defined term); it being understood that (i) the Borrowers may divide and include such transaction under one or more of the clauses of such Section (or any relevant portion thereof or of the applicable related defined term) that permit such transaction, but will not be permitted to later reclassify such transaction and (ii) notwithstanding anything in this Section 1.05 to the contrary for purposes of this Agreement, (x) Indebtedness incurred under the Pre-Petition ABL Credit Agreement and, to the extent applicable, the ABL Credit Agreement shall only be permitted to be incurred or be outstanding under Section 6.01(j) and (y) Indebtedness uncured under the Loan Documents or the Pre-Petition Loan Documents shall only be permitted to be incurred or be outstanding under Section 6.01(a).

SECTION 1.06.   Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

ARTICLE II

The Credits

SECTION 2.01.   Commitments.

(a)      Subject to the terms and conditions set forth herein and in the Order, each Lender severally and not jointly agrees to make, on the Funding Date, Loans to the Borrowers in an aggregate amount not to exceed such Lender's New Money Commitment.  The New Money Commitments in respect of the New Money Loans shall terminate automatically immediately

UST-0154

after the making of the New Money Loans on the Funding Date. Proceeds of the New Money Loans shall be deposited in the DIP Funding Account and used solely as permitted herein.

(b)     Subject to the terms and conditions set forth herein and in the Order, each Lender severally and not jointly agrees to make or be deemed to have made on the Effective Date, Loans to the Borrower in the aggregate amount of the Roll-up Loans Commitment. The Administrative Agent, the Lenders and the Loan Parties each acknowledges and agrees that the Roll-up Loans Commitment shall expire upon the deemed funding of the Roll-up Loans on the Effective Date.[5]

SECTION 2.02.     Loans and Borrowings.

(a)     Each Loan shall be made as part of a Borrowing consisting of Loans of the same Type made by the Lenders ratably in accordance with their respective Commitments.

(b)     Subject to Section 2.12, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrowers may request in accordance herewith. Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrowers to repay such Loan in accordance with the terms of this Agreement.

(c)     At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate principal amount that is an integral multiple of $1,000,000 and not less than $5,000,000; provided that a Eurodollar Borrowing that results from a continuation of an outstanding Eurodollar Borrowing may be in an aggregate amount that is equal to such outstanding Borrowing. At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate principal amount that is an integral multiple of $500,000 and not less than $1,000,000. Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of six (or such greater number as may be agreed to by the Administrative Agent) Eurodollar Borrowings outstanding.

(d)     Notwithstanding any other provision of this Agreement, the Borrowers shall not be entitled to request, or to elect to convert to or continue, any Eurodollar Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date applicable thereto.

SECTION 2.03.     Requests for Borrowings. To request a Borrowing, the Borrowers deliver to the Administrative Agent a Borrowing Request  (delivered by e-mail, hand or facsimile) (a) in the case of a Eurodollar Borrowing, not later than 12:00 p.m., New York City time, three Business Days before the date of the proposed Borrowing (or, such shorter period of time as may be agreed to by the Administrative Agent) or (b) in the case of an ABR Borrowing, not later than 12:00 p.m., New York City time, one Business Day before the date of the proposed Borrowing. Each written Borrowing Request shall specify the following information in compliance with Section 2.02:

---

[5] Roll-Up Loan funding mechanics to be confirmed.

35

UST-0155

(i)     the aggregate amount of such Borrowing;

(ii)    the date of such Borrowing, which shall be a Business Day;

(iii)   whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv)    in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(v)     the location,  number of the account and any other wiring information required by the Administrative Agent of the Borrowers to which funds are to be disbursed.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration.  Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04.    Funding of Borrowings.

(a)     Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 2:00 p.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.  Upon receipt of all requested funds, the Administrative Agent will make such Loans available to the Borrowers by promptly remitting the amounts so received, in like funds, by wire transfer to the DIP Funding Account.

(b)     Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, but shall have no obligation to, in reliance on such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (i) in the case of a payment to be made by such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of a payment to be made by the Borrowers, the interest rate applicable to ABR Loans.  If the Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period.  If such Lender pays such amount

36

UST-0156

to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrowers shall be without prejudice to any claim any Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

SECTION 2.05.    Interest Elections.

(a)    Each Borrowing initially shall be of the Type and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in the applicable Borrowing Request or as otherwise provided in Section 2.03. Thereafter, the Borrowers may elect to convert such Borrowing to a Borrowing of a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section. The Borrowers may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)    To make an election pursuant to this Section, the Borrowers shall notify the Administrative Agent of such election in writing by delivering (by e-mail, hand delivery or facsimile) an Interest Election Request to the Administrative Agent by the time that a Borrowing Request would be required under Section 2.03 if the Borrowers were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such Interest Election Request shall be irrevocable. Each written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)    if the resulting Borrowing is to be a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration.

(c)    Promptly following receipt of an Interest Election Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

37

UST-0157

(d)     If the Borrowers fail to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be continued as a Eurodollar Borrowing for an additional Interest Period of one month. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing with respect to any Borrower, or if any other Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, has notified the Borrowers of the election to give effect to this sentence on account of such Event of Default, then, so long as such Event of Default is continuing, (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.06.     Termination of Commitments.

(a)     Unless previously terminated, the Commitments of each Lender shall automatically terminate and permanently reduce to $0 upon the making of such Lender's Loans pursuant to Section 2.01(a) and (b), as applicable.

SECTION 2.07.     Repayment of Loans; Evidence of Debt.

(a)     The Borrowers hereby unconditionally, jointly and severally, promise to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender as provided in Section 2.08.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any conflict between the accounts maintained pursuant to paragraph (b) or (c) of this Section, the accounts maintained by the Administrative Agent shall, absent manifest error, control.

(e)     Any Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrowers shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its

38

UST-0158

registered assigns) substantially in the form of Exhibit K attached hereto. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

SECTION 2.08. <u>Amortization of Term Loans</u>.

(a) [Reserved]

(b) To the extent not previously paid, all Term Loans shall be due and payable on the Maturity Date.

(c) [Reserved]

(d) Prior to any repayment of any Borrowings under this Section, the Borrowers shall notify the Administrative Agent in writing of such selection not later than 12:00 p.m., New York City time, three Business Days before the scheduled date of such repayment. Administrative Agent shall promptly notify each Lender of such repayment notification. Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing. Repayments of Borrowings shall be accompanied by accrued interest (and premium, if any) on the amounts repaid.

SECTION 2.09. <u>Prepayment of Loans</u>.

(a) Subject to the Order and the Intercreditor Agreement, in the event that any Net Proceeds are received by or on behalf of the Parent Borrower or any Restricted Subsidiary in respect of an Asset Sale of all or substantially all of the assets of the Company and its Restricted Subsidiaries, the Borrowers shall, within three Business Days after such Net Proceeds are received, prepay Borrowings in an amount equal to 100% of such Net Proceeds subject to the requirements of Section 2.09(e), with application to the Loan Document Obligations set forth in Section 2.09(d) below; provided that any Net Proceeds in respect of ABL Priority Collateral received by the Borrowers or any Restricted Subsidiary as a result of such Asset Sale shall be applied in accordance with the Order and the Intercreditor Agreement, as applicable.

(b) Subject to the Order and the Intercreditor Agreement, in the event and on each occasion that any Net Proceeds are received by or on behalf of the Parent Borrower or any Restricted Subsidiary in respect of any Prepayment Event (other than an Asset Sale of all or substantially all of the assets of the Company and its Restricted Subsidiaries), the Borrowers shall, on the day such Net Proceeds are received (or, in the case of a Prepayment Event described in clause (a) or (b) of the definition of "Prepayment Event," within three Business Days after such Net Proceeds are received), be deposited into the Asset Sale Escrow Account and held in the Asset Sale Escrow Account in accordance with clause (c) below; provided that in the case of a Prepayment Event described in clauses (a) or (b) of the definition thereof, any Net Proceeds in respect of ABL Priority Collateral received by the Borrowers or any Restricted Subsidiary as a result of such Prepayment Event shall be applied in accordance with the Order and the Intercreditor Agreement, as applicable.

39

UST-0159

(c)     Net Proceeds received in connection with any Prepayment Event described in clause (a) or (b) of the definition of "Prepayment Event" (other than an Asset Sale of all or substantially all of the assets of the Company and its Restricted Subsidiaries), and solely to the extent that such Net Proceeds in respect of the applicable Asset Sale constitute Term Priority Collateral, shall be deposited into the Asset Sale Escrow Account. Notwithstanding anything to the contrary herein, Net Proceeds of any Asset Sale held in the Asset Sale Escrow Account may be used solely, (i) prior to the occurrence of the Conversion Date, to prepay the Loan Document Obligations (including, for the avoidance of doubt, the Redemption Premium) in full in cash (including, for the avoidance of doubt, on the Maturity Date) and (ii) upon the occurrence of the Conversion Date, as directed by the Borrowers.

(d)     Any optional or mandatory prepayment of Borrowings under this Section, shall be applied to reduce the principal amount of the Term Loans to be repaid on the Maturity Date. Notwithstanding the foregoing, any Lender may elect, by written notice to the Administrative Agent by not later than 3:00 p.m. New York City time, two Business Days (or such shorter period as may be established by the Administrative Agent) prior to the required prepayment date, to decline all or any portion of any prepayment of its Loans pursuant to this Section (other than an optional prepayment pursuant to paragraph (a) of this Section or a prepayment pursuant to clause (c) of the definition of "Prepayment Event," which may not be declined), in which case the aggregate amount of the payment that would have been applied to prepay Loans but was so declined shall *first*, be offered to Lenders who did not decline its pro rata share of the prepayment who may elect by written notice to the Administrative Agent by not later than 3:00 p.m. New York City time, one Business Day prior to the required prepayment date, to decline all or any portion of such offered prepayment amount and *second*, if declined by such Lenders, may be retained by the Borrowers and shall constitute "<u>Declined Proceeds</u>." For the avoidance of doubt, a Lender shall be deemed to have accepted any prepayment amount offered under this paragraph (d) is such Lender does not deliver a written notice to the Administrative Agent rejecting such prepayment amount in accordance with this paragraph (d).

(e)     In the event that all or any portion of the Loans are repaid or prepaid as a result of (i) [reserved], (ii) a mandatory prepayment pursuant to Section 2.09(a), solely as a result of an Asset Sale of all or substantially all of the assets of the Parent Borrower and its Restricted Subsidiaries (which, for the avoidance of doubt, includes the "Premium" and "Lane Bryant" business lines) or (iii) the repayment of the Loans on the Maturity Date, in each case prior to or without the occurrence of the Conversion Date, such repayments or prepayments will include a premium in an aggregate amount equal to 11.23% of the amount of the loans so prepaid or repaid (the foregoing premium, the "<u>Redemption Premium</u>").

(f)     The Borrowers shall notify the Administrative Agent in writing of any optional prepayment and, to the extent practicable, any mandatory prepayment hereunder by Borrowing, not later than 12:00 p.m., New York City time, three Business Days before the date of such prepayment. Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; <u>provided</u> that a notice of prepayment of Borrowings pursuant to paragraph (a) of this Section may state that such notice is conditioned upon the occurrence of one or more events specified therein, in which case such notice may be revoked by the Parent Borrower (by notice to the

LA\4104335.13

UST-0160

Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest as required by Section 2.11.

(g)     Notwithstanding any provisions of this Section 2.09 to the contrary, if any prepayment would otherwise be required to be made pursuant to clause (b) of this Section 2.09, solely as it relates to the portion of such Net Proceeds generated outside of the United States, so long as (x) the applicable local law will not permit repatriation of such Net Proceeds to the United States or (y) material adverse tax consequences to the Parent Borrower or any of its Subsidiaries would result from such repatriation, such Net Proceeds so affected shall not be required to be included in the mandatory prepayments referred to in such clause (b).

SECTION 2.10.     Closing Payments, Premiums and Fees.

(a)     The Borrowers agree, jointly and severally, to pay (or cause to be paid) on the Funding Date to each Lender, a closing payment in an amount equal to 2.50% of the aggregate principal amount of such Lender's New Money Loan, which such payment may be treated as original issue discount.  The premium referenced in this clause (a) shall be fully earned on the Effective Date and due and payable in full on the date set forth above.

(b)     The Borrowers agree, jointly and severally, to pay (i) to the Administrative Agent, for its own account, fees and expenses in the amounts and payable at the times and in the manner set forth  in the Administrative Agent Fee Letter, (ii) to the Backstop Lenders, for their own account, premiums in amounts and payable at the times separately agreed upon in the Commitment Letter and (iii) to the Lenders, for their own account, premiums in amounts and payable at the times separately agreed upon in the RSA.

(c)     All amounts payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, in the case of closing payments, to the Term Lenders entitled thereto.  Amounts paid shall not be refundable under any circumstances (absent manifest error in the amount paid).

SECTION 2.11.     Interest.

(a)     The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)     The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)     During the continuance of an Event of Default (i) under clauses (a) or (b) of Article VII, the Borrowers shall pay interest on such past due amounts (after giving effect to any

UST-0161

applicable grace period) owing by the Borrowers hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable laws and (ii) under any other clause of Article VII, the Borrowers shall pay interest on all outstanding Loan Document Obligations owing by the Borrowers hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable laws. Accrued and unpaid interest on such amounts (including interest on past due interest) shall be due and payable upon written demand.

(d)        Accrued interest on each Loan (for ABR Loans, accrued through the last day of the prior calendar quarter) shall be payable in arrears on each Interest Payment Date for such Loan; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)        All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.12.    Alternate Rate of Interest.  (i) If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)        the Administrative Agent determines in good faith (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(b)        the Administrative Agent is advised in writing by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Eurodollar Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrowers and the Lenders as promptly as practicable and, until the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist (which notification shall be made promptly after the Administrative Agent obtains knowledge of the cessation of such circumstances), (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective, and such Borrowing shall be continued as an ABR Borrowing, and (ii) any Borrowing Request for a Eurodollar Borrowing shall be treated as a request for an ABR Borrowing.

LA\4104335.13

UST-0162

(ii) If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in paragraph (i)(a) of this Section have arisen (including because the Screen Rate is not available or published on a current basis) and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in paragraph (i)(a) of this Section have not arisen but the supervisor for the administrator of the Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the Screen Rate shall no longer be used for determining interest rates for loans, then the Administrative Agent and the Company shall endeavor to establish an alternate rate of interest to the Adjusted LIBO Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans denominated in dollars in the United States at such time, and the Administrative Agent and the Company shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable; provided that if such alternate rate of interest shall be less than 1.00%, such rate shall be deemed to be 1.00% for all purposes of this Agreement.  Such amendment shall become effective with the prior consent of the Required Lenders and without any further action or consent of any other party to this Agreement.  Until an alternate rate of interest shall be determined in accordance with this paragraph (but, in the case of the circumstances described in clause (ii) above, only to the extent the Screen Rate for such Interest Period is not available or published at such time on a current basis), (x) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Term Loan Borrowing shall be ineffective, and such Borrowing shall be continued as an ABR Term Loan Borrowing, and (y) any Borrowing Request for a Eurodollar Term Loan Borrowing shall be treated as a request for an ABR Term Loan Borrowing.

SECTION 2.13.    Increased Costs.

(a)      If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)      impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Eurodollar Loans made by such Lender; or

(iii)      subject any Recipient to any Taxes (other than any (A) Indemnified Taxes or (B) Excluded Taxes) on or with respect to its loans, loan principal, letters of credit, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender or other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount)

UST-0163

then, from time to time upon request of such Lender or other Recipient, the Borrowers will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs or expenses incurred or reduction suffered.  Notwithstanding the foregoing, if the Parent Borrower reasonably believes that any such Taxes were not correctly or legally asserted, the applicable Recipient will use commercially reasonable efforts to cooperate with the Parent Borrower to obtain a refund of such Taxes so long as such efforts would not, in the sole determination of such Recipient exercised in good faith result in any non-reimbursable additional costs, expenses or risks or be otherwise disadvantageous to it.

(b)     If any Lender determines that any Change in Law regarding capital or liquidity requirements has had or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity), then, from time to time upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company as well as a reasonably detailed description of the occurrence giving rise to such event, as the case may be, as specified in paragraph (a) or (b) of this Section delivered to the Borrowers shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 10 Business Days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs or expenses incurred or reductions suffered more than 180 days prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or expenses or reductions and of such Lender's or intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or expenses or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)     Notwithstanding the above, a Lender will not demand compensation for any increased cost or reduction set forth in this Section 2.13 at any time if it is not the general practice and policy of such Lender to demand such compensation from similarly situated borrowers in similar circumstances under agreements containing provisions permitting such compensation to be claimed at such time.

SECTION 2.14.   Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan

44

UST-0164

other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.09(f) and is revoked in accordance therewith) or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrowers pursuant to Section 2.17, then, in any such event, the Borrowers shall compensate each Lender for the loss, cost and expense (excluding any loss of margin) attributable to such event. Such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan (but not including the Applicable Rate applicable thereto), for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate such Lender would bid if it were to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the London interbank market. A certificate of any Lender delivered to the Borrowers and setting forth and explaining in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be conclusive absent manifest error. The Borrowers shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

SECTION 2.15.   Taxes.

(a)   Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by any applicable withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.15) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)   Payment of Other Taxes by the Loan Parties.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the, option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)   Evidence of Payment.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.15, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

LA\4104335.13

UST-0165

(d)     Indemnification by the Loan Parties.  The Loan Parties shall jointly and severally indemnify each Recipient, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)     Status of Lenders.  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrowers and the Administrative Agent, at the time or times reasonably requested by the Borrowers or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrowers or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.15(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)     Without limiting the generality of the foregoing:

(A)     any Lender that is a U.S. Person shall deliver to the Borrowers and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), whichever of the following is applicable (in such number of copies as shall be requested by the recipient):

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party(x) with respect to payments of interest under any Loan Document, executed

46

UST-0166

copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms) establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "business profits" or "other income" article of such tax treaty;

       (2)     executed copies of IRS Form W-8ECI (or any successor forms);

       (3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit H-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Parent Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and that no payments in connection with any Loan Document are effectively connected with the Foreign Lender's conduct of a U.S. trade or business (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms); or

       (4)     to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or a participating Lender), executed copies of IRS Form W-8IMY (or any successor forms), accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-2 or H-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be

UST-0167

prescribed by applicable law to permit the Borrowers or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA and to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered (including any specific documentation required in this Section 2.15(e)) expires or becomes obsolete or inaccurate in any respect, it shall deliver promptly to the Borrowers or Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrowers or the Administrative Agent) or promptly notify the Borrowers and the Administrative Agent in writing of its legal ineligibility to do so.

(f)     <u>Indemnification by the Lenders</u>. Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(c)(ii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (f).

(g)     <u>Treatment of Certain Refunds</u>. If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes as to which it has been indemnified pursuant to this Section 2.15 (including by the payment of additional amounts pursuant to this Section 2.15), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.15 with respect

UST-0168

to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 2.15(g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 2.15(g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 2.15(g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(h)    <u>Defined Terms</u>. For the avoidance of doubt, for purposes of this Section 2.15, the term "applicable law" includes FATCA.

(i)    <u>Issue Price</u>. The Borrowers and Administrative Agent shall cooperate in good faith to determine the "issue price" (within the meaning of Section 1273 of the Code) of (i) the Loans and (ii) if the Exit Conversion occurs, the loans under the Exit Facility Agreement and, in either case, shall not take any Tax reporting position inconsistent with such determination, except as otherwise required by a Change in Law or pursuant to the good faith resolution of a Tax contest

(j)    <u>Survival</u>. Each party's obligations under this Section 2.15 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 2.16.    <u>Payments Generally; Pro Rata Treatment; Sharing of Set-offs</u>.

(a)    The Borrowers shall make each payment required to be made by the Borrowers hereunder or under any other Loan Document on or prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, on or prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without any defense, setoff, recoupment or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to such account as may be specified by the Administrative Agent; <u>provided</u> that payments pursuant to Sections 2.13, 2.14, 2.15 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payment received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder or under any other Loan Document shall be due on a day that is not a Business Day, the date for payment shall be

49

UST-0169

extended to the next succeeding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments under each Loan Document shall be made in dollars.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, premiums and fees then due hereunder, such funds shall be applied towards payment of the amounts then due hereunder ratably among the parties entitled thereto, in accordance with the amounts then due to such parties.

(c)     If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall notify the Administrative Agent of such fact and shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the amount of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amounts of principal of and accrued interest on their Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement (for the avoidance of doubt, as in effect from time to time) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any Person in accordance with the terms of Section 9.04. The Borrowers consent to the foregoing and agree, to the extent the Borrowers may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against any Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrowers in the amount of such participation. For purposes of subclause (b)(i) of the definition of Excluded Taxes, a Lender that acquires a participation pursuant to this Section 2.16(c) shall be treated as having acquired such participation on the earlier date(s) on which such Lender acquired the applicable interest(s) in the Commitment(s) and/or Loan(s) to which such participation relates.

(d)     Unless the Administrative Agent shall have received written notice from the Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, but shall not be obligated to, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

UST-0170

(e)     If any Lender shall fail to make any payment required to be made by it hereunder to or for the account of the Administrative Agent, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations in respect of such payment until all such unsatisfied obligations have been discharged and/or (ii) hold any such amounts in a segregated account as cash collateral for, and apply any such amounts to, any future payment obligations of such Lender hereunder to or for the account of the Administrative Agent.

SECTION 2.17.     Mitigation Obligations; Replacement of Lenders.

(a)     If any Lender requests compensation under Section 2.13, or if the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Section 2.13 or 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby, jointly and severally, agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment and delegation.

(b)     If (i) any Lender requests compensation under Section 2.13, (ii) the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or (iii) any Lender has failed to consent to a proposed amendment, waiver, discharge or termination that under Section 9.02 requires the consent of all the Lenders (or all the affected Lenders) and with respect to which the Required Lenders shall have granted their consent, then the Borrowers may, at the Borrowers' sole expense and effort, upon notice to such Lender and the Administrative Agent by the Borrowers, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights (other than its existing rights to payments pursuant to Section 2.13 or 2.15) and obligations under this Agreement and the other Loan Documents (or, in the case of any such assignment and delegation resulting from a failure to provide a consent, all its interests, rights and obligations under this Agreement and the other Loan Documents as a Lender) to an Eligible Assignee that shall assume such obligations (which may be another Lender, if a Lender accepts such assignment and delegation); provided that (A) the Borrowers shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b)(i), which consent shall not unreasonably be withheld, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the assignee (in the case of such principal and accrued interest and fees) or the Borrowers (in the case of all other amounts), (C) in the case of any such assignment and delegation resulting from a claim for compensation under Section 2.13 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments and (D) in the case of any such assignment and delegation resulting from the failure to provide a consent, the

LA\4104335.13

UST-0171

assignee shall have given such consent and, as a result of such assignment and delegation and any contemporaneous assignments and delegations and consents, the applicable amendment, waiver, discharge or termination can be effected. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver or consent by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation have ceased to apply. Each party hereto agrees that an assignment and delegation required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrowers, the Administrative Agent and the assignee and that the Lender required to make such assignment and delegation need not be a party thereto.

SECTION 2.18.    [Reserved].

SECTION 2.19.    [Reserved].

SECTION 2.20.    Joint and Several Liability of the Borrowers. The Loan Document Obligations of the Borrowers shall be joint and several in nature. Each Borrower hereby irrevocably and unconditionally agrees that it is jointly and severally liable for all Loan Document Obligations of the Borrowers hereunder and the other Loan Documents, whether now or hereafter existing or due or to become due. The Loan Document Obligations of the Borrowers under the Loan Documents may be enforced by the Administrative Agent and the Lenders against any Borrower or all Borrowers in any manner or order selected by the Administrative Agent or the Required Lenders in their sole discretion. Without limiting the foregoing provisions of this Section 2.20, each Borrower acknowledges and agrees that:

(a)    its obligations under this Agreement shall remain enforceable against it even though such obligations may be unenforceable or not allowable against any Borrower during the existence of an insolvency proceeding against any Borrower or otherwise;

(b)    its obligations under this Agreement are independent of the obligations of any other Borrower, and a separate action or actions may be brought and prosecuted against it in respect of such obligations irrespective of whether any action is brought against any other Borrower or any other Borrower is joined in any such action or actions;

(c)    it hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any of all of the following: (i) any lack of validity or enforceability of this Agreement or any agreement or instrument relating thereto in respect of any other Borrower; (ii) any change in the time, manner or place of payment of, or in any other term of, all or any of the obligations of any other Borrower under or in respect of this Agreement, or any other amendment or waiver of or any consent to departure from this Agreement, in respect of any other Borrower; (iii) any change, restructuring or termination of the structure or existence of any other Borrower; (iv) the failure of any other person to execute or deliver any other agreement or the release or reduction of liability of any other person with respect to any obligations of the Borrowers under this Agreement; or (v) any other circumstance (including any statute of limitations but other than the Loan Document Obligations having been paid in full) or any existence or reliance on any representation by any other person that might otherwise constitute a defense available to, or a discharge or, any other Borrower;

LA\4104335.13

UST-0172

(d)      its obligations under this Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any such obligations is rescinded or must otherwise be returned by any person upon the insolvency, bankruptcy or reorganization of any other Borrower, all as though such payment had not been made;

(e)      it hereby unconditionally and irrevocably waives any right to revoke its joint and several liability under the Loan Documents and acknowledges that such liability is continuing and applies to all obligations of the Borrowers under the Loan Documents, whether existing now or in the future;

(f)      in any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of the Subsidiary Borrower under this Agreement would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of the any other creditors, on account of the amount of its liability under this Agreement, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Borrower, any Loan Document or any other person be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 2.20(g) and any rights of subrogation, indemnity or reimbursement) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceedings; and

(g)      it hereby agrees that to the extent that any Borrower shall have paid more than its proportionate share of any payment made hereunder, such Borrower shall be entitled to seek and receive contribution from and against any other Borrower hereunder which has not paid its proportionate share of such payment; provided that the provisions of this Section 2.20(g) shall in no respect limit the obligations and liabilities of any Borrower to the Administrative Agent and the Lenders, and each Borrower shall remain liable to the Administrative Agent and the Lenders for the full amount hereunder; provided, however each Borrower agrees that the foregoing rights of contribution as well as any right of subrogation, indemnity or reimbursement that it may acquire or that may arise against any other Borrower due to any payment or performance made under this Agreement shall in all respects be subordinated and junior in right of payment to, and shall not be exercised by such Borrower until, all Loan Document Obligations have been paid in full.

SECTION 2.21.    Super-Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations.

(a)      The priority of Administrative Agent's Liens on the Collateral, claims and other interests shall be as set forth in the Order.

(b)      Upon the maturity (whether by acceleration or otherwise) of any of the Loan Document Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Loan Document Obligations without further application to or order of the Court.

LA\4104335.13

UST-0173

SECTION 2.22.   Conversion to Exit Facility Agreement.  The Loans shall be repaid in cash in accordance with the terms hereunder; *provided* that, notwithstanding the foregoing, upon the satisfaction or waiver by the Required Lenders of each of the conditions set forth in the "Conditions to Borrowings" section of the Exit Facility Term Sheet, automatically and without any further consent or action required by the Administrative Agent, any Lender, or any other Secured Party, the Loans shall be refinanced with loans under the Exit Facility Agreement in accordance with the Exit Facility Term Sheet (the "Exit Conversion").  Upon the Exit Conversion, (i) the Borrowers (or the entities assuming and/or acquiring directly or indirectly the operations and assets of the Borrowers in the Acceptable Plan, and each Guarantor and each entity assuming the operations and assets of each Guarantor that is a Debtor in the Acceptable Plan, to the extent such Person is required under the Exit Facility Term Sheet to continue to be a guarantor thereunder), shall assume all obligations in respect of the Loans hereunder and all other monetary obligations in respect hereof, (ii) each Loan hereunder shall be continued as and converted to a Loan under the Exit Facility Agreement, (iii) each Lender hereunder shall be a Lender under the Exit Facility Agreement and (iv) this Agreement shall terminate and be superseded and replaced in its entirety by, and deemed amended and restated in its entirety in the form of, the Exit Facility Agreement (with such changes and insertions thereto, as are reasonably satisfactory to the Administrative Agent and the Borrower, incorporated as necessary to make any technical changes necessary to effectuate the intent of this Section 2.22 and to make any changes as required in the Exit Facility Term Sheet, including to increase the facility amount and give effect to any "last out" term loans).  Notwithstanding the foregoing, all obligations of the Borrowers and the Guarantors to the Administrative Agent and the Lenders under this Agreement and any other Loan Document which are expressly stated in this Agreement or such other Loan Document as surviving such agreement's termination shall, as so specified, survive without prejudice and remain in full force and effect.  Each of the Loan Parties, the Administrative Agent and the Lenders shall take such actions and execute and deliver such agreements, instruments or other documents as the Administrative Agent may reasonably request to give effect to the provisions of this Section 2.22 and as are required to complete the schedules to the Exit Facility Agreement or other agreements contemplated thereby; *provided*, *however*, that any such action by the Administrative Agent or any of the Lenders shall not be a condition precedent to the effectiveness of the Exit Facility Agreement if and to the extent so provided in the Confirmation Order.  Each Lender hereto hereby agrees that, on the Conversion Date, (i) the Administrative Agent (in its capacity as Administrative Agent under the Exit Facility Agreement) may execute and deliver the Exit Facility Agreement (and any guaranty contemplated thereby) on its own behalf and on behalf of each such Lender and (ii) the Administrative Agent may execute and deliver the security documents contemplated by the Exit Facility Term Sheet. On the Conversion Date, the Administrative Agent shall transfer any amounts remaining in the DIP Accounts to an account designated by the Borrowers.

<div align="center">

ARTICLE III

Representations and Warranties

</div>

Each Borrower represents and warrants to the Administrative Agent and the Lenders as follows:

<div align="center">54</div>

UST-0174

SECTION 3.01.   Organization; Powers.  The Parent Borrower and each Restricted Subsidiary is duly organized, validly existing and (to the extent the concept is applicable in such jurisdiction and, in the case of any Restricted Subsidiary, except where the failure to be so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect) in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to, subject to the entry of the Order, carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02.   Authorization; Enforceability; Benefit to Loan Parties.

(a)      Subject to entry of the Order, the Transactions, insofar as they are to be carried out by each Loan Party, are within such Loan Party's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational and, if required, shareholder or other equityholder action.  Subject to entry of the Order, this Agreement has been duly executed and delivered by each Borrower and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Borrower or such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(b)      Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lenders to the Borrowers hereunder.  Each Loan Party has determined that, subject to entry of the Order, the execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

SECTION 3.03.   Governmental Approvals; No Conflicts.  Except for the entry of, and pursuant to the terms of, the Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are (or will so be) in full force and effect, (b) will not violate any applicable law, including any order of any Governmental Authority, (c) will not violate the charter, by-laws or other organizational documents of the Parent Borrower or any Restricted Subsidiary, (d) will not violate or result in a default under any indenture or agreement (including the Pre-Petition ABL Credit Agreement, the ABL Credit Agreement to the extent applicable, the Pre-Petition Credit Agreement or other material instrument binding upon the Parent Borrower or any Restricted Subsidiary or any of their assets) (other than defaults arising solely as a result of the commencement of the Cases), or give rise to a right thereunder to require any payment to be made by the Parent Borrower or any Restricted Subsidiary, and (e) will not result in the creation or imposition of any Lien on any asset of the Parent Borrower or any Restricted Subsidiary, except Liens created pursuant to the Loan Documents or Liens created in connection with the Pre-Petition ABL Credit Agreement, the  ABL Credit Agreement to the extent applicable, or the Pre-Petition Credit Agreement, in the case of clauses (a) (as to the Transactions other than entry

into the Loan Documents), (b) and (d) above, except for a failure to obtain or make, violation or creation, as applicable, which individually or in the aggregate would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.04.    Financial Condition; No Material Adverse Change.

(a)    The Borrowers have heretofore furnished to the Lenders (i) the audited consolidated balance sheets and related consolidated statements of operations, comprehensive income, equity and cash flows of the Parent Borrower and its consolidated Subsidiaries as of and for the fiscal year ended August 3, 2019, and (B) the unaudited consolidated balance sheets and related consolidated statements of operations, comprehensive income and cash flows of the Parent Borrower and its consolidated Subsidiaries as of and for each of the fiscal quarters and the portions of the fiscal year ended November 2, 2019 and February 1, 2020 . Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)    Since the Petition Date, other than those customarily resulting from the commencement of the Cases and changes set forth in the Parent Borrower's business plan delivered to the Ad Hoc Committee prior to the Petition Date, there has been no event, development or circumstance that has had, or would reasonably be expected to have, a Material Adverse Effect.

SECTION 3.05.    Properties.

(a)    The Parent Borrower and each Restricted Subsidiary has good title to, or valid leasehold interests in, all its tangible property material to its business, except for defects in title that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect and Liens expressly permitted by Section 6.02.

(b)    (i) The Parent Borrower and each Restricted Subsidiary owns, is licensed to use, or otherwise has the right to use all trademarks, service marks, tradenames, trade dress, copyrights, patents, designs and other intellectual property material to its business, and (ii) the conduct of their respective businesses, including the use thereof by the Parent Borrower and the Restricted Subsidiaries in their respective businesses, does not infringe upon the rights of any other Person, except for any such infringements or any such failure to own, license or have the right to use that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(c)    Schedule 3.05 sets forth the address of each real property that is owned in fee by the Loan Parties as of the Effective Date.

SECTION 3.06.    Litigation and Environmental Matters.

(a)    Except for the Disclosed Matters and the Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrowers, threatened against the Parent Borrower or any Restricted

56

UST-0176

Subsidiary (i) as to which there is a reasonable likelihood of an adverse determination and that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve any of the Loan Documents or the Transactions.

(b)     Except for the Disclosed Matters or matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, neither the Parent Borrower nor any Restricted Subsidiary (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

SECTION 3.07.   Compliance with Laws and Agreements.

(a)     The Parent Borrower and each Restricted Subsidiary is in compliance with all laws, including all orders of Governmental Authorities, applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except any non-compliance arising solely as a result of the commencement of the Cases or where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect (it being agreed that this Section does not apply to any law which is specifically addressed in Section 3.06(b), 3.07(b), 3.08, 3.09, 3.10 or 3.14).  Except for any defaults or events of defaults arising solely as a result of the commencement of the Cases, any defaults or events of defaults arising under the Pre-Petition ABL Credit Agreement or the Pre-Petition Credit Agreement, no Event of Default has occurred and is continuing.

(b)     The Borrowers have implemented and maintain in effect policies and procedures designed to ensure compliance in all material respects by the Parent Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Parent Borrower, its Subsidiaries and their respective officers and employees and to the knowledge of the Borrowers, their respective directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.  None of (a) the Parent Borrower, any Subsidiary or, to the knowledge of the Borrowers, any of their respective directors, officers or employees, or (b) to the knowledge of the Borrowers any agent of the Parent Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Borrowing, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

SECTION 3.08.   Investment Company Status.  No Loan Party is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09.   Taxes.  The Parent Borrower and each Subsidiary has (a) timely filed or caused to be filed all Tax returns and reports required to have been filed, except to the extent that the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, and (b) paid or caused to be paid all Taxes required to have been paid by it (including in its capacity as withholding agent), except (i) any Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which the

57

UST-0177

Parent Borrower or such Subsidiary has set aside on its books reserves with respect thereto to the extent required by GAAP or (ii) to the extent that the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  There is no current or proposed tax assessment, deficiency or other claim against the Parent Borrower or any of the Subsidiaries that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 3.10.    ERISA; Labor Matters.

(a)    Except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred or is reasonably expected to occur, (ii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, and (iii) each Plan is in compliance with the applicable provisions of ERISA, the Code and other applicable laws. On the Effective Date, the excess of the present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of preparing the audited financial statements set forth in the Borrower's most recent Annual Report on Form 10-K), as of the date of the most recent financial statements reflecting such amounts, over the fair market value of the assets of such Plan, if any, could not be reasonably expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)    Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) there are no strikes, lockouts, slowdowns or any other labor disputes against the Parent Borrower or any Restricted Subsidiary pending or, to the knowledge of the Borrowers, threatened, (ii) the hours worked by and payments made to employees of the Parent Borrower and the Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act of 1938 or any other applicable federal, state, local or foreign law dealing with such matters, (iii) all payments due from the Parent Borrower or any Restricted Subsidiary, or for which any claim may be made against the Parent Borrower or any Restricted Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Parent Borrower or such Restricted Subsidiary to the extent required by GAAP and (iv) the consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Parent Borrower or any Restricted Subsidiary is bound.

SECTION 3.11.    [Reserved].

SECTION 3.12.    Subsidiaries and Joint Ventures.  Schedule 3.12 sets forth, as of the Effective Date, the name, type of organization and jurisdiction of organization of, and the percentage of each class of Equity Interests owned by the Parent Borrower or any Subsidiary in, (a) each Subsidiary and (b) each joint venture in which the Parent Borrower or any Subsidiary owns any Equity Interests, and identifies each Designated Subsidiary.  All the issued and outstanding Equity Interests in each Subsidiary owned by any Loan Party have been (to the extent such concepts are relevant with respect to such Equity Interests) duly authorized and validly issued and are fully paid and non-assessable (except as such rights may arise under mandatory provisions of applicable statutory law that may not be waived and not as a result of

58

UST-0178

any rights contained in organizational documents). Except as set forth in Schedule 3.12, as of the Effective Date, there is no existing option, warrant, call, right, commitment or other agreement to which the Parent Borrower or any Subsidiary is a party requiring, and there are no Equity Interests in any Subsidiary outstanding that upon exercise, conversion or exchange would require, the issuance by any Subsidiary of any additional Equity Interests or other securities exercisable for, convertible into, exchangeable for or evidencing the right to subscribe for or purchase any Equity Interests in any Subsidiary.

SECTION 3.13.   Insurance.  Schedule 3.13 sets forth a description of all insurance maintained by or on behalf of the Parent Borrower and the Restricted Subsidiaries as of the Effective Date.  As of the Effective Date, all premiums due and payable in respect of such insurance have been paid.  The Borrowers believe that the insurance maintained by or on behalf of the Parent Borrower and the Restricted Subsidiaries is adequate.

SECTION 3.14.   Federal Reserve Regulations.  Neither the Parent Borrower nor any Restricted Subsidiary is principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock.  No part of the proceeds of the Loans will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, in any manner or for any purpose that would entail a violation of Regulations T, U or X of the Board of Governors.

SECTION 3.15.   [Reserved].

SECTION 3.16.   Collateral Matters.

(a)      Subject to the entry of the Order, the Collateral Agreement and the Order are effective to create in favor of the Administrative Agent (for the benefit of the Secured Parties) legal, valid, enforceable and perfected Liens on the Collateral described therein (with such priority as provided for therein).

(b)      Except for the entry of the Order, no filing or other action will be necessary to perfect such Liens.

(c)      The Order is (or will be, as applicable) effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable perfected security interest in the Collateral (with such priority as provided for in the Order (including, without limitation, with respect to the Carve Out)) without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents except to the extent set forth in such orders.

SECTION 3.17.   Use of Proceeds.  Unless otherwise agreed by the Administrative Agent (acting at the direction of the Required Lenders), the proceeds of the New Money Loans will be deposited into the DIP Funding Account and used in accordance with the terms of the Approved Budget (subject to Permitted Variances) and the terms of the Order or any other order entered into by the Court that is consistent with the RSA, the Order and this Agreement, including, without limitation (i) to pay amounts due to Lenders and the Administrative Agent hereunder and the reasonable and documented professional fees and expenses (including legal,

LA\4104335.13

UST-0179

financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Administrative Agent, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby (including pursuant to such court approval), (ii) to make adequate protection payments, (iii) to fund the Carve Out, and (iv) to pay administration costs of the Cases and Claims or amounts approved by the Court in the "first day" and "second day" orders or as required under the Bankruptcy Code. Notwithstanding anything to the contrary herein, the proceeds of the New Money Loans may be used to prepay or repay the ABL Credit Agreement (to the extent applicable) solely to extent provided for in the Approved Budget then in effect at the date of such prepayment or repayment, and in any event in an aggregate amount during the term of this Agreement not to exceed $50,000,000.

SECTION 3.18.  Approved Budget.  The Borrowers have heretofore furnished to the Administrative Agent the initial Approved Budget.  Each Approved Budget was prepared in good faith based upon assumptions the Borrowers believed to be reasonable assumptions on the date of delivery of such Approved Budget.

SECTION 3.19.  Chapter 11 Cases.

(a)  The Cases were commenced on the Petition Date in accordance with applicable laws and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Order and (ii) the hearing for the entry of the Order. Debtors shall give, on a timely basis as specified in the Order, all notices required to be given to all parties specified in the Order.

(b)  After the entry of the Order, and pursuant to and to the extent permitted in the Order, the Loan Document Obligations will constitute allowed administrative expense claims in the Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve Out and (ii) the priorities set forth in the Order.

(c)  After the entry of the Order and pursuant to and to the extent provided in the Order, the Loan Document Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority, only to (i) the Carve Out, (ii) the Liens pursuant to Section 6.02(i) with respect to Indebtedness under the ABL Credit Agreement (to the extent applicable), subject to the terms of such Section 6.02(i) and (iii) to the extent set forth in the Order.

(d)  The Order is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Required Lenders' consent, modified or amended. The Loan Parties are in compliance in all material respects with the Order.

(e)  Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Order, upon the Maturity Date (whether by acceleration or otherwise) of any of the Loan Document Obligations, to the extent the

LA\4104335.13

UST-0180

Conversion Date has not occurred, the Administrative Agent and Lenders shall be entitled to immediate payment of such Loan Document Obligations and to enforce the remedies provided for hereunder or under applicable laws, without further notice, motion or application to, hearing before, or order from, the Court.

ARTICLE IV

Conditions

SECTION 4.01.   Conditions to Effective Date.  The effectiveness of this Agreement and the obligations of the Lenders to make the Roll-up Loans hereunder shall not become effective until the date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)      The Administrative Agent shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) evidence satisfactory to the Administrative Agent (which may include a facsimile transmission) that such party has signed a counterpart of this Agreement.

(b)      The Administrative Agent shall have received a favorable written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of Kirkland & Ellis LLP, counsel for the Loan Parties, addressing corporate authority matters and other matters  as the Administrative Agent shall reasonably request, each such opinion to be in form, scope and substance reasonably satisfactory to the Administrative Agent and the Lenders.

(c)      The Administrative Agent shall have received as to each Loan Party such customary documents and certificates as it shall reasonably have requested relating to the organization, existence and good standing of such Loan Party and the authorization of the Loan Documents or the Transactions, all in form and substance reasonably satisfactory to the Administrative Agent.

(d)      (a) The representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct (i) in the case of the representations and warranties qualified as to materiality, in all respects and (ii) otherwise, in all material respects, in each case on and as of the Effective Date, except in the case of any such representation and warranty that expressly relates to a prior date, in which case such representation and warranty shall be so true and correct on and as of such prior date and (b) at the time of and immediately after giving effect to the Transactions to occur on the Effective Date, no Event of Default shall have  occurred and be continuing.

(e)      The Administrative Agent shall have received a certificate, dated the Effective Date and signed by the chief financial officer of the Parent Borrower, confirming compliance with the conditions set forth in paragraph (d) of this Section.

(f)      The Lenders and the Administrative Agent shall have received the Approved Budget.

UST-0181

(g)     The Administrative Agent, for its benefit and the benefit of each other Secured Party, shall have been granted a perfected lien on the Collateral by the Order on the terms and conditions set forth herein and in the other Loan Documents.

(h)     The Administrative Agent shall have received the results of a search of the UCC (or equivalent) filings made with respect to the Loan Parties in the jurisdictions reasonably requested by the Administrative Agent.

(i)     The Lenders shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" rules and regulations, including the USA Patriot Act, to include a duly executed IRS Form W-9 or such other applicable IRS Form for each Borrower, at least three Business Days prior to the Effective Date to the extent such information was requested at least 10 Business Days prior to the Effective Date.

(j)     The Collateral Agreement each shall have been duly executed and delivered by each party thereto, and shall be in full force and effect.

(k)     The Administrative Agent shall have received (i) unaudited interim consolidated financial statements of the Parent Borrower for each fiscal month ended after the fiscal quarter ending February 1, 2020 through the end of [  ], 2020 and (ii) unaudited financial statements for the fiscal quarter ended May 2, 2020.

(l)     Since the Petition Date, other than those events or circumstances arising from the commencement of the Cases, there has been no event or circumstance, either individually or in the aggregate, that has or could reasonably be expected to have a Material Adverse Effect.

(m)     (i) the Administrative Agent shall have received drafts of the "first day" pleadings for the Cases, in each case, in form and substance reasonably satisfactory to the Administrative Agent; and (ii) all motions, orders (including the "first day" orders and the Cash Management Order) and other documents to be filed with and submitted to the Court on the Petition Date shall be in form and substance reasonably satisfactory to the Administrative Agent, and the Court shall have approved and entered all "first day" orders, including, without limitation, the Cash Management Order.

(n)     No trustee, receiver or examiner with expanded powers shall have been appointed in any of the Chapter 11 Cases.

(o)     The Pre-Petition Agent and the Pre-Petition Lenders shall have each received adequate protection in respect of the Liens securing their respective Pre-Petition Lender Obligations pursuant to the Order.

The Administrative Agent shall notify the Borrowers and the Lenders of the Effective Date, and such notice shall be conclusive and binding.

SECTION 4.02.   Conditions to the New Money Loan.  The obligations of the Lenders to make the New Money Loans hereunder shall not become effective until the date on or after the

UST-0182

Effective Date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)     The Administrative Agent shall have received a written Borrowing Request to include a flow of funds memorandum in form and substance satisfactory to the Administrative Agent and the Lenders.

(b)     The ABL Credit Agreement shall have been duly executed and delivered by each of the parties thereto, and shall be in full force and effect.

(c)     The Intercreditor Acknowledgment shall have been duly executed and delivered by each party thereto, and shall be in full force and effect.

(d)     The Administrative Agent, the Ad Hoc Committee and the Ad Hoc Committee Advisors shall have received all fees and other amounts due and payable on or prior to the Funding Date, including, to the extent invoiced at least two Business Days prior to the Funding Date, payment or reimbursement of all fees and expenses (including fees, charges and disbursements of counsel) required to be paid or reimbursed by any Loan Party under the Commitment Letter or any Loan Document, in each case, payable from the proceeds of the initial funding of the Term Loans.

The Administrative Agent shall notify the Borrowers and the Lenders of the Funding Date, and such notice shall be conclusive and binding.


ARTICLE V

Affirmative Covenants

Until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all premiums and fees payable hereunder shall have been paid in full, each Borrower covenants and agrees with the Lenders that:

SECTION 5.01.   Financial Statements and Other Information.  The Borrowers will furnish to the Administrative Agent, on behalf of each Lender and, in the case of clauses (e), (f) and (g), to the Ad Hoc Committee Advisors:

(a)     within 90 days after the end of each fiscal year of the Parent Borrower, its consolidated balance sheet and related consolidated statements of operations, comprehensive income, equity and cash flows as of the end of and for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year,  all certified by a Financial Officer of the Parent Borrower to the effect that such consolidated financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries as of the end of and for such fiscal year on a consolidated basis in accordance with GAAP;

LA\4104335.13

UST-0183

(b)     within 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Parent Borrower, its consolidated balance sheet as of the end of such fiscal quarter, the related consolidated statements of operations and comprehensive income for such fiscal quarter and the then elapsed portion of the fiscal year and the related consolidated statement of cash flows for the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Parent Borrower as presenting fairly, in all material respects, the financial position, results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries as of the end of and for such fiscal quarter and such portion of the fiscal year on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes;

(c)     within 30 days after the end of each of the first two fiscal months of each fiscal quarter of the Company, the consolidated balance sheet and related statements of operations and comprehensive income of the Company as of the end of and for such fiscal month and the then elapsed portion of the fiscal year and the related consolidated statement of cash flows of the Company for the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Company as presenting fairly in all material respects the financial position, results of operations and cash flows of the Company and its consolidated Subsidiaries as of the end of and for such fiscal month and such portion of the fiscal year on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes (it being understood and agreed that any adjustments reflected in such monthly financial statements may differ (in part or entirely) from any adjustments reflected in the financial statements delivered in the foregoing clauses (a) or (b);

(d)     concurrently with each delivery of financial statements under clause (a), (b) or (c) above, a completed Compliance Certificate signed by a Financial Officer of the Parent Borrower, (i) certifying, in the case of the financial statements delivered under clause (a), (b) or (c) above, that such financial statements present fairly in all material respects the financial position, results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP, subject to normal year end audit adjustments and the absence of footnotes, (ii) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (iii) to the extent applicable, setting forth reasonably detailed calculations demonstrating compliance with Section 6.12, (iv) if any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04, specifying the effect of such change on the financial statements accompanying such certificate, and (v) certifying that all notices required to be provided under Section 5.03 and 5.04 have been provided;

(e)     no later than 5:00 p.m. New York City time on the four week anniversary of the Effective Date(or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion), and each fourth (4th) calendar week thereafter, an updated budget consistent with the form and level of detail set forth in the initial Approved Budget,

UST-0184

including the same line-items provided with the initial Approved Budget, and otherwise in form and substance reasonably acceptable to Ad Hoc Committee Advisors in their reasonable discretion.  Upon, and subject to, the approval of any such updated budget by the Ad Hoc Committee Advisors in their reasonable discretion, such supplemented budget shall constitute the then-approved Approved Budget, effective as of the beginning of the week immediately following the week in which it was delivered; *provided* that unless and until the Ad Hoc Committee Advisors approve such supplemental budget in their reasonable discretion, the then-current Approved Budget shall remain in effect;

(f)        no later than 5:00 p.m. New York City time on the Thursday of each calendar week (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) commencing on (a) the date that is the third Thursday following the Effective Date, a line-item by line-item report setting forth for each line item in the Approved Budget, in reasonable detail, the actual receipts received and operating disbursements (including any professional fees) made during the prior week then-ended and (b) the date that is the first Thursday following the Effective Date a report setting forth (i) the Liquidity as of the  Friday of the most recently ended calendar week and (ii) the aggregate amount of end of day cash and Cash Equivalents as of the Friday of the most recently ended calendar week of all non-Loan Party Subsidiaries on deposit in or credited to any account maintained by such non-Loan Party Subsidiaries;

(g)        no later than 5:00 p.m. New York City time on the Thursday (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) of each calendar week commencing on the date that is the second Thursday following the Effective Date, (each such Thursday or later time, a "Variance Report Date"), a line-item by line-item variance report (each, a "Variance Report"),substantially in the form attached hereto as Exhibit J or otherwise as reasonably acceptable to the Required Lenders in their sole discretion, setting forth, in reasonable detail: (x) any variances between actual amounts for each line item in the Approved Budget for the Variance Testing Period versus projected amounts set forth in the applicable Approved Budget for each line item included therein on a cumulative basis for such Variance Testing Period (for the avoidance of doubt, to be prepared by comparing the sum of the four (4) figures for each relevant week for such corresponding line item in the relevant Approved Budget that was in effect in respect of each relevant week at the time), and (y) the computations necessary to determine compliance with Section 6.12, together with a statement from a Financial Officer certifying the information contained in the report.  The Variance Report shall also provide a reasonably detailed explanation for any negative variance in such Variance Report in excess of 15% in actual receipts and any positive variance in such Variance Report in excess of 15% in  actual operating disbursements during the Variance Testing Period (in each case unless the dollar amount corresponding to such percentage variance is less than $1,000,000) as compared to projections for such corresponding line items during the Variance Testing Period as set forth in the Approved Budget;

(h)        (i) to the extent applicable, within 1 Business Day of delivery of a Borrowing Base Certificate (as defined in the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, as applicable) to the ABL Agent, copy of such certificate and (ii) a copy of each report or forecast delivered under the ABL Credit Agreement, within 1 Business Day of delivery thereof;

UST-0185

(i)  promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the Parent Borrower or any Subsidiary with the SEC or with any national securities exchange, or distributed by the Parent Borrower to its shareholders generally, as the case may be;

(j)  [reserved];

(k)  promptly after any written request therefor, evidence of insurance renewals as required under Section 5.08 hereunder in form and substance reasonably acceptable to the Administrative Agent; and

(l)  promptly after any written request therefor, such other information regarding the operations, business affairs and financial condition of the Parent Borrower or any Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request.

Information required to be delivered pursuant to clause (a), (b) or (i) of this Section shall be deemed to have been delivered if such information, or one or more annual or quarterly reports containing such information, shall have been posted by the Administrative Agent on an IntraLinks or similar site to which the Lenders have been granted access or shall be available on the website of the SEC at http://www.sec.gov.  Information required to be delivered pursuant to this Section may also be delivered by electronic communications pursuant to procedures approved by the Administrative Agent.

SECTION 5.02.   Notices of Material Events.  The Borrowers will furnish to the to the Ad Hoc Committee Advisors and the Administrative Agent (for distribution to the Lenders) written notice promptly upon any Financial Officer, or other officer or employee responsible for compliance with the Loan Documents, of the Borrowers becoming aware of any of the following:

(a)  the occurrence of any Default;

(b)  the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against (other than in connection with the Cases) or affecting the Parent Borrower or any Restricted Subsidiary, or any adverse development in any such pending action, suit or proceeding not previously disclosed in writing by the Borrowers to the Administrative Agent and the Lenders, that in each case would reasonably be expected to result in a Material Adverse Effect or that in any manner questions the validity of any Loan Document;

(c)  the occurrence of an ERISA Event that has resulted, or would reasonably be expected to result, in a Material Adverse Effect;

(d)  (i) as soon as practicable in advance of filing (and to the extent practicable not later than three (3) days prior to the filing thereof) with the Court or delivering (and to the extent practicable not later than three (3) days prior to the delivery thereof) to the Committee appointed in a Case, if any, or to the U.S. Trustee, as the case may be, the Order, all other material proposed orders and pleadings related to (x) the Cases (all of which must be in form and

66

UST-0186

substance reasonably satisfactory to the Required Lenders), (y) the Pre-Petition Credit Agreement and this Agreement and the credit facilities contemplated thereby and/or any sale contemplated in accordance with the Required Milestones and any Plan of Reorganization and/or any disclosure statement related thereto (all of which must be in form and substance reasonably satisfactory to the Administrative Agent), and (ii) substantially simultaneously with the filing with the Court or delivering to the Committee appointed in any Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Cases that may be filed with the Court or delivered to the Committee appointed in any Case, if any, or to the U.S. Trustee; or

(e)      any other development that has resulted, or would reasonably be expected to result, in a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Parent Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03.     Collateral Obligations; Additional Subsidiaries.

(a) Each Borrower will, and will cause the other applicable Loan Parties to comply with the "Collateral and Guarantee Requirement". If any additional Designated Subsidiary is formed or acquired after the Effective Date (or any Excluded Subsidiary becomes a Designated Subsidiary), the Borrowers will promptly notify the Administrative Agent thereof and will, as promptly as practicable, and in any event within 15 days (or such longer period as the Administrative Agent may agree) after such Designated Subsidiary is formed or acquired (or any Excluded Subsidiary becomes a Designated Subsidiary) cause the Collateral and Guarantee Requirement to be satisfied with respect to such Designated Subsidiary and with respect to any Equity Interests in or Indebtedness of such Designated Subsidiary owned by or on behalf of any Loan Party.

(b) Each of the Loan Parties hereby covenants and agrees that upon the entry of, and subject to, the Order and subject to the Carve Out in all respects, the Loan Document Obligations, pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed DIP Superpriority Claims in the Cases.

(c) The relative priorities of the Liens described in this Section 5.03 with respect to the Collateral shall be as set forth in the Order. In accordance with the Order, all of the Liens described in this Section 5.03 shall be effective and perfected upon entry of the Order, without the necessity of the execution, recordation of filings by the Debtors of security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent, of, or over, any Collateral, as set forth in the Order.

(d) Each Loan Party that is a Debtor hereby confirms and acknowledges that, pursuant to the Order , the Liens in favor of the Administrative Agent on behalf of and for the benefit of the

LA\4104335.13

UST-0187

Secured Parties in all of the Collateral, now existing or hereafter acquired, shall be created and perfected without the recordation or filing in any land records or filing offices of any mortgage, assignment or similar instrument.

SECTION 5.04.    Information Regarding Collateral.

(a)    The Borrowers will furnish to the Administrative Agent promptly (and in any event within 15 days thereof (or such longer period as the Administrative Agent may agree)) written notice of any change in (i) the legal name of any Loan Party, as set forth in its organizational documents, (ii) the jurisdiction of organization or the form of organization of any Loan Party (including as a result of any merger or consolidation), (iii) the location of the chief executive office of any Loan Party or (iv) the organizational identification number, if any, and the Federal Taxpayer Identification Number of such Loan Party, in each case, only with respect to any Loan Party organized under the laws of a jurisdiction that requires such information to be set forth on the face of a UCC financing statement, of such Loan Party.  The Borrowers also agree promptly to notify the Administrative Agent if any material portion of the Collateral is damaged or destroyed.

(b)    If any material assets are acquired by any Loan Party after the Effective Date (other than assets constituting Collateral under the Collateral Documents that become subject to the Lien of the Collateral Documents upon the acquisition thereof), the Borrowers will promptly notify the Administrative Agent thereof and will cause such assets to be subjected to a Lien securing the Loan Document Obligations and will take such actions as shall be necessary or reasonably requested by the Administrative Agent to satisfy the Collateral and Guarantee Requirement, including to grant and perfect such Lien, all at the expense of the Borrowers. It is understood and agreed that, notwithstanding anything to the contrary set forth in this Agreement or in any Collateral Document, the Loan Parties shall not be required to (A) grant leasehold mortgages, (B) obtain landlord lien waivers, estoppels, collateral access agreements or bailee agreements, except to the extent delivered pursuant to the ABL Credit Agreement or related loan documents, (C) enter into Control Agreements in respect of any Excluded Deposit Account, (D) perfect security interests in any assets represented by a certificate of title or (E) enter into any Collateral Documents governed by the law of a jurisdiction other than the United States.

(c)    If, despite the restrictions set forth in Section 6.02, the Company or any Subsidiary shall grant a Lien on any of its assets to secure Indebtedness under the ABL Credit Agreement, the Pre-Petition ABL Credit Agreement and the Secured Obligations are not secured by a Lien on such assets, the Company will (i) promptly notify the Administrative Agent and cause such assets to be subjected to a Lien securing the Secured Obligations and (ii) take, or cause such Subsidiary to take, as the case may be, such actions as shall be necessary or reasonably requested by the Administrative Agent to satisfy the Collateral and Guarantee Requirement, including to grant and perfect such Lien, and to cause such Liens securing Indebtedness under the ABL Credit Agreement thereof and such Liens securing the Secured Obligations to become subject to the Intercreditor Agreement, all at the expense of the Loan Parties.

SECTION 5.05.    Existence; Conduct of Business.  Subject to any required approval by the Court, each Borrower will, and will cause each Restricted Subsidiary to, do or cause to be

68

UST-0188

done all things reasonably necessary to preserve, renew and keep in full force and effect (i) its legal existence and (ii) the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except in the case of clause (ii) where failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation, dissolution, disposition or other transaction permitted under Section 6.03 or 6.05.

SECTION 5.06.   Payment of Obligations.  To the extent permitted by the Order and the terms thereof, each Borrower will, and will cause each Restricted Subsidiary to, pay or discharge all its material obligations, including material Tax liabilities (whether or not shown on a Tax return), before the same shall become delinquent or in default, subject to the Approved Budget (and the Permitted Variances provided for therein)except where (a) (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) the Parent Borrower or such Restricted Subsidiary has set aside on its books reserves with respect thereto to the extent required by GAAP and (iii) such contest effectively suspends collection of the contested obligation and the enforcement of any Lien securing such obligation or (b) the failure to make payment would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 5.07.   Maintenance of Properties.  Each Borrower will, and will cause each Restricted Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.08.   Insurance.  Each Borrower will, and will cause each Restricted Subsidiary to, maintain, with financially sound and reputable insurance companies, insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations.  Each such policy of liability or casualty insurance maintained by or on behalf of Loan Parties shall (a) in the case of each liability insurance policy (other than workers' compensation, director and officer liability or other policies in which such endorsements are not customary), name the Administrative Agent, on behalf of the Secured Parties, as an additional insured thereunder and (b) in the case of each casualty insurance policy, contain a loss payable clause or endorsement that names the Administrative Agent, on behalf of the Secured Parties, as a loss payee thereunder, and the Borrowers will use commercially reasonable efforts to have each such policy provide for at least 30 days' (or such shorter number of days as may be agreed to by the Administrative Agent) prior written notice to the Administrative Agent of any cancellation of such policy.

SECTION 5.09.   Books and Records; Inspection and Rights.  Each Borrower will, and will cause each Restricted Subsidiary to, (a) keep proper books of record and account in which full, true and correct (in all material respects) entries in accordance with GAAP and applicable law are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the Administrative Agent or any Lender (to the extent accompanying the Administrative Agent or any designated representative thereof)

69

UST-0189

(including employees of the Administrative Agent, any Lender or any consultants, accountants, lawyers and appraisers retained by the Administrative Agent), upon reasonable prior notice (but in no event more than once each fiscal year of the Parent Borrower unless an Event of Default has occurred and is continuing), to visit and inspect its properties, to examine and make extracts from its books and records and to discuss its affairs, finances and condition with its officers and, accompanied by one or more such officers or their designees if requested by the Borrowers, independent accountants, all at such reasonable times during normal business hours and as often as reasonably requested.  The Borrowers shall have the right to have a representative present at any and all inspections.

SECTION 5.10.    Compliance with Laws.  Each Borrower will, and will cause each Restricted Subsidiary to, comply with all laws (including Environmental Laws and orders of any Governmental Authority) applicable to it or its property, except (i) where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect or (ii) to the extent subject to the Automatic Stay.

SECTION 5.11.    Bankruptcy Matters.

(a)    cause all proposed (i) "first day" and "second day" (if applicable) orders on a final basis, (ii) orders (other than the Order) related to or affecting the Loans and other Obligations and the Loan Documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any Plan of Reorganization and/or any disclosure statement related thereto, (iii) orders concerning the financial condition of the Borrowers or any of their respective Restricted Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure, and (iv) orders establishing procedures for administration of the Cases or approving significant transactions submitted to the Court, in each case, proposed by the Loan Parties to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Required Lenders in their reasonable discretion in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders (and with respect to any provision that affects the rights, obligations, liabilities or duties of the Administrative Agent) prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable in all respects;

(b)    comply in a timely manner with their obligations and responsibilities as debtors in possession under the Order; and

(c)    except as otherwise permitted by an Acceptable Plan or this Agreement, provide prior written notice as soon as reasonably practicable to the Required Lenders prior to any assumption or rejection of any Loan Party's or any Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code.

(d)    deliver to the Administrative Agent all documents required to be delivered to creditors under the RSA, any applicable restructuring support agreement or

70

UST-0190

any case stipulation; <u>provided</u> that the Borrower shall not be required to deliver any such documents provided by any party in interest to the extent that any such document is filed under seal; <u>provided</u>, <u>further</u>, that such documents that are filed under seal, to the extent permitted by applicable law, shall be provided to the advisors to the Administrative Agent on a professional eyes' only basis.

(e)     comply with each of the Required Milestones contained on <u>Schedule 5.11</u> upon the terms and at the times provided for therein.

SECTION 5.12.   <u>Maintenance of Ratings</u>.  The Borrowers will use commercially reasonable efforts to obtain a rating of the credit facilities created hereunder by each of S&P and Moody's within 15 days of the Effective Date, it being understood that there is no obligation to maintain any particular rating at any time.

SECTION 5.13.   [Reserved].

SECTION 5.14.   [Reserved].

SECTION 5.15.   <u>Conference Calls</u>.  The Borrowers will hold and participate in:

(a) a monthly conference call for Lenders to discuss financial information delivered pursuant to Section 5.01.  The Borrowers will hold such conference call following the delivery of the required financial information for such month pursuant to Section 5.01(c) and not later than two Business Days from the time the Borrowers are required to deliver the financial information as set forth in Section 5.01(c).

(b) weekly conference calls for the Ad Hoc Committee Advisors to discuss financial information delivered pursuant to Section 5.01(f).

Such monthly and weekly calls will occur as a standing appointment at a time to be mutually agreed upon by the Borrowers and the Lenders or the Ad Hoc Committee Advisors, as applicable.

ARTICLE VI

<u>Negative Covenants</u>

Until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all premiums and fees payable hereunder shall have been paid in full, each Borrower covenants and agrees with the Lenders that:

SECTION 6.01.   <u>Indebtedness; Certain Equity Securities</u>.

Neither Borrower will, nor will it permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

(a)     Indebtedness created under the Loan Documents (including, for the avoidance of doubt, the Carve Out) and the Pre-Petition Loan Documents;

UST-0191

(b)      Indebtedness existing on the date hereof and set forth on Schedule 6.01;

(c)      unsecured Indebtedness of the Parent Borrower to any Restricted Subsidiary and of any Restricted Subsidiary to the Parent Borrower or any other Restricted Subsidiary; provided that (i) such Indebtedness shall not have been transferred to any Person other than the Parent Borrower or any Restricted Subsidiary, (ii) any such Indebtedness owing by any Loan Party to a Restricted Subsidiary that is not a Loan Party shall be unsecured and subordinated in right of payment to the Loan Document Obligations and the Pre-Petition Lender Obligations and (iii) any such Indebtedness shall be incurred in compliance with Section 6.04;

(d)      Guarantees incurred in compliance with Section 6.04;

(e)      Indebtedness of the Parent Borrower or any Restricted Subsidiary (i) incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations and Synthetic Lease Obligations, provided that such Indebtedness is incurred prior to or within 270 days after such acquisition or the completion of such construction or improvement and the principal amount of such Indebtedness does not exceed the cost of acquiring, constructing or improving such fixed or capital assets or (ii) assumed in connection with the acquisition of any fixed or capital assets; provided that the aggregate principal amount of Indebtedness permitted by this clause (e) at the time of incurrence thereof shall not exceed $1,000,000;

(f)      Indebtedness in respect of netting services, overdraft protections and deposit and checking accounts, in each case, in the ordinary course of business;

(g)      Indebtedness in respect of letters of credit, bank guarantees and similar instruments issued for the account of the Parent Borrower or any Restricted Subsidiary in the ordinary course of business supporting obligations under workers' compensation, health, disability, unemployment insurance and other social security laws;

(h)      Indebtedness expressly permitted by the Approved Budget (including with respect to any Permitted Variances);

(i)      [reserved];

(j)      Indebtedness under (i) the Pre-Petition ABL Credit Agreement and (ii) if applicable, the ABL Credit Agreement in an aggregate principal amount not to exceed $400,000,000 at any time outstanding;

(k)      Indebtedness of Loan Parties in respect of surety bonds (whether bid, performance, appeal or otherwise) and performance and completion guarantees and other obligations of a like nature, in each case incurred in the ordinary course of business;

(l)      [reserved];

(m)      [reserved];

(n)      [reserved];

LA\4104335.13

UST-0192

(o)     [reserved];

(p)     other unsecured Indebtedness in an aggregate principal amount not to exceed at the time of incurrence thereof $4,000,000;

(q)     Indebtedness consisting of (i) the financing of insurance premiums and (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(r)     obligations under any agreement governing the provision of treasury or cash management services, including deposit accounts, overnight draft, credit cards, debit cards, p-cards (including purchasing cards and commercial cards), funds transfer, automated clearinghouse, zero balance accounts, returned check concentration, controlled disbursement, lockbox, account reconciliation and reporting and trade finance services and other cash management services; and

(s)     Indebtedness in the form of Swap Agreements permitted under Section 6.07.

The accrual of interest, the accretion of accreted value and the payment of interest or dividends in the form of additional Indebtedness or Disqualified Stock, as applicable, the accretion of original issue discount, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies shall not be deemed to be an incurrence of Indebtedness or Disqualified Stock for purposes of this Section 6.01.

SECTION 6.02.     Liens.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Lien on any asset now owned or hereafter acquired, except:

(a)     (i) Liens granted by the Order (including the Carve Out), (ii) Liens created under the Loan Documents or the Pre-Petition Loan Documents;

(b)     Permitted Encumbrances;

(c)     any Lien on any asset of the Parent Borrower or any Restricted Subsidiary existing on the date hereof and set forth on Schedule 6.02; provided that (i) such Lien shall not apply to any other asset of the Parent Borrower or any Restricted Subsidiary and (ii) such Lien shall secure only those obligations that it secures on the date hereof and any extensions, renewals and refinancing thereof that do not increase the outstanding principal amount thereof;

(d)     [reserved];

(e)     Liens on fixed or capital assets acquired, constructed or improved by the Parent Borrower or any Restricted Subsidiary; provided that (i) such Liens secure only Indebtedness permitted by Section 6.01(e) and obligations relating thereto not constituting Indebtedness and (ii) such Liens shall not apply to any other asset of the Parent Borrower or any Restricted Subsidiary (other than the proceeds and products thereof); provided further that in the event purchase money obligations are owed to any Person with respect to financing of more than one

73

UST-0193

purchase of any fixed or capital assets, such Liens may secure all such purchase money obligations and may apply to all such fixed or capital assets financed by such Person;

(f)     in connection with the sale or transfer of any Equity Interests or other assets in a transaction permitted under Section 6.05, customary rights and restrictions contained in agreements relating to such sale or transfer pending the completion thereof, solely to the extent such sale or transfer would have been permitted on the date of the creation of such Lien;

(g)     in the case of (i) any Restricted Subsidiary that is not a wholly-owned Restricted Subsidiary or (ii) the Equity Interests in any Person that is not a Restricted Subsidiary, any encumbrance or restriction, including any put and call arrangements, related to Equity Interests in such Restricted Subsidiary or such other Person set forth in the organizational documents of such Restricted Subsidiary or such other Person or any related joint venture, shareholders' or similar agreement, in each case, so long as such encumbrance or restriction is in existence on the Petition Date;

(h)     Liens solely on any cash deposits, escrow arrangements or similar arrangements made by the Parent Borrower or any Restricted Subsidiary in connection with any letter of intent or purchase agreement for a transaction permitted hereunder;

(i)     Liens on the Collateral securing Indebtedness permitted by Section 6.01(j) and obligations relating thereto not constituting Indebtedness; provided that any such Liens are subject to (x) the Order and (y), if such Liens are on assets of the Loan Parties, the Intercreditor Agreement;

(j)     any Lien on assets of any Foreign Subsidiary (other than any Luxembourg IP Subsidiary); provided that such Lien shall secure only Indebtedness of such Foreign Subsidiary permitted by Section 6.01 and obligations relating thereto not constituting Indebtedness;

(k)     other Liens securing Indebtedness or other obligations in an aggregate principal amount at the time of incurrence of such Indebtedness or other obligations not to exceed $1,000,000;

(l)     non-exclusive licenses of intellectual property granted in the ordinary course of business; and

(m)     Liens in favor of the Pre-Petition Lenders as adequate protection granted pursuant to the Orders.

SECTION 6.03.     Fundamental Changes; Business Activities.

(a)     Neither Borrower will, nor will it permit any Restricted Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, (i) any Restricted Subsidiary may  (x) merge into the Parent Borrower in a transaction in which the Parent Borrower is the surviving entity and (y) merge into the Subsidiary Borrower in a transaction in which the Subsidiary Borrower is the surviving entity, (ii) any Person (other the Parent Borrower or the Subsidiary

74

UST-0194

Borrower) may merge into or consolidate with any Restricted Subsidiary in a transaction in which the surviving entity is a Restricted Subsidiary and, if any party to such merger or consolidation is a Loan Party, a Loan Party, (iii) [reserved] and (iv) any Restricted Subsidiary (other than the Subsidiary Borrower) may liquidate or dissolve if the Borrowers determine in good faith that such liquidation or dissolution is in the best interests of the Borrowers and is not materially disadvantageous to the Lenders; provided that any such merger or consolidation involving a Person that is not a wholly-owned Restricted Subsidiary immediately prior to such merger or consolidation shall not be permitted unless it is also permitted by Section 6.04.

(b)     Neither Borrower will, nor will it permit any of its Restricted Subsidiaries to, engage to any material extent in any business other than businesses of the type conducted by the Parent Borrower and the Restricted Subsidiaries on the date hereof  and businesses reasonably related or complementary thereto.

SECTION 6.04.    Investments, Loans, Advances, Guarantees and Acquisitions.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, purchase, hold, acquire (including pursuant to any merger or consolidation), make or otherwise permit to exist any Investment in any other Person, except:

(a)     Investments in cash and Cash Equivalents;

(b)     Investments existing on the date hereof or contractually committed to as of the date hereof and set forth on Schedule 6.04 and any extensions thereof (but not any additions thereto (including any capital contributions) made after the date hereof) ;

(c)     Investments by the Parent Borrower and the Restricted Subsidiaries in Equity Interests in their respective subsidiaries; provided that (i) such subsidiaries are Subsidiaries prior to such Investments, and (ii) in the case of any such Investments by the Loan Parties in, and loans and advances by the Loan Parties to, Restricted Subsidiaries that are not Loan Parties (excluding all such Investments, loans, advances and Guarantees existing on the date hereof and permitted by clause (b) above), (A) the aggregate amount of all such Investments (including loans and advances) permitted pursuant to this clause (c) and pursuant to clauses (d) and (e) below, taken together, shall not exceed $10,000,000 and (B) in each case, all such Investments (including loans and advances) shall be (x) made in the ordinary course of business, (y), solely in connection with the operational and compliance needs of the Parent Borrower and its Restricted Subsidiaries and (z) permitted by the Approved Budget (subject to Permitted Variance);

(d)     loans or advances made by the Parent Borrower to any Restricted Subsidiary or made by any Restricted Subsidiary to the Parent Borrower or any other Restricted Subsidiary; provided that (i) the Indebtedness resulting therefrom is permitted by Section 6.01(c) and (ii) the amount of such loans and advances made by the Loan Parties to Restricted Subsidiaries that are not Loan Parties shall be subject to the limitation set forth in clause (c) above and shall be permitted by the Approved Budget (subject to Permitted Variance);

(e)     Guarantees by the Parent Borrower or any Restricted Subsidiary of Indebtedness or other obligations of the Parent Borrower or any Restricted Subsidiary, solely to the extent (i) arising as a result of any such Person being a joint and several co-applicant with respect to any

75

UST-0195

letter of credit or letter of guaranty or (ii) of any leases of retail store locations and related obligations arising thereunder, in each case, in the ordinary course of business; provided that the aggregate amount of Indebtedness and other obligations of Restricted Subsidiaries that are not Loan Parties that is Guaranteed by any Loan Party shall be subject to the limitation set forth in clause (c) above and shall be permitted by the Approved Budget (subject to Permitted Variances);

(f)     [reserved];

(g)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(h)     [reserved];

(i)     deposits, prepayments and other credits to suppliers, lessors and landlords made in the ordinary course of business;

(j)     advances by the Parent Borrower or any Restricted Subsidiary to employees in the ordinary course of business consistent with past practices for travel and entertainment expenses, relocation costs and similar purposes;

(k)     [reserved];

(l)     Investments in the form of Swap Agreements permitted under Section 6.07;

(m)     investments constituting deposits described in clauses (c) and (d) of the definition of "Permitted Encumbrances" and endorsements of instruments for collection or deposit in the ordinary course of business;

(n)     other Investments to the extent permitted by and expressly set forth in the Order;

(o)     other Investments in an aggregate amount not to exceed $1,000,000; and

(p)     Investments in respect of actions permitted by Section 6.05(g).

For the purposes of this Section, any unreimbursed payment by the Parent Borrower or any Restricted Subsidiary for goods or services delivered to any Subsidiary shall be deemed to be an Investment in such Subsidiary.

SECTION 6.05.    Asset Sales.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, sell, transfer or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the Parent Borrower permit any Restricted Subsidiary to issue any additional Equity Interests in such Restricted Subsidiary (other than to the Parent Borrower or any other Restricted Subsidiary in compliance with Section 6.04, and other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable law) (each of the foregoing, an "Asset Sale"), except:

UST-0196

(a)     (i) sales of inventory, (ii) sales, transfers and other dispositions of used, surplus, obsolete or outmoded machinery or equipment and (iii) contributions of merchandise to charitable organizations, to the extent in the ordinary course of business and consistent with past practices, (iv) dispositions of Cash Equivalents and (v) use of cash in accordance with the Approved Budget and pursuant to transactions permitted under this agreement, in each case (other than in the case of clause (iii)) in the ordinary course of business;

(b)     sales, transfers, leases and other dispositions to the Parent Borrower or any Restricted Subsidiary in the ordinary course of business; provided that any such sales, transfers, leases or other dispositions involving a Restricted Subsidiary that is not a Loan Party shall be made in compliance with Sections 6.04 and 6.09;

(c)     the sale or discount of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not in connection with any financing transaction;

(d)     dispositions of assets subject to any casualty or condemnation proceeding (including in lieu thereof);

(e)     leases or subleases of real property granted by the Parent Borrower or any Restricted Subsidiary to third Persons not interfering in any material respect with the business of the Parent Borrower or any Restricted Subsidiary, including, without limitation, retail store lease assignments and surrenders;

(f)     [reserved];

(g)     in connection with the consolidation of foreign operations of the Parent Borrower and its Subsidiaries, the direct or indirect transfers or other dispositions by any Restricted Subsidiary of any foreign assets or the Equity Interests of a Foreign Subsidiary that is a Restricted Subsidiary to (i) with respect to any Luxembourg IP Subsidiary or any non-Loan Party Restricted Subsidiary with the prior consent of the Required Lenders and (ii) any other Restricted Subsidiary;

(h)     to the extent prior consent of the Required Lenders is received, the elimination or forgiving of intercompany balances in connection with intercompany restructurings (including dissolutions, liquidations and mergers) between or among the Parent Borrower and its Restricted Subsidiaries;

(i)     other sales, transfers or dispositions pursuant to an order of the Court which sale, transfer or disposition are consistent with the Restructuring Support Agreement and the Approved Budget; and

(j)     Specified Dispositions or dispositions expressly identified and provided for in the Approved Budget; and

(k)     sales, transfers and other dispositions of assets that are not permitted by any other clause of this Section in an aggregate amount equal to a fair market value, as determined by a

LA\4104335.13

UST-0197

Responsible Officer of the Parent Borrower reasonably and acting in good faith, of not more than $1,000,000;

provided that all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by clause (a)(ii), (a)(iii), (b), (c), (d), (g) or (h)) shall be made for fair value.

SECTION 6.06.   Sale/Leaseback Transactions.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, enter into any Sale/Leaseback Transaction, except to the extent such Sale/Leaseback Transaction is entered into in connection with a Specified Disposition.

SECTION 6.07.   Swap Agreements.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, enter into any Swap Agreement, other than Swap Agreements entered into in the ordinary course of business to hedge or mitigate risks to which the Parent Borrower or a Restricted Subsidiary is exposed in the conduct of its business or the management of its liabilities and not for speculative purposes.

SECTION 6.08.   Restricted Payments; Certain Payments of Indebtedness.

(a)      Neither Borrower will, nor will it permit any Restricted Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that:

(i)      the Parent Borrower may declare and pay dividends with respect to its Equity Interests payable solely in additional Equity Interests (other than Disqualified Stock) of the Parent Borrower;

(ii)      any Restricted Subsidiary may declare and pay dividends or make other distributions with respect to its Equity Interests, or make other Restricted Payments in respect of its Equity Interests, in each case ratably to the holders of such Equity Interests (or, if not ratably, on a basis more favorable to the Parent Borrower and the Restricted Subsidiaries);

(iii)      the Parent Borrower may make Restricted Payments pursuant to and in accordance with customary stock option plans or other equity or benefit plans for management or employees of the Parent Borrower and the Restricted Subsidiaries in effect from time to time;

(iv)      Restricted Payments made by any Restricted Subsidiary to another non-Restricted Subsidiary to consummate transactions that would otherwise be permitted by Section 6.04(c);

(v)      the Parent Borrower may make cash payments in lieu of the issuance of fractional shares representing insignificant interests in the Parent Borrower in connection with the exercise of warrants, options or other securities convertible into or exchangeable for shares of common stock in the Parent Borrower;

UST-0198

(vi)     Restricted Payments to Parent Borrower on or around and upon the execution and effectiveness of the RSA to pay fees and expenses in accordance therewith;

(vii)     [reserved]; and

(viii)     Restricted Payments made to consummate the transactions permitted by Section 6.05(g).

(b)     Neither Borrower will, nor will it permit any Restricted Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Specified Indebtedness, except:

(i)     [reserved];

(ii)     [reserved];

(iii)     [reserved];

(iv)     [reserved];

(v)     [reserved];

(vi)     payments to the extent provided for in the Approved Budget (including Permitted Variances thereto) and permitted by the Order, as applicable; and

(vii)     [reserved].

(c)     Neither Borrower will, nor will it permit any of the Restricted Subsidiaries to, amend, modify or change in any manner adverse to the interests of the Lenders any term or condition of any documentation governing Specified Indebtedness; provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous written notice thereof is provided to the Administrative Agent.

SECTION 6.09.     Transactions with Affiliates.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, sell, lease, license or otherwise transfer any assets to, or purchase, lease, license or otherwise acquire any assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions on terms and conditions not less favorable to the Parent Borrower or such Restricted Subsidiary than those that would prevail in an arm's-length transaction with unrelated third parties, (b) transactions between or among the Parent Borrower and the Restricted Subsidiaries, (c) any Restricted Payment permitted by Section 6.08 or Investments permitted pursuant to Section 6.04(j), (d) the payment of reasonable fees and compensation to, and the providing of reasonable indemnities on behalf of, directors and officers of the Parent Borrower or any Restricted Subsidiary, as determined by the board of directors of the Parent Borrower in good faith, (e) employment contracts or subscription, put/call arrangements with employees, officers or directors, (f) transactions necessary to make adequate

79

UST-0199

protection payments on account of secured Pre-Petition Indebtedness pursuant to the Order and (g) the transactions described on Schedule 6.09.

SECTION 6.10.   Restrictive Agreements.

(a) Neither Borrower will, nor will it permit any Restricted Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that restricts or imposes any condition upon (1) the ability of the Parent Borrower or any Restricted Subsidiary to create, incur or permit to exist any Lien upon any of its assets to secure the Loan Document Obligations or (2) the ability of any Restricted Subsidiary to pay dividends or other distributions with respect to its Equity Interests or to make or repay loans or advances to the Parent Borrower or to Guarantee the Loan Agreement; provided that (i) the foregoing shall not apply to (A) restrictions and conditions imposed by law or by any Loan Document, (B) restrictions and conditions existing on the Effective Date identified on Schedule 6.10 (but shall apply to any amendment or modification expanding the scope of any such restriction or condition), (C) customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided that such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (D) in the case of any Restricted Subsidiary that is not a wholly-owned Restricted Subsidiary, restrictions and conditions imposed by its organizational documents or any related joint venture or similar agreement, provided that such restrictions and conditions apply only to such Restricted Subsidiary and to any Equity Interests in such Restricted Subsidiary, (E) restrictions and conditions set forth in the Pre-Petition Credit Agreement, Pre-Petition ABL Credit Agreement and, to the extent applicable, the ABL Credit Agreement, (F) restrictions and conditions imposed by agreements relating to Indebtedness of Restricted Subsidiaries that are not Loan Parties permitted under Section 6.01 and (G) restrictions and conditions imposed on cash to secure letters of credit and other segregated deposits that are permitted pursuant to Section 6.02(h), provided that such restrictions and conditions apply only to such Restricted Subsidiaries that are not Loan Parties, (ii) clause (a) of the foregoing shall not apply to (A) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by Section 6.01(e) if such restrictions or conditions apply only to the assets securing such Indebtedness and (B) customary provisions in leases and other agreements restricting the assignment thereof and (iii) clause (b) of the foregoing shall not apply to restrictions and conditions imposed by agreements relating to Indebtedness of any Restricted Subsidiary in existence at the time such Restricted Subsidiary became a Restricted Subsidiary and otherwise permitted under Section 6.01 (but shall apply to any amendment or modification expanding the scope of, any such restriction or condition), provided that such restrictions and conditions apply only to such Restricted Subsidiary.

(b) Except as permitted pursuant to the terms of this Agreement and the Order or otherwise consented to by the Required Lenders:

(i) Make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to the Order that is adverse to the Lenders.

(ii) Incur, create, assume or suffer to exist or permit any other superpriority claim which is pari passu with or senior to the DIP Superpriority Claims of the Administrative

UST-0200

Agent, and the Lenders hereunder, except for the Carve Out and, subject to the Intercreditor Agreement, the ABL Credit Agreement to the extent applicable.

SECTION 6.11.    Amendment of Organizational Documents.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, amend, modify or waive any of its rights under its certificate of incorporation, by-laws or other organizational documents, in either case, to the extent such amendment, modification or waiver would be adverse to the rights or interests of the Lenders hereunder or under any other Loan Document; provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous written notice thereof is provided to the Administrative Agent.

SECTION 6.12.    Financial Covenants

(a)  The Parent Borrower will not permit Liquidity at any time to be less than $100,000,000.

(b) Commencing after the end of the 3rd week following the Effective Date, and solely to the extent that Liquidity is less than $150,000,000, the Parent Borrower will not permit any negative variance between the Actual Net Cash Flow Amount for any Cumulative Four-Week Period and the Budgeted Net Cash Flow Amount for such Cumulative Four-Week Period to be greater than 20%.

(c) The Parent Borrower will not permit the amount of cash and Cash Equivalents of non-Loan Party Subsidiaries as of the end of the day on Friday of each calendar week on deposit in or credited to any account maintained by non-Loan Party Subsidiaries to exceed $45,000,000 in the aggregate for all non-Loan Party Subsidiaries, excluding from such covenant any payments made (or to be made) from the Maurice business segments or entities.

SECTION 6.13.    Accounting Changes.  The Parent Borrower will not make any change in the Parent Borrower's fiscal quarter or fiscal year other than as required pursuant to GAAP.

SECTION 6.14.    Sanctions.  The Parent Borrower and its Subsidiaries will not, directly or indirectly, use the proceeds of any Borrowing, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other individual or entity, to fund any activities of or business with any individual or entity, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by an individual or entity (including any individual or entity participating in the transaction, whether as Lender, Administrative Agent, or otherwise) of Sanctions.

SECTION 6.15.    Anti-Corruption Laws.  The Parent Borrower and its Subsidiaries will not, directly or indirectly, use the proceeds of any Borrowing for any purpose which would breach any Anti-Corruption Laws.

ARTICLE VII

Events of Default

If any of the following events ("Events of Default") shall occur:

81

UST-0201

(a)　　the Borrowers shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)　　the Borrowers shall fail to pay any interest on any Loan or any fee, premium (including the Redemption Premium, if any) or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)　　any representation, warranty or certification made or deemed made by the Parent Borrower or any Restricted Subsidiary in this Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been materially incorrect when made or deemed made (or, in the case of any representation or warranty qualified by materiality, incorrect);

(d)　　the Borrowers shall fail to observe or perform any covenant, condition or agreement contained in Section 5.01, 5.02(a), 5.03 or 5.05 (with respect to the existence of any Borrower), 5.11 (including the Required Milestones) or in Article VI;

(e)　　any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those specified in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of 7 Business Days after receipt of written notice thereof from the Administrative Agent;

(f)　　except as a result of commencement of the Cases or entry into this Agreement, and, to the extent applicable, the ABL Credit Agreement, unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Court or unless any of the following results from obligations with respect to which the Court prohibits or does not permit any Loan Party from applicable compliance, the Parent Borrower or any Restricted Subsidiary shall fail to make any payment (whether of principal, interest, termination payment or other payment obligation and regardless of amount) in respect of any Material Indebtedness (other than the Loan Document Obligations) when and as the same shall become due and payable (after giving effect to any applicable grace period);

(g)　　except as a result of commencement of the Cases or entry into this Agreement and, to the extent applicable, the ABL Credit Agreement, unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Court or unless any of the following results from obligations with respect to which the Court prohibits or does not permit any Loan Party from applicable compliance, (i) any event or condition shall occur that results in any Material Indebtedness becoming due, or being terminated or required to be prepaid, repurchased, redeemed or defeased, prior to its scheduled maturity, or that enables or permits (with the giving of notice, if required) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf, or, in the case of any Swap Agreement, the applicable counterparty, to cause any Material Indebtedness to become due, or to terminate or to

LA\4104335.13

UST-0202

require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to (i) any secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the assets securing such Indebtedness or (ii) any Indebtedness that becomes due as a result of a voluntary refinancing thereof permitted under Section 6.01; provided, further, that no such event under the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, as applicable, shall constitute an Event of Default under this clause (g) until the earliest to occur of (x) 5 days after the date of such Event of Default (during which period such Event of Default is not waived or cured), (y) the acceleration of the Indebtedness under the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, as applicable, and (z) the exercise of remedies by the ABL Agent in respect of a material portion of the ABL Priority Collateral, to the extent applicable;

(h)     [reserved];

(i)     [reserved];

(j)     [reserved];

(k)     except for any order fixing the amount of any Claim in the Cases, one or more judgments for the payment of money in an aggregate amount in excess of $10,000,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment and has not denied coverage) shall be rendered against the Parent Borrower or any Restricted Subsidiary, or any combination thereof, and the same shall remain undischarged for a period of 15 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Parent Borrower or any Restricted Subsidiary to enforce any such judgment;

(l)     one or more ERISA Events shall have occurred that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect;

(m)     a Change in Control shall occur;

(n)     any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder, satisfaction in full of all the Loan Document Obligations (other than contingent indemnification claims) or any act or omission by the Administrative Agent or any Lender, ceases to be in full force and effect; or any Loan Party contests in any manner the validity or enforceability of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; and

(o)     any Lien purported to be created under any Collateral Document and the Order shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any material Collateral, with the priority required by the applicable Collateral Document, except (i) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents to a Person that is not a Loan Party, (ii) the release thereof as provided in the applicable Collateral Document or Section 9.16 or consented to under Section 9.02, (iii) as a result of the failure of the Administrative Agent to (A) maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Collateral

83

UST-0203

Agreement or (B) continue in accordance with applicable law the effectiveness of any UCC financing statement or (iv) as to Collateral constituting real property, to the extent such losses are covered by Lender's title insurance policy and such insurer has not denied coverage;

(p) the RSA is terminated for any reason, or is modified, amended or waived in any manner materially adverse to the Secured Parties without the prior consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders);

(q) any Loan Party shall file a motion in the Cases without the express written consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders), (i) to obtain additional financing under Section 364(d) of the Bankruptcy Code not otherwise permitted under this Agreement or (ii) except as provided in the Order, as the case may be, to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code that does not either have the prior written consent of the Required Lenders (or the Administrative Agent acting at the direction of the Required Lenders) or provide for the payment of the Loan Document Obligations in full and in cash upon the incurrence of such additional financing;

(r) an order with respect to any of the Cases shall be entered by the Court (i) appointing a trustee under Section 1104, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or (iii) converting the Cases to cases under Chapter 7 of the Bankruptcy Code;

(s) an order shall be entered by the Court dismissing any of the Cases which does not contain a provision for termination of all Commitments, and payment in full in cash of all Loan Document Obligations upon entry thereof;

(t) an order with respect to any of the Cases shall be entered by the Court without the express prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent), with such consent not to be unreasonably withheld, conditioned or delayed, (i) to revoke, reverse, stay, modify, supplement or amend the Order in a manner adverse to the Lenders and/or the Administrative Agent or (ii) to permit, unless otherwise contemplated by the Order, any administrative expense or any Claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the administrative priority of the Loan Parties' Claims in respect of the Loan Document Obligations (other than the Carve Out);

(u) (i) an application for any of the orders described in clause (r) above shall be made by a Loan Party or any such application shall be made by a Person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or the relief requested is not withdrawn, dismissed or denied within forty-five (45) days after the filing or (ii) any Person obtains an order under Section 506(c) of the Bankruptcy Code against the Administrative Agent;

(v) the entry of an order by the Court terminating or modifying the exclusive right of any Loan Party to file a Plan of Reorganization pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders;

(w) any Loan Party shall fail to comply with the Order;

UST-0204

(x)     any order by the Court is entered granting any superpriority claim that is pari passu with or senior to those of the Secured Parties or any Lien that is senior to the Liens securing the Loan Document Obligations, other than in accordance with the Order;

(y)     the Court enters an order that is adverse in any material respect, when taken as a whole, to the interests of the Administrative Agent and the Lenders or their respective rights and remedies in their capacities as such under this Agreement or in any of the Cases;

(z)     the Loan Parties or any of their Subsidiaries, or any person claiming by or through the Loan Parties or any of their Subsidiaries, obtain court authorization to commence, or commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Administrative Agent or the Lenders in each case relating to this Agreement, in each case other than as permitted by the Order;

(aa)     the Court denies confirmation of the Plan, provided, that if the Loan Parties subsequently obtain an order of the Court approving a plan of reorganization that either (i) proposes to repay in full in cash of all Loan Document Obligations under the Term Credit Facility, immediately upon the effectiveness thereof, (ii) is, taken as a whole, in form and substance substantially similar to the Plan of Reorganization or (iii) otherwise is approved by the Required Lenders, an Event of Default shall not occur;

(bb)     The Loan Parties attempts to consummate a sale of substantially all of its assets via a plan of reorganization or a 363 sale without consent of the Required Lenders; or

(cc)     the filing by any of the Loan Parties of a Plan of Reorganization other than an Acceptable Plan;

then, notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Order, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrowers, take either or both of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, (ii) declare the Loans then outstanding to be due and payable in whole, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees, premiums and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers and (iii) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law.

ARTICLE VIII

The Administrative Agent

Each of the Lenders hereby irrevocably appoints the entity named as Administrative Agent in the heading of this Agreement and its successors to serve as administrative agent and collateral agent under the Loan Documents, and authorizes the Administrative Agent to take such

LA\4104335.13

UST-0205

actions on its behalf, including execution of the other Loan Documents, and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, each Lender hereby authorizes the Administrative Agent to consent, on behalf of each Lender, to the Order, each to be negotiated between the Loan Parties, the Administrative Agent, certain other parties and the statutory committees appointed pursuant to Sections 327 and 1103 of the Bankruptcy Code.

The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Parent Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing (and it is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law, and that such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties), (b) the Administrative Agent shall not have any duty to take any discretionary action or to exercise any discretionary power, except discretionary rights and powers expressly contemplated by the Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents), provided that the Administrative Agent shall not be required to take any action that, in its opinion, could expose the Administrative Agent to liability or be contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any debtor relief law, and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Parent Borrower or any Subsidiary or any other Affiliate thereof that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents) or in the absence of its own gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and nonappealable judgment). The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof (stating that it is a "notice of default") is given to the Administrative Agent by the Borrowers or a Lender, and the Administrative Agent shall

86

UST-0206

not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or in connection with any Loan Document, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default, (iv) the sufficiency, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the creation, perfection or priority of Liens on the Collateral or the existence of the Collateral or (vi) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or satisfaction of any condition that expressly refers to the matters described therein being acceptable or satisfactory to the Administrative Agent.

The Administrative Agent shall be entitled to rely, and shall not incur any liability for relying, upon any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the signatory, sender or authenticator thereof). The Administrative Agent also shall be entitled to rely, and shall not incur any liability for relying, upon any statement made to it orally or by telephone and believed by it to be made by the proper Person (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the signatory, sender or authenticator thereof), and may act upon any such statement prior to receipt of written confirmation thereof. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender, unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all their duties and exercise their rights and powers through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Subject to the terms of this paragraph, the Administrative Agent may resign at any time, upon thirty days prior notice, from its capacity as such. In connection with such resignation, the

87

UST-0207

Administrative Agent shall give notice of its intent to resign to the Lenders and the Borrowers. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the consent of the Borrower so long as no Event of Default under clauses (a) or (b) of Article VII is continuing, to appoint a successor.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its intent to resign, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be a bank with an office in New York, New York, or an Affiliate of any such bank.  Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents.  The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed by the Borrowers and such successor.  Notwithstanding the foregoing, in the event no successor Administrative Agent shall have been so appointed and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its intent to resign, the retiring Administrative Agent may give notice of the effectiveness of its resignation to the Lenders and the Borrowers, whereupon, on the date of effectiveness of such resignation stated in such notice, (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents, provided that, solely for purposes of maintaining any security interest granted to the Administrative Agent under any Collateral Document for the benefit of the Secured Parties, the retiring Administrative Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Secured Parties and, in the case of any Collateral in the possession of the Administrative Agent, shall continue to hold such Collateral, in each case until such time as a successor Administrative Agent is appointed and accepts such appointment in accordance with this paragraph (it being understood and agreed that the retiring Administrative Agent shall have no duty or obligation to take any further action under any Collateral Document, including any action required to maintain the perfection of any such security interest), and (b) the Required Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, provided that (i) all payments required to be made hereunder or under any other Loan Document to the Administrative Agent for the account of any Person other than the Administrative Agent shall be made directly to such Person and (ii) all notices and other communications required or contemplated to be given or made to the Administrative Agent shall also directly be given or made to each Lender.  Following the effectiveness of the Administrative Agent's resignation from its capacity as such, the provisions of this Article and Section 9.03, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent and in respect of the matters referred to in the proviso under clause (a) above.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any other Lender or the Debtors' Investment Banker, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the

88

UST-0208

Administrative Agent, or any other Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Each Lender, by delivering its signature page to this Agreement and funding its Loans on the Effective Date, or delivering its signature page to an Assignment and Assumption or any other Loan Document pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent or the Lenders on the Effective Date.

Except with respect to the exercise of setoff rights of any Lender in accordance with the Loan Documents or with respect to a Lender's right to file a proof of claim in an insolvency proceeding, no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Loan Document Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent on behalf of the Secured Parties in accordance with the terms thereof.  In the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Administrative Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and the Administrative Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Loan Document Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent on behalf of the Secured Parties at such sale or other disposition.

The Secured Parties irrevocably authorize the Administrative Agent, at its option and in its discretion, to subordinate or release any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is a Permitted Encumbrance or that is permitted by Section 6.02(d), (e), (g) and (h).  The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

In case of the pendency of any proceeding with respect to any Loan Party under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

LA\4104335.13

UST-0209

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, and all other Loan Document Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim under Sections 2.10, 2.11, 2.13, 2.14, 2.15 and 9.03) allowed in such judicial proceeding;

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(c)     any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Lender and each Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders or the other Secured Parties, to pay to the Administrative Agent any amount due to it, in its capacity as the Administrative Agent, under the Loan Documents (including under Section 9.03).

To the extent required by any applicable laws (as determined in good faith by the Administrative Agent), the Administrative Agent may withhold from any payment to any Lender under any Loan Document an amount equivalent to any applicable withholding Tax.  Without limiting or expanding the provisions of Section 2.15, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective).  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this paragraph.  The agreements in this paragraph shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Loan Document Obligations.

Notwithstanding anything herein to the contrary, neither the Debtors' Investment Banker nor any Person (if any) named on the cover page of this Agreement for recognition purposes only shall have any duties or obligations under this Agreement or any other Loan Document (except in any such Person's capacity, as and to the extent applicable, as a Lender), but all such Persons shall have the benefit of the indemnities to the extent referenced and provided for hereunder.

Unless otherwise expressly stated or referred to in this Article, the provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and, except solely to the extent of the Borrowers' rights to consent pursuant to and subject to the conditions set

UST-0210

forth in this Article, none of the Borrowers or any other Loan Party shall have any rights as a third party beneficiary of any such provisions. Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Loan Document Obligations provided under the Loan Documents, to have agreed to the provisions of this Article.

## ARTICLE IX

## Miscellaneous

SECTION 9.01.    Notices.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) of this Section), all notices and other communications provided for herein shall be in writing and shall be delivered by e-mail, hand or overnight courier service, or mailed by certified or registered mail, as follows:

(i)    if to the Borrowers:

Ascena Retail Group, Inc.
933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attention:  Dan Lamadrid, Executive Vice President and Chief Financial Officer
E-mail: dan.lamadrid@ascenaretail.com

with a copy to:

933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attention: Gary Holland, General Counsel and VP
E-mail: gary.holland@ascenaretail.com

With a copy to:
Kirkland & Ellis LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Attention:  David M. Nemecek, P.C.
Email: david.nemecek@kirkland.com

(ii)    if to the Administrative Agent:

Alter Domus (US) LLC
225 W. Washington St., 9th Floor
Chicago, IL 60606
Attention: Legal Department and Hendrik van der Zandt
Email: legal@alterdomus.com and hendrik.vanderzandt@alterdomus.com

UST-0211

with a copy to:

Holland & Knight LLP
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
Attention: Joshua Spencer
Email: joshua.spencer@hklaw.com

and

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attention: Evan Fleck
Email: EFleck@milbank.com

(iii)     if to any other Lender, to it at its address or e-mail address set forth in its Administrative Questionnaire.

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received and (ii) delivered through electronic communications to the extent provided in paragraph (b) of this Section shall be effective as provided in such paragraph.

(b)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications (including e-mail and internet or intranet websites) pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices under Article II to any Lender if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Parent Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.  All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by return e-mail or other written acknowledgement); provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (b)(i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     Any party hereto may change its address for notices and other communications hereunder by notice to the other parties hereto.

LA\4104335.13

UST-0212

(d)    The Borrowers agree that the Administrative Agent may, but shall not be obligated to, make any Communication by posting such Communication on Debt Domain, Intralinks, Syndtrak or a similar electronic transmission system (the "Platform").  The Platform is provided "as is" and "as available."  Neither the Administrative Agent nor any of its Related Parties warrants, or shall be deemed to warrant, the adequacy of the Platform and each expressly disclaims liability for errors or omissions in the Communications.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made, or shall be deemed to be made, by the Administrative Agent or any of its Related Parties in connection with the Communications or the Platform.

SECTION 9.02.    Waivers; Amendments.

(a)    No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  Without limiting the generality of the foregoing, the execution and delivery of this Agreement or the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)    Except as provided in Sections 9.02(c) and 9.19 and except with respect to the Administrative Agent Fee Letter, none of this Agreement, any other Loan Document or any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrowers, the Administrative Agent and the Required Lenders and, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders, provided that (i) any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrowers and the Administrative Agent to cure any technical error, ambiguity, omission, defect or inconsistency so long as, in each case, the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment and (ii) no such agreement shall (A) increase the Commitment of any Lender without the written consent of such Lender, (B) reduce or forgive the principal amount of any Loan or reduce the rate of interest thereon or reduce or forgive any interest or fees or premiums (including any prepayment premiums but excluding for the avoidance of doubt, any mandatory prepayment) payable hereunder without the written consent of each Lender directly affected thereby, (C) postpone the scheduled maturity date of any Loan,

UST-0213

or the date of any scheduled payment of the principal amount of any Term Loan under Section 2.08, or any date for the payment of any interest or fees or premium payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly affected thereby, (D) change Section 2.16(b) or 2.16(c) in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender, (E) change any of the provisions of this Section or the percentage set forth in the definition of the term "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender; provided that, with the consent of the Required Lenders, the provisions of this Section and the definition of the term "Required Lenders" may be amended to include references to any new class of loans created under this Agreement (or to lenders extending such loans) on substantially the same basis as the corresponding references relating to the existing Loans or Lenders, (F) release substantially all of the value of the Guarantees provided by the Guarantors (including, in each case, by limiting liability in respect thereof) created under the Collateral Agreement without the written consent of each Lender (except as expressly provided in Section 9.16 or the Collateral Agreement including any such release by the Administrative Agent in connection with any sale or other disposition of any Subsidiary upon the exercise of remedies under the Collateral Documents), it being understood that an amendment or other modification of the type of obligations guaranteed under the Collateral Agreement shall not be deemed to be a release or limitation of any Guarantee, and (G) release all or substantially all the Collateral from the Liens of the Collateral Documents, without the written consent of each Lender (except as expressly provided in Section 9.16 or the applicable Collateral Document (including any such release by the Administrative Agent in connection with any sale or other disposition of the Collateral upon the exercise of remedies under the Collateral Documents), it being understood that an amendment or other modification of the type of obligations secured by the Collateral Documents shall not be deemed to be a release of the Collateral from the Liens of the Collateral Documents); provided further that no such agreement shall amend, modify, extend or otherwise affect the rights or obligations of the Administrative Agent without the prior written consent of the Administrative Agent. Notwithstanding the foregoing, no consent with respect to any amendment, waiver or other modification of this Agreement or any other Loan Document shall be required of, in the case of any amendment, waiver or other modification referred to in clause (ii) of the first proviso of this paragraph, any Lender that receives payment in full of the principal of and interest accrued on each Loan made by, and all other amounts owing to, such Lender or accrued for the account of such Lender under this Agreement and the other Loan Documents at the time such amendment, waiver or other modification becomes effective and whose Commitments terminate by the terms and upon the effectiveness of such amendment, waiver or other modification.

(c)     Notwithstanding anything herein to the contrary, the Administrative Agent may, without the consent of any Secured Party, consent to a departure by any Loan Party from any covenant of such Loan Party set forth in this Agreement, the Collateral Agreement or in any other Collateral Document to the extent such departure is consistent with the authority of the Administrative Agent set forth in the definition of the term "Collateral and Guarantee Requirement".

94

UST-0214

(d)     The Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, waivers or other modifications on behalf of such Lender.  Any amendment, waiver or other modification effected in accordance with this Section 9.02 shall be binding upon each Person that is at the time thereof a Lender and each Person that subsequently becomes a Lender.

(e)     Notwithstanding the foregoing, Exhibit G to this Agreement, the definitions of "Exit Facility Agreement" and "Exit Facility Term Sheet" and Section 2.22 (or any other provision which would result in an amendment, restatement, waiver or modification of any of the foregoing) may be amended, restated, waived or otherwise modified with the prior written consent of the Required Lenders, the Administrative Agent and the Parent Borrower; provided that to the extent such amendment, restatement, waiver or other modification would require the consent of any affected "Lender", all "Lenders" or any other Person (or requisite class of Persons) under the terms of Exhibit G as in effect on the Effective Date, the prior written consent of the corresponding affected Lender, all Lenders or such corresponding Person (or requisite class of Persons) under this Agreement shall be required; provided, further, that the Lenders hereby authorize the Administrative Agent to enter into any amendments to this Agreement and the other Loan Documents as may be necessary, in the reasonable opinion of the Administrative Agent and the Borrower, to give effect to the transaction contemplated by Section 2.22 and such other technical or immaterial amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Parent Borrower in connection therewith.

SECTION 9.03.     Expenses; Indemnity; Damage Waiver.

(a)     The Borrowers shall, jointly and severally, pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Ad Hoc Committee, the Lenders and their respective Affiliates, including the reasonable and documented out-of-pocket fees, charges and disbursements of one primary counsel for the Administrative Agent, and one primary counsel for the Ad Hoc Committee, and if deemed necessary by the Administrative Agent or the Ad Hoc Committee, one local counsel for the Administrative Agent and Ad Hoc Committee, as applicable in each applicable jurisdiction, in connection with the structuring, arrangement and syndication of the credit facilities provided for herein and any credit or similar facility refinancing or replacing, in whole or in part, any of the credit facilities provided for herein, including the preparation, execution, delivery and administration of this Agreement, the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof, the Order and any transaction contemplated thereby (whether or not the transactions contemplated hereby or thereby shall be consummated) and any refinancing of the obligations hereunder or any "exit financing" requested by the Loan Parties in connection with the Chapter 11 Cases (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable and documented out-of-pocket expenses in connection with the administration of actions related to the Collateral, including any actions taken to perfect or maintain priority of the Administrative Agent's Liens on the Collateral, to maintain any insurance required hereunder, to verify the Collateral, or any audit, inspection, or appraisal related to any Loan Party or the Collateral  and (iii) all out-of-pocket expenses incurred by the Administrative Agent, the Ad Hoc Committee or any Lender, including the fees, charges and disbursements of any counsel for any of the foregoing, in connection with the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this

95

UST-0215

Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)     The Borrowers shall, jointly and severally, indemnify the Administrative Agent (and any subagent thereof), and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee"), against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the structuring, arrangement and the syndication of the credit facilities provided for herein, the preparation, execution, enforcement, delivery and administration of this Agreement, the other Loan Documents or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to this Agreement or the other Loan Documents of their obligations thereunder or the consummation of the Transactions or any other transactions contemplated thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on, at, under to or from any property currently or formerly owned or operated by the Parent Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Parent Borrower or any Subsidiary or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether such proceeding is initiated against or by any party to this Agreement, or any Affiliate thereof, by an Indemnitee or any third party or whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses (i) are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee, (ii) are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from a material breach by such Indemnitee of the Loan Documents or (iii) involve a dispute solely among Indemnitees (other than an action involving (i) alleged conduct by any Borrower or any of its Affiliates or (ii) against the Administrative Agent in its capacity as such).  This Section shall not apply to any Taxes (other than Other Taxes or any Taxes that represent losses, claims, damages or related expenses arising from any non-Tax claim).

(c)     Each Lender severally agrees to indemnify and hold harmless the Administrative Agent (or any sub-agent thereof), to the extent that the Administrative Agent (or any sub-agent) shall not have been timely reimbursed by the Borrowers, based on and to the extent of such Lender's pro rata share, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Administrative Agent (or any sub-agent thereof) in exercising its powers, rights and remedies or performing its duties hereunder or under the other Loan Documents or otherwise in its capacity as the Administrative Agent (or any sub-agent thereof) in any way relating to or arising out of this Agreement or the other Loan Documents; provided, that no Lender shall be liable to the Administrative Agent (or any sub-agent) for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or any sub-agent's) gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent

LA\4104335.13

UST-0216

jurisdiction (it being understood and agreed that no action taken in accordance with the directions of the Required Lenders (or such other Lenders as may be required to give such instructions under Article VIII) shall constitute gross negligence or willful misconduct). If any indemnity furnished to the Administrative Agent (or any sub-agent thereof) for any purpose shall, in the opinion of the Administrative Agent (or any sub-agent thereof), be insufficient or become impaired, the Administrative Agent (or any sub-agent ) may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, that in no event shall this sentence require any Lender to indemnify the Administrative Agent (or any sub-agent thereof) against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's pro rata share. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the total outstanding Loans and unused Commitments at such time (or if such indemnity payment is sought after the date on which the Loans have been paid in full in accordance with such Lender's pro rata share immediately prior to the date on which the Loans are paid in full).

(d)     To the extent permitted by applicable law, (i) the Borrowers shall not assert, or permit any of their respective Affiliates or Related Parties to assert, and hereby waives, any claim against any Indemnitee for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the internet)and (ii) none of the Borrowers or any Secured Party shall assert, or permit any of their respective Affiliates or Related Parties to assert any claims on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)     All amounts due under this Section shall be payable not later than 10 days after written demand therefor.

SECTION 9.04.    Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) neither Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by any Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section), the Debtors' Investment Banker (to the extent provided in Article VIII)and, to the extent expressly contemplated hereby, the sub-agents of the Administrative Agent and the Related Parties of any of the Administrative Agent and any Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

UST-0217

(b)    Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

(i)    the Borrowers; provided that no consent of Borrowers shall be required (1) for an assignment to a Lender, a Related Lender, an Affiliate of a Lender or an Approved Fund (2) if in connection with the Initial Allocation (as defined in the Commitment Letter) and (3) if an Event of Default has occurred and is continuing, for any other assignment; provided further that, the Borrowers shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof.

(ii)    the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of any Loan to a Lender, a Related Lender, an Affiliate of a Lender or an Approved Fund.

(iii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, a Related Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent and recorded in the Register) shall not be less than $1,000,000 unless each of the Borrowers and the Administrative Agent otherwise consent; provided that no such consent of the Borrowers shall be required (i) if an Event of Default has occurred and is continuing or (ii) in connection with the Initial Allocation (as defined in the Commitment Letter);

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided that only one such processing and recordation fee shall be payable in the event of simultaneous assignments from any Lender or its Approved Funds to one or more other Approved Funds of such Lender;

(D)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent all requested "know your customer" documentation, a duly executed IRS Form W-9 or such other applicable IRS Form, and an Administrative Questionnaire in which the assignee designates one or more credit

98

UST-0218

contacts to whom all syndicate-level information (which may contain MNPI) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable law, including Federal, State and foreign securities laws;

(E)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent, the Ad Hoc Committee Advisors and the Company a signed joinder to the Restructuring Support Agreement; and

(F)     each Lender acknowledges and agrees that the Loans, on the one hand, and the unfunded Commitments on the other hand, shall be held by such Lender in equal percentages and such Loans, on the one hand, and such unfunded Commitments, on the other hand, are "stapled" to each other, and shall be assigned in equal percentages.

(iv)     Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.13, 2.14, 2.15 and 9.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 9.04(c).

(v)     The Administrative Agent, acting solely for this purpose as a nonfiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and records of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers and, as to entries pertaining to it, any Lender, at any reasonable time and from time to time upon reasonable prior written notice.

(vi)     Upon receipt by the Administrative Agent of an Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), all other information required under (iii)(D) above and the processing and recordation fee referred to in this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that

99

UST-0219

the Administrative Agent shall not be required to accept such Assignment and Assumption or so record the information contained therein if the Administrative Agent reasonably believes that such Assignment and Assumption lacks any written consent required by this Section or is otherwise not in proper form, it being acknowledged that the Administrative Agent shall have no duty or obligation (and shall incur no liability) with respect to obtaining (or confirming the receipt) of any such written consent or with respect to the form of (or any defect in) such Assignment and Assumption, any such duty and obligation being solely with the assigning Lender and the assignee. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph, and following such recording, unless otherwise determined by the Administrative Agent (such determination to be made in the sole discretion of the Administrative Agent, which determination may be conditioned on the consent of the assigning Lender and the assignee), shall be effective notwithstanding any defect in the Assignment and Assumption relating thereto. Each assigning Lender and the assignee, by its execution and delivery of an Assignment and Assumption, shall be deemed to have represented to the Administrative Agent that all written consents required by this Section with respect thereto (other than the consent of the Administrative Agent) have been obtained and that such Assignment and Assumption is otherwise duly completed and in proper form, and each assignee, by its execution and delivery of an Assignment and Assumption, shall be deemed to have represented to the assigning Lender and the Administrative Agent that such assignee is an Eligible Assignee.

(vii)    No such assignment shall be made to the Parent Borrower or any of its Subsidiaries, except as set forth in Section 9.04(e).

(c)    (i) Any Lender may, without the consent of the Borrowers or the Administrative Agent, sell participations to one or more Eligible Assignees ("Participants") in all or a portion of such Lender's rights and obligations under this Agreement; provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under the Loan Documents. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant or requires the approval of all the Lenders. The Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.13, 2.14 and 2.15 (subject to the requirements and limitations therein, including the requirements under Section 2.15(e) (it being understood that the documentation required under Section 2.15(e) shall be delivered solely to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (x) agrees to be subject to the provisions of Sections 2.16 and 2.17 as if it were an assignee under paragraph (b) of this Section and (y) shall not be entitled to receive any greater payment under Section 2.13 or 2.15, with respect to any participation, than its participating Lender would have been entitled to receive,

UST-0220

except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrowers' request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 2.17(b) with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; <u>provided</u> that such Participant agrees to be subject to Section 2.16(c) as though it were a Lender.

(i) Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain records of the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement or any other Loan Document (the "<u>Participant Register</u>"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments or Loans or its other obligations under this Agreement or any other Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment or Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d) Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; <u>provided</u> that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e) Notwithstanding anything to the contrary contained in this Section 9.04 or any other provision of this Agreement, no Lender shall have the right at any time to sell, assign or transfer all or a portion of the Loans owing to it to the Parent Borrower or any of its Subsidiaries.

SECTION 9.05. <u>Survival</u>. All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, any Lender or any Affiliate of any of the foregoing may have had notice or knowledge of any Default or incorrect representation or warranty at the time any Loan Document is executed and delivered or any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the

UST-0221

Commitments have not expired or terminated. The provisions of Sections 2.13, 2.14, 2.15, 2.16(e) and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.06.    Counterparts; Integration; Effectiveness; Electronic Execution. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 9.07.    Severability. Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08.    Right of Setoff. If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized (notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Court) at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender to or for the credit or the account of any Loan Party against any of and all the Loan Document Obligations held by such Lender, irrespective of whether or not such Lender shall have made any demand under the Loan Documents and although such obligations may be unmatured. The applicable Lender shall notify the Borrowers and the Administrative Agent of such set-off or application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such set-off or application under this Section. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

LA\4104335.13

UST-0222

SECTION 9.09.    Governing Law; Jurisdiction; Consent to Service of Process.

(a)      Except to the extent superseded by the Bankruptcy Code, this Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)      Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the Court or the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and the Borrowers hereby irrevocably and unconditionally agree that all claims arising out of or relating to this Agreement or any other Loan Document brought by the Borrowers or any of their respective Affiliates shall be brought, and shall be heard and determined in the Court, in such New York State or, to the extent permitted by law, in such Federal court.  Each party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or any of its properties in the courts of any jurisdiction.

(c)      The Borrowers hereby irrevocably and unconditionally waive, to the fullest extent they may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)      Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10.    WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

LA\4104335.13

UST-0223

SECTION 9.11.   Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12.   Confidentiality.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below) with the same degree of care that it uses to protect its own confidential information, but in no event less than a commercially reasonable degree of care, except that Information may be disclosed (a) to its Related Parties, including accountants, legal counsel and other agents and advisors, it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable law or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies under this Agreement or any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing confidentiality undertakings substantially similar to those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its Related Parties) to any swap or derivative transaction relating to the Parent Borrower or any Subsidiary or its obligations, (g) on a confidential basis to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the credit facilities provided for herein, (h) with the consent of the Borrowers or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender or any Affiliate of any of the foregoing on a non-confidential basis from a source other than the Borrowers; provided that, in the case of clause (c) above, the party disclosing such information shall provide to the Borrowers prior written notice of such disclosure to the extent permitted by applicable law (and to the extent commercially feasible under the circumstances) and shall cooperate with the Borrowers in obtaining a protective order for, or other confidential treatment of, such disclosure.  For the purposes of this Section, "Information" means all information received from the Borrowers relating to the Parent Borrower or any Subsidiary or their businesses or the Collateral.

SECTION 9.13.   Several Obligations; Nonreliance; Violation of Law.  The respective obligations of the Lenders hereunder are several and not joint and the failure of any Lender to make any Loan or perform any of its obligations hereunder shall not relieve any other Lender from any of its obligations hereunder.  Anything contained in this Agreement to the contrary notwithstanding, no Lender shall be obligated to extend credit to the Borrowers in violation of applicable law.

SECTION 9.14.   USA Patriot Act Notice.  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Loan Party that pursuant to the requirements of the Patriot Act it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party

LA\4104335.13

UST-0224

and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with such Act.

SECTION 9.15.    Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.16.    Release of Liens and Guarantees.  A Guarantor (for the avoidance of doubt, other than the Borrowers) shall be released from its obligations under the Loan Documents, and all security interests created by the Collateral Documents in Collateral owned by such Guarantor shall be released, upon the consummation of any transaction permitted by this Agreement as a result of which such Guarantor ceases to be a Restricted Subsidiary (including any voluntary liquidation or dissolution of such Guarantor in accordance with Section 6.03); provided that, if so required by this Agreement, the Required Lenders shall have consented to such transaction and the terms of such consent shall not have provided otherwise.  Upon any sale or other transfer by any Loan Party (other than to a Borrower or any other Loan Party or to any other Subsidiary of the Parent Borrower) of any Collateral in a transaction permitted under this Agreement, or upon the effectiveness of any written consent to the release of the security interest created under any Collateral Document in any Collateral pursuant to Section 9.02, the security interests in such Collateral created by the Collateral Documents shall be automatically released. In connection with any termination or release pursuant to this Section, the Administrative Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release.  Any execution and delivery of documents pursuant to this Section shall be without recourse to or warranty by the Administrative Agent.

SECTION 9.17.    No Fiduciary Relationship.  Each Borrower, on behalf of itself and the Subsidiaries, agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, the Parent Borrower, the Subsidiaries and its other Affiliates, on the one hand, and the Administrative Agent, the Lenders and their Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Administrative Agent, the Lenders or their Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications.  The Administrative Agent, the Lenders and their Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of the Parent Borrower, the Subsidiaries and its other Affiliates, and none of the Administrative Agent, the Lenders or their Affiliates has any

105

UST-0225

obligation to disclose any of such interests to the Parent Borrower, the Subsidiaries or its other Affiliates.  To the fullest extent permitted by law, each Borrower hereby waives and releases any claims that it or any of its Affiliates may have against the Administrative Agent, the Lenders and their Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 9.18.   Non-Public Information.

(a)     Each Lender acknowledges that all information, including requests for waivers and amendments, furnished by a Borrower or the Administrative Agent pursuant to or in connection with, or in the course of administering, this Agreement will be syndicate-level information, which may contain MNPI.  Each Lender represents to the Borrowers and the Administrative Agent that (i) it has developed compliance procedures regarding the use of MNPI and that it will handle MNPI in accordance with such procedures and applicable law, including Federal, state and foreign securities laws, and (ii) it has identified in its Administrative Questionnaire a credit contact who may receive information that may contain MNPI in accordance with its compliance procedures and applicable law, including Federal, state and foreign securities laws.

(b)     The Borrowers and each Lender acknowledge that, if information furnished by the Loan Parties pursuant to or in connection with this Agreement is being distributed by the Administrative Agent through the Platform, (i) the Administrative Agent may post any information that the Borrowers have indicated as containing MNPI solely on that portion of the Platform designated for Private Side Lender Representatives and (ii) if the Borrowers have not indicated whether any information furnished by it pursuant to or in connection with this Agreement contains MNPI, the Administrative Agent reserves the right to post such information solely on that portion of the Platform designated for Private Side Lender Representatives.  The Borrowers agree to clearly designate all information provided to the Administrative Agent by or on behalf of the Borrowers that is suitable to be made available to Public Side Lender Representatives, and the Administrative Agent shall be entitled to rely on any such designation by the Borrowers without liability or responsibility for the independent verification thereof.

SECTION 9.19.   Intercreditor Agreement.  (a) Each of the Lenders and the other Secured Parties acknowledges that obligations of the Loan Parties under the ABL Credit Agreement are secured by Liens on assets of the Loan Parties that constitute Collateral and that the relative Lien priorities and other creditor rights of the Secured Parties and the secured parties under the ABL Credit Agreement will be set forth in the Intercreditor Agreement.  Each of the Lenders and the other Secured Parties hereby acknowledges that it has received a copy of the Intercreditor Agreement.  Each of the Lenders and the other Secured Parties hereby irrevocably authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, the Intercreditor Agreement and any documents relating thereto.

(a)     Each of the Lenders and the other Secured Parties hereby irrevocably (i) consents to the treatment of Liens provided for under the Intercreditor Agreement, including to the subordination of the Liens on the ABL Priority Collateral securing the Loan Document Obligations on the terms set forth in the Intercreditor Agreement, (ii) agrees that, upon the

106

UST-0226

execution and delivery thereof, such Secured Party will be bound by the provisions of the Intercreditor Agreement as if it were a signatory thereto and will take no actions contrary to the provisions of the Intercreditor Agreement, (iii) agrees that no Secured Party shall have any right of action whatsoever against the Administrative Agent as a result of any action taken by the Administrative Agent pursuant to this Section 9.19 or in accordance with the terms of the Intercreditor Agreement, (iv) authorizes and directs the Administrative Agent to carry out the provisions and intent of each such document and (v) authorizes and directs the Administrative Agent to take such actions as shall be required to release Liens on the Collateral in accordance with the terms of the Intercreditor Agreement.

(b)        Each of the Lenders and the other Secured Parties hereby irrevocably further authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, any amendments, supplements or other modifications of the Intercreditor Agreement that the Borrowers may from time to time request and that are reasonably acceptable to the Administrative Agent (i) to give effect to any establishment, incurrence, amendment, extension, renewal, refinancing or replacement of any Loan Document Obligations or the Indebtedness under the ABL Credit Agreement to the extent applicable, (ii) to confirm for any party that the Intercreditor Agreement is effective and binding upon the Administrative Agent on behalf of the Secured Parties or (iii) to effect any other amendment, supplement or modification permitted by the terms of the Intercreditor Agreement.

(c)        Each of the Lenders and the other Secured Parties hereby irrevocably further authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, any amendments, supplements or other modifications of any Collateral Document to add or remove any legend that may be required pursuant to the Intercreditor Agreement.

(d)        The Administrative Agent shall have the benefit of the provisions of Article VIII with respect to all actions taken by it pursuant to this Section or in accordance with the terms of the Intercreditor Agreement to the full extent thereof.

SECTION 9.20.    Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any related agreement, arrangement or understanding among the parties hereto, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)        the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder that may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)        the effects of any Bail-In Action on any such liability, including, if applicable:

LA\4104335.13

UST-0227

(i)  a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

[Signature pages follow]

LA\4104335.13

UST-0228

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**PARENT BORROWER:**

ASCENA RETAIL GROUP, INC.

By: _____
     Name:
     Title:

LA\4104335.13

UST-0229

**SUBSIDIARY BORROWER:**

ANNTAYLOR RETAIL, INC.

By: _____

    Name:

    Title:

LA\4104335.13

UST-0230

ALTER DOMUS (US) LLC,
as Administrative Agent,

By: _____
     Name:
     Title:

*[Signature Page to the Term Credit Agreement]*

UST-0231

## Schedule 2.01

## Commitments

| Lender | Commitment |
|--------|------------|
| [   ] | $            [   ],000,000 |
| **Total** | $            [   ],000,000 |

UST-0232

## Schedule 5.11
## Required Milestones

The Loan Parties shall use their reasonable best efforts to pursue and implement the Restructuring Transactions as defined in, and in accordance with, the RSA and shall, subject to the availability of the Court and as such time periods may be extended by the Required Lenders, achieve the following milestones:

(a)     the Petition Date has not occurred by 11:59 p.m. (Eastern Time) on July 23, 2020;

(b)     the Debtors have not filed the Rent Deferral Motion (as defined in the RSA) with the Court within three (3) calendar days of the Petition Date;

(c)     the Court has not entered the Cash Collateral Order (as defined in RSA) on an interim basis by the date that is five (5) Business Days after the Petition Date;

(d)     the Court has not entered the DIP Financing Order (as defined in the RSA) on a final basis by the date that is thirty-five (35) calendar days after the Petition Date;

(e)     the Court has not entered the Disclosure Statement Order (as defined in the RSA) by the date that is sixty (60) calendar days after the Petition Date;

(f)     solicitation of the Plan (as defined in the RSA) has not commenced by the date that is seventy (70) calendar days after the Petition Date;

(g)     the Court has not entered the Confirmation Order (as defined in the RSA) by the date that is one hundred ten (110) calendar days after the Petition Date; and

(h)     the Plan Effective Date (as defined in the RSA) has not occurred by the date that is one hundred thirty (130) calendar days after the Petition Date.

UST-0233

**Exhibit B**

<u>See Attached.</u>

UST-0234

# Exit Facility Term Sheet[1]

| | |
|---|---|
| **Borrowers:** | Reorganized Ascena Retail Group, Inc., a Delaware corporation (the "**Parent Borrower**") and AnnTaylor Retail, Inc., a Florida corporation (the "**Subsidiary Borrower**" and, together with the Parent Borrower, the "**Borrowers**"). |
| **Administrative Agent and Collateral Agent:** | Alter Domus (US) LLC (in its capacity as administrative agent, the "**Administrative Agent**", and in its capacity as collateral agent, the "**Collateral Agent**"). |
| **Lenders:** | Holders of DIP Term Facility Claims will receive First Out Term Loans and, together with other holders of Term Loan Claims, Last Out Term Loans (each as defined below), respectively, as set forth in the Proposed Plan (collectively, the "**Lenders**") |
| **Term Loan Facility:** | First lien senior secured term loan facility in an aggregate original principal amount of $400 million, denominated in US Dollars, consisting of: |

- $311.8 million of first-out term loans (the "**First Out Term Loan Facility**", the loans thereunder, the "**First Out Term Loans**" and the commitments thereunder, the "**First-Out Commitments**") converted in accordance with the Proposed Plan to holders of DIP Term Facility Claims; and

- $88.2 million of last-out term loans (the "**Last Out Term Loan Facility**", the loans thereunder, the "**Last Out Term Loans**" and the commitments thereunder, the "**Last-Out Commitments**") distributed to holders of Term Loan Claims in accordance with the Proposed Plan.

As used herein, "**Term Loan Facility**" means, collectively, the First Out Term Loan Facility and the Last Out Term Loan Facility. "**Commitments**" means, collectively, the First Out Commitments and the Last Out Commitments. "**Term Loans**" means, collectively, the First Out Term Loans and the Last Out Term Loans.

The First Out Term Loans will be "first out" in right of payment priority and the Last Out Term Loans will be "last out" in right of payment priority (in each case, as between the tranches of Term

---

[1] Capitalized terms used but not defined in this Exit Facility Term Sheet have the meanings ascribed to them in the Restructuring Support Agreement, dated as of July 23, 2020 (the "**Restructuring Support Agreement**") to which this Exit Facility Term Sheet is attached or the Proposed Plan attached as Exhibit B to the Restructuring Support Agreement.

UST-0235

Loans).  The First Out Term Loans and Last Out Term Loans shall be secured on a *pari passu* basis by the same lien on the Collateral (as defined below).

**Definitive Documentation:**

The definitive documentation for the Term Loan Facility (the "**Definitive Documentation**") shall, except as otherwise set forth herein, be based on the Term Credit Agreement, dated as of August 21, 2015 (as amended, supplemented or otherwise modified prior to the date hereof), by and among Ascena Retail Group, Inc., AnnTaylor Retail, Inc., certain subsidiaries of the Parent Borrower party thereto, Goldman Sachs Bank USA, as the administrative agent and the collateral agent, and certain lenders party thereto from time to time (the "**Prepetition Term Loan Credit Agreement**"), (i) as modified by the terms set forth herein, (ii) subject to modifications to reflect changes in law or accounting standards since the date of such precedent and administrative agency, collateral agency and operational requirements of the Administrative Agent and Collateral Agent and (iii) with such other terms and conditions as may be reasonably agreed between the Borrowers and the Required Consenting Stakeholders; provided that, except as otherwise agreed by the Required Consenting Stakeholders, the Definitive Documentation shall be substantially consistent with the documentation governing the Exit ABL Facility (other than (i) provisions that are specific to asset-based facilities, (ii) the financial covenants applicable thereto, (iii) cross-defaults with respect to the Term Loan Facility and (iv) such other terms mutually agreed between the Borrowers and the Required Consenting Stakeholders).  The Definitive Documentation shall be negotiated in good faith within a reasonable time period to be determined based on the expected date of Bankruptcy Court's entry into the Confirmation Order, with initial drafts of the Definitive Documentation to be prepared by counsel for the Consenting Stakeholders, which is Milbank LLP. This paragraph, collectively, is referred the here as the "**Documentation Principles**".

**Maturity Date:**

First Out Term Loans: 4 years after the Effective Date (the "**First Out Maturity Date**").

Last Out Term Loans: 5 years after the Effective Date (the "**Last Out Maturity Date**").

**Amortization:**

First Out Term Loans: Commencing with the last day of the first full calendar quarter following the Effective Date, the outstanding principal amount of the First Out Term Loans will be payable on each calendar quarter in equal amounts of (i) for each calendar quarter occurring on or prior to the second anniversary of the Effective Date, 1.00% *per annum* and (ii) for each calendar quarter

2

UST-0236

thereafter, 3.00% *per annum,* in each case of the original principal amount of the First Out Term Loans, with the remaining balance, together with all other amounts owed with respect thereto, payable on the First Out Maturity Date, subject to reduction pursuant to the prepayment provisions to be mutually agreed in the Definitive Documentation.

Last Out Term Loans:  The outstanding principal amount of the Last Out Term Loans will be payable on each calendar quarter in equal amounts of 1.00% *per annum* of the original principal amount of the Last Out Term  Loans, with the remaining balance, together with all other amounts owed with respect thereto, payable on the Last Out Maturity Date .

**Voluntary Prepayments:**    The Borrowers may make voluntary prepayments of the Term Loans, in each case, other than in connection with a repricing event, without premium or penalty, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of LIBOR borrowings other than on the last day of the relevant interest period.

**Mandatory Prepayments:**    Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles; provided that no prepayment shall be required pursuant to Section 2.09(c) thereof for any Excess Cash Flow (as defined in the Prepetition Term Loan Credit Agreement).

**Interest:**    With respect to the First Out Term Loans, at the Parent Borrower's election:

- ABR (defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement) *plus* 10.75% per annum in cash or Adjusted LIBO Rate (defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement) *plus* 11.75% per annum in cash (subject to a 0.00% per annum floor on ABR and a 1.00% *per annum* floor on the Adjusted LIBO Rate) .

With respect to the Last Out Term Loans, at the Parent Borrower's election:

- prior to the second anniversary of the Effective Date, ABR *plus* 2.00% *per annum* in cash and 8.00% *per annum* in kind ("**PIK**") or Adjusted LIBO Rate *plus* 2.50% *per annum* in cash and 8.50% PIK, and thereafter, ABR *plus* 10.00% *per annum* in cash or Adjusted LIBO Rate *plus* 11.00% *per annum* in cash

3

UST-0237

(in each case subject to a 0.00% *per annum* floor on ABR and a 1.00% *per annum* floor on the Adjusted LIBO Rate).

| | |
|---|---|
| **Prepayment Premium** | NC1/106.375%/103.1875%/par, with the Make-Whole Amount payable at an amount equal to the present value of the amount of interest that would have been paid on the principal amount of the Loans to and including the 3.5 year anniversary of the Closing Date (in each case, calculated on the basis of the interest rate with respect to the Loans then in effect, on a quarterly basis and on the basis of actual days elapsed over a year of three hundred sixty-five (365) days). The present value calculation shall be calculated using the discount rate equal to the Treasury Rate as of such repayment or prepayment date or date of required repayment plus fifty (50) basis points. The Prepayment Premium and Make-Whole Amount shall be payable upon any repricing event or acceleration. The Definitive Documentation shall contain a "Momentive" provision satisfactory to the Required Consenting Stakeholders. |
| **Guarantees:** | All obligations of the Borrowers under the definitive credit agreement for the Term Loan Facility (the "**Exit Credit Agreement**") and the related guarantee and collateral agreement, mortgage agreements and other collateral documents (together with the Exit Credit Agreement, the "**Loan Documents**") (collectively, the "**Borrowers Obligations**") will be unconditionally guaranteed jointly and severally on a senior basis (the "**Guarantees**") by the direct parent of the Borrower and each existing and subsequently acquired or organized direct or indirect Material Domestic Subsidiary, Material Foreign Subsidiary and, notwithstanding anything to the contrary herein, (x) each Luxembourg subsidiary, (y) each guarantor party to the Prepetition Term Loan Credit Agreement and (z) each subsidiary owning material intellectual property (or owning subsidiaries which own material intellectual property) or material real property of the company (the "**Subsidiary Guarantors**", together with the Borrowers, the "**Loan Parties**"); provided that, notwithstanding anything to the contrary herein, (i) the guarantor exclusions shall be limited to (a) immaterial domestic subsidiaries, (b) immaterial foreign subsidiaries (which, for avoidance of doubt, will not include any Luxembourg subsidiaries), (c) bona fide joint ventures with third parties, (d) any subsidiary that is prohibited by applicable law, rule or regulation or by any contractual obligation at the time such person becomes a subsidiary (and not entered into in contemplation of this clause (d) and for so long as such prohibition or restriction remains in effect), as applicable, from granting a guarantee or which would require governmental (including regulatory) consent, approval, license or authorization to provide such guarantee unless such consent, approval, license or |

4

UST-0238

authorization has been received, (e) any subsidiary acquired pursuant to an acquisition or other investment permitted by the Definitive Documentation that has assumed, permitted secured indebtedness not incurred in contemplation of such acquisition or other investment and any subsidiary thereof that guarantees such secured indebtedness, in each case to the extent and for so long as such secured and (f) circumstances where the Borrowers and the Administrative Agent reasonably agree that the cost of providing such a guarantee is excessive in relation to the value afforded thereby and (ii) the Definitive Documentation shall not permit any unrestricted subsidiaries.

"**CFC**" shall mean any direct or indirect Foreign Subsidiary of any Borrower that is a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code of 1986, as amended (the "Code").

"**CFC Holdco**" shall mean any direct or indirect subsidiary of any Borrower, which subsidiary is treated as a disregarded entity for U.S. federal income tax purposes and substantially all of the assets of which consist of the equity interests in and/or indebtedness issued by one or more Foreign Subsidiaries that are CFCs."

"**Material Domestic Subsidiary**" shall be defined to include any subsidiary organized in the U.S. with total assets or EBITDA in excess of 2.5% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis; provided, that at no time shall the aggregate total assets or EBITDA of all Material Domestic Subsidiaries, taken together, account for more than 5.0% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis.

"**Material Foreign Subsidiary**" shall be defined to include any Luxembourg subsidiary and any other subsidiary organized in a non-U.S. jurisdiction where the total assets or EBITDA associated with such jurisdiction (in the aggregate for all subsidiaries organized therein) exceeds 2.5% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis. Notwithstanding the foregoing or anything to the contrary in this term sheet, any guarantee granted by any CFC shall be terminated (and no more than 65% of the voting stock of any Material Foreign Subsidiary shall be Collateral) for so long as such guarantee and/or pledge of the additional Collateral shall cause (or is reasonably expected to cause) any U.S. shareholder of such CFC to include in income for any year any Section 956 Income that is in excess of the Income Threshold (as defined below).

5

UST-0239

Notwithstanding the foregoing or anything to the contrary in this term sheet, any guarantee granted by any CFC Holdco shall be terminated (and no more than 65% of the voting stock of any CFC Holdco shall be Collateral) for so long as such guarantee and/or pledge of the additional Collateral shall cause (or is reasonably expected to cause) any U.S. shareholder of such CFC Holdco to include in income for any year an amount (after accounting for any reduction under the rules of Treas. Reg. § 1.956-1 and Section 245A of the Code) under Section 956 of the Code ("**Section 956 Income**") that is in excess of the Income Threshold.  The "**Income Threshold**" shall mean, with respect to any CFC Holdco or CFC, as applicable, an amount to be mutually agreed.

"**subsidiary(ies)**" has the meaning assigned to such term in the Pre-Petition Credit Agreement.

|  |  |
|---|---|
| **Security:** | Subject to the intercreditor agreement described below under "**Intercreditor Agreement**" and other customary limitations and exclusions to be mutually agreed, the Borrowers Obligations and the Guarantees (collectively the "**Secured Obligations**") will be secured on a first priority basis by substantially all assets of the Loan Parties (collectively, the "**Collateral**"); provided that, notwithstanding anything to the contrary set forth herein (i) all cash and cash equivalents held in accounts (other than customary excluded accounts) in the name of any Loan Party shall be subject to account control agreements in favor of the Collateral Agent (or for so long as the Exit ABL Facility and ABL Intercreditor are in effect, in favor of the ABL Agent), (ii) all equity in the Borrowers, all domestic (including immaterial) subsidiaries, all Luxembourg subsidiaries, all foreign subsidiaries and all Material Foreign Subsidiaries shall at all times be included in the Collateral and (iii) all material intellectual property and material real property shall at all times be included in the Collateral.  The pledge of, security interest in, and mortgages on, the Collateral granted by each Loan Party shall secure its own respective Secured Obligations. |

All of the foregoing described in this section and the "Guarantees" section above, the "**Collateral and Guarantee Requirement**".

|  |  |
|---|---|
| **Conditions to Borrowings:** | The availability of the Term Loans under the Exit Credit Agreement will be subject solely to satisfaction (or waiver) of the following conditions (the date on which such conditions are satisfied (or waived) being the "**Effective Date**"): |

- execution and delivery of the Definitive Documentation to be delivered at closing;

6

UST-0240

- delivery of promissory notes to the Lenders, if requested at least two (2) Business Days before the Effective Date;

- delivery of board resolutions and organizational documents of the Loan Parties;

- delivery of incumbency/specimen signature certificate of the Loan Parties;

- delivery of customary legal opinions by counsel to the Borrowers;

- there shall not have occurred since the Petition Date any event or condition that has had or would be reasonably expected, either individually or in the aggregate, to have a Material Adverse Effect (for purposes of this condition, defined in a manner based on the Prepetition Term Loan Credit Agreement but including a proviso stating that in determining whether a "Material Adverse Effect" has occurred or exists under clause (a) thereof, the impacts of the chapter 11 cases and of COVID-19 on the assets, business, financial condition or results of operations on the Loan Parties or any of their respective Subsidiaries will be disregarded (provided that this exception shall not apply to the extent that it is materially disproportionately adverse to the Parent Borrower and its Restricted Subsidiaries, taken as a whole, as compared to other companies in the same industry in which the Parent Borrower and its Restricted Subsidiaries operate));

- the Administrative Agent shall have received a certificate (in substantially the same form as the corresponding certificate delivered in connection with the Prepetition Term Loan Credit Agreement) of the chief financial officer (or financial officer in a similar role) of the Parent Borrower, stating that it and its subsidiaries, taken as a whole, as of the Effective Date, are solvent, in each case, after giving effect to the consummation of the Plan;

- all fees due to the Administrative Agent, Collateral Agent and Lenders including advisors to the Consenting Stakeholders, Greenhill & Co. and Milbank LLP, shall have been paid (or shall have been caused to be paid), and all expenses to be paid or reimbursed to the Administrative Agent, Collateral Agent and Lenders that have been invoiced at least three (3) Business Days prior to the

7

UST-0241

Effective Date shall have been paid (or shall have been caused to be paid);

- the Loan Parties shall have provided the documentation and other information to the Administrative Agent that are required by regulatory authorities under applicable "know-your-customer" rules and regulations, including the Patriot Act, at least three (3) Business Days prior to the Effective Date (or such later date agreed to by the Administrative Agent) to the extent requested ten (10) days prior to the Effective Date;

- the Bankruptcy Court shall have entered (A) the Confirmation Order and (B) one or more orders authorizing and approving the extensions of credit in respect of the Exit Credit Agreement, each in the amounts and on the terms set forth herein, and all transactions contemplated by the Exit Credit Agreement, and, in each case, such orders shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified;

- the Collateral and Guarantee Requirement (excluding certain customary post-closing items to be mutually agreed) shall have been satisfied or waived and the Intercreditor Agreement and the Agreement Among Lenders shall have been executed and delivered and be in full force and effect;

- the effective date under the Plan shall have occurred, or contemporaneous with the conversion of the DIP Term Facility to the Term Loan Facility shall occur, and all conditions precedent thereto as set forth therein shall have been satisfied or waived (including (x) the issuance to (i) the holders of DIP Term Facility Claims of 44.9% of the New Common Stock, subject to dilution from the Management Incentive Plan and (ii) the holders of Term Loan Claims of 55.1% of New Common Stock (subject to reduction for New Common Stock distrusted in accordance with the following clause (y)) and (y) each holder of a Term Loan Claim that is a Required Consenting Stakeholder (including through any of its Related Parties) having received its pro rata share of an amount of New Common Stock equal to $7.5 million, in each case shall have occurred substantially contemporaneously with the closing of the Term Loan Facility);

- the Pre-Petition ABL Credit Agreement shall have been replaced with a new credit agreement providing asset-based

8

UST-0242

lending facilities for working capital and other general corporate purposes of the Borrowers and its subsidiaries on terms and conditions reasonably acceptable to the Required Consenting Stakeholders (any such credit agreement, the "**Exit ABL Credit Agreement**", and the facility in place as of the Effective Date under either the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, the "**Exit ABL Facility**");

- (i) with respect to Catherine's business segment either completion of a liquidation or consummation of a sale transaction as a going concern to a third party on terms satisfactory to the Required Consenting Stakeholders, and (ii) with respect to the Justice business segment, either completion of a liquidation, consummation of a sale transaction as a going concern to a third party or consummation of a reorganization of the business segment, in each case on terms reasonably satisfactory to the Required Consenting Stakeholders, in each case on or prior to the Effective Date;

- minimum pro forma Liquidity (as defined in the DIP Term Facility), calculated after giving effect to the restructuring transactions and effectiveness of the Plan, of at least $150 million (pro forma for the occurrence of the Effective Date and related transactions, including after taking into account all restructuring expenses (including professional fees) that are paid post emergence and the availability of the Exit ABL Facility and any incurrence of loans thereunder);

- with respect to store leases which are not rejected, aggregate annual cost savings for FY2020 of at least $18 million, calculated in a manner consistent with how "Occupancy Cost Savings" are calculated in the Real Estate Services Agreement dated as of May 1, 2020 by and between A&G Realty Partners, LLC and the Parent Borrower;

- with respect to the Premium segment and Lane Bryant (in aggregate), the number of store closures that shall have occurred prior to the Effective Date shall be consistent with the closures anticipated under the Company's business plan provided to the Ad Hoc Committee Advisors (as determined by the Ad Hoc Committee Advisors in their reasonable discretion) or as otherwise consented to by the Required Consenting Stakeholders;

9

UST-0243

- all pre-Petition transfers of intellectual property to the LuxCo Entities shall have been unwound and all licensing arrangements with respect thereto shall have been cancelled, in each case on terms reasonably satisfactory to the Required Consenting Stakeholders and all such intellectual property shall be owned and registered in the name of Annco, Inc., unless the Required Consenting Stakeholders and the Company mutually agree that the cost, difficulty, burden or consequences of such transfer and/or cancelation exceeds the practical benefits to the Lenders afforded thereby and cannot be completed in a tax efficient manner;

- the accuracy of representations and warranties in all material respects (without duplication of any materiality qualifier) on the Effective Date (except to the extent any such representation or warranty is stated to relate solely to an earlier date, in which case such representation or warranty shall be true and correct in all material respects (without duplication of any materiality qualifier) as of such earlier date; and

- the absence of the existence of any default or event of default.

| | |
|---|---|
| **Representations and Warranties:** | Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles. |
| **Affirmative Covenants:** | Usual and customary, subject to the Documentation Principles; provided that (i) financial reporting shall include (a) unaudited monthly internally generated financial statements and "flash reports", together with certain KPI reports for each banner to be agreed (with such KPI report requirement to fall away upon the Parent Borrower and its subsidiaries achieving a consolidated total leverage ratio for four (4) consecutive fiscal quarters of not more than 1.50:1.00, (b) unaudited quarterly (for all four quarters) and audited annual financial statements, (c) quarterly MD&A and (d) an annual budget, (ii) the annual lender call referenced therein shall be revised to quarterly lender calls and (iii) the Parent Borrower shall use commercially reasonable efforts to obtain credit ratings by each of Standard & Poor's Rating Services and Moody's Investors Service, Inc. prior to the Effective Date, it being understood that there shall be no obligation to maintain any particular rating at any time. |
| **Negative Covenants:** | Usual and customary, subject to the Documentation Principles and subject to customary and usual exceptions, qualifications and |

10

UST-0244

"baskets" to be mutually agreed and set forth in the Exit Credit Agreement, which shall include a customary cumulative credit basket.

**Financial Covenant:**  First Out Term Loans:

- Total leverage ratio at levels to be agreed amongst the Company and the Initial Consenting Stakeholders, which shall be tested quarterly commencing at the end of the first full fiscal quarter following the Effective Date.

- Minimum liquidity covenant, which shall take into account unrestricted cash and ABL availability (based on borrowing base) at levels to be agreed amongst the Company and the Required Consenting Stakeholders, which shall be maintained at all times.

- All expenses in connection with the Chapter 11 filing shall be added back to the calculation of EBITDA (to be defined in the Definitive Documentation, subject to the Documentation Principles). Component definitions for determining total leverage ratio are to be agreed amongst the Company and the Required Consenting Stakeholders.

Last Out Term Loans: total leverage ratio, subject to a cushion relative to the First Out Term Loan levels that is acceptable to the Company and the Required Consenting Stakeholders.

**Unrestricted Subsidiaries:**  None.

**Events of Default:**  Usual and customary for transactions of this type, subject to the Documentation Principles and to include a full cross-default to the Exit ABL Facility. Defaults in respect of a Financial Covenant shall be subject to customary equity cure rights.

**Voting:**  Usual and customary for transactions of this type, subject to the Documentation Principles and the Agreement Among Lenders, but with First Out Lenders and Last Out Lenders voting as a single class; provided that (i) there shall be no limitation on voting by lenders that are affiliates of the Borrowers and (ii) any majority lender vote shall require the affirmative vote of at least two un-affiliated institutions.

UST-0245

| | |
|---|---|
| **Required Lenders** | Lenders having Term Loans outstanding that, taken together, represent more than 50% of the sum of all Term Loans outstanding at such time. |
| **Intercreditor Agreement:** | Usual and customary for transactions of this type, subject to the Documentation Principles and based on that certain ABL Intercreditor Agreement, dated as of August 21, 2015, among the ABL Agent, the Term Loan Agent, and the other parties thereto, except as otherwise agreed by the Required Consenting Term Loan Lenders. |
| **Agreement Among Lenders:** | To be entered into among the lenders under the First Out Term Loan Facility, the lenders under the Last Out Term Loan Facility and the Parent Borrower or, to be set forth in the Exit Credit Agreement and to provide that, with respect to any amendment, waiver, consent or other action, including the exercise of remedies or the provision of future DIP financings, the Last Out Lenders shall vote in the same manner as the First Out Lenders, other than with respect to amendments, waivers, consents or with respect to certain economic terms which are customarily all-lender votes. |
| **Cost and Yield Protection:** | Usual and customary for transactions of this type, subject to the Documentation Principles. |
| **Defaulting Lenders:** | Usual and customary for transactions of this type, subject to the Documentation Principles. |
| **Assignments and Participations:** | Usual and customary for transactions of this type, subject to the Documentation Principles and permitting loan buy-backs and Dutch auctions on customary terms; provided that there shall be no restrictions on holdings by lenders that are affiliates of the Borrowers. |
| **Refinancing, Extension and Replacement Facilities** | Usual and customary provisions providing for the ability to refinance, extend or replace loans or any class of loans under the Term Loan Facility from time to time, in whole or part, with one or more new debt facilities. |
| **Expenses and Indemnification:** | Usual and customary for transactions of this type, subject to the Documentation Principles (including, but limited to, the reasonable fees and expenses of no more than one counsel to the Required Lenders (other than the Administrative Agent), which counsel shall be Milbank LLP, and one counsel to the Administrative Agent and one local counsel for the Required Lenders in each relevant jurisdiction (other than the Administrative Agent) and one local counsel for the Administrative agent in each relevant jurisdiction. |

UST-0246

**Governing Law and Forum:**          New York.

UST-0247

**EXHIBIT D**

**Exit Facility Term Sheet**

UST-0248

# Exit Facility Term Sheet[1]

| | |
|---|---|
| **Borrowers:** | Reorganized Ascena Retail Group, Inc., a Delaware corporation (the "**Parent Borrower**") and AnnTaylor Retail, Inc., a Florida corporation (the "**Subsidiary Borrower**" and, together with the Parent Borrower, the "**Borrowers**"). |
| **Administrative Agent and Collateral Agent:** | Alter Domus (US) LLC (in its capacity as administrative agent, the "**Administrative Agent**", and in its capacity as collateral agent, the "**Collateral Agent**"). |
| **Lenders:** | Holders of DIP Term Facility Claims will receive First Out Term Loans and, together with other holders of Term Loan Claims, Last Out Term Loans (each as defined below), respectively, as set forth in the Proposed Plan (collectively, the "**Lenders**") |
| **Term Loan Facility:** | First lien senior secured term loan facility in an aggregate original principal amount of $400 million, denominated in US Dollars, consisting of: |

- $311.8 million of first-out term loans (the "**First Out Term Loan Facility**", the loans thereunder, the "**First Out Term Loans**" and the commitments thereunder, the "**First-Out Commitments**") converted in accordance with the Proposed Plan to holders of DIP Term Facility Claims; and

- $88.2 million of last-out term loans (the "**Last Out Term Loan Facility**", the loans thereunder, the "**Last Out Term Loans**" and the commitments thereunder, the "**Last-Out Commitments**") distributed to holders of Term Loan Claims in accordance with the Proposed Plan.

As used herein, "**Term Loan Facility**" means, collectively, the First Out Term Loan Facility and the Last Out Term Loan Facility. "**Commitments**" means, collectively, the First Out Commitments and the Last Out Commitments. "**Term Loans**" means, collectively, the First Out Term Loans and the Last Out Term Loans.

The First Out Term Loans will be "first out" in right of payment priority and the Last Out Term Loans will be "last out" in right of payment priority (in each case, as between the tranches of Term

---

[1] Capitalized terms used but not defined in this Exit Facility Term Sheet have the meanings ascribed to them in the Restructuring Support Agreement, dated as of July 23, 2020 (the "**Restructuring Support Agreement**") to which this Exit Facility Term Sheet is attached or the Proposed Plan attached as Exhibit B to the Restructuring Support Agreement.

UST-0249

Loans). The First Out Term Loans and Last Out Term Loans shall be secured on a *pari passu* basis by the same lien on the Collateral (as defined below).

| | |
|---|---|
| **Definitive Documentation:** | The definitive documentation for the Term Loan Facility (the "**Definitive Documentation**") shall, except as otherwise set forth herein, be based on the Term Credit Agreement, dated as of August 21, 2015 (as amended, supplemented or otherwise modified prior to the date hereof), by and among Ascena Retail Group, Inc., AnnTaylor Retail, Inc., certain subsidiaries of the Parent Borrower party thereto, Goldman Sachs Bank USA, as the administrative agent and the collateral agent, and certain lenders party thereto from time to time (the "**Prepetition Term Loan Credit Agreement**"), (i) as modified by the terms set forth herein, (ii) subject to modifications to reflect changes in law or accounting standards since the date of such precedent and administrative agency, collateral agency and operational requirements of the Administrative Agent and Collateral Agent and (iii) with such other terms and conditions as may be reasonably agreed between the Borrowers and the Required Consenting Stakeholders; provided that, except as otherwise agreed by the Required Consenting Stakeholders, the Definitive Documentation shall be substantially consistent with the documentation governing the Exit ABL Facility (other than (i) provisions that are specific to asset-based facilities, (ii) the financial covenants applicable thereto, (iii) cross-defaults with respect to the Term Loan Facility and (iv) such other terms mutually agreed between the Borrowers and the Required Consenting Stakeholders). The Definitive Documentation shall be negotiated in good faith within a reasonable time period to be determined based on the expected date of Bankruptcy Court's entry into the Confirmation Order, with initial drafts of the Definitive Documentation to be prepared by counsel for the Consenting Stakeholders, which is Milbank LLP. This paragraph, collectively, is referred the here as the "**Documentation Principles**". |
| **Maturity Date:** | First Out Term Loans: 4 years after the Effective Date (the "**First Out Maturity Date**"). |
| | Last Out Term Loans: 5 years after the Effective Date (the "**Last Out Maturity Date**"). |
| **Amortization:** | First Out Term Loans: Commencing with the last day of the first full calendar quarter following the Effective Date, the outstanding principal amount of the First Out Term Loans will be payable on each calendar quarter in equal amounts of (i) for each calendar quarter occurring on or prior to the second anniversary of the Effective Date, 1.00% *per annum* and (ii) for each calendar quarter |

2

UST-0250

thereafter, 3.00% *per annum,* in each case of the original principal amount of the First Out Term Loans, with the remaining balance, together with all other amounts owed with respect thereto, payable on the First Out Maturity Date, subject to reduction pursuant to the prepayment provisions to be mutually agreed in the Definitive Documentation.

Last Out Term Loans:  The outstanding principal amount of the Last Out Term Loans will be payable on each calendar quarter in equal amounts of 1.00% *per annum* of the original principal amount of the Last Out Term  Loans, with the remaining balance, together with all other amounts owed with respect thereto, payable on the Last Out Maturity Date .

| | |
|---|---|
| **Voluntary Prepayments:** | The Borrowers may make voluntary prepayments of the Term Loans, in each case, other than in connection with a repricing event, without premium or penalty, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of LIBOR borrowings other than on the last day of the relevant interest period. |
| **Mandatory Prepayments:** | Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles; provided that no prepayment shall be required pursuant to Section 2.09(c) thereof for any Excess Cash Flow (as defined in the Prepetition Term Loan Credit Agreement). |
| **Interest:** | With respect to the First Out Term Loans, at the Parent Borrower's election: |

- ABR (defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement) *plus* 10.75% per annum in cash or Adjusted LIBO Rate (defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement) *plus* 11.75% per annum in cash (subject to a 0.00% per annum floor on ABR and a 1.00% *per annum* floor on the Adjusted LIBO Rate) .

With respect to the Last Out Term Loans, at the Parent Borrower's election:

- prior to the second anniversary of the Effective Date, ABR *plus* 2.00% *per annum* in cash and 8.00% *per annum* in kind ("**PIK**") or Adjusted LIBO Rate *plus* 2.50% *per annum* in cash and 8.50% PIK, and thereafter, ABR *plus* 10.00% *per annum* in cash or Adjusted LIBO Rate *plus* 11.00% *per annum* in cash

3

UST-0251

(in each case subject to a 0.00% *per annum* floor on ABR and a 1.00% *per annum* floor on the Adjusted LIBO Rate).

**Prepayment Premium**

NC1/106.375%/103.1875%/par, with the Make-Whole Amount payable at an amount equal to the present value of the amount of interest that would have been paid on the principal amount of the Loans to and including the 3.5 year anniversary of the Closing Date (in each case, calculated on the basis of the interest rate with respect to the Loans then in effect, on a quarterly basis and on the basis of actual days elapsed over a year of three hundred sixty-five (365) days). The present value calculation shall be calculated using the discount rate equal to the Treasury Rate as of such repayment or prepayment date or date of required repayment plus fifty (50) basis points. The Prepayment Premium and Make-Whole Amount shall be payable upon any repricing event or acceleration. The Definitive Documentation shall contain a "Momentive" provision satisfactory to the Required Consenting Stakeholders.

**Guarantees:**

All obligations of the Borrowers under the definitive credit agreement for the Term Loan Facility (the "**Exit Credit Agreement**") and the related guarantee and collateral agreement, mortgage agreements and other collateral documents (together with the Exit Credit Agreement, the "**Loan Documents**") (collectively, the "**Borrowers Obligations**") will be unconditionally guaranteed jointly and severally on a senior basis (the "**Guarantees**") by the direct parent of the Borrower and each existing and subsequently acquired or organized direct or indirect Material Domestic Subsidiary, Material Foreign Subsidiary and, notwithstanding anything to the contrary herein, (x) each Luxembourg subsidiary, (y) each guarantor party to the Prepetition Term Loan Credit Agreement and (z) each subsidiary owning material intellectual property (or owning subsidiaries which own material intellectual property) or material real property of the company (the "**Subsidiary Guarantors**", together with the Borrowers, the "**Loan Parties**"); provided that, notwithstanding anything to the contrary herein, (i) the guarantor exclusions shall be limited to (a) immaterial domestic subsidiaries, (b) immaterial foreign subsidiaries (which, for avoidance of doubt, will not include any Luxembourg subsidiaries), (c) bona fide joint ventures with third parties, (d) any subsidiary that is prohibited by applicable law, rule or regulation or by any contractual obligation at the time such person becomes a subsidiary (and not entered into in contemplation of this clause (d) and for so long as such prohibition or restriction remains in effect), as applicable, from granting a guarantee or which would require governmental (including regulatory) consent, approval, license or authorization to provide such guarantee unless such consent, approval, license or

4

UST-0252

authorization has been received, (e) any subsidiary acquired pursuant to an acquisition or other investment permitted by the Definitive Documentation that has assumed, permitted secured indebtedness not incurred in contemplation of such acquisition or other investment and any subsidiary thereof that guarantees such secured indebtedness, in each case to the extent and for so long as such secured and (f) circumstances where the Borrowers and the Administrative Agent reasonably agree that the cost of providing such a guarantee is excessive in relation to the value afforded thereby and (ii) the Definitive Documentation shall not permit any unrestricted subsidiaries.

"**CFC**" shall mean any direct or indirect Foreign Subsidiary of any Borrower that is a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code of 1986, as amended (the "Code").

"**CFC Holdco**" shall mean any direct or indirect subsidiary of any Borrower, which subsidiary is treated as a disregarded entity for U.S. federal income tax purposes and substantially all of the assets of which consist of the equity interests in and/or indebtedness issued by one or more Foreign Subsidiaries that are CFCs."

"**Material Domestic Subsidiary**" shall be defined to include any subsidiary organized in the U.S. with total assets or EBITDA in excess of 2.5% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis; provided, that at no time shall the aggregate total assets or EBITDA of all Material Domestic Subsidiaries, taken together, account for more than 5.0% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis.

"**Material Foreign Subsidiary**" shall be defined to include any Luxembourg subsidiary and any other subsidiary organized in a non-U.S. jurisdiction where the total assets or EBITDA associated with such jurisdiction (in the aggregate for all subsidiaries organized therein) exceeds 2.5% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis. Notwithstanding the foregoing or anything to the contrary in this term sheet, any guarantee granted by any CFC shall be terminated (and no more than 65% of the voting stock of any Material Foreign Subsidiary shall be Collateral) for so long as such guarantee and/or pledge of the additional Collateral shall cause (or is reasonably expected to cause) any U.S. shareholder of such CFC to include in income for any year any Section 956 Income that is in excess of the Income Threshold (as defined below).

5

UST-0253

Notwithstanding the foregoing or anything to the contrary in this term sheet, any guarantee granted by any CFC Holdco shall be terminated (and no more than 65% of the voting stock of any CFC Holdco shall be Collateral) for so long as such guarantee and/or pledge of the additional Collateral shall cause (or is reasonably expected to cause) any U.S. shareholder of such CFC Holdco to include in income for any year an amount (after accounting for any reduction under the rules of Treas. Reg. § 1.956-1 and Section 245A of the Code) under Section 956 of the Code ("**Section 956 Income**") that is in excess of the Income Threshold. The "**Income Threshold**" shall mean, with respect to any CFC Holdco or CFC, as applicable, an amount to be mutually agreed.

"**subsidiary(ies)**" has the meaning assigned to such term in the Pre-Petition Credit Agreement.

**Security:** Subject to the intercreditor agreement described below under "**Intercreditor Agreement**" and other customary limitations and exclusions to be mutually agreed, the Borrowers Obligations and the Guarantees (collectively the "**Secured Obligations**") will be secured on a first priority basis by substantially all assets of the Loan Parties (collectively, the "**Collateral**"); provided that, notwithstanding anything to the contrary set forth herein (i) all cash and cash equivalents held in accounts (other than customary excluded accounts) in the name of any Loan Party shall be subject to account control agreements in favor of the Collateral Agent (or for so long as the Exit ABL Facility and ABL Intercreditor are in effect, in favor of the ABL Agent), (ii) all equity in the Borrowers, all domestic (including immaterial) subsidiaries, all Luxembourg subsidiaries, all foreign subsidiaries and all Material Foreign Subsidiaries shall at all times be included in the Collateral and (iii) all material intellectual property and material real property shall at all times be included in the Collateral. The pledge of, security interest in, and mortgages on, the Collateral granted by each Loan Party shall secure its own respective Secured Obligations.

All of the foregoing described in this section and the "Guarantees" section above, the "**Collateral and Guarantee Requirement**".

**Conditions to Borrowings:** The availability of the Term Loans under the Exit Credit Agreement will be subject solely to satisfaction (or waiver) of the following conditions (the date on which such conditions are satisfied (or waived) being the "**Effective Date**"):

- execution and delivery of the Definitive Documentation to be delivered at closing;

6

UST-0254

- delivery of promissory notes to the Lenders, if requested at least two (2) Business Days before the Effective Date;

- delivery of board resolutions and organizational documents of the Loan Parties;

- delivery of incumbency/specimen signature certificate of the Loan Parties;

- delivery of customary legal opinions by counsel to the Borrowers;

- there shall not have occurred since the Petition Date any event or condition that has had or would be reasonably expected, either individually or in the aggregate, to have a Material Adverse Effect (for purposes of this condition, defined in a manner based on the Prepetition Term Loan Credit Agreement but including a proviso stating that in determining whether a "Material Adverse Effect" has occurred or exists under clause (a) thereof, the impacts of the chapter 11 cases and of COVID-19 on the assets, business, financial condition or results of operations on the Loan Parties or any of their respective Subsidiaries will be disregarded (provided that this exception shall not apply to the extent that it is materially disproportionately adverse to the Parent Borrower and its Restricted Subsidiaries, taken as a whole, as compared to other companies in the same industry in which the Parent Borrower and its Restricted Subsidiaries operate));

- the Administrative Agent shall have received a certificate (in substantially the same form as the corresponding certificate delivered in connection with the Prepetition Term Loan Credit Agreement) of the chief financial officer (or financial officer in a similar role) of the Parent Borrower, stating that it and its subsidiaries, taken as a whole, as of the Effective Date, are solvent, in each case, after giving effect to the consummation of the Plan;

- all fees due to the Administrative Agent, Collateral Agent and Lenders including advisors to the Consenting Stakeholders, Greenhill & Co. and Milbank LLP, shall have been paid (or shall have been caused to be paid), and all expenses to be paid or reimbursed to the Administrative Agent, Collateral Agent and Lenders that have been invoiced at least three (3) Business Days prior to the

UST-0255

Effective Date shall have been paid  (or shall have been caused to be paid);

- the Loan Parties shall have provided the documentation and other information to the Administrative Agent that are required by regulatory authorities under applicable "know-your-customer" rules and regulations, including the Patriot Act, at least three (3) Business Days prior to the Effective Date (or such later date agreed to by the Administrative Agent) to the extent requested ten (10) days prior to the Effective Date;

- the Bankruptcy Court shall have entered (A) the Confirmation Order and (B) one or more orders authorizing and approving the extensions of credit in respect of the Exit Credit Agreement, each in the amounts and on the terms set forth herein, and all transactions contemplated by the Exit Credit Agreement, and, in each case, such orders shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified;

- the Collateral and Guarantee Requirement (excluding certain customary post-closing items to be mutually agreed) shall have been satisfied or waived and the Intercreditor Agreement and the Agreement Among Lenders shall have been executed and delivered and be in full force and effect;

- the effective date under the Plan shall have occurred, or contemporaneous with the conversion of the DIP Term Facility to the Term Loan Facility shall occur, and all conditions precedent thereto as set forth therein shall have been satisfied or waived (including (x) the issuance to (i) the holders of DIP Term Facility Claims of 44.9% of the New Common Stock, subject to dilution from the Management Incentive Plan and (ii) the holders of Term Loan Claims of 55.1% of New Common Stock (subject to reduction for New Common Stock distrusted in accordance with the following clause (y)) and (y) each holder of a Term Loan Claim that is a Required Consenting Stakeholder (including through any of its Related Parties) having received its pro rata share of an amount of New Common Stock equal to $7.5 million, in each case shall have occurred substantially contemporaneously with the closing of the Term Loan Facility);

- the Pre-Petition ABL Credit Agreement shall have been replaced with a new credit agreement providing asset-based

8

UST-0256

lending facilities for working capital and other general corporate purposes of the Borrowers and its subsidiaries on terms and conditions reasonably acceptable to the Required Consenting Stakeholders (any such credit agreement, the "**Exit ABL Credit Agreement**", and the facility in place as of the Effective Date under either the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, the "**Exit ABL Facility**");

- (i) with respect to Catherine's business segment either completion of a liquidation or consummation of a sale transaction as a going concern to a third party on terms satisfactory to the Required Consenting Stakeholders, and (ii) with respect to the Justice business segment, either completion of a liquidation, consummation of a sale transaction as a going concern to a third party or consummation of a reorganization of the business segment, in each case on terms reasonably satisfactory to the Required Consenting Stakeholders, in each case on or prior to the Effective Date;

- minimum pro forma Liquidity (as defined in the DIP Term Facility), calculated after giving effect to the restructuring transactions and effectiveness of the Plan, of at least $150 million (pro forma for the occurrence of the Effective Date and related transactions, including after taking into account all restructuring expenses (including professional fees) that are paid post emergence and the availability of the Exit ABL Facility and any incurrence of loans thereunder);

- with respect to store leases which are not rejected, aggregate annual cost savings for FY2020 of at least $18 million, calculated in a manner consistent with how "Occupancy Cost Savings" are calculated in the Real Estate Services Agreement dated as of May 1, 2020 by and between A&G Realty Partners, LLC and the Parent Borrower;

- with respect to the Premium segment and Lane Bryant (in aggregate), the number of store closures that shall have occurred prior to the Effective Date shall be consistent with the closures anticipated under the Company's business plan provided to the Ad Hoc Committee Advisors (as determined by the Ad Hoc Committee Advisors in their reasonable discretion) or as otherwise consented to by the Required Consenting Stakeholders;

9

UST-0257

- all pre-Petition transfers of intellectual property to the LuxCo Entities shall have been unwound and all licensing arrangements with respect thereto shall have been cancelled, in each case on terms reasonably satisfactory to the Required Consenting Stakeholders and all such intellectual property shall be owned and registered in the name of Annco, Inc., unless the Required Consenting Stakeholders and the Company mutually agree that the cost, difficulty, burden or consequences of such transfer and/or cancelation exceeds the practical benefits to the Lenders afforded thereby and cannot be completed in a tax efficient manner;

- the accuracy of representations and warranties in all material respects (without duplication of any materiality qualifier) on the Effective Date (except to the extent any such representation or warranty is stated to relate solely to an earlier date, in which case such representation or warranty shall be true and correct in all material respects (without duplication of any materiality qualifier) as of such earlier date; and

- the absence of the existence of any default or event of default.

| | |
|---|---|
| **Representations and Warranties:** | Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles. |
| **Affirmative Covenants:** | Usual and customary, subject to the Documentation Principles; provided that (i) financial reporting shall include (a) unaudited monthly internally generated financial statements and "flash reports", together with certain KPI reports for each banner to be agreed (with such KPI report requirement to fall away upon the Parent Borrower and its subsidiaries achieving a consolidated total leverage ratio for four (4) consecutive fiscal quarters of not more than 1.50:1.00, (b) unaudited quarterly (for all four quarters) and audited annual financial statements, (c) quarterly MD&A and (d) an annual budget, (ii) the annual lender call referenced therein shall be revised to quarterly lender calls and (iii) the Parent Borrower shall use commercially reasonable efforts to obtain credit ratings by each of Standard & Poor's Rating Services and Moody's Investors Service, Inc. prior to the Effective Date, it being understood that there shall be no obligation to maintain any particular rating at any time. |
| **Negative Covenants:** | Usual and customary, subject to the Documentation Principles and subject to customary and usual exceptions, qualifications and |

10

UST-0258

"baskets" to be mutually agreed and set forth in the Exit Credit Agreement, which shall include a customary cumulative credit basket.

| | |
|---|---|
| **Financial Covenant:** | First Out Term Loans: |

- Total leverage ratio at levels to be agreed amongst the Company and the Initial Consenting Stakeholders, which shall be tested quarterly commencing at the end of the first full fiscal quarter following the Effective Date.

- Minimum liquidity covenant, which shall take into account unrestricted cash and ABL availability (based on borrowing base) at levels to be agreed amongst the Company and the Required Consenting Stakeholders, which shall be maintained at all times.

- All expenses in connection with the Chapter 11 filing shall be added back to the calculation of EBITDA (to be defined in the Definitive Documentation, subject to the Documentation Principles). Component definitions for determining total leverage ratio are to be agreed amongst the Company and the Required Consenting Stakeholders.

Last Out Term Loans: total leverage ratio, subject to a cushion relative to the First Out Term Loan levels that is acceptable to the Company and the Required Consenting Stakeholders.

| | |
|---|---|
| **Unrestricted Subsidiaries:** | None. |
| **Events of Default:** | Usual and customary for transactions of this type, subject to the Documentation Principles and to include a full cross-default to the Exit ABL Facility. Defaults in respect of a Financial Covenant shall be subject to customary equity cure rights. |
| **Voting:** | Usual and customary for transactions of this type, subject to the Documentation Principles and the Agreement Among Lenders, but with First Out Lenders and Last Out Lenders voting as a single class; provided that (i) there shall be no limitation on voting by lenders that are affiliates of the Borrowers and (ii) any majority lender vote shall require the affirmative vote of at least two un-affiliated institutions. |

UST-0259

| **Required Lenders** | Lenders having Term Loans outstanding that, taken together, represent more than 50% of the sum of all Term Loans outstanding at such time. |
|---|---|
| **Intercreditor Agreement:** | Usual and customary for transactions of this type, subject to the Documentation Principles and based on that certain ABL Intercreditor Agreement, dated as of August 21, 2015, among the ABL Agent, the Term Loan Agent, and the other parties thereto, except as otherwise agreed by the Required Consenting Term Loan Lenders. |
| **Agreement Among Lenders:** | To be entered into among the lenders under the First Out Term Loan Facility, the lenders under the Last Out Term Loan Facility and the Parent Borrower or, to be set forth in the Exit Credit Agreement and to provide that, with respect to any amendment, waiver, consent or other action, including the exercise of remedies or the provision of future DIP financings, the Last Out Lenders shall vote in the same manner as the First Out Lenders, other than with respect to amendments, waivers, consents or with respect to certain economic terms which are customarily all-lender votes. |
| **Cost and Yield Protection:** | Usual and customary for transactions of this type, subject to the Documentation Principles. |
| **Defaulting Lenders:** | Usual and customary for transactions of this type, subject to the Documentation Principles. |
| **Assignments and Participations:** | Usual and customary for transactions of this type, subject to the Documentation Principles and permitting loan buy-backs and Dutch auctions on customary terms; provided that there shall be no restrictions on holdings by lenders that are affiliates of the Borrowers. |
| **Refinancing, Extension and Replacement Facilities** | Usual and customary provisions providing for the ability to refinance, extend or replace loans or any class of loans under the Term Loan Facility from time to time, in whole or part, with one or more new debt facilities. |
| **Expenses and Indemnification:** | Usual and customary for transactions of this type, subject to the Documentation Principles (including, but limited to, the reasonable fees and expenses of no more than one counsel to the Required Lenders (other than the Administrative Agent), which counsel shall be Milbank LLP, and one counsel to the Administrative Agent and one local counsel for the Required Lenders in each relevant jurisdiction (other than the Administrative Agent) and one local counsel for the Administrative agent in each relevant jurisdiction. |

UST-0260

**Governing Law and
Forum:**     New York.

UST-0261

## EXHIBIT E

**Form of Joinder Agreement**

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among ascena retail group, inc. and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders and agrees to be bound by the terms and conditions thereof and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date hereof.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| ABL Claims | |
| Term Loan Claims | |
| Equity Interests | |

---

[1]   Capitalized terms used but not otherwise defined herein shall having the meaning given to such terms in the Agreement.

UST-0262

## EXHIBIT F

### Provision for Transfer Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among ascena retail group, inc. and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
| --- | --- |
| ABL Claims | |
| Term Loan Claims | |
| Equity Interests | |
| DIP ABL Facility Claims | |
| Backstop Commitments | |
| DIP Term Facility Claims | |

---

[1]   Capitalized terms used but not otherwise defined herein shall having the meaning given to such terms in the Agreement.

UST-0263

**Exhibit B**

**Corporate Organizational Structure**

UST-0264



UST-0265

**<u>Exhibit C</u>**

**Evidentiary Support for First Day Motions[1]**

---

[1]     Capitalized terms used but not defined in this **<u>Exhibit C</u>** shall have the meanings ascribed to them in the *Declaration of Carrie W. Teffner, Interim Executive Chair of Ascena Retail Group, Inc. in Support of Debtors' Chapter 11 Proceedings and First Day Motions* or in the applicable First Day Motion.

UST-0266

**Administrative and Procedural Motions**

**A.** **Debtors' Motion for an Expedited Hearing on "First Day Motions" (the "Expedited Hearing Motion").**

1.      Pursuant to the Expedited Hearing Motion, the Debtors request entry of an order: (a) scheduling an expedited hearing on the Debtors' First Day Motions; and (b) deeming the Debtors' notice of the First Day Hearing to be adequate and appropriate notice under the circumstances.  I believe that expedited relief is essential to maintaining the normal day-to-day operations of the Debtors' business and is necessary to preserve and maximize the value of Debtors' estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the Expedited Hearing Motion should be approved.

**B.** **Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion").**

2.      Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing procedural consolidation and joint administration of these chapter 11 cases.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience and cost savings to Ascena without harming the substantive rights of any party in interest.

3.      Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity.  For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration of these chapter 11 cases, for procedural purposes only, under a single docket, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of 64 independent

UST-0267

chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint

Administration Motion should be approved.

**C.**     **Debtors' Motion For Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief (the "<u>Case Management Procedures Motion</u>").**

4.      Pursuant to the Case Management Procedures Motion, the Debtors request entry

of an order establishing certain noticing, case management, and administrative procedures

including, among other things:   (a) directing that matters requiring notice under

Bankruptcy Rule 2002(a)(2)–(6) will be served only to individuals and entities identified on a

shortened mailing list and those creditors who, in accordance with Local Rules 2002-1 and

9013-1(M), file with the Court a request that they receive such notice pursuant to

Bankruptcy Rule 2002; (b) allowing electronic service of all documents (except complaints and

summonses) for the 2002 List; (c) directing that all matters be heard at periodic omnibus

hearings to be scheduled in advance by the Court; and (d) granting related relief.

5.      Given the thousands of potential creditors who may file requests for service of

filings and considering the numerous motions and applications to be filed in these chapter 11

cases, approval of the Case Management Procedures will provide significant administrative

convenience and cost savings by reducing the need for emergency hearings and requests for

expedited relief, and will foster consensual resolution of important matters.  Furthermore, the

Debtors' use of electronic service to the 2002 List will undoubtedly reduce the administrative

and financial burden of providing notice to the Debtors' creditors and other parties in interest.

6.      The establishment of the Case Management Procedures will also promote the

efficient and orderly administration of these chapter 11 cases.  Authorizing the Debtors to serve

their documents on a limited mailing matrix will ease the administrative and economic burdens

on the Court and the Debtors' estates.  Authorizing electronic service in these chapter 11 cases

UST-0268

for the 2002 List will also allow for efficient and effective service at a significantly reduced cost

to the Debtors' estates and other serving parties. Early notice of Omnibus Hearings to all parties

in interest will enable these parties to plan efficiently for the use of hearing time, will avoid the

need for numerous hearings within each month, and will lessen the burden on the Court and on

the Debtors' estates. Additionally, parties in interest will still have the opportunity to bring true

emergency matters before the Court on an expedited basis pursuant to the Local Bankruptcy

Rules and the Case Management Procedures. Accordingly, on behalf of the Debtors, I

respectfully submit that the Case Management Procedures Motion should be approved.

> **D.** **Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules and Statements of Financial Affairs, (II) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (III) Authorizing the Debtors to File a Consolidated List of the Debtors' 50 Largest Unsecured Creditors, (IV) Authorizing the Debtors to Redact Certain Personal Identification Information, (V) Waiving the Requirement to File a List of Equity Security Holders, and (VI) Granting Related Relief (the "Creditor Matrix, SOFAs, and Schedules Motion").**

7. Pursuant to the Creditor Matrix, SOFAs, and Schedules Motion, the Debtors seek

entry of an order: (a) extending the deadline by which the Debtors must file their Schedules and

Statements by 31 days, for a total of 45 days from the Petition Date, without prejudice to the

Debtors' ability to request additional extensions for cause shown; (b) authorizing the Debtors to

file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each

Debtor; (c) authorizing the Debtors to file a consolidated list of the Debtors' 50 largest unsecured

creditors in lieu of filing lists for each Debtor; (d) authorizing the Debtors to redact certain

personal identification information; and (e) granting related relief.

8. *Schedules and Statements Extension*. To prepare the Schedules and Statements,

the Debtors must compile information from books, records, and documents relating to creditor

claims, as well as the Debtors' many assets, contracts, and leases across stores located

UST-0269

nationwide. This information is voluminous and located in numerous places throughout the Debtors' organization. Although the Debtors, with the assistance of their professional advisors, are mobilizing their employees to work diligently and expeditiously on preparing the Schedules and Statements, resources are strained and limited. Given the amount of work entailed in completing the Schedules and Statements and the competing demands on the Debtors' employees and professionals to assist in efforts to stabilize business operations during the initial postpetition period, I believe that the Debtors likely will not be able to properly and accurately complete the Schedules and Statements within the required time period. The Debtors therefore request that the Court extend the 14-day period for an additional 31 days, without prejudice to the Debtors' right to request further extensions, for cause shown.

9. ***Consolidated Creditor Matrix***. Compiling separate top creditor lists for each individual Debtor would consume an excessive amount of the Debtors' time and resources, and filing a consolidated list would more appropriately reflect the liabilities against the Debtors' operations on an enterprise level.

10. ***Consolidated List of 50 Largest Creditors***. The Debtors also request authority to file a single, consolidated list of their 50 largest general unsecured creditors. It is my understanding that this will help alleviate administrative burdens, costs, and the possibility of duplicative service, and will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous creditor matrix.

11. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Creditor Matrix, SOFAs, and Schedules Motion.

UST-0270

  **E.**  **Debtors' Application for Entry of an Order (I) Authorizing the Debtors to Employ and Retain Prime Clerk LLC as Claims and Noticing Agent, and (II) Granting Related Relief (the "<u>Claims and Noticing Agent Application</u>").**

  12.  Pursuant to the Claims and Noticing Agent Application, the Debtors seek entry of an order appointing Prime Clerk as Claims and Noticing Agent in the Debtors' chapter 11 cases effective as of the Petition Date to, among other tasks, assume full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases pursuant to the provisions of the Engagement Agreement.

  13.  Based on my discussions with Ascena's advisors, I believe that the Debtors' selection of Prime Clerk to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates. Moreover, it is my understanding that based on all engagement proposals obtained and reviewed that Prime Clerk's rates are competitive and reasonable given the quality of services and expertise.

  14.  The Debtors anticipate that there will be thousands of persons and entities to be noticed in these chapter 11 cases. In light of the number of parties in interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of noticing, and processing proofs of claim and is in the best interests of both the Debtors' estates and their creditors. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Claims and Noticing Agent Application.

UST-0271

**Operational Motions**

 **F.**  **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions, and (II) Granting Related Relief ("Cash Management Motion").**

  15.  Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to (i) continue to operate their Cash Management System; (ii) pay any prepetition or postpetition amounts outstanding on account of the Bank Fees, (iii) maintain existing Business Forms in the ordinary course of business, and (iv) continue to perform the Intercompany Transactions consistent with historical practice; and (b) granting related relief.

  16.  The Debtors operate a complex Cash Management System. The Cash Management System is typical of multi-store retail operations and comparable to the centralized cash management systems used by other similarly sized companies to manage the cash flow of operating units in a cost-effective, efficient manner. The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds and to facilitate cash monitoring, forecasting, and reporting. The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions. The Debtors' corporate accounting and cash forecasting departments regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly. The Cash Management System is comprised of approximately 154 Bank Accounts, which are held at 54 Cash Management Banks.

  17.  Historically, the Debtors estimate that they pay approximately $300,000 in Bank Fees each month, depending on transaction volume. The Debtors estimate that approximately

UST-0272

$400,000 in prepetition Bank Fees remains outstanding as of the Petition Date. The Debtors further estimate that cash collections average approximately $250 million per month, including store cash receipts, credit card receipts, wholesale and licensing revenue, and e-commerce sales. In addition, the Debtors estimate that total disbursements will range between $250 million and $350 million per month during these chapter 11 cases.

18. In the ordinary course of business, the Debtors maintain business relationships with each other and certain non-Debtor entities resulting in intercompany receivables and payables in the ordinary course of business. Accordingly, at any given time there may be Intercompany Claims owing by one Debtor to non-Debtor affiliates. Between the Debtors and the non-Debtor affiliates, Intercompany Claims arise in the ordinary course, primarily related to income taxes or fees charged by certain Debtors or non-Debtor affiliates to other Debtor or non-Debtor affiliates on account of intercompany provisions of goods or services. Intercompany Claims between the Debtors and the non-Debtors are settled in the ordinary course of dealings and are reflected in the Debtors' books and records.

19. The Debtors track all fund transfers in their respective accounting system and can ascertain, trace, and account for all Intercompany Transactions. The Debtors will continue to track postpetition intercompany transfers. If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders. The Debtors respectfully submit that the continued performance of the Intercompany Transactions is in the best interest of the Debtors' estates and their creditors and, therefore, the Debtors should be permitted to continue such performance.

UST-0273

20.     It is my understanding that the relief requested in the Cash Management Motion is essential to the continued operation of the Debtors' business and denial of such relief would severely disrupt, if not cripple, the Debtors' businesses. Therefore, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Cash Management Motion.

**G.     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief (the "Wages Motion").**

21.     Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to: (a) pay all prepetition and postpetition wages, salaries, other compensation, and reimbursable expenses on account of the Employee Compensation and Benefits Programs in the ordinary course of business; and (b) continue to administer the Employee Compensation and Benefits Programs.

22.     The Debtors employ over 9,442 individuals on a full-time basis and 27,393 individuals on a part-time basis. Approximately 33,832 Employees are paid on an hourly basis, and approximately 3,003 Employees earn a salary. Approximately ten Employees at one store location are members of a labor force union.[2] In addition to the Employees, the Debtors also periodically retain specialized individuals as independent contractors, as well as temporary workers paid through third-party administrators, to complete discrete projects sourced periodically from various staffing agencies to fulfill certain duties on a short-term basis. At this

---

[2]     The Union Employees are members of the Local 338 Chapter of the Retail Wholesale Department Store Union/United Food and Commercial Workers International Union. The Union Employees work at a store in Green Acres, Valley Stream, NY. The Debtors are party to collective bargaining agreements with the Union.

UST-0274

time, the Debtors retain approximately 600 Temporary Staff. The Temporary Staff are an important supplement to the efforts of the Debtors' Employees.

23.     I understand that the Debtors' Employees and Temporary Workers perform a wide variety of functions critical to the Debtors' operations at the Debtors' home office, distribution centers, and stores. Certain of these individuals are highly trained and have an essential working knowledge of the Debtors' business that cannot be easily replaced. The remainder of these individuals provide work necessary to continue the Debtors' store-level operations. Without the continued, uninterrupted services of their Employees and Temporary Workers, the Debtors' reorganization efforts will be threatened.

24.     The vast majority of Employees rely exclusively on the Employee Compensation and Benefits Programs to pay their daily living expenses and support their families. Thus, Employees will be exposed to significant financial consequences if the Debtors are not permitted to continue the Employee Compensation and Benefits Programs in the ordinary course of business. Consequently, I believe that the relief requested is necessary and appropriate.

25.     The Debtors seek to minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected. The Debtors are seeking authority to pay and honor certain prepetition claims relating to the Employee Compensation and Benefits, including, among other things, wages, salaries, and other compensation; expense reimbursement, including, expenses paid from Employees' personal funds, commuter programs, business vehicle reimbursement and commuter programs, and educational reimbursement; payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes, 401(k) contributions, and charitable donation contributions); health insurance, including, medical, dental, vision, and disability; retirement

10

UST-0275

benefits; non-qualified deferred compensation; workers' compensation benefits; paid time off, other paid leave, unpaid leave; life and accidental death and dismemberment insurance; short- and long-term disability coverage; employee assistance; severance; and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business and as further described in the Wages Motion.

26. Pursuant to the Wages Motion, the Debtors also seek authority to continue their ordinary course incentive programs and to honor their obligations to non-insider Employees under the pre-existing bonus programs. The Debtors believe the Non-Insiders Employee Incentive Programs drive Employees' performance, align Employees' interests with those of the Debtors generally, and promote the overall efficiency and safety of the Debtors' operations.

27. The Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees, the Debtors may experience significant employee turnover and instability at this critical time in these chapter 11 cases. Additionally, without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face. Such Employees may then elect to seek alternative employment opportunities.

28. I understand that a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant cost and efforts. Payment of certain prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of the Employees as the Debtors seek to operate their business in these chapter 11 cases. Therefore, I believe that the relief requested in the Wages Motion

UST-0276

inures to the benefit of all parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Wages Motion.

**H.** **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue and Renew Their Insurance Policies and Honor All Obligations In Respect Thereof; and (B) Continue the Surety Bond Program, and (II) Granting Related Relief (the "Insurance Motion").**

29. Pursuant to the Insurance Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to (i) continue insurance coverage entered into prepetition and satisfy payment of prepetition obligations related thereto in the ordinary course of business and renew, supplement, or purchase insurance coverage in the Debtors' discretion on a postpetition basis, and (ii) continue and renew their surety bond program on an uninterrupted basis; and (b) granting related relief.

30. In the ordinary course of business, the Debtors maintain 69 Insurance Policies that are administered by various third-party insurance carriers. These Insurance Policies provide coverage for, among other things, the Debtors' commercial property, general liability, automobile liability, workers' compensation, umbrella coverage, excess liability, pollution liability, executive protection, commercial crime, special risk, cyber liability, cargo and marine cargo liability, employers' liability, foreign general liability, business travel, and directors' and officers' liability. The aggregate annual premium on account of the Insurance Policies is approximately $11.52 million.

31. In addition, the Debtors' contract with Helmsman Management Services LLC and Sedgwick Claims Management Services Inc., third-party claims administrators, for assistance in managing the portfolio of general liability claims asserted against the Debtors. The Debtors estimate that, as of the Petition Date, approximately $54,400 is outstanding on account of prepetition obligations to Helmsman. Accordingly, the Debtors seek authority to pay each of

UST-0277

Sedgwick Claims and Helmsman any amounts owing on account of prepetition claims management services and to continue the claims management services program on a postpetition basis in the ordinary course of business.

32.     I understand that the Debtors obtain the majority of their Insurance Policies through their insurance broker, Marsh.  Marsh assists the Debtors in obtaining comprehensive insurance coverage with respect to the Debtors' commercial property, general liability, automobile liability, workers' compensation, umbrella coverage, excess liability, cargo earthquake and flood, and marine cargo liability.  The Debtors also obtain insurance brokerage services from Aon with respect to the Debtors' cyber insurance policies.  I also understand that CAC Specialty is the exclusive broker of record with respect to the Debtors' D&O Policies.  The Debtors pay CAC Specialty a commission in connection with these services, payable as part of the premiums paid on the D&O Policies.  As of the Petition Date, the Debtors do not believe that they owe any amounts to Marsh, Aon, or CAC Specialty on account of fees, commissions, or any other prepetition obligations.  Nevertheless, out of an abundance of caution, the Debtors seek authority to honor any amounts owed to Marsh, Aon, or CAC Specialty to ensure uninterrupted coverage under their Insurance Policies during the course of these chapter 11 cases.

33.     The Debtors also maintain a Surety Bond Program in the ordinary course of business to fulfill obligations to certain third parties, often utility companies, governmental units or other public agencies, to secure the Debtors' payment or performance of certain obligations.  A majority of the Debtors' Surety Bond Program is comprised of utility bonds.  The Debtors also maintain general customs bonds with the United States Customs and Border Protection Agency to assure the Debtors' ability to pay any applicable duties, penalties or obligations, including any anti-dumping duties it may incur with respect to its imports. The Debtors contract with Berkley

13

UST-0278

to provide the requisite surety bonds, which total approximately $40.8 million.  In addition, as part of the Surety Bond Program, the Debtors are in the process of cancelling certain surety bonds previously issued by Zurich Insurance and replacing them with new surety bonds to be issued by Berkley.  As of the Petition Date, the Debtors estimate that approximately 15 surety bonds with Zurich Insurance recently cancelled, or currently in the process of being cancelled, will be replaced with new surety bonds with Berkley, in the aggregate amount of approximately $275,000.  The Debtors estimate that, as of the Petition Date, approximately $9,000 is owed to Berkley on account of the Surety Bond Program.  Accordingly, the Debtors seek authority to honor any amounts owed to Berkley to ensure the Surety Bond Program remains uninterrupted.

34.     I believe that continuation and renewal of the Insurance Policies and Surety Bond Program is essential to preserving the value of the Debtors' business, properties, and assets. Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the requirements of the U.S. Trustee.  I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Insurance Motion.

**I.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees, and (II) Granting Related Relief (the "Taxes Motion").**

35.     Pursuant to the Taxes Motion, the Debtors seek authority for the Debtors to make payment and remittance (or use applicable credits to offset) of certain taxes and fees that accrued prior to the Petition Date and that will become payable during the pendency of these chapter 11 cases.  The Debtors also request that the Court authorize all applicable financial institutions,

UST-0279

when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in the Taxes Motion.

36.     In the ordinary course of business, the Debtors collect, withhold, and incur sales, use, withholding, Foreign, franchise, and property taxes, as well as other business and regulatory fees and occasionally are the subject of audit investigations on account of prior year tax returns. The Debtors estimate that approximately $74.14 million in Taxes and Fees are outstanding as of the Petition Date.  The Debtors' ability to pay the taxes and fees is critical to the Debtors' continued and uninterrupted operations.  The Debtors' failure to pay prepetition taxes and fees as they come due may ultimately increase the amount of priority claims held by authorities against the Debtors' estates to the detriment of the Debtors' general unsecured creditors.

37.     I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Taxes Motion.

**J.      Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief (the "Utilities Motion").**

38.     Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders:  (a) approving the Debtors' Proposed Adequate Assurance of payment for future utility services; (b) prohibiting Utility Companies from altering, refusing, or discontinuing services; (c) approving the Debtors' proposed procedures for resolving Adequate Assurance Requests; and (d) granting related relief.

UST-0280

39.     In connection with the operation of their business and management of their properties, the Debtors obtain electricity, natural gas, propane, telecommunications, water, waste management (including sewer and trash), internet, cable, and other similar services from the Utility Companies.  On average, the Debtors pay approximately $4.8 million each month for third-party Utility Services, calculated as a historical average payment for the twelve-month period ended April 30, 2020.  Accordingly, the Debtors estimate that their cost for Utility Services during the next 30 days (not including any deposits to be paid) will be approximately $4.4 million.  The Debtors estimate the amount currently held as deposits or prepayments with respect to the Utility Companies is approximately $1.17 million.

40.     To provide additional assurance of payment, the Debtors propose to deposit $1.89 million into a segregated account as an Adequate Assurance Deposit, which may be applied to any postpetition defaults in payment to the Utility Companies.  The Adequate Assurance Deposit represents an amount sufficient to cover one half of the Debtors' average monthly cost of Utility Services, calculated as a historical average payment for the twelve-month period ended April 30, 2020, less the amount of Prepetition Deposits held by the Utility Companies..  The Adequate Assurance Deposit will be held by the Debtors, and the Debtors' creditors will have no lien on any Adequate Assurance Deposit to the extent not returned to the Debtors pursuant to the terms set forth in the Order or the Adequate Assurance Account.

41.     In light of the severe consequences to the Debtors' businesses and operations that would result from any interruption in Utility Services, but recognizing the right of the Utility Companies to evaluate the Proposed Adequate Assurance, if a Utility Company believes additional adequate assurance is required, it may request such assurance pursuant to the Adequate Assurance Procedures.

UST-0281

42.     In addition, the Debtors have an agreement with Engie, a company that manages the Debtors' payments owed to some of their Utility Providers.  As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Service Fees related to the Services Agreement.  Out of an abundance of caution, however, the Debtors seek authority to continue honoring any prepetition obligations to Engie under the Services Agreement.

43.     Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.  Indeed, because the Debtors operate a customer-facing retail enterprise and the Debtors' business depends upon having an ability to maintain open and active stores, any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue its operations.  I believe this disruption would adversely impact customer relationships and result in a significant decline in the Debtors' revenues and profits.  Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, value and creditor recoveries.  It is critical, therefore, that Utility Services continue uninterrupted during these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

**K.     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Lien Claimants, (B) 503(b)(9) Claimants; (C) Foreign Vendors, and (D) Critical Vendors, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief (the "<u>All Trade Motion</u>").**

44.     Pursuant to the All Trade Motion, the Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to pay Foreign Vendor Claims and Critical Vendor Claims in an aggregate amount not to exceed approximately $50 million on account of prepetition amounts outstanding; (b) authorizing the Debtors to pay 503(b)(9) Claims in an aggregate amount not to exceed approximately $20 million on account of prepetition amounts outstanding; (c) authorizing, but not directing, the Debtors to pay in the ordinary course of business the Lien

UST-0282

Claims; (d) confirming the administrative expense priority status of Outstanding Orders; and (e) granting related relief.

45. **_Lien Vendor Claims_.** The flow of Merchandise from the Debtors' manufacturers to (a) stock the Debtors' domestic brick and mortar stores, (b) fulfill online orders, or (c) fulfill orders of the Debtors' wholesalers (both domestic and foreign) and foreign franchisees, depends on the services provided by, among others, various freight vendors, ocean carriers, truckers, common or contract carriers, customs brokers, and other shipping services providers. Additionally, the Debtors employ various general contractors and vendors to assist with remodels and on-site construction and repairs at the retail stores, including renovation and repair services for ongoing store remodels or deliver various furniture and fixtures for installation in the individual retail stores. I understand that, in the event the Lien Claims remain unpaid, the Lien Claimants are likely to attempt to assert such possessory liens, and may refuse to deliver or release goods in their possession until their claims are satisfied and their liens redeemed, which would disrupt the Debtors' operations and affect the Debtors' ability to efficiently administer these chapter 11 cases. As of the Petition Date, the Debtors owe approximately $10.0 million on account of Lien Claims, approximately $8.0 million of which the Debtors estimate will become due and owing on an interim basis pending entry of the Final Order.

46. **_503(b)(9) Claims_.** The Debtors have received certain goods from various 503(b)(9) Claimants within the twenty days before the Petition Date. Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts. Rather, the Debtors often obtain supplies on an order-by-order basis. As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims. Further, substantially all of the 503(b)(9) Claimants are Foreign Vendors that supply goods, materials, or services to the

18

UST-0283

Debtors that are crucial to the Debtors' ongoing operations, including Merchandise necessary to stock the shelves and racks in Debtors' stores and fulfill online orders. In light of certain consequences related to the COVID-19 pandemic, the Debtors have concluded that payment of certain of the 503(b)(9) Claimants outside of the chapter 11 plan process is essential to avoid disruptions to the Debtors' operations. The Debtors believe that as of the Petition Date, they owe approximately $75.0 million on account of goods delivered within the 20 days immediately preceding the Petition Date.

47. ***Foreign Vendor Claims***. Substantially all of the Debtors' Merchandise is manufactured overseas, and the Debtors regularly transact business with a diverse set of Foreign Vendors. At any given time, the Debtors are engaged with the Foreign Vendors to: (i) produce goods in accordance with current purchase orders; (ii) ship merchandise to stock the Debtors' retail stores, distribution centers, and fulfill online orders; or (iii) negotiate the terms of future purchase orders. All of the Foreign Vendors supply Merchandise that is crucial to the Debtors' ongoing operations. The Debtors generally do not maintain long-term contracts with suppliers and typically transact business on an order-by-order basis. It is my understanding that the Foreign Vendors may refuse to release Merchandise or other goods for shipment to the United States if they are not paid current. Further, if the Debtors are unable to honor the payment terms for Merchandise that shipped before the Petition Date, but will not become due and owing until after the Petition Date, the Foreign Vendors are unlikely to complete production on open purchase orders or accept new purchase orders in the future. As of the Petition Date, the Debtors owe approximately $67.5 million on account of Foreign Vendor Claims.

48. ***Critical Vendor Claims***. The Debtors obtain specialized goods, marketing, or technical services with expertise specific to the Debtors' business and infrastructure from a

UST-0284

limited number of highly specialized vendors, service providers, and other businesses. With the assistance of their advisors, the Debtors have spent significant time reviewing and analyzing their books and records, consulting operations managers and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable law, regulations, and historical practice to identify certain critical business relationships and suppliers of goods and services that are critical to the Debtors' go-forward business—the loss of which could materially harm their businesses, shrink their market share, reduce their enterprise value, and impair going-concern viability. As of the Petition Date, the Debtors owe approximately $26.0 million on account of Critical Vendor Claims that are not entitled to administrative or other priority status under section 503(b)(9) of the Bankruptcy Code.

49. ***Outstanding Orders***. Before the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date. To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, I understand that certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.

50. It is my understanding that the relief requested in the All Trade Motion will allow the Debtors to maintain operational stability and prevent a disruption to the Debtors' supply chain, which could result in a significant loss of operational efficiency, decreases the value of these businesses, and impair stakeholder value at this critical juncture in these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the All Trade Motion.

UST-0285

**L.** **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief (the "<u>Customer Programs Motion</u>").**

51.     Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to: (a) maintain and administer their Customer Programs and honor certain prepetition obligations related thereto; and (b) granting related relief.

52.     The Debtors have historically provided certain incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships. The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their "brand." These programs include refund and exchange programs, loyalty programs, gift card and certificate programs, charity donation programs, and other sale promotions. Accordingly, maintaining the goodwill of their customers is important to the Debtors' ongoing operations in these chapter 11 cases, and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

53.     The Debtors estimate that, of their prepetition obligations under the Customer Programs, approximately $210 million constitutes accrued credits, adjustments, discounts, or other similar obligations owing to their customers, the vast majority of which ***do not*** entail the expenditure of cash.

54.     I believe that continuing to administer the Customer Programs without interruption during the pendency of the chapter 11 cases will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' creditors and benefit their estates. In contrast, if the Debtors are unable to continue the Customer Programs postpetition or pay amounts due and owing to customers, the Debtors risk alienating

UST-0286

certain customer constituencies (who might then initiate business relationships with the Debtors' competitors) and might suffer corresponding losses in customer loyalty and goodwill that will harm their prospects for reorganization and/or maximizing the value of their estate.

55. I believe that the relief requested herein will pay dividends with respect to the long-term reorganization of their businesses, both in terms of profitability and the engendering of goodwill, especially at this critical time following the filing of the chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Customer Programs Motion.

**M. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors To Assume The Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief (the "Store Closing Motion").**

56. Pursuant to the Store Closing Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to assume the Consulting Agreement, by and between Ascena Retail Group, Inc. and SB360 Capital Partners, LLC; (b) authorizing and approving the continuation of store closing or similar themed sales at the Closing Stores, which commenced prior to the Petition Date, in accordance with the terms of the Sale Guidelines; and (c) granting related relief.

57. *The Store Closings*. The Debtors' management team and advisors conducted an extensive store-by-store performance analysis of all existing stores evaluating, among other factors, historical and recent store profitability, historical and recent sales trends, occupancy costs, the geographic market in which each store is located, the mall in which each store is located, the potential to negotiate rent reductions with applicable landlords, and specific operational circumstances related to each store's performance. The Debtors' management team and advisors have determined that it is appropriate to close and wind down approximately 1,000

UST-0287

underperforming brick-and-mortar store locations, and potentially additional stores contingent upon further determination by the Debtors and their advisors.

58.     The Debtors will independently close certain premium brand stores in the United States.  To maximize the value of their estates, the Debtors may need to close additional stores to the extent lease negotiations are unsuccessful.

59.     ***The Consultant Agreement*.**  The Debtors selected and engaged the Consultant to manage the Store Closings as well as to sell the Store Closure Assets located in the stores and otherwise prepare the stores for turnover to the applicable landlords on the terms set forth in the Consulting Agreement.  The Consultant's evaluation process included, among other things, a formal request for proposal, equal access to all information provided by the Debtors, diligence provided though a virtual data room, reference calls, standard requirements for the submission or recovery assumptions, forecasts and analysis, and a phone and in-person meetings with the Debtors' management, during which the candidates made a formal proposal.  Based on this extensive evaluation, the Debtors' management, in consultation with the Debtors' advisors, determined that the Consultant provided the best and most competitive proposal.

60.     The Debtors and their advisors determined that the Consultant was the best liquidator to assist with consolidating its store base because of the Consultant's extensive expertise in conducting retail store closing sales, including the orderly liquidation of inventory, furniture, fixtures, equipment, and other assets.

61.     The Debtors' engaged in extensive negotiations with the Consultant regarding the terms and conditions of the Consulting Agreement and I believe that they were conducted in good faith, and at arm's-length.  I also believe that the Debtors' entry into the Consulting

UST-0288

Agreement was a sound exercise of the Debtors' reasonable business judgment and in the best interests of their estates.

62.     It is my understanding that the Consulting Agreement will enable the Debtors to use the logistical capabilities, experience, skills, and resources of the Consultant to effectively and efficiently conduct the Sale and, thus, significantly improve the potential value to be received through the Sale for the benefit of all stakeholders.  I believe the relief requested in the Store Closing Motion is necessary in order to ensure the development and certainty of an orderly process so as to produce the most value for the Debtors' estates.  Value realized in the closing of the Stores will inure to the benefit of the Debtors' estates, which will more than offset any expenses incurred by reason of the assumption of the Consulting Agreement.  Further, the Consultant's fees are based on the results of the Sale, ensuring that the Consultant is incentivized to maximize value for the Debtors' estates.

63.     The relief requested by the Store Closing Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 105(a) and 363(b) of the Bankruptcy Code.  The Debtors and their advisors believe that the Sale Guidelines represent the most efficient and appropriate means of maximizing the value of the Store Closure Assets, while balancing the potentially competing concerns of landlords and other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Store Closing Motion.

**N.     Debtors' Motion For Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock, and (II) Granting Related Relief (the "NOL Motion").**

64.     Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders: (a) approving certain notification and hearing procedures related to certain transfers of Debtor Ascena Retail Group, Inc.'s common stock or any beneficial ownership therein, directing that

UST-0289

any purchase, sale, other transfer of Common Stock in violation of the Procedures shall be null and void *ab initio*; and (b) granting related relief.

65.     I understand that the Debtors possess NOLs and certain other Tax Attributes that are of significant value to the Debtors and their estates because the Debtors can carry forward such Tax Attributes to offset future taxable income, thereby reducing their future aggregate tax obligations.  The NOLs are substantial, and I believe that any termination or limitation of the NOLs including during the first month of these chapter 11 cases could cause significant and irreparable damage to the Debtors' estates and stakeholders.

66.     If no restrictions on trading are imposed as requested in the NOL Motion, such trading or deductions could severely limit or even eliminate the Debtors' ability to utilize the NOLs.  I believe that the loss of these valuable estate assets could lead to significant negative consequences for the Debtors, their estates, their stakeholders, and the overall reorganization process.  I further believe that the Procedures and other relief requested in the NOL Motion are critical for maximizing estate value and will help ensure a meaningful recovery for creditors.  Accordingly, on behalf of the Debtors, I respectfully submit the Court should grant the relief requested in the NOL Motion.

**O.**     **Debtors' Motion for Entry of an Order Authorizing (I)  Rejection of Certain Unexpired Leases and (II) Abandonment of Any Personal Property, Effective as of the Rejection Date and (III) Granting Related Relief (the "Lease Rejection Motion").**

67.     Pursuant to the Lease Rejection Motion, the Debtors seek entry of an order authorizing the Debtors to:  (a) reject certain unexpired leases of real property, including any guaranties thereof and any amendments, modifications, or subleases thereto; (b) abandon certain equipment, fixtures, furniture, or other personal property that may be located at the premises and not otherwise transitioned to another store location, both rejection of Leases and abandonment of

UST-0290

Personal Property to be effective as of the applicable Rejection Date; and (c) granting related relief.

68.     The Debtors, with the assistance of their advisors, have determined that certain of their brick-and-mortar retail and outlet stores do not have a place in the Debtors' go-forward business plan.  I understand that, prior to the Petition Date, the Debtors determined in their business judgment to initiate store closings in an attempt to preserve liquidity.  Accordingly, the Debtors, in their reasonable business judgment, seek to the reject the Leases for the Closing Stores that have not expired by the terms of the applicable Lease by the Petition Date, effective as of the applicable Rejection Date.

69.     I understand that the Debtors have determined that the Leases are neither compatible with the Debtors' business needs nor a source of potential value for the Debtors' future operations, creditors, or other parties in interest.  Absent rejection, I believe that the Leases would impose ongoing obligations on the Debtors and their estates that constitute an unnecessary drain on the Debtors' resources.  Further, I understand that the Leases do not have any realizable value in the marketplace.  Accordingly, in an effort to avoid unnecessary postpetition rent and administrative costs, the Debtors have determined that it is in the best interests of their estates to reject the identified Leases, effective as of the Rejection Date. Accordingly, on behalf of the Debtors, I respectfully submit the Court should grant the relief requested in the Lease Rejection Motion.

UST-0291

**P.** **Debtors' Motion for Entry of an Order Authorizing Rejection of Certain Foreign Franchise Agreements Effective as of the Petition Date (the "<u>Franchise Agreement Rejection Motion</u>").**

70. Pursuant to the Franchise Agreement Rejection Motion, the Debtors seek entry of an order authorizing the Debtors to reject certain Agreements and granting related relief.

71. In the lead up to these chapter 11 cases, the Debtors undertook an initial analysis of their contracts. As a result of this analysis, the Debtors determined, in their business judgment, that the Agreements identified in the Franchise Agreement Rejection Motion are unnecessary and burdensome to the Debtors' estates and should be rejected immediately. The Agreements include the Justice Brand Franchise Agreements between Tween Brands Service Co. and multiple parties throughout Mexico, Indonesia, and the Middle East, and the LOFT Brand Franchise Agreements between AnnTaylor, Inc. and several parties in Mexico.

72. The Debtors undertook a comprehensive review of the Agreements and determined that the "value" is undeniably negative. Absent rejection, the Agreements impose ongoing obligations on the Debtors and their estates that constitute an unnecessary drain on the Debtors' resources compared to any benefits associates therewith. The Agreements have no place in the Debtors' go-forward business. Specifically, the Debtors are obligated to prove certain licensing and development rights that provide no benefits to the estates in light of the planned wind-down of Justice and store portfolio rationalization.

73. Accordingly, to avoid incurring unnecessary administrative expense claims with respect to the Agreements, the Debtors seek to reject the Agreements effective as of the Petition Date. Accordingly, on behalf of the Debtors, I respectfully submit the Court should grant the relief requested in the Franchise Agreement Rejection Motion.

UST-0292

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

John R. Luze (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:      (202) 842-7800
Facsimile:      (202) 842-7899

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ASCENA RETAIL GROUP, INC., | ) Case No. 20-33113 (KRH) |
| | ) |
| Debtor. | ) |
| | ) |
| Tax I.D. No. 30-0641353 | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| 933 INSPIRATION LLC, | ) Case No. 20-33117 (KRH) |
| | ) |
| Debtor. | ) |
| | ) |
| Tax I.D. No. 45-5138910 | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| ANN CARD SERVICES, INC., | ) Case No. 20-33120 (KRH) |
| | ) |
| Debtor. | ) |
| | ) |
| Tax I.D. No. 46-1273502 | ) |

UST-0293

|  | ) |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ANN, INC., | ) | Case No. 20-33122 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 13-3499319 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| ANNCO, INC., | ) | Case No. 20-33125 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 06-1565136 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| ANNTAYLOR DISTRIBUTION SERVICES, INC., | ) | Case No. 20-33126 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 61-1274547 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| ANNTAYLOR OF PUERTO RICO, INC., | ) | Case No. 20-33130 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 66-0568835 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| ANNTAYLOR RETAIL, INC., | ) | Case No. 20-33132 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 06-1415434 | ) |  |

2

UST-0294

|  | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | |
| ANNTAYLOR, INC., | ) | Case No. 20-33134 (KRH) |
|  | ) | |
| Debtor. | ) | |
|  | ) | |
| Tax I.D. No. 51-0297083 | ) | |
|  | ) | |
| In re: | ) | Chapter 11 |
|  | ) | |
| ASCENA RETAIL HOLDINGS, INC., | ) | Case No. 20-33136 (KRH) |
|  | ) | |
| Debtor. | ) | |
|  | ) | |
| Tax I.D. No. 82-5323435 | ) | |
|  | ) | |
| In re: | ) | Chapter 11 |
|  | ) | |
| ASCENA TRADE SERVICES, LLC, | ) | Case No. 20-33140 (KRH) |
|  | ) | |
| Debtor. | ) | |
|  | ) | |
| Tax I.D. No. 47-1096647 | ) | |
|  | ) | |
| In re: | ) | Chapter 11 |
|  | ) | |
| ASNA PLUS FASHION, INC., | ) | Case No. 20-33141 (KRH) |
|  | ) | |
| Debtor. | ) | |
|  | ) | |
| Tax I.D. No. 82-2505755 | ) | |
|  | ) | |
| In re: | ) | Chapter 11 |
|  | ) | |
| ASNA VALUE FASHION LLC, | ) | Case No. 20-33142 (KRH) |
|  | ) | |
| Debtor. | ) | |
|  | ) | |
| Tax I.D. No. 81-3580343 | ) | |

UST-0295

|  | ) |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BACKINGBRANDS BUYING AGENT, LLC, | ) | Case No. 20-33143 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 83-4537194 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| BACKINGBRANDS SOLUTIONS, LLC, | ) | Case No. 20-33146 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 83-1072376 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| C.S.F. CORP., | ) | Case No. 20-33147 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 23-2559339 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| CATALOG RECEIVABLES LLC, | ) | Case No. 20-33148 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 20-2776707 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| CATALOG SELLER LLC, | ) | Case No. 20-33149 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 20-2776763 | ) |  |

UST-0296

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CATHERINES #5124, INC., | ) Case No. 20-33151 (KRH) |
|  | ) |
| Debtor. | ) |
|  | ) |
| Tax I.D. No. 41-2057508 | ) |
| In re: | ) Chapter 11 |
|  | ) |
| CATHERINES #5147, INC., | ) Case No. 20-33153 (KRH) |
|  | ) |
| Debtor. | ) |
|  | ) |
| Tax I.D. No. 33-1027890 | ) |
| In re: | ) Chapter 11 |
|  | ) |
| CATHERINES STORES CORPORATION, | ) Case No. 20-33155 (KRH) |
|  | ) |
| Debtor. | ) |
|  | ) |
| Tax I.D. No. 62-1350411 | ) |
| In re: | ) Chapter 11 |
|  | ) |
| CATHERINES, INC., | ) Case No. 20-33158 (KRH) |
|  | ) |
| Debtor. | ) |
|  | ) |
| Tax I.D. No. 51-0297099 | ) |
| In re: | ) Chapter 11 |
|  | ) |
| CCTM, INC., | ) Case No. 20-33160 (KRH) |
|  | ) |
| Debtor. | ) |
|  | ) |
| Tax I.D. No. 20-5677183 | ) |

UST-0297

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| CHARMING SALES CO. FOUR, INC., | ) Case No. 20-33162 (KRH) |
| Debtor. | ) |
| Tax I.D. No. 41-1950727 | ) |
| In re: | ) Chapter 11 |
| CHARMING SALES CO. ONE, INC., | ) Case No. 20-33164 (KRH) |
| Debtor. | ) |
| Tax I.D. No. 93-0791385 | ) |
| In re: | ) Chapter 11 |
| CHARMING SALES CO. THREE, INC., | ) Case No. 20-33166 (KRH) |
| Debtor. | ) |
| Tax I.D. No. 39-1389176 | ) |
| In re: | ) Chapter 11 |
| CHARMING SALES CO. TWO, INC., | ) Case No. 20-33173 (KRH) |
| Debtor. | ) |
| Tax I.D. No. 39-1414983 | ) |
| In re: | ) Chapter 11 |
| CHARMING SHOPPES OF DELAWARE, INC., | ) Case No. 20-33174 (KRH) |
| Debtor. | ) |
| Tax I.D. No. 23-1624093 | ) |

6

UST-0298

|  |  |  |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 20-33175 (KRH) |
| CHARMING SHOPPES RECEIVABLES CORP., | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 51-0383871 | ) | |
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 20-33176 (KRH) |
| CHARMING SHOPPES SELLER, INC., | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 23-3005349 | ) | |
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 20-33114 (KRH) |
| CHARMING SHOPPES STREET, INC., | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 23-3005350 | ) | |
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 20-33115 (KRH) |
| CHARMING SHOPPES, INC., | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 23-1721355 | ) | |
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 20-33116 (KRH) |
| CHESTNUT ACQUISITION SUB INC., | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 26-0115759 | ) | |

UST-0299

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CROSSTOWN TRADERS, INC., | ) | Case No. 20-33118 (KRH) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 05-0535617 | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CS HOLDCO II INC., | ) | Case No. 20-33119 (KRH) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 45-2874632 | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CSGC, INC., | ) | Case No. 20-33121 (KRH) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 46-0512649 | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CSI INDUSTRIES, INC., | ) | Case No. 20-33123 (KRH) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 23-2446257 | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CSPE, LLC, | ) | Case No. 20-33124 (KRH) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 20-4900521 | ) | |

8

UST-0300

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DBCM HOLDINGS, LLC, | ) | Case No. 20-33112 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 34-1988040 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| DBI HOLDINGS, INC., | ) | Case No. 20-33127 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 06-0812960 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| DBX, INC., | ) | Case No. 20-33128 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 13-3747455 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| DULUTH REAL ESTATE LLC, | ) | Case No. 20-33129 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 36-4797417 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| ETNA RETAIL DC, LLC, | ) | Case No. 20-33131 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 46-4866008 | ) |  |

UST-0301

|  |  |
|---|---|
| In re: | Chapter 11 |
| FASHION APPAREL SOURCING LLC, | Case No. 20-33133 (KRH) |
| Debtor. | |
| Tax I.D. No. 46-5005271 | |
| In re: | Chapter 11 |
| FASHION SERVICE FULFILLMENT CORPORATION, | Case No. 20-33135 (KRH) |
| Debtor. | |
| Tax I.D. No. 90-0124559 | |
| In re: | Chapter 11 |
| FASHION SERVICE LLC, | Case No. 20-33137 (KRH) |
| Debtor. | |
| Tax I.D. No. 23-2536983 | |
| In re: | Chapter 11 |
| GC FULFILLMENT, LLC, | Case No. 20-33139 (KRH) |
| Debtor. | |
| Tax I.D. No. 20-5913907 | |
| In re: | Chapter 11 |
| LANE BRYANT #6243, INC., | Case No. 20-33144 (KRH) |
| Debtor. | |
| Tax I.D. No. 52-2153729 | |

10

UST-0302

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LANE BRYANT OF PENNSYLVANIA, INC., | ) | Case No. 20-33145 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 20-5163249 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| LANE BRYANT OUTLET 4106, INC., | ) | Case No. 20-33150 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 20-4885336 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| LANE BRYANT PURCHASING CORP., | ) | Case No. 20-33152 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 20-3186128 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| LANE BRYANT, INC., | ) | Case No. 20-33154 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 13-3118358 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| PSTM, INC., | ) | Case No. 20-33156 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 20-3955974 | ) |  |

UST-0303

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SONSI, INC., | ) | Case No. 20-33157  (KRH) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 27-1726857 | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SPIRIT OF AMERICA, INC., | ) | Case No. 20-33159 (KRH) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 52-2177250 | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| TOO GC, LLC, | ) | Case No. 20-33161 (KRH) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 31-1812510 | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| TWEEN BRANDS AGENCY, INC., | ) | Case No. 20-33163 (KRH) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 31-1694590 | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| TWEEN BRANDS DIRECT SERVICES INC., | ) | Case No. 20-33165 (KRH) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Tax I.D. No. 31-1694594 | ) | |

UST-0304

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| TWEEN BRANDS, INC., | ) | Case No. 20-33170 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 31-1333930 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| TWEEN BRANDS INVESTMENT, LLC, | ) | Case No. 20-33167 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 04-3609377 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| TWEEN BRANDS MARKETING, INC., | ) | Case No. 20-33168 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 82-2877804 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| TWEEN BRANDS SERVICE CO., | ) | Case No. 20-33169 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 30-0048148 | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| WINKS LANE, INC., | ) | Case No. 20-33171 (KRH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Tax I.D. No. 23-2411389 | ) |  |

13

UST-0305

|  | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | |
| WORLDWIDE RETAIL HOLDINGS, INC., | ) | Case No. 20-33172 (KRH) |
|  | ) | |
| Debtor. | ) | |
|  | ) | |
| Tax I.D. No. 30-0639445 | ) | |

## ORDER (I) DIRECTING JOINT ADMINISTRATION OF
## CHAPTER 11 CASES AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[1] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) directing the joint administration of the Debtors' chapter 11 cases for procedural purposes only; and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated August 15, 1984; and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the

---

[1]	Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion.

UST-0306

relief granted herein; and upon all of the proceedings had before this Court; and after due

deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth in this Order.

2.      The above-captioned chapter 11 cases are consolidated for procedural purposes

only and shall be jointly administered by the Court under Case No. 20-33113 (KRH).

3.      The caption of the jointly administered cases should read as follows:

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

4.      The foregoing caption satisfies the requirements set forth in section 342(c)(1) of

the Bankruptcy Code.

5.      A docket entry, substantially similar to the following, shall be entered on the

docket of each of the Debtors other than Ascena Retail Group, Inc. to reflect the joint

administration of these chapter 11 cases:

> An order has been entered in accordance with Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of Virginia directing joint administration for procedural purposes only of the chapter 11 cases of:  Ascena Retail Group, Inc., Case No. 20-33113; 933 Inspiration LLC, Case No. 20-33117; ANN Card Services, Inc., Case No. 20-33120; ANN, Inc., Case No. 20-33122; AnnCo, Inc., Case No. 20-33125;

UST-0307

AnnTaylor Distribution Services, Inc., Case No. 20-33126;
AnnTaylor of Puerto Rico, Inc. Case No. 20-33130; AnnTaylor
Retail, Inc., Case No. 20-33132; AnnTaylor, Inc., Case No. 20-
33134; Ascena Retail Holdings, Inc., Case No. 20-33136; Ascena
Trade Services, LLC, Case No. 20-33140; ASNA Plus Fashion,
Inc., Case No. 20-33141; ASNA Value Fashion LLC, Case No. 20-
33142; BackingBrands Buying Agent, LLC, Case No. 20-33143;
BackingBrands Solutions, LLC, Case No. 20-33146; C.S.F. Corp.,
Case No. 20-33147; Catalog Receivables LLC, Case No. 20-
33148; Catalog Seller LLC, Case No. 20-33149; Catherines #5124,
Inc., Case No. 20-33151; Catherines #5147, Inc., Case No. 20-
33153; Catherines Stores Corporation, Case No. 20-33155;
Catherines, Inc., Case No. 20-33158; CCTM, Inc., Case No. 20-
33160; Charming Sales Co. Four, Inc., Case No. 20-33162;
Charming Sales Co. One, Inc., Case No. 20-33164; Charming
Sales Co. Three, Inc., Case No. 20-33166; Charming Sales Co.
Two, Inc., Case No. 20-33173; Charming Shoppes of Delaware,
Inc., Case No. 20-33174; Charming Shoppes Receivables Corp.,
Case No. 20-33175; Charming Shoppes Seller, Inc., Case No. 20-
33176; Charming Shoppes Street, Inc., Case No. 20-33114;
Charming Shoppes, Inc., Case No. 20-33115; Chestnut Acquisition
Sub Inc., Case No. 20-33116; Crosstown Traders, Inc., Case
No. 20-33118; CS HoldCo II Inc., Case No. 20-33119; CSGC,
Inc., Case No. 20-33121; CSI Industries, Inc., Case No. 20-33123;
CSPE, LLC, Case No. 20-33124; DBCM Holdings, LLC, Case
No. 20-33112; DBI Holdings, Inc., Case No. 20-33127; DBX, Inc.,
Case No. 20-33128; Duluth Real Estate LLC, Case No. 20-33129;
Etna Retail DC, LLC, Case No. 20-33131; Fashion Apparel
Sourcing LLC, Case No. 20-33133; Fashion Service Fulfillment
Corporation, Case No. 20-33135; Fashion Service LLC, Case
No. 20-33137; GC Fulfillment, LLC, Case No. 20-33139; Lane
Bryant #6243, Inc., Case No. 20-33144; Lane Bryant of
Pennsylvania, Inc., Case No. 20-33145; Lane Bryant Outlet 4106,
Inc., Case No. 20-33150; Lane Bryant Purchasing Corp., Case
No. 20-33152; Lane Bryant, Inc., Case No. 20-33154; PSTM, Inc.,
Case No. 20-33156; Sonsi, Inc., Case No. 20-33157; Spirit of
America, Inc., Case No. 20-33159; Too GC, LLC, Case No. 20-
33161; Tween Brands Agency, Inc., Case No. 20-33163; Tween
Brands Direct Services Inc., Case No. 20-33165; Tween Brands
Investment, LLC, Case No. 20-33167; Tween Brands Marketing,
Inc., Case No. 20-33168; Tween Brands Service Co., Case No. 20-
33169; Tween Brands, Inc., Case No. 20-33170; Winks Lane, Inc.,
Case No. 20-33171; and Worldwide Retail Holdings, Inc., Case
No. 20-33172. The docket in Case No. 20-33113 (KRH) should be
consulted for all matters affecting this case.

UST-0308

6.      The Debtors shall maintain, and the Clerk of the United States Bankruptcy Court for the Eastern District of Virginia shall keep, one consolidated docket, one file, and one consolidated service list for these chapter 11 cases.

7.      The Debtors are authorized to file the monthly operating reports required by the *Operating Guidelines and Reporting Requirements of the United States Trustee for Chapter 11 Debtors in Possession and Chapter 11 Trustees*, issued by the United States Trustee for the Eastern District of Virginia, on a consolidated basis, but the Debtors shall track and break out disbursements on a debtor-by-debtor basis in each monthly operating report.

8.      Nothing contained in the Motion or this Order shall be deemed or construed as directing or otherwise effecting a substantive consolidation of these chapter 11 cases and this Order shall be without prejudice to the rights of the Debtors to seek entry of an Order substantively consolidating their respective cases.

9.      Nothing contained in the Motion or this Order shall be deemed or construed as precluding the Debtors from causing any of their non-Debtor, wholly owned subsidiaries from commencing voluntary cases under the Bankruptcy Code.

10.      The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived.

11.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

12.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

UST-0309

13. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

14. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

15. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: <u>Jul 23 2020</u>
Richmond, Virginia

/s/ Kevin R Huennekens
_____
United States Bankruptcy Judge

Entered on Docket:  Jul 23 2020

18

UST-0310

WE ASK FOR THIS:

/s/ Cullen D. Speckhart
_____

**KIRKLAND & ELLIS LLP**                    **COOLEY LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**      Cullen D. Speckhart (VSB 79096)
Edward O. Sassower, P.C.                     *Admitted to practice in New York, Virginia, Missouri and*
Steven N. Serajeddini, P.C. (*pro hac vice* pending)   *Texas; Not admitted to practice in DC, supervised by members*
601 Lexington Avenue                         *of DC bar*
New York, New York 10022                     Olya Antle (VSB 83153)
Telephone:       (212) 446-4800              *Admitted to practice in Virginia; Not admitted to practice in*
Facsimile:       (212) 446-4900              *DC, supervised by members of DC bar*
-and-                                        1299 Pennsylvania Avenue, NW, Suite 700
John R. Luze (*pro hac vice* pending)        Washington, DC 20004-2400
300 North LaSalle                            Telephone:       (202) 842-7800
Chicago, Illinois 60654                      Facsimile:       (202) 842-7899
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**CERTIFICATION OF ENDORSEMENT
UNDER LOCAL BANKRUPTCY RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

_____/s/ Cullen D. Speckhart_____

UST-0311

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF ASCENA RETAIL GROUP, INC. AND ITS DEBTOR AFFILIATES

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS, ANY OF THE RESTRUCTURING SUPPORT PARTIES, OR ANY OTHER PARTY IN INTEREST.**

**YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

**THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:         (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:         (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated: July 31, 2020

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:        (202) 842-7800
Facsimile:         (202) 842-7899

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena. The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

UST-0312

**TABLE OF CONTENTS**

**Article I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** ........................................................................................................1
A.      Defined Terms. .................................................................................................... 1
B.      Rules of Interpretation. ...................................................................................... 11
C.      Computation of Time. ........................................................................................ 11
D.      Governing Law. ................................................................................................. 11
E.      Reference to Monetary Figures. ......................................................................... 12
F.      Controlling Document. ....................................................................................... 12
G.      Restructuring Support Agreement Party Consent Rights and Controlling Documents. .................. 12

**Article II. ADMINISTRATIVE CLAIMS, DIP ABL FACILITY CLAIMS, DIP TERM FACILITY CLAIMS, AND PRIORITY CLAIMS** .............................................................................. 12
A.      Administrative Claims. ...................................................................................... 12
B.      DIP ABL Facility Claims. .................................................................................. 13
C.      DIP Term Facility Claims. ................................................................................. 13
D.      Professional Compensation. ............................................................................... 13
E.      Priority Tax Claims. .......................................................................................... 15

**Article III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ...................... 15
A.      Classification of Claims and Interests. ................................................................. 15
B.      Treatment of Claims and Interests. ..................................................................... 15
C.      Special Provision Governing Unimpaired Claims. .................................................. 18
D.      Elimination of Vacant Classes. ........................................................................... 18
E.      Voting Classes; Presumed Acceptance by Non-Voting Classes. ............................... 18
F.      Intercompany Interests. ...................................................................................... 18
G.      Subordinated Claims and Interests. ..................................................................... 18
H.      Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code. .......................... 19

**Article IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ......................................................... 19
A.      Restructuring Transactions. ................................................................................ 19
B.      General Settlement of Claims. ............................................................................ 19
C.      Sources of Consideration for Plan Distributions. ................................................... 19
D.      Corporate Existence. ......................................................................................... 20
E.      Vesting of Assets in the Reorganized Debtors. ..................................................... 21
F.      Cancellation of Existing Securities and Instruments. .............................................. 21
G.      Corporate Action. ............................................................................................. 21
H.      New Corporate Governance Documents. .............................................................. 21
I.      Directors and Officers of the Reorganized Debtors. ............................................... 22
J.      Effectuating Documents; Further Transactions. ..................................................... 22
K.      Exemption from Certain Taxes and Fees. ............................................................. 22
L.      Preservation of Causes of Action. ....................................................................... 23
M.      Director, Officer, Manager, and Employee Liability Insurance. ................................ 23
N.      Management Incentive Plan. ............................................................................... 24
O.      Employee Obligations. ...................................................................................... 24

**Article V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ................ 24
A.      Assumption and Rejection of Executory Contracts and Unexpired Leases. ................. 24
B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. .................. 25
C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ............... 25
D.      Indemnification Obligations. .............................................................................. 26
E.      Insurance Policies. ............................................................................................ 26
F.      Modifications, Amendments, Supplements, Restatements, or Other Agreements. ......... 27
G.      Reservation of Rights. ....................................................................................... 27
H.      Nonoccurrence of Effective Date. ....................................................................... 27

UST-0313

I.     Contracts and Leases Entered Into After the Petition Date. ........................................27

**Article VI. PROVISIONS GOVERNING DISTRIBUTIONS** ......................................................**27**
  A.    Timing and Calculation of Amounts to Be Distributed. ...........................................27
  B.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ...................28
  C.    Securities Registration Exemption ...........................................................................28
  D.    Tax Issues and Compliance with Tax Requirements. ..............................................29
  E.    Allocations. ...........................................................................................................29
  F.    No Interest. ............................................................................................................29
  G.    Setoffs and Recoupment. .......................................................................................29
  H.    Claims Paid or Payable by Third Parties. ...............................................................29

**Article VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND**
**DISPUTED CLAIMS** ........................................................................................................**30**
  A.    Allowance of Claims. ............................................................................................30
  B.    Claims Administration Responsibilities. ................................................................30
  C.    Estimation of Claims. ...........................................................................................30
  D.    Adjustment to Claims Register Without Objection. ................................................31
  E.    Time to File Objections to Claims. .........................................................................31
  F.    Disallowance of Claims. ........................................................................................31
  G.    Amendments to Claims. ........................................................................................31
  H.    No Distributions Pending Allowance ......................................................................32
  I.    Distributions After Allowance. ...............................................................................32

**Article VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** .............**32**
  A.    Compromise and Settlement of Claims, Interests, and Controversies. ....................32
  B.    Discharge of Claims and Termination of Interests. .................................................32
  C.    Term of Injunctions or Stays. ................................................................................33
  D.    Release of Liens. ...................................................................................................33
  E.    Debtor Release. .....................................................................................................33
  F.    Release by holders of Claims or Interests. ..............................................................34
  G.    Exculpation. ..........................................................................................................34
  H.    Injunction. ............................................................................................................35
  I.    Protection Against Discriminatory Treatment. .......................................................35
  J.    Recoupment. .........................................................................................................35
  K.    Subordination Rights. ...........................................................................................35

**Article IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE**
**PLAN** ..............................................................................................................................**36**
  A.    Conditions Precedent to the Effective Date. ...........................................................36
  B.    Waiver of Conditions. ...........................................................................................37
  C.    Substantial Consummation. ...................................................................................37
  D.    Effect of Nonoccurrence of Conditions to the Effective Date. ................................37

**Article X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** .....................**37**
  A.    Modification and Amendments. .............................................................................37
  B.    Effect of Confirmation on Modifications. ...............................................................38
  C.    Revocation or Withdrawal of the Plan. ..................................................................38

**Article XI. RETENTION OF JURISDICTION** ...........................................................................**38**

**Article XII. MISCELLANEOUS PROVISIONS** ........................................................................**40**
  A.    Immediate Binding Effect. .....................................................................................40
  B.    Additional Documents. ..........................................................................................40
  C.    Statutory Fees. ......................................................................................................40
  D.    Dissolution of the Committee. ...............................................................................40

UST-0314

E.      Reservation of Rights.................................................................................................40
F.      Successors and Assigns.............................................................................................40
G.      Service of Documents ..............................................................................................41
H.      Entire Agreement......................................................................................................41
I.      Exhibits.....................................................................................................................41
J.      Nonseverability of Plan Provisions..........................................................................42
K.      Votes Solicited in Good Faith...................................................................................42
L.      Waiver or Estoppel....................................................................................................42

UST-0315

**INTRODUCTION**

Ascena Retail Group, Inc. ("Ascena") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose this joint plan of reorganization (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**Article I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A. *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1. "*ABL Agent*" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent and collateral agent under the ABL Credit Agreement.

2. "*ABL Claim*" means any Claim derived from, based upon, or secured pursuant to the ABL Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto.

3. "*ABL Commitment Letter*" has the meaning set forth in the Restructuring Support Agreement.

4. "*ABL Credit Agreement*" means that certain Amended and Restated Credit Agreement dated as of January 3, 2011, as amended and restated by the Second Restatement Agreement dated as of June 14, 2012, by the Third Restatement Agreement dated as of March 13, 2013, by the Fourth Restatement Agreement dated as of July 24, 2015, the Fifth Restatement Agreement dated as of February 27, 2018, and as may otherwise be amended, restated, supplemented or otherwise modified, among Ascena, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto, the issuing banks party thereto, and the ABL Agent, as administrative agent, collateral agent, and swingline lender.

5. "*ABL Documents*" means the ABL Credit Agreement and any other agreements and documents executed in connection with or related thereto.

6. "*ABL Lenders*" means each of the lenders from time to time party to the ABL Credit Agreement.

7. "*Ad Hoc Group*" means, collectively, that certain group of lenders under the Term Loan Facility represented by Milbank LLP, as counsel, and Greenhill & Co., LLC, as financial advisor.

8. "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; and (b) Allowed Professional Fee Claims.

UST-0316

9.  "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which:  (a) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

10.  "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

11.  "*Allowed*" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Court a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim allowed pursuant to the Plan, any stipulation approved by the Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes.  For the avoidance of doubt, a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

12.  "*Ascena*" means Ascena Retail Group, Inc.

13.  "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtors, the debtors in possession, the Estates, or other appropriate parties in interest have asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

14.  "*Backstop Commitment*" means the commitment, on the terms set forth in the Backstop Commitment Letter, of the Backstop Parties to backstop the DIP Term Facility.

15.  "*Backstop Commitment Letter*" means that certain Backstop Commitment Letter, dated as of July 23, 2020, by and among the Backstop Parties and Ascena, as may be amended, supplemented, or modified from time to time, setting forth, among other things, the terms and conditions of the DIP Term Facility and the Backstop Commitment.

16.  "*Backstop Parties*" means certain of the Consenting Stakeholders or their successors, assigns, or Related Funds (in each case, as allowed pursuant to the Backstop Commitment Agreement) that have committed to backstop the DIP Term Facility on the terms set forth in the Backstop Commitment Letter, solely in their capacities as such.

17.  "*Backstop Percentage*" means the applicable percentage set forth in Schedule 2 to the Backstop Commitment Letter.

18.  "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

19.  "*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of Virginia or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the Eastern District of Virginia.

UST-0317

20. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

21. "*Bar Date*" means, collectively, each applicable date established by the Bankruptcy Court by which Proofs of Claim must be Filed.

22. "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

23. "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable.

24. "*Cash Collateral*" has the meaning set forth in the Cash Collateral Order.

25. "*Cash Collateral Order*" means the *Interim Order Under 11 U.S.C. §§ 105, 361, 362, 363, and 507, and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)*, entered on the Bankruptcy Court's docket on July 23, 2020.

26. "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

27. "*Chapter 11 Cases*" means the procedurally consolidated cases filed or to be filed (as applicable) for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

28. "*Claim*" means a claim, as defined in section 101(5) of the Bankruptcy Code, against a Debtor.

29. "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to Claims.

30. "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

31. "*Class*" means a category of Claims or Interests under section 1122(a) of the Bankruptcy Code.

32. "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

33. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

34. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Rule 3020(b)(2) and section 1128 of the Bankruptcy Code, including any adjournments thereof, at which the Bankruptcy Court will consider confirmation of the Plan.

3

UST-0318

35.  "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

36.  "*Consenting Stakeholders*" has the meaning set forth in the Restructuring Support Agreement.

37.  "*Consummation*" means the occurrence of the Effective Date.

38.  "*Creditors' Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

39.  "*Cure/Assumption Objection Deadline*" means the date that is 14 days after filing of the Schedule of Assumed Executory Contracts and Unexpired Leases with the Plan Supplement and service of the Cure Notice; *provided* that if any Executory Contract or Unexpired Lease is added to the Schedule of Assumed Executory Contracts and Unexpired Leases after the filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be 14 days after service of the amended Schedule of Assumed Executory Contracts and Unexpired Leases with such modification.

40.  "*Cure Claim*" means a monetary Claim based upon a Debtor's defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to section 365 of the Bankruptcy Code.

41.  "*Cure Notice*" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include:  (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases; (b) Cure Claims to be paid in connection therewith; and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

42.  "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for current or former directors', managers', and officers' liability.

43.  "*Definitive Documents*" has the meaning set forth in the Restructuring Support Agreement.

44.  "*DIP ABL Agent*" means, as applicable, the administrative agent under the DIP ABL Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP ABL Agreement.

45.  "*DIP ABL Agreement*" means any debtor-in-possession senior secured asset-based revolving credit agreement, by and among the Debtors, the DIP ABL Agent, and the DIP ABL Lenders, as applicable, as approved by the DIP Financing Order.

46.  "*DIP ABL Facility*" means any senior secured asset-based revolving credit facility in accordance to the terms and conditions set forth in the DIP ABL Agreement and the DIP Financing Order, as applicable.

47.  "*DIP ABL Facility Claim*" means any Claim derived from, based upon, or secured pursuant to the DIP ABL Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP ABL Facility.

48.  "*DIP ABL Lender*" means, as applicable, each lender under the DIP ABL Agreement.

49.  "*DIP Financing Order*" means the Final Order of the Bankruptcy Court setting forth the terms of and approving the DIP ABL Facility, as applicable, and the DIP Term Facility.

50.  "*DIP Term Agent*" means Alter Domus (US) LLC, in its capacity as administrative agent under the DIP Term Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Term Agreement.

UST-0319

51. "*DIP Term Agreement*" means that certain debtor-in-possession senior secured term credit agreement, by and among the Debtors, the DIP Term Agent, and the DIP Term Lenders, as approved by the DIP Financing Order.

52. "*DIP Term Facility*" means that certain $311.8 million senior secured term credit facility issued in accordance to the terms and conditions set forth in the DIP Term Agreement and the DIP Financing Order, as applicable.

53. "*DIP Term Facility Claim*" means any Claim derived from, based upon, or secured pursuant to the DIP Term Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Term Facility.

54. "*DIP Term Lender*" means each lender under the DIP Term Agreement.

55. "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that: (a) has been disallowed by a Final Order; (b) is Scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not Scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the holder thereof; or (e) has been withdrawn by the holder thereof.

56. "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto.

57. "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement, entered on September 3, 2020 [Docket No. [●]].

58. "*Disputed*" means a Claim that is not yet Allowed.

59. "*Distribution Record Date*" means the date for determining which holders of Claims are eligible to receive distributions hereunder and shall be the Effective Date or such other date as designated in a Final Order of the Bankruptcy Court; *provided* that the Distribution Record Date shall not apply to publicly held securities.

60. "*DTC*" means the Depository Trust Company.

61. "*Effective Date*" means, with respect to the Plan, the date that is the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.A have been satisfied or waived (in accordance with Article IX.B); and (c) the Plan is declared effective by the Debtors.

62. "*Employee Benefits Programs*" means, collectively, all of the Debtors' wages, compensation, and employee benefits programs according to existing terms and practices, including executive and Insider compensation and benefits programs, Insider and non-Insider severance programs, Insider and non-Insider incentive programs, and Insider and non-Insider retention programs, in each case as were in effect as of the effective date of the Restructuring Support Agreement and were disclosed to counsel for the Required Consenting Stakeholders, including any modifications agreed between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement; *provided* that Employee Benefits Programs shall not include (x) any compensation, post-employment, separation or retirement arrangement with any former Insider (as of the effectiveness of the Restructuring Support Agreement) or (y) any non-qualified deferred compensation plan or supplemental retirement plan, solely to the extent and such plan would benefit any former Insider (as of the effectiveness of the Restructuring Support Agreement), in each case without the consent of the Required Consenting Stakeholders following the Petition Date.

UST-0320

63.     "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

64.     "*Equity Premium*" means an amount of New Common Stock equal to $7.5 million, calculated assuming a total equity value of Reorganized Ascena to be agreed by the Debtors and the Required Consenting Stakeholders.

65.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 upon the commencement of the applicable Debtor's Chapter 11 Case.

66.     "*Exculpated Parties*" means collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) any statutory committees appointed in the Chapter 11 Cases and each of their respective members; (e) each current and former Affiliate of each Entity in clause (a) through the following clause (f); and (f) each Related Party of each Entity in clause (a) through this clause (f).

67.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

68.     "*Exit ABL Facility*" means either (a) a replacement asset-based revolving loan facility pursuant to which one or more DIP ABL Lenders, each in its sole discretion, consents to convert some or all of its outstanding DIP ABL Facility Claims and commitments under the DIP ABL Facility into commitments under such Exit ABL Facility, or (b) a new asset-based revolving loan facility in an amount up to $400 million and, in all events, in an amount sufficient to pay in full in cash the DIP ABL Facility Claims as of the Effective Date.

69.     "*Exit Facilities*" means, collectively, the Exit ABL Facility, the First Out Exit Term Loan Facility, and the Second Out Exit Term Loan Facility.

70.     "*Exit Facilities Term Sheet*" means the term sheet set forth as <u>Exhibit D</u> to the Restructuring Support Agreement.

71.     "*Exit Facility Credit Agreements*" means, collectively, the credit agreements governing the Exit Facilities.

72.     "*Exit Facility Documents*" means the Exit Facility Credit Agreements and related documents governing the Exit Facilities, which shall be, to the extent available, set forth in the Plan Supplement.

73.      "*First Out Exit Term Loan Facility*" shall have the meaning given to "First Out Term Loan Facility" in the Exit Facilities Term Sheet.

74.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

75.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

76.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified, or amended, is not subject to any pending stay and as to which the time to appeal, move for reargument, reconsideration, or rehearing, or seek certiorari has expired and no appeal, motion for reargument, reconsideration, or rehearing or petition for certiorari has been timely taken or filed, or as to which any appeal that has been taken, motion for reargument, reconsideration, or rehearing that has been granted or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule

6

UST-0321

60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

77. "*General Unsecured Claim*" means any Claim that is not Secured and is not (a) an Administrative Claim, (b) a Secured Tax Claim, (c) an Other Secured Claim, (d) a Priority Tax Claim, (e) an Other Priority Claim, (f) an ABL Claim, (g) a Term Loan Claim, or (h) an Intercompany Claim.

78. "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

79. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

80. "*Insider*" shall have the meaning set forth in section 101(31) of the Bankruptcy Code.

81. "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor or a Debtor's Affiliate.

82. "*Intercompany Interest*" means, other than an Interest in Ascena, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

83. "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor.

84. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time, as applicable to the Chapter 11 Cases.

85. "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

86. "*Management Incentive Plan*" means a post-Effective Date management incentive plan, the material terms of which shall be consistent with Article IV.N of the Plan.

87. "*New Board*" means the initial board of directors, members, or managers, as applicable, of Reorganized Ascena.

88. "*New Common Stock*" means the common shares of Reorganized Ascena.

89. "*New Corporate Governance Documents*" means the form of certificate or articles of incorporation, bylaws, limited liability company agreement, partnership agreement, or such other applicable formation documents (if any) of Reorganized Ascena, including any certificates of designation, each of which shall be included in the Plan Supplement.

90. "*Notice and Claims Agent*" means Prime Clerk LLC.

91. "*Other Priority Claim*" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than: (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases.

92. "*Other Secured Claim*" means any Secured Claim, other than (a) an ABL Claim, (b) a DIP ABL Facility Claim, as applicable, (c) a Term Loan Claim, or (d) a DIP Term Facility Claim.

93. "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

94. "*Petition Date*" means July 23, 2020, the date on which the Debtors commenced the Chapter 11 Cases.

UST-0322

95.    "*Plan*" means this plan of reorganization, as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto.

96.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the terms thereof, the Plan, the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement).  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with Article X of the Plan.

97.    "*Priority Claims*" means, collectively, Priority Tax Claims and Other Priority Claims.

98.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

99.    "*Professional*" means an Entity retained in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 328, 363, and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

100.    "*Professional Fee Claims*" means all Claims for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the Confirmation Date that the Bankruptcy Court has not denied by Final Order.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims.

101.    "*Professional Fee Escrow Account*" means an account funded by the Debtors with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount, provided that the Cash funds in the Professional Fee Escrow Account shall be increased from Cash on hand at the Reorganized Debtors to the extent applications are filed after the Effective Date in excess of the amount of Cash funded into the escrow as of the Effective Date.

102.    "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.D of the Plan.

103.    "*Proof of Claim*" means a proof of Claim Filed in the Chapter 11 Cases.

104.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

105.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

106.    "*Related Fund*" means with respect to any Person, an Affiliate or any fund, account, or investment vehicle that is controlled, managed, advised, or sub-advised by such Person, an Affiliate or the same investment manager, advisor or sub-advisor as such Person or an Affiliate of such investment manager, advisor, or sub-advisor.

107.    "*Related Party*" means, with respect to any person or Entity, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special or other committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or

UST-0323

managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors of such person or Entity, and any such Person's or Entity's respective heirs, executors, estates, and nominees.

108. "*Released Party*" means, collectively, each of the following in their capacity as such: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the ABL Agent; (e) the ABL Lenders; (f) the Term Loan Agent; (g) the Term Loan Lenders; (h) each of the lenders and administrative agents under the Exit Facilities; (i) the Backstop Parties; (j) the DIP ABL Agent; (k) the DIP ABL Lenders; (l) the DIP Term Agent; (m) the DIP Term Lenders; (n) each current and former Affiliate of each Entity in the foregoing clause (a) through the following clause (o); and (o) each Related Party of each Entity in the foregoing clause (a) through this clause (o).

109. "*Releasing Party*" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the ABL Agent; (e) the ABL Lenders; (f) Term Loan Agent; (g) the Term Loan Lenders; (h) each of the lenders and administrative agents under the Exit Facilities; (i) the Backstop Parties; (j) the DIP ABL Agent; (k) the DIP ABL Lenders; (l) the DIP Term Agent; (m) the DIP Term Lenders; (n) all holders of Claims; (o) all holders of Interests; (p) each current and former Affiliate of each Entity in foregoing clause (a) through the following clause (q); and (q) each Related Party of each Entity in the foregoing clause (a) through this clause (q); *provided* that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation; *provided further* that any such Entity shall be identified by name as a non-Releasing Party in the Confirmation Order.

110. "*Reorganized Debtors*" means Reorganized Ascena and each of the other Debtors, or any successor thereto, as reorganized pursuant to and under the Plan.

111. "*Reorganized Ascena*" means either (a) Ascena, or any successor thereto, as reorganized pursuant to and under the Plan or (b) a new corporation or limited liability company that may be formed or caused to be formed by the Debtors to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Common Stock to be distributed or sold pursuant to the Plan.

112. "*Required Consenting Stakeholders*" shall have the meaning set forth in the Restructuring Support Agreement.

113. "*Restructuring*" means the restructuring of the Debtors on the terms the Plan and the Restructuring Support Agreement.

114. "*Restructuring Documents*" means the Plan, the Disclosure Statement, the Plan Supplement, and the various agreements and other documents formalizing or implementing the Plan and the transactions contemplated thereunder.

115. "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of July 23, 2020, by and among the Debtors and the Consenting Stakeholders, including all exhibits and schedules attached thereto, as may be amended from time to time in accordance with the terms thereof.

116. "*Restructuring Transactions*" means any transaction and any actions as may be necessary or appropriate to effect a corporate restructuring of the Debtors' and the Reorganized Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan, Restructuring Support Agreement, and Restructuring Transactions Memorandum, including the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued or executed pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as described in Article IV.A of the Plan.

9

UST-0324

117. "*Restructuring Transactions Memorandum*" means a document to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions, including any corporate restructuring or reorganization to be consummated in connection therewith.

118. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be assumed or assumed and assigned by the Reorganized Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time in accordance with the Plan.

119. "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time in accordance with the Plan.

120. "*Schedule of Retained Causes of Action*" means the schedule, which will be included in the Plan Supplement, of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

121. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

122. "*Second Out Exit Term Loan Facility*" shall have the meaning given to "Last Out Term Loan Facility" in the Exit Facilities Term Sheet.

123. "*Secured*" means when referring to a Claim: (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable holder's interest in the applicable Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim.

124. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

125. "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

126. "*Term Loan Agent*" means Goldman Sachs Bank USA, in its capacity as administrative agent under the Term Loan Credit Agreement, and any successor thereto.

127. "*Term Loan Claim*" means all Claims derived from, based upon, or secured pursuant to the Term Loan Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto.

128. "*Term Loan Credit Agreement*" means Term Credit Agreement, dated as of August 21, 2015, and as may otherwise be amended, restated, supplemented or otherwise modified, among Ascena, AnnTaylor Retail, Inc., the lenders party thereto, and the Term Loan Agent, as administrative agent.

129. "*Term Loan Documents*" means the Term Loan Credit Agreement and any other agreements and documents executed in connection with or related thereto

130. "*Term Loan Lenders*" means each of the lenders from time to time party to the Term Loan Credit Agreement.

10

UST-0325

131.　　"*U.S. Trustee*" means the Office of the United States Trustee for the Eastern District of Virginia.

132.　　"*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

133.　　"*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that are unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash.

134.　　"*Voting Deadline*" means October 6, 2020 at 5:00 p.m. prevailing Easter Time.

B.　　*Rules of Interpretation.*

For purposes herein:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (14) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

C.　　*Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.　　*Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

UST-0326

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the Plan Supplement shall control.  In the event of any inconsistency between the Plan or Plan Supplement, on the one hand, and the Confirmation Order on the other hand, the Confirmation Order shall control.

G.      *Restructuring Support Agreement Party Consent Rights and Controlling Documents.*

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the Restructuring Support Agreement as set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan, any Definitive Document, all exhibits to the Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Section I.A of the Plan) and be fully enforceable as if stated in full herein.

## Article II.
## ADMINISTRATIVE CLAIMS, DIP ABL FACILITY CLAIMS, DIP TERM FACILITY CLAIMS, AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP ABL Facility Claims, DIP Term Facility Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Except with respect to Administrative Claims that are Professional Fee Claims or to the extent that an Administrative Claim has not already been paid during the Chapter 11 Cases or a holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash the unpaid portion of its Allowed Administrative Claim on the latest of:  (a)  the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements and/or arrangements governing, instruments evidencing, or other documents relating to such transactions (and no requests for payment of such Administrative Claims must be Filed or served).  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim Allowed by Final Order.

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party by the Claims Objection Bar Date.

UST-0327

B.    *DIP ABL Facility Claims.*

To the extent the Debtors enter into the DIP ABL Facility prior to the Confirmation Date, all DIP ABL Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP ABL Agreement on such date, (b) all accrued and unpaid interest thereon to the date of payment, and (c) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP ABL Agreement and the DIP Financing Order.

Except to the extent that a holder of an Allowed DIP ABL Facility Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of each Allowed DIP ABL Facility Claim, on the Effective Date, each Holder of an Allowed DIP ABL Facility Claim shall be Paid in Full.  As used in this paragraph, "Paid in Full" shall mean (i) if those certain conversion conditions set forth in the DIP ABL Agreement remain unsatisfied as of the Effective Date, on the Effective Date, each holder of an Allowed DIP ABL Facility Claim shall receive the indefeasible repayment in full in Cash of all obligations (including principal, interests, fees, expenses, indemnities (other than contingent indemnification obligations for which no claim has been asserted)) under the DIP ABL Agreement, the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancellation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the DIP ABL Agreement, or (ii) if those certain conversion conditions as set forth in the DIP ABL Agreement are fully satisfied as of the Effective Date, on the Effective Date, each holder of an Allowed DIP ABL Facility Claim shall receive, unless such holder agrees to less favorable treatment, its Pro Rata share of participation in the Exit ABL Facility.  The Liens securing the DIP ABL Facility shall not be released until such time as (x) the DIP ABL Facility is Paid in Full, (y) the commitments to lend thereunder have terminated, and (z) the DIP ABL Agent has received evidence reasonably satisfactory to it that the DIP ABL Facility has been terminated and the security granted in connection therewith released.

Subject to the DIP ABL Facility Claims being Paid in Full in accordance with the terms of this Plan, or other such treatment as contemplated by Article II.B of the Plan, on the Effective Date all Liens and security interests granted to secure such obligations (other than those granted in connection with the payoff arrangements and cash collateralization of such obligations) shall be automatically terminated and of no further force or effect without any further notice to or action, order, or approval of the Bankruptcy Court.

C.    *DIP Term Facility Claims.*

All DIP Term Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP Term Agreement on such date, (b) all accrued and unpaid interest thereon to the date of payment, and (c) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP Term Agreement and the DIP Financing Order.

On the Effective Date, each holder of an Allowed DIP Term Facility Claim shall receive, unless such holder agrees to less favorable treatment and subject to the terms and conditions of the DIP Term Facility and the Exit Facility Term Sheet, cash in an amount equal to its allowed DIP Term Facility Claim; *provided* that, if certain conditions as set forth in the DIP Term Agreement and Exit Facility Term Sheet are satisfied, each holder of an allowed DIP Term Facility Claim shall receive (i) loans arising under the First Out Exit Term Loan Facility in an amount equal to such holder's allowed DIP Term Facility Claim and (ii) cash on account of accrued and unpaid interest and other charges payable through the Effective Date, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed DIP Term Facility Claim.

D.    *Professional Compensation.*

1.    <u>Professional Fee Escrow Account.</u>

As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been

13

UST-0328

irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that obligations with respect to Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

2. <u>Final Fee Applications and Payment of Professional Fee Claims.</u>

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The amount of the Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

3. <u>Professional Fee Escrow Amount.</u>

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; *provided* that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4. <u>Post-Confirmation Date Fees and Expenses.</u>

From and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors, as applicable. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten business days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors or the Reorganized Debtors, as applicable. If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected professional may submit such dispute to the Bankruptcy

UST-0329

Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

E.    *Priority Tax Claims.*

      Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of an Allowed Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, at the option of the applicable Debtor or Reorganized Debtor, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (i) Cash equal to the amount of such Allowed Priority Tax Claim on the Effective Date or (ii) otherwise treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  For the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**Article III.
CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.    *Classification of Claims and Interests.*

      This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

      The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | ABL Claims | Unimpaired | Presumed to Accept |
| 4 | Term Loan Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Interests in Ascena | Impaired | Deemed to Reject |

B.    *Treatment of Claims and Interests.*

      Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

15

UST-0330

1.     <u>Class 1 – Other Secured Claims</u>

        a.   *Classification*: Class 1 consists of Other Secured Claims against any Debtor.

        b.   *Treatment*: Each holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

            i.   payment in full in Cash;

            ii.   delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

            iii.   Reinstatement of such Claim; or

            iv.   other treatment rendering such Claim Unimpaired.

        c.   *Voting*: Class 1 is Unimpaired. Holders of Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

2.     <u>Class 2 – Other Priority Claims</u>

        a.   *Classification*: Class 2 consists of Other Priority Claims.

        b.   *Treatment*: Each holder of an Other Priority Claim shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired.

        c.   *Voting*: Class 2 is Unimpaired. Holders of Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

3.     <u>Class 3 – ABL Claims</u>

        a.   *Classification*: Class 3 consists of all ABL Claims.

        b.   *Allowance*: $333,000,000.

        c.   *Treatment*: To the extent any Allowed ABL Claims remain outstanding on the Effective Date, each holder of an Allowed ABL Claim shall receive:

            i.   payment in full in Cash of its Allowed ABL Claim and replacement or cash collateralization of all issued and undrawn letters of credit in the amounts specified under the ABL Credit Agreement;

            ii.   the collateral securing its Allowed ABL claim;

            iii.   Reinstatement of its Allowed ABL Claim under the Exit ABL Facility; or

            iv.   such other treatment that renders its Allowed ABL Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

        d.   *Voting*: Class 3 is Unimpaired. Holders of ABL Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

UST-0331

4.      Class 4 – Term Loan Claims

     a.   *Classification*:  Class 4 consists of all Term Loan Claims.

     b.   *Allowance*:  $1,271,597,089.

     c.   *Treatment:*  Each holder of an Allowed Term Loan Claim shall receive its Pro Rata share of:

        i.   the loans arising under the Second Out Exit Term Loan Facility; and

        ii.   55.1% of the New Common Stock less the percentage of New Common Stock distributed as the Equity Premium, subject to dilution on account of the Management Incentive Plan.

     d.   *Voting:* Class 4 is Impaired.  Holders of Allowed Term Loan Claims are entitled to vote to accept or reject the Plan.

5.      Class 5 – General Unsecured Claims

     a.   *Classification*:  Class 5 consists of all General Unsecured Claims.

     b.   *Treatment*:

        i.   ***If holders of Allowed General Unsecured Claims vote as a class to accept the Plan,*** each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of Cash in an amount equal to $500,000.

        ii.   ***If holders of Allowed General Unsecured Claims vote as a class to reject the Plan,*** each holder of an Allowed General Unsecured Claim shall receive treatment consistent with section 1129(a)(7) of the Bankruptcy Code, as determined by the Debtors and the Required Consenting Stakeholders.

     c.   *Voting*:  Class 5 is Impaired.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.      Class 6 – Intercompany Claims

     a.   *Classification*:  Class 6 consists of all Intercompany Claims.

     b.   *Treatment*: Subject to the Restructuring Transactions Memorandum, each Allowed Intercompany Claim shall be Reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Reorganized Debtors.

     c.   *Voting*:  Class 6 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

7.      Class 7 – Intercompany Interests

     a.   *Classification*:  Class 7 consists of all Intercompany Interests.

UST-0332

b. *Treatment*: Subject to the Restructuring Transactions Memorandum, Intercompany Interests shall receive no recovery or distribution and be Reinstated solely to the extent necessary to maintain the Debtors' corporate structure.

c. *Voting*: Class 7 is Unimpaired, and holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

8. Class 8 – Interests in Ascena

a. *Classification*: Class 8 consists of all Interests in Ascena.

b. *Treatment*: Each holder of an Allowed Interest in Ascena shall have such Interest cancelled, released, and extinguished without any distribution.

c. *Voting*: Class 8 is Impaired, and holders of Interests in Ascena are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Interests in Ascena are not entitled to vote to accept or reject the Plan.

C. *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D. *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E. *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court to deem the Plan accepted by the holders of such Claims or Interests in such Class.

F. *Intercompany Interests.*

Holders of Intercompany Interests are retaining their respective Interests not on account of their Intercompany Interests, but rather for the purposes of administrative convenience, for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims. For the avoidance of doubt, any Interest in a non-Debtor owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

G. *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

18

UST-0333

H.    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to alter, amend, or modify the Plan, or any document in the Plan Supplement in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

**Article IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.    *Restructuring Transactions.*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including, without limitation: (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) consummation of such other transactions that are required to effectuate the Restructuring Transactions, including the transaction set forth in the Restructuring Transactions Memorandum; (e) consummation of all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by Reorganized Ascena, which purchase may be structured as a taxable transaction for United States federal income tax purposes; (f) the issuance, distribution, reservation, or dilution, as applicable, of the New Common Stock, as set forth herein; and (g) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

B.    *General Settlement of Claims.*

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including with respect to issues related to the value of the Debtors' unencumbered property.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

C.    *Sources of Consideration for Plan Distributions.*

The Reorganized Debtors shall fund distributions under the Plan from the following sources:

1.    <u>Cash on Hand.</u>

The Reorganized Debtors shall use Cash on hand, including proceeds from the Exit Facilities, to fund distributions to certain holders of Allowed Claims in accordance with Article III.B of the Plan.

19

UST-0334

2.      Issuance and Distribution of New Common Stock.

On the Effective Date, Reorganized Ascena shall issue the New Common Stock to fund distributions to certain holders of Allowed Claims in accordance with Article III of the Plan.

On the Effective Date, each Consenting Stakeholder shall receive, in its capacity as such, (a) its pro rata share (the numerator being such party's holdings of the loans arising under the First Out Exit Term Loan Facility (including through a Related Fund) and the denominator being the aggregate outstanding amount of all loans arising under the First Out Exit Term Loan Facility) of 44.9% of the New Common Stock, which will be subject to dilution from the Management Incentive Plan, and (b) its pro rata share (based on such party's Backstop Percentage (including through a Related Fund)) of the Equity Premium, which will be subject to dilution from the Management Incentive Plan.

The issuance of New Common Stock under the Plan, as well as any options or other equity awards, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the holders of Claims.

Reorganized Ascena will have one class of common equity interests, the New Common Stock.

3.      Exit Facilities.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities (the terms of which shall be set forth in the Exit Facility Documents) on terms consistent with the Exit Facilities Term Sheet and ABL Commitment Letter, if applicable.

Confirmation of the Plan shall be deemed approval of the Exit Facilities and the Exit Facility Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the Exit Facilities.

On the later of (i) the Effective Date and (ii) the date on which the Exit Facility Documents have been executed and delivered, except as otherwise expressly provided in this Plan, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Facility Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted to be senior to them under the respective Exit Facility Documents, and (d) shall not be subject to recharacterization or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order (subject solely to the occurrence of the Effective Date) and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

D.      *Corporate Existence.*

Except as otherwise provided in the Plan, the Restructuring Transactions Memorandum, or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of

20

UST-0335

incorporation and bylaws (or other formation documents) are amended under the Plan, the New Corporate Governance Documents, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

E.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property of each Estate, all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan or the Restructuring Transactions Memorandum, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.      *Cancellation of Existing Securities and Instruments.*

Except as otherwise provided in the Restructuring Support Agreement, the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all notes, instruments, certificates, Securities, and other documents evidencing Claims or Interests, including the ABL Credit Agreement and the Term Loan Credit Agreement, shall be terminated and canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged.

G.      *Corporate Action.*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Restructuring Transactions, including the transactions contemplated by the Restructuring Transactions Memorandum; (2) the selection of the directors and officers for the Reorganized Debtors; (3) the entry into the Exit Facilities and the incurrence of credit thereunder; (4) the adoption of the Management Incentive Plan by the New Board; (5) the issuance and distribution of the New Common Stock; and (6) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit Facilities, the New Common Stock, and any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this Article IV.G shall be effective notwithstanding any requirements under non-bankruptcy law.

H.      *New Corporate Governance Documents.*

The New Corporate Governance Documents shall, among other things: (1) contain terms consistent with the documentation set forth in the Plan Supplement; (2) authorize the issuance, distribution, and reservation of the New Common Stock to the Entities entitled to receive such issuances, distributions and reservations under the Plan; and (3) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and limited as necessary to facilitate compliance with non-bankruptcy federal laws, prohibit the issuance of non-voting equity Securities.

UST-0336

On or immediately before the Effective Date, Ascena or Reorganized Ascena, as applicable, will file Reorganized Ascena's New Corporate Governance Documents with the applicable Secretary of State and/or other applicable authorities in its state of incorporation or formation in accordance with the applicable laws of its state of incorporation or formation, to the extent required for such New Corporate Governance Documents to become effective. After the Effective Date, Reorganized Ascena may amend and restate its formation, organizational, and constituent documents as permitted by the laws of its jurisdiction of formation and the terms of such documents.

I.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the terms of the current members of the board of directors of Ascena shall expire and the new directors and officers of Reorganized Ascena shall be appointed. The New Board will consist of seven (7) directors, including, subject to the terms of the New Corporate Governance Documents:

> a.  Carrie W. Teffner;
>
> b.  the Chief Executive Officer of Reorganized Ascena;
>
> c.  one (1) director determined by Bain Capital Credit, LP;
>
> d.  one (1) director determined by Monarch Alternative Capital LP;
>
> e.  one (1) director determined collectively by Bain Capital Credit, LP, Eaton Vance Management, Lion Point Capital, LP, and Monarch Alternative Capital LP; and
>
> f.  two (2) directors determined by the Backstop Parties.

The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing. To the extent any director or officer of Reorganized Ascena is an Insider, the nature of any compensation to be paid to such director or officer also will be disclosed.

J.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the New Boards, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary, appropriate, or desirable to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock and the Exit Facilities, in the name of and on behalf of Reorganized Ascena or the other Reorganized Debtors, as applicable, without the need for any approvals, authorization, or consents.

K.      *Exemption from Certain Taxes and Fees.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the

UST-0337

payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

L.    *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to <u>Article VIII</u> hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions) of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than with respect to the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

M.    *Director, Officer, Manager, and Employee Liability Insurance.*

On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all of the D&O Liability Insurance Policies (including, if applicable, any "tail policy") and any agreements, documents, or instruments relating thereto. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such policies (including, if applicable, any "tail policy").

23

UST-0338

After the Effective Date, none of the Debtors or the Reorganized Debtors shall terminate or otherwise reduce the coverage under any such policies (including, if applicable, any "tail policy") with respect to conduct occurring as of the Effective Date, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policies regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

On and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

N.      *Management Incentive Plan.*

On the Effective Date, the Reorganized Debtors will reserve New Common Stock representing (on a fully diluted and fully distributed basis) up to 10% of the New Common Stock exclusively for awards and distribution under the Management Incentive Plan, which will contain terms and conditions (including, without limitation, with respect to participants, form, allocation, structure, duration and timing and extent of issuance and vesting) as determined at the discretion of the New Board after the Effective Date.

O.      *Employee Obligations.*

On and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall adopt, assume, continue, and/or honor in the ordinary course of business all obligations related to all Employee Benefits Programs (as agreed to be modified between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement, as applicable) and assume all employment agreements or letters, indemnification agreements, or other agreements entered into with current and former employees (as agreed to be modified between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement, as applicable) unless such employees agree to enter into new agreements on terms and conditions acceptable to the Reorganized Debtors, the Required Consenting Stakeholders and such employee. Notwithstanding the foregoing, no (x) compensation, post-employment, separation or retirement arrangement with any former Insider (as of the effective date of the Restructuring Support Agreement) or (y) non-qualified deferred compensation plan or supplemental retirement plan, solely to the extent any such plan would benefit any former Insider (as of the Effective Date), will be assumed on the Effective Date, in each case without the prior consent of the Required Consenting Stakeholders. Except as provided in the preceding sentence, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law. Further (A) the consummation of the Restructuring Transactions and occurrence of the Effective Date will not constitute a "change of control" for purposes of any Employee Benefits Programs or any employment agreements, letters, or other agreements entered into with current and former employees that are assumed pursuant hereto and (B) entitlements to or treatment with respect to any equity awards on or following the Effective Date will solely be governed by the Management Incentive Plan and any such terms relating to allocation or acceleration of equity awards set forth in any arrangements assumed hereunder will be void.

## Article V.
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be deemed assumed by the Reorganized Debtors, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective

24

UST-0339

Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease.

In the event of an unresolved dispute regarding (1) the amount of any Cure Claim, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (3) any other matter pertaining to assumption, assignment, or payments of any Cure Claims required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order(s) of the Bankruptcy Court. The Debtors or Reorganized Debtors, as applicable, reserve the right to reject any Executory Contract or Unexpired Lease upon the resolution of any cure disputes. If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Rejected Executory Contracts and Unexpired Leases Schedule, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed or assumed and assigned, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any Cure Claim (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

UST-0340

To the extent reasonably practicable, at least 14 days before the Voting Deadline, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third parties. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Claim must be Filed by the Cure/Assumption Objection Deadline.** Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or proposed Cure Claim will be deemed to have assented to such assumption or assumption and assignment, and Cure Claim. To the extent that the Debtors seek to assume and assign an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule and such assignee will provide evidence of "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease.

In the event of an unresolved dispute regarding (1) the amount of any Cure Claim, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (3) any other matter pertaining to assumption, assignment, or payments of any Cure Claims required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order(s) of the Bankruptcy Court. If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right to reject such Executory Contract or Unexpired Lease, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the related Cure Claim, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any such assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Indemnification Obligations.*

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring Transactions on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date.

E.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims. Except as set forth in Article IV.M of the Plan, nothing in this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor. For the avoidance of doubt, insurers and third party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims.

26

UST-0341

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease as of the date of its assumption, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder.

H.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Executory Contract or Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and/or Unexpired Leases assumed by such Debtor, will be performed by the applicable Reorganized Debtor in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that have not been rejected under the Plan will survive and remain unaffected by entry of the Confirmation Order, except as provided therein.

### Article VI.
### PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Interest (or such holder's Affiliate) shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

27

UST-0342

B. *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

    1.    <u>Delivery of Distributions.</u>

    Except as otherwise provided in the Plan, distributions to holders of Allowed Claims, except as otherwise provided in this Article VI, or Interests shall be made to holders of record as of the Distribution Record Date by the Reorganized Debtors: (1) to the signatory set forth on any of the Proof of Claim Filed by such holder or its representative identified therein (or at the last known addresses of such holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (2) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors after the date of any related Proof of Claim; (3) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors have not received a written notice of a change of address; or (4) on any counsel that has appeared in the Chapter 11 Cases on such holder's behalf. Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors and the Reorganized Debtors shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

    2.    <u>No Fractional Distributions.</u>

    No fractional shares of New Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional shares. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

    3.    <u>Minimum Distributions.</u>

    Except for Allowed Administrative Claims paid in the ordinary course of business, holders of Allowed Claims entitled to distributions of $50 or less shall not receive distributions, and each such Claim shall be discharged pursuant to Article VIII and its holder is forever barred pursuant to Article VIII from asserting that Claim against the Reorganized Debtors or their property.

    4.    <u>Undeliverable Distributions and Unclaimed Property.</u>

    In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the applicable Reorganized Debtors without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder to such property or Interest in property shall be discharged and forever barred.

C. *Securities Registration Exemption.*

    The shares of New Common Stock are or may be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

    The offer, issuance, and distribution of the New Common Stock pursuant to the Plan shall be exempt (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code), pursuant to section 1145 of the Bankruptcy Code, without further act or action, from registration under (i) the Securities Act, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring

UST-0343

registration for the offer, issuance, or distribution of securities. Each of the foregoing securities (a) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (b) is freely tradable and transferable by any initial recipient thereof that (i) at the time of transfer, is not an "affiliate" of the Reorganized Ascena as defined in Rule 144(a)(1) under the Securities Act and has not been such an "affiliate" within 90 days of such transfer, and (ii) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code, subject in each case to any restrictions on the transferability of the New Common Stock contained in the New Corporate Governance Documents and any applicable regulatory approval.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock or under applicable securities laws. DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

D.     *Tax Issues and Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors, Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

E.     *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

F.     *No Interest.*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

G.     *Setoffs and Recoupment.*

The Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against or recoup any payments or distributions to be made pursuant to the Plan in respect of any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the holder of such Claim.

H.     *Claims Paid or Payable by Third Parties.*

1.     Claims Paid by Third Parties.

To the extent that the holder of an Allowed Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor, such Claim shall be Disallowed without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. To the extent a holder

29

UST-0344

of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor or Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything herein to the contrary (including, without limitation, Article VIII), nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**Article VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Allowance of Claims.*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtors shall have the sole authority to (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. On and after the Effective Date, the Reorganized Debtors will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise.

C.      *Estimation of Claims.*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law,

30

UST-0345

including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.    *Adjustment to Claims Register Without Objection.*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.    *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

F.    *Disallowance of Claims.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors. All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G.    *Amendments to Claims.*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

UST-0346

H.    *No Distributions Pending Allowance.*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors.

I.    *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the holder of such Claim the distribution to which such holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided herein.

## Article VIII.
### SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any such Claim or Interest, or any distribution to be made on account of any Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.    *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action against any Debtor of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Causes of Action accrued before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  Unless expressly provided in the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

UST-0347

C.    *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

D.    *Release of Liens.*

**Except as otherwise specifically provided in the Plan, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or Reorganized Debtors. The ABL Agent and the Term Loan Agent shall execute and deliver all documents reasonably requested by the Reorganized Debtors or the agent(s) under the Exit Facilities to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

E.    *Debtor Release.*

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim, Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or any other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the ABL Credit Facility, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP ABL Facility, the DIP Term Loan Facility, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Effective Date.**

UST-0348

F.    *Release by holders of Claims or Interests.*

**Effective as of the Effective Date, each Releasing Party (other than the Debtors and Reorganized Debtors), in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim, Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and each other Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Effective Date.**

G.    *Exculpation.*

**Notwithstanding anything contained in the Plan to the contrary, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action or any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Exit Facilities, the Backstop Commitment Letter, the DIP Financing Order, Cash Collateral Order, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

UST-0349

## H.    *Injunction.*

Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests or Causes of Action that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Reorganized Debtors or the other Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action released or settled or subject to exculpation pursuant to the Plan.

## I.    *Protection Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

## J.    *Recoupment.*

In no event shall any holder of a Claim be entitled to recoup against such Claim any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has provided notice of such recoupment in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

## K.    *Subordination Rights.*

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other holder and shall not be subject to levy, garnishment, attachment, or other legal process by any holder by reason of claimed contractual subordination rights.  Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

UST-0350

## Article IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.     *Conditions Precedent to the Effective Date.*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.B hereof):

1.  The Bankruptcy Court shall have entered the Confirmation Order, which shall:

    a.   be in form and substance consistent with the Restructuring Support Agreement;

    b.   authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

    c.   decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

    d.   authorize the Debtors, as applicable/necessary, to:   (a) implement the Restructuring Transactions; (b) issue the New Common Stock pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (c) make all distributions and issuances as required under the Plan, including cash and the New Common Stock; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Exit Facilities;

    e.   authorize the implementation of the Plan in accordance with its terms; and

    f.   provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

2.  the final version of all schedules, documents, and exhibits contained in the Plan Supplement shall have been filed and be consistent in all material respects with the Restructuring Support Agreement and the Plan;

3.  the Restructuring Support Agreement shall remain in full force and effect and shall not be terminated;

4.  the documentation related to the Exit Facilities shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Facilities shall have been satisfied or duly waived in writing in accordance with the terms of the applicable Exit Facility Documents and the closing of the Exit Facilities shall have occurred;

5.  the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions;

6.  all actions, documents, certificates, and agreements necessary to implement the Plan (including any documents contained in the Plan Supplement) shall have been performed or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units, in accordance with applicable laws;

UST-0351

7. all Professional Fee Claims shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed into the Professional Fee Escrow Account pending the Bankruptcy Court's approval thereof;

8. the DIP ABL Facility Claims and ABL Claims shall have been Paid in Full or otherwise satisfied in accordance with Articles II.B and III.B.3 of the Plan (as applicable);

9. all fees, expenses, and other amounts payable pursuant to the DIP Financing Order shall have been paid in full;

10. all professional fees and expenses of the advisors to the Ad Hoc Group shall have been paid in full in accordance with the Restructuring Support Agreement; and

11. the Debtors shall have implemented the Restructuring Transactions in a manner consistent with the Restructuring Support Agreement and this Plan.

**B.** *Waiver of Conditions.*

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article IX (other than the conditions set forth in Article IX.A.7) may be waived only by consent of the Debtors and the Required Consenting Stakeholders without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided* that the provisions of this Article IX relating to the DIP ABL Facility and the ABL Facility may be waived only by consent of the Debtors, the Required Consenting Stakeholders, the DIP ABL Agent, and the ABL Agent without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

**C.** *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

**D.** *Effect of Nonoccurrence of Conditions to the Effective Date.*

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims or Interests; (2) prejudice in any manner the rights of the Debtors, any holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders, or any other Entity in any respect; *provided* that all provisions of the Restructuring Support Agreement that survive termination of that agreement shall remain in effect in accordance with the terms thereof.

**Article X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

**A.** *Modification and Amendments.*

The Debtors reserve the right, subject to the terms of the Restructuring Support Agreement, to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors expressly reserve their rights, subject to the terms of the Restructuring Support Agreement, to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

UST-0352

B.     *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.     *Revocation or Withdrawal of the Plan.*

The Debtors reserve the right, subject to the terms of the Restructuring Support Agreement, to revoke or withdraw the Plan before the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the holders of Claims; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

<div align="center">

**Article XI.**
**RETENTION OF JURISDICTION**

</div>

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of or related to the Chapter 11 Cases and the Plan, including jurisdiction to:

1.     Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

2.     Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.     Resolve any matters related to: (a) the assumption or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims and Claims related to the rejection of an Executory Contract or Unexpired Lease, pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.     Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.     Adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.     Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.     Adjudicate, decide, or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

<div align="center">38</div>

UST-0353

8.     Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.     Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.H hereof;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16.     Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     Determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     Hear and determine all disputes involving the Restructuring Support Agreement or the Exit Facilities;

20.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     Hear and determine all disputes involving the existence, nature, or scope of the exculpation and release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

22.     Enforce all orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

23.     Hear any other matter not inconsistent with the Bankruptcy Code;

24.     Enter an order closing the Chapter 11 Cases; and

UST-0354

25.     Enforce the injunction, release, and exculpation provisions provided in Article VIII hereof.

### Article XII.
### MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

B.     *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, all holders of Claims and Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, will be paid by each of the applicable Reorganized Debtors for each quarter (including any fraction thereof) until the applicable Chapter 11 Case of such Reorganized Debtor is converted, dismissed, or closed, whichever occurs first.

D.     *Dissolution of the Committee.*

On the Effective Date, the Committee, if any is appointed, shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date by the Committee and its Professionals. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.

E.     *Reservation of Rights.*

Before the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to any Claims or Interests.

F.     *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

40

UST-0355

G.      *Service of Documents*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Ascena Retail Group, Inc.<br>933 MacArthur Boulevard<br>Mahwah, New Jersey 07430<br>Attn.: Michael Veitenheimer | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Attn.: Steven N. Serajeddini<br><br>and<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn.: John R. Luze, Jeff Michalik<br><br>and<br><br>Cooley LLP<br>1299 Pennsylvania Avenue, NW, Suite 700<br>Washington, DC 20004-2400<br>Attn.: Cullen D. Speckhart, Olya Antle |
| **United States Trustee** | **Counsel to the Ad Hoc Group** |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 | Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001-2163<br>Attn.: Evan Fleck, Abigail Debold |

After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to parties in interest providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such party must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Entire Agreement.*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://www.cases.primeclerk.com/ascena or the Bankruptcy Court's website at www.vaeb.uscourts.gov.

UST-0356

J.      *Nonseverability of Plan Provisions.*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

K.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law (including the Securities Act), rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

L.      *Waiver or Estoppel.*

Each holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

*[Remainder of page intentionally left blank]*

42

UST-0357

Respectfully submitted, as of the date first set forth above,

Dated: July 31, 2020

Ascena Retail Group, Inc. (on behalf of itself and all other Debtors)

By:    */s/ Carrie W. Teffner*

Name:    Carrie W. Teffner

Title:     Interim Executive Chair, Ascena Retail Group, Inc.

43

UST-0358

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | )  | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE JOINT
CHAPTER 11 PLAN OF REORGANIZATION OF
ASCENA RETAIL GROUP, INC. AND ITS DEBTOR AFFILIATES**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:     (202) 842-7800
Facsimile:     (202) 842-7899

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated:  July 31, 2020

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

UST-0359

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OF ASCENA RETAIL GROUP, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XI HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS AND CERTAIN PROPONENTS OF THE RESTRUCTURING SUPPORT AGREEMENT, INCLUDING HOLDERS OF APPROXIMATELY 68 PERCENT OF THE TERM LOAN CLAIMS. ALL SUCH PARTIES URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE

UST-0360

SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND CONSISTENT WITH THE RESTRUCTURING SUPPORT AGREEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

UST-0361

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................................ 1

II.    PRELIMINARY STATEMENT ......................................................................................... 1

III.   OVERVIEW OF THE PLAN ............................................................................................ 3

     A.    Purpose and Effect of the Plan .............................................................................. 3
     B.    Substantial Debt-for-Equity Exchange .................................................................. 3
     C.    Releases ................................................................................................................. 4

IV.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN .................................................................................................................................. 5

     A.    What is chapter 11? ............................................................................................... 5
     B.    Why are the Debtors sending me this Disclosure Statement? ............................... 5
     C.    Am I entitled to vote on the Plan? ......................................................................... 5
     D.    What will I receive from the Debtors if the Plan is consummated? ....................... 6
     E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP ABL Facility Claim, DIP Term Facility Claim, or a Priority Tax Claim? ............ 8
     F.    Are any regulatory approvals required to consummate the Plan? ........................ 10
     G.    What happens to my recovery if the Plan is not confirmed or does not go effective? ................. 10
     H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" .............................................................................................. 10
     I.    What are the sources of Cash and other consideration required to fund the Plan? ......................... 10
     J.    Are there risks to owning the New Common Stock upon emergence from chapter 11? ............... 10
     K.    Will the final amount of Allowed General Unsecured Claims affect my recovery under the Plan? .............................................................................................................. 10
     L.    Will there be releases and exculpation granted to parties in interest as part of the Plan? ............ 11
     M.   What impact does the Claims Bar Date have on my Claim? ................................ 13
     N.    What is the deadline to vote on the Plan? ............................................................ 14
     O.    How do I vote for or against the Plan? ................................................................ 14
     P.    Why is the Bankruptcy Court holding a Confirmation Hearing? ........................ 14
     Q.    When is the Confirmation Hearing set to occur? ................................................ 14
     R.    What is the purpose of the Confirmation Hearing? ............................................. 15
     S.    What is the effect of the Plan on the Debtors' ongoing business? ...................... 15
     T.    Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors? ................................................................ 15
     U.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? .............................................................................................................. 15
     V.    Do the Debtors recommend voting in favor of the Plan? .................................... 16
     W.   Who Supports the Plan? ....................................................................................... 16

V.    THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN ............... 16

     A.    Restructuring Support Agreement ....................................................................... 16
     B.    The Plan ............................................................................................................... 16

VI.   IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT ............. 18

     A.    Certain Key Terms Used in this Disclosure Statement ....................................... 18
     B.    Additional Important Information ........................................................................ 22

UST-0362

| VII. | THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW | 24 |
| --- | --- | --- |
| | A. | The Debtors | 24 |
| | B. | Prepetition Capital Structure | 25 |

| VIII. | EVENTS LEADING TO THE CHAPTER 11 FILINGS | 25 |
| --- | --- | --- |

| IX. | EVENTS OF THE CHAPTER 11 CASES | 26 |
| --- | --- | --- |
| | A. | Corporate Structure upon Emergence | 26 |
| | B. | Expected Timetable of the Chapter 11 Cases | 27 |
| | C. | First Day Relief | 27 |
| | D. | Other Procedural and Administrative Motions | 27 |
| | E. | Approval of the DIP Facilities | 27 |
| | F. | Executory Contracts and Unexpired Leases | 28 |
| | G. | Lease Renegotiation and Store Closing Process | 29 |
| | H. | Schedules and Statements | 30 |
| | I. | Litigation Matters | 30 |
| | J. | Appointment of Official Committee | 30 |

| X. | PROJECTED FINANCIAL INFORMATION | 30 |
| --- | --- | --- |

| XI. | RISK FACTORS | 30 |
| --- | --- | --- |
| | A. | Bankruptcy Law Considerations | 30 |
| | B. | Risks Related to Recoveries under the Plan | 35 |
| | C. | Risks Related to the Debtors' and the Reorganized Debtors' Businesses | 36 |

| XII. | SOLICITATION AND VOTING PROCEDURES | 38 |
| --- | --- | --- |
| | A. | Holders of Claims Entitled to Vote on the Plan | 38 |
| | B. | Voting Record Date | 39 |
| | C. | Voting on the Plan | 39 |
| | D. | Ballots Not Counted | 39 |

| XIII. | CONFIRMATION OF THE PLAN | 39 |
| --- | --- | --- |
| | A. | Requirements for Confirmation of the Plan | 39 |
| | B. | Best Interests of Creditors/Liquidation Analysis | 40 |
| | C. | Feasibility | 40 |
| | D. | Acceptance by Impaired Classes | 40 |
| | E. | Confirmation Without Acceptance by All Impaired Classes | 40 |
| | F. | Valuation of the Debtors | 41 |

| XIV. | CERTAIN SECURITIES LAW MATTERS | 41 |
| --- | --- | --- |
| | A. | Issuance of Securities under the Plan | 42 |
| | B. | Subsequent Transfers | 42 |
| | C. | Management Incentive Plan | 43 |

| XV. | CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 43 |
| --- | --- | --- |

| XVI. | RECOMMENDATION | 57 |
| --- | --- | --- |

UST-0363

**EXHIBITS**

| | |
|---|---|
| EXHIBIT A | Plan of Reorganization |
| EXHIBIT B | Restructuring Support Agreement |
| EXHIBIT C | Corporate Structure Chart |
| EXHIBIT D | Disclosure Statement Order |
| EXHIBIT E | Financial Projections |
| EXHIBIT F | Valuation Analysis |
| EXHIBIT G | Liquidation Analysis |

UST-0364

## I.  INTRODUCTION

Ascena Retail Group, Inc. ("Ascena") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. and Its Debtor Affiliates* (the "Plan"), dated July 31, 2020.[2]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for Ascena and each of its affiliated Debtors.

THE DEBTORS AND THE PARTIES TO THE RESTRUCTURING SUPPORT AGREEMENT (COLLECTIVELY, THE "PROPONENTS") BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS.  THE DEBTORS AND THE OTHER PROPONENTS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

## II.  PRELIMINARY STATEMENT

Amidst the challenges facing many in the retail industry, the Debtors commenced these Chapter 11 Cases with a comprehensive pre-negotiated restructuring in hand, together with key creditor support.  After several months of diligence and arms' length negotiations with certain secured term loan lenders, the Debtors have reached agreement with Term Loan Lenders holding approximately 68% of the outstanding Term Loan Claims (the "Consenting Stakeholders") to fund and support an expedited restructuring that will ensure a viable enterprise and maximize stakeholder recoveries.  The prenegotiated restructuring will deleverage the Debtors' balance sheet by more than $1 billion and provide for an infusion of $150 million in new money.  As contemplated in the Restructuring Support Agreement, dated as of July 23, 2020 (a copy of which is attached hereto as **Exhibit B**), the Debtors intend to move swiftly through these cases to preserve the significant value embodied in the Restructuring Support Agreement.

The Debtors are a leading specialty retailer for women and girls.  Tracing their roots back to a single Dressbarn store built in 1962, today the Debtors operate a portfolio of recognizable brands, including Ann Taylor, LOFT, Lane Bryant, Catherines, Justice, Lou & Grey, and Cacique.  As of the Petition Date (as defined herein), the Debtors operated approximately 2,800 stores in the United States, Canada, and Puerto Rico, with more than 12.5 million active customers, and nearly 40,000 employees. As of the Petition Date, the Debtors have approximately $1.60 billion in funded debt obligations, including approximately $330 million in outstanding obligations under the its $500 million senior secured asset-based lending facility and approximately $1.27 billion in senior secured term loan obligations.

As is the case with brick and mortar retailers across the United States and the rest of the world, the Debtors' businesses have been drastically affected by the COVID-19 pandemic.  On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.  As global markets grappled with the escalating spread of the virus, national, state, and local governments across the United States and throughout the world imposed curfews, social distancing protocols, and shelter-in-place orders.  In compliance with these mandates, and to protect the health and safety of the Debtors' customers and employees, on March 17, 2020, the Debtors implemented temporary closures of all retail stores, which then necessitated the difficult decision to furlough nearly all of its store-level workforce and a substantial portion of its corporate workforce.  Notwithstanding the Debtors' efforts to preserve liquidity over the past several months, these circumstances, coupled with the Debtors' already highly leveraged balance sheet, accelerated the need for a long-term strategic solution—a solution the Company ultimately determined to implement through these chapter 11 cases.

Over the past several years, the Debtors have been proactive in developing structural and strategic transformations to refine the Debtors' operating model to center on key customer segments, implement initiatives

---

[2]  Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan.  **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern**.

UST-0365

designed to optimize product flow through the Debtors' distribution channels, and to optimize its store fleet by reducing the number of underperforming stores and obtaining rent relief. In doing so, the Debtors have realized significant costs savings. Among other things, over the past several months, the Debtors have taken decisive action to address its capital structure and implement a strategic plan (the "Strategic Plan") aimed at rationalizing the Debtors' brand and store fleet portfolio, realigning distribution capabilities, and implementing various other cost-saving measures. The Strategic Plan represents a continuation of already existing initiatives, described herein, to address the existing macro-economic challenges of the brick and mortar retail industry.

Moreover, to proactively address the August 21, 2022 maturity of the Term Loans, the Board, including a special committee of disinterested directors (the "Special Committee"), began reviewing strategic alternatives to address the Debtors' capital structure in Fall 2019. But the effects of the COVID-19 pandemic on the Debtors' businesses has accelerated the need to realize the benefits of these strategies and settle on the necessary path forward.

Accordingly, over the past several months, the Debtors have been actively exploring financing and other alternatives and have engaged with an ad hoc group of Term Loan Lenders. After an extensive review, the Board and Special Committee ultimately determined that there were no financing or other out-of-court alternatives that provided a viable path forward. Through extensive negotiations, though, the Debtors and their secured lenders have agreed to the terms of a crucial and comprehensive recapitalization, the terms of which are embodied in the Restructuring Support Agreement and the Plan

Under the terms of the Restructuring Support Agreement and Plan, a majority of the Term Loan Lenders have agreed to equitize a substantial portion of the outstanding Term Loans and fully backstop $150 million in new money financing (the "New Term Loan Financing") to fund the Strategic Plan and the Debtors' emergence from these chapter 11 cases. More specifically, the Restructuring Support Agreement and Plan provide that:

- all Term Loan Lenders will receive the opportunity to participate in $75 million of the New Term Loan Financing, which will be funded initially in the form of a debtor-in-possession financing facility to be syndicated following the "first day" hearing in these chapter 11 cases and that the Debtors will seek approval of at the "second day" hearing;

- the Term Loan Lenders that have agreed to backstop the New Term Loan Financing will fund the remaining $75 million of the New Term Loan Financing on the same economic terms;

- all Term Loan Lenders that participate in the New Term Loan Financing will have certain of their prepetition Term Loans rolled up into the debtor-in-possession financing, and the aggregate $311.8 million in loans (including the $150 million in new money loans) will be converted to a new first-out term loan facility upon emergence from these chapter 11 cases;

- all Term Loan Lenders will receive their pro rata share of: (a) 55.1% of the equity in Reorganized Ascena; and (b) participation in $88.2 million in new second-out term loans;

- all Consenting Stakeholders will have the opportunity to receive their pro rata share (based on their holdings of loans under the new first-out term loan facility described above) 44.9% of the equity in Reorganized Ascena upon emergence from these chapter 11 cases;

- the ABL Lenders will be paid in full from cash on hand or proceeds from a new asset-based lending exit credit facility (the "ABL Exit Facility");

- holders of general unsecured claims will receive their pro rata share of $500,000, provided that holders of general unsecured claims vote as a class to accept the Plan; however, if holders of general unsecured claims vote as a class to reject the Plan, they will receive treatment consistent with section 1129(a)(7) of the Bankruptcy Code; and

- existing common equity in Ascena will be cancelled.

After many months of reviewing alternatives both before and after the COVID-19 pandemic, the Debtors determined that the Restructuring Support Agreement represents the best option available to the Debtors. The commitment of the Term Loan Lenders to support the transactions embodied in the Restructuring Support Agreement, including funding the New Term Loan Financing, provides the Debtors with substantial certainty that they will have the liquidity necessary to continue to provide a best-in-class experience for their customers and achieve their Strategic Plan both during and after emergence from these chapter 11 cases. Implementing the transactions contemplated by

UST-0366

the Restructuring Support Agreement will also substantially deleverage the Debtors' balance sheet, positioning Ascena for long-term success.

For the reasons set forth herein, the Debtors believe that the Plan represents the highest and best value maximizing alternative and urge all parties to vote to accept the Plan.

## III. OVERVIEW OF THE PLAN

The Plan provides for the reorganization of the Debtors as a going concern and will significantly reduce the Debtors' long-term debt and annual interest payments while preserving the Debtors' existing liquidity and resulting in a stronger, delevered balance sheet. Specifically, the Plan contemplates a restructuring of the Debtors through a debt-for-equity conversion. The key terms of the Plan are as follows:

### A. Purpose and Effect of the Plan

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor may reorganize its business for the benefit of its stakeholders. The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth how a debtor will treat claims and equity interests.

A bankruptcy court's confirmation of a plan of reorganization binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains any property under the plan.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the Debtors from any debt arising before the Effective Date, terminate all of the rights and interests of pre-bankruptcy equity security holders, and substitute the obligations set forth in the Plan for those pre-bankruptcy Claims and Interests. Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan does not contemplate the substantive consolidation of the Debtors' Estates. Instead, the Plan, although proposed jointly, constitutes a separate plan for each of the Debtors in these Chapter 11 Cases. Holders of Allowed Claims or Interests against each of the Debtors will receive the same recovery provided to other Holders of Allowed Claims or Interests in the applicable Class and will be entitled to their share of assets available for distribution to such Class.

The feasibility of the Plan is premised upon, among other things, the Debtors' ability to achieve the goals of their long-range business plan, make the distributions contemplated under the Plan and pay certain obligations in the ordinary course of the Reorganized Debtors' business. The Reorganized Debtors' financial projections are set forth in **Exhibit E** attached hereto. Although the Debtors' believe the projections are reasonable and appropriate, they include a number of assumptions and are subject to a number of risk factors and to significant uncertainty. Actual results may differ from the projections, and the differences may be material.

### B. Substantial Debt-for-Equity Exchange

As of the Petition Date, the Debtors had outstanding funded debt obligations in the aggregate principal amount of approximately $1.60 billion, consisting primarily of approximately (a) $330 million under the ABL Credit Agreement and (b) $1.27 billion outstanding under the Term Loan Credit Agreement.

If the Plan is confirmed, Ascena will shed more than $1 billion of funded debt upon emergence from these Chapter 11 Cases. Ascena's pro forma exit capital structure will consist of (a) a $400 million Exit ABL Facility, (b) a $311.8 million First Out Exit Term Loan Facility, (c) a $88.2 million Last Out Exit Term Loan Facility and (d) the New Common Stock.

3

UST-0367

Specifically, the Plan contemplates the following Restructuring Transactions:

- the Debtors are in discussions with the ABL Lenders regarding providing a $400 million Exit ABL Facility, which may be made available as part of a $400 million debtor-in-possession financing facility that would convert to an Exit ABL Facility upon satisfaction of certain conditions and emergence from these chapter 11 cases;

- all Term Loan Lenders will receive the opportunity to participate in the $75 million New Term Loan Financing, which will be funded initially in the form of a debtor-in-possession financing facility to be syndicated following the "first day" hearing in these chapter 11 cases and that the Debtors will seek approval of at the "second day" hearing;

- the Term Loan Lenders that have agreed to backstop the New Term Loan Financing will fund the remaining $75 million of the New Term Loan Financing on the same economic terms;

- all Term Loan Lenders that participate in the New Term Loan Financing will have $161.8 million of their prepetition Term Loans rolled up into the debtor-in-possession financing, and the aggregate $311.8 million in loans will be converted to a new first-out term loan facility upon emergence from these chapter 11 cases;

- all Term Loan Lenders will also receive their pro rata share of: (a) 55.1% of the equity in Reorganized Ascena; and (b) participation in $88.2 million of new second-out term loans;

- all Consenting Stakeholders will have the opportunity to receive their pro rata share (based on their holdings of loans under the new first-out term loan facility described above) of 44.9% of the equity in Reorganized Ascena upon emergence from these chapter 11 cases;

- holders of general unsecured claims will receive their pro rata share of cash in an aggregate amount equal to $500,000, provided that holders of general unsecured claims vote as a class to accept the Plan; *provided* that if holders of general unsecured claims vote as a class to reject the Plan, each holder of a general unsecured claim shall receive treatment consistent with section 1129(a)(7) of the Bankruptcy Code; and

- Interests in Ascena will be cancelled, released, and extinguished without any distribution.

**C.      Releases**

The Plan contains certain releases (as described more fully in Article IV.L hereof), including mutual releases between (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the ABL Agent; (e) the ABL Lenders; (f) the Term Loan Agent; (g) the Term Loan Lenders; (h) each of the lenders and administrative agents under the Exit Facilities; (i) the Backstop Parties; (j) the DIP ABL Agent; (k) the DIP ABL Lenders; (l) the DIP Term Agent; (m) the DIP Term Lenders; (n) each current and former Affiliate of each Entity in the foregoing clause (a) through the following clause (o); and (o) each Related Party of each Entity in the foregoing clause (a) through this clause (o), and, as a Releasing Party, all holders of Claims; *provided* that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation; *provided further* that any such Entity shall be identified by name as a non-Releasing Party in the Confirmation Order.

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things, the releases, exculpations, and injunctions are: (a) tailored to the specific circumstances of the cases; (b) provide closure with respect to prepetition Claims and Causes of Action, which the Debtors determined is a valuable component of the overall restructuring under the circumstances and is integral to the Plan; (c) a condition to the global settlement and a necessary part of the Plan; (d) given to the Released Parties and Exculpated Parties, each of which has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of a value-maximizing restructuring; and (e) have the support of the vast majority of the holders of the Term Loan Claims.  The Debtors believe that each of the Released Parties and Exculpated Parties has played an integral role in formulating or enabling the Debtors to propose the Plan

UST-0368

and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party in connection with Confirmation of the Plan.

## IV.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.  What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an Estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.  Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with these requirements.

### C.  Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Each Class's respective voting status is set forth below.

5

UST-0369

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | ABL Claims | Unimpaired | Presumed to Accept |
| 4 | Term Loan Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Interests in Ascena | Impaired | Deemed to Reject |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to holders of Allowed Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 1 | Other Secured Claims | In full and final satisfaction of each Allowed Other Secured Claim, except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, each holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor: (a) payment in full in Cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) other treatment rendering such Claim Unimpaired. | $[●] | 100% |
| 2 | Other Priority Claims | In full and final satisfaction of each Allowed Other Priority Claim, except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, each holder of an Other Priority Claim shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired. | $[●] | 100% |

---

3    The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

UST-0370

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 3 | ABL Claims | To the extent any Allowed ABL Claims remain outstanding on the Effective Date, in full and final satisfaction of each Allowed ABL Claim, except to the extent that a holder of an Allowed ABL Claims agrees to a less favorable treatment, such holder shall receive (a) payment in full in Cash of its Allowed ABL Claim; (b) replacement or cash collateralization of all issued and undrawn letters of credit in the amounts specified under the ABL Credit Agreement; (c) Reinstatement of its Allowed ABL Claim under the Exit ABL Facility; or (d) such other treatment that renders its Allowed ABL Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $[●] | 100% |
| 4 | Term Loan Claims | In full and final satisfaction of each Allowed Term Loan Claim, each holder of an Allowed Term Loan Claim shall receive its Pro Rata share of (a) participation in the loans arising under the Second Out Exit Term Loan Facility; and (b) 55.1% of the New Common Stock, subject to dilution on account of the Management Incentive Plan and the Equity Premium. | $[●] | [●]% |
| 5 | General Unsecured Claims | If Class 5 votes to accept the Plan then, in full and final satisfaction of each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of Cash in an amount equal to $500,000; or if Class 5 votes to reject the Plan, then in full and final satisfaction of each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive treatment consistent with section 1129(a)(7) of the Bankruptcy Code, as determined by the Debtors and the Required Consenting Stakeholders. | $[●] | [●]% |
| 6 | Intercompany Claims | In full and final satisfaction of each Allowed Intercompany Claim, subject to the Restructuring Transactions Memorandum, each Allowed Intercompany Claim shall be Reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Reorganized Debtors. | N/A | N/A |
| 7 | Intercompany Interests | In full and final satisfaction of each Allowed Intercompany Interest, subject to the Restructuring Transactions Memorandum, each Intercompany Interest shall receive no recovery or distribution and be Reinstated solely to the extent necessary to maintain the Debtors' corporate structure. | N/A | N/A |

7

UST-0371

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 8 | Interests in Ascena | Each Interest in Ascena shall be cancelled, released, and extinguished without any distribution. | N/A | 0% |

**E.** **What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP ABL Facility Claim, DIP Term Facility Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP ABL Facility Claims, DIP Term Facility Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**(i)** **Administrative Claims**

Administrative Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein. Except with respect to Administrative Claims that are Professional Fee Claims or to the extent that an Administrative Claim has not already been paid during the Chapter 11 Cases or a holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash the unpaid portion of its Allowed Administrative Claim on the latest of: (a) the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements and/or arrangements governing, instruments evidencing, or other documents relating to such transactions (and no requests for payment of such Administrative Claims must be Filed or served). Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim Allowed by Final Order.

Except as otherwise provided in Article II.A of the Plan and except with respect to Administrative Claims that are Professional Fee Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.

Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party by the Claims Objection Bar Date.

**(ii)** **DIP ABL Facility Claims**

DIP ABL Facility Claims will be satisfied as set forth in Article II.B of the Plan.

To the extent the Debtors enter into the DIP ABL Facility prior to the Confirmation Date, all DIP ABL Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP ABL Agreement on such date, (b) all accrued and unpaid interest thereon to the date of payment, and (c) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP ABL Agreement and the DIP Financing Order.

Except to the extent that a holder of an Allowed DIP ABL Facility Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of each Allowed DIP ABL Facility Claim, on the

8

UST-0372

Effective Date, each Holder of an Allowed DIP ABL Facility Claim shall be Paid in Full.  As used in this paragraph, "Paid in Full" shall mean (i) if those certain conversion conditions set forth in the DIP ABL Agreement remain unsatisfied as of the Effective Date, on the Effective Date, each holder of an Allowed DIP ABL Facility Claim shall receive the indefeasible repayment in full in Cash of all obligations (including principal, interests, fees, expenses, indemnities (other than contingent indemnification obligations for which no claim has been asserted)) under the DIP ABL Agreement, the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancellation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the DIP ABL Agreement, or (ii) if those certain conversion conditions as set forth in the DIP ABL Agreement are fully satisfied as of the Effective Date, on the Effective Date, each holder of an Allowed DIP ABL Facility Claim shall receive, unless such holder agrees to less favorable treatment, its Pro Rata share of participation in the Exit ABL Facility.  The Liens securing the DIP ABL Facility shall not be released until such time as (x) the DIP ABL Facility is Paid in Full, (y) the commitments to lend thereunder have terminated, and (z) the DIP ABL Agent has received evidence reasonably satisfactory to it that the DIP ABL Facility has been terminated and the security granted in connection therewith released.

Subject to the DIP ABL Facility Claims being Paid in Full in accordance with the terms of this Plan, or other such treatment as contemplated by Article II.B of the Plan, on the Effective Date all Liens and security interests granted to secure such obligations (other than those granted in connection with the payoff arrangements and cash collateralization of such obligations) shall be automatically terminated and of no further force or effect without any further notice to or action, order, or approval of the Bankruptcy Cour.

### (iii)    DIP Term Facility Claims

DIP Term Facility Claims will be satisfied as set forth in Article II.C of the Plan.

All DIP Term Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP Term Agreement on such date, (b) all accrued and unpaid interest thereon to the date of payment, and (c) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP Term Agreement and the DIP Financing Order.

Unless such holder agrees to less favorable treatment, and subject to the terms and conditions of the DIP Term Agreement and Exit Facilities Term Sheet, each holder of an Allowed DIP Term Facility Claim shall receive, on the Effective Date, cash in an amount equal to such holders' Allowed Dip Facility Claim; *provided* that, if certain conditions set forth in the DIP Term Agreement and Exit Facilities Term Sheet are satisfied, each holder of the DIP Term Facility Claim shall receive (a) loans arising under the First Out Exit Term Loan Facility in an amount equal to such holders' Allowed DIP Term Facility Claim and (b) cash on account of accrued and unpaid interest and other charges payable through the Effective Date, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed DIP Term Facility Claim.

Subject to the DIP ABL Facility Claims being Paid in Full in accordance with the terms of the Plan, or other such treatment as contemplated in Article II.B of the Plan, on the Effective Date all Liens and security interests granted to secure such obligations (other than those granted in connection with the payoff arrangements and cash collateralization of such obligations) shall be automatically terminated and of no further force or effect without any further notice or action, order, or approval of the Bankruptcy Court.

### (iv)    Professional Fee Claims

Professional Fee Claims will be satisfied as set forth in Article II.D of the Plan, which includes (a) the Debtors establishing and funding the Professional Fee Escrow Account for purposes of paying all Professional Fee Claims Allowed by the Bankruptcy Court, (b) the Bankruptcy Court determining the Allowed amounts of such Professional Fee Claims after notice and a hearing, (c) the Professionals providing a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors, and (d) post-Confirmation Date, the Debtors or Reorganized Debtors paying in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors, as applicable.

UST-0373

(v) **Priority Tax Claims**

Priority Tax Claims will be satisfied as set forth in Article II.E of the Plan. Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of an Allowed Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, at the option of the applicable Debtor or Reorganized Debtor, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (i) Cash equal to the amount of such Allowed Priority Tax Claim on the Effective Date or (ii) otherwise treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. For the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**F.      Are any regulatory approvals required to consummate the Plan?**

There are no known regulatory approvals that are required to consummate the Plan. However, to the extent such any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

**G.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative transaction may provide holders of Allowed Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* "*Confirmation of the Plan - Best Interests of Creditors/Liquidation Analysis*," which begins on page 40 of this Disclosure Statement, and the Liquidation Analysis attached as **Exhibit G**.

**H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan. *See "Confirmation of the Plan,"* which begins on page 40 of this Disclosure Statement, for a discussion of the conditions precedent to consummation of the Plan.

**I.      What are the sources of Cash and other consideration required to fund the Plan?**

The Plan and distributions thereunder will be funded by New Common Stock, participation in the Exit Facilities, and Cash on hand, including proceeds of the Exit Facilities.

**J.      Are there risks to owning the New Common Stock upon emergence from chapter 11?**

Yes. See the section titled "*Risk Factors*" that begins on page 29 of this Disclosure Statement.

**K.      Will the final amount of Allowed General Unsecured Claims affect my recovery under the Plan?**

The Debtors estimate that Allowed General Unsecured Claims total approximately $[●] to $[●]. If Class 5 votes to accept the Plan then, in full and final satisfaction of each General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of Cash in an amount equal to $500,000. If Class 5 votes to reject the Plan, then no distributions under the Plan shall be made on account of Allowed General Unsecured Claims. Although the Debtors' estimate of the ultimately Allowed General Unsecured Claims is the result of the Debtors' careful analysis (in consultation with its advisors) of available information, General Unsecured Claims actually Allowed may be higher or lower than the Debtors' estimate provided herein, which difference could be material.

10

UST-0374

For instance, (i) the Debtors may reject certain Executory Contracts and Unexpired Leases, which may result in rejection damages claims not accounted for in this estimate of the Allowed General Unsecured Claims, and (ii) the Debtors, the Consenting Stakeholders, or the Committee may object to certain proofs of claim, and any such objections could ultimately cause the total amount of Allowed General Unsecured Claims to be reduced, and such changes could be material.

Further, as of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the total amount of Allowed General Unsecured Claims could change as well.

**L.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and the Consenting Stakeholders in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

All holders of Claims that (i) vote to accept the Plan or (ii) who are deemed to accept the Plan or (iii) whose Claims are in a voting Class, but who abstain from voting on the Plan and do not opt out of the release provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties. These third party releases represent an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fourth Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

### 1.      Release of Liens

**Except as otherwise specifically provided in the Plan, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or Reorganized Debtors. The ABL Agent and the Term Loan Agent shall execute and deliver all documents reasonably requested by the Reorganized Debtors or the agent(s) under the Exit Facilities to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

### 2.      Debtor Release

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each**

UST-0375

Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the ABL Credit Facility, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP ABL Facility, the DIP Term Loan Facility, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Effective Date.

3.  *Release by Holders of Claims or Interests*

Effective as of the Effective Date, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Effective Date.

UST-0376

### 4. *Exculpation*

Notwithstanding anything contained in the Plan to the contrary, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action or any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Exit Facilities, the Backstop Commitment Letter, the DIP Financing Order, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 5. *Injunction*

Except with respect to the obligations arising under the Plan, or the Confirmation Order, and except as otherwise expressly provided in the Plan, or the Confirmation Order, all Entities that held, hold, or may hold claims or interests or Causes of Action that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Reorganized Debtors or the other Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action released or settled or subject to exculpation pursuant to the Plan.

### M. What impact does the Claims Bar Date have on my Claim?

The Bankruptcy Court has established [●], 2020, at 5:00 p.m., prevailing Eastern Time, as the general Claims bar date (the "<u>Bar Date</u>") in the Chapter 11 Cases. The following entities holding Claims against the Debtors that arose (or that are deemed to have arisen) prior to the Petition Date, must file proofs of claim on or before the Bar Date: (1) any entity whose Claim against a Debtor is not listed in the applicable Debtor's schedules of assets and liabilities ("<u>Schedules</u>") or is listed in the applicable Debtor's Schedules as contingent, unliquidated, or disputed if such entity desires to participate in any of the Chapter 11 Cases or share in any distribution in any of the Chapter 11 Cases; (2) any entity that believes its Claim is improperly classified in the Schedules or is listed in an incorrect amount and desires to have its Claim Allowed in a different classification or amount from that identified in the Schedules; (3) any entity

UST-0377

that believes its Claim as listed in the Schedules is not an obligation of the specific Debtor against which the Claim is listed and that desires to have its Claim Allowed against a Debtor other than that identified in the Schedules; and (4) any entity that believes its Claim against a Debtor is or may be an administrative expense pursuant to section 503(b)(9) of the Bankruptcy Code (but not any entity that believes it holds an administrative expense Claim under section 503(b)(1) of the Bankruptcy Code).

In accordance with Bankruptcy Rule 3003(c)(2), if any person or entity that is required, but fails, to file a Proof of Claim on or before the Bar Date: (1) such person or entity will be forever barred, estopped, and enjoined from asserting such Claim against the Debtors (or filing a Proof of Claim with respect thereto); (2) the Debtors and their property may be forever discharged from any and all indebtedness or liability with respect to or arising from such Claim; (3) such person or entity will not receive any distribution in the Chapter 11 Cases on account of that Claim; and (4) such person or entity will not be permitted to vote on any plan or plans of reorganization for the Debtors on account of these barred Claims or receive further notices regarding such Claim.

As described in this Disclosure Statement, the distribution you receive on account of your Claim (if any) may depend, in part, on the amount of Claims for which proofs of claim are filed on or before the Bar Date.

**N.**        **What is the deadline to vote on the Plan?**

The Voting Deadline is October 6, 2020, at 5:00 p.m. (prevailing Eastern Time).

**O.**        **How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be completed and signed so that it is **actually** **received** by October 6, 2020, at 5:00 p.m. (prevailing Eastern Time) at the following address: Ascena Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165 (or returned in accordance with the instructions otherwise set forth on your ballot). *See* Article XIII of this Disclosure Statement, which begins on page 39 of this Disclosure Statement.

If a Class of Claims or Interests is eligible to vote and no holder of Claims or Interests, as applicable, in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

**P.**        **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**Q.**        **When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for [October 15], 2020, at [10]:00 a.m. (prevailing Eastern Time). The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than October 6, 2020, at 5:00 (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit D** and incorporated herein by reference.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the national editions of the *Wall Street Journal* and *USA Today* to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

UST-0378

**R.        What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**S.        What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code. As a result, Confirmation means that the Debtors will not be liquidated or forced to go out of business. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is the first business day after which all conditions to Consummation have been satisfied or waived. *See* Article IX of the Plan. Additionally, upon Confirmation, all actions contemplated by the Plan will be deemed authorized and approved.

On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**T.        Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

As of the Effective Date, the term of the current members of the boards of directors of the Debtors shall expire, and the new board and the officers will be appointed for each of the Reorganized Debtors in accordance with the New Corporate Governance Documents and corresponding documents of each Reorganized Debtor. The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the New Board, as well as those persons that will serve as officers of Reorganized Ascena. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Provisions regarding the removal, appointment, and replacement of members of the reorganized New Board will be disclosed in the New Corporate Governance Documents.

**U.        Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Notice and Claims Agent, Prime Clerk LLC:

> ***By regular mail at:***
> **Ascena Ballot Processing**
> **c/o Prime Clerk LLC**
> **One Grand Central Place**
> **60 East 42nd Street**
> **Suite 1440**
> **New York, NY 10165**
>
> ***By hand delivery or overnight mail at:***
> **Ascena Ballot Processing**
> **c/o Prime Clerk LLC**
> **One Grand Central Place**

UST-0379

**60 East 42nd Street**
**Suite 1440**
**New York, NY 10165**

*By electronic mail at:*
**ascenaballots@primeclerk.com**

*By telephone at:*
**(877) 930-4319 (toll free)**
**(347) 899-4594 (international)**

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' notice, claims, and solicitation agent at the address above or by downloading the exhibits and documents from the website of the Debtors' notice, claims, and solicitation agent at http://cases.primeclerk.com/ascena (free of charge) or the Bankruptcy Court's website at www.vaeb.uscourts.gov (for a fee).

### V. Do the Debtors recommend voting in favor of the Plan?

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a significant deleveraging, is in the best interest of all holders of Claims, and that other alternatives fail to realize or recognize the value inherent under the Plan.

### W. Who Supports the Plan?

The Plan is supported by the Debtors and the Consenting Stakeholders as set forth in the Restructuring Support Agreement.

## V. THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN

### A. Restructuring Support Agreement

On July 23, 2020, the Debtors and certain of the Term Loan Lenders holding approximately 68% of the outstanding principal amount under the Term Loan Credit Agreement entered into the Restructuring Support Agreement.  Since executing the Restructuring Support Agreement, the Debtors have documented the terms of the prearranged restructuring contemplated thereby, in the Plan.  The Restructuring Transactions contemplated by the Plan will significantly reduce the Debtors' funded-debt obligations and annual interest payments and result in a stronger balance sheet for the Reorganized Debtors.

The Plan represents a significant step in the Debtors' months-long restructuring process.  The Restructuring Support Agreement, the DIP ABL Facility, the DIP Term Facility, and the commitments underlying the Exit Facilities will allow the Debtors to proceed expeditiously through chapter 11 to a successful emergence.  The Plan will significantly deleverage the Debtors' balance sheet and provide the capital injection needed for the Reorganized Debtors to conduct competitive operations going forward.

### B. The Plan

As discussed in Article III herein, the Plan contemplates a debt-for-equity conversion effectuated through a chapter 11 plan under the following key terms:

#### 1. Equity Interests and Other Securities

The issuance of Securities under the Plan, including the New Common Stock and options, or other equity awards, if any, reserved under the Management Incentive Plan, shall be authorized without the need for any further corporate action and without any action by the holders of Claims or Interests.

16

UST-0380

All of the New Common Stock issued pursuant to the Plan, including any options for the purchase thereof and equity awards associated therewith, shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, the Reorganized Debtors shall issue the New Common Stock to fund distributions to certain holders of Allowed Claims in accordance with Article III of the Plan. Reorganized Ascena will have one class of common equity interests, the New Common Stock.

On the Effective Date, each Consenting Stakeholder shall receive (a) its pro rata share (the numerator being such party's holdings of the loans arising First Out Exit Term Loan Facility (including through any of its Related Funds) and the denominator being the aggregate outstanding amount of all loans arising under the First Out Exit Term Loan Facility) of 44.9% of the New Common Stock, which will be subject to dilution from the Management Incentive Plan, and (b) its pro rata share (based on such party's Backstop Percentage (including through any of its Related Funds)) of the Equity Premium, which will be subject to dilution from the Management Incentive Plan.

### 2. Exit Facilities

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities (the terms of which shall be set forth in the Exit Facility Documents) on terms consistent with the Exit Facilities Term Sheet and ABL Commitment Letter, if applicable.

Confirmation of the Plan shall be deemed approval of the Exit Facilities and the Exit Facility Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the Exit Facilities.

On the later of (i) the Effective Date and (ii) the date on which the Exit Facility Documents have been executed and delivered, except as otherwise expressly provided in the Plan, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Facility Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order (subject solely to the occurrence of the Effective Date) and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 3. Use of Proceeds

Proceeds from the DIP Term Facility, the DIP ABL Facility, and Exit Facilities, as applicable, will be used, among other things, to fund certain distributions under the Plan, the Debtors' operations and administration of the Chapter 11 Cases, as well as for general corporate purposes.

17

UST-0381

#### 4. *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

Critical components of such settlement include the Debtor releases and third-party releases incorporated into the Plan, treatment of and distributions to creditors under the Plan, post-emergence governance rights incentive programs, conditions precedent to Plan confirmation, the treatment of avoidance actions, debtor-in-possession financing, milestones, and covenants. The components of the Plan reflect and implement the concessions and compromises contained in the Restructuring Support Agreement and otherwise agreed to by the Debtors and their stakeholders. The parties to the Restructuring Support Agreement and the parties to be released under the Plan afforded value to the Debtors and aided in the reorganization process by playing a role in the formulation of the Plan and have expended time and resources analyzing and negotiating the complex issues presented by the Debtors' capital structure. The release provisions in the Plan were a component of the Debtors' ability to achieve consensus on the Restructuring Support Agreement and a prearranged plan of reorganization that maximizes recoveries to the Debtors' creditors and affords the Reorganized Debtors the opportunity to restructure their business to compete effectively post-emergence. Absent the prearranged bankruptcy filing and expeditious implementation of the Plan (which preserves trade relationships and, therefore, enterprise value), the Debtors could face a longer, costlier, and uncertain chapter 11 process mired with contentious litigation or a near-term liquidation, which could materially delay and reduce distributions to creditors.

*Please refer to Article XIV herein for a more detailed discussion of securities law considerations related to the New Common Stock.*

### VI. IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

#### A. Certain Key Terms Used in this Disclosure Statement

The following are some of the defined terms used in this Disclosure Statement. This is not an exhaustive list of defined terms in the Plan or this Disclosure Statement, but is provided for ease of reference only. Please refer to the Plan for additional defined terms.

"ABL Agent" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent and collateral agent under the ABL Credit Agreement.

"ABL Claim" means any Claim derived from, based upon, or secured pursuant to the ABL Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto.

"ABL Commitment Letter" has the meaning set forth in the Restructuring Support Agreement.

"ABL Credit Agreement" means that certain Amended and Restated Credit Agreement dated as of January 3, 2011, as amended and restated by the Second Restatement Agreement dated as of June 14, 2012, by the Third Restatement Agreement dated as of March 13, 2013, by the Fourth Restatement Agreement dated as of July 24, 2015, the Fifth Restatement Agreement dated as of February 27, 2018, and as may otherwise be amended, restated, supplemented or otherwise modified, among Ascena, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto, the issuing banks party thereto, and the ABL Agent, as administrative agent and collateral agent and swingline lender.

UST-0382

"ABL Documents" means the ABL Credit Agreement and any other agreements and documents executed in connection with or related thereto.

"ABL Lenders" means each of the lenders from time to time party to the ABL Credit Agreement.

"Ad Hoc Group" means, collectively, that certain group of lenders under the Term Loan Facility represented by Milbank LLP and Greenhill & Co., LLC.

"Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

"Backstop Commitment" means the commitment, on the terms set forth in the Backstop Commitment Letter, of the Backstop Parties to backstop the DIP Term Facility.

"Backstop Commitment Letter" means that certain Backstop Commitment Letter, dated as of July 23, 2020, by and among the Backstop Parties and Ascena, as may be amended, supplemented, or modified from time to time, setting forth, among other things, the terms and conditions of the DIP Term Facility and the Backstop Commitment.

"Backstop Parties" means certain of the Consenting Term Loan Lenders or their successors, assigns, or Related Funds (in each case, as allowed pursuant to the Backstop Commitment Agreement) that have committed to backstop the DIP Term Facility on the terms set forth in the Backstop Commitment Letter, solely in their capacities as such.

"Backstop Percentage" means the applicable percentage set forth in Schedule 2 to the Backstop Commitment Letter.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Virginia having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Eastern District of Virginia.

"Bankruptcy Rules" means Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

"Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

"Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"Commitment Party" shall have the meaning set forth in the Backstop Commitment Agreement.

"Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

"Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

"Consenting Stakeholder" has the meaning set forth in the Restructuring Support Agreement.

"Cure/Assumption Objection Deadline" means the date that is 14 days after filing of the Schedule of Assumed Executory Contracts and Unexpired Leases with the Plan Supplement and service of the Cure Notice; *provided* that if any Executory Contract or Unexpired Lease is added to the Schedule of Assumed Executory Contracts and Unexpired Leases after the filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be

UST-0383

14 days after service of the amended Schedule of Assumed Executory Contracts and Unexpired Leases with such modification.

"DIP ABL Agent" means, as applicable, the administrative agent under the DIP ABL Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP ABL Agreement.

"DIP ABL Agreement" means any debtor-in-possession senior secured asset-based revolving credit agreement, by and among the Debtors, the DIP ABL Agent, and the DIP ABL Lenders, as applicable, as approved by the DIP Financing Order.

"DIP ABL Facility" means any senior secured asset-based revolving credit facility in accordance to the terms and conditions set forth in the DIP ABL Agreement and the DIP Financing Order, as applicable.

"DIP ABL Facility Claim" means any Claim derived from, based upon, or secured pursuant to the DIP ABL Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP ABL Facility.

"DIP ABL Lender" means, as applicable, each lender under the DIP ABL Agreement.

"DIP Financing Order" means the Final Order of the Bankruptcy Court setting forth the terms of and approving the DIP ABL Facility (as applicable) and the DIP Term Facility.

"DIP Term Agent" means Alter Domus (US) LLC, in its capacity as administrative agent under the DIP Term Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Term Agreement.

"DIP Term Agreement" means that certain debtor-in-possession senior secured term credit agreement, by and among the Debtors, the DIP Term Agent, and the DIP Term Lenders, as approved by the DIP Financing Order.

"DIP Term Facility" means that certain $311.8 million senior secured term credit facility issued in accordance to the terms and conditions set forth in the DIP Term Agreement and the DIP Financing Order, as applicable.

"DIP Term Facility Claim" means any Claim derived from, based upon, or secured pursuant to the DIP Term Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Term Facility.

"DIP Term Lender" means each lender under the DIP Term Agreement.

"Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"Equity Premium" means an amount of New Common Stock equal to $7.5 million, calculated assuming a total equity value of Reorganized Ascena to be agreed by the Debtors and the Required Consenting Stakeholders.

"Exit ABL Facility" means either (a) a replacement asset-based revolving loan facility pursuant to which one or more ABL Lenders, each in its sole discretion, consents to convert some or all of its outstanding DIP ABL Facility Claims and commitments under the DIP ABL Facility into commitments under such Exit ABL Facility, or (b) a new asset-based revolving loan facility in an amount up to $400 million and, in all events, in an amount sufficient to pay in full in cash the DIP ABL Facility Claims as of the Effective Date.

"Exit Facilities" means, collectively, the Exit ABL Facility, the First Out Exit Term Loan Facility, and the Last Out Exit Term Loan Facility.

"Exit Facilities Term Sheet" means the term sheet set forth as Exhibit D to the Restructuring Support Agreement

"Exit Facility Credit Agreements" means, collectively, the credit agreements governing the Exit Facilities.

UST-0384

"<u>Exit Facility Documents</u>" means the Exit Facility Credit Agreements and related documents governing the Exit Facilities, which shall be, to the extent available, set forth in the Plan Supplement.

"<u>First Out Exit Term Loan Facility</u>" shall have the meaning given to "First Out Term Loan Facility" in the Exit Facilities Term Sheet.

"<u>General Unsecured Claim</u>" means any Claim that is not Secured and is not (a) an administrative Claim, (b) a secured tax Claim, (c) an other secured Claim, (d) a priority tax Claim, (e) an other priority Claim, (f) an ABL Claim, (g) a Term Loan Claim, or (h) an intercompany Claim.

"<u>Insider</u>" has the meaning ascribed to it in section 101(31) of the Bankruptcy Code.

"<u>Interest</u>" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

"<u>Last Out Exit Term Loan Facility</u>" shall have the meaning set forth in the Exit Facilities Term Sheet.

"<u>Management Incentive Plan</u>" means a post-Effective Date management incentive plan, the material terms of which shall be consistent with Article IV.N of the Plan.

"<u>Person</u>" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

"<u>Petition Date</u>" means July 23, 2020, the date on which the Debtors commenced the Chapter 11 Cases.

"<u>Plan Supplement</u>" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the terms thereof, the Plan, the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement). The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with Article X of the Plan.

"<u>Pro Rata</u>" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

"<u>Term Loan Agent</u>" means Goldman Sachs Bank USA, in its capacity as administrative agent under the Term Loan Credit Agreement, and any successor thereto.

"<u>Term Loan Claim</u>" means all Claims derived from, based upon, or secured pursuant to the Term Loan Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto.

"<u>Term Loan Credit Agreement</u>" means the Term Credit Agreement, dated as of August 21, 2015, and as may otherwise be amended, restated, supplemented or otherwise modified, among Ascena, AnnTaylor Retail, Inc., the lenders party thereto, and the Term Loan Agent, as administrative agent.

"<u>Term Loan Documents</u>" means the Term Loan Credit Agreement and any other agreements and documents executed in connection with or related thereto

"<u>Term Loan Lenders</u>" means each of the lenders from time to time party to the Term Loan Credit Agreement.

UST-0385

**B.    Additional Important Information**

The confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including the section entitled *"Risk Factors,"* and the Plan before submitting your ballot to vote on the Plan.

***The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.***

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan.  The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents.  The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose.  In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or by any similar state, local or foreign regulatory agency, or authority, nor has the SEC or any other agency or authority passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement or upon the merits of the Plan.  Any representation to the contrary is a criminal offense.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon Confirmation of the Plan, the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder (the "Securities Act"), or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in (a) Section 1145 of the Bankruptcy Code or (b) Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  Other securities may be issued pursuant to other applicable exemptions under the federal securities laws.  All securities issued pursuant to the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.  Each Eligible Offeree must be prepared to bear the economic risk of the investment in the New Common Stock issued under Section 4(a)(2) of the Securities Act or Regulation D for an indefinite period of time, since the New Common Stock cannot be transferred or resold unless (i) they are registered under the Securities Act and under any other applicable securities laws or (ii) pursuant to an exemption from such registration.

There is not and there may not be a public market for the New Common Stock, and Reorganized Ascena does not intend to seek any listing of the New Common Stock on any stock exchange or other trading market of any type whatsoever.  Accordingly, there can be no assurance that an active trading market for the New Common Stock will ever develop or, if such a market does develop, that it will be maintained.  BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS

UST-0386

AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE, NONE OF THE DEBTORS MAKES ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES. THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR (B) SECTION 4(A)(2) OF THE SECURITIES ACT OR REGULATION D PROMULGATED THEREUNDER, OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

The Debtors make statements in this Disclosure Statement or incorporate by reference herein certain statements that are considered forward-looking statements under federal securities laws. The Debtors consider all statements regarding anticipated or future matters, to be forward-looking statements. Forward-looking statements may include statements about the Debtors':

- business strategy;

- financial condition, revenues, cash flows, and expenses;

- levels of indebtedness, liquidity, and compliance with debt covenants;

- financial strategy, budget, projections, and operating results;

- general economic and business conditions;

- counterparty credit risk;

- the outcome of pending and future litigation;

- uncertainty regarding the Debtors' future operating results; and

- plan, objections, and expectations.

Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance. There are risks, uncertainties, and other important factors that could cause the Reorganized Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. CERTAIN OF THESE FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY THE USE OF WORDS SUCH AS "BELIEVES," "EXPECTS," "PROJECTS," "INTENDS," "PLANS," "ESTIMATES," "ASSUMES," "MAY," "SHOULD," "WILL," "SEEKS," "ANTICIPATES," "OPPORTUNITY," "PRO FORMA," "PROJECTIONS," OR OTHER SIMILAR EXPRESSIONS AND VARIATIONS OF SUCH WORDS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN. These risks, uncertainties, and factors may include the following: the Debtors' ability to confirm and consummate the Plan; the potential that the Debtors may need to pursue an alternative transaction if the Plan is not confirmed; the Debtors' ability to reduce their overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees; the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; customer and vendor responses to the Chapter 11 Cases; the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; general economic, business, and market conditions; exposure to litigation; the Debtors' ability to implement cost reduction initiatives in a timely manner; the Debtors' ability to divest existing businesses; and adverse tax changes.

23

UST-0387

## VII.   THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.   The Debtors

Ascena began when an entrepreneur and innovator, Roslyn S. Jaffe saw the opportunity to provide wear-to-work dresses and clothing for the working woman during the sixties—a time in the United States when women were entering the workforce in greater numbers, with few options available for buying more stylish and affordable workplace women's clothing.  Roslyn, alongside her husband Elliot, opened the first "Dressbarn" store in 1962.  What started as a family-run, single-store retailer quickly transformed into a nationally-recognized, publicly-traded specialty retailer for fashion apparel and accessories for women.  Following its public listing in 1982, The Dressbarn, Inc. ("Dressbarn") grew rapidly to over 800 stores across 49 states by the early-2000s.  Over the years, Dressbarn has grown its portfolio of retail brands through synergistic and selective acquisition, broadening its specialty offerings and expanding its retail footprint throughout North America

In 2004, Dressbarn acquired Maurices Incorporated ("Maurices") for $320 million.  Maurices, a specialty retailer offering a broad assortment of fashionable, high quality apparel and accessories to women and men ages 17 to 34, broadened Dressbarn's demographic reach and diversified its retail base (Maurices subsequently exited men's apparel).  The Maurices acquisition added 464 stores across 38 states, located in strip centers and malls, and reflected a combined enterprise with sales exceeding $1.1 billion.  In 2009, Dressbarn expanded into the girls' clothing market by purchasing Tween Brands, Inc., the owner of the Justice chain, a leading retailer of trendy and value fashion for tween girls between ages seven and fourteen, in a stock-swap deal valued at $157 million.  Acquiring the Justice chain expanded Dressbarn's addressable market for clothing to young and teenage girls, adding 908 Justice stores.  The combined enterprise encompassed 2,465 locations, with expected sales to reach $2.4 billion.

On January 1, 2011, to reflect its broader holdings and provide the Company with strategic, operational, and financial flexibility, Elliot and Roslyn Jaffee reorganized Dressbarn as a new Delaware corporation under the name "Ascena Retail Group, Inc.," with each of its retail operating brands becoming wholly-owned subsidiaries of Ascena.  In conjunction with this, on January 3, 2011, shares of Ascena's common stock commenced trading on the NASDAQ under the ticker symbol "ASNA."

Following the reorganization, Ascena continued its growth through selective and accretive acquisitions.  In 2012, Ascena ventured into the plus-sized women's clothing market by acquiring Charming Shoppes Inc. ("Charming Shoppes"), the parent company of three distinct brands: Lane Bryant, Inc., Catherines Plus Sizes, and Fashion Bug, for approximately $890 million.  The acquisition added approximately 1,800 retail stores across 48 states.  With Charming Shoppes now operating as an independent, wholly-owned subsidiary of Ascena, the combined enterprise operated approximately 3,800 locations.  Shortly following the Charming Shoppes acquisition, Ascena ceased operations of the Fashion Bug business, closing 124 stores.

In 2015, Ascena acquired ANN INC. ("ANN"), the parent company of retail brands Ann Taylor, LOFT, and Lou & Grey, for approximately $2.16 billion.  To finance the ANN acquisition, Ascena raised new secured debt through a first lien term loan facility in the aggregate amount of $1.8 billion (approximately $1.27 billion of which was outstanding on the Petition Date).  Through the ANN acquisition, Ascena added two of the leading women's specialty retail fashion brands in North America and solidified itself as one of nation's largest and most diversified specialty apparel retailers.  The ANN Acquisition added more than 1,000 store locations across 47 states, the District of Columbia, Puerto Rico, and Canada.  Further, the Ann Taylor and LOFT brands enhanced the Company's "omnichannel" presence by providing two store-related e-commerce websites that were available online in more than 100 countries.  Following the ANN Acquisition, the store fleet of the Ascena enterprise totaled 4,930 stores, a number significantly reduced in the following years as part of the Company's rationalization efforts.

Today, Ascena operates through seven well-known brands with approximately 2,800 stores in 49 states, Canada, and Puerto Rico and revenues surpassing $5.5 billion annually.  The Company's operations consist of its direct channel operations, wholesale operations, retail store locations, and franchised store locations.  The Company's brands are organized into three reportable segments:  (i) Premium Fashion; (ii) Plus Fashion; and (iii) Kids Fashion.

UST-0388

As of the Petition Date, the Debtors have approximately 40,000 full and part-time employees, with a significant number of seasonal employees traditionally hired during each holiday selling season. A corporate organization chart is attached to the Disclosure Statement as **Exhibit C**.

### B. Prepetition Capital Structure

As of the Petition Date,[4] the Debtors reported approximately $1.60 billion in total funded debt. As described in greater detail below, the Debtors' significant funded debt obligations include: (a) approximately $330 million in principal amount of obligations under the ABL Credit Agreement; and (b) approximately $1.27 billion in principal amount of obligations under the Term Loan Credit Agreement.

#### 1. *ABL Credit Agreement*

On February 28, 2018, Ascena, as lead borrower, the ABL Lenders and the ABL Agent entered into the latest amendment to and restatement of the ABL Credit Agreement. The ABL Credit Agreement provides aggregate revolving commitments of up to $500 million, with an optional increase of up to $200 million. As of the Petition Date, approximately $330 million in borrowings was outstanding under the ABL Credit Agreement.

#### 2. *Term Loan Credit Agreement*

On August 21, 2015, Ascena, as borrower, entered into the Term Loan Credit Agreement with the Term Loan Agent and the Term Loan Lenders, providing for $1.8 billion variable-rate term loans. The Term Loan Credit Agreement matures in August 2022. As of the Petition Date, approximately $1.27 billion in aggregate principal amount remained outstanding under the Term Loan Credit Agreement.

## VIII. EVENTS LEADING TO THE CHAPTER 11 FILINGS

Beginning in March 2020, as a result of the COVID-19 pandemic, government-mandated lockdowns, and the subsequent shuttering of the global economy, Ascena, like the rest of the retail world, experienced a significant and precipitous decline in already-challenged store traffic and related consumer spending. Following the recommendations and mandates of state and local governments, on March 17, 2020, Ascena temporarily closed all Company-operated retail stores indefinitely, while distributions centers remained open, operating at limited capacity. Store closures have significantly contributed to missed sales targets, unsold inventory, and depressed profit margins.

In response, Ascena took decisive action to preserve liquidity, evaluating all options available to conserve cash and maintain ongoing operations. To that end, the Company materially reduced costs, capital expenditures, inventory commitments, and modified vendor payment terms. Moreover, on March 30, 2020, the Debtors announced the implementation of temporary salary reductions and furloughs affecting all store associates and nearly half of its corporate associate workforce. The Debtors further implemented temporary reductions in the base salaries of all corporate associates above a certain threshold, and reduced the base salaries of certain senior management positions by 50 percent. Reductions for other executives and corporate associates above a certain threshold ranged from 10 percent to 45 percent depending on base pay.

Recently, in accordance with state and local orders, the Company has reopened stores in a phased approach, with a sharp focus on employee and customer safety. As of the Petition Date, substantially all of the Company's stores had reopened. The Company is taking exceptional measures to ensure that its associates and customers remain safe in its stores. However, even with stores open, the brick and mortar retail operating environment continues to be challenging and uncertain. Certain states have implemented or indicated they are considering social distancing measures that may require that Ascena re-close certain of its stores. Moreover, it is unclear when store traffic will return to pre-COVID-19 levels. In light of this uncertainty, the Company has determined to implement the Strategic Plan to ensure that Ascena's operating model appropriately reflects current operating conditions. In addition to the effects of the COVID-19 pandemic, Ascena faces the same macro-trends that have crippled many apparel and retail

---

[4]    These financial figures reflect the Debtors' most recent review of their businesses. The Debtors reserve all rights to revise and supplement the figures presented herein.

UST-0389

companies in recent years. These factors include the general downturn in the retail industry and the marked shift away from brick-and-mortar retail to online channels. Given the Debtors' substantial brick-and-mortar presence and associated expenses, the Debtors' businesses have been heavily dependent on store traffic and resulting sales conversions to meet sales and profitability targets. The retail apparel industry, however, has undergone a permanent shift towards a more online-centric format, in which retailers sell more product through company websites or larger online retailers.

Recognizing this, in recent years the Debtors have implemented a series of cost-saving and cash conservation initiatives to grow their profit margins and address their debt obligations and have made significant investment into their omnichannel strategy to fuel online sales growth. In the months preceding the COVID-19 outbreak, the Debtors' management team, special committee, and the Board of Directors had been developing a revised, comprehensive transformation strategy focused on addressing the following: (i) closure of under-performing brands; (ii) right-sizing the store fleet for go-forward brands to ensure remaining stores deliver healthy EBITDA results; (iii) simplifying the organizational structure and operating model to drive aggressive cost reduction; (iv) rationalizing real estate portfolio; and (v) rationalizing go-forward supply chain. In light of the effects of COVID-19, Management, the Special Committee, and the Board accelerated and refocused these efforts to build a plan that would allow the Company to remain viable in the new COVID-19 operating environment.

In parallel with stabilizing Ascena's business and cash position, the Board and Special Committee focused on addressing the effect of COVID-19 on Ascena's business, including refining and accelerating certain actions in the Company's existing business plan, ultimately embodied in the Strategic Plan, and exploration of options to extend runway. The Board explored the viability of a number of out-of-court alternatives, including various out-of-court financing structures, the sale of all or a portion of the business, and other alternatives. Eventually it became clear that the out-of-court alternatives reviewed by the Board and short-term liquidity saving measures implemented by the Company would not be sufficient to address the effects of the COVID-19 pandemic.

In addition to an already highly leveraged balance sheet, to weather the storm caused by the COVID-19 pandemic, the Company was forced to accumulate additional obligations to preserve cash, including additional drawings under the ABL Facility and vendor and landlord facing claims. The accumulation of these additional obligations, coupled with the challenging market conditions, made it impossible to structure an out-of-court transaction that would allow Ascena to achieve its long-term strategic plan. To facilitate a Restructuring Transaction to address the Company's capital structure and its outstanding liabilities in a more comprehensive manner, in early 2020, the Company began engagement with the ad hoc group of Term Loan Lenders and the administrative agent under the ABL Facility. Several months of discussions and negotiations ultimately resulted in the Restructuring Support Agreement, which contemplates a transformative restructuring and is supported by Term Loan Lenders holding more than 68% of the outstanding Term Loans. The Company is also in continuing discussions with its ABL Lenders to provide the ABL Exit Financing.

The Restructuring Support Agreement contemplates a comprehensive reorganization that will be implemented through a chapter 11 plan of reorganization and that will result in a substantial deleveraging of the Debtors' balance sheet and an infusion of new capital to fund the Strategic Plan and Ascena's emergence from these chapter 11 cases. Under the Restructuring Support Agreement, certain of the Term Loan Lenders have agreed to backstop a $150 million new money and equitize a substantial portion of the $1.27 billion in outstanding Term Loans. Upon emergence from chapter 11, in addition to any outstanding borrowings under the Exit ABL Facility, the Company's secured term loan obligations will be reduced to $400 million and the Company will have discharged substantial unsecured obligations that have accumulated (in significant part) as a result of the COVID-19 pandemic (and that the Company would not have otherwise been able to address on an out-of-court basis).

## IX.    EVENTS OF THE CHAPTER 11 CASES

### A.    Corporate Structure upon Emergence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation,

UST-0390

limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### B. Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly. Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 within 110 days of the Petition Date. **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

### C. First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Carrie W. Teffner, Interim Executive Chair of Ascena Retail Group, Inc., in Support of the Chapter 11 Petitions and First Day Motions* [Docket No. 14], filed on July 23, 2020. Significantly, pursuant to the First Day Motions, the Debtors sought and were granted the authority to pay the Claims of a number of their vendors in full, in the ordinary course of business.

The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at http://cases.primeclerk.com/ascena.

### D. Other Procedural and Administrative Motions

The Debtors also filed several motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Ordinary Course Professionals Motion. On [●], 2020, the Debtors filed the Motion for Entry of an Order Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business [Docket No. [●]] (the "OCP Motion"). The OCP Motion sought to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses. On [●], 2020, the Bankruptcy Court entered an order granting the OCP Motion [Docket No. [●]].

- Retention Applications. On [●], 2020, the Debtors filed a number of applications seeking to retain certain professionals pursuant to sections 327 and 328 of the Bankruptcy Code, including Kirkland & Ellis LLP as legal counsel, Guggenheim Securities, LLC as investment banker, Alvarez & Marsal Holdings, LLC as restructuring advisor, Deloitte Tax LLP as tax and accounting advisory consultants, and Prime Clerk LLC as claims and noticing agent (collectively, the "Retention Applications"). On [●], 2020, the Bankruptcy Court approved each of the Retention Applications. The foregoing professionals are, in part, responsible for assisting the Debtors with the administration of the Chapter 11 Cases. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

### E. Approval of the DIP Facilities

Based on the Debtors' need for debtor-in-possession financing and their conclusion that the DIP ABL Facility and the DIP Term Facility represent the best terms available, on the Petition Date, the Debtors filed a motion seeking

UST-0391

authorization to enter into the DIP ABL Facility and DIP Term Facility on a final basis (the "DIP Financing Order"). As discussed above, on [●], 2020, the Bankruptcy Court entered the DIP Financing Order.

**F.      Executory Contracts and Unexpired Leases**

*1.      Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be deemed assumed by the Reorganized Debtors, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than:  (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order.  Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease.

*2.      Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

*3.      Cure of Default for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed or assumed and assigned, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any Cure Claim (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to

UST-0392

assumption, the Cure Claims shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

To the extent reasonably practicable, at least 14 days before the Voting Deadline, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third parties. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Claims must be Filed by the Cure/Assumption Objection Deadline.** Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or proposed Cure Claim will be deemed to have assented to such assumption or assumption and assignment, and Cure Claim. To the extent that the Debtors seek to assume and assign an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule and such assignee will provide evidence of "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease.

In the event of an unresolved dispute regarding (1) the amount of any Cure Claim, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (3) any other matter pertaining to assumption, assignment, or payments of any Cure Claims required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order(s) of the Bankruptcy Court. If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Rejected Executory Contracts and Unexpired Leases Schedule, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the related Cure Claim, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under such assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### 4. *Adequate Assurance of Future Performance Under Assumed Executory Contracts and Unexpired Leases*

The Debtors have provided Financial Projections attached hereto as <u>Exhibit E</u> and are prepared to demonstrate the feasibility of the Plan at the Confirmation Hearing in satisfaction of any obligation to provide adequate assurance of future performance under Executory Contracts and Unexpired Leases that are assumed under the Plan.

### G. **Lease Renegotiation and Store Closing Process**

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreements, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* [Docket No. 16] (the "<u>Store Closing Motion</u>") seeking to implement a key component of their restructuring strategy and right-size their operations by closing underperforming or geographically undesirable stores. The Bankruptcy Court approved the Store Closing Motion on an interim basis on July 24, 2020 [Docket No. 70] and on a final basis on [●], 2020 [Docket No. [●]].

The Debtors have conducted a thorough analysis of their existing operations and determined to wind down the majority of the brick and mortar operations for the Justice and Catherines brands and, accordingly, cease operations for a large majority of retail stores for those brands. In total, these brands account for approximately 1,000 of the Debtors' stores, each of which the Debtors are seeking, in the Store Closing Motion, authority to close and wind down. The closure of these stores will simplify the Debtors' organizational structure, right-size the Debtors' physical store footprint, and ensure that the Debtors' remaining go-forward operations are healthy and operating efficiently. These efforts, which are ongoing, are part of the Debtors' attempt to rationalize their store fleet.

UST-0393

### H.   Schedules and Statements

On July 24, 2020, the Bankruptcy Court granted an interim order [Docket No. 77] extending the time by which the Debtors must file the Schedules of Assets and Liabilities and Statement of Financial Affairs to August 27, 2020.  Once filed, the Schedules and Statements are available at http://cases.primeclerk.com/ascena (free of charge) or the Bankruptcy Court's website at www.vaeb.uscourts.gov (for a fee).

### I.   Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to prepetition litigation generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.

### J.   Appointment of Official Committee

On [●], 2020, the U.S. Trustee filed the *Appointment of Unsecured Creditors Committee* [Docket No. [●]] notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in the Chapter 11 Cases.  The Committee is currently composed of the following members:  [●].  The Committee has retained [●] as its legal counsel and [●] as its financial advisor.

## X.   PROJECTED FINANCIAL INFORMATION

Attached hereto as **Exhibit E** is a projected consolidated income statement, which includes consolidated, projected, unaudited, financial statement information of the Reorganized Debtors (collectively, the "Financial Projections") for the period beginning [●] and continuing through 2021.  The Financial Projections are based on an assumed Effective Date of [●], 2020.  To the extent that the Effective Date occurs before or after [●], 2020, recoveries on account of Allowed Claims could be impacted.

Creditors and other interested parties should see the below "*Risk Factors*" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

## XI.   RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.   Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

#### 1.   *Parties in Interest May Object to the Plan's Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each

UST-0394

encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

### 3. The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims and Interests as those proposed in the Plan.

### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5. The Restructuring Support Agreement Could Be Terminated, Which Would Leave the Debtors Without a Clear Path Forward to Reorganize

The Debtors' ability to consummate a value-maximizing restructuring may be materially impaired by a termination of the Restructuring Support Agreement. The Restructuring Support Agreement may be terminated, by the Required Consenting Stakeholders, by the delivery to the other parties thereto of a written notice upon the occurrence of the following events, as may be amended from time to time in accordance with the terms of the Restructuring Support Agreement:

1. the Petition Date has not occurred by 11:59 p.m. (Eastern Time) on July 23, 2020;

UST-0395

2.  the Debtors have not filed the Rent Deferral Motion with the Bankruptcy Court by the date that is three (3) calendar days after the Petition Date;[5]

3.  the Bankruptcy Court has not entered the Cash Collateral Order on an interim basis by the date that is five (5) Business Days after the Petition Date;

4.  the Bankruptcy Court has not entered the DIP Financing Order on a final basis by the date that is thirty-five (35) calendar days after the Petition Date;

5.  the Bankruptcy Court has not entered the Disclosure Statement Order by the date that is sixty (60) calendar days after the Petition Date;

6.  solicitation of the Plan has not commenced by the date that is seventy (70) calendar days after the Petition Date;

7.  the Bankruptcy Court has not entered the Confirmation Order by the date that is one hundred ten (110) calendar days after the Petition Date;

8.  the Plan Effective Date has not occurred by the date that is one hundred thirty (130) calendar days after the Petition Date;

9.  the breach in any material respect by a Company Party (as defined in the Restructuring Support Agreement) of any of the representations, warranties, or covenants of the Company Parties set forth in the Restructuring Support Agreement that (i) is adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (ii) remains uncured for ten (10) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 13.11 of the Restructuring Support Agreement detailing any such breach;

10. the DIP ABL Facility (as applicable) is terminated and accelerated in accordance with its terms;

11. the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, including the Bankruptcy Court, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 13.11 of the Restructuring Support Agreement detailing any such issuance; *provided* that this termination right may not be exercised by any party that sought or requested such ruling or order in contravention of any obligation set out in the Restructuring Support Agreement;

12. the Bankruptcy Court enters an order denying confirmation of the Plan or the Confirmation Order is reversed or vacated;

13. the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders, not to be unreasonably withheld), (i) dismissing any of the Chapter 11 Cases, (ii) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (iii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases;

14. any Company Party (i) files, waives, amends or modifies, or files a pleading seeking approval of any Definitive Document (as defined the Restructuring Support Agreement) or authority to waive, amend or modify any Definitive Document (including any waiver of any term or condition therein) in a manner that is materially inconsistent with, or constitutes a material breach of, this Agreement

---

[5]  On July 31, 2020, the Debtors filed a *Motion for Entry of an Order (I) Extending Time for Performance of Obligations Arising Under Unexpired Non-Residential Real Property Leases, and (II) Granting Related Relief*, contemporaneously herewith.

UST-0396

(including with respect to the consent rights afforded the Consenting Stakeholders under this Agreement), without the prior written consent of the Required Consenting Stakeholders, (ii) withdraws the Plan without the prior consent of the Required Consenting Stakeholders, or (iii) publicly announces its intention to take any such acts listed in the foregoing clause (i) or (ii), in the case of each of the foregoing clauses (i) through (iii), which remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 15.10 of the Restructuring Support Agreement detailing any of the foregoing;

15. any Company Party files or supports another party in filing (i) a motion or pleading challenging the amount, validity, or priority of any claims held by any Consenting Stakeholder against the Company Parties (or any liens securing such claims) or (ii) a motion or pleading asserting (or seeking standing to assert) any purported claims or Causes of Action against any of the Consenting Stakeholders;

16. the Bankruptcy Court grants relief that is materially inconsistent with the Restructuring Support Agreement or the Plan (in each case, with such amendments and modifications as have been effected in accordance with the terms hereof) and adverse to the Consenting Stakeholders;

17. any Company Party files, proposes, or otherwise supports any plan of liquidation, asset sale of all or substantially all of a Company Party's assets or plan of reorganization other than the Plan; or

18. any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring the Restructuring Support Agreement to be unenforceable.

The Debtors believe that the Restructuring Support Agreement provides stability by, among other things, ensuring cooperation among creditors. The Debtors believe that the Plan and restructuring contemplated by the Restructuring Support Agreement avoids all of the foregoing, and implements an expeditious reorganization of the Debtors.

### 6. Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 7. Continued Risk Upon Confirmation

Even if a chapter 11 plan of reorganization is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code will give the Debtors the exclusive right to propose the Plan and will prohibit creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions for chapter 11 relief. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

UST-0397

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 8. The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 9. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 10. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 11. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 12. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

UST-0398

B.     **Risks Related to Recoveries under the Plan**

1.     *The Debtors May Not Be Able to Achieve Their Projected Financial Results*

With respect to holders of Interests in the Reorganized Debtors, the Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the particular industry segments in which the Debtors operate in particular. Although the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, (a) the value of the New Common Stock may be negatively affected, (b) the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, and (c) the Debtors may be unable to service their debt obligations as they come due. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

2.     *The New Common Stock Will Not be Listed*

The New Common Stock to be issued under the Plan will not be listed on or traded on any nationally recognized market or exchange as of the Effective Date. Pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act, and/or the safe harbor of Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements, the offering, issuance, and distribution of any securities pursuant to the Plan and any and all settlement agreements incorporated herein shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable law requiring registration by virtue of section 1145 of the Bankruptcy Code, prior to the offering, issuance, distribution, or sale of securities. In addition, to the maximum extent provided under section 1145 of the Bankruptcy Code, any and all New Equity contemplated by the Plan and any and all settlement agreements incorporated therein will be freely tradable and transferable by any initial recipient thereof that (x) is not an "affiliate" of the Reorganized Debtor (as defined in rule 144(a)(1) under the Securities Act), (y) has not been such an "affiliate" within 90 days of such transfer, and (z) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

On the Effective Date, Reorganized Ascena shall be a private, non-SEC reporting company. There can be no assurance that an active market for the New Common Stock will develop, nor can any assurance be given as to the prices at which such stock might be traded. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities.

3.     *The Restructuring of the Debtors May Adversely Affect the Debtors' Tax Attributes*

The Debtors estimate that, as of December 31, 2019, they together had approximately (a) $277,414,113 of federal net operating loss carryforwards ("NOLs"); (b) $32,634,930 of interest expense deductions that have been deferred under section 163(j) of the Tax Code; (c) $2,628,560 of general business credit carryforwards; and (d) $2,674,533 of charitable contribution carryforwards. Additionally, the Debtors further estimate that in the 2020 tax year they may have generated approximately (w) $434,893,373 of federal NOLs; (x) $95,250,682 of interest expense deductions that have been deferred under section 163(j) of the Tax Code; (y) $703,133 in general business credit carryforwards; and (z) $500,000 of charitable contribution carryforwards (items (a) through (d), and (w) through (z), together, the "Tax Attributes"). The Debtors are currently generating additional tax losses, which will ultimately increase the Debtors' NOLs and other tax attributes. As discussed below, the Debtors are currently generating additional tax losses, which will ultimately increase the Debtors' Tax Attributes. These Tax Attributes provide the potential for material future tax savings or other tax structuring possibilities in these chapter 11 cases. The Tax Attributes are of significant value to the Debtors and their Estates because the Debtors can carry forward such Tax Attributes to offset future taxable income (for up to 20 years in the case of the Debtors' federal NOLs), thereby reducing their future aggregate tax obligations. In addition, the Debtors may utilize such Tax Attributes to offset any

UST-0399

taxable income generated by transactions consummated during these chapter 11 cases. The value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders. In general, such NOLs and other tax attributes could be reduced by the amount of discharge of indebtedness arising in a chapter 11 case under section 108 of the Internal Revenue Code of 1986, as amended (the "Tax Code") or to offset any taxable gains recognized by the Debtors attributable to the Restructuring Transactions. In addition, if the Debtors experience an "ownership change," as defined in section 382 of the Tax Code, then their ability to use the NOL carryforwards may be substantially limited, which could have a negative impact on the Debtors' financial position and results of operations. Generally, there is an "ownership change" if one or more stockholders owning 5 percent or more of a corporation's common stock have aggregate increases in their ownership of such stock of more than 50 percentage points over the prior three-year period. Following the implementation of a plan of reorganization, it is possible that an "ownership change" may be deemed to occur. Under section 382 of the Tax Code, absent an applicable exception, if a corporation undergoes an "ownership change," the amount of its NOLs that may be utilized to offset future taxable income generally is subject to an annual limitation. The Debtors currently expect that their Tax Attributes may be significantly reduced, eliminated, or limited in connection with the Restructuring Transactions, through a combination of one or more of the above factors.

For a detailed description of the effect consummation of the Plan may have on the Debtors' tax attributes, see "*Certain United States Federal Income Tax Consequences of the Plan,*" which begins on page 43 herein.

### 4. *The Debtors May Not Be Able to Accurately Report Their Financial Results*

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.

By rules of the Securities and Exchange Commission, the Debtors have not evaluated their internal controls over financial reporting, the purpose of which would be for management to report on the effectiveness of the Debtors' internal controls over financial reporting that would be needed to comply with Section 404(a) of the Sarbanes Oxley Act of 2002. As the Debtors progress towards preparing for the reporting requirements associated with internal controls over financial reporting as prescribed in the Sarbanes Oxley Act of 2002, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors'' businesses, results of operations, and financial condition.

### C. Risks Related to the Debtors' and the Reorganized Debtors' Businesses

### 1. *The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases*

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan or an alternative Restructuring Transaction; (b) ability to obtain court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, service providers, customers, employees, vendors, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

UST-0400

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 2. *Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses*

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships. So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 3. *Financial Results May Be Volatile and May Not Reflect Historical Trends*

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

### 4. *The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service Their Indebtedness*

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations depends on their financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control (including the factors discussed in Article XI, which begins on page 30, herein). The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit them to pay the principal, premium, if any, and interest on their Exit Facilities.

UST-0401

### 5. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

The Debtors are currently subject to certain legal proceedings, some of which may adversely affect the Debtors. In the future, the Reorganized Debtors may become party to additional litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 6. The Loss of Key Personnel Could Adversely Affect the Debtors' and Reorganized Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. The Debtors and the Reorganized Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' and the Reorganized Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' and the Reorganized Debtors' businesses and the results of operations.

### 7. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Reorganized Debtors' Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all claims that arise prior to the Debtors' filing a petition for reorganization under the Bankruptcy Code or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

## XII.   SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit D**.

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.*

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.   Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of Claims and Interests are entitled to vote on a chapter 11 plan. The table in Article IV.C of this Disclosure Statement, which begins on page 6 hereof, provides a

UST-0402

summary of the status and voting rights of each Class (and, therefore, of each holder of a Claim or Interest within such Class absent an objection to the holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Classes 4 and 5 (the "Voting Classes"). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from holders of Claims and Interests in Classes 1, 2, 3, 6, 7 or 8. Additionally, the Disclosure Statement Order provides that certain holders of Claims in the Voting Class, such as those Holders whose Claims have been Disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

**B.      Voting Record Date**

**The Voting Record Date is September 3, 2020**. The Voting Record Date is the date on which it will be determined which holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

**C.      Voting on the Plan**

**The Voting Deadline is October 6, 2020, at 5:00 p.m.** prevailing Eastern Time; *provided* that the Voting Deadline with respect to any Claim based on the rejection damages under any Executory Contract or Unexpired Lease that is added to the Schedule of Rejected Executory Contracts and Unexpired Leases after [●], 2020, shall be [●], 2020, the date of the Confirmation Hearing. In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are **actually received** by the Debtors' voting and claims agent (the "Voting and Claims Agent") on or before the Voting Deadline:

**D.      Ballots Not Counted**

**No ballot will be counted if, among other things**: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' Schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no Proof of Claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), an indenture trustee, or the Debtors' financial or legal advisors instead of the Voting and Claims Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE VOTING AND CLAIMS AGENT TOLL-FREE AT +1 (877) 930 4319. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL NOT BE COUNTED.**

---

# XIII.    CONFIRMATION OF THE PLAN

**A.      Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy,

UST-0403

all of the necessary statutory requirements; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

### B.   Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit G** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of A&M.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Allowed Claims as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Allowed Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

### C.   Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared the Financial Projections.  Based upon the Financial Projections, the Debtors believe that they will be a viable operation following their emergence from chapter 11 and that the Plan will meet the feasibility requirements of the Bankruptcy Code.  The Financial Projections are attached hereto as **Exhibit E** and incorporated herein by reference.

### D.   Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[6]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### E.   Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the

---

[6]   A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

UST-0404

plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document in a manner consistent with the Restructuring Support Agreement, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1. No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. In considering whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character), bankruptcy courts will take into account a number of factors.

### 2. Fair and Equitable Test

The "fair and equitable" test requires that no class of claims or interests receive more than a 100 percent recovery. As to any dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors need to confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan will not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F. Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. The Valuation Analysis is set forth in **Exhibit F** attached hereto and incorporated herein by reference.

## XIV. CERTAIN SECURITIES LAW MATTERS

The Debtors believe that the New Common Stock and any options or other equity awards (and any New Common Stock underlying such awards) to be issued pursuant to the Management Incentive Plan will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities law (a "Blue Sky Law"). The Debtors further believe that the offer, sale, issuance, and initial distribution of the New Common Stock by Reorganized Ascena pursuant to the Plan is exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law as described in more detail below. The New Common Stock underlying the Management Incentive

UST-0405

Plan will be issued pursuant to an available exemption from registration under the Securities Act and other applicable law.

### A. Issuance of Securities under the Plan

Except as expressly provided herein, all shares of New Common Stock issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code (the "1145 Securities"). Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the issuance of a security do not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange or partly for cash or property. The Debtors believe that the issuance of the 1145 Securities, and all shares of New Common Stock that constitute 1145 Securities, in exchange for the Claims and Interests described above satisfy the requirements of section 1145(a) of the Bankruptcy Code. Accordingly, no registration statement will be filed under the Securities Act or any state securities laws.

Recipients of the New Common Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law. As discussed below, the exemptions provided for in Section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in Section 1145(b) of the Bankruptcy Code.

### B. Subsequent Transfers

The 1145 Securities may be freely transferred by most recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter." Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act, which includes control persons of the issuer. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

You should confer with your own legal advisors to determine whether you are an "underwriter."

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or

UST-0406

other applicable law. Under certain circumstances, holders of New Common Stock who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock and, in turn, whether any Person may freely resell New Common Stock. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR REORGANIZED ASCENA MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES. POTENTIAL RECIPIENTS OF NEW INTERESTS ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING THEIR ABILITY TO FREELY TRADE SUCH SECURITIES WITHOUT COMPLIANCE WITH THE FEDERAL LAW AND ANY APPLICABLE STATE BLUE SKY LAW.**

C. **Management Incentive Plan**

The Confirmation Order shall authorize the board of directors of Reorganized Ascena to adopt and enter into the Management Incentive Plan, which shall reserve exclusively for management employees a pool of up to 10% of the New Common Stock (the "MIP Pool"). Awards from the MIP Pool will dilute all of the New Common Stock outstanding at the time of such issuance.

## XV. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A. **Introduction**

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain holders of Claims entitled to vote on the Plan (each such holder, a "Holder"). This summary is based on the Tax Code, the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in

43

UST-0407

securities, subchapter S corporations, persons who hold Claims or who will hold the New Common Stock as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to holders of Claims that act or receive consideration in a capacity other than any other holder of a Claim of the same Class or Classes, and the tax consequences for such holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to holders (i) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (ii) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person ("U.S. Holder"). For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) (a "non-U.S. Holder").

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

In accordance with the Backstop Commitment Letter and in connection with the implementation of the Plan, Holders of Term Loan Claims are given the right to participate in a portion of the New Term Loan Financing, which will be funded initially in the form of the DIP Term Facility (the "Participation Right").

Although not free from doubt, any value attributable to the Participation Right may be considered for tax purposes as value received by such Holders of Term Loan Claims and accordingly, as a recovery on such Claims under the Plan. The Debtors have not yet determined whether treatment of the Participation Right as a recovery on the Term Loan Claims is appropriate or whether the Participation Right has any value. If the Participation Right is treated as a recovery on the Term Loan Claims, it is also uncertain whether the Participation Right and its subsequent exercise for U.S. federal income tax purposes should be treated as either (1) an option to acquire a portion of the New Term Loan Financing and New Common Stock or (2) an integrated transaction pursuant to which a portion of the New Term Loan Financing and/or New Common Stock are acquired in partial satisfaction of a Holder's New Term Loan Claim. The characterization of the Participation Right as the exercise of an option or, alternatively, as an integrated transaction may impact, among other things, the amount of gain or loss (if any) that a holder of a Term Loan Claim may recognize upon satisfaction of its Claim and, assuming the exercise of the Participation Right, a Holder's tax basis in the New Term Loan Financing and additional New Common Stock received.

The remainder of this summary assumes (unless otherwise indicated) that the Participation Right is treated for U.S. federal income tax purposes as an option to acquire an "investment unit" which is comprised of two components: (1) the right to acquire a portion of the New Term Loan Financing (the "Participation Debt Right") and (2) the right to acquire New Common Stock (the "Participation Stock Right"). Under Applicable Tax Law, the right to acquire stock of the issuer is generally treated as a security with a zero principal amount for purposes of the reorganization provisions discussed below. However, the right to acquire a debt instrument has generally not been treated as a security. It is unclear whether the treatment of the Participation Right should be bifurcated between the Participation Debt Right and the Participation Stock Right under Applicable Tax Law.

UST-0408

Each Holder of a Term Loan Claim receiving a Participation Right should consult with its own tax advisor to determine whether or not the Participation Right, the Participation Debt Right and/or the Participation Stock Right is a "security" for U.S. federal income tax purposes. The Debtors have not yet determined whether any such treatment is appropriate. The characterization of the Participation Right and its subsequent exercise for U.S. federal income tax purposes—as the exercise of an option to acquire an investment unit comprised of the Participation Debt and the Participation Stock—is uncertain.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### B. Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors

The tax consequences of the implementation of the Plan to the Debtors will differ depending on whether the Restructuring Transactions are structured as a taxable sale of the assets and/or stock of any Debtor or subsidiary thereof (a "Taxable Transaction") or as a recapitalization of the Debtors (a "Recapitalization Transaction"). It has not yet been determined how the Restructuring Transactions will be structured under Applicable Tax Law. Such decision will depend on, among other things, whether assets being sold (or deemed to be sold) pursuant to any Taxable Transaction have an aggregate fair market value in excess of their aggregate tax basis (*i.e.*, a "built-in gain") or an aggregate fair market value less than their aggregate tax basis (*i.e.*, a "built-in loss"), the amount of the expected reduction in the aggregate tax basis of such assets by excluded cancellation of indebtedness income ("COD Income"), whether sufficient tax attributes are available to offset any such built-in gain, future tax benefits associated with a step-up (if any) in the tax basis of the assets sold pursuant to a Taxable Transaction, and the amount and character of any losses with respect to the stock of any applicable Debtor or subsidiary thereof, in each case for U.S. federal, state, and local income tax purposes.

If the transactions undertaken pursuant to the Plan are structured in whole or in part as a Taxable Transaction involving the transfer (or deemed transfer) of the Debtors' assets, the Debtors generally would realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (which generally should equal the fair market value of the assets transferred (or deemed to be transferred) by the Debtors) and the Debtors' tax basis in such assets. Realized gains, if any, may be offset by current-year losses and deductions, which may include interest deductions that may be (or become) available under section 163(j) of the Tax Code, and NOLs from prior years; *provided* that any such gain that is ordinary in nature may not be offset by capital losses. Any taxable gain remaining after such offsets would result in a cash tax obligation. If the Reorganized Debtors purchase (or are deemed to purchase) assets or stock of any Debtor pursuant to a Taxable Transaction, such Reorganized Debtor will take a fair market value basis in the transferred assets or stock. However, if a Taxable Transaction involves a purchase of stock, the Debtor whose stock is transferred will retain its basis in its assets, unless the Debtors and/or Reorganized Debtors timely make certain elections provided for under the Tax Code to treat such stock purchase as the purchase of the Debtors' assets.

The Debtors estimate that, as of December 31, 2019, they together had approximately (a) $277,414,113 of federal NOLs; (b) $32,634,930 of interest expense deductions that have been deferred under section 163(j) of the Tax Code; (c) $2,628,560 of general business credit carryforwards; and (d) $2,674,533 of charitable contribution carryforwards. Additionally, the Debtors further estimate that in the 2020 tax year they may have generated approximately (w) $434,893,373 of federal NOLs; (x) $95,250,682 of interest expense deductions that have been deferred under section 163(j) of the Tax Code; (y) $703,133 in general business credit carryforwards; and (z) $500,000 of charitable contribution carryforwards. The Debtors are currently generating additional tax losses, which will ultimately increase the Debtors' NOLs and other tax attributes. As discussed below, it has not been determined yet whether Debtors' NOLs are expected to be eliminated upon implementation of the Plan.

UST-0409

#### 1.  Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such satisfied indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not, however, required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the Tax Code.  In general, tax attributes will be reduced in the following order:  (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.  The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Debtors expect to realize significant COD Income.  The amount of the tax attributes required to be reduced will depend on whether the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction.  The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan.  Additionally, it has not been determined yet whether COD Income will be sufficient to eliminate all of the Debtors' NOLs and tax credits allocable to periods prior to the Effective Date.  In addition, depending on the structure of the transactions undertaken pursuant to the Plan, some of the Debtors' tax basis in their assets may be reduced by COD Income that is not absorbed by the NOLs and tax credits.

#### 2.  Limitation of NOL Carryforwards and Other Tax Attributes

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of any remaining NOLs, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation.  The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock and the distribution of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.  The Debtors do not expect to have a net unrealized built-in loss at the time the Plan goes effective.

#### (a)  General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the

UST-0410

highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs:  0.89 percent for July 2020).  The section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.  Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### (b)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce their NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses.  The resulting limitation would be determined under the regular rules for ownership changes.

As discussed above, it has not been determined yet whether the Debtors' NOLs allocable to periods prior to the Effective Date will be eliminated and therefore would not be subject to the section 382 limitation following the year in which the Effective Date occurs.  The availability to the Debtors of either the 382(l)(5) Exception or the 382(l)(6) Exception will depend on the structure of the transactions undertaken pursuant to the Plan.

### (c)    Excess Loss Accounts

Generally, when corporations are members of an affiliated group filing a consolidated return, a parent corporation's basis in the stock of a subsidiary in such a group is (a) increased by the sum of (i) income of such subsidiary and (ii) contributions to such subsidiary, and (b) reduced by the sum of (i) losses or deductions of such subsidiary that are used by the affiliated group and (ii) distributions from such subsidiary.  In the case that the amount described in clause (b) above exceeds the amount described in clause (a) above, and such excess is greater than the parent corporation's basis in the subsidiary stock before the adjustments specified in clauses (a)–(b) are made, the amount by which such excess is greater than the parent corporation's basis in the subsidiary stock is called an "excess loss account" and is treated as negative basis for U.S. federal income tax purposes. The affiliated group must recognize income equal to the excess loss account in the subsidiary's stock in certain events, including (x) to the extent the subsidiary recognizes COD Income that is excluded from gross income pursuant to section 108 of the Tax Code (as discussed above), and the affiliated group does not reduce its tax attributes by such excluded COD Income, and (y) if the stock of the subsidiary is treated as disposed of for no consideration.  It is possible that a Debtor will exclude COD Income in excess of available tax attributes and that there could be an excess loss account in the stock of that Debtor. In that case, the Debtors will recognize taxable income in the amount of such excess COD Income, but not to exceed the amount of the excess loss account.  In selecting the appropriate form and structure of the Restructuring

47

UST-0411

Transactions, the Debtors will consider current and future cash tax costs, including the expected cost of recognizing all or a portion of an excess loss account as taxable income.

### (d) Other Income and Uncertainty of Debtors' Tax Treatment

The Debtors may incur other income for U.S. federal income tax purposes in connection with the Plan (including if the Debtors consummate Restructuring Transactions that are different from the transactions that are currently contemplated and described herein) that, unlike COD Income, generally will not be excluded from the Debtors' U.S. federal taxable income. In addition, the U.S. federal income tax considerations relating to the Plan are complex and subject to uncertainties. No assurance can be given that the IRS will agree with the Debtors' interpretations of the tax rules applicable to, or tax positions taken with respect to, the transactions undertaken to effect the Plan. If the IRS were to successfully challenge any such interpretation or position, the Debtors may recognize additional taxable income for U.S. federal income tax purposes, and the Debtors may not have sufficient deductions, losses or other attributes for U.S. federal income tax purposes to fully offset such income.

### C. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Claims Entitled to Vote

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

As described above, the U.S. federal income tax consequences to a U.S. Holder of a Claim will depend, in part, on whether the transactions undertaken pursuant to the Plan constitute, for U.S. federal income tax purposes, (a) a Taxable Transaction, or (b) a Recapitalization Transaction. The U.S. federal income tax consequences to U.S. Holders of certain Claims may further depend on (x) whether the Claims surrendered constitute "securities" for U.S. federal income tax purposes, and (y) whether the Debtor against which such Claims are asserted is the same entity that is issuing the consideration under the Plan (or, otherwise, an entity that is a "party to a reorganization" with the Debtor against which such Claims were asserted).

In a Taxable Transaction, the Debtors generally do not anticipate that the entity issuing consideration under the Plan will be the same entity as the Debtor against which a Claim is asserted (or an entity that is a "party to a reorganization" with such Debtor). As a result, the Debtors do not anticipate that "recapitalization" treatment (within the meaning of section 368(a)(1)(E) of the Tax Code) will be applicable in a Taxable Transaction. Such treatment may, however, be applicable in a Recapitalization Transaction.

Neither the Tax Code nor the Treasury Regulations promulgated thereunder defines the term "security." Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the available collateral, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. Due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding the status of the loans under the Term Loan Credit Agreement as "securities" for U.S. federal income tax purposes.

The character of any gain or loss recognized by a U.S. Holder as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long term capital gain if the Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below.

UST-0412

1. **U.S. Federal Income Tax Consequences to the U.S. Holders of Term Loan Claims**
   *(Class 4)*

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Claim each U.S. Holder of an Allowed Term Loan Claim shall receive its Pro Rata share of and interest in (i) the Last Out Exit Term Loan Facility; (ii) New Common Stock, subject to dilution on account of the Management Incentive Plan and the Equity Backstop Fee, and (iii) potentially, the Participation Right.

As described above, because the Participation Right is made available to Holders of Term Loan Claims in accordance with the Backstop Commitment Letter and in connection with the implementation of the Plan, any value attributable to the Participation Right may be considered for tax purposes as value received by such holders of Term Loan Claims and accordingly, as a recovery on such Claims under the Plan. The Debtors have not yet determined whether treatment of the Participation Right as a recovery on the Term Loan Claims is appropriate or whether the Participation Right has any value.

If the Restructuring Transactions are structured as a Recapitalization Transaction and an Allowed Term Loan Claim qualifies as a "security" of Ascena, then the U.S. Holder of such Claim should be treated as receiving its distribution under the Plan in a recapitalization. If (1) (A) the Participation Right is not treated as recovery under the Plan or (B) the Participation Right is treated as a "security" of the Reorganized Debtor, and (2) the Last-Out Exit Term Loan Facility also qualifies as a "security" of the Reorganized Debtors, subject to the rules regarding accrued but untaxed interest, a U.S. Holder of such claim should not recognize gain or loss. Such U.S. Holder's tax basis in the Participation Right (if applicable), the New Common Stock and the Last Out Exit Term Loan Facility received, apart from amounts allocable to accrued but untaxed interest, should generally equal the U.S. Holder's tax basis in its Allowed Term Loan Claim exchanged therefor, allocated between such property received based upon their respective fair market values. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its interest in the Participation Right (if applicable), the New Common Stock and Last Out Exit Term Loan Facility received should include the holding period for the Claim exchanged therefor.

If (a) the Restructuring Transactions are structured as a Recapitalization Transaction, (b) an Allowed Term Loan Claim qualifies as a "security" of Ascena, and to the extent applicable, (c) the Participation Right is treated as part of recovery under the Plan, but (i) the Last Out Exit Term Loan Facility and/or (ii) the Participation Right (or any portion thereof) does not qualify as a "security" of the Reorganized Debtors, then the U.S. Holder of such Claim should be treated as receiving its distribution under the Plan in a recapitalization, with the receipt of the non-security consideration (other than the New Common Stock) treated as "boot" in such recapitalization. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder of such claim should not recognize loss, but should recognize gain to the extent of the lesser of (A) the sum of (i) the issue price of the Last Out Exit Term Loan Facility received, (ii) the fair market value (if any) of the Participation Right, and (iii) the fair market value of any New Common Stock received, minus (b) the Holder's adjusted tax basis in its Allowed Term Loan Claim, and (B) the fair market value of the "boot" received. Such U.S. Holder's tax basis in the New Common Stock and any consideration that qualifies as a security, apart from amounts allocable to accrued but untaxed interest, should generally equal the U.S. Holder's tax basis in its Allowed Term Loan Claim exchanged therefor increased by the amount of any gain recognized pursuant to such exchange and decreased by the fair market value of the "boot" received, allocated between such property received based on their relative fair market values. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its interest in the New Common Stock and any other consideration that does qualify as a "security" received should include the holding period for the Claim exchanged therefor. Such U.S. Holder's basis in any such consideration not considered a "security" would equal its fair market value and such U.S. Holder's holding period with respect to such consideration would begin the day after the Effective Date.

If an Allowed Term Loan Claim does not qualify as a "security" of Ascena or the Restructuring Transactions are structured to be treated as a Taxable Transaction, then the U.S. Holder of such Claim should be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. In that event, subject to the rules regarding accrued but untaxed interest, a U.S. Holder of an Allowed Term Loan Claim should recognize gain or loss equal to (a) the sum of (i) the issue price of the Last Out Exit Term Loan Facility received, (ii) the fair market value of any New Common Stock received, and (iii) potentially, the fair market value of the Participation Right, minus (b) the U.S. Holder's adjusted tax basis in its Allowed Term Loan Claim.

49

UST-0413

Such U.S. Holder should obtain a tax basis in the consideration received, other than with respect to any amounts received that are attributable to accrued but unpaid interest (or original issue discount ("OID")), equal to the consideration's fair market value (or issue price, in the case of the Last Out Exit Term Loan) as of the date such consideration is distributed to the U.S. Holder. The holding period for any such property should begin on the day following the receipt of such consideration.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, OID or market discount, see the sections entitled "Accrued Interest (and OID)" and "Market Discount" below.

It is uncertain whether a U.S. Holder that receives but does not exercise the Participation Right should be treated as receiving anything of additional value in respect of its Term Loan Claims. If the U.S. Holder is treated as having received a Participation Right of value (despite their subsequent lapse), such that it obtains a tax basis in the Participation Right, the U.S. Holder generally would recognize a loss to the extent of the U.S. Holder's tax basis in the Participation Right. In general, such loss would be a short-term capital loss.

### 2. U.S. Federal Income Tax Consequences to the U.S. Holders of General Unsecured Claims (Class 5A)

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of the General Unsecured Claims, each U.S. Holder of an Allowed General Unsecured Claim shall receive, as applicable, (i) if Class 5 votes to accept the Plan then, in full and final satisfaction of each General Unsecured Claim, each U.S. Holder thereof will receive its Pro Rata share of Cash in an aggregate amount equal to $500,000; or (ii) if Class 5 votes to reject the Plan, then in full and final satisfaction of each Allowed General Unsecured Claim, each U.S. Holder thereof will neither receive nor retain any consideration under the Plan and each General Unsecured Claim shall be Disallowed in full, released, and discharged.

If Class 5 votes to accept the Plan, each U.S. Holder of a General Unsecured Claim will be treated as exchanging such Claim for Cash in a taxable exchange under section 1001 of the Tax Code. Such U.S. Holder would recognize gain or loss equal to the difference between (a) the amount of Cash received (subject to "Accrued Interest" discussed in Article XV.C.3 herein) and (b) the U.S. Holder's adjusted tax basis in its Claim.

The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below.

To the extent that a portion of the consideration received in exchange for its Claim is allocable to accrued but untaxed interest, OID or market discount, the U.S. Holder may recognize ordinary income. See "Accrued Interest (and OID)" and "Market Discount" in Articles XV.C.3 and XV.C.5, respectively, set forth below.

### 3. Accrued Interest (and OID)

To the extent that any amount received by a U.S. Holder of a surrendered Claim is attributable to accrued but unpaid interest (or OID) on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest (or OID) previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these

UST-0414

Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 4. *Medicare Tax*

Certain U.S. Holders that are individual, estates, or trusts are required to pay an additional 3.8% tax on, among other things, dividends and gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of New Common Stock and Last Out Exit Term Loan Facility.

### 5. *Market Discount*

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount with respect to the exchanged debt instrument.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### 6. *Acquisition Premium and Bond Premium*

If a U.S. Holder of a Class 4 Allowed Term Loan Claim receives an initial tax basis in any Last Out Exit Term Loan that is less than or equal to the stated redemption price at maturity of such debt instrument, but greater than the adjusted issue price of such instruments, the U.S. Holder should be treated as acquiring such debt instruments with an "acquisition premium." Unless an election is made, the U.S. Holder generally should reduce the amount of OID otherwise includible in gross income for an accrual period by an amount equal to the amount of OID otherwise includible in gross income multiplied by a fraction, the numerator of which is the excess of the U.S. Holder's initial tax basis in its interest in such debt instrument over such debt instrument's adjusted issue price, and the denominator of which is the excess of the sum of all amounts payable on such debt instrument (other than amounts that are "qualified stated interest") over its adjusted issue price.

If a U.S. Holder of a Class 4 Allowed Term Loan Claim receives an initial tax basis in any Last Out Exit Term Loan that exceeds the stated redemption price at maturity of such debt instrument, such U.S. Holder should be

UST-0415

treated as acquiring such debt instrument with "bond premium." Such U.S. Holder generally may elect to amortize the bond premium over the term of such debt instrument on a constant yield method as an offset to interest when includible in income under such U.S. Holder's regular accounting method. If a U.S. Holder does not elect to amortize the premium, that premium may decrease the gain or increase the loss such U.S. Holder would otherwise recognize on disposition of such debt instrument.

### 7. *Issue Price*

The determination of "issue price" of the Last Out Exit Term Loan Facility for purposes of the analysis herein will depend, in part, on whether such debt instruments and other property issued to a U.S. Holder or the property surrendered under the Plan are treated as traded on an "established securities market." In general, a debt instrument will be treated as traded on an established market if, at any time during the 31-day period ending 15 days after the issue date, (a) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (b) a "firm" price quote for the debt instrument is available from at least one broker, dealer or pricing service for property and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the property; or (c) there are one or more "indicative" quotes available from at least one broker, dealer or pricing service for property. Pursuant to applicable Treasury Regulation, an "established market" need not be a formal market. The issue price of a debt instrument that is traded on an established market (or that is issued for stock or securities so traded) would be the fair market value of such debt instrument (or such stock or securities so traded) on the issue date as determined by such trading; *provided* that if both the property exchanged and the property received therefor are treated as traded, the trading price of the property so received controls. Subject to certain exceptions, the issue price of a debt instrument that is neither so traded nor issued for stock or securities so traded would be its stated principal amount (*provided* that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS). The rules regarding the determination of issue price are complex and highly detailed and you should consult your tax advisor regarding the determination of the issue price of the loans under the Last Out Exit Term Loan Facility.

Where, as here, creditors receiving debt instruments are also receiving other property (*e.g.*, New Common Stock and potentially, the Participation Right) in exchange for their Claims, the "investment unit" rules under Applicable Tax Law may also apply to the determination of the issue price for any debt instrument received in exchange for their Claims. In general, if all of the components (other than cash) of the "investment unit" are publicly traded (as described above), then the issue price of the investment unit, as a whole, is determined as the aggregate of the fair market value of each of the components of the "investment unit" allocating the issue price of the investment unit to each of the investment unit's components on the basis of each component's fair market value. In the event that some, but not all, of the property composing the "investment unit" is publicly traded, then the application of the investment unit rules is unclear. If the Claims being exchanged for the investment unit are publicly traded prior to the exchange, the trading value of such Claims may set the issue price for the investment unit, with such issue price being allocated among the components of the investment unit in proportion to their fair market value. Alternatively, if the new debt instrument is publicly traded, the trading price of the new debt instrument may control the issue price of the new debt instrument, without regard to the potential application of the investment unit rules.

In general, a U.S. Holder of Claims must follow the Debtors' determination of issue price with respect to each debt instrument issued under the Plan, unless such U.S. Holder specifically discloses its disagreement with such determination on the U.S. Holder's own tax return. The Debtors will publish their determination of the issue price in accordance with applicable Treasury Regulations.

### 8. *Dividends on New Common Stock*

Any distributions made on account of New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

UST-0416

Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

### 9.  Sale, Redemption, or Repurchase of New Common Stock

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of New Common Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below. Under the recapture rules of section 108(e)(7) of the Tax Code, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Common Stock as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed Claim or recognized an ordinary loss on the exchange of its Allowed Claim for New Common Stock.

### 10.  Sale, Redemption, or Repurchase of Interests in the Last Out Exit Term Loan Facility

Upon the sale, exchange or other taxable disposition of the Last Out Exit Term Loan Facility, a U.S. Holder generally will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or other taxable disposition (other than accrued but untaxed interest, which will be taxable as interest) and the U.S. Holder's adjusted tax basis in their interest in the Last Out Exit Term Loan Facility. A U.S. Holder's initial tax basis in the Last Out Exit Term Loan Facility will be increased by any previously accrued OID and decreased by any payments on the Last Out Exit Term Loan Facility other than qualified stated interest. Any such gain or loss generally will be capital gain or loss and generally will be long-term capital gain or loss if the interest in the Last Out Exit Term Loan Facility has been held for more than one year at the time of its sale, exchange or other taxable disposition. Certain non-corporate U.S. Holders (including individuals) may be eligible for preferential rates of U.S. federal income tax in respect of long-term capital gains. The deductibility of capital losses is subject to limitations as discussed below.

### 11.  Limitation on Use of Capital Losses

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### D.  Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Restructuring Transactions to non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex. Each non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such non-U.S. Holders.

UST-0417

### 1. *Gain Recognition*

To the extent that the Restructuring Transactions are treated as a taxable exchange or otherwise result in the recognition of taxable gain for U.S. federal income tax purposes, any gain realized by a non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. To claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2. *Accrued Interest*

Payments to a non-U.S. Holder in satisfaction of a Claim that are attributable to accrued interest generally will not be subject to U.S. federal income tax or withholding, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

- the non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of Ascena's stock entitled to vote;

- the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Ascena (each, within the meaning of the Tax Code);

- the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

- such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail under the heading "Accrued Interest," the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

UST-0418

### 3. Payments on the Last Out Exit Term Loan Facility

Subject to the discussion below regarding "FATCA," payments to a Non-U.S. Holder with respect to the Last Out Exit Term Loan Facility that are treated as interest, including payments attributable to any OID (see discussion above) generally will not be subject to U.S. federal income or withholding tax; *provided* that (a) such Non-U.S. Holder is not a bank, (b) such Non-U.S. Holder does not actually or constructively own 10% or more of the total combined voting power of all classes of Reorganized Ascena's stock entitled to vote, (c) such Non-U.S. Holder is not a "controlled foreign corporation" that is a "related person" with respect to Reorganized Ascena (each, within the meaning of the Tax Code), and (d) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, *provided* the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (a) generally will not be subject to withholding tax, but (b) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the interest (or OID) at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

Subject to the discussion below regarding "FATCA," a Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to interest, including any OID.

For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 4. Sale, Exchange or Other Disposition of the Last Out Exit Term Loan Facility

Subject to the discussion below regarding "FATCA," any gain recognized by a Non-U.S. Holder on the sale, exchange or other disposition of interests in the Last Out Exit Term Loan Facility (other than an amount representing accrued but untaxed interest (or OID) on the Last Out Exit Term Loan Facility, which is subject to the rules discussed above under "Payments on the Last Out Exit Term Loan Facility") generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for one hundred and eighty-three (183) days or more during the taxable year in which the disposition occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. Subject to the discussion below regarding "FATCA," in order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 5. Dividends on New Common Stock

Any distributions made with respect to New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the Reorganized Debtor's current or accumulated earnings and profits as determined

UST-0419

under U.S. federal income tax principles. To the extent that a non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the non-U.S. Holder's basis in its shares. Any such distributions in excess of a non-U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange as described below; see "Sale, Redemption, or Repurchase of New Common Stock" in Article XV.D.6 herein). Except as described below, dividends paid with respect to New Common Stock held by a non-U.S. Holder that are not effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable). A non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Stock held by a non-U.S. Holder that are effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

### 6. Sale, Redemption, or Repurchase of New Common Stock

A non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a Cash redemption) of New Common Stock unless:

(i)    such non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; or

(ii)   such gain is effectively connected with such non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States); or

(iii)  the Reorganized Debtors are or have been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). The Debtors consider it unlikely, based on their current business plans and operations, that any of the Reorganized Debtors will become a "U.S. real property holding corporation" in the future.

### 7. FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on New Common Stock), and, subject to the paragraph immediately below, also include gross proceeds from the sale

UST-0420

of any property of a type which can produce U.S. source interest or dividends (which would include New Common Stock) and the Last Out Exit Term Loan Facility. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019 that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such non-U.S. Holder.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THE FATCA RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF THEIR CLAIMS PURSUANT TO THE PLAN AND ON THEIR OWNERSHIP OF THE NEW COMMON STOCK AND LAST OUT EXIT TERM LOANS.**

E.    **Information Reporting and Back-Up Withholding**

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

**XVI.    RECOMMENDATION**

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

UST-0421

Dated: July 31, 2020

Respectfully submitted,

Ascena Retail Group, Inc.,
on behalf of itself and each of the other Debtors

By:  */s/ Carrie W. Teffner*
Name: Carrie W. Teffner
Title:  Interim Executive Chair, Ascena Retail
Group, Inc.

Prepared by:

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:         edward.sassower@kirkland.com
               steven.serajeddini@kirkland.com

**-**and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:         john.luze@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
Olya Antle (VSB 83153)
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:      (202) 842-7800
Facsimile:      (202) 842-7899
Email:         cspeckhart@cooley.com
               oantle@cooley.com

UST-0422

**Exhibit A**

**Plan of Reorganization**

UST-0423

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF ASCENA RETAIL GROUP, INC. AND ITS DEBTOR AFFILIATES**

NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE,
COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS, ANY OF THE
RESTRUCTURING SUPPORT PARTIES, OR ANY OTHER PARTY IN INTEREST.

YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN
FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.

THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER
CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and
Texas; Not admitted to practice in DC, supervised by
members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in
DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:    (202) 842-7800
Facsimile:    (202) 842-7899

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated: July 31, 2020

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

UST-0424

## TABLE OF CONTENTS

**Article I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** ...........................................................................................................1
A. Defined Terms. ........................................................................................................1
B. Rules of Interpretation. .........................................................................................11
C. Computation of Time. ...........................................................................................11
D. Governing Law. .....................................................................................................11
E. Reference to Monetary Figures. ............................................................................12
F. Controlling Document. ..........................................................................................12
G. Restructuring Support Agreement Party Consent Rights and Controlling Documents. .................12

**Article II. ADMINISTRATIVE CLAIMS, DIP ABL FACILITY CLAIMS, DIP TERM FACILITY CLAIMS, AND PRIORITY CLAIMS** ......................................................12
A. Administrative Claims. ..........................................................................................12
B. DIP ABL Facility Claims. .....................................................................................13
C. DIP Term Facility Claims. ....................................................................................13
D. Professional Compensation. ..................................................................................13
E. Priority Tax Claims. ..............................................................................................15

**Article III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ....................15
A. Classification of Claims and Interests. ..................................................................15
B. Treatment of Claims and Interests. .......................................................................15
C. Special Provision Governing Unimpaired Claims. ...............................................18
D. Elimination of Vacant Classes. .............................................................................18
E. Voting Classes; Presumed Acceptance by Non-Voting Classes. ..........................18
F. Intercompany Interests. .........................................................................................18
G. Subordinated Claims and Interests. .......................................................................18
H. Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.....................19

**Article IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ...........................................19
A. Restructuring Transactions. ...................................................................................19
B. General Settlement of Claims. ...............................................................................19
C. Sources of Consideration for Plan Distributions. .................................................19
D. Corporate Existence. ..............................................................................................20
E. Vesting of Assets in the Reorganized Debtors. .....................................................21
F. Cancellation of Existing Securities and Instruments. ...........................................21
G. Corporate Action. ..................................................................................................21
H. New Corporate Governance Documents. ..............................................................21
I. Directors and Officers of the Reorganized Debtors. .............................................22
J. Effectuating Documents; Further Transactions. ....................................................22
K. Exemption from Certain Taxes and Fees. .............................................................22
L. Preservation of Causes of Action. .........................................................................23
M. Director, Officer, Manager, and Employee Liability Insurance. ..........................23
N. Management Incentive Plan. ..................................................................................24
O. Employee Obligations. ..........................................................................................24

**Article V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ...........24
A. Assumption and Rejection of Executory Contracts and Unexpired Leases. ..........24
B. Claims Based on Rejection of Executory Contracts or Unexpired Leases. ...........25
C. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases..........25
D. Indemnification Obligations. .................................................................................26
E. Insurance Policies. .................................................................................................26
F. Modifications, Amendments, Supplements, Restatements, or Other Agreements..........27
G. Reservation of Rights. ...........................................................................................27
H. Nonoccurrence of Effective Date. .........................................................................27

UST-0425

I.     Contracts and Leases Entered Into After the Petition Date. ...................................27

**Article VI. PROVISIONS GOVERNING DISTRIBUTIONS**................................................**27**
  A.    Timing and Calculation of Amounts to Be Distributed. ................................27
  B.    Delivery of Distributions and Undeliverable or Unclaimed Distributions.............28
  C.    Securities Registration Exemption .................................................28
  D.    Tax Issues and Compliance with Tax Requirements. ................................29
  E.    Allocations.....................................................................29
  F.    No Interest......................................................................29
  G.    Setoffs and Recoupment. .........................................................29
  H.    Claims Paid or Payable by Third Parties. ........................................29

**Article VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS**.........................................................................**30**
  A.    Allowance of Claims. .............................................................30
  B.    Claims Administration Responsibilities. ..........................................30
  C.    Estimation of Claims. .............................................................30
  D.    Adjustment to Claims Register Without Objection. ................................31
  E.    Time to File Objections to Claims. ................................................31
  F.    Disallowance of Claims. ..........................................................31
  G.    Amendments to Claims. ..........................................................31
  H.    No Distributions Pending Allowance. .............................................32
  I.    Distributions After Allowance. ....................................................32

**Article VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ............**32**
  A.    Compromise and Settlement of Claims, Interests, and Controversies. ..............32
  B.    Discharge of Claims and Termination of Interests. ................................32
  C.    Term of Injunctions or Stays. .....................................................33
  D.    Release of Liens. .................................................................33
  E.    Debtor Release. ..................................................................33
  F.    Release by holders of Claims or Interests. ........................................34
  G.    Exculpation. .....................................................................34
  H.    Injunction. .......................................................................35
  I.    Protection Against Discriminatory Treatment. ....................................35
  J.    Recoupment. ....................................................................35
  K.    Subordination Rights. ............................................................35

**Article IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE
PLAN**.....................................................................................**36**
  A.    Conditions Precedent to the Effective Date. ......................................36
  B.    Waiver of Conditions. ............................................................37
  C.    Substantial Consummation. ......................................................37
  D.    Effect of Nonoccurrence of Conditions to the Effective Date. ......................37

**Article X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ......................**37**
  A.    Modification and Amendments. ...................................................37
  B.    Effect of Confirmation on Modifications. .........................................38
  C.    Revocation or Withdrawal of the Plan. ...........................................38

**Article XI. RETENTION OF JURISDICTION**...........................................................**38**

**Article XII. MISCELLANEOUS PROVISIONS**...........................................................**40**
  A.    Immediate Binding Effect. ........................................................40
  B.    Additional Documents. ...........................................................40
  C.    Statutory Fees. ...................................................................40
  D.    Dissolution of the Committee. ....................................................40

UST-0426

E.      Reservation of Rights....................................................................................................40
F.      Successors and Assigns.................................................................................................40
G.      Service of Documents ...................................................................................................41
H.      Entire Agreement..........................................................................................................41
I.      Exhibits.........................................................................................................................41
J.      Nonseverability of Plan Provisions..............................................................................42
K.      Votes Solicited in Good Faith.......................................................................................42
L.      Waiver or Estoppel.......................................................................................................42

UST-0427

**INTRODUCTION**

Ascena Retail Group, Inc. ("Ascena") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose this joint plan of reorganization (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**Article I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.    *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*ABL Agent*" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent and collateral agent under the ABL Credit Agreement.

2.    "*ABL Claim*" means any Claim derived from, based upon, or secured pursuant to the ABL Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto.

3.    "*ABL Commitment Letter*" has the meaning set forth in the Restructuring Support Agreement.

4.    "*ABL Credit Agreement*" means that certain Amended and Restated Credit Agreement dated as of January 3, 2011, as amended and restated by the Second Restatement Agreement dated as of June 14, 2012, by the Third Restatement Agreement dated as of March 13, 2013, by the Fourth Restatement Agreement dated as of July 24, 2015, the Fifth Restatement Agreement dated as of February 27, 2018, and as may otherwise be amended, restated, supplemented or otherwise modified, among Ascena, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto, the issuing banks party thereto, and the ABL Agent, as administrative agent, collateral agent, and swingline lender.

5.    "*ABL Documents*" means the ABL Credit Agreement and any other agreements and documents executed in connection with or related thereto.

6.    "*ABL Lenders*" means each of the lenders from time to time party to the ABL Credit Agreement.

7.    "*Ad Hoc Group*" means, collectively, that certain group of lenders under the Term Loan Facility represented by Milbank LLP, as counsel, and Greenhill & Co., LLC, as financial advisor.

8.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; and (b) Allowed Professional Fee Claims.

UST-0428

9. "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

10. "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

11. "*Allowed*" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Court a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim allowed pursuant to the Plan, any stipulation approved by the Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. For the avoidance of doubt, a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow" and "Allowing" shall have correlative meanings.

12. "*Ascena*" means Ascena Retail Group, Inc.

13. "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtors, the debtors in possession, the Estates, or other appropriate parties in interest have asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

14. "*Backstop Commitment*" means the commitment, on the terms set forth in the Backstop Commitment Letter, of the Backstop Parties to backstop the DIP Term Facility.

15. "*Backstop Commitment Letter*" means that certain Backstop Commitment Letter, dated as of July 23, 2020, by and among the Backstop Parties and Ascena, as may be amended, supplemented, or modified from time to time, setting forth, among other things, the terms and conditions of the DIP Term Facility and the Backstop Commitment.

16. "*Backstop Parties*" means certain of the Consenting Stakeholders or their successors, assigns, or Related Funds (in each case, as allowed pursuant to the Backstop Commitment Agreement) that have committed to backstop the DIP Term Facility on the terms set forth in the Backstop Commitment Letter, solely in their capacities as such.

17. "*Backstop Percentage*" means the applicable percentage set forth in Schedule 2 to the Backstop Commitment Letter.

18. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

19. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of Virginia or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the Eastern District of Virginia.

2

UST-0429

20.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

21.     "*Bar Date*" means, collectively, each applicable date established by the Bankruptcy Court by which Proofs of Claim must be Filed.

22.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

23.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable.

24.     "*Cash Collateral*" has the meaning set forth in the Cash Collateral Order.

25.     "*Cash Collateral Order*" means the *Interim Order Under 11 U.S.C. §§ 105, 361, 362, 363, and 507, and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)*, entered on the Bankruptcy Court's docket on July 23, 2020.

26.     "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

27.     "*Chapter 11 Cases*" means the procedurally consolidated cases filed or to be filed (as applicable) for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

28.     "*Claim*" means a claim, as defined in section 101(5) of the Bankruptcy Code, against a Debtor.

29.     "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to Claims.

30.     "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

31.     "*Class*" means a category of Claims or Interests under section 1122(a) of the Bankruptcy Code.

32.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

33.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

34.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Rule 3020(b)(2) and section 1128 of the Bankruptcy Code, including any adjournments thereof, at which the Bankruptcy Court will consider confirmation of the Plan.

3

UST-0430

35. "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

36. "*Consenting Stakeholders*" has the meaning set forth in the Restructuring Support Agreement.

37. "*Consummation*" means the occurrence of the Effective Date.

38. "*Creditors' Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

39. "*Cure/Assumption Objection Deadline*" means the date that is 14 days after filing of the Schedule of Assumed Executory Contracts and Unexpired Leases with the Plan Supplement and service of the Cure Notice; *provided* that if any Executory Contract or Unexpired Lease is added to the Schedule of Assumed Executory Contracts and Unexpired Leases after the filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be 14 days after service of the amended Schedule of Assumed Executory Contracts and Unexpired Leases with such modification.

40. "*Cure Claim*" means a monetary Claim based upon a Debtor's defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to section 365 of the Bankruptcy Code.

41. "*Cure Notice*" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include: (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases; (b) Cure Claims to be paid in connection therewith; and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

42. "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for current or former directors', managers', and officers' liability.

43. "*Definitive Documents*" has the meaning set forth in the Restructuring Support Agreement.

44. "*DIP ABL Agent*" means, as applicable, the administrative agent under the DIP ABL Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP ABL Agreement.

45. "*DIP ABL Agreement*" means any debtor-in-possession senior secured asset-based revolving credit agreement, by and among the Debtors, the DIP ABL Agent, and the DIP ABL Lenders, as applicable, as approved by the DIP Financing Order.

46. "*DIP ABL Facility*" means any senior secured asset-based revolving credit facility in accordance to the terms and conditions set forth in the DIP ABL Agreement and the DIP Financing Order, as applicable.

47. "*DIP ABL Facility Claim*" means any Claim derived from, based upon, or secured pursuant to the DIP ABL Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP ABL Facility.

48. "*DIP ABL Lender*" means, as applicable, each lender under the DIP ABL Agreement.

49. "*DIP Financing Order*" means the Final Order of the Bankruptcy Court setting forth the terms of and approving the DIP ABL Facility, as applicable, and the DIP Term Facility.

50. "*DIP Term Agent*" means Alter Domus (US) LLC, in its capacity as administrative agent under the DIP Term Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Term Agreement.

4

UST-0431

51.    "*DIP Term Agreement*" means that certain debtor-in-possession senior secured term credit agreement, by and among the Debtors, the DIP Term Agent, and the DIP Term Lenders, as approved by the DIP Financing Order.

52.    "*DIP Term Facility*" means that certain $311.8 million senior secured term credit facility issued in accordance to the terms and conditions set forth in the DIP Term Agreement and the DIP Financing Order, as applicable.

53.    "*DIP Term Facility Claim*" means any Claim derived from, based upon, or secured pursuant to the DIP Term Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Term Facility.

54.    "*DIP Term Lender*" means each lender under the DIP Term Agreement.

55.    "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that:  (a) has been disallowed by a Final Order; (b) is Scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not Scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the holder thereof; or (e) has been withdrawn by the holder thereof.

56.    "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto.

57.    "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement, entered on September 3, 2020 [Docket No. [●]].

58.    "*Disputed*" means a Claim that is not yet Allowed.

59.    "*Distribution Record Date*" means the date for determining which holders of Claims are eligible to receive distributions hereunder and shall be the Effective Date or such other date as designated in a Final Order of the Bankruptcy Court; *provided* that the Distribution Record Date shall not apply to publicly held securities.

60.    "*DTC*" means the Depository Trust Company.

61.    "*Effective Date*" means, with respect to the Plan, the date that is the first Business Day after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.A have been satisfied or waived (in accordance with Article IX.B); and (c) the Plan is declared effective by the Debtors.

62.    "*Employee Benefits Programs*" means, collectively, all of the Debtors' wages, compensation, and employee benefits programs according to existing terms and practices, including executive and Insider compensation and benefits programs, Insider and non-Insider severance programs, Insider and non-Insider incentive programs, and Insider and non-Insider retention programs, in each case as were in effect as of the effective date of the Restructuring Support Agreement and were disclosed to counsel for the Required Consenting Stakeholders, including any modifications agreed between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement; *provided* that Employee Benefits Programs shall not include (x) any compensation, post-employment, separation or retirement arrangement with any former Insider (as of the effectiveness of the Restructuring Support Agreement) or (y) any non-qualified deferred compensation plan or supplemental retirement plan, solely to the extent and such plan would benefit any former Insider (as of the effectiveness of the Restructuring Support Agreement), in each case without the consent of the Required Consenting Stakeholders following the Petition Date.

UST-0432

63.     "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

64.     "*Equity Premium*" means an amount of New Common Stock equal to $7.5 million, calculated assuming a total equity value of Reorganized Ascena to be agreed by the Debtors and the Required Consenting Stakeholders.

65.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 upon the commencement of the applicable Debtor's Chapter 11 Case.

66.     "*Exculpated Parties*" means collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) any statutory committees appointed in the Chapter 11 Cases and each of their respective members; (e) each current and former Affiliate of each Entity in clause (a) through the following clause (f); and (f) each Related Party of each Entity in clause (a) through this clause (f).

67.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

68.     "*Exit ABL Facility*" means either (a) a replacement asset-based revolving loan facility pursuant to which one or more DIP ABL Lenders, each in its sole discretion, consents to convert some or all of its outstanding DIP ABL Facility Claims and commitments under the DIP ABL Facility into commitments under such Exit ABL Facility, or (b) a new asset-based revolving loan facility in an amount up to $400 million and, in all events, in an amount sufficient to pay in full in cash the DIP ABL Facility Claims as of the Effective Date.

69.     "*Exit Facilities*" means, collectively, the Exit ABL Facility, the First Out Exit Term Loan Facility, and the Second Out Exit Term Loan Facility.

70.     "*Exit Facilities Term Sheet*" means the term sheet set forth as <u>Exhibit D</u> to the Restructuring Support Agreement.

71.     "*Exit Facility Credit Agreements*" means, collectively, the credit agreements governing the Exit Facilities.

72.     "*Exit Facility Documents*" means the Exit Facility Credit Agreements and related documents governing the Exit Facilities, which shall be, to the extent available, set forth in the Plan Supplement.

73.     "*First Out Exit Term Loan Facility*" shall have the meaning given to "First Out Term Loan Facility" in the Exit Facilities Term Sheet.

74.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

75.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

76.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified, or amended, is not subject to any pending stay and as to which the time to appeal, move for reargument, reconsideration, or rehearing, or seek certiorari has expired and no appeal, motion for reargument, reconsideration, or rehearing or petition for certiorari has been timely taken or filed, or as to which any appeal that has been taken, motion for reargument, reconsideration, or rehearing that has been granted or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule

6

UST-0433

60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

77. "*General Unsecured Claim*" means any Claim that is not Secured and is not (a) an Administrative Claim, (b) a Secured Tax Claim, (c) an Other Secured Claim, (d) a Priority Tax Claim, (e) an Other Priority Claim, (f) an ABL Claim, (g) a Term Loan Claim, or (h) an Intercompany Claim.

78. "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

79. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

80. "*Insider*" shall have the meaning set forth in section 101(31) of the Bankruptcy Code.

81. "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor or a Debtor's Affiliate.

82. "*Intercompany Interest*" means, other than an Interest in Ascena, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

83. "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor.

84. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time, as applicable to the Chapter 11 Cases.

85. "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

86. "*Management Incentive Plan*" means a post-Effective Date management incentive plan, the material terms of which shall be consistent with Article IV.N of the Plan.

87. "*New Board*" means the initial board of directors, members, or managers, as applicable, of Reorganized Ascena.

88. "*New Common Stock*" means the common shares of Reorganized Ascena.

89. "*New Corporate Governance Documents*" means the form of certificate or articles of incorporation, bylaws, limited liability company agreement, partnership agreement, or such other applicable formation documents (if any) of Reorganized Ascena, including any certificates of designation, each of which shall be included in the Plan Supplement.

90. "*Notice and Claims Agent*" means Prime Clerk LLC.

91. "*Other Priority Claim*" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than: (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases.

92. "*Other Secured Claim*" means any Secured Claim, other than (a) an ABL Claim, (b) a DIP ABL Facility Claim, as applicable, (c) a Term Loan Claim, or (d) a DIP Term Facility Claim.

93. "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

94. "*Petition Date*" means July 23, 2020, the date on which the Debtors commenced the Chapter 11 Cases.

UST-0434

95.    "*Plan*" means this plan of reorganization, as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto.

96.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the terms thereof, the Plan, the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement).  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with Article X of the Plan.

97.    "*Priority Claims"* means, collectively, Priority Tax Claims and Other Priority Claims.

98.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

99.    "*Professional*" means an Entity retained in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 328, 363, and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

100.    "*Professional Fee Claims*" means all Claims for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the Confirmation Date that the Bankruptcy Court has not denied by Final Order.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims.

101.    "*Professional Fee Escrow Account*" means an account funded by the Debtors with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount, provided that the Cash funds in the Professional Fee Escrow Account shall be increased from Cash on hand at the Reorganized Debtors to the extent applications are filed after the Effective Date in excess of the amount of Cash funded into the escrow as of the Effective Date.

102.    "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.D of the Plan.

103.    "*Proof of Claim*" means a proof of Claim Filed in the Chapter 11 Cases.

104.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

105.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

106.    "*Related Fund*" means with respect to any Person, an Affiliate or any fund, account, or investment vehicle that is controlled, managed, advised, or sub-advised by such Person, an Affiliate or the same investment manager, advisor or sub-advisor as such Person or an Affiliate of such investment manager, advisor, or sub-advisor.

107.    "*Related Party*" means, with respect to any person or Entity, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special or other committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or

8

UST-0435

managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors of such person or Entity, and any such Person's or Entity's respective heirs, executors, estates, and nominees.

108.    "*Released Party*" means, collectively, each of the following in their capacity as such:  (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the ABL Agent; (e) the ABL Lenders; (f) the Term Loan Agent; (g) the Term Loan Lenders; (h) each of the lenders and administrative agents under the Exit Facilities; (i) the Backstop Parties; (j) the DIP ABL Agent; (k) the DIP ABL Lenders; (l) the DIP Term Agent; (m) the DIP Term Lenders; (n) each current and former Affiliate of each Entity in the foregoing clause (a) through the following clause (o); and (o) each Related Party of each Entity in the foregoing clause (a) through this clause (o).

109.    "*Releasing Party*" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the ABL Agent; (e) the ABL Lenders; (f) Term Loan Agent; (g) the Term Loan Lenders; (h) each of the lenders and administrative agents under the Exit Facilities; (i) the Backstop Parties; (j) the DIP ABL Agent; (k) the DIP ABL Lenders; (l) the DIP Term Agent; (m) the DIP Term Lenders; (n) all holders of Claims; (o) all holders of Interests; (p) each current and former Affiliate of each Entity in foregoing clause (a) through the following clause (q); and (q) each Related Party of each Entity in the foregoing clause (a) through this clause (q); *provided* that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation; *provided further* that any such Entity shall be identified by name as a non-Releasing Party in the Confirmation Order.

110.    "*Reorganized Debtors*" means Reorganized Ascena and each of the other Debtors, or any successor thereto, as reorganized pursuant to and under the Plan.

111.    "*Reorganized Ascena*" means either (a) Ascena, or any successor thereto, as reorganized pursuant to and under the Plan or (b) a new corporation or limited liability company that may be formed or caused to be formed by the Debtors to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Common Stock to be distributed or sold pursuant to the Plan.

112.    "*Required Consenting Stakeholders*" shall have the meaning set forth in the Restructuring Support Agreement.

113.    "*Restructuring*" means the restructuring of the Debtors on the terms of the Plan and the Restructuring Support Agreement.

114.    "*Restructuring Documents*" means the Plan, the Disclosure Statement, the Plan Supplement, and the various agreements and other documents formalizing or implementing the Plan and the transactions contemplated thereunder.

115.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of July 23, 2020, by and among the Debtors and the Consenting Stakeholders, including all exhibits and schedules attached thereto, as may be amended from time to time in accordance with the terms thereof.

116.    "*Restructuring Transactions*" means any transaction and any actions as may be necessary or appropriate to effect a corporate restructuring of the Debtors' and the Reorganized Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan, Restructuring Support Agreement, and Restructuring Transactions Memorandum, including the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued or executed pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as described in Article IV.A of the Plan.

UST-0436

117.    "*Restructuring Transactions Memorandum*" means a document to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions, including any corporate restructuring or reorganization to be consummated in connection therewith.

118.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be assumed or assumed and assigned by the Reorganized Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time in accordance with the Plan.

119.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time in accordance with the Plan.

120.    "*Schedule of Retained Causes of Action*" means the schedule, which will be included in the Plan Supplement, of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

121.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

122.    "*Second Out Exit Term Loan Facility*" shall have the meaning given to "Last Out Term Loan Facility" in the Exit Facilities Term Sheet.

123.    "*Secured*" means when referring to a Claim: (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable holder's interest in the applicable Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim.

124.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

125.    "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

126.    "*Term Loan Agent*" means Goldman Sachs Bank USA, in its capacity as administrative agent under the Term Loan Credit Agreement, and any successor thereto.

127.    "*Term Loan Claim*" means all Claims derived from, based upon, or secured pursuant to the Term Loan Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto.

128.    "*Term Loan Credit Agreement*" means Term Credit Agreement, dated as of August 21, 2015, and as may otherwise be amended, restated, supplemented or otherwise modified, among Ascena, AnnTaylor Retail, Inc., the lenders party thereto, and the Term Loan Agent, as administrative agent.

129.    "*Term Loan Documents*" means the Term Loan Credit Agreement and any other agreements and documents executed in connection with or related thereto

130.    "*Term Loan Lenders*" means each of the lenders from time to time party to the Term Loan Credit Agreement.

UST-0437

131.     "*U.S. Trustee*" means the Office of the United States Trustee for the Eastern District of Virginia.

132.     "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

133.     "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that are unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash.

134.     "*Voting Deadline*" means October 6, 2020 at 5:00 p.m. prevailing Easter Time.

B.     *Rules of Interpretation.*

For purposes herein:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (14) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

C.     *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.     *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

UST-0438

E.    *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.    *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the Plan Supplement shall control.  In the event of any inconsistency between the Plan or Plan Supplement, on the one hand, and the Confirmation Order on the other hand, the Confirmation Order shall control.

G.    *Restructuring Support Agreement Party Consent Rights and Controlling Documents.*

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the Restructuring Support Agreement as set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan, any Definitive Document, all exhibits to the Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Section I.A of the Plan) and be fully enforceable as if stated in full herein.

## Article II.
## ADMINISTRATIVE CLAIMS, DIP ABL FACILITY CLAIMS, DIP TERM FACILITY CLAIMS, AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP ABL Facility Claims, DIP Term Facility Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.    *Administrative Claims.*

Except with respect to Administrative Claims that are Professional Fee Claims or to the extent that an Administrative Claim has not already been paid during the Chapter 11 Cases or a holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash the unpaid portion of its Allowed Administrative Claim on the latest of:  (a)  the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements and/or arrangements governing, instruments evidencing, or other documents relating to such transactions (and no requests for payment of such Administrative Claims must be Filed or served).  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim Allowed by Final Order.

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party by the Claims Objection Bar Date.

12

UST-0439

B.    *DIP ABL Facility Claims.*

To the extent the Debtors enter into the DIP ABL Facility prior to the Confirmation Date, all DIP ABL Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP ABL Agreement on such date, (b) all accrued and unpaid interest thereon to the date of payment, and (c) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP ABL Agreement and the DIP Financing Order.

Except to the extent that a holder of an Allowed DIP ABL Facility Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of each Allowed DIP ABL Facility Claim, on the Effective Date, each Holder of an Allowed DIP ABL Facility Claim shall be Paid in Full.  As used in this paragraph, "Paid in Full" shall mean (i) if those certain conversion conditions set forth in the DIP ABL Agreement remain unsatisfied as of the Effective Date, on the Effective Date, each holder of an Allowed DIP ABL Facility Claim shall receive the indefeasible repayment in full in Cash of all obligations (including principal, interests, fees, expenses, indemnities (other than contingent indemnification obligations for which no claim has been asserted)) under the DIP ABL Agreement, the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancellation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the DIP ABL Agreement, or (ii) if those certain conversion conditions as set forth in the DIP ABL Agreement are fully satisfied as of the Effective Date, on the Effective Date, each holder of an Allowed DIP ABL Facility Claim shall receive, unless such holder agrees to less favorable treatment, its Pro Rata share of participation in the Exit ABL Facility.  The Liens securing the DIP ABL Facility shall not be released until such time as (x) the DIP ABL Facility is Paid in Full, (y) the commitments to lend thereunder have terminated, and (z) the DIP ABL Agent has received evidence reasonably satisfactory to it that the DIP ABL Facility has been terminated and the security granted in connection therewith released.

Subject to the DIP ABL Facility Claims being Paid in Full in accordance with the terms of this Plan, or other such treatment as contemplated by Article II.B of the Plan, on the Effective Date all Liens and security interests granted to secure such obligations (other than those granted in connection with the payoff arrangements and cash collateralization of such obligations) shall be automatically terminated and of no further force or effect without any further notice to or action, order, or approval of the Bankruptcy Court.

C.    *DIP Term Facility Claims.*

All DIP Term Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP Term Agreement on such date, (b) all accrued and unpaid interest thereon to the date of payment, and (c) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP Term Agreement and the DIP Financing Order.

On the Effective Date, each holder of an Allowed DIP Term Facility Claim shall receive, unless such holder agrees to less favorable treatment and subject to the terms and conditions of the DIP Term Facility and the Exit Facility Term Sheet, cash in an amount equal to its allowed DIP Term Facility Claim; *provided* that, if certain conditions as set forth in the DIP Term Agreement and Exit Facility Term Sheet are satisfied, each holder of an allowed DIP Term Facility Claim shall receive (i) loans arising under the First Out Exit Term Loan Facility in an amount equal to such holder's allowed DIP Term Facility Claim and (ii) cash on account of accrued and unpaid interest and other charges payable through the Effective Date, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed DIP Term Facility Claim.

D.    *Professional Compensation.*

1.    <u>Professional Fee Escrow Account.</u>

As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been

13

UST-0440

irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that obligations with respect to Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

2.      Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The amount of the Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

3.      Professional Fee Escrow Amount.

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; *provided* that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4.      Post-Confirmation Date Fees and Expenses.

From and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors, as applicable. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten business days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors or the Reorganized Debtors, as applicable. If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected professional may submit such dispute to the Bankruptcy

14

UST-0441

Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

E.    *Priority Tax Claims.*

    Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of an Allowed Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, at the option of the applicable Debtor or Reorganized Debtor, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (i) Cash equal to the amount of such Allowed Priority Tax Claim on the Effective Date or (ii) otherwise treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  For the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**Article III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.    *Classification of Claims and Interests.*

    This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

    The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | ABL Claims | Unimpaired | Presumed to Accept |
| 4 | Term Loan Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Interests in Ascena | Impaired | Deemed to Reject |

B.    *Treatment of Claims and Interests.*

    Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

15

UST-0442

1.     Class 1 – Other Secured Claims

    a.   *Classification*: Class 1 consists of Other Secured Claims against any Debtor.

    b.   *Treatment*: Each holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

        i.   payment in full in Cash;

        ii.   delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

        iii.   Reinstatement of such Claim; or

        iv.   other treatment rendering such Claim Unimpaired.

    c.   *Voting*: Class 1 is Unimpaired. Holders of Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

2.     Class 2 – Other Priority Claims

    a.   *Classification*: Class 2 consists of Other Priority Claims.

    b.   *Treatment*: Each holder of an Other Priority Claim shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired.

    c.   *Voting*: Class 2 is Unimpaired. Holders of Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

3.     Class 3 – ABL Claims

    a.   *Classification*: Class 3 consists of all ABL Claims.

    b.   *Allowance*: $333,000,000.

    c.   *Treatment*: To the extent any Allowed ABL Claims remain outstanding on the Effective Date, each holder of an Allowed ABL Claim shall receive:

        i.   payment in full in Cash of its Allowed ABL Claim and replacement or cash collateralization of all issued and undrawn letters of credit in the amounts specified under the ABL Credit Agreement;

        ii.   the collateral securing its Allowed ABL claim;

        iii.   Reinstatement of its Allowed ABL Claim under the Exit ABL Facility; or

        iv.   such other treatment that renders its Allowed ABL Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    d.   *Voting*: Class 3 is Unimpaired. Holders of ABL Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

16

UST-0443

4.    Class 4 – Term Loan Claims

    a.    *Classification*:  Class 4 consists of all Term Loan Claims.

    b.    *Allowance*:  $1,271,597,089.

    c.    *Treatment:*  Each holder of an Allowed Term Loan Claim shall receive its Pro Rata share of:

        i.    the loans arising under the Second Out Exit Term Loan Facility; and

        ii.    55.1% of the New Common Stock less the percentage of New Common Stock distributed as the Equity Premium, subject to dilution on account of the Management Incentive Plan.

    d.    *Voting:* Class 4 is Impaired.  Holders of Allowed Term Loan Claims are entitled to vote to accept or reject the Plan.

5.    Class 5 – General Unsecured Claims

    a.    *Classification*:  Class 5 consists of all General Unsecured Claims.

    b.    *Treatment*:

        i.    ***If holders of Allowed General Unsecured Claims vote as a class to accept the Plan,*** each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of Cash in an amount equal to $500,000.

        ii.    ***If holders of Allowed General Unsecured Claims vote as a class to reject the Plan,*** each holder of an Allowed General Unsecured Claim shall receive treatment consistent with section 1129(a)(7) of the Bankruptcy Code, as determined by the Debtors and the Required Consenting Stakeholders.

    c.    *Voting*:  Class 5 is Impaired.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.    Class 6 – Intercompany Claims

    a.    *Classification*:  Class 6 consists of all Intercompany Claims.

    b.    *Treatment*: Subject to the Restructuring Transactions Memorandum, each Allowed Intercompany Claim shall be Reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Reorganized Debtors.

    c.    *Voting*:    Class 6 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

7.    Class 7 – Intercompany Interests

    a.    *Classification*:  Class 7 consists of all Intercompany Interests.

UST-0444

b. *Treatment*: Subject to the Restructuring Transactions Memorandum, Intercompany Interests shall receive no recovery or distribution and be Reinstated solely to the extent necessary to maintain the Debtors' corporate structure.

c. *Voting*: Class 7 is Unimpaired, and holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

8. Class 8 – Interests in Ascena

a. *Classification*: Class 8 consists of all Interests in Ascena.

b. *Treatment*: Each holder of an Allowed Interest in Ascena shall have such Interest cancelled, released, and extinguished without any distribution.

c. *Voting*: Class 8 is Impaired, and holders of Interests in Ascena are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Interests in Ascena are not entitled to vote to accept or reject the Plan.

C. *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D. *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E. *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court to deem the Plan accepted by the holders of such Claims or Interests in such Class.

F. *Intercompany Interests.*

Holders of Intercompany Interests are retaining their respective Interests not on account of their Intercompany Interests, but rather for the purposes of administrative convenience, for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims. For the avoidance of doubt, any Interest in a non-Debtor owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

G. *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

18

UST-0445

H.      *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to alter, amend, or modify the Plan, or any document in the Plan Supplement in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

## Article IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Restructuring Transactions.*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including, without limitation: (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) consummation of such other transactions that are required to effectuate the Restructuring Transactions, including the transaction set forth in the Restructuring Transactions Memorandum; (e) consummation of all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by Reorganized Ascena, which purchase may be structured as a taxable transaction for United States federal income tax purposes; (f) the issuance, distribution, reservation, or dilution, as applicable, of the New Common Stock, as set forth herein; and (g) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

B.      *General Settlement of Claims.*

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including with respect to issues related to the value of the Debtors' unencumbered property. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

C.      *Sources of Consideration for Plan Distributions.*

The Reorganized Debtors shall fund distributions under the Plan from the following sources:

1.      Cash on Hand.

The Reorganized Debtors shall use Cash on hand, including proceeds from the Exit Facilities, to fund distributions to certain holders of Allowed Claims in accordance with Article III.B of the Plan.

<center>19</center>

UST-0446

2. **Issuance and Distribution of New Common Stock.**

On the Effective Date, Reorganized Ascena shall issue the New Common Stock to fund distributions to certain holders of Allowed Claims in accordance with Article III of the Plan.

On the Effective Date, each Consenting Stakeholder shall receive, in its capacity as such, (a) its pro rata share (the numerator being such party's holdings of the loans arising under the First Out Exit Term Loan Facility (including through a Related Fund) and the denominator being the aggregate outstanding amount of all loans arising under the First Out Exit Term Loan Facility) of 44.9% of the New Common Stock, which will be subject to dilution from the Management Incentive Plan, and (b) its pro rata share (based on such party's Backstop Percentage (including through a Related Fund)) of the Equity Premium, which will be subject to dilution from the Management Incentive Plan.

The issuance of New Common Stock under the Plan, as well as any options or other equity awards, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the holders of Claims.

Reorganized Ascena will have one class of common equity interests, the New Common Stock.

3. **Exit Facilities.**

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities (the terms of which shall be set forth in the Exit Facility Documents) on terms consistent with the Exit Facilities Term Sheet and ABL Commitment Letter, if applicable.

Confirmation of the Plan shall be deemed approval of the Exit Facilities and the Exit Facility Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the Exit Facilities.

On the later of (i) the Effective Date and (ii) the date on which the Exit Facility Documents have been executed and delivered, except as otherwise expressly provided in this Plan, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Facility Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted to be senior to them under the respective Exit Facility Documents, and (d) shall not be subject to recharacterization or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order (subject solely to the occurrence of the Effective Date) and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

D. *Corporate Existence.*

Except as otherwise provided in the Plan, the Restructuring Transactions Memorandum, or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of

20

UST-0447

incorporation and bylaws (or other formation documents) are amended under the Plan, the New Corporate Governance Documents, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

E.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property of each Estate, all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan or the Restructuring Transactions Memorandum, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.      *Cancellation of Existing Securities and Instruments.*

Except as otherwise provided in the Restructuring Support Agreement, the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all notes, instruments, certificates, Securities, and other documents evidencing Claims or Interests, including the ABL Credit Agreement and the Term Loan Credit Agreement, shall be terminated and canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged.

G.      *Corporate Action.*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Restructuring Transactions, including the transactions contemplated by the Restructuring Transactions Memorandum; (2) the selection of the directors and officers for the Reorganized Debtors; (3) the entry into the Exit Facilities and the incurrence of credit thereunder; (4) the adoption of the Management Incentive Plan by the New Board; (5) the issuance and distribution of the New Common Stock; and (6) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit Facilities, the New Common Stock, and any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.G shall be effective notwithstanding any requirements under non-bankruptcy law.

H.      *New Corporate Governance Documents.*

The New Corporate Governance Documents shall, among other things: (1) contain terms consistent with the documentation set forth in the Plan Supplement; (2) authorize the issuance, distribution, and reservation of the New Common Stock to the Entities entitled to receive such issuances, distributions and reservations under the Plan; and (3) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and limited as necessary to facilitate compliance with non-bankruptcy federal laws, prohibit the issuance of non-voting equity Securities.

UST-0448

On or immediately before the Effective Date, Ascena or Reorganized Ascena, as applicable, will file Reorganized Ascena's New Corporate Governance Documents with the applicable Secretary of State and/or other applicable authorities in its state of incorporation or formation in accordance with the applicable laws of its state of incorporation or formation, to the extent required for such New Corporate Governance Documents to become effective. After the Effective Date, Reorganized Ascena may amend and restate its formation, organizational, and constituent documents as permitted by the laws of its jurisdiction of formation and the terms of such documents.

I.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the terms of the current members of the board of directors of Ascena shall expire and the new directors and officers of Reorganized Ascena shall be appointed. The New Board will consist of seven (7) directors, including, subject to the terms of the New Corporate Governance Documents:

    a.  Carrie W. Teffner;

    b.  the Chief Executive Officer of Reorganized Ascena;

    c.  one (1) director determined by Bain Capital Credit, LP;

    d.  one (1) director determined by Monarch Alternative Capital LP;

    e.  one (1) director determined collectively by Bain Capital Credit, LP, Eaton Vance Management, Lion Point Capital, LP, and Monarch Alternative Capital LP; and

    f.  two (2) directors determined by the Backstop Parties.

The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing. To the extent any director or officer of Reorganized Ascena is an Insider, the nature of any compensation to be paid to such director or officer also will be disclosed.

J.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the New Boards, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary, appropriate, or desirable to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock and the Exit Facilities, in the name of and on behalf of Reorganized Ascena or the other Reorganized Debtors, as applicable, without the need for any approvals, authorization, or consents.

K.      *Exemption from Certain Taxes and Fees.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the

UST-0449

payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

L.    *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions) of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than with respect to the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

M.    *Director, Officer, Manager, and Employee Liability Insurance.*

On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all of the D&O Liability Insurance Policies (including, if applicable, any "tail policy") and any agreements, documents, or instruments relating thereto. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such policies (including, if applicable, any "tail policy").

<center>23</center>

UST-0450

After the Effective Date, none of the Debtors or the Reorganized Debtors shall terminate or otherwise reduce the coverage under any such policies (including, if applicable, any "tail policy") with respect to conduct occurring as of the Effective Date, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policies regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

On and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

N.      *Management Incentive Plan.*

On the Effective Date, the Reorganized Debtors will reserve New Common Stock representing (on a fully diluted and fully distributed basis) up to 10% of the New Common Stock exclusively for awards and distribution under the Management Incentive Plan, which will contain terms and conditions (including, without limitation, with respect to participants, form, allocation, structure, duration and timing and extent of issuance and vesting) as determined at the discretion of the New Board after the Effective Date.

O.      *Employee Obligations.*

On and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall adopt, assume, continue, and/or honor in the ordinary course of business all obligations related to all Employee Benefits Programs (as agreed to be modified between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement, as applicable) and assume all employment agreements or letters, indemnification agreements, or other agreements entered into with current and former employees (as agreed to be modified between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement, as applicable) unless such employees agree to enter into new agreements on terms and conditions acceptable to the Reorganized Debtors, the Required Consenting Stakeholders and such employee. Notwithstanding the foregoing, no (x) compensation, post-employment, separation or retirement arrangement with any former Insider (as of the effective date of the Restructuring Support Agreement) or (y) non-qualified deferred compensation plan or supplemental retirement plan, solely to the extent any such plan would benefit any former Insider (as of the Effective Date), will be assumed on the Effective Date, in each case without the prior consent of the Required Consenting Stakeholders. Except as provided in the preceding sentence, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law. Further (A) the consummation of the Restructuring Transactions and occurrence of the Effective Date will not constitute a "change of control" for purposes of any Employee Benefits Programs or any employment agreements, letters, or other agreements entered into with current and former employees that are assumed pursuant hereto and (B) entitlements to or treatment with respect to any equity awards on or following the Effective Date will solely be governed by the Management Incentive Plan and any such terms relating to allocation or acceleration of equity awards set forth in any arrangements assumed hereunder will be void.

**Article V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be deemed assumed by the Reorganized Debtors, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective

24

UST-0451

Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease.

In the event of an unresolved dispute regarding (1) the amount of any Cure Claim, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (3) any other matter pertaining to assumption, assignment, or payments of any Cure Claims required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order(s) of the Bankruptcy Court. The Debtors or Reorganized Debtors, as applicable, reserve the right to reject any Executory Contract or Unexpired Lease upon the resolution of any cure disputes. If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Rejected Executory Contracts and Unexpired Leases Schedule, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date.

B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed or assumed and assigned, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any Cure Claim (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

25

UST-0452

To the extent reasonably practicable, at least 14 days before the Voting Deadline, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third parties. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Claim must be Filed by the Cure/Assumption Objection Deadline.** Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or proposed Cure Claim will be deemed to have assented to such assumption or assumption and assignment, and Cure Claim. To the extent that the Debtors seek to assume and assign an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule and such assignee will provide evidence of "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease.

In the event of an unresolved dispute regarding (1) the amount of any Cure Claim, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (3) any other matter pertaining to assumption, assignment, or payments of any Cure Claims required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order(s) of the Bankruptcy Court. If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right to reject such Executory Contract or Unexpired Lease, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the related Cure Claim, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any such assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Indemnification Obligations.*

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring Transactions on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date.

E.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims. Except as set forth in Article IV.M of the Plan, nothing in this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor. For the avoidance of doubt, insurers and third party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims.

26

UST-0453

F.     *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

        Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease as of the date of its assumption, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

        Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.     *Reservation of Rights.*

        Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder.

H.     *Nonoccurrence of Effective Date.*

        In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Executory Contract or Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code.

I.     *Contracts and Leases Entered Into After the Petition Date.*

        Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and/or Unexpired Leases assumed by such Debtor, will be performed by the applicable Reorganized Debtor in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that have not been rejected under the Plan will survive and remain unaffected by entry of the Confirmation Order, except as provided therein.

## Article VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.     *Timing and Calculation of Amounts to Be Distributed.*

        Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Interest (or such holder's Affiliate) shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

UST-0454

B. *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1. <u>Delivery of Distributions.</u>

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims, except as otherwise provided in this Article VI, or Interests shall be made to holders of record as of the Distribution Record Date by the Reorganized Debtors: (1) to the signatory set forth on any of the Proof of Claim Filed by such holder or its representative identified therein (or at the last known addresses of such holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (2) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors after the date of any related Proof of Claim; (3) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors have not received a written notice of a change of address; or (4) on any counsel that has appeared in the Chapter 11 Cases on such holder's behalf. Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors and the Reorganized Debtors shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

2. <u>No Fractional Distributions.</u>

No fractional shares of New Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional shares. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

3. <u>Minimum Distributions.</u>

Except for Allowed Administrative Claims paid in the ordinary course of business, holders of Allowed Claims entitled to distributions of $50 or less shall not receive distributions, and each such Claim shall be discharged pursuant to Article VIII and its holder is forever barred pursuant to Article VIII from asserting that Claim against the Reorganized Debtors or their property.

4. <u>Undeliverable Distributions and Unclaimed Property.</u>

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the applicable Reorganized Debtors without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder to such property or Interest in property shall be discharged and forever barred.

C. *Securities Registration Exemption.*

The shares of New Common Stock are or may be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

The offer, issuance, and distribution of the New Common Stock pursuant to the Plan shall be exempt (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code), pursuant to section 1145 of the Bankruptcy Code, without further act or action, from registration under (i) the Securities Act, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring

UST-0455

registration for the offer, issuance, or distribution of securities. Each of the foregoing securities (a) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (b) is freely tradable and transferable by any initial recipient thereof that (i) at the time of transfer, is not an "affiliate" of the Reorganized Ascena as defined in Rule 144(a)(1) under the Securities Act and has not been such an "affiliate" within 90 days of such transfer, and (ii) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code, subject in each case to any restrictions on the transferability of the New Common Stock contained in the New Corporate Governance Documents and any applicable regulatory approval.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock or under applicable securities laws. DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

D.     *Tax Issues and Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors, Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

E.     *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

F.     *No Interest.*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

G.     *Setoffs and Recoupment.*

The Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against or recoup any payments or distributions to be made pursuant to the Plan in respect of any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the holder of such Claim.

H.     *Claims Paid or Payable by Third Parties.*

1.     <u>Claims Paid by Third Parties.</u>

To the extent that the holder of an Allowed Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor, such Claim shall be Disallowed without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. To the extent a holder

UST-0456

of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor or Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.  Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.  Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything herein to the contrary (including, without limitation, Article VIII), nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**Article VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.  *Allowance of Claims.*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B.  *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtors shall have the sole authority to (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. On and after the Effective Date, the Reorganized Debtors will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise.

C.  *Estimation of Claims.*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law,

UST-0457

including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims Register Without Objection.*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

F.      *Disallowance of Claims.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors. All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G.      *Amendments to Claims.*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

UST-0458

H.      *No Distributions Pending Allowance.*

        If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors.

I.      *Distributions After Allowance.*

        To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the holder of such Claim the distribution to which such holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided herein.

## Article VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

   A.   *Compromise and Settlement of Claims, Interests, and Controversies.*

        Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any such Claim or Interest, or any distribution to be made on account of any Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

   B.   *Discharge of Claims and Termination of Interests.*

        Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action against any Debtor of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Causes of Action accrued before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  Unless expressly provided in the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

UST-0459

C.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

D.      *Release of Liens.*

**Except as otherwise specifically provided in the Plan, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or Reorganized Debtors.  The ABL Agent and the Term Loan Agent shall execute and deliver all documents reasonably requested by the Reorganized Debtors or the agent(s) under the Exit Facilities to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

E.      *Debtor Release.*

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim, Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or any other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the ABL Credit Facility, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP ABL Facility, the DIP Term Loan Facility, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Effective Date.**

UST-0460

F.      *Release by holders of Claims or Interests.*

        **Effective as of the Effective Date, each Releasing Party (other than the Debtors and Reorganized Debtors), in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim, Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and each other Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Effective Date.**

G.      *Exculpation.*

        **Notwithstanding anything contained in the Plan to the contrary, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action or any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Exit Facilities, the Backstop Commitment Letter, the DIP Financing Order, Cash Collateral Order, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

UST-0461

H. *Injunction.*

**Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests or Causes of Action that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Reorganized Debtors or the other Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action released or settled or subject to exculpation pursuant to the Plan.**

I. *Protection Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

J. *Recoupment.*

In no event shall any holder of a Claim be entitled to recoup against such Claim any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has provided notice of such recoupment in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

K. *Subordination Rights.*

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other holder and shall not be subject to levy, garnishment, attachment, or other legal process by any holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

UST-0462

## Article IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Effective Date.*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.B hereof):

1.    The Bankruptcy Court shall have entered the Confirmation Order, which shall:

    a.    be in form and substance consistent with the Restructuring Support Agreement;

    b.    authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

    c.    decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

    d.    authorize the Debtors, as applicable/necessary, to:   (a) implement the Restructuring Transactions; (b) issue the New Common Stock pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (c) make all distributions and issuances as required under the Plan, including cash and the New Common Stock; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Exit Facilities;

    e.    authorize the implementation of the Plan in accordance with its terms; and

    f.    provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

2.    the final version of all schedules, documents, and exhibits contained in the Plan Supplement shall have been filed and be consistent in all material respects with the Restructuring Support Agreement and the Plan;

3.    the Restructuring Support Agreement shall remain in full force and effect and shall not be terminated;

4.    the documentation related to the Exit Facilities shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Facilities shall have been satisfied or duly waived in writing in accordance with the terms of the applicable Exit Facility Documents and the closing of the Exit Facilities shall have occurred;

5.    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions;

6.    all actions, documents, certificates, and agreements necessary to implement the Plan (including any documents contained in the Plan Supplement) shall have been performed or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units, in accordance with applicable laws;

UST-0463

7. all Professional Fee Claims shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed into the Professional Fee Escrow Account pending the Bankruptcy Court's approval thereof;

8. the DIP ABL Facility Claims and ABL Claims shall have been Paid in Full or otherwise satisfied in accordance with Articles II.B and III.B.3 of the Plan (as applicable);

9. all fees, expenses, and other amounts payable pursuant to the DIP Financing Order shall have been paid in full;

10. all professional fees and expenses of the advisors to the Ad Hoc Group shall have been paid in full in accordance with the Restructuring Support Agreement; and

11. the Debtors shall have implemented the Restructuring Transactions in a manner consistent with the Restructuring Support Agreement and this Plan.

B.      *Waiver of Conditions.*

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article IX (other than the conditions set forth in Article IX.A.7) may be waived only by consent of the Debtors and the Required Consenting Stakeholders without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided* that the provisions of this Article IX relating to the DIP ABL Facility and the ABL Facility may be waived only by consent of the Debtors, the Required Consenting Stakeholders, the DIP ABL Agent, and the ABL Agent without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.      *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

D.      *Effect of Nonoccurrence of Conditions to the Effective Date.*

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims or Interests; (2) prejudice in any manner the rights of the Debtors, any holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders, or any other Entity in any respect; *provided* that all provisions of the Restructuring Support Agreement that survive termination of that agreement shall remain in effect in accordance with the terms thereof.

### Article X.
### MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments.*

The Debtors reserve the right, subject to the terms of the Restructuring Support Agreement, to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors expressly reserve their rights, subject to the terms of the Restructuring Support Agreement, to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

37

UST-0464

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan.*

The Debtors reserve the right, subject to the terms of the Restructuring Support Agreement, to revoke or withdraw the Plan before the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the holders of Claims; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## Article XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of or related to the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.      Resolve any matters related to:  (a) the assumption or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims and Claims related to the rejection of an Executory Contract or Unexpired Lease, pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide, or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

UST-0465

8.  Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.  Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.  Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.  Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.  Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

13.  Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.H hereof;

14.  Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.  Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16.  Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.  Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.  Determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.  Hear and determine all disputes involving the Restructuring Support Agreement or the Exit Facilities;

20.  Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.  Hear and determine all disputes involving the existence, nature, or scope of the exculpation and release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

22.  Enforce all orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

23.  Hear any other matter not inconsistent with the Bankruptcy Code;

24.  Enter an order closing the Chapter 11 Cases; and

UST-0466

25.     Enforce the injunction, release, and exculpation provisions provided in Article VIII hereof.

## Article XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, all holders of Claims and Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, will be paid by each of the applicable Reorganized Debtors for each quarter (including any fraction thereof) until the applicable Chapter 11 Case of such Reorganized Debtor is converted, dismissed, or closed, whichever occurs first.

D.      *Dissolution of the Committee.*

On the Effective Date, the Committee, if any is appointed, shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date by the Committee and its Professionals. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.

E.      *Reservation of Rights.*

Before the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to any Claims or Interests.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

40

UST-0467

G.      *Service of Documents*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Ascena Retail Group, Inc.<br>933 MacArthur Boulevard<br>Mahwah, New Jersey 07430<br>Attn.: Michael Veitenheimer | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Attn.: Steven N. Serajeddini<br><br>and<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn.: John R. Luze, Jeff Michalik<br><br>and<br><br>Cooley LLP<br>1299 Pennsylvania Avenue, NW, Suite 700<br>Washington, DC 20004-2400<br>Attn.: Cullen D. Speckhart, Olya Antle |
| **United States Trustee** | **Counsel to the Ad Hoc Group** |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 | Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001-2163<br>Attn.: Evan Fleck, Abigail Debold |

After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to parties in interest providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such party must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Entire Agreement.*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://www.cases.primeclerk.com/ascena or the Bankruptcy Court's website at www.vaeb.uscourts.gov.

41

UST-0468

J.      *Nonseverability of Plan Provisions.*

        If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

K.      *Votes Solicited in Good Faith.*

        Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law (including the Securities Act), rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

L.      *Waiver or Estoppel.*

        Each holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

*[Remainder of page intentionally left blank]*

UST-0469

Respectfully submitted, as of the date first set forth above,

Dated: July 31, 2020          Ascena Retail Group, Inc. (on behalf of itself and all other Debtors)

By:     */s/ Carrie W. Teffner*
Name:    Carrie W. Teffner
Title:       Interim Executive Chair, Ascena Retail Group, Inc.

UST-0470

**Exhibit B**

**Restructuring Support Agreement**

UST-0471

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

## *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 13.03, this "**Agreement**") is made and entered into as of July 23, 2020 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) and (ii) of this preamble, collectively, the "**Parties**"):[1]

    i.    Ascena Retail Group, Inc. a company incorporated under the Laws of the State of Delaware ("**Ascena Topco**"), and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**"); and

    ii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting Stakeholders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the Restructuring Term Sheet (such transactions as described in this Agreement, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**");

**WHEREAS**, certain of the Consenting Stakeholders or their affiliates that are parties to that certain Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Facility

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings given to them in Section 1 of this Agreement or the Restructuring Term Sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**").

UST-0472

Backstop Commitment Letter attached as **Exhibit C** hereto (the "**Backstop Commitment Letter**") have agreed to provide the DIP Term Loans on the terms set forth in the Backstop Commitment Letter;

WHEREAS, the DIP Term Loans will be converted into loans under the First Out Exit Term Loan Facility on the Plan Effective Date on the terms set forth in the Restructuring Term Sheet and that certain exit facility term sheet attached as **Exhibit D** hereto (the "**Exit Facility Term Sheet**"); and

WHEREAS, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Plan;

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## *AGREEMENT*

**Section 1.**   *Definitions and Interpretation*.

   1.01.   Definitions.  The following terms shall have the following definitions:

"**ABL Claims**" means any Claims arising under, related to, or on account of the ABL Credit Agreement.

"**ABL Credit Agreement**" means that certain Amended and Restated Credit Agreement dated as of January 3, 2011, as amended and restated by the Second Restatement Agreement dated as of June 14, 2012, by the Third Restatement Agreement dated as of March 13, 2013, by the Fourth Restatement Agreement dated as of July 24, 2015, by the Fifth Amendment and Restatement Agreement dated as of February 27, 2018 and as may otherwise be amended, restated, supplemented or otherwise modified, among Ascena TopCo, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto, the issuing banks party thereto, and JPMorgan Chase Bank, N.A., as administrative agent and swingline lender.

"**Agent**" or "**Agents**" means, individually or collectively, any administrative agent, collateral agent, or similar Entity under the ABL Credit Agreement and/or the Term Credit Agreement, including any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 13.03 (including the Restructuring Term Sheet, the Exit Facility Term Sheet and the Backstop Commitment Letter).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

UST-0473

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Ascena Topco**" has the meaning set forth in the preamble to this Agreement.

"**Backstop Commitment Letter**" has the meaning set forth in the preamble to this Agreement.

"**Bankruptcy Code**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cash Collateral Order**" means any order of the Bankruptcy Court granting the authorization to use cash collateral on an interim basis on terms acceptable to the Company Parties and the Required Consenting Stakeholders.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning given to it in section 101(5) of the Bankruptcy Code with respect to a Debtor.

"**Company Claims/Interests**" means any Claim or Equity Interest, including the ABL Claims, the Term Loan Claims, the DIP ABL Facility Claims, the Backstop Commitments, and the DIP Term Facility Claims.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

UST-0474

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**DIP Financing Order**" means the order entered by the Bankruptcy Court setting forth the terms of and approving the DIP ABL Facility, the DIP Term Facility, and the Backstop Commitment Letter on terms acceptable to the Company Parties and the Majority Backstop Commitment Parties (as defined in the Backstop Commitment Letter).

"**Disclosed Interests**" has the meaning set forth in Section 9(a).

"**Disclosure Statement**" means the disclosure statement with respect to the Plan.

"**Disclosure Statement Order**" means the order entered by the Bankruptcy Court approving the Disclosure Statement

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" or "**Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file upon the commencement of the Chapter 11 Cases.

"**Greenhill**" means Greenhill & Co., LLC, as financial advisor to the Lender Group.

"**Initial Consenting Stakeholders**" means Consenting Stakeholders that have that have executed and delivered counterpart signature pages to this Agreement to counsel to the Company Parties as of the Execution Date.

"**Insider**" has the meaning set forth in section 101(31) of the Bankruptcy Code.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit E**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

UST-0475

"**Lender Group**" means the ad hoc group or committee of Consenting Stakeholders represented by Greenhill and Milbank.

"**Loyens**" means Loyens & Loeff Luxembourg S.à.r.l., as Luxembourg counsel to the Lender Group.

"**LuxCo Entities**" means, collectively, AnnTaylor Loft GP Lux S.à.r.l. and AnnTaylor Loft Borrower Lux SCS.

"**Milbank**" means Milbank LLP, as counsel to the Lender Group.

"**New Corporate Governance Documents**" means the form of certificate or articles of incorporation, bylaws, limited liability company agreement, partnership agreement, or such other applicable formation documents (if any) of Reorganized Ascena, including any certificates of designation, each of which shall be included in the Plan Supplement.

"**Outside Date**" means the date that is six (6) months after the Petition Date.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the chapter 11 plan of reorganization to be filed by the Debtors in the Chapter 11 Cases consistent with this Agreement and the Restructuring Term Sheet and otherwise as reasonably acceptable to the Company Parties and the Required Consenting Stakeholders, including any and all exhibits annexes and schedules thereto.

"**Plan Effective Date**" means the date of the occurrence of the "Effective Date" of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Post-Emergence Incentive Plan Documents**" means all documentation with respect to any post-emergence management incentive plan, including the Management Incentive Plan, which, for the avoidance of doubt, does not include the Employee Benefits Programs (as defined in the Restructuring Term Sheet).

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

UST-0476

"**Rent Deferral Motion**" means a motion seeking an order from the Bankruptcy Court extending the time for performance of the Debtors' obligations arising under unexpired non-residential real property leases to the date that is at least sixty (60) days after the Petition Date.

"**Reorganized Ascena**" means either (a) Ascena Topco, or any successor thereto, as reorganized pursuant to and under the Plan or (b) a new corporation or limited liability company that may be formed or caused to be formed by the Debtors to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Common Stock to be distributed or sold pursuant to the Plan.

"**Required Consenting Stakeholders**" means, as of the relevant date, Initial Consenting Stakeholders holding at least 50.01% of the aggregate outstanding principal amount of the Term Loan Claims that are held by the Initial Consenting Stakeholders.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means any materials related to the solicitation of votes for the Plan pursuant to sections 1123, 1126, and 1143 of the Bankruptcy Code.

"**Term Loan Claims**" means any Claims arising under, related to, or on account of the Term Loan Credit Agreement.

"**Term Loan Credit Agreement**" means the Term Credit Agreement, dated as of August 21, 2015, as it may be amended, restated, supplemented or otherwise modified, among Ascena TopCo, AnnTaylor Retail, Inc., the lenders party thereto, and Goldman Sachs Bank USA, as administrative agent.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, 11.04 or 11.05.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit F**.

"**Whiteford Taylor**" means Whiteford, Taylor & Preston LLP, as local counsel to the Lender Group.

1.02.    Interpretation.  For purposes of this Agreement:

UST-0477

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)    the use of "include" or "including" is without limitation, whether stated or not; and

(j)    the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 13.11 other than counsel to the Company Parties.

**Section 2.**    *Effectiveness of this Agreement*.  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)    each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

UST-0478

(b)    holders of at least two-thirds of the aggregate outstanding principal amount of the Term Loan Claims shall have executed and delivered counterpart signature pages of this Agreement; and

(c)    counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 13.11 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred, which notice shall be promptly following the occurrence of such other conditions.

**Section 3.    *Definitive Documents*.**

3.01.    The Definitive Documents governing the Restructuring Transactions shall include the following:  (A) the Plan; (B) the Confirmation Order; (C) the Disclosure Statement; (D) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (E) the Plan Supplement; (F) the Cash Collateral Order; (G) the DIP Financing Order; (H) the Exit Facility Documents; (I) the New Corporate Governance Documents; (J) the Post-Emergence Incentive Plan Documents; (K) any new employee incentive plan or employee retention plan entered into by the Company Parties after the Agreement Effective Date; (L) any new material employment, consulting, or similar agreements entered into by the Company Parties after the Agreement Effective Date; (M) any disclosure documents related to the issuance of the New Common Stock; and (N) all material pleadings filed by the Company Parties in connection with the Chapter 11 Cases (or related orders), including the First Day Pleadings and all orders sought pursuant thereto.

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12.  Further, subject to and without limiting any additional consent or approval rights of the Parties specified elsewhere in this Agreement, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders; *provided* that the New Corporate Governance Documents and Post-Emergence Incentive Plan Documents shall be acceptable to the Required Consenting Stakeholders and reasonably acceptable to the Company Parties.

**Section 4.    *Commitments of the Consenting Stakeholders*.**

4.01.    General Commitments, Forbearances, and Waivers.

(a)    During the Agreement Effective Period, subject to Section 4.03 of this Agreement, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, to:

(i)    support the Restructuring Transactions as contemplated by this Agreement and use commercially reasonable efforts to vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or

UST-0479

approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)  support use of cash collateral by the Debtors during the pendency of the Chapter 11 Cases on the terms set forth in the Cash Collateral Order or the DIP Financing Order;

(iii)  support entry into the DIP ABL Facility on the terms set forth in the ABL Commitment Letter;

(iv)  support entry into the DIP Term Facility on the terms set forth in the Backstop Commitment Letter and take all other applicable actions required by the Backstop Commitment Letter, including the funding of any backstop commitments on the terms set forth therein;

(v)  support entry into the Exit Facilities on the terms set forth in the Exit Facility Term Sheet and take all other applicable actions required by the Exit Facility Term Sheet;

(vi)  use commercially reasonable efforts to cooperate with the Company Parties, subject to applicable Laws and at the Company Parties' sole cost and expense, in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(vii)  give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions; and

(viii)  negotiate in good faith and use commercially reasonable efforts to execute and implement, as applicable, the Definitive Documents that are consistent with this Agreement to which it is required to be a party or for which its consent is required.

(b)  During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)  object to, delay, impede, or take any other action that is reasonably likely to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)  object to, delay, impede, or take any other action that is reasonably likely to interfere with use of cash collateral by the Debtors during the pendency of the Chapter 11 Cases on the terms set forth in the Cash Collateral Order, entry into or performance under the DIP ABL Facility on the terms set forth in the ABL Commitment Letter, or entry into, performance under, or syndication of the DIP Term Facility on the terms set forth in the Backstop Commitment Letter;

(iii)  propose, file, support, solicit, or vote for any Alternative Restructuring Proposal; *provided*, for the avoidance of doubt, that nothing in this Section 4.01(b)(iii) shall limit the consultation and approval rights of Consenting Stakeholders set forth in Section 6.01(k) of this Agreement; *provided*, *further*, that a Consenting Stakeholder may propose an Alternative Restructuring Proposal to the Company Parties in connection with Section 6.01(k) of this Agreement if such Consenting Stakeholder provides notice of its intent to propose such Alternative

9

UST-0480

Restructuring Proposal (including the terms thereof) to each Initial Consenting Stakeholder at least five (5) Business Days in advance of such proposal;

   (iv) file or have filed on its behalf any motion, pleading, or other document (including any modifications or amendments thereof) with the Bankruptcy Court or any other court that, in whole or in part, is not materially consistent with this Agreement or the Plan;

   (v) initiate, or have initiated on its behalf, any litigation or proceeding of any kind against any Company Party or the other Parties in violation of this Agreement with respect to the Chapter 11 Cases, this Agreement, or the Restructuring Transactions other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; *provided* that any Consenting Stakeholder may file motions, pleadings or other documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) with respect to its or their rights under any Definitive Document and relating to or arising from matters and rights not specifically set forth in this Agreement, including the Restructuring Term Sheet;

   (vi) exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Claim or Interest; or

   (vii) object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay under section 362 of the Bankruptcy Code.

  4.02. <u>Commitments with Respect to Chapter 11 Cases</u>.

  (a) During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder of the Solicitation Materials, whether before or after the commencement of the Chapter 11 Cases:

   (i) vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

   (ii) to the extent it is permitted to elect whether to opt out of any of the releases set forth in the Plan, elect not to opt out of such releases by timely delivering its duly executed and completed ballot(s) indicating such election; and

   (iii) not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above; *provided* that nothing in this Agreement shall prevent any Consenting Stakeholder from changing, withholding, amending, or revoking (or causing the same) its vote, election, or consent with respect to the Plan if this Agreement has been terminated in accordance with its terms.

  (b) During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action in violation of this Agreement reasonably likely to interfere

<div align="center">10</div>

UST-0481

with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

4.03. Notwithstanding the foregoing, nothing in this Agreement shall: (a) require any Consenting Stakeholder to incur any expenses, liabilities or other obligations that are not expressly subject to reimbursement by the Company Parties pursuant to this Agreement, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities, or other obligations to any Consenting Stakeholder or its Affiliates that such Consenting Stakeholder reasonably believes may not be reimbursed by the Company Parties pursuant to this Agreement; (b) require any Consenting Stakeholder to provide any information that it reasonably determines to be sensitive or confidential; *provided* that, for the avoidance of doubt, each Consenting Stakeholder shall include its holdings on its signature page to this Agreement, which signature page will be delivered to (i) other Consenting Stakeholders in a redacted form that removes such Consenting Stakeholder's holdings and (ii) the Company Parties and Milbank in an unredacted form (to be hold by the Company Parties on a confidential basis and by Milbank on a professionals' eyes only basis); or (c) limit the right of any Party to exercise any right or remedy provided under this Agreement, the Confirmation Order, or any other Definitive Document. Notwithstanding the immediately preceding sentence, nothing in this Section 4.03 shall serve to limit, alter, or modify any Consenting Stakeholder's express obligations under the terms of this Agreement.

**Section 5.** *Additional Provisions Regarding the Consenting Stakeholders' Commitments*. Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (c) prevent any Consenting Stakeholder from enforcing this Agreement or from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 6.** *Commitments of the Company Parties*.

6.01. Affirmative Commitments. Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a) support and take all steps reasonably necessary or desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b) support and take all steps reasonably necessary and desirable to obtain entry of the Cash Collateral Order, the DIP Financing Order, the Disclosure Statement Order, and the Confirmation Order;

(c) to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, take all steps reasonably necessary or desirable to address any such impediment;

11

UST-0482

(d)     use commercially reasonable efforts to obtain any and all required governmental, regulatory and/or third-party approvals for the Restructuring Transactions;

(e)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(f)     use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(g)     (i) to the extent reasonably practicable, provide counsel to the Consenting Stakeholders draft copies of (x) all First Day Pleadings three (3) Business Days in advance of the Petition Date and (y) any other motions, documents and other pleadings materially affecting any Consenting Stakeholders that the Company Parties intend to file with the Bankruptcy Court, as applicable, three (3) Business Days in advance of the filing thereof and, (ii) without limiting any approval rights set forth in this Agreement, consult in good faith with counsel to the Consenting Stakeholders regarding any comments to draft copies provided pursuant to sub-clause (i);

(h)     pay in full and in cash all of the accrued reasonable and documented fees, costs, and expenses of the professionals and other advisors retained by the Lender Group, including such fees, costs, and expenses of (i) Greenhill, (ii) Milbank, (iii) Whiteford Taylor, and (iv) Loyens, and continue to pay such amounts as they come due and seek to pay such ongoing fees, costs, and expenses in connection with the Cash Collateral Order, DIP Financing Order, or other such appropriate order;

(i)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases, or (iv) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Term Loan Claims, or asserting any other cause of action against and/or with respect or relating to such Term Loan Claims or the prepetition liens securing such Term Loan Claims;

(j)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(k)     (i) solicit, consider, respond to, and facilitate Alternative Restructuring Proposals in consultation with the Required Consenting Stakeholders and (ii) pursue a Alternative Restructuring Proposal if (A) the Required Consenting Stakeholders determine that such Alternative Restructuring Proposal is a higher or better transaction than the Restructuring Transactions and (B) the Alternative Restructuring Proposal is implemented under, or without modification to the Company Parties' and the Required Consenting Stakeholders' obligations under this Agreement to pursue and implement, a Plan as modified to implement or allow for such Alternative Restructuring Proposal; *provided* that the structure of such Alternative Restructuring Proposal will not preclude any Initial Consenting Stakeholder from participating in such

UST-0483

Alternative Restructuring Proposal on a pro rata basis on substantially the same terms as any other Initial Consenting Stakeholder; and

(l)     reasonably consult with the Required Consenting Stakeholders regarding (i) the assumption or rejection of any executory contracts or unexpired leases, (ii) entry into any agreement, settlement, or other arrangement with any of the landlords under the Debtors' unexpired leases waiving, deferring, or modifying the rent payments or rent structure under such leases, and (iii) any payments of prepetition Claims (including Claims pursuant to section 503(b)(9) of the Bankruptcy Code and lien Claims) of or agreements with the Company Parties' vendors and provide notice and reasonably acceptable reporting to Milbank and Greenhill regarding any of the foregoing actions, which consultation and reporting shall include weekly calls regarding the status of the actions described in this Section 6.01(l) among the relevant employees, advisors and consultants of the Company Parties, Milbank, Greenhill and one or more Initial Consenting Stakeholders.

6.02.    Negative Commitments.  Except as set forth in Section 7 or with the prior written consent of the Required Consenting Stakeholders, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly, and shall cause their respective subsidiaries not to:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions or the Plan;

(c)     modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in any material respect;

(d)     file any motion, pleading, or Definitive Documents (including any modifications or amendments thereof) with the Bankruptcy Court or any other court that, in whole or in part, is not materially consistent with this Agreement (including the consent rights of the Consenting Stakeholders set forth in in this Agreement as to the form and substance of such motion, pleading, or other Definitive Document) or the Plan;

(e)     except with respect to any transaction contemplated by the First Day Motions (on the terms set forth in such First Day Motion and any agreement or form of agreement attached thereto) or otherwise consented to in writing by the Initial Consenting Stakeholders prior to the Agreement Effective Date: (i) sell (including any sale leaseback transaction), lease, mortgage, pledge, grant, or incur any encumbrance on, or otherwise Transfer, any material properties or material assets of the Company Parties, including any Equity Interests, other than in the ordinary course of business; (ii) purchase, lease, or otherwise acquire (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) any material assets or material properties, other than in the ordinary course of business; or (iii) commence any liquidation or wind down process with respect to any of the Company Parties' businesses or enter into any agreement or arrangement, or modification to any agreement or arrangement, in connection therewith;

13

UST-0484

(f)    (i) enter into or amend, adopt, restate, supplement, or otherwise modify any employee benefit, deferred compensation, incentive, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans or agreements, including offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements with or for the benefit of any of its employees that are a senior vice president or more senior, (ii) increase the base salary, target bonus opportunity, or other benefits payable by the Company Parties or to any of their executive officers, or (iii) make any payment to any former Insider (as of the Agreement Effective Date) of any post-employment, retirement or similar plan or program, severance agreement, or similar arrangement;

(g)    assume, assume and assign, or reject executory contracts or unexpired leases; *provided* that the consent of the Required Consenting Stakeholders shall not be unreasonably withheld; *provided*, *further*, that the Company Parties shall provide four (4) Business Days' prior written notice of any assumption, assumption and assignment, or rejection of any executory contract or unexpired lease, which notice shall include the analysis underlying the Company Parties' decision to assume, assume and assign, or reject such executory contract or unexpired lease, including adequate information supporting such analysis and decision, and, absent written notification during that period from Milbank or Greenhill to the Company Parties that the Required Consenting Stakeholders do not consent, the Required Consenting Stakeholders shall be deemed to have consented to any such assumption, assumption and assignment, or rejection;

(h)    enter in any agreement, settlement, or other arrangement with any of the landlords under the Debtors' leases waiving, deferring, or modifying the rent payments or rent structure under such leases; *provided* that the consent of the Required Consenting Stakeholders shall not be unreasonably withheld; *provided*, *further*, that the Company Parties shall provide four (4) Business Days' prior written notice of any such agreement, settlement, or other arrangement, which notice shall include the analysis underlying the Company Parties' decision to enter into such agreement, settlement, or other arrangement, including adequate information supporting such analysis and decision, and, absent written notification during that period from Milbank or Greenhill to the Company Parties that the Required Consenting Stakeholders do not consent, the Required Consenting Stakeholder shall be deemed to have consented to any such agreement, settlement, or other arrangement; or

(i)    pay any prepetition Claim (including Claims pursuant to section 503(b)(9) of the Bankruptcy Code and lien Claims) held by any of the Company Parties' vendors except in compliance with the First Day Motions and only to the extent that the Company Parties have (i) made commercially reasonable efforts to require such vendor to execute a trade agreement providing for the continuity of goods and services to the Debtors or Reorganized Debtors, as applicable, on terms reasonably acceptable to the Required Consenting Stakeholders (as determined in accordance with the consultation, notice, and consent procedures referenced in the following clause (ii)), and (ii) provided notice of such payment to one or more Initial Consenting Stakeholders pursuant to consultation, notice, and consent procedures to be agreed between the Company Parties and the Required Consenting Stakeholders.

6.03.    Except with the prior written consent of the Required Consenting Stakeholders, during the Agreement Effective Period, neither of the LuxCo Entities shall incur any material

UST-0485

obligations to any third party or otherwise lease, mortgage, pledge, grant, or incur any encumbrance on, or otherwise Transfer, any material asset.

**Section 7.** *Additional Provisions Regarding Company Parties' Commitments*.

7.01. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement (other than a failure to comply with this Section 7); *provided* that the Company Parties shall notify counsel to the Consenting Stakeholders in writing promptly in the event of any such determination (and in any event no later than two (2) Business Days following such determination).

7.02. Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims or Equity Interests (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals; *provided* that the Company Parties shall (x) provide a copy of any written Alternative Restructuring Proposal (and notice of, and a written summary of, any oral Alternative Restructuring Proposal) within two (2) Business Days of the Company Parties' or their advisors' receipt of such Alternative Restructuring Proposal to Greenhill and Milbank and (y) provide such information to Milbank as reasonably requested by the Lender Group or as necessary to keep the Lender Group reasonably informed as to the status and substance of such discussions.

7.03. Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.** *Transfer of Interests and Securities*.

8.01. During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) of any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

UST-0486

(a)     such Transfer is made on or prior to the date that is at least two (2) Business Days prior to the Plan Effective Date;

(b)     prior to the funding of the DIP Term Facility, in the case of a Transfer (other than by participation) of Term Loan Claims by a Consenting Stakeholder with a commitment to fund New Money DIP Loans (as defined in the Backstop Commitment Letter), such Consenting Stakeholder retains Term Loan Claims in an amount equal to or greater than its allocation of Roll-Up DIP Loans (as defined in the Backstop Commitment Letter); and

(c)     (i) the transferee executes and delivers to counsel to the Company Parties and Milbank, at or before the time of the proposed Transfer, a Transfer Agreement; (ii) the transferee is a Consenting Stakeholder; or (iii) the transferee is an entity that is acting in its capacity as a Qualified Marketmaker, *provided* that (x) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such Company Claims/Interests is to a transferee that is or becomes a Consenting Stakeholder at the time of such Transfer and (y) the Qualified Marketmaker complies with Section 8.05 hereof.

8.02.   Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.   This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; *provided* that such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the other Consenting Stakeholders).

8.04.   This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreement.

8.05.   Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 8.01; and (iii) the Transfer otherwise is a Permitted Transfer under Section 8.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment,

UST-0487

participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.    Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

8.07.    The Company Parties will provide notice of any Transfer Agreement received pursuant to Section 8.01(c)(i) (which notice shall include the amount and type of Company Claims/Interests Transferred pursuant to such Transfer Agreement) to Milbank by the later of (i) close of business on the second Business Day following the effective date of such Transfer Agreement and (ii) the close of business on the second Business Day after the Company Parties receive notice of any such Transfer Agreement.

8.08.    Each Consenting Stakeholder shall promptly provide Milbank and/or the Company Parties with information concerning its then-current holdings upon reasonable request from Milbank or the Company Parties.

**Section 9.**    *Representations and Warranties of Consenting Stakeholders*.  Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it is (or upon the settlement of unsettled trades, will be) the beneficial or record owner of the face amount of the Company Claims/Interests reflected in such Consenting Stakeholder's signature page to this Agreement, Joinder, or Transfer Agreement, as applicable (as may be updated pursuant to Section 8) (the "**Disclosed Interests**") or is the nominee, investment manager, or advisor for beneficial holders of the Disclosed Interests;

(b)    it has (or upon the settlement of unsettled trades, will have) the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)    such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially and adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)    it has (or upon the settlement of unsettled trades, will have) the full power to vote, approve changes to, and transfer all of its Company Claims/Interests as contemplated by this Agreement subject to applicable Law; and

(e)    solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor

UST-0488

(as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 10.**   *Mutual Representations, Warranties, and Covenants*.   Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement and as of the Plan Effective Date:

(a)    it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)    except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)    the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)    except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)    except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties that have not been disclosed to all Parties.

**Section 11.**   *Termination Events*.

11.01.  Consenting Stakeholder Termination Events.   This Agreement may be terminated by the Required Consenting Stakeholders by the delivery to the Company Parties of a written notice in accordance with Section 13.11 hereof upon the occurrence of the following events:

(a)    the Petition Date has not occurred by 11:59 p.m. (Eastern Time) on July 23, 2020;

(b)    the Debtors have not filed the Rent Deferral Motion with the Bankruptcy Court by the date that is three (3) calendar days after the Petition Date

(c)    the Bankruptcy Court has not entered the Cash Collateral Order on an interim basis by the date that is five (5) Business Days after the Petition Date;

UST-0489

(d)      the Bankruptcy Court has not entered the DIP Financing Order on a final basis by the date that is thirty-five (35) calendar days after the Petition Date;

(e)      the Bankruptcy Court has not entered the Disclosure Statement Order by the date that is sixty (60) calendar days after the Petition Date;

(f)      solicitation of the Plan has not commenced by the date that is seventy (70) calendar days after the Petition Date;

(g)      the Bankruptcy Court has not entered the Confirmation Order by the date that is one hundred ten (110) calendar days after the Petition Date;

(h)      the Plan Effective Date has not occurred by the date that is one hundred thirty (130) calendar days after the Petition Date;

(i)      the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (ii) remains uncured for ten (10) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 13.11 hereof detailing any such breach;

(j)      the DIP ABL Facility (as applicable) is terminated and accelerated in accordance with its terms;

(k)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, including the Bankruptcy Court, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 13.11 hereof detailing any such issuance; *provided* that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(l)      the Bankruptcy Court enters an order denying confirmation of the Plan or the Confirmation Order is reversed or vacated;

(m)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders, not to be unreasonably withheld), (i) dismissing any of the Chapter 11 Cases, (ii) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (iii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases;

(n)      any Company Party (i) files, waives, amends or modifies, or files a pleading seeking approval of any Definitive Document or authority to waive, amend or modify any Definitive Document (including any waiver of any term or condition therein) in a manner that is materially inconsistent with, or constitutes a material breach of, this Agreement (including with respect to the

19

UST-0490

consent rights afforded the Consenting Stakeholders under this Agreement), without the prior written consent of the Required Consenting Stakeholders, (ii) withdraws the Plan without the prior consent of the Required Consenting Stakeholders, or (iii) publicly announces its intention to take any such acts listed in the foregoing clause (i) or (ii), in the case of each of the foregoing clauses (i) through (iii), which remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 15.10 of this Agreement detailing any of the foregoing;

(o)      any Company Party files or supports another party in filing (i) a motion or pleading challenging the amount, validity, or priority of any claims held by any Consenting Stakeholder against the Company Parties (or any liens securing such claims) or (ii) a motion or pleading asserting (or seeking standing to assert) any purported claims or causes of action against any of the Consenting Stakeholders;

(p)      the Bankruptcy Court grants relief that is materially inconsistent with this Agreement or the Plan (in each case, with such amendments and modifications as have been effected in accordance with the terms hereof);

(q)      any Company Party files, proposes, or otherwise supports any plan of liquidation, asset sale of all or substantially all of a Company Party's assets or plan of reorganization other than the Plan;

(r)      the Bankruptcy Court enters an order terminating the Debtors' exclusive right to file or solicit acceptances of a plan of reorganization (including the Plan); or

(s)      any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable.

11.02.  <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 13.11 hereof upon the occurrence of any of the following events:

(a)      the breach in any material respect by one or more of the Consenting Stakeholders of any provision set forth in this Agreement and (i) such breach remains uncured for a period of fifteen (15) Business Days after the receipt by the Consenting Stakeholders of notice of such breach and (ii) the non-breaching Consenting Stakeholders no longer collectively beneficially own or control at least two-thirds of the aggregate principal amount of Term Loan Claims;

(b)      the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, including the Bankruptcy Court, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after the terminating

UST-0491

Company Party transmits a written notice in accordance with Section 13.11 hereof detailing any such issuance; *provided* that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)     the Bankruptcy Court enters an order denying confirmation of the Plan.

11.03.   Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Stakeholders; and (b) each Company Party.

11.04.   Individual Termination.  Any individual Consenting Stakeholder may terminate this Agreement, as to itself only, by the delivery to the Company Parties of a written notice in accordance with Section 13.11 hereof if (a) the Plan Effective Date has not occurred by the Outside Date or (b) Section 11.01(o) is breached by any Company Party with respect to such Consenting Stakeholder.

11.05.   Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

11.06.   Effect of Termination.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents, agreements, undertakings, waivers, forbearances, votes or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; *provided* any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 11.06 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 11.06 or otherwise if the Party seeking to terminate

UST-0492

this Agreement is in material breach of this Agreement, except a termination pursuant to Section 11.02(b) or Section 11.02(d). Nothing in this Section 11.06 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(b).

**Section 12.** *Amendments and Waivers*.

(a) This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b) This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by: (a) each Company Party and (b) the Required Consenting Stakeholders; *provided* that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement; *provided*, *further*, that (i) any modification, amendment, or supplement to the definition of "Outside Date" shall not be binding on any Consenting Stakeholder that has not provided its prior written consent to such amendment, (ii) any modification, amendment, or supplement to the definition of "Required Consenting Stakeholders" shall require the prior written consent of each Consenting Stakeholder, (iii) any modification, amendment, or supplement to Section 11.04 hereof shall require the prior written consent of each Consenting Stakeholder, (iv) any modification, amendment, or supplement to Section 4.03 shall not be binding on any Consenting Stakeholder that has not provided its prior written consent to such amendment, and (v) any modification, amendment or supplement to this Section 12 shall require the prior written consent of each Consenting Stakeholder.

(c) Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d) The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.** *Miscellaneous*.

13.01. <u>Acknowledgement</u>. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

UST-0493

13.02.  <u>Tax Matters</u>.  The Parties will work together in good faith to structure and implement the Restructuring Transactions in a tax efficient manner; *provided* that such tax structure shall be reasonably acceptable to the Required Consenting Stakeholders and the Company Parties.

13.03.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

13.04.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

13.05.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

13.06.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  EXCEPT TO THE EXTENT SUPERSEDED BY FEDERAL BANKRUPTCY LAW, THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

13.07.  <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.08.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

UST-0494

13.09. <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

13.10. <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

13.11. <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

Ascena Retail Group, Inc.
933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attn:  Michael Veitenheimer
Email: michael.veitenheimer@ascenaretail.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attn:  Steven N. Serajeddini
Email: steven.serajeddini@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attn:  John R. Luze
      Jeff Michalik
Email: john.luze@kirkland.com
      jeff.michalik@kirkland.com

(b)     if to a Consenting Stakeholder, to:

Milbank LLP
55 Hudson Yards

UST-0495

New York, NY 10001-2163
Attn:   Evan R. Fleck
        Abigail L. Debold
Email: efleck@milbank.com
        adebold@milbank.com

Any notice given by delivery, mail, or courier shall be effective when received.

13.12.  <u>Fees and Expenses</u>.  The Company Parties shall pay and reimburse all reasonable and documented fees and expenses when due (including travel costs and expenses) and all outstanding and unpaid amounts incurred in connection with the Restructuring Transactions (including, for the avoidance of doubt, all reasonable and documented fees and expenses incurred prior to the date hereof) of the attorneys, accountants, other professionals, advisors, and consultants of the Lender Group (whether incurred directly or on their behalf and regardless of whether such fees and expenses are incurred before or after the Petition Date), including the fees and expenses of Greenhill, Milbank, Whiteford Taylor, and Loyens, including all amounts payable or reimbursable under applicable fee or engagement letters (including any success or transaction fees when earned) with the Company Parties (which agreements shall not be terminated by the Company Parties before the termination of this Agreement).

13.13.  <u>Reservation of Rights</u>.  After the termination of this Agreement pursuant to Section 11, the Parties each fully reserve any and all of their respective rights, remedies, claims, and interests, subject to Section 11 in the case of any claim for breach of this Agreement.  Further, nothing in herein shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and the Plan and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring Transactions.

13.14.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties, and without reliance on any statement of any other Party or Entity (other than such express representations or warranties of the Company Parties contained herein).

13.15.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

13.16.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any

UST-0496

proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

13.17. <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

13.18. <u>Several, Not Joint, Claims</u>. Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

13.19. <u>Severability and Construction</u>. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

13.20. <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.21. <u>Capacities of Consenting Stakeholders</u>. Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

13.22. <u>Relationship Among Consenting Stakeholders and the Company Parties</u>. None of the Consenting Stakeholders shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Consenting Stakeholder, the Company Parties, or any of the Company Parties' creditors or other stakeholders, and, other than as expressly set forth herein, there are no commitments among or between the Consenting Stakeholders. It is understood and agreed that any Consenting Stakeholder may trade in any debt or equity securities of the Company Parties without the consent of the Company Parties or any other Consenting Stakeholder, subject to applicable securities laws and this Agreement, including Section 8 hereof. No prior history, pattern or practice of sharing confidences among or between any of the Consenting Stakeholders and/or the Company Parties shall in any way affect or negate this understanding and agreement.

13.23. <u>Direction to the Agent</u>. By their signatures to this Agreement, the Initial Consenting Stakeholders signatory thereto, constituting Required Lenders under the Term Loan Credit Agreement hereby direct and authorize the Administrative Agent (or any of its Affiliates) to (i) consent to the entry of the Cash Collateral Order (each of the Initial Consenting Stakeholders hereby authorizes Milbank, LLP, as counsel for the Initial Consenting Stakeholders, to direct the

UST-0497

administrative agent under the Term Loan Credit Agreement to consent to the entry of the Cash Collateral Order), (ii) to execute an acknowledgement to the supplement to the existing security agreement in respect of the equity held by the Loan Parties (as defined in the Term Loan Credit Agreement) in the LuxCo Entities as contemplated by this Agreement and (iii) to execute any documentation deemed reasonably necessary by the Administrative Agent or its Affiliates to evidence such consent or acknowledgment, as applicable (the direction by the Required Lenders hereunder to the Administrative Agent to grant such consent and acknowledgment, as applicable, and to take actions deemed reasonably necessary by it to evidence such consent or acknowledgment, as applicable, is hereinafter referred to as the "Direction"). For the avoidance of doubt, the Initial Consenting Stakeholders agree that the consents and acknowledgments granted, and the actions taken, by the Administrative Agent and its Affiliates pursuant to and arising out of the Direction are indemnified actions covered by the indemnification provisions of Section 9.03 of the Term Loan Credit Agreement.  This Direction shall be governed by, and construed in accordance with, the laws of the State of New York.  Notwithstanding Section 13.10, the Administrative Agent is a third party beneficiary to this Section 13.23 and is relying thereon in taking action in accordance with the Direction.

13.24.  Email Consents.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 12, or otherwise, including a written approval by the Company Parties or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

13.25.  Publicity.  The Company Parties will submit to Milbank all press releases, public filings, or public announcements, in each case, to be made by any of the Company Parties announcing entry into this Agreement or the transactions contemplated hereby in advance of release and will reasonably consult with Milbank with respect to such communications.  Except as required by law or regulation or by any governmental or regulatory (including self-regulatory) authority, no Party or its advisors shall (a) use the name of any Consenting Stakeholder in any public manner (including in any press release) or (b) disclose to any Person (including, for the avoidance of doubt, any other Consenting Stakeholder), other than legal, accounting, financial and other advisors to the Company Parties, the principal amount or percentage of Term Loan Claims, in each case, without such Consenting Stakeholder's prior written consent; *provided* that (i) if such disclosure is required by law, subpoena, or other legal process or regulation or by any governmental or regulatory (including self-regulatory) authority, the disclosing Party shall afford the relevant Consenting Stakeholder a reasonable opportunity to review and comment in advance of such disclosure if reasonably practicable and permitted by applicable law and shall take all reasonable measures to limit such disclosure to the extent permitted by applicable law and (ii) the foregoing shall not prohibit the public disclosure, including in connection with the Chapter 11 Cases, of the aggregate percentage or aggregate principal amount of Claims held by all the Consenting Stakeholders collectively.  Notwithstanding the foregoing, (x) any Party hereto may disclose the identities of the Parties hereto in any action to enforce this Agreement or in an action for damages as a result of any breaches hereof and (y) any Party hereto may disclose, to the extent expressly consented to in writing by a Consenting Stakeholder, such Consenting Stakeholder's identity and individual holdings.

UST-0498

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

*[Signature pages follow.]*

UST-0499

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**ASCENA RETAIL GROUP, INC.
AND THE OTHER COMPANY PARTIES**

By: _____

Name: Carrie W. Teffner

Authorized Signatory

UST-0500

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**ANNTAYLOR LOFT GP LUX S.À R.L.**

By: _Marc Crawford_
B3D63F8C32E5472
Name: Marc Crawford
Title:   authorised signatory

**ANNTAYLOR LOFT BORROWER LUX
SCS**

By: _Marc Crawford_
B3D63F8G32E5472
Name: Marc Crawford
Title:   authorised signatory

UST-0501

[*Signature pages of the Consenting Stakeholders on file with the Company*]

UST-0502

# EXHIBIT A

**Company Parties**

UST-0503

## EXHIBIT A

### Company Parties

Ascena Retail Group, Inc.
933 Inspiration LLC
ANN Card Services, Inc.
ANN, Inc.
AnnCo, Inc.
AnnTaylor Distribution Services, Inc.
AnnTaylor of Puerto Rico, Inc.
AnnTaylor Retail, Inc.
AnnTaylor, Inc.
AnnTaylor Loft Borrower Lux SCS
AnnTaylor Loft GP Lux S.À R.L.
Ascena Retail Holdings, Inc.
Ascena Trade Services, LLC
ASNA Plus Fashion, Inc.
ASNA Value Fashion LLC
BackingBrands Buying Agent, LLC
BackingBrands Solutions, LLC
C.S.F. Corp.
Catalog Receivables LLC
Catalog Seller LLC
Catherines #5124, Inc.
Catherines #5147, Inc.
Catherines Stores Corporation
Catherines, Inc.
CCTM, Inc.
Charming Sales Co. Four, Inc.
Charming Sales Co. One, Inc.
Charming Sales Co. Three, Inc.
Charming Sales Co. Two, Inc.
Charming Shoppes of Delaware, Inc.
Charming Shoppes Receivables Corp.
Charming Shoppes Seller, Inc.
Charming Shoppes Street, Inc.
Charming Shoppes, Inc.
Chestnut Acquisition Sub Inc.
Crosstown Traders, Inc.
CS Holdco II Inc.
CSGC, Inc.
CSI Industries, Inc.
CSPE, LLC
DBI Holdings, Inc.
DBCM Holdings, LLC
DBX, Inc.

UST-0504

Duluth Real Estate LLC
Etna Retail DC, LLC
Fashion Apparel Sourcing LLC
Fashion Service Fulfillment Corporation
Fashion Service LLC
GC Fulfillment, LLC
Lane Bryant #6243, Inc.
Lane Bryant of Pennsylvania, Inc.
Lane Bryant Outlet 4106, Inc.
Lane Bryant Purchasing Corp.
Lane Bryant, Inc.
PSTM, Inc.
Sponsi, Inc.
Spirit of America, Inc.
Too GC, LLC
Tween Brands Agency, Inc.
Tween Brands Direct Services Inc.
Tween Brands Investment, LLC
Tween Brands Marketing, Inc.
Tween Brands Service Co.
Tween Brands, Inc.
Winks Lane, Inc.
Worldwide Retail Holdings, Inc.

UST-0505

# EXHIBIT B

## Restructuring Term Sheet

UST-0506

*Execution Version*

---

### ASCENA RETAIL GROUP, INC., ET AL.

### RESTRUCTURING TERM SHEET[1]

---

This term sheet (the "Restructuring Term Sheet") sets forth the principal terms of the Restructuring Transactions. The Restructuring Transactions will be consummated through cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court") and as otherwise set forth in the Restructuring Support Agreement. This Restructuring Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documentation governing the Restructuring Transactions, which shall be subject to the applicable consent and approval rights of the Parties as set forth in the Restructuring Support Agreement.

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE STATUTES, RULES, AND LAWS.

UNLESS OTHERWISE SET FORTH HEREIN, TO THE EXTENT THAT ANY PROVISION OF THIS RESTRUCTURING TERM SHEET IS INCONSISTENT WITH ANOTHER PROVISION OF THE RESTRUCTURING SUPPORT AGREEMENT, THE TERMS OF THIS RESTRUCTURING TERM SHEET WITH RESPECT TO SUCH PROVISION SHALL CONTROL.

| OVERVIEW | |
|---|---|
| **Implementation** | The Debtors will effectuate the Restructuring Transactions through the filing of the Chapter 11 Cases and confirmation of the Plan, which shall be consistent with this Restructuring Term Sheet, subject to the terms and conditions set forth in the Restructuring Support Agreement. As further described herein and in the Restructuring Support Agreement, including the Backstop Commitment Letter, the Restructuring Transactions shall be funded through: (i) the consensual use of cash collateral under the Cash Collateral Order and the DIP Financing Order; (ii) a DIP Term Facility including $150 million in New Money DIP Loans and $161.8 million in Roll-Up DIP Loans; (iii) as applicable, a DIP ABL Facility; and (iv) the Exit Facilities. |
| | The Plan will constitute a separate chapter 11 plan of reorganization for each Debtor. For the avoidance of doubt, any action required to be taken by the Debtors on the Plan Effective Date pursuant to this Restructuring Term Sheet may be taken on the Plan Effective Date or as soon as is reasonably practicable thereafter. |
| **FINANCING** | |
| **DIP ABL Facility** | The Debtors may obtain a commitment from certain ABL Lenders to provide an up to $400 million senior secured asset-based revolving debtor-in-possession credit facility (the "DIP ABL Facility"), pursuant to which the commitments and loans of the ABL Lenders under the ABL Facility will |

---

[1] Capitalized terms used but not defined in this Restructuring Term Sheet have the meanings ascribed to them in (i) the Restructuring Support Agreement, dated as of July 23, 2020 (the "Restructuring Support Agreement"), to which this Restructuring Term Sheet is attached as Exhibit B or (ii) Annex I hereto.

UST-0507

| | convert into the DIP ABL Facility during the Chapter 11 Cases pursuant to the DIP Financing Order, and will obtain a commitment from certain lenders to provide the Exit ABL Facility in an amount not less than $400 million subject to the conditions set forth in the ABL Commitment Letter. |
|---|---|
| **DIP Term Facility** | Certain Prepetition Term Lenders (as defined in the Backstop Commitment Letter) and/or their affiliates (in their capacities as such, the "Backstop Commitment Parties") have committed to provide the Debtors with an up to $311.8 million superpriority senior secured debtor-in-possession term loan credit facility (the "DIP Term Facility") consisting of (a) $150 million in new money term loans (the "New Money DIP Loans") and (b) $161.8 million of term loans (the "Roll-Up DIP Loans" and, together with the New Money DIP Loans, the "DIP Term Loans") rolling Term Loan Claims held by the DIP Term Lenders that provide New Money DIP Loans on the terms and conditions set forth in the Backstop Commitment Letter and the DIP Financing Order. Prepetition Term Lenders (including, for the avoidance of doubt, the Backstop Commitment Parties) will have the right to commit to their ratable share of 50% of the DIP Term Facility up to the date that is expected to be 10 business days after distribution of the Syndication Materials, which is estimated to occur within 5 business days after the Petition Date, by executing the Restructuring Support Agreement and taking such other actions as specified in the Syndication Materials. For the avoidance of doubt, participation in the DIP Term Facility shall include a commitment to convert the DIP Term Loans into First Out Exit Term Loans on the Plan Effective Date if certain conditions as set forth in the DIP Term Agreement and Exit Facility Term Sheet attached as Exhibit D to the Restructuring Support Agreement are satisfied

The Cash Collateral Order and DIP Financing Order will include customary adequate protection for the Term Lenders, including, without limitation, and as acceptable to the Majority Backstop Commitment Parties:

    i.    superpriority adequate protection claims and adequate protection liens to the extent of any diminution in value in the collateral securing the Term Loan Claims, which adequate protection liens shall include liens on all unencumbered assets of the Debtors (excluding any assets that qualify as ABL Priority Collateral (as defined in the ABL Credit Agreement) and including the funding account for the DIP Term Facility and 100% of the equity interests in the LuxCo Entities);

    ii.    payment of the fees and expenses of the Lender Group's advisors; and

    iii.    the reporting and milestones described below.

Material terms for the DIP Term Loans include, without limitation and as set forth in the Form DIP Credit Agreement:

    a.    Maturity: Earlier of (i) 6 months after the Effective Date of the DIP Term Agreement, (ii) conversion into the First Out Term Loan Facility, (iii) dismissal of the Chapter 11 Cases, (iv) acceleration, (v) a sale of all or substantially all of the Debtors' assets, and (vi) the Plan Effective Date

    b.    Coupon: L+1,175 bps

    c.    LIBOR Floor: 1.00%

    d.    Commitment Payment: 250 bps payable in cash on the principal amount of New Money DIP Loans to all DIP Term Lenders that |

UST-0508

provide New Money DIP Loans (including the Backstop Commitment Parties)

e. <u>Seasoning/Fronting</u>: Fees to be paid by the Company Parties (in addition to the Backstop Premium and Commitment Payment)

f. <u>Mechanics</u>: Full amount of the New Money DIP Term Loans may be drawn after entry of the DIP Financing Order, subject to the terms and conditions set forth in the DIP Credit Agreement

g. <u>Ratings Covenant</u>: Commercially reasonable efforts to obtain a rating by each of S&P and Moody's within 15 days of the entry of the DIP Financing Order

h. <u>Milestones</u>: Consistent with the milestones contained in sections 11.01(a) through 11.01(g) of the Restructuring Support Agreement.

i. <u>Events of Default</u>: Customary debtor-in-possession facility "Events of Default"

j. <u>Covenants</u>: Customary covenants for similarly sized debtor-in-possession facilities

k. <u>Reporting</u>: Monthly, quarterly and annual Financial Statements; weekly reports of liquidity and line-item receipts and disbursements (including professional fees); weekly advisor and lender steering committee calls

l. <u>Variance Reporting</u>: Delivered weekly, with written explanations for variances above 15% of actual receipts or actual operating disbursements (unless the dollar amount corresponding to such percentage variance is less than $1 million)

m. <u>Budget</u>: Delivered monthly, subject to approval of the Required Lenders

n. <u>Permitted Variance</u>: 20%, tested on a cumulative basis, tested weekly on a 4-week rolling basis, of total net cash flow to projected net cash flow, applicable only when Liquidity (as defined in the Form DIP Credit Agreement) is less than $150 million

o. <u>Liquidity Covenant</u>: Minimum Liquidity of $100 million

p. <u>Collateral</u>: First priority on all collateral securing the Term Loan Claims and all unencumbered assets (excluding any assets that qualify as ABL Priority Collateral, which shall be subject to a second priority lien), including, for the avoidance of doubt, a first priority interest in the funding account for the DIP Term Facility and 100% of the equity interests in the LuxCo Entities

q. <u>Use of Proceeds</u>: To be used in accordance with the approved budget for (i) transaction expenses, (ii) adequate protection payments, (iii) fund Carve Out and (iv) general corporate purposes. Up to $50 million of the proceeds of the DIP Term Loans may be used to repay any DIP ABL Facility Claims in cash

The DIP Term Loans will be repaid in cash on their stated maturity date; *provided* that, if certain conditions as set forth in the DIP Term Agreement and Exit Facility Term Sheet attached as <u>Exhibit D</u> to the Restructuring Support Agreement are satisfied, on the Conversion Date (as defined in the DIP Term Agreement), the DIP Term Loans held as of the date that is 2 Business Days prior to the Plan Effective Date will be converted to loans under the First Out

UST-0509

| | Term Loan Facility (the "First Out Exit Term Loans") on the terms and conditions set forth in the DIP Term Agreement and the Exit Facility Term Sheet; *provided* that upon certain events described in the DIP Term Agreement and if the Conversion Date has not occurred, each DIP Term Loan shall be repaid with a non-refundable aggregate premium in an amount equal to 11.23% of the DIP Term Loans so repaid in cash on the date on which such DIP Term Loans are repaid, and shall be subject to the withholding provisions set forth in Section 2.15 of the DIP Term Agreement. |
|---|---|
| **Backstop Commitment** | Pursuant to the Backstop Commitment Letter, the Backstop Commitment Parties will, in the allocations set forth on Schedule 1 thereto, (a) provide 50% of the DIP Term Loans and First Out Exit Term Loans and (b) provide any DIP Term Loans and First Out Exit Term Loans not provided by other Prepetition Term Lenders in accordance with the syndication process described above. |
| | As consideration for the Backstop Commitments and agreements of the Backstop Commitment Parties under the Restructuring Support Agreement, Ascena Topco will pay (or cause to be paid) to the Backstop Commitment Parties (or, at any Backstop Commitment Party's option and upon such Related Lender's designation (which may be provided by electronic communication), its Related Lender), a non-refundable backstop premium equal to $7.5 million (the "Backstop Premium"),[2] which shall be allocated to each Backstop Commitment Party, in an amount equal to (1) its percentage set forth on Schedule 2 to the Backstop Commitment Letter (the "Backstop Percentage"), *multiplied by* (2) the Backstop Premium, which shall be fully earned, nonrefundable and non-avoidable on the execution of the Backstop Commitment Letter and payable, free and clear of any withholding tax, in cash upon the funding of the New Money DIP Loans. |
| | If (a) a Termination Date occurs prior to the funding of the DIP Term Facility or (b) the DIP Term Facility has been funded and the Conversion Date does not occur, a non-refundable aggregate premium in an amount equal to $7.5 million shall be payable, free and clear of any withholding tax, in cash (the "Termination Premium") on the Termination Date, in the case of clause (a), or the date on which the DIP Term Loans are repaid in full in cash, in the case of clause (b), which shall be allocated to each Backstop Commitment Party in an amount equal to (1) its Backstop Percentage, *multiplied by* (2) the Termination Premium. |
| **Definitive Documents** | Any documents, including any Definitive Documents, that remain the subject of negotiation as of the Agreement Effective Date shall be subject to the rights and obligations set forth in the Restructuring Support Agreement. Failure to reference such rights and obligations as it relates to any document referenced in this Restructuring Term Sheet shall not impair such rights and obligations. |

---

[2]    For tax purposes, unless otherwise required by a change in applicable tax law or contrary determination (as defined in Section 1313(a) of the Internal Revenue Code of 1986, as amended), the Company Parties and the Backstop Commitment Parties will (i) treat the Backstop Premium and the Termination Premium as premiums paid by Ascena Topco to the Backstop Commitment Parties in exchange for the issuance of a put right to Ascena Topco with respect to the DIP Term Facility and (ii) not take any tax position inconsistent with the tax treatment described in clause (i).

UST-0510

| TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ||
|---|---|
| **DIP ABL Facility Claims** | To the extent the Debtors obtain a commitment for a DIP ABL Facility that is funded prior to the Plan Effective Date, the Plan shall provide as follows:<br><br>i.   If those certain conversion conditions set forth in the DIP ABL Agreement remain unsatisfied as of the Plan Effective Date, on the Plan Effective Date, each holder of an allowed DIP ABL Facility Claim shall receive, unless such holder agrees to less favorable treatment, cash in an amount equal to its allowed DIP ABL Facility Claim in full and final satisfaction, release, and discharge of, and in exchange for, such allowed DIP ABL Facility Claim.<br><br>ii.   If those certain conversion conditions as set forth in the DIP ABL Agreement are fully satisfied as of the Plan Effective Date, on the Plan Effective Date, each holder of an allowed DIP ABL Facility Claim shall receive, unless such holder agrees to less favorable treatment, its pro rata share of participation in the Exit ABL Facility. |
| **DIP Term Facility Claims** | On the Plan Effective Date, each holder of an allowed DIP Term Facility Claim shall receive, unless such holder agrees to less favorable treatment and subject to the terms and conditions of the DIP Term Facility and the Exit Facility Term Sheet, cash in an amount equal to its allowed DIP Term Facility Claim; *provided* that, if certain conditions as set forth in the DIP Term Agreement and Exit Facility Term Sheet are satisfied, each holder of an allowed DIP Term Facility Claim shall receive (i) loans arising under the First Out Exit Term Loan Facility in an amount equal to such holder's allowed DIP Term Facility Claim and (ii) cash on account of accrued and unpaid interest and other charges payable through the Plan Effective Date, in full and final satisfaction, release, and discharge of, and in exchange for, such allowed DIP Term Facility Claim. |
| **Administrative Claims** | On the Plan Effective Date, each holder of an allowed Administrative Claim shall receive payment in full in cash. |
| **Priority Tax Claims** | On the Plan Effective Date, each holder of an allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. |
| **Other Secured Claims** | Each holder of an allowed Other Secured Claim shall receive, at the option of the applicable Debtor:<br><br>i.   payment in full in cash;<br><br>ii.   delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;<br><br>iii.   reinstatement of such Claim; or<br><br>iv.   other treatment rendering such Claim unimpaired. |
| **Other Priority Claims** | Each holder of an Other Priority Claim shall receive payment in full in cash or other treatment rendering such Claim unimpaired. |
| **ABL Claims** | To the extent any allowed ABL Claims remain outstanding on the Plan Effective Date, each holder of an allowed ABL Claim shall receive:<br><br>i.   payment in full in cash of its allowed ABL Claim;<br><br>ii.   the collateral securing its allowed ABL Claim;<br><br>iii.   reinstatement of its allowed ABL Claim under the Exit ABL |

UST-0511

| | |
|---|---|
| | Facility; or |
| | iv. such other treatment that renders its allowed ABL Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| **Term Loan Claims** | Each holder of an allowed Term Loan Claim shall receive its pro rata share of: |
| | i. $88.2 million of Last Out Term Loans, which shall include the terms set forth in the Exit Facility Term Sheet; and |
| | ii. 55.1% of the common shares of Reorganized Ascena (such shares, the "New Common Stock") less the percentage of New Common Stock distributed as the Equity Premium (as defined below), subject to dilution on account of the Management Incentive Plan. |
| **General Unsecured Claims** | i. *If holders of allowed General Unsecured Claims vote as a class to accept the Plan,* each holder of an allowed General Unsecured Claim shall receive its pro rata share of cash in an aggregate amount equal to $500,000, as determined by the Debtors and the Required Consenting Stakeholders. |
| | ii. *If holders of allowed General Unsecured Claims vote as a class to reject the Plan,* each holder of an allowed General Unsecured Claim shall receive treatment consistent with section 1129(a)(7) of the Bankruptcy Code, as determined by the Debtors and the Required Consenting Stakeholders. |
| **Intercompany Claims** | Each allowed Intercompany Claim shall be reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Reorganized Debtors. |
| **Intercompany Interests** | Intercompany Interests shall receive no recovery or distribution and be reinstated solely to the extent necessary to maintain the Debtors' corporate structure. |
| **Interests in Ascena** | Each holder of an allowed Interest in Ascena shall have such Interest cancelled, released, and extinguished without any distribution. |
| **CHAPTER 11 PLAN RELEASES, EXCULPATION, AND INJUNCTION PROVISIONS** | |
| **Discharge of Claims and Termination of Interests** | Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Plan Effective Date by the Reorganized Debtors), Interests, and Causes of Action against any Debtor of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any liability (including withdrawal liability) to the extent such Claims or Causes of Action accrued before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim based upon such debt or right |

UST-0512

| | is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Plan Effective Date. Unless expressly provided in the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Plan Effective Date occurring. |
|---|---|
| **Releases by the Debtors** | Effective as of the Plan Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Plan Effective Date. |
| **Releases by Holders of Claims and Interests** | Effective as of the Plan Effective Date, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of |

UST-0513

|  | any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Plan Effective Date. |
|---|---|
| **Exculpation** | Notwithstanding anything contained in the Plan to the contrary, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action or any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Exit Facilities, the Backstop Commitment Letter, the DIP Financing Order, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing |

UST-0514

| | the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
|---|---|
| **Injunction** | Except with respect to the obligations arising under the Plan, the DIP Financing Order, or the Confirmation Order, and except as otherwise expressly provided in the Plan, the DIP Financing Order, or the Confirmation Order, all Entities that held, hold, or may hold claims or interests or Causes of Action that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Reorganized Debtors or the other Released Parties:   (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action released or settled or subject to exculpation pursuant to the Plan. |
| **OTHER TERMS OF THE RESTRUCTURING TRANSACTIONS** | |
| **Equity Allocation** | On the Plan Effective Date, each Consenting Stakeholder shall receive (a) its pro rata share (the numerator being such party's holdings of First Out Exit Term Loans (including through any of its Related Parties) and the denominator being the aggregate outstanding amount of all First Out Exit Term Loans) of 44.9% of the New Common Stock, which will be subject to dilution from the Management Incentive Plan, and (b) its pro rata share (based on such party's Backstop Percentage (including through any of its Related Parties)) of an amount of New Common Stock equal to $7.5 million, calculated assuming a total equity value of Reorganized Ascena to be agreed by the Company Parties and the Required Consenting Stakeholders (such pro rata share, the "Equity Premium"), which will be subject to dilution from the Management Incentive Plan.[3] |

---

[3]   For tax purposes, unless otherwise required by a change in applicable tax law or contrary determination (as defined in Section 1313(a) of the Internal Revenue Code of 1986, as amended), (i) the Company Parties and the Consenting Stakeholders as of the Petition Date will treat the Equity Premium as acquired by such Consenting Stakeholders at the Plan Effective Date in exchange for participation in the Restructuring Transactions and for tax purposes more specifically as a put premium and (ii) not take any tax position inconsistent with the tax treatment described in clause (i).

UST-0515

| Critical Vendors | The Debtors will seek the Bankruptcy Court's approval to use up to $50 million in the aggregate to pay the prepetition claims of certain foreign and critical vendors, subject to the consent and consultation rights in the Restructuring Support Agreement. |
|---|---|
| LuxCo Entities | On the Execution Date, all of the previously unencumbered equity held by the Loan Parties (as defined in the Term Loan Credit Agreement) in the LuxCo Entities will be pledged as Collateral (as defined in the Term Loan Credit Agreement). |
| New Board | The initial board of directors, members, or managers, as applicable (each, a "Director"), of Reorganized Ascena (the "New Board") will consist of 7 Directors, including, subject to the terms of the New Corporate Governance Documents: <br><br> i. Carrie W. Teffner; <br><br> ii. the CEO of Reorganized Ascena; <br><br> iii. 1 Director determined by Bain Capital Credit, LP ("Bain"); <br><br> iv. 1 Director determined by Monarch Alternative Capital LP ("Monarch"); <br><br> v. 1 Director determined collectively by Bain, Eaton Vance Management, Lion Point Capital, LP, and Monarch; and <br><br> vi. 2 Directors determined by the Backstop Commitment Parties. |
| Management Incentive Plan | The Reorganized Debtors will reserve a pool of up to 10% of the New Common Stock for a post-emergence management incentive plan (the "Management Incentive Plan") for management employees of the Reorganized Debtors, which will contain terms and conditions (including, without limitation, with respect to participants, form, allocation, structure, duration and timing and extent of issuance and vesting) as determined at the discretion of the New Board after the Plan Effective Date. |
| Tax Structure | The Parties will work together in good faith to structure and implement the Restructuring Transactions in a tax efficient manner; *provided* that such tax structure shall be reasonably acceptable to the Required Consenting Stakeholders and the Company Parties. |
| Executory Contracts and Unexpired Leases | The Plan will provide that the executory contracts and unexpired leases that are not rejected as of the Plan Effective Date (either pursuant to the Plan or a separate motion) will be deemed assumed pursuant to section 365 of the Bankruptcy Code. |
| Employment Obligations | Pursuant to the Restructuring Support Agreement and this Restructuring Term Sheet, the Consenting Stakeholders consent to the continuation and assumption of all of the Debtors' wages, compensation, and employee benefits programs according to existing terms and practices, including executive and Insider compensation and benefits programs, Insider and non-Insider severance programs, Insider and non-Insider incentive programs, and Insider and non-Insider retention programs, in each case as are in effect as of the Agreement Effective Date and have been disclosed to counsel for the Required Consenting Stakeholders, including any modifications agreed between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement (collectively, the "Employee Benefits Programs"), and any motions in the Bankruptcy Court for approval thereof; provided, however, that Employee Benefits Programs shall not include (x) any compensation, post-employment, separation or retirement arrangement with any former Insider (as of the Agreement Effective Date) or (y) any non-qualified |

UST-0516

| | deferred compensation plan or supplemental retirement plan, solely to the extent and such plan would benefit any former Insider (as of the Agreement Effective Date), in each case without the consent of the Required Consenting Stakeholders following the Petition Date. On the Plan Effective Date, pursuant to the Plan, the Debtors shall assume all obligations related to all Employee Benefits Programs (as agreed to be modified between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement, as applicable) and assume all employment agreements or letters, indemnification agreements, or other agreements entered into with current and former employees (as agreed to be modified between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement, as applicable) unless such employees agree to enter into new agreements on terms and conditions acceptable to the Reorganized Debtors, the Required Consenting Stakeholders and such employee. Notwithstanding the foregoing, no (x) compensation, post-employment, separation or retirement arrangement with any former Insider (as of the Agreement Effective Date) or (y) non-qualified deferred compensation plan or supplemental retirement plan, solely to the extent any such plan would benefit any former Insider (as of the Plan Effective Date), will be assumed on the Plan Effective Date, in each case without the prior consent of the Required Consenting Stakeholders. |
|---|---|
| **Indemnification Obligations** | Consistent with applicable law, all indemnification provisions in place as of the Plan Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring Transactions on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Plan Effective Date. |
| **Subordination** | The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |
| **Restructuring Transactions** | The Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan and the Restructuring Transactions therein. On the Plan Effective Date, the Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in this Restructuring Term Sheet or the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled, and the Debtors' obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Retention of Jurisdiction** | The Plan will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters. |

UST-0517

| Retained Causes of Action | The Reorganized Debtors, as applicable, shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action that the Debtors have released pursuant to the release and exculpation provisions of the Plan. |
|---|---|
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from SEC registration under applicable law. On the Plan Effective Date, Reorganized Ascena will cease to be a public reporting company. |
| **Conditions Precedent to the Plan Effective Date** | The following, among others as agreed by the Debtors and the Required Consenting Stakeholders, shall be conditions to the Plan Effective Date:<br><br>1. The Bankruptcy Court shall have entered the Confirmation Order, which shall:<br><br>   a. be in form and substance consistent with the Restructuring Support Agreement;<br><br>   b. authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;<br><br>   c. decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;<br><br>   d. authorize the Debtors, as applicable/necessary, to: (a) implement the Restructuring Transactions; (b) issue the New Common Stock pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (c) make all distributions and issuances as required under the Plan, including cash and the New Common Stock; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Exit Facilities;<br><br>   e. authorize the implementation of the Plan in accordance with its terms; and<br><br>   f. provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;<br><br>2. the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Restructuring Support Agreement and the Plan;<br><br>3. the Restructuring Support Agreement shall remain in full force and effect and shall not be terminated;<br><br>4. the documentation related to the Exit Facilities shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Plan Effective Date) to the effectiveness of the Exit Facilities shall have been satisfied or duly waived in writing in accordance with the terms of each of the Exit Facilities and the closing of the Exit Facilities shall have |

UST-0518

|  | occurred; |
|---|---|
|  | 5. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring; |
|  | 6. all actions, documents, certificates, and agreements necessary to implement the Plan (including any documents contained in the Plan Supplement) shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units, in accordance with applicable laws; |
|  | 7. all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses; |
|  | 8. all professional fees and expenses and of the advisors to the Consenting Stakeholders shall have been paid in full in accordance with the Restructuring Support Agreement; and |
|  | 9. the Debtors shall have implemented the Restructuring Transactions in a manner consistent with the Restructuring Support Agreement and this Plan. |
| **Waiver of Conditions Precedent to the Plan Effective Date** | The Debtors, with the prior consent of the Required Consenting Stakeholders, may waive any one or more of the Conditions Precedent to the Plan Effective Date. |

UST-0519

*Execution Version*

## ANNEX I

### DEFINITIONS

| Term | Definition |
|------|------------|
| **ABL Commitment Letter** | The letter committing certain ABL Lenders to provide the DIP ABL Facility and Exit ABL Facility on terms acceptable to the Required Consenting Stakeholders. |
| **ABL Facility** | The credit facility established by the ABL Credit Agreement. |
| **ABL Lenders** | Each of the lenders from time to time party to the ABL Credit Agreement. |
| **Administrative Claim** | A Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan Effective Date of preserving the Estates and operating the Debtors' businesses; and (b) allowed Professional Fee Claims. |
| **Causes of Action** | Any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim |
| **DIP ABL Agreement** | The debtor-in-possession senior secured asset-based revolving credit agreement establishing the DIP ABL Facility on terms acceptable to the Required Consenting Stakeholders. |
| **DIP ABL Facility Claim** | Any Claim derived from, based upon, or secured pursuant to the DIP ABL Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP ABL Facility. |
| **DIP Term Agreement** | The Superpriority Senior Secured Debtor-In-Possession Credit Agreement in the form of the Form DIP Credit Agreement and otherwise acceptable to the Majority Backstop Commitment Parties. |
| **DIP Term Facility Claim** | Any Claim derived from, based upon, or secured pursuant to the DIP Term Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Term Facility. |
| **DIP Term Lenders** | The lenders under the DIP Term Agreement. |

UST-0520

| Term | Definition |
|---|---|
| **Estate** | As to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 upon the commencement of the applicable Debtor's Chapter 11 Case. |
| **Exculpated Parties** | Collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) any statutory committees appointed in the Chapter 11 Cases and each of their respective members; (e) each current and former Affiliate of each Entity in clause (a) through the following clause (f); and (f) each Related Party of each Entity in clause (a) through this clause (e). |
| **Exit ABL Facility** | The senior secured asset-based revolving credit facility in an aggregate amount up to $400 million and otherwise on the terms set forth in the ABL Commitment Letter and pursuant to definitive documentation acceptable to the Required Consenting Stakeholders. |
| **Exit Facilities** | Collectively, the Exit ABL Facility, the First Out Term Loan Facility, and the Last Out Term Loan Facility. |
| **General Unsecured Claim** | Any Claim that is not secured and is not (a) an Administrative Claim, (b) an Other Secured Claim, (c) a Priority Tax Claim, (d) an Other Priority Claim, (e) an ABL Claim, (f) a Term Loan Claim, or (g) an Intercompany Claim. |
| **Intercompany Claim** | Any Claim held by a Debtor or a Debtor's affiliate against a Debtor or a Debtor's affiliate. |
| **Intercompany Interests** | Other than an Interest in Ascena Topco, an Interest in one Debtor held by another Debtor or a Debtor's affiliate. |
| **Lien** | Has the meaning set forth in section 101(37) of the Bankruptcy Code. |
| **Other Priority Claim** | Any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than: (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases. |
| **Other Secured Claim** | Any secured Claim, other than (a) an ABL Claim, (b) a DIP ABL Facility Claim, (c) a Term Loan Claim, or (d) a DIP Term Facility Claim. |
| **Priority Tax Claim** | Any Claim of a Governmental Unit (as set forth in section 101(27) of the Bankruptcy Code) of the kind specified in section 507(a)(8) of the Bankruptcy Code. |
| **Professional** | An Entity retained in the Chapter 11 Cases pursuant to a final order in accordance with sections 327, 363, and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Plan Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code. |
| **Professional Fee Claims** | All Claims for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the date on which the Confirmation Order is entered that the Bankruptcy Court has not denied by final order. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a final order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims. |

UST-0521

| Term | Definition |
|---|---|
| **Proof of Claim** | A proof of Claim filed in the Chapter 11 Cases. |
| **Related Party** | With respect to any person or Entity, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special or other committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors of such person or Entity, and any such Person's or Entity's respective heirs, executors, estates, and nominees. |
| **Released Party** | Collectively, each of the following in their capacity as such:  (a) each of the Debtors;  (b)  the  Reorganized Debtors;  (c) each  of  the  Consenting Stakeholders; (d) the ABL Agent; (e) the Term Loan Agent; (f) each of the lenders and administrative agents under the Exit Facilities; (g) the Backstop Parties; (h) the DIP ABL Agent; (i) the DIP ABL Lenders; (j) the DIP Term Agent; (k) the DIP Term Lenders;  (l) each current and former Affiliate of each Entity in the foregoing clause (a) through the following clause (m); and (m) each Related Party of each Entity in the foregoing clause (a) through this clause (m). |
| **Releasing Party** | Collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the ABL  Agent;  (e)  the  Term  Loan  Agent;  (f) each  of  the  lenders  and administrative agents under the Exit Facilities; (g) the Backstop Parties; (h) the DIP ABL Agent; (i) the DIP ABL Lenders; (j) the DIP Term Agent; (k) the DIP Term Lenders; (l) all holders of Claims; (m) all holders of Interests; (n) each current and former Affiliate of each Entity in foregoing clause (a) through the following clause (o); and (o) each Related Party of each Entity in the foregoing clause (a) through this clause (o); *provided* that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation; *provided further* that any such Entity shall be identified by name as a non-Releasing Party in the Confirmation Order. |
| **Reorganized Debtors** | Reorganized Ascena and each of the other Debtors, or any successor thereto, as reorganized pursuant to and under the Plan. |
| **Term Lenders** | Each of the lenders from time to time party to the Term Loan Credit Agreement. |

UST-0522

# EXHIBIT C

**Backstop Commitment Letter**

UST-0523

July 23, 2020

PERSONAL AND CONFIDENTIAL
Ascena Retail Group, Inc.
933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attention: Dan Lamadrid

<div align="center">

Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Facility
Backstop Commitment Letter

</div>

Ladies and Gentlemen:

Ascena Retail Group, Inc. ("Ascena TopCo", "you" or "your") has (i) advised the parties listed on the signature pages hereto as Backstop Commitment Parties (each, a "Backstop Commitment Party" and, collectively, the "Backstop Commitment Parties", "we", "us" or "our"), that Ascena Topco and certain of its subsidiaries (the "Subsidiary Debtors" and, collectively with Ascena Topco, the "Debtors"), are considering filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), and, in connection with the foregoing, (ii) requested that the Backstop Commitment Parties agree to commit to provide a superpriority senior secured debtor-in-possession term loan credit facility for Ascena Topco under Sections 364(c) and 364(d) of the Bankruptcy Code (the "DIP Facility") consisting of (x) new money term loans (the "New Money DIP Loans") in an aggregate principal amount of $150 million and (y) term loans (the "Roll-Up DIP Loans" and, together with the New Money DIP Loans, the "DIP Loans") resulting from the conversion of the Prepetition Term Loans (as defined below) of the Prepetition Term Lenders (as defined below) that provide (themselves or through their affiliates) New Money DIP Loans in an aggregate amount equal to $161.8 million on the Effective Date, or as otherwise set forth in the Form DIP Credit Agreement. The DIP Facility shall convert on a dollar-for-dollar basis into an exit facility (the "Exit Conversion", such converted loans, the "Exit Term Loans", and the financing provided by the Exit Term Loans, the "Exit Facility") substantially on the terms set forth in this letter (including all exhibits, annexes, and schedules hereto, the "Backstop Commitment Letter"), as well as the form Senior Secured Super-Priority Debtor-In-Possession Term Credit Agreement attached hereto as **Exhibit A** (the "Form DIP Credit Agreement") and the Exit Facility Term Sheet attached hereto as **Exhibit B** (the "Exit Facility Term Sheet"), which terms will be memorialized in a credit agreement that will govern the Exit Facility (the "Exit Facility Credit Agreement"), subject solely to the conditions set forth in the sections of Article IV of the Form DIP Credit Agreement and the "Conditions to Borrower" set forth in the Exit Facility Term Sheet, in each case, that are applicable to the relevant borrowing. Unless otherwise specified herein, all references to "$" shall refer to U.S. dollars. Capitalized terms used herein without definition shall have the meaning assigned thereto in the Form DIP Credit Agreement or the Exit Facility Term Sheet, as applicable.

1.  Backstop Commitment.

To provide assurance that the DIP Facility and the Exit Facility shall be available on the terms and conditions set forth herein, in the Form DIP Credit Agreement and the Exit Facility Term Sheet, as applicable, each Backstop Commitment Party is pleased to advise Ascena Topco of its several and not joint commitment (the "Backstop Commitment") to provide, itself or through one or more funds managed by such Backstop Commitment Party, the amount of the DIP Loans and Exit Term Loans, each as set forth on **Schedule 1** hereto (as updated from time to time prior to the date that is two business days prior to the Effective Date) on the terms set forth in the Backstop Commitment Letter, subject solely to the conditions set forth in the sections of Article IV of the Form DIP Credit Agreement and the "Conditions to Borrowing" set forth in the Exit Facility Term Sheet that are applicable to the relevant borrowing. Each Backstop

<div align="center">1</div>

UST-0524

Commitment Party may, at its option, arrange for the Form DIP Credit Agreement or the Exit Facility Credit Agreement, if applicable, to be executed by one or more financial institutions selected by the applicable Backstop Commitment Party and reasonably acceptable to Ascena Topco (the "Fronting Lender(s)"), to act as an initial lender and to fund some or all of the Backstop Commitment Party's Backstop Commitment, in which case the applicable Backstop Commitment Party will acquire its shares of the DIP Facility and/or Exit Facility, as applicable, by assignment from the Fronting Lender(s) in accordance with the assignment provisions of the Form DIP Credit Agreement and the Exit Facility Credit Agreement, as applicable.

It is understood and agreed that the aggregate commitments under this Backstop Commitment Letter in respect of New Money DIP Loans (and the automatic conversion thereof to Exit Term Loans on the Conversion Date) are $150 million in total, subject to the Initial Allocation, as set forth in Section 2 hereof and each Backstop Commitment Party hereby agrees and commits to such automatic conversion of the New Money DIP Loans to Exit Term Loans on the Conversion Date.

2. Initial Allocation.

Each Lender (as defined in the Prepetition Term Loan Credit Agreement, a "Prepetition Term Lender") as of the Syndication End Date (as defined below) (including the Backstop Commitment Parties) shall have the right to participate (the "Opportunity") in 50.0% of the DIP Facility and the Exit Facility, in each case based on its Pro Rata Share (as defined below). The Opportunity will be conducted on the terms and conditions set forth in syndication procedures and related documentation, which procedures and documentation shall be reasonably acceptable to the Debtors and the Backstop Commitment Parties (the "Syndication Procedures"); provided that, the Backstop Commitment Parties shall use commercially reasonable efforts to cause the Syndication Procedures to be distributed by no later than 10:00 am New York Time on the fifth Business Day following the Petition Date (or such later date as agreed by you and the Majority Backstop Commitment Parties (as defined below)). Pursuant to the Syndication Procedures, each Prepetition Term Lender electing to participate in the Opportunity shall, among other things (i) provide written notification of such election to the Ad Hoc Committee Advisors by no later than the date that is 10 Business Days after the Syndication Procedures are distributed to the Prepetition Term Lenders (the "Syndication End Date") (or such later time as reasonably agreed by the Majority Backstop Commitment Parties and you) and (ii) execute a joinder to the Restructuring Support Agreement, dated as of the date hereof (the "Restructuring Support Agreement"), by and among Ascena Topco and certain of its subsidiaries and certain Prepetition Term Lenders prior to the Syndication End Date (or such later time as reasonably agreed by the Majority Backstop Commitment Parties and you) (the "Initial Allocation"); provided, that, any Backstop Commitment Party that is a Prepetition Term Lender shall (unless it elects otherwise) be deemed to have provided such notice of election to participate in the DIP Facility and the Exit Facility in respect of such holdings upon executing this Backstop Commitment Letter and the Restructuring Support Agreement. Each Prepetition Term Lender that elects to participate in the DIP Facility shall be obligated to participate in its ratable portion of the Exit Term Loans and the commitments under the Exit Facility will be "stapled to" the DIP Facility and traded in equal percentage.

"Pro Rata Share" means with respect to each Prepetition Term Lender (x) the aggregate principal amount of Loans (as defined in the Prepetition Term Loan Credit Agreement, the "Prepetition Term Loans") held by such Prepetition Term Lender, as set forth in the register for the Prepetition Term Loan Credit Agreement on the Syndication End Date divided by (y) the aggregate principal amount of Prepetition Term Loans held by all Prepetition Term Lenders outstanding under the Prepetition Term Loan Credit Agreement at such time.

UST-0525

"Majority Backstop Commitment Parties" means, at any time, Backstop Commitment Parties having Backstop Commitments outstanding that, taken together, represent at least 50.01% of the sum of all Backstop Commitments outstanding at such time.

Each Backstop Commitment Party shall have the right to assign its Commitments under the DIP Facility and the Exit Facility to participating Lenders in accordance with the Initial Allocation; provided that, notwithstanding the Initial Allocation, (i) no Backstop Commitment Party shall be relieved, released or novated from its obligations hereunder (including its obligation to fund the DIP Facility on the Effective Date, subject to the satisfaction (or waiver) of the conditions set forth in Article IV of the Form DIP Credit Agreement and its obligation to convert into the Exit Facility on the Conversion Date, subject to the satisfaction (or waiver) of the conditions set forth in the Exit Facility Term Sheet) in connection with the Initial Allocation, including its Backstop Commitments, until after the Initial Allocation Date has occurred, (ii) no allocation shall become effective as between you and such Backstop Commitment Party with respect to all or any portion of such Backstop Commitment Party's Backstop Commitments in respect of the DIP Facility and the Exit Facility until after the occurrence of the Initial Allocation Date, and (iii) unless you otherwise agree in writing, each Backstop Commitment Party shall retain exclusive control over all rights and obligations with respect to its Backstop Commitments in respect of the DIP Facility and the Exit Facility, including all rights with respect to consents, modifications, supplements, waivers and amendments, until the Initial Allocation Date has occurred. Any unsubscribed portion of the Opportunity as of the Syndication End Date shall be automatically allocated to, and funded by (if applicable), the Backstop Commitment Parties based on their respective percentages set forth on Schedule 2 hereto.

Each of the parties hereto agrees to use its respective commercially reasonable efforts to assist the Administrative Agent in connection with the Initial Allocation. The Backstop Commitment Parties agree that, following the Initial Allocation, Ascena Topco and its subsidiaries and the Administrative Agent may conclusively rely on the schedule of "Post-Initial Allocation Term Loan Commitments" provided to Ascena Topco by the financial advisor for the Backstop Commitment Parties, Greenhill & Co., LLC, including the Lenders listed therein and their respective Commitments. None of Ascena Topco nor any of its affiliates nor any of their respective advisors shall be liable with respect to such schedule.

You acknowledge and agree that nothing in this Backstop Commitment Letter or the nature of our services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between any Backstop Commitment Party, the Administrative Agent or its affiliates, on the one hand, and you, your equity holders or your affiliates, on the other hand, and you waive, to the fullest extent permitted by law, any claims you may have against any Backstop Commitment Party, the Administrative Agent or its affiliates for breach of fiduciary duty or alleged breach of fiduciary duty in connection with this Backstop Commitment Letter or the transactions contemplated hereby, and agree that no Backstop Commitment Party, the Administrative Agent or affiliates of any of the foregoing will have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including your equity holders, employees or creditors. You acknowledge that the transactions contemplated hereby (including the exercise of rights and remedies hereunder) are arms'-length commercial transactions and that we and the Administrative Agent are acting as principal and in our own respective best interests. You are relying on your own experts and advisors to determine whether the transactions contemplated hereby are in your best interests and are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated hereby. In addition, you acknowledge that we and the Administrative Agent may employ the services of our respective affiliates in providing certain services hereunder and may exchange with such affiliates information concerning Ascena Topco and other companies that may be the subject of the transactions contemplated hereby and such affiliates will be entitled to the benefits afforded to us and the Agents hereunder; provided, that any such affiliates receiving information concerning Ascena Topco and other companies in accordance with this paragraph shall be subject to the same confidentiality

UST-0526

obligations provided for in this Backstop Commitment Letter (with each Backstop Commitment Party responsible for its affiliates' compliance with this paragraph).

3. <u>Information.</u>

You hereby represent and warrant that (a) all written information concerning you and your subsidiaries and your and their respective business (other than financial projections, estimates, forecasts and budgets and other forward-looking information (collectively, the "<u>Projections</u>") and information of a general economic or industry specific nature) (the "<u>Information</u>") that has been or will be made available to us or any of our respective affiliates by or on behalf of you is or will be, when furnished and to the best of your knowledge, complete and correct in all material respects, when taken as a whole, and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to the updates provided for in the penultimate sentence of this Section 3) and (b) the Projections that have been or will be made available to us or any of our affiliates by or on behalf of you or any of your representatives have been or will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made and at the time the related Projections are made available to us or any of our affiliates (it being acknowledged that (i) such Projections are merely a prediction as to future events and are not to be viewed as facts, (ii) such Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, (iii) the actual results during the period or periods covered by any such Projections may differ significantly from the projected results, and (iv) no guarantee or assurance can be given that the projected results will be realized). In particular, where Projections expressly or implicitly take into account the current market volatility and widespread impact of the COVID-19 outbreak, the extent of the impact of these developments on the Debtors' and their subsidiaries' operational and financial performance will depend on future developments, including the duration and spread of the outbreak and related governmental advisories and restrictions, and the impact of the COVID-19 outbreak on overall demand for the Debtors' and their subsidiaries' products and services, all of which are outside of the control of the Debtors or their subsidiaries, highly uncertain and cannot be predicted. You agree that if, at any time prior to the entry of the Order approving the DIP Facility, any of the representations, warranties and covenants in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations, warranties and covenants were being made, at such subsequent time, then you will promptly supplement the Information and the Projections so that such representations, warranties and covenants would be correct in material respects; provided, for the avoidance of doubt, there will be no requirement to update previously delivered Projections to reflect new assumptions so long as the assumptions were reasonable at the time made and made available to us or any of our affiliates. The accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the obligations of the Backstop Commitment Parties hereunder or the availability of the DIP Facility.

4. <u>Premium</u>.

As consideration for the Backstop Commitments and agreements of the Backstop Commitment Parties hereunder and under the Restructuring Support Agreement, Ascena Topco agrees to pay (or cause to be paid) to the Backstop Commitment Parties, (or, at any Backstop Commitment Party's option and upon such Related Lender's designation (which may be provided by electronic communication), its Related Lender), a non-refundable backstop premium equal to $7.5 million (the "<u>Backstop Commitment Premium</u>"), which shall be allocated to each Backstop Commitment Party, in an amount equal to (1) its percentage set forth on <u>Schedule 2</u> hereto (the "<u>Backstop Percentage</u>"), *multiplied by* (2) the Backstop Commitment Premium, which shall be fully earned, nonrefundable and non-avoidable on the execution of this Backstop Commitment Letter and payable in cash free and clear of any withholding tax upon the

UST-0527

funding of the New Money DIP Loans on the Funding Date. Notwithstanding the foregoing, at the option of the Lenders, any or all of the Backstop Commitment Premium may instead be effected in the form of original issue discount with respect to the DIP Facility.

If a Termination Date occurs prior to the funding of the DIP Term Facility, a non-refundable aggregate premium in an amount equal to $7.5 million shall be payable in cash free and clear of any withholding tax (the "Termination Premium") on the Termination Date, which shall be allocated to each Backstop Commitment Party in an amount equal to (1) its Backstop Percentage, multiplied by (2) the Termination Premium.

5. Payments and Fees

Without duplication of any amounts payable pursuant to Section 2.10 of the Form DIP Credit Agreement, the New Money DIP Loans will be subject to a commitment payment for each Lender participating in the DIP Facility in an amount of up to 2.50% of the principal amount of such Lender's New Money DIP Loans as of the Funding Date, earned upon entry of the Order and due and payable upon the Funding Date (the payment described in this sentence, the "DIP Commitment Payment"). For the avoidance of doubt, the entirety of the DIP Commitment Payment shall be treated as original issue discount with respect to the DIP Facility, and shall be subject to the withholding provisions set forth in Section 2.15 of the Form DIP Credit Agreement.

The Debtors agree to pay the fees, costs and expenses (collectively, the "Fronting Expenses") incurred in connection with the initial funding of the New Money DIP Loans by the Fronting Lender(s) and any assignments made by such Fronting Lender(s) to the Backstop Commitment Parties in connection therewith; provided that such Fronting Expenses shall not exceed 0.50% of such Fronting Lender(s)' New Money DIP Loans so funded.

6. Conditions.

The Backstop Commitment Parties' Backstop Commitments and agreements hereunder in respect of the DIP Facility are subject solely to the satisfaction (or waiver) of the conditions precedent set forth in the sections of Article IV of the Form DIP Credit Agreement that are applicable to the relevant borrowing. Subject to the Order, there are no conditions (implied or otherwise) to the Backstop Commitments hereunder in respect of the DIP Facility, and there will be no conditions (implied or otherwise) to the availability of the DIP Facility on the Effective Date or the funding of the New DIP Term Loans on the Funding Date, including compliance with the terms of this Backstop Commitment Letter or the Form DIP Credit Agreement, other than those that are expressly stated in the applicable sections of Article IV of the Form DIP Credit Agreement relevant to the availability of the DIP Facility on the Effective Date or the Funding Date, as applicable. The Backstop Commitment Parties' commitment in respect of the Exit Facility are subject to the satisfaction or waiver of the conditions precedent set forth in "Conditions to Borrowing" in the Exit Facility Term Sheet. Subject to the Order, there are no conditions (implied or otherwise) to the Backstop Commitments hereunder in respect of the Exit Facility, and there will be no conditions (implied or otherwise) to the conversion of the Exit Facility on the Conversion Date, including compliance with the terms of this Backstop Commitment Letter or the Form DIP Credit Agreement, other than those that are expressly stated in the "Conditions to Borrowing" in the Exit Facility Term Sheet.

7. Indemnification and Expenses.

You agree to (a) indemnify and hold harmless each Backstop Commitment Party and the Administrative Agent, their respective affiliates and their and their affiliates' officers, directors, employees, agents, attorneys, accountants, advisors (including investment managers and advisers),

UST-0528

consultants, representatives, controlling persons, members and permitted successors and assigns (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("Losses") to which any such Indemnified Person may become subject arising out of or in connection with this Backstop Commitment Letter, the DIP Facility, the Exit Facility the use of proceeds thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing, and to (b) reimburse each Backstop Commitment Party from time to time within five (5) Business Days of receipt of their reasonable demand by presentation of a summary statement for any reasonable and documented out-of-pocket legal or other expenses incurred in connection with the Cases, the DIP Facility, the Exit Facility, the enforcement of this Backstop Commitment Letter, the definitive documentation for the DIP Facility, the Exit Facility, and, in each case any ancillary documents and security arrangements in connection therewith, but no other third-party financial advisors (other than Greenhill & Co., LLC as financial advisor for the Backstop Commitment Parties) without your prior written consent; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses to the extent (a) they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's (i) gross negligence, bad faith, fraud or willful misconduct or (ii) material breach of its obligations under this Backstop Commitment Letter, or (b) they relate to a dispute solely among Indemnified Persons and not arising out of any act or omission of the Debtors or any of their respective subsidiaries (other than any claim, litigation, investigation or proceeding against the Administrative Agent in its capacity or in fulfilling its role as such).

None of you, the other Debtors, any of your or their respective subsidiaries, we nor any other Indemnified Person will be responsible or liable to one another for any indirect, special, punitive or consequential damages which may be alleged as a result of or arising out of, or in any way related to, the DIP Facility, the Exit Facility, the enforcement of this Backstop Commitment Letter, the definitive documentation for the DIP Facility or the Exit Facility, or any ancillary documents and security arrangements in connection therewith; provided that your indemnity and reimbursement obligations under this Section 6 shall not be limited by this sentence.

8.     **Assignments, Amendments.**

This Backstop Commitment Letter shall not be assignable by you or us without the prior written consent of the other parties hereto (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto, the Indemnified Persons and with respect to Section 2, Section 6 and this Section 7, the Administrative Agent, and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto, the Indemnified Persons and with respect to Section 2 and Section 6 and this Section 7, the Administrative Agent. Notwithstanding anything set forth in this Section 8 to the contrary, each Backstop Commitment Party (i) shall assign all or a portion of its Backstop Commitment to other banks, financial institutions, or institutional lenders and investors solely in connection with the Initial Allocation pursuant to Section 2 above (subject to the terms and conditions set forth therein) and (ii) may assign its respective Backstop Commitment, in whole or in part, to any Related Lender, or to any other Backstop Commitment Party. This Backstop Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by the Backstop Commitment Parties and you.

This Backstop Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Backstop Commitment Letter by facsimile or other electronic transmission (including E-Signature) shall be effective as delivery of a manually executed counterpart hereof. Section headings used herein are for convenience of reference only, are not part of this Backstop Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Backstop Commitment Letter. You acknowledge that information and documents

UST-0529

relating to the DIP Facility and/or Exit Facility may be transmitted through the internet, e-mail or similar electronic transmission systems and that neither any Backstop Commitment Party nor any Agent, nor any of their respective affiliates, shall be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner.

This Backstop Commitment Letter supersedes all prior understandings, whether written or oral, between us with respect to the DIP Facility and the Exit Facility.

9.      Governing Law, Etc.; Jurisdiction.

THIS BACKSTOP COMMITMENT LETTER AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS BACKSTOP COMMITMENT LETTER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF THE DOMESTIC SUBSTANTIVE LAWS OF ANY OTHER STATE).

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the non-exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan in New York City, and any appellate court from any thereof and the Bankruptcy Court, in any suit, action or proceeding arising out of or relating to this Backstop Commitment Letter or the DIP Facility, and agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court, or, to the extent applicable, the Bankruptcy Court; *provided* that suit for the recognition or enforcement of any judgment obtained in any such court may be brought in any other court of competent jurisdiction, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Backstop Commitment Letter or the DIP Facility in any New York State court, in any such Federal court or in Bankruptcy Court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court, and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

You hereby agree that you shall not bring any suit, action, proceeding, claim or counterclaim under this Backstop Commitment Letter or with respect to the transactions contemplated hereby in any court other than such New York State court or Federal Court of the United States of America sitting in the Borough of Manhattan in New York City.  Service of any process, summons, notice or document by registered mail addressed to you at the address above shall be effective service of process against you for any suit, action or proceeding brought in any such court.

10.     Waiver of Jury Trial.

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS BACKSTOP COMMITMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

UST-0530

11. <u>Confidentiality</u>.

This Backstop Commitment Letter is delivered to Ascena Topco on the understanding that neither this Backstop Commitment Letter nor any of its terms or substance shall be disclosed, directly or indirectly, to any other person or entity except (a) you and your officers, directors, employees, legal counsel, accountants, auditors, financial advisors, existing and prospective holders of indebtedness and their respective affiliates, representatives, officers, directors and legal counsel, in each case, who are involved in the consideration of the financing transactions contemplated hereby who have been informed by you of the confidential nature of this Backstop Commitment Letter and have agreed to treat such information confidentially, (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent not prohibited by law, to inform Backstop Commitment Parties promptly in advance thereof), (c) the office of the U.S. Trustee, any *ad-hoc* or statutorily appointed committee of unsecured creditors, and their respective representatives and professional advisors on a confidential and "need to know" basis, (d) to the Bankruptcy Court, in a redacted manner in form and substance reasonably satisfactory to the Backstop Commitment Parties, to the extent required to obtain Bankruptcy Court approval in connection with any acts or obligations to be taken pursuant to this Backstop Commitment Letter or the transactions contemplated hereby and (e) you may disclose the aggregate fee amounts contained herein, as part of pro forma information or a generic disclosure of aggregate sources and uses related to fee amounts related to the Transactions to the extent customary or required in offering or marketing materials or in any public or regulatory filing relating to the Transactions.

Each Backstop Commitment Party agrees to keep confidential, and not to publish, disclose or otherwise divulge, confidential information with respect to the transactions contemplated hereby or obtained from or on behalf of you or your respective affiliates in the course of the transactions contemplated hereby, except that the Backstop Commitment Parties shall be permitted to disclose such confidential information (a) to their affiliates and their and their affiliates' respective directors, officers, agents, employees, attorneys, accountants, auditors and advisors involved in the transactions contemplated hereby on a "need to know" basis and who are made aware of and agree to comply with the provisions of this paragraph, in each case on a confidential basis (with the Backstop Commitment Party responsible for such persons' compliance with this paragraph), (b) on a confidential basis to any bona fide prospective Lender, prospective participant or swap counterparty (in accordance with the terms of the Form DIP Credit Agreement) that agrees to keep such information confidential in accordance with (x) the provisions of this paragraph (or language substantially similar to this paragraph that is reasonably acceptable to you) for your benefit or (y) other customary confidentiality language in a "click-through" arrangement, (c) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case you agree, to the extent not prohibited by law, to inform Backstop Commitment Parties promptly in advance thereof), (d) to the extent such information: (i) becomes publicly available other than as a result of a breach of this Backstop Commitment Letter or other confidentiality obligation owed by such Backstop Commitment Party to you or your affiliates or (ii) becomes available to the Backstop Commitment Parties on a non-confidential basis from a source other than you or on your behalf that, to such Backstop Commitment Party's knowledge, is not in violation of any confidentiality obligation owed to you or your affiliates, (e) to the extent you shall have consented to such disclosure in writing (which may include through electronic means), (f) as is necessary in protecting and enforcing the Backstop Commitment Parties' rights with respect to this Backstop Commitment Letter and/or the DIP Facility, (g) to the extent independently developed by such Backstop Commitment Party or its affiliates without reliance on confidential information, (h) with respect to the existence and contents of the Form DIP Credit Agreement, in consultation with you, to the rating agencies or (i) with respect to the existence and contents of the Backstop Commitment Letter and the DIP Facility, to market data collectors or similar service providers in connection with the arrangement, administration or management of the DIP Facility and to industry

8

UST-0531

trade organizations where such information with respect to the DIP Facility is customarily included in league table measurements. The Backstop Commitment Parties' and their respective affiliates', if any, obligations under this paragraph shall terminate automatically to the extent superseded by the confidentiality provision in the Form DIP Credit Agreement upon the effectiveness thereof and, in any event, will terminate one year from the date hereof.

12.    Miscellaneous.

The Backstop Commitment Parties hereby notify Ascena Topco that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act"), it and its affiliates are required to obtain, verify and record information that identifies Ascena Topco, each other Debtor, which information includes names, addresses, tax identification numbers and other information that will allow Backstop Commitment Parties and its affiliates to identify Ascena Topco and each other Debtor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for Backstop Commitment Parties and its affiliates.

Absent a change in applicable tax law or a contrary determination (as defined in Section 1313(a) of the Internal Revenue Code of 1986, as amended), each of the parties hereto agrees (i) the Backstop Commitment Premium and the Termination Premium shall be treated as premiums paid by the Debtors to the relevant Backstop Commitment Party in exchange for the issuance of a put right to Ascena Topco with respect to the DIP Facility and (ii) to not take any tax position inconsistent with the tax treatment described in clause (i).

Each of the parties hereto agrees that this Backstop Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein, including an agreement to negotiate in good faith the definitive documentation for the DIP Facility and the Exit Facility by the parties hereto in a manner consistent with this Backstop Commitment Letter, it being acknowledged and agreed that the availability of the DIP Facility and Exit Facility is subject to the conditions precedent expressly set forth in Section 5 hereof.

If the foregoing correctly sets forth our agreement, please indicate Ascena Topco's acceptance of the terms of this Backstop Commitment Letter by returning to the Backstop Commitment Parties executed counterparts of this Backstop Commitment Letter not later than 11:59 p.m., New York City time, on July 23, 2020. This offer will automatically expire at such time if the Backstop Commitment Parties have not received such executed counterparts in accordance with the preceding sentence. This Backstop Commitment Letter and the Backstop Commitments and agreements hereunder shall automatically terminate on the earlier of (i) July 26, 2020, unless the Petition Date has occurred by such date, (ii) the date that is 36 calendar days after the Petition Date, unless prior to such time the DIP Financing Order (as defined in the Restructuring Support Agreement) shall have been entered by the Bankruptcy Court, (iii) five Business Days after the Termination Date (as defined in the Restructuring Support Agreement) or the Restructuring Support Agreement otherwise ceases to be in full force and effect or (iv) five Business Days after the Outside Date (as defined in the Restructuring Support Agreement), unless prior to such time the Exit Conversion shall have occurred, in each case unless extended by agreement of you and the Majority Backstop Commitment Parties (which agreement may be evidenced by email of counsel). Notwithstanding the immediately preceding sentence, Section 4 above, as well as the indemnification and expenses, confidentiality, Initial Allocation, information, jurisdiction, governing law and waiver of jury trial provisions contained herein shall remain in full force and effect in accordance with their terms notwithstanding the termination of this Backstop Commitment Letter or the Backstop Commitment Parties' Backstop Commitments hereunder; *provided* that your obligations under this Commitment Letter, other than those pursuant to Section 4 and with respect to the Initial Allocation and confidentiality, shall

UST-0532

automatically terminate and be superseded by the applicable provisions in the Form DIP Credit Agreement and the Exit Facility Credit Agreement, in each case, to the extent covered thereby, upon the initial funding on the Effective Date or the occurrence of the Exit Conversion, and you shall be released from all liability in connection therewith at such time.

[Signature Pages follow.]

10

UST-0533

[*Signature pages of the Backstop Commitment Parties on file with the Company*]

UST-0534

Accepted and agreed to as of July 23, 2020:

ASCENA RETAIL GROUP, INC.

By: _Dan Lamadrid_ _____
EC956D080DCB49E...
Name: Dan Lamadrid
Title:  Executive Vice President and
Chief Financial Officer

*Signature page to Backstop Commitment Letter*

UST-0535

**Schedule 1**

[*On file with the Company*]

UST-0536

**Schedule 2**

[*On file with the Company*]

UST-0537

**Exhibit A**

<u>See Attached.</u>

UST-0538

$311,800,000

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
TERM CREDIT AGREEMENT

dated as of

[  ], 2020,

among

ASCENA RETAIL GROUP, INC.,
as Parent Borrower

ANNTAYLOR RETAIL, INC.,
as Subsidiary Borrower

The LENDERS Party Hereto

and

ALTER DOMUS (US) LLC,
as Administrative Agent

UST-0539

# TABLE OF CONTENTS

**Page**

ARTICLE I

Definitions

| | | |
|---|---|---|
| SECTION 1.01. | Defined Terms | 2 |
| SECTION 1.02. | Classification of Loans and Borrowings | 34 |
| SECTION 1.03. | Terms Generally | 34 |
| SECTION 1.04. | Accounting Terms; GAAP | 35 |
| SECTION 1.05. | Classification of Actions | 35 |
| SECTION 1.06. | Divisions | 35 |

ARTICLE II

The Credits

| | | |
|---|---|---|
| SECTION 2.01. | Commitments | 36 |
| SECTION 2.02. | Loans and Borrowings | 36 |
| SECTION 2.03. | Requests for Borrowings | 37 |
| SECTION 2.04. | Funding of Borrowings | 37 |
| SECTION 2.05. | Interest Elections | 38 |
| SECTION 2.06. | Termination of Commitments | 39 |
| SECTION 2.07. | Repayment of Loans; Evidence of Debt | 39 |
| SECTION 2.08. | Amortization of Term Loans | 40 |
| SECTION 2.09. | Prepayment of Loans | 40 |
| SECTION 2.10. | Fees | 42 |
| SECTION 2.11. | Interest | 42 |
| SECTION 2.12. | Alternate Rate of Interest | 43 |
| SECTION 2.13. | Increased Costs | 44 |
| SECTION 2.14. | Break Funding Payments | 45 |
| SECTION 2.15. | Taxes | 46 |
| SECTION 2.16. | Payments Generally; Pro Rata Treatment; Sharing of Set-offs | 50 |
| SECTION 2.17. | Mitigation Obligations; Replacement of Lenders | 52 |
| SECTION 2.18. | [Reserved] | 53 |
| SECTION 2.19. | [Reserved] | 53 |
| SECTION 2.20. | Joint and Several Liability of the Borrowers | 53 |
| SECTION 2.21. | Super-Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations | 54 |
| SECTION 2.22. | Conversion to Exit Facility Agreement | 55 |

ARTICLE III

Representations and Warranties

| | | |
|---|---|---|
| SECTION 3.01. | Organization; Powers | 56 |

i

UST-0540

SECTION 3.02.    Authorization; Enforceability; Benefit to Loan Parties ............................56
SECTION 3.03.    Governmental Approvals; No Conflicts ...................................................56
SECTION 3.04.    Financial Condition; No Material Adverse Change.................................57
SECTION 3.05.    Properties ...............................................................................................57
SECTION 3.06.    Litigation and Environmental Matters .....................................................57
SECTION 3.07.    Compliance with Laws and Agreements ..................................................58
SECTION 3.08.    Investment Company Status ...................................................................58
SECTION 3.09.    Taxes ......................................................................................................58
SECTION 3.10.    ERISA; Labor Matters ...........................................................................59
SECTION 3.11.    [Reserved] ..............................................................................................59
SECTION 3.12.    Subsidiaries and Joint Ventures ..............................................................59
SECTION 3.13.    Insurance ................................................................................................60
SECTION 3.14.    Federal Reserve Regulations...................................................................60
SECTION 3.15.    [Reserved] ..............................................................................................60
SECTION 3.16.    Collateral Matters...................................................................................60
SECTION 3.17.    Use of Proceeds......................................................................................60
SECTION 3.18.    Approved Budget ...................................................................................61
SECTION 3.19.    Chapter 11 Cases....................................................................................61

## ARTICLE IV

### Conditions

SECTION 4.01.    Conditions to Effective Date and Availability of the Term Loans ............62
SECTION 4.02    Conditions to the New Money Loan. ........................................................63

## ARTICLE V

### Affirmative Covenants

SECTION 5.01.    Financial Statements and Other Information .............................................64
SECTION 5.02.    Notices of Material Events......................................................................67
SECTION 5.03.    Collateral Obligations; Additional Subsidiaries ......................................68
SECTION 5.04.    Information Regarding Collateral.............................................................68
SECTION 5.05.    Existence; Conduct of Business...............................................................69
SECTION 5.06.    Payment of Obligations...........................................................................70
SECTION 5.07.    Maintenance of Properties ......................................................................70
SECTION 5.08.    Insurance ................................................................................................70
SECTION 5.09.    Books and Records; Inspection and Rights .............................................70
SECTION 5.10.    Compliance with Laws ...........................................................................71
SECTION 5.11.    Bankruptcy Matters.................................................................................71
SECTION 5.12.    Maintenance of Ratings ..........................................................................72
SECTION 5.13.    Certain Post-Closing Collateral Obligations...........................................72
SECTION 5.14.    Reserved..................................................................................................72
SECTION 5.15.    Conference Calls.....................................................................................72

UST-0541

# ARTICLE VI

## Negative Covenants

SECTION 6.01. Indebtedness; Certain Equity Securities ...................................................73
SECTION 6.02. Liens ................................................................................................................74
SECTION 6.03. Fundamental Changes; Business Activities ...........................................76
SECTION 6.04. Investments, Loans, Advances, Guarantees and Acquisitions.................76
SECTION 6.05. Asset Sales ....................................................................................................78
SECTION 6.06. Sale/Leaseback Transactions ....................................................................79
SECTION 6.07. Swap Agreements .......................................................................................79
SECTION 6.08. Restricted Payments; Certain Payments of Indebtedness .........................79
SECTION 6.09. Transactions with Affiliates ......................................................................81
SECTION 6.10. Restrictive Agreements ..............................................................................81
SECTION 6.11. Amendment of Organizational Documents .............................................82
SECTION 6.12. Financial Covenants ...................................................................................82
SECTION 6.13. Accounting Changes ...................................................................................83
SECTION 6.14. Sanctions ......................................................................................................83
SECTION 6.15. Anti-Corruption Laws ...............................................................................83

# ARTICLE VII

## Events of Default

# ARTICLE VIII

## The Administrative Agent

# ARTICLE IX

## Miscellaneous

SECTION 9.01. Notices ..........................................................................................................93
SECTION 9.02. Waivers; Amendments ...............................................................................95
SECTION 9.03. Expenses; Indemnity; Damage Waiver ...................................................97
SECTION 9.04. Successors and Assigns...............................................................................99
SECTION 9.05. Survival .......................................................................................................103
SECTION 9.06. Counterparts; Integration; Effectiveness; Electronic Execution.............104
SECTION 9.07. Severability .................................................................................................104
SECTION 9.08. Right of Setoff............................................................................................104
SECTION 9.09. Governing Law; Jurisdiction; Consent to Service of Process.................105
SECTION 9.10. WAIVER OF JURY TRIAL.....................................................................105
SECTION 9.11. Headings .....................................................................................................106
SECTION 9.12. Confidentiality ...........................................................................................106
SECTION 9.13. Several Obligations; Nonreliance; Violation of Law.............................106
SECTION 9.14. USA Patriot Act Notice ............................................................................106
SECTION 9.15. Interest Rate Limitation ...........................................................................107

LA\4104335.13

UST-0542

SECTION 9.16.  Release of Liens and Guarantees ...................................................107
SECTION 9.17.  No Fiduciary Relationship ..............................................................107
SECTION 9.18.  Non-Public Information ...................................................................108
SECTION 9.19.  Intercreditor Agreement ..................................................................108
SECTION 9.20.  Acknowledgement and Consent to Bail-In of EEA Financial
                Institutions..................................................................................109

<u>SCHEDULE</u>:

Schedule 2.01   —   Commitments
Schedule 3.05   —   Real Property
Schedule 3.06   —   Disclosed Matters
Schedule 3.12   —   Subsidiaries and Joint Ventures
Schedule 3.13   —   Insurance
Schedule 5.11   —   Required Milestones
Schedule 6.01   —   Pre-Petition Indebtedness
Schedule 6.02   —   Liens
Schedule 6.04   —   Investments
Schedule 6.09   —   Transactions with Affiliates
Schedule 6.10   —   Restrictive Agreements

<u>EXHIBITS</u>:

Exhibit A    —    Form of Assignment and Assumption
Exhibit B    —    Form of Borrowing Request
Exhibit C    —    Form of Guarantee and Collateral Agreement
Exhibit D    —    Form of Compliance Certificate
Exhibit E    —    Form of Interest Election Request
Exhibit F    —    [Reserved]
Exhibit G    —     Form of Exit Facility Term Sheet
Exhibit H-1  —    Form of U.S. Tax Certificate for Non-U.S. Lenders that are not
                  Partnerships for U.S. Federal Income Tax Purposes
Exhibit H-2  —    Form of U.S. Tax Certificate for Non-U.S. Lenders that are Partnerships
                  for U.S. Federal Income Tax Purposes
Exhibit H-3  —    Form of U.S. Tax Certificate for Non-U.S. Participants that are not
                  Partnerships for U.S. Federal Income Tax Purposes
Exhibit H-4  —    Form of U.S. Tax Certificate for Non-U.S. Participants that are
                  Partnerships for U.S. Federal Income Tax Purposes
Exhibit I    —    [Reserved]
Exhibit J    —    Form of Variance Report
Exhibit K    —    Form of Note

Annex A      —    Approved Budget

LA\4104335.13

UST-0543

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION TERM CREDIT AGREEMENT, dated as of [ ], 2020, among ASCENA RETAIL GROUP, INC., a Delaware corporation, as debtor and debtor-in-possession (the "Parent Borrower"), ANNTAYLOR RETAIL, INC., a Florida corporation as debtor and debtor-in-possession (the "Subsidiary Borrower" and, together with the Parent Borrower, the "Borrowers" and each, a "Borrower"), the LENDERS party hereto and Alter Domus (US) LLC ("Alter Domus"), as Administrative Agent.

On July 23, 2020 (the "Petition Date"), the Borrowers and the other Loan Parties (collectively, the "Debtors", and each individually, a "Debtor") commenced voluntary cases (collectively, the "Cases" and each individually, a "Case") in the United States Bankruptcy Court for the Eastern District of Virginia Richmond Division (the "Court"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

Prior to the Petition Date, the Lenders provided financing to the Borrowers pursuant to that certain Term Credit Agreement dated as of August 21, 2015, among the Borrowers, the other Loan Parties, the Pre-Petition Lenders and Goldman Sachs Bank USA, as the Pre-Petition Agent and the other parties thereto (as amended, amended and restated, supplemented or otherwise modified from time to time through the date hereof, the "Pre-Petition Credit Agreement").

As of the Petition Date, the Pre-Petition Lenders under the Pre-Petition Credit Agreement were owed approximately $1,271,597,089 in Loans (as defined in the Pre-Petition Credit Agreement), plus interest, fees, costs and expenses and all other Pre-Petition Lender Obligations under the Pre-Petition Credit Agreement.

The Loan Document Obligations under and as defined in the Pre-Petition Credit Agreement are secured by a security interest in substantially all of the existing and after-acquired assets of the Borrowers and the other Loan Parties as more fully set forth in the Pre-Petition Loan Documents, and such security interest is perfected and, with certain exceptions, as described in the Pre-Petition Loan Documents, has priority over other security interests.

The Borrowers have requested, and, upon the terms set forth in this Agreement, the Lenders have agreed to make or be deemed to have made available to the Borrowers, a senior secured super priority term credit facility of up to $311,800,000 in the aggregate that is automatically convertible into a secured exit facility upon the satisfaction (or waiver) of certain conditions in the form of a term facility to be made available to the Borrowers at any time until the Maturity Date subject to the terms and conditions set forth herein (the "Term Credit Facility").

The Borrowers and other Loan Parties have agreed to secure all of their Loan Document Obligations under the Loan Documents by granting to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, a security interest in and lien upon all of their existing and after-acquired personal and real property, subject to the Intercreditor Agreement and the limitations and priorities contained in the Loan Documents and the Order.

UST-0544

Accordingly, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

<div align="center">

ARTICLE I

<u>Definitions</u>

</div>

SECTION 1.01.    <u>Defined Terms</u>.  As used in this Agreement, the following terms have the meanings specified below:

"<u>ABL Agent</u>" means the Person acting as agent under the ABL Credit Agreement, in its individual capacity, and its successors.

"<u>ABL Credit Agreement</u>" means the Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, dated the Funding Date, among the Parent Borrower, the borrowing subsidiaries party thereto, the other loan party thereto, the lenders party thereto and the ABL Agent, as administrative agent, as amended, restated, supplemented, modified, renewed, refunded, replaced or refinanced from time to time through the date hereof.

"<u>ABL Lenders</u>" means the lenders under the ABL Credit Agreement.

"<u>ABL Priority Collateral</u>" has the meaning set forth in the Intercreditor Agreement.

"<u>ABR</u>," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bears interest at a rate determined by reference to the Alternate Base Rate.

"<u>Acceptable Plan</u>" means a Plan of Reorganization that is consistent with the RSA and otherwise satisfactory to the Required Lenders and the Loan Parties in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof); it being agreed that the Plan (as defined in the RSA) is an "Acceptable Plan" to the Required Lenders.

"<u>Actual Net Cash Flow Amount</u>" means the actual net cash flows of the Loan Parties during the relevant period of determination which corresponds to each of the Budgeted Net Cash Flow Amounts described in the line item contained in the Approved Budget across from the heading "Unlevered Operating Cash Flow, Including Restructuring".

"<u>Ad Hoc Committee</u>" means the ad hoc committee of Consenting Stakeholders (as defined in the RSA).

"<u>Ad Hoc Committee Advisors</u>" means Greenhill Partners and Milbank LLP, the advisors of the Ad Hoc Committee.

"<u>Adjusted LIBO Rate</u>" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded to the nearest 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate; <u>provided</u> that,

<div align="center">2</div>

UST-0545

notwithstanding the foregoing, in the case of the Term Loans, the Adjusted LIBO Rate shall at no time be less than 1.00% per annum.

"Administrative Agent" means Alter Domus (US) LLC, in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Administrative Agent Fee Letter" means that certain Fee Letter dated as of even date herewith between the Borrowers and Alter Domus.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" means this Senior Secured Super-Priority Debtor-In-Possession Term Credit Agreement, as modified, supplemented, amended or restated from time to time.

"Alter Domus" has the meaning set forth in the introductory paragraph hereto.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% per annum and (c) the Adjusted LIBO Rate on such day (or if such day is not a Business Day, the immediately preceding Business Day) for a deposit in dollars with a maturity of one month plus 1% per annum; provided that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the Screen Rate (or the Interpolated Screen Rate, as applicable) at approximately 11:00 a.m., London time, on such day for a deposit in dollars with a maturity of one month. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively. Notwithstanding the foregoing, in the case of the Term Loans, the Alternate Base Rate shall at no time be less than 2.00% per annum.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Parent Borrower and its Subsidiaries from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 and the UK Bribery Act 2010.

"Applicable Rate" means, for any day, with respect to any Term Loan, (i) 11.75% in the case Eurodollar Term Loans and (ii) 10.75% in the case of ABR Term Loans.

"Approved Budget" means the budget prepared by the Parent Borrower in form and substance reasonably satisfactory to the Ad Hoc Committee Advisors, it being understood and agreed that the budget in the form of Annex A and initially furnished to the Administrative Agent on or prior to the Effective Date is deemed reasonably satisfactory to the Ad Hoc Committee Advisors, as the same may be updated, modified or supplemented from time to time as provided in Section 5.01. The initial Approved Budget shall depict, on a weekly and line item

UST-0546

basis, (i) projected cash receipts, (ii) projected cash disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Loan Parties' professionals and advisors), asset sales and any other fees and expenses relating to the Loan Documents), (iii) net cash flows, (iv) Liquidity and (v) professional fees and disbursements with respect to the Loan Parties' professionals, in each case for the first thirteen (13) week period from the Effective Date, and such initial Approved Budget shall be approved by, and in form and substance reasonably satisfactory to, the Administrative Agent and the Required Lenders in their sole discretion (it being acknowledged and agreed that the initial Approved Budget attached hereto as <u>Annex A</u> is approved by and reasonably satisfactory to the Administrative Agent and the Required Lenders)[1].

"<u>Approved Fund</u>" means any Person (other than a natural person that is engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"<u>Asset Sale</u>" has the meaning set forth in Section 6.05.

"<u>Asset Sale Escrow Account</u>" [_____][2].

"<u>Assignment and Assumption</u>" means an assignment and assumption entered into by a Lender and an Eligible Assignee, with the consent of any Person whose consent is required by Section 9.04, and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"<u>Automatic Stay</u>" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"<u>Backstop Lender</u>" means each Lender who is party to the Commitment Letter.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of such EEA Financial Institution.

"<u>Bail-In Legislation</u>" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"<u>Bankruptcy Code</u>" means the Bankruptcy Reform Act of 1978, as codified at 11 U.S.C. §§ 101 et seq.

---

[1] Subject to review of initial Approved Budget.

[2] Escrow mechanics to be confirmed.

LA\4104335.13

UST-0547

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Cases.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrowers" has the meaning set forth in the introductory paragraph hereto.

"Borrowing" means Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrowers for a Borrowing in accordance with Section 2.03, which shall be, in the case of any such written request, in the form of Exhibit B or any other form approved by the Administrative Agent.

"Budgeted Net Cash Flow Amount" means the amount described in the line item contained in the Approved Budget across from the heading "Unlevered Operating Cash Flow Including Restructuring", during the relevant period of determination.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP (as in effect on December 31, 2018, notwithstanding any modification or interpretative change thereto after such date and excluding the effect to any treatment of lease under Accounting Standards Codification 842 (or any other Accounting Standards Codification or Financial Accounting Standard have a similar result or effect)), the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve Out" has the meaning set forth in the Order.

"Cases" has the meaning set forth in the Recitals.

"Cash Equivalents" means:

(a)    marketable direct obligations issued or unconditionally guaranteed by the United States Government, the Government of Canada, or the UK government, or issued by an agency thereof and backed by the full faith and credit of the United States Government, the Government of Canada, or the UK government, as the case may be, in each case maturing within two years after the date of acquisition thereof;

UST-0548

(b)    marketable direct obligations issued by any state of the United States of America or any province of Canada, or any member of the European Union or any political subdivision of any such state or province or any public instrumentality thereof, in each case maturing within two years after the date of acquisition thereof and, at the time of acquisition, having a rating of at least A by S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then from such other nationally recognized rating services acceptable to the Administrative Agent);

(c)    commercial paper maturing no more than one year after the date of creation thereof and, at the time of acquisition, having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then the highest rating from such other nationally recognized rating services acceptable to the Administrative Agent);

(d)    certificates of deposit or bankers acceptances denominated in US Dollars, Canadian Dollars, Sterling or Euro and maturing within one year after the date of acquisition thereof issued by any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(e)    repurchase agreements of any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(f)    overnight investments with any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(g)    other readily marketable instruments issued or sold by any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(h)    shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (a) through (g) above;

(i)    funds invested in brokerage accounts with nationally recognized brokerage houses or money market accounts; and

(j)    in the case of investments by any Foreign Subsidiary or investments made in a country outside the United States, other customarily utilized high quality investments

6

UST-0549

in the country where such Foreign Subsidiary is located or in which such investment is made that would customarily constitute "cash equivalents".

"Cash Management Order" means the order of the Court entered in the Cases after the "first day" hearing on a final basis, together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Required Lenders, which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements (as set forth in the Pre-Petition Credit Agreement) or such other arrangements as shall be reasonably acceptable to the Required Lenders in all material respects

"CFC" means (a) any Person that is a "controlled foreign corporation" within the meaning of Section 957(a) of the Code and (b) each subsidiary of any Person described in clause (a).

"CFC Holdco" means a Subsidiary with no material assets other than equity interests of one or more Foreign Subsidiaries that are CFCs.

"Change in Control" means during any period of 12 consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Parent Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any rule, regulation, treaty or other law, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted, promulgated or issued.

"Charges" has the meaning set forth in Section 9.15.

 "Claim" means any (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an

UST-0550

equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means (a) means, collectively, all of the real, personal and mixed property (including Equity Interests) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Loan Document Obligations, and (b) the ["DIP Collateral"][3] referred to in the Order, it being understood that "Collateral" shall include all such "DIP Collateral" irrespective of whether any such property was excluded pursuant to the Pre-Petition Loan Documents.

"Collateral Agreement" means the Guarantee and Collateral Agreement among the Borrowers, the other Loan Parties and the Administrative Agent, substantially in the form of Exhibit C, together with all supplements thereto.

"Collateral and Guarantee Requirement" means, at any time, the requirement that:

(a)    the Administrative Agent shall have received from the Borrowers and each Designated Subsidiary (a) either (i) a counterpart of the Collateral Agreement, duly executed and delivered on behalf of such Person, or (ii) in the case of any Person that becomes a Designated Subsidiary after the Effective Date, a supplement to the Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Person, together with such documents with respect to such Designated Subsidiary as may reasonably be requested by the Administrative Agent and (b) an Intercreditor Acknowledgement in the form referred to in the Intercreditor Agreement, duly executed and delivered on behalf of such Person;

(b)    all Equity Interests owned by or on behalf of any Loan Party shall have been pledged pursuant to, and to the extent required by, the Collateral Agreement, including Equity Interests in any Luxembourg IP Subsidiary and any first-tier CFC or CFC Holdco, and the Administrative Agent shall, to the extent required by the Collateral Agreement, have received certificates or other instruments representing all such certificated Equity Interests, together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

(c)    all other assets, to the extent not constituting Excluded Property, shall have been pledged pursuant to, and to the extent required by, the Collateral Agreement;

(d)    all documents and instruments, including UCC financing statements, required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded to perfect the Liens intended to be created by the Collateral Documents with the priority required by the Collateral Documents shall have been filed,

---

[3] Subject to Final Order.

LA\4104335.13

UST-0551

registered or recorded or delivered to the Administrative Agent for filing, registration or recording;

(e)    each Loan Party shall have obtained all material consents and approvals required in connection with the execution and delivery of all Collateral Documents to which it is a party and the performance of its obligations thereunder; and

(f)    the Loan Document Obligations shall at all times be secured by a valid, binding, continuing, enforceable perfected first priority Lien on the DIP Accounts and the proceeds thereof and, on the Effective Date (or such later date as the Required Lenders may agree in its sole discretion), the Borrowers must obtain Control Agreement for the DIP Accounts.

Notwithstanding the foregoing, any Designated Subsidiary formed or acquired after the Effective Date shall not be required to comply with the foregoing requirements prior to the time specified in Section 5.03.  The foregoing definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance or, subject to the requirements of applicable law, flood insurance, legal opinions, appraisals, surveys or other deliverables with respect to, particular assets of the Loan Parties, or the provision of Guarantees by any Restricted Subsidiary, if and for so long as the Administrative Agent (acting at the direction of the Required Lenders), in consultation with the Borrowers, reasonably determines that the cost of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance or flood insurance, legal opinions, appraisals, surveys or other deliverables in respect of such assets, or providing such Guarantees, shall be excessive in view of the benefits to be obtained by the Lenders therefrom.  The Required Lenders may in their sole discretion, grant extensions of time for the creation and perfection of security interests in (including delivery of promissory notes as required by clause (c) above) or the obtaining of title insurance or, subject to the requirements of applicable law, flood insurance, legal opinions, appraisals, surveys or other deliverables with respect to particular assets or the provision of any Guarantee by any Designated Subsidiary where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Collateral Documents.

"Collateral Documents" means the Order, Collateral Agreement, and each other document granting a Lien upon any assets of any Loan Party as security for payment of the Loan Document Obligations.

"Commitment" means, with respect to each Lender, such Lender's New Money Commitment and such Lender's Roll-Up Loans Commitment.

"Commitment Letter" means the Commitment Letter dated July 23, 2020, among the Ad Hoc Committee and the Parent Borrower.

"Committee" means an official committee of unsecured creditors appointed in any of the Cases by the U.S. Trustee.

"Communications" means, collectively, any written notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to

UST-0552

any Loan Document or the transactions contemplated therein that is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to Section 9.01, including through the Platform.

"Compliance Certificate" means a Compliance Certificate in the form of Exhibit D or any other form approved by the Administrative Agent.

"Confirmation Order" means an order of the Court entered in the Cases pursuant to section 1129 of the Bankruptcy Code, which order (x) shall confirm an Acceptable Plan, be a final Order and otherwise be in form and substance reasonably satisfactory to the Required Lenders, together with all extensions, modifications, and amendments thereto, also in form and substance reasonably satisfactory to the Required Lenders and (y) (i) if the Term Credit Facility converts to the Exit Facility, shall authorize and approve the extensions of credit under the Exit Facility Credit Agreement and the performance of the Borrowers' (or the entities assuming and/or acquiring directly or indirectly the operations and assets of the Borrowers in the Acceptable Plan) and Guarantors' obligations thereunder, authorize a pro forma capital structure that satisfies the conditions precedent to the occurrence of the Conversion Date and otherwise satisfies all other conditions to the Conversion Date or (ii) if the Term Credit Facility is to be repaid in cash, shall authorize and approve such repayment, any financing the proceeds of which will be used to fund such repayment, and the termination in full of all outstanding obligations under the Term Credit Facility.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means, with respect to any deposit account or securities account maintained by any Loan Party, a control agreement in form and substance reasonably satisfactory to the Administrative Agent, duly executed and delivered by such Loan Party and the depositary bank or the securities intermediary, as the case may be, with which such account is maintained.

"Conversion Date" means the date upon which each of the conditions precedent to effectiveness of the Exit Facility Agreement set forth in the Exit Facility Term Sheet shall have been satisfied or waived.

"Court" has the meaning set forth in the Recitals.

"Cumulative Four-Week Period" means the four-week period up to and through the Saturday of the week most recently ended prior to the applicable Variance Report Date, or if a four-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Saturday of the most recent week then ended.

"Debtor" has the meaning set forth in the Recitals.

"Debtors' Investment Banker" means Guggenheim Securities, LLC.

"Declined Proceeds" has the meaning set forth in Section 2.09(d).

LA\4104335.13

UST-0553

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" means (i) in the case of overdue principal of any Loan, 2.0% per annum plus the rate otherwise applicable to such Loan as provided in Section 2.11 or (ii) in the case of any other overdue amount, 2.0% per annum plus the rate applicable to ABR Term Loans as provided in Section 2.11(a).

"Deposit Account" has the meaning set forth in the Collateral Agreement.

"Designated Jurisdiction" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"Designated Persons" means any person or entity listed on a Sanctions list.

"Designated Subsidiary" means each Subsidiary other than an Excluded Subsidiary.

"DIP Accounts" means the DIP Funding Account and the Asset Sale Escrow Account.

"DIP Funding Account" means a Deposit Account in the name of the Parent Borrower subject to a blocked Control Agreement in favor of the Administrative Agent, on behalf of the Secured Parties, in which the proceeds of the Loans shall be deposited and held on the Funding Date and used solely for the purposes set forth in Section 3.17.

"DIP Superpriority Claim" means allowed superpriority expense claims pursuant to Bankruptcy Code Sections 364(c)(1), 503 and 507 granted by the Order.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 3.06.

"Disqualified Stock" means any Equity Interests which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case at any time on or prior to the date that is 91 days after the latest Maturity Date (determined as of the date of issuance thereof or, in the case of any such Equity Interests outstanding on the date hereof, the date hereof), or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) cash, (ii) debt or (iii) any Equity Interests referred to in (a) above, in each case at any time prior to the date that is 91 days after the latest Maturity Date (determined as of the date of issuance thereof or, in the case of any such Equity Interests outstanding on the date hereof, the date hereof). Notwithstanding the foregoing, any Equity Interests that would constitute Disqualified Stock solely because holders of the Equity Interests have the right to require the issuer of such Equity Interests to repurchase such Equity Interests upon the occurrence of a change in control or an asset sale will not constitute Disqualified Stock if the terms of such Equity Interests provide that the issuer may not repurchase or redeem any such

UST-0554

Equity Interests pursuant to such provisions unless such repurchase or redemption is permitted under the terms of this Agreement.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary of the Parent Borrower that is organized under the laws of the United States, any state of the United States or the District of Columbia, except for a Subsidiary directly or indirectly owned by a CFC.

"EEA Financial Institution" means (a) any financial institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any member state of the European Union, Iceland, Liechtenstein and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02), which date is [  ], 2020[4].

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person, other than, in each case, a natural person or the Parent Borrower, any Subsidiary or any other Affiliate of the Parent Borrower.

"Environment" means ambient air, indoor air, surface water, groundwater, drinking water, land surface and subsurface strata, and natural resources such as wetlands, flora and fauna.

"Environmental Laws" means all applicable federal, state, and local laws (including common law), regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and binding agreements with any Governmental Authority in each case, relating to pollution or protection of the Environment, human health and safety (to the extent related to exposure to Hazardous Materials), or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

---

[4] To be the date the Order is approved.

LA\4104335.13

UST-0555

"Environmental Liability" means any liability, claim, action, suit, agreement, judgment or order arising under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, including those arising from or relating to: (a) compliance or non-compliance with any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threat of Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest (other than, prior to the date of such conversion, any Indebtedness that is convertible into any such Equity Interests).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414(m) or 414(o) of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived), (b) any failure by any Plan to satisfy the minimum funding requirements of Section 412 or 430 of the Code or Section 302 or 303 of ERISA with respect to such Plan, in each case whether or not waived, or any failure by any Loan Party or any ERISA Affiliate to make a required contribution to a Multiemployer Plan, (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) a determination that any Plan is in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code), (e) the incurrence by any Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA (other than PBGC premiums due but not delinquent under Section 4007 of ERISA), (f) the receipt by any Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Section 4042 of ERISA, (g) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan; (h) a complete withdrawal or partial withdrawal by any Loan Party or any ERISA Affiliate from any Plan or Multiemployer Plan, (i) the receipt by any Loan Party or any ERISA Affiliate of any notice concerning the imposition of Withdrawal Liability, or a determination that a Multiemployer Plan is insolvent, within the meaning of Title IV of ERISA, or in "endangered" or "critical" status, within the meaning of Section 305 of ERISA or Section 432 of the Code, (j) a failure by any Loan Party or any ERISA Affiliate to pay when due (after expiration of any applicable grace period) any installment payment with respect to Withdrawal Liability, (k) the imposition of a Lien upon any Loan Party or any ERISA

13

UST-0556

Affiliate pursuant to Section 430(k) of the Code or Section 303(k) of ERISA, (l) the occurrence of a non-exempt "prohibited transaction" (as defined in Section 4975 of the Code or Section 406 of ERISA) with respect to which any Loan Party or any ERISA Affiliate is a "disqualified person" (within the meaning of Section 4975 of the Code) or a "party in interest" (within the meaning of Section 406 of ERISA) or could otherwise reasonably be expected to be liable or (m) any event with respect to any Foreign Plan which could reasonably be expected to result in liability to any Loan Party similar to the liability that could arise with respect to an event described in clauses (a) through (l) above.

"<u>EU Bail-In Legislation Schedule</u>" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"<u>Eurodollar</u>," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"<u>Events of Default</u>" has the meaning set forth in Article VII.

"<u>Exchange Act</u>" means the United States Securities Exchange Act of 1934.

"<u>Excluded Deposit Account</u>" means (a) [reserved], (b) any Deposit Account that is a zero balance disbursement account the funds in which are used solely for the payment of salaries and wages, (c) any Deposit Account that is a zero balance disbursement account the funds in which are used solely for payment of medical or insurance reimbursement, workers' compensation and similar expenses, (d) any escrow account to the extent the creation of a security interest therein would violate any agreement with a Person other than the Parent Borrower or a Subsidiary, and (e) any fiduciary or trust account.

"<u>Excluded Property</u>" the collective reference to:

(A)      any licenses, franchises, charters and authorizations of a Governmental Authority to the extent a security interest therein under the Loan Documents is prohibited by or would require the consent, license or approval of any Governmental Authority (except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition);

(B)      any asset if the granting of a security interest under the Loan Documents in such asset would be prohibited by any (x) law, treaty, rule or regulation (including all applicable regulations and laws regarding assignments of and security interests in, government receivables) or a court or other Governmental Authority or would require the consent, license or approval of any Governmental Authority (other than proceeds thereof, to the extent the assignment of such proceeds is effective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition and the assignment of such proceeds is not prohibited by applicable law and does not require the consent, license or approval of any Governmental Authority) or (y) contractual obligation (only to the extent such restriction is binding on such asset (i) on the Petition Date or (ii) on the date of the acquisition thereof and not entered into in contemplation thereof) (except to the extent such prohibition or restriction is

14

UST-0557

ineffective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition);

(C)     any lease, license or other agreement to the extent that a grant of a security interest therein under the Loan Documents would violate or invalidate such lease, license or agreement (except any such lease, license or agreement among Parent Borrower and its wholly-owned Subsidiaries and except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition);

(D)     Equity Interests  in any Person that is not a Subsidiary, in partnerships, in joint ventures and in non-wholly owned Subsidiaries to the extent the pledge or other granting of a security interest under the Loan Documents in such Equity Interests would be prohibited by, or require a consent or approval of unaffiliated third parties or are not permitted under, organizational or governance documents or shareholders' or similar agreements of or with respect to such Person (except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order, or other applicable law notwithstanding such prohibition);

(E)     to the extent applicable law requires that a Subsidiary issue directors' qualifying shares, nominee shares or similar shares which are required by applicable law to be held by persons other than a Loan Party, such qualifying shares, nominee shares or similar shares held by Persons other than a Loan Party;

(F)     any United States intent-to-use application for registration of a trademark or service mark prior to the acceptance by the United States Patent and Trademark Office of a statement of use or an amendment to allege use, to the extent and for so long as the grant of a security interest therein would impair the validity or enforceability of, or render void or voidable or result in the cancellation of, a Loan Party's right, title or interest therein or any trademark or service mark registration issued therefrom;

(G)     "margin stock" within the meaning of Regulation U;

(H)     Excluded Deposit Accounts; and

(I)     proceeds in an amount not to exceed the Carve Out, if applicable, under the Order.

provided that (a) in the case of clauses 2(y), (3) and (5), such exclusion shall not apply (i) to the extent the prohibition or restriction is ineffective under Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code, the Bankruptcy Code or other applicable law or (ii) to proceeds of the assets referred to in such clause, the assignment of which is expressly deemed effective under Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code, the Bankruptcy Code or other applicable law and (b) assets described above shall no longer be "Excluded Property" upon termination of the applicable prohibition or restriction described above that caused such assets to be treated as "Excluded Property".

UST-0558

"Excluded Subsidiary" means (a) [reserved], (b) any Foreign Subsidiary of the Parent Borrower, (c) any Subsidiary that is a direct or indirect Subsidiary of a Foreign Subsidiary of the Parent Borrower that is a CFC, (d) any CFC Holdco, (e) any Subsidiary that is prohibited or restricted by applicable law, rule or regulation or contractual obligation in existence on the Petition Date from providing a Guarantee of the Loan Document Obligations (solely for so long as such prohibition or restriction remains in existence) or if such Guarantee would require governmental (including regulatory) consent, approval, license or authorization unless such consent, approval, license or authorization has been received (but without obligation to seek the same), (f) [reserved], (g) [reserved], (h) [reserved], and (i) any other Restricted Subsidiary with respect to which, in the reasonable judgment of the Required Lenders (confirmed in writing by notice to the Parent Borrower), the cost or other consequences of becoming a Guarantor shall be excessive in view of the benefits to be obtained by the Lenders therefrom. In no event shall (i) the Subsidiary Borrower be an Excluded Subsidiary or (ii) any Subsidiary of the Parent Borrower that is a "Subsidiary Loan Party" (under and as defined in the ABL Credit Agreement to the extent applicable) or that is otherwise a guarantor of, or has otherwise provided security for, the obligations under the ABL Credit Agreement(to the extent applicable) be an Excluded Subsidiary.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by such Recipient's net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed by a jurisdiction as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, such jurisdiction (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the applicable Loan or Commitment (other than an assignee pursuant to an assignment request by the Borrowers under Section 2.17(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.15, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in such Loan or Commitment or to such Lender immediately before it changed its lending office, (c) any Taxes attributable to a Lender's failure to comply with Section 2.15(e) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Exit Conversion" has the meaning set forth in Section 2.22.

"Exit Facility Agreement" means the credit agreement that is approved by the Confirmation Order and entered into on the Conversion Date consistent in all material respects with the terms set forth in the Exit Facility Term Sheet and any related schedules and exhibits attached thereto; *provided*, that such credit agreement shall have been made available to the Administrative Agent and all Lenders; provided, further, that upon the satisfaction of waiver of the conditions contemplated by Section 2.22, each Lender hereunder that is a Lender on the Conversion Date hereby authorizes the Administrative Agent to use its executed signature page to this Agreement as an executed signature page to the Exit Facility Agreement without any further action on the part of any such Lender or any other Person.

UST-0559

"<u>Exit Facility Term Sheet</u>" means the term sheet attached as Exhibit G hereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury regulations or other official administrative interpretations thereof, any agreements entered into pursuant to current Section 1471(b) of the Code (or any amended or successor version described above), and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement between a non-U.S. jurisdiction and the United States of America.

"<u>Federal Funds Effective Rate</u>" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"<u>Financial Officer</u>" means, with respect to any Person, the chief financial officer, principal accounting officer, treasurer, assistant treasurer, chief restructuring officer or controller of such Person.

"<u>Foreign Lender</u>" means a Lender that is not a U.S. Person.

"<u>Foreign Plan</u>" means any defined benefit pension plan, benefit plan, fund (including any superannuation fund) or other similar program that, under the requirements of law of any jurisdiction other than the United States, is required to be funded through a trust or other funding vehicle (other than a trust or funding vehicle or any of the foregoing sponsored or maintained exclusively by a Governmental Authority) and is directly sponsored and maintained by a Loan Party primarily for the benefit of its employees who are employed and residing outside the United States.

"<u>Foreign Subsidiary</u>" means any Subsidiary of the Parent Borrower, other than a Domestic Subsidiary.

"<u>Funding Date</u>" means the date on which the conditions specified in Section 4.02 are satisfied (or waived in accordance with Section 9.02).

"<u>GAAP</u>" means generally accepted accounting principles in the United States of America, applied in accordance with the consistency requirements thereof.

"<u>Governmental Authority</u>" means the government of the United States of America, any other nation or any political subdivision thereof, whether state, local, county, provincial or otherwise, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers

UST-0560

or functions of or pertaining to government (including any supra-national body exercising such powers or functions, such as the European Union or the European Central Bank).

"GS Bank" means Goldman Sachs Bank USA, in its individual capacity, and its successors.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount, as of any date of determination, of any Guarantee shall be the principal amount outstanding on such date of Indebtedness or other obligation guaranteed thereby (or, in the case of (i) any Guarantee the terms of which limit the monetary exposure of the guarantor or (ii) any Guarantee of an obligation that does not have a principal amount, the maximum monetary exposure as of such date of the guarantor under such Guarantee (as determined, in the case of clause (i), pursuant to such terms or, in the case of clause (ii), reasonably and in good faith by a Financial Officer of the Parent Borrower)).

"Guarantors" means each Subsidiary of the Parent Borrower (other than any Excluded Subsidiary), in each case, until any such Subsidiary (other than the Subsidiary Borrower) is released as a Guarantor in accordance with the Loan Documents.

"Hazardous Materials" means any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any applicable Environmental Law, including, without limitation, any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos-containing materials, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances or mold.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person (excluding trade accounts payable incurred in the ordinary course of business), (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (i) current accounts payable incurred in the ordinary course of business, (ii) deferred compensation payable to directors, officers or employees of the Parent Borrower or any Restricted Subsidiary and (iii) any purchase price adjustment or earnout incurred in connection with an acquisition, except to the extent that the amount payable pursuant

18

UST-0561

to such purchase price adjustment or earnout is, or becomes, a liability on the balance sheet of the Parent Borrower in accordance with GAAP), (e) all Capital Lease Obligations and Synthetic Lease Obligations of such Person, (f) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (g) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (h) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed by such Person (but only to the extent of the lesser of (x) the amount of such Indebtedness and (y) the fair market value of such property, if such Indebtedness has not been assumed by such Person), (i) net payments that would have to be made in the event of an early termination in respect of any outstanding Swap Agreement, (j) all obligations of such Persons with respect to the redemption, repayment or repurchase of Disqualified Stock (excluding accrued dividends) and (k) all Guarantees by such Person of Indebtedness of others. The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor by contract, as a matter of law or otherwise as a result of such Person's ownership interest in or other relationship with such other Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. It is acknowledged and agreed that private label and corporate letters of credit issued by the Parent Borrower or any Subsidiary for the making of payment for the purchase of inventory in the ordinary course of business (and in respect of which no financial institution is an issuer thereof or has any disbursement obligations thereunder) do not constitute Indebtedness of the Parent Borrower or such Subsidiary.

"Indemnified Taxes" means (a) all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), all Other Taxes.

"Indemnitee" has the meaning set forth in Section 9.03(b).

"Information" has the meaning set forth in Section 9.12.

"Intercreditor Acknowledgment" means that certain Acknowledgment and Agreement, dated as of the Funding Date, by and among the Administrative Agent, the Pre-Petition Agent, the ABL Agent and the Pre-Petition ABL Agent, and acknowledged by the Loan Parties.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of August 21, 2015, among the Pre-Petition Agent, as term collateral agent, the Pre-Petition ABL Agent, as ABL collateral agent, and acknowledged by the Loan Parties, as may be supplemented and modified by the Intercreditor Acknowledgment, and as may be further amended, amended and restated, supplemented or otherwise modified and in effect from time to time.

"Interest Election Request" means a request by the Borrowers to convert or continue a Borrowing in accordance with Section 2.05, which shall be, in the case of any such written request, in the form of Exhibit E or any other form approved by the Administrative Agent.

LA\4104335.13

UST-0562

"Interest Payment Date" means (a) with respect to any ABR Loan, the first Business Day of each calendar quarter and the Maturity Date applicable to such ABR Loan and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, such day or days prior to the last day of such Interest Period as shall occur at intervals of three months' duration after the first day of such Interest Period and the Maturity Date applicable to such Eurodollar Loan.

"Interest Period" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months (or, with the consent of each Lender participating therein, twelve months) thereafter, as the Borrowers may elect; provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing. For the avoidance of doubt, no Interest Period shall extend beyond the Maturity Date.

"Interpolated Screen Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, a rate *per annum* which results from interpolating on a linear basis between (a) the Screen Rate for the longest maturity for which a Screen Rate is available that is shorter than such Interest Period and (b) the Screen Rate for the shortest maturity for which a Screen Rate is available that is longer than such Interest Period, in each case at 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"Investment" means, with respect to a specified Person, any direct or indirect acquisition or investment by such Person in any other Person, in the form of (a) the purchase or other acquisition (including without limitation by merger or otherwise) of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person  or (c) the purchase or other acquisition (in one transaction or a series of transactions, including without limitation by merger or otherwise) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, division, product or line of business of such Person.  For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made), without adjustment for subsequent changes in the value of such Investment, net of any cash return representing a return of capital with respect to such Investment.

"IRS" means the United States Internal Revenue Service.

UST-0563

"<u>Lenders</u>" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that shall have ceased to be a party hereto pursuant to an Assignment and Assumption.

"<u>LIBO Rate</u>" means, with respect to any Eurodollar Borrowing for any Interest Period, a rate *per annum* equal to the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for deposits in dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period as displayed on the applicable Bloomberg screen page that displays such rate (or, in the event such rate does not appear the applicable Bloomberg screen page, on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion) at 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period (the "<u>Screen Rate</u>"). If no Screen Rate shall be available for a particular Interest Period but Screen Rates shall be available for maturities both longer and shorter than such Interest Period, then the LIBO Rate for such Interest Period shall be the Interpolated Screen Rate. Notwithstanding the foregoing, if the LIBO Rate, determined as provided above in this definition, would be less than zero, the LIBO Rate shall for all purposes of this Agreement be zero.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, charge, security interest or other encumbrance in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"<u>Liquidity</u>" means, at any time, the sum of, without duplication, (a) Availability (as defined in the Pre-Petition ABL Credit Agreement as in effect on the date hereof or, to the extent applicable, the ABL Credit Agreement as in effect on the Funding Date), (b) unrestricted cash and cash equivalents of the Parent Borrower and its Restricted Subsidiaries that would be reflected on a consolidated balance sheet of the Parent Borrower in accordance with GAAP on such date (other than the cash proceeds of any Indebtedness being incurred on such date) and (c) cash and cash equivalents of the Parent Borrower and its Restricted Subsidiaries (excluding, for the avoidance of doubt, Eligible Pledged Cash (as defined in the Pre-Petition ABL Credit Agreement as in effect on the date hereof or, to the extent applicable, the ABL Credit Agreement, as in effect on the Funding Date) to the extent duplicative) that are restricted in favor of the Administrative Agent or any Lender (or, the Pre-Petition ABL Agent or, to the extent applicable, the ABL Agent, for the benefit of the Administrative Agent pursuant to the Intercreditor Agreement) (which cash and cash equivalents may also secure other Indebtedness together with the Loan Document Obligations).

"<u>Loan Document Obligations</u>" means all unpaid principal of and accrued and unpaid interest on the Loans, all accrued and unpaid fees, premiums (including the Redemption Premium, if any) and all expenses, reimbursements, indemnities and other obligations of the Loan Parties to any Lender, the Administrative Agent, or any Indemnitee arising under the Loan Documents, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees,

UST-0564

premiums (including the Redemption Premium, if any), costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any bankruptcy or insolvency laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, premiums (including the Redemption Premium, if any), costs, expenses and indemnities are allowed claims in such proceeding.

"<u>Loan Documents</u>" means this Agreement, the Commitment Letter, the Collateral Agreement, the Control Agreement with respect to the DIP Accounts, the other Collateral Documents, the Intercreditor Agreement, the Intercreditor Acknowledgment, the Administrative Agent Fee Letter, the Order and, except for purposes of Section 9.02, any promissory notes delivered pursuant to Section 2.07(e).

"<u>Loan Parties</u>" means the Borrowers and the Guarantors.

"<u>Loans</u>" means the loans made by the Lenders to the Borrowers pursuant to this Agreement.

"<u>Luxembourg IP Subsidiary</u>" means each of (i) AnnTaylor Loft GP Lux S.à.rl. and (ii) AnnTaylor Loft Borrower Lux SCS.

"<u>Material Adverse Effect</u>" means a material adverse effect on (a) the results of operations, assets, business or financial condition of the Parent Borrower and the Restricted Subsidiaries, taken as a whole, excluding in any event (i) the effect of filing the Cases, the events and conditions leading up to and customarily resulting from the commencement and continuation of the Cases, the effects thereof and any action required to be taken under the Loan Documents or the Order and the Cases themselves, (ii) any matters publicly disclosed prior to the filing of the Cases and (iii) any matters or transactions disclosed, contemplated or required to be taken in any "first day" or "second day" orders, motions related thereto or in any supporting declarations thereof, (b) the ability of the Loan Parties to perform any of their monetary obligations under the Loan Documents to which it is a party or (c) the rights of or benefits available to the Administrative Agent or the Lenders under the Loan Documents; provided that in determining whether a "material adverse effect" has occurred or exists under clause (a) hereof, the impacts of COVID-19 on the results of operations, assets, business or financial condition of the Parent Borrower and the Restricted Subsidiaries will be disregarded (provided that this exception shall not apply to the extent that it is materially disproportionately adverse to the Parent Borrower and its Restricted Subsidiaries, taken as a whole, as compared to other companies in the same industry in which the Parent Borrower and its Restricted Subsidiaries operate).

"<u>Material Indebtedness</u>" means Indebtedness (other than the Loans and Guarantees under the Loan Documents), or obligations in respect of one or more Swap Agreements, of any one or more of the Parent Borrower and the Subsidiaries in an aggregate principal amount exceeding $10,000,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Parent Borrower or any Restricted Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Parent Borrower or such Restricted Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

UST-0565

"Maturity Date" means the date that is the earliest of (i) six months after the Effective Date, (ii) the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of an Acceptable Plan, (iii) the date the Court converts any of the Cases to a Chapter 7 case, (iv) the date the Court dismisses any of the Cases, (v) the date on which the Loan Parties consummate a sale of all or substantially all of the assets of the Loan Parties pursuant to section 363 of the Bankruptcy Code or otherwise, and (vi) such earlier date on which the Loans shall become due and payable by acceleration or otherwise in accordance with the terms of this Agreement and the other Loan Documents.

"Maximum Rate" has the meaning set forth in Section 9.15.

"MNPI" means material information concerning the Parent Borrower, any Subsidiary or any Affiliate of any of the foregoing or their securities that has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD under the Securities Act and the Exchange Act. For purposes of this definition, "material information" means information concerning the Parent Borrower or its Subsidiaries, or any of their respective securities, that would reasonably be expected to be material for purposes of the United States federal and state securities laws.

"Moody's" means Moody's Investors Service, Inc., and any successor to its rating agency business.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA that is or was, during the past six years, maintained or sponsored by any Loan Party or ERISA Affiliate or to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the past six years has made or been obligated to make contributions, in each case, if a liability to a Loan Party remains outstanding.

"Net Proceeds" means, with respect to any event, (a) the cash (which term, for purposes of this definition, shall include Cash Equivalents) proceeds (including, in the case of any casualty, condemnation or similar proceeding, insurance, condemnation or similar proceeds) received in respect of such event, including any cash received in respect of any noncash proceeds, but only as and when received, net of (b) the sum, without duplication, of (i) all actual fees and out-of-pocket expenses paid in connection with such event by the Parent Borrower and the Restricted Subsidiaries to Persons that are not Affiliates of the Parent Borrower or any Restricted Subsidiary, (ii) in the case of a sale, transfer or other disposition (including pursuant to a Sale/Leaseback Transaction or a casualty or a condemnation or similar proceeding) of an asset, the amount of all payments required to be made by the Parent Borrower and the Restricted Subsidiaries as a result of such event to repay Indebtedness (other than Loans and Indebtedness under the ABL Credit Agreement) secured by such asset on a basis prior to the Liens, if any, on such assets securing the Loan Document Obligations and (iii) the amount of all taxes paid (or reasonably estimated to be payable) by the Parent Borrower and the Restricted Subsidiaries, and the amount of any reserves established by the Parent Borrower and the Restricted Subsidiaries in accordance with GAAP to fund purchase price adjustment, indemnification and similar contingent liabilities (other than any earnout obligations) reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to the occurrence of such event (as determined reasonably and in good faith

23

UST-0566

by the chief financial officer of the Parent Borrower).  For purposes of this definition, in the event any contingent liability reserve established with respect to any event as described in clause (b)(iii) above shall be reduced, the amount of such reduction shall, except to the extent such reduction is made as a result of a payment having been made in respect of the contingent liabilities with respect to which such reserve has been established, be deemed to be receipt, on the date of such reduction, of cash proceeds in respect of such event.

"New Money Commitment" means as to each Lender, its obligation to make a New Money Loan to Borrowers hereunder, expressed as an amount representing the maximum principal amount of New Money Loans to be made by such Lender under this Agreement, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption substantially in the form of Exhibit A hereto.  The amount of each Lender's New Money Commitment is set forth on Schedule 2.01 under the caption "New Money Loans" or, otherwise, in the Assignment and Assumption pursuant to which such Lender shall have assumed its New Money Commitment, as the case may be.  The aggregate amount of the New Money Commitments on the date hereof is $150 million.

"New Money Loans" means the loans made pursuant to Section 2.01(a).

"OFAC" means the United States Treasury Department Office of Foreign Assets Control.

"Order" means the order of the Court entered in the Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Court, which order shall be satisfactory in form and substance to the Required Lenders, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless Administrative Agent waives such requirement), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Required Lenders, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the Administrative Agent's and the Lenders' claims.

"Other Connection Taxes"  means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under , engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, excluding any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.17).

24

UST-0567

"Parent Borrower" has the meaning set forth in the introductory paragraph hereto.

"Participant Register" has the meaning set forth in Section 9.04(c)(ii).

"Participants" has the meaning set forth in Section 9.04(c)(i).

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub.L. No. 107-56 (signed into law October 26, 2001)).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"Permitted Encumbrances" means:

      (a)      Liens imposed by law for Taxes that are not yet delinquent or are being contested in compliance with Section 5.06;

      (b)      carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law (other than any Lien imposed pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code), arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.06;

      (c)      pledges and deposits made (i) in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations and (ii) in respect of letters of credit, bank guarantees or similar instruments issued for the account of the Parent Borrower or any Restricted Subsidiary in the ordinary course of business supporting obligations of the type set forth in clause (i) above or reimbursement or indemnification obligations to insurance carriers providing property, casualty or liability insurance to the Parent Borrower and its Restricted Subsidiaries;

      (d)      pledges and deposits made to secure the performance of bids, trade contracts (other than Indebtedness for borrowed money), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

      (e)      judgment liens in respect of judgments that do not constitute an Event of Default under clause (k) of Article VII;

      (f)      easements, zoning restrictions, rights-of-way, site plan agreements, development agreements, operating agreements, cross-easement agreements, reciprocal easement agreements and other encumbrances and exceptions to title on real property that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Parent Borrower or any Restricted Subsidiary or the ordinary operation of such real property;

LA\4104335.13

UST-0568

(g)     customary rights of setoff upon deposits of cash in favor of banks and other depository institutions and Liens of a collecting bank arising under the UCC in respect of payment items in the course of collection;

(h)     Liens arising from precautionary UCC financing statement filings (or similar filings under applicable law) regarding operating leases or consignments, in each case arising in the ordinary course of business;

(i)     Liens representing any interest or title of a licensor, lessor or sublicensor or sublessor, or a licensee, lessee or sublicensee or sublessee, in the property subject to any lease (other than Capital Lease Obligations), license or sublicense or concession agreement permitted by this Agreement;

(j)     Liens arising in the ordinary course of business in favor of custom and forwarding agents and similar Persons in respect of imported goods and merchandise in the custody of such Persons;

(k)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(l)     Liens or rights of setoff against credit balances of the Parent Borrower or any Restricted Subsidiary with credit card issuers or credit card processors to secure obligations of the Parent Borrower or such Restricted Subsidiary, as the case may be, to any such credit card issuer or credit card processor incurred in the ordinary course of business as a result of fees and chargebacks;

(m)     Liens on Equity Interests of any joint venture (i) securing obligations of such joint venture or (ii) pursuant to the relevant joint venture agreement, in each case in existence on or prior to the Petition Date; and

(n)     other Liens that are contractual rights of set-off;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness, other than Liens referred to in clause (c) above securing letters of credit, bank guarantees or similar instruments.

"Permitted Variance" means, any variance that does not violate Section 6.12(b).

"Person" or "person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the Recitals.

"Plan" means any "employee pension benefit plan," as defined in Section 3(2) of ERISA (other than a Multiemployer Plan or Foreign Plan), (a) that is subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and (b) (i) in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA

LA\4104335.13

UST-0569

and/or (ii) that is or was, within the past six years, maintained or sponsored by any Loan Party or ERISA Affiliate or to which any Loan Party or ERISA Affiliate makes or is obligated to make contributions, or during the past six years, has made or been obligated to make contributions, in each case of (ii) if a liability to a Loan Party remains outstanding.

"Plan of Reorganization" means a plan of reorganization with respect to the Loan Parties and their Subsidiaries pursuant to the Cases.

"Platform" has the meaning set forth in Section 9.01(d).

"Pre-Petition ABL Agent" means JPMorgan Chase Bank, N.A., as administrative agent under the Pre-Petition ABL Credit Agreement.

"Pre-Petition ABL Credit Agreement" means the Amended and Restated ABL Credit Agreement, dated as of August 21, 2015, among the Parent Borrower, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto and the Pre-Petition ABL Agent, as amended, restated, supplemented, modified, renewed, refunded, replaced (whether at maturity or thereafter) or refinanced from time to time in one or more agreements (in each case with the same or new agents, lenders or institutional investors), including any agreement adding or changing the borrower or any guarantor or extending the maturity thereof or otherwise restructuring all or any portion of the Indebtedness thereunder or increasing the amount loaned or issued thereunder or altering the maturity thereof, in each case, through the Petition Date.

"Pre-Petition Agent" means GS Bank, in its capacity as administrative agent under any of the Pre-Petition Loan Documents.

"Pre-Petition Credit Agreement" has the meaning assigned to such term in the Recitals.

"Pre-Petition Indebtedness" means the Indebtedness of the Loan Parties existing prior to the Petition Date and set forth on Schedule 6.01.

"Pre-Petition Lenders" means the lenders under the Pre-Petition Credit Agreement.

"Pre-Petition Lender Obligations" means all "Loan Document Obligations" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Loan Documents" means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Loans" means Pre-Petition Lender Obligations in respect of principal of "Loans" under, and as defined in, the Pre-Petition Credit Agreement and interest, expenses, fees, premium and other sums payable in respect thereof under the Pre-Petition Loan Documents.

"Prepayment Event" means:

27

UST-0570

(a)     any Asset Sale of the type described in clauses (j) and (k) of Section 6.05 unless such disposition results in aggregate Net Proceeds not exceeding $500,000 for any individual transactions or series of related transactions;

(b)     any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any asset of the Parent Borrower or any Restricted Subsidiary resulting in aggregate Net Proceeds exceeding $500,000; or

(c)     the incurrence by the Parent Borrower or any Restricted Subsidiary of any Indebtedness, other than any Indebtedness permitted to be incurred by Section 6.01.

"Prime Rate" means the rate of interest per annum published by The Wall Street Journal, Money Rates Section as the "Prime Rate", as in effect from time to time.  Each change in the Prime Rate shall be effective from and including the date such change is published. If the Wall Street Journal ceases publication of such rate, in such other nationally recognized financial publication of general circulation as the Administrative Agent may designate based on the Administrative Agent's reasonable determination that the rate so published is comparable to the "Prime" rate published in the Wall Street Journal.

"Private Side Lender Representatives" means, with respect to any Lender, representatives of such Lender that are not Public Side Lender Representatives.

"Public Side Lender Representatives" means, with respect to any Lender, representatives of such Lender that do not wish to receive MNPI.

"Recipient" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document.

"Redemption Premium" has the meaning set forth in Section 2.09(e).

"Register" has the meaning set forth in Section 9.04(b)(v).

"Related Lender" means with respect to any Person, an Affiliate or any fund, account or investment vehicle that is controlled, managed, advised or sub-advised by such Person, an Affiliate or the same investment manager, advisor or sub-advisor as such Person or an Affiliate of such investment manager, advisor or sub-advisor.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and of such Person's Affiliates.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the Environment or within or upon any building, structure, facility or fixture.

UST-0571

"Required Lenders" means, at any time, Lenders having aggregate Loans (or, prior to the borrowing hereunder on the date hereof, Commitments) representing more than 50.01% of the aggregate principal amount of the Loans (or, prior to the borrowing hereunder on the date hereof, the aggregate Commitments) at such time.

"Required Milestones" means the covenants set forth on Schedule 5.11.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Parent Borrower or any Restricted Subsidiary, or any payment or distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, exchange, conversion, cancellation or termination of any Equity Interests in the Parent Borrower or any Restricted Subsidiary.

"Restricted Subsidiary" means any Subsidiary of the Parent Borrower.

"Restructuring Support Agreement" or "RSA" means that certain Restructuring Support Agreement, dated as of July 23, 2020, executed and delivered by the Loan Parties and the other parties thereto, as such agreement may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Roll-up Loans" are the loans made pursuant to Section 2.01(b).

"Roll-up Loans Commitment" means, as to each Lender, its obligation to make a Loan to the Borrower pursuant to Section 2.01(b) in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 (as updated from time to time within [ ] days of the Effective Date) under the caption "Roll-up Loans Commitment", as applicable. The aggregate amount of the Roll-up Loans Commitment on the date hereof is $161.8 million, which amount shall (i) comprise a roll-up and refinancing of the Prepetition Loans approved pursuant to the Order and (ii) be deemed funded by the Lenders pursuant to Section 2.01.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"Sale/Leaseback Transaction" means an arrangement relating to property owned by the Parent Borrower or any Restricted Subsidiary whereby the Parent Borrower or such Restricted Subsidiary sells or transfers such property to any Person and the Parent Borrower or any Restricted Subsidiary leases such property, or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, from such Person or its Affiliates.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of Designated Persons maintained by OFAC, the U.S. Department of State, or by the United Nations Security Council, the European Union or any EU member state, (b) any Person

29

UST-0572

operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any Person or Persons described in the preceding clauses (a) and (b).

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"Screen Rate" has the meaning assigned to it in the definition of "LIBO Rate."

"SEC" means the United States Securities and Exchange Commission.

"Secured Parties" means (a) the Administrative Agent, (b) [reserved], (c) the Lenders, (d) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (e) the permitted successors and assigns of the foregoing.

"Securities Act" means the United States Securities Act of 1933.

"Specified Dispositions" means (i) the closure, sale, transfer or disposition of the Loan Parties' or their Subsidiaries' stores, leases, warehouses, distribution centers and other real property (and all fixtures and equipment in each case in connection therewith), (ii) bulk sales or other dispositions of inventory or equipment of the Loan Parties' or their Subsidiaries' and (iii) termination of leases, licenses, subleases or sublicenses, in each case, in connection therewith; provided that such Specified Dispositions are identified in writing by the Parent Borrower to the Required Lenders and agreed to by the Required Lenders, in their reasonable discretion on or prior to the Effective Date and as may be updated, supplemented or modified from time to time, as agreed to by the Required Lenders in their reasonable discretion.

"Specified Indebtedness" means any Subordinated Indebtedness and any unsecured Indebtedness or any secured Indebtedness that is not secured on a pari passu basis with the Loan Document Obligations; provided that, Indebtedness under the ABL Credit Agreement, to the extent applicable, shall constitute Specified Indebtedness solely for purposes of Section 6.08(c).

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves), expressed as a decimal, established by the Board of Governors to which the Administrative Agent is subject for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board of Governors). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subordinated Indebtedness" of a Person means any Indebtedness of such Person which is subordinated in right of payment to the Loan Document Obligations.

LA\4104335.13

UST-0573

"subsidiary" means, with respect to any Person (the "parent") at any date, (a) any Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date and (b) any other Person (i) of which Equity Interests representing more than 50% of the equity value or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (ii) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any direct or indirect subsidiary of the Parent Borrower (including, for the avoidance of doubt, the Subsidiary Borrower).

"Subsidiary Borrower" has the meaning set forth in the introductory paragraph hereto.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Parent Borrower or any Subsidiary shall be a Swap Agreement.

"Synthetic Lease" means, as to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for US federal income tax purposes, other than any such lease under which such Person is the lessor.

"Synthetic Lease Obligations" means, as to any Person, an amount equal to the sum, without duplication, of (a) the obligations of such Person to pay rent or other amounts under any Synthetic Lease which are attributable to principal and (b) the amount of any purchase price payment under any Synthetic Lease assuming the lessee exercises the option to purchase the leased property at the end of the lease term.  For purposes of Section 6.02, a Synthetic Lease Obligation shall be deemed to be secured by a Lien on the property being leased and such property shall be deemed to be owned by the lessee.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Credit Facility" has the meaning set forth in the Recitals.

"Term Lender" means a Lender with a Commitment or an outstanding Term Loan.

"Term Loan" means a Loan made pursuant to Section 2.01.

"Term Priority Collateral" has the meaning set forth in the Intercreditor Agreement.

LA\4104335.13

UST-0574

"Transactions" means (a) the execution, delivery and performance by the Loan Parties of this Agreement, the borrowing of the Term Loans and the use of the proceeds thereof, (b) to the extent applicable, the execution, delivery and performance by the Loan Parties of the ABL Credit Agreement, (c) the creation and perfection of the security interests provided for in the Collateral Documents, and (d) the payment of all fees, commissions, costs and expenses in connection with the foregoing.

"Type" when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the perfection of security interests created by the Collateral Documents.

"U.S. Person" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning set forth in Section 2.15(e)(ii)(B)(3).

"U.S. Trustee" means the United States Trustee applicable in the Cases.

"Variance Report" shall have the meaning assigned to such term in Section 5.01(g).

"Variance Report Date" shall have the meaning assigned to such term in Section 5.01(g).

"Variance Testing Period" shall mean the four-week calendar period up to and through the Saturday of the week most recently ended prior to the applicable Variance Report Date (provided that, the first Variance Testing Period shall include the entire period from the Petition Date through the Saturday of the week most recently ended prior to the applicable Variance Testing Period).

"wholly-owned" when used in reference to a subsidiary of any Person, means that all the Equity Interests in such subsidiary (other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable law) are owned, beneficially and of record, by such Person, another wholly-owned subsidiary of such Person or any combination thereof.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

UST-0575

SECTION 1.02.   Classification of Loans and Borrowings.  For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Type.

SECTION 1.03.   Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all real and personal, tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply), and all judgments, orders, writs and decrees, of all Governmental Authorities.  Except as otherwise provided herein and unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document (including this Agreement and the other Loan Documents) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), and all references to any statute shall be construed as referring to all rules, regulations, rulings and official interpretations promulgated or issued thereunder, (c) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof and (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement.

SECTION 1.04.   Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature used herein shall be construed in accordance with GAAP as in effect from time to time; provided that (a) if the Parent Borrower notifies the Administrative Agent in writing (including via e-mail) that the Borrowers request an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrowers that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith; provided that the Borrowers, on the one hand, and the Lenders, on the other hand, agree to negotiate in good faith with respect to any proposed amendment to eliminate or adjust for the effect of any such change in GAAP; and (b) notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed,

LA\4104335.13

UST-0576

and all computations of amounts and ratios referred to herein shall be made, without giving effect to (i) any election under Statement of Financial Accounting Standards 159, The Fair Value Option for Financial Assets and Financial Liabilities, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of the Parent Borrower or any Restricted Subsidiary at "fair value," as defined therein, and (ii) any change in GAAP occurring after July 24, 2015 as a result of the adoption of any proposals set forth in the Proposed Accounting Standards Update, Leases (Topic 840), issued by the Financial Accounting Standards Board on August 17, 2010, or any other proposals issued by the Financial Accounting Standards Board in connection therewith, in each case if such change would require treating any lease (or similar arrangement conveying the right to use) as a capital lease where such lease (or similar arrangement) was not required to be so treated under GAAP as in effect on July 24, 2015.

SECTION 1.05.    Classification of Actions.  For purposes of determining compliance at any time with the covenants set forth in Section 6.01 and Section 6.02 (or, in each case, any defined terms used therein), in the event that the subject transaction meets the criteria of more than one of the categories of transactions permitted pursuant to the Sections (or related defined terms) in Section 6.01 and Section 6.02, the Borrowers may, in their sole discretion, classify the applicable transaction (or any portion thereof) under such Section (or defined term); it being understood that (i) the Borrowers may divide and include such transaction under one or more of the clauses of such Section (or any relevant portion thereof or of the applicable related defined term) that permit such transaction, but will not be permitted to later reclassify such transaction and (ii) notwithstanding anything in this Section 1.05 to the contrary for purposes of this Agreement, (x) Indebtedness incurred under the Pre-Petition ABL Credit Agreement and, to the extent applicable, the ABL Credit Agreement shall only be permitted to be incurred or be outstanding under Section 6.01(j) and (y) Indebtedness uncured under the Loan Documents or the Pre-Petition Loan Documents shall only be permitted to be incurred or be outstanding under Section 6.01(a).

SECTION 1.06.    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

ARTICLE II

The Credits

SECTION 2.01.    Commitments.

(a)    Subject to the terms and conditions set forth herein and in the Order, each Lender severally and not jointly agrees to make, on the Funding Date, Loans to the Borrowers in an aggregate amount not to exceed such Lender's New Money Commitment.  The New Money Commitments in respect of the New Money Loans shall terminate automatically immediately

LA\4104335.13

UST-0577

after the making of the New Money Loans on the Funding Date.  Proceeds of the New Money Loans shall be deposited in the DIP Funding Account and used solely as permitted herein.

(b)     Subject to the terms and conditions set forth herein and in the Order, each Lender severally and not jointly agrees to make or be deemed to have made on the Effective Date, Loans to the Borrower in the aggregate amount of the Roll-up Loans Commitment.  The Administrative Agent, the Lenders and the Loan Parties each acknowledges and agrees that the Roll-up Loans Commitment shall expire upon the deemed funding of the Roll-up Loans on the Effective Date.[5]

SECTION 2.02.    Loans and Borrowings.

(a)     Each Loan shall be made as part of a Borrowing consisting of Loans of the same Type made by the Lenders ratably in accordance with their respective Commitments.

(b)     Subject to Section 2.12, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrowers may request in accordance herewith.  Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrowers to repay such Loan in accordance with the terms of this Agreement.

(c)     At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate principal amount that is an integral multiple of $1,000,000 and not less than $5,000,000; provided that a Eurodollar Borrowing that results from a continuation of an outstanding Eurodollar Borrowing may be in an aggregate amount that is equal to such outstanding Borrowing.  At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate principal amount that is an integral multiple of $500,000 and not less than $1,000,000.  Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of six (or such greater number as may be agreed to by the Administrative Agent) Eurodollar Borrowings outstanding.

(d)     Notwithstanding any other provision of this Agreement, the Borrowers shall not be entitled to request, or to elect to convert to or continue, any Eurodollar Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date applicable thereto.

SECTION 2.03.    Requests for Borrowings.  To request a Borrowing, the Borrowers deliver to the Administrative Agent a Borrowing Request  (delivered by e-mail, hand or facsimile) (a) in the case of a Eurodollar Borrowing, not later than 12:00 p.m., New York City time, three Business Days before the date of the proposed Borrowing (or, such shorter period of time as may be agreed to by the Administrative Agent) or (b) in the case of an ABR Borrowing, not later than 12:00 p.m., New York City time, one Business Day before the date of the proposed Borrowing.  Each written Borrowing Request shall specify the following information in compliance with Section 2.02:

---

[5] Roll-Up Loan funding mechanics to be confirmed.

35

UST-0578

      (i)      the aggregate amount of such Borrowing;

      (ii)      the date of such Borrowing, which shall be a Business Day;

      (iii)      whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

      (iv)      in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

      (v)      the location, number of the account and any other wiring information required by the Administrative Agent of the Borrowers to which funds are to be disbursed.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration. Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04.    <u>Funding of Borrowings</u>.

(a)    Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 2:00 p.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. Upon receipt of all requested funds, the Administrative Agent will make such Loans available to the Borrowers by promptly remitting the amounts so received, in like funds, by wire transfer to the DIP Funding Account.

(b)    Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, but shall have no obligation to, in reliance on such assumption, make available to the Borrowers a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (i) in the case of a payment to be made by such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of a payment to be made by the Borrowers, the interest rate applicable to ABR Loans. If the Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period. If such Lender pays such amount

36

UST-0579

to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrowers shall be without prejudice to any claim any Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

SECTION 2.05.    Interest Elections.

(a)      Each Borrowing initially shall be of the Type and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in the applicable Borrowing Request or as otherwise provided in Section 2.03.  Thereafter, the Borrowers may elect to convert such Borrowing to a Borrowing of a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section.  The Borrowers may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)      To make an election pursuant to this Section, the Borrowers shall notify the Administrative Agent of such election in writing by delivering (by e-mail, hand delivery or facsimile) an Interest Election Request to the Administrative Agent by the time that a Borrowing Request would be required under Section 2.03 if the Borrowers were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such Interest Election Request shall be irrevocable.  Each written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)      the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)      the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)      whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)      if the resulting Borrowing is to be a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration.

(c)      Promptly following receipt of an Interest Election Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

LA\4104335.13

UST-0580

(d)     If the Borrowers fail to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be continued as a Eurodollar Borrowing for an additional Interest Period of one month. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing with respect to any Borrower, or if any other Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, has notified the Borrowers of the election to give effect to this sentence on account of such Event of Default, then, so long as such Event of Default is continuing, (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.06.     Termination of Commitments.

(a)     Unless previously terminated, the Commitments of each Lender shall automatically terminate and permanently reduce to $0 upon the making of such Lender's Loans pursuant to Section 2.01(a) and (b), as applicable.

SECTION 2.07.     Repayment of Loans; Evidence of Debt.

(a)     The Borrowers hereby unconditionally, jointly and severally, promise to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender as provided in Section 2.08.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any conflict between the accounts maintained pursuant to paragraph (b) or (c) of this Section, the accounts maintained by the Administrative Agent shall, absent manifest error, control.

(e)     Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrowers shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its

38

UST-0581

registered assigns) substantially in the form of Exhibit K attached hereto.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

SECTION 2.08.    Amortization of Term Loans.

(a)    [Reserved]

(b)    To the extent not previously paid, all Term Loans shall be due and payable on the Maturity Date.

(c)    [Reserved]

(d)    Prior to any repayment of any Borrowings under this Section, the Borrowers shall notify the Administrative Agent in writing of such selection not later than 12:00 p.m., New York City time, three Business Days before the scheduled date of such repayment.  Administrative Agent shall promptly notify each Lender of such repayment notification. Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing.  Repayments of Borrowings shall be accompanied by accrued interest (and premium, if any) on the amounts repaid.

SECTION 2.09.    Prepayment of Loans.

(a)    Subject to the Order and the Intercreditor Agreement, in the event that any Net Proceeds are received by or on behalf of the Parent Borrower or any Restricted Subsidiary in respect of an Asset Sale of all or substantially all of the assets of the Company and its Restricted Subsidiaries, the Borrowers shall, within three Business Days after such Net Proceeds are received, prepay Borrowings in an amount equal to 100% of such Net Proceeds subject to the requirements of Section 2.09(e), with application to the Loan Document Obligations set forth in Section 2.09(d) below; provided that any Net Proceeds in respect of ABL Priority Collateral received by the Borrowers or any Restricted Subsidiary as a result of such Asset Sale shall be applied in accordance with the Order and the Intercreditor Agreement, as applicable.

(b)    Subject to the Order and the Intercreditor Agreement, in the event and on each occasion that any Net Proceeds are received by or on behalf of the Parent Borrower or any Restricted Subsidiary in respect of any Prepayment Event (other than an Asset Sale of all or substantially all of the assets of the Company and its Restricted Subsidiaries), the Borrowers shall, on the day such Net Proceeds are received (or, in the case of a Prepayment Event described in clause (a) or (b) of the definition of "Prepayment Event," within three Business Days after such Net Proceeds are received), be deposited into the Asset Sale Escrow Account and held in the Asset Sale Escrow Account in accordance with clause (c) below; provided that in the case of a Prepayment Event described in clauses (a) or (b) of the definition thereof, any Net Proceeds in respect of ABL Priority Collateral received by the Borrowers or any Restricted Subsidiary as a result of such Prepayment Event shall be applied in accordance with the Order and the Intercreditor Agreement, as applicable.

39

UST-0582

(c) Net Proceeds received in connection with any Prepayment Event described in clause (a) or (b) of the definition of "Prepayment Event" (other than an Asset Sale of all or substantially all of the assets of the Company and its Restricted Subsidiaries), and solely to the extent that such Net Proceeds in respect of the applicable Asset Sale constitute Term Priority Collateral, shall be deposited into the Asset Sale Escrow Account. Notwithstanding anything to the contrary herein, Net Proceeds of any Asset Sale held in the Asset Sale Escrow Account may be used solely, (i) prior to the occurrence of the Conversion Date, to prepay the Loan Document Obligations (including, for the avoidance of doubt, the Redemption Premium) in full in cash (including, for the avoidance of doubt, on the Maturity Date) and (ii) upon the occurrence of the Conversion Date, as directed by the Borrowers.

(d) Any optional or mandatory prepayment of Borrowings under this Section, shall be applied to reduce the principal amount of the Term Loans to be repaid on the Maturity Date. Notwithstanding the foregoing, any Lender may elect, by written notice to the Administrative Agent by not later than 3:00 p.m. New York City time, two Business Days (or such shorter period as may be established by the Administrative Agent) prior to the required prepayment date, to decline all or any portion of any prepayment of its Loans pursuant to this Section (other than an optional prepayment pursuant to paragraph (a) of this Section or a prepayment pursuant to clause (c) of the definition of "Prepayment Event," which may not be declined), in which case the aggregate amount of the payment that would have been applied to prepay Loans but was so declined shall *first*, be offered to Lenders who did not decline its pro rata share of the prepayment who may elect by written notice to the Administrative Agent by not later than 3:00 p.m. New York City time, one Business Day prior to the required prepayment date, to decline all or any portion of such offered prepayment amount and *second*, if declined by such Lenders, may be retained by the Borrowers and shall constitute "Declined Proceeds." For the avoidance of doubt, a Lender shall be deemed to have accepted any prepayment amount offered under this paragraph (d) is such Lender does not deliver a written notice to the Administrative Agent rejecting such prepayment amount in accordance with this paragraph (d).

(e) In the event that all or any portion of the Loans are repaid or prepaid as a result of (i) [reserved], (ii) a mandatory prepayment pursuant to Section 2.09(a), solely as a result of an Asset Sale of all or substantially all of the assets of the Parent Borrower and its Restricted Subsidiaries (which, for the avoidance of doubt, includes the "Premium" and "Lane Bryant" business lines) or (iii) the repayment of the Loans on the Maturity Date, in each case prior to or without the occurrence of the Conversion Date, such repayments or prepayments will include a premium in an aggregate amount equal to 11.23% of the amount of the loans so prepaid or repaid (the foregoing premium, the "Redemption Premium").

(f) The Borrowers shall notify the Administrative Agent in writing of any optional prepayment and, to the extent practicable, any mandatory prepayment hereunder by Borrowing, not later than 12:00 p.m., New York City time, three Business Days before the date of such prepayment. Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; provided that a notice of prepayment of Borrowings pursuant to paragraph (a) of this Section may state that such notice is conditioned upon the occurrence of one or more events specified therein, in which case such notice may be revoked by the Parent Borrower (by notice to the

LA\4104335.13

UST-0583

Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest as required by Section 2.11.

(g)     Notwithstanding any provisions of this Section 2.09 to the contrary, if any prepayment would otherwise be required to be made pursuant to clause (b) of this Section 2.09, solely as it relates to the portion of such Net Proceeds generated outside of the United States, so long as (x) the applicable local law will not permit repatriation of such Net Proceeds to the United States or (y) material adverse tax consequences to the Parent Borrower or any of its Subsidiaries would result from such repatriation, such Net Proceeds so affected shall not be required to be included in the mandatory prepayments referred to in such clause (b).

SECTION 2.10.    Closing Payments, Premiums and Fees.

(a)     The Borrowers agree, jointly and severally, to pay (or cause to be paid) on the Funding Date to each Lender, a closing payment in an amount equal to 2.50% of the aggregate principal amount of such Lender's New Money Loan, which such payment may be treated as original issue discount. The premium referenced in this clause (a) shall be fully earned on the Effective Date and due and payable in full on the date set forth above.

(b)     The Borrowers agree, jointly and severally, to pay (i) to the Administrative Agent, for its own account, fees and expenses in the amounts and payable at the times and in the manner set forth  in the Administrative Agent Fee Letter, (ii) to the Backstop Lenders, for their own account, premiums in amounts and payable at the times separately agreed upon in the Commitment Letter and (iii) to the Lenders, for their own account, premiums in amounts and payable at the times separately agreed upon in the RSA.

(c)     All amounts payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, in the case of closing payments, to the Term Lenders entitled thereto. Amounts paid shall not be refundable under any circumstances (absent manifest error in the amount paid).

SECTION 2.11.    Interest.

(a)     The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)     The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)     During the continuance of an Event of Default (i) under clauses (a) or (b) of Article VII, the Borrowers shall pay interest on such past due amounts (after giving effect to any

41

UST-0584

applicable grace period) owing by the Borrowers hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable laws and (ii) under any other clause of Article VII, the Borrowers shall pay interest on all outstanding Loan Document Obligations owing by the Borrowers hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable laws. Accrued and unpaid interest on such amounts (including interest on past due interest) shall be due and payable upon written demand.

(d)    Accrued interest on each Loan (for ABR Loans, accrued through the last day of the prior calendar quarter) shall be payable in arrears on each Interest Payment Date for such Loan; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)    All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.12.   Alternate Rate of Interest.  (i) If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)    the Administrative Agent determines in good faith (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(b)    the Administrative Agent is advised in writing by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Eurodollar Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrowers and the Lenders as promptly as practicable and, until the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist (which notification shall be made promptly after the Administrative Agent obtains knowledge of the cessation of such circumstances), (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective, and such Borrowing shall be continued as an ABR Borrowing, and (ii) any Borrowing Request for a Eurodollar Borrowing shall be treated as a request for an ABR Borrowing.

LA\4104335.13

UST-0585

(ii) If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in paragraph (i)(a) of this Section have arisen (including because the Screen Rate is not available or published on a current basis) and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in paragraph (i)(a) of this Section have not arisen but the supervisor for the administrator of the Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the Screen Rate shall no longer be used for determining interest rates for loans, then the Administrative Agent and the Company shall endeavor to establish an alternate rate of interest to the Adjusted LIBO Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans denominated in dollars in the United States at such time, and the Administrative Agent and the Company shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable; provided that if such alternate rate of interest shall be less than 1.00%, such rate shall be deemed to be 1.00% for all purposes of this Agreement. Such amendment shall become effective with the prior consent of the Required Lenders and without any further action or consent of any other party to this Agreement. Until an alternate rate of interest shall be determined in accordance with this paragraph (but, in the case of the circumstances described in clause (ii) above, only to the extent the Screen Rate for such Interest Period is not available or published at such time on a current basis), (x) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Term Loan Borrowing shall be ineffective, and such Borrowing shall be continued as an ABR Term Loan Borrowing, and (y) any Borrowing Request for a Eurodollar Term Loan Borrowing shall be treated as a request for an ABR Term Loan Borrowing.

SECTION 2.13. Increased Costs.

(a) If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii) impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Eurodollar Loans made by such Lender; or

(iii) subject any Recipient to any Taxes (other than any (A) Indemnified Taxes or (B) Excluded Taxes) on or with respect to its loans, loan principal, letters of credit, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender or other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount)

43

LA\4104335.13

UST-0586

then, from time to time upon request of such Lender or other Recipient, the Borrowers will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs or expenses incurred or reduction suffered.  Notwithstanding the foregoing, if the Parent Borrower reasonably believes that any such Taxes were not correctly or legally asserted, the applicable Recipient will use commercially reasonable efforts to cooperate with the Parent Borrower to obtain a refund of such Taxes so long as such efforts would not, in the sole determination of such Recipient exercised in good faith result in any non-reimbursable additional costs, expenses or risks or be otherwise disadvantageous to it.

(b)     If any Lender determines that any Change in Law regarding capital or liquidity requirements has had or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity), then, from time to time upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company as well as a reasonably detailed description of the occurrence giving rise to such event, as the case may be, as specified in paragraph (a) or (b) of this Section delivered to the Borrowers shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 10 Business Days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs or expenses incurred or reductions suffered more than 180 days prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or expenses or reductions and of such Lender's or intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or expenses or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)     Notwithstanding the above, a Lender will not demand compensation for any increased cost or reduction set forth in this Section 2.13 at any time if it is not the general practice and policy of such Lender to demand such compensation from similarly situated borrowers in similar circumstances under agreements containing provisions permitting such compensation to be claimed at such time.

SECTION 2.14.   Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan

44

UST-0587

other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.09(f) and is revoked in accordance therewith) or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrowers pursuant to Section 2.17, then, in any such event, the Borrowers shall compensate each Lender for the loss, cost and expense (excluding any loss of margin) attributable to such event.  Such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan (but not including the Applicable Rate applicable thereto), for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate such Lender would bid if it were to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the London interbank market.  A certificate of any Lender delivered to the Borrowers and setting forth and explaining in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

SECTION 2.15.   Taxes.

(a)   Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by any applicable withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.15) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)   Payment of Other Taxes by the Loan Parties.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the, option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)   Evidence of Payment.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.15, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

LA\4104335.13

UST-0588

(d)      Indemnification by the Loan Parties.  The Loan Parties shall jointly and severally indemnify each Recipient, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)      Status of Lenders.  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrowers and the Administrative Agent, at the time or times reasonably requested by the Borrowers or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrowers or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.15(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)      Without limiting the generality of the foregoing:

(A)      any Lender that is a U.S. Person shall deliver to the Borrowers and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), whichever of the following is applicable (in such number of copies as shall be requested by the recipient):

(1)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party(x) with respect to payments of interest under any Loan Document, executed

46

UST-0589

copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms) establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI (or any successor forms);

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit H-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Parent Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and that no payments in connection with any Loan Document are effectively connected with the Foreign Lender's conduct of a U.S. trade or business (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms); or

(4)     to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or a participating Lender), executed copies of IRS Form W-8IMY (or any successor forms), accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-2 or H-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be

47

UST-0590

prescribed by applicable law to permit the Borrowers or the Administrative Agent to determine the withholding or deduction required to be made; and

> (D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA and to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered (including any specific documentation required in this Section 2.15(e)) expires or becomes obsolete or inaccurate in any respect, it shall deliver promptly to the Borrowers or Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrowers or the Administrative Agent) or promptly notify the Borrowers and the Administrative Agent in writing of its legal ineligibility to do so.

(f)    Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(c)(ii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (f).

(g)    Treatment of Certain Refunds.  If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes as to which it has been indemnified pursuant to this Section 2.15 (including by the payment of additional amounts pursuant to this Section 2.15), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.15 with respect

to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 2.15(g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 2.15(g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Section 2.15(g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(h)     Defined Terms.  For the avoidance of doubt, for purposes of this Section 2.15, the term "applicable law" includes FATCA.

(i)     Issue Price.  The Borrowers and Administrative Agent shall cooperate in good faith to determine the "issue price" (within the meaning of Section 1273 of the Code) of (i) the Loans and (ii) if the Exit Conversion occurs, the loans under the Exit Facility Agreement and, in either case, shall not take any Tax reporting position inconsistent with such determination, except as otherwise required by a Change in Law or pursuant to the good faith resolution of a Tax contest

(j)     Survival.  Each party's obligations under this Section 2.15 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 2.16.     Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)     The Borrowers shall make each payment required to be made by the Borrowers hereunder or under any other Loan Document on or prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, on or prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without any defense, setoff, recoupment or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to such account as may be specified by the Administrative Agent; provided that payments pursuant to Sections 2.13, 2.14, 2.15 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent shall distribute any such payment received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder or under any other Loan Document shall be due on a day that is not a Business Day, the date for payment shall be

LA\4104335.13

UST-0592

extended to the next succeeding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments under each Loan Document shall be made in dollars.

(b)    If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, premiums and fees then due hereunder, such funds shall be applied towards payment of the amounts then due hereunder ratably among the parties entitled thereto, in accordance with the amounts then due to such parties.

(c)    If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall notify the Administrative Agent of such fact and shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the amount of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amounts of principal of and accrued interest on their Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement (for the avoidance of doubt, as in effect from time to time) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any Person in accordance with the terms of Section 9.04. The Borrowers consent to the foregoing and agree, to the extent the Borrowers may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against any Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrowers in the amount of such participation. For purposes of subclause (b)(i) of the definition of Excluded Taxes, a Lender that acquires a participation pursuant to this Section 2.16(c) shall be treated as having acquired such participation on the earlier date(s) on which such Lender acquired the applicable interest(s) in the Commitment(s) and/or Loan(s) to which such participation relates.

(d)    Unless the Administrative Agent shall have received written notice from the Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, but shall not be obligated to, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

UST-0593

(e)     If any Lender shall fail to make any payment required to be made by it hereunder to or for the account of the Administrative Agent, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations in respect of such payment until all such unsatisfied obligations have been discharged and/or (ii) hold any such amounts in a segregated account as cash collateral for, and apply any such amounts to, any future payment obligations of such Lender hereunder to or for the account of the Administrative Agent.

SECTION 2.17.    Mitigation Obligations; Replacement of Lenders.

(a)     If any Lender requests compensation under Section 2.13, or if the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Section 2.13 or 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby, jointly and severally, agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment and delegation.

(b)     If (i) any Lender requests compensation under Section 2.13, (ii) the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or (iii) any Lender has failed to consent to a proposed amendment, waiver, discharge or termination that under Section 9.02 requires the consent of all the Lenders (or all the affected Lenders) and with respect to which the Required Lenders shall have granted their consent, then the Borrowers may, at the Borrowers' sole expense and effort, upon notice to such Lender and the Administrative Agent by the Borrowers, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights (other than its existing rights to payments pursuant to Section 2.13 or 2.15) and obligations under this Agreement and the other Loan Documents (or, in the case of any such assignment and delegation resulting from a failure to provide a consent, all its interests, rights and obligations under this Agreement and the other Loan Documents as a Lender) to an Eligible Assignee that shall assume such obligations (which may be another Lender, if a Lender accepts such assignment and delegation); provided that (A) the Borrowers shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b)(i), which consent shall not unreasonably be withheld, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the assignee (in the case of such principal and accrued interest and fees) or the Borrowers (in the case of all other amounts), (C) in the case of any such assignment and delegation resulting from a claim for compensation under Section 2.13 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments and (D) in the case of any such assignment and delegation resulting from the failure to provide a consent, the

LA\4104335.13

UST-0594

assignee shall have given such consent and, as a result of such assignment and delegation and any contemporaneous assignments and delegations and consents, the applicable amendment, waiver, discharge or termination can be effected.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver or consent by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation have ceased to apply.  Each party hereto agrees that an assignment and delegation required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrowers, the Administrative Agent and the assignee and that the Lender required to make such assignment and delegation need not be a party thereto.

SECTION 2.18.    [Reserved].

SECTION 2.19.    [Reserved].

SECTION 2.20.    Joint and Several Liability of the Borrowers.  The Loan Document Obligations of the Borrowers shall be joint and several in nature.  Each Borrower hereby irrevocably and unconditionally agrees that it is jointly and severally liable for all Loan Document Obligations of the Borrowers hereunder and the other Loan Documents, whether now or hereafter existing or due or to become due.  The Loan Document Obligations of the Borrowers under the Loan Documents may be enforced by the Administrative Agent and the Lenders against any Borrower or all Borrowers in any manner or order selected by the Administrative Agent or the Required Lenders in their sole discretion.  Without limiting the foregoing provisions of this Section 2.20, each Borrower acknowledges and agrees that:

(a)     its obligations under this Agreement shall remain enforceable against it even though such obligations may be unenforceable or not allowable against any Borrower during the existence of an insolvency proceeding against any Borrower or otherwise;

(b)     its obligations under this Agreement are independent of the obligations of any other Borrower, and a separate action or actions may be brought and prosecuted against it in respect of such obligations irrespective of whether any action is brought against any other Borrower or any other Borrower is joined in any such action or actions;

(c)     it hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any of all of the following: (i) any lack of validity or enforceability of this Agreement or any agreement or instrument relating thereto in respect of any other Borrower; (ii) any change in the time, manner or place of payment of, or in any other term of, all or any of the obligations of any other Borrower under or in respect of this Agreement, or any other amendment or waiver of or any consent to departure from this Agreement, in respect of any other Borrower; (iii) any change, restructuring or termination of the structure or existence of any other Borrower; (iv) the failure of any other person to execute or deliver any other agreement or the release or reduction of liability of any other person with respect to any obligations of the Borrowers under this Agreement; or (v) any other circumstance (including any statute of limitations but other than the Loan Document Obligations having been paid in full) or any existence or reliance on any representation by any other person that might otherwise constitute a defense available to, or a discharge or, any other Borrower;

UST-0595

(d)      its obligations under this Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any such obligations is rescinded or must otherwise be returned by any person upon the insolvency, bankruptcy or reorganization of any other Borrower, all as though such payment had not been made;

(e)      it hereby unconditionally and irrevocably waives any right to revoke its joint and several liability under the Loan Documents and acknowledges that such liability is continuing and applies to all obligations of the Borrowers under the Loan Documents, whether existing now or in the future;

(f)      in any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of the Subsidiary Borrower under this Agreement would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of the any other creditors, on account of the amount of its liability under this Agreement, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Borrower, any Loan Document or any other person be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 2.20(g) and any rights of subrogation, indemnity or reimbursement) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceedings; and

(g)      it hereby agrees that to the extent that any Borrower shall have paid more than its proportionate share of any payment made hereunder, such Borrower shall be entitled to seek and receive contribution from and against any other Borrower hereunder which has not paid its proportionate share of such payment; <u>provided</u> that the provisions of this Section 2.20(g) shall in no respect limit the obligations and liabilities of any Borrower to the Administrative Agent and the Lenders, and each Borrower shall remain liable to the Administrative Agent and the Lenders for the full amount hereunder; <u>provided</u>, however each Borrower agrees that the foregoing rights of contribution as well as any right of subrogation, indemnity or reimbursement that it may acquire or that may arise against any other Borrower due to any payment or performance made under this Agreement shall in all respects be subordinated and junior in right of payment to, and shall not be exercised by such Borrower until, all Loan Document Obligations have been paid in full.

SECTION 2.21.    <u>Super-Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations</u>.

(a)      The priority of Administrative Agent's Liens on the Collateral, claims and other interests shall be as set forth in the Order.

(b)      Upon the maturity (whether by acceleration or otherwise) of any of the Loan Document Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Loan Document Obligations without further application to or order of the Court.

UST-0596

SECTION 2.22.    Conversion to Exit Facility Agreement.  The Loans shall be repaid in cash in accordance with the terms hereunder; *provided* that, notwithstanding the foregoing, upon the satisfaction or waiver by the Required Lenders of each of the conditions set forth in the "Conditions to Borrowings" section of the Exit Facility Term Sheet, automatically and without any further consent or action required by the Administrative Agent, any Lender, or any other Secured Party, the Loans shall be refinanced with loans under the Exit Facility Agreement in accordance with the Exit Facility Term Sheet (the "Exit Conversion").  Upon the Exit Conversion, (i) the Borrowers (or the entities assuming and/or acquiring directly or indirectly the operations and assets of the Borrowers in the Acceptable Plan, and each Guarantor and each entity assuming the operations and assets of each Guarantor that is a Debtor in the Acceptable Plan, to the extent such Person is required under the Exit Facility Term Sheet to continue to be a guarantor thereunder), shall assume all obligations in respect of the Loans hereunder and all other monetary obligations in respect hereof, (ii) each Loan hereunder shall be continued as and converted to a Loan under the Exit Facility Agreement, (iii) each Lender hereunder shall be a Lender under the Exit Facility Agreement and (iv) this Agreement shall terminate and be superseded and replaced in its entirety by, and deemed amended and restated in its entirety in the form of, the Exit Facility Agreement (with such changes and insertions thereto, as are reasonably satisfactory to the Administrative Agent and the Borrower, incorporated as necessary to make any technical changes necessary to effectuate the intent of this Section 2.22 and to make any changes as required in the Exit Facility Term Sheet, including to increase the facility amount and give effect to any "last out" term loans).  Notwithstanding the foregoing, all obligations of the Borrowers and the Guarantors to the Administrative Agent and the Lenders under this Agreement and any other Loan Document which are expressly stated in this Agreement or such other Loan Document as surviving such agreement's termination shall, as so specified, survive without prejudice and remain in full force and effect.  Each of the Loan Parties, the Administrative Agent and the Lenders shall take such actions and execute and deliver such agreements, instruments or other documents as the Administrative Agent may reasonably request to give effect to the provisions of this Section 2.22 and as are required to complete the schedules to the Exit Facility Agreement or other agreements contemplated thereby; *provided*, *however*, that any such action by the Administrative Agent or any of the Lenders shall not be a condition precedent to the effectiveness of the Exit Facility Agreement if and to the extent so provided in the Confirmation Order.  Each Lender hereto hereby agrees that, on the Conversion Date, (i) the Administrative Agent (in its capacity as Administrative Agent under the Exit Facility Agreement) may execute and deliver the Exit Facility Agreement (and any guaranty contemplated thereby) on its own behalf and on behalf of each such Lender and (ii) the Administrative Agent may execute and deliver the security documents contemplated by the Exit Facility Term Sheet. On the Conversion Date, the Administrative Agent shall transfer any amounts remaining in the DIP Accounts to an account designated by the Borrowers.

<div align="center">ARTICLE III</div>

<div align="center">Representations and Warranties</div>

Each Borrower represents and warrants to the Administrative Agent and the Lenders as follows:

<div align="center">54</div>

UST-0597

SECTION 3.01.  Organization; Powers.  The Parent Borrower and each Restricted Subsidiary is duly organized, validly existing and (to the extent the concept is applicable in such jurisdiction and, in the case of any Restricted Subsidiary, except where the failure to be so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect) in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to, subject to the entry of the Order, carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02.  Authorization; Enforceability; Benefit to Loan Parties.

(a)  Subject to entry of the Order, the Transactions, insofar as they are to be carried out by each Loan Party, are within such Loan Party's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational and, if required, shareholder or other equityholder action.  Subject to entry of the Order, this Agreement has been duly executed and delivered by each Borrower and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Borrower or such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(b)  Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lenders to the Borrowers hereunder.  Each Loan Party has determined that, subject to entry of the Order, the execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

SECTION 3.03.  Governmental Approvals; No Conflicts.  Except for the entry of, and pursuant to the terms of, the Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are (or will so be) in full force and effect, (b) will not violate any applicable law, including any order of any Governmental Authority, (c) will not violate the charter, by-laws or other organizational documents of the Parent Borrower or any Restricted Subsidiary, (d) will not violate or result in a default under any indenture or agreement (including the Pre-Petition ABL Credit Agreement, the ABL Credit Agreement to the extent applicable, the Pre-Petition Credit Agreement or other material instrument binding upon the Parent Borrower or any Restricted Subsidiary or any of their assets) (other than defaults arising solely as a result of the commencement of the Cases), or give rise to a right thereunder to require any payment to be made by the Parent Borrower or any Restricted Subsidiary, and (e) will not result in the creation or imposition of any Lien on any asset of the Parent Borrower or any Restricted Subsidiary, except Liens created pursuant to the Loan Documents or Liens created in connection with the Pre-Petition ABL Credit Agreement, the  ABL Credit Agreement to the extent applicable, or the Pre-Petition Credit Agreement, in the case of clauses (a) (as to the Transactions other than entry

UST-0598

into the Loan Documents), (b) and (d) above, except for a failure to obtain or make, violation or creation, as applicable, which individually or in the aggregate would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.04.   Financial Condition; No Material Adverse Change.

(a)     The Borrowers have heretofore furnished to the Lenders (i) the audited consolidated balance sheets and related consolidated statements of operations, comprehensive income, equity and cash flows of the Parent Borrower and its consolidated Subsidiaries as of and for the fiscal year ended August 3, 2019, and (B) the unaudited consolidated balance sheets and related consolidated statements of operations, comprehensive income and cash flows of the Parent Borrower and its consolidated Subsidiaries as of and for each of the fiscal quarters and the portions of the fiscal year ended November 2, 2019 and February 1, 2020 . Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)     Since the Petition Date, other than those customarily resulting from the commencement of the Cases and changes set forth in the Parent Borrower's business plan delivered to the Ad Hoc Committee prior to the Petition Date, there has been no event, development or circumstance that has had, or would reasonably be expected to have, a Material Adverse Effect.

SECTION 3.05.   Properties.

(a)     The Parent Borrower and each Restricted Subsidiary has good title to, or valid leasehold interests in, all its tangible property material to its business, except for defects in title that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect and Liens expressly permitted by Section 6.02.

(b)     (i) The Parent Borrower and each Restricted Subsidiary owns, is licensed to use, or otherwise has the right to use all trademarks, service marks, tradenames, trade dress, copyrights, patents, designs and other intellectual property material to its business, and (ii) the conduct of their respective businesses, including the use thereof by the Parent Borrower and the Restricted Subsidiaries in their respective businesses, does not infringe upon the rights of any other Person, except for any such infringements or any such failure to own, license or have the right to use that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(c)     Schedule 3.05 sets forth the address of each real property that is owned in fee by the Loan Parties as of the Effective Date.

SECTION 3.06.   Litigation and Environmental Matters.

(a)     Except for the Disclosed Matters and the Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrowers, threatened against the Parent Borrower or any Restricted

56

UST-0599

Subsidiary (i) as to which there is a reasonable likelihood of an adverse determination and that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve any of the Loan Documents or the Transactions.

(b)    Except for the Disclosed Matters or matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, neither the Parent Borrower nor any Restricted Subsidiary (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

SECTION 3.07.    Compliance with Laws and Agreements.

(a)    The Parent Borrower and each Restricted Subsidiary is in compliance with all laws, including all orders of Governmental Authorities, applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except any non-compliance arising solely as a result of the commencement of the Cases or where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect (it being agreed that this Section does not apply to any law which is specifically addressed in Section 3.06(b), 3.07(b), 3.08, 3.09, 3.10 or 3.14).  Except for any defaults or events of defaults arising solely as a result of the commencement of the Cases, any defaults or events of defaults arising under the Pre-Petition ABL Credit Agreement or the Pre-Petition Credit Agreement, no Event of Default has occurred and is continuing.

(b)    The Borrowers have implemented and maintain in effect policies and procedures designed to ensure compliance in all material respects by the Parent Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Parent Borrower, its Subsidiaries and their respective officers and employees and, to the knowledge of the Borrowers, their respective directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.  None of (a) the Parent Borrower, any Subsidiary or, to the knowledge of the Borrowers, any of their respective directors, officers or employees, or (b) to the knowledge of the Borrowers any agent of the Parent Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Borrowing, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

SECTION 3.08.    Investment Company Status.  No Loan Party is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09.    Taxes.  The Parent Borrower and each Subsidiary has (a) timely filed or caused to be filed all Tax returns and reports required to have been filed, except to the extent that the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, and (b) paid or caused to be paid all Taxes required to have been paid by it (including in its capacity as withholding agent), except (i) any Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which the

UST-0600

Parent Borrower or such Subsidiary has set aside on its books reserves with respect thereto to the extent required by GAAP or (ii) to the extent that the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  There is no current or proposed tax assessment, deficiency or other claim against the Parent Borrower or any of the Subsidiaries that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 3.10.    ERISA; Labor Matters.

(a)    Except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred or is reasonably expected to occur, (ii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, and (iii) each Plan is in compliance with the applicable provisions of ERISA, the Code and other applicable laws. On the Effective Date, the excess of the present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of preparing the audited financial statements set forth in the Borrower's most recent Annual Report on Form 10-K), as of the date of the most recent financial statements reflecting such amounts, over the fair market value of the assets of such Plan, if any, could not be reasonably expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)    Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) there are no strikes, lockouts, slowdowns or any other labor disputes against the Parent Borrower or any Restricted Subsidiary pending or, to the knowledge of the Borrowers, threatened, (ii) the hours worked by and payments made to employees of the Parent Borrower and the Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act of 1938 or any other applicable federal, state, local or foreign law dealing with such matters, (iii) all payments due from the Parent Borrower or any Restricted Subsidiary, or for which any claim may be made against the Parent Borrower or any Restricted Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Parent Borrower or such Restricted Subsidiary to the extent required by GAAP and (iv) the consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Parent Borrower or any Restricted Subsidiary is bound.

SECTION 3.11.    [Reserved].

SECTION 3.12.    Subsidiaries and Joint Ventures.  Schedule 3.12 sets forth, as of the Effective Date, the name, type of organization and jurisdiction of organization of, and the percentage of each class of Equity Interests owned by the Parent Borrower or any Subsidiary in, (a) each Subsidiary and (b) each joint venture in which the Parent Borrower or any Subsidiary owns any Equity Interests, and identifies each Designated Subsidiary.  All the issued and outstanding Equity Interests in each Subsidiary owned by any Loan Party have been (to the extent such concepts are relevant with respect to such Equity Interests) duly authorized and validly issued and are fully paid and non-assessable (except as such rights may arise under mandatory provisions of applicable statutory law that may not be waived and not as a result of

UST-0601

any rights contained in organizational documents). Except as set forth in Schedule 3.12, as of the Effective Date, there is no existing option, warrant, call, right, commitment or other agreement to which the Parent Borrower or any Subsidiary is a party requiring, and there are no Equity Interests in any Subsidiary outstanding that upon exercise, conversion or exchange would require, the issuance by any Subsidiary of any additional Equity Interests or other securities exercisable for, convertible into, exchangeable for or evidencing the right to subscribe for or purchase any Equity Interests in any Subsidiary.

SECTION 3.13.    Insurance.  Schedule 3.13 sets forth a description of all insurance maintained by or on behalf of the Parent Borrower and the Restricted Subsidiaries as of the Effective Date.  As of the Effective Date, all premiums due and payable in respect of such insurance have been paid.  The Borrowers believe that the insurance maintained by or on behalf of the Parent Borrower and the Restricted Subsidiaries is adequate.

SECTION 3.14.    Federal Reserve Regulations.  Neither the Parent Borrower nor any Restricted Subsidiary is principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock.  No part of the proceeds of the Loans will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, in any manner or for any purpose that would entail a violation of Regulations T, U or X of the Board of Governors.

SECTION 3.15.    [Reserved].

SECTION 3.16.    Collateral Matters.

(a)    Subject to the entry of the Order, the Collateral Agreement and the Order are effective to create in favor of the Administrative Agent (for the benefit of the Secured Parties) legal, valid, enforceable and perfected Liens on the Collateral described therein (with such priority as provided for therein).

(b)    Except for the entry of the Order, no filing or other action will be necessary to perfect such Liens.

(c)    The Order is (or will be, as applicable) effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable perfected security interest in the Collateral (with such priority as provided for in the Order (including, without limitation, with respect to the Carve Out)) without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents except to the extent set forth in such orders.

SECTION 3.17.    Use of Proceeds.  Unless otherwise agreed by the Administrative Agent (acting at the direction of the Required Lenders), the proceeds of the New Money Loans will be deposited into the DIP Funding Account and used in accordance with the terms of the Approved Budget (subject to Permitted Variances) and the terms of the Order or any other order entered into by the Court that is consistent with the RSA, the Order and this Agreement, including, without limitation (i) to pay amounts due to Lenders and the Administrative Agent hereunder and the reasonable and documented professional fees and expenses (including legal,

LA\4104335.13

UST-0602

financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Administrative Agent, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby (including pursuant to such court approval), (ii) to make adequate protection payments, (iii) to fund the Carve Out, and (iv) to pay administration costs of the Cases and Claims or amounts approved by the Court in the "first day" and "second day" orders or as required under the Bankruptcy Code. Notwithstanding anything to the contrary herein, the proceeds of the New Money Loans may be used to prepay or repay the ABL Credit Agreement (to the extent applicable) solely to extent provided for in the Approved Budget then in effect at the date of such prepayment or repayment, and in any event in an aggregate amount during the term of this Agreement not to exceed $50,000,000.

SECTION 3.18.   Approved Budget.  The Borrowers have heretofore furnished to the Administrative Agent the initial Approved Budget.  Each Approved Budget was prepared in good faith based upon assumptions the Borrowers believed to be reasonable assumptions on the date of delivery of such Approved Budget.

SECTION 3.19.   Chapter 11 Cases.

(a)     The Cases were commenced on the Petition Date in accordance with applicable laws and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Order and (ii) the hearing for the entry of the Order. Debtors shall give, on a timely basis as specified in the Order, all notices required to be given to all parties specified in the Order.

(b)     After the entry of the Order, and pursuant to and to the extent permitted in the Order, the Loan Document Obligations will constitute allowed administrative expense claims in the Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve Out and (ii) the priorities set forth in the Order.

(c)     After the entry of the Order and pursuant to and to the extent provided in the Order, the Loan Document Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority, only to (i) the Carve Out, (ii) the Liens pursuant to Section 6.02(i) with respect to Indebtedness under the ABL Credit Agreement (to the extent applicable), subject to the terms of such Section 6.02(i) and (iii) to the extent set forth in the Order.

(d)     The Order is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Required Lenders' consent, modified or amended. The Loan Parties are in compliance in all material respects with the Order.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Order, upon the Maturity Date (whether by acceleration or otherwise) of any of the Loan Document Obligations, to the extent the

UST-0603

Conversion Date has not occurred, the Administrative Agent and Lenders shall be entitled to immediate payment of such Loan Document Obligations and to enforce the remedies provided for hereunder or under applicable laws, without further notice, motion or application to, hearing before, or order from, the Court.

## ARTICLE IV

### Conditions

SECTION 4.01.  Conditions to Effective Date.  The effectiveness of this Agreement and the obligations of the Lenders to make the Roll-up Loans hereunder shall not become effective until the date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)     The Administrative Agent shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) evidence satisfactory to the Administrative Agent (which may include a facsimile transmission) that such party has signed a counterpart of this Agreement.

(b)     The Administrative Agent shall have received a favorable written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of Kirkland & Ellis LLP, counsel for the Loan Parties, addressing corporate authority matters and other matters  as the Administrative Agent shall reasonably request, each such opinion to be in form, scope and substance reasonably satisfactory to the Administrative Agent and the Lenders.

(c)     The Administrative Agent shall have received as to each Loan Party such customary documents and certificates as it shall reasonably have requested relating to the organization, existence and good standing of such Loan Party and the authorization of the Loan Documents or the Transactions, all in form and substance reasonably satisfactory to the Administrative Agent.

(d)     (a) The representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct (i) in the case of the representations and warranties qualified as to materiality, in all respects and (ii) otherwise, in all material respects, in each case on and as of the Effective Date, except in the case of any such representation and warranty that expressly relates to a prior date, in which case such representation and warranty shall be so true and correct on and as of such prior date and (b) at the time of and immediately after giving effect to the Transactions to occur on the Effective Date, no Event of Default shall have  occurred and be continuing.

(e)     The Administrative Agent shall have received a certificate, dated the Effective Date and signed by the chief financial officer of the Parent Borrower, confirming compliance with the conditions set forth in paragraph (d) of this Section.

(f)     The Lenders and the Administrative Agent shall have received the Approved Budget.

LA\4104335.13

UST-0604

(g)     The Administrative Agent, for its benefit and the benefit of each other Secured Party, shall have been granted a perfected lien on the Collateral by the Order on the terms and conditions set forth herein and in the other Loan Documents.

(h)     The Administrative Agent shall have received the results of a search of the UCC (or equivalent) filings made with respect to the Loan Parties in the jurisdictions reasonably requested by the Administrative Agent.

(i)     The Lenders shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" rules and regulations, including the USA Patriot Act, to include a duly executed IRS Form W-9 or such other applicable IRS Form for each Borrower, at least three Business Days prior to the Effective Date to the extent such information was requested at least 10 Business Days prior to the Effective Date.

(j)     The Collateral Agreement each shall have been duly executed and delivered by each party thereto, and shall be in full force and effect.

(k)     The Administrative Agent shall have received (i) unaudited interim consolidated financial statements of the Parent Borrower for each fiscal month ended after the fiscal quarter ending February 1, 2020 through the end of [  ], 2020 and (ii) unaudited financial statements for the fiscal quarter ended May 2, 2020.

(l)     Since the Petition Date, other than those events or circumstances arising from the commencement of the Cases, there has been no event or circumstance, either individually or in the aggregate, that has or could reasonably be expected to have a Material Adverse Effect.

(m)     (i) the Administrative Agent shall have received drafts of the "first day" pleadings for the Cases, in each case, in form and substance reasonably satisfactory to the Administrative Agent; and (ii) all motions, orders (including the "first day" orders and the Cash Management Order) and other documents to be filed with and submitted to the Court on the Petition Date shall be in form and substance reasonably satisfactory to the Administrative Agent, and the Court shall have approved and entered all "first day" orders, including, without limitation, the Cash Management Order.

(n)     No trustee, receiver or examiner with expanded powers shall have been appointed in any of the Chapter 11 Cases.

(o)     The Pre-Petition Agent and the Pre-Petition Lenders shall have each received adequate protection in respect of the Liens securing their respective Pre-Petition Lender Obligations pursuant to the Order.

The Administrative Agent shall notify the Borrowers and the Lenders of the Effective Date, and such notice shall be conclusive and binding.

SECTION 4.02.   Conditions to the New Money Loan.   The obligations of the Lenders to make the New Money Loans hereunder shall not become effective until the date on or after the

UST-0605

Effective Date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)    The Administrative Agent shall have received a written Borrowing Request to include a flow of funds memorandum in form and substance satisfactory to the Administrative Agent and the Lenders.

(b)    The ABL Credit Agreement shall have been duly executed and delivered by each of the parties thereto, and shall be in full force and effect.

(c)    The Intercreditor Acknowledgment shall have been duly executed and delivered by each party thereto, and shall be in full force and effect.

(d)    The Administrative Agent, the Ad Hoc Committee and the Ad Hoc Committee Advisors shall have received all fees and other amounts due and payable on or prior to the Funding Date, including, to the extent invoiced at least two Business Days prior to the Funding Date, payment or reimbursement of all fees and expenses (including fees, charges and disbursements of counsel) required to be paid or reimbursed by any Loan Party under the Commitment Letter or any Loan Document, in each case, payable from the proceeds of the initial funding of the Term Loans.

The Administrative Agent shall notify the Borrowers and the Lenders of the Funding Date, and such notice shall be conclusive and binding.

# ARTICLE V

## Affirmative Covenants

Until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all premiums and fees payable hereunder shall have been paid in full, each Borrower covenants and agrees with the Lenders that:

SECTION 5.01.    Financial Statements and Other Information.  The Borrowers will furnish to the Administrative Agent, on behalf of each Lender and, in the case of clauses (e), (f) and (g), to the Ad Hoc Committee Advisors:

(a)    within 90 days after the end of each fiscal year of the Parent Borrower, its consolidated balance sheet and related consolidated statements of operations, comprehensive income, equity and cash flows as of the end of and for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year,  all certified by a Financial Officer of the Parent Borrower to the effect that such consolidated financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries as of the end of and for such fiscal year on a consolidated basis in accordance with GAAP;

63

UST-0606

(b)     within 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Parent Borrower, its consolidated balance sheet as of the end of such fiscal quarter, the related consolidated statements of operations and comprehensive income for such fiscal quarter and the then elapsed portion of the fiscal year and the related consolidated statement of cash flows for the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Parent Borrower as presenting fairly, in all material respects, the financial position, results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries as of the end of and for such fiscal quarter and such portion of the fiscal year on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes;

(c)     within 30 days after the end of each of the first two fiscal months of each fiscal quarter of the Company, the consolidated balance sheet and related statements of operations and comprehensive income of the Company as of the end of and for such fiscal month and the then elapsed portion of the fiscal year and the related consolidated statement of cash flows of the Company for the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Company as presenting fairly in all material respects the financial position, results of operations and cash flows of the Company and its consolidated Subsidiaries as of the end of and for such fiscal month and such portion of the fiscal year on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes (it being understood and agreed that any adjustments reflected in such monthly financial statements may differ (in part or entirely) from any adjustments reflected in the financial statements delivered in the foregoing clauses (a) or (b);

(d)     concurrently with each delivery of financial statements under clause (a), (b) or (c) above, a completed Compliance Certificate signed by a Financial Officer of the Parent Borrower, (i) certifying, in the case of the financial statements delivered under clause (a), (b) or (c) above, that such financial statements present fairly in all material respects the financial position, results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP, subject to normal year end audit adjustments and the absence of footnotes, (ii) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (iii) to the extent applicable, setting forth reasonably detailed calculations demonstrating compliance with Section 6.12, (iv) if any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04, specifying the effect of such change on the financial statements accompanying such certificate, and (v) certifying that all notices required to be provided under Section 5.03 and 5.04 have been provided;

(e)     no later than 5:00 p.m. New York City time on the four week anniversary of the Effective Date(or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion), and each fourth (4th) calendar week thereafter, an updated budget consistent with the form and level of detail set forth in the initial Approved Budget,

LA\4104335.13

UST-0607

including the same line-items provided with the initial Approved Budget, and otherwise in form and substance reasonably acceptable to Ad Hoc Committee Advisors in their reasonable discretion.  Upon, and subject to, the approval of any such updated budget by the Ad Hoc Committee Advisors in their reasonable discretion, such supplemented budget shall constitute the then-approved Approved Budget, effective as of the beginning of the week immediately following the week in which it was delivered; *provided* that unless and until the Ad Hoc Committee Advisors approve such supplemental budget in their reasonable discretion, the then-current Approved Budget shall remain in effect;

(f)    no later than 5:00 p.m. New York City time on the Thursday of each calendar week (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) commencing on (a) the date that is the third Thursday following the Effective Date, a line-item by line-item report setting forth for each line item in the Approved Budget, in reasonable detail, the actual receipts received and operating disbursements (including any professional fees) made during the prior week then-ended and (b) the date that is the first Thursday following the Effective Date a report setting forth (i) the Liquidity as of the  Friday of the most recently ended calendar week and (ii) the aggregate amount of end of day cash and Cash Equivalents as of the Friday of the most recently ended calendar week of all non-Loan Party Subsidiaries on deposit in or credited to any account maintained by such non-Loan Party Subsidiaries;

(g)    no later than 5:00 p.m. New York City time on the Thursday (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) of each calendar week commencing on the date that is the second Thursday following the Effective Date, (each such Thursday or later time, a "Variance Report Date"), a line-item by line-item variance report (each, a "Variance Report"),substantially in the form attached hereto as Exhibit J or otherwise as reasonably acceptable to the Required Lenders in their sole discretion, setting forth, in reasonable detail: (x) any variances between actual amounts for each line item in the Approved Budget for the Variance Testing Period versus projected amounts set forth in the applicable Approved Budget for each line item included therein on a cumulative basis for such Variance Testing Period (for the avoidance of doubt, to be prepared by comparing the sum of the four (4) figures for each relevant week for such corresponding line item in the relevant Approved Budget that was in effect in respect of each relevant week at the time), and (y) the computations necessary to determine compliance with Section 6.12, together with a statement from a Financial Officer certifying the information contained in the report.  The Variance Report shall also provide a reasonably detailed explanation for any negative variance in such Variance Report in excess of 15% in actual receipts and any positive variance in such Variance Report in excess of 15% in  actual operating disbursements during the Variance Testing Period (in each case unless the dollar amount corresponding to such percentage variance is less than $1,000,000) as compared to projections for such corresponding line items during the Variance Testing Period as set forth in the Approved Budget;

(h)    (i) to the extent applicable, within 1 Business Day of delivery of a Borrowing Base Certificate (as defined in the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, as applicable) to the ABL Agent, copy of such certificate and (ii) a copy of each report or forecast delivered under the ABL Credit Agreement, within 1 Business Day of delivery thereof;

UST-0608

(i)      promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the Parent Borrower or any Subsidiary with the SEC or with any national securities exchange, or distributed by the Parent Borrower to its shareholders generally, as the case may be;

(j)      [reserved];

(k)      promptly after any written request therefor, evidence of insurance renewals as required under Section 5.08 hereunder in form and substance reasonably acceptable to the Administrative Agent; and

(l)      promptly after any written request therefor, such other information regarding the operations, business affairs and financial condition of the Parent Borrower or any Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request.

Information required to be delivered pursuant to clause (a), (b) or (i) of this Section shall be deemed to have been delivered if such information, or one or more annual or quarterly reports containing such information, shall have been posted by the Administrative Agent on an IntraLinks or similar site to which the Lenders have been granted access or shall be available on the website of the SEC at http://www.sec.gov. Information required to be delivered pursuant to this Section may also be delivered by electronic communications pursuant to procedures approved by the Administrative Agent.

SECTION 5.02.   <u>Notices of Material Events</u>. The Borrowers will furnish to the to the Ad Hoc Committee Advisors and the Administrative Agent (for distribution to the Lenders) written notice promptly upon any Financial Officer, or other officer or employee responsible for compliance with the Loan Documents, of the Borrowers becoming aware of any of the following:

(a)      the occurrence of any Default;

(b)      the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against (other than in connection with the Cases) or affecting the Parent Borrower or any Restricted Subsidiary, or any adverse development in any such pending action, suit or proceeding not previously disclosed in writing by the Borrowers to the Administrative Agent and the Lenders, that in each case would reasonably be expected to result in a Material Adverse Effect or that in any manner questions the validity of any Loan Document;

(c)      the occurrence of an ERISA Event that has resulted, or would reasonably be expected to result, in a Material Adverse Effect;

(d)      (i) as soon as practicable in advance of filing (and to the extent practicable not later than three (3) days prior to the filing thereof) with the Court or delivering (and to the extent practicable not later than three (3) days prior to the delivery thereof) to the Committee appointed in a Case, if any, or to the U.S. Trustee, as the case may be, the Order, all other material proposed orders and pleadings related to (x) the Cases (all of which must be in form and

LA\4104335.13

UST-0609

substance reasonably satisfactory to the Required Lenders), (y) the Pre-Petition Credit Agreement and this Agreement and the credit facilities contemplated thereby and/or any sale contemplated in accordance with the Required Milestones and any Plan of Reorganization and/or any disclosure statement related thereto (all of which must be in form and substance reasonably satisfactory to the Administrative Agent), and (ii) substantially simultaneously with the filing with the Court or delivering to the Committee appointed in any Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Cases that may be filed with the Court or delivered to the Committee appointed in any Case, if any, or to the U.S. Trustee; or

(e) any other development that has resulted, or would reasonably be expected to result, in a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Parent Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03.    Collateral Obligations; Additional Subsidiaries.

(a) Each Borrower will, and will cause the other applicable Loan Parties to comply with the "Collateral and Guarantee Requirement". If any additional Designated Subsidiary is formed or acquired after the Effective Date (or any Excluded Subsidiary becomes a Designated Subsidiary), the Borrowers will promptly notify the Administrative Agent thereof and will, as promptly as practicable, and in any event within 15 days (or such longer period as the Administrative Agent may agree) after such Designated Subsidiary is formed or acquired (or any Excluded Subsidiary becomes a Designated Subsidiary) cause the Collateral and Guarantee Requirement to be satisfied with respect to such Designated Subsidiary and with respect to any Equity Interests in or Indebtedness of such Designated Subsidiary owned by or on behalf of any Loan Party.

(b) Each of the Loan Parties hereby covenants and agrees that upon the entry of, and subject to, the Order and subject to the Carve Out in all respects, the Loan Document Obligations, pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed DIP Superpriority Claims in the Cases.

(c) The relative priorities of the Liens described in this Section 5.03 with respect to the Collateral shall be as set forth in the Order. In accordance with the Order, all of the Liens described in this Section 5.03 shall be effective and perfected upon entry of the Order, without the necessity of the execution, recordation of filings by the Debtors of security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent, of, or over, any Collateral, as set forth in the Order.

(d) Each Loan Party that is a Debtor hereby confirms and acknowledges that, pursuant to the Order , the Liens in favor of the Administrative Agent on behalf of and for the benefit of the

LA\4104335.13

UST-0610

Secured Parties in all of the Collateral, now existing or hereafter acquired, shall be created and perfected without the recordation or filing in any land records or filing offices of any mortgage, assignment or similar instrument.

SECTION 5.04. <u>Information Regarding Collateral</u>.

(a) The Borrowers will furnish to the Administrative Agent promptly (and in any event within 15 days thereof (or such longer period as the Administrative Agent may agree)) written notice of any change in (i) the legal name of any Loan Party, as set forth in its organizational documents, (ii) the jurisdiction of organization or the form of organization of any Loan Party (including as a result of any merger or consolidation), (iii) the location of the chief executive office of any Loan Party or (iv) the organizational identification number, if any, and the Federal Taxpayer Identification Number of such Loan Party, in each case, only with respect to any Loan Party organized under the laws of a jurisdiction that requires such information to be set forth on the face of a UCC financing statement, of such Loan Party. The Borrowers also agree promptly to notify the Administrative Agent if any material portion of the Collateral is damaged or destroyed.

(b) If any material assets are acquired by any Loan Party after the Effective Date (other than assets constituting Collateral under the Collateral Documents that become subject to the Lien of the Collateral Documents upon the acquisition thereof), the Borrowers will promptly notify the Administrative Agent thereof and will cause such assets to be subjected to a Lien securing the Loan Document Obligations and will take such actions as shall be necessary or reasonably requested by the Administrative Agent to satisfy the Collateral and Guarantee Requirement, including to grant and perfect such Lien, all at the expense of the Borrowers. It is understood and agreed that, notwithstanding anything to the contrary set forth in this Agreement or in any Collateral Document, the Loan Parties shall not be required to (A) grant leasehold mortgages, (B) obtain landlord lien waivers, estoppels, collateral access agreements or bailee agreements, except to the extent delivered pursuant to the ABL Credit Agreement or related loan documents, (C) enter into Control Agreements in respect of any Excluded Deposit Account, (D) perfect security interests in any assets represented by a certificate of title or (E) enter into any Collateral Documents governed by the law of a jurisdiction other than the United States.

(c) If, despite the restrictions set forth in Section 6.02, the Company or any Subsidiary shall grant a Lien on any of its assets to secure Indebtedness under the ABL Credit Agreement, the Pre-Petition ABL Credit Agreement and the Secured Obligations are not secured by a Lien on such assets, the Company will (i) promptly notify the Administrative Agent and cause such assets to be subjected to a Lien securing the Secured Obligations and (ii) take, or cause such Subsidiary to take, as the case may be, such actions as shall be necessary or reasonably requested by the Administrative Agent to satisfy the Collateral and Guarantee Requirement, including to grant and perfect such Lien, and to cause such Liens securing Indebtedness under the ABL Credit Agreement thereof and such Liens securing the Secured Obligations to become subject to the Intercreditor Agreement, all at the expense of the Loan Parties.

SECTION 5.05. <u>Existence; Conduct of Business</u>. Subject to any required approval by the Court, each Borrower will, and will cause each Restricted Subsidiary to, do or cause to be

LA\4104335.13

UST-0611

done all things reasonably necessary to preserve, renew and keep in full force and effect (i) its legal existence and (ii) the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except in the case of clause (ii) where failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation, dissolution, disposition or other transaction permitted under Section 6.03 or 6.05.

SECTION 5.06. Payment of Obligations. To the extent permitted by the Order and the terms thereof, each Borrower will, and will cause each Restricted Subsidiary to, pay or discharge all its material obligations, including material Tax liabilities (whether or not shown on a Tax return), before the same shall become delinquent or in default, subject to the Approved Budget (and the Permitted Variances provided for therein)except where (a) (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) the Parent Borrower or such Restricted Subsidiary has set aside on its books reserves with respect thereto to the extent required by GAAP and (iii) such contest effectively suspends collection of the contested obligation and the enforcement of any Lien securing such obligation or (b) the failure to make payment would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 5.07. Maintenance of Properties. Each Borrower will, and will cause each Restricted Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.08. Insurance. Each Borrower will, and will cause each Restricted Subsidiary to, maintain, with financially sound and reputable insurance companies, insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations. Each such policy of liability or casualty insurance maintained by or on behalf of Loan Parties shall (a) in the case of each liability insurance policy (other than workers' compensation, director and officer liability or other policies in which such endorsements are not customary), name the Administrative Agent, on behalf of the Secured Parties, as an additional insured thereunder and (b) in the case of each casualty insurance policy, contain a loss payable clause or endorsement that names the Administrative Agent, on behalf of the Secured Parties, as a loss payee thereunder, and the Borrowers will use commercially reasonable efforts to have each such policy provide for at least 30 days' (or such shorter number of days as may be agreed to by the Administrative Agent) prior written notice to the Administrative Agent of any cancellation of such policy.

SECTION 5.09. Books and Records; Inspection and Rights. Each Borrower will, and will cause each Restricted Subsidiary to, (a) keep proper books of record and account in which full, true and correct (in all material respects) entries in accordance with GAAP and applicable law are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the Administrative Agent or any Lender (to the extent accompanying the Administrative Agent or any designated representative thereof)

69

UST-0612

(including employees of the Administrative Agent, any Lender or any consultants, accountants, lawyers and appraisers retained by the Administrative Agent), upon reasonable prior notice (but in no event more than once each fiscal year of the Parent Borrower unless an Event of Default has occurred and is continuing), to visit and inspect its properties, to examine and make extracts from its books and records and to discuss its affairs, finances and condition with its officers and, accompanied by one or more such officers or their designees if requested by the Borrowers, independent accountants, all at such reasonable times during normal business hours and as often as reasonably requested.  The Borrowers shall have the right to have a representative present at any and all inspections.

SECTION 5.10.    Compliance with Laws.  Each Borrower will, and will cause each Restricted Subsidiary to, comply with all laws (including Environmental Laws and orders of any Governmental Authority) applicable to it or its property, except (i) where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect or (ii) to the extent subject to the Automatic Stay.

SECTION 5.11.    Bankruptcy Matters.

(a)    cause all proposed (i) "first day" and "second day" (if applicable) orders on a final basis, (ii) orders (other than the Order) related to or affecting the Loans and other Obligations and the Loan Documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any Plan of Reorganization and/or any disclosure statement related thereto, (iii) orders concerning the financial condition of the Borrowers or any of their respective Restricted Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure, and (iv) orders establishing procedures for administration of the Cases or approving significant transactions submitted to the Court, in each case, proposed by the Loan Parties to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Required Lenders in their reasonable discretion in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders (and with respect to any provision that affects the rights, obligations, liabilities or duties of the Administrative Agent) prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable in all respects;

(b)    comply in a timely manner with their obligations and responsibilities as debtors in possession under the Order; and

(c)    except as otherwise permitted by an Acceptable Plan or this Agreement, provide prior written notice as soon as reasonably practicable to the Required Lenders prior to any assumption or rejection of any Loan Party's or any Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code.

(d)    deliver to the Administrative Agent all documents required to be delivered to creditors under the RSA, any applicable restructuring support agreement or

LA\4104335.13

UST-0613

any case stipulation; <u>provided</u> that the Borrower shall not be required to deliver any such documents provided by any party in interest to the extent that any such document is filed under seal; <u>provided</u>, <u>further</u>, that such documents that are filed under seal, to the extent permitted by applicable law, shall be provided to the advisors to the Administrative Agent on a professional eyes' only basis.

(e) comply with each of the Required Milestones contained on Schedule 5.11 upon the terms and at the times provided for therein.

SECTION 5.12. Maintenance of Ratings. The Borrowers will use commercially reasonable efforts to obtain a rating of the credit facilities created hereunder by each of S&P and Moody's within 15 days of the Effective Date, it being understood that there is no obligation to maintain any particular rating at any time.

SECTION 5.13. [Reserved].

SECTION 5.14. [Reserved].

SECTION 5.15. Conference Calls. The Borrowers will hold and participate in:

(a) a monthly conference call for Lenders to discuss financial information delivered pursuant to Section 5.01. The Borrowers will hold such conference call following the delivery of the required financial information for such month pursuant to Section 5.01(c) and not later than two Business Days from the time the Borrowers are required to deliver the financial information as set forth in Section 5.01(c).

(b) weekly conference calls for the Ad Hoc Committee Advisors to discuss financial information delivered pursuant to Section 5.01(f).

Such monthly and weekly calls will occur as a standing appointment at a time to be mutually agreed upon by the Borrowers and the Lenders or the Ad Hoc Committee Advisors, as applicable.

ARTICLE VI

Negative Covenants

Until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all premiums and fees payable hereunder shall have been paid in full, each Borrower covenants and agrees with the Lenders that:

SECTION 6.01. Indebtedness; Certain Equity Securities.

Neither Borrower will, nor will it permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

(a) Indebtedness created under the Loan Documents (including, for the avoidance of doubt, the Carve Out) and the Pre-Petition Loan Documents;

71

UST-0614

(b)　　　Indebtedness existing on the date hereof and set forth on Schedule 6.01;

(c)　　　unsecured Indebtedness of the Parent Borrower to any Restricted Subsidiary and of any Restricted Subsidiary to the Parent Borrower or any other Restricted Subsidiary; provided that (i) such Indebtedness shall not have been transferred to any Person other than the Parent Borrower or any Restricted Subsidiary, (ii) any such Indebtedness owing by any Loan Party to a Restricted Subsidiary that is not a Loan Party shall be unsecured and subordinated in right of payment to the Loan Document Obligations and the Pre-Petition Lender Obligations and (iii) any such Indebtedness shall be incurred in compliance with Section 6.04;

(d)　　　Guarantees incurred in compliance with Section 6.04;

(e)　　　Indebtedness of the Parent Borrower or any Restricted Subsidiary (i) incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations and Synthetic Lease Obligations, provided that such Indebtedness is incurred prior to or within 270 days after such acquisition or the completion of such construction or improvement and the principal amount of such Indebtedness does not exceed the cost of acquiring, constructing or improving such fixed or capital assets or (ii) assumed in connection with the acquisition of any fixed or capital assets; provided that the aggregate principal amount of Indebtedness permitted by this clause (e) at the time of incurrence thereof shall not exceed $1,000,000;

(f)　　　Indebtedness in respect of netting services, overdraft protections and deposit and checking accounts, in each case, in the ordinary course of business;

(g)　　　Indebtedness in respect of letters of credit, bank guarantees and similar instruments issued for the account of the Parent Borrower or any Restricted Subsidiary in the ordinary course of business supporting obligations under workers' compensation, health, disability, unemployment insurance and other social security laws;

(h)　　　Indebtedness expressly permitted by the Approved Budget (including with respect to any Permitted Variances);

(i)　　　[reserved];

(j)　　　Indebtedness under (i) the Pre-Petition ABL Credit Agreement and (ii) if applicable, the ABL Credit Agreement in an aggregate principal amount not to exceed $400,000,000 at any time outstanding;

(k)　　　Indebtedness of Loan Parties in respect of surety bonds (whether bid, performance, appeal or otherwise) and performance and completion guarantees and other obligations of a like nature, in each case incurred in the ordinary course of business;

(l)　　　[reserved];

(m)　　　[reserved];

(n)　　　[reserved];

UST-0615

(o)     [reserved];

(p)     other unsecured Indebtedness in an aggregate principal amount not to exceed at the time of incurrence thereof $4,000,000;

(q)     Indebtedness consisting of (i) the financing of insurance premiums and (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(r)     obligations under any agreement governing the provision of treasury or cash management services, including deposit accounts, overnight draft, credit cards, debit cards, p-cards (including purchasing cards and commercial cards), funds transfer, automated clearinghouse, zero balance accounts, returned check concentration, controlled disbursement, lockbox, account reconciliation and reporting and trade finance services and other cash management services; and

(s)     Indebtedness in the form of Swap Agreements permitted under Section 6.07.

The accrual of interest, the accretion of accreted value and the payment of interest or dividends in the form of additional Indebtedness or Disqualified Stock, as applicable, the accretion of original issue discount, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies shall not be deemed to be an incurrence of Indebtedness or Disqualified Stock for purposes of this Section 6.01.

SECTION 6.02.    Liens.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Lien on any asset now owned or hereafter acquired, except:

(a)     (i) Liens granted by the Order (including the Carve Out), (ii) Liens created under the Loan Documents or the Pre-Petition Loan Documents;

(b)     Permitted Encumbrances;

(c)     any Lien on any asset of the Parent Borrower or any Restricted Subsidiary existing on the date hereof and set forth on Schedule 6.02; provided that (i) such Lien shall not apply to any other asset of the Parent Borrower or any Restricted Subsidiary and (ii) such Lien shall secure only those obligations that it secures on the date hereof and any extensions, renewals and refinancing thereof that do not increase the outstanding principal amount thereof;

(d)     [reserved];

(e)     Liens on fixed or capital assets acquired, constructed or improved by the Parent Borrower or any Restricted Subsidiary; provided that (i) such Liens secure only Indebtedness permitted by Section 6.01(e) and obligations relating thereto not constituting Indebtedness and (ii) such Liens shall not apply to any other asset of the Parent Borrower or any Restricted Subsidiary (other than the proceeds and products thereof); provided further that in the event purchase money obligations are owed to any Person with respect to financing of more than one

73

UST-0616

purchase of any fixed or capital assets, such Liens may secure all such purchase money obligations and may apply to all such fixed or capital assets financed by such Person;

(f)    in connection with the sale or transfer of any Equity Interests or other assets in a transaction permitted under Section 6.05, customary rights and restrictions contained in agreements relating to such sale or transfer pending the completion thereof, solely to the extent such sale or transfer would have been permitted on the date of the creation of such Lien;

(g)    in the case of (i) any Restricted Subsidiary that is not a wholly-owned Restricted Subsidiary or (ii) the Equity Interests in any Person that is not a Restricted Subsidiary, any encumbrance or restriction, including any put and call arrangements, related to Equity Interests in such Restricted Subsidiary or such other Person set forth in the organizational documents of such Restricted Subsidiary or such other Person or any related joint venture, shareholders' or similar agreement, in each case, so long as such encumbrance or restriction is in existence on the Petition Date;

(h)    Liens solely on any cash deposits, escrow arrangements or similar arrangements made by the Parent Borrower or any Restricted Subsidiary in connection with any letter of intent or purchase agreement for a transaction permitted hereunder;

(i)    Liens on the Collateral securing Indebtedness permitted by Section 6.01(j) and obligations relating thereto not constituting Indebtedness; provided that any such Liens are subject to (x) the Order and (y), if such Liens are on assets of the Loan Parties, the Intercreditor Agreement;

(j)    any Lien on assets of any Foreign Subsidiary (other than any Luxembourg IP Subsidiary); provided that such Lien shall secure only Indebtedness of such Foreign Subsidiary permitted by Section 6.01 and obligations relating thereto not constituting Indebtedness;

(k)    other Liens securing Indebtedness or other obligations in an aggregate principal amount at the time of incurrence of such Indebtedness or other obligations not to exceed $1,000,000;

(l)    non-exclusive licenses of intellectual property granted in the ordinary course of business; and

(m)    Liens in favor of the Pre-Petition Lenders as adequate protection granted pursuant to the Orders.

SECTION 6.03.    Fundamental Changes; Business Activities.

(a)    Neither Borrower will, nor will it permit any Restricted Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, (i) any Restricted Subsidiary may  (x) merge into the Parent Borrower in a transaction in which the Parent Borrower is the surviving entity and (y) merge into the Subsidiary Borrower in a transaction in which the Subsidiary Borrower is the surviving entity, (ii) any Person (other the Parent Borrower or the Subsidiary

74

UST-0617

Borrower) may merge into or consolidate with any Restricted Subsidiary in a transaction in which the surviving entity is a Restricted Subsidiary and, if any party to such merger or consolidation is a Loan Party, a Loan Party, (iii) [reserved] and (iv) any Restricted Subsidiary (other than the Subsidiary Borrower) may liquidate or dissolve if the Borrowers determine in good faith that such liquidation or dissolution is in the best interests of the Borrowers and is not materially disadvantageous to the Lenders; provided that any such merger or consolidation involving a Person that is not a wholly-owned Restricted Subsidiary immediately prior to such merger or consolidation shall not be permitted unless it is also permitted by Section 6.04.

(b)     Neither Borrower will, nor will it permit any of its Restricted Subsidiaries to, engage to any material extent in any business other than businesses of the type conducted by the Parent Borrower and the Restricted Subsidiaries on the date hereof and businesses reasonably related or complementary thereto.

SECTION 6.04.     Investments, Loans, Advances, Guarantees and Acquisitions.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, purchase, hold, acquire (including pursuant to any merger or consolidation), make or otherwise permit to exist any Investment in any other Person, except:

(a)     Investments in cash and Cash Equivalents;

(b)     Investments existing on the date hereof or contractually committed to as of the date hereof and set forth on Schedule 6.04 and any extensions thereof (but not any additions thereto (including any capital contributions) made after the date hereof) ;

(c)     Investments by the Parent Borrower and the Restricted Subsidiaries in Equity Interests in their respective subsidiaries; provided that (i) such subsidiaries are Subsidiaries prior to such Investments, and (ii) in the case of any such Investments by the Loan Parties in, and loans and advances by the Loan Parties to, Restricted Subsidiaries that are not Loan Parties (excluding all such Investments, loans, advances and Guarantees existing on the date hereof and permitted by clause (b) above), (A) the aggregate amount of all such Investments (including loans and advances) permitted pursuant to this clause (c) and pursuant to clauses (d) and (e) below, taken together, shall not exceed $10,000,000 and (B) in each case, all such Investments (including loans and advances) shall be (x) made in the ordinary course of business, (y) solely in connection with the operational and compliance needs of the Parent Borrower and its Restricted Subsidiaries and (z) permitted by the Approved Budget (subject to Permitted Variance);

(d)     loans or advances made by the Parent Borrower to any Restricted Subsidiary or made by any Restricted Subsidiary to the Parent Borrower or any other Restricted Subsidiary; provided that (i) the Indebtedness resulting therefrom is permitted by Section 6.01(c) and (ii) the amount of such loans and advances made by the Loan Parties to Restricted Subsidiaries that are not Loan Parties shall be subject to the limitation set forth in clause (c) above and shall be permitted by the Approved Budget (subject to Permitted Variance);

(e)     Guarantees by the Parent Borrower or any Restricted Subsidiary of Indebtedness or other obligations of the Parent Borrower or any Restricted Subsidiary, solely to the extent (i) arising as a result of any such Person being a joint and several co-applicant with respect to any

LA\4104335.13

UST-0618

letter of credit or letter of guaranty or (ii) of any leases of retail store locations and related obligations arising thereunder, in each case, in the ordinary course of business; provided that the aggregate amount of Indebtedness and other obligations of Restricted Subsidiaries that are not Loan Parties that is Guaranteed by any Loan Party shall be subject to the limitation set forth in clause (c) above and shall be permitted by the Approved Budget (subject to Permitted Variances);

(f)        [reserved];

(g)        Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(h)        [reserved];

(i)        deposits, prepayments and other credits to suppliers, lessors and landlords made in the ordinary course of business;

(j)        advances by the Parent Borrower or any Restricted Subsidiary to employees in the ordinary course of business consistent with past practices for travel and entertainment expenses, relocation costs and similar purposes;

(k)        [reserved];

(l)        Investments in the form of Swap Agreements permitted under Section 6.07;

(m)        investments constituting deposits described in clauses (c) and (d) of the definition of "Permitted Encumbrances" and endorsements of instruments for collection or deposit in the ordinary course of business;

(n)        other Investments to the extent permitted by and expressly set forth in the Order;

(o)        other Investments in an aggregate amount not to exceed $1,000,000; and

(p)        Investments in respect of actions permitted by Section 6.05(g).

For the purposes of this Section, any unreimbursed payment by the Parent Borrower or any Restricted Subsidiary for goods or services delivered to any Subsidiary shall be deemed to be an Investment in such Subsidiary.

SECTION 6.05.    Asset Sales.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, sell, transfer or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the Parent Borrower permit any Restricted Subsidiary to issue any additional Equity Interests in such Restricted Subsidiary (other than to the Parent Borrower or any other Restricted Subsidiary in compliance with Section 6.04, and other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable law) (each of the foregoing, an "Asset Sale"), except:

LA\4104335.13

UST-0619

(a)    (i) sales of inventory, (ii) sales, transfers and other dispositions of used, surplus, obsolete or outmoded machinery or equipment and (iii) contributions of merchandise to charitable organizations, to the extent in the ordinary course of business and consistent with past practices, (iv) dispositions of Cash Equivalents and (v) use of cash in accordance with the Approved Budget and pursuant to transactions permitted under this agreement, in each case (other than in the case of clause (iii)) in the ordinary course of business;

(b)    sales, transfers, leases and other dispositions to the Parent Borrower or any Restricted Subsidiary in the ordinary course of business; <u>provided</u> that any such sales, transfers, leases or other dispositions involving a Restricted Subsidiary that is not a Loan Party shall be made in compliance with Sections 6.04 and 6.09;

(c)    the sale or discount of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not in connection with any financing transaction;

(d)    dispositions of assets subject to any casualty or condemnation proceeding (including in lieu thereof);

(e)    leases or subleases of real property granted by the Parent Borrower or any Restricted Subsidiary to third Persons not interfering in any material respect with the business of the Parent Borrower or any Restricted Subsidiary, including, without limitation, retail store lease assignments and surrenders;

(f)    [reserved];

(g)    in connection with the consolidation of foreign operations of the Parent Borrower and its Subsidiaries, the direct or indirect transfers or other dispositions by any Restricted Subsidiary of any foreign assets or the Equity Interests of a Foreign Subsidiary that is a Restricted Subsidiary to (i) with respect to any Luxembourg IP Subsidiary or any non-Loan Party Restricted Subsidiary with the prior consent of the Required Lenders and (ii) any other Restricted Subsidiary;

(h)    to the extent prior consent of the Required Lenders is received, the elimination or forgiving of intercompany balances in connection with intercompany restructurings (including dissolutions, liquidations and mergers) between or among the Parent Borrower and its Restricted Subsidiaries;

(i)    other sales, transfers or dispositions pursuant to an order of the Court which sale, transfer or disposition are consistent with the Restructuring Support Agreement and the Approved Budget; and

(j)    Specified Dispositions or dispositions expressly identified and provided for in the Approved Budget; and

(k)    sales, transfers and other dispositions of assets that are not permitted by any other clause of this Section in an aggregate amount equal to a fair market value, as determined by a

UST-0620

Responsible Officer of the Parent Borrower reasonably and acting in good faith, of not more than $1,000,000;

provided that all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by clause (a)(ii), (a)(iii), (b), (c), (d), (g) or (h)) shall be made for fair value.

SECTION 6.06.    Sale/Leaseback Transactions.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, enter into any Sale/Leaseback Transaction, except to the extent such Sale/Leaseback Transaction is entered into in connection with a Specified Disposition.

SECTION 6.07.    Swap Agreements.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, enter into any Swap Agreement, other than Swap Agreements entered into in the ordinary course of business to hedge or mitigate risks to which the Parent Borrower or a Restricted Subsidiary is exposed in the conduct of its business or the management of its liabilities and not for speculative purposes.

SECTION 6.08.    Restricted Payments; Certain Payments of Indebtedness.

(a)    Neither Borrower will, nor will it permit any Restricted Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that:

(i)    the Parent Borrower may declare and pay dividends with respect to its Equity Interests payable solely in additional Equity Interests (other than Disqualified Stock) of the Parent Borrower;

(ii)    any Restricted Subsidiary may declare and pay dividends or make other distributions with respect to its Equity Interests, or make other Restricted Payments in respect of its Equity Interests, in each case ratably to the holders of such Equity Interests (or, if not ratably, on a basis more favorable to the Parent Borrower and the Restricted Subsidiaries);

(iii)    the Parent Borrower may make Restricted Payments pursuant to and in accordance with customary stock option plans or other equity or benefit plans for management or employees of the Parent Borrower and the Restricted Subsidiaries in effect from time to time;

(iv)    Restricted Payments made by any Restricted Subsidiary to another non-Restricted Subsidiary to consummate transactions that would otherwise be permitted by Section 6.04(c);

(v)    the Parent Borrower may make cash payments in lieu of the issuance of fractional shares representing insignificant interests in the Parent Borrower in connection with the exercise of warrants, options or other securities convertible into or exchangeable for shares of common stock in the Parent Borrower;

LA\4104335.13

UST-0621

(vi)     Restricted Payments to Parent Borrower on or around and upon the execution and effectiveness of the RSA to pay fees and expenses in accordance therewith;

(vii)     [reserved]; and

(viii)     Restricted Payments made to consummate the transactions permitted by Section 6.05(g).

(b)     Neither Borrower will, nor will it permit any Restricted Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Specified Indebtedness, except:

(i)     [reserved];

(ii)     [reserved];

(iii)     [reserved];

(iv)     [reserved];

(v)     [reserved];

(vi)     payments to the extent provided for in the Approved Budget (including Permitted Variances thereto) and permitted by the Order, as applicable; and

(vii)     [reserved].

(c)     Neither Borrower will, nor will it permit any of the Restricted Subsidiaries to, amend, modify or change in any manner adverse to the interests of the Lenders any term or condition of any documentation governing Specified Indebtedness; provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous written notice thereof is provided to the Administrative Agent.

SECTION 6.09.     Transactions with Affiliates.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, sell, lease, license or otherwise transfer any assets to, or purchase, lease, license or otherwise acquire any assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions on terms and conditions not less favorable to the Parent Borrower or such Restricted Subsidiary than those that would prevail in an arm's-length transaction with unrelated third parties, (b) transactions between or among the Parent Borrower and the Restricted Subsidiaries, (c) any Restricted Payment permitted by Section 6.08 or Investments permitted pursuant to Section 6.04(j), (d) the payment of reasonable fees and compensation to, and the providing of reasonable indemnities on behalf of, directors and officers of the Parent Borrower or any Restricted Subsidiary, as determined by the board of directors of the Parent Borrower in good faith, (e) employment contracts or subscription, put/call arrangements with employees, officers or directors, (f) transactions necessary to make adequate

UST-0622

protection payments on account of secured Pre-Petition Indebtedness pursuant to the Order and (g) the transactions described on Schedule 6.09.

SECTION 6.10.    Restrictive Agreements.

(a) Neither Borrower will, nor will it permit any Restricted Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that restricts or imposes any condition upon (1) the ability of the Parent Borrower or any Restricted Subsidiary to create, incur or permit to exist any Lien upon any of its assets to secure the Loan Document Obligations or (2) the ability of any Restricted Subsidiary to pay dividends or other distributions with respect to its Equity Interests or to make or repay loans or advances to the Parent Borrower or to Guarantee the Loan Agreement; provided that (i) the foregoing shall not apply to (A) restrictions and conditions imposed by law or by any Loan Document, (B) restrictions and conditions existing on the Effective Date identified on Schedule 6.10 (but shall apply to any amendment or modification expanding the scope of any such restriction or condition), (C) customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided that such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (D) in the case of any Restricted Subsidiary that is not a wholly-owned Restricted Subsidiary, restrictions and conditions imposed by its organizational documents or any related joint venture or similar agreement, provided that such restrictions and conditions apply only to such Restricted Subsidiary and to any Equity Interests in such Restricted Subsidiary, (E) restrictions and conditions set forth in the Pre-Petition Credit Agreement, Pre-Petition ABL Credit Agreement and, to the extent applicable, the ABL Credit Agreement, (F) restrictions and conditions imposed by agreements relating to Indebtedness of Restricted Subsidiaries that are not Loan Parties permitted under Section 6.01 and (G) restrictions and conditions imposed on cash to secure letters of credit and other segregated deposits that are permitted pursuant to Section 6.02(h), provided that such restrictions and conditions apply only to such Restricted Subsidiaries that are not Loan Parties, (ii) clause (a) of the foregoing shall not apply to (A) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by Section 6.01(e) if such restrictions or conditions apply only to the assets securing such Indebtedness and (B) customary provisions in leases and other agreements restricting the assignment thereof and (iii) clause (b) of the foregoing shall not apply to restrictions and conditions imposed by agreements relating to Indebtedness of any Restricted Subsidiary in existence at the time such Restricted Subsidiary became a Restricted Subsidiary and otherwise permitted under Section 6.01 (but shall apply to any amendment or modification expanding the scope of, any such restriction or condition), provided that such restrictions and conditions apply only to such Restricted Subsidiary.

(b) Except as permitted pursuant to the terms of this Agreement and the Order or otherwise consented to by the Required Lenders:

(i) Make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to the Order that is adverse to the Lenders.

(ii) Incur, create, assume or suffer to exist or permit any other superpriority claim which is pari passu with or senior to the DIP Superpriority Claims of the Administrative

80

UST-0623

Agent, and the Lenders hereunder, except for the Carve Out and, subject to the Intercreditor Agreement, the ABL Credit Agreement to the extent applicable.

SECTION 6.11.    Amendment of Organizational Documents.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, amend, modify or waive any of its rights under its certificate of incorporation, by-laws or other organizational documents, in either case, to the extent such amendment, modification or waiver would be adverse to the rights or interests of the Lenders hereunder or under any other Loan Document; provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous written notice thereof is provided to the Administrative Agent.

SECTION 6.12.    Financial Covenants

(a)  The Parent Borrower will not permit Liquidity at any time to be less than $100,000,000.

(b) Commencing after the end of the 3rd week following the Effective Date, and solely to the extent that Liquidity is less than $150,000,000, the Parent Borrower will not permit any negative variance between the Actual Net Cash Flow Amount for any Cumulative Four-Week Period and the Budgeted Net Cash Flow Amount for such Cumulative Four-Week Period to be greater than 20%.

(c) The Parent Borrower will not permit the amount of cash and Cash Equivalents of non-Loan Party Subsidiaries as of the end of the day on Friday of each calendar week on deposit in or credited to any account maintained by non-Loan Party Subsidiaries to exceed $45,000,000 in the aggregate for all non-Loan Party Subsidiaries, excluding from such covenant any payments made (or to be made) from the Maurice business segments or entities.

SECTION 6.13.    Accounting Changes.  The Parent Borrower will not make any change in the Parent Borrower's fiscal quarter or fiscal year other than as required pursuant to GAAP.

SECTION 6.14.    Sanctions.  The Parent Borrower and its Subsidiaries will not, directly or indirectly, use the proceeds of any Borrowing, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other individual or entity, to fund any activities of or business with any individual or entity, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by an individual or entity (including any individual or entity participating in the transaction, whether as Lender, Administrative Agent, or otherwise) of Sanctions.

SECTION 6.15.    Anti-Corruption Laws.  The Parent Borrower and its Subsidiaries will not, directly or indirectly, use the proceeds of any Borrowing for any purpose which would breach any Anti-Corruption Laws.

ARTICLE VII

Events of Default

If any of the following events ("Events of Default") shall occur:

81

UST-0624

(a)     the Borrowers shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)     the Borrowers shall fail to pay any interest on any Loan or any fee, premium (including the Redemption Premium, if any) or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)     any representation, warranty or certification made or deemed made by the Parent Borrower or any Restricted Subsidiary in this Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been materially incorrect when made or deemed made (or, in the case of any representation or warranty qualified by materiality, incorrect);

(d)     the Borrowers shall fail to observe or perform any covenant, condition or agreement contained in Section 5.01, 5.02(a), 5.03 or 5.05 (with respect to the existence of any Borrower), 5.11 (including the Required Milestones) or in Article VI;

(e)     any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those specified in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of 7 Business Days after receipt of written notice thereof from the Administrative Agent;

(f)     except as a result of commencement of the Cases or entry into this Agreement, and, to the extent applicable, the ABL Credit Agreement, unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Court or unless any of the following results from obligations with respect to which the Court prohibits or does not permit any Loan Party from applicable compliance, the Parent Borrower or any Restricted Subsidiary shall fail to make any payment (whether of principal, interest, termination payment or other payment obligation and regardless of amount) in respect of any Material Indebtedness (other than the Loan Document Obligations) when and as the same shall become due and payable (after giving effect to any applicable grace period);

(g)     except as a result of commencement of the Cases or entry into this Agreement and, to the extent applicable, the ABL Credit Agreement, unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Court or unless any of the following results from obligations with respect to which the Court prohibits or does not permit any Loan Party from applicable compliance, (i) any event or condition shall occur that results in any Material Indebtedness becoming due, or being terminated or required to be prepaid, repurchased, redeemed or defeased, prior to its scheduled maturity, or that enables or permits (with the giving of notice, if required) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf, or, in the case of any Swap Agreement, the applicable counterparty, to cause any Material Indebtedness to become due, or to terminate or to

82

UST-0625

require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; <u>provided</u> that this clause (g) shall not apply to (i) any secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the assets securing such Indebtedness or (ii) any Indebtedness that becomes due as a result of a voluntary refinancing thereof permitted under Section 6.01; <u>provided</u>, <u>further</u>, that no such event under the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, as applicable, shall constitute an Event of Default under this clause (g) until the earliest to occur of (x) 5 days after the date of such Event of Default (during which period such Event of Default is not waived or cured), (y) the acceleration of the Indebtedness under the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, as applicable, and (z) the exercise of remedies by the ABL Agent in respect of a material portion of the ABL Priority Collateral, to the extent applicable;

(h)     [reserved];

(i)     [reserved];

(j)     [reserved];

(k)     except for any order fixing the amount of any Claim in the Cases, one or more judgments for the payment of money in an aggregate amount in excess of $10,000,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment and has not denied coverage) shall be rendered against the Parent Borrower or any Restricted Subsidiary, or any combination thereof, and the same shall remain undischarged for a period of 15 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Parent Borrower or any Restricted Subsidiary to enforce any such judgment;

(l)     one or more ERISA Events shall have occurred that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect;

(m)     a Change in Control shall occur;

(n)     any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder, satisfaction in full of all the Loan Document Obligations (other than contingent indemnification claims) or any act or omission by the Administrative Agent or any Lender, ceases to be in full force and effect; or any Loan Party contests in any manner the validity or enforceability of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; and

(o)     any Lien purported to be created under any Collateral Document and the Order shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any material Collateral, with the priority required by the applicable Collateral Document, except (i) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents to a Person that is not a Loan Party, (ii) the release thereof as provided in the applicable Collateral Document or Section 9.16 or consented to under Section 9.02, (iii) as a result of the failure of the Administrative Agent to (A) maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Collateral

LA\4104335.13

UST-0626

Agreement or (B) continue in accordance with applicable law the effectiveness of any UCC financing statement or (iv) as to Collateral constituting real property, to the extent such losses are covered by Lender's title insurance policy and such insurer has not denied coverage;

(p)        the RSA is terminated for any reason, or is modified, amended or waived in any manner materially adverse to the Secured Parties without the prior consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders);

(q)        any Loan Party shall file a motion in the Cases without the express written consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders), (i) to obtain additional financing under Section 364(d) of the Bankruptcy Code not otherwise permitted under this Agreement or (ii) except as provided in the Order, as the case may be, to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code that does not either have the prior written consent of the Required Lenders (or the Administrative Agent acting at the direction of the Required Lenders) or provide for the payment of the Loan Document Obligations in full and in cash upon the incurrence of such additional financing;

(r)        an order with respect to any of the Cases shall be entered by the Court (i) appointing a trustee under Section 1104, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or (iii) converting the Cases to cases under Chapter 7 of the Bankruptcy Code;

(s)        an order shall be entered by the Court dismissing any of the Cases which does not contain a provision for termination of all Commitments, and payment in full in cash of all Loan Document Obligations upon entry thereof;

(t)        an order with respect to any of the Cases shall be entered by the Court without the express prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent), with such consent not to be unreasonably withheld, conditioned or delayed, (i) to revoke, reverse, stay, modify, supplement or amend the Order in a manner adverse to the Lenders and/or the Administrative Agent or (ii) to permit, unless otherwise contemplated by the Order, any administrative expense or any Claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the administrative priority of the Loan Parties' Claims in respect of the Loan Document Obligations (other than the Carve Out);

(u)        (i) an application for any of the orders described in clause (r) above shall be made by a Loan Party or any such application shall be made by a Person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or the relief requested is not withdrawn, dismissed or denied within forty-five (45) days after the filing or (ii) any Person obtains an order under Section 506(c) of the Bankruptcy Code against the Administrative Agent;

(v)        the entry of an order by the Court terminating or modifying the exclusive right of any Loan Party to file a Plan of Reorganization pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders;

(w)        any Loan Party shall fail to comply with the Order;

UST-0627

(x)     any order by the Court is entered granting any superpriority claim that is pari passu with or senior to those of the Secured Parties or any Lien that is senior to the Liens securing the Loan Document Obligations, other than in accordance with the Order;

(y)     the Court enters an order that is adverse in any material respect, when taken as a whole, to the interests of the Administrative Agent and the Lenders or their respective rights and remedies in their capacities as such under this Agreement or in any of the Cases;

(z)     the Loan Parties or any of their Subsidiaries, or any person claiming by or through the Loan Parties or any of their Subsidiaries, obtain court authorization to commence, or commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Administrative Agent or the Lenders in each case relating to this Agreement, in each case other than as permitted by the Order;

(aa)     the Court denies confirmation of the Plan, provided, that if the Loan Parties subsequently obtain an order of the Court approving a plan of reorganization that either (i) proposes to repay in full in cash of all Loan Document Obligations under the Term Credit Facility, immediately upon the effectiveness thereof, (ii) is, taken as a whole, in form and substance substantially similar to the Plan of Reorganization or (iii) otherwise is approved by the Required Lenders, an Event of Default shall not occur;

(bb)     The Loan Parties attempts to consummate a sale of substantially all of its assets via a plan of reorganization or a 363 sale without consent of the Required Lenders; or

(cc)     the filing by any of the Loan Parties of a Plan of Reorganization other than an Acceptable Plan;

then, notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Order, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrowers, take either or both of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, (ii) declare the Loans then outstanding to be due and payable in whole, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees, premiums and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers and (iii) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law.

ARTICLE VIII

The Administrative Agent

Each of the Lenders hereby irrevocably appoints the entity named as Administrative Agent in the heading of this Agreement and its successors to serve as administrative agent and collateral agent under the Loan Documents, and authorizes the Administrative Agent to take such

LA\4104335.13

UST-0628

actions on its behalf, including execution of the other Loan Documents, and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, each Lender hereby authorizes the Administrative Agent to consent, on behalf of each Lender, to the Order, each to be negotiated between the Loan Parties, the Administrative Agent, certain other parties and the statutory committees appointed pursuant to Sections 327 and 1103 of the Bankruptcy Code.

The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Parent Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing (and it is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law, and that such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties), (b) the Administrative Agent shall not have any duty to take any discretionary action or to exercise any discretionary power, except discretionary rights and powers expressly contemplated by the Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents), provided that the Administrative Agent shall not be required to take any action that, in its opinion, could expose the Administrative Agent to liability or be contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any debtor relief law, and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Parent Borrower or any Subsidiary or any other Affiliate thereof that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents) or in the absence of its own gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and nonappealable judgment).  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof (stating that it is a "notice of default") is given to the Administrative Agent by the Borrowers or a Lender, and the Administrative Agent shall

UST-0629

not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or in connection with any Loan Document, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default, (iv) the sufficiency, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the creation, perfection or priority of Liens on the Collateral or the existence of the Collateral or (vi) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or satisfaction of any condition that expressly refers to the matters described therein being acceptable or satisfactory to the Administrative Agent.

The Administrative Agent shall be entitled to rely, and shall not incur any liability for relying, upon any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the signatory, sender or authenticator thereof).  The Administrative Agent also shall be entitled to rely, and shall not incur any liability for relying, upon any statement made to it orally or by telephone and believed by it to be made by the proper Person (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the signatory, sender or authenticator thereof), and may act upon any such statement prior to receipt of written confirmation thereof.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender, unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all their duties and exercise their rights and powers through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Subject to the terms of this paragraph, the Administrative Agent may resign at any time, upon thirty days prior notice, from its capacity as such.  In connection with such resignation, the

UST-0630

Administrative Agent shall give notice of its intent to resign to the Lenders and the Borrowers. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the consent of the Borrower so long as no Event of Default under clauses (a) or (b) of Article VII is continuing, to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its intent to resign, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents. The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed by the Borrowers and such successor. Notwithstanding the foregoing, in the event no successor Administrative Agent shall have been so appointed and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its intent to resign, the retiring Administrative Agent may give notice of the effectiveness of its resignation to the Lenders and the Borrowers, whereupon, on the date of effectiveness of such resignation stated in such notice, (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents, provided that, solely for purposes of maintaining any security interest granted to the Administrative Agent under any Collateral Document for the benefit of the Secured Parties, the retiring Administrative Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Secured Parties and, in the case of any Collateral in the possession of the Administrative Agent, shall continue to hold such Collateral, in each case until such time as a successor Administrative Agent is appointed and accepts such appointment in accordance with this paragraph (it being understood and agreed that the retiring Administrative Agent shall have no duty or obligation to take any further action under any Collateral Document, including any action required to maintain the perfection of any such security interest), and (b) the Required Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, provided that (i) all payments required to be made hereunder or under any other Loan Document to the Administrative Agent for the account of any Person other than the Administrative Agent shall be made directly to such Person and (ii) all notices and other communications required or contemplated to be given or made to the Administrative Agent shall also directly be given or made to each Lender. Following the effectiveness of the Administrative Agent's resignation from its capacity as such, the provisions of this Article and Section 9.03, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent and in respect of the matters referred to in the proviso under clause (a) above.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any other Lender or the Debtors' Investment Banker, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the

88

UST-0631

Administrative Agent, or any other Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Each Lender, by delivering its signature page to this Agreement and funding its Loans on the Effective Date, or delivering its signature page to an Assignment and Assumption or any other Loan Document pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent or the Lenders on the Effective Date.

Except with respect to the exercise of setoff rights of any Lender in accordance with the Loan Documents or with respect to a Lender's right to file a proof of claim in an insolvency proceeding, no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Loan Document Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent on behalf of the Secured Parties in accordance with the terms thereof. In the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Administrative Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and the Administrative Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Loan Document Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent on behalf of the Secured Parties at such sale or other disposition.

The Secured Parties irrevocably authorize the Administrative Agent, at its option and in its discretion, to subordinate or release any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is a Permitted Encumbrance or that is permitted by Section 6.02(d), (e), (g) and (h). The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

In case of the pendency of any proceeding with respect to any Loan Party under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

UST-0632

(a)       to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, and all other Loan Document Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim under Sections 2.10, 2.11, 2.13, 2.14, 2.15 and 9.03) allowed in such judicial proceeding;

(b)       to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(c)       any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Lender and each Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders or the other Secured Parties, to pay to the Administrative Agent any amount due to it, in its capacity as the Administrative Agent, under the Loan Documents (including under Section 9.03).

To the extent required by any applicable laws (as determined in good faith by the Administrative Agent), the Administrative Agent may withhold from any payment to any Lender under any Loan Document an amount equivalent to any applicable withholding Tax.  Without limiting or expanding the provisions of Section 2.15, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective).  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this paragraph. The agreements in this paragraph shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Loan Document Obligations.

Notwithstanding anything herein to the contrary, neither the Debtors' Investment Banker nor any Person (if any) named on the cover page of this Agreement for recognition purposes only shall have any duties or obligations under this Agreement or any other Loan Document (except in any such Person's capacity, as and to the extent applicable, as a Lender), but all such Persons shall have the benefit of the indemnities to the extent referenced and provided for hereunder.

Unless otherwise expressly stated or referred to in this Article, the provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and, except solely to the extent of the Borrowers' rights to consent pursuant to and subject to the conditions set

LA\4104335.13

UST-0633

forth in this Article, none of the Borrowers or any other Loan Party shall have any rights as a third party beneficiary of any such provisions.  Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Loan Document Obligations provided under the Loan Documents, to have agreed to the provisions of this Article.

<div align="center">

ARTICLE IX

Miscellaneous

</div>

SECTION 9.01.    Notices.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) of this Section), all notices and other communications provided for herein shall be in writing and shall be delivered by e-mail, hand or overnight courier service, or mailed by certified or registered mail, as follows:

(i)    if to the Borrowers:

Ascena Retail Group, Inc.
933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attention:  Dan Lamadrid, Executive Vice President and Chief Financial Officer
E-mail: dan.lamadrid@ascenaretail.com

with a copy to:

933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attention: Gary Holland, General Counsel and VP
E-mail: gary.holland@ascenaretail.com

With a copy to:
Kirkland & Ellis LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Attention:  David M. Nemecek, P.C.
Email: david.nemecek@kirkland.com

(ii)    if to the Administrative Agent:

Alter Domus (US) LLC
225 W. Washington St., 9th Floor
Chicago, IL 60606
Attention: Legal Department and Hendrik van der Zandt
Email: legal@alterdomus.com and hendrik.vanderzandt@alterdomus.com

<div align="center">91</div>

UST-0634

with a copy to:

Holland & Knight LLP
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
Attention: Joshua Spencer
Email: joshua.spencer@hklaw.com

and

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attention:  Evan Fleck
Email: EFleck@milbank.com

(iii)     if to any other Lender, to it at its address or e-mail address set forth in its Administrative Questionnaire.

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received and (ii) delivered through electronic communications to the extent provided in paragraph (b) of this Section shall be effective as provided in such paragraph.

(b)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications (including e-mail and internet or intranet websites) pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices under Article II to any Lender if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Parent Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.  All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by return e-mail or other written acknowledgement); provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (b)(i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     Any party hereto may change its address for notices and other communications hereunder by notice to the other parties hereto.

LA\4104335.13

UST-0635

(d)     The Borrowers agree that the Administrative Agent may, but shall not be obligated to, make any Communication by posting such Communication on Debt Domain, Intralinks, Syndtrak or a similar electronic transmission system (the "Platform").  The Platform is provided "as is" and "as available."  Neither the Administrative Agent nor any of its Related Parties warrants, or shall be deemed to warrant, the adequacy of the Platform and each expressly disclaims liability for errors or omissions in the Communications.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made, or shall be deemed to be made, by the Administrative Agent or any of its Related Parties in connection with the Communications or the Platform.

SECTION 9.02.     Waivers; Amendments.

(a)     No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  Without limiting the generality of the foregoing, the execution and delivery of this Agreement or the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)     Except as provided in Sections 9.02(c) and 9.19 and except with respect to the Administrative Agent Fee Letter, none of this Agreement, any other Loan Document or any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrowers, the Administrative Agent and the Required Lenders and, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders, provided that (i) any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrowers and the Administrative Agent to cure any technical error, ambiguity, omission, defect or inconsistency so long as, in each case, the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment and (ii) no such agreement shall (A) increase the Commitment of any Lender without the written consent of such Lender, (B) reduce or forgive the principal amount of any Loan or reduce the rate of interest thereon or reduce or forgive any interest or fees or premiums (including any prepayment premiums but excluding for the avoidance of doubt, any mandatory prepayment) payable hereunder without the written consent of each Lender directly affected thereby, (C) postpone the scheduled maturity date of any Loan,

UST-0636

or the date of any scheduled payment of the principal amount of any Term Loan under Section 2.08, or any date for the payment of any interest or fees or premium payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly affected thereby, (D) change Section 2.16(b) or 2.16(c) in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender, (E) change any of the provisions of this Section or the percentage set forth in the definition of the term "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender; provided that, with the consent of the Required Lenders, the provisions of this Section and the definition of the term "Required Lenders" may be amended to include references to any new class of loans created under this Agreement (or to lenders extending such loans) on substantially the same basis as the corresponding references relating to the existing Loans or Lenders, (F) release substantially all of the value of the Guarantees provided by the Guarantors (including, in each case, by limiting liability in respect thereof) created under the Collateral Agreement without the written consent of each Lender (except as expressly provided in Section 9.16 or the Collateral Agreement including any such release by the Administrative Agent in connection with any sale or other disposition of any Subsidiary upon the exercise of remedies under the Collateral Documents), it being understood that an amendment or other modification of the type of obligations guaranteed under the Collateral Agreement shall not be deemed to be a release or limitation of any Guarantee, and (G) release all or substantially all the Collateral from the Liens of the Collateral Documents, without the written consent of each Lender (except as expressly provided in Section 9.16 or the applicable Collateral Document (including any such release by the Administrative Agent in connection with any sale or other disposition of the Collateral upon the exercise of remedies under the Collateral Documents), it being understood that an amendment or other modification of the type of obligations secured by the Collateral Documents shall not be deemed to be a release of the Collateral from the Liens of the Collateral Documents); provided further that no such agreement shall amend, modify, extend or otherwise affect the rights or obligations of the Administrative Agent without the prior written consent of the Administrative Agent. Notwithstanding the foregoing, no consent with respect to any amendment, waiver or other modification of this Agreement or any other Loan Document shall be required of, in the case of any amendment, waiver or other modification referred to in clause (ii) of the first proviso of this paragraph, any Lender that receives payment in full of the principal of and interest accrued on each Loan made by, and all other amounts owing to, such Lender or accrued for the account of such Lender under this Agreement and the other Loan Documents at the time such amendment, waiver or other modification becomes effective and whose Commitments terminate by the terms and upon the effectiveness of such amendment, waiver or other modification.

(c)    Notwithstanding anything herein to the contrary, the Administrative Agent may, without the consent of any Secured Party, consent to a departure by any Loan Party from any covenant of such Loan Party set forth in this Agreement, the Collateral Agreement or in any other Collateral Document to the extent such departure is consistent with the authority of the Administrative Agent set forth in the definition of the term "Collateral and Guarantee Requirement".

UST-0637

(d)     The Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, waivers or other modifications on behalf of such Lender.  Any amendment, waiver or other modification effected in accordance with this Section 9.02 shall be binding upon each Person that is at the time thereof a Lender and each Person that subsequently becomes a Lender.

(e)     Notwithstanding the foregoing, Exhibit G to this Agreement, the definitions of "Exit Facility Agreement" and "Exit Facility Term Sheet" and Section 2.22 (or any other provision which would result in an amendment, restatement, waiver or modification of any of the foregoing) may be amended, restated, waived or otherwise modified with the prior written consent of the Required Lenders, the Administrative Agent and the Parent Borrower; provided that to the extent such amendment, restatement, waiver or other modification would require the consent of any affected "Lender", all "Lenders" or any other Person (or requisite class of Persons) under the terms of Exhibit G as in effect on the Effective Date, the prior written consent of the corresponding affected Lender, all Lenders or such corresponding Person (or requisite class of Persons) under this Agreement shall be required; provided, further, that the Lenders hereby authorize the Administrative Agent to enter into any amendments to this Agreement and the other Loan Documents as may be necessary, in the reasonable opinion of the Administrative Agent and the Borrower, to give effect to the transaction contemplated by Section 2.22 and such other technical or immaterial amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Parent Borrower in connection therewith.

SECTION 9.03.     Expenses; Indemnity; Damage Waiver.

(a)     The Borrowers shall, jointly and severally, pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Ad Hoc Committee, the Lenders and their respective Affiliates, including the reasonable and documented out-of-pocket fees, charges and disbursements of one primary counsel for the Administrative Agent, and one primary counsel for the Ad Hoc Committee, and if deemed necessary by the Administrative Agent or the Ad Hoc Committee, one local counsel for the Administrative Agent and Ad Hoc Committee, as applicable in each applicable jurisdiction, in connection with the structuring, arrangement and syndication of the credit facilities provided for herein and any credit or similar facility refinancing or replacing, in whole or in part, any of the credit facilities provided for herein, including the preparation, execution, delivery and administration of this Agreement, the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof, the Order and any transaction contemplated thereby (whether or not the transactions contemplated hereby or thereby shall be consummated) and any refinancing of the obligations hereunder or any "exit financing" requested by the Loan Parties in connection with the Chapter 11 Cases (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable and documented out-of-pocket expenses in connection with the administration of actions related to the Collateral, including any actions taken to perfect or maintain priority of the Administrative Agent's Liens on the Collateral, to maintain any insurance required hereunder, to verify the Collateral, or any audit, inspection, or appraisal related to any Loan Party or the Collateral  and (iii) all out-of-pocket expenses incurred by the Administrative Agent, the Ad Hoc Committee or any Lender, including the fees, charges and disbursements of any counsel for any of the foregoing, in connection with the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this

95

UST-0638

Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)    The Borrowers shall, jointly and severally, indemnify the Administrative Agent (and any subagent thereof), and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee"), against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the structuring, arrangement and the syndication of the credit facilities provided for herein, the preparation, execution, enforcement, delivery and administration of this Agreement, the other Loan Documents or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to this Agreement or the other Loan Documents of their obligations thereunder or the consummation of the Transactions or any other transactions contemplated thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on, at, under to or from any property currently or formerly owned or operated by the Parent Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Parent Borrower or any Subsidiary or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether such proceeding is initiated against or by any party to this Agreement, or any Affiliate thereof, by an Indemnitee or any third party or whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses (i) are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee, (ii) are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from a material breach by such Indemnitee of the Loan Documents or (iii) involve a dispute solely among Indemnitees (other than an action involving (i) alleged conduct by any Borrower or any of its Affiliates or (ii) against the Administrative Agent in its capacity as such).  This Section shall not apply to any Taxes (other than Other Taxes or any Taxes that represent losses, claims, damages or related expenses arising from any non-Tax claim).

(c)    Each Lender severally agrees to indemnify and hold harmless the Administrative Agent (or any sub-agent thereof), to the extent that the Administrative Agent (or any sub-agent) shall not have been timely reimbursed by the Borrowers, based on and to the extent of such Lender's pro rata share, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Administrative Agent (or any sub-agent thereof) in exercising its powers, rights and remedies or performing its duties hereunder or under the other Loan Documents or otherwise in its capacity as the Administrative Agent (or any sub-agent thereof) in any way relating to or arising out of this Agreement or the other Loan Documents; provided, that no Lender shall be liable to the Administrative Agent (or any sub-agent) for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or any sub-agent's) gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent

LA\4104335.13

UST-0639

jurisdiction (it being understood and agreed that no action taken in accordance with the directions of the Required Lenders (or such other Lenders as may be required to give such instructions under Article VIII) shall constitute gross negligence or willful misconduct). If any indemnity furnished to the Administrative Agent (or any sub-agent thereof) for any purpose shall, in the opinion of the Administrative Agent (or any sub-agent thereof), be insufficient or become impaired, the Administrative Agent (or any sub-agent ) may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, that in no event shall this sentence require any Lender to indemnify the Administrative Agent (or any sub-agent thereof) against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's pro rata share. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the total outstanding Loans and unused Commitments at such time (or if such indemnity payment is sought after the date on which the Loans have been paid in full in accordance with such Lender's pro rata share immediately prior to the date on which the Loans are paid in full).

(d)      To the extent permitted by applicable law, (i) the Borrowers shall not assert, or permit any of their respective Affiliates or Related Parties to assert, and hereby waives, any claim against any Indemnitee for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the internet)and (ii) none of the Borrowers or any Secured Party shall assert, or permit any of their respective Affiliates or Related Parties to assert any claims on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)      All amounts due under this Section shall be payable not later than 10 days after written demand therefor.

SECTION 9.04.      Successors and Assigns.

(a)      The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i)  neither Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by any Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section), the Debtors' Investment Banker (to the extent provided in Article VIII)and, to the extent expressly contemplated hereby, the sub-agents of the Administrative Agent and the Related Parties of any of the Administrative Agent and any Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

97

UST-0640

(b)     Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

(i)     the Borrowers; provided that no consent of Borrowers shall be required (1) for an assignment to a Lender, a Related Lender, an Affiliate of a Lender or an Approved Fund (2) if in connection with the Initial Allocation (as defined in the Commitment Letter) and (3) if an Event of Default has occurred and is continuing, for any other assignment; provided further that, the Borrowers shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof.

(ii)     the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of any Loan to a Lender, a Related Lender, an Affiliate of a Lender or an Approved Fund.

(iii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender, a Related Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent and recorded in the Register) shall not be less than $1,000,000 unless each of the Borrowers and the Administrative Agent otherwise consent; provided that no such consent of the Borrowers shall be required (i) if an Event of Default has occurred and is continuing or (ii) in connection with the Initial Allocation (as defined in the Commitment Letter);

(B)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided that only one such processing and recordation fee shall be payable in the event of simultaneous assignments from any Lender or its Approved Funds to one or more other Approved Funds of such Lender;

(D)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent all requested "know your customer" documentation, a duly executed IRS Form W-9 or such other applicable IRS Form, and an Administrative Questionnaire in which the assignee designates one or more credit

98

UST-0641

contacts to whom all syndicate-level information (which may contain MNPI) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable law, including Federal, State and foreign securities laws;

(E)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent, the Ad Hoc Committee Advisors and the Company a signed joinder to the Restructuring Support Agreement; and

(F)     each Lender acknowledges and agrees that the Loans, on the one hand, and the unfunded Commitments on the other hand, shall be held by such Lender in equal percentages and such Loans, on the one hand, and such unfunded Commitments, on the other hand, are "stapled" to each other, and shall be assigned in equal percentages.

(iv)     Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.13, 2.14, 2.15 and 9.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 9.04(c).

(v)     The Administrative Agent, acting solely for this purpose as a nonfiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and records of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers and, as to entries pertaining to it, any Lender, at any reasonable time and from time to time upon reasonable prior written notice.

(vi)     Upon receipt by the Administrative Agent of an Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), all other information required under (iii)(D) above and the processing and recordation fee referred to in this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that

99

UST-0642

the Administrative Agent shall not be required to accept such Assignment and Assumption or so record the information contained therein if the Administrative Agent reasonably believes that such Assignment and Assumption lacks any written consent required by this Section or is otherwise not in proper form, it being acknowledged that the Administrative Agent shall have no duty or obligation (and shall incur no liability) with respect to obtaining (or confirming the receipt) of any such written consent or with respect to the form of (or any defect in) such Assignment and Assumption, any such duty and obligation being solely with the assigning Lender and the assignee. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph, and following such recording, unless otherwise determined by the Administrative Agent (such determination to be made in the sole discretion of the Administrative Agent, which determination may be conditioned on the consent of the assigning Lender and the assignee), shall be effective notwithstanding any defect in the Assignment and Assumption relating thereto. Each assigning Lender and the assignee, by its execution and delivery of an Assignment and Assumption, shall be deemed to have represented to the Administrative Agent that all written consents required by this Section with respect thereto (other than the consent of the Administrative Agent) have been obtained and that such Assignment and Assumption is otherwise duly completed and in proper form, and each assignee, by its execution and delivery of an Assignment and Assumption, shall be deemed to have represented to the assigning Lender and the Administrative Agent that such assignee is an Eligible Assignee.

(vii)    No such assignment shall be made to the Parent Borrower or any of its Subsidiaries, except as set forth in Section 9.04(e).

(c)    (i) Any Lender may, without the consent of the Borrowers or the Administrative Agent, sell participations to one or more Eligible Assignees ("Participants") in all or a portion of such Lender's rights and obligations under this Agreement; provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under the Loan Documents. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant or requires the approval of all the Lenders. The Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.13, 2.14 and 2.15 (subject to the requirements and limitations therein, including the requirements under Section 2.15(e) (it being understood that the documentation required under Section 2.15(e) shall be delivered solely to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (x) agrees to be subject to the provisions of Sections 2.16 and 2.17 as if it were an assignee under paragraph (b) of this Section and (y) shall not be entitled to receive any greater payment under Section 2.13 or 2.15, with respect to any participation, than its participating Lender would have been entitled to receive,

UST-0643

except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrowers' request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 2.17(b) with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.16(c) as though it were a Lender.

(i)     Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain records of the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement or any other Loan Document (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments or Loans or its other obligations under this Agreement or any other Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment or Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     Notwithstanding anything to the contrary contained in this Section 9.04 or any other provision of this Agreement, no Lender shall have the right at any time to sell, assign or transfer all or a portion of the Loans owing to it to the Parent Borrower or any of its Subsidiaries.

SECTION 9.05.   Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, any Lender or any Affiliate of any of the foregoing may have had notice or knowledge of any Default or incorrect representation or warranty at the time any Loan Document is executed and delivered or any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the

101

UST-0644

Commitments have not expired or terminated.  The provisions of Sections 2.13, 2.14, 2.15, 2.16(e) and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.06.    Counterparts; Integration; Effectiveness; Electronic Execution.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 9.07.    Severability.  Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08.    Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized (notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Court) at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender to or for the credit or the account of any Loan Party against any of and all the Loan Document Obligations held by such Lender, irrespective of whether or not such Lender shall have made any demand under the Loan Documents and although such obligations may be unmatured.  The applicable Lender shall notify the Borrowers and the Administrative Agent of such set-off or application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such set-off or application under this Section.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

LA\4104335.13

UST-0645

SECTION 9.09.    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    Except to the extent superseded by the Bankruptcy Code, this Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the Court or the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and the Borrowers hereby irrevocably and unconditionally agree that all claims arising out of or relating to this Agreement or any other Loan Document brought by the Borrowers or any of their respective Affiliates shall be brought, and shall be heard and determined in the Court, in such New York State or, to the extent permitted by law, in such Federal court. Each party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or any of its properties in the courts of any jurisdiction.

(c)    The Borrowers hereby irrevocably and unconditionally waive, to the fullest extent they may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10.    WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

LA\4104335.13

UST-0646

SECTION 9.11.   Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12.   Confidentiality.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below) with the same degree of care that it uses to protect its own confidential information, but in no event less than a commercially reasonable degree of care, except that Information may be disclosed (a) to its Related Parties, including accountants, legal counsel and other agents and advisors, it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable law or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies under this Agreement or any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing confidentiality undertakings substantially similar to those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its Related Parties) to any swap or derivative transaction relating to the Parent Borrower or any Subsidiary or its obligations, (g) on a confidential basis to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the credit facilities provided for herein, (h) with the consent of the Borrowers or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender or any Affiliate of any of the foregoing on a non-confidential basis from a source other than the Borrowers; provided that, in the case of clause (c) above, the party disclosing such information shall provide to the Borrowers prior written notice of such disclosure to the extent permitted by applicable law (and to the extent commercially feasible under the circumstances) and shall cooperate with the Borrowers in obtaining a protective order for, or other confidential treatment of, such disclosure.  For the purposes of this Section, "Information" means all information received from the Borrowers relating to the Parent Borrower or any Subsidiary or their businesses or the Collateral.

SECTION 9.13.   Several Obligations; Nonreliance; Violation of Law.  The respective obligations of the Lenders hereunder are several and not joint and the failure of any Lender to make any Loan or perform any of its obligations hereunder shall not relieve any other Lender from any of its obligations hereunder.  Anything contained in this Agreement to the contrary notwithstanding, no Lender shall be obligated to extend credit to the Borrowers in violation of applicable law.

SECTION 9.14.   USA Patriot Act Notice.  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Loan Party that pursuant to the requirements of the Patriot Act it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party

LA\4104335.13

UST-0647

and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with such Act.

SECTION 9.15.   Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.16.   Release of Liens and Guarantees.  A Guarantor (for the avoidance of doubt, other than the Borrowers) shall be released from its obligations under the Loan Documents, and all security interests created by the Collateral Documents in Collateral owned by such Guarantor shall be released, upon the consummation of any transaction permitted by this Agreement as a result of which such Guarantor ceases to be a Restricted Subsidiary (including any voluntary liquidation or dissolution of such Guarantor in accordance with Section 6.03); provided that, if so required by this Agreement, the Required Lenders shall have consented to such transaction and the terms of such consent shall not have provided otherwise.  Upon any sale or other transfer by any Loan Party (other than to a Borrower or any other Loan Party or to any other Subsidiary of the Parent Borrower) of any Collateral in a transaction permitted under this Agreement, or upon the effectiveness of any written consent to the release of the security interest created under any Collateral Document in any Collateral pursuant to Section 9.02, the security interests in such Collateral created by the Collateral Documents shall be automatically released. In connection with any termination or release pursuant to this Section, the Administrative Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release.  Any execution and delivery of documents pursuant to this Section shall be without recourse to or warranty by the Administrative Agent.

SECTION 9.17.   No Fiduciary Relationship.  Each Borrower, on behalf of itself and the Subsidiaries, agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, the Parent Borrower, the Subsidiaries and its other Affiliates, on the one hand, and the Administrative Agent, the Lenders and their Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Administrative Agent, the Lenders or their Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications.  The Administrative Agent, the Lenders and their Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of the Parent Borrower, the Subsidiaries and its other Affiliates, and none of the Administrative Agent, the Lenders or their Affiliates has any

105

UST-0648

obligation to disclose any of such interests to the Parent Borrower, the Subsidiaries or its other Affiliates.  To the fullest extent permitted by law, each Borrower hereby waives and releases any claims that it or any of its Affiliates may have against the Administrative Agent, the Lenders and their Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 9.18.    Non-Public Information.

(a)    Each Lender acknowledges that all information, including requests for waivers and amendments, furnished by a Borrower or the Administrative Agent pursuant to or in connection with, or in the course of administering, this Agreement will be syndicate-level information, which may contain MNPI.  Each Lender represents to the Borrowers and the Administrative Agent that (i) it has developed compliance procedures regarding the use of MNPI and that it will handle MNPI in accordance with such procedures and applicable law, including Federal, state and foreign securities laws, and (ii) it has identified in its Administrative Questionnaire a credit contact who may receive information that may contain MNPI in accordance with its compliance procedures and applicable law, including Federal, state and foreign securities laws.

(b)    The Borrowers and each Lender acknowledge that, if information furnished by the Loan Parties pursuant to or in connection with this Agreement is being distributed by the Administrative Agent through the Platform, (i) the Administrative Agent may post any information that the Borrowers have indicated as containing MNPI solely on that portion of the Platform designated for Private Side Lender Representatives and (ii) if the Borrowers have not indicated whether any information furnished by it pursuant to or in connection with this Agreement contains MNPI, the Administrative Agent reserves the right to post such information solely on that portion of the Platform designated for Private Side Lender Representatives.  The Borrowers agree to clearly designate all information provided to the Administrative Agent by or on behalf of the Borrowers that is suitable to be made available to Public Side Lender Representatives, and the Administrative Agent shall be entitled to rely on any such designation by the Borrowers without liability or responsibility for the independent verification thereof.

SECTION 9.19.    Intercreditor Agreement.  (a) Each of the Lenders and the other Secured Parties acknowledges that obligations of the Loan Parties under the ABL Credit Agreement are secured by Liens on assets of the Loan Parties that constitute Collateral and that the relative Lien priorities and other creditor rights of the Secured Parties and the secured parties under the ABL Credit Agreement will be set forth in the Intercreditor Agreement.  Each of the Lenders and the other Secured Parties hereby acknowledges that it has received a copy of the Intercreditor Agreement.  Each of the Lenders and the other Secured Parties hereby irrevocably authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, the Intercreditor Agreement and any documents relating thereto.

(a)    Each of the Lenders and the other Secured Parties hereby irrevocably (i) consents to the treatment of Liens provided for under the Intercreditor Agreement, including to the subordination of the Liens on the ABL Priority Collateral securing the Loan Document Obligations on the terms set forth in the Intercreditor Agreement, (ii) agrees that, upon the

106

UST-0649

execution and delivery thereof, such Secured Party will be bound by the provisions of the Intercreditor Agreement as if it were a signatory thereto and will take no actions contrary to the provisions of the Intercreditor Agreement, (iii) agrees that no Secured Party shall have any right of action whatsoever against the Administrative Agent as a result of any action taken by the Administrative Agent pursuant to this Section 9.19 or in accordance with the terms of the Intercreditor Agreement, (iv) authorizes and directs the Administrative Agent to carry out the provisions and intent of each such document and (v) authorizes and directs the Administrative Agent to take such actions as shall be required to release Liens on the Collateral in accordance with the terms of the Intercreditor Agreement.

(b)     Each of the Lenders and the other Secured Parties hereby irrevocably further authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, any amendments, supplements or other modifications of the Intercreditor Agreement that the Borrowers may from time to time request and that are reasonably acceptable to the Administrative Agent (i) to give effect to any establishment, incurrence, amendment, extension, renewal, refinancing or replacement of any Loan Document Obligations or the Indebtedness under the ABL Credit Agreement to the extent applicable, (ii) to confirm for any party that the Intercreditor Agreement is effective and binding upon the Administrative Agent on behalf of the Secured Parties or (iii) to effect any other amendment, supplement or modification permitted by the terms of the Intercreditor Agreement.

(c)     Each of the Lenders and the other Secured Parties hereby irrevocably further authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, any amendments, supplements or other modifications of any Collateral Document to add or remove any legend that may be required pursuant to the Intercreditor Agreement.

(d)     The Administrative Agent shall have the benefit of the provisions of Article VIII with respect to all actions taken by it pursuant to this Section or in accordance with the terms of the Intercreditor Agreement to the full extent thereof.

SECTION 9.20.    Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any related agreement, arrangement or understanding among the parties hereto, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder that may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

UST-0650

(i)  a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

[Signature pages follow]

LA\4104335.13

UST-0651

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**PARENT BORROWER:**

ASCENA RETAIL GROUP, INC.

By: _____
Name:
Title:

LA\4104335.13

UST-0652

**SUBSIDIARY BORROWER:**


ANNTAYLOR RETAIL, INC.


By: _____

     Name:
     Title:

LA\4104335.13

UST-0653

ALTER DOMUS (US) LLC,
as Administrative Agent,

By: _____

     Name:
     Title:

*[Signature Page to the Term Credit Agreement]*

UST-0654

## Schedule 2.01

## Commitments

| Lender | Commitment |
|---|---|
| [   ] | $              [  ],000,000 |
| **Total** | $              [  ],000,000 |

UST-0655

## Schedule 5.11
### Required Milestones

The Loan Parties shall use their reasonable best efforts to pursue and implement the Restructuring Transactions as defined in, and in accordance with, the RSA and shall, subject to the availability of the Court and as such time periods may be extended by the Required Lenders, achieve the following milestones:

      (a)     the Petition Date has not occurred by 11:59 p.m. (Eastern Time) on July 23, 2020;

      (b)     the Debtors have not filed the Rent Deferral Motion (as defined in the RSA) with the Court within three (3) calendar days of the Petition Date;

      (c)     the Court has not entered the Cash Collateral Order (as defined in the RSA) on an interim basis by the date that is five (5) Business Days after the Petition Date;

      (d)     the Court has not entered the DIP Financing Order (as defined in the RSA) on a final basis by the date that is thirty-five (35) calendar days after the Petition Date;

      (e)     the Court has not entered the Disclosure Statement Order (as defined in the RSA) by the date that is sixty (60) calendar days after the Petition Date;

      (f)     solicitation of the Plan (as defined in the RSA) has not commenced by the date that is seventy (70) calendar days after the Petition Date;

      (g)     the Court has not entered the Confirmation Order (as defined in the RSA) by the date that is one hundred ten (110) calendar days after the Petition Date; and

      (h)     the Plan Effective Date (as defined in the RSA) has not occurred by the date that is one hundred thirty (130) calendar days after the Petition Date.

UST-0656

**Exhibit B**

<u>See Attached.</u>

UST-0657

## Exit Facility Term Sheet[1]

| | |
|---|---|
| **Borrowers:** | Reorganized Ascena Retail Group, Inc., a Delaware corporation (the "**Parent Borrower**") and AnnTaylor Retail, Inc., a Florida corporation (the "**Subsidiary Borrower**" and, together with the Parent Borrower, the "**Borrowers**"). |
| **Administrative Agent and Collateral Agent:** | Alter Domus (US) LLC (in its capacity as administrative agent, the "**Administrative Agent**", and in its capacity as collateral agent, the "**Collateral Agent**"). |
| **Lenders:** | Holders of DIP Term Facility Claims will receive First Out Term Loans and, together with other holders of Term Loan Claims, Last Out Term Loans (each as defined below), respectively, as set forth in the Proposed Plan (collectively, the "**Lenders**") |
| **Term Loan Facility:** | First lien senior secured term loan facility in an aggregate original principal amount of $400 million, denominated in US Dollars, consisting of: |

- $311.8 million of first-out term loans (the "**First Out Term Loan Facility**", the loans thereunder, the "**First Out Term Loans**" and the commitments thereunder, the "**First-Out Commitments**") converted in accordance with the Proposed Plan to holders of DIP Term Facility Claims; and

- $88.2 million of last-out term loans (the "**Last Out Term Loan Facility**", the loans thereunder, the "**Last Out Term Loans**" and the commitments thereunder, the "**Last-Out Commitments**") distributed to holders of Term Loan Claims in accordance with the Proposed Plan.

As used herein, "**Term Loan Facility**" means, collectively, the First Out Term Loan Facility and the Last Out Term Loan Facility. "**Commitments**" means, collectively, the First Out Commitments and the Last Out Commitments. "**Term Loans**" means, collectively, the First Out Term Loans and the Last Out Term Loans.

The First Out Term Loans will be "first out" in right of payment priority and the Last Out Term Loans will be "last out" in right of payment priority (in each case, as between the tranches of Term

---

[1] Capitalized terms used but not defined in this Exit Facility Term Sheet have the meanings ascribed to them in the Restructuring Support Agreement, dated as of July 23, 2020 (the "**Restructuring Support Agreement**") to which this Exit Facility Term Sheet is attached or the Proposed Plan attached as Exhibit B to the Restructuring Support Agreement.

UST-0658

Loans).  The First Out Term Loans and Last Out Term Loans shall be secured on a *pari passu* basis by the same lien on the Collateral (as defined below).

|  |  |
|---|---|
| **Definitive Documentation:** | The definitive documentation for the Term Loan Facility (the "**Definitive Documentation**") shall, except as otherwise set forth herein, be based on the Term Credit Agreement, dated as of August 21, 2015 (as amended, supplemented or otherwise modified prior to the date hereof), by and among Ascena Retail Group, Inc., AnnTaylor Retail, Inc., certain subsidiaries of the Parent Borrower party thereto, Goldman Sachs Bank USA, as the administrative agent and the collateral agent, and certain lenders party thereto from time to time (the "**Prepetition Term Loan Credit Agreement**"), (i) as modified by the terms set forth herein, (ii) subject to modifications to reflect changes in law or accounting standards since the date of such precedent and administrative agency, collateral agency and operational requirements of the Administrative Agent and Collateral Agent and (iii) with such other terms and conditions as may be reasonably agreed between the Borrowers and the Required Consenting Stakeholders; provided that, except as otherwise agreed by the Required Consenting Stakeholders, the Definitive Documentation shall be substantially consistent with the documentation governing the Exit ABL Facility (other than (i) provisions that are specific to asset-based facilities, (ii) the financial covenants applicable thereto, (iii) cross-defaults with respect to the Term Loan Facility and (iv) such other terms mutually agreed between the Borrowers and the Required Consenting Stakeholders).  The Definitive Documentation shall be negotiated in good faith within a reasonable time period to be determined based on the expected date of Bankruptcy Court's entry into the Confirmation Order, with initial drafts of the Definitive Documentation to be prepared by counsel for the Consenting Stakeholders, which is Milbank LLP. This paragraph, collectively, is referred the here as the "**Documentation Principles**". |
| **Maturity Date:** | First Out Term Loans: 4 years after the Effective Date (the "**First Out Maturity Date**").<br><br>Last Out Term Loans: 5 years after the Effective Date (the "**Last Out Maturity Date**"). |
| **Amortization:** | First Out Term Loans: Commencing with the last day of the first full calendar quarter following the Effective Date, the outstanding principal amount of the First Out Term Loans will be payable on each calendar quarter in equal amounts of (i) for each calendar quarter occurring on or prior to the second anniversary of the Effective Date, 1.00% *per annum* and (ii) for each calendar quarter |

2

UST-0659

thereafter, 3.00% *per annum,* in each case of the original principal amount of the First Out Term Loans, with the remaining balance, together with all other amounts owed with respect thereto, payable on the First Out Maturity Date, subject to reduction pursuant to the prepayment provisions to be mutually agreed in the Definitive Documentation.

Last Out Term Loans:  The outstanding principal amount of the Last Out Term Loans will be payable on each calendar quarter in equal amounts of 1.00% *per annum* of the original principal amount of the Last Out Term  Loans, with the remaining balance, together with all other amounts owed with respect thereto, payable on the Last Out Maturity Date .

| | |
|---|---|
| **Voluntary Prepayments:** | The Borrowers may make voluntary prepayments of the Term Loans, in each case, other than in connection with a repricing event, without premium or penalty, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of LIBOR borrowings other than on the last day of the relevant interest period. |
| **Mandatory Prepayments:** | Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles; provided that no prepayment shall be required pursuant to Section 2.09(c) thereof for any Excess Cash Flow (as defined in the Prepetition Term Loan Credit Agreement). |
| **Interest:** | With respect to the First Out Term Loans, at the Parent Borrower's election: |

- ABR (defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement) *plus* 10.75% per annum in cash or Adjusted LIBO Rate (defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement) *plus* 11.75% per annum in cash (subject to a 0.00% per annum floor on ABR and a 1.00% *per annum* floor on the Adjusted LIBO Rate) .

With respect to the Last Out Term Loans, at the Parent Borrower's election:

- prior to the second anniversary of the Effective Date, ABR *plus* 2.00% *per annum* in cash and 8.00% *per annum* in kind ("**PIK**") or Adjusted LIBO Rate *plus* 2.50% *per annum* in cash and 8.50% PIK, and thereafter, ABR *plus* 10.00% *per annum* in cash or Adjusted LIBO Rate *plus* 11.00% *per annum* in cash

3

UST-0660

(in each case subject to a 0.00% *per annum* floor on ABR and a 1.00% *per annum* floor on the Adjusted LIBO Rate).

**Prepayment Premium**   NC1/106.375%/103.1875%/par, with the Make-Whole Amount payable at an amount equal to the present value of the amount of interest that would have been paid on the principal amount of the Loans to and including the 3.5 year anniversary of the Closing Date (in each case, calculated on the basis of the interest rate with respect to the Loans then in effect, on a quarterly basis and on the basis of actual days elapsed over a year of three hundred sixty-five (365) days). The present value calculation shall be calculated using the discount rate equal to the Treasury Rate as of such repayment or prepayment date or date of required repayment plus fifty (50) basis points. The Prepayment Premium and Make-Whole Amount shall be payable upon any repricing event or acceleration. The Definitive Documentation shall contain a "Momentive" provision satisfactory to the Required Consenting Stakeholders.

**Guarantees:**   All obligations of the Borrowers under the definitive credit agreement for the Term Loan Facility (the "**Exit Credit Agreement**") and the related guarantee and collateral agreement, mortgage agreements and other collateral documents (together with the Exit Credit Agreement, the "**Loan Documents**") (collectively, the "**Borrowers Obligations**") will be unconditionally guaranteed jointly and severally on a senior basis (the "**Guarantees**") by the direct parent of the Borrower and each existing and subsequently acquired or organized direct or indirect Material Domestic Subsidiary, Material Foreign Subsidiary and, notwithstanding anything to the contrary herein, (x) each Luxembourg subsidiary, (y) each guarantor party to the Prepetition Term Loan Credit Agreement and (z) each subsidiary owning material intellectual property (or owning subsidiaries which own material intellectual property) or material real property of the company (the "**Subsidiary Guarantors**", together with the Borrowers, the "**Loan Parties**"); provided that, notwithstanding anything to the contrary herein, (i) the guarantor exclusions shall be limited to (a) immaterial domestic subsidiaries, (b) immaterial foreign subsidiaries (which, for avoidance of doubt, will not include any Luxembourg subsidiaries), (c) bona fide joint ventures with third parties, (d) any subsidiary that is prohibited by applicable law, rule or regulation or by any contractual obligation at the time such person becomes a subsidiary (and not entered into in contemplation of this clause (d) and for so long as such prohibition or restriction remains in effect), as applicable, from granting a guarantee or which would require governmental (including regulatory) consent, approval, license or authorization to provide such guarantee unless such consent, approval, license or

4

UST-0661

authorization has been received, (e) any subsidiary acquired pursuant to an acquisition or other investment permitted by the Definitive Documentation that has assumed, permitted secured indebtedness not incurred in contemplation of such acquisition or other investment and any subsidiary thereof that guarantees such secured indebtedness, in each case to the extent and for so long as such secured and (f) circumstances where the Borrowers and the Administrative Agent reasonably agree that the cost of providing such a guarantee is excessive in relation to the value afforded thereby and (ii) the Definitive Documentation shall not permit any unrestricted subsidiaries.

"**CFC**" shall mean any direct or indirect Foreign Subsidiary of any Borrower that is a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code of 1986, as amended (the "Code").

"**CFC Holdco**" shall mean any direct or indirect subsidiary of any Borrower, which subsidiary is treated as a disregarded entity for U.S. federal income tax purposes and substantially all of the assets of which consist of the equity interests in and/or indebtedness issued by one or more Foreign Subsidiaries that are CFCs."

"**Material Domestic Subsidiary**" shall be defined to include any subsidiary organized in the U.S. with total assets or EBITDA in excess of 2.5% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis; provided, that at no time shall the aggregate total assets or EBITDA of all Material Domestic Subsidiaries, taken together, account for more than 5.0% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis.

"**Material Foreign Subsidiary**" shall be defined to include any Luxembourg subsidiary and any other subsidiary organized in a non-U.S. jurisdiction where the total assets or EBITDA associated with such jurisdiction (in the aggregate for all subsidiaries organized therein) exceeds 2.5% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis. Notwithstanding the foregoing or anything to the contrary in this term sheet, any guarantee granted by any CFC shall be terminated (and no more than 65% of the voting stock of any Material Foreign Subsidiary shall be Collateral) for so long as such guarantee and/or pledge of the additional Collateral shall cause (or is reasonably expected to cause) any U.S. shareholder of such CFC to include in income for any year any Section 956 Income that is in excess of the Income Threshold (as defined below).

5

UST-0662

Notwithstanding the foregoing or anything to the contrary in this term sheet, any guarantee granted by any CFC Holdco shall be terminated (and no more than 65% of the voting stock of any CFC Holdco shall be Collateral) for so long as such guarantee and/or pledge of the additional Collateral shall cause (or is reasonably expected to cause) any U.S. shareholder of such CFC Holdco to include in income for any year an amount (after accounting for any reduction under the rules of Treas. Reg. § 1.956-1 and Section 245A of the Code) under Section 956 of the Code ("**Section 956 Income**") that is in excess of the Income Threshold. The "**Income Threshold**" shall mean, with respect to any CFC Holdco or CFC, as applicable, an amount to be mutually agreed.

"**subsidiary(ies)**" has the meaning assigned to such term in the Pre-Petition Credit Agreement.

**Security:**

Subject to the intercreditor agreement described below under "**Intercreditor Agreement**" and other customary limitations and exclusions to be mutually agreed, the Borrowers Obligations and the Guarantees (collectively the "**Secured Obligations**") will be secured on a first priority basis by substantially all assets of the Loan Parties (collectively, the "**Collateral**"); provided that, notwithstanding anything to the contrary set forth herein (i) all cash and cash equivalents held in accounts (other than customary excluded accounts) in the name of any Loan Party shall be subject to account control agreements in favor of the Collateral Agent (or for so long as the Exit ABL Facility and ABL Intercreditor are in effect, in favor of the ABL Agent), (ii) all equity in the Borrowers, all domestic (including immaterial) subsidiaries, all Luxembourg subsidiaries, all foreign subsidiaries and all Material Foreign Subsidiaries shall at all times be included in the Collateral and (iii) all material intellectual property and material real property shall at all times be included in the Collateral. The pledge of, security interest in, and mortgages on, the Collateral granted by each Loan Party shall secure its own respective Secured Obligations.

All of the foregoing described in this section and the "Guarantees" section above, the "**Collateral and Guarantee Requirement**".

**Conditions to Borrowings:**

The availability of the Term Loans under the Exit Credit Agreement will be subject solely to satisfaction (or waiver) of the following conditions (the date on which such conditions are satisfied (or waived) being the "**Effective Date**"):

- execution and delivery of the Definitive Documentation to be delivered at closing;

6

UST-0663

- delivery of promissory notes to the Lenders, if requested at least two (2) Business Days before the Effective Date;

- delivery of board resolutions and organizational documents of the Loan Parties;

- delivery of incumbency/specimen signature certificate of the Loan Parties;

- delivery of customary legal opinions by counsel to the Borrowers;

- there shall not have occurred since the Petition Date any event or condition that has had or would be reasonably expected, either individually or in the aggregate, to have a Material Adverse Effect (for purposes of this condition, defined in a manner based on the Prepetition Term Loan Credit Agreement but including a proviso stating that in determining whether a "Material Adverse Effect" has occurred or exists under clause (a) thereof, the impacts of the chapter 11 cases and of COVID-19 on the assets, business, financial condition or results of operations on the Loan Parties or any of their respective Subsidiaries will be disregarded (provided that this exception shall not apply to the extent that it is materially disproportionately adverse to the Parent Borrower and its Restricted Subsidiaries, taken as a whole, as compared to other companies in the same industry in which the Parent Borrower and its Restricted Subsidiaries operate));

- the Administrative Agent shall have received a certificate (in substantially the same form as the corresponding certificate delivered in connection with the Prepetition Term Loan Credit Agreement) of the chief financial officer (or financial officer in a similar role) of the Parent Borrower, stating that it and its subsidiaries, taken as a whole, as of the Effective Date, are solvent, in each case, after giving effect to the consummation of the Plan;

- all fees due to the Administrative Agent, Collateral Agent and Lenders including advisors to the Consenting Stakeholders, Greenhill & Co. and Milbank LLP, shall have been paid (or shall have been caused to be paid), and all expenses to be paid or reimbursed to the Administrative Agent, Collateral Agent and Lenders that have been invoiced at least three (3) Business Days prior to the

UST-0664

Effective Date shall have been paid  (or shall have been caused to be paid);

- the Loan Parties shall have provided the documentation and other information to the Administrative Agent that are required by regulatory authorities under applicable "know-your-customer" rules and regulations, including the Patriot Act, at least three (3) Business Days prior to the Effective Date (or such later date agreed to by the Administrative Agent) to the extent requested ten (10) days prior to the Effective Date;

- the Bankruptcy Court shall have entered (A) the Confirmation Order and (B) one or more orders authorizing and approving the extensions of credit in respect of the Exit Credit Agreement, each in the amounts and on the terms set forth herein, and all transactions contemplated by the Exit Credit Agreement, and, in each case, such orders shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified;

- the Collateral and Guarantee Requirement (excluding certain customary post-closing items to be mutually agreed) shall have been satisfied or waived and the Intercreditor Agreement and the Agreement Among Lenders shall have been executed and delivered and be in full force and effect;

- the effective date under the Plan shall have occurred, or contemporaneous with the conversion of the DIP Term Facility to the Term Loan Facility shall occur, and all conditions precedent thereto as set forth therein shall have been satisfied or waived (including (x) the issuance to (i) the holders of DIP Term Facility Claims of 44.9% of the New Common Stock, subject to dilution from the Management Incentive Plan and (ii) the holders of Term Loan Claims of 55.1% of New Common Stock (subject to reduction for New Common Stock distrusted in accordance with the following clause (y)) and (y) each holder of a Term Loan Claim that is a Required Consenting Stakeholder (including through any of its Related Parties) having received its pro rata share of an amount of New Common Stock equal to $7.5 million, in each case shall have occurred substantially contemporaneously with the closing of the Term Loan Facility);

- the Pre-Petition ABL Credit Agreement shall have been replaced with a new credit agreement providing asset-based

8

UST-0665

lending facilities for working capital and other general corporate purposes of the Borrowers and its subsidiaries on terms and conditions reasonably acceptable to the Required Consenting Stakeholders (any such credit agreement, the "**Exit ABL Credit Agreement**", and the facility in place as of the Effective Date under either the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, the "**Exit ABL Facility**");

- (i) with respect to Catherine's business segment either completion of a liquidation or consummation of a sale transaction as a going concern to a third party on terms satisfactory to the Required Consenting Stakeholders, and (ii) with respect to the Justice business segment, either completion of a liquidation, consummation of a sale transaction as a going concern to a third party or consummation of a reorganization of the business segment, in each case on terms reasonably satisfactory to the Required Consenting Stakeholders, in each case on or prior to the Effective Date;

- minimum pro forma Liquidity (as defined in the DIP Term Facility), calculated after giving effect to the restructuring transactions and effectiveness of the Plan, of at least $150 million (pro forma for the occurrence of the Effective Date and related transactions, including after taking into account all restructuring expenses (including professional fees) that are paid post emergence and the availability of the Exit ABL Facility and any incurrence of loans thereunder);

- with respect to store leases which are not rejected, aggregate annual cost savings for FY2020 of at least $18 million, calculated in a manner consistent with how "Occupancy Cost Savings" are calculated in the Real Estate Services Agreement dated as of May 1, 2020 by and between A&G Realty Partners, LLC and the Parent Borrower;

- with respect to the Premium segment and Lane Bryant (in aggregate), the number of store closures that shall have occurred prior to the Effective Date shall be consistent with the closures anticipated under the Company's business plan provided to the Ad Hoc Committee Advisors (as determined by the Ad Hoc Committee Advisors in their reasonable discretion) or as otherwise consented to by the Required Consenting Stakeholders;

9

UST-0666

- all pre-Petition transfers of intellectual property to the LuxCo Entities shall have been unwound and all licensing arrangements with respect thereto shall have been cancelled, in each case on terms reasonably satisfactory to the Required Consenting Stakeholders and all such intellectual property shall be owned and registered in the name of Annco, Inc., unless the Required Consenting Stakeholders and the Company mutually agree that the cost, difficulty, burden or consequences of such transfer and/or cancelation exceeds the practical benefits to the Lenders afforded thereby and cannot be completed in a tax efficient manner;

- the accuracy of representations and warranties in all material respects (without duplication of any materiality qualifier) on the Effective Date (except to the extent any such representation or warranty is stated to relate solely to an earlier date, in which case such representation or warranty shall be true and correct in all material respects (without duplication of any materiality qualifier) as of such earlier date; and

- the absence of the existence of any default or event of default.

| | |
|---|---|
| **Representations and Warranties:** | Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles. |
| **Affirmative Covenants:** | Usual and customary, subject to the Documentation Principles; provided that (i) financial reporting shall include (a) unaudited monthly internally generated financial statements and "flash reports", together with certain KPI reports for each banner to be agreed (with such KPI report requirement to fall away upon the Parent Borrower and its subsidiaries achieving a consolidated total leverage ratio for four (4) consecutive fiscal quarters of not more than 1.50:1.00, (b) unaudited quarterly (for all four quarters) and audited annual financial statements, (c) quarterly MD&A and (d) an annual budget, (ii) the annual lender call referenced therein shall be revised to quarterly lender calls and (iii) the Parent Borrower shall use commercially reasonable efforts to obtain credit ratings by each of Standard & Poor's Rating Services and Moody's Investors Service, Inc. prior to the Effective Date, it being understood that there shall be no obligation to maintain any particular rating at any time. |
| **Negative Covenants:** | Usual and customary, subject to the Documentation Principles and subject to customary and usual exceptions, qualifications and |

UST-0667

"baskets" to be mutually agreed and set forth in the Exit Credit Agreement, which shall include a customary cumulative credit basket.

| | |
|---|---|
| **Financial Covenant:** | First Out Term Loans: |

- Total leverage ratio at levels to be agreed amongst the Company and the Initial Consenting Stakeholders, which shall be tested quarterly commencing at the end of the first full fiscal quarter following the Effective Date.

- Minimum liquidity covenant, which shall take into account unrestricted cash and ABL availability (based on borrowing base) at levels to be agreed amongst the Company and the Required Consenting Stakeholders, which shall be maintained at all times.

- All expenses in connection with the Chapter 11 filing shall be added back to the calculation of EBITDA (to be defined in the Definitive Documentation, subject to the Documentation Principles). Component definitions for determining total leverage ratio are to be agreed amongst the Company and the Required Consenting Stakeholders.

Last Out Term Loans: total leverage ratio, subject to a cushion relative to the First Out Term Loan levels that is acceptable to the Company and the Required Consenting Stakeholders.

| | |
|---|---|
| **Unrestricted Subsidiaries:** | None. |
| **Events of Default:** | Usual and customary for transactions of this type, subject to the Documentation Principles and to include a full cross-default to the Exit ABL Facility. Defaults in respect of a Financial Covenant shall be subject to customary equity cure rights. |
| **Voting:** | Usual and customary for transactions of this type, subject to the Documentation Principles and the Agreement Among Lenders, but with First Out Lenders and Last Out Lenders voting as a single class; provided that (i) there shall be no limitation on voting by lenders that are affiliates of the Borrowers and (ii) any majority lender vote shall require the affirmative vote of at least two un-affiliated institutions. |

11

UST-0668

| | |
|---|---|
| **Required Lenders** | Lenders having Term Loans outstanding that, taken together, represent more than 50% of the sum of all Term Loans outstanding at such time. |
| **Intercreditor Agreement:** | Usual and customary for transactions of this type, subject to the Documentation Principles and based on that certain ABL Intercreditor Agreement, dated as of August 21, 2015, among the ABL Agent, the Term Loan Agent, and the other parties thereto, except as otherwise agreed by the Required Consenting Term Loan Lenders. |
| **Agreement Among Lenders:** | To be entered into among the lenders under the First Out Term Loan Facility, the lenders under the Last Out Term Loan Facility and the Parent Borrower or, to be set forth in the Exit Credit Agreement and to provide that, with respect to any amendment, waiver, consent or other action, including the exercise of remedies or the provision of future DIP financings, the Last Out Lenders shall vote in the same manner as the First Out Lenders, other than with respect to amendments, waivers, consents or with respect to certain economic terms which are customarily all-lender votes. |
| **Cost and Yield Protection:** | Usual and customary for transactions of this type, subject to the Documentation Principles. |
| **Defaulting Lenders:** | Usual and customary for transactions of this type, subject to the Documentation Principles. |
| **Assignments and Participations:** | Usual and customary for transactions of this type, subject to the Documentation Principles and permitting loan buy-backs and Dutch auctions on customary terms; provided that there shall be no restrictions on holdings by lenders that are affiliates of the Borrowers. |
| **Refinancing, Extension and Replacement Facilities** | Usual and customary provisions providing for the ability to refinance, extend or replace loans or any class of loans under the Term Loan Facility from time to time, in whole or part, with one or more new debt facilities. |
| **Expenses and Indemnification:** | Usual and customary for transactions of this type, subject to the Documentation Principles (including, but limited to, the reasonable fees and expenses of no more than one counsel to the Required Lenders (other than the Administrative Agent), which counsel shall be Milbank LLP, and one counsel to the Administrative Agent and one local counsel for the Required Lenders in each relevant jurisdiction (other than the Administrative Agent) and one local counsel for the Administrative agent in each relevant jurisdiction. |

12

UST-0669

| **Governing Law and Forum:** | New York. |

13

UST-0670

# EXHIBIT D

**Exit Facility Term Sheet**

UST-0671

# Exit Facility Term Sheet[1]

| | |
|---|---|
| **Borrowers:** | Reorganized Ascena Retail Group, Inc., a Delaware corporation (the "**Parent Borrower**") and AnnTaylor Retail, Inc., a Florida corporation (the "**Subsidiary Borrower**" and, together with the Parent Borrower, the "**Borrowers**"). |
| **Administrative Agent and Collateral Agent:** | Alter Domus (US) LLC (in its capacity as administrative agent, the "**Administrative Agent**", and in its capacity as collateral agent, the "**Collateral Agent**"). |
| **Lenders:** | Holders of DIP Term Facility Claims will receive First Out Term Loans and, together with other holders of Term Loan Claims, Last Out Term Loans (each as defined below), respectively, as set forth in the Proposed Plan (collectively, the "**Lenders**") |
| **Term Loan Facility:** | First lien senior secured term loan facility in an aggregate original principal amount of $400 million, denominated in US Dollars, consisting of: |

- $311.8 million of first-out term loans (the "**First Out Term Loan Facility**", the loans thereunder, the "**First Out Term Loans**" and the commitments thereunder, the "**First-Out Commitments**") converted in accordance with the Proposed Plan to holders of DIP Term Facility Claims; and

- $88.2 million of last-out term loans (the "**Last Out Term Loan Facility**", the loans thereunder, the "**Last Out Term Loans**" and the commitments thereunder, the "**Last-Out Commitments**") distributed to holders of Term Loan Claims in accordance with the Proposed Plan.

As used herein, "**Term Loan Facility**" means, collectively, the First Out Term Loan Facility and the Last Out Term Loan Facility. "**Commitments**" means, collectively, the First Out Commitments and the Last Out Commitments. "**Term Loans**" means, collectively, the First Out Term Loans and the Last Out Term Loans.

The First Out Term Loans will be "first out" in right of payment priority and the Last Out Term Loans will be "last out" in right of payment priority (in each case, as between the tranches of Term

---

[1] Capitalized terms used but not defined in this Exit Facility Term Sheet have the meanings ascribed to them in the Restructuring Support Agreement, dated as of July 23, 2020 (the "**Restructuring Support Agreement**") to which this Exit Facility Term Sheet is attached or the Proposed Plan attached as Exhibit B to the Restructuring Support Agreement.

UST-0672

Loans).  The First Out Term Loans and Last Out Term Loans shall be secured on a *pari passu* basis by the same lien on the Collateral (as defined below).

| | |
|---|---|
| **Definitive Documentation:** | The definitive documentation for the Term Loan Facility (the "**Definitive Documentation**") shall, except as otherwise set forth herein, be based on the Term Credit Agreement, dated as of August 21, 2015 (as amended, supplemented or otherwise modified prior to the date hereof), by and among Ascena Retail Group, Inc., AnnTaylor Retail, Inc., certain subsidiaries of the Parent Borrower party thereto, Goldman Sachs Bank USA, as the administrative agent and the collateral agent, and certain lenders party thereto from time to time (the "**Prepetition Term Loan Credit Agreement**"), (i) as modified by the terms set forth herein, (ii) subject to modifications to reflect changes in law or accounting standards since the date of such precedent and administrative agency, collateral agency and operational requirements of the Administrative Agent and Collateral Agent and (iii) with such other terms and conditions as may be reasonably agreed between the Borrowers and the Required Consenting Stakeholders; provided that, except as otherwise agreed by the Required Consenting Stakeholders, the Definitive Documentation shall be substantially consistent with the documentation governing the Exit ABL Facility (other than (i) provisions that are specific to asset-based facilities, (ii) the financial covenants applicable thereto, (iii) cross-defaults with respect to the Term Loan Facility and (iv) such other terms mutually agreed between the Borrowers and the Required Consenting Stakeholders).  The Definitive Documentation shall be negotiated in good faith within a reasonable time period to be determined based on the expected date of Bankruptcy Court's entry into the Confirmation Order, with initial drafts of the Definitive Documentation to be prepared by counsel for the Consenting Stakeholders, which is Milbank LLP. This paragraph, collectively, is referred the here as the "**Documentation Principles**". |
| **Maturity Date:** | First Out Term Loans: 4 years after the Effective Date (the "**First Out Maturity Date**"). |
| | Last Out Term Loans: 5 years after the Effective Date (the "**Last Out Maturity Date**"). |
| **Amortization:** | First Out Term Loans: Commencing with the last day of the first full calendar quarter following the Effective Date, the outstanding principal amount of the First Out Term Loans will be payable on each calendar quarter in equal amounts of (i) for each calendar quarter occurring on or prior to the second anniversary of the Effective Date, 1.00% *per annum* and (ii) for each calendar quarter |

2

UST-0673

thereafter, 3.00% *per annum,* in each case of the original principal amount of the First Out Term Loans, with the remaining balance, together with all other amounts owed with respect thereto, payable on the First Out Maturity Date, subject to reduction pursuant to the prepayment provisions to be mutually agreed in the Definitive Documentation.

Last Out Term Loans: The outstanding principal amount of the Last Out Term Loans will be payable on each calendar quarter in equal amounts of 1.00% *per annum* of the original principal amount of the Last Out Term Loans, with the remaining balance, together with all other amounts owed with respect thereto, payable on the Last Out Maturity Date .

**Voluntary Prepayments:**  The Borrowers may make voluntary prepayments of the Term Loans, in each case, other than in connection with a repricing event, without premium or penalty, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of LIBOR borrowings other than on the last day of the relevant interest period.

**Mandatory Prepayments:**  Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles; provided that no prepayment shall be required pursuant to Section 2.09(c) thereof for any Excess Cash Flow (as defined in the Prepetition Term Loan Credit Agreement).

**Interest:**  With respect to the First Out Term Loans, at the Parent Borrower's election:

- ABR (defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement) *plus* 10.75% per annum in cash or Adjusted LIBO Rate (defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement) *plus* 11.75% per annum in cash (subject to a 0.00% per annum floor on ABR and a 1.00% *per annum* floor on the Adjusted LIBO Rate) .

With respect to the Last Out Term Loans, at the Parent Borrower's election:

- prior to the second anniversary of the Effective Date, ABR *plus* 2.00% *per annum* in cash and 8.00% *per annum* in kind ("**PIK**") or Adjusted LIBO Rate *plus* 2.50% *per annum* in cash and 8.50% PIK, and thereafter, ABR *plus* 10.00% *per annum* in cash or Adjusted LIBO Rate *plus* 11.00% *per annum* in cash

3

UST-0674

(in each case subject to a 0.00% *per annum* floor on ABR and a 1.00% *per annum* floor on the Adjusted LIBO Rate).

| | |
|---|---|
| **Prepayment Premium** | NC1/106.375%/103.1875%/par, with the Make-Whole Amount payable at an amount equal to the present value of the amount of interest that would have been paid on the principal amount of the Loans to and including the 3.5 year anniversary of the Closing Date (in each case, calculated on the basis of the interest rate with respect to the Loans then in effect, on a quarterly basis and on the basis of actual days elapsed over a year of three hundred sixty-five (365) days). The present value calculation shall be calculated using the discount rate equal to the Treasury Rate as of such repayment or prepayment date or date of required repayment plus fifty (50) basis points. The Prepayment Premium and Make-Whole Amount shall be payable upon any repricing event or acceleration. The Definitive Documentation shall contain a "Momentive" provision satisfactory to the Required Consenting Stakeholders. |
| **Guarantees:** | All obligations of the Borrowers under the definitive credit agreement for the Term Loan Facility (the "**Exit Credit Agreement**") and the related guarantee and collateral agreement, mortgage agreements and other collateral documents (together with the Exit Credit Agreement, the "**Loan Documents**") (collectively, the "**Borrowers Obligations**") will be unconditionally guaranteed jointly and severally on a senior basis (the "**Guarantees**") by the direct parent of the Borrower and each existing and subsequently acquired or organized direct or indirect Material Domestic Subsidiary, Material Foreign Subsidiary and, notwithstanding anything to the contrary herein, (x) each Luxembourg subsidiary, (y) each guarantor party to the Prepetition Term Loan Credit Agreement and (z) each subsidiary owning material intellectual property (or owning subsidiaries which own material intellectual property) or material real property of the company (the "**Subsidiary Guarantors**", together with the Borrowers, the "**Loan Parties**"); provided that, notwithstanding anything to the contrary herein, (i) the guarantor exclusions shall be limited to (a) immaterial domestic subsidiaries, (b) immaterial foreign subsidiaries (which, for avoidance of doubt, will not include any Luxembourg subsidiaries), (c) bona fide joint ventures with third parties, (d) any subsidiary that is prohibited by applicable law, rule or regulation or by any contractual obligation at the time such person becomes a subsidiary (and not entered into in contemplation of this clause (d) and for so long as such prohibition or restriction remains in effect), as applicable, from granting a guarantee or which would require governmental (including regulatory) consent, approval, license or authorization to provide such guarantee unless such consent, approval, license or |

UST-0675

authorization has been received, (e) any subsidiary acquired pursuant to an acquisition or other investment permitted by the Definitive Documentation that has assumed, permitted secured indebtedness not incurred in contemplation of such acquisition or other investment and any subsidiary thereof that guarantees such secured indebtedness, in each case to the extent and for so long as such secured and (f) circumstances where the Borrowers and the Administrative Agent reasonably agree that the cost of providing such a guarantee is excessive in relation to the value afforded thereby and (ii) the Definitive Documentation shall not permit any unrestricted subsidiaries.

"**CFC**" shall mean any direct or indirect Foreign Subsidiary of any Borrower that is a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code of 1986, as amended (the "Code").

 "**CFC Holdco**" shall mean any direct or indirect subsidiary of any Borrower, which subsidiary is treated as a disregarded entity for U.S. federal income tax purposes and substantially all of the assets of which consist of the equity interests in and/or indebtedness issued by one or more Foreign Subsidiaries that are CFCs."

 "**Material Domestic Subsidiary**" shall be defined to include any subsidiary organized in the U.S. with total assets or EBITDA in excess of 2.5% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis; provided, that at no time shall the aggregate total assets or EBITDA of all Material Domestic Subsidiaries, taken together, account for more than 5.0% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis.

 "**Material Foreign Subsidiary**" shall be defined to include any Luxembourg subsidiary and any other subsidiary organized in a non-U.S. jurisdiction where the total assets or EBITDA associated with such jurisdiction (in the aggregate for all subsidiaries organized therein) exceeds 2.5% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis. Notwithstanding the foregoing or anything to the contrary in this term sheet, any guarantee granted by any CFC shall be terminated (and no more than 65% of the voting stock of any Material Foreign Subsidiary shall be Collateral) for so long as such guarantee and/or pledge of the additional Collateral shall cause (or is reasonably expected to cause) any U.S. shareholder of such CFC to include in income for any year any Section 956 Income that is in excess of the Income Threshold (as defined below).

UST-0676

Notwithstanding the foregoing or anything to the contrary in this term sheet, any guarantee granted by any CFC Holdco shall be terminated (and no more than 65% of the voting stock of any CFC Holdco shall be Collateral) for so long as such guarantee and/or pledge of the additional Collateral shall cause (or is reasonably expected to cause) any U.S. shareholder of such CFC Holdco to include in income for any year an amount (after accounting for any reduction under the rules of Treas. Reg. § 1.956-1 and Section 245A of the Code) under Section 956 of the Code ("**Section 956 Income**") that is in excess of the Income Threshold. The "**Income Threshold**" shall mean, with respect to any CFC Holdco or CFC, as applicable, an amount to be mutually agreed.

"**subsidiary(ies)**" has the meaning assigned to such term in the Pre-Petition Credit Agreement.

**Security:**

Subject to the intercreditor agreement described below under "**Intercreditor Agreement**" and other customary limitations and exclusions to be mutually agreed, the Borrowers Obligations and the Guarantees (collectively the "**Secured Obligations**") will be secured on a first priority basis by substantially all assets of the Loan Parties (collectively, the "**Collateral**"); provided that, notwithstanding anything to the contrary set forth herein (i) all cash and cash equivalents held in accounts (other than customary excluded accounts) in the name of any Loan Party shall be subject to account control agreements in favor of the Collateral Agent (or for so long as the Exit ABL Facility and ABL Intercreditor are in effect, in favor of the ABL Agent), (ii) all equity in the Borrowers, all domestic (including immaterial) subsidiaries, all Luxembourg subsidiaries, all foreign subsidiaries and all Material Foreign Subsidiaries shall at all times be included in the Collateral and (iii) all material intellectual property and material real property shall at all times be included in the Collateral. The pledge of, security interest in, and mortgages on, the Collateral granted by each Loan Party shall secure its own respective Secured Obligations.

All of the foregoing described in this section and the "Guarantees" section above, the "**Collateral and Guarantee Requirement**".

**Conditions to Borrowings:**

The availability of the Term Loans under the Exit Credit Agreement will be subject solely to satisfaction (or waiver) of the following conditions (the date on which such conditions are satisfied (or waived) being the "**Effective Date**"):

- execution and delivery of the Definitive Documentation to be delivered at closing;

6

UST-0677

- delivery of promissory notes to the Lenders, if requested at least two (2) Business Days before the Effective Date;

- delivery of board resolutions and organizational documents of the Loan Parties;

- delivery of incumbency/specimen signature certificate of the Loan Parties;

- delivery of customary legal opinions by counsel to the Borrowers;

- there shall not have occurred since the Petition Date any event or condition that has had or would be reasonably expected, either individually or in the aggregate, to have a Material Adverse Effect (for purposes of this condition, defined in a manner based on the Prepetition Term Loan Credit Agreement but including a proviso stating that in determining whether a "Material Adverse Effect" has occurred or exists under clause (a) thereof, the impacts of the chapter 11 cases and of COVID-19 on the assets, business, financial condition or results of operations on the Loan Parties or any of their respective Subsidiaries will be disregarded (provided that this exception shall not apply to the extent that it is materially disproportionately adverse to the Parent Borrower and its Restricted Subsidiaries, taken as a whole, as compared to other companies in the same industry in which the Parent Borrower and its Restricted Subsidiaries operate));

- the Administrative Agent shall have received a certificate (in substantially the same form as the corresponding certificate delivered in connection with the Prepetition Term Loan Credit Agreement) of the chief financial officer (or financial officer in a similar role) of the Parent Borrower, stating that it and its subsidiaries, taken as a whole, as of the Effective Date, are solvent, in each case, after giving effect to the consummation of the Plan;

- all fees due to the Administrative Agent, Collateral Agent and Lenders including advisors to the Consenting Stakeholders, Greenhill & Co. and Milbank LLP, shall have been paid (or shall have been caused to be paid), and all expenses to be paid or reimbursed to the Administrative Agent, Collateral Agent and Lenders that have been invoiced at least three (3) Business Days prior to the

7

UST-0678

Effective Date shall have been paid  (or shall have been caused to be paid);

- the Loan Parties shall have provided the documentation and other information to the Administrative Agent that are required by regulatory authorities under applicable "know-your-customer" rules and regulations, including the Patriot Act, at least three (3) Business Days prior to the Effective Date (or such later date agreed to by the Administrative Agent) to the extent requested ten (10) days prior to the Effective Date;

- the Bankruptcy Court shall have entered (A) the Confirmation Order and (B) one or more orders authorizing and approving the extensions of credit in respect of the Exit Credit Agreement, each in the amounts and on the terms set forth herein, and all transactions contemplated by the Exit Credit Agreement, and, in each case, such orders shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified;

- the Collateral and Guarantee Requirement (excluding certain customary post-closing items to be mutually agreed) shall have been satisfied or waived and the Intercreditor Agreement and the Agreement Among Lenders shall have been executed and delivered and be in full force and effect;

- the effective date under the Plan shall have occurred, or contemporaneous with the conversion of the DIP Term Facility to the Term Loan Facility shall occur, and all conditions precedent thereto as set forth therein shall have been satisfied or waived (including (x) the issuance to (i) the holders of DIP Term Facility Claims of 44.9% of the New Common Stock, subject to dilution from the Management Incentive Plan and (ii) the holders of Term Loan Claims of 55.1% of New Common Stock (subject to reduction for New Common Stock distrusted in accordance with the following clause (y)) and (y) each holder of a Term Loan Claim that is a Required Consenting Stakeholder (including through any of its Related Parties) having received its pro rata share of an amount of New Common Stock equal to $7.5 million, in each case shall have occurred substantially contemporaneously with the closing of the Term Loan Facility);

- the Pre-Petition ABL Credit Agreement shall have been replaced with a new credit agreement providing asset-based

8

UST-0679

lending facilities for working capital and other general corporate purposes of the Borrowers and its subsidiaries on terms and conditions reasonably acceptable to the Required Consenting Stakeholders (any such credit agreement, the "**Exit ABL Credit Agreement**", and the facility in place as of the Effective Date under either the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, the "**Exit ABL Facility**");

- (i) with respect to Catherine's business segment either completion of a liquidation or consummation of a sale transaction as a going concern to a third party on terms satisfactory to the Required Consenting Stakeholders, and (ii) with respect to the Justice business segment, either completion of a liquidation, consummation of a sale transaction as a going concern to a third party or consummation of a reorganization of the business segment, in each case on terms reasonably satisfactory to the Required Consenting Stakeholders, in each case on or prior to the Effective Date;

- minimum pro forma Liquidity (as defined in the DIP Term Facility), calculated after giving effect to the restructuring transactions and effectiveness of the Plan, of at least $150 million (pro forma for the occurrence of the Effective Date and related transactions, including after taking into account all restructuring expenses (including professional fees) that are paid post emergence and the availability of the Exit ABL Facility and any incurrence of loans thereunder);

- with respect to store leases which are not rejected, aggregate annual cost savings for FY2020 of at least $18 million, calculated in a manner consistent with how "Occupancy Cost Savings" are calculated in the Real Estate Services Agreement dated as of May 1, 2020 by and between A&G Realty Partners, LLC and the Parent Borrower;

- with respect to the Premium segment and Lane Bryant (in aggregate), the number of store closures that shall have occurred prior to the Effective Date shall be consistent with the closures anticipated under the Company's business plan provided to the Ad Hoc Committee Advisors (as determined by the Ad Hoc Committee Advisors in their reasonable discretion) or as otherwise consented to by the Required Consenting Stakeholders;

9

UST-0680

- all pre-Petition transfers of intellectual property to the LuxCo Entities shall have been unwound and all licensing arrangements with respect thereto shall have been cancelled, in each case on terms reasonably satisfactory to the Required Consenting Stakeholders and all such intellectual property shall be owned and registered in the name of Annco, Inc., unless the Required Consenting Stakeholders and the Company mutually agree that the cost, difficulty, burden or consequences of such transfer and/or cancelation exceeds the practical benefits to the Lenders afforded thereby and cannot be completed in a tax efficient manner;

- the accuracy of representations and warranties in all material respects (without duplication of any materiality qualifier) on the Effective Date (except to the extent any such representation or warranty is stated to relate solely to an earlier date, in which case such representation or warranty shall be true and correct in all material respects (without duplication of any materiality qualifier) as of such earlier date; and

- the absence of the existence of any default or event of default.

| | |
|---|---|
| **Representations and Warranties:** | Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles. |
| **Affirmative Covenants:** | Usual and customary, subject to the Documentation Principles; provided that (i) financial reporting shall include (a) unaudited monthly internally generated financial statements and "flash reports", together with certain KPI reports for each banner to be agreed (with such KPI report requirement to fall away upon the Parent Borrower and its subsidiaries achieving a consolidated total leverage ratio for four (4) consecutive fiscal quarters of not more than 1.50:1.00, (b) unaudited quarterly (for all four quarters) and audited annual financial statements, (c) quarterly MD&A and (d) an annual budget, (ii) the annual lender call referenced therein shall be revised to quarterly lender calls and (iii) the Parent Borrower shall use commercially reasonable efforts to obtain credit ratings by each of Standard & Poor's Rating Services and Moody's Investors Service, Inc. prior to the Effective Date, it being understood that there shall be no obligation to maintain any particular rating at any time. |
| **Negative Covenants:** | Usual and customary, subject to the Documentation Principles and subject to customary and usual exceptions, qualifications and |

10

UST-0681

"baskets" to be mutually agreed and set forth in the Exit Credit Agreement, which shall include a customary cumulative credit basket.

**Financial Covenant:** First Out Term Loans:

- Total leverage ratio at levels to be agreed amongst the Company and the Initial Consenting Stakeholders, which shall be tested quarterly commencing at the end of the first full fiscal quarter following the Effective Date.

- Minimum liquidity covenant, which shall take into account unrestricted cash and ABL availability (based on borrowing base) at levels to be agreed amongst the Company and the Required Consenting Stakeholders, which shall be maintained at all times.

- All expenses in connection with the Chapter 11 filing shall be added back to the calculation of EBITDA (to be defined in the Definitive Documentation, subject to the Documentation Principles). Component definitions for determining total leverage ratio are to be agreed amongst the Company and the Required Consenting Stakeholders.

Last Out Term Loans: total leverage ratio, subject to a cushion relative to the First Out Term Loan levels that is acceptable to the Company and the Required Consenting Stakeholders.

**Unrestricted Subsidiaries:** None.

**Events of Default:** Usual and customary for transactions of this type, subject to the Documentation Principles and to include a full cross-default to the Exit ABL Facility. Defaults in respect of a Financial Covenant shall be subject to customary equity cure rights.

**Voting:** Usual and customary for transactions of this type, subject to the Documentation Principles and the Agreement Among Lenders, but with First Out Lenders and Last Out Lenders voting as a single class; provided that (i) there shall be no limitation on voting by lenders that are affiliates of the Borrowers and (ii) any majority lender vote shall require the affirmative vote of at least two un-affiliated institutions.

UST-0682

| | |
|---|---|
| **Required Lenders** | Lenders having Term Loans outstanding that, taken together, represent more than 50% of the sum of all Term Loans outstanding at such time. |
| **Intercreditor Agreement:** | Usual and customary for transactions of this type, subject to the Documentation Principles and based on that certain ABL Intercreditor Agreement, dated as of August 21, 2015, among the ABL Agent, the Term Loan Agent, and the other parties thereto, except as otherwise agreed by the Required Consenting Term Loan Lenders. |
| **Agreement Among Lenders:** | To be entered into among the lenders under the First Out Term Loan Facility, the lenders under the Last Out Term Loan Facility and the Parent Borrower or, to be set forth in the Exit Credit Agreement and to provide that, with respect to any amendment, waiver, consent or other action, including the exercise of remedies or the provision of future DIP financings, the Last Out Lenders shall vote in the same manner as the First Out Lenders, other than with respect to amendments, waivers, consents or with respect to certain economic terms which are customarily all-lender votes. |
| **Cost and Yield Protection:** | Usual and customary for transactions of this type, subject to the Documentation Principles. |
| **Defaulting Lenders:** | Usual and customary for transactions of this type, subject to the Documentation Principles. |
| **Assignments and Participations:** | Usual and customary for transactions of this type, subject to the Documentation Principles and permitting loan buy-backs and Dutch auctions on customary terms; provided that there shall be no restrictions on holdings by lenders that are affiliates of the Borrowers. |
| **Refinancing, Extension and Replacement Facilities** | Usual and customary provisions providing for the ability to refinance, extend or replace loans or any class of loans under the Term Loan Facility from time to time, in whole or part, with one or more new debt facilities. |
| **Expenses and Indemnification:** | Usual and customary for transactions of this type, subject to the Documentation Principles (including, but limited to, the reasonable fees and expenses of no more than one counsel to the Required Lenders (other than the Administrative Agent), which counsel shall be Milbank LLP, and one counsel to the Administrative Agent and one local counsel for the Required Lenders in each relevant jurisdiction (other than the Administrative Agent) and one local counsel for the Administrative agent in each relevant jurisdiction. |

UST-0683

| | |
|---|---|
| **Governing Law and Forum:** | New York. |

13

UST-0684

## EXHIBIT E

### Form of Joinder Agreement

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among ascena retail group, inc. and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders and agrees to be bound by the terms and conditions thereof and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date hereof.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| ABL Claims | |
| Term Loan Claims | |
| Equity Interests | |

---

[1] Capitalized terms used but not otherwise defined herein shall having the meaning given to such terms in the Agreement.

UST-0685

## EXHIBIT F

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among ascena retail group, inc. and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| ABL Claims | |
| Term Loan Claims | |
| Equity Interests | |
| DIP ABL Facility Claims | |
| Backstop Commitments | |
| DIP Term Facility Claims | |

---

[1]    Capitalized terms used but not otherwise defined herein shall having the meaning given to such terms in the Agreement.

UST-0686

**Exhibit C**

**Corporate Structure Chart**

UST-0687



UST-0688

**Exhibit D**

**Disclosure Statement Order**

[TO COME]

UST-0689

**<u>Exhibit E</u>**

**Financial Projections**

[TO COME]

UST-0690

**<u>Exhibit F</u>**

**Valuation Analysis**

[TO COME]

UST-0691

**Exhibit G**

**Liquidation Analysis**

[TO COME]

UST-0692

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

In re:

ASCENA RETAIL GROUP, INC., *et al.*,[1]

    Debtors.

Chapter 11

Case No. 20-33113 (KRH)

(Jointly Administered)

## OBJECTION OF THE UNITED STATES TRUSTEE TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (II) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE DEBTORS' PROPOSED JOINT PLAN OF REORGANIZATION; (III) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH; (IV) SCHEDULING CERTAIN DATES WITH RESPECT THERETO, AND (V) GRANTING RELATED RELIEF

John P. Fitzgerald, III, Acting United States Trustee for Region 4 (the "United States Trustee"),[2] through counsel, in furtherance of the duties and responsibilities set forth in 28 U.S.C. §§ 586(a)(3) and (5) and pursuant to 11 U.S.C. § 307, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for this District, hereby files this objection to the Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures With Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Forms of Ballots and Notices in Connection Therewith; (IV) Scheduling Certain Dates With Respect

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena. The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

[2] Unless otherwise defined herein, capitalized terms shall have the definition assigned to them in the Disclosure Statement or the Plan.

Kathryn R. Montgomery, Esq., AUST (VSB No. 42380)
Shannon Pecoraro, Esq. (VSB No. 46864)
Office of the United States Trustee
701 East Broad St., Suite 4304
Richmond, VA 23219
Phone (804) 771-2310
Fax: (804) 771-2330

Thereto, and (V) Granting Related Relief filed on July 31, 2020 (ECF Doc. No. 156) (the

"Solicitation Procedures Motion").  In support of his objection, the United States Trustee

represents and alleges as follows:

## PRELIMINARY STATEMENT

These cases have been filed a little over a month; yet, the Debtors are already seeking the

approval of a Disclosure Statement (as defined below) that, in its current form, does not provide

adequate information and supports a plan containing provisions that render it unconfirmable.  The

United States Trustee objects to the Solicitations Procedures Motion and Disclosure Statement on

various grounds, including, among others:

- The Solicitation Procedures Motion and Plan should not provide that a failure to cast a vote is deemed to have accepted the plan.

- The proposed treatment of Intercompany Claims is unclear and may violate the absolute priority rule.

- The Debtors contemplate filing information necessary for creditors to decide whether to vote to accept or reject the Plan eight days before the voting and confirmation objection deadline.

- The treatment of claims based on rejection of executory contracts and unexpired leases is unclear.

- The release of non-debtor third parties and exculpation provisions are overly broad and do not satisfy the *Behrmann* factors.

- The Plan violates section 503(c) of the Bankruptcy Code as it relates to the Employee Benefits Program and Management Incentive Plan.

## JURISDICTION, VENUE & CONSTITUTIONAL AUTHORITY TO ENTER A FINAL ORDER

1.      The Court has jurisdiction to consider this matter under 28 U.S.C. §§ 157 and 1334.

This is a core proceeding under 28 U.S.C. § 157(b)(1).  Venue is proper in this district under

28 U.S.C. § 1408.  The Court has constitutional authority to enter a final order in this matter.  If it

is determined that the bankruptcy judge does not have the constitutional authority to enter a final

UST-0694

order or judgment in this matter, the United States Trustee consents to the entry of a final order or judgment by this Court in this matter.

2.      John P. Fitzgerald, III is the acting United States Trustee for Region 4, which includes Richmond, under 28 U.S.C. § 581(a)(7). Pursuant to 11 U.S.C. § 307, the United States Trustee has standing to appear and be heard on any issue in a case or proceeding under the Bankruptcy Code.

3.      Pursuant to 28 U.S.C. § 586(a)(3), the United States Trustee is statutorily obligated to monitor the administration of cases commenced under the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Specifically, he is charged with several supervisory responsibilities in reorganization bankruptcy cases under chapter 11 of the Bankruptcy Code, including monitoring plans and disclosure statements filed in chapter 11 cases. 28 U.S.C. § 586(a)(3)(B).

## **FACTUAL BACKGROUND**

### **I.     General Background**

4.      On July 23, 2020 (the "Petition Date"), Ascena Retail Group and sixty-four of its affiliated companies (collectively, the "Debtors") commenced voluntary cases under Chapter 11 of the Bankruptcy Code. ECF Doc. No. 1.

5.      By order entered on July 23, 2020, the Court authorized joint administration of the cases for procedural purposes. ECF Doc. No. 50. Since the orders for joint administration, the Debtors have been operating the businesses pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. To date, no trustee or examiner has been appointed in these chapter 11 cases.

6.      On August 3, 2020, pursuant to section 1102(a)(1) of the Bankruptcy Code, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee"). ECF Doc. No. 164.

UST-0695

7. The Debtors and certain non-Debtor affiliates (collectively, "Ascena") are a leading specialty retailer for women and girls. Tracing its roots back to a single Dressbarn store built in 1962, today Ascena operates a portfolio of recognizable brands, including Ann Taylor, LOFT, Lane Bryant, Catherines, Justice, Lou & Grey, and Cacique. On the Petition Date, Ascena operated with approximately 2,800 stores in the United States, Canada, and Puerto Rico, more than 12.5 million active customers, and nearly 40,000 employees. *See* Declaration of Carrier W. Teffner, Interim Executive Chair of Ascena Retail Group, Inc., in Support of Chapter 11 Petitions and First Day Motions ("Teffner Declaration"), ECF Doc. No. 14 at ¶5.

8. As of the Petition Date, Ascena had approximately $1.60 billion in funded debt obligations, including approximately $330 million in outstanding obligations under the its $500 million senior secured asset based lending facility (the "ABL Facility," and the lender thereunder, the "ABL Lenders") and approximately $1.27 billion in senior secured term loan obligations (the "Term Loans," and the lenders thereunder, the "Term Lenders"). *Id.*

9. In response to the COVID-19 pandemic, the Debtors temporarily closed all retail locations in March 2020. As COVID-19 restrictions relaxed, the Debtors have reopened their brick-and-mortar locations. *Id*. at ¶ 6

10. On July 24, 2020, the Debtors filed bidding procedures seeking approval of City Chic Collective USA Incorporated as the Stalking Horse Purchaser, subject to higher or better bids due by September 8, 2020, with an auction to be held on September 9, 2020 (if necessary), and a sale hearing scheduled for September 21, 2020. *See* ECF Doc. No. 86.

**II. Plan and Disclosure Statement**

11. On July 31, 2020, the Debtors filed a Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. and its Debtor Affiliates (the "Plan") and Disclosure Statement for the

UST-0696

Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. and its Debtor Affiliates (the "Disclosure Statement"). ECF Nos. 154 and 155.

12.    A hearing on the adequacy of the Disclosure Statement is currently scheduled for September 3, 2020.  *See* Solicitation Procedures Motion at ¶1(j).  To the extent the adequacy of the Disclosure Statement is approved, the Debtors propose to hold a confirmation hearing on or about October 15, 2020.  *Id.*

13.    The Disclosure Statement and underlying Plan contemplate classifying claims into eight classes, as follows:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | ABL Claims | Unimpaired | Presumed to Accept |
| 4 | Term Loan Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Interests in Ascena | Impaired | Deemed to Reject |

*See* Disclosure Statement at Art. IV.C., p. 6.

14.    More specifically, under the terms of the proposed Plan, holders of claims and interests will receive the following treatment:

- Allowed Other Secured Claims shall receive, at the option of the applicable Debtor: (a)  payment in full in Cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) other treatment rendering such Claim Unimpaired.

- Allowed Other Priority Claims shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired.

- 5 -

UST-0697

- Allowed ABL Claims shall receive (a) payment in full in Cash of its Allowed ABL Claim; (b) replacement or cash collateralization of all issued and undrawn letters of credit in the amounts specified under the ABL Credit Agreement; (c) Reinstatement of its Allowed ABL Claim under the Exit ABL Facility; or (d) such other treatment that renders its Allowed ABL Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

- Allowed Term Loan Claims shall receive its Pro Rata share of (a) participation in the loans arising under the Second Out Exit Term Loan Facility; and (b) 55.1% of the New Common Stock, subject to dilution on account of the Management Incentive Plan and the Equity Premium.

- Holders of General Unsecured Claims shall receive their Pro Rata share of Cash in an amount equal to $500,000; or if Holders of General Unsecured Claims vote to reject the Plan, then in full and final satisfaction of each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive treatment consistent with section 1129(a)(7) of the Bankruptcy Code, as determined by the Debtors and the Required Consenting Stakeholders.

- Intercompany Claims, subject to the Restructuring Transactions Memorandum, shall be reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Reorganized Debtors.

- Intercompany Interests shall receive no recovery or distribution and be reinstated solely to the extent necessary to maintain the Debtors' corporate structure.

- Ascena Interests will be cancelled, released, and extinguished without any distribution.

*See* Disclosure Statement at Art. IV.D., pp. 6-8.

## **LEGAL STANDARD**

To provide creditors with the information necessary to make an informed vote on the plan, the Bankruptcy Code requires the proponent of the plan to provide creditors with a "disclosure statement." 11 U.S.C. § 1125(b). The purpose of the disclosure statement is to provide creditors with information about the debtor, the plan, and their treatment thereunder necessary for creditors to make an informed and reasoned vote. *See, e.g.*, *In re Monnier Bros*, 755 F.2d 1336, 1342 (8th Cir. 1985) ("[t]he primary purpose of a disclosure statement is to give

UST-0698

the creditors the information they need to decide whether to accept the plan"); *In re Forest Grove, LLC*, 448 B.R. 729, 737 (Bankr. D. S.C. 2011) ("[t]he purpose of a disclosure statement is to clearly provide creditors with information regarding the debtor's plan and their treatment under that plan"); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001) ("the general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan").

Precisely what information must be contained in a disclosure statement varies depending on the particulars of the case. Generally speaking, a disclosure statement must contain "adequate information," which is defined as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a).

"Adequate information" for disclosure statement purposes has been described as "all information that is reasonably necessary to permit creditors and parties-in-interest to fairly and effectively evaluate the plan." *In re Robert's Plumbing & Heating, LLC*, Case No. 10-23221, 2011 WL 2972092 at * 2 (Bankr. D. Md., July 20, 2011); *see also In re A.H. Robbins Co., Inc.*, Case No. 98-1080, 1998 WL 637401 at * 3 (4th Cir. 1998) (adequate information means "sufficient information to permit a reasonable, typical creditor to make an informed judgment about the merits of the proposed plan").

The debtors bear the burden of "proving the adequacy of its disclosure statement." *In re Bellows*, 554 B.R. 219, 225 (Bankr. D. Ak. 2016); *see also In re American Capital Equipment, LLC*, 688 F.3d 145, 155 (3d Cir. 2012) (citations omitted). The Solicitation Procedure Motion

- 7 -

UST-0699

proposes procedures that do not comply with the Bankruptcy Code or the Bankruptcy Rules.

Additionally, the Disclosure Statement fails to provide sufficient disclosures appropriate to the

circumstances of these cases.

## ARGUMENT

**I. Classes Where Creditors Fail to Cast Any Vote Should Not Be Deemed to Have Accepted the Plan**

The Plan impermissibly provides that creditors who fail to vote will be deemed to have

accepted the Plan. Article III.E. of the Plan provides:

> **Voting Classes; Presumed Acceptance by Non-Voting Classes.**
> If a Class contains Claims or Interests eligible to vote and no
> holders of Claims or Interests eligible to vote in such Class vote to
> accept or reject the Plan, the Debtors shall request the Bankruptcy
> Court to deem the Plan accepted by the holders of such Claims or
> Interests in such Class.

This provision runs afoul of section 1126(c) of the Bankruptcy Code, which provides that a class

of claims has accepted the plan if the plan has been accepted by creditors "that hold at least two-

thirds in amount and more than one-half in number of the allowed claims of such class held by

creditors . . . *that have accepted or rejected the plan*." 11 U.S.C. § 1126(c) (emphasis added).

Similarly, it runs afoul of the requirement in section 1129(a)(10) that for a plan to be confirmed,

"at least one class of claims that is impaired under the plan has accepted the plan." 11 U.S.C.

§ 1126(a)(10). *See In re Bennett,* 2008 WL 1869308 (Bankr. E.D. Va., April 23, 2008) (finding

that classes where creditors had failed to return ballots were <u>not</u> deemed to have accepted the

plan); *In re Jim Beck, Inc.*, 207 B.R. 1010 (Bankr. W.D. Va. 1997) (analyzing two lines of cases

and holding that the line of cases which holds that failure of a creditor or class to cast ballot does

not result in a default acceptance of the plan is better reasoned and more persuasive than the [line

of cases following *In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263 (10th Cir. 1988)]). *See also In re*

*Vita Corp.*, 80 B.R. 525 (Bankr. C.D. Ill. 2008) (setting forth the split in the law and holding that

- 8 -

UST-0700

the failure on part of creditors in impaired classes to cast ballots either accepting or rejecting chapter 11 plan could not be deemed an acceptance of plan so as to satisfy the plan confirmation requirements); *In re Higgins Slacks Co.*, 178 B.R. 853 (Bankr. N.D. Ala. 1995) (holding that impaired classes which failed to vote to accept or reject chapter 11 plan were not deemed to have accepted plan); *In re Townco Realty, Inc.* , 81 B.R. 707 (Bankr. S.D. Fla. 1987).  *But see In re Adelphia Comm. Corp.*, 368 B.R. 140, 260 (Bankr. S.D.N.Y. 2007); *In re Tribune Co.*, 464 B.R. 126, 184 (Bankr. D. Del. 2011).

Accordingly, the United States Trustee objects to the Plan and Solicitation Procedures Motion to the extent that it seeks approval of the voting and tabulation procedure whereby, to the extent no votes to accept or reject the Plan are received by a particular Class, the Class is deemed to have accepted the Plan.

## II.    The Treatment of Intercompany Claims and Intercompany Interests is Not Clearly defined and May Violate the Absolute Priority Rule

Because the treatment of Intercompany Claims is not clearly defined, the Plan may violate the absolute priority rule.  According to Article I.A.81. of the Plan, an "Intercompany Claim" means "any Claim held by a Debtor or a Debtor's Affiliate against a Debtor or a Debtor's Affiliate as of the Petition Date."

In the Plan and Disclosure Statement, the Intercompany Claims are classified in Class 6. The treatment of the Intercompany Claims is not well defined.  The Plan provides that "Subject to the Restructuring Transactions Memorandum, each Allowed Intercompany Claim shall be Reinstated, distributed, contributed, set off, settled, cancelled and released or otherwise addressed at the option of the Reorganized Debtors"  *See* Plan at Art. III.B.6.  Class 6 is Unimpaired/Impaired and not entitled to vote

UST-0701

The Disclosure Statement should be amended to provide clarity as to the proposed
treatment of Class 6. *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417
(3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance placed upon the
disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize
the debtor's obligation to provide sufficient data to satisfy the Code standard of "adequate
information."). To the extent that Class 6 is Unimpaired, then the Disclosure Statement should
be amended to provide an explanation as to how that does not violate the Absolute Priority Rule.

### III. Provisions Which Require Amendments, Clarifications, or That Raise Objections to the Disclosure Statement

In addition to the issues raised above, the United States Trustee also objects to the
following provisions in the Solicitations Procedures Motion, Disclosure Statement and/or Plan
and requests that they be amended or that the Debtors provide justification for these provisions:

A. **Lack of financial information:** The Disclosure Statement is void of any financial
information. While the Disclosure Statement refers to Schedule E (Financial
Projections), Schedule F (Valuation Analysis), and Schedule G (Liquidation
Analysis), there are only placeholders for those exhibits and no financial information
is actually provided to support, among other things, the plan's feasibility and the best
interest test set forth at Article XIII.B. of the Disclosure Statement. Moreover,
creditors are not provided information as to the projected amount of claims or the
projected recovery under the Plan as set forth at Article IV.D.

B. **Bar date**: Article IV. M. of the Disclosure Statement provides that any Proof of
Claim filed after the applicable bar date shall be disallowed. However, this section
does not disclose a specified date, but rather contains a blank placeholder. According
to the Bar Date Motion filed on August 6, 2020, the proposed bar date for general
claims is September 24, 2020. *See* ECF Doc No. 191. The Solicitation Procedures
Motion, however, contemplates that the solicitation packages with ballots to vote will
be sent out on or about September 8, 2020 – prior to the bar date. Accordingly, the
Disclosure Statement should be amended to provide the established bar dates and
further explain how the bar date – which is later than the solicitation launch date –
will affect, if at all, creditors' ability to vote.

C. **Plan Supplement:** The definition of "Plan Supplement" provided for in the Plan
does not specify the deadline by which the Debtors need to file such supplement. *See*
Art. I.A.96. The Proposed Solicitation Procedures Order, however, contemplates that
the Plan Supplement, which will include many key documents and information, will

UST-0702

be filed with the Court eight (8) days before the voting deadline. *See* Proposed Solicitation Procedures Order at ¶ 14. The Plan Supplement will contain various documents with important financial information for parties in interest to determine whether they have objections to the Plan and for creditors to determine whether to vote in favor of the Plan. Moreover, many of the creditors and parties in interest receiving the Plan Supplement are overseas or their access to internet or mail may be delayed given the current situation with Covid-19. Accordingly, the United States Trustee requests that the Plan Supplement be filed with the Court and provided to all parties in interest by no later than 14 days prior to the deadline to vote on or object to the Plan. Moreover, the Plan should also be amended so that the deadline by which the Debtors need to file the Plan Supplement is clearly included in the definition of the term at Art. I.A.96.

D. **New Board Members:** At Article III.I., the Plan provides that as of the Effective Date, the terms of the current members of the board of directors of Ascena shall expire and the new directors and officers of the Reorganized Ascena shall be appointed. This section provides a list of the seven directors by position only and, apart from Ms. Teffner, does not disclose the identities of the individuals. The Plan states that "The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing." *See* Plan at Art. III.I. The Disclosure Statement further provides that, "the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the New Board, as well as those persons that will serve as officers of Reorganized Ascena." *See* Disclosure Statement at Art.IV.T. Although the Plan and Disclosure Statement provide that to the extent such identities are known they will be disclosed, this is not sufficient. Creditors and parties in interest should know the identities of the new board members prior to voting on the Plan. The United States Trustee requests that the identities of the new board members be disclosed in the Plan Supplement pursuant to the requirements of section 1129(a)(5) of the Bankruptcy Code.

E. **Duty to Supplement Disclosure Statement:** In Article VI.B. of the Disclosure Statement, the Debtors qualify that summaries of the Plan and statements made in the Disclosure Statement are only made as of the date thereof. However, the Debtors further state that "the Debtors are under no duty to update or supplement this Disclosure Statement." Disclosure Statement at Art.VI.B. This disclaimer is not sufficient, and to the extent the Debtors know of an inaccuracy or misrepresentation in the Plan, Disclosure Statement or Plan Supplement, they should be required to remedy it.

F. **Claims Based on Rejection of Executory Contracts and Unexpired Leases:** It is unclear how the Debtors are treating claims arising from the rejection of executory contracts and unexpired leases. In Article V.B. of the Plan and Article V.B. of the Disclosure Statement, the Debtors include the following language regarding the treatment of claims arising from the rejection of executory contracts and unexpired leases:

UST-0703

> **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**

Plan at Art.V.B. and Disclosure Statement at Art.V.B. In the first part of this clause, the Debtors seek to disallow any claims that are not filed, but then in the last part of this clause, it appears that the Debtors are deeming such claims that are filed in a Proof of Claim satisfied, released and discharged. The purpose of this language is unclear, and the Debtors should clarify such language so that creditors impacted by such rejections clearly understand their treatment.

**G. Schedule of Assumed Executory Contracts and Schedule of Rejected Executory Contracts:** The Plan and Disclosure Statement contemplate that a list of those executory contracts that the Debtors seek to assume or reject will be filed with the Plan Supplement. The cure/assumption objection deadline is 14 days after the filing of this schedule. However, as the Plan currently stands, the Plan Supplement will be filed eight days prior to the voting deadline. The timing does not work because the cure/assumption objection deadline occurs after the deadline to vote on the Plan. As stated above in section III.C., the Plan Supplement must be filed no later than 14 days prior to the voting deadline, so that parties that have cure/assumption objections can properly be heard.

**H. Statutory Fees:** Article XII.C. of the Plan and Article XII.C. of the Disclosure Statement provide that all fees payable pursuant to section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, will be paid. For the avoidance of any doubt, any outstanding fees must be paid on the Effective Date and the Reorganized Debtors shall be responsible for ensuring that these fees continue to be paid post-confirmation pursuant to the following language:

> The Debtors shall pay any outstanding U.S. Trustee Fees, pursuant to section 1930(a) of the Judicial Code, in full on the Effective Date, and the Debtors and/or Reorganized Debtors shall continue to pay such fees until the Chapter 11 cases are converted, dismissed, or closed, whichever occurs first.

UST-0704

I. **Reporting Requirements**: The Debtors should include in the Disclosure Statement and Plan a statement that the Debtors will continue complying with monthly reporting requirements through the Effective Date as required under the Local Bankruptcy Rules. After the Effective Date, the Reorganized Debtors shall file quarterly reports consistent with Local Bankruptcy Rule 2015-(a)-1. The Disclosure Statement and Plan should also clarify that the Reorganized Debtors shall no longer have the obligation to file quarterly reports with respect to a Debtor once such Debtor's case is converted, dismissed or a final decree has been entered by the Court.

IV. **The Disclosure Statement Does Not Give Adequate Information Regarding the Third-Party Release and Exculpation Clauses**

Both the Disclosure Statement and the Plan contain provisions for the release and exculpation of various non-debtor parties by other non-debtor parties from all sorts of liability. *See* Disclosure Statement at Art. IV.L.; Plan, Art. Art. VIII.E-G. As described more fully below, the Debtors have not demonstrated the appropriateness of these provisions.

Without reciting the release clauses in their entirety, the provisions contemplated for in the Plan cause all holders of claims or interests to release and hold harmless non-debtor parties (the "Released Parties") from any liability for anything occurring prior to the Effective Date <u>unless</u> they opt-out of such releases – whether they vote on the Plan or not. More specifically, while the definition of "Releasing Party" or the "Release by holders of Claims or Interests" is not entirely clear, the Plan appears to (1) indicate that those that are deemed to accept the Plan are also deemed to have consented to the third party releases, (2) require that those who are deemed to have rejected the Plan opt out of the releases (*see* Solicitation Procedures Motion at Schedule 5); (3) require that anyone who votes to accept or reject the Plan also opt out to of the releases if they do not intend to consent; and (4) require that, in order not to be deemed as having consented to the third party releases, to the extent anyone is entitled to vote, they should return a ballot

UST-0705

clearly opting out.[3]

Although there is no *per se* prohibition against imposing releases of non-debtors by other non-debtors, those releases are not appropriate in every case, or even in most cases. *See In re A.H. Robins Co., Inc.*, 880 F.2d 694, 702 (4th Cir. 1989). Whether such releases and exculpatory clauses are appropriate is dependent upon the facts and circumstances of each case. *Behrmann v. National Heritage Foundation*, 663 F.3d 704, 711 (4th Cir. 2011). Approval of non-debtor releases and exculpatory clauses "should be granted cautiously and infrequently." *Id.* at 712.

In *Behrmann*, the Fourth Circuit enumerated several factors that should be considered in determining whether third-party releases are appropriate, including but not limited to the following:

> (a) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;
>
> (b) The non-debtor has contributed substantial assets to the reorganization;

---

[3] Schedule 3 to the Solicitation Procedures Motion, which is the Ballot for voting to accept or reject the Plan, contains the following language:

> AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.F OF THE PLAN, AS SET FORTH ABOVE. YOU MAY CHECK THE BOX BELOW TO ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.F OF THE PLAN ONLY IF THE COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT OUT OF THE RELEASES AND ONLY IF YOU (A) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN OR (B) VOTE TO REJECT THE PLAN. IN THE CASE OF SUCH A DETERMINATION BY THE COURT IF YOU VOTE TO REJECT THE PLAN, YOU WILL AUTOMATICALLY BE CONSIDERED TO HAVE OPTED OUT OF THE RELEASES, REGARDLESS OF WHETHER YOU CHECK THE BOX BELOW. IF YOU SATISFY THE ABOVE REQUIREMENTS AND CHECK THE BOX BELOW (OR VOTE TO REJECT THE PLAN), YOUR OPT- OUT WILL ONLY BE EFFECTIVE IF SO ORDERED BY THE COURT. REGARDLESS OF WHETHER THE COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT OUT OF THE RELEASES, IF YOU (A) VOTE TO ACCEPT THE PLAN, (B) FAIL TO SUBMIT A BALLOT BY THE VOTING DEADLINE, OR (C) SUBMIT THE BALLOT AND ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN BUT FAIL TO CHECK THE BOX BELOW, YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE VIII.F OF THE PLAN.

- 14 -

UST-0706

(c) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;

(d) The impacted class, or classes, has overwhelmingly voted to accept the plan;

(e) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;

(f) The plan provides an opportunity for those claimants who choose not to settle to recover in full;

(g) The bankruptcy court made a record of specific factual findings that support its conclusions;

(h) A close connection between the causes of action against the third party and the causes of action against the debtor; and

(i) The plan of reorganization provides for payment of substantially all the claims affected by the injunction.[4]

In *Behrmann*, the Court also made clear that to support these types of releases, the Bankruptcy Court must "find facts sufficient to support its legal conclusion that a particular debtor's circumstances entitle it to such relief." *Behrmann*, 663 F.3d at 706-07. Indeed, in *Behrmann*, the Fourth Circuit reversed the bankruptcy court's legal conclusion that the releases at issue there were "essential" and "integral" to the transactions contemplated in the plan because the Court failed to support its conclusions with concrete factual findings. *Id.* at 708, 712-13 (record citations omitted).[5] On remand, the bankruptcy c ourt, applying the factors set forth in the *Behrmann* opinion, determined that the facts did not support allowing the releases. That

---

[4] The Fourth Circuit compiled this non-exhaustive list from *Class Five Nev. Claimants v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 280 F.3d 649, 658 (6th Cir. 2002), and *In re Railworks Corp.*, 345 B.R. 529, 536 (Bankr. D. Md. 2006). The Fourth Circuit described these factors as "instructive." *Behrmann*, 663 F.3d at 712.

[5] According to the Fourth Circuit, the Bankruptcy Court's conclusions were "meaningless in the absence of specific factual findings explaining" them. *Behrmann*, 663 F.3d at 713. Thus, among the Fourth Circuit's instructions to the Bankruptcy Court on remand was, "to set forth specific factual findings supporting its conclusions." *Id.*

UST-0707

finding was affirmed by both the District Court and the Fourth Circuit. *National Heritage Foundation, Inc. v. Highbourne Foundation*, 760 F.3d 344, 347, 352 (4th Cir. 2014). Thus, a plan containing such release provisions cannot be confirmed in the absence of a significant evidentiary presentation demonstrating facts supporting such relief. *Behrmann*, 663 F.3d at 713.

### A. The Proposed "Opt-Out" Procedure Regarding the Releases is Insufficient to Demonstrate Consent

The Debtors appear to be taking the position that the third-party releases described in the Disclosure Statement and Plan are consensual under the circumstances. Under the Plan, the Disclosure Statement, and the Solicitation Procedures Motion, the third-party releases would be effective against any creditor or interest holder that does not opt-out. A vote in favor of the Plan is deemed to consent to the releases.

Although some courts have permitted third-party releases in a chapter 11 plan based upon consent alone, the Fourth Circuit does not appear to be one of those courts. In *Behrmann,* the Fourth Circuit stated that consent is one fact that the Court should consider in determining whether to permit third party releases. *Behrmann*, 663 F.3d at 712 ("No case has tolerated nondebtor release absent the finding of circumstances that may be characterized as unique."). Even those cases that have allowed third-party releases based upon consent alone have varied on what is required to demonstrate consent. What courts have made clear, however, is that releases of non-debtors must be accompanied by the releasing creditors' "unambiguous" consent. *See In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D. N.J. 2007) (quoting *In re Arrowmill Dev. Corp.*, 211 B.R. 297, 507 (Bankr. D. N.J. 1997) (for a release to be consensual, the creditor must have "unambiguously manifested assent to the release of the nondebtor from liability on its debt.")). *See also In re SunEdison*, 576 B.R. 453 (Bankr. S.D.N.Y. 2017); *In re Chassix Holdings, Inc.,* 533 B.R. 64 (Bankr. S.D.N.Y. 2015). In other words, silence is not consent

UST-0708

when a party has no duty to speak. *See SunEdison*, 576 B.R. at 458; *In re Washington Mutual, Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) (holding that mere "opt out" procedures were insufficient, particularly with respect to creditors who did not return ballots); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (holding that the third-party release in the plan was consensual and passed muster because it provided for releases by "checking a box" on the plan solicitation ballot); *In re Arrowmill Dev. Corp.*, 211 B.R. at 507 (noting that to determine whether a creditor unambiguously manifested assent to third party releases, "it is not enough for a creditor to abstain from voting for a plan, or even to simply vote 'yes' as to the plan.").

More recently, the court in *In re Chassix Holdings, Inc.* was faced with a similar issue and ultimately held that the releases would only apply to (a) any holder of a claim who voted to accept the plan and (b) any holder of a claim who voted to reject the plan but who affirmatively elected to provide the releases by checking the appropriate box on the ballot form – or, in other words, "opted in" the releases. 553 B.R. at 82. With respect to creditors who were entitled to vote but abstained, the court noted:

> [U]nder the circumstances of this case it would be inappropriate to treat such inaction as a "consent" to third party releases. . . . The relatively small recoveries that were initially proposed, and the widely-publicized fact that other creditor groups had endorsed the proposed Plan, could easily have prompted an even higher-than-usual degree of inattentiveness or inaction among affected creditors in these cases. Furthermore, many creditors may simply have assumed that a package that related to the Debtors' bankruptcy case must have related only to the dealings with the Debtors and would not affect their claims against other parties. Charging all inactive creditors with full knowledge of the scope and implications of the proposed third party releases, and implying a "consent" to the third party releases based on the creditors' inactions, is simply not realistic or fair, and would stretch the meaning of "consent" beyond the breaking point.

*Id.* at 80-81. *See also In re Emerge Energy Services LP,* 2019 WL 7634308, at 23 (Bankr. D. Del. Dec. 5, 2019) ("[T]he Court cannot on the record before it find that the

UST-0709

failure of a creditor or equity holder to return a ballot or Opt-Out Form manifested

their intent to provide a release. Carelessness, inattentiveness, or mistake are three

reasonable alternative explanations.").

       "Opt out" procedures are problematic in that creditors may be "caught asleep at the

switch." If a creditor is truly consenting to the release provisions, then that creditor will have no

problem "opting in" to the provision. As discussed above, *Behrmann* makes clear that third-

party releases are to be approved only in extraordinary circumstances. Such releases are the

exception, not the rule. If, however, the Court permits such releases by consent alone, and

particularly by consent manifested merely by the failure to opt-out, those provisions will become

the norm and will be included in every chapter 11 plan. Indeed, if the Court allows confirmation

of plans including such provisions based solely on the failure to affirmatively "opt out," there is

no reason for a debtor to ever leave such a provision out of the plan since that debtor is likely to

get at least a few creditors to inadvertently "consent" to the releases. What renders the opt out

process even less consensual in this case is the fact that with respect to Class 5 of general

unsecured creditors – one of the two classes entitled to vote to accept or reject – the Plan

contains a death trap provision so that if the class votes in favor of the Plan, then the general

unsecured creditors will be entitled to share *pari passu* in a pot of $500,000. To the extent that

the class votes to reject the Plan, then they are entitled to a distribution pursuant to the waterfall

distribution with no guarantee of receiving any recovery on their claim. Accordingly, the death

trap encourages creditors to accept the Plan and, thus, be deemed to have consented to the third-

party releases.

       If the Court is inclined to allow releases by consent alone, the Court should follow those

courts that require strict evidence of actual consent by the affected parties. Said differently, the

UST-0710

United States Trustee requests that the following changes be made to the Disclosure Statement, ballots, or Plan:

- The Disclosure Statement and the Plan should specify that any creditor or interest holder who abstains from voting or fails to return a ballot should not be deemed to have consented to the third-party releases.

- The Disclosure Statement, the Plan, and the ballots should be amended to provide that creditors classified as "unimpaired" should not be deemed to have consented to the third-party releases; rather, they should be given an option to "opt in" of the third-party releases.

    The Disclosure Statement and the Plan should be amended to provide that creditors who are deemed to have rejected the Plan should be deemed to have rejected the third-party releases without having to object to the Plan. *See In re Chassix Holdings, Inc.,* 533 B.R. 64 (Bankr. S.D.N.Y. 2015).

### B. The Exculpation Clauses are Impermissibly Broad and Lack the Required Exception for Court Approved Suits

In addition to the fact that entitlement to the exculpation provisions has not been demonstrated, the exculpation clause here is impermissibly broad on its face because, *inter alia,* (i) it is too broad in respect to who is exculpated; (ii) it does not provide an exception allowing for suits against the exculpated parties where prior court approval is obtained; (iii) it does not contain a carve-out for acts or omissions that constitute breach of fiduciary duty; and (iv) it does not include protection from the breaches or violations of professional responsibilities.

In *In re National Heritage Foundation, Inc.*, 478 B.R. 216 (Bankr. E.D. Va. 2012), *aff'd, National Heritage Foundation v. Highbourne Foundation*, 760 F.3d 344 (4th Cir. 2014), the Court addressed exculpation clauses such as the one in this Plan. There, the Court recognized that exculpation provisions are permissible only if they are "properly limited and not over broad." *Id.* at 234.

To avoid over-breadth, exculpation clauses must be:

    (a)    narrowly tailored to meet the needs of the bankruptcy estate;

UST-0711

(b)   limited to parties who have performed necessary and valuable duties in connection with the case;

(c)   limited to acts and omissions taken in connection with the bankruptcy case; and

(d)   must not purport to release any pre-petition claims.

*Id.*  Here, the clause is not narrowly tailored to meet the needs of the bankruptcy estates and is not limited to parties who have performed necessary and valuable duties in connection with the cases.  The exculpation is with respect to any act taken or omitted to be taken even relating to "prepetition transactions  or "other occurrence taking place on or before the Effective Date" but does not limit the exculpated actions to ones that occurred post-petition.  Furthermore, the term "Exculpated Parties" is so broad that it extends to parties that may be neither creditors nor professionals and may involve people who had no direct involvement with any action taken during the pendency of the bankruptcy proceedings.  Similarly, the Plan proposes to exculpate the "Reorganized Debtors" which will not be in existence until after the Effective Date of the Plan.  Thus, under the Fourth Circuit standards, these entities have no place in an exculpation clause.

Finally, to be permissible, an exculpation clause must contain a "gatekeeper function by which the Court may, in its discretion, permit an action to go forward against the exculpated parties." *National Heritage*, 478 B.R. at 234.  The exculpation clause here contains no such exception.  Accordingly, the Disclosure Statement should be amended to provide a legal justification for the Exculpation Clause sought to be included in the Plan.

### C.    The Release and Exculpation Clauses Contain no Carve-Out for Governmental Claims

To the extent that the Court allows for any releases or exculpation to the Debtors, the United States Trustee requests that language carving out Governmental claims from the proposed

- 20 -

UST-0712

releases be included. At a minimum, the Debtors must add language to the Disclosure Statement

and Plan substantially in the form set forth below:

> Nothing in this Plan discharges, releases, precludes, or enjoins: (i) any liability to any Governmental Unit that is not a Claim; (ii) any Claim of a Governmental Unit arising on or after the Effective Date; (iii) any police or regulatory liability to a Governmental Unit on the part of any Entity as the owner or operator of property after the Effective Date; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors. Nor shall anything in the Plan enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence. Nothing in this Plan divests any tribunal of any jurisdiction it may have law to adjudicate any defense based on this paragraph of the Plan.

### D. Conclusion Regarding Release and Exculpation Provisions for the Purpose of the Hearing on the Disclosure Statement

While consideration of the release and exculpation provisions is, arguably, a matter for a

confirmation hearing rather than a hearing on approval of a proposed disclosure statement, the

absence of a discussion of the facts and factors germane to the appropriateness of the provisions

deprives creditors of a meaningful understanding of the rationale, justification, and effect of the

releases, and the likelihood that they will be approved. Those are the heart of the issue in

disclosure. Moreover, because approval for the form of the ballots is being sought, the United

States Trustee objects to their current form and requests that the Court deny the Solicitation

Procedures Motion unless the ballots are amended as set forth above.

### V. The Plan Violates Section 503(c) of the Bankruptcy Code

The Plan includes provisions regarding "Employee Obligations" and the implementation

of a "Management Incentive Plan" that may violate section 503(c) of the Bankruptcy Code. *See*

Plan at Art. IV.N and O. The Plan further provides:

UST-0713

Employee Obligations

> On and after the Effective Date, the Debtors or Reorganized
> Debtors, as applicable, shall adopt, assume, continue, and/or honor
> in the ordinary course of business all obligations related to all
> Employee Benefits Programs . . . and assume all employment
> agreements or letters, indemnification agreements, or other
> agreements entered into with current and former employees . . .
> unless such employees agree to enter into new agreements on
> terms and conditions acceptable to the Reorganized Debtors, the
> Required Consenting Stakeholders and such employee.

*See* Plan at Art. IV.O.

Management Incentive Plan

> On the Effective Date, the Reorganized Debtors will reserve New
> Common Stock representing (on a fully diluted and fully
> distributed basis) up to 10% of the New Common Stock
> exclusively for awards and distribution under the Management
> Incentive Plan, which will contain terms and conditions (including,
> without limitation, with respect to participants, form, allocation,
> structure, duration and timing and extent of issuance and vesting)
> as determined at the discretion of the New Board after the
> Effective Date.

*See* Plan at Art. IV.N.

If this Court confirms the Plan, then on the Effective Date, the Debtors/Reorganized

Debtors are required to assume all Employee Benefits Programs[6] and adopt a Management

Incentive Plan ("MIP").

The Debtors bear the burden of establishing that any of the Employee Benefits Programs

they shall assume or the MIP to be implemented satisfy the Bankruptcy Code's requirements.

---

[6] The term "Employee Benefits Programs" is defined in the Plan as:

> Collectively, all of the Debtors' wages, compensation, and employee benefits programs according
> to existing terms and practices, including executives and Insider compensation and benefits
> programs, Insider and non-Insider severance programs, Insider and non-Insider incentive
> programs, and insider and Non-Insider retention programs, in each case as were in effect as of the
> effective date of the Restructuring Support Agreement and were disclosed in to counsel . . .

*See* Plan at Art.I.A.62.

UST-0714

*See GT Advanced Tech., Inc. v. Harrington*, 2015 WL 4459502, *5 (Bankr. D.N.H. July 21,

2015) (*citing In re Hawker Beechcraft, Inc.*, 489 B.R. 308, 313 (Bankr. S.D.N.Y. 2012)). The

plain text of section 503(c) of the Bankruptcy Code does not draw a distinction between awards

made to insiders pre-confirmation versus post-confirmation. *See* 11 U.S.C. § 503(c)(1).

Notably, because section 503(c) speaks to the allowance as well as the payment of obligations, it

applies with equal force regardless of whether the payment is to be made by the debtor prior to

plan confirmation, or whether the successor of the debtor is directed to make such a payment

after emergence from bankruptcy. *See In re AMR Corp.*, 490 B.R. 158, 167-68 (Bankr. S.D.N.Y.

2013); *In re Dana Corp.*, 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006) (applying 11 U.S.C. § 503(c)

to bonus and severance payments that were to be made to debtor's insider upon emergence from

bankruptcy); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 171-72 (Bankr. D.N.J. 2010) (holding

severance provision invalid under section 503(c)(2) notwithstanding fact that severance was to

be paid after the plan effective date by the reorganized debtor).

 As to the MIP, the Plan requires that the New Board adopt and implement the MIP,

following the Effective Date. *See* Plan at Art. IV.G. While a reorganized debtor's board may

normally offer bonuses to employees after bankruptcy for future work without implicating

section 503(c), the critical difference here is there is no clarity as to whether the New Board is

constituted by the members of the present Board or whether the present Board is really the one

proposing and implementing the MIP which will only go into effect upon the "Effective Date".

 The Disclosure Statement and Plan fail to provide information as to, among other things,

the (i) Employee Benefit Programs that the Reorganized Debtors shall assume, (b) the identity,

titles, and "insider" status of the management employees whose agreements will be assumed or

who will receive the MIP equity, (c) the bonus or severance payments contemplated under

UST-0715

Employee Benefit Programs, (d) the time-based vesting criteria of the MIP, and (f) the performance-based vesting criteria of the MIP.  The current language in the documents essentially requires the Debtors or Reorganized Debtors to assume all Employee Obligations (which possibly contains incentives, bonuses, or severance payments).  In short, it is a blank check which can be used to compensate unknown individuals with unknown amounts based on unknown performance metrics.  Given the vague nature of the provision, it cannot be determined if the provision regarding the Employee Benefit Programs, or the MIP, as described, implicates or is subject to section 503(c) of the Bankruptcy Code.

Accordingly, the Disclosure Statement should be amended to provide additional information regarding (a) what Employee Benefit Programs the Debtors are required to assume, (b) ensure that any such Employee Benefit Programs be included in the Plan Supplement, and (c) the MIP, including, without limitation, whether a management incentive plan is currently in place, whether the New Board has an obligation to issue awards under the incentive plan, how the decision to allocate the stock will be made, whether it is discretionary, and what will happen to the stock allocated to the MIP if they are not awarded to management.

## CONCLUSION AND RESERVATION OF RIGHTS

Considering the foregoing, the Plan cannot be confirmed, as it fails to comply with sections 1129(a)(1) and (a)(2) of the Bankruptcy Code.  Given that the Plan is incapable of confirmation, the Court should not approve the Disclosure Statement absent the modification of its terms as set forth herein.  *See, e.g., In re GSC, Inc.,* 453 BR. 132. 1577 n.27 (Bankr. S.D.N.Y. 2011) (citing *In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) ("An unconfirmable plan is grounds for rejection of the disclosure statement; a disclosure statement that describes a plan patently unconfirmable on its fact should not be approved.")).  *See also In re Robert's Plumbing and Heating, LLC*, 2011 WL 2972092 (Bankr. D. Md. July 20, 2011) (same).

UST-0716

The United States Trustee reserves his rights to object to other deficiencies at the hearing

on the approval on the Disclosure Statement to the extent that the deficiencies in the Disclosure

Statement are not resolved prior to then or to the extent that amended or additional documents

filed after the date of this Objection are filed and raise the same or additional concerns as

highlighted herein.

The United States Trustee also submits that, if applicable, the foregoing objections

constitute objections to the confirmation of the Plan and reserves his rights to raise any such

objections that are deemed to be confirmation objects at a later time.

<div style="margin-left: 50%;">

Respectfully Submitted,

</div>

Dated: August 26, 2020

<div style="margin-left: 50%;">

JOHN P. FITZGERALD, III
Acting United States Trustee Region 4

By: */s/ Elisabetta G. Gasparini*
Elisabetta G. Gasparini (SC Fed. No. 11548)
Office of the United States Trustee
1835 Assembly Street, Suite 953
Columbia, South Carolina 29201
(803) 765-5227
Elisabetta.G.Gasparini@usdoj.gov

By: */s/ Lisa Yonka Stevens*
Lisa Yonka Stevens (Va. Bar No. 91352)
Office of the United States Trustee
6305 Ivy Lane, Suite 600
Greenbelt, Maryland 20770
(301) 344-6216
Lisa.Y.Stevens@usdoj.gov

By: */s/ Kathryn Montgomery*
Kathryn Montgomery (Va. Bar. No. 42380)
Shannon Pecoraro (Va. Bar No. 46864)
Office of the United States Trustee
701 East Broad Street, Suite 4304
Richmond, Virginia 23219
(804) 771-2310
Kathryn.Montgomery@usdoj.gov
Shannon. Pecoraro@usdoj.gov

</div>

UST-0717

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 26, 2020, I caused a copy of the foregoing pleading

to be served by email on the parties on the attached list with email addresses, and all parties

receiving notices in this case through the Administrative Procedures of the CM/ECF System for

the United States Bankruptcy Court for the Eastern District of Virginia.

By: */s/ Elisabetta G. Gasparini*
Elisabetta G. Gasparini (SC Fed. No. 11548)
Office of the United States Trustee
1835 Assembly Street, Suite 953
Columbia, South Carolina 29201
(803) 765-5227
Elisabetta.G.Gasparini@usdoj.gov

By: */s/ Lisa Yonka Stevens*
Lisa Yonka Stevens (Va. Bar No. 91352)
Office of the United States Trustee
6305 Ivy Lane, Suite 600
Greenbelt, Maryland 20770
(301) 344-6216
Lisa.Y.Stevens@usdoj.gov

By: */s/ Kathryn Montgomery*
Kathryn Montgomery (Va. Bar. No. 42380)
Shannon Pecoraro (Va. Bar No. 46864)
Office of the United States Trustee
701 East Broad Street, Suite 4304
Richmond, Virginia 23219
(804) 771-2310
Kathryn.Montgomery@usdoj.gov
Shannon. Pecoraro@usdoj.gov

UST-0718

DAVID W. BADDLEY
COUNSEL FOR U.S. SECURITIES AND EXCHANGE COMMISSION
FLORIDA BAR NO. 0148393
ILLINOIS ARDC NO. 6282466
950 EAST PACES FERRY ROAD, NE
SUITE 900
ATLANTA, GA 30326-1382
TEL: (404) 842-7625
BADDLEYD@SEC.GOV

### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCENA RETAIL GROUP, INC., *et. al.*, | ) | Case No. 20-33113 (KRH) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Hearing Date: Sept. 3, 2020** |
| | ) | **Hearing Time: 1:00 p.m.** |
| | ) | |

**OBJECTION BY THE U.S. SECURITIES AND EXCHANGE COMMISSION TO
DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE
ADEQUACY OF THE DISCLOSURE STATEMENT, (II) APPROVING THE
SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO
CONFIRMATION OF THE DEBTORS' PROPOSED JOINT PLAN OF
REORGANIZATION, (III) APPROVING THE FORMS OF BALLOTS AND
NOTICES IN CONNECTION THEREWITH, (IV) SCHEDULING CERTAIN
<u>DATES WITH RESPCT THERETO, AND (V) GRANTING RELATED RELIEF</u>**

The U.S. Securities and Exchange Commission ("**SEC**") objects to the above-referenced

motion [ECF No. 156, the "**Motion**"] because the Motion asks this Court to approve plan

procedures that are grossly unfair to the Debtors' public shareholders, by attempting to relieve

the Debtors of their burden to satisfy the high bar in this Circuit for binding shareholders to a

third-party release.

Under the Debtors' plan, shareholders will receive nothing, their shares will be canceled

and they are not allowed to vote. Yet, the Debtors seek approval of a form of notice, which

1

UST-0719

would force shareholders (in the middle of a global pandemic) to quickly return an "opt-out"

form to preserve whatever remaining rights they may have as shareholders against non-debtors.

This includes claims arising from egregious conduct, such as fraud, willful misconduct, breach of

fiduciary duty and violations of securities laws.

For any shareholders who fail to timely respond, the Debtors would have this Court treat

those shareholders as "consenting" to the release. And then relying on that consent, the Debtors

will seek to avoid the burden of proving that the release is both fair and essential (as required by

Fourth Circuit law), which under the facts of this case, they clearly cannot do. Indeed, the

release is nothing more than an attempt to enrich the Debtors' current and former officers and

directors, and many others, with releases for misconduct that would otherwise be non-

dischargeable in their own personal bankruptcy. The SEC respectfully requests that the Court

reject this opt-out procedure, and subject whatever third-party release the Debtors propose to the

standard in this Circuit governing non-consensual releases.[1]

## BACKGROUND

1.      The SEC is the federal agency responsible for regulating the U.S. securities

markets, protecting investors, and enforcing the federal securities laws. Debtor, Ascena Retail

Group, Inc. ("**ARGI**"), is a public company; its common stock traded on the Nasdaq Stock

Market Exchange until recently. Currently, ARGI's common stock trades on the OTCMarkets

Pink Open Market platform under the trading symbol "ASNAQ."

2.      On July 31, 2020, ARGI and its affiliated debtors filed a *Joint Chapter 11 Plan of*

*Reorganization of Ascena Retail Group, Inc. and its Debtors Affiliates.* [ECF No. 154, the

---

[1] In the event the Court rules that an opt-out procedure is appropriate, then the SEC requests that
the form of notice (attached to the Motion as Schedule 5) be substantially re-written. The notice
is written with a substantial amount of legalese, and lacks clear instructions in plain English,
sufficient to inform the shareholder class precisely what they are required to do.

UST-0720

"**Plan**"].  The Plan is based on the terms of a Restructuring Support Agreement that the Debtors

negotiated pre-bankruptcy with the holders of roughly 68% of the term loan claims. [ECF No.

155, "**Disclosure Statement**" at p.7].  Under that agreement, and the Plan, the term loan lenders

will acquire 100% of the equity in the reorganized company, and ARGI's public shareholders

will receive nothing.

3.      Article VIII(F) of the Plan contains a release provision, under which every

"Releasing Party" will be deemed to have released all claims it may have against every

"Released Party."  The term "Releasing Party" includes ARGI's public shareholders unless a

shareholder either opts-out of the release, or objects to the Plan.  Shareholders do not receive

anything of value in exchange for giving the release.

4.      The parties protected by the release (i.e., the "Released Parties") include every

person or entity that conceivably could ever have caused shareholder harm, including all of the

Debtors' current and former officers and directors.  Significantly, Released Parties are not

required to pay or provide any consideration to shareholders in exchange for the release.

Further, the scope of the release is unlimited, and would include claims for fraud, breach of

fiduciary duty, willful misconduct and violations of securities laws.

## **LEGAL DISCUSSION**

### A.      **THIRD-PARTY RELEASES ARE DISFAVORED IN THIS CIRCUIT.**

5.      The Fourth Circuit Court of Appeals has established a "longstanding rule" that

bankruptcy courts in this Circuit should approve third-party releases "cautiously and

infrequently." *Nat'l Heritage Foundation, Inc. v. Highbourne Foundation*, 760 F.3d 344, 347 (4th

Cir. 2014) (*quoting Behrmann v. Nat'l Heritage Foundation, Inc.*, 663 F.3d 704, 712 (4th Cir.

2011)).  To that end, the Fourth Circuit has established a high bar for approving a third-party

release.  Among other things, the bankruptcy court must consider the following six substantive

UST-0721

factors, which overall, are designed to ensure that the release is essential to the reorganization

and fair to the releasing parties:

1. There is an identity of interests between the debtor and the party protected by the release;

2. The party protected by the release has contributed substantial assets to the reorganization;

3. The release is essential to the reorganization;

4. The class of creditors or equity holders subject to the release has overwhelmingly voted to accept the plan;

5. The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the release; and

6. The plan provides an opportunity for those claimants who choose not to settle to recover in full.

*Behrmann*, 663 F.3d at 711-12. Further, the Fourth Circuit requires the bankruptcy court to

make a record of "specific factual findings" that support its conclusion to grant a third-party

release. *Id.* at 712 ("[T]he meaningful exercise of appellate review at a minimum requires that

the [bankruptcy] court make specific factual findings in support of its decision to grant equitable

relief.")

6. The Motion fails to explain why the Debtors seek approval of the opt-out

procedure. If the Debtors intend to try to meet the *Behrmann* standard for shareholders who do

not opt-out, then the SEC would acknowledge that approval of the release is a confirmation

issue. But it appears that the opt-out process is intended to establish implied consent, which the

Debtors will argue validates the release against non-responding shareholders without the need to

satisfy *Behrmann*. As such, this issue should be decided now.

UST-0722

**B.      TO AVOID THE *BEHRMANN* STANDARD, A CONSENSUAL RELEASE
SHOULD REQUIRE A SHAREHOLDER'S AFFIRMATIVE ASSENT.**

7.      There are two general views as to what constitutes "consent" to a third-party

release.  On one hand, some courts view silence or inaction as sufficient. *See e.g., In re*

*Indianapolis Downs, LLC,* 486 B.R. 286, 306 (Bankr. D. Del. 2013).  Other courts, however,

require an affirmative assent to be bound, such as voting in favor of the plan which contains the

release, or for a non-voting creditor, by checking a box to opt-in to a release.  *See e.g., In re*

*Emerge Energy Servs. LP*, No. 19-11563 (KBO), 2019 Bankr. LEXIS 3717, at *54 (Bankr. D.

Del. Dec. 5, 2019) (holding that failure to return an Opt-Out Form is not a manifestation of intent

to provide a release); *In re Washington Mutual, Inc*., 442 B.R. 314, 355 (Bankr. D. Del. 2011)

("Failing to return a ballot is not a sufficient manifestation of consent to a third party release.");

*In re Exide Technologies*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) (consent found only with

respect to creditors who voted to accept the plan); In re *Zenith Electronics Corp*., 241 B.R. 92,

111 (Bankr. D. Del. 1999) (finding that release had to be modified to apply only to those who

voted in favor of the plan).

8.      The SEC believes that requiring affirmative assent in this case is both

fundamentally more fair to the shareholder class, and also consistent with the Fourth Circuit's

mandate to approve third-party releases "cautiously and infrequently."  Shareholders receive

nothing for agreeing to the release.  And, the release covers egregious conduct, including fraud.

It is unreasonable to interpret a shareholder's silence as a willingness to consent to such a

release, which in effect, is nothing more than a gift to the released parties.  Further, stretching the

term "consent" to include silence, under these circumstances, would ignore caution and permit

debtors to obtain third-party releases against almost anyone, without the Court making the

required evidentiary findings that the release is fair and essential.

UST-0723

9.      It is well established in this District, in an analogous context under the

Bankruptcy Code, that silence is not consent.  Section 363(f)(2) allows a trustee to sell property

of the estate, free and clear of any interest in the property, if the entity holding the interest

"consents." 11 U.S.C. §363(f)(2).  Courts in this District routinely hold that an interest holder

does not "consent," for purposes of Section 363(f)(2), by failing to object. *See In re DeCelis*, 349

B.R. 465 (Bankr. E.D. Va. 2006); *In re Silver*, 338 B.R. 277 (Bankr. E.D. Va. 2004); *In re*

*Takeout Taxi Holdings, Inc.*, 307 B.R. 525 (Bankr. E.D. Va. 2004).  The Court's explanation as

to why silence is not consent under Section 363(f)(2) is equally applicable in the context of a

third-party release:

> When a person consents to a particular action, that person has
> unequivocally manifested his or her affirmation of the proposed action
> through some discernable statement or act.  In contrast, when a person
> fails to object to a proposed action, that person's affirmation can only be
> deduced from the lack of any statement or act which would suggest a
> contrary position.  Obviously, such deductive reasoning always leaves
> open the possibility that the person's failure to object is attributable to
> some reason totally unrelated to that person's actual consent to the
> proposed act.  For example, in the context of mass mailings to the creditor
> matrix, the person may have mistaken an important notice for junk mail
> and tossed it into the trash without even have read it."

*DeCelis*, 349 B.R. at 467-68.  *Cf. In re Russell*, 458 B.R. 731 (Bankr. E.D. Va. 2010) (creditor

did not "accept" plan treatment under Chapter 13 plan by failing to object).

10.     This Court's Local Rules also demonstrate that "consent" requires affirmative

assent.  For example, a corporation's consent to an involuntary petition must be signed by an

attorney and accompanied by a copy of the corporate resolution authorizing the consent. LBR

1074-1.  Likewise, a Chapter 13 trustee consents to a supplemental "no look" fee application

only by endorsing a proposed order approving that application. LBR 2016-1(C)(3)(d)(iii).

Finally, all consent orders in this District require the endorsement by the necessary parties. LBR

9022-1.  Nowhere in the Local Bankruptcy Rules is a party's failure to act viewed by the Court

UST-0724

as consent.  *In re DeCelis*, 349 B.R. at 468 ("If a party's consent is a prerequisite to proceeding

with a proposed action, then that party should not have to request a hearing or otherwise object if

it does not want the action to occur.  Its silence should be sufficient.")

      11.    Finally, the proposed release in this case cannot be approved under the

Bankruptcy Code.  The Fourth Circuit has made clear that the source of a bankruptcy court's

authority to approve a third-party release is Section 105(a) of the Bankruptcy Code. 11 U.S.C.

§105(a). *Behrmann*, 663 F.3d at 710.  But the Supreme Court has held that Section 105(a) cannot

be used to create substantive rights or to conflict with other provisions of the Code. *See Law v.

Siegel*, 571 U.S. 415, 421, 134 S.Ct. 1188, 1194 (2014).  Section 523(a) of the Bankruptcy Code

excepts from discharge a variety of debts, including debts for fraud, breach of fiduciary duty,

willful misconduct, and violations of securities laws. *See* 11 U.S.C. §§ 523(a)(2), (a)(4), (a)(6)

and (a)(19).  Thus, a bankruptcy court is not authorized by Section 105(a) to grant to a **non-

debtor** the protections that Congress has expressly denied to the debtor, who has subjected all of

its assets to the jurisdiction of the bankruptcy court.

     **C.**    **THE PROPOSED NOTICE TO SHAREHOLDERS IS INADEQUATE AND
DOES NOT PROVIDE SUFFICIENT TIME TO RESPOND.**

      12.    If the Court is inclined to approve an opt-out procedure, then the proposed notice

to shareholders should be substantially re-written to clearly explain, in plain English, what is

expected of them.  A third-party release is a form of injunction that requires adequate disclosure.

*In re Lower Bucks Hospital*, 571 Fed.Appx. 139 (3d Cir. 2014).  Such disclosure must describe

in "specific and conspicuous language…all acts to be enjoined and identify the entities that

would be subject to the injunction." Fed.R.Bankr.P. 3016(c).  The adequacy of disclosure is

subjective and made on a case-by-case basis, subject to the discretion of the bankruptcy court.

*Lower Bucks*, 571 Fed.Appx. at 142.

UST-0725

13.     The proposed notice to shareholders is attached to the Motion on <u>Schedule 5</u>.

[ECF No. 156 at pp. 66-73]. While a seasoned bankruptcy practitioner would be able to navigate

the notice and recognize that it contains an opt-out release, public shareholders almost certainly

will fail to understand what is required of them to protect their rights against non-debtors. The

release disclosure is at the very end of the notice. The proposed notice contains too much

legalese and is not designed to clearly instruct shareholders, in plain English, the importance of

opting out to protect their rights. If the Court is inclined to approve an opt-out release procedure,

it should require the notice to be written in a way that can be easily understood by unrepresented

public shareholders who have no experience or familiarity with the bankruptcy process.[2]

14.     In addition, the proposed notice procedures do not give shareholders sufficient

time to consider and return the opt-out release form. Shareholders may have less than ten days to

return their opt-out forms.[3] Any approved procedures should ensure that shareholders have at

least 28 days from the time they receive the notice to the time they must return the opt-out form.

<u>**RESERVATION OF RIGHTS**</u>

15.     The SEC reserves all rights to object to confirmation of the Plan, including on

grounds not raised in this objection.

---

[2] A clear notice would tell a shareholder the following: (1) You are a shareholder of Ascena
Retail Group, Inc., which has filed for bankruptcy; (2) Under the company's bankruptcy plan,
your shares will be canceled and you will not receive any money on account of your shares; (3)
Unless you return the enclosed Opt-Out Form by [Date], you will also lose whatever rights you
have as a shareholder against numerous individuals and entities who are not in bankruptcy
(including officers and directors); and (4) There is no harm to you under the plan if you choose
to return the Opt-Out form.

[3] Notices to shareholders may not be mailed out until September 8, 2020. Assuming three-day
delivery time, they would be received on September 11. But to be received back by October 6,
2020 (the proposed deadline), shareholders would need to mail their opt-out form by no later
than October 1. This gives shareholders, at most, 20 days to respond. But this process assumes
that the Debtors are able to mail notices directly to all beneficial owners of record. Most likely,
notices will need to go through brokers and nominees who hold shares in street name, which
could add another 10-day delay in the noticing process.

UST-0726

WHEREFORE, the U.S. Securities and Exchange Commission requests entry of an Order

denying the Motion for the reasons stated above, providing such other relief as the Court deems

appropriate.

Dated: August 28, 2020

Respectfully submitted,

_/s/ David W. Baddley_
David W. Baddley, Esq.
Bankruptcy Counsel
Florida Bar No. 0148393
Illinois ARDC No. 6282466
Appearing Pursuant to Local Rule 2090-1(E)(3)
Tel: (404) 842-7625
Fax: (404) 842-7633
Email: baddleyd@sec.gov

COUNSEL FOR U.S. SECURITIES AND
EXCHANGE COMMISSION
Atlanta Regional Office
950 East Paces Ferry Road, Suite 900
Atlanta, Georgia 30326-1382

UST-0727

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing Objection was served this 28th day

of August, 2020 upon all parties receiving notices through the Administrative Procedures of the

CM/ECF System for the Bankruptcy Court for the Eastern District of Virginia, and separately

upon the following by electronic mail delivery:

Oyla Antle (oantle@cooley.com)
Cullen Drescher Speckhart (cspeckhart@cooley.com)
Steven N. Serajeddini (steven.serajeddini@kirkland.com)
John R. Luze (john.luze@kirkland.com)
Jeff Michalik (jeff.michalik@kirkland.com)
Evan R. Fleck (efleck@milbank.com)
Abigail L. Debold (adebold@milbank.com)
Kathryn R. Montgomery (Kathryn.Montgomery@usdoj.gov)
Shannon Pecoraro (Shannon.Pecoraro@usdoj.gov)
Elisabetta. G. Gasparini (Elisabetta.G.Gasparini@usdoj.gov)
Lisa Yonka Stevens (Lisa.Y.Stevens@usdoj.gov)
Brittany Berlauk Falabella (bfalabella@hirscherlaw.com)
Robert S. Westermann (rwestermann@hf-law.com)


_____*/s/ David W. Baddley*_____

UST-0728

Michael S. Etkin (*pro hac vice* pending)
Andrew Behlmann (*pro hac vice* pending)
John P. Schneider (*pro hac vice* pending)
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile:  (973) 597-2333

Ronald A. Page, Jr. (VA 71343)
**RONALD PAGE, PLC**
P.O. Box 73087
N. Chesterfield, Virginia 23235
Telephone: (804) 562-8704
Facsimile:  (804) 482-2427

*Bankruptcy Counsel to the Lead Plaintiffs and the Proposed Class*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCENA RETAIL GROUP, INC., *et al.*, [1] | ) | Case No. 20-33113 (KRH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## SECURITIES LEAD PLAINTIFFS' OBJECTION TO APPROVAL OF THE DISCLOSURE STATEMENT AND SOLICITATION AND BALLOT PROCEDURES AND NOTICES RELATING TO THE JOINT CHAPTER 11 PLAN OF ASCENA RETAIL GROUP, INC. AND ITS DEBTOR AFFILIATES

Joel Patterson and Michaella Corporation (the "Lead Plaintiffs"), the court-appointed lead plaintiffs in the securities fraud class action captioned as *In re Ascena Retail Group, Inc. Securities Litigation,* Case No. 2:19-cv-13529-KM-JBC (the "Securities Litigation"), pending in the United States District Court for the District of New Jersey (the "District Court"), for itself and the putative class it seeks to represent in the Securities Litigation (the "Proposed Class"), hereby submits this objection (the "Objection") to (a) approval of the proposed disclosure statement (the "Disclosure Statement") [Docket No. 155] for the *Joint Chapter 11 Plan of*

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena. The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

UST-0729

*Reorganization of Ascena Retail Group, Inc. and its Debtor Affiliates* (the "<u>Plan</u>") [Docket No. 154] and (b) approval of the procedures (the "<u>Solicitation Procedures</u>") Ascena Retail Group, Inc. ("<u>Ascena</u>")[2] and the other debtors and debtors-in-possession (collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>") have proposed for soliciting votes on the Plan, as set forth in the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* (the "<u>Solicitation Procedures Motion</u>") [Docket No. 156]. As and for its Objection, Lead Plaintiffs respectfully state as follows:[3]

## <u>PRELIMINARY STATEMENT</u>

1.      Through a sweeping and virtually incomprehensible Third-Party Release by holders of claims or interests that attempts to engineer "deemed consent" via an opt-out mechanism that would bind even holders of claims in impaired, non-voting classes, the Plan potentially impacts the direct claims of Lead Plaintiffs and the other members of the Proposed Class against some or all of the Non-Debtor Defendants in the Securities Litigation. The Lead Plaintiffs and Proposed Class will receive nothing under the Plan, nor are any of the Non-Debtor Defendants – two former directors and officers of Ascena who oversaw the Debtors' downfall – providing any contribution whatsoever in exchange for what appears to be a gratuitous Third-Party Release. The Disclosure Statement does not even attempt to offer any factual or legal

---

[2]    Prior to its incorporation in 2011, Ascena was known as The Dress Barn, Inc. All references herein to Ascena include its predecessor, The Dress Barn, Inc.
[3]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Disclosure Statement, Plan, and/or Solicitation Procedures Motion.

UST-0730

justification for such an overreaching release. On this basis alone, the Disclosure Statement should not be approved.

2.      The Disclosure Statement also lacks adequate disclosure in other areas to advise Lead Plaintiffs, the Proposed Class, and creditors generally of the Plan's effect on their claims against the Debtors and the Non-Debtor Defendants and on the continued prosecution of the Securities Litigation. Among other things, the Disclosure Statement:

- contains no description whatsoever of the Securities Litigation;

- violates Bankruptcy Rule 3016(c) by failing to disclose the scope of the Third-Party Release and Plan Injunction;

- fails to provide any legal or factual basis for the Third-Party Release or the Plan Injunction, particularly as they may relate to Lead Plaintiffs, the Proposed Class, and the Securities Litigation;

- does not disclose whether or how the Debtors intend to preserve evidence potentially relevant to the Securities Litigation after the Effective Date of the Plan;

- does not disclose whether or how Lead Plaintiffs and the Proposed Class will be able to pursue the Class Claims against the Debtors to the extent of available insurance; and

- does not (nor do the Plan or the Solicitation Procedures) acknowledge Lead Plaintiffs' authority to opt out of the Third-Party Release on behalf of the Proposed Class.

Unless the Debtors modify the Plan to address the fatal defects that will prevent its confirmation, augment the Disclosure Statement with fulsome disclosure regarding each of the issues above, and remedy the related defects in the Solicitation Procedures, the Disclosure Statement and Solicitation Procedures should not be approved.

## **BACKGROUND**

## I.      **THE SECURITIES LITIGATION**

3.      The Securities Litigation is a federal securities class action filed in June 2019. By order entered August 23, 2019, (the "Stipulated Order") [Securities Litigation Docket No. 26],

UST-0731

the District Court appointed Lead Plaintiffs as lead plaintiffs and Robbins Geller Rudman & Dowd LLP and Pomerantz LLP as lead counsel ("Lead Counsel") in the Securities Litigation.

### The Amended Complaint

4. Lead Plaintiffs filed their *Consolidated Amended Complaint for Violations of the Federal Securities Laws* (the "Amended Complaint") on November 21, 2019, against Ascena and Messrs. David R. Jaffe and Robert Giammatteo, two of Ascena's former officers and directors (the "Non-Debtor Defendants," and collectively with Ascena, the "Defendants").

5. The Amended Complaint generally alleges that the Defendants engaged in a deceptive scheme and made false and misleading statements and omissions of material fact, which artificially inflated and/or maintained artificial inflation in the price of Ascena's common stock between December 1, 2015 and May 17, 2017 (the "Class Period"), in violation of Sections 10(b) and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)), and United States Securities and Exchange Commission (the "SEC") Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

### The Plan, Disclosure Statement, and Solicitation Procedures

6. The Debtors commenced these Chapter 11 Cases on July 23, 2020. On July 31, 2020, the Debtors filed the Plan and Disclosure Statement. A hearing on the Disclosure Statement is presently scheduled for September 3, 2020 at 1:00 p.m. (ET).

### The Third-Party Release and Plan Injunction

7. Article VIII.F of the Plan contains a deemed release (the "Third-Party Release") of numerous third parties' claims against the Debtors and myriad other non-Debtors, as follows in relevant part:

F. Release by Holders of Claims or Interests

4

UST-0732

Effective as of the Effective Date, ***each Releasing Party*** (other than the Debtors and Reorganized Debtors), in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim, Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, ***is deemed to have released and discharged each Debtor, Reorganized Debtor, and each other Released Party from any and all Causes of Action***, ***whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors***, that such Entity would have been legally entitled to assert (whether individually or collectively), ***based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof),*** the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan . . . or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Effective Date.

Plan, Art. VIII.F. (emphasis added).

8.      A "Releasing Party" deemed to grant the Third-Party Release includes, among numerous others:

> . . . ***(n) all holders of Claims; (o) all holders of Interests*** . . . ***provided that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan;*** or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation[.]

Plan, Art. I.A.109 (emphasis added).  Under Articles I.A.109 and VIII.F of the Plan, the holders of claims in impaired, non-voting classes would be deemed to grant the Third-Party Release unless they take affirmative steps to opt out – even though they are receiving nothing under the Plan and are not entitled to vote.  This would effectively leave members of the Proposed Class, who likely have received no notice of these Chapter 11 Cases, without a remedy for the Defendants' wrongdoing.

9.      The individuals and entities deemed "Released Parties" and who benefit from the Third-Party Release under the Plan comprise a similarly sweeping universe including, among

5

UST-0733

numerous others, the Debtors, their current and former Affiliates, and the Debtors and their

Affiliates' current and former directors, managers, officers, equity holders, and employees. *See*

Plan, Art.I.A.107 & 108. Through the seemingly endless web of interconnected Plan provisions

that a creditor or interest holder is compelled to navigate and the lists of categories of parties,

related parties, and related parties' related parties that the Plan defines as Released Parties, it

appears that each of the Non-Debtor Defendants may be a Released Party deemed to be released

by the Releasing Parties from "any and all Causes of Action, whether known or unknown,

including any derivative claims, asserted or assertable on behalf of any of the Debtors . . . based

on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the

management, ownership or operation thereof), the purchase, sale, or rescission of any Security of

the Debtors . . . or upon any other act, omission, transaction, agreement, event, or other

occurrence (in each case, related to any of the foregoing) taking place on or before the Effective

Date." *See* Plan, Art. VIII.F. The Third-Party Release does not even include a standard carve-

out from the Third-Party Release of acts constituting fraud, willful misconduct, or gross

negligence.

10.     The Plan also contains an injunction barring, among other things, "(i)

commencing or continuing in any manner any action or other proceeding of any kind on account

of or in connection with or with respect to any such claims or interests or Causes of Action"

against any Released Party by "all Entities that held, hold, or may hold claims or interests or

Causes of Action []" (the "Plan Injunction"). *See* Plan, Art. VIII.H.

### *Treatment of the Claims of Lead Plaintiffs and the Proposed Class under the Plan*

11.     The yet to be filed claims of Lead Plaintiffs and the Proposed Class against the

Debtors (the "Class Claims") (the proposed bar date for filing such claims is September 30,

UST-0734

2020)[4] arise from the purchase and sale of securities of Ascena, and thus are subject to subordination pursuant to section 510(b) of the Bankruptcy Code.

12.     The Plan does not classify the Class Claims or any other claims subordinated pursuant to section 510(b).   However, claims subordinated pursuant to section 510(b) arising in connection with purchase or sale of common stock, such as the Class Claims, are given equal priority as common stock.

13.     Under the Plan, "Interest" is defined as "any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor." *See* Plan, Art. I.A.109.   The term "equity security" as defined in section 101(16) of the Bankruptcy Code includes shares in a corporation or similar securities.  11 U.S.C. § 101(16)(A).  The Plan further provides that the "classification, and treatment of all . . . Allowed Interests . . . under the Plan take[s] into account[s] and conform[s] to the relative priority and rights of the . . . Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto," including under section 510(b) of the Bankruptcy Code.  *See* Plan, Art. III.G.

14.     Therefore, it can be deduced that the Class Claims, which are subject to section 510(b)'s subordination provisions and are given equal priority as common stock, fall within the Plan's definition of "Interest."

15.     Interests in Ascena are classified in Class 8 under the Plan.  Pursuant to the Plan, claims in Class 8 will be "cancelled, released, and extinguished without any distribution."  *See* Plan, Art. III.B.8.  Because Class 8 is receiving nothing under the Plan, holders of claims in Class 8 are deemed to reject the Plan and not entitled to vote.  *Id.*  As discussed above, holders of

---

[4]     *See Notice of Filing of Further Revised Proposed Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Docket No. 419].

UST-0735

claims in impaired, non-voting classes such as Class 8 would nonetheless be required to affirmatively opt-out of the Third-Party Release even though they are receiving nothing under the Plan and are not entitled to vote. Adding insult to injury, the Plan, Disclosure Statement, and Solicitation Procedures do not even appear to recognize Lead Plaintiffs' inherent authority to opt out of the Third-Party Release on behalf of the Proposed Class.

**OBJECTION**

16. The Disclosure Statement cannot be approved, irrespective of the extent of any additional disclosures the Debtors may add, because the Plan is unconfirmable. However, even if the Plan was not fatally flawed, the Disclosure Statement cannot be approved because it lacks adequate information with respect to key terms of the Plan.

## I. THE DISCLOSURE STATEMENT CANNOT BE APPROVED BECAUSE THE PLAN IT DESCRIBES IS PATENTLY UNCONFIRMABLE

17. A disclosure statement describing a plan that cannot be confirmed cannot be approved, regardless of the amount of disclosure it contains. *See, e.g., In re Wong*, 598 B.R. 827, 829 (Bankr. D. Md. 2019); *In re CHL, LLC*, 2018 WL 3025310, at *4 (Bankr. E.D.N.C. June 14, 2018); *see also In re Beyond.com*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (denying approval of disclosure statement where plan could not be confirmed); *In re Phoenix Petroleum Co.,* 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures."). The purpose behind this rule is pure common sense: courts will not permit a bankruptcy estate to incur the costs of soliciting votes for a plan that, even if unanimously accepted by creditors, could never be confirmed. *See, e.g., In re Main Street AC, Inc*., 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999); *In re Pecht,* 57 B.R. 137, 139

UST-0736

(Bankr. E.D. Va. 1986) ("If, on the face of the plan, the plan could not be confirmed, then the court will not subject the estate to the expense of soliciting votes and seeking confirmation.").

18.     Such is the case here.  For the reasons described below, the Plan could never be confirmed in its present form.  Permitting the Debtors to proceed with the solicitation of votes on a Plan that cannot be confirmed would be a waste of estate resources.  Accordingly, the Disclosure Statement cannot and should not be approved and the Debtors should not be authorized to solicit votes on this Plan.

### A.     *The Third-Party Release is Impermissible.*

19.     The Third-Party Release is improper to the extent it purports to release any direct claims belonging to Lead Plaintiffs and the Proposed Class against the Non-Debtor Defendants or any other Released Party that becomes a non-debtor defendant.  The inequity of the Third-Party Release is magnified by the fact that Lead Plaintiffs and members of the Proposed Class are not entitled to vote on the Plan, are deemed to reject the Plan, *and are receiving nothing* under the Plan.  Most or all members of the Proposed Class are likely strangers to these Chapter 11 Cases.  Yet, the Third-Party Release would strip Lead Plaintiffs and the Proposed Class of their claims against the Non-Debtor Defendants, likely their *only* source of compensation for the losses they incurred as a result of the misconduct alleged in the Securities Litigation.

20.     The Plan purports to allow creditors such as Lead Plaintiffs and members of the Proposed Class to salvage their claims against the Non-Debtor Defendants and each Released Party from the impact of the Third-Party Release by affirmatively opting out.  This opt-out requirement improperly places the onus on defrauded investors (assuming they are even aware of these Chapter 11 Cases) to locate and review the Plan, study the complicated Third-Party

9

UST-0737

Release, and ascertain that *even though they are receiving nothing under the Plan* and thus are not entitled to vote, they nevertheless must take affirmative steps to preserve their rights against the Released Parties. That exercise is excessively convoluted even for parties represented by counsel, much less absent class members. Indeed, many members of the Proposed Class may no longer hold the Debtors' securities and thus are likely unaware of the Plan, the voting deadline, or the Chapter 11 Cases generally. Placing the burden of locating and interpreting complex legal documents on individual members of the Proposed Class, *who are receiving nothing under the Plan*, and many of whom likely are not even aware that they have claims against the Non-Debtor Defendants that could be impacted by the Third-Party Release, is fundamentally inequitable, unjustifiable, and legally impermissible.

21. As applied to holders of claims in impaired, non-voting classes, such as Lead Plaintiffs and the Proposed Class, the defective opt-out provision in the Plan and Solicitation Procedures, and the illusory "consent" supposedly created thereby, transform the Third-Party Release into a *de facto* nonconsensual release.

22. The standard for analyzing a non-debtor, third-party release was espoused in the Fourth Circuit's decision in *Behrman v. National Heritage Foundation*, 663 F.3d 704 (4th Cir. 2011). In *Behrman*, the court considered the propriety of a release provision included in the debtor's plan of reorganization. *Id*. at 706. The debtor, National Heritage Foundation ("NHF"), sought to release the official committee of unsecured creditors and other parties closely connected with NHF, including its officers and directors, from claims that accrued on or before the effective date of the reorganization plan. *Id*. at 707. In analyzing the bankruptcy court's decision to confirm the plan with the release provision, the Fourth Circuit began from the well-settled principle that non-debtor releases in a plan of reorganization are a "***unique***" and

10

UST-0738

"*dramatic measure*" that should be "*granted cautiously and infrequently*." *Id.* at 711 (citations

and quotations omitted) (emphasis added). It then turned to the Sixth Circuit's decision in *Class*

*Five Nev. Claimants v. Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002), which had set forth a

number of factors to evaluate in discerning whether a non-debtor release should be approved.

Finding *Dow Corning* instructive, the Court in *Behrman* adopted the *Dow Corning* factors,

which are:

> (i) there is an identity of interests between the debtor and the third
> party, usually an indemnity relationship, such that a suit against the
> non-debtor is, in essence, a suit against the debtor or will deplete
> the assets of the estate; (ii) the non-debtor has contributed
> substantial assets to the reorganization; (iii) the injunction is
> essential to reorganization, namely, the reorganization hinges on
> the debtor being free from indirect suits against parties who would
> have indemnity or contribution claims against the debtor; (iv) the
> impacted class, or classes, has overwhelmingly voted to accept the
> plan; (v) the plan provides a mechanism to pay for all, or
> substantially all, of the class or classes affected by the injunction;
> (vi) the plan provides an opportunity for those claimants who
> choose not to settle to recover in full and; (vii) The bankruptcy
> court made a record of specific factual findings that support its
> conclusions.

*Id.* at 711-12. For the reasons articulated below, application of the six substantive *Dow Corning*

factors overwhelmingly vitiate against the Third-Party Release of the Non-Debtor Defendants:

23. <u>*Factor I*</u> – Under the first *Dow Corning* factor, the Court must consider "whether

there is an identity of interests – usually an indemnity obligation – between the debtor and the

released parties." A non-debtor release "may be appropriate in such circumstances because *a*

*suit against the non-debtor may, in essence, be a suit against the debtor that risks depleting the*

*assets of the estate*." *National Heritage Foundation, Inc. v. Highbourne Foundation,* 760 F.3d

344, 348 (4th Cir. 2014) (citation omitted) (emphasis added). Here, this factor weighs against

approving the Third-Party Release with respect to the Securities Litigation for at least three

reasons. First, any indemnification claims by the Non-Debtor Defendants in connection with the

UST-0739

Securities Litigation are, as the claims of Lead Plaintiffs and the Proposed Class, subordinated pursuant to section 510(b) and thus are not entitled to any distribution under the Plan. Second, any such indemnification claims are also potentially subject to disallowance under section 502(e)(1)(B) of the Bankruptcy Code. Third, the Debtors are assuming their D&O Liability Insurance Policies (including tail policies) through the Plan. As a result, the Class Claims asserted against the Non-Debtor Defendants in Securities Litigation *cannot* affect the Debtors' estates at all.[5]

24.  *Factor II* – Under the second *Dow Corning* factor, the Court must consider whether the Non-Debtor Defendants made a ***substantial contribution of assets*** to the Debtors' reorganization efforts. The substantial contribution requirement necessitates that the Non-Debtor Defendants do more than just perform their job duties; they must actually provide a ***financial contribution*** to the Debtors' reorganization. *See Id.* ('The absence of such contribution weighs against" granting a nonconsensual third-party release) citing *In re SL Liquidating, Inc.,* 428 B.R. 799, 804 (Bankr. S.D. Ohio 2010) (concluding that directors and officers did not make a substantial contribution when their "described efforts . . . [were] consistent with their preexisting fiduciary duties and job responsibilities.")). The Debtors assert that the Third-Party Release of the Non-Debtor Defendants is appropriate because the Non-Debtor Defendants "afforded value to the Debtors and aided in the reorganization process [.]"[6]  However, the Non-Debtor Defendants, as former directors and officers, could not possibly have aided in the reorganization process. Nor have the Debtors identified *any* financial contribution provided by the Non-Debtor

---

[5]  As of the Plan Effective Date, the Debtors "shall be deemed to have assumed all of the D&O Liability Insurance Policies (including, if applicable, any 'tail policy'" pursuant to section 365(a) of the Bankruptcy Code. *See* Plan, Art. IV.M.

[6]  *See* Disclosure Statement, Art. III.C.

UST-0740

Defendants in exchange for the Third-Party Release. Thus, this factor weighs against approving the Third-Party Release of the Non-Debtor Defendants.

25.    _Factor III_ – Under the third _Dow Corning_ factor, the Court must consider whether the Debtors have demonstrated that **the Third-Party Release of the Non-Debtor Defendants is "essential"** to their Plan, such that their reorganization hinges on the Non-Debtor Defendants being relieved of direct claims against them. A suit against the Non-Debtor Defendants would not affect the Debtors' reorganization given the presence of the D&O Liability Insurance Policies. Additionally, there is nothing stated in the Disclosure Statement (nor could there be) indicating that the Debtors cannot reorganize and confirm the Plan without the Third-Party Release that would eviscerate the Securities Litigation. Moreover, as the Fourth Circuit recognized in _Highbourne_, the presence of a severability clause "suggests that [a] plan would remain viable absent the release provision." _Id._ at 349. Here, the Plan contains a severability clause, providing that the Plan will remain in effect should the court determine that "_any term or provision_ of the Plan" is invalid, void, or unenforceable. _See_ Plan, VII.J. (emphasis added). Given the presence of both the D&O Liability Insurance Policies and the severability clause, as well as the absence of any indicia that the Debtors cannot reorganize and confirm the Plan without the Third-Party Release, this factor weighs against approving the Third-Party Release of the Non-Debtor Defendants

26.    _Factor IV_ – Under the fourth _Dow Corning_ factor, the Court must determine that **each class affected by the Third-Party Release "overwhelmingly voted in favor of the Plan**." Clearly, because Class 8 is not even permitted to vote on the Plan, this factor weighs against approving the Third-Party Release of the Non-Debtor Defendants.

13

UST-0741

27. <u>*Factor V*</u> – Under the fifth *Dow Corning* factor, the Court must determine whether the Debtors' Plan provides a mechanism to consider and pay all or substantially all of the class or classes affected by the non-debtor release. As the Fourth Circuit made clear in *Highbourne*, "**the absence of such a mechanism can weigh against the validity of a non-debtor release, especially when the result is that the impacted class's claims are extinguished entirely**." *Id.* at 351. Because Class 8 receives nothing under the Plan, this factor weighs against approving the Third-Party Release of the Non-Debtor Defendants.

28. <u>*Factor VI*</u> – Under the final substantive *Dow Corning* factor, the Court must determine whether the Plan provides an opportunity for those who chose not to settle to recover in full. Stated differently, the Plan must "provide an opportunity for non-consenting creditors to recover in full." *In re City of Detroit*, 524 B.R. 147, 175 (Bankr. E.D. Mich. 2014). The Plan does not have such a provision. Instead, through the Plan, the Debtors seek to strip Lead Plaintiffs and the Proposed Class of their Class Claims by way of the Third-Party Release and Plan Injunction. Clearly, this factor weighs against approving the Third-Party Release of the Non-Debtor Defendants.

29. As a general matter, this case is not *Dow Corning*. Nonetheless, as evidenced above, each substantive *Dow Corning* factor weighs heavily against this Court's approval of the Third-Party Release of the Non-Debtor Defendants. Given the Fourth Circuit's directive that non-debtor releases should be "granted cautiously and infrequently," 663 F.3d at 711, it is plainly evident that the Third-Party Release of the Non-Debtor Defendants is inappropriate.

30. Even if the Plan's opt-out mechanism could be described as consensual with respect to Lead Plaintiffs and the Proposed Class (which it is not), no reasonable, fully informed member of the Proposed Class would ever voluntarily relinquish its independent, direct claims

14

UST-0742

against the solvent, insured Non-Debtor Defendants or anyone else in exchange for absolutely

nothing. *See In re Chassix Holdings, Inc*., 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015). The

*Chassix* court observed that:

> The purpose of the "opt-out" and "deemed consent" voting rules that the
> Debtors proposed was to aid the parties in compiling a broader set of third
> party releases than might be obtained if a different, "affirmative consent"
> approach were adopted. The proposed procedures would have done so by
> ***deeming "consent" to exist in situations where no affirmative consent***
> ***had actually been manifested. Finding "consent" in these circumstances***
> ***is to some extent a legal fiction. We know from experience that many***
> ***creditors and interest holders who receive disclosure statements and***
> ***solicitation materials simply will not respond to them, either because***
> ***they elect not to read them at all or for other reasons.*** . . . The point is
> that inattentiveness, inaction and mistake are a known and expected part of
> the voting process.

Id. at 78 (emphasis added)*; see also In re SunEdison, Inc*., 576 B.R. 453, 460 (Bankr. S.D.N.Y.

2017); *In re Aegean Marine Petroleum Network Inc.*, Case No. 18-13374-mew (Bankr.

S.D.N.Y.), Transcript of Hearing Held Feb. 14, 2019 (the "Aegean Transcript").[7]

31.    The *Aegean Marine* court criticized the impropriety of a similar effort to use an

opt-out mechanism to fabricate "judicial deemed consent" to a third-party release by, among

others, holders of securities fraud claims:

> This is all about consent and what consent means, right? So you're
> basically urging me to say that you need me to manufacture consent for
> you because we know, we know in every one of these cases, there are
> people who are going to get this big package and they're not going to open
> it, or even if they open it, they're not going to understand it, and they're
> not going to respond. We know that. ***So all that this opt-out approach***
> ***does is it seeks to manufacture judicial deemed consent without an***
> ***actual thought process on behalf of the person whose consent is being***
> ***sought.***
>
> As I said in *Chassix*, there are times in the law when policies put that
> burden on people. The law supports class actions. It supports it for the
> purpose of judicial efficiency. And so it puts on people the burden of

---

[7]    The relevant pages of the Aegean Transcript are annexed hereto as **Exhibit [A]**.

UST-0743

opting out, otherwise, they're included. ***There is no such policy in favor of releases. In fact, the policy is the opposite.*** What I'm told [in] <u>Metromedia</u> is that they ought to be rare. . . .

***If we're going to seek consent, it ought to be real consent***, and it should be on an opt-in basis, not an opt-out basis.

Aegean Transcript at 28:1-29:6 (emphasis added). The *SunEdison* court similarly observed that

The Debtors' argument that the Non-Voting Releasors' silence should be deemed their consent to the Release is not persuasive because the Debtors have not identified the source of their duty to speak. The Debtors do not contend that an ongoing course of conduct with their creditors gave rise to a duty to speak. . . .

Instead, the Debtors essentially contend that the warning in the Disclosure Statement and the ballots regarding the potential effect of silence gave rise to a duty to speak, and the Non-Voting Releasors' failure to object to or reject the Plan should be treated as their deemed consent to the Release. Indeed, this appears to be the unspoken rationale of the authorities cited by the Debtors. ***The Debtors have failed, however, to show that the Non-Voting Releasors' silence was misleading or that it signified their consent to the Release. There are other plausible inferences that support the opposite inference. For example, the meager recoveries (here, less than 3% for the unsecured creditors) may explain their inaction without regard to the Release.***

*SunEdison*, 576 B.R. at 460-61 (emphasis added).

32.     The circumstances here are even more egregious. In *SunEdison,* unsecured creditors were receiving *something* under the plan, yet the court noted that their miniscule recovery (not their magnanimous desire to grant a gratuitous third-party release) was a plausible explanation for the fact that they did not vote. In *Chassix,* unsecured creditors faced the possibility of losing their distributions if their class did not accept the plan – but if their class did accept the plan, they stood to receive meaningful distributions.

33.     Here, by contrast, Lead Plaintiffs and the Proposed Class are not receiving anything under the Plan, and thus are *not even entitled to vote* on the Plan. The opt-out mechanism is designed to engineer deemed "consent" that no rational Proposed Class member

UST-0744

would ever voluntarily give. Members of the Proposed Class – to the extent they are even aware of the Chapter 11 Cases or the Plan at all – have little reason to do anything with respect to the Plan, much less find, review, and decipher a convoluted Third-Party Release. The proposed opt-out mechanism is simply a means of manufacturing illusory "consent" to a release that would amount to the "Court-endorsed trap for the careless or inattentive creditor" the *Chassix* court decried. 533 B.R. at 79. "If . . . a Bankruptcy Court should be wary of imposing third party releases on creditors, then a Bankruptcy Court should be equally wary of approving voting procedures that effectively would impose those same releases on creditors who have not affirmatively manifested their consent to them." *Id.*

34. The Third-Party Release also renders the Plan unconfirmable because this Court lacks jurisdiction, constitutional adjudicatory authority, or both to release any direct, non-bankruptcy, non-core claims asserted by Lead Plaintiffs and the Proposed Class against the Non-Debtor Defendants in the Securities Litigation. Lead Plaintiffs and the Proposed Class are constitutionally entitled to adjudication of those claims in an Article III tribunal (the District Court), and thus they cannot be released or otherwise adjudicated by this Court.

35. To correct these fatal defects that will prevent the eventual confirmation of the Plan, the Plan must expressly exclude Lead Plaintiffs and the Proposed Class, and their claims against the Non-Debtor Defendants in the Securities Litigation, from the Third-Party Release and the Plan Injunction. Absent such revisions, the Disclosure Statement and Solicitation Procedures should not be approved. To that end, Lead Plaintiffs suggest that the following should be added to the definition of "Released Parties" in the Plan, with a corresponding disclosure in the Disclosure Statement, to clarify that the Non-Debtor Defendants, in their capacity as such, are not Released Parties, as follows:

UST-0745

> *Provided, however* that the non-Debtor defendants now or hereafter named
> in the securities class action captioned as *In re Ascena Retail Group, Inc.
> Securities Litigation,* Case No. 2:19-cv-13529-KM-JBC, pending in the
> United States District Court for the District of New Jersey, in their
> capacity as such, shall not be Released Parties.

Finally, for the avoidance of any doubt or ambiguity otherwise created by the language of the

Third-Party Release, the Plan should expressly indicate as follows, with a corresponding

disclosure in the Disclosure Statement:

> Notwithstanding anything to the contrary in this Plan, the Plan
> Supplement, or the Confirmation Order, nothing herein or therein does,
> shall, or may be construed to release, enjoin, or otherwise adversely
> impact the claims and causes of action asserted against any non-Debtor
> defendant now or hereafter named in the securities class action captioned
> as *In re Ascena Retail Group, Inc. Securities Litigation,* Case No. 2:19-cv-
> 13529-KM-JBC, pending in the United States District Court for the
> District of New Jersey.

Absent the foregoing revisions, the Plan is not confirmable and thus the Disclosure Statement

and Solicitation Procedures should not be approved.

## II.   THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE IT DOES NOT PROVIDE ADEQUATE INFORMATION

### A.   *The Disclosure Statement Contains no Description of the Securities Litigation*

36.     The Securities Litigation involves serious and substantial allegations of

wrongdoing by Ascena and the Non-Debtor Defendants.  Creditors and parties are entitled to be

advised of the pendency of the Securities Litigation when deciding how to vote on the Plan.  *See*

*In re Bally Total Fitness of Greater N.Y., Inc.,* 2007 Bankr. Lexis 4729, at *23 (Bankr. S.D.N.Y.

Sept. 17, 2007) (taking into account pending litigation when determining feasibility of a Plan).

Yet, the Disclosure Statement contains **no mention** whatsoever of the Securities Litigation.

37.     So as to incorporate a meaningful description of the Securities Litigation, the

following paragraph should be added to the Disclosure Statement:

UST-0746

A putative securities class action against Ascena Retail Group, Inc. ("Ascena"), and two of its now former officers and directors, David R. Jaffe and Robert Giammatteo (collectively with Ascena, "Defendants"), is pending in the United States District Court for the District of New Jersey (the "New Jersey District Court"), captioned as *In re Ascena Retail Group, Inc. Securities Litigation,* Case No. 2:19-cv-13529-KM-JBC (the "Securities Litigation"). The Securities Litigation asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder arising from Ascena's material overstatement of the value and business prospects of its subsidiary, ANN, Inc., ("ANN"), as well the value of ANN's principal brands, Ann Taylor and LOFT, on behalf of a putative class consisting of all persons who purchased or otherwise acquired Ascena common stock between December 1, 2015 and May 17, 2017, inclusive (the "Class Period"). Defendants filed a motion to dismiss the Securities Litigation on February 7, 2020, and the motion was fully briefed as of July 3, 2020. On July 28, 2020, the New Jersey District Court issued an order providing "in light of the defendant's suggestion of bankruptcy … the matter is stayed and the pending motion [to dismiss] is administratively terminated without prejudice." The Order also requires the parties to "promptly inform the court as to any change in status regarding the automatic stay in bankruptcy."

**B.**     ***The Disclosure Statement violates Bankruptcy Rule 3016(c) by failing to Disclose the scope of the Third-Party Release and Plan Injunction***

38.     Federal Rule of Bankruptcy Procedure 3016(c) ("Rule 3016") provides that:

> [i]f a plan provides for an injunction against conduct not otherwise enjoined under the [Bankruptcy] Code, the plan and disclosure statement shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction.

Fed. R. Bankr. P. 3016(c); *see also In re Lower Bucks Hosp.*, 471 B.R. 419, 460 (Bankr. E.D. Pa. 2012).   The *Lower Bucks* court noted that although Rule 3016(c) purports to address only injunctions, "[i]ts purpose is to alert parties in interest that the plan purports to restrict their rights in ways that ordinarily would not result from confirmation of a plan." 471 B.R. at 460.  As here, "[w]hether 'enjoined' or merely 'released,' in this case, the Plan was designed to deprive [third parties] of their right to prosecute a claim against a non-debtor." *Id.*  Thus, Rule 3016(c) applies

19

UST-0747

to the presentation of both the Third-Party Release and the Plan Injunction in the Plan and
Disclosure Statement.

39.     The Disclosure Statement might facially comply with Rule 3016(c) by presenting
the language of the Third-Party Release and the Plan Injunction, copied essentially verbatim
from the Plan, in bold text – but its compliance with the rule ends there.  The Disclosure
Statement merely parrots the convoluted and nearly incomprehensible Third-Party Release
language from the Plan – without describing with any specificity (or at all) the universe of claims
and parties impacted by the Third-Party Release, nor does it "describe in specific and
conspicuous language … all acts to be enjoined" by the Plan Injunction.

40.     As a glaring example, the Disclosure Statement does not make specific reference
to the fact that the Third-Party Release and Plan Injunction could release and enjoin the
prosecution of the claims asserted against the Non-Debtor Defendants in the Securities
Litigation.  Even if members of the Proposed Class were aware of the Plan and located and
reviewed the Disclosure Statement and Plan, there is nothing whatsoever in the Disclosure
Statement to inform them of the draconian impact the Third-Party Release and Plan Injunction
could have on their independent claims against the Non-Debtor Defendants.

41.     Rather, to even attempt to ascertain the types of claims that the Third-Party
Release would release, a creditor must determine (a) whether the creditor is a "Releasing Party"
under the convoluted definition in the Plan, (b) whether the claim it seeks to assert is ".based on
or relating to, or in any manner arising from, in whole or in part, the Debtors (including the
management, ownership or operation thereof), the purchase, sale, or rescission of any Security of
the Debtors . . . or upon any other act, omission, transaction, agreement, event, or other
occurrence (in each case, related to any of the foregoing) taking place on or before the Effective

UST-0748

Date[,]" among myriad other potential categories of claims, and (c) whether the party against which they seek to assert the claim is a "Released Party," a definition that again incorporates multiple, extremely broad tiers of related parties and related parties' related parties, defined only by extremely broad categories, requiring cross-references among multiple defined terms, and with no explanatory disclosure in the Disclosure Statement.

42.     The result of this analysis is that it is essentially impossible for a member of the Proposed Class to reasonably ascertain, even after attempting to navigate numerous provisions of multiple documents, whether the Plan will release a particular claim against a particular non-Debtor or Defendant. Thus, there is no way a member of the Class reading the Disclosure Statement (if they are even aware that it exists) could make an informed decision whether to object to or opt out of the Third-Party Release, especially where they are not even entitled to vote. Absent appropriate revisions to the Disclosure Statement and Plan to remedy the defects and issues relating to the scope and appropriateness of the Third-Party Release and Plan Injunction, the Disclosure Statement and Solicitation Procedures should not be approved. To be clear, though, the fatal defects in the Third-Party Release cannot be cured simply by additional disclosure.

**C.      *The Disclosure Statement fails to provide any legal or factual Basis for the Third-Party Release or the Plan Injunction, particularly as they relate to Lead Plaintiffs, the Proposed Class, and the Securities Litigation***

43.     As discussed in more detail in section I(A) above, there is no legitimate factual or legal basis and there is no attempt to even articulate such a basis, for the Debtors' failure to expressly exclude the independent direct claims of Lead Plaintiffs and the Proposed Class against the solvent, insured Non-Debtor Defendants from the scope of the Third-Party Release. The prejudice to Lead Plaintiffs and the Proposed Class is particularly onerous where Lead Plaintiffs and the Proposed Class are not receiving any economic value under the Plan.

21

UST-0749

Moreover, the Third-Party Release operates as an impermissible *de facto* final judgment dismissing the claims of Lead Plaintiffs and the Proposed Class against the Non-Debtor Defendants, even though those claims cannot be adjudicated outside of the District Court unless Lead Plaintiffs and the Proposed Class consent to Bankruptcy Court adjudication (which they do not). Despite these glaring flaws, the Disclosure Statement does not provide any justification for the gratuitous and legally impermissible deemed release by Lead Plaintiffs and members of the Proposed Class, who are receiving nothing under the Plan – because there is not any.

44.    Moreover, to the extent the Debtors seek approval of Solicitation Procedures that would impose an obligation on holders of claims in impaired classes that are not entitled to vote to nevertheless take affirmative steps to opt out of the onerous Third-Party Release, such Solicitation Procedures are impermissible for the same reasons, discussed in section I(A) above, that the Third-Party Release is legally impermissible and factually unjustifiable.

### D. *The Disclosure Statement does not disclose whether the claims of Lead Plaintiffs and the Proposed Class will be preserved against the Debtors to the extent of available insurance coverage.*

45.    The Debtors' prepetition D&O Liability Insurance Policies are left intact by the Plan and deemed assumed to the extent they are executory contracts. *See* Plan, Art. IV.M.  The Debtors appear to have D&O insurance policies, but the Disclosure Statement does not describe such policies or explain whether these or any other insurance policies cover the Class Claims, and if so, how the Plan would permit Lead Plaintiffs or the Proposed Class to access coverage under such policies for the Class Claims to the extent of available insurance coverage, which would have no economic impact on the Debtors' estates. This omission is particularly glaring in light of Article VI.H.2 of the Plan, which provides that no distributions will be made on account of allowed claims covered by the Debtors' D&O Liability Insurance Policies until the holders thereof exhaust all remedies with respect to such insurance policies. However, the Disclosure

22

UST-0750

Statement does not explain whether or how Lead Plaintiffs and the Proposed Class can comply

with that mandate. Rather, the Plan purports to cancel, release and extinguish the Class Claims

despite the apparent availability of insurance. The Disclosure Statement must provide such

information.

### E. *The Disclosure Statement does not disclose whether or how the Debtors intend to preserve the evidence potentially relevant <u>to the Securities Litigation after the Effective Date of the Plan.</u>*

46. 27. The Securities Litigation is subject to the Private Securities Litigation

Reform Act of 1995 ("<u>PSLRA</u>"), 15 U.S.C. § 78u-4, which, among other things, mandates that

> any party to the action with actual notice of the allegations contained in
> the complaint shall treat all documents, data compilations (including
> electronically recorded or stored data), and tangible objects that are in the
> custody or control of such person and that are relevant to the allegations,
> as if they were the subject of a continuing request for production of
> documents from an opposing party under the Federal Rules of Civil
> Procedure.

15 U.S.C. § 78u-4(b)(3)(C)(i). This mandatory requirement is subject to "sanction for willful

violation." 15 U.S.C. § 78u-4(b)(3)(C)(ii).

47. Ascena was an active party to the Securities Litigation prior to the Petition Date

and remains a party to the Securities Litigation. Thus, Ascena was, and continues to be, subject

to the PSLRA's document preservation mandate. Due to the operation of the automatic stay, the

Securities Litigation is currently stayed with respect to Ascena. Lead Plaintiffs believe it is

appropriate for the Plan to permit the continued pursuit of the Securities Litigation against

Ascena to the extent of any available residual entity coverage under the D&O Liability Insurance

Policies, in which instance Ascena will remain a party to the Securities Litigation. In the event

Ascena ceases (temporarily or otherwise) to be a party to the Securities Litigation, the PSLRA's

document preservation mandate should continue to apply to the Debtors and the Reorganized

Debtors.

UST-0751

48.     Continuing preservation of Ascena's books, records, electronically stored information, and other items of evidence that are potentially relevant to the Securities Litigation post-Effective Date is crucial to avoid prejudice to Lead Plaintiffs and the Proposed Class. However, the Plan does not contain and the Disclosure Statement does not describe any requirement that the Debtors take any action to preserve evidence potentially relevant to the Securities Litigation, nor does the Disclosure Statement contain any explanation of what, if any, measures the Debtors will implement to ensure such evidence is retained and preserved through the completion of the Securities Litigation.

49.     The Plan and Disclosure Statement should also make clear that the Plan Injunction would not affect the ability of Lead Plaintiffs and the Proposed Class to obtain the Debtors' books and records that are potentially relevant to the Securities Litigation through post-Effective Date discovery in the Securities Litigation.

50.     Inclusion of the following provision in the Plan, along with corresponding disclosure in the Disclosure Statement, would resolve Lead Plaintiffs' concerns with respect to the post-Effective Date preservation of and access to evidence that is potentially relevant to the Securities Litigation:

> Until the entry of a final and non-appealable order of judgment or settlement with respect to all defendants now or hereafter named in the litigation captioned as *In re Ascena Retail Group, Inc. Securities Litigation,* Case No. 2:19-cv-13529-KM-JBC, pending in the United States District Court for the District of New Jersey (the "Securities Litigation"), the Debtors, Reorganized Debtors, Wind-Down Debtors, and any transferee or custodian of the Debtors' books, records, documents, files, electronic data (in whatever format, including native format, and from every source and location, including but not limited to all hard drives, servers, and cloud-based storage located in the United States and overseas), or any tangible object or other item of evidence relevant or potentially relevant to the Securities Litigation, wherever stored (collectively, the "Potentially Relevant Books and Records"), shall preserve and maintain the Potentially Relevant Books and Records as if

UST-0752

they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure, and shall not destroy, abandon, transfer, or otherwise render unavailable such Potentially Relevant Books and Records. For the avoidance of doubt, the Plan Injunction shall not affect in any manner any rights of the lead plaintiffs and the proposed class in the Securities Litigation to seek and obtain Potentially Relevant Books and Records through discovery in the Securities Litigation.

**F.      *The Plan and Solicitation Procedures should be modified to acknowledge Lead Plaintiffs' authority to opt out of the Third-Party Release on behalf of the Proposed Class.* [8]**

51.      If the opt-out mechanism remains in place, the Plan must expressly recognize Lead Plaintiffs' authority to opt out of the Third-Party Release on behalf of the Proposed Class. Lead Plaintiffs, like all class representatives in federal class-action litigation, are fiduciaries for all absent members of the Proposed Class. *See, e.g., In re Gen. Motors Corp. Pick-Up Truck Fuel Prod. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) ("Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed."); *Schick v. Berg*, 2004 WL 856298, *4 (S.D.N.Y. Apr. 20, 2004) ("The general rule is that the named plaintiff and counsel bringing the action stand as fiduciaries for the entire class, commencing with the filing of a class complaint.").

52.      As a fiduciary for the Proposed Class, Lead Plaintiffs not only have the ability to take necessary actions to protect the rights of absent members of the Proposed Class, including by opting out of the Third-Party Release on their behalf, they may have an affirmative obligation to do so. The same duty applies to Lead Counsel, which "must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

---

[8]      Lead Plaintiffs reserve the right to seek further relief in connection with the Third-Party Release to the extent necessary, including but not limited to seeking application of Bankruptcy Rule 7023 and certification of the Proposed Class for the purpose of opting out of the Third-Party Release on behalf of the Proposed Class.

UST-0753

53.     Nowhere are these duties more essential than in connection with the Third-Party Release, which threatens to eviscerate the claims of Lead Plaintiffs and the Proposed Class against numerous solvent Non-Debtor Defendants.  In order to enable Lead Plaintiffs to fulfill their fiduciary duty, the Court should find in any order approving the Solicitation Procedures that Lead Plaintiffs have inherent authority (or, absent such a finding, expressly authorize Lead Plaintiffs) to opt out of the Third-Party Release on behalf of the entire Proposed Class.

54.     Such a finding is also consistent with Lead Plaintiffs' inherent powers as court-appointed lead plaintiffs.  For instance, Lead Plaintiffs have the ability to prepare and file pleadings, submit briefs and argue motions, conduct discovery and depositions, and prepare for and conduct a trial of the Securities Litigation.  Where the Third-Party Release and Plan Injunction would have essentially the same practical effect as an order dismissing the Amended Complaint with prejudice with respect to most or all of the Non-Debtor Defendants, the ability to opt-out of that release is no different from Lead Plaintiffs' inherent ability to defend a motion to dismiss.

55.     The ability to opt-out on behalf of the entire Proposed Class does not expand upon Lead Plaintiffs' rights in any way or prejudice the Debtors or the Non-Debtor Defendants.  On the contrary, it simply enables Lead Plaintiffs to fulfill their duties under Fed. R. Civ. P. 23 and the PSLRA, and to take the necessary steps to avoid the manifest injustice threatened by the Third-Party Release.  By opting out of the Third-Party Release on behalf of the entire Proposed Class, Lead Plaintiffs will prevent the Debtors from artificially "'deeming "consent' to exist in situations where no affirmative consent ha[s] actually been manifested," where, if given the option to affirmatively consent, no rational class member would ever consent at all. *See Chassix*, 533 B.R. at 78. Recognizing Lead Plaintiffs' ability to opt-out on behalf of the Proposed Class

UST-0754

will preserve and protect the rights and claims of class members so they can decide for themselves whether to participate in the Securities Litigation when the time comes.

## **RESERVATION OF RIGHTS**

56.     Neither the filing of this Objection nor anything contained herein are intended to limit, prejudice, or otherwise impact any rights of Lead Plaintiffs or the Proposed Class in connection with the filing, solicitation, or confirmation of the Plan (or any other plan) or approval of the Disclosure Statement and the Plan's solicitation procedures.  Lead Plaintiffs, on behalf of themselves and the Proposed Class, hereby reserve all such rights, including but not limited to the rights to object on any and all grounds to (i) approval of the disclosure statement and solicitation procedures for any plan and (ii) confirmation of any plan, and take any other action permitted or required under the Bankruptcy Code and other applicable law, on behalf of itself and the Proposed Class, or to seek, on behalf of itself and the Proposed Class, any other relief in connection with the foregoing.

57.     For the avoidance of doubt, this Objection does not, shall not, and shall not be deemed to:

   a.     constitute a submission by Lead Plaintiffs, either individually or for the Proposed Class or any member thereof, to the jurisdiction of the Bankruptcy Court;

   b.     constitute consent by Lead Plaintiffs, either individually or for the Proposed Class or any member thereof, to entry by the Bankruptcy Court of any final order in any non-core proceeding, **which consent is hereby withheld unless, and solely to the extent, expressly granted in the future with respect to a specific matter**;

   c.     waive any substantive or procedural rights of Lead Plaintiffs or the Proposed Class or any member thereof, including but not limited to (a) the right to challenge the constitutional authority of the Bankruptcy Court to enter a final order or judgment on any matter, (b) the right to have final orders in non-core matters entered only after *de novo* review by a District Court judge, (c) the right to trial

27

UST-0755

by jury in any proceedings so triable herein, in the Debtors' Chapter 11 Cases, including all adversary proceedings and other related cases and proceedings (collectively, "Related Proceedings"), in the Securities Litigation, or in any other case, controversy, or proceeding related to or arising from the Debtors, their chapter 11 cases, any Related Proceedings, or the Securities Litigation, (d) the right to have the reference withdrawn by a United States District Court in any matter subject to mandatory or discretionary withdrawal, or (e) all other rights, claims, actions, arguments, counterarguments, defenses, setoffs, or recoupments to which Lead Plaintiffs or the Proposed Class or any member thereof are or may be entitled under agreements, at law, in equity, or otherwise, all of which rights, claims, actions, arguments, counterarguments, defenses, setoffs, and recoupments are expressly reserved.

58.    **For the avoidance of doubt, Lead Plaintiffs, on behalf of themselves and the Proposed Class and the members thereof, do not consent, and expressly object, to (a) the Third-Party Release and Plan Injunction and (b) this Court's entry of any final order or judgment that this Court lacks jurisdiction or statutory and/or constitutional adjudicatory authority to enter without the affirmative and knowing consent of all parties affected thereby.  Lead Plaintiffs, on behalf of themselves and the Proposed Class and the members thereof, further reserve all rights to object to confirmation of the Plan, or any other plan proposed in the Chapter 11 Cases, on any basis, including but not limited to the fact that the Court lacks constitutional adjudicatory authority pursuant to *Stern v. Marshall*, 564 U.S. 462 (2011), and its progeny to approve a release of the claims of Lead Plaintiffs and the Proposed Class against the Non-Debtor Defendants.**

*[ signature page follows ]*

UST-0756

## CONCLUSION

For all of the foregoing reasons, the Disclosure Statement and Solicitation Procedures should not be approved unless the issues raised in this Objection are addressed through appropriate modifications of the Disclosure Statement, Solicitation Procedures, and Plan.

Dated: August 28, 2020

/s/ Ronald A. Page, Jr.
Ronald A. Page, Jr. (VA 71343)
**RONALD PAGE, PLC**
P.O. Box 73087
N. Chesterfield, Virginia 23235
Telephone: (804) 562-8704
Facsimile: (804) 482-2427
Email:  rpage@rpagelaw.com

- and -

Michael S. Etkin (*pro hac vice* pending)
Andrew Behlmann (*pro hac vice* pending)
John P. Schneider (*pro hac vice* pending)
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2333
Email:  metkin@lowenstein.com
Email:  abehlmann@lowenstein.com
Email:  jschneider@lowenstein.com

*Bankruptcy Counsel to the Lead Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 28, 2020, a true and correct copy of the above and foregoing was served by electronic delivery to all persons on the ECF Distribution List for this case and via email on the Core/2002 Service List.

By /s/ Ronald A. Page, Jr.

_____
Counsel

UST-0757

# EXHIBIT A

UST-0758

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 18-13374-mew

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   AEGEAN MARINE PETROLEUM NETWORK INC,

8

9           Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  March 26, 2019

17                  2:04 PM

18

19

20

21  B E F O R E :

22  HON MICHAEL E. WILES

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  MATTHEW

Page 2

1    HEARING re Application for compensation by Oaktree Capital

2    Management, LP and Hartree Partners, LP

3    Objection filed

4

5    HEARING re Motion authorizing rejection of certain unexpired

6    leases and granting related relief

7

8    HEARING re Confirmation hearing

9

10   HEARING re Objection by the UST filed

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

UST-0760

```
 1   A P P E A R A N C E S :

 2

 3   MILBANK, TWEED, HADLEY & MCCLOY LLP

 4        Attorneys for Mercuria Asset Holdings (Hong Kong)

 5        Limited

 6        55 Hudson Yards

 7        New York, NY 10001

 8

 9   BY:  ALEXANDER B. LEES

10        LAUREN C. DOYLE

11        ABHILASH RAVAL

12

13   UNITED STATES SECURITIES AND EXCHANGE COMMISSION

14        3 World Financial Center

15        New York, NY 10281

16

17   BY:  ALAN S. MAZA

18

19   SILVERMAN ACAMPORA

20        Attorneys for Mercuria US Asset Holdings, LLC

21        100 Jericho Quadrangle, Suite 300

22        Jericho, NY 11753

23

24   BY:  RONALD J. FRIEDMAN

25
```

```
 1   LOWENSTEIN SANDLER LLP

 2        Attorneys for Utah Retirement System

 3        1251 Avenue of the Americas

 4        New York, NY 10020

 5

 6   BY:  MICHAEL S. ETKIN

 7

 8   WHITE & CASE LLP

 9        Attorneys for Oaktree/Hartree

10        1221 Avenue of the Americas

11        new York, NY 10020

12

13   BY:  HARRISON DENMAN

14

15   KIRKLAND & ELLIS LLP

16        Attorneys for Debtors and Debtors in Possession

17        300 North LaSalle

18        Chicago, IL 60654

19

20   BY:  MARC KIESELSTEIN

21        BEN WINGER

22

23

24

25
```

UST-0762

```
 1   UNITED STATES DEPARTMENT OF JUSTICE

 2        Attorneys for the U.S. Trustee

 3        201 Varick Street, Suite 1006

 4        New York, NY 10014

 5

 6   BY:  BRIAN MASUMOTO

 7

 8   AKIN GUMP STRAUSS HAUER & FELD LLP

 9        Attorneys for the Creditors' Committee

10        One Bryant Park

11        New York, NY 10036

12

13   BY:  KEVIN ZUZOLO

14        ABID QURESHI

15

16

17

18

19

20

21

22

23

24

25
```

1   ALSO PRESENT TELEPHONICALLY:

2

3   JASON DIBATTISTA

4   TAYLOR B. HARRISON

5   JAMES A. COPELAND

6   JONATHAN W. RANDLES

7   AARON METVINER

8   JASON B. SANJANA

9   SCOTT GREISSMAN

10  CAITLIN M. GRIFFIN

11  BRYAN V. UELK

12  BRITON P. SPARKMAN

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S

 2         MR. KIESELSTEIN:  We're here with a three-item

 3    agenda, the first and the main event is seeking confirmation

 4    of our plan of reorganization.  The second is our rejection

 5    motion which was unopposed but which we would like to

 6    continue to the next omnibus so commercial discussions can

 7    continue.  And then third is the Oaktree substantial

 8    contribution motion where a settlement has been reached, but

 9    I understand the U.S. Trustee might have some issues.  We're

10    going to put that to the -- to the back.

11         THE COURT:  If I understand the terms of the

12    settlement, you'd better put it to the front.

13         MR. KIESELSTEIN:  Okay.

14         THE COURT:  Because one of my questions is whether

15    it amounts to a plan modification, so why don't you proceed

16    with that one first?

17         MR. KIESELSTEIN:  Understood, Your Honor.

18         I'd say -- make a couple of points about that.

19    One, we were talking about $450,000 out of a $40 million

20    cash pool for the general unsecured creditors.  In our mind,

21    that would amount to an immaterial modification of the plan

22    under lots of precedent.

23         I would also point out that two-thirds in dollar

24    amount of those who would be impacted by that, that is RSA

25    parties essentially, have already agreed to the slight
```

UST-0765

1    reduction in the cash pool recovery.

2              So, you know, we view there being no need -- and,

3    in fact, it would be highly impractical to require re-

4    solicitation of public debtholders for some number of days

5    or weeks to bring this settlement home.

6              Remember, the Class 4A creditors voted 99-plus

7    percent in favor of this plan, which provided $40 million

8    plus the litigation trust claims.  And we think it

9    extraordinarily unlikely with two-thirds of dollar amount on

10   the record is supporting this settlement that we would have

11   some sort of numericity problem because people who had not

12   voted, or abstained on 40, would rise up at 39.5.

13             THE COURT:  But the application itself was made at

14   a time when, if it were granted, Mercuria would have paid it

15   so that any of the unsecured creditors who voted on the plan

16   would've had no idea that they were being asked to pay any

17   of it.

18             Now I'm being asked on the afternoon of

19   confirmation with no notice to all of those people to

20   approve their payment of an administrative expense, or a

21   portion of an administrative expense, in front of Oaktree.

22   Whether you think the dollars are big or not, all of those

23   people had the right to know about it and to object if they

24   thought it didn't meet the standards under Section 503,

25   didn't they?  And wouldn't I be depriving them of that?

1    They would have no idea that this is coming up before me

2    today.

3              MR. KIESELSTEIN:  Yeah.  I'm going to let others

4    speak -- people to the settlement speak to that particular

5    issue.  We obviously were trying to facilitate a settlement.

6    I think it's obvious that the -- I won't say the lion's

7    share but a substantial portion of the benefit from the

8    whole Oaktree/Hartree impromptu auction with the -- with the

9    Mercuria folks benefited.  We saw the numbers rise from 20

10   to 30 to 40 million dollars in the course of an afternoon,

11   Your Honor, and we think it's the -- it's the right and fair

12   result.

13             And I think critical mass of those who've been

14   active and engaged in the case, who've appeared, who've

15   participated, who voted are onboard for this modification.

16   I think it would be a -- sort of a Pyrrhic exercise to go

17   through the expense and the delay and the cost.  I think it

18   would eat up the amount of money we're talking about and

19   then some.

20             I understand that it's a slight diminution in the

21   overall recovery for that -- for that class of creditors.

22   Again, the bulk of the dollars are already onboard for that

23   modification.  But I'd yield the podium to any of the people

24   who are more actively at the settlement table, if that's all

25   right with Your Honor.

UST-0767

```
 1              MR. QURESHI:  Good afternoon, Your Honor.  For the

 2    record, Abid Qureshi, Akin, Gump, Strauss, Hauer & Feld on

 3    behalf of the official committee.

 4              Your Honor, with respect to the Oaktree

 5    substantial contribution claim, while Your Honor is, of

 6    course, correct that with this modification, people who

 7    voted on the plan would, of course, not have had information

 8    concerning the settlement at their disposal at the time of

 9    the vote.

10              I think the right lens to view this through is

11    whether, in fact, this settlement constitutes a material

12    modification to the plan, such that re-solicitation is

13    appropriate.

14              And, in turn, what the caselaw there suggests is

15    that the question to be asked is whether this modification

16    is such that it might be likely to alter the vote of people

17    who --

18              THE COURT:  Why is that the only question?  You've

19    made a settlement.  Don't I have to decide the

20    reasonableness of that settlement?

21              MR. QURESHI:  Certainly Your Honor can --

22              THE COURT:  Don't other unsecured creditors have a

23    right to weigh in as to whether they think it's reasonable

24    or not?

25              MR. QURESHI:  Well, in this case, Your Honor,
```

1   given the lack of materiality of the settlement, I mean, it

2   is -- the $450,000 that has been agreed to as part of this

3   settlement constitutes, just with respect to the cash

4   distribution to unsecured creditors, a hair over 1 percent.

5   When one takes into account some amount of recoveries that

6   certainly unsecured creditors expect there will be on

7   account of the litigation claims, it's going to be much less

8   than that, as Mr. Kieselstein pointed out.  Resoliciting

9   would, I think, cost materially more than that.

10          So given that it is not a material modification

11   that --

12          THE COURT:  Even if I don't resolicit, wouldn't

13   notice of the proposed settlement give them opportunity to

14   object to it, be what due process would ordinarily require

15   here?

16          MR. QURESHI:  If this were, I suppose, Your Honor,

17   outside the context of plan confirmation, certainly it could

18   be teed up in that fashion, but I do think that in

19   connection with confirmation of a plan as part of everything

20   else with the plan.  I do think that it's appropriate given

21   the immateriality of the -- of the amount.

22          THE COURT:  What's the basis on which you decided

23   that a $450,000 payment on behalf of the unsecureds was

24   appropriate here?

25          MR. QURESHI:  A number of things went into that

1    decision on behalf of the committee, Your Honor.  Number one

2    is that does represent in total amount going to Oaktree a

3    reduction from the fees that, in fact, they incurred.

4            Oaktree's counsel provided invoices to the

5    committee as well as to the U.S. Trustee in advance of the

6    committee supporting this settlement.  And it represents, I

7    think -- and Oaktree's counsel can correct me -- but I think

8    approximately one-third reduction in the fees that they

9    actually incurred.  So that was one basis.

10            And the second, Your Honor, was given the overall

11    contribution that the unsecured creditors believe that

12    Oaktree made to this case, the very substantial way in which

13    recoveries have been improved to unsecured creditors, we

14    think there's grave data as to whether this estate would

15    even have been administratively solvent absent Oaktree's

16    role.

17            THE COURT:  Do you know of any other instance in

18    which somebody who bids and helps drive up the bid has been

19    given substantial contribution claim like this?

20            MR. QURESHI:  I don't have any other specific

21    examples, but --

22            THE COURT:  What would -- if I do that here, what

23    would stop every bidder in every auction ever in front of me

24    from asking for its fees to be paid?

25            MR. QURESHI:  Fair enough, Your Honor.  I think

UST-0770

1    each case needs to be addressed on the facts and

2    circumstances of that case. This was not typical of what I

3    might call an ordinary 363 auction process where there is an

4    organized sale process that takes place over 120 days, or

5    whatever the time period is. A whole bunch of people show

6    up, and there is an auction.

7            This was -- this case was a morass of litigation

8    from the day it commenced, and there was an extremely short

9    period of time, extremely short window where there was a

10   possibility of even getting to this kind of a resolution. I

11   think Oaktree was taking on a lot of risk by stepping into

12   that mess. And had they not stepped into that mess, it is a

13   case that likely would not even have been administratively

14   solvent.

15           So I think all of those circumstances, Your Honor,

16   distinguish it from a more ordinary course 363 auction where

17   people are participating. And in that circumstance, I think

18   seeking a substantial contribution claim for participating

19   in that type of auction is materially different from what

20   occurred here.

21           THE COURT: All right.

22           MR. QURESHI: Your Honor, Mr. Somerstein was just

23   pointing out to me that it is common in bid procedures

24   orders itself to specify that a substantial contribution

25   claim will not be allowed as a result of participating in an

Case 23-11131-KBO Doc 478 Filed 08/28/20 Entered 08/28/20 16:54:41 Desc Main
Document 41 Page 44 of 184
Case 22-33114-KRH Doc 478 Filed 08/28/20 Entered 08/28/20 16:54:41 Desc Main

Page 14

```
1     action process.  But again, here, given the fast-moving

2     nature of the case and the substantial risk that things

3     could've turned out very differently, we think it's

4     appropriate.

5             Unless Your Honor has questions, I'll turn it over

6     to Oaktree.

7             THE COURT:  All right.  I think I understand your

8     position.  I'll hear from anybody else who wants to be heard

9     on this.

10            MR. DENMAN:  Thank you, Your Honor.  Harrison

11    Denman from White & Case for Oaktree/Hartree.

12            I'd just like to respond to two of those

13    arguments.  I agree with everything that's been said.

14            First, on the notice point --

15            THE COURT:  Presumably, you don't agree with some

16    of the things I've said.

17            MR. DENMAN:  Well, I respectfully disagree.

18            The first is with respect to notice, Your Honor,

19    this idea that this is coming in at the last minute with

20    respect to unsecured creditors.

21            I understand it may not be visible to Your Honor,

22    but these discussions that culminated in this economic

23    agreement among all the constituencies did not come together

24    overnight.  There has been discussion among the unsecured

25    creditors, Mercuria, and Oaktree for months, really.  And I
```

```
 1    alluded to it the last time I was before you at the

 2    disclosure statement hearing, and that's continued before

 3    and after we filed our application.  I've had dialogue

 4    directly with individual noteholders, with the committee

 5    advisors, with trade creditors.  It's been a pretty robust

 6    discussion that has universal endorsement.  So this is not

 7    something that -- from the party and interest side has come

 8    up overnight.

 9            The second --

10            THE COURT:  And at one point in these cases, you

11    said that Oaktree was considering suing the parties to the

12    plan support agreement that it had signed.  What happened to

13    that?  Did you drop that?

14            MR. DENMAN:  We did, Your Honor.  There was a --

15            THE COURT:  Did you drop that as part of this

16    deal, or did you drop that separately?

17            MR. DENMAN:  We separately have communicated that

18    we would not be continuing to pursue that.  We had a dispute

19    -- largely because it became moot.  We had a dispute at the

20    time with respect to whether or not the RSA was properly

21    terminated.  Given the passage of time and how the

22    milestones would've played out anyway, it became purely

23    academic, and there was no reason to even further discuss

24    it.

25            But the second point I wanted to discuss -- so in
```

1    addition to that notice issue --

2              THE COURT:  How can I judge whether this is a

3    reasonable settlement when I don't even have any backup for

4    your fees?  At least some of the things you sought to do --

5    for example, at the hearing in front of me, you may have

6    made a topping bid, but you all -- your counsel also spent a

7    significant amount of time trying to get approval of terms

8    of Debtor in Possession financing agreement that essentially

9    would have, right out of the bat, foreclosed any further

10   competition.  Whatever time was spent on that, how did that

11   substantially benefit the estate?

12             MR. DENMAN:  Well, Your Honor, I don't -- first, I

13   don't think that our DIP, to the extent approved, would've

14   foreclosed for the participation the Debtor --

15             THE COURT:  Sure it did.  It was conditioned on

16   approval of your RSA.  When I said that I wouldn't have that

17   condition, you pulled out of the process.

18             MR. DENMAN:  I understand.  The --

19             THE COURT:  You were not willing to go forward

20   unless you were locked in.  So whatever time you spent

21   trying to get that, how on Earth was that for the benefit of

22   the estate?

23             MR. DENMAN:  Well, Your Honor, the honor -- RSA

24   that we were connected to had the usual fiduciary out.  In

25   the same way that Mercuria has proposed stalking horse had a

```
 1    breakup fee, right.  I think that each side, as they

 2    pursued, was trying to present the Debtors with the best

 3    deal possible.

 4            I think that -- you know, there really is no doubt

 5    that the DIP in conjunction with the RSA and the

 6    restructuring discussions that Oaktree commenced created

 7    value for the estates here, created value for unsecured

 8    creditors.

 9            THE COURT:  Let me ask you.  Oaktree's been

10    involved in a lot of bankruptcy cases.  Have you ever gone

11    into a substantial contribution application for being a

12    bidder?

13            MR. DENMAN:  Yeah, Your Honor, I want to -- I want

14    to just -- that was my second point, and I'm glad you

15    brought it up again.

16            I want to just go back to this idea of us being

17    another bidder, another topping bidder.  I don't know that's

18    an accurate characterization of our role here.

19            THE COURT:  Well, before you tell me that, answer

20    my question.  Have you ever gotten a substantial

21    contribution award for being a bidder?

22            MR. DENMAN:  I personally have not done this

23    before.

24            THE COURT:  Okay.  Go ahead.

25            MR. DENMAN:  So, you know, I think that there is a
```

```
 1    fundamental difference between a party that comes in under

 2    Court-approved bid procedures, which often has the language

 3    that was discussed, and makes incremental bids according to

 4    parameters that have already been blessed, the consequences

 5    of which are naturally confined to certain aspects of these

 6    cases as compared with what we did.  Right?

 7           We were an alternative plan sponsor.  We came in,

 8    and we didn't just compete on the price of assets.  We

 9    didn't compete according to bid procedures.  We presented a

10    completely different transaction framework, one that upended

11    the potential recoveries of the stakeholders in these cases.

12           Previously, before we arrived, you know, had we

13    waited for Court approval of the bid procedures and then

14    proceeded in that manner, and having -- had we just been

15    another topping bidder, it's unclear whether our incremental

16    value would really have reverberated in the same way to

17    these estates.

18           You know, as a result of the -- converting this

19    into a plan process and sponsoring a plan, Mercuria's intern

20    proposal had to include better provisions in the same plan

21    context.  The result was subsidiary creditors getting

22    unimpaired and paid in full whereas previously they were

23    sharing pro rata with a portion of a $20 million cash

24    distribution.

25           THE COURT:  Before you made your proposal, did you
```

```
 1    ask the parties if they would support a substantial

 2    contribution application to pay your fees?

 3              MR. DENMAN:  We did, Your Honor.  We had extensive

 4    dialogue.

 5              THE COURT:  Who did you have conversations with?

 6              MR. DENMAN:  I had plenty of conversations with

 7    committee counsel.  I had conversations with counsels to the

 8    Debtors.  I had conversations with individual noteholders,

 9    and I believe that's it.

10              THE COURT:  How much of the fees that you're

11    seeking predated the time when you had those conversations?

12              MR. DENMAN:  About $900,000 plus.  In other words,

13    if the total application was for 1.15, or approximately, the

14    amount that was incurred after the date that Oaktree walked

15    away, which was at the DIP hearing with Your Honor, was

16    relatively small.  It was, I think, in the vicinity of 150

17    grand.

18              THE COURT:  Okay.  And how much of the total that

19    you sought was incurred before you first spoke to the

20    committee about making another bid?

21              MR. DENMAN:  About making what, Your Honor?

22              THE COURT:  Making a bid.

23              MR. DENMAN:  Zero.  I don't think we had

24    conversations with the committee at the time that we were

25    stepping forward to start the process.  We -- I could be
```

 1    corrected on that.  It's possible it happened without my

 2    involvement.

 3              THE COURT:  So you incurred over $1 billion in a

 4    one-week period that was --

 5              MR. DENMAN:  No, Your Honor.

 6              THE COURT:  -- (indiscernible) here?

 7              MR. DENMAN:  I think, as I clarified, we incurred

 8    approximately 950 grand or so within about a two-and-a-half-

 9    week period.  I recognize it is a lot of money, frankly.

10    But I also hope Your Honor appreciates just the sheer volume

11    of work that needed to happen to be able to submit a

12    competing plan proposal and negotiate and execute final

13    documentation on that timetable.

14              It was -- it was intentionally a tight timetable.

15    I need to make sure Your Honor appreciates that.  It wasn't

16    an accident that we needed to move the world in two weeks,

17    in two and a half weeks, to try and get that done.  And that

18    was by design to try and make that as difficult as possible.

19              THE COURT:  I often have -- well, I don't -- but I

20    -- it's certainly not infrequent that I have cases where

21    somebody has a proposed stalking-horse bid that then is

22    withdrawn because somebody betters it.  Prior to the time

23    when the stalking-horse bid is approved, the stalking-horse

24    bid usually has an expense reimburse provision, but the

25    usual rule is if I haven't approved it, they don't get their

```
1   expenses.  And I think under your proposal, if you talked to
2   Mercuria, they wouldn't have gotten their expenses.  So if
3   you were topped before I approved any deal, why should I
4   give you your expenses?
5              MR. DENMAN:  Your Honor, I just think this is
6   fundamentally outside the paradigm of a topping bid.  I
7   think this is about a generation and creation of value for
8   the estates, and I think that's reflected in the -- in the
9   enforcement that you see from the constituencies here.  If
10  this was inappropriate, I think I would expect the parties
11  in interest that are going to be bearing the economic
12  responsibility for this to object or have a problem with it.
13  And the fact they don't, and I think that's reflected in the
14  fact that the agreed-upon --
15             THE COURT:  One of them does.  It's agreed to pay
16  about a quarter of what you asked for, and to the extent
17  it's their money, they can do what they want, Mercuria.  A
18  lot of the other parties in interest here, some of them have
19  supported you, but many of them don't even know about this.
20  But that's part of my problem.  Many of them have no idea
21  they're being asked to pay for this.
22             MR. DENMAN:  Your Honor, we've -- knowing that the
23  largest trade creditor of the official committee and two-
24  thirds of the noteholders are onboard, we think that
25  accounts for substantially all the creditors who would be
```

```
 1    monetarily sensitive to this, economically incentivized to

 2    object.  So, you know, I suppose it's possible there are

 3    some noteholders out there who we haven't heard from them;

 4    they haven't heard or shown any interest in these cases to

 5    date.  So I -- to the extent they were involved in any of

 6    the discussions involving these cases, they have been

 7    brought up to speed months ago with respect to this and the

 8    possibility of this.

 9              THE COURT:  Okay.  Does the United States Trustee

10    wish to be heard?

11              MR. KIESELSTEIN:  Could I make just two brief

12    points, Your Honor?

13              THE COURT:  Sure.

14              MR. KIESELSTEIN:  I neglected to -- thank you.

15              Your Honor, I do want to emphasize the small

16    window that was available for someone to come in while

17    Mercuria was largely unprotected.  We see that dynamic

18    before.

19              I also want to emphasize -- and we talked about

20    this vis-à-vis Mercuria -- the limited amounts of diligence

21    that were available at this company, the cloud that was

22    hanging over this company, and -- frankly -- the boldness

23    that it took for someone to step in and devote as much time

24    and energy as was devoted here in a very compressed

25    timeframe.  I know the number is a large number, but the
```

```
 1    intensity of the work that went on was really hard to --

 2    hard to describe.  It was a short window, and they shot

 3    through it.  And they obviously did a tremendous amount of

 4    value enhancement.

 5              I think that's far different from bid procedures

 6    of 45- or 60-day marketing period where everybody sort of

 7    knows the ground rules.  I mean, we were -- we were thrilled

 8    to have Oaktree appear on the scene.  We worked as hard as

 9    we could to accommodate their desires and needs so they

10    could put forward the type of proposal that they put

11    forward.

12              The other thing I would note, Your Honor, is I

13    think we've said publicly we think hundreds of millions of

14    dollars were diverted from this company prepetition.  The

15    litigation trust will be well-funded, well-staffed, and

16    we'll pursue these claims.  I'd be -- we haven't projected a

17    value because it's a matter of enforcement and

18    collectability.

19              But I think at the end of the day, this -- in

20    essence -- $150,000 modification for some group of the

21    unsecureds is going to fall far below the minimum threshold

22    that most courts apply when we think about material adverse

23    modifications to a plan.

24              And so I think that's a pretty safe prediction,

25    projection to make here.  I think it would be a shame to
```

```
 1    lose the benefit of this settlement, this arrangement, where

 2    all the real parties who've participated feel strongly that

 3    it's been merited.  It's been earned.

 4           Thank you, Your Honor.

 5           MR. MASUMOTO:  Good afternoon, Your Honor.  Brian

 6    Masumoto for the Office of United States Trustee.

 7           Your Honor, I believe you've, probably more

 8    effectively than I could've, raised the issues that we had

 9    outstanding.  We were made aware of the settlement, but we

10    nevertheless did not feel comfortable in not raising our

11    concerns to the Court.  Your Honor raised the issues

12    regarding whether or not the substantial contribution issue

13    was satisfactorily established on behalf of Oaktree.

14           I would like to indicate that -- I noted that in

15    the committee's statement in support of the substantial

16    contribution, they indicated that on December 10th, the

17    Debtors and the committee received an unsolicited proposal

18    from Oaktree/Hartree, which suggests, again, that there were

19    not any prior conversations regarding substantial

20    contributions that may have -- may have instigated or may

21    have promoted the attempt by Oaktree to participate.

22           They certainly were proposing a DIP proposal on

23    their own merits, and one would assume that financially

24    benefited them.  The fact that it also benefited the

25    unsecured creditors was an incidental benefit from our point
```

1   and wasn't -- was not necessarily the sole driving factor in

2   their -- in their competitive proposal.

3           In addition, from our standpoint, there are

4   several other aspects:  the issue as to whether or not they

5   satisfactorily established their substantial contribution.

6   We do also oppose the process where, for example, the time

7   records were not attached to their application.

8           And again, as noted by Your Honor, although upon

9   request they did provide invoices to our office, I -- the

10  Debtors and, I believe, the committee, and Mercuria, that

11  was never provided to the Court.  And any 503(b)-substantial

12  application -- substantial contribution application is

13  required under the code under 503 to be upon notice and

14  hearing.  And without those time records made publicly

15  available for others to evaluate as to whether or not the

16  criteria of substantial contribution had been achieved or

17  not is something that we believe should not be perpetuated

18  in this case.

19          I mean, we believe that those time records

20  should've been made available certainly to the public and

21  most definitely to the Court.  As Your Honor pointed out,

22  the Court's been denied the opportunity to evaluate the

23  reasonableness of the fees.

24          I believe that there was some response that

25  indicated that the U.S. Trustee got something slightly

 1    different than what Mercuria did.  And upon conversation

 2    with Mercuria counsel, what invoices were -- that was

 3    provided did not have dollar figures attached to the

 4    individual time records, the extension amounts.  That's a --

 5    that's a detail that Mercuria did request from late in case,

 6    and I believe that -- and that was provided.  From our

 7    standpoint, that wasn't really relevant.  I mean, for the

 8    overall -- for the overall perspective that we believe that

 9    a complete fee application with details should be provided

10    publicly and to the Court --

11            THE COURT:  Did you get fee backup information

12    yourself?

13            MR. MASUMOTO:  We received invoices which have

14    time records and the number of hours.  The invoices

15    indicated that there were $1,200 apparently spent by a

16    significant number of people.  I think there were 15

17    partners, maybe 15 associates, and other timekeepers

18    involved.

19            I can tell you from a technical standpoint, as far

20    as the Southern District guidelines are concerned, there was

21    a great deal of lumping.  I believe there were just about

22    300 --

23            THE COURT:  You mentioned a date a few minutes

24    ago.  You said when the committee said that it had received

25    an unsolicited offer from Oaktree, was it December 10th?

UST-0784

1          MR. MASUMOTO:  December 10th, and I believe the

2     hearing was on the 13th.

3          THE COURT:  Did any of those time entries cover

4     work done before December 10th?

5          MR. MASUMOTO:  I believe there were time entries

6     beginning on November 29th.  I haven't totaled up the

7     amounts.  So from November 29th on, their invoices include

8     records -- time records from various individuals, again,

9     without the actual dollar amount.

10         So, once again, from a process standpoint the fee

11    application issue is something that our office, I guess,

12    quite strongly opposes in terms of what the current

13    procedure is recommending.

14         I -- going back to the issue of the circumstances

15    of the -- of the competitive bid, I do believe that the --

16    that White & Case -- that Oaktree and Hartree should also

17    disclose to the Court the circumstances of the process.

18    Their entitlement to substantial contribution under 503(b)

19    is premised upon their status as a creditor.  And in this

20    case, the creditor's status arose post-petition.

21         I believe -- I'm not quite sure.  We did solicit

22    information and received that information from counsel, and

23    if Your Honor believes that it's relevant, I think they can

24    provide that information.  But I believe there's no dispute

25    that they acquired the claim just prior to the hearing on

UST-0785

```
 1    the DIP financing.

 2              Interestingly enough, I mean, we looked at -- in

 3    looking at the circumstances, one of the initial questions

 4    that arose is whether or not a 2019 statement would've been

 5    required.  A 2019 requires essentially the disclosure of

 6    disposable economic interest.  And as Your Honor may be

 7    aware, part of the change that occurred in that -- in

 8    bankruptcy rule was part of the idea as to the intent and

 9    motivations of party, particularly those who require

10    interest post-petition.  In fact, one of the exemptions from

11    disclosure of the amounts is as to a party who may have

12    acquired their interest a year prior to the petition.

13              So we believe that in addition to -- again,

14    addressing the issues that Your Honor raised regarding

15    whether or not they truly provided a substantial

16    contribution as opposed to advancing a bid in their own

17    interest, they should provide additional information

18    regarding their acquisition and disposition of the credit --

19    of their claims, which allow them to achieve the creditor

20    status.

21              THE COURT:  Are you able to tell at all from the

22    time entries you have how much effort Oaktree put into this

23    before it first contacted the committee or the Debtors?

24              MR. MASUMOTO:  Not entirely, Your Honor.  I mean,

25    again, the invoices indicated the date and the hours
```

1   provided but not the dollar extension as to the amounts

2   achieved.  But I believe that information is available,

3   since I believe Mercuria did request that information and

4   has that information.  So I can't quantify the amount after

5   they communicate it with the committee.

6           We did -- I -- in fact, we had a conversation with

7   the committee counsel just prior to the hearing addressing

8   the issue.  One thing that did surprise us with respect to

9   the settlement was the committee's participation in this

10  settlement.  From our perspective, the point that Your Honor

11  made was that if, in fact, the substantial contribution was

12  approved by Your Honor, it would technically be treated as

13  an admin expense to which Mercuria would have to provide the

14  funds for, I guess, under their commitment.

15          The committee, from the standpoint -- once again,

16  Oaktree/Hartree proposed their DIP financing for their own,

17  presumably, financial benefit.  It had an incidental benefit

18  to the unsecured creditors committee, which upon approval of

19  the Mercuria DIP and the withdrawal of Oaktree was locked

20  in.  The $40 million was already guaranteed and provided for

21  under that approval by the Court.  And so it puzzled us a

22  little that the committee was willing to participate in the

23  settlement.

24          I can understand the gratitude they may have had

25  going from $15 million cash to $40 million plus

```
 1    participation in the litigation trust, but, again, from our

 2    standpoint, it would've been locked in at the time of the

 3    approval of the DIP.  And as Your Honor indicated, any

 4    approval would essentially be a burden and fall upon

 5    Mercuria to cover as opposed to the committee.

 6              So we did have some questions as to exactly why --

 7    I mean, it would've been more understandable had a different

 8    scenario arose, had the committee been actively soliciting

 9    alternatives to the DIP and sort of prevailed upon Oaktree.

10    Again, I'm not sure that would give rise to a legal

11    obligation but certainly would -- could give rise to an

12    understanding that they feel a moral obligation to support

13    the efforts of Oaktree/Hartree.

14              If you have any other questions, Your Honor, I'd

15    be happy to attempt to answer them.  Otherwise, nothing

16    further.  Thank you.

17              THE COURT:  No, I don't.  Thanks.

18              MR. MASUMOTO:  Thank you.

19              THE COURT:  All right.  Does Mercuria wish to be

20    heard?

21              MR. FRIEDMAN:  If I may, Your Honor.

22              THE COURT:  Yep.

23              MR. FRIEDMAN:  Good afternoon.  Ronald Friedman

24    from Silverman Acampora, Counsel to Mercuria U.S. Holdings

25    with respect to this issue, as you know from our pleading,
```

1   Your Honor.

2           I would just note, Your Honor, at the outset that

3   the last point that Mr. Kieselstein just made is clearly on

4   the mark from Mercuria's perspective for a few factors.

5   One, at the end of the day, I believe that out of the 450

6   that would come from that litigation trust, over --

7   approximately 350,000 of that 450 is coming directly out of

8   the divide benefit to the noteholders in that fund.  So Mr.

9   Kieselstein's dollar amount of between $100 and $150,000

10  spread amongst the class is really, I think, the analysis

11  that we should looking at.  We clearly believe it's not

12  material.

13          Secondarily, Your Honor, we believe that in the

14  context of confirmation, you have the sincere authority to

15  proceed with this.

16          But most importantly, Your Honor -- and I heard

17  your question relative to the precedential value of this and

18  is every other bidder in every other 363 auction kind of

19  come storming in here.  And I think the answer is a

20  resounding no. And the reason why it's a resounding no, Your

21  Honor, is there's a courtroom full of folks here, and they'd

22  be hard-pressed to tell you a case that they have an all

23  fours with what's transpired here, given all the facts and

24  circumstances and time --

25          THE COURT:  Do you know how often I hear that?  I

UST-0789

```
 1    hear that about --

 2              MR. FRIEDMAN:  I'm sure you hear it all the time,

 3    Your Honor.

 4              THE COURT:  Every single --

 5              MR. FRIEDMAN:  Every single big case.

 6              THE COURT:  -- case that I have ever had in front

 7    of me, people say, oh, there's never been one like this.

 8              MR. FRIEDMAN:  Well, Your Honor, on -- with these

 9    assets and this timeframe, I think that we could take that.

10              But one of the things we looked at, Your Honor,

11    from Mercuria's perspective is -- and I heard Mr. Masumoto,

12    and certainly he and I had the chance to confer on this --

13    is we asked the folks in White & Case for the invoices

14    because, of course, we have to follow the process.  And when

15    we did our analysis of those invoices, we broke it down into

16    categories of time, right, to one of the points you were

17    razing.

18              And in essence, the overall recovery that White &

19    Case would be reciting under this settlement is pretty close

20    to spot on to what our analysis was after taking our

21    consideration for the lumping entries, and the time entries

22    after the action, and the time entries from before when they

23    were just getting generic case background, and looking at

24    the time entry relative to what was spent on the DIP and

25    RSA, etc.
```

```
 1          And our calculation comes in right spot dag in the

 2     middle of where they would end up on this overall recovery

 3     where they're receiving roughly 750 -- they're receiving

 4     $750,000.  Our analysis shows that if everybody did a

 5     fulsome review of all of those records under a settlement

 6     construct that, you know, that would be a fair and

 7     reasonable award.

 8          And given all the facts and circumstances here,

 9     including the fact that the DIP is fully drawn, that we

10     don't believe there would be any benefit in a practical

11     sense to doing any resolicitation, having any costs

12     attendant delay, deferring there was closing on the

13     restructuring transaction, assuming confirmation was

14     achieved today.

15          To do that so that potentially $100,000 of

16     distribution to creditors could be accomplished when there's

17     hundreds of million dollars of avoidance claims in that

18     litigation trust, we just don't believe is necessary, Your

19     Honor.

20          One other point I just wanted to make in the

21     review of the timesheets, we didn't just get the first

22     rounds from White & Case.  They provided us some time

23     records.  We didn't think they were detailed enough.  We

24     asked for that to come in another format.  We received the

25     same format, I believe, that both Kirkland & Ellis, as well
```

 1   as the U.S. Trustee's Office received.  And we asked for one

 2   version subsequent to that, Your Honor, because we wanted to

 3   do a fee application type review, as is customary in a

 4   bankruptcy case, where we could see that Mr. Smith spent one

 5   hour and that it had a dollar value right next to it.  And

 6   previously, when it had come to us, it was in a different

 7   format.

 8           And after having done that entire exhaustive

 9   review, Your Honor, and certainly having spoken with the

10   client and conferred with all the parties, and we spoke with

11   counsel to the Committee, and obviously we engaged with

12   White & Case, and we certainly spoke to the folks from

13   Kirkland & Ellis, we believe that the settlement that we've

14   achieved is not only necessary and appropriate, Your Honor,

15   but we believe that it is actually a fair result for all the

16   parties in interest in here.  And I wanted you to be aware

17   that we had done that exhaustive review.

18           THE COURT:  Okay.  Anything else?

19           MR. DENMAN:  Your Honor, I just wanted to make one

20   point of clarity, given the back and forth.  First, Your

21   Honor had mentioned the moment in time at which we had first

22   started talking to the Debtors regarding the bid.  There

23   would be no time entries that -- you know, that predated

24   that moment of talking.  We were speaking with the Debtors

25   at the very beginning, okay?

Case 22-33111-KRH Doc 478 Filed 08/28/20 Entered 08/28/20 16:04:41 Desc Main
Document 41 Page 65 of 184
Case 20-33113-KRH Doc 478 Filed 08/28/20 Entered 08/28/20 16:04:41 Desc Main
Document 41 Page 65 of 184

Page 35

```
 1              And you know, the second point I would make is

 2      that, Your Honor, to the extent the notice to the unsecured

 3      creditors' point is a problem for you, I suppose there would

 4      be a way to this on some form of abbreviated notice or

 5      something like that to -- I suspect, the interested parties

 6      are exhaustively already involved here.  But to the extent

 7      that was necessary, I'm sure an arrangement could be made,

 8      to the extent that helps.

 9              And I think that's it.  Thank you.

10              THE COURT:  Anything else?  All right.  On the

11      Oaktree application for a substantial contribution, I have a

12      proposed settlement, a portion of which would be paid by

13      Mercuria.  And quite frankly, if Mecuria wants to pay money,

14      that's fine.  It's sophisticated, can make its own

15      decisions.  I have no desire or intent to interfere with the

16      portion of the settlement that would be paid directly by

17      Mercuria.

18              I also have before me a proposal that $450,000

19      would be paid to Oaktree towards its attorney's fees and

20      would be paid out of monies that otherwise would go to

21      unsecured creditors.  This is presented to me, I suppose, as

22      both a plan modification and has a proposed settlement.

23              Now, some of the parties that would be affected by

24      that are represented before me today.  I'm told that the

25      noteholders that have actually endorsed this deal represents
```

```
 1    some large percentage.  Somebody used the number of

 2    approximately $350,000 out of the $450,000 that they would

 3    be paying.  And quite frankly, if they want to pay that,

 4    they can go ahead.

 5            But I have a lot of problems with the proposed

 6    settlement on behalf of the other noteholders, who have

 7    neither been told about this and who, in effect, are being

 8    told that they're settling a claim that was not even made

 9    against them.

10            The application that was made was for the

11    allowance of an administrative expense claim on the grounds

12    that Oaktree had made a substantial contribution.  Under the

13    terms of the plan, administrative expense claims are to be

14    paid by Mercuria, not by the unsecured creditors.

15            Under the terms of the plan, a fixed pool was to

16    be set aside for the unsecured creditors, consisting of $40

17    million plus various litigation claims.  And there was

18    nothing about the Oaktree application, therefore, that would

19    implicate the unsecured creditors or even make them a party.

20    A party in the sense that they could be heard, sure, but not

21    a party in the sense that money was being sought from them.

22            They asked me today to approve this settlement

23    with no notice to those other unsecured creditors.  It is

24    something I'm just not willing to do, particularly since one

25    of the things that I am required to consider in deciding
```

UST-0794

1    whether to approve a settlement is whether they think it's a

2    reasonable compromise based on the merits of the issue.

3    Other unsecured creditors have the right to raise objections

4    to this.  If they had done so, I would have sustained them.

5         The parties who want to make payments to Oaktree

6    are free to do so.  But there are a number of problems with

7    the merits of the application to the extent it asserts a

8    substantial contribution claim.

9         Section 503 of the Bankruptcy Code says that a

10   creditor may receive a substantial contribution claim, or a

11   claim for making a substantial contribution.  Oaktree

12   contends that it was a creditor here because it acquired a

13   claim.  But there is absolutely zero, zero connection

14   between that creditor's status and the activities for which

15   it seeks compensation.

16        It is not seeking a substantial contribution claim

17   as a creditor.  It is seeking a substantial contribution

18   claim as a bidder.  And I am not going to treat the purchase

19   of a creditor claim as though that irrelevant act somehow

20   brings Section 503(b)(3) into play.

21        I recognize that there is case law to the effect

22   that Section 503(b) says that there are various

23   administrative expenses that may be allowed, including --

24   and then there's a long list of other items.  I recognize

25   that under the Bankruptcy Code, the word "including" is

1    defined as being not exclusive, and therefore, not excluding

2    other things.

3            But the usual rule in bankruptcy is that

4    administrative expenses are the expenses incurred by the

5    trustee or the debtor itself, or that are incurred directly

6    in the preservation that had administration of the assets of

7    the estate.

8            Paying non-debtors is an exception to that rule.

9    And there are exceptions in Section 503(b), but they don't

10   use the word "including", and they are limited to the

11   circumstances that are listed there, such as claims by a

12   creditor for its substantial contribution in a case.

13           I think that the cases that have held that those

14   circumstances are -- those items are exclusive as to when

15   substantial contribution can be awarded have the better of

16   the argument.

17           But I don't need to make a final decision on that

18   because whether I think the argument is foreclosed or not,

19   it is under the case law in this Circuit that paying the

20   expenses of another party is supposed to be the exception

21   rather than the rule.  It is supposed to be a narrow

22   exception, and it's supposed to be applied only where,

23   usually at least, the party who seeks compensation has done

24   something that an estate fiduciary otherwise would have

25   done.  That is not what I have here.

```
 1          I have a party who for its own interest made a
 2    competing proposal.  I do not mean in any way to denigrate
 3    the importance of that proposal.  I myself said that I was
 4    happy that they participated.  It obviously did have
 5    benefits in the way that it affected the competing proposal
 6    that Mercuria then made.
 7          But that is exactly what happens when I have
 8    competing debtor in possession financing proposals, when I
 9    have competing plan proposals, when I have competing auction
10    sale proposals, when I have practically any kind of
11    competing proposal that is made in the course of the case.
12          I cannot see how awarding this claim would do
13    anything other than encourage everybody who ever makes a
14    competing proposal to demand a substantial contribution
15    claim proportionate to whatever value their competing bid
16    produced by somebody else.
17          Oaktree did not act as an estate representative.
18    It was quite clear in the proceedings in front of me that it
19    was pursuing its own interest.  It was doing its darndest,
20    in fact, to lock down the deal in its own -- to its own
21    benefit, and to foreclose further discussion.  And oddly
22    enough, it was fighting to prevent exactly what it now says
23    was the benefit that entitles it to compensation, which is
24    an odd situation.
25          I think that the better rule is that people who
```

```
 1    for their own economic interest pursue certain activities in

 2    a bankruptcy case have to bear their own expenses.  That's

 3    true whether they're offering competing debtor in possession

 4    financing proposals, or that they're offering competing plan

 5    financing proposals, or that they're offering a competing

 6    purchase price in an auction or not an auction.  I just

 7    think that that's the correct rule.

 8            I don't believe anybody has cited to me any

 9    authority under which -- under circumstances like these, a

10    court has awarded a substantial contribution claim.  And I

11    think under that context, I will not approve the settlement

12    insofar as it affects people who haven't even been told

13    about it.  I just don't think it's reasonable.  They haven't

14    been given a chance to object.  And to the extent that I'm

15    being asked to do it without that right to object, I won't

16    do it.  I will, on their behalf, make the objection and

17    sustain it.

18            So, if you want Mercuria to make your payment that

19    it's agreed to make, that's fine.  If the other noteholders

20    who are endorsing this deal want to nevertheless make the

21    shares of that payment out of their own recoveries that they

22    otherwise would have made, that's no skin off my nose.

23    They're sophisticated people.  They can do that if they

24    want.  But to the extent that you want payment from those

25    other people, I won't approve it.
```

1          So, what do you want to do?

2          MR. KIESELSTEIN:  I'm sure the parties will want

3     to confer, Your Honor --

4          THE COURT:  Okay.

5          MR. KIESELSTEIN:  -- in light of your comments.

6     So, I would suggest we move off that agenda item --

7          THE COURT:  Well, let's --

8          MR. KIESELSTEIN:  -- if that's all right.

9          THE COURT:  -- see if they talk for a few minutes

10    and take a short break anyway before we move on to the other

11    items.

12         MR. KIESELSTEIN:  Sure.  Of course.

13         THE COURT:  Okay.

14       (Recess)

15         THE COURT:  Please be seated.  Okay.

16         MR. DENMAN:  Your Honor, thanks for the recess. I

17    don't think anything constructive could really occur on this

18    kind of a timetable.  We're certainly not going to be able

19    to reach and discuss and coordinate with the individual

20    noteholders in that kind of hallway discussion forum.

21         So, Your Honor has ruled what Your Honor ruled.

22    We've heard you with respect to the Mercuria deal.  From our

23    perspective there's still an advised proposed order by which

24    Mercuria and I settled and agreed to a $300 million payment.

25    Your Honor indicated that you are not inclined to touch

 1      that.

 2              I suspect, given the substance of Your Honor's

 3      order, you may hear from them.  But that's where we are.

 4              MR. QURESHI:  Thank you, Your Honor.  At this

 5      point, Your Honor, having conferred with the parties and

 6      certainly with the folks at White & Case, having heard Your

 7      Honor's ruling, we think that the application should be

 8      denied and let the case proceed to its confirmation.

 9              THE COURT:  Why should I deny the approval of the

10      settlement as it relates to you?  You yourself stood here

11      and told me why I should approve it.

12              MR. QURESHI:  In order to have complete fidelity

13      on as many issues as possible, Your Honor, yes, I did.  But

14      given all the facts and circumstances, Your Honor, and

15      certainly the determination Your Honor made relative to the

16      merits of the application, which are certainly embodied in

17      the objection that we filed on our client's behalf, we

18      sought to resolve it.  We had proposed language that would

19      resolve it.  Unfortunately, it doesn't get resolved unless

20      everything else gets resolved.  And so...

21              THE COURT:  You made a deal with them, right, that

22      you would pay that amount?

23              MR. QURESHI:  We made a deal with them, Your

24      Honor, conditioned upon everything else getting done in that

25      way, that's correct, in order to move forward towards

```
 1    confirmation without having any delay or litigation over a

 2    503(b) application that's been denied.

 3              THE COURT:  Well, I only learned that there was a

 4    deal, let alone what its terms were, shortly before I came

 5    out on the bench because I was occupied by other matters

 6    earlier today.  So, I don't have any idea whether you have a

 7    binding obligation with them or not, independent of whether

 8    I approved it or not.  So, what's Oaktree's position on

 9    that?

10              MR. DENMAN:  To be clear, Your Honor, we think we

11    have a binding agreement with them.  They agreed to provide

12    us $300 million -- $300,000 --

13              (Laughter in the Courtroom)

14              MR. DENMAN:  I take that silence as acquiescence,

15    Your Honor.

16              (Laughter in the Courtroom)

17              MR. DENMAN:  And a deal is a deal.  And we didn't

18    think it would be inappropriate for somebody to strike a

19    deal coming to court and then walk away from it after

20    hearing the benefit of Your Honor's ruling, certainly --

21              THE COURT:  Do you have a written settlement

22    agreement or, no, it's just what was in the order?

23              MR. DENMAN:  You know, Your Honor, it was

24    conversations that occurred over the course of the weekend

25    that culminated in a revised proposed order.  That's really
```

1    all we have.

2            THE COURT:  And he's saying in effect that it was

3    contingent on my approval of the other parts of the deal.  I

4    mean, I have approved it as to him.  So, any contingency as

5    to that part of it I've satisfied.  So, is it your

6    understanding that your deal with Mercuria was contingent on

7    my approval of the deal as it relates to the unsecured

8    creditors?

9            MR. DENMAN:  No, that's not how I understood

10   things.

11           THE COURT:  And is that your understanding?  And

12   where does that come from?

13           MR. DENMAN:  Your Honor, my understanding is --

14           THE COURT:  I'm sorry, I was asking Mercuria.

15   He's standing right next to you.  Sorry.

16           MR. DENMAN:  I saw him over your shoulder.

17           MR. QURESHI:  Yes, Your Honor, it was part of a

18   global resolution in order to resolve the litigation issue

19   relative to the 503(b) application and the construct of the

20   entire matter to move forward to its confirmation.  And

21   everything was embodied in the draft of the confirmation

22   order that was circulated.  There is no separate settlement

23   agreement.

24           THE COURT:  All right.  Well, I'm not going to

25   rule on that issue.  It Oaktree thinks that it has an

1     enforceable deal with the Mercuria people, it can seek to

2     enforce it and I'll decide the merits of that separately.  I

3     have not denied approval of that.

4          I have denied the request insofar as it affects

5     unsecured creditors who weren't aware of it and who weren't

6     even told that the application would purportedly come out of

7     their pockets.  And as to whom I, on their behalf, have

8     decided that not only did they have a right to object, but

9     to the extent there was an objection I would decline to

10    approve it, perhaps sustaining the U.S. Trustee's objection

11    in that regard.

12         But that still was approval of almost the entirety

13    of the application, at least to the extent that the major

14    noteholders were willing to live with the expenses that they

15    had told me that they were willing to bear.  So, I'll just

16    leave that issue for now.  Okay?

17         MR. QURESHI:  Very well, Your Honor.

18         THE COURT:  All right.

19         MR. QURESHI:  So, that application will be

20    included on the calendar?

21         THE COURT:  I'll issue an order that reflects the

22    rulings that I had made.  And to the extent that there is

23    still a dispute over whether you need to pay Oaktree or not,

24    I don't think that's going to affect confirmation because

25    I'm pretty sure Mercuria can afford that money.

1           MR. QURESHI:  Thank you, Your Honor.

2           MR. KIESELSTEIN:  Thank you, Your Honor.  Marc

3    Kieselstein again on behalf of the Debtors.  We're making

4    incredible time.

5           THE COURT:  Now on to the easier issues.

6           (Laughter in the Courtroom)

7           MR. KIESELSTEIN:  Exactly.  Your Honor, there was

8    reference to that settlement in the latest version of the

9    confirmation order.  We'll obviously strip that out and

10   it'll be dealt with in Your Honor's separate order.

11          With regard to the confirmation of the plan, Your

12   Honor, how we plan to proceed is, my partner, Mr. Winger,

13   will go through the uncontested elements of 1129 and the

14   other portions of the plan for which no objections have been

15   launched.  Then I would come back and do the third-party

16   releases and exculpation issues.  And then Mr. Winger would

17   do the professional -- the committee member professional fee

18   issue, if that's all right with Your Honor.

19          THE COURT:  All right.  As to the uncontested

20   issues on confirmation, I know you want to offer

21   declarations into evidence and materials to support the

22   factual record.  But I've read the plan.  We don't need to -

23   - certainly, we don't need to go over each element of

24   Section 1129.  I will just -- after the record is complete,

25   I will ask people if there are any other objections, and

```
 1    assuming there aren't, I don't think we need more detail

 2    than that.

 3              MR. KIESELSTEIN: Excellent, Your Honor.

 4              THE COURT:  Okay.

 5              MR. KIESELSTEIN:  And I know Mr. Winger will be

 6    shortly moving those declarations into evidence.

 7              THE COURT:  Okay.

 8              MR. WINGER:  Good afternoon, Your Honor.  Ben

 9    Winger, from Kirkland & Ellis, on behalf of the Debtors.

10    I'll get right to it.  We have four declarations.  The

11    declaration of Ms. Jane Sullivan at Docket Number 470; she

12    provided the voting certification in support of the plan.  A

13    declaration of Tyler Baron at Docket Number 479; he's

14    providing evidence in relation to the release issues, which

15    Mr. Kieselstein will address.  The declaration of Andrew

16    Hede, Docket Number 480; he's providing the evidentiary

17    support for some of the blocking and tackling in 1129, some

18    of the standard provisions that we will address, if Your

19    Honor has any questions.  And then finally, the declaration

20    of Mr. Zui Jamal at Docket Number 481; he's addressed

21    certain valuation issues.

22              They're all here in the courtroom today, Your

23    Honor, and can answer any questions, if there are.

24              THE COURT:  All right.  Is there anyone who

25    objects to the admission of the four declarations into
```

```
 1    evidence?  Okay.  Nobody has objected.  Is there anybody who

 2    wishes to cross-examine the declarants as to the substance

 3    of their declarations?  Okay.  Nobody has indicated a desire

 4    to do so.  I will admit the declarations.

 5         (Declarations of Jane Sullivan, Tyler Baron, Andrew

 6    Hede and Zui Jamal Admitted Into Evidence.)

 7              MR. WINGER:  Unless Your Honor has any questions,

 8    I'll cede the podium back to Mr. Kieselstein.

 9              THE COURT:  Apart from the third-party release

10    issues and exculpation issues, and apart from the rights of

11    committee members to ask for payments of their expenses, are

12    there any other objections to confirmation?

13              MR. WINGER:  The short answer is no, Your Honor.

14              THE COURT:  Okay.  I wanted to just make sure that

15    somebody didn't have one that we had overlooked.  But I

16    don't see anybody objecting, and so I will take that as a

17    know that there are no other objections.

18              MR. WINGER:  Thank you, Your Honor.

19              THE COURT:  Okay.  Mr. Kieselstein?

20              MR. KIESELSTEIN:  I didn't expect Mr. Winger to be

21    quite that quick.

22         (Laughter in the Courtroom)

23              MR. KIESELSTEIN:  Your Honor, Marc Kieselstein

24    again, on behalf of the Debtors.  Your Honor, we do have a

25    brief deck on the third-party release exculpation issues.
```

```
1    May I approach?

2              THE COURT:  Yes, but I have to warn you, I don't

3    really want a PowerPoint presentation.  I more prefer to ask

4    questions and get answers.

5              MR. KIESELSTEIN:  Okay, then let's dispense with

6    that, Your Honor.

7              THE COURT:  Okay.

8              MR. KIESELSTEIN:  And don't look at it too harshly

9    on our final fee application.

10       (Laughter in the Courtroom)

11             MR. KIESELSTEIN:  Your Honor, we stand before the

12   Court today, Your Honor, with a highly consensual plan with

13   widespread support, which no creditor or interest holder has

14   lodged an objection, where all the voting classes have

15   delivered a resounding mandate in favor of confirmation.

16             This is a result that epitomizes Chapter 11 and

17   what it's intended to do, which is to take a distressed

18   company that offers a product or a service at the

19   marketplace values --

20             THE COURT:  What percentage of the unsecured

21   creditors have either voted in favor of the plan or, even if

22   they voted against it, checked the box in favor of granting

23   the releases that you desire?

24             MR. KIESELSTEIN:  Ninety-nine percent of those who

25   voted.  And remember, only the TopCo unsecureds voted
```

1    because the other 74 Debtors were unimpaired.  We did have,

2    I think, around 15 opt-ins, which gives me -- you know,

3    restores my faith in humanity somewhat.  So, some people

4    read it and decided that they would opt-in to the release.

5         There were obviously a number of people who didn't

6    vote, as is always the case.  We have retail debtholders

7    here and retail equity holders as well.  But support for the

8    plan, which Your Honor said was tantamount to support for

9    the releases -- a vote for the plan was a vote for the

10   releases, third-party and otherwise -- was pretty

11   overwhelming, 99 percent in the Class 4A, and over 75

12   percent in the equity class.

13        THE COURT:  So, let me ask you now -- and I want

14   to break this down because all too often everybody talks

15   about all of these various provisions in the plan as if to

16   some extent, they are a form of third-party release, and I

17   don't really think of them that way.

18        You do have in the plan a proposed release of the

19   Debtors' own claims --

20        MR. KIESELSTEIN:  Yes.

21        THE COURT:  -- against a wide group of people,

22   directors, officers, Mercuria, the Committee, various

23   people, correct?  And as I understand it, there are no

24   objections to those releases.

25        MR. KIESELSTEIN:  No objections, but I would just

```
 1    caveat it, Your Honor, as to the former directors and

 2    officers --

 3              THE COURT:  Yes, that's --

 4              MR. KIESELSTEIN:  -- there's nothing.  No debtor

 5    releases, no consensual --

 6              THE COURT:  Right.

 7              MR. KIESELSTEIN:  -- or non-consensual third-party

 8    releases.

 9              THE COURT:  Right.  It's just been preserved

10    through the litigation costs.  And just so I can be 100

11    percent sure, is there anything in the Debtors' releases

12    here that would affect the claims that have been asserted

13    already in any pending action?

14              MR. KIESELSTEIN:  No, not that I'm aware of, Your

15    Honor.

16              THE COURT:  Okay.  So, if the Debtor releases its

17    own claims, then to the extent you're worried about

18    derivative claims, or claims people might make my virtual of

19    injuries suffered by the Debtor, those claims are already

20    gone?

21              MR. KIESELSTEIN:  That's correct.  That's how the

22    Debtor release is supposed to work.  So, we're then in the

23    land of the direct, or alleged to be direct, third-party

24    claims.

25              THE COURT:  Okay.  So, then we've got a proposed
```

1    exculpation provision.  And these are often called third-

2    party releases too, but I think of them differently.  And

3    I'll be the first one to acknowledge that the case law on

4    just why these are separately approved is fairly thin.  But

5    they are regularly approved.  And to  some extent, the case

6    law, most of the case law, focuses on the court's authority

7    over estate fiduciaries and the qualified immunity that a

8    fiduciary has when it's acting under the authority of a

9    court.

10        I know the U.S. Trustee has objected to the extent

11   your exculpation provisions would go beyond the fiduciaries

12   themselves.  But I actually think of the exculpation

13   provisions a little differently.  It seems to me that they

14   are meant to indicate not only the fact that I have

15   supervisory authority over the fiduciaries themselves, but I

16   have supervisory authority over the transactions that

17   occurred during the course of the bankruptcy case.

18        And so, when I think of some of these properly

19   worded exculpation provisions, what I think they do is

20   reflect the fact that if I have approved something,

21   supervised and approved it, it ought not to be anybody's

22   business to sue anybody over the terms of what I have

23   already decided is appropriate in this case.

24        Now, that does mean that when I look at these

25   exculpation provisions, I don't word them quite so

UST-0810

```
 1    generously as almost every Chapter 11 plan that I receive

 2    does.  And in fact, every release that I have ever seen,

 3    it's almost like a contest of draftsmanship as to how can

 4    the lawyers possibly cover everything that human imagination

 5    could reach.  I think an exculpation provision is more

 6    appropriately limited to any claim based on the negotiation,

 7    execution and implementation of agreements and transactions

 8    that have been approved by the Court, except that people

 9    aren't exculpated and forgiven from their obligations to

10    perform the terms of those transactions and agreements.

11              MR. KIESELSTEIN:  Of course.

12              THE COURT:  And all the other language about

13    anything that, you know, bears an iota of similarity or a

14    reference to that should come out.  I think that's the

15    proper scope of an exculpation provision.

16              And I'll hear from you, Mr. Masumoto, if you want

17    to argue, but I think that as long as that's what its focus

18    is, that I don't have a problem providing that to people who

19    also aren't estate fiduciaries.  And I note that at least

20    the Seventh Circuit Court of Appeals has approved that

21    approach.  Although they called it a third-party release, it

22    really was an exculpation, in the Airadigm case, 519 F.3d

23    640.  Do you want to be heard on that, Mr. Masumoto?

24              MR. MASUMOTO:  Your Honor, I'll defer to Your

25    Honor.  As Your Honor indicated, our position is pretty much
```

```
 1    standard.  We believe it's limited to fiduciaries.  But as

 2    Your Honor recognized, many of your colleagues have approved

 3    broader application of it.  And so, we'll defer to Your

 4    Honor's scope.

 5              THE COURT:  So, you've got releases on behalf of

 6    everybody who voted in favor of the plan; releases on behalf

 7    of the 15 people who voted against it, but who checked the

 8    box; releases of all the Debtors' claims, which includes any

 9    derivative claims; exculpation for the transactions that I

10    approved of during the course of the bankruptcy case.

11              You've got releases from the indentured trustees,

12    as I remember, through the restructuring support agreement;

13    releases from all of noteholders who signed up to the

14    restructuring support agreement; and releases from everybody

15    else who was in the restructuring support agreement.

16              MR. KIESELSTEIN:  Mm hmm.

17              THE COURT:  What on earth is left that you're

18    worried about?

19              MR. KIESELSTEIN:  Well, Your Honor, first of all,

20    a couple things.  We tried very hard, having read your

21    transcripts from Fairway and from Westinghouse to use the

22    based upon language.  We may not have completely succeeded,

23    but we certainly were attentive to your pronouncements on

24    this issue and try to be faithful to them.  And there is any

25    other further tweaking we need to do, of course we're happy
```

```
1     to do it.

2            With regard to who's left, let me harken back to

3     the conversation we had about the prior motion.  There are a

4     great many people who didn't vote on the plan and didn't opt

5     in.  The question is, are the parties here -- and we haven't

6     talked about the magnitude of the contribution, which I'm

7     happy to do; it's laid out in great detail in Mr. Baron's

8     declaration --

9            THE COURT:  Why don't all those releases and

10    exculpation's that I have just described fully compensate

11    them for any contribution they might've made in the course

12    of this case?  Why should I go further and take away any

13    direct claims that somebody else might have out there

14    against these people?

15           MR. KIESELSTEIN:  Well, the first thing I would

16    say, because I think Metromedia says that you can, and under

17    appropriate circumstances, should.

18           THE COURT:  One of those appropriate circumstances

19    is I'm supposed to be told what the claim is that I am

20    taking away --

21           MR. KIESELSTEIN:  Sure.

22           THE COURT:  -- so that I can understand why it is

23    something for which that particular claimant is already

24    getting compensation in the case, and therefore make a

25    determination as to why it's fair.  So, what is the claim
```

UST-0813

1    I'm (indiscernible)?

2              MR. KIESELSTEIN:  So, let me give you a couple of

3    examples.  Let me start with Mercuria --

4              THE COURT:  Okay.

5              MR. KIESELSTEIN:  -- because they are a released

6    party along with 1:17:27 Mr. Moore, Mr. Baron and Mr.

7    Bartoszek.  We heard it in this courtroom, Your Honor.  We

8    heard a variety of theories bandied about by people with

9    whom we've since made peace, but who represented the

10   noteholder constituency as a whole, talking about things

11   like liability on account of inappropriate loan to own

12   strategies, inappropriate control over the coffers --

13             THE COURT:  So, when the Debtor releases its

14   claims against -- Debtors release their claims against

15   Mercuria, the people who were parties to the actual

16   transaction with Mercuria are included among those releasing

17   parties.  The indentured trustees have released their

18   claims.  Mercuria is going to be the new owner of the

19   business.  All the other creditors at the operating levels,

20   including the companies where Mercuria actually did

21   business, are being paid in full and are unimpaired.  So --

22             MR. KIESELSTEIN:  We're talking about the other

23   creditors at the TopCo.  That's who we're talking about.

24   Which is whom the ad hoc group was comprised of.

25             THE COURT:  And if the Debtors have released their

```
 1    claims, what claim is left?

 2              MR. KIESELSTEIN:  Well, I'm not sure, Your Honor,

 3    that they've articulated all of their theories.

 4              THE COURT:  Well, that's not good enough to

 5    justify taking it away, is it?

 6              MR. KIESELSTEIN:  The quest --

 7              THE COURT:  See, you know, all too often I get

 8    this request.  What Metromedia says to me is I'm only

 9    supposed to take away third-party claims if it's essential

10    to the reorganization.  And I'm only supposed to do it under

11    rare circumstances.

12              What I actually hear whenever these releases are

13    mentioned is that I should belt and suspenders things and

14    get rid of a universe of unknown things to give people

15    greater comfort, without any explanation or identification

16    of what it is I'm taking away, how it is that that's fair

17    necessarily to the people who I will be taking things away

18    from, with an assertion that, well, there probably isn't

19    anything of significance out there, but with absolutely no

20    factual record, nor could there be a factual record that

21    would allow me to really judge whether that's the case or

22    not.  And all in the theory that this is essential.  Well,

23    frankly, if there's nothing out there, then it can't be

24    essential to the reorganization.

25              MR. KIESELSTEIN:  I think that writes Metromedia
```

```
 1    right out of the law books --

 2              THE COURT:  I don't think so.

 3              MR. KIESELSTEIN:  -- with respect, Your Honor.

 4              THE COURT:  I think your approach writes it out of

 5    the law books, quite frankly.

 6              MR. KIESELSTEIN:  Okay.

 7              THE COURT:  You know, submission reads as though

 8    you think that third-party releases are bonus, like a merit

 9    badge, as I said in Fairway.  It's what you get for doing

10    well.  All the different criteria that the Courts of Appeals

11    have asked me to look at, which is not just whether somebody

12    made a contribution, but what is the claim that's being

13    taken away, is the owner of that claim being treated fairly,

14    is it otherwise getting compensation for that claim through

15    the bankruptcy process?  Nothing.

16              And one of the things that Metromedia told me to

17    do was be extremely wary of releases that aren't tied to

18    specific claims instead -- and then instead of just broad

19    and general in terms, which is exactly what you're asking

20    for.

21              MR. KIESELSTEIN:  Well, let me speak to the claims

22    that might be asserted against the directors and officers,

23    the direct claims.  There was an amended complaint filed

24    during the pendency of this case around some of the past

25    financial misconduct, or alleged past financial misconduct,
```

UST-0816

```
1    which added in current directors of the board.  They didn't

2    add in the three gentlemen who joined in May.

3            But they were directors of a public company that

4    was undergoing a thorough investigation of alleged

5    misconduct, potentially securities fraud, between the period

6    when they joined the board and today.  Could someone come in

7    and say you disclosed too much, Mr. Baron, Mr. Moore, Mr.

8    Bartoszek?  You disclosed too little?  You should have done

9    X, you should have done Y, when conducting the

10   investigation?

11           If it turns out the litigation claims don't yield

12   enough to provide a dividend to the equity class, is someone

13   going to come back and say --

14           THE COURT:  Let me turn that around on you.

15           MR. KIESELSTEIN:  Sure.

16           THE COURT:  You've told me basically why members

17   of the audit committee would want that release.  But if

18   there are shareholders or former shareholders who probably

19   didn't even have the right to participate in this case who

20   believed they were prejudiced by conduct by those people

21   that maybe they'll say that it violated this Federal

22   securities laws, if that claim is out there, why should I

23   foreclose it?  Why is it essential to this reorganization

24   that I foreclose it?

25           MR. KIESELSTEIN:  Because --
```

```
 1              THE COURT:  Why should -- if there's a claim out
 2      there, don't tell me that it's junk claim, because it is
 3      never essential to anything to get rid of a junk claim.  And
 4      if there is a claim out there that's more than junk, why
 5      should I foreclose it?
 6              MR. KIESELSTEIN:  What I would say, Your Honor, is
 7      this is where you weigh the contribution and what it yields
 8      for the estate --
 9              THE COURT:  No.
10              MR. KIESELSTEIN:  -- and the --
11              THE COURT:  No.  I reject that 100 percent.  This
12      notion -- this interpretation of Metromedia that I get it to
13      appoint myself as the arbiter of whether somebody gets a
14      gold star on their report card for the quality of the work
15      that they do, and the payment for that comes at the expense
16      of other people by releasing their third-party claims is
17      wrong.  It's 100 percent wrong.  I will never approve it.  I
18      will never adopt it.
19              You don't get a release just because you did your
20      work.  You have to show that there's something about the
21      particular claim that you want released that has to be
22      barred in order to make this reorganization workable.  And
23      you have to show that it's fair for me to take that person's
24      claim away from them in light of what they're getting this
25      case.  That's not what you're saying.
```

```
 1            What you're saying is this was a hard case, these

 2      people did a good job, give them a bonus, not out of the

 3      pockets of the Debtors but out of the pockets of a bunch of

 4      third parties.  That's not right.

 5            MR. KIESELSTEIN:  Well, I think, Your Honor, you

 6      said is it fair to take it away from the holders.  And I

 7      think the only way to evaluate that question is to say,

 8      well, what did they get that would justify someone taking

 9      away this claim, which hasn't been brought yet but can

10      easily be envisioned, which is impossible for me to value

11      because I don't believe these gentlemen did anything wrong

12      that would justify compensation.  And if that means that's

13      it, I lose, I don't know what to say to that because --

14            THE COURT:  You know, directors of companies that

15      are outside of bankruptcy face immensely difficult and

16      trying situations all the time.  They don't get a release of

17      claims against them for doing their work in those

18      circumstances.  Why should it be different just because

19      somebody's in bankruptcy?

20            MR. KIESELSTEIN:  For one thing, they have

21      indemnity obligations against solvent entities, generally

22      speaking.

23            THE COURT:  Right, and you -- and as I understand

24      it, the Debtors here have assumed their indemnity

25      obligations to the members of the audit committee.
```

UST-0819

1          MR. KIESELSTEIN:  To those members of the audit

2     committee, they have.

3          THE COURT:  Well, that's who you're seeking the

4     releases on behalf of.  So, what's the difference?

5          MR. KIESELSTEIN:  Well, I think there are other

6     circumstances about going through a bankruptcy process that

7     are wildly distinct from what one does in the normal course

8     of a director.  And that takes me back to the work that was

9     done here by three gentlemen who were not officers of the

10    company, but who were directors and devoted hundreds,

11    thousands of hours, to both getting this company saved and

12    to invigorating the investigation so that the litigation

13    trust was a viable and well-funded vehicle for --

14          THE COURT:  So, if a --

15          MR. KIESELSTEIN:  -- recoveries to creditors and

16    stakeholders.

17          THE COURT:  If a former shareholder out there

18    thinks that a member of the audit committee committed

19    securities fraud, you're saying that because the audit

20    committee did such stellar work during the course of these

21    cases, I should reward them by barring that claim?  Now,

22    especially if it's a former shareholder, somebody who wasn't

23    even a shareholder at the time the case happened?

24          MR. KIESELSTEIN:  Well, a former shareholder would

25    not have been around when these gentlemen joined the board.

1    I suppose there is a slight window in time --

2              THE COURT:  Exactly.

3              MR. KIESELSTEIN:  -- between May and November

4    where someone could have turned into a former shareholder.

5              THE COURT:  Not so slight a window in time.  It's

6    a six-month window in time.

7              MR. KIESELSTEIN:  Understood.

8              THE COURT:  So, they would've got no benefit from

9    all that work.  Why should they be giving up their claims?

10             MR. KIESELSTEIN:  Your Honor --

11             THE COURT:  You know, it's peculiar.  You're

12   asking me to give the directors something that I could not

13   give them if they filed their own bankruptcy cases.  I can't

14   give them a discharge of securities law claims.  They're not

15   entitled to it --

16             MR. KIESELSTEIN:  Well, and there is --

17             THE COURT:  -- in their own bankruptcy cases.

18             MR. KIESELSTEIN:  There is a governmental

19   carveout, even for the third-party non-consensual releases

20   for

21             THE COURT:  The --

22             MR. KIESELSTEIN:  -- regulatory and police power.

23             THE COURT:  No, no, no, no, no.  The exception

24   from discharge for an individual is not limited to

25   governmental claims.  It's securities liabilities.

1    MR. KIESELSTEIN:  Understood.

2    THE COURT:  So, you're asking me to basically give

3  them something that I couldn't even give them in their own

4  bankruptcy cases, based on conduct that predated this case,

5  for which I have no record indicating or allowing me to make

6  a decision as to whether there are meritorious claims or

7  not, for which the Debtor has provided indemnification that

8  by itself protects the members of the Committee.

9    MR. KIESELSTEIN:  I can't provide you, Your Honor,

10  facts showing a meritorious claim when we don't believe

11  there is a meritorious claim.  So, that seems like a heads I

12  win, tails you lose, kind of situation.

13    THE COURT:  But it seems to me that what you're

14  saying is you think they've earned it, not so much that it

15  has to be done in order for the reorganization to proceed.

16    MR. KIESELSTEIN:  Well, vis-à-vis Mercuria, I

17  don't know what their position would be.  If you're asking

18  whether these three fiduciaries would go back and pull the

19  plug on the plan, I mean, that's, I think, you know, an

20  impossible ask.  Of course, they would not do that.  And if

21  that means you never get a release because it's never

22  essential when it comes to an individual, then to me that is

23  basically negating Metromedia, because --

24    THE COURT:  (indiscernible) and --

25    MR. KIESELSTEIN:  -- how could you ever satisfy

1    that test, Your Honor?

2            THE COURT:  Well, in Johns Manville there were

3    rights of direct action against insurers so that the claims

4    the insurers were settling with Johns Manville were really

5    the same --

6            MR. KIESELSTEIN:  Sure.

7            THE COURT:  -- as to third-party claims.  And so,

8    the criteria to be applied were, well, the people whose

9    third-party claims in that context were being barred, are

10   they getting a fair recovery when the insurers turn over

11   their policy proceeds to be administered by a trust?

12           In the ResCap case, which you have cited, Ally,

13   the parent of ResCap was paying billions of dollars to

14   settle claims that clearly overlapped with claims that some

15   creditors were making against Ally and didn't want to pay

16   twice.  So, there was a direct connection between the claims

17   that it was settling and the contributions it was making on

18   those claims and the claims that were being barred.  You

19   have nothing like that here.

20           MR. KIESELSTEIN:  Why would my -- why would these

21   fiduciaries contribute something on behalf of claims that

22   have no merit?  Again, if that's the test, they have to

23   throw a million dollars in for spurious claims, and this is

24   really a question of whether the closure and finality is

25   something that can be earned by fiduciaries sticking their

```
 1    head in the meatgrinder in a situation like this and going

 2    above and beyond.

 3              I don't agree with the notion that this is like

 4    the Little League team at the final luncheon or banquet,

 5    most improved backup right fielder, which was, I think, my

 6    ward back in the day.  But I do think there are

 7    circumstances which distinguish one case for another and

 8    it's a sliding-scale.

 9              You're right.  We're not compensating people for

10    taking away these claims, which I struggle to conjure up,

11    frankly.  But again, that seems like a cul-de-sac where

12    whichever way I turn, there's some element of Metromedia

13    that you don't think we're satisfying.

14              THE COURT:  Yeah, right, because Metromedia says

15    that you're only supposed to get third-party releases in

16    rare and unusual cases.

17              MR. KIESELSTEIN:  Right.

18              THE COURT:  The standard you're proposing to me is

19    part of the problem.  In actual practice, at least in terms

20    of what debtors ask for, these aren't rare and unusual.

21    Everybody wants them in every single case.

22              Everybody, every debtor tells me that the case

23    imposed extraordinary challenges for the directors, and they

24    did such a great job that I should reward them by taking

25    away claims that people might have against them based on
```

1    things that even predated the bankruptcy.  Everybody asks

2    for that.

3            MR. KIESELSTEIN:  And sometimes it's true.

4            THE COURT:  It's not true.  You know what?  It's a

5    misreading of Metromedia; that's my opinion.

6            MR. KIESELSTEIN:  So sort of irrespective, and I

7    don't mean to argue with Your Honor, God forbid.  I'm just -

8    - the magnitude of the contribution, it sounds like it's

9    sort of beside the point.

10           THE COURT:  It's only one factor; that's just it,

11   it's only factor and it can't be viewed in the abstract.

12   The contribution has to have some bearing on the claim

13   that's being released, and the release of the claim has to

14   be important to the case, not just a reward.  The actual

15   release has to be of some significance.  The existence of

16   the claim has to be an obstacle to the restructuring somehow

17   in order to justify my reaching it.  You've got nothing like

18   that here.

19           MR. KIESELSTEIN:  Well, Your Honor, what I would

20   say is when someone, like these gentlemen, join a board with

21   no real appreciation of how bad the situation is and they

22   turn to me, as they did in this case, and say we didn't sign

23   up for this, you know, why should we -- why don't we just

24   exit stage left.

25           Do we want to incentivize people to just say, this

Page 68

```
 1    is too challenging, this is too hard, I didn't sign up for

 2    this, let me just get out of here as quickly as possible

 3    like a rationale human being would?  But we want to

 4    incentivize people to get in there, roll up their sleeves

 5    and stay the course, particularly to the extent of what was

 6    done here.  I'm sure there are cases --

 7              THE COURT:  People join audit committees, and they

 8    take as their protection their indemnification and insurance

 9    rights all the time.  This idea that because a company is

10    bankrupt, they have to have these third-party releases in

11    addition is, frankly, nonsense.

12              All of these requests in my mind -- or not all of

13    them -- most of these requests are nothing but pure over-

14    lawyering.  They are, as you yourself said, there are

15    efforts to kind of provide additional comfort.  I understand

16    why people would like to have them.  But in terms of the

17    standards that I'm supposed to be applying under the

18    governing case law, they don't even come close.

19              MR. KIESELSTEIN:  So we think we have three

20    factors, and it wasn't -- it's not a matter of prompting

21    factors as what's clear and the post-Metromedia law makes

22    clear, there's a variety of factors court's consider -- it's

23    to your point -- about including.  It's not an exhaustive

24    list, it's not a prescriptive list.

25              So we have the magnitude of the contributions,
```

```
1    which I think by any fair assessment, was extraordinary.  I

2    think we have the indemnity obligation so that claims

3    against these individuals are going to be claims against the

4    reorganized debtors precisely because the indemnity

5    obligations are being assumed.

6              THE COURT:  So what?

7              MR. KIESELSTEIN:  That's one of the factors cited

8    by Metromedia.

9              THE COURT:  Well, why is it essential to this

10   reorganization to bar those claims?

11             MR. KIESELSTEIN:  I mean, again, essential, Your

12   Honor, meaning the plans fails if you turn down those

13   releases.  If that's your standard, I'll stop talking

14   because we can't meet the essential standard.  Mr. Baron is

15   not going to go back and organize a meeting of the board

16   tomorrow and say, let's pull the plug on the plan and

17   destroy all the value that's been created.  That would be

18   the act of a bad fiduciary, Your Honor.

19             But that doesn't mean they're not entitled to --

20   and I don't mean it in the sense of entitlement.  I mean

21   that they haven't earned, merited one of those rare

22   situations where they are -- they have the release as an

23   appropriate full measure of finality in exchange for the

24   full measure devotion above and beyond that they gave in

25   this case.
```

```
 1            And the third Metromedia factor that we clearly

 2     hit is the widespread support for the plan.  And, Your

 3     Honor, I want to go back to when we had the opt-in/opt-out

 4     discussion, which went about as well for me as this one is

 5     going.

 6            And what Your Honor said there was, I'm not going

 7     to imply consent by silence.  People get a big package,

 8     they're busy, they throw it in the circular file, they don't

 9     read it.  So I'm not going to imply that they, you know,

10     they made a conscious decision not to opt-out, so I'm not

11     going to give you the benefit of the doubt on that one.

12            Here, it's the flip side of the coin.  All these

13     people were conspicuously notified in big boldface that, you

14     know, if you vote for the plan, you give the release.  If we

15     don't get sufficient consensus, or whatever the words we

16     used, we reserve the right at confirmation to seek third-

17     party consensual -- non-consensual releases, and we'll

18     provide evidence at that time.  Okay?  They got that.  Are

19     we implying from their silence that they were against it,

20     because we didn't imply from their silence that they were in

21     favor of the opt-out?  So they all had full due process.

22            THE COURT:  I thought what we were doing is what I

23     was told to do in Metromedia, which was regardless of

24     whether I have an objection, satisfy myself as to whether

25     this is an appropriate exercise of a very narrow and
```

1    authority that I should only be exercising in extreme

2    circumstances; that's what I'm doing.  It has nothing to do

3    with whether anybody objected.

4            MR. KIESELSTEIN:  Okay.

5            THE COURT:  And I have to say that the

6    justifications that you have offered here seem to me to fall

7    totally short of what's necessary under Metromedia.

8            MR. KIESELSTEIN:  I'm hearing you say basically if

9    it's not essential, it doesn't pass muster.  If the plan's

10   not going to blow up without it, it doesn't pass muster.

11   Maybe I'm mishearing you, Judge, but that's what -- that's

12   what I'm hearing.

13           THE COURT:  That's certainly one of the things I'm

14   supposed to consider, and I don't have anything close to

15   that here.  I don't even have any connection between the

16   activities that were engaged in and the claims that you're

17   seeking to get released.

18           As I say, you seem to treat it as thought it's

19   like, I can give you a reward out of the pockets of people

20   who aren't even sitting here by taking their claims away and

21   freeing you from them.  It's just crazy.  I think it's just

22   crazy.

23           MR. KIESELSTEIN:  Okay.  That's probably a good

24   place for me to stop at crazy.

25           THE COURT:  All right, yes.

```
 1              MR. MAZA:  Alan Maza from the SEC.  May I address
 2      the Court?
 3              THE COURT:  Yes.
 4              MS. DOYLE:  Your Honor, before he addresses the
 5      Court.  Lauren Doyle, Milbank, on behalf of Mercuria.  May I
 6      take another stab, although I've heard what you've said?
 7              THE COURT:  Go ahead.
 8              MS. DOYLE:  Thank you.  Again for the record, Your
 9      Honor, Lauren Doyle from Milbank on behalf of Mercuria.
10      I've completely heard what you said, and I don't want to
11      discredit any of it.  I just want to take a slightly
12      different stab at the concept of truly unusual circumstances
13      and whether the injunction plays and the words from
14      Metromedia being, an important part in the debtor's
15      reorganization.  So I would argue that Mercuria's role in
16      these cases is truly unusual circumstances.
17              THE COURT:  I think what I'm being asked is, why
18      the particular release that's being sought is an important
19      part of reorganization; not whether other things that
20      Mercuria did, which presumably it did for its own economic
21      interest, were important to the reorganization.
22              MS. DOYLE:  If I may, if I could start with why
23      they were -- what they did and then get to the claims, I
24      think I'll be able to make the connection.
25              So starting sort of with the concept of what
```

 1    Mercuria did, right.  This was a company that was on the

 2    brink of liquidation.  It was on the brink of collapse

 3    multiple times, beginning from March of last year all the

 4    way up until the petition date, and some would argue, even

 5    after the petition date, right.

 6              So when Mercuria came in in the summer, it

 7    basically provided essential trade financing that would have

 8    -- that ultimately prevented the company from collapse at

 9    that time.  Then it went on on another sort of effort to

10    save the company and prevent total liquidation, replaced the

11    prepetition lenders and bought out that loans and provided

12    another 30 million of incremental value to bridge this

13    company to a Chapter 11 reorganization process.

14              THE COURT:  But it was making loans that it

15    thought would pay off and investments that it thought would

16    be profitable.

17              MS. DOYLE:  Absolutely.

18              THE COURT:  It wasn't like a firefighter charging

19    into the World Trade Center.

20              MS. DOYLE:  Absolutely, and I don't mean to take

21    away from the fact that there is always the business

22    interest in making loans.  And I'm going to get to the

23    claims, because the claims that have been raised and the

24    claims that we're concerned about, completely and directly

25    tie to the actions Mercuria took during that time.

```
1              THE COURT:  So what the debtor mentioned was if

2       somebody wants to sue you based on the pre-bankruptcy loans

3       and agreements you made.  I've already told you I'm going to

4       not allow people to sue you for the transactions I've

5       approved.  So if somebody's got a claim against you based on

6       those pre-bankruptcy agreement, and I'm having trouble

7       figuring out, given all the releases and exculpations and

8       debtor releases that you have, who on earth that could be.

9              But let's assume somebody does.  Why should your

10      commercial activities during this bankruptcy case, however

11      helpful they might have been, why should that entitle you to

12      release of those other claims?

13             MS. DOYLE:  Because those -- the direct claims,

14      and I realize that Your Honor has already taken care of the

15      situation with respect to debtor claims and derivative

16      claims.

17             But to the extent that there were direct claims

18      that the committee or noteholders were asserting at the

19      beginning of this case with respect to actions taken by

20      Mercuria to effectively keep this business from liquidating

21      that led to an enormous auction process, that led to

22      enormous value for creditors, all of which if they hadn't

23      done any of that there would be no reorganization, there

24      would be certainty of Chapter 7, those are the direct claims

25      that if somebody, related to their prepetition activities,
```

```
 1    that is somebody wanted to create nuisance value, we don't

 2    think there's any value, but they want to create nuisance

 3    value.

 4              If they wanted to sort of engage in discovery and

 5    bring frivolous claims, Mercuria would have to fight those

 6    claims.  They'd have to fight that litigation.  That's a

 7    cost that after everything they've brought to the table,

 8    they shouldn't then have to continue to face post-emergence.

 9              THE COURT:  How do I know that they're nuisance

10    claims?

11              MS. DOYLE:  I would argue that you had an estate,

12    two estate fiduciaries investigate these claims and

13    determine that there was nothing there to merit.

14              THE COURT:  I don't usually issue declaratory

15    judgments unless I have two parties to the issue in front of

16    me and an actual controversy; that's basically what you're

17    asking me to do here.  You're asking me to decide whether

18    somebody's unasserted claim would be worthless enough that I

19    should go ahead and get rid of it on the theory that it

20    would just be a nuisance.

21              MS. DOYLE:  I'm not arguing that you should get

22    rid of it just because --

23              THE COURT:  What if it wouldn't be a nuisance?

24    What if there was real merit to it; why should I bar that?

25              MS. DOYLE:  Because, Your Honor, that is the
```

```
 1   prepetition acts related to the debtors that Mercuria took.

 2   If there's a direct claim, it has to be related to the

 3   debtors, right, that that's all the scope of these releases

 4   go to.

 5               THE COURT:  And if they did something wrong pre-

 6   bankruptcy that actually hurt somebody that they've got a

 7   claim for, why should I throw that away?

 8               MS. DOYLE:  And that's the exchange of value.

 9   That's where Mercuria has stepped in and has agreed to pay

10   administrative expenses.

11               THE COURT:  What value has that hypothetical

12   plaintiff gotten in exchange for that claim?

13               MS. DOYLE:  If it's at AMPNI, it's gotten

14   recovery, our pro-rata recovery on the 40 million that was

15   contributed to AMPNI, to the parent.  It's gotten an

16   interest in the litigation trust where other claims have

17   been channeled.

18               If it's at the non-debtor subsidiaries, it's

19   effectively had its claims paid in full, which is why I

20   suggest that there's -- it's potentially nuisance value,

21   especially at that level, because they've had their claims

22   paid in full, so what possible harm could they have from the

23   prepetition transactions.

24               You've got equity holders who are also going to

25   recover in their order of priority from the litigation
```

UST-0834

```
 1    trust, and that's all a result of the financial commitments

 2    that Mercuria made to these estates.

 3                THE COURT:  Okay.

 4                MS. DOYLE:  Thank you, Your Honor.

 5                MR. MAZA:  Thank you, Your Honor.  Al Maza from

 6    the SEC.  Of course, we echo what Your Honor has presented

 7    as his concerns, and the SEC staff has identical concerns.

 8    We don't identify this case as we're extraordinary, but I'd

 9    like to correct the record somewhat.

10                The shareholders actually are not getting anything

11    under this plan.  Yes, on paper, they are, but they will

12    have to hope that the unsecured convertible noteholders will

13    get a full payment under the absolute priority rule until

14    they see a dime.  Essentially, what they're getting is the

15    right to go after D&O policies, which they could have gotten

16    outside of this bankruptcy.

17                This bankruptcy does not improve their position at

18    all.  And, in fact, what this Chapter 11 plan contemplates

19    is a worsening of their position.  Because if there would

20    have been a Chapter 7, they would have still gotten nothing,

21    been able to go after D&O policies, and also not be stripped

22    of these significant rights, direct claims.

23                As Your Honor mentioned, there has been no

24    identification, specific identification, of the claims.  The

25    other concern, which is kind of been glossed over is, this
```

UST-0835

```
 1   debtor left the disclosure statement hearing under the guise

 2   that this was an opt-in.  They filed an amended plan with

 3   the proviso --

 4          THE COURT:  Well, they left with the idea that it

 5   was opt-in because I kind of made it that way.

 6          MR. MAZA:  I understand that.

 7          THE COURT:  It certainly wasn't the way they

 8   wanted to.

 9          MR. MAZA:  No, no, it wasn't, and we greatly

10   appreciate Your Honor's intervention on that issue.

11   Essentially what I'm saying is, how integral are these

12   releases to the plan that it plan is then solicited with no

13   identification.  The only way we know that Mercuria and the

14   three directors are seeking this non-consensual release is

15   basically Friday when declarations are filed, that these are

16   the parties.  Until then, it's basically, you know, mystical

17   who are these -- who's being bound by this.

18          Now, is it really fair to expect any shareholder

19   to say what the SEC did in this case, you know what, there

20   is the possibility somebody's getting a non-consensual

21   release here.  We better take the time and the effort to

22   file a potential objection with the Court.  I mean, that

23   alone sets this up for a situation of even a due process

24   concern.

25          But then going back, we believe that for all the
```

 1    reasons Your Honor stated, and I won't go over them, but

 2    they were ones we were going to state, that clearly

 3    extraordinary circumstances that would impact the estate.

 4    And the fact that Mercuria was going to go through with this

 5    plan regardless does not meet any standard that would

 6    justify this harsh treatment to all these shareholders, some

 7    of whom are not even aware of these circumstances that they

 8    are now going to be facing with release of these claims, or

 9    are they really coming out with any benefit.

10         The substantial contribution that Mercuria is

11    giving is not really coming down to benefit those parties

12    that are now going to suffer the burden of this

13    extraordinary release.  Okay, U.S. Trustee.

14         MR. MASUMOTO:  Your Honor, just briefly.  Once

15    again, I think Your Honor has been even more effective than

16    I would have been on the issues raised.

17         And as Your Honor knows, we're always concerned

18    about the rare and unusual circumstance test that seems to

19    be met in virtually every large case in the Southern

20    District.  And as I said, I believe Your Honor has more

21    effectively addressed it than I possibly could, so I think

22    I'll quit while I'm ahead.

23         THE COURT:  Does anybody else wish to be heard on

24    the release issue?  I have somebody in the back.

25         MAN 1:  My name is (indiscernible), a holder, 1000

```
 1    equity shares in (indiscernible), and under this plan,

 2    they're going to be cancelled.  Mercuria and the new board

 3    of directors should not get releases upon the requests that

 4    have been made here.

 5            They should earn those releases, with, like,

 6    litigation trust attorneys should diligently pursue Dimitris

 7    Melissanidis to the gates of hell for what he has done here

 8    and for what he's done to the economy of the Greek economy.

 9    This is one of the only successful businesses in the area.

10    And now, Mercuria's pulled out their executive facility from

11    Athens and Piraeus, and there's nothing there for the Greek

12    people and there's nothing here for the shareholders.

13            Mercuria and the new board of directors have to

14    earn their right to releases.  They have to make misfeasance

15    actions against the old board of directors and theft actions

16    against Melissanidis, the director of corporate development

17    and major shareholder, 22 percent.  They have to go after

18    those guys without exception and diligently.  And if they do

19    that, they will get their releases.  And that's all I have

20    to say about it.  Thank you.

21            THE COURT:  Thank you very much.  Anybody else?

22    All right.  Give me five minutes to look over my notes and

23    then I'll give you my ruling on the releases.  Okay?

24        [BREAK]

25            THE COURT:  Please be seated.  All right, I'm
```

1   going to make my ruling on the release disputes.  Bear with

2   me because I'll be referring back and forth to various

3   notes.  I will ask the debtors to obtain a transcript and to

4   submit it to me so that I may clean up the inevitable places

5   where I inadvertently misspeak, and also so that I can

6   insert citations.

7           I have a number of citations I will refer to, but

8   if I read every last word and citation point of every case

9   that I will refer to given the collective billing rate in

10  this office, I think it would be a complete waste of money.

11  So I will refer to cases but leave out the detailed

12  citations and include them later.

13          I have before me the Debtors' request that I

14  confirm their Chapter 11 plan of reorganization.  Objections

15  have been filed by the Securities and Exchange Commission

16  and by the Office of the United States Trustee regarding

17  certain third-party releases that the debtors have asked me

18  to impose on a non-consensual basis.

19          By way of background, the plan of reorganization

20  in this case provides a number of protections to the

21  debtors' directors, officers, and various other parties.

22  These include both consensual and non-consensual releases.

23          First, the plan provides for various consensual

24  releases that will be binding only on the following persons

25  as releasors: creditors who were entitled to vote and who

1   voted in favor of the plan; creditors and holders of

2   interests who elected to opt into the releases by checking a

3   box indicating that they wished to grant the requested

4   releases; and certain other parties who agreed to give

5   releases in connection with the plan, including parties who

6   consented to give releases through their joinder in a plan

7   support agreement.

8          Second, pursuant to Article 9(b) of the plan, the

9   debtors have agreed to release all of their own claims

10  against a broad group of released parties.  The releases by

11  the debtors cover virtually any kind of claim that might

12  have been asserted, although they do carve out certain

13  defined litigation claims and securities law claims that

14  parties wish to pursue.

15         The debtors' releases of their own claims will

16  have the effect of releasing any derivative claims that

17  creditors or shareholders might have filed with respect to

18  the released matters and the plan so states.

19         I have received no objections to the consensual

20  releases.  I have received no objections to the proposed

21  releases of the debtors' own claims.

22         It is often the case that a Bankruptcy Court is

23  asked to enforce a debtors' own releases by issuing an

24  injunction that prevents third parties from asserting claims

25  that belonged to the estate and that were released by the

UST-0840

1   Debtors.  These are sometimes described as third-party

2   releases, but I do not think that is really an accurate

3   characterization of what they are.

4           Injunctions of this kind are more properly

5   described as injunctions against interference with the

6   debtors' court-approved decisions about the disposition of

7   claims that belonged to the Debtors.  See, for example,

8   MacArthur Co. v Johns-Manville Corp., a Second Circuit

9   decision, confirming that it was appropriate to enjoin

10  creditors from pursuing claims that belonged to the debtors

11  and that the debtors had released.

12          Third, the plan in this case includes an

13  exculpation provision that is meant to insulate court-

14  supervised fiduciaries and some other parties from claims

15  that are based on actions that the court supervised and that

16  the court approved.

17          To some extent, these exculpation provisions are

18  based on the theory that, as a matter of substantive law,

19  court-supervised fiduciaries are entitled to qualified

20  immunity for their actions.  See In Re PWS Holding Corp., In

21  Re API, Inc. and Pan American Corp. v. Delta Airlines.

22          The reported case law is thin, however, I think

23  and for properly limited exculpation provision as a

24  protection not only of the Court's authority over certain

25  court-supervised fiduciaries, but also as to court-

1    supervised and court-approved transactions.  See Iridium

2    Communications Inc v. FCC, a Seventh Circuit decision,

3    approving a plan provision that exculpated an entity that

4    funded a plan from liability arising out of or in connection

5    with the confirmation of the plan, except for willful

6    misconduct.

7         If the Court has approved a transaction as being

8    the best interests of the estate and the parties and has

9    authorized the transaction to proceed, then the parties to

10    those transactions should be not -- should not be subject to

11    claims that effectively seek to undermine or second-guess

12    the Court's determinations.

13         In this case, the proposed definition of

14    exculpated parties includes not only the debtors, the

15    committee and their respective advisors and employees, but

16    also Mercuria, which is the acquiring party and the debtor-

17    in-possession lender, the DIP agents and DIP lenders, the

18    prepetition secured credit facility agents and lenders, and

19    the unsecured notes indenture trustees.

20         In addition, the proposed exculpation provision in

21    the plan provides generally that each exculpated party shall

22    have no liability to anyone for any plain, quote, "related

23    to any act or omission based on," end quote, the Chapter 11

24    cases, the restructuring support agreement, the disclosure

25    statement, the plan, the plan supplement, or, quote, "any

1 restructuring transaction, contract, instrument, release, or

2 other agreement or document created or entered into in

3 connection with the disclosure statement or the plan," end

4 quote, all of which is subject to a general exclusion or

5 claims that are determined in a final order to have

6 constituted actual fraud, willful misconduct, or gross

7 negligence.

8    I think as I said during argument that, to some

9 extent, the wording of this provision is too broad.

10 Certainly, for example, the exculpation provision should not

11 bar the enforcement of contracts that were entered into in

12 the course of the case and that were approved by the Court,

13 but literally, that's what that language would do.

14    As I said earlier, I think an appropriate

15 exculpation provision should say that it bars claims against

16 the exculpated parties based on the negotiation, execution,

17 and implementation of agreements and transactions that were

18 approved by the Court.

19    The United States Trustee has objected to the

20 inclusion of parties who are not estate fiduciaries.  But I

21 think that if the exculpation is limited, as described

22 above, then it is not problematic, and it is appropriate for

23 the reasons that I have stated.

24    So the releases in this case -- the plan in this

25 case, excuse me, already provides for a number of consensual

```
 1    releases that I have been told will cover 99 percent of the

 2    unsecured creditors; provides for broad release of the

 3    debtors' own claims, which thereby bars derivative claims;

 4    and it includes an exculpation, which under my rulings,

 5    protects people from the -- for their involvement in

 6    transactions that I have already approved.

 7            In addition to all of the foregoing, however, the

 8    debtors have asked me to approve certain non-consensual

 9    releases that would be binding even if the releasing parties

10    did not agree to provide such releases.  These do not

11    involve claims against the debtors themselves, and they are

12    not claims owned by the debtors themselves, nor are they

13    limited to claims that are derivative claims that are

14    pursued in the name instead of the debtors.

15            They also are not limited to matters that occurred

16    during the bankruptcy case or that this Court has supervised

17    and previously approved.  Instead, the proposed involuntary

18    releases would encompass claims that, as a matter of law,

19    are owned directly by creditors or stockholders, not by the

20    debtors, and that relate to transactions and events that

21    were not supervised and approved by this Court.

22            I am being asked to extinguish any direct claims

23    that creditors and shareholders may own against certain

24    parties who themselves are not debtors in these cases, and

25    to do so without the consent of the persons whose claims are
```

1    being released.

2         The proposed releases and their beneficiaries are

3    broadly described in the plan.  But as I understand the

4    debtors' current position, there are only two groups in

5    whose favor the debtors proposed that non-consensual

6    releases be provided.  One group is Mercuria and its

7    officers, advisors, et cetera.  Mercuria, as I mentioned,

8    provided prepetition credit to some of the debtors.  It also

9    is the acquiring party under the plan, and it provided the

10   debtor-in-possession financing during this case.

11        The other group is made up of three individuals

12   who joined the audit committee of the debtors' board of

13   directors after May -- which year?

14        MR. KIESELSTEIN:  28th.

15        THE COURT:  -- May 2018.  The debtors asked me to

16   rule that all claims that any creditor or stockholder may

17   have against these entities and individuals that has

18   anything to do with the debtors is to be released, barred

19   and enjoined without the holders of the consent -- without

20   the consent of the holders of those claims.

21        Some circuit courts of appeal have held that

22   bankruptcy courts lack the power to grant nonconsensual

23   third-party releases of the kind that the Debtors seek here.

24   There are a number of citations, which I'll just refer to

25   here and insert in the final opinion.  Bank of New York

1    Trust vs. Official Unsecured Creditors Committee, Pacific

2    Lumber; Resorts International, vs. Lowenschuss; Feld vs.

3    Zale, Fifth Circuit; Lansing Diversified Properties vs.

4    First National Bank, which is a Tenth Circuit decision.

5           Other courts of appeal, including the Second

6    Circuit Court of Appeals, have held that bankruptcy courts

7    have the power to impose involuntary releases, but that such

8    involuntary releases should be imposed "only in rare cases."

9    In Re: Metromedia Fiber Network, Inc., a Second Circuit

10   decision.

11          Other courts have similarly held that bankruptcy

12   courts have the power to impose involuntary releases but

13   usually with similar cautions to the effect that such

14   releases should be issued sparingly and only when absolutely

15   needed.  National Heritage Foundation, Inc. vs. Highbourne

16   Fund, which is a Fourth Circuit decision; Behrmann vs.

17   National Heritage Foundation, another Fourth Circuit

18   decision; Class Five Claimants vs. Dow Corning Corp., a

19   Sixth Circuit decision; Menard-Sanford vs. Mabey AH Robins,

20   another Fourth Circuit decision.

21          Releases, when they are presented to me, and they

22   are frequently presented to me, are often presented as

23   though the approval an involuntary release is no big deal.

24   I disagree.  And in order to put the issue in context, it is

25   worth pausing for a minute to note just what an

UST-0846

1    extraordinary thing it is for a court to impose an

2    involuntary third-party release and how different that is

3    from what courts ordinarily do.

4            A bankruptcy court has in rem jurisdiction over a

5    debtor's property.  Pursuant to that in rem authority, a

6    bankruptcy court may dispose of claims against the Debtor --

7    excuse me, the estate itself.  But third-party claims, by

8    definition, belong to third parties.  They are not property

9    of the estate.  The bankruptcy court has no in rem

10   jurisdiction over them.

11           As a general rule, a bankruptcy court has no power

12   to say what happens to property that belongs to a creditor

13   or to a party in interest, see Callaway vs. Benton, a

14   Supreme Court Decision in 1949.

15           It is often argued that bankruptcy courts have

16   broad subject matter jurisdiction over proceedings that are

17   related to a bankruptcy case as though imposing an

18   involuntary release are somehow analogous to an exercise of

19   the court's power to rule on a proceeding that is pending in

20   front of it.  But there are many problems with that

21   reasoning and that analogy.

22           First, Section 1334 gives bankruptcy courts

23   subject matter jurisdiction over proceedings that are

24   related to a bankruptcy case.  However, when third party

25   releases are proposed there is really any proceeding pending

UST-0847

Page 90

```
 1    at all.  Instead, the court is asked to exercise power over

 2    a potential claim for which no actual proceeding exists.

 3           Second, Section 1334 just generally describes the

 4    scope of a bankruptcy court's potential subject matter

 5    jurisdiction.  Subject matter jurisdiction not enough to

 6    give a court power over a litigation claim.  Instead, the

 7    court needs to have, in addition to an actual proceeding,

 8    personal jurisdiction over the relevant parties.  We're very

 9    accustomed, in the bankruptcy court and the bankruptcy

10    process to giving creditors notice of things we propose to

11    do.  Yet in the context of a statutory in rem deposition --

12    disposition of the debtors' own assets, that is sufficient.

13           But we are not talking here about the disposition

14    of the Debtors' own assets, or of any assets over which we

15    have in rem jurisdiction.  Instead we are talking about

16    issuing a ruling that extinguishes one non-debtor's claim

17    against another non-debtor.

18           In other contexts, the Supreme Court has made

19    clear that as a matter of due process, notice is not enough

20    to confer personal jurisdiction over a party, or over its

21    claims, or to give the court power over those claims.

22    Instead, a formal service of process is required.  See, for

23    example, Martin vs. Wilks, a Supreme Court decision in which

24    the court held that a party seeking a judgment binding on

25    another cannot obligate that person to intervene.  Joinder
```

UST-0848

1    as a party, rather than knowledge of a lawsuit and an

2    opportunity to intervene is the method by which potential

3    parties are subjected to the jurisdiction of the court and

4    bound by a judgment or decree.  See also Chase National Bank

5    vs. City of Norwalk, Ohio, a 1934 Supreme Court decision in

6    which the Court held that the law does not impose, upon any

7    person absolutely entitled to a hearing, the burden of

8    voluntary intervention in a suit to which he is a stranger.

9          Third, even if there were a proceeding pending in

10   front of me in which I had subject matter jurisdiction and

11   personal jurisdiction, and in which a third-party claim was

12   asserted, that would not mean that I would have the power to

13   impose an involuntary release.

14         In the American system litigants have the right to

15   assert claims so long as they meet pleading standards and

16   Rule 11 standards.  When a court has jurisdiction over a

17   claim, that means the court has the power to resolve the

18   claim on its merits.  The Supreme Court has held that a

19   court has no power to dictate settlement terms or to force

20   parties to release their claims.  See United States v. Ward

21   Baking Company, a 1964 Supreme Court decision confirming

22   that a court lacked authority to enter a consent judgment to

23   which the government did not consent, and confirming that in

24   the absence of the parties' agreement the court's power was

25   limited to the resolution of the case on its merits.

 1          Similarly, the Supreme Court has held that two

 2     parties cannot, by agreement between them, dispose of claims

 3     that belong to a third party.  See Local No. 3 International

 4     Association of Firefighters vs. City of Cleveland, a 1986

 5     Supreme Court decision.  Instead, a claim that belongs to a

 6     third party may be resolved only through litigation on the

 7     merits or on terms to which the third party agrees.

 8          Finally, we should not lose sight of the fact that

 9     when we impose involuntary releases we do not provide

10     claimants with the due process rights they ordinarily would

11     have.  The Federal Rules of Bankruptcy Procedure require the

12     commencement of adversary proceedings, with formal service

13     of process, when a money judgment is sought against a third

14     party or when a court is asked to rule upon a third party's

15     interest in property, or when a court is asked to make a

16     declaration of the third party's rights, or when a court is

17     asked to enjoin conduct.  But these procedures are not

18     applied when third party releases are sought.

19          In such cases, the proposal is that a third

20     party's property be taken, that a release be affected and a

21     pursuit of a claim enjoined without any formal service of

22     process that would make the third-party subject to the court

23     please with respect to the relevant claims, and without the

24     commencement without any formal legal action involving the

25     relevant claims.  Nor does the party, whose claim would be

Page 93

 1    taken, have any rights to discovery or any of the other

 2    rights that are afford to an ordinary litigant.

 3            Instead, as the court noted in In Re: Digital

 4    Impact, an Oklahoma decision in 1998, a third-party release

 5    has the effect of a judgment against the claimant and in

 6    favor of the non-debtor that is accomplished without due

 7    process.  In fact, when a court determines to award a third-

 8    party release in a bankruptcy case, it is often asked to do

 9    so based only on the merits of somebody's contribution to

10    the reorganization of itself, rather than the benefits to be

11    provided directly to the persons whose claims are being

12    released.  But even in those instances in which powers of

13    eminent domain authorize an involuntary taking of property,

14    due process requires that the claimant receive compensation

15    that is based on the actual value of the property being

16    taken and the compensation that that person has received.

17    See, for example, First English Evangelical Lutheran Church,

18    a Supreme Court decision in 1987.

19            We often even have the anomalous situation in

20    which the beneficiary of a third-party release asks for

21    broader protection than he or she could have obtained in his

22    or her own bankruptcy filing.  For example, and this is true

23    here, too, debtors often seek to free to officers and

24    directors from potential securities law claims.  But under

25    Section 523(a)(19) of the bankruptcy code, my abilities for

```
 1    violations of the securities laws are not dischargeable so

 2    long as the violation results in a judgment or settlement

 3    either before or after the bankruptcy case is filed.  We

 4    therefore have the odd situation where we are being asked to

 5    use an unwritten authority to release non-debtors from

 6    claims when the bankruptcy code would bar us from giving

 7    similar relief to a debtor.

 8            The issues I have described above ought to

 9    illustrate just how extraordinary a thing it is for us to

10    impose involuntary releases and why, as commanded by the

11    Second Circuit in Metromedia, we should do so only in those

12    extraordinary cases where a particular release is essential

13    and integral to the reorganization itself.

14            Unfortunately, in actual process parties, usually

15    ignore this portion of the Metromedia decision and seek to

16    impose involuntary releases based solely on the contention

17    that anybody who makes a contribution to the case has earned

18    a third-party release.

19            Almost every proposed Chapter 11 plan that I

20    receive includes proposed releases.  Instead of targeting

21    particular claims and explaining why the release of those

22    particular claims is necessary, the proposed releases

23    instead are usually as broad as possible in their scope.

24    Parties rare identify any particular claim that they are

25    even worried about or that has been threatened, and almost
```

1     never explain why the -- an order extinguishing a particular

2     third-party claim is fair to the party whose claim is being

3     extinguished.  Instead, I am usually told that various

4     people have made contributions to the process that have been

5     important in producing a successful outcome.

6                Frankly, if this were enough then releases would

7     never be limited to the rare and unusual circumstances that

8     the court required in Metromedia.  As I observed in the

9     transcript from argument in the Fairway cases, which one of

10    the parties cited here, and as I said earlier, third party

11    releases are not a merit badge that somebody gets in return

12    for making a positive contribution to a restructuring, they

13    are not a participation trophy, they're not a gold star for

14    doing a good job on your homework.  Doing positive things,

15    even important positive things in a restructuring case is

16    not enough under Metromedia.

17               Nonconsensual releases are not supposed to be

18    granted unless barring a particular claim is important in

19    order to accomplish a particular feature of the

20    restructuring.  In the Residential Capital case that was

21    cited to me, for example, there was a huge overlap between

22    claims that Residential Capital was making against its

23    parent company and claims that various other parties were

24    making against the parent.  In that case, the parent didn't

25    want to settle the claims made by Residential Capital unless

1    the third party claims that essentially were the same were

2    also barred.  In that context, the court was able to make a

3    determination as to whether the settlement with the debtor

4    and the funds that would be made available on those same

5    claims justified the third-party release.

6            Similarly, in Johns Manville, the court ruled that

7    insurers should be freed from potential direct liability

8    claims by third parties in order to induce them to

9    contribute policy proceeds to a trust that would benefit

10   those same claimants.  The courts in those cases were able

11   to assess the claims that were being released, to see the

12   direct connection between those claims, and the

13   contributions that were be made -- being made, to decide

14   whether, in light of the contributions that were made

15   specifically for the benefit of the claimants giving the

16   releases, whether those releases were significant and also

17   to determine that the terms of the restructuring in those

18   cases really depended on those releases.

19           I don't have any of that here.  I have only

20   suggestions that Mercuria and the members of the audit

21   committee did things that were positive to the process, but

22   no suggestion that what they did provided a specific

23   recovery to the people whose claims would be taken, or any

24   evidence that would allow me to judge the value of the

25   claims that would be taken away.

```
 1            Parties often argue to me that claims being

 2    released are just potential nuisance claims so that I can go

 3    ahead and order a release without worrying that I'm doing

 4    anything that's really harmful to the releasing parties.

 5    But if the claims that are the subject of the proposed

 6    releases would be without merit, as people often argue, that

 7    begs the question of why should they be released at all?

 8            The teaching of Metromedia is that releases should

 9    be given only when it is necessary and integral to a

10    reorganization.  By definition, it cannot be said that the

11    release of a meritless or nuisance claim is essential or

12    integral to anything.  Getting a release may be a comfort

13    the parties would like to have, releases are not supposed to

14    be imposed voluntarily just to make people feel better.

15    They're supposed to be ordered only when they are actually

16    important and necessary to the accomplishment of the

17    transaction before the Court.

18            Turning now to the particular releases that the

19    Debtors seek in this case.  For the most part the Debtors

20    have not identified specific claims that they believe must

21    be barred in order to enable the reorganization.  Metromedia

22    cautioned that the bankruptcy courts are to be particularly

23    skeptical of broad and general releases that are not tied,

24    in a demonstrated way, to something that the reorganization

25    needs to accomplish.  There are no particular third-party
```

 1    claims identified here that, if pursued, would undermine the

 2    restructuring and the deals that are part of that

 3    restructuring.

 4          As to Mercuria, the Debtors themselves have

 5    released their claims based on pre-petition activities.  I

 6    also have approved an exculpation that covers transactions

 7    that I approved during the course of the bankruptcy case

 8    itself.  Many of the parties in interest have released their

 9    claims against Mercuria and I'm told that 99 percent of the

10    unsecured creditors have consensually released their claims

11    against Mercuria.

12          The Debtors have cited to loans and to an

13    exclusivity agreement to which Mercuria was a party prior to

14    the bankruptcy case.  But given that the Debtors have

15    released their own claims, which has the effect of barring

16    derivative claims, I am at a loss to understand what claim

17    is left as to which Mercuria needs protection.  The

18    creditors of the entities to whom Mercuria made pre-

19    bankruptcy loans are being paid in full.  The indenture

20    trustees, who represent the parent company's unsecured

21    noteholders, have granted releases to Mercuria and as I

22    noted, an overwhelming percentage of the individual

23    noteholders have done so too.

24          The parties aren't clearly able to even to

25    identify anything that is left.  And when I'm left with the

UST-0856

Case 22-33146-KRH Doc 478 Filed 08/28/20 Entered 08/28/20 16:04:41 Desc Main
Case 20-33113-KRH Doc 478 Filed 08/28/20 Entered 08/28/20 16:04:41 Desc Main
Document Page 129 of 184

Page 99

     1    suggestion that nobody can really think of anything, or

     2    certainly not anything that they think has merit, but that

     3    it is nevertheless somehow important to this reorganization

     4    to issue a broad release, frankly, in substance, this

     5    amounts to a suggestion that I should give releases unless I

     6    can come up with a good reason not to do so.  I think that

     7    is the opposite of the approach that Metromedia commands me

     8    to take.

     9          The governing case law requires me to consider the

    10    particular claims that are to be released, whether the

    11    releasing parties are otherwise getting recoveries on those

    12    released claims, and other factors relevant, not only to the

    13    contributions made by the proposed release parties, but also

    14    to the fairness of the releases from the point of view of

    15    the people upon whom the releases are to be imposed.  See,

    16    for example, Dow Corning.  If, as is the case here, the

    17    relevant claims and the owners of them cannot even be

    18    identified, then there is a failure of proof of the facts

    19    necessary to support the proposed involuntary releases.

    20          As to the members of the audit committee, the

    21    Debtors have argued that they could be subjected to amended

    22    securities law claims based on certain events that occurred

    23    prior to the bankruptcy case.  I am told that these would be

    24    without merit and that I should bar them to give the

    25    directors peace of mind as a reward for the service that

1    they provided during the case.  However, I have no record in

2    front of me that would support a conclusion that no

3    reasonable claims could be asserted against the proposed

4    releasees here.

5           I am told that the directors in this case had to

6    navigate through many troubles and that they therefore have

7    earned the right to be freed of litigation claims relating

8    to pre-bankruptcy matters.  Frankly, that just doesn't

9    follow.  There are plenty of officers and directors of non-

10   bankrupt companies who have to steer their companies through

11   difficult situations.  I am sure that they would also like

12   to dispose of potential litigation claims against them as a

13   reward for the work that they have done.  But that is not

14   recognized as a ground on which to terminate litigation

15   claims outside of bankruptcy.  There is no reason why it

16   should constitute an excuse to terminate litigation claims

17   just because a company is emerging from bankruptcy.

18          If the argument is that the directors have done a

19   spectacular job, then maybe they should ask for a bonus, and

20   maybe they would be entitled to one.  At least such a bonus

21   would be payable by the entities for whom the relevant

22   directors did their work.  When the Debtors argue that the

23   audit committee members have earned peace of mind here, they

24   essentially are saying that the audit committee members

25   should be given a bonus that would not be paid by the

1    Debtors, but instead would be involuntarily assessed against

2    the third parties who own the release -- the claims to be

3    released.  Some of those might be shareholders who, as

4    things stand, are likely getting no benefit from the plan

5    and from the underlying work that allegedly justifies the

6    releases.

7            This is not a proper way of rewarding good work.

8    I do not mean to demean the work done by the members of the

9    audit committee, I have no reason to doubt that they did

10   exception work and that they faced extraordinary challenges.

11   But as the courts held in Washington Mutual and in other

12   cases that I will cite, they did what they were paid to do,

13   and it doesn't mean that they're entitled to a release of

14   third-party claims, particularly when those releases really

15   are not necessary or important to the accomplishment of the

16   restructuring transactions.

17           I have also been told that from the point of view

18   of the audit committee members themselves, they are already

19   the beneficiaries of indemnifications from the Debtor.  So

20   to the extent they have earned protections, they already

21   have them.

22           Finally, some courts have justified releases of

23   officers and directors on the ground that in the absence of

24   such releases the officers and directors will assert

25   indemnification claims.  I have to say that I am at a loss

UST-0859

1    to understand how that is a justification to take away the

2    rights that claimants may have to pursue claims that they

3    own directly against the officers and directors.

4           Assume here, for example, that shareholders might

5    have claims against the audit committee members.  As to the

6    Debtors, if the Debtors were liable against any similar

7    claims, the Debtors presumably would argue that their own

8    liabilities are subordinated under Section 510(b) of the

9    bankruptcy code.  If those claimants have the rights to

10   recover from individuals, there's no reason why they should

11   be deprived of those potential recoveries just -- and that

12   doesn't change just because the Debtors have elected, for

13   their own reasons, to affirm their indemnification

14   obligations to those defendants.

15          To the extent that the directors have

16   indemnification rights, it just makes clear that there's no

17   reason why a release of the claims against them is necessary

18   or important to the reorganization process.

19          For that reason, I will approve the consensual

20   releases.  I will approve a modified versus of the

21   exculpation provision that I have described, but the request

22   for additional third-party releases will be denied.

23          Okay?  I assume that you nevertheless want the

24   plan to be confirmed?

25          MR. KIESELSTEIN:  Well, speaking for the Debtors,

1    we certainly want the plan to be confirmed.  Obviously, we

2    need to confirm that with the folks at Mercuria, who were

3    also hoping to get the release that Your Honor is not

4    willing to grant.

5            MS. DOYLE:  (Indiscernible), Your Honor.

6            MALE VOICE1:  Everyone is fine to go forward, Your

7    Honor.

8            THE COURT:  Okay.  Very good.  I have no other

9    issues with confirmation.  So we'll have to make changes to

10   confirm what I've approved and not approved, and I'll have

11   to see your confirmation order.  I assume you should --

12   before I look at it you should fix it up to reflect the

13   rulings I've made today.

14           MR. KIESELSTEIN:  That we will certainly do, Your

15   Honor.  There is one more objection, though, that's still

16   floating around.

17           THE COURT:  Oh, I'm sorry, that's right. I forgot.

18   The -- I worked so hard on this one I forgot the other one.

19           MR. KIESELSTEIN:  And we appreciate it, Your

20   Honor.

21           MR. WINGER:  Your Honor, Ben Winger on behalf of

22   the debtors.  I'll try to be brief and cede the podium to

23   the UCC and the individual members who have direct skin in

24   this particular provision -- just 60 seconds of context and

25   background.  The provision that the UST finds objectionable

1    is Article 2(c) of the plan.  It provides for the payment of

2    individual committee members' reasonable fees and expenses.

3    And this is a provision which gives life to an RSA term,

4    which basically says verbatim the same thing.  And that's a

5    term that was agreed to by the RSA parties includes,

6    Mercuria, the committee, and the debtors.  From our

7    perspective, we understand the UST has a Lehman issue with

8    this particular provision.

9         We were trying to be transparent and not create

10   the mischief that Lehman cautioned against.  And, therefore,

11   included this provision in the plan being particularly

12   mindful of 1129(a)(4) in this Court's review of certain for

13   reasonableness.  So that is where we approached this

14   particular provision, and I understand there are issues with

15   respect to how claims are going to be characterized.  And

16   I'm going to let the UCC and the individual committee

17   members take that, unless Your Honor has any questions just

18   on the table (indiscernible).

19        THE COURT:  Remind me, does the plan provide

20   people with notice and an opportunity to object as to the

21   amounts that are being sought and what does it do?  Does it

22   dispense with the need for my approval if there's no

23   objection, if that's how it works?

24        MR. WINGER:  The process that's laid out would

25   involve notice to the U.S. Trustee, Mercuria, and the

1    debtors, to the extent there's an objection, that would be

2    brought to Your Honor's attention.  You would have ultimate

3    review, if there's no objection, then it would move forward

4    with (indiscernible).

5              THE COURT:  All right.  Who wishes to go first?

6              MR. QURESHI:  Thank you, Your Honor, just for the

7    record, Abid Qureshi, Akin Gump, on behalf of the committee.

8    Your Honor, I did take some comfort in some commentary in

9    the context of the (indiscernible) where Your Honor made the

10   observation that as long as Mercuria is paying for things

11   that's okay, and so that was in the context of Oaktree.  And

12   that is case here, Your Honor, none of these fees that were

13   negotiated as part of the RSA discussions will have any

14   impact on creditor recoveries.  This is quite simply an

15   agreed term of an overall resolution embodied in the RSA;

16   whereas, part of those negotiations in the give-and-take of

17   everything that was happening, Mercuria agreed to pay these

18   fees.  So, again, it having no impact on unsecured

19   recoveries at all.

20        We think this is very distinguishable from what

21   the situation was in Lehman.  And as Mr. Winger's set forth,

22   there is transparency here in that all of the parties and

23   the Trustee will have the opportunity to review and take

24   issue with the reasonableness.

25              THE COURT:  Okay.  Mr. Masumoto.

1            MR. MASUMOTO:  Good afternoon, Your Honor.  Brian

2     Masumoto for the office of the United States Trustee.  Your

3     Honor, the parties are correct in that this provision is a

4     concern to the U.S. Trustee, particularly since similar

5     provisions in other plans are designed essentially to invoke

6     the provision 1129(a)(4), they're elevating claims that

7     would not normally be considered admin expenses into admin

8     claims endorsed under that provision.  And Lehman

9     essentially addressed the circumstance where committee

10    member professionals were to be compensated and authorized

11    under 1129(a)(4) where the concerns, in our office, signed

12    an order for claims for committee professionals to be

13    elevated to an admin expense status, they must comply with

14    the substantial contribution provision under Section 503(b).

15    Here --

16            THE COURT:  Why is that?

17            MR. MASUMOTO:  I'm sorry.

18            THE COURT:  Why is that?

19            MR. MASUMOTO:  Because 503(b) provides that

20    varying circumstances under which professionals or committee

21    members can be compensated.  And the criteria for that under

22    Section 503(b)(3) and (b)(4) required the substantial

23    contribution.

24            THE COURT:  Right.

25            MR. MASUMOTO:  So from our standpoint --

UST-0864

1          THE COURT:  What you're saying is that Mercuria's

2     going to make the payments?

3          MR. MASUMOTO:  Yes, Your Honor.  And I understand

4     the attempt to sort of analogize this to the Oaktree

5     substantial contribution circumstance.  Here, just to

6     reiterate the process issue, we do have concerns again.  As

7     indicated under the terms of the plan, the Court has no say

8     in the initial approval because the Court will never be

9     provided with the applications (indiscernible) records or

10    any of that sort unless if -- unless there's a dispute.  In

11    fact, whether or not substantial contribution is met is

12    something that the Court wouldn't even know about or be able

13    to address unless there's an objection raised.

14          Now, in the reply memorandum that was filed by the

15    debtor, it did insert a provision that indicates that the

16    U.S. Trustee could raise the substantial contribution issue.

17    But, again, under the terms of the plan, the procedure is

18    within five days, the committee professionals can provide

19    their invoices and with five days' notice to the parties,

20    the U.S. Trustee and Mercuria -- I'm not even sure if the

21    debtor gets to weigh in.  But that's the only notice and

22    without any hearing for which these fees would be provided.

23    As we articulated or stated with respect to the substantial

24    contribution for Oaktree, we believe that any such provision

25    for substantial contribution should be pursuant to it and

UST-0865

```
 1    noticed -- a notice and hearing with the full application

 2    including time records to be on file publicly and to be

 3    addressed by the Court.

 4         The issue here also, as we see it, as being

 5    different from the Oaktree circumstance, is that what you

 6    have here are committee professionals who are performing

 7    work in the bankruptcy court.  There's an exact statutory

 8    provision addressing the circumstances where such

 9    professionals can be compensated.  We do not believe that an

10    RSA agreement can contravene the requirements of the

11    bankruptcy code and essentially be able to bypass the

12    requirements that are set forth under the code.  So

13    otherwise the RSA becomes the same vehicle that the parties

14    have used, the 1129(a)(4) provision to do, i.e., shoehorn

15    claims that are not necessarily authorized under the

16    bankruptcy code and indicate that by -- by separate

17    contractual agreements, thereby not to be enforced by the

18    planned reorganization.

19         Therefore, our office opposes any circumstances in

20    which compensation to committee professionals, who have

21    performed work in the bankruptcy case, should not satisfy

22    the requirements under Section 530(b)(3)(d) and (b)(4)

23    regarding the merits of the substantial contribution.

24         THE COURT:  Okay.  Mr. Qureshi, if I understand

25    correctly, your position is that if it's not the estate, but
```

```
 1    is instead the acquiring party who's making the payments

 2    then it's not a 503 issue?

 3              MR. QURESHI:  That's correct, Your Honor.

 4              THE COURT:  Isn't it still an issue under

 5    1129(a)(4), which still requires that the payment be subject

 6    to my approval as reasonable?

 7              MR. QURESHI:  So, Your Honor, I think that this is

 8    probably characterized as essentially an agreement that was

 9    reached in the context of the RSA between the committee

10    members and Mercuria, that Mercuria would pay those fees

11    directly without impact on the estate.  Mercuria did want to

12    reserve for itself the ability to review those fees for

13    reasonableness.  And, for that reason, we needed to have

14    essentially bankruptcy court jurisdiction retained over that

15    issue to the extent that there might be a dispute.

16              THE COURT:  Does not even telling me what they are

17    and only presenting it to me if somebody objects really do

18    what 1129(a)(4) contemplates?

19              MR. QURESHI:  Well, Your Honor, if the issue is --

20              THE COURT:  Subject to the possibility of a ruling

21    if somebody objects, but there's -- really, under that

22    procedure, there's probably in all likelihood a situation

23    where it wouldn't even be presented to the (indiscernible).

24              MR. QURESHI:  So, Your Honor, if the Court's

25    concern is a due process one and notice, I'm sure that's
```

UST-0867

 1    something that we can rectify.  We'll note that --

 2            THE COURT:  You might have guessed that's kind of

 3    a big deal for me.

 4            MR. QURESHI:  I'm well aware of that, Your Honor.

 5    I would note that there are other provisions in the plan,

 6    and I'll the indentured trustees address those that deal

 7    with the indentures trustee fees.  So, I think, arguably,

 8    we're talking here about the payment of fees, really for

 9    just one committee member, which will amount to, I believe,

10    less than a $150,000.  So in the context of things, it's not

11    a large amount that we're talking about.

12            THE COURT:  Okay.

13            MR. QURESHI:  But certainly --

14            THE COURT:  Well, why shouldn't -- why shouldn't

15    we say that rather than only coming to me if somebody

16    objects that people need to file their requests probably

17    nobody will object.  But if there is an objection, then we

18    can sort out whether it needs to be 503 or different

19    standards.  But at least then, it's something that will be

20    presented to me for approval, and we will have satisfied the

21    criteria no matter what section applies.  Okay?

22            MR. QURESHI:  Very well, Your Honor.  Thank you.

23            THE COURT:  All right.  Yes.

24            MS. DOYLE:  Your Honor, for the record again,

25    Lauren Doyle, Akin Gump, on behalf of Mercuria.  I just

1    wanted to clarify the record as there's a lot of back and

2    forth about what Mercuria's required to do and what we

3    agreed to do pursuant to the RSA.  In the terms of the RSA,

4    it says that the plan will provide for the reimbursement of

5    the committee member fees.  So as to whether Your Honor

6    approves that it's included in the plan or not is up to Your

7    Honor, and we'll (indiscernible) by that resolution and the

8    terms of the plan, but it's not a separate Mercuria

9    obligation.

10           THE COURT:  All right.  I will leave for another

11   day the decision of whether this is governed by Section 503

12   or somehow it is separate and governed by Section 1129(a)(4)

13   without reference to Section 503 or whichever one it is, I

14   think I need to approve it.  So I'll just change that

15   procedure, and then we'll keep our fingers crossed that

16   nobody has any issues.

17           MR. CURCHACK:  Good afternoon, Your Honor, Walter

18   Curchack of Loeb & Loeb on behalf of U.S. Bank, one of the

19   indentured trustees.  I know the hour is late, and I think I

20   know where you're headed, but nevertheless feel the

21   obligation to take a shot at something because it was

22   something that was of concern to the indentured trustees.

23   There's a provision in the plan which hasn't been addressed,

24   it hasn't been objected to, and it's Section Article 4(q) of

25   the plan.  It simply provides that the debtor

UST-0869

Case 20-33113-KRH Doc 478 Filed 08/28/20 Entered 08/28/20 16:04:15 Desc Main
Case 20-33113-KRH-DJN Doc 478 Filed 08/28/20 Entered 08/28/20 16:04:15 Desc Main
Document    41 Page 142 of 184

Page 112

1    (indiscernible) organized debtors will pay the professional

2    fees of the indentured trustees subject to certain

3    conditions.  This has been -- that was in the RSA, it was in

4    the (indiscernible) statement, it was in the plan.  It

5    hasn't been objected to.  It's not a 503(b) payment.  And

6    the purpose of it, frankly, is to avoid the need for the

7    trustees to exercise their (indiscernible) liens.  If those

8    fees which, I think, everything will concede the business

9    deal with Mercuria is going to pay those monies.  And for

10   the sake of simplicity, let's assume there were only

11   bondholders here.  The deal is $40 million goes to the

12   bondholders, not $40 million less some amount.

13            THE COURT:  Does the U.S. Trustee object to that

14   provision of the plan?

15            MR. MASUMOTO:  Your Honor, to the extent that any

16   provision validated claim filed by a professional or other

17   individual as an admin expense, that's a problem for our

18   office.  I believe that it falls under our concerns that

19   (indiscernible) and the Lehman case.  As indicated by

20   Mercuria's counsel, he indicated that whatever the RSA is --

21   should be absorbed as part of the plan --

22            THE COURT:  But isn't the effect of this provision

23   the same as saying that unsecured creditors will receive $40

24   million plus whatever the fees of the indentured trustee

25   are?  The indentured trustee has a charging right at least

UST-0870

1    as to the noteholders.

2           MR. MASUMOTO:  In other cases, you know, that's

3    how claims have been settled.  The idea is that there's a

4    gross offer of recovery to account for whatever charges and

5    fees that may exist.  But from a standpoint of elevating a

6    claim for professionals to an admin expense that, we

7    believe, is -- contradicts the scope of the 1129(a)(4) and

8    the (indiscernible) Lehman.

9           MR. CURCHACK:  Again, Your Honor, this particular

10    section does not elevate it to an administrative claim.  It

11    doesn't address it as an administrative claim at all.  It's

12    something that is really inapplicable.  It's simply a

13    question -- and even in Lehman even where there was a $26

14    million fee against billions and billions dollars of --

15    probably a smaller percentage than it is here.  That issue's

16    not present here because the issue is presuming the claim --

17    the agreed economic deal to the bondholders.

18           THE COURT:  I understand the argument, but why

19    don't you -- I think there's an argument under 1129(a)(4)

20    that it's being paid under the plan I should rule it as

21    reasonable anyway, so why don't you make your application.

22    We'll find out, at that point, if there really is even an

23    issue as to what standards we apply.

24           MR. CURCHACK:  Well, frankly, the problem with

25    that, Your Honor, is one of timing because it prevents the

UST-0871

```
 1    plan from -- it prevents the indentured trustees from making

 2    the distribution or the full distribution to the holders on

 3    the effective date if they need to exercise the

 4    (indiscernible) so that's why it was built in and intended

 5    to be paid --

 6              THE COURT:  When do you contemplate the effective

 7    date will be and how long will it take you to make your

 8    application?

 9              MR. CURCHACK:  Most of the applications that are

10    feasible have been provided to (indiscernible).

11              MR. WINGER:  Your Honor, the target effective date

12    is as soon as April 1st, and we would ask that these

13    applications be made as soon as possible.

14              THE COURT:  Okay.  Do you have any objection to

15    shortening the notice period for these applications?

16              MR. MASUMOTO:  No, Your Honor.

17              THE COURT:  Okay.  So when can you have them

18    ready?

19              MR. QURESHI:  Your Honor, again, for the record,

20    Abid Qureshi, Akin Gump for the committee, just so that

21    we're all clear on process.  I think what we can on behalf

22    of the committee members and their respective professionals

23    is -- I would think within, well, hopefully by Friday, but

24    very quickly get on file -- essentially fee applications,

25    not conceding that these need to be approved under 503(b),
```

 1    but just to disclose the fees, everybody can review the fees

 2    for reasonableness, and to the extent anybody has any

 3    issues, all rights are reserved with respect to 503(b) and

 4    whether later a record needs to be put on under that

 5    provision or not.

 6              THE COURT:  Okay.  And if they file those on

 7    Friday, can we agree to have a hearing on Monday the 1st to

 8    the extent there are any objections?  You can make your

 9    objections orally.  I won't need papers on this issue.

10              MR. MASUMOTO:  I will defer to Your Honor

11    (indiscernible).

12              THE COURT:  Is that all right?  Does that serve

13    everybody's --

14              MR. MASUMOTO:  Yeah, our rights are reserved,

15    we'll argue that -- so (indiscernible).

16              MR. QURESHI:  Your Honor, I think that's the issue

17    is to the extent the issue is reasonableness -- well, we

18    believe the circumstances will justify even though we're

19    passing -- even passing over that (indiscernible) not being

20    in dispute, Your Honor, is right will be the reasonableness

21    of anything in this court.  But substantial contribution it

22    seems is not an appropriate part of this review, we're not

23    anticipating for the indentured trustees on a substantial

24    contribution allocation because we don't think it's

25    necessary or called for.  But simply filing for the record

UST-0873

Page 116

```
 1    the amounts of our fees for determination whether anyone

 2    objects to them is unreasonable given what's gone on in this

 3    case.

 4            THE COURT:  Well, are you willing to say that you

 5    aren't seeking to justify and on a substantial contribution

 6    and only on other basis?

 7            MR. CURCHACK:  I think I would say that I don't

 8    believe it's necessary, at this point, to satisfy that

 9    standard, and therefore, I would not expect to be able to

10    put together an application by Friday that would comply with

11    what I would view as the substantial contribution

12    application which goes far beyond the reasonableness test

13    that I think is appropriate under 1129(a)(4).

14            MR. QURESHI:  Your Honor, might I suggest that --

15    I think perhaps the easiest way to proceed is we file the

16    applications by Friday, have a hearing on April 1st to see

17    if there is an objection.  To the extent that there is --

18    that there are any objections with respect to

19    reasonableness, those can be dealt with on the 1st.  To the

20    extent that there is an objection that these fees should be

21    grouped up under 503(b), then I think it would be

22    appropriate to reserve the rights of the parties so they

23    can, at a later date, at a subsequent hearing put on the

24    record, should they choose, to justify those fees under

25    503(b).
```

```
1                THE COURT:  Okay.  All right.

2                MR. MASUMOTO:  Your Honor, again (indiscernible)

3     reserve with respect to the arguments that we've raised as

4     for the Lehman case, (indiscernible) procedure.  We don't

5     want our arguments to be weeded out (indiscernible)

6     contribution.

7                THE COURT:  I understand.  I don't want to

8     prejudice anybody's right to be heard, and I also don't want

9     the tail to wag the dog here and for this to get in the way

10    of an effective date.

11               MR. SOMERSTEIN:  Your Honor, Mark Somerstein,

12    Ropes & Gray, for Deutsche Bank Trust Company Americas.

13    There's two indentured trustees (indiscernible).  I think

14    that the procedure actually does prejudice my client.  The

15    indentured -- the U.S. Trustee did not object to this

16    provision.  It was nowhere in their papers.  They objected

17    to a different provision.  So I think it's unfair to give

18    them an opportunity to argue that Article 4(q) now involves

19    a substantial contribution requirement.  That was never

20    presented to the court until somehow this moment.

21               THE COURT:  They didn't cite to that particular

22    provision, but wasn't that clear in their objection?

23               MR. SOMERSTEIN:  No, Your Honor, to the contrary,

24    it was --

25               THE COURT:  Are you a member of the committee?
```

```
 1              MR. SOMERSTEIN:  Yes.  It was not clear at all,

 2    Your Honor, that they were objecting to that provision.

 3              THE COURT:  All right.  Well, I'm going to require

 4    you to submit your application by Friday.  We'll have a

 5    hearing on Monday to consider whether there's any issue as

 6    to reasonableness or any issue at all.  If there still is an

 7    issue, at that time, as to whether you need to justify it

 8    under a different standard, I will consider whether I think

 9    that's true, and I will also consider your contention that

10    the U.S. Trustee didn't make the objection.  Well, let's get

11    it on file and find out if we have any issue.

12              MR. SOMERSTEIN:  Thank you, Your Honor.  Of

13    course, we reserve our rights to assert --

14              THE COURT:  Everybody's reserved their rights.

15              MR. SOMERSTEIN:  Thank you.

16              MR. QURESHI:  Your Honor, on an unrelated point,

17    again, Abid Qureshi for the committee.  I just wanted the

18    Court to be aware that the litigation trust has selected a

19    trustee, and that trustee is Peter Kravitz of Province.  And

20    the trust advisory board has also been put in place, and

21    that consists of three members, Patrick Bartels, Gene Davis,

22    and Ray Wallander.  Again, just wanted the Court to be aware

23    of that.

24              THE COURT:  All right.  I will hear the issues

25    relating to these fee applications on April 1st at 11:00.
```

```
 1    And I would encourage you to let me know by then just what

 2    you're doing as to the Oaktree application and whether

 3    there's any agreement about who's paying what or whether I

 4    need to schedule further proceedings.  Okay?

 5              MS. DOYLE:  Your Honor, I have one other point

 6    that we wanted to put on the record that was an arrangement

 7    that was worked out just in the time before we started this

 8    hearing.  In terms of the -- what we would refer to "AMPNI,"

 9    which is the parents of the debtors or the debtor parent.

10    It has been agreed to between the debtors and Mercuria that

11    only the agreements between the debtors and Tyler Baron,

12    Donald Moore, and Ray Bartoszek, will be assumed pursuant to

13    the plan, that there are -- we've been told that there are

14    no other employment agreements and employee at -- that

15    entity referred to as AMPNI.  With respect to those

16    employment agreements, notwithstanding the fact that they

17    will be assumed, there are no payments that will need to be

18    made under those employment agreements on a go-forward

19    basis.  That is all I have.

20              THE COURT:  Except to the extent that there's

21    indemnification obligations, I assume.

22              MS. DOYLE:  The indemnification obligations under

23    the law, whatever the bylaws say, not with any specific

24    employment agreement.

25              THE COURT:  Okay.
```

1          MR. KIESELSTEIN:  That's a correct recitation,

2    Your Honor.  We don't believe there are any monies that

3    would be owed.  These are paid in advance, and the retention

4    aspect was paid on the front end subject to a clawback which

5    would no longer be applicable.

6          THE COURT:  Okay.  All right.  Anything else that

7    I have forgotten about that we need to do today?

8          MR. KIESELSTEIN:  I don't think so, Your Honor.

9          THE COURT:  Okay.

10          MR. KIESELSTEIN:  I think we had a full afternoon.

11          THE COURT:  All right.  Thank you very much.

12          MR. KIESELSTEIN:  Thank you.

13          MAN 1:  Thank you.

14          (Whereupon these proceedings were concluded at

15    5:25 PM)

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2

 3                          RULINGS

 4                                       Page      Line

 5

 6    Consensual Releases Approved        103        19

 7

 8    Request for Additional Third-party  103        22

 9    Releases Denied

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 122

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  March 28, 2019

UST-0880

[& - accomplished]                                                                                           Page 1

| & | 15  26:16,17 29:25 | 4 | 75  50:11 |
|---|---|---|---|

**&**  3:3 4:8,15 5:8
10:2 14:11 27:16
32:13,18 33:22,25
34:12,13 42:6
47:9 111:18
117:12

**15**  26:16,17 29:25
50:2 54:7
**150**  19:16
**150,000**  23:20
31:9 110:10
**18-13374**  1:3
**19**  93:25 121:6
**1934**  91:5
**1949**  89:14
**1964**  91:21
**1986**  92:4
**1987**  93:18
**1998**  93:4
**1:17:27**  56:6
**1st**  114:12 115:7
116:16,19 118:25

**4**  104:12 106:6,11
106:22 108:14,22
109:5,18 111:12
111:24 113:7,19
116:13 117:18
**40**  7:19 8:7,12
9:10 29:20,25
36:16 76:14
112:11,12,23
**45**  23:6
**450**  31:5,7
**450,000**  7:19 11:2
11:23 35:18 36:2
**470**  47:11
**479**  47:13
**480**  47:16
**481**  47:20
**4a**  8:6 50:11

**75**  50:11
**750**  33:3
**750,000**  33:4

| 1 | | | 9 |
|---|---|---|---|

**1**  11:4 20:3 79:25
120:13
**1,200**  26:15
**1.15**  19:13
**100**  3:21 31:9
51:10 60:11,17
**100,000**  33:15
**1000**  79:25
**10001**  3:7
**10004**  1:14
**10014**  5:4
**10020**  4:4,11
**10036**  5:11
**1006**  5:3
**10281**  3:15
**103**  121:6,8
**10th**  24:16 26:25
27:1,4
**11**  49:16 53:1
73:13 77:18 81:14
84:23 91:16 94:19
**1129**  46:13,24
47:17 104:12
106:6,11 108:14
109:5,18 111:12
113:7,19 116:13
**11501**  122:23
**11753**  3:22
**11:00**  118:25
**120**  13:4
**1221**  4:10
**1251**  4:3
**1334**  89:22 90:3
**13th**  27:2

**9**  82:8
**900,000**  19:12
**950**  20:8
**99**  8:6 50:11 86:1
98:9

| | 2 | 5 | a |
|---|---|---|---|

**2**  104:1
**20**  9:9 18:23
**201**  5:3
**2018**  87:15
**2019**  1:16 28:4,5
122:25
**22**  80:17 121:8
**26**  1:16 113:13
**28**  122:25
**28th**  87:14
**29th**  27:6,7
**2:04**  1:17

**503**  8:24 25:11,13
27:18 37:9,20,22
38:9 43:2 44:19
106:14,19,22
109:2 110:18
111:11,13 112:5
114:25 115:3
116:21,25
**510**  102:8
**519**  53:22
**523**  93:25
**530**  108:22
**55**  3:6
**5:25**  120:15

**aaron**  6:7
**abbreviated**  35:4
**abhilash**  3:11
**abid**  5:14 10:2
105:7 114:20
118:17
**abilities**  93:25
**ability**  109:12
**able**  20:11 28:21
41:18 72:24 77:21
96:2,10 98:24
107:12 108:11
116:9
**absence**  91:24
101:23
**absent**  12:15
**absolute**  77:13
**absolutely**  37:13
57:19 73:17,20
88:14 91:7
**absorbed**  112:21
**abstained**  8:12
**abstract**  67:11
**academic**  15:23
**acampora**  3:19
30:24
**accident**  20:16
**accommodate**
23:9
**accomplish**  95:19
97:25
**accomplished**
33:16 93:6

| | 3 | 6 | |
|---|---|---|---|

**3**  3:14 37:20 92:3
106:22 108:22
**30**  9:10 73:12
**300**  3:21 4:17
26:22 41:24 43:12
122:22
**300,000**  43:12
**330**  122:21
**350,000**  31:7 36:2
**363**  13:3,16 31:18
**39.5.**  8:12

**60**  23:6 103:24
**60654**  4:18
**640**  53:23

| | | 7 | |
|---|---|---|---|

**7**  74:24 77:20
**74**  50:1

Veritext Legal Solutions
www.veritext.com

**accomplishment**
97:16 101:15
**account** 11:5,7
56:11 113:4
**accounts** 21:25
**accurate** 17:18
83:2 122:4
**accustomed** 90:9
**achieve** 28:19
**achieved** 25:16
29:2 33:14 34:14
**acknowledge** 52:3
**acquiescence**
43:14
**acquired** 27:25
28:12 37:12
**acquiring** 84:16
87:9 109:1
**acquisition** 28:18
**act** 37:19 39:17
69:18 84:23
**acting** 52:8
**action** 14:1 32:22
51:13 65:3 92:24
**actions** 73:25
74:19 80:15,15
83:15,20
**active** 9:14
**actively** 9:24 30:8
**activities** 37:14
40:1 71:16 74:10
74:25 98:5
**acts** 76:1
**actual** 27:9 56:15
66:19 67:14 75:16
85:6 90:2,7 93:15
94:14
**ad** 56:24
**add** 59:2
**added** 59:1
**addition** 16:1 25:3
28:13 68:11 84:20
86:7 90:7

**additional** 28:17
68:15 102:22
121:8
**address** 47:15,18
72:1 107:13 110:6
113:11
**addressed** 13:1
47:20 79:21 106:9
108:3 111:23
**addresses** 72:4
**addressing** 28:14
29:7 108:8
**admin** 29:13
106:7,7,13 112:17
113:6
**administered**
65:11
**administration**
38:6
**administrative**
8:20,21 36:11,13
37:23 38:4 76:10
113:10,11
**administratively**
12:15 13:13
**admission** 47:25
**admit** 48:4
**admitted** 48:6
**adopt** 60:18
**advance** 12:5
120:3
**advancing** 28:16
**adversary** 92:12
**adverse** 23:22
**advised** 41:23
**advisors** 15:5
84:15 87:7
**advisory** 118:20
**aegean** 1:7
**affect** 45:24 51:12
**affirm** 102:13
**afford** 45:25 93:2

**afternoon** 8:18
9:10 10:1 24:5
30:23 47:8 106:1
111:17 120:10
**agenda** 7:3 41:6
**agents** 84:17,18
**ago** 22:7 26:24
**agree** 14:13,15
66:3 86:10 115:7
**agreed** 7:25 11:2
21:14,15 40:19
41:24 43:11 76:9
82:4,9 104:5
105:15,17 111:3
113:17 119:10
**agreement** 14:23
15:12 16:8 43:11
43:22 44:23 54:12
54:14,15 74:6
82:7 84:24 85:2
91:24 92:2 98:13
108:10 109:8
119:3,24
**agreements** 53:7
53:10 74:3 85:17
108:17 119:11,14
119:16,18
**agrees** 92:7
**ah** 88:19
**ahead** 17:24 36:4
72:7 75:19 79:22
97:3
**airadigm** 53:22
**airlines** 83:21
**akin** 5:8 10:2
105:7 110:25
114:20
**al** 77:5
**alan** 3:17 72:1
**alexander** 3:9
**alleged** 51:23
58:25 59:4

**allegedly** 101:5
**allocation** 115:24
**allow** 28:19 57:21
74:4 96:24
**allowance** 36:11
**allowed** 13:25
37:23
**allowing** 64:5
**alluded** 15:1
**ally** 65:12,15
**alter** 10:16
**alternative** 18:7
**alternatives** 30:9
**amended** 58:23
78:2 99:21
**american** 83:21
91:14
**americas** 4:3,10
117:12
**amount** 7:21,24
8:9 9:18 11:5,21
12:2 16:7 19:14
23:3 27:9 29:4
31:9 42:22 110:9
110:11 112:12
**amounts** 7:15
22:20 26:4 27:7
28:11 29:1 99:5
104:21 116:1
**ampni** 76:13,15
119:8,15
**analogize** 107:4
**analogous** 89:18
**analogy** 89:21
**analysis** 31:10
32:15,20 33:4
**andrew** 47:15
48:5
**anomalous** 93:19
**answer** 17:19
30:15 31:19 47:23
48:13

UST-0882

| | | | |
|---|---|---|---|
| **answers** 49:4 | **appreciate** 78:10 | **approximately** | 64:2,17 75:17,17 |
| **anticipating** | 103:19 | 12:8 19:13 20:8 | **asks** 67:1 93:20 |
| 115:23 | **appreciates** 20:10 | 31:7 36:2 | **aspect** 120:4 |
| **anybody** 14:8 | 20:15 | **april** 114:12 | **aspects** 18:5 25:4 |
| 40:8 48:1,16 | **appreciation** | 116:16 118:25 | **assert** 91:15 |
| 52:22 71:3 79:23 | 67:21 | **arbiter** 60:13 | 101:24 118:13 |
| 80:21 94:17 115:2 | **approach** 49:1 | **area** 80:9 | **asserted** 51:12 |
| **anybody's** 52:21 | 53:21 58:4 99:7 | **aren't** 116:5 | 58:22 82:12 91:12 |
| **anybody's** 117:8 | **approached** | **arguably** 110:7 | 100:3 |
| **anyway** 15:22 | 104:13 | **argue** 53:17 67:7 | **asserting** 74:18 |
| 41:10 113:21 | **appropriate** | 72:15 73:4 75:11 | 82:24 |
| **apart** 48:9,10 | 10:13 11:20,24 | 97:1,6 100:22 | **assertion** 57:18 |
| **api** 83:21 | 14:4 34:14 52:23 | 102:7 115:15 | **asserts** 37:7 |
| **apparently** 26:15 | 55:17,18 69:23 | 117:18 | **assess** 96:11 |
| **appeal** 87:21 88:5 | 70:25 83:9 85:14 | **argued** 89:15 | **assessed** 101:1 |
| **appeals** 53:20 | 85:22 115:22 | 99:21 | **assessment** 69:1 |
| 58:10 88:6 | 116:13,22 | **arguing** 75:21 | **asset** 3:4,20 |
| **appear** 23:8 | **appropriately** | **argument** 38:16 | **assets** 18:8 32:9 |
| **appeared** 9:14 | 53:6 | 38:18 85:8 95:9 | 38:6 90:12,14,14 |
| **applicable** 120:5 | **approval** 16:7,16 | 100:18 113:18,19 | **associates** 26:17 |
| **application** 2:1 | 18:13 29:18,21 | **arguments** 14:13 | **association** 92:4 |
| 8:13 15:3 17:11 | 30:3,4 42:9 44:3,7 | 117:3,5 | **assume** 24:23 |
| 19:2,13 25:7,12 | 45:3,12 88:23 | **arising** 84:4 | 74:9 102:4,23 |
| 25:12 26:9 27:11 | 104:22 107:8 | **arose** 27:20 28:4 | 103:11 112:10 |
| 34:3 35:11 36:10 | 109:6 110:20 | 30:8 | 119:21 |
| 36:18 37:7 42:7 | **approve** 8:20 | **arrangement** 24:1 | **assumed** 61:24 |
| 42:16 43:2 44:19 | 36:22 37:1 40:11 | 35:7 119:6 | 69:5 119:12,17 |
| 45:6,13,19 49:9 | 40:25 42:11 45:10 | **arrived** 18:12 | **assuming** 33:13 |
| 54:3 108:1 113:21 | 60:17 86:8 102:19 | **article** 82:8 104:1 | 47:1 |
| 114:8 116:10,12 | 102:20 111:14 | 111:24 117:18 | **athens** 80:11 |
| 118:4 119:2 | **approved** 16:13 | **articulated** 57:3 | **attached** 25:7 |
| **applications** | 18:2 20:23,25 | 107:23 | 26:3 |
| 107:9 114:9,13,15 | 21:3 29:12 43:8 | **aside** 36:16 | **attempt** 24:21 |
| 114:24 116:16 | 44:4 52:4,5,20,21 | **asked** 8:16,18 | 30:15 107:4 |
| 118:25 | 53:8,20 54:2,10 | 10:15 21:16,21 | **attendant** 33:12 |
| **applied** 38:22 | 74:5 83:6,16 84:1 | 32:13 33:24 34:1 | **attention** 105:2 |
| 65:8 92:18 | 84:7 85:12,18 | 36:22 40:15 58:11 | **attentive** 54:23 |
| **applies** 110:21 | 86:6,17,21 98:6,7 | 72:17 81:17 82:23 | **attorney's** 35:19 |
| **apply** 23:22 | 103:10,10 114:25 | 86:8,22 87:15 | **attorneys** 3:4,20 |
| 113:23 | 121:6 | 90:1 92:14,15,17 | 4:2,9,16 5:2,9 |
| **applying** 68:17 | **approves** 111:6 | 93:8 94:4 | 80:6 |
| **appoint** 60:13 | **approving** 84:3 | **asking** 12:24 | **auction** 9:8 12:23 |
| | | 44:14 58:19 63:12 | 13:3,6,16,19 |

UST-0883

| | | | |
|---|---|---|---|
| 31:18 39:9 40:6,6 74:21 | 69:15 70:3 78:25 79:24 81:2 111:1 | 97:21 | 31:11,13 33:10,18 33:25 34:13,15 |
| **audit** 59:17 61:25 62:1,18,19 68:7 87:12 96:20 99:20 100:23,24 101:9 101:18 102:5 | **background** 32:23 81:19 103:25 | **barring** 62:21 95:18 98:15 | 40:8 54:1 61:11 64:10 78:25 79:20 |
| | **backup** 16:3 26:11 66:5 | **bars** 85:15 86:3 | 97:20 107:24 108:9 110:9 |
| | **bad** 67:21 69:18 | **bartels** 118:21 | 112:18 113:7 |
| **authority** 31:14 40:9 52:6,8,15,16 71:1 83:24 89:5 91:22 94:5 | **badge** 58:9 95:11 | **bartoszek** 56:7 59:8 119:12 | 115:18 116:8 120:2 |
| | **baking** 91:21 | **based** 37:2 53:6 54:22 64:4 66:25 74:2,5 83:15,18 | **believed** 59:20 |
| | **bandied** 56:8 | | **believes** 27:23 |
| **authorize** 93:13 | **bank** 87:25 88:4 91:4 111:18 117:12 | 84:23 85:16 93:9 93:15 94:16 98:5 99:22 | **belong** 89:8 92:3 |
| **authorized** 84:9 106:10 108:15 | | | **belonged** 82:25 83:7,10 |
| **authorizing** 2:5 | **bankrupt** 68:10 100:10 | **basically** 59:16 64:2,23 71:8 73:7 75:16 78:15,16 104:4 | **belongs** 89:12 92:5 |
| **available** 22:16,21 25:15,20 29:2 96:4 | **bankruptcy** 1:1 1:12,23 17:10 28:8 34:4 37:9,25 38:3 40:2 52:17 | | **belt** 57:13 |
| **avenue** 4:3,10 | | **basis** 11:22 12:9 81:18 116:6 119:19 | **ben** 4:21 47:8 103:21 |
| **avoid** 112:6 | 54:10 58:15 61:15 61:19 62:6 63:13 63:17 64:4 67:1 | **bat** 16:9 | **bench** 43:5 |
| **avoidance** 33:17 | | **bear** 40:2 45:15 81:1 | **beneficiaries** 87:2 101:19 |
| **award** 17:21 33:7 93:7 | 74:2,6,10 76:6 77:16,17 82:22 86:16 87:22 88:6 | **bearing** 21:11 67:12 | **beneficiary** 93:20 |
| **awarded** 38:15 40:10 | 88:11 89:4,6,9,11 89:15,17,22,24 | **bears** 53:13 | **benefit** 9:7 16:11 16:21 24:1,25 29:17,17 31:8 |
| **awarding** 39:12 | 90:4,9,9 92:11 93:8,22,25 94:3,6 | **beginning** 27:6 34:25 73:3 74:19 | 33:10 39:21,23 43:20 63:8 70:11 |
| **aware** 24:9 28:7 34:16 45:5 51:14 79:7 110:4 118:18 118:22 | 97:22 98:7,14,19 99:23 100:8,15,17 102:9 108:7,11,16 | **begs** 97:7 | 79:9,11 96:9,15 101:4 |
| | | **behalf** 10:3 11:23 12:1 24:13 36:6 40:16 42:17 45:7 | **benefited** 9:9 24:24,24 |
| **b** | 108:21 109:14 | 46:3 47:9 48:24 54:5,6 62:4 65:21 | **benefits** 39:5 93:10 |
| **b** 1:21 3:9 6:4,8 25:11 27:18 37:20 37:22 38:9 43:2 | **banquet** 66:4 | 72:5,9 103:21 105:7 110:25 | **benton** 89:13 |
| | **bar** 69:10 75:24 85:11 94:6 99:24 | 111:18 114:21 | **best** 17:2 84:8 |
| 44:19 82:8 102:8 106:14,19,22,22 | **baron** 47:13 48:5 56:6 59:7 69:14 | **behrmann** 88:16 | **better** 7:12 18:20 38:15 39:25 78:21 97:14 |
| 108:22,22 112:5 114:25 115:3 116:21,25 | 119:11 | **believe** 12:11 19:9 24:7 25:10,17,19 25:24 26:6,8,21 | **betters** 20:22 |
| **back** 7:10 17:16 27:14 34:20 46:15 | **baron's** 55:7 | 27:1,5,15,21,24 28:13 29:2,3 31:5 | **beyond** 52:11 66:2 69:24 116:12 |
| 48:8 55:2 59:13 62:8 64:18 66:6 | **barred** 60:22 65:9 65:18 87:18 96:2 | | |

**bid**  12:18 13:23
16:6 18:2,9,13
19:20,22 20:21,23
20:24 21:6 23:5
27:15 28:16 34:22
39:15
**bidder**  12:23
17:12,17,17,21
18:15 31:18 37:18
**bids**  12:18 18:3
**big**  8:22 32:5 70:7
70:13 88:23 110:3
**billing**  81:9
**billion**  20:3
**billions**  65:13
113:14,14
**binding**  43:7,11
81:24 86:9 90:24
**blessed**  18:4
**blocking**  47:17
**blow**  71:10
**board**  59:1,6
62:25 67:20 69:15
80:2,13,15 87:12
118:20
**boldface**  70:13
**boldness**  22:22
**bondholders**
112:11,12 113:17
**bonus**  58:8 61:2
100:19,20,25
**books**  58:1,5
**bought**  73:11
**bound**  78:17 91:4
**bowling**  1:13
**box**  49:22 54:8
82:3
**break**  41:10 50:14
80:24
**breakup**  17:1
**brian**  5:6 24:5
106:1

**bridge**  73:12
**brief**  22:11 48:25
103:22
**briefly**  79:14
**bring**  8:5 75:5
**brings**  37:20
**brink**  73:2,2
**briton**  6:12
**broad**  58:18 82:10
85:9 86:2 89:16
94:23 97:23 99:4
**broader**  54:3
93:21
**broadly**  87:3
**broke**  32:15
**brought**  17:15
22:7 61:9 75:7
105:2
**bryan**  6:11
**bryant**  5:10
**built**  114:4
**bulk**  9:22
**bunch**  13:5 61:3
**burden**  30:4
79:12 91:7
**business**  52:22
56:19,21 73:21
74:20 112:8
**businesses**  80:9
**busy**  70:8
**bylaws**  119:23
**bypass**  108:11

**c**

**c**  3:1,10 7:1 104:1
122:1,1
**caitlin**  6:10
**calculation**  33:1
**calendar**  45:20
**call**  13:3
**callaway**  89:13
**called**  52:1 53:21
115:25

**cancelled**  80:2
**capital**  2:1 95:20
95:22,25
**card**  60:14
**care**  74:14
**carve**  82:12
**carveout**  63:19
**case**  1:3 4:8 9:14
10:25 12:12 13:1
13:2,7,13 14:2,11
25:18 26:5 27:16
27:20 31:22 32:5
32:6,13,19,23
33:22 34:4,12
37:21 38:12,19
39:11 40:2 42:6,8
50:6 52:3,5,6,17
52:23 53:22 54:10
55:12,24 57:21
58:24 59:19 60:25
61:1 62:23 64:4
65:12 66:7,21,22
67:14,22 68:18
69:25 74:10,19
77:8 78:19 79:19
81:8,20 82:22
83:12,22 84:13
85:12,24,25 86:16
87:10 89:17,24
91:25 93:8 94:3
94:17 95:15,20,24
97:19 98:7,14
99:9,16,23 100:1
100:5 105:12
108:21 112:19
116:3 117:4
**caselaw**  10:14
**cases**  15:10 17:10
18:6,11 20:20
22:4,6 38:13
62:21 63:13,17
64:4 66:16 68:6
72:16 81:11 84:24

86:24 88:8 92:19
94:12 95:9 96:10
96:18 101:12
113:2
**cash**  7:20 8:1 11:3
18:23 29:25
**categories**  32:16
**cautioned**  97:22
104:10
**cautions**  88:13
**caveat**  51:1
**cede**  48:8 103:22
**center**  3:14 73:19
**certain**  2:5 18:5
40:1 47:21 81:17
82:4,12 83:24
86:8,23 99:22
104:12 112:2
**certainly**  10:21
11:6,17 20:20
24:22 25:20 30:11
32:12 34:9,12
41:18 42:6,15,16
43:20 46:23 54:23
71:13 78:7 85:10
99:2 103:1,14
110:13
**certainty**  74:24
**certification**
47:12
**certified**  122:3
**cetera**  87:7
**challenges**  66:23
101:10
**challenging**  68:1
**chance**  32:12
40:14
**change**  28:7
102:12 111:14
**changes**  103:9
**channeled**  76:17
**chapter**  49:16
53:1 73:13 74:24

UST-0885

| | | | |
|---|---|---|---|
| 77:18,20 81:14 | city 91:5 92:4 | 82:9,13,13,15,16 | closing 33:12 |
| 84:23 94:19 | claim 10:5 12:19 | 82:21,24 83:7,10 | closure 65:24 |
| **characterization** | 13:18,25 27:25 | 83:14 84:11 85:5 | cloud 22:21 |
| 17:18 83:3 | 36:8,11 37:8,10 | 85:15 86:3,3,11 | code 25:13 37:9 |
| **characterized** | 37:11,13,16,18,19 | 86:12,13,13,18,22 | 37:25 93:25 94:6 |
| 104:15 109:8 | 39:12,15 40:10 | 86:25 87:16,20 | 102:9 108:11,12 |
| **charges** 113:4 | 53:6 55:19,25 | 89:6,7 90:21,21 | 108:16 |
| **charging** 73:18 | 57:1 58:12,13,14 | 91:15,20 92:2,23 | coffers 56:12 |
| 112:25 | 59:22 60:1,2,3,4 | 92:25 93:11,24 | coin 70:12 |
| **chase** 91:4 | 60:21,24 61:9 | 94:6,21,22 95:22 | collapse 73:2,8 |
| **checked** 49:22 | 62:21 64:10,11 | 95:23,25 96:1,5,8 | colleagues 54:2 |
| 54:7 | 67:12,13,16 74:5 | 96:11,12,23,25 | collectability |
| **checking** 82:2 | 75:18 76:2,7,12 | 97:1,2,5,20 98:1,5 | 23:18 |
| **chicago** 4:18 | 82:11 90:2,6,16 | 98:9,10,15,16 | collective 81:9 |
| **choose** 116:24 | 91:11,17,18 92:5 | 99:10,12,17,22 | come 14:23 15:7 |
| **church** 93:17 | 92:21,25 94:24 | 100:3,7,12,15,16 | 22:16 31:6,19 |
| **circuit** 38:19 | 95:2,2,18 97:11 | 101:2,14,25 102:2 | 33:24 34:6 44:12 |
| 53:20 83:8 84:2 | 98:16 112:16 | 102:5,7,17 104:15 | 45:6 46:15 53:14 |
| 87:21 88:3,4,6,9 | 113:6,10,11,16 | 106:6,8,12 108:15 | 59:6,13 68:18 |
| 88:16,17,19,20 | **claimant** 55:23 | 113:3 | 99:6 |
| 94:11 | 93:5,14 | clarified 20:7 | comes 18:1 33:1 |
| **circular** 70:8 | **claimants** 88:18 | clarify 111:1 | 60:15 64:22 |
| **circulated** 44:22 | 92:10 96:10,15 | clarity 34:20 | comfort 57:15 |
| **circumstance** | 102:2,9 | class 8:6 9:21 | 68:15 97:12 105:8 |
| 13:17 79:18 106:9 | **claims** 8:8 11:7 | 31:10 50:11,12 | comfortable |
| 107:5 108:5 | 23:16 28:19 33:17 | 59:12 88:18 | 24:10 |
| **circumstances** | 36:13,17 38:11 | classes 49:14 | coming 9:1 14:19 |
| 13:2,15 27:14,17 | 50:19 51:12,17,18 | clawback 120:4 | 31:7 43:19 79:9 |
| 28:3 31:24 33:8 | 51:18,19,24 54:8 | clean 81:4 | 79:11 110:15 |
| 38:11,14 40:9 | 54:9 55:13 56:14 | clear 39:18 43:10 | commanded |
| 42:14 55:17,18 | 56:14,18 57:1,9 | 68:21,22 90:19 | 94:10 |
| 57:11 61:18 62:6 | 58:18,21,23 59:11 | 102:16 114:21 | commands 99:7 |
| 66:7 71:2 72:12 | 60:16 61:17 63:9 | 117:22 118:1 | commenced 13:8 |
| 72:16 79:3,7 95:7 | 63:14,25 64:6 | clearly 31:3,11 | 17:6 |
| 106:20 108:8,19 | 65:3,7,9,14,14,16 | 65:14 70:1 79:2 | commencement |
| 115:18 | 65:18,18,21,23 | 98:24 | 92:12,24 |
| **citation** 81:8 | 66:10,25 69:2,3 | cleveland 92:4 | commentary |
| **citations** 81:6,7 | 69:10 71:16,20 | client 34:10 | 105:8 |
| 81:12 87:24 | 72:23 73:23,23,24 | 117:14 | comments 41:5 |
| **cite** 101:12 117:21 | 74:12,13,15,16,17 | client's 42:17 | commercial 7:6 |
| **cited** 40:8 65:12 | 74:24 75:5,6,10 | close 32:19 68:18 | 74:10 |
| 69:7 95:10,21 | 75:12 76:16,19,21 | 71:14 | commission 3:13 |
| 98:12 | 77:22,24 79:8 | | 81:15 |

UST-0886

**[commitment - context]**

| | | | |
|---|---|---|---|
| **commitment** 29:14 | **company's** 98:20 | **condition** 16:17 | **consent** 70:7 |
| **commitments** 77:1 | **compared** 18:6 | **conditioned** 16:15 42:24 | 86:25 87:19,20 91:22,23 |
| **committed** 62:18 | **compensate** 55:10 | **conditions** 112:3 | **consented** 82:6 |
| **committee** 5:9 | **compensated** | **conduct** 59:20 | **consequences** |
| 10:3 12:1,5,6 15:4 | 106:10,21 108:9 | 64:4 92:17 | 18:4 |
| 19:7,20,24 21:23 | **compensating** | **conducting** 59:9 | **consider** 36:25 |
| 24:17 25:10 26:24 | 66:9 | **confer** 32:12 41:3 | 68:22 71:14 99:9 |
| 28:23 29:5,7,15 | **compensation** 2:1 | 90:20 | 118:5,8,9 |
| 29:18,22 30:5,8 | 37:15 38:23 39:23 | **conferred** 34:10 | **consideration** |
| 34:11 46:17 48:11 | 55:24 58:14 61:12 | 42:5 | 32:21 |
| 50:22 59:17 61:25 | 93:14,16 108:20 | **confined** 18:5 | **considered** 106:7 |
| 62:2,18,20 64:8 | **compete** 18:8,9 | **confirm** 81:14 | **considering** 15:11 |
| 74:18 84:15 87:12 | **competing** 20:12 | 103:2,10 | **consisting** 36:16 |
| 88:1 96:21 99:20 | 39:2,5,8,9,9,11,14 | **confirmation** 2:8 | **consists** 118:21 |
| 100:23,24 101:9 | 39:15 40:3,4,5 | 7:3 8:19 11:17,19 | **conspicuously** |
| 101:18 102:5 | **competition** 16:10 | 31:14 33:13 42:8 | 70:13 |
| 104:2,6,16 105:7 | **competitive** 25:2 | 43:1 44:20,21 | **constituencies** |
| 106:9,12,20 | 27:15 | 45:24 46:9,11,20 | 14:23 21:9 |
| 107:18 108:6,20 | **complaint** 58:23 | 48:12 49:15 70:16 | **constituency** |
| 109:9 110:9 111:5 | **complete** 26:9 | 84:5 103:9,11 | 56:10 |
| 114:20,22 117:25 | 42:12 46:24 81:10 | **confirmed** 102:24 | **constitute** 100:16 |
| 118:17 | **completely** 18:10 | 103:1 | **constituted** 85:6 |
| **committee's** 24:15 | 54:22 72:10 73:24 | **confirming** 83:9 | **constitutes** 10:11 |
| 29:9 | **comply** 106:13 | 91:21,23 | 11:3 |
| **committees** 68:7 | 116:10 | **conjunction** 17:5 | **construct** 33:6 |
| **common** 13:23 | **compressed** 22:24 | **conjure** 66:10 | 44:19 |
| **communicate** | **comprised** 56:24 | **connected** 16:24 | **constructive** |
| 29:5 | **compromise** 37:2 | **connection** 11:19 | 41:17 |
| **communicated** | **concede** 112:8 | 37:13 65:16 71:15 | **contacted** 28:23 |
| 15:17 | **conceding** 114:25 | 72:24 82:5 84:4 | **contemplate** |
| **communications** | **concept** 72:12,25 | 85:3 96:12 | 114:6 |
| 84:2 | **concern** 77:25 | **conscious** 70:10 | **contemplates** |
| **companies** 56:20 | 78:24 106:4 | **consensual** 49:12 | 77:18 109:18 |
| 61:14 100:10,10 | 109:25 111:22 | 51:5,7 63:19 | **contends** 37:12 |
| **company** 22:21 | **concerned** 26:20 | 70:17,17 78:14,20 | **contention** 94:16 |
| 22:22 23:14 49:18 | 73:24 79:17 | 81:18,22,22,23 | 118:9 |
| 59:3 62:10,11 | **concerning** 10:8 | 82:19 85:25 86:8 | **contest** 53:3 |
| 68:9 73:1,8,10,13 | **concerns** 24:11 | 87:5 102:19 121:6 | **context** 11:17 |
| 91:21 95:23 | 77:7,7 106:11 | **consensually** | 18:21 31:14 40:11 |
| 100:17 117:12 | 107:6 112:18 | 98:10 | 65:9 88:24 90:11 |
| | **concluded** 120:14 | **consensus** 70:15 | 96:2 103:24 105:9 |
| | **conclusion** 100:2 | | 105:11 109:9 |

UST-0887

| | | | |
|---|---|---|---|
| 110:10 | **conversations** | 17:19,24 18:2,13 | 91:19,21,22 92:1 |
| **contexts** 90:18 | 19:5,6,7,8,11,24 | 18:25 19:5,10,18 | 92:5,14,15,16,22 |
| **contingency** 44:4 | 24:19 43:24 | 19:22 20:3,6,19 | 93:3,7,18 95:8 |
| **contingent** 44:3,6 | **convertible** 77:12 | 21:15 22:9,13 | 96:2,6 97:17 |
| **continue** 7:6,7 | **converting** 18:18 | 24:11 25:11,21 | 103:8,17 104:19 |
| 75:8 | **coordinate** 41:19 | 26:10,11,23 27:3 | 105:5,25 106:16 |
| **continued** 15:2 | **copeland** 6:5 | 27:17 28:21 29:21 | 106:18,24 107:1,7 |
| **continuing** 15:18 | **corning** 88:18 | 30:17,19,22 31:25 | 107:8,12 108:3,7 |
| **contract** 85:1 | 99:16 | 32:4,6 34:18 | 108:24 109:4,14 |
| **contracts** 85:11 | **corp** 83:8,20,21 | 35:10 40:10 41:4 | 109:16,20 110:2 |
| **contractual** | 88:18 | 41:7,9,13,15 42:9 | 110:12,14,23 |
| 108:17 | **corporate** 80:16 | 42:21 43:3,19,21 | 111:10 112:13,22 |
| **contradicts** 113:7 | **correct** 10:6 12:7 | 44:2,11,14,24 | 113:18 114:6,14 |
| **contrary** 117:23 | 40:7 42:25 50:23 | 45:18,21 46:5,19 | 114:17 115:6,12 |
| **contravene** | 51:21 77:9 106:3 | 47:4,7,24 48:9,14 | 115:21 116:4 |
| 108:10 | 109:3 120:1 | 48:19 49:2,7,12 | 117:1,7,20,21,25 |
| **contribute** 65:21 | **corrected** 20:1 | 49:20 50:13,21 | 118:3,14,18,22,24 |
| 96:9 | **correctly** 108:25 | 51:3,6,9,16,25 | 119:20,25 120:6,9 |
| **contributed** 76:15 | **cost** 9:17 11:9 | 52:9 53:8,12,20 | 120:11 |
| **contribution** 7:8 | 75:7 | 54:5,17 55:9,18 | **court's** 25:22 52:6 |
| 10:5 12:11,19 | **costs** 33:11 51:10 | 55:22 56:4,13,25 | 68:22 83:24 84:12 |
| 13:18,24 17:11,21 | **could've** 14:3 24:8 | 57:4,7 58:2,4,7 | 89:19 90:4 91:24 |
| 19:2 24:12,16 | **counsel** 12:4,7 | 59:14,16 60:1,9 | **courtroom** 31:21 |
| 25:5,12,16 27:18 | 16:6 19:7 26:2 | 60:11 61:14,23 | 43:13,16 46:6 |
| 28:16 29:11 35:11 | 27:22 29:7 30:24 | 62:3,14,17 63:2,5 | 47:22 48:22 49:10 |
| 36:12 37:8,10,11 | 34:11 112:20 | 63:8,11,17,21,23 | 56:7 |
| 37:16,17 38:12,15 | **counsels** 19:7 | 64:2,13,24 65:2,7 | **courts** 23:22 |
| 39:14 40:10 55:6 | **country** 122:21 | 66:14,18 67:4,10 | 58:10 87:21,22 |
| 55:11 58:12 60:7 | **couple** 7:18 54:20 | 68:7 69:6,9 70:22 | 88:5,6,11,12 89:3 |
| 67:8,12 79:10 | 56:2 | 71:5,13,25 72:2,3 | 89:15,22 96:10 |
| 93:9 94:17 95:12 | **course** 9:10 10:6,7 | 72:5,7,17 73:14 | 97:22 101:11,22 |
| 106:14,23 107:5 | 13:16 32:14 39:11 | 73:18 74:1 75:9 | **court's** 104:12 |
| 107:11,16,24,25 | 41:12 43:24 52:17 | 75:14,23 76:5,11 | 109:24 |
| 108:23 115:21,24 | 53:11 54:10,25 | 77:3 78:4,7,22 | **cover** 27:3 30:5 |
| 116:5,11 117:6,19 | 55:11 62:7,20 | 79:23 80:21,25 | 53:4 82:11 86:1 |
| **contributions** | 64:20 68:5 77:6 | 82:22 83:6,13,15 | **covers** 98:6 |
| 24:20 65:17 68:25 | 85:12 98:7 118:13 | 83:16,19,25,25 | **crazy** 71:21,22,24 |
| 95:4 96:13,14 | **court** 1:1,12 7:11 | 84:1,7 85:12,18 | **create** 75:1,2 |
| 99:13 | 7:14 8:13 10:18 | 86:16,21 87:15 | 104:9 |
| **control** 56:12 | 10:22 11:12,22 | 88:6 89:1,4,6,9,11 | **created** 17:6,7 |
| **controversy** 75:16 | 12:17,22 13:21 | 89:14 90:1,6,7,9 | 69:17 85:2 |
| **conversation** 26:1 | 14:7,15 15:10,15 | 90:18,21,23,24 | **creation** 21:7 |
| 29:6 55:3 | 16:2,15,19 17:9 | 91:3,5,6,16,17,18 | |

| credit 28:18 84:18 | d | debtor's 72:14 | declarants 48:2 |
|---|---|---|---|
| 87:8 | d 7:1 108:22 | 89:5 90:16 | declaration 47:11 |
| creditor 21:23 | 121:1 | debtors 4:16,16 | 47:13,15,19 55:8 |
| 27:19 28:19 37:10 | d&o 77:15,21 | 17:2 19:8 24:17 | 92:16 |
| 37:12,17,19 38:12 | dag 33:1 | 25:10 28:23 34:22 | declarations |
| 49:13 87:16 89:12 | darndest 39:19 | 34:24 38:8 46:3 | 46:21 47:6,10,25 |
| 105:14 | data 12:14 | 47:9 48:24 50:1 | 48:3,4,5 78:15 |
| creditor's 27:20 | date 19:14 22:5 | 50:19 51:11 54:8 | declaratory 75:14 |
| 37:14 | 26:23 28:25 73:4 | 56:14,25 61:3,24 | decline 45:9 |
| creditors 7:20 8:6 | 73:5 114:3,7,11 | 66:20 69:4 76:1,3 | decree 91:4 |
| 8:15 9:21 10:22 | 116:23 117:10 | 81:3,13,17,21 | defendants |
| 11:4,6 12:11,13 | 122:25 | 82:9,11,15,21,23 | 102:14 |
| 14:20,25 15:5 | davis 118:21 | 83:1,6,7,10,11 | defer 53:24 54:3 |
| 17:8 18:21 21:25 | day 13:8 23:6,19 | 84:14 86:3,8,11 | 115:10 |
| 24:25 29:18 33:16 | 31:5 66:6 111:11 | 86:12,14,20,24 | deferring 33:12 |
| 35:3,21 36:14,16 | days 8:4 13:4 | 87:4,5,8,12,15,18 | defined 38:1 |
| 36:19,23 37:3 | 107:18 | 87:23 90:12,14 | 82:13 |
| 44:8 45:5 49:21 | days' 107:19 | 93:23 94:5 97:19 | definitely 25:21 |
| 56:19,23 62:15 | de 66:11 | 97:19 98:4,12,14 | definition 84:13 |
| 65:15 74:22 81:25 | deal 15:16 17:3 | 99:21 100:22 | 89:8 97:10 |
| 82:1,17 83:10 | 21:3 26:21 35:25 | 101:1 102:6,6,7 | delay 9:17 33:12 |
| 86:2,19,23 88:1 | 39:20 40:20 41:22 | 102:12,25 103:22 | 43:1 |
| 90:10 98:10,18 | 42:21,23 43:4,17 | 104:6 105:1 112:1 | delivered 49:15 |
| 112:23 | 43:17,19 44:3,6,7 | 119:9,10,11 | delta 83:21 |
| creditors' 5:9 | 45:1 88:23 110:3 | december 24:16 | demand 39:14 |
| criteria 25:16 | 110:6 112:9,11 | 26:25 27:1,4 | demean 101:8 |
| 58:10 65:8 106:21 | 113:17 | decide 10:19 45:2 | demonstrated |
| 110:21 | deals 98:2 | 75:17 96:13 | 97:24 |
| critical 9:13 | dealt 46:10 | decided 11:22 | denied 25:22 42:8 |
| cross 48:2 | 116:19 | 45:8 50:4 52:23 | 43:2 45:3,4 |
| crossed 111:15 | debtholders 8:4 | deciding 36:25 | 102:22 121:9 |
| cul 66:11 | 50:6 | decision 12:1 | denigrate 39:2 |
| culminated 14:22 | debtor 1:9 16:8 | 38:17 64:6 70:10 | denman 4:13 |
| 43:25 | 16:14 38:5 39:8 | 83:9 84:2 88:4,10 | 14:10,11,17 15:14 |
| curchack 111:17 | 40:3 51:4,16,19 | 88:16,18,19,20 | 15:17 16:12,18,23 |
| 111:18 113:9,24 | 51:22 56:13 64:7 | 89:14 90:23 91:5 | 17:13,22,25 19:3 |
| 114:9 116:7 | 66:22 74:1,8,15 | 91:21 92:5 93:4 | 19:6,12,21,23 |
| current 27:12 | 76:18 78:1 84:16 | 93:18 94:15 | 20:5,7 21:5,22 |
| 59:1 87:4 | 87:10 89:6 90:17 | 111:11 | 34:19 41:16 43:10 |
| customary 34:3 | 93:6 94:7 96:3 | decisions 35:15 | 43:14,17,23 44:9 |
| | 101:19 107:15,21 | 83:6 | 44:13,16 |
| | 111:25 119:9 | deck 48:25 | deny 42:9 |

**department** 5:1
**depended** 96:18
**deposition** 90:11
**deprived** 102:11
**depriving** 8:25
**derivative** 51:18
54:9 74:15 82:16
86:3,13 98:16
**describe** 23:2
**described** 55:10
83:1,5 85:21 87:3
94:8 102:21
**describes** 90:3
**design** 20:18
**designed** 106:5
**desire** 35:15 48:3
49:23
**desires** 23:9
**destroy** 69:17
**detail** 26:5 47:1
55:7
**detailed** 33:23
81:11
**details** 26:9
**determination**
42:15 55:25 96:3
116:1
**determinations**
84:12
**determine** 75:13
96:17
**determined** 85:5
**determines** 93:7
**deutsche** 117:12
**development**
80:16
**devote** 22:23
**devoted** 22:24
62:10
**devotion** 69:24
**dialogue** 15:3
19:4

**dibattista** 6:3
**dictate** 91:19
**didn't** 117:21
118:10
**difference** 18:1
62:4
**different** 13:19
18:10 23:5 26:1
30:7 34:6 58:10
61:18 72:12 89:2
108:5 110:18
117:17 118:8
**differently** 14:3
52:2,13
**difficult** 20:18
61:15 100:11
**digital** 93:3
**diligence** 22:20
**diligently** 80:6,18
**dime** 77:14
**diminution** 9:20
**dimitris** 80:6
**dip** 16:13 17:5
19:15 24:22 28:1
29:16,19 30:3,9
32:24 33:9 84:17
84:17
**direct** 51:23,23
55:13 58:23 65:3
65:16 74:13,17,24
76:2 77:22 86:22
96:7,12 103:23
**directly** 15:4 31:7
35:16 38:5 73:24
86:19 93:11 102:3
109:11
**director** 62:8
80:16
**directors** 50:22
51:1 58:22 59:1,3
61:14 62:10 63:12
66:23 78:14 80:3
80:13,15 81:21

87:13 93:24 99:25
100:5,9,18,22
101:23,24 102:3
102:15
**disagree** 14:17
88:24
**discharge** 63:14
63:24
**dischargeable**
94:1
**disclose** 27:17
115:1
**disclosed** 59:7,8
**disclosure** 15:2
28:5,11 78:1
84:24 85:3
**discovery** 75:4
93:1
**discredit** 72:11
**discuss** 15:23,25
41:19
**discussed** 18:3
**discussion** 14:24
15:6 39:21 41:20
70:4
**discussions** 7:6
14:22 17:6 22:6
105:13
**dispense** 49:5
104:22
**disposable** 28:6
**disposal** 10:8
**dispose** 89:6 92:2
100:12
**disposition** 28:18
83:6 90:12,13
**dispute** 15:18,19
27:24 45:23
107:10 109:15
115:20
**disputes** 81:1
**distinct** 62:7

**distinguish** 13:16
66:7
**distinguishable**
105:20
**distressed** 49:17
**distribution** 11:4
18:24 33:16 114:2
114:2
**district** 1:2 26:20
79:20
**diversified** 88:3
**diverted** 23:14
**divide** 31:8
**dividend** 59:12
**docket** 47:11,13
47:16,20
**document** 85:2
**documentation**
20:13
**doesn't** 113:11
**dog** 117:9
**doing** 33:11 39:19
58:9 61:17 70:22
71:2 95:14,14
97:3 119:2
**dollar** 7:23 8:9
26:3 27:9 29:1
31:9 34:5
**dollars** 8:22 9:10
9:22 23:14 33:17
65:13,23 113:14
**domain** 93:13
**donald** 119:12
**don't** 113:19,21
115:24 116:7
117:4,7,8 120:2,8
**doubt** 17:4 70:11
101:9
**dow** 88:18 99:16
**doyle** 3:10 72:4,5
72:8,9,22 73:17
73:20 74:13 75:11
75:21,25 76:8,13

UST-0890

77:4 103:5 110:24
110:25 119:5,22
**draft** 44:21
**draftsmanship**
53:3
**drawn** 33:9
**drive** 12:18
**driving** 25:1
**drop** 15:13,15,16
**due** 11:14 70:21
78:23 90:19 92:10
93:6,14 109:25
**dynamic** 22:17

**e**

**e** 1:21,21,22 3:1,1
7:1,1 121:1 122:1
**earlier** 43:6 85:14
95:10
**earn** 80:5,14
**earned** 24:3 64:14
65:25 69:21 94:17
100:7,23 101:20
**earth** 16:21 54:17
74:8
**easier** 46:5
**easiest** 116:15
**easily** 61:10
**eat** 9:18
**echo** 77:6
**economic** 14:22
21:11 28:6 40:1
72:20 113:17
**economically** 22:1
**economy** 80:8,8
**ecro** 1:25
**effect** 36:7 37:21
44:2 82:16 88:13
93:5 98:15 112:22
**effective** 79:15
114:3,6,11 117:10
**effectively** 24:8
74:20 76:19 79:21
84:11

**effort** 28:22 73:9
78:21
**efforts** 30:13
68:15
**either** 49:21 94:3
**elected** 82:2
102:12
**element** 46:23
66:12
**elements** 46:13
**elevate** 113:10
**elevated** 106:13
**elevating** 106:6
113:5
**ellis** 4:15 33:25
34:13 47:9
**embodied** 42:16
44:21 105:15
**emergence** 75:8
**emerging** 100:17
**eminent** 93:13
**emphasize** 22:15
22:19
**employee** 119:14
**employees** 84:15
**employment**
119:14,16,18,24
**enable** 97:21
**encompass** 86:18
**encourage** 39:13
119:1
**endorsed** 35:25
106:8
**endorsement** 15:6
**endorsing** 40:20
**energy** 22:24
**enforce** 45:2
82:23
**enforceable** 45:1
**enforced** 108:17
**enforcement** 21:9
23:17 85:11

**engage** 75:4
**engaged** 9:14
34:11 71:16
**english** 93:17
**enhancement**
23:4
**enjoin** 83:9 92:17
**enjoined** 87:19
92:21
**enormous** 74:21
74:22
**enter** 91:22
**entered** 85:2,11
**entire** 34:8 44:20
**entirely** 28:24
**entirety** 45:12
**entities** 61:21
87:17 98:18
100:21
**entitle** 74:11
**entitled** 63:15
69:19 81:25 83:19
91:7 100:20
101:13
**entitlement** 27:18
69:20
**entitles** 39:23
**entity** 84:3 119:15
**entries** 27:3,5
28:22 32:21,21,22
34:23
**entry** 32:24
**envisioned** 61:10
**epitomizes** 49:16
**equity** 50:7,12
59:12 76:24 80:1
**especially** 62:22
76:21
**essence** 23:20
32:18
**essential** 57:9,22
57:24 59:23 60:3
64:22 69:9,11,14

71:9 73:7 94:12
97:11
**essentially** 7:25
16:8 28:5 30:4
77:14 78:11 96:1
100:24 106:5,9
108:11 109:8,14
114:24
**established** 24:13
25:5
**estate** 12:14 16:11
16:22 38:7,24
39:17 52:7 53:19
60:8 75:11,12
79:3 82:25 84:8
85:20 89:7,9
108:25 109:11
**estates** 17:7 18:17
21:8 77:2
**et** 87:7
**etkin** 4:6
**evaluate** 25:15,22
61:7
**evangelical** 93:17
**event** 7:3
**events** 86:20
99:22
**everybody** 23:6
33:4 39:13 50:14
54:6,14 66:21,22
67:1 115:1
**everybody's**
115:13 118:14
**evidence** 46:21
47:6,14 48:1,6
70:18 96:24
**evidentiary** 47:16
**exact** 108:7
**exactly** 30:6 39:7
39:22 46:7 58:19
63:2
**examine** 48:2

[example - fielder]                                                    Page 12

**example**  16:5 25:6
  83:7 85:10 90:23
  93:17,22 95:21
  99:16 102:4
**examples**  12:21
  56:3
**excellent**  47:3
**exception**  38:8,20
  38:22 63:23 80:18
  101:10
**exceptions**  38:9
**exchange**  3:13
  69:23 76:8,12
  81:15
**excluding**  38:1
**exclusion**  85:4
**exclusive**  38:1,14
**exclusivity**  98:13
**exculpated**  53:9
  84:3,14,21 85:16
**exculpation**  46:16
  48:10,25 52:1,11
  52:12,19,25 53:5
  53:15,22 54:9
  83:13,17,23 84:20
  85:10,15,21 86:4
  98:6 102:21
**exculpation's**
  55:10
**exculpations**  74:7
**excuse**  85:25 89:7
  100:16
**execute**  20:12
**execution**  53:7
  85:16
**executive**  80:10
**exemptions**  28:10
**exercise**  9:16
  70:25 89:18 90:1
  112:7 114:3
**exercising**  71:1
**exhaustive**  34:8
  34:17 68:23

**exhaustively**  35:6
**exist**  113:5
**existence**  67:15
**exists**  90:2
**exit**  67:24
**expect**  11:6 21:10
  48:20 78:18 116:9
**expense**  8:20,21
  9:17 20:24 29:13
  36:11,13 60:15
  106:13 112:17
  113:6
**expenses**  21:1,2,4
  37:23 38:4,4,20
  40:2 45:14 48:11
  76:10 104:2 106:7
**explain**  95:1
**explaining**  94:21
**explanation**  57:15
**extension**  26:4
  29:1
**extensive**  19:3
**extent**  16:13
  21:16 22:5 35:2,6
  35:8 37:7 40:14
  40:24 45:9,13,22
  50:16 51:17 52:5
  52:10 68:5 74:17
  83:17 85:9 101:20
  102:15 105:1
  109:15 112:15
  115:2,8,17 116:17
  116:20 119:20
**extinguish**  86:22
**extinguished**  95:3
**extinguishes**
  90:16
**extinguishing**
  95:1
**extraordinarily**
  8:9
**extraordinary**
  66:23 69:1 77:8

  79:3,13 89:1 94:9
  94:12 101:10
**extreme**  71:1
**extremely**  13:8,9
  58:17

                f

**f**  1:21 122:1
**f.3d**  53:22
**face**  61:15 75:8
**faced**  101:10
**facilitate**  9:5
**facility**  80:10
  84:18
**facing**  79:8
**fact**  8:3 10:11
  12:3 21:13,14
  24:24 28:10 29:6
  29:11 33:9 39:20
  52:14,20 53:2
  73:21 77:18 79:4
  92:8 93:7 107:11
  119:16
**factor**  25:1 67:10
  67:11 70:1
**factors**  31:4 68:20
  68:21,22 69:7
  99:12
**facts**  13:1 31:23
  33:8 42:14 64:10
  99:18
**factual**  46:22
  57:20,20
**fails**  69:12
**failure**  99:18
**fair**  9:11 12:25
  33:6 34:15 55:25
  57:16 60:23 61:6
  65:10 69:1 78:18
  95:2
**fairly**  52:4 58:13
**fairness**  99:14
**fairway**  54:21
  58:9 95:9

**faith**  50:3
**faithful**  54:24
**fall**  23:21 30:4
  71:6
**falls**  112:18
**far**  23:5,21 26:19
  116:12
**fashion**  11:18
**fast**  14:1
**favor**  8:7 49:15,21
  49:22 54:6 70:21
  82:1 87:5 93:6
**fcc**  84:2
**feasible**  114:10
**feature**  95:19
**federal**  59:21
  92:11
**fee**  17:1 26:9,11
  27:10 34:3 46:17
  49:9 113:14
  114:24 118:25
**feel**  24:2,10 30:12
  97:14 111:20
**fees**  12:3,8,24
  16:4 19:2,10
  25:23 35:19 104:2
  105:12,18 107:22
  109:10,12 110:7,8
  111:5 112:2,8,24
  113:5 115:1,1
  116:1,20,24
**feld**  5:8 10:2 88:2
**fiber**  88:9
**fidelity**  42:12
**fiduciaries**  52:7
  52:11,15 53:19
  54:1 64:18 65:21
  65:25 75:12 83:14
  83:19,25 85:20
**fiduciary**  16:24
  38:24 52:8 69:18
**fielder**  66:5

UST-0892

**fifth** 88:3
**fight** 75:5,6
**fighting** 39:22
**figures** 26:3
**figuring** 74:7
**file** 70:8 78:22
  108:2 110:16
  114:24 115:6
  116:15 118:11
**filed** 2:3,10 15:3
  42:17 58:23 63:13
  78:2,15 81:15
  82:17 94:3 107:14
  112:16
**filing** 93:22
  115:25
**final** 20:12 38:17
  49:9 66:4 85:5
  87:25
**finality** 65:24
  69:23
**finally** 47:19 92:8
  101:22
**financial** 3:14
  29:17 58:25,25
  77:1
**financially** 24:23
**financing** 16:8
  28:1 29:16 39:8
  40:4,5 73:7 87:10
**find** 113:22
  118:11
**finds** 103:25
**fine** 35:14 40:19
  103:6
**fingers** 111:15
**firefighter** 73:18
**firefighters** 92:4
**first** 7:3,16 14:14
  14:18 16:12 19:19
  28:23 33:21 34:20
  34:21 52:3 54:19
  55:15 81:23 88:4

89:22 93:17 105:5
**five** 80:22 88:18
  107:18,19
**fix** 103:12
**fixed** 36:15
**flip** 70:12
**floating** 103:16
**focus** 53:17
**focuses** 52:6
**folks** 9:9 31:21
  32:13 34:12 42:6
  103:2
**follow** 32:14
  100:9
**following** 81:24
**forbid** 67:7
**force** 91:19
**foreclose** 39:21
  59:23,24 60:5
**foreclosed** 16:9,14
  38:18
**foregoing** 86:7
  122:3
**forgiven** 53:9
**forgot** 103:17,18
**forgotten** 120:7
**form** 35:4 50:16
**formal** 90:22
  92:12,21,24
**format** 33:24,25
  34:7
**former** 51:1 59:18
  62:17,22,24 63:4
**forth** 34:20 81:2
  105:21 108:12
  111:2
**forum** 41:20
**forward** 16:19
  19:25 23:10,11
  42:25 44:20 103:6
  105:3 119:18
**foundation** 88:15
  88:17

**four** 47:10,25
**fours** 31:23
**fourth** 88:16,17
  88:20
**framework** 18:10
**frankly** 20:9
  22:22 35:13 36:3
  57:23 58:5 66:11
  68:11 95:6 99:4
  100:8 112:6
  113:24
**fraud** 59:5 62:19
  85:6
**free** 37:6 93:23
**freed** 96:7 100:7
**freeing** 71:21
**frequently** 88:22
**friday** 78:15
  114:23 115:7
  116:10,16 118:4
**friedman** 3:24
  30:21,23,23 32:2
  32:5,8
**frivolous** 75:5
**front** 7:12 8:21
  12:23 16:5 32:6
  39:18 75:15 89:20
  91:10 100:2 120:4
**full** 18:22 31:21
  56:21 69:23,24
  70:21 76:19,22
  77:13 98:19 108:1
  114:2 120:10
**fully** 33:9 55:10
**fulsome** 33:5
**fund** 31:8 88:16
**fundamental** 18:1
**fundamentally**
  21:6
**funded** 23:15
  62:13 84:4
**funds** 29:14 96:4

**further** 15:23
  16:9 30:16 39:21
  54:25 55:12 119:4

**g**

**g** 7:1
**gates** 80:7
**gene** 118:21
**general** 7:20
  58:19 85:4 89:11
  97:23
**generally** 61:21
  84:21 90:3
**generation** 21:7
**generic** 32:23
**generously** 53:1
**gentlemen** 59:2
  61:11 62:9,25
  67:20
**getting** 13:10
  18:21 32:23 42:24
  55:24 58:14 60:24
  62:11 65:10 77:10
  77:14 78:20 97:12
  99:11 101:4
**give** 11:13 21:4
  30:10,11 56:2
  57:14 61:2 63:12
  63:13,14 64:2,3
  70:11,14 71:19
  80:22,23 82:4,6
  90:6,21 99:5,24
  105:16 117:17
**given** 11:1,10,20
  12:10,19 14:1
  15:21 31:23 33:8
  34:20 40:14 42:2
  42:14 74:7 81:9
  97:9 98:14 100:25
  116:2
**gives** 50:2 89:22
  104:3
**giving** 63:9 79:11
  90:10 94:6 96:15

**glad** 17:14
**global** 44:18
**glossed** 77:25
**go** 9:16 16:19
17:16,24 35:20
36:4 46:13,23
52:11 55:12 64:18
69:15 70:3 72:7
75:19 76:4 77:15
77:21 79:1,4
80:17 97:2 103:6
105:5 119:18
**god** 67:7
**goes** 112:11
116:12
**going** 7:10 9:3
11:7 12:2 21:11
23:21 27:14 29:25
37:18 41:18 44:24
45:24 56:18 59:13
62:6 66:1 69:3,15
70:5,6,9,11 71:10
73:22 74:3 76:24
78:25 79:2,4,8,12
80:2 81:1 104:15
104:16 107:2
112:9 118:3
**gold** 60:14 95:13
**good** 10:1 24:5
30:23 47:8 57:4
61:2 71:23 95:14
99:6 101:7 103:8
106:1 111:17
**gotten** 17:20 21:2
76:12,13,15 77:15
77:20
**governed** 111:11
111:12
**governing** 68:18
99:9
**government** 91:23
**governmental**
63:18,25

**grand** 19:17 20:8
**grant** 82:3 87:22
103:4
**granted** 8:14
95:18 98:21
**granting** 2:6
49:22
**gratitude** 29:24
**grave** 12:14
**gray** 117:12
**great** 26:21 55:4,7
66:24
**greater** 57:15
**greatly** 78:9
**greek** 80:8,11
**green** 1:13
**greissman** 6:9
**griffin** 6:10
**gross** 85:6 113:4
**ground** 23:7
100:14 101:23
**grounds** 36:11
**group** 23:20 50:21
56:24 82:10 87:6
87:11
**grouped** 116:21
**groups** 87:4
**guaranteed** 29:20
**guess** 27:11 29:14
84:11
**guessed** 110:2
**guidelines** 26:20
**guise** 78:1
**gump** 5:8 10:2
105:7 110:25
114:20
**guys** 80:18

**h**

**hadley** 3:3
**hair** 11:4
**half** 20:8,17
**hallway** 41:20

**hanging** 22:22
**happen** 20:11
**happened** 15:12
20:1 62:23
**happening** 105:17
**happens** 39:7
89:12
**happy** 30:15 39:4
54:25 55:7
**hard** 23:1,2,8
31:22 54:20 61:1
68:1 103:18
**harken** 55:2
**harm** 76:22
**harmful** 97:4
**harrison** 4:13 6:4
14:10
**harsh** 79:6
**harshly** 49:8
**hartree** 2:2 4:9
9:8 14:11 24:18
27:16 29:16 30:13
**hasn't** 111:23,24
112:5
**hauer** 5:8 10:2
**head** 66:1
**headed** 111:20
**heads** 64:11
**hear** 14:8 31:25
32:1,2 42:3 53:16
57:12 118:24
**heard** 14:8 22:3,4
22:10 30:20 31:16
32:11 36:20 41:22
42:6 53:23 56:7,8
72:6,10 79:23
117:8
**hearing** 2:1,5,8,8
2:10 15:2 16:5
19:15 25:14 27:2
27:25 29:7 43:20
71:8,12 78:1 91:7
107:22 108:1

115:7 116:16,23
118:5 119:8
**hede** 47:16 48:6
**held** 38:13 87:21
88:6,11 90:24
91:6,18 92:1
101:11
**hell** 80:7
**helpful** 74:11
**helps** 12:18 35:8
**heritage** 88:15,17
**highbourne** 88:15
**highly** 8:3 49:12
**hit** 70:2
**hmm** 54:16
**hoc** 56:24
**holder** 49:13
79:25
**holders** 50:7 61:6
76:24 82:1 87:19
87:20 114:2
**holding** 83:20
**holdings** 3:4,20
30:24
**home** 8:5
**homework** 95:14
**hon** 1:22
**hong** 3:4
**honor** 7:17 9:11
9:25 10:1,4,5,21
10:25 11:16 12:1
12:10,25 13:15,22
14:5,10,18,21
15:14 16:12,23,23
17:13 19:3,15,21
20:5,10,15 21:5
21:22 22:12,15
23:12 24:4,5,7,11
25:8,21 27:23
28:6,14,24 29:10
29:12 30:3,14,21
31:1,2,13,16,21
32:3,8,10 33:19

UST-0894

34:2,9,14,19,21
35:2 41:3,16,21
41:21,25 42:4,5
42:13,14,15,24
43:10,15,23 44:13
44:17 45:17 46:1
46:2,7,12,18 47:3
47:8,19,23 48:7
48:13,18,23,24
49:6,11,12 50:8
51:1,15 53:24,25
53:25 54:2,19
56:7 57:2 58:3
60:6 61:5 63:10
64:9 65:1 67:7,19
69:12,18 70:3,6
72:4,9 74:14
75:25 77:4,5,6,23
79:1,14,15,17,20
103:3,5,7,15,20
103:21 104:17
105:6,8,9,12
106:1,3 107:3
109:3,7,19,24
110:4,22,24 111:5
111:7,17 112:15
113:9,25 114:11
114:16,19 115:10
115:16,20 116:14
117:2,11,23 118:2
118:12,16 119:5
120:2,8
honor's 42:2,7
43:20 46:10 54:4
78:10
honor's 105:2
hope 20:10 77:12
hopefully 114:23
hoping 103:3
horse 16:25 20:21
20:23,23
hour 34:5 111:19

hours 26:14 28:25
62:11
hudson 3:6
huge 95:21
human 53:4 68:3
humanity 50:3
hundreds 23:13
33:17 62:10
hurt 76:6
hyde 2:25 122:3,8
hypothetical
76:11

i

i.e. 108:14
idea 8:16 9:1
14:19 17:16 21:20
28:8 43:6 68:9
78:4 113:3
identical 77:7
identification
57:15 77:24,24
78:13
identified 97:20
98:1 99:18
identify 77:8
94:24 98:25
ignore 94:15
il 4:18
illustrate 94:9
imagination 53:4
immaterial 7:21
immateriality
11:21
immensely 61:15
immunity 52:7
83:20
impact 79:3 93:4
105:14,18 109:11
impacted 7:24
implementation
53:7 85:17
implicate 36:19

imply 70:7,9,20
implying 70:19
importance 39:3
important 67:14
72:14,18,21 95:5
95:15,18 97:16
99:3 101:15
102:18
importantly
31:16
impose 81:18 88:7
88:12 89:1 91:6
91:13 92:9 94:10
94:16
imposed 66:23
88:8 97:14 99:15
imposing 89:17
impossible 61:10
64:20
impractical 8:3
impromptu 9:8
improve 77:17
improved 12:13
66:5
inadvertently
81:5
inapplicable
113:12
inappropriate
21:10 43:18 56:11
56:12
incentivize 67:25
68:4
incentivized 22:1
incidental 24:25
29:17
inclined 41:25
include 18:20
27:7 81:12,22
included 45:20
56:16 104:11
111:6

includes 54:8
83:12 84:14 86:4
94:20 104:5
including 33:9
37:23,25 38:10
56:20 68:23 82:5
88:5 108:2
inclusion 85:20
incredible 46:4
incremental 18:3
18:15 73:12
incurred 12:3,9
19:14,19 20:3,7
38:4,5
indemnification
64:7 68:8 101:25
102:13,16 119:21
119:22
indemnifications
101:19
indemnity 61:21
61:24 69:2,4
indenture 84:19
98:19
indentured 54:11
56:17 110:6
111:19,22 112:2
112:24,25 114:1
115:23 117:13,15
indentures 110:7
independent 43:7
indicate 24:14
52:14 108:16
indicated 24:16
25:25 26:15 28:25
30:3 41:25 48:3
53:25 107:7
112:19,20
indicates 107:15
indicating 64:5
82:3
indiscernible 20:6
56:1 64:24 79:25

| | | | |
|---|---|---|---|
| 80:1 103:5 104:18 105:4,9 107:9 109:23 111:7 112:1,4,7,19 113:8 114:4,10 115:11,15,19 117:2,4,5,13 | intensity 23:1 intent 28:8 35:15 intentionally 20:14 interest 15:7 21:11,18 22:4 28:6,10,12,17 34:16 39:1,19 40:1 49:13 72:21 73:22 76:16 89:13 92:15 98:8 | 99:19 involve 86:11 104:25 involved 17:10 22:5 26:18 35:6 involvement 20:2 86:5 involves 117:18 involving 22:6 92:24 | it's 108:25 109:2 110:10,19 111:6,8 111:24 112:5 113:11,12,20 115:24 116:8 117:17 i'll 103:22 110:6 111:14 |
| individual 15:4 19:8 26:4 41:19 63:24 64:22 98:22 103:23 104:2,16 112:17 | interested 35:5 interestingly 28:2 interests 82:2 84:8 | iota 53:13 iridium 84:1 irrelevant 37:19 irrespective 67:6 | i'm 104:16 106:17 107:20 109:25 110:4 118:3 |
| individuals 27:8 69:3 87:11,17 102:10 induce 96:8 | interfere 35:15 interference 83:5 intern 18:19 | isn't 109:4 112:22 issue 9:5 16:1 24:12 25:4 27:11 | **j** |
| inevitable 81:4 information 10:7 26:11 27:22,22,24 28:17 29:2,3,4 | international 88:2 92:3 interpretation 60:12 | 27:14 29:8 30:25 37:2 44:18,25 45:16,21 46:18 54:24 75:14,15 | j 3:24 jamal 47:20 48:6 james 6:5 jane 47:11 48:5 |
| infrequent 20:20 initial 28:3 107:8 injunction 72:13 82:24 | intervene 90:25 91:2 intervention 78:10 91:8 | 78:10 79:24 88:24 99:4 104:7 105:24 107:6,16 108:4 109:2,4,15,19 | jason 6:3,8 jericho 3:21,22 job 61:2 66:24 95:14 100:19 |
| injunctions 83:4,5 injuries 51:19 ins 50:2 | investigate 75:12 investigation 59:4 59:10 62:12 | 113:16,23 115:9 115:16,17 118:5,6 118:7,11 | johns 65:2,4 83:8 96:6 join 67:20 68:7 |
| insert 81:6 87:25 107:15 | investments 73:15 invigorating 62:12 | issued 88:14 issues 7:9 24:8,11 28:14 42:13 46:5 | joinder 82:6 90:25 joined 59:2,6 |
| insofar 40:12 45:4 instance 12:17 instances 93:12 | invoices 12:4 25:9 26:2,13,14 27:7 28:25 32:13,15 | 46:16,20 47:14,21 48:10,10,25 79:16 94:8 103:9 104:14 | 62:25 87:12 jonathan 6:6 judge 1:23 16:2 |
| instigated 24:20 instrument 85:1 insulate 83:13 | 107:19 invoke 106:5 involuntarily | 111:16 115:3 118:24 issue's 113:15 | 57:21 71:11 96:24 judgment 90:24 91:4,22 92:13 |
| insurance 68:8 insurers 65:3,4,10 96:7 | 101:1 involuntary 86:17 88:7,8,12,23 89:2 | issuing 82:23 90:16 it'll 46:10 | 93:5 94:2 judgments 75:15 junk 60:2,3,4 |
| integral 78:11 94:13 97:9,12 | 89:18 91:13 92:9 93:13 94:10,16 | item 7:2 41:6 items 37:24 38:14 | jurisdiction 89:4 89:10,16,23 90:5 |
| intended 49:17 114:4 | | 41:11 | 90:5,8,15,20 91:3 91:10,11,16 109:14 |
| | | | justice 5:1 justification 102:1 |

UST-0896

| | | | |
|---|---|---|---|
| **justifications** 71:6 | **know** 8:2,23 | 63:14 68:18,21 | **likelihood** 109:22 |
| **justified** 96:5 | 12:17 17:4,17,25 | 82:13 83:18,22 | **limited** 3:5 22:20 |
| 101:22 | 18:12,18 21:19 | 86:18 91:6 93:24 | 38:10 53:6 54:1 |
| **justifies** 101:5 | 22:2,25 30:25 | 99:9,22 119:23 | 63:24 83:23 85:21 |
| **justify** 57:5 61:8 | 31:25 33:6 34:23 | **laws** 59:22 94:1 | 86:13,15 91:25 |
| 61:12 67:17 79:6 | 35:1 43:23 46:20 | **lawsuit** 91:1 | 95:7 |
| 115:18 116:5,24 | 47:5 48:17 50:2 | **lawyering** 68:14 | **line** 121:4 |
| 118:7 | 52:10 53:13 57:7 | **lawyers** 53:4 | **lion's** 9:6 |
| | 58:7 61:13,14 | **league** 66:4 | **liquidating** 74:20 |
| **k** | 63:11 64:17,19 | **learned** 43:3 | **liquidation** 73:2 |
| | 67:4,23 70:9,14 | **leases** 2:6 | 73:10 |
| **keep** 74:20 111:15 | 75:9 78:13,16,19 | **leave** 45:16 81:11 | **list** 37:24 68:24,24 |
| **kevin** 5:13 | 107:12 111:19,20 | 111:10 | **listed** 38:11 |
| **kieselstein** 4:20 | 113:2 119:1 | **led** 74:21,21 | **literally** 85:13 |
| 7:2,13,17 9:3 11:8 | **knowing** 21:22 | **ledanski** 2:25 | **litigant** 93:2 |
| 22:11,14 31:3 | **knowledge** 91:1 | 122:3,8 | **litigants** 91:14 |
| 41:2,5,8,12 46:2,3 | **knows** 23:7 79:17 | **lees** 3:9 | **litigation** 8:8 11:7 |
| 46:7 47:3,5,15 | **kong** 3:4 | **left** 54:17 55:2 | 13:7 23:15 30:1 |
| 48:8,19,20,23,23 | **kravitz** 118:19 | 57:1 67:24 78:1,4 | 31:6 33:18 36:17 |
| 49:5,8,11,24 | | 98:17,25,25 | 43:1 44:18 51:10 |
| 50:20,25 51:4,7 | **l** | **legal** 30:10 92:24 | 59:11 62:12 75:6 |
| 51:14,21 53:11 | | 122:20 | 76:16,25 80:6 |
| 54:16,19 55:15,21 | **lack** 11:1 87:22 | **lehman** 104:7,10 | 82:13 90:6 92:6 |
| 56:2,5,22 57:2,6 | **lacked** 91:22 | 105:21 106:8 | 100:7,12,14,16 |
| 57:25 58:3,6,21 | **laid** 55:7 104:24 | 112:19 113:8,13 | 118:18 |
| 59:15,25 60:6,10 | **land** 51:23 | 117:4 | **little** 29:22 52:12 |
| 61:5,20 62:1,5,15 | **language** 18:2 | **lender** 84:17 | 59:8 66:4 |
| 62:24 63:3,7,10 | 42:18 53:12 54:22 | **lenders** 73:11 | **live** 45:14 |
| 63:16,18,22 64:1 | 85:13 | 84:17,18 | **llc** 3:20 |
| 64:9,16,25 65:6 | **lansing** 88:3 | **lens** 10:10 | **llp** 3:3 4:1,8,15 |
| 65:20 66:17 67:3 | **large** 22:25 36:1 | **let's** 112:10 | 5:8 |
| 67:6,19 68:19 | 79:19 110:11 | 118:10 | **loan** 56:11 |
| 69:7,11 71:4,8,23 | **largely** 15:19 | **level** 76:21 | **loans** 73:11,14,22 |
| 87:14 102:25 | 22:17 | **levels** 56:19 | 74:2 98:12,19 |
| 103:14,19 120:1,8 | **largest** 21:23 | **liabilities** 63:25 | **local** 92:3 |
| 120:10,12 | **lasalle** 4:17 | 102:8 | **lock** 39:20 |
| **kieselstein's** 31:9 | **late** 26:5 111:19 | **liability** 56:11 | **locked** 16:20 |
| **kind** 13:10 31:18 | **latest** 46:8 | 84:4,22 96:7 | 29:19 30:2 |
| 39:10 41:18,20 | **laughter** 43:13,16 | **liable** 102:6 | **lodged** 49:14 |
| 64:12 68:15 77:25 | 46:6 48:22 49:10 | **liens** 112:7 | **loeb** 111:18,18 |
| 78:5 82:11 83:4 | **launched** 46:15 | **life** 104:3 | **long** 37:24 53:17 |
| 87:23 110:2 | **lauren** 3:10 72:5,9 | **light** 41:5 60:24 | 91:15 94:2 105:10 |
| **kirkland** 4:15 | 110:25 | 96:14 | 114:7 |
| 33:25 34:13 47:9 | **law** 37:21 38:19 | | |
| | 52:3,6,6 58:1,5 | | |

UST-0897

[longer - metromedia]                                                                    Page 18

| | | | |
|---|---|---|---|
| **longer** 120:5 | **marc** 4:20 46:2 | 91:12 101:8,13 | 56:3,15,16,18,20 |
| **look** 49:8 52:24 | 48:23 | **meaning** 69:12 | 64:16 72:5,9,20 |
| 58:11 80:22 | **march** 1:16 73:3 | **means** 61:12 | 73:1,6,25 74:20 |
| 103:12 | 122:25 | 64:21 91:17 | 75:5 76:1,9 77:2 |
| **looked** 28:2 32:10 | **marine** 1:7 | **meant** 52:14 | 78:13 79:4,10 |
| **looking** 28:3 | **mark** 31:4 117:11 | 83:13 | 80:2,13 84:16 |
| 31:11 32:23 | **marketing** 23:6 | **measure** 69:23,24 | 87:6,7 96:20 98:4 |
| **lose** 24:1 61:13 | **marketplace** | **meatgrinder** 66:1 | 98:9,11,13,17,18 |
| 64:12 92:8 | 49:19 | **mecuria** 35:13 | 98:21 103:2 104:6 |
| **loss** 98:16 101:25 | **martin** 90:23 | **meet** 8:24 69:14 | 104:25 105:10,17 |
| **lot** 13:11 17:10 | **mass** 9:13 | 79:5 91:15 | 107:20 109:10,10 |
| 20:9 21:18 36:5 | **masumoto** 5:6 | **meeting** 69:15 | 109:11 110:25 |
| 111:1 | 24:5,6 26:13 27:1 | **melissanidis** 80:7 | 111:8 112:9 |
| **lots** 7:22 | 27:5 28:24 30:18 | 80:16 | 119:10 |
| **lowenschuss** 88:2 | 32:11 53:16,23,24 | **member** 46:17 | **mercuria's** 18:19 |
| **lowenstein** 4:1 | 79:14 105:25 | 62:18 106:10 | 31:4 32:11 72:15 |
| **lp** 2:2,2 | 106:1,2,17,19,25 | 110:9 111:5 | 80:10 |
| **lumber** 88:2 | 107:3 112:15 | 117:25 | **mercuria's** 107:1 |
| **lumping** 26:21 | 113:2 114:16 | **members** 48:11 | 111:2 112:20 |
| 32:21 | 115:10,14 117:2 | 59:16 61:25 62:1 | **merit** 58:8 65:22 |
| **luncheon** 66:4 | **material** 10:11 | 64:8 96:20 99:20 | 75:13,24 95:11 |
| **lutheran** 93:17 | 11:10 23:22 31:12 | 100:23,24 101:8 | 97:6 99:2,24 |
| | **materiality** 11:1 | 101:18 102:5 | **merited** 24:3 |
| **m** | **materially** 11:9 | 103:23 104:17 | 69:21 |
| | 13:19 | 106:21 109:10 | **meritless** 97:11 |
| **m** 6:10 | **materials** 46:21 | 114:22 118:21 | **meritorious** 64:6 |
| **mabey** 88:19 | **matter** 1:5 23:17 | **members'** 104:2 | 64:10,11 |
| **macarthur** 83:8 | 44:20 68:20 83:18 | **memorandum** | **merits** 24:23 37:2 |
| **magnitude** 55:6 | 86:18 89:16,23 | 107:14 | 37:7 42:16 45:2 |
| 67:8 68:25 | 90:4,5,19 91:10 | **menard** 88:19 | 91:18,25 92:7 |
| **main** 7:3 | 110:21 | **mentioned** 26:23 | 93:9 108:23 |
| **major** 45:13 | **matters** 43:5 | 34:21 57:13 74:1 | **mess** 13:12,12 |
| 80:17 | 82:18 86:15 100:8 | 77:23 87:7 | **met** 79:19 107:11 |
| **making** 19:20,21 | **matthew** 1:25 | **mercuria** 3:4,20 | **method** 91:2 |
| 19:22 37:11 46:3 | **maza** 3:17 72:1,1 | 8:14 9:9 14:25 | **metromedia** |
| 65:15,17 73:14,22 | 77:5,5 78:6,9 | 16:25 21:2,17 | 55:16 57:8,25 |
| 95:12,22,24 109:1 | **mccloy** 3:3 | 22:17,20 25:10 | 58:16 60:12 64:23 |
| 114:1 | **mean** 11:1 23:7 | 26:1,2,5 29:3,13 | 66:12,14 67:5 |
| **male** 103:6 | 25:19 26:7 28:2 | 29:19 30:5,19,24 | 68:21 69:8 70:1 |
| **man** 79:25 120:13 | 28:24 30:7 39:2 | 35:13,17 36:14 | 70:23 71:7 72:14 |
| **management** 2:2 | 44:4 52:24 64:19 | 39:6 40:18 41:22 | 88:9 94:11,15 |
| **mandate** 49:15 | 67:7 69:11,19,20 | 41:24 44:6,14 | 95:8,16 97:8,21 |
| **manner** 18:14 | 69:20 73:20 78:22 | 45:1,25 50:22 | 99:7 |
| **manville** 65:2,4 | | | |
| 83:8 96:6 | | | |

metviner  6:7
mew  1:3
michael  1:22 4:6
middle  33:2
might've  55:11
milbank  3:3 72:5
  72:9
milestones  15:22
million  7:19 8:7
  9:10 18:23 29:20
  29:25,25 33:17
  36:17 41:24 43:12
  65:23 73:12 76:14
  112:11,12,24
  113:14
millions  23:13
mind  7:20 68:12
  99:25 100:23
mindful  104:12
mineola  122:23
minimum  23:21
minute  14:19
  88:25
minutes  26:23
  41:9 80:22
mischief  104:10
misconduct  58:25
  58:25 59:5 84:6
  85:6
misfeasance  80:14
mishearing  71:11
misreading  67:5
misspeak  81:5
mm  54:16
modification  7:15
  7:21 9:15,23 10:6
  10:12,15 11:10
  23:20 35:22
modifications
  23:23
modified  102:20
moment  34:21,24
  117:20

monday  115:7
  118:5
monetarily  22:1
money  9:18 20:9
  21:17 35:13 36:21
  45:25 81:10 92:13
monies  35:20
  112:9 120:2
month  63:6
months  14:25
  22:7
moore  56:6 59:7
  119:12
moot  15:19
moral  30:12
morass  13:7
motion  2:5 7:5,8
  55:3
motivations  28:9
move  20:16 41:6
  41:10 42:25 44:20
  105:3
moving  14:1 47:6
multiple  73:3
muster  71:9,10
mutual  101:11
mystical  78:16

n

n  3:1 7:1 121:1
  122:1
name  79:25 86:14
narrow  38:21
  70:25
national  88:4,15
  88:17 91:4
naturally  18:5
nature  14:2
navigate  100:6
necessarily  25:1
  57:17 108:15
necessary  33:18
  34:14 35:7 71:7
  94:22 97:9,16

99:19 101:15
  102:17 115:25
  116:8
need  8:2 20:15
  38:17 45:23 46:22
  46:23 47:1 54:25
  103:2 104:22
  110:16 111:14
  112:6 114:3,25
  115:9 118:7 119:4
  119:17 120:7
needed  20:11,16
  88:15 109:13
needs  13:1 23:9
  90:7 97:25 98:17
  110:18 115:4
negating  64:23
neglected  22:14
negligence  85:7
negotiate  20:12
negotiated  105:13
negotiation  53:6
  85:16
negotiations
  105:16
neither  36:7
network  1:7 88:9
never  25:11 32:7
  60:3,17,18 64:21
  64:21 95:1,7
  107:8 117:19
nevertheless
  24:10 40:20 99:3
  102:23 111:20
new  1:2,14 3:7,15
  4:4,11 5:4,11
  56:18 80:2,13
  87:25
nine  49:24
ninety  49:24
non  38:8 51:7
  63:19 70:17 76:18
  78:14,20 81:18,22

86:8 87:5 90:16
  90:17 93:6 94:5
  100:9
nonconsensual
  87:22 95:17
nonsense  68:11
normal  62:7
normally  106:7
north  4:17
norwalk  91:5
nose  40:22
note  23:12 31:2
  53:19 88:25 110:1
  110:5
noted  24:14 25:8
  93:3 98:22
noteholder  56:10
noteholders  15:4
  19:8 21:24 22:3
  31:8 35:25 36:6
  40:19 41:20 45:14
  54:13 74:18 77:12
  98:21,23 113:1
notes  80:22 81:3
  84:19
notice  8:19 11:13
  14:14,18 16:1
  25:13 35:2,4
  36:23 90:10,19
  104:20,25 107:19
  107:21 108:1
  109:25 114:15
noticed  108:1
notified  70:13
notion  60:12 66:3
notwithstanding
  119:16
november  27:6,7
  63:3
nuisance  75:1,2,9
  75:20,23 76:20
  97:2,11

**number** 8:4 11:25
12:1 22:25,25
26:14,16 36:1
37:6 47:11,13,16
47:20 50:5 81:7
81:20 85:25 87:24
**numbers** 9:9
**numericity** 8:11
**ny** 1:14 3:7,15,22
4:4,11 5:4,11
122:23

**o**

**o** 1:21 7:1 122:1
**oaktree** 2:1 4:9
7:7 8:21 9:8 10:4
12:2,12 13:11
14:6,11,25 15:11
17:6 19:14 23:8
24:13,18,21 26:25
27:16 28:22 29:16
29:19 30:9,13
35:11,19 36:12,18
37:5,11 39:17
44:25 45:23
105:11 107:4,24
108:5 119:2
**oaktree's** 12:4,7
12:15 17:9 43:8
**object** 8:23 11:14
21:12 22:2 40:14
40:15 45:8 104:20
110:17 112:13
117:15
**objected** 48:1
52:10 71:3 85:19
111:24 112:5
117:16
**objecting** 48:16
118:2
**objection** 2:3,10
40:16 42:17 45:9
45:10 49:14 70:24
78:22 103:15

104:23 105:1,3
107:13 110:17
114:14 116:17,20
117:22 118:10
**objectionable**
103:25
**objections** 37:3
46:14,25 48:12,17
50:24,25 81:14
82:19,20 115:8,9
116:18
**objects** 47:25
109:17,21 110:16
116:2
**obligate** 90:25
**obligation** 30:11
30:12 43:7 69:2
111:9,21
**obligations** 53:9
61:21,25 69:5
102:14 119:21,22
**observation**
105:10
**observed** 95:8
**obstacle** 67:16
**obtain** 81:3
**obtained** 93:21
**obvious** 9:6
**obviously** 9:5 23:3
34:11 39:4 46:9
50:5 103:1
**occupied** 43:5
**occur** 41:17
**occurred** 13:20
28:7 43:24 52:17
86:15 99:22
**odd** 39:24 94:4
**oddly** 39:21
**offer** 26:25 46:20
113:4
**offered** 71:6
**offering** 40:3,4,5

**offers** 49:18
**office** 24:6 25:9
27:11 34:1 81:10
81:16 106:2,11
108:19 112:18
**officers** 50:22
51:2 58:22 62:9
81:21 87:7 93:23
100:9 101:23,24
102:3
**official** 10:3 21:23
88:1
**oh** 32:7 103:17
**ohio** 91:5
**okay** 7:13 17:24
19:18 22:9 34:18
34:25 41:4,13,15
45:16 47:4,7 48:1
48:3,14,19 49:5,7
51:16,25 56:4
58:6 70:18 71:4
71:23 77:3 79:13
80:23 102:23
103:8 105:11,25
108:24 110:12,21
114:14,17 115:6
117:1 119:4,25
120:6,9
**oklahoma** 93:4
**old** 80:15 122:21
**omission** 84:23
**omnibus** 7:6
**onboard** 9:15,22
21:24
**once** 27:10 29:15
79:14
**ones** 79:2
**operating** 56:19
**opinion** 67:5
87:25
**opportunity**
11:13 25:22 91:2
104:20 105:23

117:18
**oppose** 25:6
**opposed** 28:16
30:5
**opposes** 27:12
108:19
**opposite** 99:7
**opt** 50:2,4 55:4
70:3,3,10,21 78:2
78:5 82:2
**orally** 115:9
**order** 41:23 42:3
42:12,25 43:22,25
44:18,22 45:21
46:9,10 60:22
64:15 67:17 76:25
85:5 88:24 95:1
95:19 96:8 97:3
97:21 103:11
106:12
**ordered** 97:15
**orders** 13:24
**ordinarily** 11:14
89:3 92:10
**ordinary** 13:3,16
93:2
**organize** 69:15
**organized** 13:4
112:1
**ought** 52:21 94:8
**outcome** 95:5
**outset** 31:2
**outside** 11:17 21:6
61:15 77:16
100:15
**outstanding** 24:9
**overall** 9:21 12:10
26:8,8 32:18 33:2
105:15
**overlap** 95:21
**overlapped** 65:14
**overlooked** 48:15

Veritext Legal Solutions
www.veritext.com

UST-0900

| | | | |
|---|---|---|---|
| **overnight** 14:24 15:8 | **participating** 13:17,18,25 | 48:25 50:10,16 51:7,23 52:2 | **peculiar** 63:11 |
| **overwhelming** 50:11 98:22 | **participation** 16:14 29:9 30:1 | 53:21 56:6 57:9 58:8 60:16 63:19 | **pendency** 58:24 **pending** 51:13 89:19,25 91:9 |
| **owed** 120:3 | 95:13 | 65:7,9 66:15 | **people** 8:11,19,23 |
| **owned** 86:12,19 | **particular** 9:4 | 68:10 70:17 81:17 | 9:4,23 10:6,16 |
| **owner** 56:18 | 55:23 60:21 72:18 | 83:1 84:16,21 | 13:5,17 26:16 |
| 58:13 | 94:12,21,22,24 | 87:9,23 89:2,7,13 | 32:7 39:25 40:12 |
| **owners** 99:17 | 95:1,18,19 97:18 | 89:24 90:20,24 | 40:23,25 45:1 |
| | 97:25 99:10 | 91:1,11 92:3,6,7 | 46:25 50:3,5,21 |
| **p** | 103:24 104:8,14 | 92:14,18,22,25 | 50:23 51:18 53:8 |
| **p** 3:1,1 6:12 7:1 | 113:9 117:21 | 93:4,8,20 94:18 | 53:18 54:7 55:4 |
| **pacific** 88:1 | **particularly** 28:9 | 95:2,2,10 96:1,5 | 55:14 56:8,15 |
| **package** 70:7 | 36:24 68:5 97:22 | 97:25 98:13 | 57:14,17 59:20 |
| **page** 121:4 | 101:14 104:11 | 101:14 102:22 | 60:16 61:2 65:8 |
| **paid** 8:14 12:24 | 106:4 | 109:1 121:8 | 66:9,25 67:25 |
| 18:22 35:12,16,19 | **parties** 7:25 15:11 | **party's** 92:14,16 | 68:4,7,16 70:7,13 |
| 35:20 36:14 56:21 | 19:1 21:10,18 | 92:20 | 71:19 74:4 80:12 |
| 76:19,22 98:19 | 24:2 34:10,16 | **pass** 71:9,10 | 86:5 95:4 96:23 |
| 100:25 101:12 | 35:5,23 37:5 41:2 | **passage** 15:21 | 97:6,14 99:15 |
| 113:20 114:5 | 42:5 55:5 56:15 | **passing** 115:19,19 | 104:20 110:16 |
| 120:3,4 | 56:17 61:4 75:15 | **patrick** 118:21 | **percent** 8:7 11:4 |
| **pan** 83:21 | 78:16 79:11 81:21 | **pausing** 88:25 | 49:24 50:11,12 |
| **paper** 77:11 | 82:4,5,10,14,24 | **pay** 8:16 19:2 | 51:11 60:11,17 |
| **papers** 115:9 | 83:14 84:8,9,14 | 21:15,21 35:13 | 80:17 86:1 98:9 |
| 117:16 | 85:16,20 86:9,24 | 36:3 42:22 45:23 | **percentage** 36:1 |
| **paradigm** 21:6 | 89:8 90:8 91:3,20 | 65:15 73:15 76:9 | 49:20 98:22 |
| **parameters** 18:4 | 91:24 92:2 94:14 | 105:17 109:10 | 113:15 |
| **parent** 65:13 | 94:24 95:10,23 | 112:1,9 | **perform** 53:10 |
| 76:15 95:23,24,24 | 96:8 97:1,4,13 | **payable** 100:21 | **performed** 108:21 |
| 98:20 119:9 | 98:8,24 99:11,13 | **paying** 36:3 38:8 | **performing** 108:6 |
| **parents** 119:9 | 101:2 104:5 | 38:19 65:13 | **period** 13:5,9 20:4 |
| **park** 5:10 | 105:22 106:3 | 105:10 119:3 | 20:9 23:6 59:5 |
| **part** 11:2,19 | 107:19 108:13 | **payment** 8:20 | 114:15 |
| 15:15 21:20 28:7 | 116:22 | 11:23 40:18,21,24 | **perpetuated** |
| 28:8 44:5,17 | **partner** 46:12 | 41:24 60:15 77:13 | 25:17 |
| 66:19 72:14,19 | **partners** 2:2 | 104:1 109:5 110:8 | **person** 90:25 91:7 |
| 97:19 98:2 105:13 | 26:17 | 112:5 | 93:16 |
| 105:16 112:21 | **parts** 44:3 | **payments** 37:5 | **person's** 60:23 |
| 115:22 | **party** 15:7 18:1 | 48:11 107:2 109:1 | **personal** 90:8,20 |
| **participate** 24:21 | 28:9,11 36:19,20 | 119:17 | 91:11 |
| 29:22 59:19 | 36:21 38:20,23 | **peace** 56:9 99:25 | **personally** 17:22 |
| **participated** 9:15 | 39:1 46:15 48:9 | 100:23 | |
| 24:2 39:4 | | | |

UST-0901

[persons - priority]

**persons** 81:24
86:25 93:11
**perspective** 26:8
29:10 31:4 32:11
41:23 104:7
**peter** 118:19
**petition** 27:20
28:10,12 73:4,5
98:5
**petroleum** 1:7
**piraeus** 80:11
**place** 13:4 71:24
118:20
**places** 81:4
**plain** 84:22
**plaintiff** 76:12
**plan** 7:4,15,21 8:7
8:15 10:7,12
11:17,19,20 15:12
18:7,19,19,20
20:12 23:23 35:22
36:13,15 39:9
40:4 46:11,12,14
46:22 47:12 49:12
49:21 50:8,9,15
50:18 53:1 54:6
55:4 64:19 69:16
70:2,14 77:11,18
78:2,12,12 79:5
80:1 81:14,19,23
82:1,5,6,8,18
83:12 84:3,4,5,21
84:25,25 85:3,24
87:3,9 94:19
101:4 102:24
103:1 104:1,11,19
107:7,17 110:5
111:4,6,8,23,25
112:4,14,21
113:20 114:1
119:13
**plan's** 71:9

**planned** 108:18
**plans** 69:12 106:5
**play** 37:20
**played** 15:22
**plays** 72:13
**pleading** 30:25
91:15
**please** 41:15
80:25 92:23
**plenty** 19:6 100:9
**plug** 64:19 69:16
**plus** 8:6,8 19:12
29:25 36:17
112:24
**pm** 1:17 120:15
**pockets** 45:7 61:3
61:3 71:19
**podium** 9:23 48:8
103:22
**point** 7:23 14:14
15:10,25 17:14
24:25 29:10 31:3
33:20 34:20 35:1
35:3 42:5 67:9
68:23 81:8 99:14
101:17 113:22
116:8 118:16
119:5
**pointed** 11:8
25:21
**pointing** 13:23
**points** 7:18 22:12
32:16
**police** 63:22
**policies** 77:15,21
**policy** 65:11 96:9
**pool** 7:20 8:1
36:15
**portion** 8:21 9:7
18:23 35:12,16
94:15
**portions** 46:14

**position** 14:8 43:8
53:25 64:17 77:17
77:19 87:4 108:25
**positive** 95:12,14
95:15 96:21
**possession** 4:16
16:8 39:8 40:3
84:17 87:10
**possibility** 13:10
22:8 78:20 109:20
**possible** 17:3 20:1
20:18 22:2 42:13
68:2 76:22 94:23
114:13
**possibly** 53:4
79:21
**post** 27:20 28:10
68:21 75:8
**potential** 18:11
78:22 90:2,4 91:2
93:24 96:7 97:2
100:12 102:11
**potentially** 33:15
59:5 76:20
**power** 63:22
87:22 88:7,12
89:11,19 90:1,6
90:21 91:12,17,19
91:24
**powerpoint** 49:3
**powers** 93:12
**practical** 33:10
**practically** 39:10
**practice** 66:19
**pre** 74:2,6 76:5
98:5,18 100:8
**precedent** 7:22
**precedential**
31:17
**precisely** 69:4
**predated** 19:11
34:23 64:4 67:1

**prediction** 23:24
**prefer** 49:3
**prejudice** 117:8
117:14
**prejudiced** 59:20
**premised** 27:19
**prepetition** 23:14
73:11 74:25 76:1
76:23 84:18 87:8
**prescriptive**
68:24
**present** 6:1 17:2
113:16
**presentation** 49:3
**presented** 18:9
35:21 77:6 88:21
88:22,22 109:23
110:20 117:20
**presenting** 109:17
**preservation** 38:6
**preserved** 51:9
**pressed** 31:22
**presumably** 14:15
29:17 72:20 102:7
**presuming** 113:16
**pretty** 15:5 23:24
32:19 45:25 50:10
53:25
**prevailed** 30:9
**prevent** 39:22
73:10
**prevented** 73:8
**prevents** 82:24
113:25 114:1
**previously** 18:12
18:22 34:6 86:17
**price** 18:8 40:6
**prior** 20:22 24:19
27:25 28:12 29:7
55:3 98:13 99:23
**priority** 76:25
77:13

**pro** 18:23 76:14
**probably** 24:7
  57:18 59:18 71:23
  109:8,22 110:16
  113:15
**problem** 8:11
  21:12,20 35:3
  53:18 66:19
  112:17 113:24
**problematic**
  85:22
**problems** 36:5
  37:6 89:20
**procedure** 27:13
  92:11 107:17
  109:22 111:15
  117:4,14
**procedures** 13:23
  18:2,9,13 23:5
  92:17
**proceed** 7:15
  31:15 42:8 46:12
  64:15 84:9 116:15
**proceeded** 18:14
**proceeding** 89:19
  89:25 90:2,7 91:9
**proceedings**
  39:18 89:16,23
  92:12 119:4
  120:14 122:4
**proceeds** 65:11
  96:9
**process** 11:14
  13:3,4 14:1 16:17
  18:19 19:25 25:6
  27:10,17 32:14
  58:15 62:6 70:21
  73:13 74:21 78:23
  90:10,19,22 92:10
  92:13,22 93:7,14
  94:14 95:4 96:21
  102:18 104:24
  107:6 109:25

**produced** 39:16
**producing** 95:5
**product** 49:18
**professional**
  46:17,17 112:1,16
**professionals**
  106:10,12,20
  107:18 108:6,9,20
  113:6 114:22
**profitable** 73:16
**projected** 23:16
**projection** 23:25
**promoted** 24:21
**prompting** 68:20
**pronouncements**
  54:23
**proof** 99:18
**proper** 53:15
  101:7
**properly** 15:20
  52:18 83:4,23
**properties** 88:3
**property** 89:5,8
  89:12 92:15,20
  93:13,15
**proportionate**
  39:15
**proposal** 18:20,25
  20:12 21:1 23:10
  24:17,22 25:2
  35:18 39:2,3,5,11
  39:14 92:19
**proposals** 39:8,9
  39:10 40:4,5
**propose** 90:10
**proposed** 11:13
  16:25 20:21 29:16
  35:12,22 36:5
  41:23 42:18 43:25
  50:18 51:25 82:20
  84:13,20 86:17
  87:2,5 89:25

**94:19,20,22 97:5
  99:13,19 100:3
**proposing** 24:22
  66:18
**protection** 68:8
  83:24 93:21 98:17
**protections** 81:20
  101:20
**protects** 64:8 86:5
**provide** 25:9
  27:24 28:17 29:13
  43:11 59:12 64:9
  68:15 70:18 86:10
  92:9 104:19
  107:18 111:4
**provided** 8:7 12:4
  25:11 26:3,6,9
  28:15 29:1,20
  33:22 47:12 64:7
  73:7,11 87:6,8,9
  93:11 96:22 100:1
  107:9,22 114:10
**provides** 81:20,23
  84:21 85:25 86:2
  104:1 106:19
  111:25
**providing** 47:14
  47:16 53:18
**province** 118:19
**provision** 20:24
  52:1 53:5,15
  83:13,23 84:3,20
  85:9,10,15 102:21
  103:24,25 104:3,8
  104:11,14 106:3,6
  106:8,14 107:15
  107:24 108:8,14
  111:23 112:14,16
  112:22 115:5
  117:16,17,22
  118:2
**provisions** 18:20
  47:18 50:15 52:11

**52:13,19,25 83:17
  106:5 110:5
**proviso** 78:3
**public** 8:4 25:20
  59:3
**publicly** 23:13
  25:14 26:10 108:2
**pull** 64:18 69:16
**pulled** 16:17
  80:10
**purchase** 37:18
  40:6
**pure** 68:13
**purely** 15:22
**purportedly** 45:6
**purpose** 112:6
**pursuant** 82:8
  89:5 107:25 111:3
  119:12
**pursue** 15:18
  23:16 40:1 80:6
  82:14 102:2
**pursued** 17:2
  86:14 98:1
**pursuing** 39:19
  83:10
**pursuit** 92:21
**put** 7:10,12 23:10
  23:10 28:22 88:24
  115:4 116:10,23
  118:20 119:6
**puzzled** 29:21
**pws** 83:20
**pyrrhic** 9:16

**q**

**quadrangle** 3:21
**qualified** 52:7
  83:19
**quality** 60:14
**quantify** 29:4
**quarter** 21:16
**quest** 57:6

| | | | |
|---|---|---|---|
| **question** 10:15,18 17:20 31:17 55:5 61:7 65:24 97:7 113:13 | **rate** 81:9 | **receive** 37:10 53:1 93:14 94:20 112:23 | **refer** 81:7,9,11 87:24 119:8 |
| **questions** 7:14 14:5 28:3 30:6,14 47:19,23 48:7 49:4 104:17 | **rationale** 68:3 | **received** 24:17 26:13,24 27:22 33:24 34:1 82:19 82:20 93:16 | **reference** 46:8 53:14 111:13 |
| **quick** 48:21 | **raval** 3:11 | **receiving** 33:3,3 | **referred** 119:15 |
| **quickly** 68:2 114:24 | **ray** 118:22 119:12 | **recess** 41:14,16 | **referring** 81:2 |
| **quit** 79:22 | **razing** 32:17 | **recitation** 120:1 | **reflect** 52:20 103:12 |
| **quite** 27:12,21 35:13 36:3 39:18 48:21 52:25 58:5 105:14 | **reach** 41:19 53:5 | **reciting** 32:19 | **reflected** 21:8,13 |
| **quote** 84:22,23,25 85:4 | **reached** 7:8 109:9 | **recognize** 20:9 37:21,24 | **reflects** 45:21 |
| **qureshi** 5:14 10:1 10:2,21,25 11:16 11:25 12:20,25 13:22 42:4,12,23 44:17 45:17,19 46:1 105:6,7 108:24 109:3,7,19 109:24 110:4,13 110:22 114:19,20 115:16 116:14 118:16,17 | **reaching** 67:17 | **recognized** 54:2 100:14 | **regard** 45:11 46:11 55:2 |
| | **read** 46:22 50:4 54:20 70:9 81:8 | **recommending** 27:13 | **regarding** 24:12 24:19 28:14,18 34:22 81:16 108:23 |
| | **reads** 58:7 | **record** 8:10 10:2 46:22,24 57:20,20 64:5 72:8 77:9 100:1 105:7 110:24 111:1 114:19 115:4,25 116:24 119:6 122:4 | **regardless** 70:23 79:5 |
| | **ready** 114:18 | | **regularly** 52:5 |
| | **real** 24:2 67:21 75:24 | | **regulatory** 63:22 |
| | **realize** 74:14 | | **reimburse** 20:24 |
| | **really** 14:25 17:4 18:16 23:1 26:7 31:10 41:17 43:25 49:3 50:17 53:22 57:21 65:4,24 78:18 79:9,11 83:2 89:25 96:18 97:4 99:1 101:14 109:17,21 110:8 113:12,22 | **records** 25:7,14 25:19 26:4,14 27:8,8 33:5,23 107:9 108:2 | **reimbursement** 111:4 |
| | | **recover** 76:25 102:10 | **reiterate** 107:6 |
| | | **recoveries** 11:5 12:13 18:11 40:21 62:15 99:11 102:11 105:14,19 | **reject** 60:11 |
| **r** | **reason** 15:23 31:20 99:6 100:15 101:9 102:10,17 102:19 109:13 | **recovery** 8:1 9:21 32:18 33:2 65:10 76:14,14 96:23 113:4 | **rejection** 2:5 7:4 |
| **r** 1:21 3:1 7:1 122:1 | | | **relate** 86:20 |
| **raise** 37:3 107:16 | **reasonable** 10:23 16:3 33:7 37:2 40:13 100:3 104:2 109:6 113:21 | **rectify** 110:1 | **related** 2:6 74:25 76:1,2 84:22 89:17,24 |
| **raised** 24:8,11 28:14 73:23 79:16 107:13 117:3 | **reasonableness** 10:20 25:23 104:13 105:24 109:13 115:2,17 115:20 116:12,19 118:6 | **reduction** 8:1 12:3,8 | **relates** 42:10 44:7 |
| **raising** 24:10 | | | **relating** 100:7 118:25 |
| **randles** 6:6 | **reasoning** 89:21 | | **relation** 47:14 |
| **rare** 57:11 66:16 66:20 69:21 79:18 88:8 94:24 95:7 | **reasons** 79:1 85:23 102:13 | | **relative** 31:17 32:24 42:15 44:19 |
| **rata** 18:23 76:14 | | | **relatively** 19:16 |
| | | | **release** 47:14 48:9 48:25 50:4,16,18 51:22 53:2,21 56:14 59:17 60:19 61:16 64:21 67:13 67:15 69:22 70:14 |

[release - right]

72:18 74:12 78:14
78:21 79:8,13,24
81:1 82:9 85:1
86:2 88:23 89:2
89:18 91:13,20
92:20 93:4,8,20
94:5,12,18,21
96:5 97:3,11,12
99:4,13 101:2,13
102:17 103:3
**released** 56:5,17
56:25 60:21 67:13
71:17 82:10,18,25
83:11 87:1,18
93:12 96:11 97:2
97:7 98:5,8,10,15
99:10,12 101:3
**releasees** 100:4
**releases** 46:16
49:23 50:9,10,24
51:5,8,11,16 52:2
54:5,6,8,11,13,14
55:9 56:13 57:12
58:8,17 62:4
63:19 66:15 68:10
69:13 70:17 74:7
74:8 76:3 78:12
80:3,5,14,19,23
81:17,22,24 82:2
82:4,5,6,10,15,20
82:21,23 83:2
85:24 86:1,9,10
86:18 87:2,6,23
88:7,8,12,14,21
89:25 92:9,18
94:10,16,20,22
95:6,11,17 96:16
96:16,18 97:6,8
97:13,18,23 98:21
99:5,14,15,19
101:6,14,22,24
102:20,22 121:6,9

**releasing** 56:16
60:16 82:16 86:9
97:4 99:11
**releasors** 81:25
**relevant** 26:7
27:23 90:8 92:23
92:25 99:12,17
100:21
**relief** 2:6 94:7
**rem** 89:4,5,9
90:11,15
**remember** 8:6
49:25 54:12
**remind** 104:19
**reorganization**
7:4 57:10,24
59:23 60:22 64:15
69:10 72:15,19,21
73:13 74:23 81:14
81:19 93:10 94:13
97:10,21,24 99:3
102:18 108:18
**reorganized** 69:4
**replaced** 73:10
**reply** 107:14
**report** 60:14
**reported** 83:22
**represent** 12:2
98:20
**representative**
39:17
**represented** 35:24
56:9
**represents** 12:6
35:25
**request** 25:9 26:5
29:3 45:4 57:8
81:13 102:21
121:8
**requested** 82:3
**requests** 68:12,13
80:3 110:16

**require** 8:3 11:14
28:9 92:11 118:3
**required** 25:13
28:5 36:25 90:22
95:8 106:22 111:2
**requirement**
117:19
**requirements**
108:10,12,22
**requires** 28:5
93:14 99:9 109:5
**rescap** 65:12,13
**reserve** 70:16
109:12 116:22
117:3 118:13
**reserved** 115:3,14
118:14
**residential** 95:20
95:22,25
**resolicit** 11:12
**resolicitation**
33:11
**resoliciting** 11:8
**resolution** 13:10
44:18 91:25
105:15 111:7
**resolve** 42:18,19
44:18 91:17
**resolved** 42:19,20
92:6
**resorts** 88:2
**resounding** 31:20
31:20 49:15
**respect** 10:4 11:3
14:18,20 15:20
22:7 29:8 30:25
41:22 58:3 74:15
74:19 82:17 92:23
104:15 107:23
115:3 116:18
117:3 119:15
**respectfully** 14:17

**respective** 84:15
114:22
**respond** 14:12
**response** 25:24
**responsibility**
21:12
**restores** 50:3
**restructuring**
17:6 33:13 54:12
54:14,15 67:16
84:24 85:1 95:12
95:15,20 96:17
98:2,3 101:16
**result** 9:12 13:25
18:18,21 34:15
49:16 77:1
**results** 94:2
**retail** 50:6,7
**retained** 109:14
**retention** 120:3
**retirement** 4:2
**return** 95:11
**reverberated**
18:16
**review** 33:5,21
34:3,9,17 104:12
105:3,23 109:12
115:1,22
**revised** 43:25
**reward** 62:21
66:24 67:14 71:19
99:25 100:13
**rewarding** 101:7
**rid** 57:14 60:3
75:19,22
**right** 8:23 9:11,25
10:10,23 13:21
14:7 16:9 17:1
18:6 30:19 32:16
33:1 34:5 35:10
37:3 40:15 41:8
42:21 44:15,24
45:8,18 46:18,19

[right - shareholders]

| | | | |
|---|---|---|---|
| 47:10,24 51:6,9 | **ruled** 41:21,21 | **scott** 6:9 | **seen** 53:2 |
| 58:1 59:19 61:4 | 96:6 | **seated** 41:15 | **selected** 118:18 |
| 61:23 66:5,9,14 | **rules** 23:7 92:11 | 80:25 | **sense** 33:11 36:20 |
| 66:17 70:16 71:25 | **ruling** 42:7 43:20 | **sec** 72:1 77:6,7 | 36:21 69:20 |
| 73:1,5 76:3 77:15 | 80:23 81:1 90:16 | 78:19 | **sensitive** 22:1 |
| 80:14,22,25 91:14 | 109:20 | **second** 7:4 12:10 | **separate** 44:22 |
| 100:7 103:17 | **rulings** 45:22 86:4 | 15:9,25 17:14 | 46:10 108:16 |
| 105:5 106:24 | 103:13 121:3 | 35:1 82:8 83:8 | 111:8,12 |
| 110:23 111:10 | | 84:11 88:5,9 90:3 | **separately** 15:16 |
| 112:25 115:12,20 | **s** | 94:11 | 15:17 45:2 52:4 |
| 117:1,8 118:3,24 | | **secondarily** 31:13 | **serve** 115:12 |
| 120:6,11 | **s** 3:1,17 4:6 7:1 | **seconds** 103:24 | **service** 49:18 |
| **rights** 48:10 65:3 | **sac** 66:11 | **section** 8:24 37:9 | 90:22 92:12,21 |
| 68:9 77:22 92:10 | **safe** 23:24 | 37:20,22 38:9 | 99:25 |
| 92:16 93:1,2 | **sake** 112:10 | 46:24 89:22 90:3 | **set** 36:16 105:21 |
| 102:2,9,16 115:3 | **sale** 13:4 39:10 | 93:25 102:8 | 108:12 |
| 115:14 116:22 | **sandler** 4:1 | 106:14,22 108:22 | **sets** 78:23 |
| 118:13,14 | **sanford** 88:19 | 110:21 111:11,12 | **settle** 65:14 95:25 |
| **rise** 8:12 9:9 | **sanjana** 6:8 | 111:13,24 113:10 | **settled** 41:24 |
| 30:10,11 | **satisfactorily** | **secured** 84:18 | 113:3 |
| **risk** 13:11 14:2 | 24:13 25:5 | **securities** 3:13 | **settlement** 7:8,12 |
| **road** 122:21 | **satisfied** 44:5 | 59:5,22 62:19 | 8:5,10 9:4,5,24 |
| **robins** 88:19 | 110:20 | 63:14,25 81:15 | 10:8,11,19,20 |
| **robust** 15:5 | **satisfy** 64:25 | 82:13 93:24 94:1 | 11:1,3,13 12:6 |
| **role** 12:16 17:18 | 70:24 108:21 | 99:22 | 16:3 24:1,9 29:9 |
| 72:15 | 116:8 | **see** 21:9 22:17 | 29:10,23 32:19 |
| **roll** 68:4 | **satisfying** 66:13 | 34:4 39:12 41:9 | 33:5 34:13 35:12 |
| **ronald** 3:24 30:23 | **save** 73:10 | 48:16 57:7 77:14 | 35:16,22 36:6,22 |
| **ropes** 117:12 | **saved** 62:11 | 83:7,20 84:1 | 37:1 40:11 42:10 |
| **roughly** 33:3 | **saw** 9:9 44:16 | 89:13 90:22 91:4 | 43:21 44:22 46:8 |
| **rounds** 33:22 | **saying** 44:2 60:25 | 91:20 92:3 93:17 | 91:19 94:2 96:3 |
| **rsa** 7:24 15:20 | 61:1 62:19 64:14 | 96:11 99:15 | **settling** 36:8 65:4 |
| 16:16,23 17:5 | 78:11 100:24 | 103:11 108:4 | 65:17 |
| 32:25 104:3,5 | 107:1 112:23 | 116:16 | **seventh** 53:20 |
| 105:13,15 108:10 | **says** 37:9,22 39:22 | **seek** 45:1 70:16 | 84:2 |
| 108:13 109:9 | 55:16 57:8 66:14 | 84:11 87:23 93:23 | **shame** 23:25 |
| 111:3,3 112:3,20 | 104:4 111:4 | 94:15 97:19 | **share** 9:7 |
| **rule** 20:25 28:8 | **scale** 66:8 | **seeking** 7:3 13:18 | **shareholder** |
| 38:3,8,21 39:25 | **scenario** 30:8 | 19:11 37:16,17 | 62:17,22,23,24 |
| 40:7 44:25 77:13 | **scene** 23:8 | 62:3 71:17 78:14 | 63:4 78:18 80:17 |
| 87:16 89:11,19 | **schedule** 119:4 | 90:24 116:5 | **shareholders** |
| 91:16 92:14 | **scope** 53:15 54:4 | **seeks** 37:15 38:23 | 59:18,18 77:10 |
| 113:20 | 76:3 90:4 94:23 | | 79:6 80:12 82:17 |
| | 113:7 | | |

Veritext Legal Solutions
www.veritext.com

UST-0906

| | | | |
|---|---|---|---|
| 86:23 101:3 102:4 | **sincere** 31:14 | **somebody's** 61:19 | **spoken** 34:9 |
| **shares** 40:21 80:1 | **single** 32:4,5 | 74:5 75:18 78:20 | **sponsor** 18:7 |
| **sharing** 18:23 | 66:21 | 93:9 | **sponsoring** 18:19 |
| **sheer** 20:10 | **sitting** 71:20 | **somerstein** 13:22 | **spot** 32:20 33:1 |
| **shoehorn** 108:14 | **situation** 39:24 | 117:11,11,23 | **spread** 31:10 |
| **short** 13:8,9 23:2 | 64:12 66:1 67:21 | 118:1,12,15 | **spurious** 65:23 |
| 41:10 48:13 71:7 | 74:15 78:23 93:19 | **somewhat** 50:3 | **stab** 72:6,12 |
| **shortening** 114:15 | 94:4 105:21 | 77:9 | **staff** 77:7 |
| **shortly** 43:4 47:6 | 109:22 | **sonya** 2:25 122:3 | **staffed** 23:15 |
| **shot** 23:2 111:21 | **situations** 61:16 | 122:8 | **stage** 67:24 |
| **should've** 25:20 | 69:22 100:11 | **soon** 114:12,13 | **stakeholders** |
| **shoulder** 44:16 | **six** 63:6 | **sophisticated** | 18:11 62:16 |
| **shouldn't** 110:14 | **sixth** 88:19 | 35:14 40:23 | **stalking** 16:25 |
| 110:14 | **skeptical** 97:23 | **sorry** 44:14,15 | 20:21,23,23 |
| **show** 13:5 60:20 | **skin** 40:22 103:23 | 103:17 106:17 | **stand** 49:11 101:4 |
| 60:23 | **sleeves** 68:4 | **sort** 8:11 9:16 | **standard** 47:18 |
| **showing** 64:10 | **sliding** 66:8 | 23:6 30:9 67:6,9 | 54:1 66:18 69:13 |
| **shown** 22:4 | **slight** 7:25 9:20 | 72:25 73:9 75:4 | 69:14 79:5 116:9 |
| **shows** 33:4 | 63:1,5 | 107:4,10 110:18 | 118:8 |
| **side** 15:7 17:1 | **slightly** 25:25 | **sought** 16:4 19:19 | **standards** 8:24 |
| 70:12 | 72:11 | 36:21 42:18 72:18 | 68:17 91:15,16 |
| **sight** 92:8 | **small** 19:16 22:15 | 92:13,18 104:21 | 110:19 113:23 |
| **sign** 67:22 68:1 | **smaller** 113:15 | **sounds** 67:8 | **standing** 44:15 |
| **signed** 15:12 | **smith** 34:4 | **southern** 1:2 | **standpoint** 25:3 |
| 54:13 106:11 | **sole** 25:1 | 26:20 79:19 | 26:7,19 27:10 |
| **significance** 57:19 | **solely** 94:16 | **sparingly** 88:14 | 29:15 30:2 106:25 |
| 67:15 | **solicit** 27:21 | **sparkman** 6:12 | 113:5 |
| **significant** 16:7 | **solicitation** 8:4 | **speak** 9:4,4 58:21 | **star** 60:14 95:13 |
| 26:16 77:22 96:16 | 10:12 | **speaking** 34:24 | **start** 19:25 56:3 |
| **silence** 43:14 70:7 | **solicited** 78:12 | 61:22 102:25 | 72:22 |
| 70:19,20 | **soliciting** 30:8 | **specific** 12:20 | **started** 34:22 |
| **silverman** 3:19 | **solutions** 122:20 | 58:18 77:24 96:22 | 119:7 |
| 30:24 | **solvent** 12:15 | 97:20 119:23 | **starting** 72:25 |
| **similar** 88:13 94:7 | 13:14 61:21 | **specifically** 96:15 | **state** 79:2 |
| 102:6 106:4 | **somebody** 12:18 | **specify** 13:24 | **stated** 79:1 85:23 |
| **similarity** 53:13 | 20:21,22 36:1 | **spectacular** | 107:23 |
| **similarly** 88:11 | 39:16 43:18 48:15 | 100:19 | **statement** 15:2 |
| 92:1 96:6 | 55:13 58:11 60:13 | **speed** 22:7 | 24:15 28:4 78:1 |
| **simplicity** 112:10 | 62:22 74:2,9,25 | **spent** 16:6,10,20 | 84:25 85:3 112:4 |
| **simply** 105:14 | 75:1 76:6 79:24 | 26:15 32:24 34:4 | **states** 1:1,12 3:13 |
| 111:25 113:12 | 95:11 109:17,21 | **spoke** 19:19 34:10 | 5:1 22:9 24:6 |
| 115:25 | 110:15 | 34:12 | 81:16 82:18 85:19 |
| | | | 91:20 106:2 |

UST-0907

| | | | |
|---|---|---|---|
| **status** 27:19,20 28:20 37:14 106:13 | **subsequent** 34:2 116:23 | **sullivan** 47:11 48:5 | **sustained** 37:4 **sustaining** 45:10 **system** 4:2 91:14 |
| **statutory** 90:11 108:7 | **subsidiaries** 76:18 **subsidiary** 18:21 | **summer** 73:6 **supervised** 52:21 | **t** |
| **stay** 68:5 | **substance** 42:2 48:2 99:4 | 83:14,15,19,25 84:1 86:16,21 | **t** 122:1,1 |
| **steer** 100:10 | **substantial** 7:7 | **supervisory** 52:15 | **table** 9:24 75:7 104:18 |
| **stellar** 62:20 | 9:7 10:5 12:12,19 | 52:16 | **tackling** 47:17 |
| **step** 22:23 | 13:18,24 14:2 | **supplement** 84:25 | **tail** 117:9 |
| **stepped** 13:12 76:9 | 17:11,20 19:1 24:12,15,19 25:5 | **support** 15:12 19:1 24:15 30:12 | **tails** 64:12 **take** 32:9 41:10 |
| **stepping** 13:11 19:25 | 25:11,12,16 27:18 28:15 29:11 35:11 | 46:21 47:12,17 49:13 50:7,8 | 43:14 48:16 49:17 55:12 57:9 60:23 |
| **sticking** 65:25 | 36:12 37:8,10,11 | 54:12,14,15 70:2 | 61:6 68:8 72:6,11 |
| **stockholder** 87:16 | 37:16,17 38:12,15 | 82:7 84:24 99:19 | 73:20 78:21 99:8 |
| **stockholders** 86:19 | 39:14 40:10 79:10 106:14,22 107:5 | 100:2 **supported** 21:19 | 102:1 104:17 105:8,16,23 |
| **stood** 42:10 | 107:11,16,23,25 | **supporting** 8:10 | 111:21 114:7 |
| **stop** 12:23 69:13 71:24 | 108:23 115:21,23 116:5,11 117:19 | 12:6 **suppose** 11:16 | **taken** 58:13 74:14 74:19 92:20 93:1 |
| **storming** 31:19 | **substantially** 16:11 21:25 | 22:2 35:3,21 63:1 | 93:16 96:23,25 |
| **stranger** 91:8 | **substantive** 83:18 | **supposed** 38:20 38:21,22 51:22 | **takes** 11:5 13:4 62:8 |
| **strategies** 56:12 | **succeeded** 54:22 | 55:19 57:9,10 | **talk** 41:9 |
| **strauss** 5:8 10:2 | **successful** 80:9 | 66:15 68:17 71:14 | **talked** 21:1 22:19 |
| **street** 5:3 | 95:5 | 95:17 97:13,15 | 55:6 |
| **strike** 43:18 | **sue** 52:22 74:2,4 | **supreme** 89:14 | **talking** 7:19 9:18 |
| **strip** 46:9 | **suffer** 79:12 | 90:18,23 91:5,18 | 34:22,24 56:10,22 |
| **stripped** 77:21 | **suffered** 51:19 | 91:21 92:1,5 | 56:23 69:13 90:13 |
| **strongly** 24:2 27:12 | **sufficient** 70:15 90:12 | 93:18 **sure** 16:15 20:15 | 90:15 110:8,11 **talks** 50:14 |
| **struggle** 66:10 | **suggest** 41:6 | 22:13 27:21 30:10 | **tantamount** 50:8 |
| **subject** 84:10 85:4 | 76:20 116:14 | 32:2 35:7 36:20 | **target** 114:11 |
| 89:16,23 90:4,5 | **suggestion** 96:22 | 41:2,12 45:25 | **targeting** 94:20 |
| 91:10 92:22 97:5 | 99:1,5 | 48:14 51:11 55:21 | **taylor** 6:4 |
| 109:5,20 112:2 | **suggestions** 96:20 | 57:2 59:15 65:6 | **teaching** 97:8 |
| 120:4 | **suggests** 10:14 | 68:6 100:11 | **team** 66:4 |
| **subjected** 91:3 99:21 | 24:18 | 107:20 109:25 **surprise** 29:8 | **technical** 26:19 **technically** 29:12 |
| **submission** 58:7 | **suing** 15:11 | **suspect** 35:5 42:2 | **teed** 11:18 |
| **submit** 20:11 81:4 | **suit** 91:8 | **suspenders** 57:13 | **telephonically** 6:1 |
| 118:4 | **suite** 3:21 5:3 | **sustain** 40:17 | **tell** 17:19 26:19 |
| **subordinated** 102:8 | 122:22 | | 28:21 31:22 60:2 |

UST-0908

**telling** 109:16
**tells** 66:22
**tenth** 88:4
**term** 104:3,5
  105:15
**terminate** 100:14
  100:16
**terminated** 15:21
**terms** 7:11 16:7
  27:12 36:13,15
  43:4 52:22 53:10
  58:19 66:19 68:16
  91:19 92:7 96:17
  107:7,17 111:3,8
  119:8
**test** 65:1,22 79:18
  116:12
**thank** 14:10 22:14
  24:4 30:16,18
  35:9 42:4 46:1,2
  48:18 72:8 77:4,5
  80:20,21 105:6
  110:22 118:12,15
  120:11,12,13
**thanks** 30:17
  41:16
**that's** 104:4,23,24
  105:11 107:21
  109:3,25 110:2
  112:17 113:2
  114:4 115:16
  118:9 120:1
**theft** 80:15
**theories** 56:8 57:3
**theory** 57:22
  75:19 83:18
**there's** 104:22
  105:1,3 107:10,13
  108:7 109:21,22
  111:1,23 113:3,19
  117:13 118:5
  119:3,20

**they're** 106:6
**thin** 52:4 83:22
**thing** 23:12 29:8
  55:15 61:20 89:1
  94:9 104:4
**things** 11:25 14:2
  14:16 16:4 32:10
  36:25 38:2 44:10
  54:20 56:10 57:13
  57:14,17 58:16
  67:1 71:13 72:19
  90:10 95:14,15
  96:21 101:4
  105:10 110:10
**think** 8:8,22 9:6
  9:11,13,16,17
  10:10,23 11:9,18
  11:20 12:7,7,14
  14:3,7 16:13 17:1
  17:4,25 19:16,23
  20:7 21:1,5,7,8,10
  21:13,24 23:5,13
  23:13,19,22,24,25
  26:16 27:23 31:10
  31:19 32:9 33:23
  35:9 37:1 38:13
  38:18 39:25 40:7
  40:11,13 41:17
  42:7 43:10,18
  45:24 47:1 50:2
  50:17 52:2,12,18
  52:19 53:5,14,17
  55:16 57:25 58:2
  58:4,8 61:5,7 62:5
  64:14,19 66:5,6
  66:13 68:19 69:1
  69:2 71:21 72:17
  72:24 75:2 79:15
  79:21 81:10 83:2
  83:22 85:8,14,21
  99:1,2,6 105:20
  109:7 110:7

111:14,19 112:8
113:19 114:21,23
115:16,24 116:7
116:13,15,21
117:13,17 118:8
120:8,10
**thinks** 44:25
  62:18
**third** 7:7 12:8
  46:15 48:9,25
  50:10,16 51:7,23
  52:1 53:21 57:9
  58:8 60:16 61:4
  63:19 65:7,9
  66:15 68:10 70:1
  70:16 81:17 82:24
  83:1,12 87:23
  89:2,7,8,24 91:9
  91:11 92:3,6,7,13
  92:14,16,18,19,22
  93:4,7,20 94:18
  95:2,10 96:1,5,8
  97:25 101:2,14
  102:22 121:8
**thirds** 7:23 8:9
  21:24
**thorough** 59:4
**thought** 8:24
  70:22 71:18 73:15
  73:15
**thousands** 62:11
**threatened** 94:25
**three** 7:2 59:2
  62:9 64:18 68:19
  78:14 87:11
  118:21
**threshold** 23:21
**thrilled** 23:7
**throw** 65:23 70:8
  76:7
**tie** 73:25
**tied** 58:17 97:23

**tight** 20:14
**time** 8:14 10:8
  13:5,9 15:1,20,21
  16:7,10,20 19:11
  19:24 20:22 22:23
  25:6,14,19 26:4
  26:14 27:3,5,8
  28:22 30:2 31:24
  32:2,16,21,22,24
  33:22 34:21,23
  46:4 61:16 62:23
  63:1,5,6 68:9
  70:18 73:9,25
  78:21 108:2 118:7
  119:7
**timeframe** 22:25
  32:9
**timekeepers**
  26:17
**times** 73:3
**timesheets** 33:21
**timetable** 20:13
  20:14 41:18
**timing** 113:25
**today** 9:2 33:14
  35:24 36:22 43:6
  47:22 49:12 59:6
  103:13 120:7
**told** 35:24 36:7,8
  40:12 42:11 45:6
  45:15 55:19 58:16
  59:16 70:23 74:3
  86:1 95:3 98:9
  99:23 100:5
  101:17 119:13
**tomorrow** 69:16
**topco** 49:25 56:23
**topped** 21:3
**topping** 16:6
  17:17 18:15 21:6
**total** 12:2 19:13
  19:18 73:10

| | | | |
|---|---|---|---|
| **totaled** 27:6 | 25:25 38:5 52:10 | 111:18 112:13 | **unprotected** |
| **totally** 71:7 | 79:13 81:16 85:19 | 117:15 118:10 | 22:17 |
| **touch** 41:25 | 104:25 105:23 | **ucc** 103:23 104:16 | **unreasonable** |
| **trade** 15:5 21:23 | 106:2,4 107:16,20 | **uelk** 6:11 | 116:2 |
| 73:7,19 | 110:7 112:13,24 | **ultimate** 105:2 | **unrelated** 118:16 |
| **transaction** 18:10 | 112:25 117:15 | **ultimately** 73:8 | **unsecured** 7:20 |
| 33:13 56:16 84:7 | 118:10,19,19 | **unasserted** 75:18 | 8:15 10:22 11:4,6 |
| 84:9 85:1 97:17 | **trustee's** 34:1 | **unclear** 18:15 | 12:11,13 14:20,24 |
| **transactions** | 45:10 | **uncontested** | 17:7 24:25 29:18 |
| 52:16 53:7,10 | **trustees** 54:11 | 46:13,19 | 35:2,21 36:14,16 |
| 54:9 74:4 76:23 | 56:17 84:19 98:20 | **undergoing** 59:4 | 36:19,23 37:3 |
| 84:1,10 85:17 | 110:6 111:19,22 | **underlying** 101:5 | 44:7 45:5 49:20 |
| 86:6,20 98:6 | 112:2,7 114:1 | **undermine** 84:11 | 77:12 84:19 86:2 |
| 101:16 | 115:23 117:13 | 98:1 | 88:1 98:10,20 |
| **transcribed** 2:25 | **try** 20:17,18 54:24 | **understand** 7:9 | 105:18 112:23 |
| **transcript** 81:3 | 103:22 | 7:11 9:20 14:7,21 | **unsecureds** 11:23 |
| 95:9 122:4 | **trying** 9:5 16:7,21 | 16:18 29:24 50:23 | 23:21 49:25 |
| **transcripts** 54:21 | 17:2 61:16 104:9 | 55:22 61:23 68:15 | **unsolicited** 24:17 |
| **transparency** | **turn** 10:14 14:5 | 78:6 87:3 98:16 | 26:25 |
| 105:22 | 59:14 65:10 66:12 | 102:1 104:7,14 | **unusual** 66:16,20 |
| **transparent** 104:9 | 67:22 69:12 | 107:3 108:24 | 72:12,16 79:18 |
| **transpired** 31:23 | **turned** 14:3 63:4 | 113:18 117:7 | 95:7 |
| **treat** 37:18 71:18 | **turning** 97:18 | **understandable** | **unwritten** 94:5 |
| **treated** 29:12 | **turns** 59:11 | 30:7 | **upended** 18:10 |
| 58:13 | **tweaking** 54:25 | **understanding** | **use** 38:10 54:21 |
| **treatment** 79:6 | **tweed** 3:3 | 30:12 44:6,11,13 | 94:5 |
| **tremendous** 23:3 | **twice** 65:16 | **understood** 7:17 | **ust** 2:10 103:25 |
| **tried** 54:20 | **two** 7:23 8:9 | 44:9 63:7 64:1 | 104:7 |
| **trophy** 95:13 | 14:12 20:8,16,17 | **unexpired** 2:5 | **usual** 16:24 20:25 |
| **trouble** 74:6 | 21:23 22:11 75:12 | **unfair** 117:17 | 38:3 |
| **troubles** 100:6 | 75:15 87:4 92:1 | **unfortunately** | **usually** 20:24 |
| **true** 40:3 67:3,4 | 117:13 | 42:19 94:14 | 38:23 75:14 88:13 |
| 93:22 118:9 122:4 | **tyler** 47:13 48:5 | **unimpaired** 18:22 | 94:14,23 95:3 |
| **truly** 28:15 72:12 | 119:11 | 50:1 56:21 | **utah** 4:2 |
| 72:16 | **type** 13:19 23:10 | **united** 1:1,12 3:13 | |
| **trust** 8:8 23:15 | 34:3 | 5:1 22:9 24:6 | **v** |
| 30:1 31:6 33:18 | **typical** 13:2 | 81:16 85:19 91:20 | |
| 62:13 65:11 76:16 | | 106:2 | **v** 6:11 83:8,21 |
| 77:1 80:6 88:1 | **u** | **universal** 15:6 | 84:2 91:20 |
| 96:9 117:12 | | **universe** 57:14 | **validated** 112:16 |
| 118:18,20 | **u.s.** 1:23 5:2 7:9 | **unknown** 57:14 | **valuation** 47:21 |
| **trustee** 5:2 7:9 | 12:5 25:25 30:24 | **unopposed** 7:5 | **value** 17:7,7 18:16 |
| 12:5 22:9 24:6 | 34:1 45:10 52:10 | | 21:7 23:4,17 |
| | 79:13 104:25 | | 31:17 34:5 39:15 |
| | 106:4 107:16,20 | | 61:10 69:17 73:12 |

UST-0910

[value - would've]

74:22 75:1,2,3
76:8,11,20 93:15
96:24
**values** 49:19
**varick** 5:3
**variety** 56:8 68:22
**various** 27:8
36:17 37:22 50:15
50:22 81:2,21,23
95:3,23
**varying** 106:20
**vehicle** 62:13
108:13
**verbatim** 104:4
**veritext** 122:20
**version** 34:2 46:8
**versus** 102:20
**viable** 62:13
**vicinity** 19:16
**view** 8:2 10:10
99:14 101:17
116:11
**viewed** 67:11
**violated** 59:21
**violation** 94:2
**violations** 94:1
**virtual** 51:18
**virtually** 79:19
82:11
**vis** 22:20,20 64:16
64:16
**visible** 14:21
**voice1** 103:6
**volume** 20:10
**voluntarily** 97:14
**voluntary** 91:8
**vote** 10:9,16 50:6
50:9,9 55:4 70:14
81:25
**voted** 8:6,12,15
9:15 10:7 49:21
49:22,25,25 54:6
54:7 82:1

**voting** 47:12
49:14
**vs** 88:1,2,2,3,15
88:16,18,19 89:13
90:23 91:5 92:4

**w**

**w** 6:6
**wag** 117:9
**waited** 18:13
**walk** 43:19
**walked** 19:14
**wallander** 118:22
**walter** 111:17
**want** 17:13,13,16
21:17 22:15,19
36:3 37:5 40:18
40:20,24,24 41:1
41:2 46:20 49:3
50:13 53:16,23
59:17 60:21 65:15
67:25 68:3 70:3
72:10,11 75:2
95:25 102:23
103:1 109:11
117:5,7,8
**wanted** 15:25
33:20 34:2,16,19
48:14 75:1,4 78:8
111:1 118:17,22
119:6
**wants** 14:8 35:13
66:21 74:2
**ward** 66:6 91:20
**warn** 49:2
**wary** 58:17
**washington**
101:11
**wasn't** 117:22
**waste** 81:10
**way** 12:12 16:25
18:16 35:4 39:2,5
42:25 50:17 61:7
66:12 73:4 78:5,7

78:13 81:19 97:24
101:7 116:15
117:9
**we've** 21:22 23:13
34:13 41:22 51:25
56:9
**weeded** 117:5
**week** 20:4,9
**weekend** 43:24
**weeks** 8:5 20:16
20:17
**weigh** 10:23 60:7
107:21
**went** 11:25 23:1
70:4 73:9
**westinghouse**
54:21
**we'll** 110:1 111:7
111:15 113:22
115:15 118:4
**we're** 110:8,11
114:21 115:18,22
**we've** 117:3
119:13
**what's** 116:2
**whichever** 66:12
111:13
**white** 4:8 14:11
27:16 32:13,18
33:22 34:12 42:6
**who've** 9:13,14,14
24:2
**who's** 109:1 119:3
**wide** 50:21
**widespread** 49:13
70:2
**wildly** 62:7
**wiles** 1:22
**wilks** 90:23
**willful** 84:5 85:6
**willing** 16:19
29:22 36:24 45:14
45:15 103:4 116:4

**win** 64:12
**window** 13:9
22:16 23:2 63:1,5
63:6
**winger** 4:21 46:12
46:16 47:5,8,9
48:7,13,18,20
103:21,21 104:24
114:11
**winger's** 105:21
**wish** 22:10 30:19
79:23 82:14
**wished** 82:3
**wishes** 48:2 105:5
**withdrawal** 29:19
**withdrawn** 20:22
**won't** 115:9
**word** 37:25 38:10
52:25 81:8
**worded** 52:19
**wording** 85:9
**words** 19:12
70:15 72:13
**work** 20:11 23:1
27:4 51:22 60:14
60:20 61:17 62:8
62:20 63:9 100:13
100:22 101:5,7,8
101:10 108:7,21
**workable** 60:22
**worked** 23:8
103:18 119:7
**works** 104:23
**world** 3:14 20:16
73:19
**worried** 51:17
54:18 94:25
**worrying** 97:3
**worsening** 77:19
**worth** 88:25
**worthless** 75:18
**would've** 8:16
15:22 16:13 28:4

Veritext Legal Solutions
www.veritext.com

| 30:2,7 63:8 |
| **wouldn't**  107:12 |
| 109:23 |
| **writes**  57:25 58:4 |
| **written**  43:21 |
| **wrong**  60:17,17 |
| 61:11 76:5 |

| **x** |
| --- |
| **x**  1:4,10 59:9 |
| 121:1 |

| **y** |
| --- |
| **y**  59:9 |
| **yards**  3:6 |
| **yeah**  9:3 17:13 |
| 66:14 115:14 |
| **year**  28:12 73:3 |
| 87:13 |
| **yep**  30:22 |
| **yield**  9:23 59:11 |
| **yields**  60:7 |
| **york**  1:2,14 3:7,15 |
| 4:4,11 5:4,11 |
| 87:25 |
| **you're**  107:1 |
| 111:20 119:2 |

| **z** |
| --- |
| **zale**  88:3 |
| **zero**  19:23 37:13 |
| 37:13 |
| **zui**  47:20 48:6 |
| **zuzolo**  5:13 |

| **à** |
| --- |
| **à**  22:20 64:16 |

<pre>
 1              IN THE UNITED STATES BANKRUPTCY COURT
               EASTERN DISTRICT OF VIRGINIA (RICHMOND)
 2
      In Re:                          )  Case No. 20-33113 (KRH)
 3                                    )  Richmond, Virginia
      ASCENA RETAIL GROUP, INC., et   )
 4    al.                             )
                                      )  September 10, 2020
 5              Debtors.              )  11:07 a.m.
                                      )
 6    ------------------------------- )

 7                  TRANSCRIPT OF ZOOM HEARING ON

 8    1. "DISCLOSURE STATEMENT MOTION" DEBTORS' MOTION FOR ENTRY OF
          AN ORDER (I) APPROVING THE ADEQUACY OF THE DISCLOSURE
 9        STATEMENT, (II) APPROVING THE SOLICITATION AND NOTICE
         PROCEDURES WITH RESPECT TO CONFIRMATION OF THE DEBTORS'
10       PROPOSED JOINT PLAN OF REORGANIZATION, (III) APPROVING THE
          FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (IV)
11    SCHEDULING CERTAIN DATES WITH RESPECT THERETO, AND (V) GRANTING
                       RELATED RELIEF [DOCKET NO. 156]
12
         2. "CASH COLLATERAL/DIP MOTION" DEBTORS' MOTION FOR ENTRY OF
13    INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN
       POST-PETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE
14         CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING
          SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING
15    ADEQUATE PROTECTION TO THE PREPETITION LENDERS, (V) MODIFYING
      THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII)
16                 GRANTING RELATED RELIEF [DOCKET NO. 18]

17    3. "RENT DEFERRAL MOTION" DEBTORS' MOTION FOR ENTRY OF AN ORDER
      (I) EXTENDING TIME FOR PERFORMANCE OF OBLIGATIONS ARISING UNDER
18        UNEXPIRED NON-RESIDENTIAL REAL PROPERTY LEASES, AND (II)
                   GRANTING RELATED RELIEF [DOCKET NO. 158]
19
      4. "A&M APPLICATION" DEBTORS' APPLICATION FOR ENTRY OF AN ORDER
20     AUTHORIZING THE RETENTION AND EMPLOYMENT OF ALVAREZ & MARSAL
      NORTH AMERICA, LLC AS RESTRUCTURING ADVISORS TO THE DEBTORS AND
21    DEBTORS IN POSSESSION PURSUANT TO SECTIONS 327(a) AND 328(a) OF
       THE BANKRUPTCY CODE, EFFECTIVE AS OF JULY 23, 2020 [DOCKET NO.
22                                263]

23

24

25
</pre>

1    5. "MOTION TO EXPEDITE DIP SEAL MOTION" DEBTORS' MOTION FOR AN
     EXPEDITED HEARING AND SHORTENED NOTICE WITH RESPECT TO DEBTORS'
2      EMERGENCY MOTION SEEKING ENTRY OF AN ORDER AUTHORIZING THE
      DEBTORS TO FILE THE FEE LETTERS UNDER SEAL [DOCKET NO. 573]
3
     6. "DIP SEAL MOTION" DEBTORS' EMERGENCY MOTION SEEKING ENTRY OF
4     AN ORDER AUTHORIZING THE DEBTORS TO FILE THE FEE LETTERS UNDER
                     SEAL [DOCKET NO. 568]
5
                BEFORE THE HONORABLE KEVIN R. HUENNEKENS
6                 UNITED STATES BANKRUPTCY JUDGE

7   APPEARANCES (ALL TELEPHONIC):
    For the Debtors:               STEVEN N. SERAJEDDINI, P.C.
8                                  KIRKLAND & ELLIS LLP
                                   601 Lexington Avenue
9                                  New York, NY 10022

10                                 JOHN R. LUZE, ESQ.
                                   JAMES R P HILEMAN, ESQ.
11                                 KIRKLAND & ELLIS LLP
                                   300 North LaSalle
12                                 Chicago, IL 60654

13  For the United States Trustee: LISA Y. STEVENS, ESQ.
                                   OFFICE OF THE UNITED STATES
14                                 TRUSTEE
                                   6305 Ivy Lane
15                                 Suite 600
                                   Greenbelt, MD 20770
16
                                   KATHRYN R. MONTGOMERY, AUST
17                                 OFFICE OF THE UNITED STATES
                                   TRUSTEE
18                                 701 East Broad Street
                                   Suite 4304
19                                 Richmond, VA 23219

20  For the Official Committee of  ROBERT J. FEINSTEIN, ESQ.
    Unsecured Creditors            PACHULSKI STANG ZIEHL & JONES
21                                 780 Third Avenue
                                   34th Floor
22                                 New York, NY 10017

23  For JPMorgan Chase Bank, as    JULIA FROST-DAVIES, ESQ.
    Agent for the Pre-Petition ABL CHRISTOPHER L. CARTER, ESQ.
24  Lenders:                       MORGAN, LEWIS & BOCKIUS LLP
                                   One Federal Street
25                                 Boston, MA 02110

UST-0914

```
 1   For JPMorgan Chase Bank, as       TYLER BROWN, ESQ.
     Agent for the Pre-Petition ABL   HUNTON ANDREWS KURTH LLP
 2   Lenders:                          Riverfront Plaza, East Tower
                                       951 East Byrd Street
 3                                     Richmond, VA 23219

 4   For Various Landlords:            IVAN M. GOLD, ESQ.
                                       ALLEN MATKINS LECK GAMBLE
 5                                     MALLORY & NATSIS LLP
                                       3 Embarcadero Center
 6                                     12th Floor
                                       San Francisco, CA 94111
 7
     For U.S. Securities and          DAVID W. BADDLEY, ESQ.
 8   Exchange Commission:              U.S. SECURITIES AND EXCHANGE
                                       COMMISSION
 9                                     950 East Paces Ferry Road
                                       Suite 900
10                                     Atlanta, GA 30326

11   For Joel Patterson and           ANDREW BEHLMANN, ESQ.
     Michaella Corporation:            LOWENSTEIN SANDLER LLP
12                                     One Lowenstein Drive
                                       Roseland, NJ 07068
13
                                       RONALD PAGE, ESQ.
14                                     RONALD PAGE PLC
                                       P.O. Box 73087
15                                     North Chesterfield, VA 23235

16

17

18

19

20

21   Transcription Services:          eScribers, LLC
                                       7227 North 16th Street
22                                     Suite #207
                                       Phoenix, AZ 85020
23                                     (973) 406-2250

24   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

UST-0915

Colloquy 4

```
 1              THE COURT:  Are the debtors ready to proceed?
 2              MR. SERAJEDDINI:  Yes, Your Honor.
 3              THE COURT:  All right.  Please.
 4              MR. SERAJEDDINI:  Good morning.  Steven Serajeddini of
 5    Kirkland & Ellis on behalf of the debtors.  With me are my
 6    colleagues John Luze and Jeffrey Hileman.
 7              Your Honor, we're here today for motions to approve
 8    the disclosure statement and our two DIP financings.  So I'll
 9    explain in a moment, our motion to refer rent payments will not
10    be heard today.
11              So we thank Your Honor, first and foremost, by
12    indulging us by moving this hearing a couple of times.  I'm
13    very happy to report that we've been able to use the time very
14    well here.  The punchline is that the plans and our financings
15    are now supported by all our major creditor constituencies.
16    Let me update the Court on how we got there.
17              The first resolution is with an ad hoc group of
18    lenders that Your Honor heard from on discovery matters earlier
19    in the case.  The ad hoc group objected to certain of the terms
20    of the DIP facility, largely premised on the fact that they
21    wanted to participate in more of the facility.  We were able,
22    over the last several weeks, to work with the ad hoc group and
23    the RSA lender group to amend the terms of the DIP financing to
24    allow for this.  With these changes, we've gone from sixty-
25    eight percent of our lenders supporting the RSA to now nearly
```

UST-0916

```
 1    ninety-five percent of our term loan lenders as party to the
 2    RSA.  That's an incredible level of consensus for such a large
 3    and widely held loan, so we're very happy about that.
 4            We've also had a very fruitful dialogue with the
 5    official committee of unsecured creditors.  Since the
 6    appointment of the committee its advisors have been hard at
 7    work with us and the RSA parties to build consensus here, and
 8    this restructuring is a very positive outcome for all of our
 9    stakeholders.  And our creditors' committee, to its significant
10    credit, recognized that right away and worked with us to make
11    the deal even better.  And the RSA parties also came to the
12    table and engaged in a very reasonable manner.  And as a result
13    of all that, we were able to come to a deal before the Court.
14            The key terms of the deal, Your Honor, some of which
15    are up for today and some of which will be heard at a later
16    date, involve an increase of the unsecured creditor
17    distribution from 500,000 to 6.5 million, plus up to a further
18    3 million in recoveries, based on our waterfall relying on net
19    proceeds of certain of the companies' pending litigations.
20            Debtors will use commercially reasonable efforts to
21    make critical vendor distributions on the premise that we are
22    obtaining favorable trade terms or further plan support.  And
23    we'll also withdraw the rent deferral motion and make
24    administrative rent payments to our landlords in the near term,
25    including stub rent and resolution of these issues.
```

UST-0917

1        And last, the debtors will waive certain Chapter 5

2   causes of action against our partners, our vendors, our

3   landlords, service providers, and employees in connection with

4   confirmation of the plan.  So just greater resolution around

5   that issue.

6        All of these changes were reflected in the amended

7   documents that were filed last night, and on that basis the

8   creditors' committee is supportive of both the plan and debtor-

9   in-possession financing.

10        So Your Honor, that brings us to about as

11   comprehensive of a resolution with our creditors that we can

12   have at a disclosure statement hearing, and we're thrilled to

13   have done it here in record time.  So again, very positive news

14   for the case and for the company.

15        So unless Your Honor has any questions for me at the

16   outset, I can turn to that first item on the agenda, which is

17   the motion to approve the disclosure statement.

18        THE COURT:  Let me just say that you have been very

19   busy, and I spent a largely sleepless night last night trying

20   to catch up with you, so I have been through the documents, and

21   so have, I believe, a working familiarity with what you're

22   doing here.  But yes, please take up the first motion.

23        MR. SERAJEDDINI:  Great.  Thank you, Your Honor.  So

24   the motion to approve the disclosure statement was filed at

25   docket number 156.  We filed exhibits at docket number 548, and

UST-0918

1  we filed the revised plan last night at docket 564, disclosure

2  statement at 565, and revised proposed order at 566.  And

3  apologies for all that paper.

4        Your Honor has heard from me before on the terms of

5  the transaction here, but just to repeat briefly.  Our plan

6  here proposes to equitize our term loan into fifty-five percent

7  of the equity and receive distributions on eighty-eight million

8  of takeback that our DIP term loans, if approved today, will

9  roll into exit facilities, and the DIP term loan specifically

10 will roll into forty-five percent of the reorganized equity as

11 well.

12       General unsecured creditors will receive the greater

13 cash recovery and other benefits I mentioned earlier, and our

14 equity holders will get the benefits of mutual releases, unless

15 they opt out of the releases.  And we'll take that up today as

16 well.

17       So Your Honor, last, but not least, I want to stress

18 that this is a reorganization.  It preserves a significant

19 going concern operation, tens of thousands of jobs, and the

20 financings here will be fully funded, so there will be no major

21 hurdles between here and confirmation in terms of getting this

22 transaction executed, provided we receive the appropriate

23 approvals.

24       We received a handful of formal and informal comments

25 and objections to the disclosure statement.  Happy to say that

UST-0919

 1  we resolved all but two of those, and those are from the

 2  securities lead plaintiffs as well as the SEC.

 3          With respect to the U.S. Trustee, we're resolved,

 4  subject to the understanding that the rights are reserved of

 5  the U.S. Trustee, as they are with all parties.  You sometimes

 6  wish you had a banner up on this issue at the disclosure

 7  statement stage, but on confirmation issues everyone's rights

 8  are reserved.  No one is bound.  And in particular, the U.S.

 9  Trustee is focused on issues related to releases and

10  exculpations, as well as deem acceptance of the plan by a class

11  if no votes are cast in the class.  So technical issue there

12  that we'll take up, if needed, at confirmation.

13          But as I said, the remainder of the objections have

14  been resolved.  We worked very hard to do that.  The changes

15  were reflected in the revised documents I mentioned, and we

16  included a chart in our reply brief that ticked through those

17  changes.  Happy to address any of them at the appropriate time

18  if Your Honor has any questions.

19          But I'd like to turn back to the two objectors and

20  what their objections are.  So again, they take their exception

21  with issues related to releases here.  Scope of the releases,

22  the opt-out and the form of notice, and the rights of the

23  securities lead plaintiffs to opt out on behalf of their

24  putative class of shareholders.

25          So taking those in order, Your Honor, in terms of the

UST-0920

 1  scope, again, confirmation issue, we responded at length in our

 2  brief, so parties are on notice as to what we'll be arguing.

 3  The releases here are consensual.  The great opt-out debate has

 4  been taken up many times across the country, and the vast

 5  majority of decisions, including, most importantly, Your

 6  Honor's and those of Judge Phillips, have concluded that opt-

 7  outs are a valid form in this context of implied consent.

 8          In terms of support for the releases, we'll meet our

 9  burden at confirmation.  The restructuring has global support

10  here.  The releases are an integral part of the transaction.

11  The releases provide meaningful value to reorganized

12  stakeholders and the debtors.  The released parties have made

13  valuable contributions to this process and shareholders -- I

14  note that shareholders themselves are receiving releases, that

15  is the releases here are mutual.

16          Court has ruled on these issues before, and the

17  releases in this case are consistent with the precedents.  So

18  for now, again, all we can say is nothing here comes close to

19  the level of patent unconfirmability which is the standard on

20  this issue, and in terms of the opt-outs, again, parties are

21  free to argue whatever they want at confirmation, but this form

22  of notice has been recognized by this Court before, and we

23  believe is appropriate to give parties notice of the issues at

24  stake here.

25          A little more on that notice, because the SEC actually

UST-0921

1    objected specifically to the notice, body of the notice itself.

2    Their request was to put it, in their words, in plain English.

3    And that's certainly the goal of all our legal communications,

4    so no argument at all on that front.  We asked for help from

5    the SEC to do that from their perspective.  They didn't give us

6    any comments.  But we made such changes as noting in the title

7    to the notices, which isn't always the case, but we went the

8    extra step here, to note that there is a third-party release in

9    the actual title of the document, so no party is confused.

10            In its current form, I actually counted this morning,

11   the word "release" is mentioned thirty-eight times in the

12   document.  It's a short document, and the form clearly says

13   that by checking this box you elect to opt out of the third-

14   party release.  So parties are on notice as to what they need

15   to do, and we're expecting them to read far more complicated

16   and lengthy documents in this case than these ballots.  And so

17   I think on that basis, and again, consistent with the Court's

18   most recent ruling in Pier 1, not sure what else there is for

19   us to do here in terms of the form of release, but as I said,

20   we were always happy to take comments.  We just didn't receive

21   any.

22            In terms of the last issue, and that's raised by the

23   lead plaintiffs regarding the ability of the class action

24   plaintiffs to opt out on behalf of all of their putative class

25   members.  And I emphasize putative.  This class hasn't been

UST-0922

1    certified in this court or any other court.  This is just a

2    putative class.

3            And again, the issue of whether they have standing to

4    object to or otherwise take up these issues, I suppose can be

5    heard at confirmation, but the issue of their right to assert

6    rights in the bankruptcy in general, that's pretty well-trodden

7    ground.  Bankruptcy cases are clear on that.

8            Counsel has to clear several burdens in order to

9    acquire the clients it seeks, and therefore it's not

10   appropriate for counsel to exercise those rights on behalf of

11   the clients.  So there's no reason to modify our solicitation

12   procedures today to allow for that specific right.  If counsel

13   wants to raise arguments as to that issue, again, at

14   confirmation, I suppose they're free to do that.

15           But again, none of that is up for today.  For today's

16   purposes, we believe our notices and our opt-out form is

17   consistent with the legal requirements, and the fact that it's

18   served upon each of the parties to whom we seek a release is

19   sufficient to meet the requirements.

20           So again, unless Your Honor has any questions for me,

21   for those reasons and all the reasons outlined in our papers

22   the disclosure statement here meets the elements of 1125, and

23   we ask that the Court authorize the motion and allow us to

24   begin solicitation in these cases.

25           THE COURT:  All right.  Thank you very much.

UST-0923

 1          Let me hear first from the Securities and Exchange

 2   Commission.

 3          MR. BADDLEY:  Good morning, Your Honor.  This is David

 4   Baddley.  Can you hear me all right?

 5          THE COURT:  I can hear you, Mr. Baddley.  Thank you.

 6          MR. BADDLEY:  Thank you.  Your Honor, we don't get the

 7   opportunity to appear in bankruptcy court very often, so let

 8   me, I guess, start off by saying what it is that the SEC is not

 9   intending to do in this case.

10          We are not intending to get in the way of a

11   restructuring of any sort of bankruptcy process that will save

12   a company, save jobs, save customers, save suppliers.  Our

13   interest in this case is very narrow.  It is to ensure the fair

14   treatment of public shareholders.  And it's occurred to me

15   from, I guess, hearing the history of opt-out notices and some

16   of this that I'm probably asking for everyone here to take a

17   fresh look at this issue.

18          And we do have serious issues and concerns with an

19   opt-out process, especially in this case, with the type of

20   release that's being proposed.

21          I understand that there's, kind of, this threshold

22   issue first of should we even get into that today.  Would the

23   Court like to hear the SEC's perspective on this issue at this

24   time or save it for confirmation?

25          The first thing that I do think should be discussed

UST-0924

 1    today, if any sort of process is going to go forward, as
 2    debtors' counsel pointed out, is the form of the notice and the
 3    time that shareholders would have to respond.  We were asked,
 4    after our objection was filed, whether or not there were any
 5    disclosures that could be added to the disclosure statement.  I
 6    was not aware that we were also invited to assist the debtors
 7    in rewriting the form of notice.
 8         Frankly, I think our view on what a simple and clear
 9    notice to shareholders should have is what we put in a footnote
10    in our objection, which would say (1) you're a shareholder of
11    Ascena Retail Group, (2) you are getting no distribution, (3)
12    unless you return this form, you will also lose all of your
13    rights against any other parties, and (4) there is no harm to
14    you in returning this form.  And frankly, the box should
15    already be checked.  Anyone who's returning it is intending to
16    opt out.
17         Insofar as whether or not this should be tabled for
18    confirmation, ultimately, that's Your Honor's call.  I guess
19    our concerns are allowing a procedure to go forward in order to
20    try to create a consent without deciding whether or not that is
21    actually a valid procedure.  So at the end of the day, we may
22    be looking back and saying that whole process was for naught,
23    if the Court were to agree that failure to return a piece of
24    paper constitutes consent.
25         We're also kind of looking at this and who the

UST-0925

 1    recipients of this notice will be, the current climate in the
 2    world.  I think getting any sort of notice like this can cause
 3    anxiety in a regular person, because frankly, they're not going
 4    to know what it says.  They're not going to know what it means.
 5    And one thought I had recently, and also on this, is what
 6    happens if we really do have a really diligent shareholder who
 7    goes out and gets legal advice on this, and they incur time and
 8    money to evaluate their rights and go through the process, only
 9    to find out on the backend that this never should have been
10    approved in the first place?

11            I also think it would be helpful to give us some sort
12    of clarity on what the issue will be at confirmation.  If we
13    know that failure to opt out is not consent, then we have teed
14    up what would be the ripe issue for confirmation, which is does
15    the release meet the standard for a nonconsensual release under
16    Fourth Circuit law?  Tabling it just leaves everything open,
17    and we don't really know what the final issues would be.

18            But again, we're happy to go in whichever way the
19    Court thinks best, but I do think it is important to us that we
20    do be heard on why failure to opt out in a case like this,
21    where you have public shareholders and this type of release,
22    where, frankly, no reasonable shareholder would ever agree to
23    this, it seems that it's just trying to create consent to avoid
24    a burden that's not necessary.

25            And just, kind of, getting back to the form of the

UST-0926

 1  notice, I work at the SEC, but I'm a bankruptcy lawyer.  I know

 2  that everyone on this Zoom call can read this notice and know

 3  exactly what it's intended to do.  I invite people to, just as

 4  an anecdote, give it to friends.  Give it to family members and

 5  say if you got this in the mail, would you know what to do with

 6  it?

 7          I have actually done that.  I did it recently.  And

 8  I'm not saying this for evidence.  I'm saying this for

 9  perspective, that college educated people who invest in the

10  stock market get something like this and have no idea what it

11  means.  No one told me that they would return the form.  People

12  will say oh, I would send it to my advisor, ask them what I

13  should do.

14          But it is in no way clear to anyone who does not

15  practice Chapter 11 bankruptcy, and I don't know how to make

16  these things more clear, other than what I said of plain words,

17  plain English, skipping all the please take notice that, and

18  just getting to the point and telling people if you don't

19  return this sheet of paper, you are going to lose all of your

20  rights against anyone else who's not in bankruptcy.

21          So that's my opening on what we think about the

22  notice.  Oh, and on the timing to respond, I've never

23  understood why opt-outs need to be returned by confirmation.

24  It's not a condition.  Clearly, anyone who's protected by this

25  release would have to assume that everyone's going to opt out,

UST-0927

Case 3:23-13143-KCF DJN Doc 590 cument 339-11/20 led 06/26/09 11/20 1031.16:54:58 Desc Main
Document 414 age 16 of 67
Colloquy 16

1 so I've always questioned why can't this be a ninety-day return

2 window. Why does it have to be heard or received prior to

3 confirmation? And I've never really gotten a clear

4 understanding on that.

5 So again, our request would be if the Court were to

6 allow some sort of procedure to go forward with reserving all

7 rights to confirmation, we'd want a clear notice and definite

8 would be a broader return window. Frankly, I mean, creditors

9 get ninety days to file a proof of claim against the debtor.

10 Here, this is basically preserving rights and retaining claims

11 against an entire world of people. Ninety days doesn't seem

12 that unreasonable.

13 So again, reserving our views on the opt-out, the

14 substance of the objection, which I'm happy to get into if the

15 Court would like, but I wanted to address those preliminary --

16 THE COURT: All right. I would like to focus on the

17 actual notice, and rights to object to opt-out such can be

18 taken up at confirmation. That's a confirmation issue, so we

19 don't need to get into that. And I'm certainly going to let

20 the debtor respond in just a moment. But let me hear next from

21 the counsel for the putative class.

22 MR. BEHLMANN: Good morning, Your Honor. Andrew

23 Behlmann from Lowenstein Sandler on behalf of Michaella

24 Corporation and Joel Patterson, who are, as debtors' counsel

25 noted, lead plaintiffs in a federal securities litigation

UST-0928

 1 | pending in the District of New Jersey.  I have been admitted

 2 | pro hac vice at docket number 543, and my local counsel, Mr.

 3 | Ronald Page, is present on the hearing via Zoom today.

 4 |         THE COURT:  Very good.

 5 |         MR. BEHLMANN:  Just a very, very 30,000-foot overview

 6 | of the securities litigation, I think, might be somewhat

 7 | helpful, Your Honor.  The case is pending.  It was

 8 | consolidated, and a consolidated amended complaint was filed on

 9 | November 21st of 2019.  That complaint asserts claims under the

10 | Securities Exchange Act of 1934 and certain related SEC rules

11 | against three defendants.  One is Ascena itself, and the other

12 | two are individuals:  Mr. David Jaffe, the retired CEO, who as

13 | of the filing of the complaint was still a director, and Mr.

14 | Robert Giammatteo, who was the CFO and EVP at all relevant

15 | times in the last period.

16 |         The complaint alleges that the defendants materially

17 | overstated the value and the business prospects of Ann Inc.,

18 | which was a subsidiary of the debtors, and its Ann Taylor and

19 | LOFT brands.  And those claims are asserted on behalf of a

20 | putative class of all persons, a little different from the

21 | folks that the SEC is concerned about at the moment.  These are

22 | people that bought Ascena's common stock or otherwise acquired

23 | Ascena's common stock during the period from December 1st of

24 | 2015 through May 17th of 2017, inclusive.  So not necessarily

25 | current holders.  Folks that did purchase stocks, because their

UST-0929

1    claims arise out of the transactions in the stock.

2           As Mr. Serajeddini noted at the outset a little while

3    ago, our principal concern is with the third-party release.  I

4    think we're in a little different position from the SEC,

5    though, because to us this is not just a confirmation issue.

6    It's an issue that's inextricably intertwined with the

7    solicitation procedures, and our view is that approving the

8    solicitation procedures and the disclosure statement in their

9    current form is going to set the train on the track and set the

10   opt-out process in motion.

11          But separate and apart from that, we also, as we note

12   in our objection, believe that this issue does render the plan

13   patently nonconfirmable, not to the extent we would necessarily

14   be able to reserve the issue for confirmation, but to the

15   extent that sending all the ballots out, sending all the opt-

16   out notices out, sets the plan on a path to failure in its

17   current form.

18          So what is our specific issue, because this is a

19   little more granular than some of the other concerns that have

20   been voiced, and I think it's a little more granular than the

21   way the debtors have described it?  The third-party release

22   that it's in the plan in its current form, including the

23   amended plan filed last night, would bind all holders of

24   Interests as releasing parties.  That's capital I Interests as

25   defined in the plan.

UST-0930

1          The claims of the lead plaintiffs in the class against

2    the debtors arise from purchases or sales of the securities of

3    the debtors.  Therefore, they're subordinated pursuant to

4    Section 510(b) of the Bankruptcy Code.  The plan, in turn,

5    includes in its definition of Interests claims that are

6    subordinated pursuant to Section 510(b) of the Bankruptcy Code.

7    So we are, essentially, treated, for plan purposes, as holders

8    of interests, basically classified alongside current holders.

9          Current holders and also Section 510(b) claims through

10   the definition are receiving nothing under the plan.  So

11   they're impaired.  They're deemed to reject the plan.  They're

12   not entitled to vote on the plan.  They're getting nothing.

13   They don't have an opportunity to vote.  And many class members

14   just -- again, we're talking about a class period from December

15   2015 through May of 2017, between four-and-a-half and about

16   three-and-a-half years ago.  Many of those class members likely

17   do not still hold the debtors' stock.  Some may.  Some may be

18   current holders.  But many likely have sold since then and do

19   not still hold the stock.

20         Those folks that have since sold aren't even going to

21   receive notice of the bankruptcy.  They might read about it in

22   the news or happen to stumble upon it somewhere, but they're

23   not going to receive notice.  They probably didn't receive the

24   notice of commencement of the case, and they may not even

25   receive the solicitation packages.

UST-0931

1    But even those that might happen to learn of it,

2  whether they're current holders or whether they stumble upon

3  information about the bankruptcy in the news or otherwise, they

4  don't necessarily have any reason to believe that they should

5  spend any more than five seconds thinking about the bankruptcy

6  case, because they're getting nothing.  They're not entitled to

7  vote.  They're receiving nothing under the plan.  Yet the

8  third-party release threatens to gratuitously release their

9  claims against the two individual nondebtor defendants unless

10  they take a whole bunch of affirmative steps.

11    They've got to learn about the bankruptcy case, in the

12  first instance, which, as I mentioned, is going to be a tough

13  threshold for some people.  They have to find the plan and

14  disclosure statement, read the third-party release provisions

15  that are scattered around through definitions and otherwise.

16  They have to, and this is a fundamental piece, understand that

17  their claims are subordinated, which is a legal conclusion that

18  requires them to understand what Section 510(b) of the

19  Bankruptcy Code even is.

20    They have to figure out that the two defendants in the

21  class case, which in the class case motions to dismiss are

22  still pending, so that they may not even be aware of the class

23  case or be aware that they might have claims arising from their

24  purchases during the class period, but they have to figure out

25  that the defendants in that case are released parties.  They

UST-0932

1    have to put all that together there, synthesize what it all

2    means, and then fill out a form and mail it in.

3            If they don't do all of those things, they're going to

4    be deemed under the current plan to have "consented" -- and

5    I'll put that in quotes -- "consented" to give away their

6    claims against the nondebtor defendants in exchange for

7    absolutely nothing.  They're not getting anything under the

8    plan.  They're not getting anything from the individual

9    defendants themselves.  They're basically just deemed to have

10   given away their claims for absolutely nothing.

11           The rhetorical question that I believe we posed in our

12   objection, but I think is worth raising now, is why would any

13   informed class member ever knowingly consent to a release like

14   that, where they're receiving nothing?  The only plausible

15   answer is that they would not.  The supposed consent is purely

16   illusory.

17           Interestingly, the debtors stated in their reply that

18   they filed last night that, "that third-party releases

19   contained in the plan are consistent with Chapter 11 plans that

20   have been confirmed in this district".  They sort of gloss over

21   the issue that the concern that we've raised, and the concern

22   that I believe the SEC has also raised, is that these releases

23   would bind folks that are deemed to reject the plan.  They

24   don't have an opportunity to vote.  They don't have an economic

25   incentive to do anything.  They have no plausible reason to do

UST-0933

1  anything in the bankruptcy case.

2          So we took a look at some of those cases.  The debtors

3  cited six cases.  We had an opportunity to look at five of

4  them, because one is fairly old.  It's a thirteen-year old

5  case, Movie Gallery.  But we took a look at five of them that

6  were readily available in footnote 29.  And that's Gymboree,

7  Pier 1, Patriot Coal, Toys "R" Us, and Penn Virginia.

8          So in Gymboree the third-party release, the definition

9  of releasing parties included all holders that are deemed to

10  accept, so they're unimpaired, all holders who vote to accept,

11  so they're entitled to vote, they vote to accept the plan.  The

12  thinking is they accept it in toto.  All holders in voting

13  classes who abstain from voting and do not opt out.  Nowhere in

14  Gymboree did it say if you're deemed to reject the plan, if

15  you're not getting a ballot, if you're not getting anything

16  under the plan, if you have no economic reason to even look at

17  this plan, you're deemed to grant the release.  Nowhere.

18          Pier 1.  Same basic set, plus there was an express

19  caveat in Pier 1 that if you are deemed to reject, then you're

20  not a releasing party.  Exactly what we're asking for here.

21          Patriot Coal.  All other holders of claims or equity

22  interests except holders who vote to reject, do not vote to

23  accept or reject but who opt out, or who were in a class that

24  is deemed to reject the plan.  Again, folks that are deemed to

25  reject the plan, simply carved out of the release.

UST-0934

Case 22-33114 Case 22-33114-KRH Doc 590 Document Filed 09/11/24 Filed 06/26/21 Entered 09/11/22 09:19:33 Desc Main Document 4142 Page 23 of 67 Page 938 of 1585

Colloquy                                                        23

 1        Toys "R" Us - Delaware.  The releasing parties
 2   including admin claimants who don't opt out, unimpaired
 3   claimants who don't opt out, those who voted to accept, and
 4   those who receive a ballot, abstain, and do not opt out.
 5   Nowhere in Toys "R" Us did the definition of releasing parties
 6   include people who are deemed to reject the plan and don't even
 7   have an opportunity to vote.
 8        And then, finally, in Penn Virginia, the definition of
 9   releasing parties included all holders who are deemed to
10   accept, all holders who vote to accept, all holders of claims
11   in voting classes who do not abstain and do not -- or who do
12   not vote and do not opt out, and that's it.  Again, Penn
13   Virginia, no reference to folks in impaired nonvoting classes
14   being among those deemed to grant the release.
15        So those cases are not consistent with respect to this
16   particular issue, and this is not something that is just a
17   matter of course, as the debtors would suggest in their reply
18   and in their opening argument.  This is a somewhat unique
19   circumstance that the debtors have attempted to shoehorn into
20   this plan.  Presumably, we're not aware of what other claims
21   may be out there that the debtors are concerned about, but
22   presumably for the benefit of the two individual defendants in
23   the securities litigation, one of whom is, I believe, the son
24   of the founders of the company, and one who is a former very
25   senior officer.

UST-0935

1              None of those cases contained third-party releases

2    that bound creditors and impaired nonvoting classes.  And nor

3    should this plan, because a release of that nature is the very

4    definition of fundamental unfairness, and setting the

5    solicitation process in motion with respect to a plan

6    containing that type of release just sets the ball rolling

7    towards either a confirmation battle that leads to having to

8    reengineer the plan or just fundamental unfairness.

9              I would like, if it makes sense, I think, to reserve

10   on the issue of a class-wide opt-out.  We raised that in our

11   objection, and Mr. Serajeddini addressed it briefly.  I think

12   that that is a reasonable fallback in the event Your Honor is

13   inclined to leave impaired nonvoting classes in the definition

14   of releasing parties.  We'd ask that the solicitation

15   procedures order recognize our authority, just inherently as a

16   court-appointed lead plaintiff, to opt-out on behalf of the

17   whole class, but I would reserve further argument on that,

18   because I think the proper approach and the proper resolution

19   of this issue is simply to excise the impaired nonvoting

20   classes from the definition of releasing parties entirely.

21   There's really no other fair and equitable approach.

22             THE COURT:  All right.  Thank you very much.

23             So Mr. Serajeddini, I would like to get back with you

24   and ask you to respond, but I would ask you to focus on two

25   issues to help me, if you would.  The first is Mr. Baddley's

UST-0936

 1    suggested language that he said was included in the footnote to

 2    his reply that he was suggesting be included.  And the second,

 3    with regard to the class, how is the debtor giving notice to

 4    the putative class that very well may not be shareholders at

 5    the present time, but at a time extended did they get notice of

 6    the filing of the bankruptcy case?

 7            MR. SERAJEDDINI:  Certainly, Your Honor.  And by the

 8    way, I should say at the outset, we most definitely respect the

 9    input and participation of the SEC and thank them for their

10    engagement here.  I think their participation in Chapter 11

11    processes is helpful to the process.  So I want to note that at

12    the outset.

13            I also, to answer Your Honor's two specific questions,

14    on the first issue, in terms of comments, the notices, I said

15    in my comments, we're very, very happy to take those comments,

16    and we just heard them.  Apparently there was a

17    miscommunication over email, which is to be understood in these

18    environments, but we're happy to take the SEC's comments,

19    including all of the bulleted point that counsel listed, with

20    whatever modifications we need to do to actually make it

21    consistent with what the plan says.  But other than that, happy

22    to take counsel's comments.  And in fact, what I'd suggest,

23    Your Honor, is that we just do it upfront in the notice before

24    you get into the rest of the notice, so we have the rest of the

25    boilerplate, which I think some of it does have specific legal

UST-0937

Colloquy                                                                  26

 1   import -- that's important to us, but for counsel's purposes
 2   including their four bullets right upfront to address that
 3   issue.  I think that's definitely something we can accommodate.
 4              THE COURT:  Well, that would be helpful for me.  I
 5   think that that would -- just include it right at the very
 6   beginning as the bullet points, because it also goes to Mr.
 7   Behlmann's argument that he was making about this nonvoting
 8   opt-out class, and they would know right at the very beginning
 9   what's going on, and so that we would cover that point, because
10   I think many of the points that are being argued here today are
11   obviously confirmation issues, and I don't intend to get into
12   those, but as far as notice is concerned, I would like to see
13   that language added.
14              MR. SERAJEDDINI:  Absolutely.  We're happy to
15   accommodate, Your Honor.  And then in terms of Mr. Behlmann's
16   second issue, in terms of the notice given to the parties, I
17   believe current and former shareholders are being served the
18   same as well as a nonvoting party.  They're being served the
19   same nonvoting status opt-out form.  But we're happy to
20   coordinate with counsel to ensure that the parties that
21   counsel's most concerned about are, in fact, receiving those
22   notices.  It's somewhat ironic, but counsel relies on mass
23   noticing as well in his line of work, so --
24              THE COURT:  I'm aware of that.
25              MR. SERAJEDDINI:  So there should be an ability to

UST-0938

```
 1    compare mailing lists and confirm that we're using the
 2    appropriate parties in the list, and all the appropriate
 3    parties are getting the notice here.  We're happy to make that
 4    accommodation.
 5            THE COURT:  Okay.  Very good.
 6            So Mr. Baddley, turning back to you, then, sir, I am
 7    going to require the language that you propose be included
 8    upfront, simple, and clear.  So I think that the legalese, as
 9    you call it, needs to be in there as well, but certainly
10    there's nothing wrong with including the language, and I think
11    that this hearing being about disclosure, that's an excellent
12    suggestion, and obviously the debtor is willing to embrace it.
13    So I would request that you coordinate.  Just make sure that
14    you're happy with that, but I will require that language to be
15    included.
16            Now, with that, I am preserving any other arguments
17    you have with regard to the opt-out versus opt-in and such.
18    That would be a confirmation issue that we would take up at the
19    confirmation hearing.  I certainly invite you to have continued
20    dialogue with debtors' counsel on any issues that are of
21    concern to the SEC.
22            But I don't mean to cut you off, sir, and I would like
23    you to respond if you have any further issue you need to
24    address today.
25            MR. BADDLEY:  No, Your Honor.  Thank you.  I think
```

UST-0939

 1    that would be it for today with respect to just the notice.  I
 2    had suggested maybe more time, but perhaps that could be
 3    addressed at confirmation as well.
 4            THE COURT:  Very good.  Thank you, sir.
 5            All right.  So Mr. Behlmann.  I'm going to require
 6    that notice be sent out.  I would request that you coordinate
 7    with debtors' counsel with regard to any mailing lists or
 8    whatever you have, just to make sure that we give adequate
 9    notice to as many people as possible.  I think that many of the
10    arguments that you've been making before me today are also
11    confirmation issues with regard to the opt-out/opt-in legal
12    precedent, those kinds of things, for confirmation, which,
13    again, I would invite you to have a conversation with debtors'
14    counsel.
15            But again, did you have anything further that you
16    wanted me to address on your behalf today?
17            MR. BEHLMANN:  I do, Your Honor.  I actually wanted to
18    respond just very briefly to one of the comments that Mr.
19    Serajeddini made and I believe that Your Honor referenced.
20    Unfortunately, this isn't a case where it's as simple as just
21    giving the debtor a mailing list of who the class members are.
22    Given where the securities litigation currently stands, under
23    the PSLRA, the federal statute that imposes some limitations on
24    securities class actions, while the motions to dismiss are
25    pending in the case, which they -- the dispositive motions are

UST-0940

 1  out there.  They're fully briefed, although the case is
 2  temporarily stayed by operation of the bankruptcy through an
 3  order of the district court.  There is no discovery permitted
 4  in the district court case in the securities litigation.  So we
 5  have not had the opportunity, and will not have the
 6  opportunity, to actually take any discovery regarding the
 7  identities of the class members or anything like that.
 8         At this point in the case, we don't have a mailing
 9  list we can simply hand to Mr. Serajeddini.  There would be a
10  much more involved and much more intensive process necessary
11  for the debtors to give notice to members of the class.  It's
12  not unprecedented, but it is much more convoluted than simply
13  handing them a mailing list, because that mailing list is not
14  something we have.
15         It's not a circumstance where publication notice
16  suffices, because they are reasonably ascertainable, but
17  there's more steps than simply handing over a mailing list,
18  because we do not have that.  It would involve the debtors,
19  through their claims and noticing agent, taking certain steps
20  to distribute notices through nominee brokers and things like
21  that, which is, again, part of why we think it makes more sense
22  just to carve us out at this stage, but we understand and
23  respect Your Honor's decision that that is a confirmation
24  issue.
25         So I don't know how exactly we should proceed, but I

UST-0941

1    think it's a little more complex than Mr. Serajeddini

2    suggested.  It's not just a matter of handing them a mailing

3    list.

4           THE COURT:  All right.  Very good.  Thank you.  And

5    what that tells me is that that burden is on the debtor to make

6    sure that adequate notice is given, which is what we required

7    under the Bankruptcy Code for anybody to be bound, obviously.

8    So anything further, Mr. Serajeddini?

9           MR. SERAJEDDINI:  No, Your Honor.

10           THE COURT:  All right.  So the Court now has before it

11    the approval of the disclosure statement, the amended

12    disclosure statement, as was filed.  The Court is going to

13    approve that disclosure statement, with the additional language

14    that the Court has required here today, and all confirmation

15    objections are preserved and will be taken up at the

16    confirmation hearing.

17           Any question about the Court's ruling?

18           MR. SERAJEDDINI:  None here.  Thank you, Your Honor.

19           With that, I'll turn it over to my colleague, Mr.

20    Luze, on the DIP financing motion.

21           THE COURT:  All right.  Thank you very much, sir.

22           Mr. Luze?

23           MR. LUZE:  Thank you, Your Honor.  Can you hear me

24    okay?

25           THE COURT:  I can.  Thank you very much.

UST-0942

1        MR. LUZE:  Thank you, Your Honor.  As Mr. Serajeddini

2   noted at the outset, we've reached a global settlement with the

3   official creditors' committee in these Chapter 11 cases, as

4   well as a group of -- a minority group of term lenders

5   represented by King & Spalding, as it relates to their issues.

6   Primarily with the DIP, the settlement with respect to the King

7   & Spalding group is exclusively a DIP issue.  And issues were

8   resolved in an amendment to (audio interference) and an

9   amendment to the backstop arrangement, which will be included

10  as an exhibit to the solicitation version of the disclosure

11  statement, so it will be filed on the docket for everyone to

12  see, and that documentation was filed and was finalized in the

13  early morning hours.

14        And then with respect to the creditors' committee, the

15  core terms are reflected in the revisions to the DIP order.

16  There has also been an annex to the DIP order that reflects

17  what I refer to as the global settlement and is consistent with

18  the terms that Mr. Serajeddini described.  But on the basis of

19  that agreement, the creditors' committee have not objected to

20  the final DIP order today.

21        We have otherwise resolved almost all of the formal

22  objections except for the objection raised by the Office of the

23  United States Trustee and all of the informal objections.  So

24  Your Honor, we have primarily three issues with the U.S.

25  Trustee that are legal in nature that I will address briefly

UST-0943

 1 │ (audio interference) papers.

 2 │      Before we get into that, as a housekeeping matter,

 3 │ Your Honor, the evidence in support of the DIP is set forth in

 4 │ the first-day declaration of Ms. Teffner, which we've gotten

 5 │ quite a bit of mileage out of at this point, at docket number

 6 │ 14, and the declaration of Stuart Erickson of Guggenheim, who

 7 │ is the lead investment banker for the company.  It was attached

 8 │ to our reply at docket number 569.  I would respectfully

 9 │ request that those declarations be admitted in evidence.  Both

10 │ of the declarants are in the courtroom with me.

11 │      THE COURT:  Does any party wish to object to the

12 │ admission of those declarations or cross-examine the declarant?

13 │      All right.  Hearing no takers, those are admitted.

14 │      (Declaration of Carrie W. Teffner was hereby received

15 │ into evidence as Debtors' Exhibit as of this date)

16 │      (Declaration of Stuart Erickson was hereby received

17 │ into evidence as Debtors' Exhibit as of this date)

18 │      MR. LUZE:  Thank you, Your Honor.  So I'll address the

19 │ open issues with the Office of the United States Trustee

20 │ briefly.  We also address these issues in greater detail in the

21 │ papers.

22 │      First, Your Honor, is the United States Trustee's

23 │ objection to the orders granting of liens on proceeds of

24 │ avoidance actions for DIP obligations and adequate protection

25 │ obligations.  The argument of the U.S. Trustee, in short, is

UST-0944

 1  that the proceeds of those actions should be reserved

 2  exclusively for the benefit of holders of unsecured claims in

 3  these Chapter 11 cases.

 4          The company's position, as set out in our papers, Your

 5  Honor, is that the Bankruptcy Code does provide for the ability

 6  of the debtor to grant a lien on unencumbered assets and does

 7  not exclude in any way or mandate in any way that the proceeds

 8  of avoidance actions must be set aside for holders of unsecured

 9  claims.

10          So it is clear, from our perspective, that there is

11  authority, as a legal matter, as a bedrock legal principle, to

12  grant liens over proceeds from avoidance actions.  To the

13  extent the question is, you know, the company can, should they

14  grant liens over the proceeds of avoidance actions.  And I

15  think the answer here, Your Honor, is resoundingly yes.

16          The DIP financings and the consent of our pre-petition

17  secured lenders to use the cash collateral is of immense

18  benefit to the company and provides a very strong message to

19  the market that the company is open for business, which is

20  incredibly important, especially in the retail context, and

21  provides the company with liquidity during the case and after

22  the case.  And the latter point is especially important because

23  both facilities convert into exit facilities and provide the

24  liquidity to the company's long-term business plan.

25          On top of all that, the pre-petition secured lenders

UST-0945

 1  proactively, alongside the debtors, engaged with the creditors'
 2  committee in a constructive dialogue to resolve their issues
 3  with respect to this specific point and have provided for a
 4  Chapter 11 plan with a lot of consideration.  It was negotiated
 5  at arm's length, and have agreed, in the DIP order, to a soft
 6  marshalling provision where they had agreed to marshal away
 7  from unencumbered assets to collect on their adequate
 8  protection DIP liens.  So they would first seek to collect
 9  against previously -- well, all previously unencumbered assets,
10  but assets that would have been included in the pre-petition
11  collateral package, before they seek to assert a lien on
12  proceeds in avoidance actions.

13          So for all of those reasons, Your Honor, we think the
14  answer is not only can the debtors offer a lien on avoidance
15  actions proceeds but they -- it should be approved in this
16  case.

17          The second legal issue raised on the U.S. Trustee's
18  objection that remains open, Your Honor, is the Section 506(c)
19  waiver.  Again, Your Honor, it's the same considerations that
20  that point is important to the secured lenders, as part of an
21  overall package, to give them security for both the use of pre-
22  petition cash collateral and the extension of new financing,
23  and there's not alternative financing available on different
24  terms.

25          Again, the lenders and the company and the unsecured

UST-0946

```
 1   creditors' committee engaged specifically on this issue, and
 2   the resolution is reflected in the order.  It is also
 3   consistent -- we cited orders, from this Court and others, in
 4   recent retail cases where this waiver is granted, as set forth
 5   in our papers.  We believe it's within the company's discretion
 6   to grant this waiver, and here it's on a consensual basis with
 7   unsecured creditor constituencies.
 8          Finally, Your Honor, is a disclosure issue related to
 9   the fee letters, specifically as it relates to the ABL DIP
10   financing.  As is common, Your Honor, the ABL agent has
11   requested that, while we can disclose the fully unredacted fee
12   letters to the committee and the U.S. Trustee, which we've
13   done, and file them such that they'd be available to the Court
14   to review, they would be filed under seal and not available to
15   the general public on the docket.
16          This pricing information is competitively sensitive
17   information for the agent, and not only just in the market but,
18   in this particular deal, the syndicated ABL banks are all of
19   the agent's direct competitors in this space, and it is
20   important to the ABL agent, and it was a condition that --
21   condition to disclosure, I should say, not to entry into the
22   facility as a whole, that it be filed under seal.
23          So with that, Your Honor, I would conclude my argument
24   and pass the virtual podium over to Ms. Stevens.
25          THE COURT:  All right.  I would like to hear from Mr.
```

UST-0947

 1   Feinstein first, and then I'll turn back to the U.S. Trustee.

 2            MR. FEINSTEIN:  Thank you, Your Honor.  Can you see me

 3   and hear me okay?

 4            THE COURT:  I can, sir.  Thank you.

 5            MR. FEINSTEIN:  Thank you.  So first, Your Honor, I

 6   want to thank you for agreeing to adjourn this hearing twice

 7   because it didn't lead to a resolution.  And just, you know, I

 8   don't know how much Your Honor cares to hear how the sausage

 9   was made, but when the committee was formed, we approached the

10   debtor and the lenders, right out of the box, saying there are

11   a number of issues in the DIP that are very troubling to the

12   committee, but if we can do an overall deal for the case,

13   including the plan, then we would support the DIP, with certain

14   modifications, but not modifying the two issues that just came

15   up, which was the surcharge waiver and the lien on avoidance

16   actions.

17            And ordinarily, we would fight those, and I'm not

18   going to debate debtor's counsel about whether those are

19   appropriate or routine or not, but because we entered into

20   these global settlement discussions, we were able to get on

21   board with the DIP as is.  And certainly with respect to the

22   liens on avoidance actions, these are assets that typically

23   unsecured creditors look to, but here two important things

24   happened.  One was this agreement with respect to marshaling so

25   that those are the last assets that anybody would look to.  But

UST-0948

1     more importantly, that there is now a robust pot of cash in the

2     plan for general unsecured creditors.

3            And it's hard to reorganize these days, and this is a

4     remarkable outcome, if this case goes  to confirmation, because

5     so many retailers liquidate.  So there's tremendous value to

6     the constituents of the committee, landlords, vendors,

7     employees, to see a going concern.  So we really wanted to make

8     sure this case stayed pointed in that direction.  And on that

9     basis we didn't want to object to the DIP.  And there were

10    things in there that were troubling but because we've reached a

11    global settlement, we support the DIP, as presented to the

12    Court, with the modifications provided.

13           We think there's a lot of good in the overall

14    resolution for our constituents, not just the pot of cash under

15    the plan but also the rent deferral motions are being

16    withdrawn.  And there's a lot of landlords in this case who

17    were suffering a lot of pain, so we're pleased that, as part of

18    this agreement, that motion's going to be withdrawn, and the

19    rent is supposed to be paid by the 18th, not just the deferred

20    rent but the stub rent.

21           And then in terms of our vendor constituents the

22    preference waiver is very important.  And also the critical

23    vendor program, Your Honor, which is real money going to pre-

24    petition unsecured creditors.  And I think I mentioned this at

25    the hearing on the critical vendor motion itself, often this

UST-0949

```
 1   money for critical vendors is kind of flashed to vendors as an
 2   enticement, but a lot of times it doesn't get spent.  So you'll
 3   see that one of the terms and conditions here is a good-faith
 4   effort by the debtors to spend not less than seventy percent of
 5   that money.  And we think that's good for vendors, also good
 6   for the company.
 7           So I'll stop there, Your Honor.  We also, by the way,
 8   did have the fee letters from the ABL lender.  We appreciate
 9   the commercial sensitivities, so we're supportive of those
10   documents remaining under seal.  It's important to get the deal
11   done.  And on that basis, again, as modified, the committee
12   supports entry of the final DIP order.  Happy to answer any
13   questions, Your Honor.
14           THE COURT:  Thank you, Mr. Feinstein.
15           All right.  Let me hear from the Office of the U.S.
16   Trustee, please.
17           MS. STEVENS:  Good morning, Your Honor.  Lisa Stevens
18   on behalf of the United States Trustee.  With me on the
19   conference call is my colleague Kathryn Montgomery, the
20   Assistant United States Trustee in Richmond.
21           Again, Your Honor, we're here on the DIP financing and
22   cash collateral motion, and we believe that post-petition
23   financing should only be approved if its terms are not
24   overreaching or excessively favorable to the secured lender.
25   And we think that the waivers in this case do just that in that
```

UST-0950

1    they're overreaching and excessively favorable to the lenders.

2        The debtors seek to grant their secured lenders the

3    lien on these Chapter 5 actions, and the issue is of concern in

4    this case notably because there were large bonuses that were

5    paid to certain executives on the eve of filing for the

6    bankruptcy, and we think that these will implicate or may

7    implicate avoidance actions and that they should not become

8    collateral for the secured creditors but rather they should be

9    preserved for the unsecured creditors.

10       We are well aware that the debtors and the unsecured

11   creditors' committee have entered into a global settlement, and

12   we applaud the parties and the efforts, and we also think it's

13   helpful, the additional marshaling language that they have

14   added to the proposed order.  However, the United States

15   Trustee still fundamentally objects to the granting of liens on

16   the avoidance actions; because the right to recover the

17   preferences attach post-petition, it is disfavor for the debtor

18   to be able to sign these rights, and we think that the

19   potential proceeds should be preserved for the unsecured

20   creditors.

21       In addition, with respect to the 506 waiver of the

22   surcharge rights, 506(c) is a rule of fundamental fairness that

23   requires secured creditors to share some of the burdens of the

24   administrative expenses in a bankruptcy, where it's reasonable

25   and appropriate, and we believe that those are present here.

UST-0951

1  The section waiver inappropriately seeks to shift the cost of

2  preserving the lenders' collateral to the estate, and we

3  believe that's inequitable and unnecessary.

4         Moving on a little bit more to the desire to seal the

5  administrative agent's fees, we filed our objection and raised

6  this issue over a month ago, and we've been in discussions with

7  counsel about it to try to see if there's a way to narrow what

8  the objectionable issues were.  And then, at the eleventh hour,

9  they filed the motion to seal last night, which we believe

10 grants extraordinary relief, and that they haven't met their

11 burden of why this is necessary here.  And we think that it is

12 critical these costs and terms be disclosed to all parties-in-

13 interest, not just a select few.

14        Also it goes to the underlying pinnings of what

15 bankruptcy is.  It's about transparency and that public records

16 should be open for examination.  And we're referring to Section

17 107(a) of the Bankruptcy Code that provides that papers filed

18 in a case are public records and they're open to examination.

19 Similarly, Rule 5001 provides that all trials and hearings

20 shall be conducted in open court.  Thus, the sealing order

21 seeks to run contrary to the express dictates of Congress, and

22 it's an extraordinary remedy.  And they should only be provided

23 in limited, exceptional, and compelling circumstances, and none

24 of those are present here.

25        A party seeking to deny public access to court

UST-0952

 1   documents must overcome a strong presumption and must do so by

 2   demonstrating, with specificity, the precise harm that will

 3   flow from these disclosures, and the debtors have failed to do

 4   so.

 5          The debtors have not provided any actual explanation

 6   on how anything in the fee letter meets the criteria of Section

 7   107(b).  Rather, they simply assert that the disclosure of the

 8   terms would likely cause substantial harm, could create an

 9   unfair advantage.

10          To the extent that the debtors assert that such

11   information is protected commercial information, it simply does

12   not meet the standard.  Commercial information is information

13   which would result in an unfair advantage to competitors,

14   providing them with information as to the -- as to the

15   commercial operations of the party.

16          To constitute protectable commercial information, the

17   information must be so critical to the operations that the

18   disclosures will unfairly benefit the entity's competitors.

19          Typically, this information is names of clients.

20   Again, the fee letter contains, for the most part, nomenclature

21   assigned to the fee letter, and we don't believe that any of

22   these administrative agents' fees meet the criteria, and that

23   they're not confidential information.

24          Moreover, it's difficult to imagine that the entire

25   letter is confidential.  And instead of taking a more narrow

UST-0953

 1    approach, the debtors have redacted the entire letter -- have

 2    withheld the entire letter rather than redacting it.

 3           Further, the debtors provide no specific examples

 4    demonstrating how disclosures of the fee letter would hurt

 5    anyone, merely -- they've provided no evidence, and all they

 6    have stated is that the ABL agent says that it's highly

 7    sensitive and confidential information.  Well, their reasoning

 8    that they decide that they want to keep it confidential doesn't

 9    really overcome the high standards of Section 107.

10           On the other hand, we do think that this information

11    sought is critical to any creditor and party-in-interest, and

12    in balancing the equities, it should be disclosed.  To the

13    extent that the proposed order provides such letter will be

14    available to certain parties, we think that, again, that

15    violates the transparency, and we think it impermissibly shifts

16    the burden away from the debtor to fully and accurately

17    disclose information in the court.

18           For those reasons, we believe that the fee letter

19    should not be sealed.  Thank you, Your Honor.

20           THE COURT:  Thank you, Ms. Stevens.

21           All right, Ms. Frost-Davies, do you wish to be heard?

22           MS. FROST-DAVIES:  (Audio interference) Davies from

23    Morgan, Lewis & Bockius.  With me is Tyler Brown --

24           THE COURT:  Is Ms. Frost-Davies with us?

25           MS. FROST-DAVIES:  (Audio interference) hear me, Your

UST-0954

Colloquy                                                        43

 1  Honor?

 2              THE COURT:  I was having --

 3              MS. FROST-DAVIES:  Can you hear me, Your Honor?

 4              THE COURT:  -- difficulty hearing you.  Just if you

 5  can just repeat your name for the record, please.

 6              MS. FROST-DAVIES:  (Audio interference) hear me, Your

 7  Honor?

 8              THE COURT:  Yes, I can, thank you.

 9              MS. FROST-DAVIES:  Okay, certainly.  Sorry about that.

10  So Your Honor, for the record, Julia Frost-Davies of Morgan,

11  Lewis & Bockius, on behalf of JPMorgan Chase Bank, N.A., as

12  agent for the pre-petition and proposed DIP ABL lenders.  With

13  me is my colleague Chris Carter, and our co-counsel Tyler

14  Brown.

15              Your Honor, I'm going to take the points in reverse

16  order, if I might because of primacy of recency.  The fee

17  letter is right on my mind.

18              It is absolutely critical to our client that the fees

19  that are contained in the letter be kept confidential.  I can

20  explain why it is highly proprietary and commercial.  The

21  pricing of financing facilities, particularly of this size, in

22  this industry, is highly competitive.  As Mr. Luze noted, the

23  members of our bank group alone compete with one another.

24              And so when one of them is doing an agency, there will

25  be arranger fees that will go to the agent, and then there will

UST-0955

 1    be other fees that go to all of the other lenders.  Those are

 2    not disclosed even among the banks themselves.

 3           Now, in order to be sure that these are reasonable and

 4    that they are proper fees, we've taken a measured approach in

 5    the motion to seal that Mr. Luze has filed.  We have already

 6    provided the fee letters to the Office of the United States

 7    Trustee.  We have provided it to counsel for the unsecured

 8    creditors' committee on a professional-eyes-only basis.  And of

 9    course it has been provided to the Court.

10           The debtors and their independent financial advisors

11    and attorneys made the decision, in their business judgment,

12    that this financing facility would provide the best route for

13    the debtors to reorganize and to exit.  That is highly

14    competitive.  Other institutions will benefit from having that

15    information.  And frankly, it could be to the detriment of the

16    debtors, because if everyone knows what everybody else's levels

17    are, it -- they lose their ability to negotiate and to compete.

18           We do have a failsafe in the order.  If Your Honor

19    sees, in paragraph 2 of the proposed order, any party who

20    believes that he or she needs to see them, for a reason that is

21    not improper, can come to us.  I have my name and phone number

22    all over our emails and on our website.  And I'm happy to talk

23    with them.  We can enter into appropriate confidentiality

24    arrangements.  And if that doesn't work, they can certainly

25    come back to Your Honor.

UST-0956

 1          But it is extremely important to us that this remain
 2  private.  And for those reasons, they've recently had orders
 3  that are almost identical entered by Judge Isgur in the
 4  Tailored Brands case in Texas and in the Forever 21 case in
 5  Delaware.
 6          So Your Honor, with that, I submit that it is very
 7  important to us, as part of our agreement to finance, that
 8  these letters be sealed.
 9          If I could turn to the DIP objections, and I'll take
10  them in three pieces.  The first is the 506(c) waiver, and the
11  request by the Office of the United States Trustee that the
12  lenders -- I think the words were -- bear some of the burden.
13          Your Honor, our clients have a first lien on working-
14  capital assets.  Every dollar spent on this case for
15  professionals, pursuant to the carve-out, for administrative
16  expenses, for employees, comes exactly out of our collateral,
17  before we recover on it ourselves.
18          Leaving aside whether under Hartford Underwriters,
19  506(c) actually may be brought by anyone other than the
20  debtors, in this case we've already given at the office and
21  continue to give.  And we cannot expose or client to the risk
22  of an additional surcharge of their collateral.
23          With respect to the 552 waiver, I think it's been
24  clear by the conduct of the parties in this case, everyone is
25  working well together.  We've supported them from day one on

UST-0957

 1    cash collateral, DIP, and now exit financing.  And I think it

 2    is inappropriate not to have a waiver of the equities-of-the-

 3    case exception, which could leave to any impairment of our

 4    liens.

 5              With respect to the avoidance actions, I just want to

 6    clear up one thing that Ms. Stevens said.  It's not a lien on

 7    the actions themselves.  The lien is compromised -- or the

 8    interest is compromised in two ways.  First it's a lien only on

 9    the proceeds; and second, the Pachulski team asked, and we

10    agreed, that we marshal away from those assets.  So we will

11    first look to any other working-capital assets, any other

12    assets that were previously unencumbered, before ever resorting

13    to proceeds of avoidance actions.

14              And frankly, Your Honor, if we are in a case where the

15    senior secured lenders have to resort to the proceeds of

16    avoidance actions, something has gone terribly wrong.  And that

17    is not where this case is positioned.

18              I appreciate and understand the Office of the United

19    States Trustee wanting to look out for the interests of

20    unsecured creditors.  If we were at an interim hearing, I think

21    that would carry more weight.  Your Honor, in this case, we

22    have had weeks of negotiations with the fiduciaries for the

23    unsecured creditors, the team at Pachulski.  And we have, as

24    part of our consensual settlement, reached these agreements.

25              I'm happy to answer any questions Your Honor may have.

UST-0958

 1              THE COURT:  Thank you very much.

 2              Mr. Gold, did you wish to be heard?

 3              MR. GOLD:  I do, briefly, Your Honor.  Good morning.

 4    Ivan Gold of Allen Matkins, representing a number of the

 5    debtors' landlords.  I'd just like to speak to a very brief and

 6    discrete portion of the 506(c)/552 waivers.

 7              While certainly we appreciate the efforts of committee

 8    counsel and the cooperation of the lender group and the debtors

 9    in reaching what they describe as a global resolution, the

10    interplay between the DIP motion and the rent deferral motion

11    should not be lost on us.  The debtors, through a series of

12    adjournments, basically self-granted the relief sought by the

13    rent-deferral motion.

14              Today's day forty-nine of the case.  And Your Honor

15    should consider -- because we all weren't born yesterday, and

16    we're all old enough to remember cases that turned out to be

17    administratively insolvent or where after the DIP was approved,

18    circumstances changed, unfortunately, some of them in this

19    court.

20              It is not a burden, and it better balances the

21    interests of the parties to defer the 506(c) and 552 waivers

22    until the deferred rent and the stub rent are paid.  We're

23    talking only a matter of weeks.  If the lenders intend to pay

24    it, to use the old expression, they're giving us the sleeves

25    off their vest.

UST-0959

1          But that protection should be afforded the parties in

2     a case that some of the discussion today aside, the case is

3     hardly a rich recovery to unsecured creditors, so the amount of

4     cushion in this case is not significant.

5          So I would urge Your Honor to temporally limit the

6     effectiveness of the 506(c) and 552 waivers until these rent

7     deferrals of post-petition obligations, which ordinarily should

8     have been paid by now, in the ordinary course, certainly with

9     respect to the last couple months' worth of rent, for a motion

10    that's now been withdrawn, you should just kick the can just a

11    touch on the waivers.  And they can certainly go into effect

12    when those payments are made.  Thank you, Your Honor.

13         THE COURT:  Thank you, Mr. Gold.

14         Any other party wish to be heard before I turn back to

15    the debtor?

16         All right, Mr. Luze?

17         MR. LUZE:  Certainly, Your Honor.  Nothing further on

18    the initial points we discussed and others have addressed.

19    Just briefly on Mr. Gold's point, about a -- I guess a brief

20    deferral of the effectiveness of the waivers.

21         I think it's important, Your Honor, that the company,

22    today, has certainty with respect to the effectiveness of its

23    order; and the effectiveness of the financings are conditioned

24    on getting all of the relief entered today that's in the order.

25         It was carefully negotiated with the lenders and the

UST-0960

1   committee and other parties-in-interest that filed objections.

2   And the company has committed, as part of the deal with the

3   committee, to withdraw rent deferral and get those amounts paid

4   quickly, I mean, essentially as quickly as the company can cut

5   the checks.  And those dates are spelled out in the order, and

6   the company intends to move very expeditiously on that.

7           I would just -- I would not want to get into a

8   situation where there's lack of clarity with respect to the

9   effectiveness of the provisions of the DIP order or a lack of

10  clarity as to whether the lenders feel like they should be

11  funding, because certain provisions are not, because we are in

12  a situation where we are reconciling some amount of post-

13  petition rent with a single landlord or something -- even if

14  it's a little larger.

15          And so Your Honor, I think it's important that we have

16  that certainty today.  It was what was bargained for, and the

17  company will live up to its end of the bargain as well, with

18  respect to its commitment to get the deferred -- the unpaid

19  post-petition rent paid on a timely basis, consistent with

20  (audio interference).

21          THE COURT:  All right, thank you very much.

22          All right, the Court has before it the approval of the

23  DIP financing agreement.  The Court has heard the objections

24  raised by the Office of the U.S. Trustee.

25          The Court -- first of all, with regard to the pricing

UST-0961

Colloquy 50

```
 1   information in the fee letters, believes that that is very
 2   sensitive information.  The Court understands that and
 3   appreciates that -- why it is so sensitive to the -- to the
 4   lenders in this case.  And so the Court is going to grant the
 5   motion to file that under seal.
 6          As pointed out by Ms. Frost-Davies, there is an opt-
 7   out provision.  If somebody has a legitimate reason to see
 8   that, they can request that information with the appropriate
 9   safeguards.
10          With regard to the other issues, the Court is mindful
11   that the Bankruptcy Code is a powerful tool that allows
12   businesses the opportunity to reorganize and right the ship and
13   get back on its feet.  And that's what the Code is meant to do,
14   and the Code does that effectively.
15          And the provisions of the Code shouldn't get in the
16   way of that.  And what we have got here is a going-concern
17   plan.  We have ninety-five percent of the creditors on board.
18   And Mr. Feinstein has outlined the deal that he has made with
19   the debtors on behalf of the unsecured creditors.
20          And while -- where, Mr. Gold, it's probably not the
21   best deal, but a deal that allows and preserves a going
22   concern, allows businesses to continue, and landlords to be
23   paid in the future, as well as rent to be paid.  And this is an
24   important part of that process.
25          So the Court's going to approve the DIP, overrule the
```

UST-0962

Colloquy                                                    51

 1    objections of the Office of U.S. Trustee.  I don't think -- if

 2    I was hearing the unsecured creditors' committee objecting to

 3    the waivers, it would be a completely different story.  But

 4    they are not.

 5              And they're on board.  And it's because they have

 6    struck their business deal.  And that's what's important.  And

 7    so the Court's going to overrule the objections and allow --

 8    and approve the DIP.  And I think that the certainty that Mr.

 9    Luze mentioned in his concluding remarks is absolutely

10    important.  And so it'll be approved on a final basis.

11              Any questions regarding the Court's ruling?

12              All right.  Thank you.

13              Do we have any other business we need to take up in

14    this case today, Mr. Luze?

15              MR. LUZE:  No, Your Honor.  We will submit those

16    orders.  I would note that item number 4 on the agenda is the

17    A&M retention application, which was continued from the 3rd,

18    but is now consensual.  We worked through the issues with the

19    U.S. Trustee, so we will include that in the orders we submit

20    to chambers.  I don't think any argument is necessary on it.

21              THE COURT:  All right, excellent.  You know, I don't

22    like unnecessary argument, so thank you for that.

23              And thank you, Ms. Stevens, for working out the issues

24    with Mr. Luze on that issue.

25              All right, well, I thank everybody for your very

UST-0963

1  capable presentations today, and with that, then, we will be

2  adjourned.  Thank you.

3          THE CLERK:  The Court is now adjourned.

4     (Whereupon these proceedings were concluded at 12:19 PM)

UST-0964

```
 1                          I N D E X

 2    EXHIBITS:  DESCRIPTION                    MARK   ADMIT

 3    FOR THE DEBTORS:

 4              Declaration of Carrie W. Teffner        32
              Declaration of Stuart Erickson           32
 5

 6    RULINGS:                                 PAGE   LINE

 7    Disclosure statement is granted, with      30     13
      the additional language added on the
 8    record; all confirmation objections
      are preserved.
 9
      DIP seal motion is granted.               50      4
10
      DIP motion is granted.                    50     25
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UST-0965

1              C E R T I F I C A T I O N

2

3          I, Hana Copperman, the court-approved transcriber, do

4     hereby certify the foregoing is a true and correct transcript

5     from the official electronic sound recording of the proceedings

6     in the above-entitled matter.

7

8

9                                          September 11, 2020

10    _____        _____

11    HANA COPPERMAN                  DATE

12    AAERT Certified Electronic Transcriber CET-487

13

14

15

16

17

18

19

20

21

22

23

24

25

UST-0966

Case 20-33113-KRH Doc 580 Filed 09/11/20 Entered 09/11/20 19:06:56 Desc Main
Document 414 Page 55 of 67
Case 20-33113-KRH Doc 590 Document Filed 09/11/20 Page 970 of 1585 Page ID#
ASCENA RETAIL GROUP, INC.
Case No. 20-33113 (KRH)
September 10, 2020

## A

**A&M (1)**
51:17
**ability (4)**
10:23;26:25;33:5;
44:17
**ABL (7)**
35:9,10,18,20;
38:8;42:6;43:12
**able (6)**
4:13,21;5:13;
18:14;36:20;39:18
**absolutely (5)**
21:7,10;26:14;
43:18;51:9
**abstain (3)**
22:13;23:4,11
**accept (8)**
22:10,10,11,12,23;
23:3,10,10
**acceptance (1)**
8:10
**access (1)**
40:25
**accommodate (2)**
26:3,15
**accommodation (1)**
27:4
**accurately (1)**
42:16
**acquire (1)**
11:9
**acquired (1)**
17:22
**across (1)**
9:4
**Act (1)**
17:10
**action (2)**
6:2;10:23
**actions (17)**
28:24;32:24;33:1,
8,12,14;34:12,15;
36:16,22;39:3,7,16;
46:5,7,13,16
**actual (3)**
10:9;16:17;41:5
**actually (8)**
9:25;10:10;13:21;
15:7;25:20;28:17;
29:6;45:19
**ad (3)**
4:17,19,22
**added (3)**
13:5;26:13;39:14
**addition (1)**
39:21
**additional (3)**
30:13;39:13;45:22
**address (8)**
8:17;16:15;26:2;

**27:24;28:16;31:25;
32:18,20**
**addressed (3)**
24:11;28:3;48:18
**adequate (4)**
28:8;30:6;32:24;
34:7
**adjourn (1)**
36:6
**adjourned (2)**
52:2,3
**adjournments (1)**
47:12
**admin (1)**
23:2
**administrative (5)**
5:24;39:24;40:5;
41:22;45:15
**administratively (1)**
47:17
**admission (1)**
32:12
**admitted (3)**
17:1;32:9,13
**advantage (2)**
41:9,13
**advice (1)**
14:7
**advisor (1)**
15:12
**advisors (2)**
5:6;44:10
**affirmative (1)**
20:10
**afforded (1)**
48:1
**again (25)**
6:13;8:20;9:1,18,
20;10:17;11:3,13,15,
20;14:18;16:5,13;
19:14;22:24;23:12;
28:13,15;29:21;
34:19,25;38:11,21;
41:20;42:14
**against (10)**
6:2;13:13;15:20;
16:9,11;17:11;19:1;
20:9;21:6;34:9
**agency (1)**
43:24
**agenda (2)**
6:16;51:16
**agent (7)**
29:19;35:10,17,
20;42:6;43:12,25
**agents' (1)**
41:22
**agent's (2)**
35:19;40:5
**ago (3)**
18:3;19:16;40:6
**agree (2)**
13:23;14:22

**agreed (3)**
34:5,6;46:10
**agreeing (1)**
36:6
**agreement (5)**
31:19;36:24;
37:18;45:7;49:23
**agreements (1)**
46:24
**alleges (1)**
17:16
**Allen (1)**
47:4
**allow (5)**
4:24;11:12,23;
16:6;51:7
**allowing (1)**
13:19
**allows (3)**
50:11,21,22
**almost (2)**
31:21;45:3
**alone (1)**
43:23
**alongside (2)**
19:8;34:1
**alternative (1)**
34:23
**although (1)**
29:1
**always (3)**
10:7;20,16:1
**amend (1)**
4:23
**amended (4)**
6:6;17:8;18:23;
30:11
**amendment (2)**
31:8,9
**among (2)**
23:14;44:2
**amount (2)**
48:3;49:12
**amounts (1)**
49:3
**Andrew (1)**
16:22
**anecdote (1)**
15:4
**Ann (2)**
17:17,18
**annex (1)**
31:16
**anxiety (1)**
14:3
**apart (1)**
18:11
**apologies (1)**
7:3
**Apparently (1)**
25:16
**appear (1)**
12:7

**applaud (1)**
39:12
**application (1)**
51:17
**appointment (1)**
5:6
**appreciate (3)**
38:8;46:18;47:7
**appreciates (1)**
50:3
**approach (4)**
24:18,21;42:1;
44:4
**approached (1)**
36:9
**appropriate (10)**
7:22;8:17;9:23;
11:10;27:2,2;36:19;
39:25;44:23;50:8
**approval (2)**
30:11;49:22
**approvals (1)**
7:23
**approve (6)**
4:7;6:17,24;30:13;
50:25;51:8
**approved (6)**
7:8;14:10;34:15;
38:23;47:17;51:10
**approving (1)**
18:7
**argue (1)**
9:21
**argued (1)**
26:10
**arguing (1)**
9:2
**argument (8)**
10:4;23:18;24:17;
26:7;32:25;35:23;
51:20,22
**arguments (3)**
11:13;27:16;28:10
**arise (2)**
18:1;19:2
**arising (1)**
20:23
**arm's (1)**
34:5
**around (2)**
6:4;20:15
**arrangement (1)**
31:9
**arrangements (1)**
44:24
**arranger (1)**
43:25
**Ascena (2)**
13:11;17:11
**Ascena's (2)**
17:22,23
**ascertainable (1)**
29:16

**aside (3)**
33:8;45:18;48:2
**assert (4)**
11:5;34:11;41:7,
10
**asserted (1)**
17:19
**asserts (1)**
17:9
**assets (10)**
33:6;34:7,9,10;
36:22,25;45:14;
46:10,11,12
**assigned (1)**
41:21
**assist (1)**
13:6
**Assistant (1)**
38:20
**assume (1)**
15:25
**attach (1)**
39:17
**attached (1)**
32:7
**attempted (1)**
23:19
**attorneys (1)**
44:11
**audio (6)**
31:8;32:1;42:22,
25;43:6;49:20
**authority (2)**
24:15;33:11
**authorize (1)**
11:23
**available (5)**
22:6;34:23;35:13,
14;42:14
**avoid (1)**
14:23
**avoidance (13)**
32:24;33:8,12,14;
34:12,14;36:15,22;
39:7,16;46:5,13,16
**aware (6)**
13:6;20:22,23;
23:20;26:24;39:10
**away (6)**
5:10;21:5,10;34:6;
42:16;46:10

## B

**back (9)**
8:19;13:22;14:25;
24:23;27:6;36:1;
44:25;48:14;50:13
**backend (1)**
14:9
**backstop (1)**
31:9
**BADDLEY (6)**

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
**(1) A&M - BADDLEY**

UST-0967

12:3,4,5,6;27:6,25
**Baddley's (1)**
    24:25
**balances (1)**
    47:20
**balancing (1)**
    42:12
**ball (1)**
    24:6
**ballot (2)**
    22:15;23:4
**ballots (2)**
    10:16;18:15
**Bank (2)**
    43:11,23
**banker (1)**
    32:7
**bankruptcy (24)**
    11:6,7;12:7,11;
    15:1,15,20;19:4,6,
    21;20:3,5,11,19;
    22:1;25:6;29:2;30:7;
    33:5;39:6,24;40:15,
    17;50:11
**banks (2)**
    35:18;44:2
**banner (1)**
    8:6
**bargain (1)**
    49:17
**bargained (1)**
    49:16
**based (1)**
    5:18
**basic (1)**
    22:18
**basically (4)**
    16:10;19:8;21:9;
    47:12
**basis (9)**
    6:7;10:17;31:18;
    35:6;37:9;38:11;
    44:8;49:19;51:10
**battle (1)**
    24:7
**bear (1)**
    45:12
**become (1)**
    39:7
**bedrock (1)**
    33:11
**begin (1)**
    11:24
**beginning (2)**
    26:6,8
**behalf (11)**
    4:5;8:23;10:24;
    11:10;16:23;17:19;
    24:16;28:16;38:18;
    43:11;50:19
**BEHLMANN (5)**
    16:22,23;17:5;
    28:5,17

**Behlmann's (2)**
    26:7,15
**believes (1)**
    44:20;50:1
**benefit (5)**
    23:22;33:2,18;
    41:18;44:14
**benefits (2)**
    7:13,14
**best (3)**
    14:19;44:12;50:21
**better (2)**
    5:11;47:20
**bind (2)**
    18:23;21:23
**bit (2)**
    32:5;40:4
**board (3)**
    36:21;50:17;51:5
**Bockius (2)**
    42:23;43:11
**body (1)**
    10:1
**boilerplate (1)**
    25:25
**bonuses (1)**
    39:4
**born (1)**
    47:15
**both (4)**
    6:8;32:9;33:23;
    34:21
**bought (1)**
    17:22
**bound (3)**
    8:8;24:2;30:7
**box (3)**
    10:13;13:14;36:10
**brands (2)**
    17:19;45:4
**brief (4)**
    8:16;9:2;47:5;
    48:19
**briefed (1)**
    29:1
**briefly (7)**
    7:5;24:11;28:18;
    31:25;32:20;47:3;
    48:19
**brings (1)**
    6:10
**broader (1)**
    16:8
**brokers (1)**
    29:20
**brought (1)**
    45:19
**Brown (2)**
    42:23;43:14
**build (1)**
    5:7
**bullet (1)**
    26:6

**bulleted (1)**
    25:19
**bullets (1)**
    26:2
**bunch (1)**
    20:10
**burden (7)**
    9:9;14:24;30:5;
    40:11;42:16;45:12;
    47:20
**burdens (2)**
    11:8;39:23
**business (6)**
    17:17;33:19,24;
    44:11;51:6,13
**businesses (2)**
    50:12,22
**busy (1)**
    6:19

**C**

**call (4)**
    13:18;15:2;27:9;
    38:19
**came (2)**
    5:11;36:14
**can (30)**
    6:11,16;9:18;11:4;
    12:4,5;14:2;15:2;
    16:17;26:3;29:9;
    30:23,25;33:13;
    34:14;35:11;36:2,4,
    12;43:3,5,8,19;
    44:21,23,24;48:10,
    11;49:4;50:8
**capable (1)**
    52:1
**capital (2)**
    18:24;45:14
**carefully (1)**
    48:25
**cares (1)**
    36:8
**Carrie (1)**
    32:14
**carry (1)**
    46:21
**Carter (1)**
    43:13
**carve (1)**
    29:22
**carved (1)**
    22:25
**carve-out (1)**
    45:15
**case (50)**
    4:19;6:14;9:17;
    10:7,16;12:9,13,19;
    14:20;17:7;19:24;
    20:6,11,21,21,23,25;
    22:1,5;25:6;28:20,
    25;29:1,4,8;33:21,

22;34:16;36:12;
    37:4,8,16;38:25;
    39:4;40:18;45:4,4,
    14,20,24;46:3,14,17,
    21;47:14;48:2,2,4;
    50:4;51:14
**cases (10)**
    11:7,24;22:2,3;
    23:15;24:1;31:3;
    33:3;35:4;47:16
**cash (7)**
    7:13;33:17;34:22;
    37:1,14;38:22;46:1
**cast (1)**
    8:11
**catch (1)**
    6:20
**cause (2)**
    14:2;41:8
**causes (1)**
    6:2
**caveat (1)**
    22:19
**CEO (1)**
    17:12
**certain (9)**
    4:19;5:19;6:1;
    17:10;29:19;36:13;
    39:5;42:14;49:11
**certainly (12)**
    10:3;16:19;25:7;
    27:9,19;36:21;43:9;
    44:24;47:7;48:8,11,
    17
**certainty (3)**
    48:22;49:16;51:8
**certified (1)**
    11:1
**CFO (1)**
    17:14
**chambers (1)**
    51:20
**changed (1)**
    47:18
**changes (5)**
    4:24;6:6;8:14,17;
    10:6
**Chapter (8)**
    6:1;15:15;21:19;
    25:10;31:3;33:3;
    34:4;39:3
**chart (1)**
    8:16
**Chase (1)**
    43:11
**checked (1)**
    13:15
**checking (1)**
    10:13
**checks (1)**
    49:5
**Chris (1)**
    43:13

22:34:16;36:12;

**Circuit (1)**
    14:16
**circumstance (2)**
    23:19;29:15
**circumstances (2)**
    40:23;47:18
**cited (2)**
    22:3;35:3
**claim (1)**
    16:9
**claimants (2)**
    23:2,3
**claims (18)**
    16:10;17:9,19;
    18:1;19:1,5,9;20:9,
    17,23;21:6,10;22:21;
    23:10,20;29:19;33:2,
    9
**clarity (3)**
    14:12;49:8,10
**class (27)**
    8:10,11,24;10:23,
    24,25;11:2;16:21;
    17:20;19:1,13,14,16;
    20:21,21,22,24;
    21:13;22:23;24:17;
    25:3,4;26:8;28:21,
    24;29:7,11
**classes (6)**
    22:13;23:11,13;
    24:2,13,20
**classified (1)**
    19:8
**class-wide (1)**
    24:10
**clear (11)**
    11:7,8;13:8;15:14,
    16;16:3,7;27:8;
    33:10;45:24;46:6
**clearly (2)**
    10:12;15:24
**CLERK (1)**
    52:3
**client (2)**
    43:18;45:21
**clients (4)**
    11:9,11;41:19;
    45:13
**climate (1)**
    14:1
**close (1)**
    9:18
**Coal (2)**
    22:7,21
**co-counsel (1)**
    43:13
**Code (10)**
    19:4,6;20:19;30:7;
    33:5;40:17;50:11,13,
    14,15
**collateral (9)**
    33:17;34:11,22;
    38:22;39:8;40:2;

Min-U-Script®                    eScribers, LLC | (973) 406-2250                    (2) Baddley's - collateral
                                 operations@escribers.net | www.escribers.net
                                                                                  UST-0968

45:16,22;46:1

**colleague (3)**
30:19;38:19;43:13
**colleagues (1)**
4:6
**collect (2)**
34:7,8
**college (1)**
15:9
**commencement (1)**
19:24
**comments (9)**
7:24;10:6,20;
25:14,15,15,18,22;
28:18
**commercial (6)**
38:9;41:11,12,15,
16;43:20
**commercially (1)**
5:20
**Commission (1)**
12:2
**commitment (1)**
49:18
**committed (1)**
49:2
**committee (20)**
5:5,6,9;6:8;31:3,
14,19;34:2;35:1,12;
36:9,12;37:6;38:11;
39:11;44:8;47:7;
49:1,3;51:2
**common (3)**
17:22,23;35:10
**communications (1)**
10:3
**companies' (1)**
5:19
**company (15)**
6:14;12:12;23:24;
32:7;33:13,18,19,21;
34:25;38:6;48:21;
49:2,4,6,17
**company's (3)**
33:4,24;35:5
**compare (1)**
27:1
**compelling (1)**
40:23
**compete (2)**
43:23;44:17
**competitive (2)**
43:22;44:14
**competitively (1)**
35:16
**competitors (3)**
35:19;41:13,18
**complaint (4)**
17:8,9,13,16
**completely (1)**
51:3
**complex (1)**
30:1

**complicated (1)**
10:15
**comprehensive (1)**
6:11
**compromised (2)**
46:7,8
**concern (8)**
7:19;18:3;21:21,
21;27:21;37:7;39:3;
50:22
**concerned (4)**
17:21;23:21;
26:12,21
**concerns (3)**
12:18;13:19;18:19
**conclude (1)**
35:23
**concluded (2)**
9:6;52:4
**concluding (1)**
51:9
**conclusion (1)**
20:17
**condition (3)**
15:24;35:20,21
**conditioned (1)**
48:23
**conditions (1)**
38:3
**conduct (1)**
45:24
**conducted (1)**
40:20
**conference (1)**
38:19
**confidential (5)**
41:23,25;42:7,8;
43:19
**confidentiality (1)**
44:23
**confirm (1)**
27:1
**confirmation (31)**
6:4;7:21;8:7,12;
9:1,9,21;11:5,14;
12:24;13:18;14:12,
14;15:23;16:3,7,18,
18;18:5,14;24:7;
26:11;27:18,19;28:3,
11,12;29:23;30:14,
16;37:4
**confirmed (1)**
21:20
**confused (1)**
10:9
**Congress (1)**
40:21
**connection (1)**
6:3
**consensual (4)**
9:3;35:6;46:24;
51:18
**consensus (2)**

5:2,7
**consent (8)**
9:7;13:20,24;
14:13,23;21:13,15;
33:16
**consented (2)**
21:4,5
**consider (1)**
47:15
**consideration (1)**
34:4
**considerations (1)**
34:19
**consistent (9)**
9:17;10:17;11:17;
21:19;23:15;25:21;
31:17;35:3;49:19
**consolidated (2)**
17:8,8
**constituencies (2)**
4:15;35:7
**constituents (3)**
37:6,14,21
**constitute (1)**
41:16
**constitutes (1)**
13:24
**constructive (1)**
34:2
**contained (3)**
21:19;24:1;43:19
**containing (1)**
24:6
**contains (1)**
41:20
**context (2)**
9:7;33:20
**continue (2)**
45:21;50:22
**continued (2)**
27:19;51:17
**contrary (1)**
40:21
**contributions (1)**
9:13
**conversation (1)**
28:13
**convert (1)**
33:23
**convoluted (1)**
29:12
**cooperation (1)**
47:8
**coordinate (3)**
26:20;27:13;28:6
**core (1)**
31:15
**Corporation (1)**
16:24
**cost (1)**
40:1
**costs (1)**
40:12

**Counsel (17)**
11:8,10,12;13:2;
16:21,24;17:2;
25:19;26:20,22;
27:20;28:7,14;
36:18;40:7;44:7;
47:8
**counsel's (3)**
25:22;26:1,21
**counted (1)**
10:10
**country (1)**
9:4
**couple (2)**
4:12;48:9
**course (3)**
23:17;44:9;48:8
**COURT (62)**
4:1,3,16;5:13;
6:18;9:16,22;11:1,1,
23,25;12:5,7,23;
13:23;14:19;16:5,15,
16;17:4;24:22;26:4,
24;27:5;28:4;29:3,4;
30:4,10,10,12,14,21,
25;32:11;35:3,13,25;
36:4;37:12;38:14;
40:20,25;42:17,20,
24;43:2,4,8;44:9;
47:1,19;48:13;49:21,
22,23,25;50:2,4,10;
51:21;52:3
**court-appointed (1)**
24:16
**courtroom (1)**
32:10
**Court's (5)**
10:17;30:17;
50:25;51:7,11
**cover (1)**
26:9
**create (3)**
13:20;14:23;41:8
**credit (1)**
5:10
**creditor (4)**
4:15;5:16;35:7;
42:11
**creditors (17)**
5:5;6:11;7:12;
16:8;24:2;36:23;
37:2,24;39:8,9,20,
23;46:20,23;48:3;
50:17,19
**creditors' (10)**
5:9;6:8;31:3,14,
19;34:1;35:1;39:11;
44:8;51:2
**criteria (2)**
41:6,22
**critical (8)**
5:21;37:22,25;
38:1;40:12;41:17;

42:11;43:18
**cross-examine (1)**
32:12
**current (12)**
10:10;14:1;17:25;
18:9,17,22;19:8,9,
18;20:2;21:4;26:17
**currently (1)**
28:22
**cushion (1)**
48:4
**customers (1)**
12:12
**cut (2)**
27:22;49:4

**D**

**date (3)**
5:16;32:15,17
**dates (1)**
49:5
**David (2)**
12:3;17:12
**Davies (1)**
42:22
**day (3)**
13:21;45:25;47:14
**days (3)**
16:9,11;37:3
**deal (3)**
5:11,13,14;35:18;
36:12;38:10;49:2;
50:18,21,21;51:6
**debate (2)**
9:3;36:18
**debtor (11)**
16:9,20;25:3;
27:12;28:21;30:5;
33:6;36:10;39:17;
42:16;48:15
**debtor- (1)**
6:8
**debtors (34)**
4:1,5;5:20;6:1;
9:12;13:6;17:18;
18:21;19:2,3;21:17;
22:2;23:17,19,21;
29:11,18;34:1,14;
38:4;39:2,10;41:3,5,
10;42:1,3;44:10,13,
16;45:20;47:8,11;
50:19
**debtors' (9)**
13:2;16:24;19:17;
27:20;28:7,13;32:15,
17;47:5
**debtor's (1)**
36:18
**December (2)**
17:23;19:14
**decide (1)**
42:8

UST-0969

**deciding (1)**
　13:20
**decision (2)**
　29:23;44:11
**decisions (1)**
　9:5
**declarant (1)**
　32:12
**declarants (1)**
　32:10
**declaration (4)**
　32:4,6,14,16
**declarations (2)**
　32:9,12
**deem (1)**
　8:10
**deemed (13)**
　19:11;21:4,9,23;
　22:9,14,17,19,24,24;
　23:6,9,14
**defendants (8)**
　17:11,16;20:9,20,
　25;21:6,9;23:22
**defer (1)**
　47:21
**deferral (5)**
　5:23;37:15;47:10;
　48:20;49:3
**deferrals (1)**
　48:7
**deferred (2)**
　37:19;47:22;49:18
**defined (1)**
　18:25
**definite (1)**
　16:7
**definitely (2)**
　25:8;26:3
**definition (8)**
　19:5,10;22:8;23:5,
　8;24:4,13,20
**definitions (1)**
　20:15
**Delaware (2)**
　23:1;45:5
**demonstrating (2)**
　41:2;42:4
**deny (1)**
　40:25
**describe (1)**
　47:9
**described (2)**
　18:21;31:18
**desire (1)**
　40:4
**detail (1)**
　32:20
**detriment (1)**
　44:15
**dialogue (3)**
　5:4;27:20;34:2
**dictates (1)**
　40:21

**different (4)**
　17:20;18:4;34:23;
　51:3
**difficult (1)**
　41:24
**difficulty (1)**
　43:4
**diligent (1)**
　14:6
**DIP (33)**
　4:8,20,23;7:8,9;
　30:20;31:6,7,15,16,
　20;32:3,24;33:16;
　34:5,8;35:9;36:11,
　13,21;37:9,11;38:12,
　21;43:12;45:9;46:1;
　47:10,17;49:9,23;
　50:25;51:8
**direct (1)**
　35:19
**direction (1)**
　37:8
**director (1)**
　17:13
**disclose (2)**
　35:11;42:17
**disclosed (3)**
　40:12;42:12;44:2
**disclosure (19)**
　4:8;6:12,17,24;
　7:1,25;8:6;11:22;
　13:5;18:8;20:14;
　27:11;30:11,12,13;
　31:10;35:8,21;41:7
**disclosures (4)**
　13:5;41:3,18;42:4
**discovery (3)**
　4:18;29:3,6
**discrete (1)**
　47:6
**discretion (1)**
　35:5
**discussed (2)**
　12:25;48:18
**discussion (1)**
　48:2
**discussions (2)**
　36:20;40:6
**disfavor (1)**
　39:17
**dismiss (2)**
　20:21;28:24
**dispositive (1)**
　28:25
**distribute (1)**
　29:20
**distribution (2)**
　5:17;13:11
**distributions (2)**
　5:21;7:7
**District (4)**
　17:1;21:20;29:3,4
**docket (8)**

6:25,25;7:1;17:2;
　31:11;32:5,8;35:15
**document (3)**
　10:9,12,12
**documentation (1)**
　31:12
**documents (6)**
　6:7,20;8:15;10:16;
　38:10;41:1
**dollar (1)**
　45:14
**done (4)**
　6:13;15:7;35:13;
　38:11
**during (3)**
　17:23;20:24;33:21

---

## E

**earlier (2)**
　4:18;7:13
**early (1)**
　31:13
**economic (2)**
　21:24;22:16
**educated (1)**
　15:9
**effect (1)**
　48:11
**effectively (1)**
　50:14
**effectiveness (5)**
　48:6,20,22,23;49:9
**effort (1)**
　38:4
**efforts (3)**
　5:20;39:12;47:7
**eight (1)**
　4:25
**eighty-eight (1)**
　7:7
**either (1)**
　24:7
**elect (1)**
　10:13
**elements (1)**
　11:22
**eleventh (1)**
　40:8
**Ellis (1)**
　4:5
**else (2)**
　10:18;15:20
**else's (1)**
　44:16
**email (1)**
　25:17
**emails (1)**
　44:22
**embrace (1)**
　27:12
**emphasize (1)**
　10:25

**employees (3)**
　6:3;37:7;45:16
**end (2)**
　13:21;49:17
**engaged (3)**
　5:12;34:1;35:1
**engagement (1)**
　25:10
**English (2)**
　10:2;15:17
**enough (1)**
　47:16
**ensure (2)**
　12:13;26:20
**enter (1)**
　44:23
**entered (4)**
　36:19;39:11;45:3;
　48:24
**enticement (1)**
　38:2
**entire (4)**
　16:11;41:24;42:1,
　2
**entirely (1)**
　24:20
**entitled (3)**
　19:12;20:6;22:11
**entity's (1)**
　41:18
**entry (2)**
　35:21;38:12
**environments (1)**
　25:18
**equitable (1)**
　24:21
**equities (1)**
　42:12
**equities-of-the- (1)**
　46:2
**equitize (1)**
　7:6
**equity (4)**
　7:7,10,14;22:21
**Erickson (2)**
　32:6,16
**especially (3)**
　12:19;33:20,22
**essentially (2)**
　19:7;49:4
**estate (1)**
　40:2
**evaluate (1)**
　14:8
**eve (1)**
　39:5
**even (11)**
　5:11;12:22;19:20,
　24;20:1,19,22;22:16;
　23:6;44:2;49:13
**event (1)**
　24:12
**everybody (2)**

**everyone (5)**
　12:16;15:2;31:11;
　44:16;45:24
**everyone's (2)**
　8:7;15:25
**evidence (6)**
　15:8;32:3,9,15,17;
　42:5
**EVP (1)**
　17:14
**exactly (4)**
　15:3;22:20;29:25;
　45:16
**examination (2)**
　40:16,18
**examples (1)**
　42:3
**excellent (2)**
　27:11;51:21
**except (2)**
　22:22;31:22
**exception (2)**
　8:20;46:3
**exceptional (1)**
　40:23
**excessively (2)**
　38:24;39:1
**Exchange (3)**
　12:1;17:10;21:6
**excise (1)**
　24:19
**exclude (1)**
　33:7
**exclusively (2)**
　31:7;33:2
**exculpations (1)**
　8:10
**executed (1)**
　7:22
**executives (1)**
　39:5
**exercise (1)**
　11:10
**exhibit (3)**
　31:10;32:15,17
**exhibits (1)**
　6:25
**exit (4)**
　7:9;33:23;44:13;
　46:1
**expecting (1)**
　10:15
**expeditiously (1)**
　49:6
**expenses (2)**
　39:24;45:16
**explain (2)**
　4:9;43:20
**explanation (1)**
　41:5
**expose (1)**
　45:21

UST-0970

**express (2)**
  22:18;40:21
**expression (1)**
  47:24
**extended (1)**
  25:5
**extension (1)**
  34:22
**extent (5)**
  18:13,15;33:13;
  41:10;42:13
**extra (1)**
  10:8
**extraordinary (2)**
  40:10,22
**extremely (1)**
  45:1

### F

**facilities (4)**
  7:9;33:23,23;
  43:21
**facility (4)**
  4:20,21;35:22;
  44:12
**fact (4)**
  4:20;11:17;25:22;
  26:21
**failed (1)**
  41:3
**failsafe (1)**
  44:18
**failure (4)**
  13:23;14:13,20;
  18:16
**fair (2)**
  12:13;24:21
**fairly (1)**
  22:4
**fairness (1)**
  39:22
**fallback (1)**
  24:12
**familiarity (1)**
  6:21
**family (1)**
  15:4
**far (2)**
  10:15;26:12
**favorable (1)**
  5:22;38:24;39:1
**federal (2)**
  16:25;28:23
**fee (11)**
  35:9,11;38:8;41:6,
  20,21;42:4,18;43:16;
  44:6;50:1
**feel (1)**
  49:10
**fees (6)**
  40:5;41:22;43:18,
  25;44:1,4

**feet (1)**
  50:13
**Feinstein (5)**
  36:1,2,5;38:14;
  50:18
**few (1)**
  40:13
**fiduciaries (1)**
  46:22
**fifty-five (1)**
  7:6
**fight (1)**
  36:17
**figure (2)**
  20:20,24
**file (3)**
  16:9;35:13;50:5
**filed (18)**
  6:7,24,25;7:1;
  13:4;17:8;18:23;
  21:18;30:12;31:11,
  12;35:14,22;40:5,9,
  17;44:5;49:1
**filing (3)**
  17:13;25:6;39:5
**fill (1)**
  21:2
**final (4)**
  14:17;31:20;
  38:12;51:10
**finalized (1)**
  31:12
**finally (2)**
  23:8;35:8
**finance (1)**
  45:7
**financial (1)**
  44:10
**financing (12)**
  4:23;6:9;30:20;
  34:22,23;35:10;
  38:21,23;43:21;
  44:12;46:1;49:23
**financings (5)**
  4:8,14;7:20;33:16;
  48:23
**find (2)**
  14:9;20:13
**first (20)**
  4:11,17;6:16,22;
  12:1,22,25;14:10;
  20:12;24:25;25:14;
  32:22;34:8;36:1,5;
  45:10,13;46:8,11;
  49:25
**first-day (1)**
  32:4
**five (3)**
  20:5;22:3,5
**flashed (1)**
  38:1
**flow (1)**
  41:3

**focus (2)**
  16:16;24:24
**focused (1)**
  8:9
**folks (6)**
  17:21,25;19:20;
  21:23;22:24;23:13
**footnote (3)**
  13:9;22:6;25:1
**foremost (1)**
  4:11
**Forever (1)**
  45:4
**form (18)**
  8:22;9:7,21;10:10,
  12,19;11:16;13:2,7,
  12,14;14:14;25;15:11;
  18:9,17,22;21:2;
  26:19
**formal (2)**
  7:24;31:21
**formed (1)**
  36:9
**former (2)**
  23:24;26:17
**forth (2)**
  32:3;35:4
**forty-five (1)**
  7:10
**forty-nine (1)**
  47:14
**forward (3)**
  13:1,19;16:6
**founders (1)**
  23:24
**four (1)**
  26:2
**four-and-a-half (1)**
  19:15
**Fourth (1)**
  14:16
**Frankly (7)**
  13:8,14;14:3,22;
  16:8;44:15;46:14
**free (2)**
  9:21;11:14
**fresh (1)**
  12:17
**friends (1)**
  15:4
**front (1)**
  10:4
**Frost-Davies (9)**
  42:21,22,24,25;
  43:3,6,9,10;50:6
**fruitful (1)**
  5:4
**fully (4)**
  7:20;29:1;35:11;
  42:16
**fundamental (4)**
  20:16;24:4,8;
  39:22

**fundamentally (1)**
  39:15
**funded (1)**
  7:20
**funding (1)**
  49:11
**further (8)**
  5:17,22;24:17;
  27:23;28:15;30:8;
  42:3;48:17
**future (1)**
  50:23

### G

**Gallery (1)**
  22:5
**General (4)**
  7:12;11:6;35:15;
  37:2
**gets (1)**
  14:7
**Giammatteo (1)**
  17:14
**given (5)**
  21:10;26:16;
  28:22;30:6;45:20
**giving (3)**
  25:3;28:21;47:24
**global (7)**
  9:9;31:2,17;36:20;
  37:11;39:11;47:9
**gloss (1)**
  21:20
**goal (1)**
  10:3
**goes (4)**
  14:7;26:6;37:4;
  40:14
**going-concern (1)**
  50:16
**Gold (5)**
  47:2,3,4;48:13;
  50:20
**Gold's (1)**
  48:19
**Good (12)**
  4:4;12:3;16:22;
  17:4;27:5;28:4;30:4;
  37:13;38:5,5,17;47:3
**good-faith (1)**
  38:3
**grant (8)**
  22:17;23:14;33:6,
  12,14;35:6;39:2;
  50:4
**granted (1)**
  35:4
**granting (2)**
  32:23;39:15
**grants (1)**
  40:10
**granular (2)**

  18:19,20
**gratuitously (1)**
  20:8
**Great (2)**
  6:23;9:3
**greater (3)**
  6:4;7:12;32:20
**ground (1)**
  11:7
**group (10)**
  4:17,19,22,23;
  13:11;31:4,4,7;
  43:23;47:8
**guess (2)**
  12:8,15;13:18;
  48:19
**Guggenheim (1)**
  32:6
**Gymboree (3)**
  22:6,8,14

### H

**hac (1)**
  17:2
**hand (2)**
  29:9;42:10
**handful (1)**
  7:24
**handing (3)**
  29:13,17;30:2
**happen (2)**
  19:22;20:1
**happened (1)**
  36:24
**happens (2)**
  14:6
**happy (17)**
  4:13;5:3;7:25;
  8:17;10:20;14:18;
  16:14;25:15,18,21;
  26:14,19;27:3,14;
  38:12;44:22;46:25
**hard (3)**
  5:6;8:14;37:3
**hardly (1)**
  48:3
**harm (3)**
  13:13;41:2,8
**Hartford (1)**
  45:18
**hear (13)**
  12:1,4,5,23;16:20;
  30:23;35:25;36:3,8;
  38:15;42:25;43:3,6
**heard (12)**
  4:10,18;5:15;7:4;
  11:5;14:20;16:2;
  25:16;42:21;47:2;
  48:14;49:23
**hearing (13)**
  4:12;6:12;12:15;
  17:3;27:11,19;

Min-U-Script®    eScribers, LLC | (973) 406-2250    (5) express - hearing
operations@escribers.net | www.escribers.net
UST-0971

30:16;32:13;36:6;
37:25;43:4;46:20;
51:2
**hearings (1)**
40:19
**held (1)**
5:3
**help (2)**
10:4;24:25
**helpful (5)**
14:11;17:7;25:11;
26:4;39:13
**hereby (2)**
32:14,16
**high (1)**
42:9
**highly (4)**
42:6;43:20,22;
44:13
**Hileman (1)**
4:6
**history (1)**
12:15
**hoc (3)**
4:17,19,22
**hold (2)**
19:17,19
**holders (18)**
7:14;17:25;18:23;
19:7,8,9,18;20:2;
22:9,10,12,21,22;
23:9,10,10;33:2,8
**Honor (69)**
4:2,7,11,18;5:14;
6:10,15,23;7:4,17;
8:18,25;11:20;12:3,
6;16:22;17:7;24:12;
25:7,23;26:15;
27:25;28:17,19;30:9,
18,23;31:1,24;32:3,
18,22;33:5,15;34:13,
18,19;35:8,10,23;
36:2,5,8;37:23;38:7,
13,17,21;42:19;43:1,
3,7,10,15;44:18,25;
45:6,13;46:14,21,25;
47:3,14;48:5,12,17,
21;49:15;51:15
**Honor's (4)**
9:6;13:18;25:13;
29:23
**hour (1)**
40:8
**hours (1)**
31:13
**housekeeping (1)**
32:2
**hurdles (1)**
7:21
**hurt (1)**
42:4

## I

**idea (1)**
15:10
**identical (1)**
45:3
**identities (1)**
29:7
**illusory (1)**
21:16
**imagine (1)**
41:24
**immense (1)**
33:17
**impaired (5)**
19:11;23:13;24:2,
13,19
**impairment (1)**
46:3
**impermissibly (1)**
42:15
**implicate (2)**
39:6,7
**implied (1)**
9:7
**import (1)**
26:1
**important (16)**
14:19;26:1;33:20,
22;34:20;35:20;
36:23;37:22;38:10;
45:1,7;48:21;49:15;
50:24;51:6,10
**importantly (2)**
9:5;37:1
**imposes (1)**
28:23
**improper (1)**
44:21
**inappropriate (1)**
46:2
**inappropriately (1)**
40:1
**Inc (1)**
17:17
**incentive (1)**
21:25
**inclined (1)**
24:13
**include (3)**
23:6;26:5;51:19
**included (9)**
8:16;22:9;23:9;
25:1,2;27:7,15;31:9;
34:10
**includes (1)**
19:5
**including (8)**
5:25;9:5;18:22;
23:2;25:19;26:2;
27:10;36:13
**inclusive (1)**

17:24
**increase (1)**
5:16
**incredible (1)**
5:2
**incredibly (1)**
33:20
**incur (1)**
14:7
**independent (1)**
44:10
**individual (3)**
20:9;21:8;23:22
**individuals (1)**
17:12
**indulging (1)**
4:12
**industry (1)**
43:22
**inequitable (1)**
40:3
**inextricably (1)**
18:6
**informal (2)**
7:24;31:23
**information (19)**
20:3;35:16,17;
41:11,11,12,12,14,
16,17,19,23;42:7,10,
17;44:15;50:1,2,8
**informed (1)**
21:13
**inherently (1)**
24:15
**initial (1)**
48:18
**in-possession (1)**
6:9
**input (1)**
25:9
**Insofar (1)**
13:17
**insolvent (1)**
47:17
**instance (1)**
20:12
**instead (1)**
41:25
**institutions (1)**
44:14
**integral (1)**
9:10
**intend (2)**
26:11;47:23
**intended (1)**
15:3
**intending (3)**
12:9,10;13:15
**intends (1)**
49:6
**intensive (1)**
29:10
**interest (3)**

12:13;40:13;46:8
**Interestingly (1)**
21:17
**Interests (7)**
18:24,24;19:5,8;
22:22;46:19;47:21
**interference (6)**
31:8;32:1;42:22,
25;43:6;49:20
**interim (1)**
46:20
**interplay (1)**
47:10
**intertwined (1)**
18:6
**into (19)**
7:6,9,10;12:22;
16:14,19;23:19;
25:24;26:11;32:2,15,
17;33:23;35:21;
36:19;39:11;44:23;
48:11;49:7
**invest (1)**
15:9
**investment (1)**
32:7
**invite (3)**
15:3;27:19;28:13
**invited (1)**
13:6
**involve (2)**
5:16;29:18
**involved (1)**
29:10
**ironic (1)**
26:22
**Isgur (1)**
45:3
**issue (37)**
6:5;8:6,11;9:1,20;
10:22;11:3,5,13;
12:17,22,23;14:12,
14;16:18;18:5,6,12,
14,18;21:21;23:16;
24:10,19;25:14;26:3,
16;27:18,23;29:24;
31:7;34:17;35:1,8;
39:3;40:6;51:24
**issues (25)**
5:25;8:7,9,21;
9:16,23;11:4;12:18;
14:17;24:25;26:11;
27:20;28:11;31:5,7,
24;32:19,20;34:2;
36:11,14;40:8;
50:10;51:18,23
**item (2)**
6:16;51:16
**Ivan (1)**
47:4

## J

**Jaffe (1)**
17:12
**Jeffrey (1)**
4:6
**Jersey (1)**
17:1
**jobs (2)**
7:19;12:12
**Joel (1)**
16:24
**John (1)**
4:6
**JPMorgan (1)**
43:11
**Judge (2)**
9:6;45:3
**judgment (1)**
44:11
**Julia (1)**
43:10

## K

**Kathryn (1)**
38:19
**keep (1)**
42:8
**kept (1)**
43:19
**key (1)**
5:14
**kick (1)**
48:10
**kind (4)**
12:21;13:25;
14:25;38:1
**kinds (1)**
28:12
**King (2)**
31:5,6
**Kirkland (1)**
4:5
**knowingly (1)**
21:13
**knows (1)**
44:16

## L

**lack (2)**
49:8,9
**landlord (1)**
49:13
**landlords (6)**
5:24;6:3;37:6,16;
47:5;50:22
**language (7)**
25:1;26:13;27:7,
10,14;30:13;39:13
**large (2)**
5:2;39:4
**largely (2)**
4:20;6:19

Case 20-33113(KRH) Doc 580 Filed 09/11/20 Entered 09/11/20 17:06:56 Desc Main
Case 20-33113(KRH) Doc 590-1 Filed 09/11/20 Entered 09/11/20 17:06:56 Desc Main
ASCENA RETAIL GROUP, INC. Document 414-1 Page 61 of 67
Case No. 20-33113 (KRH)

September 10, 2020

**larger (1)**
49:14
**last (13)**
4:22;6:1,7,19;7:1,
17;10:22;17:15;
18:23;21:18;36:25;
40:9;48:9
**later (1)**
5:15
**latter (1)**
33:22
**law (1)**
14:16
**lawyer (1)**
15:1
**lead (8)**
8:2,23;10:23;
16:25;19:1;24:16;
32:7;36:7
**leads (1)**
24:7
**learn (2)**
20:1,11
**least (1)**
7:17
**leave (2)**
24:13;46:3
**leaves (1)**
14:16
**Leaving (1)**
45:18
**legal (10)**
10:3;11:17;14:7;
20:17;25:25;28:11;
31:25;33:11,11;
34:17
**legalese (1)**
27:8
**legitimate (1)**
50:7
**lender (4)**
4:23;38:8,24;47:8
**lenders (19)**
4:18,25;5:1;31:4;
33:17,25;34:20,25;
36:10;39:1,2;43:12;
44:1;45:12;46:15;
47:23;48:25;49:10;
50:4
**lenders' (1)**
40:2
**length (2)**
9:1;34:5
**lengthy (1)**
10:16
**less (1)**
38:4
**letter (11)**
41:6,20,21,25;
42:1,2,4,13,18;
43:17,19
**letters (6)**
35:9,12;38:8;44:6;

45:8;50:1
**level (2)**
5:2;9:19
**levels (1)**
44:16
**Lewis (2)**
42:23;43:11
**lien (9)**
33:6;34:11,14;
36:15;39:3;45:13;
46:6,7,8
**liens (7)**
32:23;33:12,14;
34:8;36:22;39:15;
46:4
**likely (3)**
19:16,18;41:8
**limit (1)**
48:5
**limitations (1)**
28:23
**limited (1)**
40:23
**line (1)**
26:23
**liquidate (1)**
37:5
**liquidity (2)**
33:21,24
**Lisa (1)**
38:17
**list (7)**
27:2;28:21;29:9,
13,13,17;30:3
**listed (1)**
25:19
**lists (2)**
27:1;28:7
**litigation (5)**
16:25;17:6;23:23;
28:22;29:4
**litigations (1)**
5:19
**little (9)**
9:25;17:20;18:2,4,
19,20;30:1;40:4;
49:14
**live (1)**
49:17
**loan (4)**
5:1,3;7:6,9
**loans (1)**
7:8
**local (1)**
17:2
**LOFT (1)**
17:19
**long-term (1)**
33:24
**look (9)**
12:17;22:2,3,5,16;
36:23,25;46:11,19
**looking (2)**

13:22,25
**lose (3)**
13:12;15:19;44:17
**lost (1)**
47:11
**lot (5)**
34:4;37:13,16,17;
38:2
**Lowenstein (1)**
16:23
**Luze (14)**
4:6;30:20,22,23;
31:1;32:18;43:22;
44:5;48:16,17;51:9,
14,15,24

## M

**mail (2)**
15:5;21:2
**mailing (8)**
27:1;28:7,21;29:8,
13,13,17;30:2
**major (2)**
4:15;7:20
**majority (1)**
9:5
**makes (2)**
24:9;29:21
**making (2)**
26:7;28:10
**mandate (1)**
33:7
**manner (1)**
5:12
**many (8)**
9:4;19:13,16,18;
26:10;28:9,9;37:5
**market (3)**
15:10;33:19;35:17
**marshal (2)**
34:6;46:10
**marshaling (2)**
36:24;39:13
**marshalling (1)**
34:6
**mass (1)**
26:22
**materially (1)**
17:16
**Matkins (1)**
47:4
**matter (5)**
23:17;30:2;32:2;
33:11;47:23
**matters (1)**
4:18
**may (12)**
13:21;17:24;
19:15,17,17,24;
20:22;23:21;25:4;
39:6;45:19;46:25
**maybe (1)**

28:2
**mean (3)**
16:8;27:22;49:4
**meaningful (1)**
9:11
**means (3)**
14:4;15:11;21:2
**meant (1)**
50:13
**measured (1)**
44:4
**meet (5)**
9:8;11:19;14:15;
41:12,22
**meets (2)**
11:22;41:6
**member (1)**
21:13
**members (8)**
10:25;15:4;19:13,
16;28:21;29:7,11;
43:23
**mentioned (6)**
7:13;8:15;10:11;
20:12;37:24;51:9
**merely (1)**
42:5
**message (1)**
33:18
**met (1)**
40:10
**Michaella (1)**
16:23
**might (5)**
17:6;19:21;20:1,
23;43:16
**mileage (1)**
32:5
**million (3)**
5:17,18;7:7
**mind (1)**
43:17
**mindful (1)**
50:10
**minority (1)**
31:4
**miscommunication (1)**
25:17
**modifications (3)**
25:20;36:14;37:12
**modified (1)**
38:11
**modify (1)**
11:11
**modifying (1)**
36:14
**moment (3)**
4:9;16:20;17:21
**money (4)**
14:8;37:23;38:1,5
**Montgomery (1)**
38:19
**month (1)**

40:6
**months' (1)**
48:9
**more (18)**
4:21;9:25;10:15;
15:16;18:19,20;
20:5;28:2;29:10,10,
12,17,21;30:1;37:1;
40:4;41:25;46:21
**Moreover (1)**
41:24
**Morgan (2)**
42:23;43:10
**morning (7)**
4:4;10:10;12:3;
16:22;31:13;38:17;
47:3
**most (5)**
9:5;10:18;25:8;
26:21;41:20
**motion (18)**
4:9;5:23;6:17,22,
24;11:23;18:10;
24:5;30:20;37:25;
38:22;40:9;44:5;
47:10,10,13;48:9;
50:5
**motions (5)**
4:7;20:21;28:24,
25;37:15
**motion's (1)**
37:18
**move (1)**
49:6
**Movie (1)**
22:5
**moving (2)**
4:12;40:4
**much (10)**
11:25;24:22;
29:10,10,12;30:21,
25;36:8;47:1;49:21
**must (4)**
33:8;41:1,1,17
**mutual (2)**
7:14;9:15

## N

**NA (1)**
43:11
**name (2)**
43:5;44:21
**names (1)**
41:19
**narrow (3)**
12:13;40:7;41:25
**nature (2)**
24:3;31:25
**naught (1)**
13:22
**near (1)**
5:24

UST-0973

Case 20-33113 (KRH) Doc 580 Filed 09/11/20 Entered 09/11/20 19:06:58 Desc Main
Document Page 62 of 67
ASCENA RETAIL GROUP, INC.
Case No. 20-33113 (KRH)

September 10, 2020

**nearly (1)**
4:25
**necessarily (3)**
17:24;18:13;20:4
**necessary (4)**
14:24;29:10;
40:11;51:20
**need (6)**
10:14;15:23;
16:19;25:20;27:23;
51:13
**needed (1)**
8:12
**needs (2)**
27:9;44:20
**negotiate (1)**
44:17
**negotiated (2)**
34:4;48:25
**negotiations (1)**
46:22
**net (1)**
5:18
**New (2)**
17:1;34:22
**news (3)**
6:13;19:22;20:3
**next (1)**
16:20
**night (7)**
6:7,19,19;7:1;
18:23;21:18;40:9
**ninety (2)**
16:9,11
**ninety-day (1)**
16:1
**ninety-five (2)**
5:1;50:17
**nomenclature (1)**
41:20
**nominee (1)**
29:20
**nonconfirmable (1)**
18:13
**nonconsensual (1)**
14:15
**nondebtor (2)**
20:9;21:6
**none (4)**
11:15;24:1;30:18;
40:23
**nonvoting (7)**
23:13;24:2,13,19;
26:7,18,19
**nor (1)**
24:2
**notably (1)**
39:4
**note (5)**
9:14;10:8;18:11;
25:11;51:16
**noted (4)**
16:25;18:2;31:2;

43:22
**notice (35)**
8:22;9:2,22,23,25;
10:1,1,14;13:2,7,9;
14:1,2;15:1,2,17,22;
16:7,17;19:21,23,24;
25:3,5,23,24;26:12,
16;27:3;28:1,6,9;
29:11,15;30:6
**notices (7)**
10:7;11:16;12:15;
18:16;25:14;26:22;
29:20
**noticing (2)**
26:23;29:19
**noting (1)**
10:6
**November (1)**
17:9
**Nowhere (3)**
22:13,17;23:5
**number (9)**
6:25,25;17:2;32:5,
8;36:11;44:21;47:4;
51:16

## O

**object (4)**
11:4;16:17;32:11;
37:9
**objected (3)**
4:19;10:1;31:19
**objecting (1)**
51:2
**objection (10)**
13:4,10;16:14;
18:12;21:12;24:11;
31:22;32:23;34:18;
40:5
**objectionable (1)**
40:8
**objections (11)**
7:25;8:13,20;
30:15;31:22,23;
45:9;49:1,23;51:1,7
**objectors (1)**
8:19
**objects (1)**
39:15
**obligations (3)**
32:24,25;48:7
**obtaining (1)**
5:22
**obviously (3)**
26:11;27:12;30:7
**occurred (1)**
12:14
**off (3)**
12:8;27:22;47:25
**offer (1)**
34:14
**Office (9)**

31:22;32:19;
38:15;44:6;45:11,
20;46:18;49:24;51:1
**officer (1)**
23:25
**official (1)**
5:5;31:3
**often (2)**
12:7;37:25
**old (4)**
22:4,4;47:16,24
**one (14)**
8:8;14:5;15:11;
17:11;22:4;23:23,
24;28:18;36:24;
38:3;43:23,24;
45:25;46:6
**only (8)**
14:8;21:14;34:14;
35:17;38:23;40:22;
46:8;47:23
**open (7)**
14:16;32:19;
33:19;34:18;40:16,
18,20
**opening (2)**
15:21;23:18
**operation (2)**
7:19;29:2
**operations (2)**
41:15,17
**opportunity (8)**
12:7;19:13;21:24;
22:3;23:7;29:5,6;
50:12
**opt (14)**
7:15;8:23;10:13,
24;13:16;14:13,20;
15:25;22:13,23;23:2,
3,4,12
**opt- (3)**
9:6;18:15;50:6
**opt-in (1)**
27:17
**opt-out (13)**
8:22;9:3;11:16;
12:15,19;16:13,17;
18:10;24:10,16;26:8,
19;27:17
**opt-out/opt-in (1)**
28:11
**opt-outs (2)**
9:20;15:23
**order (23)**
7:2;8:25;11:8;
13:19;24:15;29:3;
31:15,16,20;34:5;
35:2;38:12;39:14;
40:20;42:13;43:16;
44:3,18,19;48:23,24;
49:5,9
**orders (5)**
32:23;35:3;45:2;

51:16,19
**ordinarily (2)**
36:17;48:7
**ordinary (1)**
48:8
**others (2)**
35:3;48:18
**otherwise (5)**
11:4;17:22;20:3,
15;31:21
**ourselves (1)**
45:17
**out (39)**
7:15;8:23;10:13,
24;13:2,16;14:7,9,
13,20;15:25;18:1,15,
16,16;20:20,24;21:2;
22:13,23,25;23:2,3,
4,12,21;28:6;29:1,
22;32:5;33:4;36:10;
45:16;46:19;47:16;
49:5;50:6,7;51:23
**outcome (2)**
5:8;37:4
**outlined (2)**
11:21;50:18
**outs (1)**
9:7
**outset (5)**
6:16;18:2;25:8,12;
31:2
**over (10)**
4:22;21:20;25:17;
29:17;30:19;33:12,
14;35:24;40:6;44:22
**overall (3)**
34:21;36:12;37:13
**overcome (2)**
41:1;42:9
**overreaching (2)**
38:24;39:1
**overrule (2)**
50:25;51:7
**overstated (1)**
17:17
**overview (1)**
17:5

## P

**Pachulski (2)**
46:9,23
**package (2)**
34:11,21
**packages (1)**
19:25
**Page (1)**
17:3
**paid (8)**
37:19;39:5;47:22;
48:8;49:3,19;50:23,
23
**pain (1)**

37:17
**paper (3)**
7:3;13:24;15:19
**papers (6)**
11:21;32:1,21;
33:4;35:5;40:17
**paragraph (1)**
44:19
**part (9)**
9:10;29:21;34:20;
37:17;41:20;45:7;
46:24;49:2;50:24
**participate (1)**
4:21
**participation (2)**
25:9,10
**particular (3)**
8:8;23:16;35:18
**particularly (1)**
43:21
**parties (27)**
5:7,11;8:5;9:2,12,
20,23;10:14;11:18;
13:13;18:24;20:25;
22:9;23:1,5,9;24:14,
20;26:16,20;27:2,3;
39:12;42:14;45:24;
47:21;48:1
**parties-in- (1)**
40:12
**parties-in-interest (1)**
49:1
**partners (1)**
6:2
**party (10)**
5:1;10:9,14;22:20;
26:18;32:11;40:25;
41:15;44:19;48:14
**party-in-interest (1)**
42:11
**pass (1)**
35:24
**patent (1)**
9:19
**patently (1)**
18:13
**path (1)**
18:16
**Patriot (2)**
22:7,21
**Patterson (1)**
16:24
**pay (1)**
47:23
**payments (3)**
4:9;5:24;48:12
**pending (5)**
5:19;17:1,7;20:22;
28:25
**Penn (3)**
22:7;23:8,12
**people (9)**
15:3,9,11,18;

16:11;17:22;20:13;
23:6;28:9
**percent (6)**
4:25;5:1;7:6,10;
38:4;50:17
**perhaps (1)**
28:2
**period (4)**
17:15,23;19:14;
20:24
**permitted (1)**
29:3
**person (1)**
14:3
**persons (1)**
17:20
**perspective (4)**
10:5;12:23;15:9;
33:10
**petition (3)**
34:22;37:24;49:13
**Phillips (1)**
9:6
**phone (1)**
44:21
**piece (2)**
13:23;20:16
**pieces (1)**
45:10
**Pier (4)**
10:18;22:7,18,19
**pinnings (1)**
40:14
**place (1)**
14:10
**plain (3)**
10:2;15:16,17
**plaintiff (1)**
24:16
**plaintiffs (6)**
8:2,23;10:23,24;
16:25;19:1
**plan (40)**
5:22;6:4,8;7:1,5;
8:10;18:12,16,22,23,
25;19:4,7,10,11,12;
20:7,13;21:4,8,19,
23;22:11,14,16,17,
24,25;23:6,20;24:3,
5,8;25:21;33:24;
34:4;36:13;37:2,15;
50:17
**plans (2)**
4:14;21:19
**plausible (2)**
21:14,25
**Please (5)**
4:3;6:22;15:17;
38:16;43:5
**pleased (1)**
37:17
**plus (2)**
5:17;22:18

**PM (1)**
52:4
**podium (1)**
35:24
**point (9)**
15:18;25:19;26:9;
29:8;32:5;33:22;
34:3,20;48:19
**pointed (3)**
13:2;37:8;50:6
**points (4)**
26:6,10;43:15;
48:18
**portion (1)**
47:6
**posed (1)**
21:11
**position (2)**
18:4;33:4
**positioned (1)**
46:17
**positive (2)**
5:8;6:13
**possible (1)**
28:9
**post- (1)**
49:12
**post-petition (4)**
38:22;39:17;48:7;
49:19
**pot (2)**
37:1,14
**potential (1)**
39:19
**powerful (1)**
50:11
**practice (1)**
15:15
**pre- (2)**
34:21;37:23
**precedent (1)**
28:12
**precedents (1)**
9:17
**precise (1)**
41:2
**preference (1)**
37:22
**preferences (1)**
39:17
**preliminary (1)**
16:15
**premise (1)**
5:21
**premised (1)**
4:20
**pre-petition (4)**
33:16,25;34:10;
43:12
**present (4)**
17:3;25:5;39:25;
40:24
**presentations (1)**

52:1
**presented (1)**
37:11
**preserved (3)**
30:15;39:9,19
**preserves (2)**
7:18;50:21
**preserving (3)**
16:10;27:16;40:2
**Presumably (2)**
23:20,22
**presumption (1)**
41:1
**pretty (1)**
11:6
**previously (3)**
34:9,9;46:12
**pricing (3)**
35:16;43:21;49:25
**primacy (1)**
43:16
**Primarily (2)**
31:6,24
**principal (1)**
18:3
**principle (1)**
33:11
**prior (1)**
16:2
**private (1)**
45:2
**pro (1)**
17:2
**proactively (1)**
34:1
**probably (3)**
12:16;19:23;50:20
**procedure (3)**
13:19,21;16:6
**procedures (4)**
11:12;18:7,8;
24:15
**proceed (2)**
4:1;29:25
**proceedings (1)**
52:4
**proceeds (12)**
5:19;32:23;33:1,7,
12,14;34:12,15;
39:19;46:9,13,15
**process (11)**
9:13;12:11,19;
13:1,22;14:8;18:10;
24:5;25:11;29:10;
50:24
**processes (1)**
25:11
**professional-eyes-only (1)**
44:8
**professionals (1)**
45:15
**program (1)**
37:23

**proof (1)**
16:9
**proper (3)**
24:18,18;44:4
**propose (1)**
27:7
**proposed (6)**
7:2;12:20;39:14;
42:13;43:12;44:19
**proposes (1)**
7:6
**proprietary (1)**
43:20
**prospects (1)**
17:17
**protectable (1)**
41:16
**protected (2)**
15:24;41:11
**protection (3)**
32:24;34:8;48:1
**provide (5)**
9:11;33:5,23;42:3;
44:12
**provided (9)**
7:22;34:3;37:12;
40:22;41:5;42:5;
44:6,7,9
**providers (1)**
6:3
**provides (5)**
33:18,21;40:17,
19;42:13
**providing (1)**
41:14
**provision (2)**
34:6;50:7
**provisions (4)**
20:14;49:9,11;
50:15
**PSLRA (1)**
28:23
**public (6)**
12:14;14:21;
35:15;40:15,18,25
**publication (1)**
29:15
**punchline (1)**
4:14
**purchase (1)**
17:25
**purchases (2)**
19:2;20:24
**purely (1)**
21:15
**purposes (3)**
11:16;19:7;26:1
**pursuant (3)**
19:3,6;45:15
**put (4)**
10:2;13:9;21:1,5
**putative (7)**
8:24;10:24,25;

11:2;16:21;17:20;
25:4

## Q

**quickly (1)**
49:4,4
**quite (1)**
32:5
**quotes (1)**
21:5

## R

**raise (1)**
11:13
**raised (8)**
10:22;21:21,22;
24:10;31:22;34:17;
40:5;49:24
**raising (1)**
21:12
**rather (3)**
39:8;41:7;42:2
**reached (3)**
31:2;37:10;46:24
**reaching (1)**
47:9
**read (4)**
10:15;15:2;19:21;
20:14
**readily (1)**
22:6
**ready (1)**
4:1
**real (1)**
37:23
**really (7)**
14:6,6,17;16:3;
24:21;37:7;42:9
**reason (6)**
11:11;20:4;21:25;
22:16;44:20;50:7
**reasonable (6)**
5:12,20;14:22;
24:12;39:24;44:3
**reasonably (1)**
29:16
**reasoning (1)**
42:7
**reasons (5)**
11:21,21;34:13;
42:18;45:2
**receive (9)**
7:7,12,22;10:20;
19:21,23,23,25;23:4
**received (3)**
7:24;16:2;32:14,
16
**receiving (5)**
9:14;19:10;20:7;
21:14;26:21
**recency (1)**

UST-0975

43:16

**recent (2)**
10:18;35:4

**recently (3)**
14:5;15:7;45:2

**recipients (1)**
14:1

**recognize (1)**
24:15

**recognized (2)**
5:10;9:22

**reconciling (1)**
49:12

**record (3)**
6:13;43:5,10

**records (2)**
40:15,18

**recover (2)**
39:16;45:17

**recoveries (1)**
5:18

**recovery (2)**
7:13;48:3

**redacted (1)**
42:1

**redacting (1)**
42:2

**reengineer (1)**
24:8

**refer (2)**
4:9;31:17

**reference (1)**
23:13

**referenced (1)**
28:19

**referring (1)**
40:16

**reflected (4)**
6:6;8:15;31:15;
35:2

**reflects (1)**
31:16

**regard (6)**
25:3;27:17;28:7,
11;49:25;50:10

**regarding (3)**
10:23;29:6;51:11

**regular (1)**
14:3

**reject (9)**
19:11;21:23;
22:14,19,22,23,24,
25;23:6

**related (4)**
8:9,21;17:10;35:8

**relates (2)**
31:5;35:9

**release (22)**
10:8,11,14,19;
11:18;12:20;14:15,
15,21;15:25;18:3,21;
20:8,8,14;21:13;
22:8,17,25;23:14;

24:3,6

**released (2)**
9:12;20:25

**releases (15)**
7:14,15;8:9,21,21;
9:3,8,10,11,14,15,17;
21:18,22;24:1

**releasing (8)**
18:24;22:9,20;
23:1,5,9;24:14,20

**relevant (1)**
17:14

**relief (3)**
40:10;47:12;48:24

**relies (1)**
26:22

**relying (1)**
5:18

**remain (1)**
45:1

**remainder (1)**
8:13

**remaining (1)**
38:10

**remains (1)**
34:18

**remarkable (1)**
37:4

**remarks (1)**
51:9

**remedy (1)**
40:22

**remember (1)**
47:16

**render (1)**
18:12

**rent (17)**
4:9;5:23,24,25;
37:15,19,20,20;
47:10,22,22;48:6,9;
49:3,13,19;50:23

**rent-deferral (1)**
47:13

**reorganization (1)**
7:18

**reorganize (3)**
37:3;44:13;50:12

**reorganized (2)**
7:10;9:11

**repeat (2)**
7:5;43:5

**reply (5)**
8:16;21:17;23:17;
25:2;32:8

**report (1)**
4:13

**represented (1)**
31:5

**representing (1)**
47:4

**request (7)**
10:2;16:5;27:13;
28:6;32:9;45:11;

50:8

**requested (1)**
35:11

**require (3)**
27:7,14;28:5

**required (2)**
30:6,14

**requirements (2)**
11:17,19

**requires (2)**
20:18;39:23

**reserve (3)**
18:14;24:9,17

**reserved (3)**
8:4,8;33:1

**reserving (2)**
16:6,13

**resolution (5)**
4:17;5:25;6:4,11;
24:18;35:2;36:7;
37:14;47:9

**resolve (1)**
34:2

**resolved (5)**
8:1,3,14;31:8,21

**resort (1)**
46:15

**resorting (1)**
46:12

**resoundingly (1)**
33:15

**respect (18)**
8:3;23:15;24:5;
25:8;28:1;29:23;
31:6,14;34:3;36:21,
24;39:21;45:23;
46:5;48:9,22;49:8,18

**respectfully (1)**
32:8

**respond (6)**
13:3;15:22;16:20;
24:24;27:23;28:18

**responded (1)**
9:1

**rest (2)**
25:24,24

**restructuring (3)**
5:8;9:9;12:11

**result (2)**
5:12;41:13

**Retail (3)**
13:11;33:20;35:4

**retailers (1)**
37:5

**retaining (1)**
16:10

**retention (1)**
51:17

**retired (1)**
17:12

**return (6)**
13:12,23;15:11,
19;16:1,8

**returned (1)**
15:23

**returning (2)**
13:14,15

**reverse (1)**
43:15

**review (1)**
35:14

**revised (3)**
7:1,2;8:15

**revisions (1)**
31:15

**rewriting (1)**
13:7

**rhetorical (1)**
21:11

**rich (1)**
48:3

**Richmond (1)**
38:20

**right (29)**
4:3;5:10;11:5,12,
25;12:4;16:16;
24:22;26:2,5,8;28:5;
30:4,10,21;32:13;
35:25;36:10;38:15;
39:16;42:21;43:17;
48:16;49:21,22;
50:12;51:12,21,25

**rights (13)**
8:4,7,22;11:6,10;
13:13;14:8;15:20;
16:7,10,17;39:18,22

**ripe (1)**
14:14

**risk (1)**
45:21

**Robert (1)**
17:14

**robust (1)**
37:1

**roll (2)**
7:9,10

**rolling (1)**
24:6

**Ronald (1)**
17:3

**route (1)**
44:12

**routine (1)**
36:19

**RSA (5)**
4:23,25;5:2,7,11

**rule (2)**
39:22;40:19

**ruled (1)**
9:16

**rules (1)**
17:10

**ruling (3)**
10:18;30:17;51:11

**run (1)**
40:21

## S

**safeguards (1)**
50:9

**sales (1)**
19:2

**Same (4)**
22:18;26:18,19;
34:19

**Sandler (1)**
16:23

**sausage (1)**
36:8

**save (5)**
12:11,12,12,12,24

**saying (5)**
12:8;13:22;15:8,8;
36:10

**scattered (1)**
20:15

**Scope (2)**
8:21;9:1

**seal (7)**
35:14,22;38:10;
40:4,9;44:5;50:5

**sealed (2)**
42:19;45:8

**sealing (1)**
40:20

**SEC (11)**
8:2;9:25;10:5;
12:8;15:1;17:10,21;
18:4;21:22;25:9;
27:21

**second (4)**
25:2;26:16;34:17;
46:9

**seconds (1)**
20:5

**SEC's (2)**
12:23;25:18

**Section (9)**
19:4,6,9;20:18;
34:18;40:1,16;41:6;
42:9

**secured (8)**
33:17,25;34:20;
38:24;39:2,8,23;
46:15

**securities (11)**
8:2,23;12:1;16:25;
17:6,10;19:2;23:23;
28:22,24;29:4

**security (1)**
34:21

**seek (4)**
11:18;34:8,11;
39:2

**seeking (1)**
40:25

**seeks (3)**
11:9;40:1,21

UST-0976

seem (1)
    16:11
seems (1)
    14:23
sees (1)
    44:19
select (1)
    40:13
self-granted (1)
    47:12
send (1)
    15:12
sending (2)
    18:15,15
senior (2)
    23:25;46:15
sense (2)
    24:9;29:21
sensitive (4)
    35:16;42:7;50:2,3
sensitivities (1)
    38:9
sent (1)
    28:6
separate (1)
    18:11
SERAJEDDINI (18)
    4:2,4,4;6:23;18:2;
    24:11,23;25:7;26:14,
    25;28:19;29:9;30:1,
    8,9,18;31:1,18
series (1)
    47:11
serious (1)
    12:18
served (3)
    11:18;26:17,18
service (1)
    6:3
set (7)
    18:9,9;22:18;32:3;
    33:4,8;35:4
sets (2)
    18:16;24:6
setting (1)
    24:4
settlement (7)
    31:2,6,17;36:20;
    37:11;39:11;46:24
seventy (1)
    38:4
several (2)
    4:22;11:8
shall (1)
    40:20
share (1)
    39:23
shareholder (3)
    13:10;14:6,22
shareholders (9)
    8:24;9:13,14;
    12:14;13:3,9;14:21;
    25:4;26:17

sheet (1)
    15:19
shift (1)
    40:1
shifts (1)
    42:15
ship (1)
    50:12
shoehorn (1)
    23:19
short (2)
    10:12;32:25
sign (1)
    39:18
significant (3)
    5:9;7:18;48:4
Similarly (1)
    40:19
simple (3)
    13:8;27:8;28:20
simply (7)
    22:25;24:19;29:9,
    12,17;41:7,11
single (1)
    49:13
situation (2)
    49:8,12
six (1)
    22:3
sixty- (1)
    4:24
size (1)
    43:21
skipping (1)
    15:17
sleepless (1)
    6:19
sleeves (1)
    47:24
soft (1)
    34:5
sold (2)
    19:18,20
solicitation (8)
    11:11,24;18:7,8;
    19:25;24:5,14;31:10
somebody (1)
    50:7
sometimes (1)
    8:5
somewhat (3)
    17:6;23:18;26:22
somewhere (1)
    19:22
son (1)
    23:23
Sorry (1)
    43:9
sort (6)
    12:11;13:1;14:2,
    11;16:6;21:20
sought (2)
    42:11;47:12

space (1)
    35:19
Spalding (2)
    31:5,7
speak (1)
    47:5
specific (6)
    11:12;18:18;
    25:13,25;34:3;42:3
specifically (4)
    7:9;10:1;35:1,9
specificity (1)
    41:2
spelled (1)
    49:5
spend (2)
    20:5;38:4
spent (3)
    6:19;38:2;45:14
stage (2)
    8:7;29:22
stake (1)
    9:24
stakeholders (2)
    5:9;9:12
standard (3)
    9:19;14:15;41:12
standards (1)
    42:9
standing (1)
    11:3
stands (1)
    28:22
start (1)
    12:8
stated (2)
    21:17;42:6
statement (15)
    4:8;6:12,17,24;
    7:2,25;8:7;11:22;
    13:5;18:8;20:14;
    30:11,12,13;31:11
States (9)
    31:23;32:19,22;
    38:18,20;39:14;
    44:6;45:11;46:19
status (1)
    26:19
statute (1)
    28:23
stayed (2)
    29:2;37:8
step (1)
    10:8
steps (3)
    20:10;29:17,19
Steven (1)
    4:4
Stevens (6)
    35:24;38:17,17;
    42:20;46:6;51:23
still (5)
    17:13;19:17,19;

20:22;39:15
stock (6)
    15:10;17:22,23;
    18:1;19:17,19
stocks (1)
    17:25
stop (1)
    38:7
story (1)
    51:3
stress (1)
    7:17
strong (2)
    33:18;41:1
struck (1)
    51:6
Stuart (2)
    32:6,16
stub (1)
    5:25;37:20;47:22
stumble (2)
    19:22;20:2
subject (1)
    8:4
submit (3)
    45:6;51:15,19
subordinated (3)
    19:3,6;20:17
subsidiary (1)
    17:18
substance (1)
    16:14
substantial (1)
    41:8
suffering (1)
    37:17
suffices (1)
    29:16
sufficient (1)
    11:19
suggest (2)
    23:17;25:22
suggested (3)
    25:1;28:2;30:2
suggesting (1)
    25:2
suggestion (1)
    27:12
suppliers (1)
    12:12
support (6)
    5:22;9:8,9;32:3;
    36:13;37:11
supported (2)
    4:15;45:25
supporting (1)
    4:25
supportive (2)
    6:8;38:9
supports (1)
    38:12
suppose (2)
    11:4,14

supposed (2)
    21:15;37:19
surcharge (3)
    36:15;39:22;45:22
sure (6)
    10:18;27:13;28:8;
    30:6;37:8;44:3
syndicated (1)
    35:18
synthesize (1)
    21:1

                T

table (1)
    5:12
tabled (1)
    13:17
Tabling (1)
    14:16
Tailored (1)
    45:4
takeback (1)
    7:8
takers (1)
    32:13
talk (1)
    44:22
talking (2)
    19:14;47:23
Taylor (1)
    17:18
team (2)
    46:9,23
technical (1)
    8:11
teed (1)
    14:13
Teffner (2)
    32:4,14
telling (1)
    15:18
tells (1)
    30:5
temporally (1)
    48:5
temporarily (1)
    29:2
tens (1)
    7:19
term (6)
    5:1,24;7:6,8,9;
    31:4
terms (22)
    4:19,23;5:14,22;
    7:4,21;8:25;9:8,20;
    10:19,22;25:14;
    26:15,16;31:15,18;
    34:24;37:21;38:3,
    23;40:12;41:8
terribly (1)
    46:16
Texas (1)

45:4

**therefore (2)**
11:9;19:3

**thinking (2)**
20:5;22:12

**third- (1)**
10:13

**third-party (8)**
10:8;18:3,21;20:8,
14;21:18;22:8;24:1

**thirteen-year (1)**
22:4

**thirty-eight (1)**
10:11

**though (1)**
18:5

**thought (1)**
14:5

**thousands (1)**
7:19

**threatens (1)**
20:8

**three (3)**
17:11;31:24;45:10

**three-and-a-half (1)**
19:16

**threshold (2)**
12:21;20:13

**thrilled (1)**
6:12

**Thus (1)**
40:20

**ticked (1)**
8:16

**timely (1)**
49:19

**times (5)**
4:12;9:4;10:11;
17:15;38:2

**timing (1)**
15:22

**title (2)**
10:6,9

**today (23)**
4:7,10;5:15;7:8,
15;11:12,15;12:22;
13:1;17:3;26:10;
27:24;28:1,10,16;
30:14;31:20;48:2,22,
24;49:16;51:14;52:1

**today's (2)**
11:15;47:14

**together (2)**
21:1;45:25

**told (1)**
15:11

**took (2)**
22:2,5

**tool (1)**
50:11

**top (1)**
33:25

**toto (1)**

22:12

**touch (1)**
48:11

**tough (1)**
20:12

**towards (1)**
24:7

**Toys (3)**
22:7;23:1,5

**track (1)**
18:9

**trade (1)**
5:22

**train (1)**
18:9

**transaction (3)**
7:5,22;9:10

**transactions (1)**
18:1

**transparency (2)**
40:15;42:15

**treated (1)**
19:7

**treatment (1)**
12:14

**tremendous (1)**
37:5

**trials (1)**
40:19

**troubling (2)**
36:11;37:10

**Trustee (19)**
8:3,5,9;31:23,25;
32:19,25;35:12;
36:1;38:16,18,20;
39:15;44:7;45:11;
46:19;49:24;51:1,19

**Trustee's (2)**
32:22;34:17

**try (2)**
13:20;40:7

**trying (2)**
6:19;14:23

**turn (7)**
6:16;8:19;19:4;
30:19;36:1;45:9;
48:14

**turned (1)**
47:16

**turning (1)**
27:6

**twice (1)**
36:6

**two (12)**
4:8;8:1,19;17:12;
20:9,20;23:22;
24:24;25:13;36:14,
23;46:8

**Tyler (1)**
42:23;43:13

**type (3)**
12:19;14:21;24:6

**typically (2)**

36:22;41:19

---

## U

**ultimately (1)**
13:18

**unconfirmability (1)**
9:19

**under (15)**
14:15;17:9;19:10;
20:7;21:4,7;22:16;
28:22;30:7;35:14,
22;37:14;38:10;
45:18;50:5

**underlying (1)**
40:14

**understands (1)**
50:2

**understood (2)**
15:23;25:17

**Underwriters (1)**
45:18

**unencumbered (4)**
33:6;34:7,9;46:12

**unfair (2)**
41:9,13

**unfairly (1)**
41:18

**unfairness (2)**
24:4,8

**Unfortunately (2)**
28:20;47:18

**unimpaired (2)**
22:10;23:2

**unique (1)**
23:18

**United (9)**
31:23;32:19,22;
38:18,20;39:14;
44:6;45:11;46:18

**unless (5)**
6:15;7:14;11:20;
13:12;20:9

**unnecessary (2)**
40:3;51:22

**unpaid (1)**
49:18

**unprecedented (1)**
29:12

**unreasonable (1)**
16:12

**unredacted (1)**
35:11

**unsecured (19)**
5:5,16;7:12;33:2,
8;34:25;35:7;36:13;
37:2,24;39:9,10,19;
44:7;46:20,23;48:3;
50:19;51:2

**up (18)**
5:15,17;6:20,22;
7:15;8:6,12;9:4;
11:4,15;14:14;

16:18;27:18;30:15;
36:15;46:6;49:17;
51:13

**update (1)**
4:16

**upfront (3)**
25:23;26:2;27:8

**upon (3)**
11:18;19:22;20:2

**urge (1)**
48:5

**use (5)**
4:13;5:20;33:17;
34:21;47:24

**using (1)**
27:1

---

## V

**valid (2)**
9:7;13:21

**valuable (1)**
9:13

**value (3)**
9:11;17:17;37:5

**vast (1)**
9:4

**vendor (4)**
5:21;37:21,23,25

**vendors (5)**
6:2;37:6;38:1,1,5

**version (1)**
31:10

**versus (1)**
27:17

**vest (1)**
47:25

**via (1)**
17:3

**vice (1)**
17:2

**view (2)**
13:8;18:7

**views (1)**
16:13

**violates (1)**
42:15

**Virginia (3)**
22:7;23:8,13

**virtual (1)**
35:24

**voiced (1)**
18:20

**vote (12)**
19:12,13;20:7;
21:24;22:10,11,11,
22,22;23:7,10,12

**voted (1)**
23:3

**votes (1)**
8:11

**voting (3)**
22:12,13;23:11

---

## W

**waive (1)**
6:1

**waiver (10)**
34:19;35:4,6;
36:15;37:22;39:21;
40:1;45:10,23;46:2

**waivers (7)**
38:25;47:6,21;
48:6,11,20;51:3

**wants (1)**
11:13

**waterfall (1)**
5:18

**way (10)**
12:10;14:18;
15:14;18:21;25:8;
33:7,7;38:7;40:7;
50:16

**ways (1)**
46:8

**website (1)**
44:22

**weeks (3)**
4:22;46:22;47:23

**weight (1)**
46:21

**well-trodden (1)**
11:6

**weren't (1)**
47:15

**what's (2)**
26:9;51:6

**Whereupon (1)**
52:4

**whichever (1)**
14:18

**whole (4)**
13:22;20:10;
24:17;35:22

**who's (3)**
13:15;15:20,24

**widely (1)**
5:3

**willing (1)**
27:12

**window (2)**
16:2,8

**wish (5)**
8:6;32:11;42:21;
47:2;48:14

**withdraw (2)**
5:23;49:3

**withdrawn (3)**
37:16,18;48:10

**withheld (1)**
42:2

**within (1)**
35:5

**without (1)**
13:20

UST-0978

**word (1)**
  10:11
**words (3)**
  10:2;15:16;45:12
**work (5)**
  4:22;5:7;15:1;
  26:23;44:24
**worked (3)**
  5:10;8:14;51:18
**working (3)**
  6:21;45:25;51:23
**working- (1)**
  45:13
**working-capital (1)**
  46:11
**world (2)**
  14:2;16:11
**worth (2)**
  21:12;48:9
**wrong (2)**
  27:10;46:16

**Y**

**years (1)**
  19:16
**yesterday (1)**
  47:15

**Z**

**Zoom (2)**
  15:2;17:3

**1**

**1 (5)**
  10:18;13:10;22:7,
  18,19
**107 (1)**
  42:9
**107a (1)**
  40:17
**107b (1)**
  41:7
**11 (6)**
  15:15;21:19;
  25:10;31:3;33:3;
  34:4
**1125 (1)**
  11:22
**12:19 (1)**
  52:4
**14 (1)**
  32:6
**156 (1)**
  6:25
**17th (1)**
  17:24
**18th (1)**
  37:19
**1934 (1)**
  17:10

**1st (1)**
  17:23

**2**

**2 (2)**
  13:11;44:19
**2015 (2)**
  17:24;19:15
**2017 (2)**
  17:24;19:15
**2019 (1)**
  17:9
**21 (1)**
  45:4
**21st (1)**
  17:9
**29 (1)**
  22:6

**3**

**3 (2)**
  5:18;13:11
**30,000-foot (1)**
  17:5
**3rd (1)**
  51:17

**4**

**4 (2)**
  13:13;51:16

**5**

**5 (2)**
  6:1;39:3
**500,000 (1)**
  5:17
**5001 (1)**
  40:19
**506 (1)**
  39:21
**506c (6)**
  34:18;39:22;
  45:10,19;47:21;48:6
**506c/552 (1)**
  47:6
**510b (4)**
  19:4,6,9;20:18
**543 (1)**
  17:2
**548 (1)**
  6:25
**552 (3)**
  45:23;47:21;48:6
**564 (1)**
  7:1
**565 (1)**
  7:2
**566 (1)**
  7:2

**569 (1)**
  32:8

**6**

**6.5 (1)**
  5:17

UST-0979

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and*
*Texas; Not admitted to practice in DC, supervised by*
*members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in*
*DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:    (202) 842-7800
Facsimile:    (202) 842-7899

*Co-Counsel to the Debtors and Debtors in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## ORDER (I) APPROVING THE ADEQUACY
## OF THE DISCLOSURE STATEMENT, (II) APPROVING
## THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT
## TO CONFIRMATION OF THE DEBTORS' PROPOSED AMENDED JOINT
## PLAN OF REORGANIZATION, (III) APPROVING THE FORMS OF BALLOTS
## AND NOTICES IN CONNECTION THEREWITH, (IV) SCHEDULING CERTAIN
## DATES WITH RESPECT THERETO, AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an (this "Order"), pursuant to sections 105, 363, 1125,

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
claims and noticing agent at http://cases.primeclerk.com/ascena. The location of Debtor Ascena Retail Group,
Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur
Boulevard, Mahwah, New Jersey 07430.

[2]    Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion.

UST-0980

1126, and 1128 of the Bankruptcy Code, Bankruptcy Rules 2002, 3016, 3017, 3018, 3020 and

Rules 2002-1 and 3016-1 of the Local Rules of the United States Bankruptcy Court for the Eastern

District of Virginia (the "Local Bankruptcy Rules"), approving, (a) the adequacy of the *Disclosure*

*Statement for the Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc.,*

*and Its Debtor Affiliates* (the "Disclosure Statement"), (b) the Solicitation and Voting Procedures,

(c) the Voting Record Date, Solicitation Deadline, and Voting Deadline (d) the manner and form

of the Solicitation Packages and the materials contained therein, (e) the Plan Supplement Notice,

(f) the Non-Voting Status Notices, (g) the form of notices to counterparties to Executory Contracts

and Unexpired Leases that will be assumed or rejected pursuant to the Plan,[3] (h) the Voting and

Tabulation Procedures, (i) the Plan Objection Deadline, the Confirmation Hearing Date, the

Confirmation Hearing Notice, and (j) certain dates and deadlines related thereto, all as more fully

set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over

this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the*

*United States District Court for the Eastern District of Virginia*, dated August 15, 1984; and that

this Court may enter a final order consistent with Article III of the United States Constitution; and

this Court having found that venue of this proceeding and the Motion in this district is proper

pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in

the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in

interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a

hearing on the Motion were appropriate under the circumstances and no other notice need be

provided; and this Court having reviewed the Motion and having heard the statements in support

---

[3]     The "Plan" means the *Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. and Its*
*Debtor Affiliates* [Docket No. 564].

UST-0981

of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having

determined that the legal and factual bases set forth in the Motion and at the Hearing establish just

cause for the relief granted herein; and upon all of the proceedings had before this Court; and after

due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth in this Order.

## I.      Approval of the Disclosure Statement.

2.      The Disclosure Statement, attached hereto as Schedule 1, is hereby approved as

providing holders of Claims entitled to vote on the Plan with adequate information to make an

informed decision as to whether to vote to accept or reject the Plan in accordance with

section 1125(a)(1) of the Bankruptcy Code.

3.      The Disclosure Statement (including all applicable exhibits thereto) provides

holders of Claims and Interests, and other parties in interest with sufficient notice of the injunction,

exculpation, and release provisions contained in Article VIII of the Plan, in satisfaction of the

requirements of Bankruptcy Rule 3016(c).

## II.      Approval of the Solicitation and Voting Procedures.

4.      The Debtors are authorized to solicit, receive, and tabulate votes to accept the Plan

in accordance with the Solicitation and Voting Procedures attached hereto as Schedule 2, which

are hereby approved in their entirety.

## III.     Approval of the Materials and Timeline for Soliciting Votes and the Procedures for Confirming the Plan.

### A.      Approval of Certain Dates and Deadlines with Respect to the Plan and Disclosure Statement.

5.      The following dates are hereby established (subject to modification as necessary)

with respect to the solicitation of votes to accept or reject, and voting on, the Plan as well as filing

objections to the Plan and confirming the Plan (all times prevailing Eastern Time):

UST-0982

| Event | Date |
|---|---|
| Voting Record Date | September 10, 2020 |
| Solicitation Deadline | Within three business days after entry of the order approving the Disclosure Statement, which is expected to be September 15, 2020 (or as soon as reasonably practicable thereafter) |
| Publication Deadline | Within seven business days after the Solicitation Deadline, which is expected to be September 24, 2020 |
| Plan Objection Deadline | October 13, 2020, at 5:00 p.m., prevailing Eastern Time |
| Voting Deadline | October 13, 2020, at 5:00 p.m., prevailing Eastern Time |
| Deadline to File Confirmation Brief | October 19, 2020, at 12:00 p.m., prevailing Eastern Time |
| Plan Objection Response Deadline | October 19, 2020, at 12:00 p.m., prevailing Eastern Time |
| Deadline to File Voting Report | October 19, 2020, at 12:00 p.m., prevailing Eastern Time |
| Confirmation Hearing Date | October 23, 2020, at 11:00 a.m., prevailing Eastern Time . |

**B.** **Approval of the Form of, and Distribution of, Solicitation Packages to Parties Entitled to Vote on the Plan.**

6.    In addition to the Disclosure Statement and exhibits thereto, including the Plan and this Order (without exhibits, except the Solicitation Procedures), the Solicitation Packages to be transmitted on or before the Solicitation Deadline to those holders of Claims in the Voting Classes entitled to vote on the Plan as of the Voting Record Date, shall include the following, the form of each of which is hereby approved:

a.    an appropriate form of Ballot attached hereto as <u>Schedule 3</u> respectively;[4]

---

[4]    The Debtors will make every reasonable effort to ensure that any holder of a Claim who has filed duplicate Claims against the Debtors (whether against the same or multiple Debtors) that are classified under the Plan in the same

UST-0983

b.      the Cover Letter attached hereto as <u>Schedule 7</u>; and

c.      the Confirmation Hearing Notice attached hereto as <u>Schedule 8</u>.

7.      The Solicitation Packages provide the holders of Claims entitled to vote on the Plan and whether to opt out of the Third Party Releases with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code, and the Local Bankruptcy Rules.

8.      The Debtors shall distribute Solicitation Packages to all holders of Claims entitled to vote on the Plan on or before the Solicitation Deadline.  Such service shall satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

9.      The Debtors are authorized, but not directed or required, to distribute the Plan, the Disclosure Statement, and this Order to holders of Claims entitled to vote on the Plan in electronic format ("<u>E-Documents</u>").  The Ballots as well as the Cover Letter (which will provide that paper copies of the E-Documents may be obtained pursuant to paragraph 10 below) and the Confirmation Hearing Notice will be provided in paper form.  On or before the Solicitation Deadline, the Debtors shall provide complete Solicitation Packages (excluding the Ballots) to the U.S. Trustee and to all parties on the 2002 List as of the Voting Record Date.

10.      Any party that receives materials in electronic format, but would prefer to receive materials in paper format, may contact the Notice and Claims Agent and request paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense).

---

Voting Class, receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class.

UST-0984

11.     The Notice and Claims Agent is authorized to assist the Debtors in (a) distributing the Solicitation Package, (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by holders of Claims against the Debtors, (c) responding to inquiries from holders of Claims and Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, (d) soliciting votes on the Plan, and (e) if necessary, contacting creditors regarding the Plan.

12.     The Notice and Claims Agent is also authorized to accept Ballots and Opt Out Forms via electronic online transmission solely through a customized online balloting portal on the Debtors' case website.  The encrypted ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot or Opt Out Forms submitted in this manner and the creditor's electronic signature will be deemed to be immediately legally valid and effective.  Ballots or Opt Out Forms submitted via the customized online balloting portal shall be deemed to contain an original signature.

### C.     Approval of the Confirmation Hearing Notice.

13.     The Confirmation Hearing Notice, substantially in the form attached hereto as Schedule 8 filed by the Debtors and served upon parties in interest in the Chapter 11 Cases on or before the Solicitation Deadline will constitute adequate and sufficient notice of the hearing to consider approval of the Plan, the manner in which a copy of the Plan could be obtained, and the time fixed for filing objections thereto, in satisfaction of the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.  The Debtors shall publish the Confirmation Hearing Notice (in a format modified for publication) one

UST-0985

time within seven (7) business days following the Solicitation Deadline, and in no event later than

September 24, 2020 in *USA Today* (national edition) and *The New York Times*.

### D. Approval of Notice of Filing of the Plan Supplement.

14. The Debtors are authorized to send notice of the filing of the Plan Supplement, which will be filed and served no later than fourteen days prior to the Voting Deadline, substantially in the form attached hereto as <u>Schedule 9</u>, on the date the Plan Supplement is filed pursuant to the terms of the Plan.

### E. Approval of the Form of Notices to Non-Voting Classes.

15. Except to the extent the Debtors determine otherwise, the Debtors are not required to provide Solicitation Packages to holders of Claims or Interests in Non-Voting Classes, as such holders are not entitled to vote on the Plan. Instead, on or before the Solicitation Deadline, the Notice and Claims Agent shall mail (first-class postage prepaid) a Non-Voting Status Notice (including the Opt Out Form) in lieu of Solicitation Packages, the form of each of which is hereby approved, to those parties, outlined below, who are not entitled to vote on the Plan:

| Class(es) | Status | Treatment |
|---|---|---|
| 1, 2, 3, and 7 | Unimpaired—Conclusively Presumed to Accept | Will receive a notice, substantially in the form attached to the Order as <u>Schedule 4</u>, in lieu of a Solicitation Package. |
| 8 | Impaired—Deemed to Reject | Will receive a notice, substantially in the form attached to the Order as <u>Schedule 5</u>, in lieu of a Solicitation Package. |
| N/A | Disputed Claims | Holders of Claims that are subject to a pending objection by the Debtors are not entitled to vote the disputed portion of their Claim. As such, holders of such Claims will receive a notice, substantially in the form attached to the Order as <u>Schedule 6</u> (which notice shall be served together with such objection). |

16. The Debtors are not required to mail Solicitation Packages or other solicitation materials to: (a) holders of Claims that have already been paid in full during the Chapter 11 Cases

UST-0986

or that are authorized to be paid in full in the ordinary course of business pursuant to an order previously entered by this Court; or (b) any party to whom the Disclosure Statement Hearing Notice was sent but was subsequently returned as undeliverable.

### F. Approval of Notices to Contract and Lease Counterparties.

17. The Debtors are authorized to mail a notice of assumption or rejection of any Executory Contracts or Unexpired Leases (and any corresponding cure claims), in the forms attached hereto as <u>Schedule 9</u> and <u>Schedule 10</u> to the applicable counterparties to Executory Contracts and Unexpired Leases that will be assumed or rejected pursuant to the Plan (as the case may be), within the time periods specified in the Plan.

### G. Approval of the Procedures for Filing Objections to the Plan.

18. Objections to the Plan will not be considered by the Court unless such objections are timely filed and properly served in accordance with this Order. Specifically, all objections to confirmation of the Plan or requests for modifications to the Plan, if any, ***must***: (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Bankruptcy Rules; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the notice parties identified in the Confirmation Hearing Notice.

### IV. Miscellaneous.

19. The Debtors reserve the right to modify the Plan without further order of the Court in accordance with Article X of the Plan, including the right to withdraw the Plan as to an individual Debtor at any time before the Confirmation Date.

20. Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

UST-0987

21.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

22.    The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

23.    The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived.

24.    Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) are satisfied by such notice.

25.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

26.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

27.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: Sep 11 2020
Richmond, Virginia

/s/ Kevin R Huennekens
_____
United States Bankruptcy Judge

Entered on Docket: Sep 11 2020

UST-0988

WE ASK FOR THIS:

/s/ Cullen D. Speckhart

**KIRKLAND & ELLIS LLP**

**COOLEY LLP**

**KIRKLAND & ELLIS INTERNATIONAL LLP**

Cullen D. Speckhart (VSB 79096)

Edward O. Sassower, P.C.

*Admitted to practice in New York, Virginia, Missouri and*

Steven N. Serajeddini, P.C. (admitted *pro hac vice*)

*Texas; Not admitted to practice in DC, supervised by*

601 Lexington Avenue

*members of DC bar*

New York, New York 10022

Olya Antle (VSB 83153)

Telephone:        (212) 446-4800

*Admitted to practice in Virginia; Not admitted to practice in*

Facsimile:        (212) 446-4900

*DC, supervised by members of DC bar*

-and-

1299 Pennsylvania Avenue, NW, Suite 700

John R. Luze (admitted *pro hac vice*)

Washington, DC 20004-2400

300 North LaSalle

Telephone:        (202) 842-7800

Chicago, Illinois 60654

Facsimile:        (202) 842-7899

Telephone:        (312) 862-2000

Facsimile:        (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

**CERTIFICATION OF ENDORSEMENT
UNDER LOCAL BANKRUPTCY RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Cullen D. Speckhart

UST-0989

**Schedule 1**

**Disclosure Statement**

UST-0990

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DISCLOSURE STATEMENT FOR THE AMENDED
## JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
## ASCENA RETAIL GROUP, INC. AND ITS DEBTOR AFFILIATES

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia,*
*Missouri and Texas; Not admitted to practice in*
*DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to*
*practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:  (202) 842-7800
Facsimile:  (202) 842-7899

*Co-Counsel to the Debtors and Debtors in Possession*

Dated:  September 10, 2020

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

UST-0991

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OF ASCENA RETAIL GROUP, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XI HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS AND CERTAIN PROPONENTS OF THE RESTRUCTURING SUPPORT AGREEMENT, INCLUDING HOLDERS OF APPROXIMATELY 68 PERCENT OF THE TERM LOAN CLAIMS. ALL SUCH PARTIES URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE

UST-0992

SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND CONSISTENT WITH THE RESTRUCTURING SUPPORT AGREEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

UST-0993

# TABLE OF CONTENTS

Page

I.      INTRODUCTION..........................................................................................................1

II.     PRELIMINARY STATEMENT...................................................................................1

III.    OVERVIEW OF THE PLAN.......................................................................................3
        A.      Purpose and Effect of the Plan...........................................................................3
        B.      Substantial Debt-for-Equity Exchange...............................................................3
        C.      Releases...............................................................................................................4
        D.      GUC Trust...........................................................................................................5

IV.     QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        PLAN.............................................................................................................................8
        A.      What is chapter 11?.............................................................................................8
        B.      Why are the Debtors sending me this Disclosure Statement?.............................8
        C.      Am I entitled to vote on the Plan?.......................................................................8
        D.      What will I receive from the Debtors if the Plan is consummated?....................9
        E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP
                ABL Facility Claim, DIP Term Facility Claim, or a Priority Tax Claim? ....................11
        (i)     Administrative Claims.......................................................................................11
        F.      Are any regulatory approvals required to consummate the Plan?......................13
        G.      What happens to my recovery if the Plan is not confirmed or does not go effective? ..................13
        H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
                Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
                "Consummation?".................................................................................................13
        I.      What are the sources of Cash and other consideration required to fund the Plan?.........................13
        J.      Are there risks to owning the New Common Stock upon emergence from chapter 11?..................13
        K.      Will the final amount of Allowed General Unsecured Claims affect my recovery under
                the Plan?.............................................................................................................13
        L.      Will there be releases and exculpation granted to parties in interest as part of the Plan? ..............14
        M.      What impact does the Claims Bar Date have on my Claim? ..............................16
        N.      What is the deadline to vote on the Plan? .........................................................17
        O.      How do I vote for or against the Plan?...............................................................17
        P.      Why is the Bankruptcy Court holding a Confirmation Hearing?.......................17
        Q.      When is the Confirmation Hearing set to occur? ..............................................17
        R.      What is the purpose of the Confirmation Hearing?............................................17
        S.      What is the effect of the Plan on the Debtors' ongoing business? ....................18
        T.      Will any party have significant influence over the corporate governance and operations of
                the Reorganized Debtors?..................................................................................18
        U.      Who do I contact if I have additional questions with respect to this Disclosure Statement
                or the Plan?........................................................................................................18
        V.      Do the Debtors recommend voting in favor of the Plan?...................................19
        W.      Who Supports the Plan?.....................................................................................19

V.      THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN .................19
        A.      Restructuring Support Agreement......................................................................19
        B.      The Plan.............................................................................................................19

VI.     IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT ..................21
        A.      Certain Key Terms Used in this Disclosure Statement .....................................21
        B.      Additional Important Information.......................................................................25

UST-0994

VII.   THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW..........27

    A.     The Debtors..........................................................................................................27
    B.     Prepetition Capital Structure ..............................................................................28

VIII.   EVENTS LEADING TO THE CHAPTER 11 FILINGS .........................................................29

IX.   EVENTS OF THE CHAPTER 11 CASES ...............................................................................30

    A.     Corporate Structure upon Emergence ................................................................30
    B.     Expected Timetable of the Chapter 11 Cases.....................................................30
    C.     First Day Relief....................................................................................................30
    D.     Other Procedural and Administrative Motions ...................................................31
    E.     Approval of the DIP Facilities ............................................................................31
    F.     Executory Contracts and Unexpired Leases........................................................31
    G.     Lease Renegotiation and Store Closing Process .................................................33
    H.     Schedules and Statements ....................................................................................33
    I.     Litigation Matters.................................................................................................33
    J.     Appointment of Official Committee ....................................................................34
    K.     Potential Asset Sales ............................................................................................34
    L.     Restructuring Support Agreement Amendment ...................................................34
    M.     Global Settlement with the Creditors Committee ...............................................34

X.   PROJECTED FINANCIAL INFORMATION ..........................................................................35

XI.   RISK FACTORS .........................................................................................................................35

    A.     Bankruptcy Law Considerations .........................................................................35
    B.     Risks Related to Recoveries under the Plan ........................................................39
    C.     Risks Related to the Debtors' and the Reorganized Debtors' Businesses.....................41

XII.   SOLICITATION AND VOTING PROCEDURES ...................................................................43

    A.     Holders of Claims Entitled to Vote on the Plan .................................................43
    B.     Voting Record Date .............................................................................................44
    C.     Voting on the Plan................................................................................................44
    D.     Ballots Not Counted ............................................................................................44

XIII.   CONFIRMATION OF THE PLAN...........................................................................................44

    A.     Requirements for Confirmation of the Plan ........................................................44
    B.     Best Interests of Creditors/Liquidation Analysis ...............................................44
    C.     Feasibility.............................................................................................................45
    D.     Acceptance by Impaired Classes .........................................................................45
    E.     Confirmation Without Acceptance by All Impaired Classes ...............................45
    F.     Valuation of the Debtors......................................................................................46
    G.     Statutory Reporting Requirements ......................................................................46
    H.     Preservation of Books and Records .....................................................................46

XIV.   CERTAIN SECURITIES LAW MATTERS .............................................................................47

    A.     Issuance of Securities under the Plan ..................................................................47
    B.     Subsequent Transfers ..........................................................................................47
    C.     Management Incentive Plan and Employee Obligations....................................48

UST-0995

**XV.**   **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** .................................................................................................................... **49**

**XVI.**   **RECOMMENDATION** ........................................................................................................ **65**

UST-0996

**EXHIBITS**

EXHIBIT A      Plan of Reorganization

EXHIBIT B-1    Restructuring Support Agreement

EXHIBIT B-2    Restructuring Support Agreement Amendment

EXHIBIT C      Corporate Structure Chart

EXHIBIT D      Disclosure Statement Order

EXHIBIT E      Financial Projections

EXHIBIT F      Valuation Analysis

EXHIBIT G      Liquidation Analysis

UST-0997

## I. INTRODUCTION

Ascena Retail Group, Inc. ("Ascena") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. and Its Debtor Affiliates* (the "Plan"), dated September 9, 2020.[2] A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for Ascena and each of its affiliated Debtors.

THE DEBTORS, THE CREDITORS COMMITTEE, AND THE PARTIES TO THE RESTRUCTURING SUPPORT AGREEMENT (COLLECTIVELY, THE "PROPONENTS") BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS. THE DEBTORS AND THE OTHER PROPONENTS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

## II. PRELIMINARY STATEMENT

Amidst the challenges facing many in the retail industry, the Debtors commenced these Chapter 11 Cases with a comprehensive pre-negotiated restructuring in hand, together with key creditor support. After several months of diligence and arms' length negotiations with certain secured term loan lenders, the Debtors have reached agreement with Term Loan Lenders holding approximately 68% of the outstanding Term Loan Claims (the "Consenting Stakeholders") to fund and support an expedited restructuring that will ensure a viable enterprise and maximize stakeholder recoveries. The prenegotiated restructuring will deleverage the Debtors' balance sheet by more than $1 billion and provide for an infusion of $150 million in new money. As contemplated in the Restructuring Support Agreement, dated as of July 23, 2020 (a copy of which is attached hereto as **Exhibit B-1**), the Debtors intend to move swiftly through these cases to preserve the significant value embodied in the Restructuring Support Agreement. On September 9, 2020, the Debtors and the Consenting Stakeholders agreed to amend the Restructuring Support Agreement (a copy of such amendment is attached hereto as **Exhibit B-2**), and additional Term Loan Lenders signed joinder agreements to become Consenting Stakeholders, increasing the support for the Restructuring Support Agreement to approximately 94.62% of the outstanding Term Loan Claims. Additionally, the Creditors Committee and each of its members now support the restructuring embodied in the Restructuring Support Agreement, on the terms described herein and set forth in the Plan. Thus, every major creditor constituency that has been active in these Chapter 11 Cases now supports the restructuring embodied in, and confirmation of, the Plan.

The Debtors are a leading specialty retailer for women and girls. Tracing their roots back to a single Dressbarn store built in 1962, today the Debtors operate a portfolio of recognizable brands, including Ann Taylor, LOFT, Lane Bryant, Catherines, Justice, Lou & Grey, and Cacique. As of the Petition Date (as defined herein), the Debtors operated approximately 2,800 stores in the United States, Canada, and Puerto Rico, with more than 12.5 million active customers, and nearly 40,000 employees. As of the Petition Date, the Debtors have approximately $1.60 billion in funded debt obligations, including approximately $330 million in outstanding obligations under the its $500 million senior secured asset-based lending facility and approximately $1.27 billion in senior secured term loan obligations.

As is the case with brick and mortar retailers across the United States and the rest of the world, the Debtors' businesses have been drastically affected by the COVID-19 pandemic. On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. As global markets grappled with the escalating spread of the virus, national, state, and local governments across the United States and throughout the world imposed curfews, social distancing protocols, and shelter-in-place orders. In compliance with these mandates, and to protect the health and safety of the Debtors' customers and employees, on March 17, 2020, the Debtors implemented temporary closures

---

[2]   Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern**.

of all retail stores, which then necessitated the difficult decision to furlough nearly all of its store-level workforce and a substantial portion of its corporate workforce. Notwithstanding the Debtors' efforts to preserve liquidity over the past several months, these circumstances, coupled with the Debtors' already highly leveraged balance sheet, accelerated the need for a long-term strategic solution—a solution the Company ultimately determined to implement through these chapter 11 cases.

Over the past several years, the Debtors have been proactive in developing structural and strategic transformations to refine the Debtors' operating model to center on key customer segments, implement initiatives designed to optimize product flow through the Debtors' distribution channels, and to optimize its store fleet by reducing the number of underperforming stores and obtaining rent relief. In doing so, the Debtors have realized significant costs savings. Among other things, over the past several months, the Debtors have taken decisive action to address its capital structure and implement a strategic plan (the "Strategic Plan") aimed at rationalizing the Debtors' brand and store fleet portfolio, realigning distribution capabilities, and implementing various other cost-saving measures. The Strategic Plan represents a continuation of already existing initiatives, described herein, to address the existing macro-economic challenges of the brick and mortar retail industry.

Moreover, to proactively address the August 21, 2022 maturity of the Term Loans, the Board, including a special committee of disinterested directors (the "Special Committee"), began reviewing strategic alternatives to address the Debtors' capital structure in Fall 2019. But the effects of the COVID-19 pandemic on the Debtors' businesses has accelerated the need to realize the benefits of these strategies and settle on the necessary path forward.

Accordingly, over the several months prior to the Petition Date, the Debtors actively explored financing and other alternatives and engaged with an ad hoc group of Term Loan Lenders. After an extensive review, the Board and Special Committee ultimately determined that there were no financing or other out-of-court alternatives that provided a viable path forward. Through extensive negotiations, though, the Debtors and their secured lenders have agreed to the terms of a crucial and comprehensive recapitalization, the terms of which are embodied in the Restructuring Support Agreement and the Plan.

Under the terms of the Restructuring Support Agreement and Plan, a majority of the Term Loan Lenders have agreed to equitize a substantial portion of the outstanding Term Loans and fully backstop $150 million in new money financing (the "New Term Loan Financing") to fund the Strategic Plan and the Debtors' emergence from these chapter 11 cases. More specifically, the Restructuring Support Agreement and Plan provide that:

- all Term Loan Lenders will receive the opportunity to participate in $75 million of the New Term Loan Financing, which will be funded initially in the form of a debtor-in-possession financing facility to be syndicated following the "first day" hearing in these chapter 11 cases and that the Debtors will seek approval of at the "second day" hearing;

- the Term Loan Lenders that have agreed to backstop the New Term Loan Financing will fund the remaining $75 million of the New Term Loan Financing on the same economic terms;

- all Term Loan Lenders that participate in the New Term Loan Financing will have certain of their prepetition Term Loans rolled up into the debtor-in-possession financing, and the aggregate $311.8 million in loans (including the $150 million in new money loans) will be converted to a new first-out term loan facility upon emergence from these chapter 11 cases;

- all Term Loan Lenders will receive their pro rata share of: (a) 55.1% of the equity in Reorganized Ascena; and (b) participation in $88.2 million in new second-out term loans;

- all Consenting Stakeholders will have the opportunity to receive their pro rata share (based on their holdings of loans under the new first-out term loan facility described above) 44.9% of the equity in Reorganized Ascena upon emergence from these chapter 11 cases;

- the ABL Lenders will be paid in full from cash on hand or proceeds from a new asset-based lending exit credit facility (the "ABL Exit Facility");

- holders of general unsecured claims will receive their pro rata share of the GUC Trust Net Assets; and

- existing common equity in Ascena will be cancelled.

After many months of reviewing alternatives both before and after the COVID-19 pandemic, the Debtors determined that the Restructuring Support Agreement represents the best option available to the Debtors. The

UST-0999

commitment of the Term Loan Lenders to support the transactions embodied in the Restructuring Support Agreement and the Plan, including funding the New Term Loan Financing, provides the Debtors with substantial certainty that they will have the liquidity necessary to continue to provide a best-in-class experience for their customers and achieve their Strategic Plan both during and after emergence from these chapter 11 cases. Implementing the transactions contemplated by the Restructuring Support Agreement will also substantially deleverage the Debtors' balance sheet, positioning Ascena for long-term success.

For the reasons set forth herein, the Debtors believe that the Plan represents the highest and best value maximizing alternative and urge all parties to vote to accept the Plan.

## III. OVERVIEW OF THE PLAN

The Plan provides for the reorganization of the Debtors as a going concern and will significantly reduce the Debtors' long-term debt and annual interest payments while preserving the Debtors' existing liquidity and resulting in a stronger, delevered balance sheet. Specifically, the Plan contemplates a restructuring of the Debtors through a debt-for-equity conversion. The key terms of the Plan are as follows:

### A. Purpose and Effect of the Plan

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor may reorganize its business for the benefit of its stakeholders. The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth how a debtor will treat claims and equity interests.

A bankruptcy court's confirmation of a plan of reorganization binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains any property under the plan.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the Debtors from any debt arising before the Effective Date, terminate all of the rights and interests of pre-bankruptcy equity security holders, and substitute the obligations set forth in the Plan for those pre-bankruptcy Claims and Interests. Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan does not contemplate the substantive consolidation of the Debtors' Estates. Instead, the Plan, although proposed jointly, constitutes a separate plan for each of the Debtors in these Chapter 11 Cases. Holders of Allowed Claims or Interests against each of the Debtors will receive the same recovery provided to other Holders of Allowed Claims or Interests in the applicable Class and will be entitled to their share of assets available for distribution to such Class.

The feasibility of the Plan is premised upon, among other things, the Debtors' ability to achieve the goals of their long-range business plan, make the distributions contemplated under the Plan and pay certain obligations in the ordinary course of the Reorganized Debtors' business. The Reorganized Debtors' financial projections are set forth in **Exhibit E** attached hereto. Although the Debtors' believe the projections are reasonable and appropriate, they include a number of assumptions and are subject to a number of risk factors and to significant uncertainty. Actual results may differ from the projections, and the differences may be material.

### B. Substantial Debt-for-Equity Exchange

As of the Petition Date, the Debtors had outstanding funded debt obligations in the aggregate principal amount of approximately $1.60 billion, consisting primarily of approximately (a) $330 million under the ABL Credit Agreement and (b) $1.27 billion outstanding under the Term Loan Credit Agreement.

UST-1000

If the Plan is confirmed, Ascena will shed more than $1 billion of funded debt upon emergence from these Chapter 11 Cases. Ascena's pro forma exit capital structure will consist of (a) a $400 million Exit ABL Facility, (b) a $311.8 million First Out Exit Term Loan Facility, (c) a $88.2 million Last Out Exit Term Loan Facility, and (d) the New Common Stock.

Specifically, the Plan contemplates the following Restructuring Transactions:

- the ABL Lenders have agreed to provide a $400 million debtor-in-possession financing facility that will convert to a $400 million Exit ABL Facility upon satisfaction of certain conditions and emergence from these chapter 11 cases;

- all Term Loan Lenders will receive the opportunity to participate in the $75 million New Term Loan Financing, which will be funded initially in the form of a debtor-in-possession financing facility;

- the Term Loan Lenders that have agreed to backstop the New Term Loan Financing will fund the remaining $75 million of the New Term Loan Financing on the same economic terms;

- all Term Loan Lenders that participate in the New Term Loan Financing will have $161.8 million of their prepetition Term Loans rolled up into the debtor-in-possession financing, and the aggregate $311.8 million in loans will be converted to a new first-out term loan facility upon emergence from these chapter 11 cases;

- all Term Loan Lenders will also receive their pro rata share of: (a) 55.1% of the equity in Reorganized Ascena; and (b) participation in $88.2 million of new second-out term loans;

- all Consenting Stakeholders will have the opportunity to receive their pro rata share (based on their holdings of loans under the new first-out term loan facility described above) of 44.9% of the equity in Reorganized Ascena upon emergence from these chapter 11 cases;

- holders of general unsecured claims will receive their pro rata share of the GUC Trust Net Assets; and

- Interests in Ascena will be cancelled, released, and extinguished without any distribution.

### C. Releases

The Plan contains certain releases (as described more fully in Article IV.L hereof), including mutual releases between (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the ABL Agent; (e) the ABL Lenders; (f) the Term Loan Agent; (g) the Term Loan Lenders; (h) each of the lenders and administrative agents under the Exit Facilities; (i) the Backstop Parties; (j) the DIP ABL Agent; (k) the DIP ABL Lenders; (l) the DIP Term Agent; (m) the DIP Term Lenders; (n) each current and former Affiliate of each Entity in the foregoing clause (a) through the following clause (o); and (o) each Related Party of each Entity in the foregoing clause (a) through this clause (o); and (p) the Committee, and, as a Releasing Party, all holders of Impaired Claims who vote to accept the Plan, all holders of Impaired Claims who abstained from voting on the Plan or voted to reject the Plan but did not timely opt out of or object to the applicable release, and all holders of Unimpaired Claims who did not timely opt out of or object to the applicable release; *provided* that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation; *provided further* that any such Entity shall be identified by name as a non-Releasing Party in the Confirmation Order and shall not receive the Avoidance Action Waiver. Additionally, any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

In its objection to the adequacy of the Disclosure Statement, the U.S. Trustee argued that the Plan's third-party release and exculpation provisions are impermissibly broad and thus render the Plan patently unconfirmable. In support of its position, the U.S. Trustee cited to *Behrmann v. Nat. Heritage Foundation*, 663 F.3d 704 (4th Cir. 2011) and *In re National Heritage Foundation, Inc.*, 478 B.R. 216 (Bankr. E.D. Va. 2012). The Debtors disagree. The Debtors are prepared to demonstrate at the Confirmation Hearing that the Plan's release, injunction, and exculpation

UST-1001

provisions comply with the controlling Fourth Circuit standards. Further, the Global Settlement and the Restructuring Support Agreement—and which now is supported by the Committee—reflect the view of the Debtors and their key creditor constituencies that pursuing the restructuring reflected in the Plan, including the Plan's third-party release and exculpation provisions, is the best path to maximize value in the Chapter 11 Cases. There can be no assurance that the Bankruptcy Court will agree with the Debtors' position.

Further, in its objection to the adequacy of this Disclosure Statement, the U.S. Trustee and the United States Securities and Exchange Commission argued that the Plan's opt-out procedure is not sufficient to demonstrate consent to the releases contained in the Plan. Again, the Debtors disagree. A number of courts have found that an opt-out procedure, substantially similar to the procedure contemplated by the Plan, is sufficient to demonstrate the consent of parties that do not opt out. *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305-06 (Bankr. D. Del. 2013). There can be no assurance that the Bankruptcy Court will agree with the Debtors' position.

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things, the releases, exculpations, and injunctions are: (a) tailored to the specific circumstances of the cases; (b) provide closure with respect to prepetition Claims and Causes of Action, which the Debtors determined is a valuable component of the overall restructuring under the circumstances and is integral to the Plan; (c) a condition to the global settlement and a necessary part of the Plan; (d) given to the Released Parties and Exculpated Parties, each of which has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of a value-maximizing restructuring; and (e) have the support of the vast majority of the holders of the Term Loan Claims. The Debtors believe that each of the Released Parties and Exculpated Parties has played an integral role in formulating or enabling the Debtors to propose the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party in connection with Confirmation of the Plan.

For the avoidance of doubt, nothing in the Plan shall discharge, release, preclude, or enjoin: (i) any liability to any Governmental Unit that is not a Claim; (ii) any Claim of a Governmental Unit arising on or after the Effective Date; (iii) any police or regulatory liability to a Governmental Unit on the part of any Entity as the owner or operator of property after the Effective Date; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors. Nor shall anything in the Plan enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence. Nothing in the Plan shall divest any tribunal of any jurisdiction it may have to adjudicate any defense based on this paragraph.

## D.    GUC Trust

On or prior to the Effective Date, the Debtors shall transfer the GUC Trust Assets to the GUC Trust and the Debtors and the GUC Trustee shall execute the GUC Trust Agreement and shall take all steps necessary to establish the GUC Trust in accordance with the Plan and the beneficial interests therein. In the event of any conflict between the terms of the Plan and the terms of the GUC Trust Agreement, the terms of the Plan shall govern. Additionally, on the Effective Date, the Debtors shall transfer and shall be deemed to transfer to the GUC Trust all of their rights, title, and interest in and to all of the GUC Trust Assets and, in accordance with section 1141 of the Bankruptcy Code, the GUC Trust Assets shall automatically vest in the GUC Trust free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax. The GUC Trustee shall be the exclusive administrator of the assets of the GUC Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representatives of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the GUC Trustee's duties under the GUC Trust Agreement. The GUC Trust shall be governed by the GUC Trust Agreement and administered by the GUC Trustee. The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this section. The GUC Trustee shall hold and distribute the GUC Trust Assets in accordance with the provisions of the Plan and the GUC Trust Agreement. Other rights and duties of the GUC Trustee shall be as set forth in the GUC Trust Agreement. After the Effective Date, the Debtors and the Reorganized Debtors shall have no interest in the GUC Trust Assets except as set forth in the Plan, the Confirmation Order, or the GUC Trust Agreement. For the avoidance of doubt, the claims and Causes of Action held by the Debtors or Reorganized Debtors in connection with the suit

UST-1002

*Target Corp. et al. v. Visa Inc. et al.*, case no. 1:13-cv-03477, currently pending in the U.S. District Court for the Southern District of New York, shall vest in and be controlled by the Reorganized Debtors, notwithstanding the provisions of this Plan providing that future cash proceeds of such suit will be transferred to the GUC Trust (at which time (and not before) such proceeds shall vest in the GUC Trust); *provided* that the Reorganized Debtors shall provide reasonable information regarding the progress and status such suit to the GUC Trustee on a confidential basis upon reasonable request of the GUC Trustee.

*GUC Trustee and GUC Trust Agreement.* The GUC Trust Agreement will be filed with the Plan Supplement and generally will provide for, among other things: (i) the transfer of the GUC Trust Assets to the GUC Trust; (ii) the payment of certain reasonable expenses of the GUC Trust from the GUC Trust Assets; and (iii) distributions to holders of Allowed General Unsecured Claims, as provided herein and in the GUC Trust Agreement. For the avoidance of doubt, the GUC Trust Agreement also will identify: (a) who will select the GUC Trustee; (b) who will select the GUC Trustee; (c) the terms of the GUC Trustee's engagement; (d) the identity of any parties who will supervise the fees of the GUC Trustee; and (e) whether the GUC Trustee shall be bonded. The GUC Trust Agreement may include reasonable and customary provisions that allow for indemnification by the GUC Trust. Any such indemnification shall be the sole responsibility of the GUC Trust and payable solely from the GUC Trust Assets. The GUC Trustee shall be responsible for all decisions and duties with respect to the GUC Trust and the GUC Trust Assets, except as otherwise provided in the Plan, the Confirmation Order, or the GUC Trust Agreement.

*Cooperation of the Reorganized Debtors.* Except as otherwise provided in the Plan, the Confirmation Order, or the GUC Trust Agreement, the Debtors or Reorganized Debtors, as applicable, upon reasonable notice, shall reasonably cooperate with the GUC Trustee in the administration of the GUC Trust, including by providing reasonable access to pertinent documents, including books and records, to the extent the Reorganized Debtors have such information and/or documents, to the GUC Trustee sufficient to enable the GUC Trustee to perform its duties hereunder. The Reorganized Debtors shall reasonably cooperate with the GUC Trustee in the administration of the GUC Trust, including by providing reasonable access to documents and current officers and directors with respect to contesting, settling, compromising, reconciling, and objecting to General Unsecured Claims; *provided* that, in each case, the GUC Trust agrees upon request to reimburse reasonable out-of-pocket expenses for preservation of documents, copying, or similar expenses. The collection, review, and preservation of documents for any investigation or litigation by the GUC Trustee shall be at the expense of the GUC Trust.

*Preservation of Privilege.* The Reorganized Debtors shall enter into a common interest agreement whereby the Reorganized Debtors will be able to share documents, information, or communications (whether written or oral) relating to the GUC Trust Assets. The GUC Trust shall seek to preserve and protect all applicable privileges attaching to any such documents, information, or communications. The GUC Trustee's receipt of such documents, information or communications shall not constitute a waiver of any privilege. All privileges shall remain in the control of the Debtors or the Reorganized Debtors and the Debtors or the Reorganized Debtors, as applicable, retain the right to waive their own privileges.

*GUC Trust Fees and Expenses.* From and after the Effective Date, the GUC Trustee, on behalf of the GUC Trust, shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the GUC Trust Fees and Expenses from the GUC Trust Assets. The GUC Trustee is authorized to allocate such expenses (including, without limitation, any taxes imposed on or payable by the GUC Trust or in respect of the GUC Trust Assets and professional fees) to, and pay them from, the GUC Trust Assets, as the GUC Trustee may determine in good faith is fair (such as based upon the GUC Trustee's good faith determination of the nature or purpose of the fee or expense, the relative amount of General Unsecured Claims, the relative estimated value of the GUC Trust Assets or such other matters as the GUC Trustee deems relevant); *provided* that the GUC Trustee (i) shall reasonably attribute the expenses (including, without limitation, any taxes imposed on or payable by the GUC Trust or in respect of the GUC Trust Assets and professional fees) of the liquidation, defense, or resolution of General Unsecured Claims to the GUC Trust Assets and pay them therefrom, and (ii) shall reasonably attribute the expenses (including, without limitation, any taxes imposed on or payable by the GUC Trust or in respect of the GUC Trust Assets and professional fees) of calculating, disseminating, and administering distributions (*e.g.*, accounting and mailing costs) on General Unsecured Claims to the GUC Trust Assets and pay them therefrom. The Reorganized Debtors shall not be responsible for any costs, fees, or expenses of the GUC Trust.

*Tax Treatment.* In furtherance of this Section of the Plan, (i) it is intended that the GUC Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation

6

UST-1003

section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of General Unsecured Claims, consistent with the terms of the Plan, and accordingly, all assets held by the GUC Trust are intended to be deemed for federal income tax purposes to have been distributed by the Debtors or Reorganized Debtors, as applicable, to the holders of Allowed General Unsecured Claims, and then contributed by the holders of Allowed General Unsecured Claims to the GUC Trust in exchange for their interest in the GUC Trust; (ii) the primary purpose of the GUC Trust shall be the liquidation and distribution of the GUC Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including, without limitation, the Debtors, the Estates, holders of Allowed General Unsecured Claims receiving interests in the GUC Trust, and the GUC Trustee) shall report consistently with such treatment described in provisos (i) and (ii) of this paragraph; (iv) all parties (including, without limitation, the Debtors, the Estates, holders of Allowed General Unsecured Claims receiving interests in the GUC Trust, and the GUC Trustee) shall report consistently with the valuation of the GUC Trust Assets transferred to the GUC Trust as determined by the GUC Trustee (or its designee); (v) the GUC Trustee shall be responsible for filing all applicable tax returns for the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the GUC Trustee shall annually send to each holder of an interest in the GUC Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes.

Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC Trustee), the GUC Trustee may timely elect to (i) treat any portion of the GUC Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including, without limitation, the Debtors, the Estates, holders of Allowed General Unsecured Claims receiving interests in the GUC Trust, and the GUC Trustee) shall report for United States federal, state, and local income tax purposes consistently with the foregoing. Any taxes (including with respect to earned interest, if any) imposed on the GUC Trust as a result of this treatment shall be paid out of the assets of the GUC Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The GUC Trustee may request an expedited determination of taxes of the GUC Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the GUC Trust for all taxable periods through the dissolution of the GUC Trust.

The GUC Trust shall continue to have all of the rights and powers granted to the Reorganized Debtors as set forth in this Plan and applicable non-bankruptcy law, and the GUC Trustee shall also have the rights, powers, and obligations set forth in the GUC Trust Agreement.

*Non-Transferability of GUC Trust Interests.* Any and all GUC Trust Interests shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law. In addition, any and all GUC Trust Interests will not constitute "securities" and will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any such interests constitute "securities," the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer, issuance and distribution under the Plan of the GUC Trust Interests will be exempt from registration under the Securities Act and all applicable state and local securities laws and regulations.

*Dissolution of the GUC Trust.* The GUC Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, at such time as all distributions required to be made by the GUC Trustee under the Plan have been made. Upon dissolution of the GUC Trust, any remaining GUC Trust Assets shall be distributed to holders of Allowed General Unsecured Claims in accordance with the Plan and the GUC Trust Agreement, as appropriate.

*Single Satisfaction of Allowed General Unsecured Claims.* Notwithstanding anything to the contrary herein, in no event shall holders of Allowed General Unsecured Claims recover more than the full amount of their Allowed General Unsecured Claims from the GUC Trust.

UST-1004

## IV.     QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.     What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an Estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.     Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement is being submitted in accordance with these requirements.

### C.     Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Each Class's respective voting status is set forth below.

UST-1005

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | ABL Claims | Unimpaired | Presumed to Accept |
| 4 | Term Loan Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Interests in Ascena | Impaired | Deemed to Reject |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to holders of Allowed Claims and Interests under the Plan. Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 1 | Other Secured Claims | In full and final satisfaction of each Allowed Other Secured Claim, except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, each holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor: (a) payment in full in Cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) other treatment rendering such Claim Unimpaired. | $0 | 100% |
| 2 | Other Priority Claims | In full and final satisfaction of each Allowed Other Priority Claim, except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, each holder of an Other Priority Claim shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired. | $35,000,000 to $45,000,000 | 100% |

---

[3]    The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

UST-1006

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 3 | ABL Claims | To the extent any Allowed ABL Claims remain outstanding on the Effective Date, in full and final satisfaction of each Allowed ABL Claim, except to the extent that a holder of an Allowed ABL Claims agrees to a less favorable treatment, such holder shall receive (a) payment in full in Cash of its Allowed ABL Claim; (b) replacement or cash collateralization of all issued and undrawn letters of credit in the amounts specified under the ABL Credit Agreement; (c) Reinstatement of its Allowed ABL Claim under the Exit ABL Facility; or (d) such other treatment that renders its Allowed ABL Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $0 | 100% |
| 4 | Term Loan Claims | In full and final satisfaction of each Allowed Term Loan Claim, each holder of an Allowed Term Loan Claim shall receive its Pro Rata share of (a) participation in the loans arising under the Second Out Exit Term Loan Facility; and (b) 55.1% of the New Common Stock, subject to dilution on account of the Management Incentive Plan and the Equity Premium. | $1,110,000,000 | 45.6% |
| 5 | General Unsecured Claims | In full and final satisfaction of each Allowed General Unsecured Claim, each holder of a General Unsecured Claim shall receive its Pro Rata share of the GUC Trust Net Assets. | $700,000,000 to $800,000,000 | 1.1% to 1.3% |
| 6 | Intercompany Claims | In full and final satisfaction of each Allowed Intercompany Claim, subject to the Restructuring Transactions Memorandum, each Allowed Intercompany Claim shall be Reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Reorganized Debtors; *provided* that no distributions shall be made on account of any such Intercompany Claims. | N/A | N/A |
| 7 | Intercompany Interests | In full and final satisfaction of each Allowed Intercompany Interest, subject to the Restructuring Transactions Memorandum, each Intercompany Interest shall receive no recovery or distribution and be Reinstated solely to the extent necessary to maintain the Debtors' corporate structure. | N/A | N/A |
| 8 | Interests in Ascena | Each Interest in Ascena shall be cancelled, released, and extinguished without any distribution. | N/A | 0% |

10

UST-1007

**E.** **What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP ABL Facility Claim, DIP Term Facility Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP ABL Facility Claims, DIP Term Facility Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**(i)** **Administrative Claims**

Administrative Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein. Except with respect to Administrative Claims that are Professional Fee Claims or to the extent that an Administrative Claim has not already been paid during the Chapter 11 Cases or a holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash the unpaid portion of its Allowed Administrative Claim on the latest of: (a) the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements and/or arrangements governing, instruments evidencing, or other documents relating to such transactions (and no requests for payment of such Administrative Claims must be Filed or served). Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim Allowed by Final Order.

Except as otherwise provided in Article II.A of the Plan and except with respect to Administrative Claims that are Professional Fee Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.

Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party by the Claims Objection Bar Date.

**(ii)** **DIP ABL Facility Claims**

DIP ABL Facility Claims will be satisfied as set forth in Article II.B of the Plan.

All DIP ABL Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP ABL Agreement on such date, (b) all accrued and unpaid interest thereon to the date of payment, and (c) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP ABL Agreement and the DIP Financing Order.

Except to the extent that a holder of an Allowed DIP ABL Facility Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of each Allowed DIP ABL Facility Claim, on the Effective Date, each Holder of an Allowed DIP ABL Facility Claim shall be Paid in Full. As used in this paragraph, "Paid in Full" shall mean (i) if those certain conversion conditions set forth in the DIP ABL Agreement remain unsatisfied as of the Effective Date, on the Effective Date, each holder of an Allowed DIP ABL Facility Claim shall receive the indefeasible repayment in full in Cash of all obligations (including principal, interests, fees, expenses, indemnities (other than contingent indemnification obligations for which no claim has been asserted)) under the DIP ABL Agreement, the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancellation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the DIP ABL Agreement, or (ii) if those certain conversion conditions as set forth in the DIP ABL Agreement are fully satisfied as of the Effective Date, on the Effective Date, each holder of an Allowed DIP ABL Facility Claim shall receive, unless such holder agrees to less favorable treatment, its Pro Rata share of participation in the Exit ABL Facility. The Liens securing the DIP ABL Facility shall not be released until

11

UST-1008

such time as (x) the DIP ABL Facility is Paid in Full, (y) the commitments to lend thereunder have terminated, and (z) the DIP ABL Agent has received evidence reasonably satisfactory to it that the DIP ABL Facility has been terminated and the security granted in connection therewith released.

Subject to the DIP ABL Facility Claims being Paid in Full in accordance with the terms of this Plan, or other such treatment as contemplated by Article II.B of the Plan, on the Effective Date all Liens and security interests granted to secure such obligations (other than those granted in connection with the payoff arrangements and cash collateralization of such obligations) shall be automatically terminated and of no further force or effect without any further notice to or action, order, or approval of the Bankruptcy Court.

**(iii)  DIP Term Facility Claims**

DIP Term Facility Claims will be satisfied as set forth in Article II.C of the Plan.

All DIP Term Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP Term Agreement on such date, (b) all accrued and unpaid interest thereon to the date of payment, and (c) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP Term Agreement and the DIP Financing Order.

Unless such holder agrees to less favorable treatment, and subject to the terms and conditions of the DIP Term Agreement and Exit Facilities Term Sheet, each holder of an Allowed DIP Term Facility Claim shall receive, on the Effective Date, cash in an amount equal to such holders' Allowed Dip Facility Claim; *provided* that, if certain conditions set forth in the DIP Term Agreement and Exit Facilities Term Sheet are satisfied, each holder of the DIP Term Facility Claim shall receive (a) loans arising under the First Out Exit Term Loan Facility in an amount equal to such holders' Allowed DIP Term Facility Claim and (b) cash on account of accrued and unpaid interest and other charges payable through the Effective Date, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed DIP Term Facility Claim.

Subject to the DIP ABL Facility Claims being Paid in Full in accordance with the terms of the Plan, or other such treatment as contemplated in Article II.B of the Plan, on the Effective Date all Liens and security interests granted to secure such obligations (other than those granted in connection with the payoff arrangements and cash collateralization of such obligations) shall be automatically terminated and of no further force or effect without any further notice or action, order, or approval of the Bankruptcy Court.

**(iv)  Professional Fee Claims**

Professional Fee Claims will be satisfied as set forth in Article II.D of the Plan, which includes (a) the Debtors establishing and funding the Professional Fee Escrow Account for purposes of paying all Professional Fee Claims Allowed by the Bankruptcy Court, (b) the Bankruptcy Court determining the Allowed amounts of such Professional Fee Claims after notice and a hearing, (c) the Professionals providing a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors, and (d) post-Confirmation Date, the Debtors or Reorganized Debtors paying in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors, as applicable.

**(v)  Priority Tax Claims**

Priority Tax Claims will be satisfied as set forth in Article II.E of the Plan. Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of an Allowed Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, at the option of the applicable Debtor or Reorganized Debtor, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (i) Cash equal to the amount of such Allowed Priority Tax Claim on the Effective Date or (ii) otherwise treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. For the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

UST-1009

**F.      Are any regulatory approvals required to consummate the Plan?**

There are no known regulatory approvals that are required to consummate the Plan.  However, to the extent such any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

**G.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative transaction may provide holders of Allowed Claims with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* "*Confirmation of the Plan - Best Interests of Creditors/Liquidation Analysis*," which begins on page 44 of this Disclosure Statement, and the Liquidation Analysis attached as **Exhibit G**.

**H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan.  *See "Confirmation of the Plan,"* which begins on page 44 of this Disclosure Statement, for a discussion of the conditions precedent to consummation of the Plan.

**I.      What are the sources of Cash and other consideration required to fund the Plan?**

The Plan and distributions thereunder will be funded by New Common Stock, participation in the Exit Facilities, and Cash on hand, including proceeds of the Exit Facilities.

**J.      Are there risks to owning the New Common Stock upon emergence from chapter 11?**

Yes.  See the section titled "*Risk Factors*" that begins on page 35 of this Disclosure Statement.

**K.      Will the final amount of Allowed General Unsecured Claims affect my recovery under the Plan?**

The Debtors estimate that Allowed General Unsecured Claims, in the aggregate, total approximately $700,000,000 to $800,000,000.  Each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the GUC Recovery Pool.  Although the Debtors' estimate of the ultimately Allowed General Unsecured Claims is the result of the Debtors' careful analysis (in consultation with its advisors) of available information, General Unsecured Claims actually Allowed may be higher or lower than the Debtors' estimate provided herein, which difference could be material.

For instance, (i) the Debtors may reject certain Executory Contracts and Unexpired Leases, which may result in rejection damages claims not accounted for in this estimate of the Allowed General Unsecured Claims, and (ii) the Debtors, the Consenting Stakeholders, or the Committee may object to certain proofs of claim, and any such objections could ultimately cause the total amount of Allowed General Unsecured Claims to be reduced, and such changes could be material.

Further, as of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become involved in additional litigation in the future as a result of conduct that occurred prior to the Petition Date.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a

UST-1010

higher amount than is reflected in the amounts estimated by the Debtors herein, the total amount of Allowed General Unsecured Claims could change as well.

**L.    Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and the Consenting Stakeholders in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

All holders of Claims that (i) vote to accept the Plan or (ii) who are deemed to accept the Plan or (iii) whose Claims are in a voting Class, but who abstain from voting on the Plan <u>and</u> do not opt out of the release provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties. These third party releases represent an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fourth Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

*1.    Release of Liens*

**Except as otherwise specifically provided in the Plan, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or Reorganized Debtors.  The ABL Agent and the Term Loan Agent shall execute and deliver all documents reasonably requested by the Reorganized Debtors or the agent(s) under the Exit Facilities to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

*2.    Debtor Release*

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation**

14

UST-1011

thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the ABL Credit Facility, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP ABL Facility, the DIP Term Loan Facility, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Effective Date.

### 3. *Release by Holders of Claims or Interests*

Effective as of the Effective Date, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Effective Date.

### 4. *Exculpation*

Notwithstanding anything contained in the Plan to the contrary, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action or any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Exit Facilities, the Backstop Commitment Letter, the DIP Financing Order, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal

UST-1012

opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

5. **Injunction**

Except with respect to the obligations arising under the Plan, or the Confirmation Order, and except as otherwise expressly provided in the Plan, or the Confirmation Order, all Entities that held, hold, or may hold claims or interests or Causes of Action that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Reorganized Debtors or the other Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action released or settled or subject to exculpation pursuant to the Plan.

M. **What impact does the Claims Bar Date have on my Claim?**

The Bankruptcy Court has established September 30, 2020, at 4:00 p.m., prevailing Eastern Time, as the general Claims bar date (the "Bar Date") in the Chapter 11 Cases. The following entities holding Claims against the Debtors that arose (or that are deemed to have arisen) prior to the Petition Date, must file proofs of claim on or before the Bar Date: (1) any entity whose Claim against a Debtor is not listed in the applicable Debtor's schedules of assets and liabilities ("Schedules") or is listed in the applicable Debtor's Schedules as contingent, unliquidated, or disputed if such entity desires to participate in any of the Chapter 11 Cases or share in any distribution in any of the Chapter 11 Cases; (2) any entity that believes its Claim is improperly classified in the Schedules or is listed in an incorrect amount and desires to have its Claim Allowed in a different classification or amount from that identified in the Schedules; (3) any entity that believes its Claim as listed in the Schedules is not an obligation of the specific Debtor against which the Claim is listed and that desires to have its Claim Allowed against a Debtor other than that identified in the Schedules; and (4) any entity that believes its Claim against a Debtor is or may be an administrative expense pursuant to section 503(b)(9) of the Bankruptcy Code (but not any entity that believes it holds an administrative expense Claim under section 503(b)(1) of the Bankruptcy Code).

In accordance with Bankruptcy Rule 3003(c)(2), if any person or entity that is required, but fails, to file a Proof of Claim on or before the Bar Date: (1) such person or entity will be forever barred, estopped, and enjoined from asserting such claim against the Debtors (or filing a Proof of Claim with respect thereto); (2) the Debtors and their property may be forever discharged from any and all indebtedness or liability with respect to or arising from such Claim; (3) such person or entity will not receive any distribution in the Chapter 11 Cases on account of that Claim;

UST-1013

and (4) such person or entity will not be permitted to vote on any plan or plans of reorganization for the Debtors on account of these barred Claims or receive further notices regarding such Claim.

As described in this Disclosure Statement, the distribution you receive on account of your Claim (if any) may depend, in part, on the amount of Claims for which proofs of claim are filed on or before the Bar Date.

**N.      What is the deadline to vote on the Plan?**

The Voting Deadline is October 13, 2020, at 5:00 p.m. (prevailing Eastern Time).

**O.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be completed and signed so that it is **actually received** by October 13, 2020, at 5:00 p.m. (prevailing Eastern Time) at the following address: Ascena Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165 (or returned in accordance with the instructions otherwise set forth on your ballot).  *See* Article XII of this Disclosure Statement, which begins on page 43 of this Disclosure Statement.

If a Class of Claims or Interests is eligible to vote and no holder of Claims or Interests, as applicable, in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.  For the avoidance of doubt, any holders of a Claim or Interest who abstain from voting shall not be presumed to accept the Plan in their individual capacity as such.

**P.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**Q.      When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for October 23, 2020, at 11:00 a.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than October 13, 2020, at 5:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit D** and incorporated herein by reference.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the national editions of *The New York Times* and *USA Today* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**R.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

UST-1014

**S.**    **What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, Confirmation means that the Debtors will not be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is the first business day after which all conditions to Consummation have been satisfied or waived.  *See* Article IX of the Plan.  Additionally, upon Confirmation, all actions contemplated by the Plan will be deemed authorized and approved.

On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**T.**    **Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

As of the Effective Date, the term of the current members of the boards of directors of the Debtors shall expire, and the new board and the officers will be appointed for each of the Reorganized Debtors in accordance with the New Corporate Governance Documents and corresponding documents of each Reorganized Debtor.  The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the New Board, as well as those persons that will serve as officers of Reorganized Ascena.  To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed.  Provisions regarding the removal, appointment, and replacement of members of the reorganized New Board will be disclosed in the New Corporate Governance Documents.

**U.**    **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Notice and Claims Agent, Prime Clerk LLC:

> ***By regular mail at:***
> **Ascena Ballot Processing**
> **c/o Prime Clerk LLC**
> **One Grand Central Place**
> **60 East 42nd Street**
> **Suite 1440**
> **New York, NY 10165**
>
> ***By hand delivery or overnight mail at:***
> **Ascena Ballot Processing**
> **c/o Prime Clerk LLC**
> **One Grand Central Place**
> **60 East 42nd Street**
> **Suite 1440**
> **New York, NY 10165**
>
> ***By electronic mail at:***
> **ascenaballots@primeclerk.com**
>
> ***By telephone at:***
> **(877) 930-4319 (toll free)**
> **(347) 817-4076 (international)**

UST-1015

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' notice, claims, and solicitation agent at the address above or by downloading the exhibits and documents from the website of the Debtors' notice, claims, and solicitation agent at http://cases.primeclerk.com/ascena (free of charge) or the Bankruptcy Court's website at www.vaeb.uscourts.gov (for a fee).

### V. Do the Debtors recommend voting in favor of the Plan?

Yes. The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe the Plan, which contemplates a significant deleveraging, is in the best interest of all holders of Claims, and that other alternatives fail to realize or recognize the value inherent under the Plan.

### W. Who Supports the Plan?

The Plan is supported by the Debtors and the Consenting Stakeholders as set forth in the Restructuring Support Agreement.

## V. THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN

### A. Restructuring Support Agreement

On July 23, 2020, the Debtors and certain of the Term Loan Lenders holding approximately 68% of the outstanding principal amount under the Term Loan Credit Agreement entered into the Restructuring Support Agreement. Since executing the Restructuring Support Agreement, the Debtors have documented the terms of the prearranged restructuring contemplated thereby, in the Plan. Additionally, on September 9, 2020, the Debtors and the Consenting Stakeholders agreed to amend the Restructuring Support Agreement and additional Term Loan Lenders signed joinder agreements to become Consenting Stakeholders, increasing the support for the Restructuring Support Agreement to approximately 94.62% of the outstanding Term Loan Claims. The Restructuring Transactions contemplated by the Restructuring Support Agreement and the Plan will significantly reduce the Debtors' funded-debt obligations and annual interest payments and result in a stronger balance sheet for the Reorganized Debtors.

The Plan represents a significant step in the Debtors' months-long restructuring process. The Restructuring Support Agreement (as amended), the DIP ABL Facility, the DIP Term Facility, and the commitments underlying the Exit Facilities will allow the Debtors to proceed expeditiously through chapter 11 to a successful emergence. The Plan will significantly deleverage the Debtors' balance sheet and provide the capital injection needed for the Reorganized Debtors to conduct competitive operations going forward.

### B. The Plan

As discussed in Article III herein, the Plan contemplates a debt-for-equity conversion effectuated through a chapter 11 plan under the following key terms:

#### 1. Equity Interests and Other Securities

The issuance of Securities under the Plan, including the New Common Stock and options, or other equity awards, if any, reserved under the Management Incentive Plan, shall be authorized without the need for any further corporate action and without any action by the holders of Claims or Interests.

All of the New Common Stock issued pursuant to the Plan, including any options for the purchase thereof and equity awards associated therewith, shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

19

UST-1016

On the Effective Date, the Reorganized Debtors shall issue the New Common Stock to fund distributions to certain holders of Allowed Claims in accordance with Article III of the Plan. Reorganized Ascena will have one class of common equity interests, the New Common Stock.

On the Effective Date, each Consenting Stakeholder shall receive (a) its pro rata share (the numerator being such party's holdings of the loans arising First Out Exit Term Loan Facility (including through any of its Related Funds) and the denominator being the aggregate outstanding amount of all loans arising under the First Out Exit Term Loan Facility) of 44.9% of the New Common Stock, which will be subject to dilution from the Management Incentive Plan, and (b) its pro rata share (based on such party's Backstop Percentage (including through any of its Related Funds)) of the Equity Premium, which will be subject to dilution from the Management Incentive Plan.

### 2. *Exit Facilities*

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities (the terms of which shall be set forth in the Exit Facility Documents) on terms consistent with the Exit Facilities Term Sheet and ABL Commitment Letter, if applicable.

Confirmation of the Plan shall be deemed approval of the Exit Facilities and the Exit Facility Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the Exit Facilities.

On the later of (i) the Effective Date and (ii) the date on which the Exit Facility Documents have been executed and delivered, except as otherwise expressly provided in the Plan, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Facility Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order (subject solely to the occurrence of the Effective Date) and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 3. *Use of Proceeds*

Proceeds from the DIP Term Facility, the DIP ABL Facility, and Exit Facilities, as applicable, will be used, among other things, to fund certain distributions under the Plan, the Debtors' operations and administration of the Chapter 11 Cases, as well as for general corporate purposes.

### 4. *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy

UST-1017

Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

Critical components of such settlement include the Debtor releases and third-party releases incorporated into the Plan, treatment of and distributions to creditors under the Plan, post-emergence governance rights incentive programs, conditions precedent to Plan confirmation, the treatment of avoidance actions, debtor-in-possession financing, milestones, and covenants. The components of the Plan reflect and implement the concessions and compromises contained in the Restructuring Support Agreement and otherwise agreed to by the Debtors and their stakeholders. The parties to the Restructuring Support Agreement and the parties to be released under the Plan afforded value to the Debtors and aided in the reorganization process by playing a role in the formulation of the Plan and have expended time and resources analyzing and negotiating the complex issues presented by the Debtors' capital structure. The release provisions in the Plan were a component of the Debtors' ability to achieve consensus on the Restructuring Support Agreement and a prearranged plan of reorganization that maximizes recoveries to the Debtors' creditors and affords the Reorganized Debtors the opportunity to restructure their business to compete effectively post-emergence. Absent the prearranged bankruptcy filing and expeditious implementation of the Plan (which preserves trade relationships and, therefore, enterprise value), the Debtors could face a longer, costlier, and uncertain chapter 11 process mired with contentious litigation or a near-term liquidation, which could materially delay and reduce distributions to creditors.

***Please refer to Article XIV herein for a more detailed discussion of securities law considerations related to the New Common Stock.***

## VI.     IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

### A.     Certain Key Terms Used in this Disclosure Statement

The following are some of the defined terms used in this Disclosure Statement. This is not an exhaustive list of defined terms in the Plan or this Disclosure Statement, but is provided for ease of reference only. Please refer to the Plan for additional defined terms.

"ABL Agent" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent and collateral agent under the ABL Credit Agreement.

"ABL Claim" means any Claim derived from, based upon, or secured pursuant to the ABL Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto.

"ABL Commitment Letter" has the meaning set forth in the Restructuring Support Agreement.

"ABL Credit Agreement" means that certain Amended and Restated Credit Agreement dated as of January 3, 2011, as amended and restated by the Second Restatement Agreement dated as of June 14, 2012, by the Third Restatement Agreement dated as of March 13, 2013, by the Fourth Restatement Agreement dated as of July 24, 2015, the Fifth Restatement Agreement dated as of February 27, 2018, and as may otherwise be amended, restated, supplemented or otherwise modified, among Ascena, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto, the issuing banks party thereto, and the ABL Agent, as administrative agent and collateral agent and swingline lender.

"ABL Documents" means the ABL Credit Agreement and any other agreements and documents executed in connection with or related thereto.

"ABL Lenders" means each of the lenders from time to time party to the ABL Credit Agreement.

"Ad Hoc Group" means, collectively, that certain group of lenders under the Term Loan Facility represented by Milbank LLP and Greenhill & Co., LLC.

"Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

UST-1018

"Backstop Commitment" means the commitment, on the terms set forth in the Backstop Commitment Letter, of the Backstop Parties to backstop the DIP Term Facility.

"Backstop Commitment Letter" means that certain Backstop Commitment Letter, dated as of July 23, 2020, by and among the Backstop Parties and Ascena, as may be amended, supplemented, or modified from time to time, setting forth, among other things, the terms and conditions of the DIP Term Facility and the Backstop Commitment.

"Backstop Parties" means certain of the Consenting Term Loan Lenders or their successors, assigns, or Related Funds (in each case, as allowed pursuant to the Backstop Commitment Agreement) that have committed to backstop the DIP Term Facility on the terms set forth in the Backstop Commitment Letter, solely in their capacities as such.

"Backstop Percentage" means the applicable percentage set forth in Schedule 2 to the Backstop Commitment Letter.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Virginia having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Eastern District of Virginia.

"Bankruptcy Rules" means Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

"Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

"Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"Commitment Party" shall have the meaning set forth in the Backstop Commitment Agreement.

"Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

"Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

"Consenting Stakeholder" has the meaning set forth in the Restructuring Support Agreement.

"Cure/Assumption Objection Deadline" means the date that is 14 days after filing of the Schedule of Assumed Executory Contracts and Unexpired Leases with the Plan Supplement and service of the Cure Notice; *provided* that if any Executory Contract or Unexpired Lease is added to the Schedule of Assumed Executory Contracts and Unexpired Leases after the filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be fourteen (14) days after service of the amended Schedule of Assumed Executory Contracts and Unexpired Leases with such modification.

"DIP ABL Agent" means, as applicable, the administrative agent under the DIP ABL Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP ABL Agreement.

"DIP ABL Agreement" means any debtor-in-possession senior secured asset-based revolving credit agreement, by and among the Debtors, the DIP ABL Agent, and the DIP ABL Lenders, as applicable, as approved by the DIP Financing Order.

UST-1019

"DIP ABL Facility" means any senior secured asset-based revolving credit facility in accordance to the terms and conditions set forth in the DIP ABL Agreement and the DIP Financing Order, as applicable.

"DIP ABL Facility Claim" means any Claim derived from, based upon, or secured pursuant to the DIP ABL Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP ABL Facility.

"DIP ABL Lender" means, as applicable, each lender under the DIP ABL Agreement.

"DIP Financing Order" means the Final Order of the Bankruptcy Court setting forth the terms of and approving the DIP ABL Facility (as applicable) and the DIP Term Facility.

"DIP Term Agent" means Alter Domus (US) LLC, in its capacity as administrative agent under the DIP Term Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Term Agreement.

"DIP Term Agreement" means that certain debtor-in-possession senior secured term credit agreement, by and among the Debtors, the DIP Term Agent, and the DIP Term Lenders, as approved by the DIP Financing Order.

"DIP Term Facility" means that certain $311.8 million senior secured term credit facility issued in accordance to the terms and conditions set forth in the DIP Term Agreement and the DIP Financing Order, as applicable.

"DIP Term Facility Claim" means any Claim derived from, based upon, or secured pursuant to the DIP Term Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Term Facility.

"DIP Term Lender" means each lender under the DIP Term Agreement.

"Employee Benefits Programs" means, collectively, all of the Debtors' wages, compensation, and employee benefits programs according to existing terms and practices, including executive and Insider compensation and benefits programs, Insider and non-Insider severance programs, Insider and non-Insider incentive programs, and Insider and non-Insider retention programs, in each case as were in effect as of the effective date of the Restructuring Support Agreement and were disclosed to counsel for the Required Consenting Stakeholders, including any modifications agreed between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement; *provided* that Employee Benefits Programs shall not include (x) any compensation, post-employment, separation or retirement arrangement with any former Insider (as of the effectiveness of the Restructuring Support Agreement); (y) any non-qualified deferred compensation plan or supplemental retirement plan, solely to the extent and such plan would benefit any former Insider (as of the effectiveness of the Restructuring Support Agreement), in each case without the consent of the Required Consenting Stakeholders following the Petition Date; or (z) any workers' compensation insurance policies and any agreements, documents or instruments related thereto.

"Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"Equity Premium" means an amount of New Common Stock equal to $7.5 million, calculated assuming a total equity value of Reorganized Ascena to be agreed by the Debtors and the Required Consenting Stakeholders.

"Exit ABL Facility" means either (a) a replacement asset-based revolving loan facility pursuant to which one or more ABL Lenders, each in its sole discretion, consents to convert some or all of its outstanding DIP ABL Facility Claims and commitments under the DIP ABL Facility into commitments under such Exit ABL Facility, or (b) a new asset-based revolving loan facility in an amount up to $400 million and, in all events, in an amount sufficient to pay in full in cash the DIP ABL Facility Claims as of the Effective Date.

"Exit Facilities" means, collectively, the Exit ABL Facility, the First Out Exit Term Loan Facility, and the Last Out Exit Term Loan Facility.

UST-1020

"Exit Facilities Term Sheet" means the term sheet set forth as Exhibit D to the Restructuring Support Agreement.

"Exit Facility Credit Agreements" means, collectively, the credit agreements governing the Exit Facilities.

"Exit Facility Documents" means the Exit Facility Credit Agreements and related documents governing the Exit Facilities, which shall be, to the extent available, set forth in the Plan Supplement.

"First Out Exit Term Loan Facility" shall have the meaning given to "First Out Term Loan Facility" in the Exit Facilities Term Sheet.

"General Unsecured Claim" means any Claim that is not Secured and is not (a) an administrative Claim, (b) a secured tax Claim, (c) an other secured Claim, (d) a priority tax Claim, (e) an other priority Claim, (f) an ABL Claim, (g) a Term Loan Claim, or (h) an intercompany Claim.

"GUC Trust" means the trust established by this Plan for the benefit of Allowed General Unsecured Claims pursuant to the GUC Trust Agreement.

"GUC Trust Agreement" means the trust agreement entered into on or before the Effective Date between the Debtors and the GUC Trustee, which shall be in form and substance reasonably acceptable to the Creditors' Committee, the Debtors, and the Consenting Stakeholders.

"GUC Trust Assets" means (i) cash in the amount of $6,500,000; and (ii) 100% of the first $1 million and 50% of the next $4 million of proceeds (if any) received by Ascena resulting from *Target Corp. et al. v. Visa Inc. et al.*, case no. 1:13-cv-03477, currently pending in the U.S. District Court for the Southern District of New York, net of any costs incurred by Ascena in connection therewith.  Any such proceeds in excess of $5 million (and 50% of proceeds between $1 million and $5 million) shall be retained by the Reorganized Debtors.

"GUC Trust Expenses" means the reasonable expenses (including any taxes imposed on or payable by the GUC Trust or in respect of the GUC Trust Assets and professional fees) incurred by the GUC Trust and any professionals retained by the GUC Trust and any additional amount determined necessary by the GUC Trustee to adequately reserve for the operating expenses of the GUC Trust.

"GUC Trust Net Assets" means the GUC Trust Assets less the GUC Trust Expenses.

"GUC  Trustee" means, in its capacity as such, the Person selected by the Creditors' Committee to serve as the trustee of the Trust, and any successor thereto in accordance with the GUC Trust Agreement.

"Insider" has the meaning ascribed to it in section 101(31) of the Bankruptcy Code.

"Interest" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including any common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), and any claim against or interest in the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

"Last Out Exit Term Loan Facility" shall have the meaning set forth in the Exit Facilities Term Sheet.

"Management Incentive Plan" means a post-Effective Date management incentive plan, the material terms of which shall be consistent with Article IV.O of the Plan.

"Person" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

"Petition Date" means July 23, 2020, the date on which the Debtors commenced the Chapter 11 Cases.

UST-1021

"Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the terms thereof, the Plan, the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement). The Debtors shall file the initial version of the Plan Supplement at least fourteen (14) days prior to the Voting Deadline; *provided* that the Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with Article X of the Plan.

"Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

"Term Loan Agent" means Goldman Sachs Bank USA, in its capacity as administrative agent under the Term Loan Credit Agreement, and any successor thereto.

"Term Loan Claim" means all Claims derived from, based upon, or secured pursuant to the Term Loan Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto.

"Term Loan Credit Agreement" means the Term Credit Agreement, dated as of August 21, 2015, and as may otherwise be amended, restated, supplemented or otherwise modified, among Ascena, AnnTaylor Retail, Inc., the lenders party thereto, and the Term Loan Agent, as administrative agent.

"Term Loan Documents" means the Term Loan Credit Agreement and any other agreements and documents executed in connection with or related thereto

"Term Loan Lenders" means each of the lenders from time to time party to the Term Loan Credit Agreement.

### B. Additional Important Information

The confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including the section entitled *"Risk Factors,"* and the Plan before submitting your ballot to vote on the Plan.

***The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.***

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan. The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement; however, to the extent the Debtors become aware of any material inaccuracy or misstatement herein, the Debtors shall issue a correction and file it on the docket of these Chapter 11 Cases.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose. In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or by any similar state, local or foreign regulatory agency, or authority, nor has

UST-1022

the SEC or any other agency or authority passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement or upon the merits of the Plan. Any representation to the contrary is a criminal offense.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon Confirmation of the Plan, the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder (the "Securities Act"), or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in (a) Section 1145 of the Bankruptcy Code or (b) Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder. Other securities may be issued pursuant to other applicable exemptions under the federal securities laws. All securities issued pursuant to the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act. Each Eligible Offeree must be prepared to bear the economic risk of the investment in the New Common Stock issued under Section 4(a)(2) of the Securities Act or Regulation D for an indefinite period of time, since the New Common Stock cannot be transferred or resold unless (i) they are registered under the Securities Act and under any other applicable securities laws or (ii) pursuant to an exemption from such registration.

There is not and there may not be a public market for the New Common Stock, and Reorganized Ascena does not intend to seek any listing of the New Common Stock on any stock exchange or other trading market of any type whatsoever. Accordingly, there can be no assurance that an active trading market for the New Common Stock will ever develop or, if such a market does develop, that it will be maintained. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE, NONE OF THE DEBTORS MAKES ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES. THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR (B) SECTION 4(A)(2) OF THE SECURITIES ACT OR REGULATION D PROMULGATED THEREUNDER, OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

The Debtors make statements in this Disclosure Statement or incorporate by reference herein certain statements that are considered forward-looking statements under federal securities laws. The Debtors consider all statements regarding anticipated or future matters, to be forward-looking statements. Forward-looking statements may include statements about the Debtors':

- business strategy;

- financial condition, revenues, cash flows, and expenses;

- levels of indebtedness, liquidity, and compliance with debt covenants;

- financial strategy, budget, projections, and operating results;

- general economic and business conditions;

- counterparty credit risk;

26

UST-1023

- the outcome of pending and future litigation;

- uncertainty regarding the Debtors' future operating results; and

- plan, objections, and expectations.

Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance. There are risks, uncertainties, and other important factors that could cause the Reorganized Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. CERTAIN OF THESE FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY THE USE OF WORDS SUCH AS "BELIEVES," "EXPECTS," "PROJECTS," "INTENDS," "PLANS," "ESTIMATES," "ASSUMES," "MAY," "SHOULD," "WILL," "SEEKS," "ANTICIPATES," "OPPORTUNITY," "PRO FORMA," "PROJECTIONS," OR OTHER SIMILAR EXPRESSIONS AND VARIATIONS OF SUCH WORDS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN. These risks, uncertainties, and factors may include the following: the Debtors' ability to confirm and consummate the Plan; the potential that the Debtors may need to pursue an alternative transaction if the Plan is not confirmed; the Debtors' ability to reduce their overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees; the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; customer and vendor responses to the Chapter 11 Cases; the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; general economic, business, and market conditions; exposure to litigation; the Debtors' ability to implement cost reduction initiatives in a timely manner; the Debtors' ability to divest existing businesses; and adverse tax changes.

## VII. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A. The Debtors

Ascena began when an entrepreneur and innovator, Roslyn S. Jaffe saw the opportunity to provide wear-to-work dresses and clothing for the working woman during the sixties—a time in the United States when women were entering the workforce in greater numbers, with few options available for buying more stylish and affordable workplace women's clothing. Roslyn, alongside her husband Elliot, opened the first "Dressbarn" store in 1962. What started as a family-run, single-store retailer quickly transformed into a nationally-recognized, publicly-traded specialty retailer for fashion apparel and accessories for women. Following its public listing in 1982, The Dressbarn, Inc. ("Dressbarn") grew rapidly to over 800 stores across 49 states by the early-2000s. Over the years, Dressbarn has grown its portfolio of retail brands through synergistic and selective acquisition, broadening its specialty offerings and expanding its retail footprint throughout North America

In 2004, Dressbarn acquired Maurices Incorporated ("Maurices") for $320 million. Maurices, a specialty retailer offering a broad assortment of fashionable, high quality apparel and accessories to women and men ages 17 to 34, broadened Dressbarn's demographic reach and diversified its retail base (Maurices subsequently exited men's apparel). The Maurices acquisition added 464 stores across 38 states, located in strip centers and malls, and reflected a combined enterprise with sales exceeding $1.1 billion. In 2009, Dressbarn expanded into the girls' clothing market by purchasing Tween Brands, Inc., the owner of the Justice chain, a leading retailer of trendy and value fashion for tween girls between ages seven and fourteen, in a stock-swap deal valued at $157 million. Acquiring the Justice chain expanded Dressbarn's addressable market for clothing to young and teenage girls, adding 908 Justice stores. The combined enterprise encompassed 2,465 locations, with expected sales to reach $2.4 billion.

On January 1, 2011, to reflect its broader holdings and provide the Company with strategic, operational, and financial flexibility, Elliot and Roslyn Jaffee reorganized Dressbarn as a new Delaware corporation under the name "Ascena Retail Group, Inc.," with each of its retail operating brands becoming wholly-owned subsidiaries of Ascena. In conjunction with this, on January 3, 2011, shares of Ascena's common stock commenced trading on the NASDAQ under the ticker symbol "ASNA."

27

UST-1024

Following the reorganization, Ascena continued its growth through selective and accretive acquisitions. In 2012, Ascena ventured into the plus-sized women's clothing market by acquiring Charming Shoppes Inc. ("Charming Shoppes"), the parent company of three distinct brands: Lane Bryant, Inc., Catherines Plus Sizes, and Fashion Bug, for approximately $890 million. The acquisition added approximately 1,800 retail stores across 48 states. With Charming Shoppes now operating as an independent, wholly-owned subsidiary of Ascena, the combined enterprise operated approximately 3,800 locations. Shortly following the Charming Shoppes acquisition, Ascena ceased operations of the Fashion Bug business, closing 124 stores.

In 2015, Ascena acquired ANN INC. ("ANN"), the parent company of retail brands Ann Taylor, LOFT, and Lou & Grey, for approximately $2.16 billion. To finance the ANN acquisition, Ascena raised new secured debt through a first lien term loan facility in the aggregate amount of $1.8 billion (approximately $1.27 billion of which was outstanding on the Petition Date). Through the ANN acquisition, Ascena added two of the leading women's specialty retail fashion brands in North America and solidified itself as one of nation's largest and most diversified specialty apparel retailers. The ANN Acquisition added more than 1,000 store locations across 47 states, the District of Columbia, Puerto Rico, and Canada. Further, the Ann Taylor and LOFT brands enhanced the Company's "omnichannel" presence by providing two store-related e-commerce websites that were available online in more than 100 countries. Following the ANN Acquisition, the store fleet of the Ascena enterprise totaled 4,930 stores, a number significantly reduced in the following years as part of the Company's rationalization efforts.

Today, Ascena operates through seven well-known brands with approximately 2,800 stores in 49 states, Canada, and Puerto Rico and revenues surpassing $5.5 billion annually. The Company's operations consist of its direct channel operations, wholesale operations, retail store locations, and franchised store locations. The Company's brands are organized into three reportable segments: (i) Premium Fashion; (ii) Plus Fashion; and (iii) Kids Fashion.

As of the Petition Date, the Debtors have approximately 40,000 full and part-time employees, with a significant number of seasonal employees traditionally hired during each holiday selling season. A corporate organization chart is attached to the Disclosure Statement as **Exhibit C**.

**B.        Prepetition Capital Structure**

As of the Petition Date,[4] the Debtors reported approximately $1.60 billion in total funded debt. As described in greater detail below, the Debtors' significant funded debt obligations include: (a) approximately $330 million in principal amount of obligations under the ABL Credit Agreement; and (b) approximately $1.27 billion in principal amount of obligations under the Term Loan Credit Agreement.

### 1.    ABL Credit Agreement

On February 28, 2018, Ascena, as lead borrower, the ABL Lenders and the ABL Agent entered into the latest amendment to and restatement of the ABL Credit Agreement. The ABL Credit Agreement provides aggregate revolving commitments of up to $500 million, with an optional increase of up to $200 million. As of the Petition Date, approximately $330 million in borrowings was outstanding under the ABL Credit Agreement.

### 2.    Term Loan Credit Agreement

On August 21, 2015, Ascena, as borrower, entered into the Term Loan Credit Agreement with the Term Loan Agent and the Term Loan Lenders, providing for $1.8 billion variable-rate term loans. The Term Loan Credit Agreement matures in August 2022. As of the Petition Date, approximately $1.27 billion in aggregate principal amount remained outstanding under the Term Loan Credit Agreement.

---

[4]    These financial figures reflect the Debtors' most recent review of their businesses. The Debtors reserve all rights to revise and supplement the figures presented herein.

UST-1025

## VIII.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

Beginning in March 2020, as a result of the COVID-19 pandemic, government-mandated lockdowns, and the subsequent shuttering of the global economy, Ascena, like the rest of the retail world, experienced a significant and precipitous decline in already-challenged store traffic and related consumer spending.  Following the recommendations and mandates of state and local governments, on March 17, 2020, Ascena temporarily closed all Company-operated retail stores indefinitely, while distributions centers remained open, operating at limited capacity. Store closures have significantly contributed to missed sales targets, unsold inventory, and depressed profit margins.

In response, Ascena took decisive action to preserve liquidity, evaluating all options available to conserve cash and maintain ongoing operations.  To that end, the Company materially reduced costs, capital expenditures, inventory commitments, and modified vendor payment terms.  Moreover, on March 30, 2020, the Debtors announced the implementation of temporary salary reductions and furloughs affecting all store associates and nearly half of its corporate associate workforce.  The Debtors further implemented temporary reductions in the base salaries of all corporate associates above a certain threshold, and reduced the base salaries of certain senior management positions by 50 percent.  Reductions for other executives and corporate associates above a certain threshold ranged from 10 percent to 45 percent depending on base pay.

Recently, in accordance with state and local orders, the Company has reopened stores in a phased approach, with a sharp focus on employee and customer safety.  As of the Petition Date, substantially all of the Company's stores had reopened.  The Company is taking exceptional measures to ensure that its associates and customers remain safe in its stores.  However, even with stores open, the brick and mortar retail operating environment continues to be challenging and uncertain.  Certain states have implemented or indicated they are considering social distancing measures that may require that Ascena re-close certain of its stores.  Moreover, it is unclear when store traffic will return to pre-COVID-19 levels.  In light of this uncertainty, the Company has determined to implement the Strategic Plan to ensure that Ascena's operating model appropriately reflects current operating conditions.  In addition to the effects of the COVID-19 pandemic, Ascena faces the same macro-trends that have crippled many apparel and retail companies in recent years.  These factors include the general downturn in the retail industry and the marked shift away from brick-and-mortar retail to online channels.  Given the Debtors' substantial brick-and-mortar presence and associated expenses, the Debtors' businesses have been heavily dependent on store traffic and resulting sales conversions to meet sales and profitability targets.  The retail apparel industry, however, has undergone a permanent shift towards a more online-centric format, in which retailers sell more product through company websites or larger online retailers.

Recognizing this, in recent years the Debtors have implemented a series of cost-saving and cash conservation initiatives to grow their profit margins and address their debt obligations and have made significant investment into their omnichannel strategy to fuel online sales growth.  In the months preceding the COVID-19 outbreak, the Debtors' management team, special committee, and the Board of Directors had been developing a revised, comprehensive transformation strategy focused on addressing the following:  (i) closure of under-performing brands; (ii) right-sizing the store fleet for go-forward brands to ensure remaining stores deliver healthy EBITDA results; (iii) simplifying the organizational structure and operating model to drive aggressive cost reduction; (iv) rationalizing real estate portfolio; and (v) rationalizing go-forward supply chain.  In light of the effects of COVID-19, Management, the Special Committee, and the Board accelerated and refocused these efforts to build a plan that would allow the Company to remain viable in the new COVID-19 operating environment.

In parallel with stabilizing Ascena's business and cash position, the Board and Special Committee focused on addressing the effect of COVID-19 on Ascena's business, including refining and accelerating certain actions in the Company's existing business plan, ultimately embodied in the Strategic Plan, and exploration of options to extend runway.  The Board explored the viability of a number of out-of-court alternatives, including various out-of-court financing structures, the sale of all or a portion of the business, and other alternatives.  Eventually it became clear that the out-of-court alternatives reviewed by the Board and short-term liquidity saving measures implemented by the Company would not be sufficient to address the effects of the COVID-19 pandemic.

In addition to an already highly leveraged balance sheet, to weather the storm caused by the COVID-19 pandemic, the Company was forced to accumulate additional obligations to preserve cash, including additional drawings under the ABL Facility and vendor and landlord facing claims.  The accumulation of these additional

UST-1026

obligations, coupled with the challenging market conditions, made it impossible to structure an out-of-court transaction that would allow Ascena to achieve its long-term strategic plan. To facilitate a Restructuring Transaction to address the Company's capital structure and its outstanding liabilities in a more comprehensive manner, in early 2020, the Company began engagement with the Ad Hoc Group and the administrative agent under the ABL Facility. Several months of discussions and negotiations ultimately resulted in the Restructuring Support Agreement, which contemplates a transformative restructuring and is supported by Term Loan Lenders holding more than 68% of the outstanding Term Loans. The Company is also in continuing discussions with its ABL Lenders to provide the ABL Exit Financing.

The Restructuring Support Agreement contemplates a comprehensive reorganization that will be implemented through a chapter 11 plan of reorganization and that will result in a substantial deleveraging of the Debtors' balance sheet and an infusion of new capital to fund the Strategic Plan and Ascena's emergence from these chapter 11 cases. Under the Restructuring Support Agreement, certain of the Term Loan Lenders have agreed to backstop a $150 million new money and equitize a substantial portion of the $1.27 billion in outstanding Term Loans. Upon emergence from chapter 11, in addition to any outstanding borrowings under the Exit ABL Facility, the Company's secured term loan obligations will be reduced to $400 million and the Company will have discharged substantial unsecured obligations that have accumulated (in significant part) as a result of the COVID-19 pandemic (and that the Company would not have otherwise been able to address on an out-of-court basis).

## IX. EVENTS OF THE CHAPTER 11 CASES

### A. Corporate Structure upon Emergence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### B. Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly. Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 within 110 days of the Petition Date. **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

### C. First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Carrie W. Teffner, Interim Executive Chair of Ascena Retail Group, Inc., in Support of the Chapter 11 Petitions and First Day Motions* [Docket No. 14], filed on July 23, 2020. Significantly, pursuant to the First Day Motions, the Debtors sought and were granted the authority to pay the Claims of a number of their vendors in full, in the ordinary course of business.

The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at http://cases.primeclerk.com/ascena.

UST-1027

### D. Other Procedural and Administrative Motions

The Debtors also filed several motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Ordinary Course Professionals Motion. On August 13, 2020, the Debtors filed the Motion for Entry of an Order Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business [Docket No. 262] (the "OCP Motion"). The OCP Motion sought to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses. On September 8, 2020, the Bankruptcy Court entered an order granting the OCP Motion [Docket No. 551].

- Retention Applications. On August 13, 2020, the Debtors filed a number of applications seeking to retain certain professionals pursuant to sections 327 and 328 of the Bankruptcy Code, including Kirkland & Ellis LLP as legal counsel, Guggenheim Securities, LLC as investment banker, Alvarez & Marsal Holdings, LLC as restructuring advisor, and Prime Clerk LLC as claims and noticing agent (collectively, the "Retention Applications"). The foregoing professionals are, in part, responsible for assisting the Debtors with the administration of the Chapter 11 Cases. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

### E. Approval of the DIP Facilities

Based on the Debtors' need for debtor-in-possession financing and their conclusion that the DIP ABL Facility and the DIP Term Facility represent the best terms available, on the Petition Date, the Debtors filed a motion seeking authorization to enter into the DIP ABL Facility and DIP Term Facility (the "DIP Financing Order"). The Debtors are seeking approval of the DIP Financing Order on September 10, 2020.

### F. Executory Contracts and Unexpired Leases

#### 1. Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be deemed assumed by the Reorganized Debtors, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts pursuant to the Plan are effective as of the Effective Date. All rejections of Unexpired Leases pursuant to the Plan shall be deemed rejected on the later of: (a) the Effective Date or (b) the date the Debtors surrender the Leases to the applicable landlord by delivery of the keys or key codes or providing notice in writing that the landlord may take possession of the leased premises and change the locks. For the avoidance of doubt, the Debtors or the Reorganized Debtors, as applicable, shall timely perform all leasehold obligations through the effective date of the rejection of such Unexpired Leases.

UST-1028

Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease.

## 2. *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, the GUC Trust, or property of the foregoing parties, without the need for any objection by the Debtors, the Reorganized Debtors, or the GUC Trust, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity. Any such late-filed Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** To the extent an Entity holds both a late-filed Claim arising out of the rejection of the Executory Contract or Unexpired Lease and a liquidated, non-contingent Claim listed in the Schedules or a Proof of Claim, only such late-filed Claim shall be deemed fully satisfied, released, and discharged pursuant to this provision in the Plan. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

## 3. *Cure of Default for Assumed Executory Contracts and Unexpired Leases*

Any Cure Obligations under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of monetary Cure Obligations, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, and payment or performance of all other Cure Obligations on or after the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of an unresolved dispute regarding (1) the amount of any Cure Claim, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (3) any other matter pertaining to assumption, assignment, or payment or performance of any Cure Obligations required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order(s) of the Bankruptcy Court.

To the extent reasonably practicable, at least 14 days before the Voting Deadline, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third parties. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Claims must be Filed by the Cure/Assumption Objection Deadline.** Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or proposed Cure Claim will be deemed to have assented to such assumption or assumption and assignment, and Cure Claim. To the extent that the Debtors seek to assume and assign an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule and such assignee will provide evidence of "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease. For the avoidance of doubt, with respect to any asserted non-monetary Cure Obligations, such non-monetary Cure Obligations may be cured (or resolved) by the assignee and the applicable counterparty in the ordinary course of business following the assumption and all parties reserve all rights with respect to any such asserted non-monetary Cure Obligations.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment or performance of the related Cure Obligations, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under such

32

UST-1029

assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court upon the cure of all defaults under such Executory Contract or Unexpired Lease to the extent required under the Bankruptcy Code.

Notwithstanding anything to the contrary herein or in the Plan (including Article VIII thereof), no post-assumption obligations (including indemnification obligations, if any) arising as a result of or pursuant to the assumption or the assumption and assignment of any Unexpired Lease shall be deemed released, waived, or discharged.

### 4. Adequate Assurance of Future Performance Under Assumed Executory Contracts and Unexpired Leases

The Debtors have provided Financial Projections attached hereto as **Exhibit E** and are prepared to demonstrate the feasibility of the Plan at the Confirmation Hearing in satisfaction of any obligation to provide adequate assurance of future performance under Executory Contracts and Unexpired Leases that are assumed under the Plan.

### G. Lease Renegotiation and Store Closing Process

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* [Docket No. 16] (the "Store Closing Motion") seeking to implement a key component of their restructuring strategy and right-size their operations by closing underperforming or geographically undesirable stores. The Bankruptcy Court approved the Store Closing Motion on an interim basis on July 24, 2020 [Docket No. 70] and on a final basis on August 27, 2020 [Docket No. 445].

The Debtors have conducted a thorough analysis of their existing operations and determined to wind down the majority of the brick and mortar operations for the Justice and Catherines brands and, accordingly, cease operations for a large majority of retail stores for those brands. In total, these brands account for approximately 1,000 of the Debtors' stores, each of which the Debtors are seeking, in the Store Closing Motion, authority to close and wind down. The closure of these stores will simplify the Debtors' organizational structure, right-size the Debtors' physical store footprint, and ensure that the Debtors' remaining go-forward operations are healthy and operating efficiently. These efforts, which are ongoing, are part of the Debtors' attempt to rationalize their store fleet.

### H. Schedules and Statements

On July 24, 2020, the Bankruptcy Court granted an interim order [Docket No. 77] extending the time by which the Debtors must file the Schedules of Assets and Liabilities (the "Schedules") and Statement of Financial Affairs (the "Statements") to August 27, 2020. The Debtors filed their Schedules and Statements on August 27, 2020. Copies of the Schedules and Statements are available at http://cases.primeclerk.com/ascena (free of charge) or the Bankruptcy Court's website at www.vaeb.uscourts.gov (for a fee).

### I. Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to prepetition litigation generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.

A putative securities class action against Ascena, and two of its now-former officers and directors, David R. Jaffe and Robert Giammatteo (collectively with Ascena, the "Defendants"), is pending in the United States District

UST-1030

Court for the District of New Jersey (the "New Jersey District Court"), captioned as *In re Ascena Retail Group, Inc. Securities Litigation*, Case No. 2:19-cv-13529-KM-JBC (the "Securities Litigation"). The Securities Litigation asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder arising from Ascena's alleged material overstatement of the value and business prospects of its subsidiary, ANN, Inc. ("ANN"), as well as the value of ANN's principal brands, Ann Taylor and LOFT, on behalf of a putative class consisting of all persons who purchased or otherwise acquired Ascena common stock between December 1, 2015 and May 17, 2017, inclusive (the "Class Period"). The Defendants filed a motion to dismiss the Securities Litigation on February 7, 2020, and the motion was fully briefed as of July 3, 2020. On July 28, 2020, the New Jersey District Court issued an order providing "in light of the defendant's suggestion of bankruptcy . . . the matter is stayed and the pending motion [to dismiss] is administratively terminated without prejudice." The Order also requires the parties to "promptly inform the court as to any change in status regarding the automatic stay in bankruptcy."

### J. Appointment of Official Committee

On August 3, 2020, the U.S. Trustee filed the *Appointment of Unsecured Creditors Committee* [Docket No. 164] notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in the Chapter 11 Cases. The Committee is currently composed of the following members: The Taubman Company, Lakontra International Merchandising Corp., Snogen Green Co., Ltd., Li & Fung Limited, Brookfield Properties Retail, Inc., Washington Prime Group, Inc., and Amanda Meo. The Committee has retained Pachulski Stang Ziehl & Jones LLP as its legal counsel and Province, Inc. as its financial advisor.

### K. Potential Asset Sales

The Debtors may pursue and may ultimately determine to consummate a sale of certain assets, brands, or business units pursuant to or contemporaneous with confirmation of the Plan. This Disclosure Statement (including the Financial Projections (defined below)) do not assume that any such sales will occur. To the extent the Debtors later determine to pursue any such sale, the outcome of the sale may affect recoveries under the plan, as well as the Debtors' financial projections.

### L. Restructuring Support Agreement Amendment

On September 9, 2020, the Debtors and the Required Consenting Stakeholders agreed to amend the Restructuring Support Agreement, and additional Term Loan Lenders signed joinder agreements to become Consenting Stakeholders, increasing the support for the Restructuring Support Agreement to approximately 94.62% of the outstanding Term Loan Claims. The amendment is the result of postpetition negotiations between the Debtors, the Ad Hoc Group, and a second organized group of Term Loan Lenders represented by King & Spalding LLP (the "K&S Group"). Primarily, the amendment contemplates that the members of the K&S Group would sign joinders to the Restructuring Support Agreement and participate in a portion of the New Term Loan Financing. The K&S Group also will receive reasonable and documented legal fees incurred through the closing date of the DIP Term Agreement.

### M. Global Settlement with the Creditors Committee

On September 8, 2020, the Debtors also agreed to a global settlement (the "Global Settlement") with the Creditors Committee, the Consenting Stakeholders, and the DIP Lenders. The key terms of the Global Settlement include:

- the creation of the GUC Trust under the Plan and the GUC Trustee selected by the Creditors' Committee funded with the GUC Trust Assets for the benefit of Allowed General Unsecured Claims;

- the Avoidance Action Waiver;

- the withdrawal of the Debtors' Motion for Entry of an Order (I) Extending Time for Performance of Obligations Arising Under Unexpired Non-Residential Real Property Leases, and (II) Granting Related Relief [Docket No. 144] and payment of deferred and stub rent owing to landlords (and, for

UST-1031

the avoidance of doubt, accruing before the effective date of the rejection of any applicable real property lease, as applicable) pursuant to the terms of the DIP Financing Order;

- the commitment by the Debtors to use commercially reasonable efforts to condition any critical or foreign vendor payment on the applicable vendor agreeing to (a) provide trade terms at least as favorable as the most favorable terms provided by such vendor in the six-month period ending February 29, 2020 for at least six (6) months after the Effective Date and (b) vote in favor of the Plan, if the Plan is consistent with the terms of the Global Settlement;

- the commitment by the Debtors to use commercially reasonable efforts to spend at least 70% of the authorized critical vendor and foreign vendor payments; *provided* that the size and terms of the critical vendor and foreign program shall not otherwise change from what was previously authorized by the Court; and

- the support of the Creditors' Committee in favor of the Plan.

Contemporaneously with the filing of this Disclosure Statement, the Debtors have filed an amended version of the Plan, which incorporates the terms of the Global Settlement. The Committee and each of its members now support the restructuring embodied in the Restructuring Support Agreement, on the terms described herein and set forth in the Plan.

## X.     PROJECTED FINANCIAL INFORMATION

Attached hereto as **Exhibit E** is a projected consolidated income statement, which includes consolidated, projected, unaudited, financial statement information of the Reorganized Debtors (collectively, the "Financial Projections") for the period beginning July 2021 and continuing through July 2025. The Financial Projections are based on an assumed Effective Date of October 31, 2020. To the extent that the Effective Date occurs before or after October 31, 2020, recoveries on account of Allowed Claims could be impacted.

Creditors and other interested parties should see the below "*Risk Factors*" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

## XI.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.     Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

#### 1.     *Parties in Interest May Object to the Plan's Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

UST-1032

## 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

## 3. The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims and Interests as those proposed in the Plan.

## 4. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

## 5. The Restructuring Support Agreement Could Be Terminated, Which Would Leave the Debtors Without a Clear Path Forward to Reorganize

The Debtors' ability to consummate a value-maximizing restructuring may be materially impaired by a termination of the Restructuring Support Agreement. The Restructuring Support Agreement may be terminated, by the Required Consenting Stakeholders, by the delivery to the other parties thereto of a written notice upon the occurrence of the following events, as may be amended from time to time in accordance with the terms of the Restructuring Support Agreement:

1. the Petition Date has not occurred by 11:59 p.m. (Eastern Time) on July 23, 2020;

2. the Debtors have not filed the Rent Deferral Motion with the Bankruptcy Court by the date that is three (3) calendar days after the Petition Date;

UST-1033

3. the Bankruptcy Court has not entered the Cash Collateral Order on an interim basis by the date that is five (5) Business Days after the Petition Date;

4. the Bankruptcy Court has not entered the DIP Financing Order on a final basis by the date that is thirty-five (35) calendar days after the Petition Date;[5]

5. the Bankruptcy Court has not entered the Disclosure Statement Order by the date that is sixty (60) calendar days after the Petition Date;

6. solicitation of the Plan has not commenced by the date that is seventy (70) calendar days after the Petition Date;

7. the Bankruptcy Court has not entered the Confirmation Order by the date that is one hundred ten (110) calendar days after the Petition Date;

8. the Plan Effective Date has not occurred by the date that is one hundred thirty (130) calendar days after the Petition Date;

9. the breach in any material respect by a Company Party (as defined in the Restructuring Support Agreement) of any of the representations, warranties, or covenants of the Company Parties set forth in the Restructuring Support Agreement that (i) is adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (ii) remains uncured for ten (10) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 13.11 of the Restructuring Support Agreement detailing any such breach;

10. the DIP ABL Facility (as applicable) is terminated and accelerated in accordance with its terms;

11. the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, including the Bankruptcy Court, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 13.11 of the Restructuring Support Agreement detailing any such issuance; *provided* that this termination right may not be exercised by any party that sought or requested such ruling or order in contravention of any obligation set out in the Restructuring Support Agreement; the Bankruptcy Court enters an order denying confirmation of the Plan or the Confirmation Order is reversed or vacated;

12. the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders, not to be unreasonably withheld), (i) dismissing any of the Chapter 11 Cases, (ii) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (iii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases;

13. any Company Party (i) files, waives, amends or modifies, or files a pleading seeking approval of any Definitive Document (as defined the Restructuring Support Agreement) or authority to waive, amend or modify any Definitive Document (including any waiver of any term or condition therein) in a manner that is materially inconsistent with, or constitutes a material breach of, this Agreement (including with respect to the consent rights afforded the Consenting Stakeholders under this Agreement), without the prior written consent of the Required Consenting Stakeholders, (ii) withdraws the Plan without the prior consent of the Required Consenting Stakeholders, or (iii) publicly announces its intention to take any such acts listed in the foregoing clause (i) or (ii), in the case of each of the foregoing clauses (i) through (iii), which remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Stakeholders transmit a written notice

---

[5] The Consenting Stakeholders agreed to extend this milestone through September 11, 2020.

UST-1034

in accordance with Section 15.10 of the Restructuring Support Agreement detailing any of the foregoing;

14.   any Company Party files or supports another party in filing (i) a motion or pleading challenging the amount, validity, or priority of any claims held by any Consenting Stakeholder against the Company Parties (or any liens securing such claims) or (ii) a motion or pleading asserting (or seeking standing to assert) any purported claims or Causes of Action against any of the Consenting Stakeholders;

15.   the Bankruptcy Court grants relief that is materially inconsistent with the Restructuring Support Agreement or the Plan (in each case, with such amendments and modifications as have been effected in accordance with the terms hereof) and adverse to the Consenting Stakeholders;

16.   any Company Party files, proposes, or otherwise supports any plan of liquidation, asset sale of all or substantially all of a Company Party's assets or plan of reorganization other than the Plan; or

17.   any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring the Restructuring Support Agreement to be unenforceable.

The Debtors believe that the Restructuring Support Agreement provides stability by, among other things, ensuring cooperation among creditors. The Debtors believe that the Plan and restructuring contemplated by the Restructuring Support Agreement avoids all of the foregoing, and implements an expeditious reorganization of the Debtors.

### 6.   *Nonconsensual Confirmation*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 7.   *Continued Risk Upon Confirmation*

Even if a chapter 11 plan of reorganization is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code will give the Debtors the exclusive right to propose the Plan and will prohibit creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions for chapter 11 relief. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

UST-1035

### 8. The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 9. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 10. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 11. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 12. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### B. Risks Related to Recoveries under the Plan

### 1. The Debtors May Not Be Able to Achieve Their Projected Financial Results

With respect to holders of Interests in the Reorganized Debtors, the Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections set forth in this Disclosure Statement represent the

UST-1036

Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the particular industry segments in which the Debtors operate in particular. Although the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, (a) the value of the New Common Stock may be negatively affected, (b) the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, and (c) the Debtors may be unable to service their debt obligations as they come due. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 2. The New Common Stock Will Not be Listed

The New Common Stock to be issued under the Plan will not be listed on or traded on any nationally recognized market or exchange as of the Effective Date. Pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act, and/or the safe harbor of Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements, the offering, issuance, and distribution of any securities pursuant to the Plan and any and all settlement agreements incorporated herein shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable law requiring registration by virtue of section 1145 of the Bankruptcy Code, prior to the offering, issuance, distribution, or sale of securities. In addition, to the maximum extent provided under section 1145 of the Bankruptcy Code, any and all New Equity contemplated by the Plan and any and all settlement agreements incorporated therein will be freely tradable and transferable by any initial recipient thereof that (x) is not an "affiliate" of the Reorganized Debtor (as defined in rule 144(a)(1) under the Securities Act), (y) has not been such an "affiliate" within 90 days of such transfer, and (z) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

On the Effective Date, Reorganized Ascena shall be a private, non-SEC reporting company. There can be no assurance that an active market for the New Common Stock will develop, nor can any assurance be given as to the prices at which such stock might be traded. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities.

### 3. The Restructuring of the Debtors May Adversely Affect the Debtors' Tax Attributes

The Debtors estimate that, as of December 31, 2019, they together had approximately (a) $277,414,113 of federal net operating loss carryforwards ("NOLs"); (b) $32,634,930 of interest expense deductions that have been deferred under section 163(j) of the Tax Code; (c) $2,628,560 of general business credit carryforwards; and (d) $2,674,533 of charitable contribution carryforwards. Additionally, the Debtors further estimate that in the 2020 tax year they may have generated approximately (w) $434,893,373 of federal NOLs; (x) $95,250,682 of interest expense deductions that have been deferred under section 163(j) of the Tax Code; (y) $703,133 in general business credit carryforwards; and (z) $500,000 of charitable contribution carryforwards (items (a) through (d), and (w) through (z), together, the "Tax Attributes"). The Debtors are currently generating additional tax losses, which will ultimately increase the Debtors' NOLs and other tax attributes. As discussed below, the Debtors are currently generating additional tax losses, which will ultimately increase the Debtors' Tax Attributes. These Tax Attributes provide the potential for material future tax savings or other tax structuring possibilities in these chapter 11 cases. The Tax Attributes are of significant value to the Debtors and their Estates because the Debtors can carry forward such Tax Attributes to offset future taxable income (for up to 20 years in the case of the Debtors' federal NOLs), thereby reducing their future aggregate tax obligations. In addition, the Debtors may utilize such Tax Attributes to offset any taxable income generated by transactions consummated during these chapter 11 cases. The value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders. In general, such NOLs and other tax attributes could be reduced by the amount of discharge of indebtedness arising in a chapter 11 case under section 108 of the Internal Revenue Code of 1986, as amended (the "Tax Code") or to offset any taxable gains recognized by the Debtors attributable to the Restructuring Transactions. In addition, if the Debtors experience an "ownership change," as defined in section 382 of the Tax Code, then their ability to use the NOL carryforwards may be substantially limited,

UST-1037

which could have a negative impact on the Debtors' financial position and results of operations. Generally, there is an "ownership change" if one or more stockholders owning 5 percent or more of a corporation's common stock have aggregate increases in their ownership of such stock of more than 50 percentage points over the prior three-year period. Following the implementation of a plan of reorganization, it is possible that an "ownership change" may be deemed to occur. Under section 382 of the Tax Code, absent an applicable exception, if a corporation undergoes an "ownership change," the amount of its NOLs that may be utilized to offset future taxable income generally is subject to an annual limitation. The Debtors currently expect that their Tax Attributes may be significantly reduced, eliminated, or limited in connection with the Restructuring Transactions, through a combination of one or more of the above factors.

For a detailed description of the effect consummation of the Plan may have on the Debtors' tax attributes, see "*Certain United States Federal Income Tax Consequences of the Plan,*" which begins on page 49 herein.

### 4. The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.

By rules of the Securities and Exchange Commission, the Debtors have not evaluated their internal controls over financial reporting, the purpose of which would be for management to report on the effectiveness of the Debtors' internal controls over financial reporting that would be needed to comply with Section 404(a) of the Sarbanes Oxley Act of 2002. As the Debtors progress towards preparing for the reporting requirements associated with internal controls over financial reporting as prescribed in the Sarbanes Oxley Act of 2002, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors'' businesses, results of operations, and financial condition.

### C. Risks Related to the Debtors' and the Reorganized Debtors' Businesses

#### 1. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan or an alternative Restructuring Transaction; (b) ability to obtain court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, service providers, customers, employees, vendors, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the

UST-1038

Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

**2. *Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses***

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships. So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

**3. *Financial Results May Be Volatile and May Not Reflect Historical Trends***

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

**4. *The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service Their Indebtedness***

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations depends on their financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control (including the factors discussed in Article XI hereof). The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit them to pay the principal, premium, if any, and interest on their Exit Facilities.

**5. *The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases***

The Debtors are currently subject to certain legal proceedings, some of which may adversely affect the Debtors. In the future, the Reorganized Debtors may become party to additional litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the

42

UST-1039

potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

> **6.   *The Loss of Key Personnel Could Adversely Affect the Debtors' and Reorganized Debtors' Operations***

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. The Debtors and the Reorganized Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' and the Reorganized Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' and the Reorganized Debtors' businesses and the results of operations.

> **7.   *Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Reorganized Debtors' Financial Condition and Results of Operations***

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all claims that arise prior to the Debtors' filing a petition for reorganization under the Bankruptcy Code or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

## XII.   SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit D**.

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.*

+-----------------------------------------------------------------------+
| **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS** |
| **DISCLOSURE STATEMENT IS ONLY A SUMMARY**. |
| PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE |
| COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS. |
+-----------------------------------------------------------------------+

### A.   Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of Claims and Interests are entitled to vote on a chapter 11 plan. The table in Article IV.C of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each holder of a Claim or Interest within such Class absent an objection to the holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Classes 4 and 5 (the "Voting Classes"). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

UST-1040

The Debtors are **not** soliciting votes from holders of Claims and Interests in Classes 1, 2, 3, 6, 7 or 8. Additionally, the Disclosure Statement Order provides that certain holders of Claims in the Voting Class, such as those Holders whose Claims have been Disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

## B. Voting Record Date

**The Voting Record Date is September 10, 2020**.  The Voting Record Date is the date on which it will be determined which holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

## C. Voting on the Plan

**The Voting Deadline is October 13, 2020, at 5:00 p.m.** prevailing Eastern Time; *provided* that the Voting Deadline with respect to any Claim based on the rejection damages under any Executory Contract or Unexpired Lease that is added to the Schedule of Rejected Executory Contracts and Unexpired Leases after October 13, 2020, shall be the date of the Confirmation Hearing.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are **actually received** by the Debtors' voting and claims agent (the "Voting and Claims Agent") on or before the Voting Deadline:

## D. Ballots Not Counted

**No ballot will be counted if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' Schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no Proof of Claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), an indenture trustee, or the Debtors' financial or legal advisors instead of the Voting and Claims Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE VOTING AND CLAIMS AGENT TOLL-FREE AT +1 (877) 930 4319. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

---

## XIII. CONFIRMATION OF THE PLAN

### A. Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

### B. Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in class either (1) has accepted the plan or (2) will receive or retain under

UST-1041

the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit G** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of A&M. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Allowed Claims as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Allowed Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

**C.      Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the Financial Projections. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following their emergence from chapter 11 and that the Plan will meet the feasibility requirements of the Bankruptcy Code. The Financial Projections are attached hereto as **Exhibit E** and incorporated herein by reference.

The Debtors shall pay any outstanding U.S. Trustee Fees, pursuant to section 1930(a) of the Judicial Code, in full on the Effective Date, and the Debtors and/or Reorganized Debtors shall continue to pay such fees until the Chapter 11 cases are converted, dismissed, or closed, whichever occurs first.

**D.      Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[6]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

**E.      Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

---

[6]   A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

UST-1042

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document in a manner consistent with the Restructuring Support Agreement, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1. *No Unfair Discrimination*

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. In considering whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character), bankruptcy courts will take into account a number of factors.

### 2. *Fair and Equitable Test*

The "fair and equitable" test requires that no class of claims or interests receive more than a 100 percent recovery. As to any dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors need to confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan will not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F. Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. The Valuation Analysis is set forth in **Exhibit F** attached hereto and incorporated herein by reference.

### G. Statutory Reporting Requirements

The Debtors will continue complying with monthly reporting requirements through the Effective Date as required under the Local Bankruptcy Rules. After the Effective Date, the Reorganized Debtors shall file quarterly reports consistent with Local Bankruptcy Rule 2015-(a)-1. The GUC Trustee also shall quarterly file reports detailing receipts and distributions from the GUC Trust for informational purposes only, in a form similar to the information provided by the Reorganized Debtors. For the avoidance of doubt, the GUC Trust shall not be responsible for paying post-Effective Date U.S. Trustee Fees. The Reorganized Debtors shall no longer have the obligation to file quarterly reports with respect to a Debtor once such Debtor's case is converted or dismissed or a final decree has been entered by the Court. The GUC Trust shall no longer have the obligation to file quarterly reports once each of the Chapter 11 Cases is converted or dismissed or a final decree has been entered by the Court.

### H. Preservation of Books and Records

Until the entry of a final and non-appealable order of judgment or settlement with respect to all defendants now or hereafter named in the litigation captioned as *In re Ascena Retail Group, Inc. Securities Litigation*, Case No. 2:19-cv-13529-KM-JBC, pending in the United States District Court for the District of New Jersey (the "Securities Litigation"), the Debtors, the Reorganized Debtors, and any transferee or custodian of the Debtors' books, records, documents, files, electronic data (in whatever format, including native format, and from every source

UST-1043

and location, including but not limited to all hard drives, servers, and cloud-based storage located in the United States and overseas), or any tangible object or other item of evidence relevant or potentially relevant to the Securities Litigation, wherever stored (collectively, the "Potentially Relevant Books and Records"), shall preserve and maintain the Potentially Relevant Books and Records as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure, and shall not destroy, abandon, transfer, or otherwise render unavailable such Potentially Relevant Books and Records.  For the avoidance of doubt, the Plan Injunction shall not affect in any manner any rights of the lead plaintiffs and the proposed class in the Securities Litigation to seek and obtain Potentially Relevant Books and Records through discovery in the Securities Litigation.

## XIV.    CERTAIN SECURITIES LAW MATTERS

The Debtors believe that the New Common Stock and any options or other equity awards (and any New Common Stock underlying such awards) to be issued pursuant to the Management Incentive Plan will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities law (a "Blue Sky Law").  The Debtors further believe that the offer, sale, issuance, and initial distribution of the New Common Stock by Reorganized Ascena pursuant to the Plan is exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law as described in more detail below.  The New Common Stock underlying the Management Incentive Plan will be issued pursuant to an available exemption from registration under the Securities Act and other applicable law.

### A.    Issuance of Securities under the Plan

Except as expressly provided herein, all shares of New Common Stock issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code (the "1145 Securities").  Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the issuance of a security do not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange or partly for cash or property.  The Debtors believe that the issuance of the 1145 Securities, and all shares of New Common Stock that constitute 1145 Securities, in exchange for the Claims and Interests described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.  Accordingly, no registration statement will be filed under the Securities Act or any state securities laws.

Recipients of the New Common Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law.  As discussed below, the exemptions provided for in Section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in Section 1145(b) of the Bankruptcy Code.

### B.    Subsequent Transfers

The 1145 Securities may be freely transferred by most recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter."  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act, which includes control persons of the issuer.  In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

UST-1044

You should confer with your own legal advisors to determine whether you are an "underwriter."

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of New Common Stock who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock and, in turn, whether any Person may freely resell New Common Stock. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR REORGANIZED ASCENA MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES. POTENTIAL RECIPIENTS OF NEW INTERESTS ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING THEIR ABILITY TO FREELY TRADE SUCH SECURITIES WITHOUT COMPLIANCE WITH THE FEDERAL LAW AND ANY APPLICABLE STATE BLUE SKY LAW.**

### C.    Management Incentive Plan and Employee Obligations

The Confirmation Order shall authorize the board of directors of Reorganized Ascena to adopt and enter into the Management Incentive Plan, which shall reserve exclusively for management employees a pool of up to 10% of the New Common Stock (the "MIP Pool"). Awards from the MIP Pool will dilute all of the New Common Stock outstanding at the time of such issuance.

The Plan also provides that, on and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall adopt, assume, continue, and/or honor in the ordinary course of business all obligations related to all Employee Benefits Programs (as agreed to be modified between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement, as applicable) and assume all employment agreements or letters, indemnification agreements, or other agreements entered into with current and

UST-1045

former employees (as agreed to be modified between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement, as applicable) unless such employees agree to enter into new agreements on terms and conditions acceptable to the Reorganized Debtors, the Required Consenting Stakeholders and such employee. Notwithstanding the foregoing, no (x) compensation, post-employment, separation or retirement arrangement with any former Insider (as of the effective date of the Restructuring Support Agreement) or (y) non-qualified deferred compensation plan or supplemental retirement plan, solely to the extent any such plan would benefit any former Insider (as of the Effective Date), will be assumed on the Effective Date, in each case without the prior consent of the Required Consenting Stakeholders. Except as provided in the preceding sentence, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law. Further (A) the consummation of the Restructuring Transactions and occurrence of the Effective Date will not constitute a "change of control" for purposes of any Employee Benefits Programs or any employment agreements, letters, or other agreements entered into with current and former employees that are assumed pursuant hereto and (B) entitlements to or treatment with respect to any equity awards on or following the Effective Date will solely be governed by the Management Incentive Plan and any such terms relating to allocation or acceleration of equity awards set forth in any arrangements assumed hereunder will be void.

In its objection to the adequacy of the Disclosure Statement, the U.S. Trustee argued that the Plan's assumption of the Employee Benefits Programs may implicate section 503(c) of the Bankruptcy Code. In support of its position, the U.S. Trustee cites a lack of information regarding, among other things, the specific Employee Benefits Programs to be assumed and the identities of the affected employees. The U.S. Trustee also asserts that any cure amounts to be paid in connection with assuming the Employee Benefits Programs are improper. The Debtors disagree. The Debtors are prepared to demonstrate at the Confirmation Hearing that the assumption of the Employee Benefits Programs complies with the requirements of the Bankruptcy Code, including section 503(c). Importantly, the Debtors' key creditor constituencies support the Plan, including the assumption of the Employee Benefits Programs, as the best path to maximizing value in the Chapter 11 Cases. However, there can be no assurance that the Bankruptcy Court will agree with the Debtors' position.

## XV.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.  Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain holders of Claims entitled to vote on the Plan (each such holder, a "Holder"). This summary is based on the Tax Code, the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, persons who hold Claims or who will hold the New Common Stock as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which

UST-1046

any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to holders of Claims that act or receive consideration in a capacity other than any other holder of a Claim of the same Class or Classes, and the tax consequences for such holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to holders (i) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (ii) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person ("U.S. Holder"). For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) (a "non-U.S. Holder").

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

In accordance with the Backstop Commitment Letter and in connection with the implementation of the Plan, Holders of Term Loan Claims are given the right to participate in a portion of the New Term Loan Financing, which will be funded initially in the form of the DIP Term Facility (the "Participation Right").

Although not free from doubt, any value attributable to the Participation Right may be considered for tax purposes as value received by such Holders of Term Loan Claims and accordingly, as a recovery on such Claims under the Plan. The Debtors have not yet determined whether treatment of the Participation Right as a recovery on the Term Loan Claims is appropriate or whether the Participation Right has any value. If the Participation Right is treated as a recovery on the Term Loan Claims, it is also uncertain whether the Participation Right and its subsequent exercise for U.S. federal income tax purposes should be treated as either (1) an option to acquire a portion of the New Term Loan Financing and New Common Stock or (2) an integrated transaction pursuant to which a portion of the New Term Loan Financing and/or New Common Stock are acquired in partial satisfaction of a Holder's New Term Loan Claim. The characterization of the Participation Right as the exercise of an option or, alternatively, as an integrated transaction may impact, among other things, the amount of gain or loss (if any) that a holder of a Term Loan Claim may recognize upon satisfaction of its Claim and, assuming the exercise of the Participation Right, a Holder's tax basis in the New Term Loan Financing and additional New Common Stock received.

The remainder of this summary assumes (unless otherwise indicated) that the Participation Right is treated for U.S. federal income tax purposes as an option to acquire an "investment unit" which is comprised of two components: (1) the right to acquire a portion of the New Term Loan Financing (the "Participation Debt Right") and (2) the right to acquire New Common Stock (the "Participation Stock Right"). Under Applicable Tax Law, the right to acquire stock of the issuer is generally treated as a security with a zero principal amount for purposes of the reorganization provisions discussed below. However, the right to acquire a debt instrument has generally not been treated as a security. It is unclear whether the treatment of the Participation Right should be bifurcated between the Participation Debt Right and the Participation Stock Right under Applicable Tax Law.

Each Holder of a Term Loan Claim receiving a Participation Right should consult with its own tax advisor to determine whether or not the Participation Right, the Participation Debt Right and/or the Participation Stock Right is a "security" for U.S. federal income tax purposes. The Debtors have not yet determined whether any such treatment is appropriate. The characterization of the Participation Right and its subsequent exercise for U.S. federal income tax

UST-1047

purposes—as the exercise of an option to acquire an investment unit comprised of the Participation Debt and the Participation Stock—is uncertain.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.       Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

The tax consequences of the implementation of the Plan to the Debtors will differ depending on whether the Restructuring Transactions are structured as a taxable sale of the assets and/or stock of any Debtor or subsidiary thereof (a "Taxable Transaction") or as a recapitalization of the Debtors (a "Recapitalization Transaction"). It has not yet been determined how the Restructuring Transactions will be structured under Applicable Tax Law. Such decision will depend on, among other things, whether assets being sold (or deemed to be sold) pursuant to any Taxable Transaction have an aggregate fair market value in excess of their aggregate tax basis (i.e., a "built-in gain") or an aggregate fair market value less than their aggregate tax basis (i.e., a "built-in loss"), the amount of the expected reduction in the aggregate tax basis of such assets by excluded cancellation of indebtedness income ("COD Income"), whether sufficient tax attributes are available to offset any such built-in gain, future tax benefits associated with a step-up (if any) in the tax basis of the assets sold pursuant to a Taxable Transaction, and the amount and character of any losses with respect to the stock of any applicable Debtor or subsidiary thereof, in each case for U.S. federal, state, and local income tax purposes.

If the transactions undertaken pursuant to the Plan are structured in whole or in part as a Taxable Transaction involving the transfer (or deemed transfer) of the Debtors' assets, the Debtors generally would realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (which generally should equal the fair market value of the assets transferred (or deemed to be transferred) by the Debtors) and the Debtors' tax basis in such assets. Realized gains, if any, may be offset by current-year losses and deductions, which may include interest deductions that may be (or become) available under section 163(j) of the Tax Code, and NOLs from prior years; *provided* that any such gain that is ordinary in nature may not be offset by capital losses. Any taxable gain remaining after such offsets would result in a cash tax obligation. If the Reorganized Debtors purchase (or are deemed to purchase) assets or stock of any Debtor pursuant to a Taxable Transaction, such Reorganized Debtor will take a fair market value basis in the transferred assets or stock. However, if a Taxable Transaction involves a purchase of stock, the Debtor whose stock is transferred will retain its basis in its assets, unless the Debtors and/or Reorganized Debtors timely make certain elections provided for under the Tax Code to treat such stock purchase as the purchase of the Debtors' assets.

The Debtors estimate that, as of December 31, 2019, they together had approximately (a) $277,414,113 of federal NOLs; (b) $32,634,930 of interest expense deductions that have been deferred under section 163(j) of the Tax Code; (c) $2,628,560 of general business   credit carryforwards; and (d) $2,674,533 of charitable contribution carryforwards. Additionally, the Debtors further estimate that in the 2020 tax year they may have generated approximately (w)  $434,893,373 of federal NOLs; (x) $95,250,682 of interest expense deductions that have been deferred under section 163(j) of the Tax Code; (y) $703,133 in general business credit carryforwards; and (z) $500,000 of charitable contribution carryforwards. The Debtors are currently generating additional tax losses, which will ultimately increase the Debtors' NOLs and other tax attributes. As discussed below, it has not been determined yet whether Debtors' NOLs are expected to be eliminated upon implementation of the Plan.

*1.      Cancellation of Debt and Reduction of Tax Attributes*

In general, absent an exception, a debtor will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value

UST-1048

of any other new consideration (including stock of the debtor) given in satisfaction of such satisfied indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not, however, required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the Tax Code. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Debtors expect to realize significant COD Income. The amount of the tax attributes required to be reduced will depend on whether the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction. The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan. Additionally, it has not been determined yet whether COD Income will be sufficient to eliminate all of the Debtors' NOLs and tax credits allocable to periods prior to the Effective Date. In addition, depending on the structure of the transactions undertaken pursuant to the Plan, some of the Debtors' tax basis in their assets may be reduced by COD Income that is not absorbed by the NOLs and tax credits.

### 2. Limitation of NOL Carryforwards and Other Tax Attributes

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of any remaining NOLs, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock and the distribution of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change. The Debtors do not expect to have a net unrealized built-in loss at the time the Plan goes effective.

### (a) General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs: 0.89 percent for July 2020). The section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the

UST-1049

subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

<div align="center">(b)    <strong>Special Bankruptcy Exceptions</strong></div>

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce their NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

As discussed above, it has not been determined yet whether the Debtors' NOLs allocable to periods prior to the Effective Date will be eliminated and therefore would not be subject to the section 382 limitation following the year in which the Effective Date occurs. The availability to the Debtors of either the 382(l)(5) Exception or the 382(l)(6) Exception will depend on the structure of the transactions undertaken pursuant to the Plan.

<div align="center">(c)    <strong>Excess Loss Accounts</strong></div>

Generally, when corporations are members of an affiliated group filing a consolidated return, a parent corporation's basis in the stock of a subsidiary in such a group is (a) increased by the sum of (i) income of such subsidiary and (ii) contributions to such subsidiary, and (b) reduced by the sum of (i) losses or deductions of such subsidiary that are used by the affiliated group and (ii) distributions from such subsidiary. In the case that the amount described in clause (b) above exceeds the amount described in clause (a) above, and such excess is greater than the parent corporation's basis in the subsidiary stock before the adjustments specified in clauses (a)–(b) are made, the amount by which such excess is greater than the parent corporation's basis in the subsidiary stock is called an "excess loss account" and is treated as negative basis for U.S. federal income tax purposes. The affiliated group must recognize income equal to the excess loss account in the subsidiary's stock in certain events, including (x) to the extent the subsidiary recognizes COD Income that is excluded from gross income pursuant to section 108 of the Tax Code (as discussed above), and the affiliated group does not reduce its tax attributes by such excluded COD Income, and (y) if the stock of the subsidiary is treated as disposed of for no consideration. It is possible that a Debtor will exclude COD Income in excess of available tax attributes and that there could be an excess loss account in the stock of that Debtor. In that case, the Debtors will recognize taxable income in the amount of such excess COD Income, but not to exceed the amount of the excess loss account. In selecting the appropriate form and structure of the Restructuring Transactions, the Debtors will consider current and future cash tax costs, including the expected cost of recognizing all or a portion of an excess loss account as taxable income.

UST-1050

### (d)     Other Income and Uncertainty of Debtors' Tax Treatment

The Debtors may incur other income for U.S. federal income tax purposes in connection with the Plan (including if the Debtors consummate Restructuring Transactions that are different from the transactions that are currently contemplated and described herein) that, unlike COD Income, generally will not be excluded from the Debtors' U.S. federal taxable income. In addition, the U.S. federal income tax considerations relating to the Plan are complex and subject to uncertainties. No assurance can be given that the IRS will agree with the Debtors' interpretations of the tax rules applicable to, or tax positions taken with respect to, the transactions undertaken to effect the Plan. If the IRS were to successfully challenge any such interpretation or position, the Debtors may recognize additional taxable income for U.S. federal income tax purposes, and the Debtors may not have sufficient deductions, losses or other attributes for U.S. federal income tax purposes to fully offset such income.

### C.     Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Claims Entitled to Vote

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

As described above, the U.S. federal income tax consequences to a U.S. Holder of a Claim will depend, in part, on whether the transactions undertaken pursuant to the Plan constitute, for U.S. federal income tax purposes, (a) a Taxable Transaction, or (b) a Recapitalization Transaction. The U.S. federal income tax consequences to U.S. Holders of certain Claims may further depend on (x) whether the Claims surrendered constitute "securities" for U.S. federal income tax purposes, and (y) whether the Debtor against which such Claims are asserted is the same entity that is issuing the consideration under the Plan (or, otherwise, an entity that is a "party to a reorganization" with the Debtor against which such Claims were asserted).

In a Taxable Transaction, the Debtors generally do not anticipate that the entity issuing consideration under the Plan will be the same entity as the Debtor against which a Claim is asserted (or an entity that is a "party to a reorganization" with such Debtor). As a result, the Debtors do not anticipate that "recapitalization" treatment (within the meaning of section 368(a)(1)(E) of the Tax Code) will be applicable in a Taxable Transaction. Such treatment may, however, be applicable in a Recapitalization Transaction.

Neither the Tax Code nor the Treasury Regulations promulgated thereunder defines the term "security." Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the available collateral, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. Due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding the status of the loans under the Term Loan Credit Agreement as "securities" for U.S. federal income tax purposes.

The character of any gain or loss recognized by a U.S. Holder as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long term capital gain if the Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below.

UST-1051

### 1. U.S. Federal Income Tax Consequences to the U.S. Holders of Term Loan Claims (Class 4)

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Claim each U.S. Holder of an Allowed Term Loan Claim shall receive its Pro Rata share of and interest in (i) the Last Out Exit Term Loan Facility; (ii) New Common Stock, subject to dilution on account of the Management Incentive Plan and the Equity Premium, and (iii) potentially, the Participation Right.

As described above, because the Participation Right is made available to Holders of Term Loan Claims in accordance with the Backstop Commitment Letter and in connection with the implementation of the Plan, any value attributable to the Participation Right may be considered for tax purposes as value received by such holders of Term Loan Claims and accordingly, as a recovery on such Claims under the Plan. The Debtors have not yet determined whether treatment of the Participation Right as a recovery on the Term Loan Claims is appropriate or whether the Participation Right has any value.

If the Restructuring Transactions are structured as a Recapitalization Transaction and an Allowed Term Loan Claim qualifies as a "security" of Ascena, then the U.S. Holder of such Claim should be treated as receiving its distribution under the Plan in a recapitalization. If (1) (A) the Participation Right is not treated as recovery under the Plan or (B) the Participation Right is treated as a "security" of the Reorganized Debtor, and (2) the Last-Out Exit Term Loan Facility also qualifies as a "security" of the Reorganized Debtors, subject to the rules regarding accrued but untaxed interest, a U.S. Holder of such claim should not recognize gain or loss. Such U.S. Holder's tax basis in the Participation Right (if applicable), the New Common Stock and the Last Out Exit Term Loan Facility received, apart from amounts allocable to accrued but untaxed interest, should generally equal the U.S. Holder's tax basis in its Allowed Term Loan Claim exchanged therefor, allocated between such property received based upon their respective fair market values. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its interest in the Participation Right (if applicable), the New Common Stock and Last Out Exit Term Loan Facility received should include the holding period for the Claim exchanged therefor.

If (a) the Restructuring Transactions are structured as a Recapitalization Transaction, (b) an Allowed Term Loan Claim qualifies as a "security" of Ascena, and to the extent applicable, (c) the Participation Right is treated as part of recovery under the Plan, but (i) the Last Out Exit Term Loan Facility and/or (ii) the Participation Right (or any portion thereof) does not qualify as a "security" of the Reorganized Debtors, then the U.S. Holder of such Claim should be treated as receiving its distribution under the Plan in a recapitalization, with the receipt of the non-security consideration (other than the New Common Stock) treated as "boot" in such recapitalization. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder of such claim should not recognize loss, but should recognize gain to the extent of the lesser of (A) the sum of (i) the issue price of the Last Out Exit Term Loan Facility received, (ii) the fair market value (if any) of the Participation Right, and (iii) the fair market value of any New Common Stock received, minus (b) the Holder's adjusted tax basis in its Allowed Term Loan Claim, and (B) the fair market value of the "boot" received. Such U.S. Holder's tax basis in the New Common Stock and any consideration that qualifies as a security, apart from amounts allocable to accrued but untaxed interest, should generally equal the U.S. Holder's tax basis in its Allowed Term Loan Claim exchanged therefor increased by the amount of any gain recognized pursuant to such exchange and decreased by the fair market value of the "boot" received, allocated between such property received based on their relative fair market values. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its interest in the New Common Stock and any other consideration that does qualify as a "security" received should include the holding period for the Claim exchanged therefor. Such U.S. Holder's basis in any such consideration not considered a "security" would equal its fair market value and such U.S. Holder's holding period with respect to such consideration would begin the day after the Effective Date.

If an Allowed Term Loan Claim does not qualify as a "security" of Ascena or the Restructuring Transactions are structured to be treated as a Taxable Transaction, then the U.S. Holder of such Claim should be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. In that event, subject to the rules regarding accrued but untaxed interest, a U.S. Holder of an Allowed Term Loan Claim should recognize gain or loss equal to (a) the sum of (i) the issue price of the Last Out Exit Term Loan Facility received, (ii) the fair market value of any New Common Stock received, and (iii) potentially, the fair market value of the Participation Right, minus (b) the U.S. Holder's adjusted tax basis in its Allowed Term Loan Claim.

UST-1052

Such U.S. Holder should obtain a tax basis in the consideration received, other than with respect to any amounts received that are attributable to accrued but unpaid interest (or original issue discount ("OID")), equal to the consideration's fair market value (or issue price, in the case of the Last Out Exit Term Loan) as of the date such consideration is distributed to the U.S. Holder. The holding period for any such property should begin on the day following the receipt of such consideration.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, OID or market discount, see the sections entitled "Accrued Interest (and OID)" and "Market Discount" below.

It is uncertain whether a U.S. Holder that receives but does not exercise the Participation Right should be treated as receiving anything of additional value in respect of its Term Loan Claims. If the U.S. Holder is treated as having received a Participation Right of value (despite their subsequent lapse), such that it obtains a tax basis in the Participation Right, the U.S. Holder generally would recognize a loss to the extent of the U.S. Holder's tax basis in the Participation Right. In general, such loss would be a short-term capital loss.

### 2. U.S. Federal Income Tax Consequences to the U.S. Holders of General Unsecured Claims (Class 5)

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of the General Unsecured Claims, each U.S. Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of GUC Trust Net Assets as a beneficiary of the GUC Trust and a holder of GUC Trust Interests. Such U.S. Holder would recognize gain or loss equal to the difference between (a) the fair market value of the GUC Trust Interests received (subject to "Accrued Interest" discussed in Article XV.C.3 herein) and (b) the U.S. Holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below.

#### (a)    Liquidating Trust Treatment

Although not free from doubt, other than with respect to any assets that are subject to potential disputed claims of ownership or uncertain distributions, the GUC Trust is intended to be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of General Unsecured Claims. The Debtors intend to take the position that this treatment applies to the extent reasonably practicable. In such case, any beneficiaries of the GUC Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the assets of the GUC Trust and then contributed such undivided interest to the GUC Trust. If this treatment applies, the person or persons responsible for administering the GUC Trust shall, in an expeditious but orderly manner, make timely distributions to beneficiaries of the GUC Trust pursuant to the Plan and not unduly prolong its duration. The GUC Trust would not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the governing documents for the GUC Trust.

Other than with respect to any assets of the GUC Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable Holders of Claims prior to the contribution of such assets to the GUC Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly.

Other than with respect to any assets of the GUC Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on the GUC Trust with respect to earnings generated by the assets held by it. Each beneficiary must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or generated by the GUC Trust, even if no distributions are made. Allocations of taxable income with respect to the GUC Trust shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on

UST-1053

distributions described herein) if, immediately before such deemed distribution, the GUC Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the beneficiaries, taking into account all prior and concurrent distributions from the GUC Trust. Similarly, taxable losses of the GUC Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets. The tax book value of the assets for this purpose shall equal their respective fair market values on the Effective Date or, if later, the date such assets were acquired, adjusted in either case in accordance with the tax accounting principles prescribed by the applicable provisions of the Tax Code, Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

The character of items of income, gain, loss, deduction and credit to any Holder of a beneficial interest in the GUC Trust, and the ability of such Holder to benefit from any deductions or losses, may depend on the particular circumstances or status of the Holder. Taxable income or loss allocated to a beneficiary should be treated as income or loss with respect to the interest of such beneficiary in the GUC Trust and not as income or loss with respect to such beneficiary's applicable Claim. In the event any tax is imposed on the GUC Trust, the person or persons responsible for administering the GUC Trust shall be responsible for payment, solely out of the assets of the GUC Trust, of any such taxes imposed on the GUC Trust.

The person or persons responsible for administering the GUC Trust shall be liable to prepare and provide to, or file with, the appropriate taxing authorities and other required parties such notices, tax returns and other filings, including all federal, state and local tax returns as may be required under the Bankruptcy Code, the Plan or by other applicable law, including, if required under applicable law, notices required to report interest or dividend income. The person or persons responsible for administering the GUC Trust will file tax returns pursuant to section 1.671-4(a) of the Treasury Regulations on the basis that the GUC Trust is a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations and related Treasury Regulations. As soon as reasonably practicable after the close of each calendar year, the person or persons responsible for administering the GUC Trust will send each affected beneficiary a statement setting forth such beneficiary's respective share of income, gain, deduction, loss and credit for the year, and will instruct the Holder to report all such items on its tax return for such year and to pay any tax due with respect thereto.

(b)        **Disputed Ownership Fund Treatment**

With respect to any of the assets of the GUC Trust that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss with respect to such property on the date that the property is so transferred. Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

To the extent that a portion of the consideration received in exchange for its Claim is allocable to accrued but untaxed interest, OID or market discount, the U.S. Holder may recognize ordinary income. See "Accrued Interest (and OID)" and "Market Discount" in Articles XV.C.3 and XV.C.5, respectively, set forth below.

3.        *Accrued Interest (and OID)*

To the extent that any amount received by a U.S. Holder of a surrendered Claim is attributable to accrued but unpaid interest (or OID) on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest (or OID) previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

UST-1054

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 4. *Medicare Tax*

Certain U.S. Holders that are individual, estates, or trusts are required to pay an additional 3.8% tax on, among other things, dividends and gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of New Common Stock and Last Out Exit Term Loan Facility.

### 5. *Market Discount*

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount with respect to the exchanged debt instrument.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### 6. *Acquisition Premium and Bond Premium*

If a U.S. Holder of a Class 4 Allowed Term Loan Claim receives an initial tax basis in any Last Out Exit Term Loan that is less than or equal to the stated redemption price at maturity of such debt instrument, but greater than the adjusted issue price of such instruments, the U.S. Holder should be treated as acquiring such debt instruments with an "acquisition premium." Unless an election is made, the U.S. Holder generally should reduce the amount of OID otherwise includible in gross income for an accrual period by an amount equal to the amount of OID otherwise includible in gross income multiplied by a fraction, the numerator of which is the excess of the U.S. Holder's initial tax basis in its interest in such debt instrument over such debt instrument's adjusted issue price, and the denominator

58

UST-1055

of which is the excess of the sum of all amounts payable on such debt instrument (other than amounts that are "qualified stated interest") over its adjusted issue price.

If a U.S. Holder of a Class 4 Allowed Term Loan Claim receives an initial tax basis in any Last Out Exit Term Loan that exceeds the stated redemption price at maturity of such debt instrument, such U.S. Holder should be treated as acquiring such debt instrument with "bond premium." Such U.S. Holder generally may elect to amortize the bond premium over the term of such debt instrument on a constant yield method as an offset to interest when includible in income under such U.S. Holder's regular accounting method. If a U.S. Holder does not elect to amortize the premium, that premium may decrease the gain or increase the loss such U.S. Holder would otherwise recognize on disposition of such debt instrument.

### 7. *Issue Price*

The determination of "issue price" of the Last Out Exit Term Loan Facility for purposes of the analysis herein will depend, in part, on whether such debt instruments and other property issued to a U.S. Holder or the property surrendered under the Plan are treated as traded on an "established securities market." In general, a debt instrument will be treated as traded on an established market if, at any time during the 31-day period ending 15 days after the issue date, (a) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (b) a "firm" price quote for the debt instrument is available from at least one broker, dealer or pricing service for property and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the property; or (c) there are one or more "indicative" quotes available from at least one broker, dealer or pricing service for property. Pursuant to applicable Treasury Regulation, an "established market" need not be a formal market. The issue price of a debt instrument that is traded on an established market (or that is issued for stock or securities so traded) would be the fair market value of such debt instrument (or such stock or securities so traded) on the issue date as determined by such trading; *provided* that if both the property exchanged and the property received therefor are treated as traded, the trading price of the property so received controls. Subject to certain exceptions, the issue price of a debt instrument that is neither so traded nor issued for stock or securities so traded would be its stated principal amount (*provided* that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS). The rules regarding the determination of issue price are complex and highly detailed and you should consult your tax advisor regarding the determination of the issue price of the loans under the Last Out Exit Term Loan Facility.

Where, as here, creditors receiving debt instruments are also receiving other property (*e.g.*, New Common Stock and potentially, the Participation Right) in exchange for their Claims, the "investment unit" rules under Applicable Tax Law may also apply to the determination of the issue price for any debt instrument received in exchange for their Claims. In general, if all of the components (other than cash) of the "investment unit" are publicly traded (as described above), then the issue price of the investment unit, as a whole, is determined as the aggregate of the fair market value of each of the components of the "investment unit" allocating the issue price of the investment unit to each of the investment unit's components on the basis of each component's fair market value. In the event that some, but not all, of the property composing the "investment unit" is publicly traded, then the application of the investment unit rules is unclear. If the Claims being exchanged for the investment unit are publicly traded prior to the exchange, the trading value of such Claims may set the issue price for the investment unit, with such issue price being allocated among the components of the investment unit in proportion to their fair market value. Alternatively, if the new debt instrument is publicly traded, the trading price of the new debt instrument may control the issue price of the new debt instrument, without regard to the potential application of the investment unit rules.

In general, a U.S. Holder of Claims must follow the Debtors' determination of issue price with respect to each debt instrument issued under the Plan, unless such U.S. Holder specifically discloses its disagreement with such determination on the U.S. Holder's own tax return. The Debtors will publish their determination of the issue price in accordance with applicable Treasury Regulations.

### 8. *Dividends on New Common Stock*

Any distributions made on account of New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined

UST-1056

under U.S. federal income tax principles.  To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

### 9.  Sale, Redemption, or Repurchase of New Common Stock

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of New Common Stock.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Common Stock for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described below.  Under the recapture rules of section 108(e)(7) of the Tax Code, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Common Stock as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed Claim or recognized an ordinary loss on the exchange of its Allowed Claim for New Common Stock.

### 10.  Sale, Redemption, or Repurchase of Interests in the Last Out Exit Term Loan Facility

Upon the sale, exchange or other taxable disposition of the Last Out Exit Term Loan Facility, a U.S. Holder generally will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or other taxable disposition (other than accrued but untaxed interest, which will be taxable as interest) and the U.S. Holder's adjusted tax basis in their interest in the Last Out Exit Term Loan Facility.  A U.S. Holder's initial tax basis in the Last Out Exit Term Loan Facility will be increased by any previously accrued OID and decreased by any payments on the Last Out Exit Term Loan Facility other than qualified stated interest.  Any such gain or loss generally will be capital gain or loss and generally will be long-term capital gain or loss if the interest in the Last Out Exit Term Loan Facility has been held for more than one year at the time of its sale, exchange or other taxable disposition.  Certain non-corporate U.S. Holders (including individuals) may be eligible for preferential rates of U.S. federal income tax in respect of long-term capital gains.  The deductibility of capital losses is subject to limitations as discussed below.

### 11.  Limitation on Use of Capital Losses

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### D.  Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Restructuring Transactions to non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  The rules

UST-1057

governing the U.S. federal income tax consequences to non-U.S. Holders are complex. Each non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such non-U.S. Holders.

### 1. Gain Recognition

To the extent that the Restructuring Transactions are treated as a taxable exchange or otherwise result in the recognition of taxable gain for U.S. federal income tax purposes, any gain realized by a non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. To claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2. Accrued Interest

Payments to a non-U.S. Holder in satisfaction of a Claim that are attributable to accrued interest generally will not be subject to U.S. federal income tax or withholding, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

- the non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of Ascena's stock entitled to vote;

- the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Ascena (each, within the meaning of the Tax Code);

- the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

- such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary

UST-1058

course of their trade or business.  As described above in more detail under the heading "Accrued Interest," the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

### 3.    *Payments on the Last Out Exit Term Loan Facility*

Subject to the discussion below regarding "FATCA," payments to a Non-U.S. Holder with respect to the Last Out Exit Term Loan Facility that are treated as interest, including payments attributable to any OID (see discussion above) generally will not be subject to U.S. federal income or withholding tax; *provided* that (a) such Non-U.S. Holder is not a bank, (b) such Non-U.S. Holder does not actually or constructively own 10% or more of the total combined voting power of all classes of Reorganized Ascena's stock entitled to vote, (c) such Non-U.S. Holder is not a "controlled foreign corporation" that is a "related person" with respect to Reorganized Ascena (each, within the meaning of the Tax Code), and (d) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, *provided* the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (a) generally will not be subject to withholding tax, but (b) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the interest (or OID) at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

Subject to the discussion below regarding "FATCA," a Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to interest, including any OID.

For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 4.    *Sale, Exchange or Other Disposition of the Last Out Exit Term Loan Facility*

Subject to the discussion below regarding "FATCA," any gain recognized by a Non-U.S. Holder on the sale, exchange or other disposition of interests in the Last Out Exit Term Loan Facility (other than an amount representing accrued but untaxed interest (or OID) on the Last Out Exit Term Loan Facility, which is subject to the rules discussed above under "Payments on the Last Out Exit Term Loan Facility") generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for one hundred and eighty-three (183) days or more during the taxable year in which the disposition occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder.  Subject to the discussion below regarding "FATCA," in order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

UST-1059

### 5. Dividends on New Common Stock

Any distributions made with respect to New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the Reorganized Debtor's current or accumulated earnings and profits as determined under U.S. federal income tax principles. To the extent that a non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the non-U.S. Holder's basis in its shares. Any such distributions in excess of a non-U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange as described below; see "Sale, Redemption, or Repurchase of New Common Stock" in Article XV.D.6 herein). Except as described below, dividends paid with respect to New Common Stock held by a non-U.S. Holder that are not effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable). A non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Stock held by a non-U.S. Holder that are effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

### 6. Sale, Redemption, or Repurchase of New Common Stock

A non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a Cash redemption) of New Common Stock unless:

(i) such non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; or

(ii) such gain is effectively connected with such non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States); or

(iii) the Reorganized Debtors are or have been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). The Debtors consider it unlikely, based on their current business plans and operations, that any of the Reorganized Debtors will become a "U.S. real property holding corporation" in the future.

UST-1060

### 7. *Sale, Redemption, or Repurchase of Interests in the GUC Trust*

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of its Interests in the GUC Trust unless (i) such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United State, or (ii) such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of its New Interests. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

### 8. *FATCA*

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on New Common Stock), and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include New Common Stock) and the Last Out Exit Term Loan Facility. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019 that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such non-U.S. Holder.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THE FATCA RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF THEIR CLAIMS PURSUANT TO THE PLAN AND ON THEIR OWNERSHIP OF THE NEW COMMON STOCK AND LAST OUT EXIT TERM LOANS.**

### E. Information Reporting and Back-Up Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

UST-1061

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS**.

## XVI. RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

UST-1062

Dated: September 10, 2020

Respectfully submitted,

Ascena Retail Group, Inc.,
on behalf of itself and each of the other Debtors

By:     */s/ Carrie W. Teffner*
Name:   Carrie W. Teffner
Title:  Interim Executive Chair, Ascena Retail Group,
        Inc.

Prepared by:

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          edward.sassower@kirkland.com
                steven.serajeddini@kirkland.com

**-**and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          john.luze@kirkland.com

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
Olya Antle (VSB 83153)
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:      (202) 842-7800
Facsimile:      (202) 842-7899
Email:          cspeckhart@cooley.com
                oantle@cooley.com

*Co-Counsel to the Debtors and Debtors in Possession*

UST-1063

## Exhibit A

**Plan of Reorganization**

UST-1064

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF ASCENA RETAIL GROUP, INC. AND ITS DEBTOR AFFILIATES

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS, ANY OF THE RESTRUCTURING SUPPORT PARTIES, OR ANY OTHER PARTY IN INTEREST.**

**YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

**THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:        (202) 842-7800
Facsimile:        (202) 842-7899

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: September 10, 2020

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena. The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

UST-1065

# TABLE OF CONTENTS

**Article I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** ...........................................................................................................................1
- A.  Defined Terms. ................................................................................................................1
- B.  Rules of Interpretation. ...............................................................................................12
- C.  Computation of Time. ..................................................................................................12
- D.  Governing Law. ............................................................................................................13
- E.  Reference to Monetary Figures. .................................................................................13
- F.  Controlling Document. .................................................................................................13
- G.  Restructuring Support Agreement Party Consent Rights and Controlling Documents. .................13

**Article II. ADMINISTRATIVE CLAIMS, DIP ABL FACILITY CLAIMS, DIP TERM FACILITY CLAIMS, PROFESSIONAL COMPENSATION, AND PRIORITY CLAIMS** ..................13
- A.  Administrative Claims. .................................................................................................13
- B.  DIP ABL Facility Claims. ............................................................................................14
- C.  DIP Term Facility Claims. ...........................................................................................14
- D.  Professional Compensation. ........................................................................................15
- E.  Priority Tax Claims. .....................................................................................................16

**Article III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ...................16
- A.  Classification of Claims and Interests. .......................................................................16
- B.  Treatment of Claims and Interests. ............................................................................17
- C.  Special Provision Governing Unimpaired Claims. ....................................................19
- D.  Elimination of Vacant Classes. ...................................................................................19
- E.  Voting Classes; Presumed Acceptance by Non-Voting Classes. ...............................20
- F.  Intercompany Interests. ...............................................................................................20
- G.  Subordinated Claims and Interests. ...........................................................................20
- H.  Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.......................20

**Article IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ................................................20
- A.  Restructuring Transactions. ........................................................................................20
- B.  Administrative Consolidation for Distribution Purposes Only. ...............................21
- C.  General Settlement of Claims / Global Settlement with the Creditors' Committee. ................21
- D.  Sources of Consideration for Plan Distributions. ......................................................22
- E.  Corporate Existence. ....................................................................................................23
- F.  Vesting of Assets in the Reorganized Debtors. ...........................................................23
- G.  Cancellation of Existing Securities and Instruments. ...............................................23
- H.  Corporate Action. .........................................................................................................23
- I.  New Corporate Governance Documents. ....................................................................24
- J.  Directors and Officers of the Reorganized Debtors. ..................................................24
- K.  Effectuating Documents; Further Transactions.........................................................24
- L.  Exemption from Certain Taxes and Fees. ..................................................................25
- M.  Preservation of Causes of Action. ...............................................................................25
- N.  D&O Liability Insurance Policies. ..............................................................................26
- O.  GUC Trust. ....................................................................................................................26
- P.  Management Incentive Plan. ........................................................................................28
- Q.  Employee Obligations. ..................................................................................................29

**Article V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ..............29
- A.  Assumption and Rejection of Executory Contracts and Unexpired Leases. .............29
- B.  Claims Based on Rejection of Executory Contracts or Unexpired Leases. ...............30
- C.  Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ...........30
- D.  Indemnification Obligations. ........................................................................................31
- E.  Insurance Policies. .........................................................................................................31
- F.  Modifications, Amendments, Supplements, Restatements, or Other Agreements. ........32

i

UST-1066

G.   Reservation of Rights. .......................................................................................32
H.   Nonoccurrence of Effective Date. ....................................................................32
I.   Contracts and Leases Entered Into After the Petition Date. ..............................32

**Article VI. PROVISIONS GOVERNING DISTRIBUTIONS** ...............................................**33**
A.   Timing and Calculation of Amounts to Be Distributed. ....................................33
B.   Delivery of Distributions and Undeliverable or Unclaimed Distributions .........33
C.   Securities Registration Exemption. ..................................................................34
D.   Tax Issues and Compliance with Tax Requirements. ........................................34
E.   Allocations. .....................................................................................................34
F.   No Interest. ......................................................................................................35
G.   Setoffs and Recoupment. .................................................................................35
H.   Claims Paid or Payable by Third Parties. .........................................................35

**Article VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS** ...............................................................................................**36**
A.   Allowance of Claims. .......................................................................................36
B.   Claims Administration Responsibilities. ...........................................................36
C.   Estimation of Claims. .......................................................................................37
D.   Adjustment to Claims Register Without Objection. ..........................................37
E.   Time to File Objections to Claims. ...................................................................37
F.   Disallowance of Claims. ...................................................................................37
G.   Amendments to Claims. ...................................................................................37
H.   No Distributions Pending Allowance. ...............................................................38
I.   Distributions After Allowance. ........................................................................38

**Article VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** .........**38**
A.   Compromise and Settlement of Claims, Interests, and Controversies. ...............38
B.   Discharge of Claims and Termination of Interests. ...........................................38
C.   Term of Injunctions or Stays. ...........................................................................39
D.   Release of Liens. ..............................................................................................39
E.   Debtor Release. ...............................................................................................39
F.   Release by holders of Claims or Interests. ........................................................40
G.   Exculpation. ....................................................................................................40
H.   Injunction. .......................................................................................................41
I.   Protection Against Discriminatory Treatment. .................................................41
J.   Governmental Units. ........................................................................................41
K.   Recoupment. ...................................................................................................41
L.   Subordination Rights. .......................................................................................41

**Article IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE
PLAN** .....................................................................................................................**42**
A.   Conditions Precedent to the Effective Date. .....................................................42
B.   Waiver of Conditions. ......................................................................................43
C.   Substantial Consummation. ..............................................................................43
D.   Effect of Nonoccurrence of Conditions to the Effective Date. ..........................43

**Article X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ...................**44**
A.   Modification and Amendments. ........................................................................44
B.   Effect of Confirmation on Modifications. ..........................................................44
C.   Revocation or Withdrawal of the Plan. .............................................................44

**Article XI. RETENTION OF JURISDICTION** ..............................................................**44**

**Article XII. MISCELLANEOUS PROVISIONS** .............................................................**46**
A.   Immediate Binding Effect. ...............................................................................46

UST-1067

B. Additional Documents. ...................................................................................................46
C. Statutory Fees and Reporting Requirements. ...................................................................46
D. Dissolution of the Creditors' Committee. .......................................................................47
E. Reservation of Rights. .....................................................................................................47
F. Successors and Assigns. ..................................................................................................47
G. Service of Documents. .....................................................................................................47
H. Entire Agreement. ...........................................................................................................48
I. Exhibits. ..........................................................................................................................48
J. Nonseverability of Plan Provisions. ................................................................................48
K. Votes Solicited in Good Faith. ........................................................................................48
L. Waiver or Estoppel. .........................................................................................................48

UST-1068

**INTRODUCTION**

Ascena Retail Group, Inc. ("Ascena") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose this joint plan of reorganization (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of the Plan, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**Article I.
DEFINED TERMS, RULES OF INTERPRETATION,
COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms.*

As used in the Plan, capitalized terms have the meanings set forth below.

1.      "*503(b)(9) Claims*" means those Claims arising under section 503(b)(9) of the Bankruptcy Code.

2.      "*ABL Agent*" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent and collateral agent under the ABL Credit Agreement.

3.      "*ABL Claim*" means any Claim derived from, based upon, or secured pursuant to the ABL Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto.

4.      "*ABL Commitment Letter*" means that certain *Superpriority Senior Secured Debtor-In-Possession ABL Facility Commitment Letter* [Docket No. 303, Ex. A], as amended, supplemented or modified in accordance with the terms thereof.

5.      "*ABL Credit Agreement*" means that certain Amended and Restated Credit Agreement dated as of January 3, 2011, as amended and restated by the Second Restatement Agreement dated as of June 14, 2012, by the Third Restatement Agreement dated as of March 13, 2013, by the Fourth Restatement Agreement dated as of July 24, 2015, the Fifth Restatement Agreement dated as of February 27, 2018, and as may otherwise be amended, restated, supplemented or otherwise modified, among Ascena, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto, the issuing banks party thereto, and the ABL Agent, as administrative agent, collateral agent, and swingline lender.

6.      "*ABL Documents*" means the ABL Credit Agreement and any other agreements and documents executed in connection with or related thereto.

7.      "*ABL Lenders*" means each of the lenders from time to time party to the ABL Credit Agreement.

8.      "*Ad Hoc Group*" means, collectively, that certain group of lenders under the Term Loan Facility represented by Milbank LLP, as counsel, and Greenhill & Co., LLC, as financial advisor.

UST-1069

9.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b) (including, without limitation, 503(b)(9)), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; and (b) Allowed Professional Fee Claims.

10.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which:  (a) with respect to Administrative Claims other than Professional Fee Claims and 503(b)(9) Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date; and (c) with respect to 503(b)(9) Claims, was September 30, 2020.

11.      "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

12.      "*Allowed*" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Court a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim allowed pursuant to the Plan, any stipulation approved by the Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes.  For the avoidance of doubt, a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

13.      "*Ascena*" means Ascena Retail Group, Inc.

14.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtors, the debtors in possession, the Estates, or other appropriate parties in interest have asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

15.      "*Avoidance Action Waiver*" shall mean a waiver of any and all Avoidance Actions held by the Debtors against any vendor, service provider, landlord, and non-insider employee that does not opt out of the releases contained in the Plan.

16.      "*Backstop Commitment*" means the commitment, on the terms set forth in the Backstop Commitment Letter, of the Backstop Parties to backstop the DIP Term Facility.

17.      "*Backstop Commitment Letter*" means that certain Backstop Commitment Letter, dated as of July 23, 2020, by and among the Backstop Parties and Ascena, as may be amended, supplemented, or modified from time to time, setting forth, among other things, the terms and conditions of the DIP Term Facility and the Backstop Commitment.

18.      "*Backstop Parties*" means certain of the Consenting Stakeholders or their successors, assigns, or Related Funds (in each case, as allowed pursuant to the Backstop Commitment Agreement) that have committed to backstop the DIP Term Facility on the terms set forth in the Backstop Commitment Letter, solely in their capacities as such.

UST-1070

19.     "*Backstop Percentage*" means the applicable percentage set forth in Schedule 2 to the Backstop Commitment Letter.

20.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

21.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of Virginia or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the Eastern District of Virginia.

22.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

23.     "*Bar Date*" means, collectively, each applicable date established by the Bankruptcy Court by which Proofs of Claim must be Filed.

24.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

25.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable.

26.     "*Cash Collateral*" shall have the meaning set forth in the DIP Financing Order.

27.     "*Cash Collateral Order*" means the *Interim Order Under 11 U.S.C. §§ 105, 361, 362, 363, and 507, and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)*, entered on the Bankruptcy Court's docket on July 23, 2020.

28.     "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

29.     "*Chapter 11 Cases*" means the procedurally consolidated cases filed or to be filed (as applicable) for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

30.     "*Claim*" means a claim, as defined in section 101(5) of the Bankruptcy Code, against a Debtor.

31.     "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to Claims.

32.     "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

33.     "*Class*" means a category of Claims or Interests under section 1122(a) of the Bankruptcy Code.

UST-1071

34.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

35.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

36.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Rule 3020(b)(2) and section 1128 of the Bankruptcy Code, including any adjournments thereof, at which the Bankruptcy Court will consider confirmation of the Plan.

37.     "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

38.     "*Consenting Stakeholders*" shall have the meaning set forth in the Restructuring Support Agreement.

39.     "*Consummation*" means the occurrence of the Effective Date.

40.     "*Creditors' Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

41.     "*Cure/Assumption Objection Deadline*" means the date that is 14 days after filing of the Schedule of Assumed Executory Contracts and Unexpired Leases with the Plan Supplement and service of the Cure Notice; *provided* that if any Executory Contract or Unexpired Lease is added to the Schedule of Assumed Executory Contracts and Unexpired Leases after the filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be 14 days after service of the amended Schedule of Assumed Executory Contracts and Unexpired Leases with such modification.

42.     "*Cure Claim*" means a monetary Claim based upon a Debtor's defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to section 365 of the Bankruptcy Code.

43.     "*Cure Obligations*" means all (a) Cure Claims and (b) other obligations required under the Bankruptcy Code to cure any non-monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

44.     "*Cure Notice*" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include: (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases; (b) Cure Claims to be paid in connection therewith; and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

45.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") and all agreements, documents or instruments relating thereto issued or providing coverage at any time to any of the Debtors or any of their predecessors for current or former directors', managers', and officers' liability.

46.     "*Definitive Documents*" shall have the meaning set forth in the Restructuring Support Agreement.

47.     "*DIP ABL Agent*" means the administrative agent under the DIP ABL Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP ABL Agreement.

48.     "*DIP ABL Agreement*" means the debtor-in-possession senior secured asset-based revolving credit agreement, by and among the Debtors, the DIP ABL Agent, and the DIP ABL Lenders, as approved by the DIP Financing Order.

UST-1072

49.     "*DIP ABL Facility*" means the senior secured asset-based revolving credit facility in accordance to the terms and conditions set forth in the DIP ABL Agreement and the DIP Financing Order.

50.     "*DIP ABL Facility Claim*" means any Claim derived from, based upon, or secured pursuant to the DIP ABL Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP ABL Facility.

51.     "*DIP ABL Lender*" means, as applicable, each lender under the DIP ABL Agreement.

52.     "*DIP Financing Order*" means the Final Order of the Bankruptcy Court setting forth the terms of and approving the DIP ABL Facility and the DIP Term Facility.

53.     "*DIP Term Agent*" means Alter Domus (US) LLC, in its capacity as administrative agent under the DIP Term Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Term Agreement.

54.     "*DIP Term Agreement*" means that certain debtor-in-possession senior secured term credit agreement, by and among the Debtors, the DIP Term Agent, and the DIP Term Lenders, as approved by the DIP Financing Order.

55.     "*DIP Term Facility*" means that certain $311.8 million senior secured term credit facility issued in accordance to the terms and conditions set forth in the DIP Term Agreement and the DIP Financing Order, as applicable.

56.     "*DIP Term Facility Claim*" means any Claim derived from, based upon, or secured pursuant to the DIP Term Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Term Facility.

57.     "*DIP Term Lender*" means each lender under the DIP Term Agreement.

58.     "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that:  (a) has been disallowed by a Final Order; (b) is Scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not Scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the holder thereof; or (e) has been withdrawn by the holder thereof.

59.     "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto.

60.     "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement, entered on September [●], 2020 [Docket No. [●]].

61.     "*Disputed*" means a Claim that is not yet Allowed.

62.     "*Distribution Record Date*" means the date for determining which holders of Claims are eligible to receive distributions hereunder and shall be the Effective Date or such other date as designated in a Final Order of the Bankruptcy Court; *provided* that the Distribution Record Date shall not apply to publicly held securities.

63.     "*DTC*" means the Depository Trust Company.

UST-1073

64.    "*Effective Date*" means, with respect to the Plan, the date that is the first Business Day after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.A have been satisfied or waived (in accordance with Article IX.B); and (c) the Plan is declared effective by the Debtors.

65.    "*Employee Benefits Programs*" means, collectively, all of the Debtors' wages, compensation, and employee benefits programs according to existing terms and practices, including executive and Insider compensation and benefits programs, Insider and non-Insider severance programs, Insider and non-Insider incentive programs, and Insider and non-Insider retention programs, in each case as were in effect as of the effective date of the Restructuring Support Agreement and were disclosed to counsel for the Required Consenting Stakeholders, including any modifications agreed between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement; *provided* that Employee Benefits Programs shall not include (x) any compensation, post-employment, separation or retirement arrangement with any former Insider (as of the effectiveness of the Restructuring Support Agreement); (y) any non-qualified deferred compensation plan or supplemental retirement plan, solely to the extent and such plan would benefit any former Insider (as of the effectiveness of the Restructuring Support Agreement), in each case without the consent of the Required Consenting Stakeholders following the Petition Date; or (z) any workers' compensation insurance policies and any agreements, documents or instruments related thereto.

66.    "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

67.    "*Equity Premium*" means an amount of New Common Stock equal to $7.5 million, calculated assuming a total equity value of Reorganized Ascena to be agreed by the Debtors and the Required Consenting Stakeholders.

68.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 upon the commencement of the applicable Debtor's Chapter 11 Case.

69.    "*Exculpated Parties*" means collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the Creditors' Committee and its members; (e) each current and former Affiliate of each Entity in clause (a) through the following clause (f); and (f) each Related Party of each Entity in clause (a) through this clause (f).

70.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

71.    "*Exit ABL Facility*" means either (a) a replacement asset-based revolving loan facility pursuant to which one or more DIP ABL Lenders, each in its sole discretion, consents to convert some or all of its outstanding DIP ABL Facility Claims and commitments under the DIP ABL Facility into commitments under such Exit ABL Facility, or (b) a new asset-based revolving loan facility in an amount up to $400 million and, in all events, in an amount sufficient to pay in full in cash the DIP ABL Facility Claims as of the Effective Date.

72.    "*Exit Facilities*" means, collectively, the Exit ABL Facility, the First Out Exit Term Loan Facility, and the Second Out Exit Term Loan Facility.

73.    "*Exit Facilities Term Sheet*" means the term sheet set forth as <u>Exhibit D</u> to the Restructuring Support Agreement.

74.    "*Exit Facility Credit Agreements*" means, collectively, the credit agreements governing the Exit Facilities.

75.    "*Exit Facility Documents*" means the Exit Facility Credit Agreements and related documents governing the Exit Facilities, which shall be, to the extent available, set forth in the Plan Supplement.

76.    "*First Out Exit Term Loan Facility*" shall have the meaning given to "First Out Term Loan Facility" in the Exit Facilities Term Sheet.

UST-1074

77.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

78.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

79.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified, or amended, is not subject to any pending stay and as to which the time to appeal, move for reargument, reconsideration, or rehearing, or seek certiorari has expired and no appeal, motion for reargument, reconsideration, or rehearing or petition for certiorari has been timely taken or filed, or as to which any appeal that has been taken, motion for reargument, reconsideration, or rehearing that has been granted or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

80.     "*General Unsecured Claim*" means any Claim that is not Secured and is not (a) an Administrative Claim, (b) a Secured Tax Claim, (c) an Other Secured Claim, (d) a Priority Tax Claim, (e) an Other Priority Claim, (f) an ABL Claim, (g) a Term Loan Claim, (h) an Intercompany Claim; (i) a deficiency claim held by any ABL Agent, ABL Lender, Term Loan Agent, or Term Lender; or (j) a Claim for services rendered on account a Holder of an ABL or Term Loan Claim.

81.     "*Global Settlement*" means the agreement between the Debtors, the Creditors' Committee, the DIP Lenders, and the Prepetition Secured Parties (as defined in the DIP Financing Order), the key terms of which are set forth herein and in the DIP Financing Order and <u>Annex 6</u> thereto.

82.     "*GUC Trust*" means the trust established by the Plan for the benefit of Allowed General Unsecured Claims pursuant to the GUC Trust Agreement.

83.     "*GUC Trust Agreement*" means the trust agreement entered into on or before the Effective Date between the Debtors and the GUC Trustee, which shall be in form and substance reasonably acceptable to the Creditors' Committee, the Debtors, and the Consenting Stakeholders.

84.     "*GUC Trust Assets*" means (i) cash in the amount of $6,500,000; and (ii) 100% of the first $1 million and 50% of the next $4 million of proceeds (if any) received by Ascena resulting from *Target Corp. et al. v. Visa Inc. et al.*, case no. 1:13-cv-03477, currently pending in the U.S. District Court for the Southern District of New York, net of any costs incurred by Ascena in connection therewith.  Any such proceeds in excess of $5 million (and 50% of proceeds between $1 million and $5 million) shall be retained by the Reorganized Debtors.

85.     "*GUC Trust Expenses*" means the reasonable expenses (including any taxes imposed on or payable by the GUC Trust or in respect of the GUC Trust Assets and professional fees) incurred by the GUC Trust and any professionals retained by the GUC Trust and any additional amount determined necessary by the GUC Trustee to adequately reserve for the operating expenses of the GUC Trust.

86.     "*GUC Trust Interest*" means a non-certificated beneficial interest in the GUC Trust granted to each beneficiary of the GUC Trust, which shall entitle such holder to a Pro Rata share of the GUC Trust Net Assets, subject to the terms of the Plan and the GUC Trust Agreement.

87.     "*GUC Trust Net Assets*" means the GUC Trust Assets less the GUC Trust Expenses.

88.     "*GUC  Trustee*" means, in its capacity as such, the Person selected by the Creditors' Committee to serve as the trustee of the Trust, and any successor thereto in accordance with the GUC Trust Agreement.

UST-1075

89. "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

90. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

91. "*Insider*" shall have the meaning set forth in section 101(31) of the Bankruptcy Code.

92. "*Insurance Policies*" means all insurance policies issued or providing coverage at any time to any of the Debtors or any of their predecessors and all agreements, documents or instruments relating thereto (including, but not limited to, the D&O Liability Insurance Policies) other than any split-dollar life insurance policies that are listed in the Schedule of Rejected Executory Contracts and Unexpired Leases.

93. "*Insurer*" means any company or other entity that has issued or entered into an Insurance Policy (including any third party administrator) and any respective predecessors and/or affiliates thereof.

94. "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor or a Debtor's Affiliate.

95. "*Intercompany Interest*" means, other than an Interest in Ascena, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

96. "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including any common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), and any claim against or interest in the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

97. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time, as applicable to the Chapter 11 Cases.

98. "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

99. "*Management Incentive Plan*" means a post-Effective Date management incentive plan, the material terms of which shall be consistent with Article IV.O of the Plan.

100. "*New Board*" means the initial board of directors, members, or managers, as applicable, of Reorganized Ascena.

101. "*New Common Stock*" means the common shares of Reorganized Ascena.

102. "*New Corporate Governance Documents*" means the form of certificate or articles of incorporation, bylaws, limited liability company agreement, partnership agreement, or such other applicable formation documents (if any) of Reorganized Ascena, including any certificates of designation, each of which shall be included in the Plan Supplement.

103. "*Notice and Claims Agent*" means Prime Clerk LLC.

104. "*Other Priority Claim*" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than: (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases.

105. "*Other Secured Claim*" means any Secured Claim, other than (a) an ABL Claim, (b) a DIP ABL Facility Claim, as applicable, (c) a Term Loan Claim, or (d) a DIP Term Facility Claim.

UST-1076

106. "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

107. "*Petition Date*" means July 23, 2020, the date on which the Debtors commenced the Chapter 11 Cases.

108. "*Plan*" means this plan of reorganization, as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto.

109. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the terms thereof, the Plan, the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement). The Debtors shall file the initial version of the Plan Supplement at least fourteen (14) days prior to the Voting Deadline; *provided* that the Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with Article X of the Plan.

110. "*Priority Claims*" means, collectively, Priority Tax Claims and Other Priority Claims.

111. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

112. "*Professional*" means an Entity retained in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 328, 363, and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

113. "*Professional Fee Claims*" means all Claims for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the Confirmation Date that the Bankruptcy Court has not denied by Final Order. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims.

114. "*Professional Fee Escrow Account*" means an account funded by the Debtors with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount, provided that the Cash funds in the Professional Fee Escrow Account shall be increased from Cash on hand at the Reorganized Debtors to the extent applications are filed after the Effective Date in excess of the amount of Cash funded into the escrow as of the Effective Date.

115. "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.D of the Plan.

116. "*Proof of Claim*" means a proof of Claim Filed in the Chapter 11 Cases.

117. "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

118. "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

119. "*Related Fund*" means with respect to any Person, an Affiliate or any fund, account, or investment vehicle that is controlled, managed, advised, or sub-advised by such Person, an Affiliate or the same investment manager, advisor or sub-advisor as such Person or an Affiliate of such investment manager, advisor, or sub-advisor.

9

UST-1077

120. "*Related Party*" means, with respect to any person or Entity, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special or other committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors of such person or Entity, and any such Person's or Entity's respective heirs, executors, estates, and nominees.

121. "*Released Party*" means, collectively, each of the following in their capacity as such: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the ABL Agent; (e) the ABL Lenders; (f) the Term Loan Agent; (g) the Term Loan Lenders; (h) each of the lenders and administrative agents under the Exit Facilities; (i) the Backstop Parties; (j) the DIP ABL Agent; (k) the DIP ABL Lenders; (l) the DIP Term Agent; (m) the DIP Term Lenders; (n) each current and former Affiliate of each Entity in the foregoing clause (a) through the following clause (o); (o) each Related Party of each Entity in the foregoing clause (a) through this clause (o); and (p) the Creditors' Committee; *provided* that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

122. "*Releasing Party*" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the ABL Agent; (e) the ABL Lenders; (f) Term Loan Agent; (g) the Term Loan Lenders; (h) each of the lenders and administrative agents under the Exit Facilities; (i) the Backstop Parties; (j) the DIP ABL Agent; (k) the DIP ABL Lenders; (l) the DIP Term Agent; (m) the DIP Term Lenders; (n) all holders of Impaired Claims who voted to accept the Plan; (o) all holders of Impaired Claims who abstained from voting on the Plan or voted to reject the Plan but did not timely opt out of or object to the applicable release; (p) all holders of Unimpaired Claims who did not timely opt out of or object to the applicable release; (q) all holders of Interests; (r) each current and former Affiliate of each Entity in foregoing clause (a) through the following clause (s); and (s) each Related Party of each Entity in the foregoing clause (a) through this clause (s); (t) the Creditors' Committee; *provided* that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation; *provided further* that any such Entity shall be identified by name as a non-Releasing Party in the Confirmation Order and shall not receive the Avoidance Action Waiver.

123. "*Reorganized Debtors*" means Reorganized Ascena and each of the other Debtors, or any successor thereto, as reorganized pursuant to and under the Plan.

124. "*Reorganized Ascena*" means either (a) Ascena, or any successor thereto, as reorganized pursuant to and under the Plan or (b) a new corporation or limited liability company that may be formed or caused to be formed by the Debtors to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Common Stock to be distributed or sold pursuant to the Plan.

125. "*Required Consenting Stakeholders*" shall have the meaning set forth in the Restructuring Support Agreement.

126. "*Restructuring*" means the restructuring of the Debtors on the terms of the Plan and the Restructuring Support Agreement.

127. "*Restructuring Documents*" means the Plan, the Disclosure Statement, the Plan Supplement, and the various agreements and other documents formalizing or implementing the Plan and the transactions contemplated thereunder.

128. "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of July 23, 2020, by and among the Debtors and the Consenting Stakeholders, including all exhibits and schedules attached thereto, as may be amended from time to time in accordance with the terms thereof.

UST-1078

129.     "*Restructuring Transactions*" means any transaction and any actions as may be necessary or appropriate to effect a corporate restructuring of the Debtors' and the Reorganized Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan, Restructuring Support Agreement, and Restructuring Transactions Memorandum, including the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued or executed pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as described in Article IV.A of the Plan.

130.     "*Restructuring Transactions Memorandum*" means a document to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions, including any corporate restructuring or reorganization to be consummated in connection therewith.

131.     "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be assumed or assumed and assigned by the Reorganized Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time in accordance with the Plan.

132.     "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time in accordance with the Plan.

133.     "*Schedule of Retained Causes of Action*" means the schedule, which will be included in the Plan Supplement, of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

134.     "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

135.     "*Second Out Exit Term Loan Facility*" shall have the meaning given to "Last Out Term Loan Facility" in the Exit Facilities Term Sheet.

136.     "*Secured*" means when referring to a Claim: (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable holder's interest in the applicable Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim.

137.     "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

138.     "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

139.     "*Term Loan Agent*" means Goldman Sachs Bank USA, in its capacity as administrative agent under the Term Loan Credit Agreement, and any successor thereto.

140.     "*Term Loan Claim*" means all Claims derived from, based upon, or secured pursuant to the Term Loan Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto.

UST-1079

141.   "*Term Loan Credit Agreement*" means Term Credit Agreement, dated as of August 21, 2015, and as may otherwise be amended, restated, supplemented or otherwise modified, among Ascena, AnnTaylor Retail, Inc., the lenders party thereto, and the Term Loan Agent, as administrative agent.

142.   "*Term Loan Documents*" means the Term Loan Credit Agreement and any other agreements and documents executed in connection with or related thereto

143.   "*Term Loan Lenders*" means each of the lenders from time to time party to the Term Loan Credit Agreement.

144.   "*U.S. Trustee*" means the Office of the United States Trustee for the Eastern District of Virginia.

145.   "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

146.   "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that are unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash.

147.   "*Voting Deadline*" means October 13, 2020 at 5:00 p.m. prevailing Easter Time.

*B.   Rules of Interpretation.*

For purposes herein:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (14) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

*C.   Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

UST-1080

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the Plan Supplement shall control.  In the event of any inconsistency between the Plan or Plan Supplement, on the one hand, and the Confirmation Order on the other hand, the Confirmation Order shall control.

G.      *Restructuring Support Agreement Party Consent Rights and Controlling Documents.*

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the Restructuring Support Agreement as set forth in the Restructuring Support Agreement with respect to the form and substance of the Plan, any Definitive Document, all exhibits to the Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Section I.A of the Plan) and be fully enforceable as if stated in full herein.

## Article II.
### ADMINISTRATIVE CLAIMS, DIP ABL FACILITY CLAIMS, DIP TERM FACILITY CLAIMS, PROFESSIONAL COMPENSATION, AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP ABL Facility Claims, DIP Term Facility Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Except with respect to Administrative Claims that are Professional Fee Claims or to the extent that an Administrative Claim has not already been paid during the Chapter 11 Cases or a holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash the unpaid portion of its Allowed Administrative Claim on the latest of:  (a)  the Effective Date if such Administrative Claim is Allowed as of the Effective Date, including those 503(b)(9) Claims that are not Disputed; (b) the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements and/or arrangements governing, instruments evidencing, or other documents relating to such transactions (and no requests for payment of such Administrative Claims must be Filed or served).  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim Allowed by Final Order.

13

UST-1081

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party by the Claims Objection Bar Date.

B.       *DIP ABL Facility Claims.*

All DIP ABL Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP ABL Agreement on such date, (b) all accrued and unpaid interest thereon to the date of payment, and (c) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP ABL Agreement and the DIP Financing Order.

Except to the extent that a holder of an Allowed DIP ABL Facility Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of each Allowed DIP ABL Facility Claim, on the Effective Date, each Holder of an Allowed DIP ABL Facility Claim shall be Paid in Full.  As used in this paragraph, "Paid in Full" shall mean (i) if those certain conversion conditions set forth in the DIP ABL Agreement remain unsatisfied as of the Effective Date, on the Effective Date, each holder of an Allowed DIP ABL Facility Claim shall receive the indefeasible repayment in full in Cash of all obligations (including principal, interests, fees, expenses, indemnities (other than contingent indemnification obligations for which no claim has been asserted)) under the DIP ABL Agreement, the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancellation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the DIP ABL Agreement, or (ii) if those certain conversion conditions as set forth in the DIP ABL Agreement are fully satisfied as of the Effective Date, on the Effective Date, each holder of an Allowed DIP ABL Facility Claim shall receive, unless such holder agrees to less favorable treatment, its Pro Rata share of participation in the Exit ABL Facility.  The Liens securing the DIP ABL Facility shall not be released until such time as (x) the DIP ABL Facility is Paid in Full, (y) the commitments to lend thereunder have terminated, and (z) the DIP ABL Agent has received evidence reasonably satisfactory to it that the DIP ABL Facility has been terminated and the security granted in connection therewith released.

Subject to the DIP ABL Facility Claims being Paid in Full in accordance with the terms of the Plan, or other such treatment as contemplated by Article II.B of the Plan, on the Effective Date all Liens and security interests granted to secure such obligations (other than those granted in connection with the payoff arrangements and cash collateralization of such obligations) shall be automatically terminated and of no further force or effect without any further notice to or action, order, or approval of the Bankruptcy Court.

C.       *DIP Term Facility Claims.*

All DIP Term Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP Term Agreement on such date, (b) all accrued and unpaid interest thereon to the date of payment, and (c) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP Term Agreement and the DIP Financing Order.

On the Effective Date, each holder of an Allowed DIP Term Facility Claim shall receive, unless such holder agrees to less favorable treatment and subject to the terms and conditions of the DIP Term Facility and the Exit Facility Term Sheet, cash in an amount equal to its allowed DIP Term Facility Claim; *provided* that, if certain conditions as set forth in the DIP Term Agreement and Exit Facility Term Sheet are satisfied, each holder of an allowed DIP Term Facility Claim shall receive (i) loans arising under the First Out Exit Term Loan Facility in an amount equal to such holder's allowed DIP Term Facility Claim and (ii) cash on account of accrued and unpaid interest and other charges payable through the Effective Date, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed DIP Term Facility Claim.

14

UST-1082

D.    *Professional Compensation.*

    1.    <u>Professional Fee Escrow Account.</u>

    As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

    The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that obligations with respect to Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

    2.    <u>Final Fee Applications and Payment of Professional Fee Claims.</u>

    All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The amount of the Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

    3.    <u>Professional Fee Escrow Amount.</u>

    The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; *provided* that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

    4.    <u>Post-Confirmation Date Fees and Expenses.</u>

    From and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors, as applicable. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the

UST-1083

Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten business days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors or the Reorganized Debtors, as applicable. If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

E.    *Priority Tax Claims.*

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of an Allowed Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, at the option of the applicable Debtor or Reorganized Debtor, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (i) Cash equal to the amount of such Allowed Priority Tax Claim on the Effective Date or (ii) otherwise treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. For the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**Article III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.    *Classification of Claims and Interests.*

The Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

UST-1084

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | ABL Claims | Unimpaired | Presumed to Accept |
| 4 | Term Loan Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Interests in Ascena | Impaired | Deemed to Reject |

B.       *Treatment of Claims and Interests.*

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.       Class 1 – Other Secured Claims

    a.   *Classification*:  Class 1 consists of Other Secured Claims against any Debtor.

    b.   *Treatment*:  Each holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

        i.    payment in full in Cash;

        ii.   delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

        iii.  Reinstatement of such Claim; or

        iv.   other treatment rendering such Claim Unimpaired.

    c.   *Voting*:   Class 1 is Unimpaired.   Holders of Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

2.       Class 2 – Other Priority Claims

    a.   *Classification*:  Class 2 consists of Other Priority Claims.

    b.   *Treatment*:  Each holder of an Other Priority Claim shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired.

UST-1085

      c.   *Voting*:  Class 2 is Unimpaired.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

3.      <u>Class 3 – ABL Claims</u>

      a.   *Classification*:  Class 3 consists of all ABL Claims.

      b.   *Allowance*:  $333,000,000.

      c.   *Treatment*:  To the extent any Allowed ABL Claims remain outstanding on the Effective Date, each holder of an Allowed ABL Claim shall receive:

          i.   payment in full in Cash of its Allowed ABL Claim and replacement or cash collateralization of all issued and undrawn letters of credit in the amounts specified under the ABL Credit Agreement;

          ii.   the collateral securing its Allowed ABL claim;

          iii.   Reinstatement of its Allowed ABL Claim under the Exit ABL Facility; or

          iv.   such other treatment that renders its Allowed ABL Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

      d.   *Voting*:  Class 3 is Unimpaired.  Holders of ABL Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

4.      <u>Class 4 – Term Loan Claims</u>

      a.   *Classification*:  Class 4 consists of all Term Loan Claims.

      b.   *Allowance*:  $1,271,597,089.

      c.   *Treatment:*  Each holder of an Allowed Term Loan Claim shall receive its Pro Rata share of:

          i.   the loans arising under the Second Out Exit Term Loan Facility; and

          ii.   55.1% of the New Common Stock less the percentage of New Common Stock distributed as the Equity Premium, subject to dilution on account of the Management Incentive Plan.

      d.   *Voting:* Class 4 is Impaired.  Holders of Allowed Term Loan Claims are entitled to vote to accept or reject the Plan.

5.      <u>Class 5 – General Unsecured Claims</u>

      a.   *Classification*:  Class 5 consists of all General Unsecured Claims.

      b.   *Treatment*:  Each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of GUC Trust Net Assets as a beneficiary of the GUC Trust and a holder of GUC Trust Interests.

UST-1086

     c.   *Voting*:  Class 5 is Impaired.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.     <u>Class 6 – Intercompany Claims</u>

     a.   *Classification*:  Class 6 consists of all Intercompany Claims.

     b.   *Treatment*: Subject to the Restructuring Transactions Memorandum, each Allowed Intercompany Claim shall be Reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Reorganized Debtors; *provided* that no distributions shall be made on account of any Intercompany Claims.

     c.   *Voting*:  Class 6 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

7.     <u>Class 7 – Intercompany Interests</u>

     a.   *Classification*:  Class 7 consists of all Intercompany Interests.

     b.   *Treatment*:  Subject to the Restructuring Transactions Memorandum, Intercompany Interests shall receive no recovery or distribution and be Reinstated solely to the extent necessary to maintain the Debtors' corporate structure.

     c.   *Voting*:  Class 7 is Unimpaired, and holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

8.     <u>Class 8 – Interests in Ascena</u>

     a.   *Classification*:  Class 8 consists of all Interests in Ascena.

     b.   *Treatment*:  Each holder of an Allowed Interest in Ascena shall have such Interest cancelled, released, and extinguished without any distribution.

     c.   *Voting*:  Class 8 is Impaired, and holders of Interests in Ascena are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Interests in Ascena are not entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims.*

     Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.     *Elimination of Vacant Classes.*

     Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

UST-1087

E.    *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court to deem the Plan accepted by the holders of such Claims or Interests in such Class.  For the avoidance of doubt, any holders of a Claim or Interest who abstain from voting shall not be presumed to accept the Plan in their individual capacity as such.

F.    *Intercompany Interests.*

Holders of Intercompany Interests are retaining their respective Interests not on account of their Intercompany Interests, but rather for the purposes of administrative convenience, for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.  For the avoidance of doubt, any Interest in a non-Debtor owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

G.    *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

H.    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to alter, amend, or modify the Plan, or any document in the Plan Supplement in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

**Article IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.    *Restructuring Transactions.*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including, without limitation: (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) consummation of such other transactions that are required to effectuate the Restructuring Transactions, including the transaction set forth in the Restructuring Transactions Memorandum; (e) consummation of all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by Reorganized Ascena, which purchase may be structured as a taxable transaction for United States federal income tax purposes; (f) the issuance, distribution, reservation, or dilution, as applicable, of the

20

UST-1088

New Common Stock, as set forth herein; and (g) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

**B.**      *Administrative Consolidation for Distribution Purposes Only.*

On the Effective Date, and solely for administrative purposes to facilitate distributions from the GUC Trust: (1) all General Unsecured Claims against each of the Debtors shall be deemed merged or treated as liabilities of the GUC Trust to the extent Allowed; (2) all General Unsecured Claim guaranties by a Debtor of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several General Unsecured Claim against any of the Debtors shall be deemed to be one obligation of the GUC Trust; (3) each and every General Unsecured Claim filed in any of the Chapter 11 Cases shall be treated as filed against the consolidated Debtors and shall be treated as one General Unsecured Claim against and obligation of the GUC Trust.  For the avoidance of doubt, for purposes of determining the availability of the right of set off under section 553 of the Bankruptcy Code, the Debtors shall be treated as separate entities so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may not be set off against the liabilities of any of the other Debtors.  Such administrative consolidation is solely for the purpose of facilitating distributions to holders of General Unsecured Claims under this Plan and shall not affect the legal and corporate structures of the Reorganized Debtors.  Moreover, such administrative consolidation shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or the ability of the GUC Recovery Trustee to seek to have any General Unsecured Claim subordinated in accordance with any contractual rights or equitable principles.

**C.**      *General Settlement of Claims / Global Settlement with the Creditors' Committee.*

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including with respect to issues related to the value of the Debtors' unencumbered property.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

The Plan embodies the Global Settlement, the key terms of which include the following:

- the creation of the GUC Trust under the Plan and the GUC Trustee selected by the Creditors' Committee funded with the GUC Trust Assets for the benefit of Allowed General Unsecured Claims;

- the Avoidance Action Waiver;

- the withdrawal of the Debtors' *Motion for Entry of an Order (I) Extending Time for Performance of Obligations Arising Under Unexpired Non-Residential Real Property Leases, and (II) Granting Related Relief* [Docket No. 144] and payment of deferred and stub rent owing to landlords (and, for the avoidance of doubt, accruing before the effective date of the rejection of any applicable real property lease, as applicable) pursuant to the terms of the DIP Financing Order;

- the commitment by the Debtors to use commercially reasonable efforts to condition any critical or foreign vendor payment on the applicable vendor agreeing to (a) provide trade terms at least as favorable as the most favorable terms provided by such vendor in the six-month period ending February 29, 2020 for at least six (6) months after the Effective Date and (b) vote in favor of the Plan, if the Plan is consistent with the terms of the Global Settlement;

21

UST-1089

- the commitment by the Debtors to use commercially reasonable efforts to spend at least 70% of the authorized critical vendor and foreign vendor payments; *provided* that the size and terms of the critical vendor and foreign program shall not otherwise change from what was previously authorized by the Court; and

- the support of the Creditors' Committee in favor of the Plan.

D.      *Sources of Consideration for Plan Distributions.*

The Reorganized Debtors shall fund distributions under the Plan from the following sources:

1.      Cash on Hand.

The Reorganized Debtors shall use Cash on hand, including proceeds from the Exit Facilities, to fund distributions to certain holders of Allowed Claims in accordance with Article III.B of the Plan.

2.      Issuance and Distribution of New Common Stock.

On the Effective Date, Reorganized Ascena shall issue the New Common Stock to fund distributions to certain holders of Allowed Claims in accordance with Article III of the Plan.

On the Effective Date, each Consenting Stakeholder shall receive, in its capacity as such, (a) its pro rata share (the numerator being such party's holdings of the loans arising under the First Out Exit Term Loan Facility (including through a Related Fund) and the denominator being the aggregate outstanding amount of all loans arising under the First Out Exit Term Loan Facility) of 44.9% of the New Common Stock, which will be subject to dilution from the Management Incentive Plan, and (b) its pro rata share (based on such party's Backstop Percentage (including through a Related Fund)) of the Equity Premium, which will be subject to dilution from the Management Incentive Plan.

The issuance of New Common Stock under the Plan, as well as any options or other equity awards, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the holders of Claims.

Reorganized Ascena will have one class of common equity interests, the New Common Stock.

3.      Exit Facilities.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities (the terms of which shall be set forth in the Exit Facility Documents) on terms consistent with the Exit Facilities Term Sheet and ABL Commitment Letter, if applicable.

Confirmation of the Plan shall be deemed approval of the Exit Facilities and the Exit Facility Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the Exit Facilities.

On the later of (i) the Effective Date and (ii) the date on which the Exit Facility Documents have been executed and delivered, except as otherwise expressly provided in the Plan, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Facility Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted to be senior to them under the respective Exit Facility Documents, and (d) shall not be subject to recharacterization or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.   The Reorganized Debtors and the Entities granted such Liens and security interests shall be authorized to make all filings

UST-1090

and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order (subject solely to the occurrence of the Effective Date) and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

E.      *Corporate Existence.*

Except as otherwise provided in the Plan, the Restructuring Transactions Memorandum, or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan, the New Corporate Governance Documents, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

F.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property of each Estate, all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan or the Restructuring Transactions Memorandum, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.      *Cancellation of Existing Securities and Instruments.*

Except as otherwise provided in the Restructuring Support Agreement, the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all notes, instruments, certificates, Securities, and other documents evidencing Claims or Interests, including the ABL Credit Agreement and the Term Loan Credit Agreement, shall be terminated and canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged.

H.      *Corporate Action.*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable:  (1) the implementation of the Restructuring Transactions, including the transactions contemplated by the Restructuring Transactions Memorandum; (2) the selection of the directors and officers for the Reorganized Debtors; (3) the entry into the Exit Facilities and the incurrence of credit thereunder; (4) the adoption of the Management Incentive Plan by the New Board; (5) the issuance and distribution of the New Common Stock; and (6) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors.

UST-1091

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit Facilities, the New Common Stock, and any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I.      *New Corporate Governance Documents.*

The New Corporate Governance Documents shall, among other things: (1) contain terms consistent with the documentation set forth in the Plan Supplement; (2) authorize the issuance, distribution, and reservation of the New Common Stock to the Entities entitled to receive such issuances, distributions and reservations under the Plan; and (3) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and limited as necessary to facilitate compliance with non-bankruptcy federal laws, prohibit the issuance of non-voting equity Securities.

On or immediately before the Effective Date, Ascena or Reorganized Ascena, as applicable, will file Reorganized Ascena's New Corporate Governance Documents with the applicable Secretary of State and/or other applicable authorities in its state of incorporation or formation in accordance with the applicable laws of its state of incorporation or formation, to the extent required for such New Corporate Governance Documents to become effective. After the Effective Date, Reorganized Ascena may amend and restate its formation, organizational, and constituent documents as permitted by the laws of its jurisdiction of formation and the terms of such documents.

J.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the terms of the current members of the board of directors of Ascena shall expire and the new directors and officers of Reorganized Ascena shall be appointed. The New Board will consist of seven (7) directors, including, subject to the terms of the New Corporate Governance Documents:

      a.   Carrie W. Teffner;

      b.   the Chief Executive Officer of Reorganized Ascena;

      c.   one (1) director determined by Bain Capital Credit, LP;

      d.   one (1) director determined by Monarch Alternative Capital LP;

      e.   one (1) director determined collectively by Bain Capital Credit, LP, Eaton Vance Management, Lion Point Capital, LP, and Monarch Alternative Capital LP; and

      f.   two (2) directors determined by the Backstop Parties.

The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing. To the extent any director or officer of Reorganized Ascena is an Insider, the nature of any compensation to be paid to such director or officer also will be disclosed.

K.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the New Boards, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary, appropriate, or desirable to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock and the Exit Facilities, in the name of and on behalf of Reorganized Ascena or the other Reorganized Debtors, as applicable, without the need for any approvals, authorization, or consents.

UST-1092

L.      *Exemption from Certain Taxes and Fees.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (a) the issuance, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

M.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions) of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than with respect to the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan and the Avoidance Action Waiver, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**  The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

25

UST-1093

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

N.      *D&O Liability Insurance Policies.*

On the Effective Date, pursuant to sections 105 and 365(a) of the Bankruptcy Code, the Reorganized Debtors shall be deemed to have assumed all of the D&O Liability Insurance Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all of the D&O Liability Insurance Policies.

After the Effective Date, none of the Debtors or the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies with respect to conduct occurring as of the Effective Date, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policies regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date, all in accordance with and subject in all respects to the terms and conditions of the D&O Liability Insurance Policies.

On and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

O.      *GUC Trust.*

On or prior to the Effective Date, the Debtors shall transfer the GUC Trust Assets to the GUC Trust and the Debtors and the GUC Trustee shall execute the GUC Trust Agreement and shall take all steps necessary to establish the GUC Trust in accordance with the Plan and the beneficial interests therein. In the event of any conflict between the terms of the Plan and the terms of the GUC Trust Agreement, the terms of the Plan shall govern. Additionally, on the Effective Date, the Debtors shall transfer and shall be deemed to transfer to the GUC Trust all of their rights, title, and interest in and to all of the GUC Trust Assets and, in accordance with section 1141 of the Bankruptcy Code, the GUC Trust Assets shall automatically vest in the GUC Trust free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax. The GUC Trustee shall be the exclusive administrator of the assets of the GUC Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representatives of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the GUC Trustee's duties under the GUC Trust Agreement. The GUC Trust shall be governed by the GUC Trust Agreement and administered by the GUC Trustee. The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this section. The GUC Trustee shall hold and distribute the GUC Trust Assets in accordance with the provisions of the Plan and the GUC Trust Agreement. Other rights and duties of the GUC Trustee shall be as set forth in the GUC Trust Agreement. After the Effective Date, the Debtors and the Reorganized Debtors shall have no interest in the GUC Trust Assets except as set forth in the Plan, the Confirmation Order, or the GUC Trust Agreement. For the avoidance of doubt, the claims and Causes of Action held by the Debtors or Reorganized Debtors in connection with the suit *Target Corp. et. al. v. Visa Inc. et al.*, case no. 1:13-cv-03477, currently pending in the U.S. District Court for the Southern District of New York, shall vest in and be controlled by the Reorganized Debtors notwithstanding the provisions of this Plan providing that future cash proceeds of such suit will be transferred to the GUC Trust (at which time (and not before) such proceeds shall vest in the GUC Trust); *provided* that the Reorganized Debtors shall provide reasonable information regarding the progress and status such suit to the GUC Trustee on a confidential basis upon reasonable request of the GUC Trustee.

UST-1094

GUC Trustee and GUC Trust Agreement. The GUC Trust Agreement will be filed with the Plan Supplement and generally will provide for, among other things: (i) the transfer of the GUC Trust Assets to the GUC Trust; (ii) the payment of certain reasonable expenses of the GUC Trust from the GUC Trust Assets; and (iii) distributions to holders of Allowed General Unsecured Claims, as provided herein and in the GUC Trust Agreement. For the avoidance of doubt, the GUC Trust Agreement also will identify: (a) the identity of the GUC Trustee; (b) who will select the GUC Trustee; (c) the terms of the GUC Trustee's engagement; (d) the identity of any parties who will supervise the fees of the GUC Trustee; and (e) whether the GUC Trustee shall be bonded. The GUC Trust Agreement may include reasonable and customary provisions that allow for indemnification by the GUC Trust. Any such indemnification shall be the sole responsibility of the GUC Trust and payable solely from the GUC Trust Assets. The GUC Trustee shall be responsible for all decisions and duties with respect to the GUC Trust and the GUC Trust Assets, except as otherwise provided in the Plan, the Confirmation Order, or the GUC Trust Agreement.

Cooperation of the Reorganized Debtors. Except as otherwise provided in the Plan, the Confirmation Order, or the GUC Trust Agreement, the Debtors or Reorganized Debtors, as applicable, upon reasonable notice, shall reasonably cooperate with the GUC Trustee in the administration of the GUC Trust, including by providing reasonable access to pertinent documents, including books and records, to the extent the Reorganized Debtors have such information and/or documents, to the GUC Trustee sufficient to enable the GUC Trustee to perform its duties hereunder. The Reorganized Debtors shall reasonably cooperate with the GUC Trustee in the administration of the GUC Trust, including by providing reasonable access to documents and current officers and directors with respect to contesting, settling, compromising, reconciling, and objecting to General Unsecured Claims; *provided* that, in each case, the GUC Trust agrees upon request to reimburse reasonable out-of-pocket expenses for preservation of documents, copying, or similar expenses. The collection, review, and preservation of documents for any investigation or litigation by the GUC Trustee shall be at the expense of the GUC Trust.

Preservation of Privilege. The Reorganized Debtors shall enter into a common interest agreement whereby the Reorganized Debtors will be able to share documents, information, or communications (whether written or oral) relating to the GUC Trust Assets. The GUC Trust shall seek to preserve and protect all applicable privileges attaching to any such documents, information, or communications. The GUC Trustee's receipt of such documents, information or communications shall not constitute a waiver of any privilege. All privileges shall remain in the control of the Debtors or the Reorganized Debtors and the Debtors or the Reorganized Debtors, as applicable, retain the right to waive their own privileges.

GUC Trust Fees and Expenses. From and after the Effective Date, the GUC Trustee, on behalf of the GUC Trust, shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the GUC Trust Fees and Expenses from the GUC Trust Assets. The GUC Trustee is authorized to allocate such expenses (including, without limitation, any taxes imposed on or payable by the GUC Trust or in respect of the GUC Trust Assets and professional fees) to, and pay them from, the GUC Trust Assets, as the GUC Trustee may determine in good faith is fair (such as based upon the GUC Trustee's good faith determination of the nature or purpose of the fee or expense, the relative amount of General Unsecured Claims, the relative estimated value of the GUC Trust Assets or such other matters as the GUC Trustee deems relevant); *provided* that the GUC Trustee (i) shall reasonably attribute the expenses (including, without limitation, any taxes imposed on or payable by the GUC Trust or in respect of the GUC Trust Assets and professional fees) of the liquidation, defense, or resolution of General Unsecured Claims to the GUC Trust Assets and pay them therefrom, and (ii) shall reasonably attribute the expenses (including, without limitation, any taxes imposed on or payable by the GUC Trust or in respect of the GUC Trust Assets and professional fees) of calculating, disseminating, and administering distributions (*e.g.*, accounting and mailing costs) on General Unsecured Claims to the GUC Trust Assets and pay them therefrom. The Reorganized Debtors shall not be responsible for any costs, fees, or expenses of the GUC Trust.

Tax Treatment. In furtherance of this Section of the Plan, (i) it is intended that the GUC Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of General Unsecured Claims, consistent with the terms of the Plan, and accordingly, all assets held by the GUC Trust are intended to be deemed for federal income tax purposes to have been distributed by the Debtors or Reorganized Debtors, as applicable, to the holders of Allowed General Unsecured Claims, and then contributed by the holders of Allowed General Unsecured Claims to the GUC Trust in exchange for their interest in the GUC Trust; (ii) the primary purpose of the GUC Trust

UST-1095

shall be the liquidation and distribution of the GUC Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including, without limitation, the Debtors, the Estates, holders of Allowed General Unsecured Claims receiving interests in the GUC Trust, and the GUC Trustee) shall report consistently with such treatment described in provisos (i) and (ii) of this paragraph; (iv) all parties (including, without limitation, the Debtors, the Estates, holders of Allowed General Unsecured Claims receiving interests in the GUC Trust, and the GUC Trustee) shall report consistently with the valuation of the GUC Trust Assets transferred to the GUC Trust as determined by the GUC Trustee (or its designee); (v) the GUC Trustee shall be responsible for filing all applicable tax returns for the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (vi) the GUC Trustee shall annually send to each holder of an interest in the GUC Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes.

Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC Trustee), the GUC Trustee may timely elect to (i) treat any portion of the GUC Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including, without limitation, the Debtors, the Estates, holders of Allowed General Unsecured Claims receiving interests in the GUC Trust, and the GUC Trustee) shall report for United States federal, state, and local income tax purposes consistently with the foregoing. Any taxes (including with respect to earned interest, if any) imposed on the GUC Trust as a result of this treatment shall be paid out of the assets of the GUC Trust (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). The GUC Trustee may request an expedited determination of taxes of the GUC Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the GUC Trust for all taxable periods through the dissolution of the GUC Trust.

The GUC Trust shall continue to have all of the rights and powers granted to the Reorganized Debtors as set forth in this Plan and applicable non-bankruptcy law, and the GUC Trustee shall also have the rights, powers, and obligations set forth in the GUC Trust Agreement.

Non-Transferability of GUC Trust Interests. Any and all GUC Trust Interests shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law. In addition, any and all GUC Trust Interests will not constitute "securities" and will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any such interests constitute "securities," the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer, issuance and distribution under the Plan of the GUC Trust Interests will be exempt from registration under the Securities Act and all applicable state and local securities laws and regulations.

Dissolution of the GUC Trust. The GUC Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, at such time as all distributions required to be made by the GUC Trustee under the Plan have been made. Upon dissolution of the GUC Trust, any remaining GUC Trust Assets shall be distributed to holders of Allowed General Unsecured Claims in accordance with the Plan and the GUC Trust Agreement, as appropriate.

Single Satisfaction of Allowed General Unsecured Claims. Notwithstanding anything to the contrary herein, in no event shall holders of Allowed General Unsecured Claims recover more than the full amount of their Allowed General Unsecured Claims from the GUC Trust.

P.      *Management Incentive Plan.*

On the Effective Date, the Reorganized Debtors will reserve New Common Stock representing (on a fully diluted and fully distributed basis) up to 10% of the New Common Stock exclusively for awards and distribution under the Management Incentive Plan, which will contain terms and conditions (including, without limitation, with respect to participants, form, allocation, structure, duration and timing and extent of issuance and vesting) as determined at the discretion of the New Board after the Effective Date.

UST-1096

Q.      *Employee Obligations.*

On and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall adopt, assume, continue, and/or honor in the ordinary course of business all obligations related to all Employee Benefits Programs (as agreed to be modified between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement, as applicable) and assume all employment agreements or letters, indemnification agreements, or other agreements entered into with current and former employees (as agreed to be modified between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement, as applicable) unless such employees agree to enter into new agreements on terms and conditions acceptable to the Reorganized Debtors, the Required Consenting Stakeholders and such employee. Notwithstanding the foregoing, no (x) compensation, post-employment, separation or retirement arrangement with any former Insider (as of the effective date of the Restructuring Support Agreement) or (y) non-qualified deferred compensation plan or supplemental retirement plan, solely to the extent any such plan would benefit any former Insider (as of the Effective Date), will be assumed on the Effective Date, in each case without the prior consent of the Required Consenting Stakeholders. Except as provided in the preceding sentence, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law. Further (A) the consummation of the Restructuring Transactions and occurrence of the Effective Date will not constitute a "change of control" for purposes of any Employee Benefits Programs or any employment agreements, letters, or other agreements entered into with current and former employees that are assumed pursuant hereto and (B) entitlements to or treatment with respect to any equity awards on or following the Effective Date will solely be governed by the Management Incentive Plan and any such terms relating to allocation or acceleration of equity awards set forth in any arrangements assumed hereunder will be void.

**Article V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be deemed assumed by the Reorganized Debtors, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease.

In the event of an unresolved dispute regarding (1) the amount of any Cure Claim, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (3) any other matter pertaining to assumption, assignment, or payments of any Cure Claims required

UST-1097

by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order(s) of the Bankruptcy Court. The Debtors or Reorganized Debtors, as applicable, reserve the right to reject any Executory Contract or Unexpired Lease upon the resolution of any cure disputes. If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Rejected Executory Contracts and Unexpired Leases Schedule, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date.

B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, the GUC Trust, or property of the foregoing parties, without the need for any objection by the Debtors, the Reorganized Debtors, or the GUC Trust, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity. Any such late-filed Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** To the extent an Entity holds both a late-filed Claim arising out of the rejection of the Executory Contract or Unexpired Lease and a liquidated, non-contingent Claim listed in the Schedules or a Proof of Claim, only such late-filed Claim shall be deemed fully satisfied, released, and discharged pursuant to this paragraph. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

Any Cure Obligations under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of monetary Cure Obligations, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, and payment or performance of all other Cure Obligations on or after the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of an unresolved dispute regarding (1) the amount of any Cure Claim, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (3) any other matter pertaining to assumption, assignment, or payment or performance of any Cure Obligations required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order(s) of the Bankruptcy Court.

To the extent reasonably practicable, at least 14 days before the Voting Deadline, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third parties. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Claims must be Filed by the Cure/Assumption Objection Deadline.** Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or proposed Cure Claim will be deemed to have assented to such assumption or assumption and assignment, and Cure Claim. To the extent that the Debtors seek to assume and assign an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule and such assignee will provide evidence of "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease. For the avoidance of doubt, with respect to any asserted non-monetary Cure Obligations, such non-monetary Cure Obligations may be cured (or resolved) by the assignee and the applicable counterparty in the ordinary course of business following the assumption and all parties reserve all rights with respect to any such asserted non-monetary Cure Obligations.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment or performance of the related Cure Obligations, shall result in the full release and

UST-1098

satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under such assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court upon the cure of all defaults under such Executory Contract or Unexpired Lease to the extent required under the Bankruptcy Code.

To the extent the Debtors propose any assumptions and assignments, as opposed to assumptions, of Unexpired Leases, Cure Notices shall include information sufficient to establish adequate assurance of future performance of the proposed assignee entity, a statement of the intended use and trade name to be used at the premises, a statement of retail experience including the number of stores, and a contact person. Cure Notices shall be served on the applicable landlord and its counsel by email (if known) at least fourteen (14) days prior to the deadline to object to such Cure Notice.

Notwithstanding anything to the contrary herein or in the Plan (including Article VIII thereof), no post-assumption obligations (including indemnification obligations, if any) arising as a result of or pursuant to the assumption or the assumption and assignment of any Unexpired Lease shall be deemed released, waived, or discharged.

D.      *Indemnification Obligations.*

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring Transactions on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date.

E.      *Insurance Policies.*

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Definitive Documents, the Exit Facility Documents, the Restructuring Documents, the Restructuring Support Agreement, the Schedule of Rejected Executory Contracts and Unexpired Leases, the Confirmation Order, any Cure Notice, any bar date notice or claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases): (a) each of the Insurance Policies are treated as Executory Contracts under the Plan; (b) on the Effective Date, the Reorganized Debtors shall be deemed to have assumed all Insurance Policies in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code; (c) nothing waives, releases, discharges or impairs in any respect any Insurance Policy and all debts, obligations, and liabilities of the Debtors (and, after the Effective Date, of the Reorganized Debtors) thereunder, whether arising before or after the Effective Date; (d) nothing alters, modifies, amends, affects, impairs or prejudices (1) the terms and conditions of (or the coverage provided by) any Insurance Policies or (2) the duty, if any, that the Insurers pay claims covered by such Insurance Policies and the right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor; (e) the Claims of the Insurers arising (whether before or after the Effective Date) under the Insurance Policies (1) shall be paid in full in the ordinary course of business by the Debtors (or, after the Effective Date, the Reorganized Debtors) regardless of whether such amounts are or shall become liquidated, due or paid before or after the Petition Date or the Effective Date, and (2) shall not be discharged or released by the Plan or the Confirmation Order or any other order of the Bankruptcy Court; (f) for the avoidance of doubt, Insurers shall not need to nor be required to file or serve any objection to a proposed cure amount or a request, application, Claim, Cure Claim, Proof of Claim, or motion for payment or allowance of any Administrative Claim and shall not be subject to any claims bar date, Cure Notice, Cure/Assumption Objection Deadline or similar deadline governing cure amounts, Cure Claims or Claims; and (g) the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set

31

UST-1099

forth in Article VIII of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit: (1) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable nonbankruptcy law to proceed with their claims; (2) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (C) all costs in relation to each of the foregoing; (3) the Insurers to collect from any or all of the collateral or security provided by or on behalf of the Debtors (or the Reorganized Debtors, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable) and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the applicable Insurance Policies, in such order as the applicable Insurer may determine; and (4) the Insurers to cancel any Insurance Policies, and take other actions relating to the Insurance Policies (including effectuating a setoff), to the extent permissible under applicable nonbankruptcy law, and in accordance with the terms of the Insurance Policies.

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease as of the date of its assumption, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder.

H.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Executory Contract or Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and/or Unexpired Leases assumed by such Debtor, will be performed by the applicable Reorganized Debtor in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that have not been rejected under the Plan will survive and remain unaffected by entry of the Confirmation Order, except as provided therein.

UST-1100

## Article VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A. *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Interest (or such holder's Affiliate) shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B. *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1. Delivery of Distributions.

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims, except as otherwise provided in this Article VI, or Interests shall be made to holders of record as of the Distribution Record Date by the Reorganized Debtors or the GUC Trust, as applicable: (1) to the signatory set forth on any of the Proof of Claim Filed by such holder or its representative identified therein (or at the last known addresses of such holder if no Proof of Claim is Filed or if the Debtors or the GUC Trust have been notified in writing of a change of address); (2) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the GUC Trust after the date of any related Proof of Claim; (3) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors or the GUC Trust have not received a written notice of a change of address; or (4) on any counsel that has appeared in the Chapter 11 Cases on such holder's behalf. Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, the GUC Trust, and the GUC Trustee shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

2. No Fractional Distributions.

No fractional shares of New Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional shares. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

3. Minimum Distributions.

Except for Allowed Administrative Claims paid in the ordinary course of business, holders of Allowed Claims entitled to distributions of $50 or less shall not receive distributions, and each such Claim shall be discharged pursuant to Article VIII and its holder is forever barred pursuant to Article VIII from asserting that Claim against the Reorganized Debtors or the GUC Trust or their property, as applicable.

UST-1101

4. <u>Undeliverable Distributions and Unclaimed Property.</u>

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Reorganized Debtors or the GUC Trust, as applicable, have determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the applicable Reorganized Debtors or the GUC Trust (in the case of distributions from the GUC Trust Assets) without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder to such property or Interest in property shall be discharged and forever barred.

C.      *Securities Registration Exemption.*

The shares of New Common Stock are or may be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

The offer, issuance, and distribution of the New Common Stock pursuant to the Plan shall be exempt (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code), pursuant to section 1145 of the Bankruptcy Code, without further act or action, from registration under (i) the Securities Act, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of securities. Each of the foregoing securities (a) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (b) is freely tradable and transferable by any initial recipient thereof that (i) at the time of transfer, is not an "affiliate" of the Reorganized Ascena as defined in Rule 144(a)(1) under the Securities Act and has not been such an "affiliate" within 90 days of such transfer, and (ii) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code, subject in each case to any restrictions on the transferability of the New Common Stock contained in the New Corporate Governance Documents and any applicable regulatory approval.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock or under applicable securities laws. DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

D.      *Tax Issues and Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors, the GUC Trust, the Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors, the Reorganized Debtors, and the GUC Trust reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

E.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

UST-1102

F.      *No Interest.*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

G.      *Setoffs and Recoupment.*

The Debtors, the Reorganized Debtors, or the GUC Trust, as applicable, may, but shall not be required to, set off against or recoup any payments or distributions to be made pursuant to the Plan in respect of any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the claimant (other than any Claims released under the Plan), but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized Debtors, or the GUC Trust, as applicable, of any such Claim it may have against the holder of such Claim.

Notwithstanding anything to the contrary in the Plan, the Restructuring Support Agreement, the Plan Supplement, or any other documents related to any of the foregoing, nothing shall modify the rights, if any, of any holder of Claims or any current or former party to an Executory Contract, whether currently or previously executory, or an Unexpired Lease, to assert any right of setoff or recoupment that such party may have under applicable bankruptcy or non-bankruptcy law (including the express assertion of such setoff or recoupment through a timely filed Proof of Claim), including, but not limited to: (i) the ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their Unexpired Lease(s) with the Debtors, or any successors to the Debtors, under the Plan; (ii) assertion of rights of setoff or recoupment, if any, in connection with Claims reconciliation; or (iii) assertion of setoff or recoupment as a defense, if any, to any claim or action by the Debtors, Reorganized Debtors, or any representative or successor of the Debtors or Reorganized Debtors.  The Debtors' rights with respect thereto are expressly reserved.

H.      *Claims Paid or Payable by Third Parties.*

1.      Claims Paid by Third Parties.

To the extent that the holder of an Allowed Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor or the GUC Trust, such Claim shall be Disallowed without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor, or the GUC Trust on account of such Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor, Reorganized Debtor, or the GUC Trust to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Claim that is payable pursuant to one of the Insurance Policies until the holder of such Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Insurers agrees to pay in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' agreement, the applicable

UST-1103

portion of such Claim may be expunged to the extent of any agreed upon payment without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

        3.     <u>Applicability of Insurance Policies.</u>

Except as otherwise provided in the Plan, distributions to holders of Claims covered by Insurance Policies shall be in accordance with the provisions of any applicable Insurance Policy. Notwithstanding anything herein to the contrary (including, without limitation, Article VIII), nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including Insurers under any Insurance Policies or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

## Article VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

    *A.*    *Allowance of Claims.*

After the Effective Date, each of the Reorganized Debtors or the GUC Trust, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

    *B.*    *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the GUC Trust shall have the sole authority to File and prosecute objections to Class 5 General Unsecured Claims, and the GUC Trust shall have the sole authority to (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all such Claims; (2) settle, compromise, or resolve any Disputed Claim held by a Class 5 General Unsecured Claim Holder without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. Written consent of the GUC Trustee is required for any settlement by the Reorganized Debtors that proposes or would result in an Allowed Class 5 General Unsecured Claim.

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to File and prosecute objections to all other Claims, and the Reorganized Debtors shall have the sole authority to (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all other such Claims, regardless of whether such Claims are in a Class or otherwise (except Class 5 General Unsecured Claims); (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

On and after the Effective Date, the Reorganized Debtors and the GUC Trust will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise. The Debtors and Reorganized Debtors, as applicable, and the GUC Trustee shall cooperate in good faith, including providing a reasonable amount of notice of not less than seven (7) days before the filing of any objection seeking to convert or reclassify Claims into General Unsecured Claims, or seeking to convert or reclassify General Unsecured Claims into other Claims, and, in each case, the rights and defenses of the Debtors, the Reorganized Debtors, or the GUC Trust, as applicable, to any such objections are fully preserved.

UST-1104

C.    *Estimation of Claims.*

Before, on, or after the Effective Date, the Debtors, the Reorganized Debtors, or the GUC Trust, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors, the Reorganized Debtors, or the GUC Trust may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.    *Adjustment to Claims Register Without Objection.*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, the Reorganized Debtors, or the GUC Trust without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.    *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

F.    *Disallowance of Claims.*

Unless the Avoidance Action Waiver applies, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.  All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors or the GUC Trust, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G.    *Amendments to Claims.*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors or the GUC Trust, as applicable, and any such new or amended Claim

UST-1105

Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

H.     *No Distributions Pending Allowance.*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors or the GUC Trust, as applicable.

I.     *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the holder of such Claim the distribution to which such holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided herein.

## Article VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.     *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any such Claim or Interest, or any distribution to be made on account of any Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors or the GUC Trust, as applicable, may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.     *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action against any Debtor of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Causes of Action accrued before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. Unless expressly

UST-1106

provided in the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.    *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

D.    *Release of Liens.*

**Except as otherwise specifically provided in the Plan, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or Reorganized Debtors.  The ABL Agent and the Term Loan Agent shall execute and deliver all documents reasonably requested by the Reorganized Debtors or the agent(s) under the Exit Facilities to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

E.    *Debtor Release.*

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim, Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or any other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the ABL Credit Facility, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP ABL Facility, the DIP Term Loan Facility, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Effective Date.**

UST-1107

F.      *Release by holders of Claims or Interests.*

        Effective as of the Effective Date, each Releasing Party (other than the Debtors and Reorganized Debtors), in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim, Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and each other Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Effective Date.

G.      *Exculpation.*

        Notwithstanding anything contained in the Plan to the contrary, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action or any claim arising from the Petition Date through the Effective Date related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Exit Facilities, the Backstop Commitment Letter, the DIP Financing Order, Cash Collateral Order, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

UST-1108

H.     *Injunction.*

**Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests or Causes of Action that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Reorganized Debtors, the GUC Trust, the GUC Trust Assets, or the GUC Trust, or the other Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action released or settled or subject to exculpation pursuant to the Plan.**

I.     *Protection Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

J.     *Governmental Units.*

For the avoidance of doubt, nothing in the Plan shall discharge, release, preclude, or enjoin: (i) any liability to any Governmental Unit that is not a Claim; (ii) any Claim of a Governmental Unit arising on or after the Effective Date; (iii) any police or regulatory liability to a Governmental Unit on the part of any Entity as the owner or operator of property after the Effective Date; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors.  Nor shall anything in the Plan enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence.  Nothing in the Plan shall divest any tribunal of any jurisdiction it may have to adjudicate any defense based on this paragraph.

K.     *Recoupment.*

In no event shall any holder of a Claim be entitled to recoup against such Claim any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors or the GUC Trust, as applicable, unless such holder actually has provided notice of such recoupment in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

L.     *Subordination Rights.*

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other holder and shall not be subject to levy, garnishment, attachment, or other legal process by any holder by reason of claimed contractual subordination rights.  Any such subordination rights shall be waived, and the

UST-1109

Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

## Article IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Effective Date.*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.B hereof):

1.    The Bankruptcy Court shall have entered the Confirmation Order, which shall:

    a.    be in form and substance consistent with the Restructuring Support Agreement and the Global Settlement;

    b.    authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

    c.    decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

    d.    authorize the Debtors, as applicable/necessary, to:  (a) implement the Restructuring Transactions; (b) issue the New Common Stock pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (c) make all distributions and issuances as required under the Plan, including cash and the New Common Stock; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Exit Facilities;

    e.    authorize the implementation of the Plan in accordance with its terms; and

    f.    provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

2.    the final version of all schedules, documents, and exhibits contained in the Plan Supplement shall have been filed and be consistent in all material respects with the Restructuring Support Agreement and the Plan;

3.    the Restructuring Support Agreement shall remain in full force and effect and shall not be terminated;

4.    the documentation related to the Exit Facilities shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Facilities shall have been satisfied or duly waived in writing in accordance with the terms of the applicable Exit Facility Documents and the closing of the Exit Facilities shall have occurred;

5.    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions;

42

UST-1110

6. the GUC Trust Agreement shall be executed and the GUC Trust Assets in existence on the Effective Date shall be transferred to the GUC Trust;

7. all actions, documents, certificates, and agreements necessary to implement the Plan (including any documents contained in the Plan Supplement) shall have been performed or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units, in accordance with applicable laws;

8. all Professional Fee Claims shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed into the Professional Fee Escrow Account pending the Bankruptcy Court's approval thereof;

9. the DIP ABL Facility Claims and ABL Claims shall have been Paid in Full or otherwise satisfied in accordance with Articles II.B and III.B.3 of the Plan (as applicable);

10. all fees, expenses, and other amounts payable pursuant to the DIP Financing Order shall have been paid in full;

11. all professional fees and expenses of the advisors to the Ad Hoc Group shall have been paid in full in accordance with the Restructuring Support Agreement; and

12. the Debtors shall have implemented the Restructuring Transactions in a manner consistent with the Restructuring Support Agreement and this Plan.

B.     *Waiver of Conditions.*

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article IX (other than the conditions set forth in Article IX.A.8) may be waived only by consent of the Debtors and the Required Consenting Stakeholders without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided* that the provisions of this Article IX relating to the DIP ABL Facility and the ABL Facility may be waived only by consent of the Debtors, the Required Consenting Stakeholders, the DIP ABL Agent, and the ABL Agent without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided further* that the provisions of this Article IX relating to the Global Settlement may be waived only with the consent of the Debtors and the Creditors' Committee.

C.     *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

D.     *Effect of Nonoccurrence of Conditions to the Effective Date.*

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims or Interests; (2) prejudice in any manner the rights of the Debtors, any holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders, or any other Entity in any respect; *provided* that all provisions of the Restructuring Support Agreement that survive termination of that agreement shall remain in effect in accordance with the terms thereof.

UST-1111

**Article X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

A.      *Modification and Amendments.*

The Debtors reserve the right, subject to the terms of the Restructuring Support Agreement and the Global Settlement, to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors expressly reserve their rights, subject to the terms of the Restructuring Support Agreement, to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan.*

The Debtors reserve the right, subject to the terms of the Restructuring Support Agreement and the Creditors' Committee's consent regarding the Global Settlement, to revoke or withdraw the Plan before the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the holders of Claims; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

**Article XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of or related to the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.      Resolve any matters related to:  (a) the assumption or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims and Claims related to the rejection of an Executory Contract or Unexpired Lease, pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory

44

UST-1112

Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.     Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.     Adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.     Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.     Adjudicate, decide, or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

8.     Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.     Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.H hereof;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16.     Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     Determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     Hear and determine all disputes involving the Restructuring Support Agreement or the Exit Facilities;

UST-1113

20.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     Hear and determine all disputes involving the existence, nature, or scope of the exculpation and release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

22.     Enforce all orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

23.     Hear any other matter not inconsistent with the Bankruptcy Code;

24.     Enter an order closing the Chapter 11 Cases; and

25.     Enforce the injunction, release, and exculpation provisions provided in Article VIII hereof.

### Article XII.
### MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

B.     *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, all holders of Claims and Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Statutory Fees and Reporting Requirements.*

The Debtors shall pay any outstanding U.S. Trustee Fees, pursuant to section 1930(a) of the Judicial Code, in full on the Effective Date, and the Debtors and/or Reorganized Debtors shall continue to pay such fees until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

The Debtors shall continue complying with monthly reporting requirements through the Effective Date as required under the Local Bankruptcy Rules. After the Effective Date, the Reorganized Debtors shall file quarterly reports consistent with Local Bankruptcy Rule 2015-(a)-1. The GUC Trustee also shall file quarterly fee reports detailing receipts and distributions from the GUC Trust for informational purposes only, in a form similar to the information provided by the Reorganized Debtors. For the avoidance of doubt, the GUC Trust shall not be responsible for paying post-Effective Date U.S. Trustee Fees. The Reorganized Debtors shall no longer have the obligation to file quarterly reports with respect to a Debtor once such Debtor's case is converted or dismissed or a final decree has been entered by the Court. The GUC Trust shall no longer have the obligation to file quarterly reports once each of the Chapter 11 Cases is converted or dismissed or a final decree has been entered by the Court.

46

UST-1114

D. *Dissolution of the Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.

E. *Reservation of Rights.*

Before the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to any Claims or Interests.

F. *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G. *Service of Documents.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Ascena Retail Group, Inc.<br>933 MacArthur Boulevard<br>Mahwah, New Jersey 07430<br>Attn.: Michael Veitenheimer | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Attn.: Steven N. Serajeddini<br><br>and<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn.: John R. Luze, Jeff Michalik<br><br>and<br><br>Cooley LLP<br>1299 Pennsylvania Avenue, NW, Suite 700<br>Washington, DC 20004-2400<br>Attn.: Cullen D. Speckhart, Olya Antle |
| **United States Trustee** | **Counsel to the Ad Hoc Group** |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 | Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001-2163<br>Attn.: Evan Fleck, Abigail Debold |

UST-1115

After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to parties in interest providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such party must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.     *Entire Agreement.*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.     *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://www.cases.primeclerk.com/ascena or the Bankruptcy Court's website at www.vaeb.uscourts.gov.

J.     *Nonseverability of Plan Provisions.*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

K.     *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law (including the Securities Act), rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

L.     *Waiver or Estoppel.*

Each holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

UST-1116

Respectfully submitted, as of the date first set forth above,

Dated: September 10, 2020

Ascena Retail Group, Inc. (on behalf of itself and all other Debtors)

By: _/s/ Carrie W. Teffner_

Name:  Carrie W. Teffner

Title:  Interim Executive Chair, Ascena Retail Group, Inc.

49

UST-1117

**Exhibit B-1**

**Restructuring Support Agreement**

UST-1118

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 13.03, this "**Agreement**") is made and entered into as of July 23, 2020 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) and (ii) of this preamble, collectively, the "**Parties**"):[1]

i.    Ascena Retail Group, Inc. a company incorporated under the Laws of the State of Delaware ("**Ascena Topco**"), and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**"); and

ii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting Stakeholders**").

### *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the Restructuring Term Sheet (such transactions as described in this Agreement, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**");

**WHEREAS**, certain of the Consenting Stakeholders or their affiliates that are parties to that certain Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Facility

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings given to them in Section 1 of this Agreement or the Restructuring Term Sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**").

UST-1119

Backstop Commitment Letter attached as **Exhibit C** hereto (the "**Backstop Commitment Letter**") have agreed to provide the DIP Term Loans on the terms set forth in the Backstop Commitment Letter;

WHEREAS, the DIP Term Loans will be converted into loans under the First Out Exit Term Loan Facility on the Plan Effective Date on the terms set forth in the Restructuring Term Sheet and that certain exit facility term sheet attached as **Exhibit D** hereto (the "**Exit Facility Term Sheet**"); and

WHEREAS, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Plan;

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.** *Definitions and Interpretation*.

1.01. Definitions. The following terms shall have the following definitions:

"**ABL Claims**" means any Claims arising under, related to, or on account of the ABL Credit Agreement.

"**ABL Credit Agreement**" means that certain Amended and Restated Credit Agreement dated as of January 3, 2011, as amended and restated by the Second Restatement Agreement dated as of June 14, 2012, by the Third Restatement Agreement dated as of March 13, 2013, by the Fourth Restatement Agreement dated as of July 24, 2015, by the Fifth Amendment and Restatement Agreement dated as of February 27, 2018 and as may otherwise be amended, restated, supplemented or otherwise modified, among Ascena TopCo, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto, the issuing banks party thereto, and JPMorgan Chase Bank, N.A., as administrative agent and swingline lender.

"**Agent**" or "**Agents**" means, individually or collectively, any administrative agent, collateral agent, or similar Entity under the ABL Credit Agreement and/or the Term Credit Agreement, including any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 13.03 (including the Restructuring Term Sheet, the Exit Facility Term Sheet and the Backstop Commitment Letter).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

UST-1120

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Ascena Topco**" has the meaning set forth in the preamble to this Agreement.

"**Backstop Commitment Letter**" has the meaning set forth in the preamble to this Agreement.

"**Bankruptcy Code**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cash Collateral Order**" means any order of the Bankruptcy Court granting the authorization to use cash collateral on an interim basis on terms acceptable to the Company Parties and the Required Consenting Stakeholders.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning given to it in section 101(5) of the Bankruptcy Code with respect to a Debtor.

"**Company Claims/Interests**" means any Claim or Equity Interest, including the ABL Claims, the Term Loan Claims, the DIP ABL Facility Claims, the Backstop Commitments, and the DIP Term Facility Claims.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

UST-1121

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**DIP Financing Order**" means the order entered by the Bankruptcy Court setting forth the terms of and approving the DIP ABL Facility, the DIP Term Facility, and the Backstop Commitment Letter on terms acceptable to the Company Parties and the Majority Backstop Commitment Parties (as defined in the Backstop Commitment Letter).

"**Disclosed Interests**" has the meaning set forth in Section 9(a).

"**Disclosure Statement**" means the disclosure statement with respect to the Plan.

"**Disclosure Statement Order**" means the order entered by the Bankruptcy Court approving the Disclosure Statement

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" or "**Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file upon the commencement of the Chapter 11 Cases.

"**Greenhill**" means Greenhill & Co., LLC, as financial advisor to the Lender Group.

"**Initial Consenting Stakeholders**" means Consenting Stakeholders that have that have executed and delivered counterpart signature pages to this Agreement to counsel to the Company Parties as of the Execution Date.

"**Insider**" has the meaning set forth in section 101(31) of the Bankruptcy Code.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit E**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

UST-1122

"**Lender Group**" means the ad hoc group or committee of Consenting Stakeholders represented by Greenhill and Milbank.

"**Loyens**" means Loyens & Loeff Luxembourg S.à.r.l., as Luxembourg counsel to the Lender Group.

"**LuxCo Entities**" means, collectively, AnnTaylor Loft GP Lux S.à.r.l. and AnnTaylor Loft Borrower Lux SCS.

"**Milbank**" means Milbank LLP, as counsel to the Lender Group.

"**New Corporate Governance Documents**" means the form of certificate or articles of incorporation, bylaws, limited liability company agreement, partnership agreement, or such other applicable formation documents (if any) of Reorganized Ascena, including any certificates of designation, each of which shall be included in the Plan Supplement.

"**Outside Date**" means the date that is six (6) months after the Petition Date.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the chapter 11 plan of reorganization to be filed by the Debtors in the Chapter 11 Cases consistent with this Agreement and the Restructuring Term Sheet and otherwise as reasonably acceptable to the Company Parties and the Required Consenting Stakeholders, including any and all exhibits annexes and schedules thereto.

"**Plan Effective Date**" means the date of the occurrence of the "Effective Date" of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Post-Emergence Incentive Plan Documents**" means all documentation with respect to any post-emergence management incentive plan, including the Management Incentive Plan, which, for the avoidance of doubt, does not include the Employee Benefits Programs (as defined in the Restructuring Term Sheet).

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

UST-1123

"**Rent Deferral Motion**" means a motion seeking an order from the Bankruptcy Court extending the time for performance of the Debtors' obligations arising under unexpired non-residential real property leases to the date that is at least sixty (60) days after the Petition Date.

"**Reorganized Ascena**" means either (a) Ascena Topco, or any successor thereto, as reorganized pursuant to and under the Plan or (b) a new corporation or limited liability company that may be formed or caused to be formed by the Debtors to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Common Stock to be distributed or sold pursuant to the Plan.

"**Required Consenting Stakeholders**" means, as of the relevant date, Initial Consenting Stakeholders holding at least 50.01% of the aggregate outstanding principal amount of the Term Loan Claims that are held by the Initial Consenting Stakeholders.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means any materials related to the solicitation of votes for the Plan pursuant to sections 1123, 1126, and 1143 of the Bankruptcy Code.

"**Term Loan Claims**" means any Claims arising under, related to, or on account of the Term Loan Credit Agreement.

"**Term Loan Credit Agreement**" means the Term Credit Agreement, dated as of August 21, 2015, as it may be amended, restated, supplemented or otherwise modified, among Ascena TopCo, AnnTaylor Retail, Inc., the lenders party thereto, and Goldman Sachs Bank USA, as administrative agent.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, 11.04 or 11.05.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit F**.

"**Whiteford Taylor**" means Whiteford, Taylor & Preston LLP, as local counsel to the Lender Group.

1.02.   Interpretation.  For purposes of this Agreement:

UST-1124

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)    the use of "include" or "including" is without limitation, whether stated or not; and

(j)    the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 13.11 other than counsel to the Company Parties.

**Section 2.** *Effectiveness of this Agreement*. This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)    each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

UST-1125

(b)     holders of at least two-thirds of the aggregate outstanding principal amount of the Term Loan Claims shall have executed and delivered counterpart signature pages of this Agreement; and

(c)     counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 13.11 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred, which notice shall be promptly following the occurrence of such other conditions.

**Section 3.     *Definitive Documents*.**

3.01.     The Definitive Documents governing the Restructuring Transactions shall include the following:  (A) the Plan; (B) the Confirmation Order; (C) the Disclosure Statement; (D) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (E) the Plan Supplement; (F) the Cash Collateral Order; (G) the DIP Financing Order; (H) the Exit Facility Documents; (I) the New Corporate Governance Documents; (J) the Post-Emergence Incentive Plan Documents; (K) any new employee incentive plan or employee retention plan entered into by the Company Parties after the Agreement Effective Date; (L) any new material employment, consulting, or similar agreements entered into by the Company Parties after the Agreement Effective Date; (M) any disclosure documents related to the issuance of the New Common Stock; and (N) all material pleadings filed by the Company Parties in connection with the Chapter 11 Cases (or related orders), including the First Day Pleadings and all orders sought pursuant thereto.

3.02.     The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12.  Further, subject to and without limiting any additional consent or approval rights of the Parties specified elsewhere in this Agreement, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders; *provided* that the New Corporate Governance Documents and Post-Emergence Incentive Plan Documents shall be acceptable to the Required Consenting Stakeholders and reasonably acceptable to the Company Parties.

**Section 4.     *Commitments of the Consenting Stakeholders*.**

4.01.     <u>General Commitments, Forbearances, and Waivers</u>.

(a)     During the Agreement Effective Period, subject to Section 4.03 of this Agreement, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, to:

(i)     support the Restructuring Transactions as contemplated by this Agreement and use commercially reasonable efforts to vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or

UST-1126

approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)     support use of cash collateral by the Debtors during the pendency of the Chapter 11 Cases on the terms set forth in the Cash Collateral Order or the DIP Financing Order;

(iii)     support entry into the DIP ABL Facility on the terms set forth in the ABL Commitment Letter;

(iv)     support entry into the DIP Term Facility on the terms set forth in the Backstop Commitment Letter and take all other applicable actions required by the Backstop Commitment Letter, including the funding of any backstop commitments on the terms set forth therein;

(v)     support entry into the Exit Facilities on the terms set forth in the Exit Facility Term Sheet and take all other applicable actions required by the Exit Facility Term Sheet;

(vi)     use commercially reasonable efforts to cooperate with the Company Parties, subject to applicable Laws and at the Company Parties' sole cost and expense, in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(vii)     give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions; and

(viii)     negotiate in good faith and use commercially reasonable efforts to execute and implement, as applicable, the Definitive Documents that are consistent with this Agreement to which it is required to be a party or for which its consent is required.

(b)     During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action that is reasonably likely to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)     object to, delay, impede, or take any other action that is reasonably likely to interfere with use of cash collateral by the Debtors during the pendency of the Chapter 11 Cases on the terms set forth in the Cash Collateral Order, entry into or performance under the DIP ABL Facility on the terms set forth in the ABL Commitment Letter, or entry into, performance under, or syndication of the DIP Term Facility on the terms set forth in the Backstop Commitment Letter;

(iii)     propose, file, support, solicit, or vote for any Alternative Restructuring Proposal; *provided*, for the avoidance of doubt, that nothing in this Section 4.01(b)(iii) shall limit the consultation and approval rights of Consenting Stakeholders set forth in Section 6.01(k) of this Agreement; *provided*, *further*, that a Consenting Stakeholder may propose an Alternative Restructuring Proposal to the Company Parties in connection with Section 6.01(k) of this Agreement if such Consenting Stakeholder provides notice of its intent to propose such Alternative

UST-1127

Restructuring Proposal (including the terms thereof) to each Initial Consenting Stakeholder at least five (5) Business Days in advance of such proposal;

(iv)     file or have filed on its behalf any motion, pleading, or other document (including any modifications or amendments thereof) with the Bankruptcy Court or any other court that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(v)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind against any Company Party or the other Parties in violation of this Agreement with respect to the Chapter 11 Cases, this Agreement, or the Restructuring Transactions other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; *provided* that any Consenting Stakeholder may file motions, pleadings or other documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) with respect to its or their rights under any Definitive Document and relating to or arising from matters and rights not specifically set forth in this Agreement, including the Restructuring Term Sheet;

(vi)     exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Claim or Interest; or

(vii)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay under section 362 of the Bankruptcy Code.

4.02.   Commitments with Respect to Chapter 11 Cases.

(a)     During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder of the Solicitation Materials, whether before or after the commencement of the Chapter 11 Cases:

(i)     vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)     to the extent it is permitted to elect whether to opt out of any of the releases set forth in the Plan, elect not to opt out of such releases by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)     not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above; *provided* that nothing in this Agreement shall prevent any Consenting Stakeholder from changing, withholding, amending, or revoking (or causing the same) its vote, election, or consent with respect to the Plan if this Agreement has been terminated in accordance with its terms.

(b)     During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action in violation of this Agreement reasonably likely to interfere

UST-1128

with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

4.03.  Notwithstanding the foregoing, nothing in this Agreement shall:  (a) require any Consenting Stakeholder to incur any expenses, liabilities or other obligations that are not expressly subject to reimbursement by the Company Parties pursuant to this Agreement, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities, or other obligations to any Consenting Stakeholder or its Affiliates that such Consenting Stakeholder reasonably believes may not be reimbursed by the Company Parties pursuant to this Agreement; (b) require any Consenting Stakeholder to provide any information that it reasonably determines to be sensitive or confidential; *provided* that, for the avoidance of doubt, each Consenting Stakeholder shall include its holdings on its signature page to this Agreement, which signature page will be delivered to (i) other Consenting Stakeholders in a redacted form that removes such Consenting Stakeholder's holdings and (ii) the Company Parties and Milbank in an unredacted form (to be hold by the Company Parties on a confidential basis and by Milbank on a professionals' eyes only basis); or (c) limit the right of any Party to exercise any right or remedy provided under this Agreement, the Confirmation Order, or any other Definitive Document.  Notwithstanding the immediately preceding sentence, nothing in this Section 4.03 shall serve to limit, alter, or modify any Consenting Stakeholder's express obligations under the terms of this Agreement.

**Section 5.**    *Additional Provisions Regarding the Consenting Stakeholders' Commitments*. Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (c) prevent any Consenting Stakeholder from enforcing this Agreement or from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 6.**    *Commitments of the Company Parties*.

6.01.  <u>Affirmative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a)  support and take all steps reasonably necessary or desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)  support and take all steps reasonably necessary and desirable to obtain entry of the Cash Collateral Order, the DIP Financing Order, the Disclosure Statement Order, and the Confirmation Order;

(c)  to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, take all steps reasonably necessary or desirable to address any such impediment;

UST-1129

(d)     use commercially reasonable efforts to obtain any and all required governmental, regulatory and/or third-party approvals for the Restructuring Transactions;

(e)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(f)     use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(g)     (i) to the extent reasonably practicable, provide counsel to the Consenting Stakeholders draft copies of (x) all First Day Pleadings three (3) Business Days in advance of the Petition Date and (y) any other motions, documents and other pleadings materially affecting any Consenting Stakeholders that the Company Parties intend to file with the Bankruptcy Court, as applicable, three (3) Business Days in advance of the filing thereof and, (ii) without limiting any approval rights set forth in this Agreement, consult in good faith with counsel to the Consenting Stakeholders regarding any comments to draft copies provided pursuant to sub-clause (i);

(h)     pay in full and in cash all of the accrued reasonable and documented fees, costs, and expenses of the professionals and other advisors retained by the Lender Group, including such fees, costs, and expenses of (i) Greenhill, (ii) Milbank, (iii) Whiteford Taylor, and (iv) Loyens, and continue to pay such amounts as they come due and seek to pay such ongoing fees, costs, and expenses in connection with the Cash Collateral Order, DIP Financing Order, or other such appropriate order;

(i)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases, or (iv) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Term Loan Claims, or asserting any other cause of action against and/or with respect or relating to such Term Loan Claims or the prepetition liens securing such Term Loan Claims;

(j)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(k)     (i) solicit, consider, respond to, and facilitate Alternative Restructuring Proposals in consultation with the Required Consenting Stakeholders and (ii) pursue a Alternative Restructuring Proposal if (A) the Required Consenting Stakeholders determine that such Alternative Restructuring Proposal is a higher or better transaction than the Restructuring Transactions and (B) the Alternative Restructuring Proposal is implemented under, or without modification to the Company Parties' and the Required Consenting Stakeholders' obligations under this Agreement to pursue and implement, a Plan as modified to implement or allow for such Alternative Restructuring Proposal; *provided* that the structure of such Alternative Restructuring Proposal will not preclude any Initial Consenting Stakeholder from participating in such

UST-1130

Alternative Restructuring Proposal on a pro rata basis on substantially the same terms as any other Initial Consenting Stakeholder; and

(l)　　reasonably consult with the Required Consenting Stakeholders regarding (i) the assumption or rejection of any executory contracts or unexpired leases, (ii) entry into any agreement, settlement, or other arrangement with any of the landlords under the Debtors' unexpired leases waiving, deferring, or modifying the rent payments or rent structure under such leases, and (iii) any payments of prepetition Claims (including Claims pursuant to section 503(b)(9) of the Bankruptcy Code and lien Claims) of or agreements with the Company Parties' vendors and provide notice and reasonably acceptable reporting to Milbank and Greenhill regarding any of the foregoing actions, which consultation and reporting shall include weekly calls regarding the status of the actions described in this Section 6.01(l) among the relevant employees, advisors and consultants of the Company Parties, Milbank, Greenhill and one or more Initial Consenting Stakeholders.

6.02.　_Negative Commitments_.  Except as set forth in Section 7 or with the prior written consent of the Required Consenting Stakeholders, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly, and shall cause their respective subsidiaries not to:

(a)　　object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)　　take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions or the Plan;

(c)　　modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in any material respect;

(d)　　file any motion, pleading, or Definitive Documents (including any modifications or amendments thereof) with the Bankruptcy Court or any other court that, in whole or in part, is not materially consistent with this Agreement (including the consent rights of the Consenting Stakeholders set forth in in this Agreement as to the form and substance of such motion, pleading, or other Definitive Document) or the Plan;

(e)　　except with respect to any transaction contemplated by the First Day Motions (on the terms set forth in such First Day Motion and any agreement or form of agreement attached thereto) or otherwise consented to in writing by the Initial Consenting Stakeholders prior to the Agreement Effective Date: (i) sell (including any sale leaseback transaction), lease, mortgage, pledge, grant, or incur any encumbrance on, or otherwise Transfer, any material properties or material assets of the Company Parties, including any Equity Interests, other than in the ordinary course of business; (ii) purchase, lease, or otherwise acquire (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) any material assets or material properties, other than in the ordinary course of business; or (iii) commence any liquidation or wind down process with respect to any of the Company Parties' businesses or enter into any agreement or arrangement, or modification to any agreement or arrangement, in connection therewith;

13

UST-1131

(f)        (i) enter into or amend, adopt, restate, supplement, or otherwise modify any employee benefit, deferred compensation, incentive, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans or agreements, including offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements with or for the benefit of any of its employees that are a senior vice president or more senior, (ii) increase the base salary, target bonus opportunity, or other benefits payable by the Company Parties or to any of their executive officers, or (iii) make any payment to any former Insider (as of the Agreement Effective Date) of any post-employment, retirement or similar plan or program, severance agreement, or similar arrangement;

(g)        assume, assume and assign, or reject executory contracts or unexpired leases; *provided* that the consent of the Required Consenting Stakeholders shall not be unreasonably withheld; *provided*, *further*, that the Company Parties shall provide four (4) Business Days' prior written notice of any assumption, assumption and assignment, or rejection of any executory contract or unexpired lease, which notice shall include the analysis underlying the Company Parties' decision to assume, assume and assign, or reject such executory contract or unexpired lease, including adequate information supporting such analysis and decision, and, absent written notification during that period from Milbank or Greenhill to the Company Parties that the Required Consenting Stakeholders do not consent, the Required Consenting Stakeholders shall be deemed to have consented to any such assumption, assumption and assignment, or rejection;

(h)        enter in any agreement, settlement, or other arrangement with any of the landlords under the Debtors' leases waiving, deferring, or modifying the rent payments or rent structure under such leases; *provided* that the consent of the Required Consenting Stakeholders shall not be unreasonably withheld; *provided*, *further*, that the Company Parties shall provide four (4) Business Days' prior written notice of any such agreement, settlement, or other arrangement, which notice shall include the analysis underlying the Company Parties' decision to enter into such agreement, settlement, or other arrangement, including adequate information supporting such analysis and decision, and, absent written notification during that period from Milbank or Greenhill to the Company Parties that the Required Consenting Stakeholders do not consent, the Required Consenting Stakeholder shall be deemed to have consented to any such agreement, settlement, or other arrangement; or

(i)        pay any prepetition Claim (including Claims pursuant to section 503(b)(9) of the Bankruptcy Code and lien Claims) held by any of the Company Parties' vendors except in compliance with the First Day Motions and only to the extent that the Company Parties have (i) made commercially reasonable efforts to require such vendor to execute a trade agreement providing for the continuity of goods and services to the Debtors or Reorganized Debtors, as applicable, on terms reasonably acceptable to the Required Consenting Stakeholders (as determined in accordance with the consultation, notice, and consent procedures referenced in the following clause (ii)), and (ii) provided notice of such payment to one or more Initial Consenting Stakeholders pursuant to consultation, notice, and consent procedures to be agreed between the Company Parties and the Required Consenting Stakeholders.

6.03.    Except with the prior written consent of the Required Consenting Stakeholders, during the Agreement Effective Period, neither of the LuxCo Entities shall incur any material

UST-1132

obligations to any third party or otherwise lease, mortgage, pledge, grant, or incur any encumbrance on, or otherwise Transfer, any material asset.

**Section 7.**     *Additional Provisions Regarding Company Parties' Commitments*.

7.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement (other than a failure to comply with this Section 7); *provided* that the Company Parties shall notify counsel to the Consenting Stakeholders in writing promptly in the event of any such determination (and in any event no later than two (2) Business Days following such determination).

7.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims or Equity Interests (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals; *provided* that the Company Parties shall (x) provide a copy of any written Alternative Restructuring Proposal (and notice of, and a written summary of, any oral Alternative Restructuring Proposal) within two (2) Business Days of the Company Parties' or their advisors' receipt of such Alternative Restructuring Proposal to Greenhill and Milbank and (y) provide such information to Milbank as reasonably requested by the Lender Group or as necessary to keep the Lender Group reasonably informed as to the status and substance of such discussions.

7.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**     *Transfer of Interests and Securities*.

8.01.    During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) of any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

15

UST-1133

(a)  such Transfer is made on or prior to the date that is at least two (2) Business Days prior to the Plan Effective Date;

(b)  prior to the funding of the DIP Term Facility, in the case of a Transfer (other than by participation) of Term Loan Claims by a Consenting Stakeholder with a commitment to fund New Money DIP Loans (as defined in the Backstop Commitment Letter), such Consenting Stakeholder retains Term Loan Claims in an amount equal to or greater than its allocation of Roll-Up DIP Loans (as defined in the Backstop Commitment Letter); and

(c)  (i) the transferee executes and delivers to counsel to the Company Parties and Milbank, at or before the time of the proposed Transfer, a Transfer Agreement; (ii) the transferee is a Consenting Stakeholder; or (iii) the transferee is an entity that is acting in its capacity as a Qualified Marketmaker, *provided* that (x) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such Company Claims/Interests is to a transferee that is or becomes a Consenting Stakeholder at the time of such Transfer and (y) the Qualified Marketmaker complies with Section 8.05 hereof.

8.02.  Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests. Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.  This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; *provided* that such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the other Consenting Stakeholders).

8.04.  This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests. Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreement.

8.05.  Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 8.01; and (iii) the Transfer otherwise is a Permitted Transfer under Section 8.01. To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment,

16

UST-1134

participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.    Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

8.07.    The Company Parties will provide notice of any Transfer Agreement received pursuant to Section 8.01(c)(i) (which notice shall include the amount and type of Company Claims/Interests Transferred pursuant to such Transfer Agreement) to Milbank by the later of (i) close of business on the second Business Day following the effective date of such Transfer Agreement and (ii) the close of business on the second Business Day after the Company Parties receive notice of any such Transfer Agreement.

8.08.    Each Consenting Stakeholder shall promptly provide Milbank and/or the Company Parties with information concerning its then-current holdings upon reasonable request from Milbank or the Company Parties.

**Section 9.**    *Representations and Warranties of Consenting Stakeholders*.    Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it is (or upon the settlement of unsettled trades, will be) the beneficial or record owner of the face amount of the Company Claims/Interests reflected in such Consenting Stakeholder's signature page to this Agreement, Joinder, or Transfer Agreement, as applicable (as may be updated pursuant to Section 8) (the "**Disclosed Interests**") or is the nominee, investment manager, or advisor for beneficial holders of the Disclosed Interests;

(b)    it has (or upon the settlement of unsettled trades, will have) the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)    such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially and adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)    it has (or upon the settlement of unsettled trades, will have) the full power to vote, approve changes to, and transfer all of its Company Claims/Interests as contemplated by this Agreement subject to applicable Law; and

(e)    solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor

UST-1135

(as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 10.**   *Mutual Representations, Warranties, and Covenants*.   Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement and as of the Plan Effective Date:

(a)   it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)   except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)   the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)   except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)   except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties that have not been disclosed to all Parties.

**Section 11.**   *Termination Events*.

11.01.   Consenting Stakeholder Termination Events.   This Agreement may be terminated by the Required Consenting Stakeholders by the delivery to the Company Parties of a written notice in accordance with Section 13.11 hereof upon the occurrence of the following events:

(a)   the Petition Date has not occurred by 11:59 p.m. (Eastern Time) on July 23, 2020;

(b)   the Debtors have not filed the Rent Deferral Motion with the Bankruptcy Court by the date that is three (3) calendar days after the Petition Date

(c)   the Bankruptcy Court has not entered the Cash Collateral Order on an interim basis by the date that is five (5) Business Days after the Petition Date;

UST-1136

(d)      the Bankruptcy Court has not entered the DIP Financing Order on a final basis by the date that is thirty-five (35) calendar days after the Petition Date;

(e)      the Bankruptcy Court has not entered the Disclosure Statement Order by the date that is sixty (60) calendar days after the Petition Date;

(f)      solicitation of the Plan has not commenced by the date that is seventy (70) calendar days after the Petition Date;

(g)      the Bankruptcy Court has not entered the Confirmation Order by the date that is one hundred ten (110) calendar days after the Petition Date;

(h)      the Plan Effective Date has not occurred by the date that is one hundred thirty (130) calendar days after the Petition Date;

(i)      the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (ii) remains uncured for ten (10) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 13.11 hereof detailing any such breach;

(j)      the DIP ABL Facility (as applicable) is terminated and accelerated in accordance with its terms;

(k)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, including the Bankruptcy Court, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 13.11 hereof detailing any such issuance; *provided* that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(l)      the Bankruptcy Court enters an order denying confirmation of the Plan or the Confirmation Order is reversed or vacated;

(m)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders, not to be unreasonably withheld), (i) dismissing any of the Chapter 11 Cases, (ii) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (iii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases;

(n)      any Company Party (i) files, waives, amends or modifies, or files a pleading seeking approval of any Definitive Document or authority to waive, amend or modify any Definitive Document (including any waiver of any term or condition therein) in a manner that is materially inconsistent with, or constitutes a material breach of, this Agreement (including with respect to the

19

UST-1137

consent rights afforded the Consenting Stakeholders under this Agreement), without the prior written consent of the Required Consenting Stakeholders, (ii) withdraws the Plan without the prior consent of the Required Consenting Stakeholders, or (iii) publicly announces its intention to take any such acts listed in the foregoing clause (i) or (ii), in the case of each of the foregoing clauses (i) through (iii), which remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 15.10 of this Agreement detailing any of the foregoing;

(o)    any Company Party files or supports another party in filing (i) a motion or pleading challenging the amount, validity, or priority of any claims held by any Consenting Stakeholder against the Company Parties (or any liens securing such claims) or (ii) a motion or pleading asserting (or seeking standing to assert) any purported claims or causes of action against any of the Consenting Stakeholders;

(p)    the Bankruptcy Court grants relief that is materially inconsistent with this Agreement or the Plan (in each case, with such amendments and modifications as have been effected in accordance with the terms hereof);

(q)    any Company Party files, proposes, or otherwise supports any plan of liquidation, asset sale of all or substantially all of a Company Party's assets or plan of reorganization other than the Plan;

(r)    the Bankruptcy Court enters an order terminating the Debtors' exclusive right to file or solicit acceptances of a plan of reorganization (including the Plan); or

(s)    any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable.

11.02. <u>Company Party Termination Events</u>. Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 13.11 hereof upon the occurrence of any of the following events:

(a)    the breach in any material respect by one or more of the Consenting Stakeholders of any provision set forth in this Agreement and (i) such breach remains uncured for a period of fifteen (15) Business Days after the receipt by the Consenting Stakeholders of notice of such breach and (ii) the non-breaching Consenting Stakeholders no longer collectively beneficially own or control at least two-thirds of the aggregate principal amount of Term Loan Claims;

(b)    the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, including the Bankruptcy Court, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after the terminating

UST-1138

Company Party transmits a written notice in accordance with Section 13.11 hereof detailing any such issuance; *provided* that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)     the Bankruptcy Court enters an order denying confirmation of the Plan.

11.03.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Stakeholders; and (b) each Company Party.

11.04.  <u>Individual Termination</u>.  Any individual Consenting Stakeholder may terminate this Agreement, as to itself only, by the delivery to the Company Parties of a written notice in accordance with Section 13.11 hereof if (a) the Plan Effective Date has not occurred by the Outside Date or (b) Section 11.01(o) is breached by any Company Party with respect to such Consenting Stakeholder.

11.05.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

11.06.  <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents, agreements, undertakings, waivers, forbearances, votes or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; *provided* any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 11.06 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 11.06 or otherwise if the Party seeking to terminate

UST-1139

this Agreement is in material breach of this Agreement, except a termination pursuant to Section 11.02(b) or Section 11.02(d). Nothing in this Section 11.06 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(b).

**Section 12.** *Amendments and Waivers*.

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each Company Party and (b) the Required Consenting Stakeholders; *provided* that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement; *provided*, *further*, that (i) any modification, amendment, or supplement to the definition of "Outside Date" shall not be binding on any Consenting Stakeholder that has not provided its prior written consent to such amendment, (ii) any modification, amendment, or supplement to the definition of "Required Consenting Stakeholders" shall require the prior written consent of each Consenting Stakeholder, (iii) any modification, amendment, or supplement to Section 11.04 hereof shall require the prior written consent of each Consenting Stakeholder, (iv) any modification, amendment, or supplement to Section 4.03 shall not be binding on any Consenting Stakeholder that has not provided its prior written consent to such amendment, and (v) any modification, amendment or supplement to this Section 12 shall require the prior written consent of each Consenting Stakeholder.

(c)     Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.** *Miscellaneous*.

13.01.  <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

UST-1140

13.02. <u>Tax Matters</u>.  The Parties will work together in good faith to structure and implement the Restructuring Transactions in a tax efficient manner; *provided* that such tax structure shall be reasonably acceptable to the Required Consenting Stakeholders and the Company Parties.

13.03. <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

13.04. <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

13.05. <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

13.06. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  EXCEPT TO THE EXTENT SUPERSEDED BY FEDERAL BANKRUPTCY LAW, THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

13.07. <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.08. <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

UST-1141

13.09.  Rules of Construction.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

13.10.  Successors and Assigns; Third Parties.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

13.11.  Notices.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

    (a)    if to a Company Party, to:

Ascena Retail Group, Inc.
933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attn:   Michael Veitenheimer
Email: michael.veitenheimer@ascenaretail.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attn:   Steven N. Serajeddini
Email: steven.serajeddini@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attn:   John R. Luze
        Jeff Michalik
Email: john.luze@kirkland.com
        jeff.michalik@kirkland.com

    (b)    if to a Consenting Stakeholder, to:

Milbank LLP
55 Hudson Yards

UST-1142

New York, NY 10001-2163
Attn:   Evan R. Fleck
        Abigail L. Debold
Email: efleck@milbank.com
        adebold@milbank.com

Any notice given by delivery, mail, or courier shall be effective when received.

13.12.   <u>Fees and Expenses</u>.  The Company Parties shall pay and reimburse all reasonable and documented fees and expenses when due (including travel costs and expenses) and all outstanding and unpaid amounts incurred in connection with the Restructuring Transactions (including, for the avoidance of doubt, all reasonable and documented fees and expenses incurred prior to the date hereof) of the attorneys, accountants, other professionals, advisors, and consultants of the Lender Group (whether incurred directly or on their behalf and regardless of whether such fees and expenses are incurred before or after the Petition Date), including the fees and expenses of Greenhill, Milbank, Whiteford Taylor, and Loyens, including all amounts payable or reimbursable under applicable fee or engagement letters (including any success or transaction fees when earned) with the Company Parties (which agreements shall not be terminated by the Company Parties before the termination of this Agreement).

13.13.   <u>Reservation of Rights</u>.  After the termination of this Agreement pursuant to Section 11, the Parties each fully reserve any and all of their respective rights, remedies, claims, and interests, subject to Section 11 in the case of any claim for breach of this Agreement.  Further, nothing in herein shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and the Plan and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring Transactions.

13.14.   <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties, and without reliance on any statement of any other Party or Entity (other than such express representations or warranties of the Company Parties contained herein).

13.15.   <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

13.16.   <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any

UST-1143

proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

13.17. <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

13.18. <u>Several, Not Joint, Claims</u>. Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

13.19. <u>Severability and Construction</u>. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

13.20. <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.21. <u>Capacities of Consenting Stakeholders</u>. Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

13.22. <u>Relationship Among Consenting Stakeholders and the Company Parties</u>. None of the Consenting Stakeholders shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Consenting Stakeholder, the Company Parties, or any of the Company Parties' creditors or other stakeholders, and, other than as expressly set forth herein, there are no commitments among or between the Consenting Stakeholders. It is understood and agreed that any Consenting Stakeholder may trade in any debt or equity securities of the Company Parties without the consent of the Company Parties or any other Consenting Stakeholder, subject to applicable securities laws and this Agreement, including Section 8 hereof. No prior history, pattern or practice of sharing confidences among or between any of the Consenting Stakeholders and/or the Company Parties shall in any way affect or negate this understanding and agreement.

13.23. <u>Direction to the Agent</u>. By their signatures to this Agreement, the Initial Consenting Stakeholders signatory thereto, constituting Required Lenders under the Term Loan Credit Agreement hereby direct and authorize the Administrative Agent (or any of its Affiliates) to (i) consent to the entry of the Cash Collateral Order (each of the Initial Consenting Stakeholders hereby authorizes Milbank, LLP, as counsel for the Initial Consenting Stakeholders, to direct the

UST-1144

administrative agent under the Term Loan Credit Agreement to consent to the entry of the Cash Collateral Order), (ii) to execute an acknowledgement to the supplement to the existing security agreement in respect of the equity held by the Loan Parties (as defined in the Term Loan Credit Agreement) in the LuxCo Entities as contemplated by this Agreement and (iii) to execute any documentation deemed reasonably necessary by the Administrative Agent or its Affiliates to evidence such consent or acknowledgment, as applicable (the direction by the Required Lenders hereunder to the Administrative Agent to grant such consent and acknowledgment, as applicable, and to take actions deemed reasonably necessary by it to evidence such consent or acknowledgment, as applicable, is hereinafter referred to as the "Direction"). For the avoidance of doubt, the Initial Consenting Stakeholders agree that the consents and acknowledgments granted, and the actions taken, by the Administrative Agent and its Affiliates pursuant to and arising out of the Direction are indemnified actions covered by the indemnification provisions of Section 9.03 of the Term Loan Credit Agreement. This Direction shall be governed by, and construed in accordance with, the laws of the State of New York. Notwithstanding Section 13.10, the Administrative Agent is a third party beneficiary to this Section 13.23 and is relying thereon in taking action in accordance with the Direction.

13.24. Email Consents. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 12, or otherwise, including a written approval by the Company Parties or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

13.25. Publicity. The Company Parties will submit to Milbank all press releases, public filings, or public announcements, in each case, to be made by any of the Company Parties announcing entry into this Agreement or the transactions contemplated hereby in advance of release and will reasonably consult with Milbank with respect to such communications. Except as required by law or regulation or by any governmental or regulatory (including self-regulatory) authority, no Party or its advisors shall (a) use the name of any Consenting Stakeholder in any public manner (including in any press release) or (b) disclose to any Person (including, for the avoidance of doubt, any other Consenting Stakeholder), other than legal, accounting, financial and other advisors to the Company Parties, the principal amount or percentage of Term Loan Claims, in each case, without such Consenting Stakeholder's prior written consent; *provided* that (i) if such disclosure is required by law, subpoena, or other legal process or regulation or by any governmental or regulatory (including self-regulatory) authority, the disclosing Party shall afford the relevant Consenting Stakeholder a reasonable opportunity to review and comment in advance of such disclosure if reasonably practicable and permitted by applicable law and shall take all reasonable measures to limit such disclosure to the extent permitted by applicable law and (ii) the foregoing shall not prohibit the public disclosure, including in connection with the Chapter 11 Cases, of the aggregate percentage or aggregate principal amount of Claims held by all the Consenting Stakeholders collectively. Notwithstanding the foregoing, (x) any Party hereto may disclose the identities of the Parties hereto in any action to enforce this Agreement or in an action for damages as a result of any breaches hereof and (y) any Party hereto may disclose, to the extent expressly consented to in writing by a Consenting Stakeholder, such Consenting Stakeholder's identity and individual holdings.

UST-1145

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

*[Signature pages follow.]*

UST-1146

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**ASCENA RETAIL GROUP, INC.
AND THE OTHER COMPANY PARTIES**

By: _C. Teffner_____

DocuSigned by:

A612CD5F749F470...

Name: Carrie W. Teffner

Authorized Signatory

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**ANNTAYLOR LOFT GP LUX S.À R.L.**

By:   _DocuSigned by:_
      _Marc Crawford_
      B3D63F8C32E5472...                    _____
      Name: Marc Crawford
      Title:   authorised signatory

**ANNTAYLOR LOFT BORROWER LUX
SCS**

By:   _DocuSigned by:_
      _Marc Crawford_
      B3D63F8C32E5472...                    _____
      Name: Marc Crawford
      Title:   authorised signatory

UST-1148

[*Signature pages of the Consenting Stakeholders on file with the Company*]

UST-1149

## EXHIBIT A

**Company Parties**

UST-1150

## EXHIBIT A

### Company Parties

Ascena Retail Group, Inc.
933 Inspiration LLC
ANN Card Services, Inc.
ANN, Inc.
AnnCo, Inc.
AnnTaylor Distribution Services, Inc.
AnnTaylor of Puerto Rico, Inc.
AnnTaylor Retail, Inc.
AnnTaylor, Inc.
AnnTaylor Loft Borrower Lux SCS
AnnTaylor Loft GP Lux S.À R.L.
Ascena Retail Holdings, Inc.
Ascena Trade Services, LLC
ASNA Plus Fashion, Inc.
ASNA Value Fashion LLC
BackingBrands Buying Agent, LLC
BackingBrands Solutions, LLC
C.S.F. Corp.
Catalog Receivables LLC
Catalog Seller LLC
Catherines #5124, Inc.
Catherines #5147, Inc.
Catherines Stores Corporation
Catherines, Inc.
CCTM, Inc.
Charming Sales Co. Four, Inc.
Charming Sales Co. One, Inc.
Charming Sales Co. Three, Inc.
Charming Sales Co. Two, Inc.
Charming Shoppes of Delaware, Inc.
Charming Shoppes Receivables Corp.
Charming Shoppes Seller, Inc.
Charming Shoppes Street, Inc.
Charming Shoppes, Inc.
Chestnut Acquisition Sub Inc.
Crosstown Traders, Inc.
CS Holdco II Inc.
CSGC, Inc.
CSI Industries, Inc.
CSPE, LLC
DBI Holdings, Inc.
DBCM Holdings, LLC
DBX, Inc.

UST-1151

Duluth Real Estate LLC
Etna Retail DC, LLC
Fashion Apparel Sourcing LLC
Fashion Service Fulfillment Corporation
Fashion Service LLC
GC Fulfillment, LLC
Lane Bryant #6243, Inc.
Lane Bryant of Pennsylvania, Inc.
Lane Bryant Outlet 4106, Inc.
Lane Bryant Purchasing Corp.
Lane Bryant, Inc.
PSTM, Inc.
Sponsi, Inc.
Spirit of America, Inc.
Too GC, LLC
Tween Brands Agency, Inc.
Tween Brands Direct Services Inc.
Tween Brands Investment, LLC
Tween Brands Marketing, Inc.
Tween Brands Service Co.
Tween Brands, Inc.
Winks Lane, Inc.
Worldwide Retail Holdings, Inc.

# EXHIBIT B

## Restructuring Term Sheet

UST-1153

_____

### ASCENA RETAIL GROUP, INC., ET AL.

### RESTRUCTURING TERM SHEET[1]

_____

This term sheet (the "Restructuring Term Sheet") sets forth the principal terms of the Restructuring Transactions. The Restructuring Transactions will be consummated through cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court") and as otherwise set forth in the Restructuring Support Agreement. This Restructuring Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documentation governing the Restructuring Transactions, which shall be subject to the applicable consent and approval rights of the Parties as set forth in the Restructuring Support Agreement.

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE STATUTES, RULES, AND LAWS.

UNLESS OTHERWISE SET FORTH HEREIN, TO THE EXTENT THAT ANY PROVISION OF THIS RESTRUCTURING TERM SHEET IS INCONSISTENT WITH ANOTHER PROVISION OF THE RESTRUCTURING SUPPORT AGREEMENT, THE TERMS OF THIS RESTRUCTURING TERM SHEET WITH RESPECT TO SUCH PROVISION SHALL CONTROL.

| OVERVIEW | |
|---|---|
| **Implementation** | The Debtors will effectuate the Restructuring Transactions through the filing of the Chapter 11 Cases and confirmation of the Plan, which shall be consistent with this Restructuring Term Sheet, subject to the terms and conditions set forth in the Restructuring Support Agreement. As further described herein and in the Restructuring Support Agreement, including the Backstop Commitment Letter, the Restructuring Transactions shall be funded through: (i) the consensual use of cash collateral under the Cash Collateral Order and the DIP Financing Order; (ii) a DIP Term Facility including $150 million in New Money DIP Loans and $161.8 million in Roll-Up DIP Loans; (iii) as applicable, a DIP ABL Facility; and (iv) the Exit Facilities.<br><br>The Plan will constitute a separate chapter 11 plan of reorganization for each Debtor. For the avoidance of doubt, any action required to be taken by the Debtors on the Plan Effective Date pursuant to this Restructuring Term Sheet may be taken on the Plan Effective Date or as soon as is reasonably practicable thereafter. |
| **FINANCING** | |
| **DIP ABL Facility** | The Debtors may obtain a commitment from certain ABL Lenders to provide an up to $400 million senior secured asset-based revolving debtor-in-possession credit facility (the "DIP ABL Facility"), pursuant to which the commitments and loans of the ABL Lenders under the ABL Facility will |

---

[1] Capitalized terms used but not defined in this Restructuring Term Sheet have the meanings ascribed to them in (i) the Restructuring Support Agreement, dated as of July 23, 2020 (the "Restructuring Support Agreement"), to which this Restructuring Term Sheet is attached as Exhibit B or (ii) Annex I hereto.

UST-1154

| | |
|---|---|
| | convert into the DIP ABL Facility during the Chapter 11 Cases pursuant to the DIP Financing Order, and will obtain a commitment from certain lenders to provide the Exit ABL Facility in an amount not less than $400 million subject to the conditions set forth in the ABL Commitment Letter. |
| **DIP Term Facility** | Certain Prepetition Term Lenders (as defined in the Backstop Commitment Letter) and/or their affiliates (in their capacities as such, the "Backstop Commitment Parties") have committed to provide the Debtors with an up to $311.8 million superpriority senior secured debtor-in-possession term loan credit facility (the "DIP Term Facility") consisting of (a) $150 million in new money term loans (the "New Money DIP Loans") and (b) $161.8 million of term loans (the "Roll-Up DIP Loans" and, together with the New Money DIP Loans, the "DIP Term Loans") rolling Term Loan Claims held by the DIP Term Lenders that provide New Money DIP Loans on the terms and conditions set forth in the Backstop Commitment Letter and the DIP Financing Order. Prepetition Term Lenders (including, for the avoidance of doubt, the Backstop Commitment Parties) will have the right to commit to their ratable share of 50% of the DIP Term Facility up to the date that is expected to be 10 business days after distribution of the Syndication Materials, which is estimated to occur within 5 business days after the Petition Date, by executing the Restructuring Support Agreement and taking such other actions as specified in the Syndication Materials. For the avoidance of doubt, participation in the DIP Term Facility shall include a commitment to convert the DIP Term Loans into First Out Exit Term Loans on the Plan Effective Date if certain conditions as set forth in the DIP Term Agreement and Exit Facility Term Sheet attached as Exhibit D to the Restructuring Support Agreement are satisfied

The Cash Collateral Order and DIP Financing Order will include customary adequate protection for the Term Lenders, including, without limitation, and as acceptable to the Majority Backstop Commitment Parties:

    i.    superpriority adequate protection claims and adequate protection liens to the extent of any diminution in value in the collateral securing the Term Loan Claims, which adequate protection liens shall include liens on all unencumbered assets of the Debtors (excluding any assets that qualify as ABL Priority Collateral (as defined in the ABL Credit Agreement) and including the funding account for the DIP Term Facility and 100% of the equity interests in the LuxCo Entities);

    ii.    payment of the fees and expenses of the Lender Group's advisors; and

    iii.    the reporting and milestones described below.

Material terms for the DIP Term Loans include, without limitation and as set forth in the Form DIP Credit Agreement:

    a.    Maturity: Earlier of (i) 6 months after the Effective Date of the DIP Term Agreement, (ii) conversion into the First Out Term Loan Facility, (iii) dismissal of the Chapter 11 Cases, (iv) acceleration, (v) a sale of all or substantially all of the Debtors' assets, and (vi) the Plan Effective Date

    b.    Coupon: L+1,175 bps

    c.    LIBOR Floor: 1.00%

    d.    Commitment Payment: 250 bps payable in cash on the principal amount of New Money DIP Loans to all DIP Term Lenders that |

UST-1155

provide New Money DIP Loans (including the Backstop Commitment Parties)

e. <u>Seasoning/Fronting</u>: Fees to be paid by the Company Parties (in addition to the Backstop Premium and Commitment Payment)

f. <u>Mechanics</u>: Full amount of the New Money DIP Term Loans may be drawn after entry of the DIP Financing Order, subject to the terms and conditions set forth in the DIP Credit Agreement

g. <u>Ratings Covenant</u>: Commercially reasonable efforts to obtain a rating by each of S&P and Moody's within 15 days of the entry of the DIP Financing Order

h. <u>Milestones</u>: Consistent with the milestones contained in sections 11.01(a) through 11.01(g) of the Restructuring Support Agreement.

i. <u>Events of Default</u>: Customary debtor-in-possession facility "Events of Default"

j. <u>Covenants</u>: Customary covenants for similarly sized debtor-in-possession facilities

k. <u>Reporting</u>: Monthly, quarterly and annual Financial Statements; weekly reports of liquidity and line-item receipts and disbursements (including professional fees); weekly advisor and lender steering committee calls

l. <u>Variance Reporting</u>: Delivered weekly, with written explanations for variances above 15% of actual receipts or actual operating disbursements (unless the dollar amount corresponding to such percentage variance is less than $1 million)

m. <u>Budget</u>: Delivered monthly, subject to approval of the Required Lenders

n. <u>Permitted Variance</u>: 20%, tested on a cumulative basis, tested weekly on a 4-week rolling basis, of total net cash flow to projected net cash flow, applicable only when Liquidity (as defined in the Form DIP Credit Agreement) is less than $150 million

o. <u>Liquidity Covenant</u>: Minimum Liquidity of $100 million

p. <u>Collateral</u>: First priority on all collateral securing the Term Loan Claims and all unencumbered assets (excluding any assets that qualify as ABL Priority Collateral, which shall be subject to a second priority lien), including, for the avoidance of doubt, a first priority interest in the funding account for the DIP Term Facility and 100% of the equity interests in the LuxCo Entities

q. <u>Use of Proceeds</u>: To be used in accordance with the approved budget for (i) transaction expenses, (ii) adequate protection payments, (iii) fund Carve Out and (iv) general corporate purposes. Up to $50 million of the proceeds of the DIP Term Loans may be used to repay any DIP ABL Facility Claims in cash

The DIP Term Loans will be repaid in cash on their stated maturity date; *provided* that, if certain conditions as set forth in the DIP Term Agreement and Exit Facility Term Sheet attached as <u>Exhibit D</u> to the Restructuring Support Agreement are satisfied, on the Conversion Date (as defined in the DIP Term Agreement), the DIP Term Loans held as of the date that is 2 Business Days prior to the Plan Effective Date will be converted to loans under the First Out

UST-1156

| | |
|---|---|
| | Term Loan Facility (the "<u>First Out Exit Term Loans</u>") on the terms and conditions set forth in the DIP Term Agreement and the Exit Facility Term Sheet; *provided* that upon certain events described in the DIP Term Agreement and if the Conversion Date has not occurred, each DIP Term Loan shall be repaid with a non-refundable aggregate premium in an amount equal to 11.23% of the DIP Term Loans so repaid in cash on the date on which such DIP Term Loans are repaid, and shall be subject to the withholding provisions set forth in Section 2.15 of the DIP Term Agreement. |
| **Backstop Commitment** | Pursuant to the Backstop Commitment Letter, the Backstop Commitment Parties will, in the allocations set forth on Schedule 1 thereto, (a) provide 50% of the DIP Term Loans and First Out Exit Term Loans and (b) provide any DIP Term Loans and First Out Exit Term Loans not provided by other Prepetition Term Lenders in accordance with the syndication process described above.<br><br>As consideration for the Backstop Commitments and agreements of the Backstop Commitment Parties under the Restructuring Support Agreement, Ascena Topco will pay (or cause to be paid) to the Backstop Commitment Parties (or, at any Backstop Commitment Party's option and upon such Related Lender's designation (which may be provided by electronic communication), its Related Lender), a non-refundable backstop premium equal to $7.5 million (the "<u>Backstop Premium</u>"),[2] which shall be allocated to each Backstop Commitment Party, in an amount equal to (1) its percentage set forth on Schedule 2 to the Backstop Commitment Letter (the "<u>Backstop Percentage</u>"), *multiplied by* (2) the Backstop Premium, which shall be fully earned, nonrefundable and non-avoidable on the execution of the Backstop Commitment Letter and payable, free and clear of any withholding tax, in cash upon the funding of the New Money DIP Loans.<br><br>If (a) a Termination Date occurs prior to the funding of the DIP Term Facility or (b) the DIP Term Facility has been funded and the Conversion Date does not occur, a non-refundable aggregate premium in an amount equal to $7.5 million shall be payable, free and clear of any withholding tax, in cash (the "<u>Termination Premium</u>") on the Termination Date, in the case of clause (a), or the date on which the DIP Term Loans are repaid in full in cash, in the case of clause (b), which shall be allocated to each Backstop Commitment Party in an amount equal to (1) its Backstop Percentage, *multiplied by* (2) the Termination Premium. |
| **Definitive Documents** | Any documents, including any Definitive Documents, that remain the subject of negotiation as of the Agreement Effective Date shall be subject to the rights and obligations set forth in the Restructuring Support Agreement.  Failure to reference such rights and obligations as it relates to any document referenced in this Restructuring Term Sheet shall not impair such rights and obligations. |

---

[2]     For tax purposes, unless otherwise required by a change in applicable tax law or contrary determination (as defined in Section 1313(a) of the Internal Revenue Code of 1986, as amended), the Company Parties and the Backstop Commitment Parties will (i) treat the Backstop Premium and the Termination Premium as premiums paid by Ascena Topco to the Backstop Commitment Parties in exchange for the issuance of a put right to Ascena Topco with respect to the DIP Term Facility and (ii) not take any tax position inconsistent with the tax treatment described in clause (i).

UST-1157

| TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN | |
|---|---|
| **DIP ABL Facility Claims** | To the extent the Debtors obtain a commitment for a DIP ABL Facility that is funded prior to the Plan Effective Date, the Plan shall provide as follows:<br><br>i.   If those certain conversion conditions set forth in the DIP ABL Agreement remain unsatisfied as of the Plan Effective Date, on the Plan Effective Date, each holder of an allowed DIP ABL Facility Claim shall receive, unless such holder agrees to less favorable treatment, cash in an amount equal to its allowed DIP ABL Facility Claim in full and final satisfaction, release, and discharge of, and in exchange for, such allowed DIP ABL Facility Claim.<br><br>ii.   If those certain conversion conditions as set forth in the DIP ABL Agreement are fully satisfied as of the Plan Effective Date, on the Plan Effective Date, each holder of an allowed DIP ABL Facility Claim shall receive, unless such holder agrees to less favorable treatment, its pro rata share of participation in the Exit ABL Facility. |
| **DIP Term Facility Claims** | On the Plan Effective Date, each holder of an allowed DIP Term Facility Claim shall receive, unless such holder agrees to less favorable treatment and subject to the terms and conditions of the DIP Term Facility and the Exit Facility Term Sheet, cash in an amount equal to its allowed DIP Term Facility Claim; *provided* that, if certain conditions as set forth in the DIP Term Agreement and Exit Facility Term Sheet are satisfied, each holder of an allowed DIP Term Facility Claim shall receive (i) loans arising under the First Out Exit Term Loan Facility in an amount equal to such holder's allowed DIP Term Facility Claim and (ii) cash on account of accrued and unpaid interest and other charges payable through the Plan Effective Date, in full and final satisfaction, release, and discharge of, and in exchange for, such allowed DIP Term Facility Claim. |
| **Administrative Claims** | On the Plan Effective Date, each holder of an allowed Administrative Claim shall receive payment in full in cash. |
| **Priority Tax Claims** | On the Plan Effective Date, each holder of an allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. |
| **Other Secured Claims** | Each holder of an allowed Other Secured Claim shall receive, at the option of the applicable Debtor:<br><br>i.   payment in full in cash;<br><br>ii.   delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;<br><br>iii.   reinstatement of such Claim; or<br><br>iv.   other treatment rendering such Claim unimpaired. |
| **Other Priority Claims** | Each holder of an Other Priority Claim shall receive payment in full in cash or other treatment rendering such Claim unimpaired. |
| **ABL Claims** | To the extent any allowed ABL Claims remain outstanding on the Plan Effective Date, each holder of an allowed ABL Claim shall receive:<br><br>i.   payment in full in cash of its allowed ABL Claim;<br><br>ii.   the collateral securing its allowed ABL Claim;<br><br>iii.   reinstatement of its allowed ABL Claim under the Exit ABL |

UST-1158

|  | Facility; or |
|  | iv. such other treatment that renders its allowed ABL Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| **Term Loan Claims** | Each holder of an allowed Term Loan Claim shall receive its pro rata share of: |
|  | i. $88.2 million of Last Out Term Loans, which shall include the terms set forth in the Exit Facility Term Sheet; and |
|  | ii. 55.1% of the common shares of Reorganized Ascena (such shares, the "New Common Stock") less the percentage of New Common Stock distributed as the Equity Premium (as defined below), subject to dilution on account of the Management Incentive Plan. |
| **General Unsecured Claims** | i. *If holders of allowed General Unsecured Claims vote as a class to accept the Plan,* each holder of an allowed General Unsecured Claim shall receive its pro rata share of cash in an aggregate amount equal to $500,000, as determined by the Debtors and the Required Consenting Stakeholders. |
|  | ii. *If holders of allowed General Unsecured Claims vote as a class to reject the Plan,* each holder of an allowed General Unsecured Claim shall receive treatment consistent with section 1129(a)(7) of the Bankruptcy Code, as determined by the Debtors and the Required Consenting Stakeholders. |
| **Intercompany Claims** | Each allowed Intercompany Claim shall be reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Reorganized Debtors. |
| **Intercompany Interests** | Intercompany Interests shall receive no recovery or distribution and be reinstated solely to the extent necessary to maintain the Debtors' corporate structure. |
| **Interests in Ascena** | Each holder of an allowed Interest in Ascena shall have such Interest cancelled, released, and extinguished without any distribution. |
| **CHAPTER 11 PLAN RELEASES, EXCULPATION, AND INJUNCTION PROVISIONS** | |
| **Discharge of Claims and Termination of Interests** | Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Plan Effective Date by the Reorganized Debtors), Interests, and Causes of Action against any Debtor of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any liability (including withdrawal liability) to the extent such Claims or Causes of Action accrued before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim based upon such debt or right |

UST-1159

| | |
|---|---|
| | is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Plan Effective Date.  Unless expressly provided in the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Plan Effective Date occurring. |
| **Releases by the Debtors** | Effective as of the Plan Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Plan Effective Date. |
| **Releases by Holders of Claims and Interests** | Effective as of the Plan Effective Date, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of |

UST-1160

| | any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Plan Effective Date. |
|---|---|
| **Exculpation** | Notwithstanding anything contained in the Plan to the contrary, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action or any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Exit Facilities, the Backstop Commitment Letter, the DIP Financing Order, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing |

UST-1161

| | the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
|---|---|
| **Injunction** | Except with respect to the obligations arising under the Plan, the DIP Financing Order, or the Confirmation Order, and except as otherwise expressly provided in the Plan, the DIP Financing Order, or the Confirmation Order, all Entities that held, hold, or may hold claims or interests or Causes of Action that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Reorganized Debtors or the other Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action released or settled or subject to exculpation pursuant to the Plan. |
| **OTHER TERMS OF THE RESTRUCTURING TRANSACTIONS** | |
| **Equity Allocation** | On the Plan Effective Date, each Consenting Stakeholder shall receive (a) its pro rata share (the numerator being such party's holdings of First Out Exit Term Loans (including through any of its Related Parties) and the denominator being the aggregate outstanding amount of all First Out Exit Term Loans) of 44.9% of the New Common Stock, which will be subject to dilution from the Management Incentive Plan, and (b) its pro rata share (based on such party's Backstop Percentage (including through any of its Related Parties)) of an amount of New Common Stock equal to $7.5 million, calculated assuming a total equity value of Reorganized Ascena to be agreed by the Company Parties and the Required Consenting Stakeholders (such pro rata share, the "Equity Premium"), which will be subject to dilution from the Management Incentive Plan.[3] |

---

[3] For tax purposes, unless otherwise required by a change in applicable tax law or contrary determination (as defined in Section 1313(a) of the Internal Revenue Code of 1986, as amended), (i) the Company Parties and the Consenting Stakeholders as of the Petition Date will treat the Equity Premium as acquired by such Consenting Stakeholders at the Plan Effective Date in exchange for participation in the Restructuring Transactions and for tax purposes more specifically as a put premium and (ii) not take any tax position inconsistent with the tax treatment described in clause (i).

UST-1162

| | |
|---|---|
| **Critical Vendors** | The Debtors will seek the Bankruptcy Court's approval to use up to $50 million in the aggregate to pay the prepetition claims of certain foreign and critical vendors, subject to the consent and consultation rights in the Restructuring Support Agreement. |
| **LuxCo Entities** | On the Execution Date, all of the previously unencumbered equity held by the Loan Parties (as defined in the Term Loan Credit Agreement) in the LuxCo Entities will be pledged as Collateral (as defined in the Term Loan Credit Agreement). |
| **New Board** | The initial board of directors, members, or managers, as applicable (each, a "Director"), of Reorganized Ascena (the "New Board") will consist of 7 Directors, including, subject to the terms of the New Corporate Governance Documents: <br><br> i.   Carrie W. Teffner; <br><br> ii.  the CEO of Reorganized Ascena; <br><br> iii. 1 Director determined by Bain Capital Credit, LP ("Bain"); <br><br> iv.  1 Director determined by Monarch Alternative Capital LP ("Monarch"); <br><br> v.   1 Director determined collectively by Bain, Eaton Vance Management, Lion Point Capital, LP, and Monarch; and <br><br> vi.  2 Directors determined by the Backstop Commitment Parties. |
| **Management Incentive Plan** | The Reorganized Debtors will reserve a pool of up to 10% of the New Common Stock for a post-emergence management incentive plan (the "Management Incentive Plan") for management employees of the Reorganized Debtors, which will contain terms and conditions (including, without limitation, with respect to participants, form, allocation, structure, duration and timing and extent of issuance and vesting) as determined at the discretion of the New Board after the Plan Effective Date. |
| **Tax Structure** | The Parties will work together in good faith to structure and implement the Restructuring Transactions in a tax efficient manner; *provided* that such tax structure shall be reasonably acceptable to the Required Consenting Stakeholders and the Company Parties. |
| **Executory Contracts and Unexpired Leases** | The Plan will provide that the executory contracts and unexpired leases that are not rejected as of the Plan Effective Date (either pursuant to the Plan or a separate motion) will be deemed assumed pursuant to section 365 of the Bankruptcy Code. |
| **Employment Obligations** | Pursuant to the Restructuring Support Agreement and this Restructuring Term Sheet, the Consenting Stakeholders consent to the continuation and assumption of all of the Debtors' wages, compensation, and employee benefits programs according to existing terms and practices, including executive and Insider compensation and benefits programs, Insider and non-Insider severance programs, Insider and non-Insider incentive programs, and Insider and non-Insider retention programs, in each case as are in effect as of the Agreement Effective Date and have been disclosed to counsel for the Required Consenting Stakeholders, including any modifications agreed between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement (collectively, the "Employee Benefits Programs"), and any motions in the Bankruptcy Court for approval thereof; provided, however, that Employee Benefits Programs shall not include (x) any compensation, post-employment, separation or retirement arrangement with any former Insider (as of the Agreement Effective Date) or (y) any non-qualified |

UST-1163

| | deferred compensation plan or supplemental retirement plan, solely to the extent and such plan would benefit any former Insider (as of the Agreement Effective Date), in each case without the consent of the Required Consenting Stakeholders following the Petition Date. On the Plan Effective Date, pursuant to the Plan, the Debtors shall assume all obligations related to all Employee Benefits Programs (as agreed to be modified between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement, as applicable) and assume all employment agreements or letters, indemnification agreements, or other agreements entered into with current and former employees (as agreed to be modified between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement, as applicable) unless such employees agree to enter into new agreements on terms and conditions acceptable to the Reorganized Debtors, the Required Consenting Stakeholders and such employee. Notwithstanding the foregoing, no (x) compensation, post-employment, separation or retirement arrangement with any former Insider (as of the Agreement Effective Date) or (y) non-qualified deferred compensation plan or supplemental retirement plan, solely to the extent any such plan would benefit any former Insider (as of the Plan Effective Date), will be assumed on the Plan Effective Date, in each case without the prior consent of the Required Consenting Stakeholders. |
|---|---|
| **Indemnification Obligations** | Consistent with applicable law, all indemnification provisions in place as of the Plan Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring Transactions on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Plan Effective Date. |
| **Subordination** | The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |
| **Restructuring Transactions** | The Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan and the Restructuring Transactions therein. On the Plan Effective Date, the Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in this Restructuring Term Sheet or the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled, and the Debtors' obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Retention of Jurisdiction** | The Plan will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters. |

UST-1164

| Retained Causes of Action | The Reorganized Debtors, as applicable, shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action that the Debtors have released pursuant to the release and exculpation provisions of the Plan. |
|---|---|
| Exemption from SEC Registration | The issuance of all securities under the Plan will be exempt from SEC registration under applicable law. On the Plan Effective Date, Reorganized Ascena will cease to be a public reporting company. |
| Conditions Precedent to the Plan Effective Date | The following, among others as agreed by the Debtors and the Required Consenting Stakeholders, shall be conditions to the Plan Effective Date: |

The following, among others as agreed by the Debtors and the Required Consenting Stakeholders, shall be conditions to the Plan Effective Date:

1. The Bankruptcy Court shall have entered the Confirmation Order, which shall:

   a. be in form and substance consistent with the Restructuring Support Agreement;

   b. authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

   c. decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

   d. authorize the Debtors, as applicable/necessary, to: (a) implement the Restructuring Transactions; (b) issue the New Common Stock pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (c) make all distributions and issuances as required under the Plan, including cash and the New Common Stock; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Exit Facilities;

   e. authorize the implementation of the Plan in accordance with its terms; and

   f. provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

2. the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Restructuring Support Agreement and the Plan;

3. the Restructuring Support Agreement shall remain in full force and effect and shall not be terminated;

4. the documentation related to the Exit Facilities shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Plan Effective Date) to the effectiveness of the Exit Facilities shall have been satisfied or duly waived in writing in accordance with the terms of each of the Exit Facilities and the closing of the Exit Facilities shall have

UST-1165

| | occurred; |
|---|---|
| | 5. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring; |
| | 6. all actions, documents, certificates, and agreements necessary to implement the Plan (including any documents contained in the Plan Supplement) shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units, in accordance with applicable laws; |
| | 7. all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses; |
| | 8. all professional fees and expenses and of the advisors to the Consenting Stakeholders shall have been paid in full in accordance with the Restructuring Support Agreement; and |
| | 9. the Debtors shall have implemented the Restructuring Transactions in a manner consistent with the Restructuring Support Agreement and this Plan. |
| **Waiver of Conditions Precedent to the Plan Effective Date** | The Debtors, with the prior consent of the Required Consenting Stakeholders, may waive any one or more of the Conditions Precedent to the Plan Effective Date. |

UST-1166

*Execution Version*

<u>ANNEX I</u>

**DEFINITIONS**

| Term | Definition |
|------|------------|
| **ABL Commitment Letter** | The letter committing certain ABL Lenders to provide the DIP ABL Facility and Exit ABL Facility on terms acceptable to the Required Consenting Stakeholders. |
| **ABL Facility** | The credit facility established by the ABL Credit Agreement. |
| **ABL Lenders** | Each of the lenders from time to time party to the ABL Credit Agreement. |
| **Administrative Claim** | A Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan Effective Date of preserving the Estates and operating the Debtors' businesses; and (b) allowed Professional Fee Claims. |
| **Causes of Action** | Any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.   Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim |
| **DIP ABL Agreement** | The debtor-in-possession senior secured asset-based revolving credit agreement establishing the DIP ABL Facility on terms acceptable to the Required Consenting Stakeholders. |
| **DIP ABL Facility Claim** | Any Claim derived from, based upon, or secured pursuant to the DIP ABL Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP ABL Facility. |
| **DIP Term Agreement** | The Superpriority Senior Secured Debtor-In-Possession Credit Agreement in the form of the Form DIP Credit Agreement and otherwise acceptable to the Majority Backstop Commitment Parties. |
| **DIP Term Facility Claim** | Any Claim derived from, based upon, or secured pursuant to the DIP Term Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Term Facility. |
| **DIP Term Lenders** | The lenders under the DIP Term Agreement. |

UST-1167

| Term | Definition |
|------|------------|
| **Estate** | As to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 upon the commencement of the applicable Debtor's Chapter 11 Case. |
| **Exculpated Parties** | Collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) any statutory committees appointed in the Chapter 11 Cases and each of their respective members; (e) each current and former Affiliate of each Entity in clause (a) through the following clause (f); and (f) each Related Party of each Entity in clause (a) through this clause (e). |
| **Exit ABL Facility** | The senior secured asset-based revolving credit facility in an aggregate amount up to $400 million and otherwise on the terms set forth in the ABL Commitment Letter and pursuant to definitive documentation acceptable to the Required Consenting Stakeholders. |
| **Exit Facilities** | Collectively, the Exit ABL Facility, the First Out Term Loan Facility, and the Last Out Term Loan Facility. |
| **General Unsecured Claim** | Any Claim that is not secured and is not (a) an Administrative Claim, (b) an Other Secured Claim, (c) a Priority Tax Claim, (d) an Other Priority Claim, (e) an ABL Claim, (f) a Term Loan Claim, or (g) an Intercompany Claim. |
| **Intercompany Claim** | Any Claim held by a Debtor or a Debtor's affiliate against a Debtor or a Debtor's affiliate. |
| **Intercompany Interests** | Other than an Interest in Ascena Topco, an Interest in one Debtor held by another Debtor or a Debtor's affiliate. |
| **Lien** | Has the meaning set forth in section 101(37) of the Bankruptcy Code. |
| **Other Priority Claim** | Any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases. |
| **Other Secured Claim** | Any secured Claim, other than (a) an ABL Claim, (b) a DIP ABL Facility Claim, (c) a Term Loan Claim, or (d) a DIP Term Facility Claim. |
| **Priority Tax Claim** | Any Claim of a Governmental Unit (as set forth in section 101(27) of the Bankruptcy Code) of the kind specified in section 507(a)(8) of the Bankruptcy Code. |
| **Professional** | An Entity retained in the Chapter 11 Cases pursuant to a final order in accordance with sections 327, 363, and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Plan Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code. |
| **Professional Fee Claims** | All Claims for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the date on which the Confirmation Order is entered that the Bankruptcy Court has not denied by final order.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a final order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims. |

UST-1168

| Term | Definition |
|------|-----------|
| Proof of Claim | A proof of Claim filed in the Chapter 11 Cases. |
| Related Party | With respect to any person or Entity, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special or other committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors of such person or Entity, and any such Person's or Entity's respective heirs, executors, estates, and nominees. |
| Released Party | Collectively, each of the following in their capacity as such: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the ABL Agent; (e) the Term Loan Agent; (f) each of the lenders and administrative agents under the Exit Facilities; (g) the Backstop Parties; (h) the DIP ABL Agent; (i) the DIP ABL Lenders; (j) the DIP Term Agent; (k) the DIP Term Lenders; (l) each current and former Affiliate of each Entity in the foregoing clause (a) through the following clause (m); and (m) each Related Party of each Entity in the foregoing clause (a) through this clause (m). |
| Releasing Party | Collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the ABL Agent; (e) the Term Loan Agent; (f) each of the lenders and administrative agents under the Exit Facilities; (g) the Backstop Parties; (h) the DIP ABL Agent; (i) the DIP ABL Lenders; (j) the DIP Term Agent; (k) the DIP Term Lenders; (l) all holders of Claims; (m) all holders of Interests; (n) each current and former Affiliate of each Entity in foregoing clause (a) through the following clause (o); and (o) each Related Party of each Entity in the foregoing clause (a) through this clause (o); *provided* that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation; *provided further* that any such Entity shall be identified by name as a non-Releasing Party in the Confirmation Order. |
| Reorganized Debtors | Reorganized Ascena and each of the other Debtors, or any successor thereto, as reorganized pursuant to and under the Plan. |
| Term Lenders | Each of the lenders from time to time party to the Term Loan Credit Agreement. |

UST-1169

# EXHIBIT C

**Backstop Commitment Letter**

UST-1170

**EXECUTION VERSION**

July 23, 2020

<u>PERSONAL AND CONFIDENTIAL</u>
Ascena Retail Group, Inc.
933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attention: Dan Lamadrid

<div align="center">

Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Facility
Backstop Commitment Letter

</div>

Ladies and Gentlemen:

Ascena Retail Group, Inc. ("<u>Ascena TopCo</u>", "<u>you</u>" or "<u>your</u>") has (i) advised the parties listed on the signature pages hereto as Backstop Commitment Parties (each, a "<u>Backstop Commitment Party</u>" and, collectively, the "<u>Backstop Commitment Parties</u>", "<u>we</u>", "<u>us</u>" or "<u>our</u>"), that Ascena Topco and certain of its subsidiaries (the "<u>Subsidiary Debtors</u>" and, collectively with Ascena Topco, the "<u>Debtors</u>"), are considering filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et seq</u>. (as amended, the "<u>Bankruptcy Code</u>"), and, in connection with the foregoing, (ii) requested that the Backstop Commitment Parties agree to commit to provide a superpriority senior secured debtor-in-possession term loan credit facility for Ascena Topco under Sections 364(c) and 364(d) of the Bankruptcy Code (the "<u>DIP Facility</u>") consisting of (x) new money term loans (the "<u>New Money DIP Loans</u>") in an aggregate principal amount of $150 million and (y) term loans (the "<u>Roll-Up DIP Loans</u>" and, together with the New Money DIP Loans, the "<u>DIP Loans</u>") resulting from the conversion of the Prepetition Term Loans (as defined below) of the Prepetition Term Lenders (as defined below) that provide (themselves or through their affiliates) New Money DIP Loans in an aggregate amount equal to $161.8 million on the Effective Date, or as otherwise set forth in the Form DIP Credit Agreement. The DIP Facility shall convert on a dollar-for-dollar basis into an exit facility (the "<u>Exit Conversion</u>", such converted loans, the "<u>Exit Term Loans</u>", and the financing provided by the Exit Term Loans, the "<u>Exit Facility</u>") substantially on the terms set forth in this letter (including all exhibits, annexes, and schedules hereto, the "<u>Backstop Commitment Letter</u>"), as well as the form Senior Secured Super-Priority Debtor-In-Possession Term Credit Agreement attached hereto as **Exhibit A** (the "<u>Form DIP Credit Agreement</u>") and the Exit Facility Term Sheet attached hereto as **Exhibit B** (the "<u>Exit Facility Term Sheet</u>"), which terms will be memorialized in a credit agreement that will govern the Exit Facility (the "<u>Exit Facility Credit Agreement</u>"), subject solely to the conditions set forth in the sections of Article IV of the Form DIP Credit Agreement and the "Conditions to Borrower" set forth in the Exit Facility Term Sheet, in each case, that are applicable to the relevant borrowing. Unless otherwise specified herein, all references to "$" shall refer to U.S. dollars. Capitalized terms used herein without definition shall have the meaning assigned thereto in the Form DIP Credit Agreement or the Exit Facility Term Sheet, as applicable.

1.    <u>Backstop Commitment</u>.

To provide assurance that the DIP Facility and the Exit Facility shall be available on the terms and conditions set forth herein, in the Form DIP Credit Agreement and the Exit Facility Term Sheet, as applicable, each Backstop Commitment Party is pleased to advise Ascena Topco of its several and not joint commitment (the "<u>Backstop Commitment</u>") to provide, itself or through one or more funds managed by such Backstop Commitment Party, the amount of the DIP Loans and Exit Term Loans, each as set forth on **Schedule 1** hereto (as updated from time to time prior to the date that is two business days prior to the Effective Date) on the terms set forth in the Backstop Commitment Letter, subject solely to the conditions set forth in the sections of Article IV of the Form DIP Credit Agreement and the "Conditions to Borrowing" set forth in the Exit Facility Term Sheet that are applicable to the relevant borrowing. Each Backstop

<div align="center">1</div>

UST-1171

Commitment Party may, at its option, arrange for the Form DIP Credit Agreement or the Exit Facility Credit Agreement, if applicable, to be executed by one or more financial institutions selected by the applicable Backstop Commitment Party and reasonably acceptable to Ascena Topco (the "Fronting Lender(s)"), to act as an initial lender and to fund some or all of the Backstop Commitment Party's Backstop Commitment, in which case the applicable Backstop Commitment Party will acquire its shares of the DIP Facility and/or Exit Facility, as applicable, by assignment from the Fronting Lender(s) in accordance with the assignment provisions of the Form DIP Credit Agreement and the Exit Facility Credit Agreement, as applicable.

It is understood and agreed that the aggregate commitments under this Backstop Commitment Letter in respect of New Money DIP Loans (and the automatic conversion thereof to Exit Term Loans on the Conversion Date) are $150 million in total, subject to the Initial Allocation, as set forth in Section 2 hereof and each Backstop Commitment Party hereby agrees and commits to such automatic conversion of the New Money DIP Loans to Exit Term Loans on the Conversion Date.

2.    Initial Allocation.

Each Lender (as defined in the Prepetition Term Loan Credit Agreement, a "Prepetition Term Lender") as of the Syndication End Date (as defined below) (including the Backstop Commitment Parties) shall have the right to participate (the "Opportunity") in 50.0% of the DIP Facility and the Exit Facility, in each case based on its Pro Rata Share (as defined below). The Opportunity will be conducted on the terms and conditions set forth in syndication procedures and related documentation, which procedures and documentation shall be reasonably acceptable to the Debtors and the Backstop Commitment Parties (the "Syndication Procedures"); provided that, the Backstop Commitment Parties shall use commercially reasonable efforts to cause the Syndication Procedures to be distributed by no later than 10:00 am New York Time on the fifth Business Day following the Petition Date (or such later date as agreed by you and the Majority Backstop Commitment Parties (as defined below)). Pursuant to the Syndication Procedures, each Prepetition Term Lender electing to participate in the Opportunity shall, among other things (i) provide written notification of such election to the Ad Hoc Committee Advisors by no later than the date that is 10 Business Days after the Syndication Procedures are distributed to the Prepetition Term Lenders (the "Syndication End Date") (or such later time as reasonably agreed by the Majority Backstop Commitment Parties and you) and (ii) execute a joinder to the Restructuring Support Agreement, dated as of the date hereof (the "Restructuring Support Agreement"), by and among Ascena Topco and certain of its subsidiaries and certain Prepetition Term Lenders prior to the Syndication End Date (or such later time as reasonably agreed by the Majority Backstop Commitment Parties and you) (the "Initial Allocation"); provided, that, any Backstop Commitment Party that is a Prepetition Term Lender shall (unless it elects otherwise) be deemed to have provided such notice of election to participate in the DIP Facility and the Exit Facility in respect of such holdings upon executing this Backstop Commitment Letter and the Restructuring Support Agreement. Each Prepetition Term Lender that elects to participate in the DIP Facility shall be obligated to participate in its ratable portion of the Exit Term Loans and the commitments under the Exit Facility will be "stapled to" the DIP Facility and traded in equal percentage.

"Pro Rata Share" means with respect to each Prepetition Term Lender (x) the aggregate principal amount of Loans (as defined in the Prepetition Term Loan Credit Agreement, the "Prepetition Term Loans") held by such Prepetition Term Lender, as set forth in the register for the Prepetition Term Loan Credit Agreement on the Syndication End Date divided by (y) the aggregate principal amount of Prepetition Term Loans held by all Prepetition Term Lenders outstanding under the Prepetition Term Loan Credit Agreement at such time.

UST-1172

"Majority Backstop Commitment Parties" means, at any time, Backstop Commitment Parties having Backstop Commitments outstanding that, taken together, represent at least 50.01% of the sum of all Backstop Commitments outstanding at such time.

Each Backstop Commitment Party shall have the right to assign its Commitments under the DIP Facility and the Exit Facility to participating Lenders in accordance with the Initial Allocation; provided that, notwithstanding the Initial Allocation, (i) no Backstop Commitment Party shall be relieved, released or novated from its obligations hereunder (including its obligation to fund the DIP Facility on the Effective Date, subject to the satisfaction (or waiver) of the conditions set forth in Article IV of the Form DIP Credit Agreement and its obligation to convert into the Exit Facility on the Conversion Date, subject to the satisfaction (or waiver) of the conditions set forth in the Exit Facility Term Sheet) in connection with the Initial Allocation, including its Backstop Commitments, until after the Initial Allocation Date has occurred, (ii) no allocation shall become effective as between you and such Backstop Commitment Party with respect to all or any portion of such Backstop Commitment Party's Backstop Commitments in respect of the DIP Facility and the Exit Facility until after the occurrence of the Initial Allocation Date, and (iii) unless you otherwise agree in writing, each Backstop Commitment Party shall retain exclusive control over all rights and obligations with respect to its Backstop Commitments in respect of the DIP Facility and the Exit Facility, including all rights with respect to consents, modifications, supplements, waivers and amendments, until the Initial Allocation Date has occurred. Any unsubscribed portion of the Opportunity as of the Syndication End Date shall be automatically allocated to, and funded by (if applicable), the Backstop Commitment Parties based on their respective percentages set forth on Schedule 2 hereto.

Each of the parties hereto agrees to use its respective commercially reasonable efforts to assist the Administrative Agent in connection with the Initial Allocation. The Backstop Commitment Parties agree that, following the Initial Allocation, Ascena Topco and its subsidiaries and the Administrative Agent may conclusively rely on the schedule of "Post-Initial Allocation Term Loan Commitments" provided to Ascena Topco by the financial advisor for the Backstop Commitment Parties, Greenhill & Co., LLC, including the Lenders listed therein and their respective Commitments. None of Ascena Topco nor any of its affiliates nor any of their respective advisors shall be liable with respect to such schedule.

You acknowledge and agree that nothing in this Backstop Commitment Letter or the nature of our services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between any Backstop Commitment Party, the Administrative Agent or its affiliates, on the one hand, and you, your equity holders or your affiliates, on the other hand, and you waive, to the fullest extent permitted by law, any claims you may have against any Backstop Commitment Party, the Administrative Agent or its affiliates for breach of fiduciary duty or alleged breach of fiduciary duty in connection with this Backstop Commitment Letter or the transactions contemplated hereby, and agree that no Backstop Commitment Party, the Administrative Agent or affiliates of any of the foregoing will have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including your equity holders, employees or creditors. You acknowledge that the transactions contemplated hereby (including the exercise of rights and remedies hereunder) are arms'-length commercial transactions and that we and the Administrative Agent are acting as principal and in our own respective best interests. You are relying on your own experts and advisors to determine whether the transactions contemplated hereby are in your best interests and are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated hereby. In addition, you acknowledge that we and the Administrative Agent may employ the services of our respective affiliates in providing certain services hereunder and may exchange with such affiliates information concerning Ascena Topco and other companies that may be the subject of the transactions contemplated hereby and such affiliates will be entitled to the benefits afforded to us and the Agents hereunder; provided, that any such affiliates receiving information concerning Ascena Topco and other companies in accordance with this paragraph shall be subject to the same confidentiality

UST-1173

obligations provided for in this Backstop Commitment Letter (with each Backstop Commitment Party responsible for its affiliates' compliance with this paragraph).

3.      Information.

You hereby represent and warrant that (a) all written information concerning you and your subsidiaries and your and their respective business (other than financial projections, estimates, forecasts and budgets and other forward-looking information (collectively, the "Projections") and information of a general economic or industry specific nature) (the "Information") that has been or will be made available to us or any of our respective affiliates by or on behalf of you is or will be, when furnished and to the best of your knowledge, complete and correct in all material respects, when taken as a whole, and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to the updates provided for in the penultimate sentence of this Section 3) and (b) the Projections that have been or will be made available to us or any of our affiliates by or on behalf of you or any of your representatives have been or will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made and at the time the related Projections are made available to us or any of our affiliates (it being acknowledged that (i) such Projections are merely a prediction as to future events and are not to be viewed as facts, (ii) such Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, (iii) the actual results during the period or periods covered by any such Projections may differ significantly from the projected results, and (iv) no guarantee or assurance can be given that the projected results will be realized). In particular, where Projections expressly or implicitly take into account the current market volatility and widespread impact of the COVID-19 outbreak, the extent of the impact of these developments on the Debtors' and their subsidiaries' operational and financial performance will depend on future developments, including the duration and spread of the outbreak and related governmental advisories and restrictions, and the impact of the COVID-19 outbreak on overall demand for the Debtors' and their subsidiaries' products and services, all of which are outside of the control of the Debtors or their subsidiaries, highly uncertain and cannot be predicted. You agree that if, at any time prior to the entry of the Order approving the DIP Facility, any of the representations, warranties and covenants in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations, warranties and covenants were being made, at such subsequent time, then you will promptly supplement the Information and the Projections so that such representations, warranties and covenants would be correct in material respects; provided, for the avoidance of doubt, there will be no requirement to update previously delivered Projections to reflect new assumptions so long as the assumptions were reasonable at the time made and made available to us or any of our affiliates. The accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the obligations of the Backstop Commitment Parties hereunder or the availability of the DIP Facility.

4.      Premium.

As consideration for the Backstop Commitments and agreements of the Backstop Commitment Parties hereunder and under the Restructuring Support Agreement, Ascena Topco agrees to pay (or cause to be paid) to the Backstop Commitment Parties, (or, at any Backstop Commitment Party's option and upon such Related Lender's designation (which may be provided by electronic communication), its Related Lender), a non-refundable backstop premium equal to $7.5 million (the "Backstop Commitment Premium"), which shall be allocated to each Backstop Commitment Party, in an amount equal to (1) its percentage set forth on Schedule 2 hereto (the "Backstop Percentage"), multiplied by (2) the Backstop Commitment Premium, which shall be fully earned, nonrefundable and non-avoidable on the execution of this Backstop Commitment Letter and payable in cash free and clear of any withholding tax upon the

UST-1174

funding of the New Money DIP Loans on the Funding Date. Notwithstanding the foregoing, at the option of the Lenders, any or all of the Backstop Commitment Premium may instead be effected in the form of original issue discount with respect to the DIP Facility.

If a Termination Date occurs prior to the funding of the DIP Term Facility, a non-refundable aggregate premium in an amount equal to $7.5 million shall be payable in cash free and clear of any withholding tax (the "Termination Premium") on the Termination Date, which shall be allocated to each Backstop Commitment Party in an amount equal to (1) its Backstop Percentage, multiplied by (2) the Termination Premium.

5.     Payments and Fees

Without duplication of any amounts payable pursuant to Section 2.10 of the Form DIP Credit Agreement, the New Money DIP Loans will be subject to a commitment payment for each Lender participating in the DIP Facility in an amount of up to 2.50% of the principal amount of such Lender's New Money DIP Loans as of the Funding Date, earned upon entry of the Order and due and payable upon the Funding Date (the payment described in this sentence, the "DIP Commitment Payment").  For the avoidance of doubt, the entirety of the DIP Commitment Payment shall be treated as original issue discount with respect to the DIP Facility, and shall be subject to the withholding provisions set forth in Section 2.15 of the Form DIP Credit Agreement.

The Debtors agree to pay the fees, costs and expenses (collectively, the "Fronting Expenses") incurred in connection with the initial funding of the New Money DIP Loans by the Fronting Lender(s) and any assignments made by such Fronting Lender(s) to the Backstop Commitment Parties in connection therewith; provided that such Fronting Expenses shall not exceed 0.50% of such Fronting Lender(s)' New Money DIP Loans so funded.

6.     Conditions.

The Backstop Commitment Parties' Backstop Commitments and agreements hereunder in respect of the DIP Facility are subject solely to the satisfaction (or waiver) of the conditions precedent set forth in the sections of Article IV of the Form DIP Credit Agreement that are applicable to the relevant borrowing. Subject to the Order, there are no conditions (implied or otherwise) to the Backstop Commitments hereunder in respect of the DIP Facility, and there will be no conditions (implied or otherwise) to the availability of the DIP Facility on the Effective Date or the funding of the New DIP Term Loans on the Funding Date, including compliance with the terms of this Backstop Commitment Letter or the Form DIP Credit Agreement, other than those that are expressly stated in the applicable sections of Article IV of the Form DIP Credit Agreement relevant to the availability of the DIP Facility on the Effective Date or the Funding Date, as applicable.  The Backstop Commitment Parties' commitment in respect of the Exit Facility are subject to the satisfaction or waiver of the conditions precedent set forth in "Conditions to Borrowing" in the Exit Facility Term Sheet. Subject to the Order, there are no conditions (implied or otherwise) to the Backstop Commitments hereunder in respect of the Exit Facility, and there will be no conditions (implied or otherwise) to the conversion of the Exit Facility on the Conversion Date, including compliance with the terms of this Backstop Commitment Letter or the Form DIP Credit Agreement, other than those that are expressly stated in the  "Conditions to Borrowing" in the Exit Facility Term Sheet.

7.     Indemnification and Expenses.

You agree to (a) indemnify and hold harmless each Backstop Commitment Party and the Administrative Agent, their respective affiliates and their and their affiliates' officers, directors, employees, agents, attorneys, accountants, advisors (including investment managers and advisers),

UST-1175

consultants, representatives, controlling persons, members and permitted successors and assigns (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("Losses") to which any such Indemnified Person may become subject arising out of or in connection with this Backstop Commitment Letter, the DIP Facility, the Exit Facility the use of proceeds thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing, and to (b) reimburse each Backstop Commitment Party from time to time within five (5) Business Days of receipt of their reasonable demand by presentation of a summary statement for any reasonable and documented out-of-pocket legal or other expenses incurred in connection with the Cases, the DIP Facility, the Exit Facility, the enforcement of this Backstop Commitment Letter, the definitive documentation for the DIP Facility, the Exit Facility, and, in each case any ancillary documents and security arrangements in connection therewith, but no other third-party financial advisors (other than Greenhill & Co., LLC as financial advisor for the Backstop Commitment Parties) without your prior written consent; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses to the extent (a) they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's (i) gross negligence, bad faith, fraud or willful misconduct or (ii) material breach of its obligations under this Backstop Commitment Letter, or (b) they relate to a dispute solely among Indemnified Persons and not arising out of any act or omission of the Debtors or any of their respective subsidiaries (other than any claim, litigation, investigation or proceeding against the Administrative Agent in its capacity or in fulfilling its role as such).

None of you, the other Debtors, any of your or their respective subsidiaries, we nor any other Indemnified Person will be responsible or liable to one another for any indirect, special, punitive or consequential damages which may be alleged as a result of or arising out of, or in any way related to, the DIP Facility, the Exit Facility, the enforcement of this Backstop Commitment Letter, the definitive documentation for the DIP Facility or the Exit Facility, or any ancillary documents and security arrangements in connection therewith; provided that your indemnity and reimbursement obligations under this Section 6 shall not be limited by this sentence.

8.    Assignments, Amendments.

This Backstop Commitment Letter shall not be assignable by you or us without the prior written consent of the other parties hereto (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto, the Indemnified Persons and with respect to Section 2, Section 6 and this Section 7, the Administrative Agent, and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto, the Indemnified Persons and with respect to Section 2 and Section 6 and this Section 7, the Administrative Agent. Notwithstanding anything set forth in this Section 8 to the contrary, each Backstop Commitment Party (i) shall assign all or a portion of its Backstop Commitment to other banks, financial institutions, or institutional lenders and investors solely in connection with the Initial Allocation pursuant to Section 2 above (subject to the terms and conditions set forth therein) and (ii) may assign its respective Backstop Commitment, in whole or in part, to any Related Lender, or to any other Backstop Commitment Party. This Backstop Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by the Backstop Commitment Parties and you.

This Backstop Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Backstop Commitment Letter by facsimile or other electronic transmission (including E-Signature) shall be effective as delivery of a manually executed counterpart hereof. Section headings used herein are for convenience of reference only, are not part of this Backstop Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Backstop Commitment Letter. You acknowledge that information and documents

relating to the DIP Facility and/or Exit Facility may be transmitted through the internet, e-mail or similar electronic transmission systems and that neither any Backstop Commitment Party nor any Agent, nor any of their respective affiliates, shall be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner.

This Backstop Commitment Letter supersedes all prior understandings, whether written or oral, between us with respect to the DIP Facility and the Exit Facility.

9.    Governing Law, Etc.; Jurisdiction.

THIS BACKSTOP COMMITMENT LETTER AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS BACKSTOP COMMITMENT LETTER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF THE DOMESTIC SUBSTANTIVE LAWS OF ANY OTHER STATE).

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the non-exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan in New York City, and any appellate court from any thereof and the Bankruptcy Court, in any suit, action or proceeding arising out of or relating to this Backstop Commitment Letter or the DIP Facility, and agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court, or, to the extent applicable, the Bankruptcy Court; *provided* that suit for the recognition or enforcement of any judgment obtained in any such court may be brought in any other court of competent jurisdiction, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Backstop Commitment Letter or the DIP Facility in any New York State court, in any such Federal court or in any Bankruptcy Court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court, and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

You hereby agree that you shall not bring any suit, action, proceeding, claim or counterclaim under this Backstop Commitment Letter or with respect to the transactions contemplated hereby in any court other than such New York State court or Federal Court of the United States of America sitting in the Borough of Manhattan in New York City. Service of any process, summons, notice or document by registered mail addressed to you at the address above shall be effective service of process against you for any suit, action or proceeding brought in any such court.

10.    Waiver of Jury Trial.

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS BACKSTOP COMMITMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

UST-1177

11. <u>Confidentiality</u>.

This Backstop Commitment Letter is delivered to Ascena Topco on the understanding that neither this Backstop Commitment Letter nor any of its terms or substance shall be disclosed, directly or indirectly, to any other person or entity except (a) you and your officers, directors, employees, legal counsel, accountants, auditors, financial advisors, existing and prospective holders of indebtedness and their respective affiliates, representatives, officers, directors and legal counsel, in each case, who are involved in the consideration of the financing transactions contemplated hereby who have been informed by you of the confidential nature of this Backstop Commitment Letter and have agreed to treat such information confidentially, (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent not prohibited by law, to inform Backstop Commitment Parties promptly in advance thereof), (c) the office of the U.S. Trustee, any *ad-hoc* or statutorily appointed committee of unsecured creditors, and their respective representatives and professional advisors on a confidential and "need to know" basis, (d) to the Bankruptcy Court, in a redacted manner in form and substance reasonably satisfactory to the Backstop Commitment Parties, to the extent required to obtain Bankruptcy Court approval in connection with any acts or obligations to be taken pursuant to this Backstop Commitment Letter or the transactions contemplated hereby and (e) you may disclose the aggregate fee amounts contained herein, as part of pro forma information or a generic disclosure of aggregate sources and uses related to fee amounts related to the Transactions to the extent customary or required in offering or marketing materials or in any public or regulatory filing relating to the Transactions.

Each Backstop Commitment Party agrees to keep confidential, and not to publish, disclose or otherwise divulge, confidential information with respect to the transactions contemplated hereby or obtained from or on behalf of you or your respective affiliates in the course of the transactions contemplated hereby, except that the Backstop Commitment Parties shall be permitted to disclose such confidential information (a) to their affiliates and their and their affiliates' respective directors, officers, agents, employees, attorneys, accountants, auditors and advisors involved in the transactions contemplated hereby on a "need to know" basis and who are made aware of and agree to comply with the provisions of this paragraph, in each case on a confidential basis (with the Backstop Commitment Party responsible for such persons' compliance with this paragraph), (b) on a confidential basis to any bona fide prospective Lender, prospective participant or swap counterparty (in accordance with the terms of the Form DIP Credit Agreement) that agrees to keep such information confidential in accordance with (x) the provisions of this paragraph (or language substantially similar to this paragraph that is reasonably acceptable to you) for your benefit or (y) other customary confidentiality language in a "click-through" arrangement, (c) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case you agree, to the extent not prohibited by law, to inform Backstop Commitment Parties promptly in advance thereof), (d) to the extent such information: (i) becomes publicly available other than as a result of a breach of this Backstop Commitment Letter or other confidentiality obligation owed by such Backstop Commitment Party to you or your affiliates or (ii) becomes available to the Backstop Commitment Parties on a non-confidential basis from a source other than you or on your behalf that, to such Backstop Commitment Party's knowledge, is not in violation of any confidentiality obligation owed to you or your affiliates, (e) to the extent you shall have consented to such disclosure in writing (which may include through electronic means), (f) as is necessary in protecting and enforcing the Backstop Commitment Parties' rights with respect to this Backstop Commitment Letter and/or the DIP Facility, (g) to the extent independently developed by such Backstop Commitment Party or its affiliates without reliance on confidential information, (h) with respect to the existence and contents of the Form DIP Credit Agreement, in consultation with you, to the rating agencies or (i) with respect to the existence and contents of the Backstop Commitment Letter and the DIP Facility, to market data collectors or similar service providers in connection with the arrangement, administration or management of the DIP Facility and to industry

UST-1178

trade organizations where such information with respect to the DIP Facility is customarily included in league table measurements. The Backstop Commitment Parties' and their respective affiliates', if any, obligations under this paragraph shall terminate automatically to the extent superseded by the confidentiality provision in the Form DIP Credit Agreement upon the effectiveness thereof and, in any event, will terminate one year from the date hereof.

12.  Miscellaneous.

The Backstop Commitment Parties hereby notify Ascena Topco that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act"), it and its affiliates are required to obtain, verify and record information that identifies Ascena Topco, each other Debtor, which information includes names, addresses, tax identification numbers and other information that will allow Backstop Commitment Parties and its affiliates to identify Ascena Topco and each other Debtor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for Backstop Commitment Parties and its affiliates.

Absent a change in applicable tax law or a contrary determination (as defined in Section 1313(a) of the Internal Revenue Code of 1986, as amended), each of the parties hereto agrees (i) the Backstop Commitment Premium and the Termination Premium shall be treated as premiums paid by the Debtors to the relevant Backstop Commitment Party in exchange for the issuance of a put right to Ascena Topco with respect to the DIP Facility and (ii) to not take any tax position inconsistent with the tax treatment described in clause (i).

Each of the parties hereto agrees that this Backstop Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein, including an agreement to negotiate in good faith the definitive documentation for the DIP Facility and the Exit Facility by the parties hereto in a manner consistent with this Backstop Commitment Letter, it being acknowledged and agreed that the availability of the DIP Facility and Exit Facility is subject to the conditions precedent expressly set forth in Section 5 hereof.

If the foregoing correctly sets forth our agreement, please indicate Ascena Topco's acceptance of the terms of this Backstop Commitment Letter by returning to the Backstop Commitment Parties executed counterparts of this Backstop Commitment Letter not later than 11:59 p.m., New York City time, on July 23, 2020. This offer will automatically expire at such time if the Backstop Commitment Parties have not received such executed counterparts in accordance with the preceding sentence. This Backstop Commitment Letter and the Backstop Commitments and agreements hereunder shall automatically terminate on the earlier of (i) July 26, 2020, unless the Petition Date has occurred by such date, (ii) the date that is 36 calendar days after the Petition Date, unless prior to such time the DIP Financing Order (as defined in the Restructuring Support Agreement) shall have been entered by the Bankruptcy Court, (iii) five Business Days after the Termination Date (as defined in the Restructuring Support Agreement) or the Restructuring Support Agreement otherwise ceases to be in full force and effect or (iv) five Business Days after the Outside Date (as defined in the Restructuring Support Agreement), unless prior to such time the Exit Conversion shall have occurred, in each case unless extended by agreement of you and the Majority Backstop Commitment Parties (which agreement may be evidenced by email of counsel). Notwithstanding the immediately preceding sentence, Section 4 above, as well as the indemnification and expenses, confidentiality, Initial Allocation, information, jurisdiction, governing law and waiver of jury trial provisions contained herein shall remain in full force and effect in accordance with their terms notwithstanding the termination of this Backstop Commitment Letter or the Backstop Commitment Parties' Backstop Commitments hereunder; *provided* that your obligations under this Commitment Letter, other than those pursuant to Section 4 and with respect to the Initial Allocation and confidentiality, shall

UST-1179

automatically terminate and be superseded by the applicable provisions in the Form DIP Credit Agreement and the Exit Facility Credit Agreement, in each case, to the extent covered thereby, upon the initial funding on the Effective Date or the occurrence of the Exit Conversion, and you shall be released from all liability in connection therewith at such time.

[Signature Pages follow.]

UST-1180

[*Signature pages of the Backstop Commitment Parties on file with the Company*]

UST-1181

Accepted and agreed to as of July 23, 2020:

ASCENA RETAIL GROUP, INC.

By: _Dan Lamadrid_ _____
      EC958DC60DCB49E...
      Name: Dan Lamadrid
      Title:  Executive Vice President and
              Chief Financial Officer

*Signature page to Backstop Commitment Letter*

**Schedule 1**

[*On file with the Company*]

UST-1183

**Schedule 2**

[*On file with the Company*]

UST-1184

**Exhibit A**

See Attached.

UST-1185

$311,800,000

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
TERM CREDIT AGREEMENT

dated as of

[   ], 2020,

among

ASCENA RETAIL GROUP, INC.,
as Parent Borrower

ANNTAYLOR RETAIL, INC.,
as Subsidiary Borrower

The LENDERS Party Hereto

and

ALTER DOMUS (US) LLC,
as Administrative Agent

UST-1186

# TABLE OF CONTENTS

**Page**

## ARTICLE I

### Definitions

| | | |
|---|---|---|
| SECTION 1.01. | Defined Terms | 2 |
| SECTION 1.02. | Classification of Loans and Borrowings | 34 |
| SECTION 1.03. | Terms Generally | 34 |
| SECTION 1.04. | Accounting Terms; GAAP | 35 |
| SECTION 1.05. | Classification of Actions | 35 |
| SECTION 1.06. | Divisions | 35 |

## ARTICLE II

### The Credits

| | | |
|---|---|---|
| SECTION 2.01. | Commitments | 36 |
| SECTION 2.02. | Loans and Borrowings | 36 |
| SECTION 2.03. | Requests for Borrowings | 37 |
| SECTION 2.04. | Funding of Borrowings | 37 |
| SECTION 2.05. | Interest Elections | 38 |
| SECTION 2.06. | Termination of Commitments | 39 |
| SECTION 2.07. | Repayment of Loans; Evidence of Debt | 39 |
| SECTION 2.08. | Amortization of Term Loans | 40 |
| SECTION 2.09. | Prepayment of Loans | 40 |
| SECTION 2.10. | Fees | 42 |
| SECTION 2.11. | Interest | 42 |
| SECTION 2.12. | Alternate Rate of Interest | 43 |
| SECTION 2.13. | Increased Costs | 44 |
| SECTION 2.14. | Break Funding Payments | 45 |
| SECTION 2.15. | Taxes | 46 |
| SECTION 2.16. | Payments Generally; Pro Rata Treatment; Sharing of Set-offs | 50 |
| SECTION 2.17. | Mitigation Obligations; Replacement of Lenders | 52 |
| SECTION 2.18. | [Reserved] | 53 |
| SECTION 2.19. | [Reserved] | 53 |
| SECTION 2.20. | Joint and Several Liability of the Borrowers | 53 |
| SECTION 2.21. | Super-Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations | 54 |
| SECTION 2.22. | Conversion to Exit Facility Agreement | 55 |

## ARTICLE III

### Representations and Warranties

| | | |
|---|---|---|
| SECTION 3.01. | Organization; Powers | 56 |

i

UST-1187

SECTION 3.02.    Authorization; Enforceability; Benefit to Loan Parties ............................56
SECTION 3.03.    Governmental Approvals; No Conflicts ...................................................56
SECTION 3.04.    Financial Condition; No Material Adverse Change...................................57
SECTION 3.05.    Properties ...............................................................................................57
SECTION 3.06.    Litigation and Environmental Matters ....................................................57
SECTION 3.07.    Compliance with Laws and Agreements ..................................................58
SECTION 3.08.    Investment Company Status ....................................................................58
SECTION 3.09.    Taxes ......................................................................................................58
SECTION 3.10.    ERISA; Labor Matters ...........................................................................59
SECTION 3.11.    [Reserved] ..............................................................................................59
SECTION 3.12.    Subsidiaries and Joint Ventures ..............................................................59
SECTION 3.13.    Insurance .................................................................................................60
SECTION 3.14.    Federal Reserve Regulations...................................................................60
SECTION 3.15.    [Reserved] ..............................................................................................60
SECTION 3.16.    Collateral Matters....................................................................................60
SECTION 3.17.    Use of Proceeds.......................................................................................60
SECTION 3.18.    Approved Budget .....................................................................................61
SECTION 3.19.    Chapter 11 Cases .....................................................................................61

ARTICLE IV

Conditions

SECTION 4.01.    Conditions to Effective Date and Availability of the Term Loans ............62
SECTION 4.02     Conditions to the New Money Loan. ........................................................63

ARTICLE V

Affirmative Covenants

SECTION 5.01.    Financial Statements and Other Information .............................................64
SECTION 5.02.    Notices of Material Events........................................................................67
SECTION 5.03.    Collateral Obligations; Additional Subsidiaries .......................................68
SECTION 5.04.    Information Regarding Collateral ..............................................................68
SECTION 5.05.    Existence; Conduct of Business .................................................................69
SECTION 5.06.    Payment of Obligations.............................................................................70
SECTION 5.07.    Maintenance of Properties ........................................................................70
SECTION 5.08.    Insurance ..................................................................................................70
SECTION 5.09.    Books and Records; Inspection and Rights ...............................................70
SECTION 5.10.    Compliance with Laws .............................................................................71
SECTION 5.11.    Bankruptcy Matters..................................................................................71
SECTION 5.12.    Maintenance of Ratings ............................................................................72
SECTION 5.13.    Certain Post-Closing Collateral Obligations.............................................72
SECTION 5.14.    Reserved...................................................................................................72
SECTION 5.15.    Conference Calls.......................................................................................72

LA\4104335.13

UST-1188

# ARTICLE VI

## Negative Covenants

SECTION 6.01.   Indebtedness; Certain Equity Securities ................................................. 73
SECTION 6.02.   Liens ................................................................................................. 74
SECTION 6.03.   Fundamental Changes; Business Activities ............................................. 76
SECTION 6.04.   Investments, Loans, Advances, Guarantees and Acquisitions .................. 76
SECTION 6.05.   Asset Sales ........................................................................................ 78
SECTION 6.06.   Sale/Leaseback Transactions ............................................................... 79
SECTION 6.07.   Swap Agreements ............................................................................... 79
SECTION 6.08.   Restricted Payments; Certain Payments of Indebtedness ........................ 79
SECTION 6.09.   Transactions with Affiliates ................................................................ 81
SECTION 6.10.   Restrictive Agreements ....................................................................... 81
SECTION 6.11.   Amendment of Organizational Documents ............................................. 82
SECTION 6.12.   Financial Covenants ............................................................................ 82
SECTION 6.13.   Accounting Changes ........................................................................... 83
SECTION 6.14.   Sanctions .......................................................................................... 83
SECTION 6.15.   Anti-Corruption Laws ......................................................................... 83

# ARTICLE VII

## Events of Default

# ARTICLE VIII

## The Administrative Agent

# ARTICLE IX

## Miscellaneous

SECTION 9.01.   Notices ............................................................................................. 93
SECTION 9.02.   Waivers; Amendments ........................................................................ 95
SECTION 9.03.   Expenses; Indemnity; Damage Waiver ................................................. 97
SECTION 9.04.   Successors and Assigns ....................................................................... 99
SECTION 9.05.   Survival ............................................................................................ 103
SECTION 9.06.   Counterparts; Integration; Effectiveness; Electronic Execution .............. 104
SECTION 9.07.   Severability ....................................................................................... 104
SECTION 9.08.   Right of Setoff ................................................................................... 104
SECTION 9.09.   Governing Law; Jurisdiction; Consent to Service of Process .................. 105
SECTION 9.10.   WAIVER OF JURY TRIAL ................................................................ 105
SECTION 9.11.   Headings ........................................................................................... 106
SECTION 9.12.   Confidentiality ................................................................................... 106
SECTION 9.13.   Several Obligations; Nonreliance; Violation of Law .............................. 106
SECTION 9.14.   USA Patriot Act Notice ...................................................................... 106
SECTION 9.15.   Interest Rate Limitation ...................................................................... 107

LA\4104335.13

UST-1189

SECTION 9.16.    Release of Liens and Guarantees ...............................................107
SECTION 9.17.    No Fiduciary Relationship .......................................................107
SECTION 9.18.    Non-Public Information ...........................................................108
SECTION 9.19.    Intercreditor Agreement ..........................................................108
SECTION 9.20.    Acknowledgement and Consent to Bail-In of EEA Financial Institutions ................................................................................109

SCHEDULE:

Schedule 2.01   —   Commitments
Schedule 3.05   —   Real Property
Schedule 3.06   —   Disclosed Matters
Schedule 3.12   —   Subsidiaries and Joint Ventures
Schedule 3.13   —   Insurance
Schedule 5.11   —   Required Milestones
Schedule 6.01   —   Pre-Petition Indebtedness
Schedule 6.02   —   Liens
Schedule 6.04   —   Investments
Schedule 6.09   —   Transactions with Affiliates
Schedule 6.10   —   Restrictive Agreements

EXHIBITS:

Exhibit A   —   Form of Assignment and Assumption
Exhibit B   —   Form of Borrowing Request
Exhibit C   —   Form of Guarantee and Collateral Agreement
Exhibit D   —   Form of Compliance Certificate
Exhibit E   —   Form of Interest Election Request
Exhibit F   —   [Reserved]
Exhibit G   —   Form of Exit Facility Term Sheet
Exhibit H-1   —   Form of U.S. Tax Certificate for Non-U.S. Lenders that are not Partnerships for U.S. Federal Income Tax Purposes
Exhibit H-2   —   Form of U.S. Tax Certificate for Non-U.S. Lenders that are Partnerships for U.S. Federal Income Tax Purposes
Exhibit H-3   —   Form of U.S. Tax Certificate for Non-U.S. Participants that are not Partnerships for U.S. Federal Income Tax Purposes
Exhibit H-4   —   Form of U.S. Tax Certificate for Non-U.S. Participants that are Partnerships for U.S. Federal Income Tax Purposes
Exhibit I   —   [Reserved]
Exhibit J   —   Form of Variance Report
Exhibit K   —   Form of Note

Annex A   —   Approved Budget

LA\4104335.13

UST-1190

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION TERM CREDIT AGREEMENT, dated as of [ ], 2020, among ASCENA RETAIL GROUP, INC., a Delaware corporation, as debtor and debtor-in-possession (the "Parent Borrower"), ANNTAYLOR RETAIL, INC., a Florida corporation as debtor and debtor-in-possession (the "Subsidiary Borrower" and, together with the Parent Borrower, the "Borrowers" and each, a "Borrower"), the LENDERS party hereto and Alter Domus (US) LLC ("Alter Domus"), as Administrative Agent.

On July 23, 2020 (the "Petition Date"), the Borrowers and the other Loan Parties (collectively, the "Debtors", and each individually, a "Debtor") commenced voluntary cases (collectively, the "Cases" and each individually, a "Case") in the United States Bankruptcy Court for the Eastern District of Virginia Richmond Division (the "Court"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

Prior to the Petition Date, the Lenders provided financing to the Borrowers pursuant to that certain Term Credit Agreement dated as of August 21, 2015, among the Borrowers, the other Loan Parties, the Pre-Petition Lenders and Goldman Sachs Bank USA, as the Pre-Petition Agent and the other parties thereto (as amended, amended and restated, supplemented or otherwise modified from time to time through the date hereof, the "Pre-Petition Credit Agreement").

As of the Petition Date, the Pre-Petition Lenders under the Pre-Petition Credit Agreement were owed approximately $1,271,597,089 in Loans (as defined in the Pre-Petition Credit Agreement), plus interest, fees, costs and expenses and all other Pre-Petition Lender Obligations under the Pre-Petition Credit Agreement.

The Loan Document Obligations under and as defined in the Pre-Petition Credit Agreement are secured by a security interest in substantially all of the existing and after-acquired assets of the Borrowers and the other Loan Parties as more fully set forth in the Pre-Petition Loan Documents, and such security interest is perfected and, with certain exceptions, as described in the Pre-Petition Loan Documents, has priority over other security interests.

The Borrowers have requested, and, upon the terms set forth in this Agreement, the Lenders have agreed to make or be deemed to have made available to the Borrowers, a senior secured super priority term credit facility of up to $311,800,000 in the aggregate that is automatically convertible into a secured exit facility upon the satisfaction (or waiver) of certain conditions in the form of a term facility to be made available to the Borrowers at any time until the Maturity Date subject to the terms and conditions set forth herein (the "Term Credit Facility").

The Borrowers and other Loan Parties have agreed to secure all of their Loan Document Obligations under the Loan Documents by granting to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, a security interest in and lien upon all of their existing and after-acquired personal and real property, subject to the Intercreditor Agreement and the limitations and priorities contained in the Loan Documents and the Order.

UST-1191

Accordingly, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

<div align="center">ARTICLE I</div>

<div align="center">Definitions</div>

SECTION 1.01.    Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABL Agent" means the Person acting as agent under the ABL Credit Agreement, in its individual capacity, and its successors.

"ABL Credit Agreement" means the Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, dated the Funding Date, among the Parent Borrower, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto and the ABL Agent, as administrative agent, as amended, restated, supplemented, modified, renewed, refunded, replaced or refinanced from time to time through the date hereof.

"ABL Lenders" means the lenders under the ABL Credit Agreement.

"ABL Priority Collateral" has the meaning set forth in the Intercreditor Agreement.

"ABR," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bears interest at a rate determined by reference to the Alternate Base Rate.

"Acceptable Plan" means a Plan of Reorganization that is consistent with the RSA and otherwise satisfactory to the Required Lenders  and the Loan Parties in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof); it being agreed that the Plan (as defined in the RSA) is an "Acceptable Plan" to the Required Lenders.

"Actual Net Cash Flow Amount" means the actual net cash flows of the Loan Parties during the relevant period of determination which corresponds to each of the Budgeted Net Cash Flow Amounts described in the line item contained in the Approved Budget across from the heading "Unlevered Operating Cash Flow, Including Restructuring".

"Ad Hoc Committee" means the ad hoc committee of Consenting Stakeholders (as defined in the RSA).

"Ad Hoc Committee Advisors" means Greenhill Partners and Milbank LLP, the advisors of the Ad Hoc Committee.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded to the nearest 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate; provided that,

<div align="center">2</div>

UST-1192

notwithstanding the foregoing, in the case of the Term Loans, the Adjusted LIBO Rate shall at no time be less than 1.00% per annum.

"Administrative Agent" means Alter Domus (US) LLC, in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Administrative Agent Fee Letter" means that certain Fee Letter dated as of even date herewith between the Borrowers and Alter Domus.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" means this Senior Secured Super-Priority Debtor-In-Possession Term Credit Agreement, as modified, supplemented, amended or restated from time to time.

"Alter Domus" has the meaning set forth in the introductory paragraph hereto.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% per annum and (c) the Adjusted LIBO Rate on such day (or if such day is not a Business Day, the immediately preceding Business Day) for a deposit in dollars with a maturity of one month plus 1% per annum; provided that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the Screen Rate (or the Interpolated Screen Rate, as applicable) at approximately 11:00 a.m., London time, on such day for a deposit in dollars with a maturity of one month. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively. Notwithstanding the foregoing, in the case of the Term Loans, the Alternate Base Rate shall at no time be less than 2.00% per annum.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Parent Borrower and its Subsidiaries from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 and the UK Bribery Act 2010.

"Applicable Rate" means, for any day, with respect to any Term Loan, (i) 11.75% in the case Eurodollar Term Loans and (ii) 10.75% in the case of ABR Term Loans.

"Approved Budget" means the budget prepared by the Parent Borrower in form and substance reasonably satisfactory to the Ad Hoc Committee Advisors, it being understood and agreed that the budget in the form of Annex A and initially furnished to the Administrative Agent on or prior to the Effective Date is deemed reasonably satisfactory to the Ad Hoc Committee Advisors, as the same may be updated, modified or supplemented from time to time as provided in Section 5.01. The initial Approved Budget shall depict, on a weekly and line item

LA\4104335.13

UST-1193

basis, (i) projected cash receipts, (ii) projected cash disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Loan Parties' professionals and advisors), asset sales and any other fees and expenses relating to the Loan Documents), (iii) net cash flows, (iv) Liquidity and (v) professional fees and disbursements with respect to the Loan Parties' professionals, in each case for the first thirteen (13) week period from the Effective Date, and such initial Approved Budget shall be approved by, and in form and substance reasonably satisfactory to, the Administrative Agent and the Required Lenders in their sole discretion (it being acknowledged and agreed that the initial Approved Budget attached hereto as <u>Annex A</u> is approved by and reasonably satisfactory to the Administrative Agent and the Required Lenders)[1].

"<u>Approved Fund</u>" means any Person (other than a natural person that is engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"<u>Asset Sale</u>" has the meaning set forth in Section 6.05.

"<u>Asset Sale Escrow Account</u>" [_____][2].

"<u>Assignment and Assumption</u>" means an assignment and assumption entered into by a Lender and an Eligible Assignee, with the consent of any Person whose consent is required by Section 9.04, and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"<u>Automatic Stay</u>" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"<u>Backstop Lender</u>" means each Lender who is party to the Commitment Letter.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of such EEA Financial Institution.

"<u>Bail-In Legislation</u>" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"<u>Bankruptcy Code</u>" means the Bankruptcy Reform Act of 1978, as codified at 11 U.S.C. §§ 101 et seq.

---

[1] Subject to review of initial Approved Budget.

[2] Escrow mechanics to be confirmed.

LA\4104335.13

UST-1194

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Cases.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrowers" has the meaning set forth in the introductory paragraph hereto.

"Borrowing" means Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrowers for a Borrowing in accordance with Section 2.03, which shall be, in the case of any such written request, in the form of Exhibit B or any other form approved by the Administrative Agent.

"Budgeted Net Cash Flow Amount" means the amount described in the line item contained in the Approved Budget across from the heading "Unlevered Operating Cash Flow Including Restructuring", during the relevant period of determination.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP (as in effect on December 31, 2018, notwithstanding any modification or interpretative change thereto after such date and excluding the effect to any treatment of lease under Accounting Standards Codification 842 (or any other Accounting Standards Codification or Financial Accounting Standard have a similar result or effect)), the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve Out" has the meaning set forth in the Order.

"Cases" has the meaning set forth in the Recitals.

"Cash Equivalents" means:

(a)    marketable direct obligations issued or unconditionally guaranteed by the United States Government, the Government of Canada, or the UK government, or issued by an agency thereof and backed by the full faith and credit of the United States Government, the Government of Canada, or the UK government, as the case may be, in each case maturing within two years after the date of acquisition thereof;

LA\4104335.13

UST-1195

(b)     marketable direct obligations issued by any state of the United States of America or any province of Canada, or any member of the European Union or any political subdivision of any such state or province or any public instrumentality thereof, in each case maturing within two years after the date of acquisition thereof and, at the time of acquisition, having a rating of at least A by S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then from such other nationally recognized rating services acceptable to the Administrative Agent);

(c)     commercial paper maturing no more than one year after the date of creation thereof and, at the time of acquisition, having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then the highest rating from such other nationally recognized rating services acceptable to the Administrative Agent);

(d)     certificates of deposit or bankers acceptances denominated in US Dollars, Canadian Dollars, Sterling or Euro and maturing within one year after the date of acquisition thereof issued by any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(e)     repurchase agreements of any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(f)     overnight investments with any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(g)     other readily marketable instruments issued or sold by any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(h)     shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (a) through (g) above;

(i)     funds invested in brokerage accounts with nationally recognized brokerage houses or money market accounts; and

(j)     in the case of investments by any Foreign Subsidiary or investments made in a country outside the United States, other customarily utilized high quality investments

6

UST-1196

in the country where such Foreign Subsidiary is located or in which such investment is made that would customarily constitute "cash equivalents".

"Cash Management Order" means the order of the Court entered in the Cases after the "first day" hearing on a final basis, together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Required Lenders, which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements (as set forth in the Pre-Petition Credit Agreement) or such other arrangements as shall be reasonably acceptable to the Required Lenders in all material respects

"CFC" means (a) any Person that is a "controlled foreign corporation" within the meaning of Section 957(a) of the Code and (b) each subsidiary of any Person described in clause (a).

"CFC Holdco" means a Subsidiary with no material assets other than equity interests of one or more Foreign Subsidiaries that are CFCs.

"Change in Control" means during any period of 12 consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Parent Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any rule, regulation, treaty or other law, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted, promulgated or issued.

"Charges" has the meaning set forth in Section 9.15.

 "Claim" means any (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an

UST-1197

Case 3:21-33-13-RHDJN Doc 592 Filed 09/11/20 Entered 09/11/20 12:55:22 Desc Main
Document 41 Page 219 of 603

equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means (a) means, collectively, all of the real, personal and mixed property (including Equity Interests) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Loan Document Obligations, and (b) the ["DIP Collateral"][3] referred to in the Order, it being understood that "Collateral" shall include all such "DIP Collateral" irrespective of whether any such property was excluded pursuant to the Pre-Petition Loan Documents.

"Collateral Agreement" means the Guarantee and Collateral Agreement among the Borrowers, the other Loan Parties and the Administrative Agent, substantially in the form of Exhibit C, together with all supplements thereto.

"Collateral and Guarantee Requirement" means, at any time, the requirement that:

(a)     the Administrative Agent shall have received from the Borrowers and each Designated Subsidiary (a) either (i) a counterpart of the Collateral Agreement, duly executed and delivered on behalf of such Person, or (ii) in the case of any Person that becomes a Designated Subsidiary after the Effective Date, a supplement to the Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Person, together with such documents with respect to such Designated Subsidiary as may reasonably be requested by the Administrative Agent and (b) an Intercreditor Acknowledgement in the form referred to in the Intercreditor Agreement, duly executed and delivered on behalf of such Person;

(b)     all Equity Interests owned by or on behalf of any Loan Party shall have been pledged pursuant to, and to the extent required by, the Collateral Agreement, including Equity Interests in any Luxembourg IP Subsidiary and any first-tier CFC or CFC Holdco, and the Administrative Agent shall, to the extent required by the Collateral Agreement, have received certificates or other instruments representing all such certificated Equity Interests, together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

(c)     all other assets, to the extent not constituting Excluded Property, shall have been pledged pursuant to, and to the extent required by, the Collateral Agreement;

(d)     all documents and instruments, including UCC financing statements, required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded to perfect the Liens intended to be created by the Collateral Documents with the priority required by the Collateral Documents shall have been filed,

---

[3] Subject to Final Order.

8
LA\4104335.13
UST-1198

registered or recorded or delivered to the Administrative Agent for filing, registration or recording;

(e)    each Loan Party shall have obtained all material consents and approvals required in connection with the execution and delivery of all Collateral Documents to which it is a party and the performance of its obligations thereunder; and

(f)    the Loan Document Obligations shall at all times be secured by a valid, binding, continuing, enforceable perfected first priority Lien on the DIP Accounts and the proceeds thereof and, on the Effective Date (or such later date as the Required Lenders may agree in its sole discretion), the Borrowers must obtain Control Agreement for the DIP Accounts.

Notwithstanding the foregoing, any Designated Subsidiary formed or acquired after the Effective Date shall not be required to comply with the foregoing requirements prior to the time specified in Section 5.03.  The foregoing definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance or, subject to the requirements of applicable law, flood insurance, legal opinions, appraisals, surveys or other deliverables with respect to, particular assets of the Loan Parties, or the provision of Guarantees by any Restricted Subsidiary, if and for so long as the Administrative Agent (acting at the direction of the Required Lenders), in consultation with the Borrowers, reasonably determines that the cost of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance or flood insurance, legal opinions, appraisals, surveys or other deliverables in respect of such assets, or providing such Guarantees, shall be excessive in view of the benefits to be obtained by the Lenders therefrom.  The Required Lenders may in their sole discretion, grant extensions of time for the creation and perfection of security interests in (including delivery of promissory notes as required by clause (c) above) or the obtaining of title insurance or, subject to the requirements of applicable law, flood insurance, legal opinions, appraisals, surveys or other deliverables with respect to particular assets or the provision of any Guarantee by any Designated Subsidiary where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Collateral Documents.

"Collateral Documents" means the Order, Collateral Agreement, and each other document granting a Lien upon any assets of any Loan Party as security for payment of the Loan Document Obligations.

"Commitment" means, with respect to each Lender, such Lender's New Money Commitment and such Lender's Roll-Up Loans Commitment.

"Commitment Letter" means the Commitment Letter dated July 23, 2020, among the Ad Hoc Committee and the Parent Borrower.

"Committee" means an official committee of unsecured creditors appointed in any of the Cases by the U.S. Trustee.

"Communications" means, collectively, any written notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to

UST-1199

any Loan Document or the transactions contemplated therein that is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to Section 9.01, including through the Platform.

"Compliance Certificate" means a Compliance Certificate in the form of Exhibit D or any other form approved by the Administrative Agent.

"Confirmation Order" means an order of the Court entered in the Cases pursuant to section 1129 of the Bankruptcy Code, which order (x) shall confirm an Acceptable Plan, be a final Order and otherwise be in form and substance reasonably satisfactory to the Required Lenders, together with all extensions, modifications, and amendments thereto, also in form and substance reasonably satisfactory to the Required Lenders and (y) (i) if the Term Credit Facility converts to the Exit Facility, shall authorize and approve the extensions of credit under the Exit Facility Credit Agreement and the performance of the Borrowers' (or the entities assuming and/or acquiring directly or indirectly the operations and assets of the Borrowers in the Acceptable Plan) and Guarantors' obligations thereunder, authorize a pro forma capital structure that satisfies the conditions precedent to the occurrence of the Conversion Date and otherwise satisfies all other conditions to the Conversion Date or (ii) if the Term Credit Facility is to be repaid in cash, shall authorize and approve such repayment, any financing the proceeds of which will be used to fund such repayment, and the termination in full of all outstanding obligations under the Term Credit Facility.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means, with respect to any deposit account or securities account maintained by any Loan Party, a control agreement in form and substance reasonably satisfactory to the Administrative Agent, duly executed and delivered by such Loan Party and the depositary bank or the securities intermediary, as the case may be, with which such account is maintained.

"Conversion Date" means the date upon which each of the conditions precedent to effectiveness of the Exit Facility Agreement set forth in the Exit Facility Term Sheet shall have been satisfied or waived.

"Court" has the meaning set forth in the Recitals.

"Cumulative Four-Week Period" means the four-week period up to and through the Saturday of the week most recently ended prior to the applicable Variance Report Date, or if a four-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Saturday of the most recent week then ended.

"Debtor" has the meaning set forth in the Recitals.

"Debtors' Investment Banker" means Guggenheim Securities, LLC.

"Declined Proceeds" has the meaning set forth in Section 2.09(d).

10

UST-1200

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" means (i) in the case of overdue principal of any Loan, 2.0% per annum plus the rate otherwise applicable to such Loan as provided in Section 2.11 or (ii) in the case of any other overdue amount, 2.0% per annum plus the rate applicable to ABR Term Loans as provided in Section 2.11(a).

"Deposit Account" has the meaning set forth in the Collateral Agreement.

"Designated Jurisdiction" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"Designated Persons" means any person or entity listed on a Sanctions list.

"Designated Subsidiary" means each Subsidiary other than an Excluded Subsidiary.

"DIP Accounts" means the DIP Funding Account and the Asset Sale Escrow Account.

"DIP Funding Account" means a Deposit Account in the name of the Parent Borrower subject to a blocked Control Agreement in favor of the Administrative Agent, on behalf of the Secured Parties, in which the proceeds of the Loans shall be deposited and held on the Funding Date and used solely for the purposes set forth in Section 3.17.

"DIP Superpriority Claim" means allowed superpriority expense claims pursuant to Bankruptcy Code Sections 364(c)(1), 503 and 507 granted by the Order.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 3.06.

"Disqualified Stock" means any Equity Interests which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case at any time on or prior to the date that is 91 days after the latest Maturity Date (determined as of the date of issuance thereof or, in the case of any such Equity Interests outstanding on the date hereof, the date hereof), or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) cash, (ii) debt or (iii) any Equity Interests referred to in (a) above, in each case at any time prior to the date that is 91 days after the latest Maturity Date (determined as of the date of issuance thereof or, in the case of any such Equity Interests outstanding on the date hereof, the date hereof).  Notwithstanding the foregoing, any Equity Interests that would constitute Disqualified Stock solely because holders of the Equity Interests have the right to require the issuer of such Equity Interests to repurchase such Equity Interests upon the occurrence of a change in control or an asset sale will not constitute Disqualified Stock if the terms of such Equity Interests provide that the issuer may not repurchase or redeem any such

UST-1201

Equity Interests pursuant to such provisions unless such repurchase or redemption is permitted under the terms of this Agreement.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary of the Parent Borrower that is organized under the laws of the United States, any state of the United States or the District of Columbia, except for a Subsidiary directly or indirectly owned by a CFC.

"EEA Financial Institution" means (a) any financial institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any member state of the European Union, Iceland, Liechtenstein and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02), which date is [ ], 2020[4].

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person, other than, in each case, a natural person or the Parent Borrower, any Subsidiary or any other Affiliate of the Parent Borrower.

"Environment" means ambient air, indoor air, surface water, groundwater, drinking water, land surface and subsurface strata, and natural resources such as wetlands, flora and fauna.

"Environmental Laws" means all applicable federal, state, and local laws (including common law), regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and binding agreements with any Governmental Authority in each case, relating to pollution or protection of the Environment, human health and safety (to the extent related to exposure to Hazardous Materials), or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

---

[4] To be the date the Order is approved.

LA\4104335.13

UST-1202

"Environmental Liability" means any liability, claim, action, suit, agreement, judgment or order arising under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, including those arising from or relating to: (a) compliance or non-compliance with any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threat of Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest (other than, prior to the date of such conversion, any Indebtedness that is convertible into any such Equity Interests).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414(m) or 414(o) of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived), (b) any failure by any Plan to satisfy the minimum funding requirements of Section 412 or 430 of the Code or Section 302 or 303 of ERISA with respect to such Plan, in each case whether or not waived, or any failure by any Loan Party or any ERISA Affiliate to make a required contribution to a Multiemployer Plan, (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) a determination that any Plan is in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code), (e) the incurrence by any Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA (other than PBGC premiums due but not delinquent under Section 4007 of ERISA), (f) the receipt by any Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Section 4042 of ERISA, (g) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan; (h) a complete withdrawal or partial withdrawal by any Loan Party or any ERISA Affiliate from any Plan or Multiemployer Plan, (i) the receipt by any Loan Party or any ERISA Affiliate of any notice concerning the imposition of Withdrawal Liability, or a determination that a Multiemployer Plan is insolvent, within the meaning of Title IV of ERISA, or in "endangered" or "critical" status, within the meaning of Section 305 of ERISA or Section 432 of the Code, (j) a failure by any Loan Party or any ERISA Affiliate to pay when due (after expiration of any applicable grace period) any installment payment with respect to Withdrawal Liability, (k) the imposition of a Lien upon any Loan Party or any ERISA

13

UST-1203

Affiliate pursuant to Section 430(k) of the Code or Section 303(k) of ERISA, (l) the occurrence of a non-exempt "prohibited transaction" (as defined in Section 4975 of the Code or Section 406 of ERISA) with respect to which any Loan Party or any ERISA Affiliate is a "disqualified person" (within the meaning of Section 4975 of the Code) or a "party in interest" (within the meaning of Section 406 of ERISA) or could otherwise reasonably be expected to be liable or (m) any event with respect to any Foreign Plan which could reasonably be expected to result in liability to any Loan Party similar to the liability that could arise with respect to an event described in clauses (a) through (l) above.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Events of Default" has the meaning set forth in Article VII.

"Exchange Act" means the United States Securities Exchange Act of 1934.

"Excluded Deposit Account" means (a) [reserved], (b) any Deposit Account that is a zero balance disbursement account the funds in which are used solely for the payment of salaries and wages, (c) any Deposit Account that is a zero balance disbursement account the funds in which are used solely for payment of medical or insurance reimbursement, workers' compensation and similar expenses, (d) any escrow account to the extent the creation of a security interest therein would violate any agreement with a Person other than the Parent Borrower or a Subsidiary, and (e) any fiduciary or trust account.

"Excluded Property" the collective reference to:

(A)    any licenses, franchises, charters and authorizations of a Governmental Authority to the extent a security interest therein under the Loan Documents is prohibited by or would require the consent, license or approval of any Governmental Authority (except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition);

(B)    any asset if the granting of a security interest under the Loan Documents in such asset would be prohibited by any (x) law, treaty, rule or regulation (including all applicable regulations and laws regarding assignments of and security interests in, government receivables) or a court or other Governmental Authority or would require the consent, license or approval of any Governmental Authority (other than proceeds thereof, to the extent the assignment of such proceeds is effective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition and the assignment of such proceeds is not prohibited by applicable law and does not require the consent, license or approval of any Governmental Authority) or (y) contractual obligation (only to the extent such restriction is binding on such asset (i) on the Petition Date or (ii) on the date of the acquisition thereof and not entered into in contemplation thereof) (except to the extent such prohibition or restriction is

14

UST-1204

ineffective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition);

       (C)    any lease, license or other agreement to the extent that a grant of a security interest therein under the Loan Documents would violate or invalidate such lease, license or agreement (except any such lease, license or agreement among Parent Borrower and its wholly-owned Subsidiaries and except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition);

       (D)    Equity Interests  in any Person that is not a Subsidiary, in partnerships, in joint ventures and in non-wholly owned Subsidiaries to the extent the pledge or other granting of a security interest under the Loan Documents in such Equity Interests would be prohibited by, or require a consent or approval of unaffiliated third parties or are not permitted under, organizational or governance documents or shareholders' or similar agreements of or with respect to such Person (except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order, or other applicable law notwithstanding such prohibition);

       (E)    to the extent applicable law requires that a Subsidiary issue directors' qualifying shares, nominee shares or similar shares which are required by applicable law to be held by persons other than a Loan Party, such qualifying shares, nominee shares or similar shares held by Persons other than a Loan Party;

       (F)    any United States intent-to-use application for registration of a trademark or service mark prior to the acceptance by the United States Patent and Trademark Office of a statement of use or an amendment to allege use, to the extent and for so long as the grant of a security interest therein would impair the validity or enforceability of, or render void or voidable or result in the cancellation of, a Loan Party's right, title or interest therein or any trademark or service mark registration issued therefrom;

       (G)    "margin stock" within the meaning of Regulation U;

       (H)    Excluded Deposit Accounts; and

       (I)    proceeds in an amount not to exceed the Carve Out, if applicable, under the Order.

provided that (a) in the case of clauses 2(y), (3) and (5), such exclusion shall not apply (i) to the extent the prohibition or restriction is ineffective under Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code, the Bankruptcy Code or other applicable law or (ii) to proceeds of the assets referred to in such clause, the assignment of which is expressly deemed effective under Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code, the Bankruptcy Code or other applicable law and (b) assets described above shall no longer be "Excluded Property" upon termination of the applicable prohibition or restriction described above that caused such assets to be treated as "Excluded Property".

15

UST-1205

"Excluded Subsidiary" means (a) [reserved], (b) any Foreign Subsidiary of the Parent Borrower, (c) any Subsidiary that is a direct or indirect Subsidiary of a Foreign Subsidiary of the Parent Borrower that is a CFC, (d) any CFC Holdco, (e) any Subsidiary that is prohibited or restricted by applicable law, rule or regulation or contractual obligation in existence on the Petition Date from providing a Guarantee of the Loan Document Obligations (solely for so long as such prohibition or restriction remains in existence) or if such Guarantee would require governmental (including regulatory) consent, approval, license or authorization unless such consent, approval, license or authorization has been received (but without obligation to seek the same), (f) [reserved], (g) [reserved], (h) [reserved], and (i) any other Restricted Subsidiary with respect to which, in the reasonable judgment of the Required Lenders (confirmed in writing by notice to the Parent Borrower), the cost or other consequences of becoming a Guarantor shall be excessive in view of the benefits to be obtained by the Lenders therefrom. In no event shall (i) the Subsidiary Borrower be an Excluded Subsidiary or (ii) any Subsidiary of the Parent Borrower that is a "Subsidiary Loan Party" (under and as defined in the ABL Credit Agreement to the extent applicable) or that is otherwise a guarantor of, or has otherwise provided security for, the obligations under the ABL Credit Agreement(to the extent applicable) be an Excluded Subsidiary.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by such Recipient's net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed by a jurisdiction as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, such jurisdiction (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the applicable Loan or Commitment (other than an assignee pursuant to an assignment request by the Borrowers under Section 2.17(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.15, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in such Loan or Commitment or to such Lender immediately before it changed its lending office, (c) any Taxes attributable to a Lender's failure to comply with Section 2.15(e) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Exit Conversion" has the meaning set forth in Section 2.22.

"Exit Facility Agreement" means the credit agreement that is approved by the Confirmation Order and entered into on the Conversion Date consistent in all material respects with the terms set forth in the Exit Facility Term Sheet and any related schedules and exhibits attached thereto; *provided*, that such credit agreement shall have been made available to the Administrative Agent and all Lenders; provided, further, that upon the satisfaction of waiver of the conditions contemplated by Section 2.22, each Lender hereunder that is a Lender on the Conversion Date hereby authorizes the Administrative Agent to use its executed signature page to this Agreement as an executed signature page to the Exit Facility Agreement without any further action on the part of any such Lender or any other Person.

16

UST-1206

"Exit Facility Term Sheet" means the term sheet attached as Exhibit G hereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury regulations or other official administrative interpretations thereof, any agreements entered into pursuant to current Section 1471(b) of the Code (or any amended or successor version described above), and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement between a non-U.S. jurisdiction and the United States of America.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financial Officer" means, with respect to any Person, the chief financial officer, principal accounting officer, treasurer, assistant treasurer, chief restructuring officer or controller of such Person.

"Foreign Lender" means a Lender that is not a U.S. Person.

"Foreign Plan" means any defined benefit pension plan, benefit plan, fund (including any superannuation fund) or other similar program that, under the requirements of law of any jurisdiction other than the United States, is required to be funded through a trust or other funding vehicle (other than a trust or funding vehicle or any of the foregoing sponsored or maintained exclusively by a Governmental Authority) and is directly sponsored and maintained by a Loan Party primarily for the benefit of its employees who are employed and residing outside the United States.

"Foreign Subsidiary" means any Subsidiary of the Parent Borrower, other than a Domestic Subsidiary.

"Funding Date" means the date on which the conditions specified in Section 4.02 are satisfied (or waived in accordance with Section 9.02).

"GAAP" means generally accepted accounting principles in the United States of America, applied in accordance with the consistency requirements thereof.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state, local, county, provincial or otherwise, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers

17

UST-1207

or functions of or pertaining to government (including any supra-national body exercising such powers or functions, such as the European Union or the European Central Bank).

"GS Bank" means Goldman Sachs Bank USA, in its individual capacity, and its successors.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount, as of any date of determination, of any Guarantee shall be the principal amount outstanding on such date of Indebtedness or other obligation guaranteed thereby (or, in the case of (i) any Guarantee the terms of which limit the monetary exposure of the guarantor or (ii) any Guarantee of an obligation that does not have a principal amount, the maximum monetary exposure as of such date of the guarantor under such Guarantee (as determined, in the case of clause (i), pursuant to such terms or, in the case of clause (ii), reasonably and in good faith by a Financial Officer of the Parent Borrower)).

"Guarantors" means each Subsidiary of the Parent Borrower (other than any Excluded Subsidiary), in each case, until any such Subsidiary (other than the Subsidiary Borrower) is released as a Guarantor in accordance with the Loan Documents.

"Hazardous Materials" means any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any applicable Environmental Law, including, without limitation, any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos-containing materials, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances or mold.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person (excluding trade accounts payable incurred in the ordinary course of business), (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (i) current accounts payable incurred in the ordinary course of business, (ii) deferred compensation payable to directors, officers or employees of the Parent Borrower or any Restricted Subsidiary and (iii) any purchase price adjustment or earnout incurred in connection with an acquisition, except to the extent that the amount payable pursuant

to such purchase price adjustment or earnout is, or becomes, a liability on the balance sheet of the Parent Borrower in accordance with GAAP), (e) all Capital Lease Obligations and Synthetic Lease Obligations of such Person, (f) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (g) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (h) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed by such Person (but only to the extent of the lesser of (x) the amount of such Indebtedness and (y) the fair market value of such property, if such Indebtedness has not been assumed by such Person), (i) net payments that would have to be made in the event of an early termination in respect of any outstanding Swap Agreement, (j) all obligations of such Persons with respect to the redemption, repayment or repurchase of Disqualified Stock (excluding accrued dividends) and (k) all Guarantees by such Person of Indebtedness of others. The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor by contract, as a matter of law or otherwise as a result of such Person's ownership interest in or other relationship with such other Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. It is acknowledged and agreed that private label and corporate letters of credit issued by the Parent Borrower or any Subsidiary for the making of payment for the purchase of inventory in the ordinary course of business (and in respect of which no financial institution is an issuer thereof or has any disbursement obligations thereunder) do not constitute Indebtedness of the Parent Borrower or such Subsidiary.

"Indemnified Taxes" means (a) all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), all Other Taxes.

"Indemnitee" has the meaning set forth in Section 9.03(b).

"Information" has the meaning set forth in Section 9.12.

"Intercreditor Acknowledgment" means that certain Acknowledgment and Agreement, dated as of the Funding Date, by and among the Administrative Agent, the Pre-Petition Agent, the ABL Agent and the Pre-Petition ABL Agent, and acknowledged by the Loan Parties.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of August 21, 2015, among the Pre-Petition Agent, as term collateral agent, the Pre-Petition ABL Agent, as ABL collateral agent, and acknowledged by the Loan Parties, as may be supplemented and modified by the Intercreditor Acknowledgment, and as may be further amended, amended and restated, supplemented or otherwise modified and in effect from time to time.

"Interest Election Request" means a request by the Borrowers to convert or continue a Borrowing in accordance with Section 2.05, which shall be, in the case of any such written request, in the form of Exhibit E or any other form approved by the Administrative Agent.

UST-1209

"Interest Payment Date" means (a) with respect to any ABR Loan, the first Business Day of each calendar quarter and the Maturity Date applicable to such ABR Loan and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, such day or days prior to the last day of such Interest Period as shall occur at intervals of three months' duration after the first day of such Interest Period and the Maturity Date applicable to such Eurodollar Loan.

"Interest Period" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months (or, with the consent of each Lender participating therein, twelve months) thereafter, as the Borrowers may elect; provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing. For the avoidance of doubt, no Interest Period shall extend beyond the Maturity Date.

"Interpolated Screen Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, a rate *per annum* which results from interpolating on a linear basis between (a) the Screen Rate for the longest maturity for which a Screen Rate is available that is shorter than such Interest Period and (b) the Screen Rate for the shortest maturity for which a Screen Rate is available that is longer than such Interest Period, in each case at 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"Investment" means, with respect to a specified Person, any direct or indirect acquisition or investment by such Person in any other Person, in the form of (a) the purchase or other acquisition (including without limitation by merger or otherwise) of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (c) the purchase or other acquisition (in one transaction or a series of transactions, including without limitation by merger or otherwise) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, division, product or line of business of such Person. For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made), without adjustment for subsequent changes in the value of such Investment, net of any cash return representing a return of capital with respect to such Investment.

"IRS" means the United States Internal Revenue Service.

UST-1210

"Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that shall have ceased to be a party hereto pursuant to an Assignment and Assumption.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, a rate *per annum* equal to the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for deposits in dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period as displayed on  the applicable Bloomberg screen page that displays such rate  (or, in the event such rate does not appear the applicable Bloomberg screen page, on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion)  at 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period (the "Screen Rate").  If no Screen Rate shall be available for a particular Interest Period but Screen Rates shall be available for maturities both longer and shorter than such Interest Period, then the LIBO Rate for such Interest Period shall be the Interpolated Screen Rate. Notwithstanding the foregoing, if the LIBO Rate, determined as provided above in this definition, would be less than zero, the LIBO Rate shall for all purposes of this Agreement be zero.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, charge, security interest or other encumbrance in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"Liquidity" means, at any time, the sum of, without duplication, (a) Availability (as defined in the Pre-Petition ABL Credit Agreement as in effect on the date hereof or, to the extent applicable, the ABL Credit Agreement as in effect on the Funding Date), (b) unrestricted cash and cash equivalents of the Parent Borrower and its Restricted Subsidiaries that would be reflected on a consolidated balance sheet of the Parent Borrower in accordance with GAAP on such date (other than the cash proceeds of any Indebtedness being incurred on such date) and (c) cash and cash equivalents of the Parent Borrower and its Restricted Subsidiaries (excluding, for the avoidance of doubt, Eligible Pledged Cash (as defined in the Pre-Petition ABL Credit Agreement as in effect on the date hereof or, to the extent applicable, the ABL Credit Agreement, as in effect on the Funding Date) to the extent duplicative) that are restricted in favor of the Administrative Agent or any Lender (or, the Pre-Petition ABL Agent or, to the extent applicable, the ABL Agent, for the benefit of the Administrative Agent pursuant to the Intercreditor Agreement) (which cash and cash equivalents may also secure other Indebtedness together with the Loan Document Obligations).

"Loan Document Obligations" means all unpaid principal of and accrued and unpaid interest on the Loans, all accrued and unpaid fees, premiums (including the Redemption Premium, if any) and all expenses, reimbursements, indemnities and other obligations of the Loan Parties to any Lender, the Administrative Agent, or any Indemnitee arising under the Loan Documents, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees,

UST-1211

premiums (including the Redemption Premium, if any), costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any bankruptcy or insolvency laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, premiums (including the Redemption Premium, if any), costs, expenses and indemnities are allowed claims in such proceeding.

"Loan Documents" means this Agreement, the Commitment Letter, the Collateral Agreement, the Control Agreement with respect to the DIP Accounts, the other Collateral Documents, the Intercreditor Agreement, the Intercreditor Acknowledgment, the Administrative Agent Fee Letter, the Order and, except for purposes of Section 9.02, any promissory notes delivered pursuant to Section 2.07(e).

"Loan Parties" means the Borrowers and the Guarantors.

"Loans" means the loans made by the Lenders to the Borrowers pursuant to this Agreement.

"Luxembourg IP Subsidiary" means each of (i) AnnTaylor Loft GP Lux S.à.rl. and (ii) AnnTaylor Loft Borrower Lux SCS.

"Material Adverse Effect" means a material adverse effect on (a) the results of operations, assets, business or financial condition of the Parent Borrower and the Restricted Subsidiaries, taken as a whole, excluding in any event (i) the effect of filing the Cases, the events and conditions leading up to and customarily resulting from the commencement and continuation of the Cases, the effects thereof and any action required to be taken under the Loan Documents or the Order and the Cases themselves, (ii) any matters publicly disclosed prior to the filing of the Cases and (iii) any matters or transactions disclosed, contemplated or required to be taken in any "first day" or "second day" orders, motions related thereto or in any supporting declarations thereof, (b) the ability of the Loan Parties to perform any of their monetary obligations under the Loan Documents to which it is a party or (c) the rights of or benefits available to the Administrative Agent or the Lenders under the Loan Documents; provided that in determining whether a "material adverse effect" has occurred or exists under clause (a) hereof, the impacts of COVID-19 on the results of operations, assets, business or financial condition of the Parent Borrower and the Restricted Subsidiaries will be disregarded (provided that this exception shall not apply to the extent that it is materially disproportionately adverse to the Parent Borrower and its Restricted Subsidiaries, taken as a whole, as compared to other companies in the same industry in which the Parent Borrower and its Restricted Subsidiaries operate).

"Material Indebtedness" means Indebtedness (other than the Loans and Guarantees under the Loan Documents), or obligations in respect of one or more Swap Agreements, of any one or more of the Parent Borrower and the Subsidiaries in an aggregate principal amount exceeding $10,000,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Parent Borrower or any Restricted Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Parent Borrower or such Restricted Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

LA\4104335.13

UST-1212

"Maturity Date" means the date that is the earliest of (i) six months after the Effective Date, (ii) the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of an Acceptable Plan, (iii) the date the Court converts any of the Cases to a Chapter 7 case, (iv) the date the Court dismisses any of the Cases, (v) the date on which the Loan Parties consummate a sale of all or substantially all of the assets of the Loan Parties pursuant to section 363 of the Bankruptcy Code or otherwise, and (vi) such earlier date on which the Loans shall become due and payable by acceleration or otherwise in accordance with the terms of this Agreement and the other Loan Documents.

"Maximum Rate" has the meaning set forth in Section 9.15.

"MNPI" means material information concerning the Parent Borrower, any Subsidiary or any Affiliate of any of the foregoing or their securities that has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD under the Securities Act and the Exchange Act.  For purposes of this definition, "material information" means information concerning the Parent Borrower or its Subsidiaries, or any of their respective securities, that would reasonably be expected to be material for purposes of the United States federal and state securities laws.

"Moody's" means Moody's Investors Service, Inc., and any successor to its rating agency business.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA that is or was, during the past six years, maintained or sponsored by any Loan Party or ERISA Affiliate or to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the past six years has made or been obligated to make contributions, in each case, if a liability to a Loan Party remains outstanding.

"Net Proceeds" means, with respect to any event, (a) the cash (which term, for purposes of this definition, shall include Cash Equivalents) proceeds (including, in the case of any casualty, condemnation or similar proceeding, insurance, condemnation or similar proceeds) received in respect of such event, including any cash received in respect of any noncash proceeds, but only as and when received, net of (b) the sum, without duplication, of (i) all actual fees and out-of-pocket expenses paid in connection with such event by the Parent Borrower and the Restricted Subsidiaries to Persons that are not Affiliates of the Parent Borrower or any Restricted Subsidiary, (ii) in the case of a sale, transfer or other disposition (including pursuant to a Sale/Leaseback Transaction or a casualty or a condemnation or similar proceeding) of an asset, the amount of all payments required to be made by the Parent Borrower and the Restricted Subsidiaries as a result of such event to repay Indebtedness (other than Loans and Indebtedness under the ABL Credit Agreement) secured by such asset on a basis prior to the Liens, if any, on such assets securing the Loan Document Obligations and (iii) the amount of all taxes paid (or reasonably estimated to be payable) by the Parent Borrower and the Restricted Subsidiaries, and the amount of any reserves established by the Parent Borrower and the Restricted Subsidiaries in accordance with GAAP to fund purchase price adjustment, indemnification and similar contingent liabilities (other than any earnout obligations) reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to the occurrence of such event (as determined reasonably and in good faith

23

UST-1213

by the chief financial officer of the Parent Borrower).  For purposes of this definition, in the event any contingent liability reserve established with respect to any event as described in clause (b)(iii) above shall be reduced, the amount of such reduction shall, except to the extent such reduction is made as a result of a payment having been made in respect of the contingent liabilities with respect to which such reserve has been established, be deemed to be receipt, on the date of such reduction, of cash proceeds in respect of such event.

"New Money Commitment" means as to each Lender, its obligation to make a New Money Loan to Borrowers hereunder, expressed as an amount representing the maximum principal amount of New Money Loans to be made by such Lender under this Agreement, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption substantially in the form of Exhibit A hereto.  The amount of each Lender's New Money Commitment is set forth on Schedule 2.01 under the caption "New Money Loans" or, otherwise, in the Assignment and Assumption pursuant to which such Lender shall have assumed its New Money Commitment, as the case may be.  The aggregate amount of the New Money Commitments on the date hereof is $150 million.

"New Money Loans" means the loans made pursuant to Section 2.01(a).

"OFAC" means the United States Treasury Department Office of Foreign Assets Control.

"Order" means the order of the Court entered in the Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Court, which order shall be satisfactory in form and substance to the Required Lenders, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless Administrative Agent waives such requirement), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Required Lenders, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the Administrative Agent's and the Lenders' claims.

"Other Connection Taxes"  means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under , engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, excluding any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.17).

"Parent Borrower" has the meaning set forth in the introductory paragraph hereto.

"Participant Register" has the meaning set forth in Section 9.04(c)(ii).

"Participants" has the meaning set forth in Section 9.04(c)(i).

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub.L. No. 107-56 (signed into law October 26, 2001)).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"Permitted Encumbrances" means:

(a)      Liens imposed by law for Taxes that are not yet delinquent or are being contested in compliance with Section 5.06;

(b)      carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law (other than any Lien imposed pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code), arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.06;

(c)      pledges and deposits made (i) in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations and (ii) in respect of letters of credit, bank guarantees or similar instruments issued for the account of the Parent Borrower or any Restricted Subsidiary in the ordinary course of business supporting obligations of the type set forth in clause (i) above or reimbursement or indemnification obligations to insurance carriers providing property, casualty or liability insurance to the Parent Borrower and its Restricted Subsidiaries;

(d)      pledges and deposits made to secure the performance of bids, trade contracts (other than Indebtedness for borrowed money), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)      judgment liens in respect of judgments that do not constitute an Event of Default under clause (k) of Article VII;

(f)      easements, zoning restrictions, rights-of-way, site plan agreements, development agreements, operating agreements, cross-easement agreements, reciprocal easement agreements and other encumbrances and exceptions to title on real property that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Parent Borrower or any Restricted Subsidiary or the ordinary operation of such real property;

LA\4104335.13

UST-1215

    (g)    customary rights of setoff upon deposits of cash in favor of banks and other depository institutions and Liens of a collecting bank arising under the UCC in respect of payment items in the course of collection;

    (h)    Liens arising from precautionary UCC financing statement filings (or similar filings under applicable law) regarding operating leases or consignments, in each case arising in the ordinary course of business;

    (i)    Liens representing any interest or title of a licensor, lessor or sublicensor or sublessor, or a licensee, lessee or sublicensee or sublessee, in the property subject to any lease (other than Capital Lease Obligations), license or sublicense or concession agreement permitted by this Agreement;

    (j)    Liens arising in the ordinary course of business in favor of custom and forwarding agents and similar Persons in respect of imported goods and merchandise in the custody of such Persons;

    (k)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

    (l)    Liens or rights of setoff against credit balances of the Parent Borrower or any Restricted Subsidiary with credit card issuers or credit card processors to secure obligations of the Parent Borrower or such Restricted Subsidiary, as the case may be, to any such credit card issuer or credit card processor incurred in the ordinary course of business as a result of fees and chargebacks;

    (m)    Liens on Equity Interests of any joint venture (i) securing obligations of such joint venture or (ii) pursuant to the relevant joint venture agreement, in each case in existence on or prior to the Petition Date; and

    (n)    other Liens that are contractual rights of set-off;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness, other than Liens referred to in clause (c) above securing letters of credit, bank guarantees or similar instruments.

    "Permitted Variance" means, any variance that does not violate Section 6.12(b).

    "Person" or "person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

    "Petition Date" has the meaning set forth in the Recitals.

    "Plan" means any "employee pension benefit plan," as defined in Section 3(2) of ERISA (other than a Multiemployer Plan or Foreign Plan), (a) that is subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and (b) (i) in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA

UST-1216

and/or (ii) that is or was, within the past six years, maintained or sponsored by any Loan Party or ERISA Affiliate or to which any Loan Party or ERISA Affiliate makes or is obligated to make contributions, or during the past six years, has made or been obligated to make contributions, in each case of (ii) if a liability to a Loan Party remains outstanding.

"Plan of Reorganization" means a plan of reorganization with respect to the Loan Parties and their Subsidiaries pursuant to the Cases.

"Platform" has the meaning set forth in Section 9.01(d).

"Pre-Petition ABL Agent" means JPMorgan Chase Bank, N.A., as administrative agent under the Pre-Petition ABL Credit Agreement.

"Pre-Petition ABL Credit Agreement" means the Amended and Restated ABL Credit Agreement, dated as of August 21, 2015, among the Parent Borrower, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto and the Pre-Petition ABL Agent, as amended, restated, supplemented, modified, renewed, refunded, replaced (whether at maturity or thereafter) or refinanced from time to time in one or more agreements (in each case with the same or new agents, lenders or institutional investors), including any agreement adding or changing the borrower or any guarantor or extending the maturity thereof or otherwise restructuring all or any portion of the Indebtedness thereunder or increasing the amount loaned or issued thereunder or altering the maturity thereof, in each case, through the Petition Date.

"Pre-Petition Agent" means GS Bank, in its capacity as administrative agent under any of the Pre-Petition Loan Documents.

"Pre-Petition Credit Agreement" has the meaning assigned to such term in the Recitals.

"Pre-Petition Indebtedness" means the Indebtedness of the Loan Parties existing prior to the Petition Date and set forth on Schedule 6.01.

"Pre-Petition Lenders" means the lenders under the Pre-Petition Credit Agreement.

"Pre-Petition Lender Obligations" means all "Loan Document Obligations" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Loan Documents" means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Loans" means Pre-Petition Lender Obligations in respect of principal of "Loans" under, and as defined in, the Pre-Petition Credit Agreement and interest, expenses, fees, premium and other sums payable in respect thereof under the Pre-Petition Loan Documents.

"Prepayment Event" means:

UST-1217

(a)     any Asset Sale of the type described in clauses (j) and (k) of Section 6.05 unless such disposition results in aggregate Net Proceeds not exceeding $500,000 for any individual transactions or series of related transactions;

(b)     any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any asset of the Parent Borrower or any Restricted Subsidiary resulting in aggregate Net Proceeds exceeding $500,000; or

(c)     the incurrence by the Parent Borrower or any Restricted Subsidiary of any Indebtedness, other than any Indebtedness permitted to be incurred by Section 6.01.

"Prime Rate" means the rate of interest per annum published by The Wall Street Journal, Money Rates Section as the "Prime Rate", as in effect from time to time.  Each change in the Prime Rate shall be effective from and including the date such change is published. If the Wall Street Journal ceases publication of such rate, in such other nationally recognized financial publication of general circulation as the Administrative Agent may designate based on the Administrative Agent's reasonable determination that the rate so published is comparable to the "Prime" rate published in the Wall Street Journal.

"Private Side Lender Representatives" means, with respect to any Lender, representatives of such Lender that are not Public Side Lender Representatives.

"Public Side Lender Representatives" means, with respect to any Lender, representatives of such Lender that do not wish to receive MNPI.

"Recipient" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document.

"Redemption Premium" has the meaning set forth in Section 2.09(e).

"Register" has the meaning set forth in Section 9.04(b)(v).

"Related Lender" means with respect to any Person, an Affiliate or any fund, account or investment vehicle that is controlled, managed, advised or sub-advised by such Person, an Affiliate or the same investment manager, advisor or sub-advisor as such Person or an Affiliate of such investment manager, advisor or sub-advisor.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and of such Person's Affiliates.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the Environment or within or upon any building, structure, facility or fixture.

LA\4104335.13

UST-1218

"Required Lenders" means, at any time, Lenders having aggregate Loans (or, prior to the borrowing hereunder on the date hereof, Commitments) representing more than 50.01% of the aggregate principal amount of the Loans (or, prior to the borrowing hereunder on the date hereof, the aggregate Commitments) at such time.

"Required Milestones" means the covenants set forth on Schedule 5.11.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Parent Borrower or any Restricted Subsidiary, or any payment or distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, exchange, conversion, cancellation or termination of any Equity Interests in the Parent Borrower or any Restricted Subsidiary.

"Restricted Subsidiary" means any Subsidiary of the Parent Borrower.

"Restructuring Support Agreement" or "RSA" means that certain Restructuring Support Agreement, dated as of July 23, 2020, executed and delivered by the Loan Parties and the other parties thereto, as such agreement may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Roll-up Loans" are the loans made pursuant to Section 2.01(b).

"Roll-up Loans Commitment" means, as to each Lender, its obligation to make a Loan to the Borrower pursuant to Section 2.01(b) in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 (as updated from time to time within [ ] days of the Effective Date) under the caption "Roll-up Loans Commitment", as applicable. The aggregate amount of the Roll-up Loans Commitment on the date hereof is $161.8 million, which amount shall (i) comprise a roll-up and refinancing of the Prepetition Loans approved pursuant to the Order and (ii) be deemed funded by the Lenders pursuant to Section 2.01.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"Sale/Leaseback Transaction" means an arrangement relating to property owned by the Parent Borrower or any Restricted Subsidiary whereby the Parent Borrower or such Restricted Subsidiary sells or transfers such property to any Person and the Parent Borrower or any Restricted Subsidiary leases such property, or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, from such Person or its Affiliates.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of Designated Persons maintained by OFAC, the U.S. Department of State, or by the United Nations Security Council, the European Union or any EU member state, (b) any Person

29

UST-1219

operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any Person or Persons described in the preceding clauses (a) and (b).

"<u>Sanctions</u>" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"<u>Screen Rate</u>" has the meaning assigned to it in the definition of "LIBO Rate."

"<u>SEC</u>" means the United States Securities and Exchange Commission.

"<u>Secured Parties</u>" means (a) the Administrative Agent, (b) [reserved], (c) the Lenders, (d) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (e) the permitted successors and assigns of the foregoing.

"<u>Securities Act</u>" means the United States Securities Act of 1933.

 "<u>Specified Dispositions</u>" means (i) the closure, sale, transfer or disposition of the Loan Parties' or their Subsidiaries' stores, leases, warehouses, distribution centers and other real property (and all fixtures and equipment in each case in connection therewith), (ii) bulk sales or other dispositions of inventory or equipment of the Loan Parties' or their Subsidiaries' and (iii) termination of leases, licenses, subleases or sublicenses, in each case, in connection therewith; provided that such Specified Dispositions are identified in writing by the Parent Borrower to the Required Lenders and agreed to by the Required Lenders, in their reasonable discretion on or prior to the Effective Date and as may be updated, supplemented or modified from time to time, as agreed to by the Required Lenders in their reasonable discretion.

"<u>Specified Indebtedness</u>" means any Subordinated Indebtedness and any unsecured Indebtedness or any secured Indebtedness that is not secured on a pari passu basis with the Loan Document Obligations; provided that, Indebtedness under the ABL Credit Agreement, to the extent applicable, shall constitute Specified Indebtedness solely for purposes of Section 6.08(c).

"<u>Statutory Reserve Rate</u>" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves), expressed as a decimal, established by the Board of Governors to which the Administrative Agent is subject for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board of Governors).  Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"<u>Subordinated Indebtedness</u>" of a Person means any Indebtedness of such Person which is subordinated in right of payment to the Loan Document Obligations.

LA\4104335.13

UST-1220

"subsidiary" means, with respect to any Person (the "parent") at any date, (a) any Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date and (b) any other Person (i) of which Equity Interests representing more than 50% of the equity value or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (ii) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any direct or indirect subsidiary of the Parent Borrower (including, for the avoidance of doubt, the Subsidiary Borrower).

"Subsidiary Borrower" has the meaning set forth in the introductory paragraph hereto.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Parent Borrower or any Subsidiary shall be a Swap Agreement.

"Synthetic Lease" means, as to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for US federal income tax purposes, other than any such lease under which such Person is the lessor.

"Synthetic Lease Obligations" means, as to any Person, an amount equal to the sum, without duplication, of (a) the obligations of such Person to pay rent or other amounts under any Synthetic Lease which are attributable to principal and (b) the amount of any purchase price payment under any Synthetic Lease assuming the lessee exercises the option to purchase the leased property at the end of the lease term.  For purposes of Section 6.02, a Synthetic Lease Obligation shall be deemed to be secured by a Lien on the property being leased and such property shall be deemed to be owned by the lessee.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Credit Facility" has the meaning set forth in the Recitals.

"Term Lender" means a Lender with a Commitment or an outstanding Term Loan.

"Term Loan" means a Loan made pursuant to Section 2.01.

"Term Priority Collateral" has the meaning set forth in the Intercreditor Agreement.

31

UST-1221

"Transactions" means (a) the execution, delivery and performance by the Loan Parties of this Agreement, the borrowing of the Term Loans and the use of the proceeds thereof, (b) to the extent applicable, the execution, delivery and performance by the Loan Parties of the ABL Credit Agreement, (c) the creation and perfection of the security interests provided for in the Collateral Documents, and (d) the payment of all fees, commissions, costs and expenses in connection with the foregoing.

"Type" when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the perfection of security interests created by the Collateral Documents.

"U.S. Person" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning set forth in Section 2.15(e)(ii)(B)(3).

"U.S. Trustee" means the United States Trustee applicable in the Cases.

"Variance Report" shall have the meaning assigned to such term in Section 5.01(g).

"Variance Report Date" shall have the meaning assigned to such term in Section 5.01(g).

"Variance Testing Period" shall mean the four-week calendar period up to and through the Saturday of the week most recently ended prior to the applicable Variance Report Date (provided that, the first Variance Testing Period shall include the entire period from the Petition Date through the Saturday of the week most recently ended prior to the applicable Variance Testing Period).

"wholly-owned" when used in reference to a subsidiary of any Person, means that all the Equity Interests in such subsidiary (other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable law) are owned, beneficially and of record, by such Person, another wholly-owned subsidiary of such Person or any combination thereof.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

LA\4104335.13

UST-1222

SECTION 1.02.   Classification of Loans and Borrowings.  For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Type.

SECTION 1.03.   Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all real and personal, tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply), and all judgments, orders, writs and decrees, of all Governmental Authorities.  Except as otherwise provided herein and unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document (including this Agreement and the other Loan Documents) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), and all references to any statute shall be construed as referring to all rules, regulations, rulings and official interpretations promulgated or issued thereunder, (c) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof and (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement.

SECTION 1.04.   Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature used herein shall be construed in accordance with GAAP as in effect from time to time; provided that (a) if the Parent Borrower notifies the Administrative Agent in writing (including via e-mail) that the Borrowers request an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrowers that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith; provided that the Borrowers, on the one hand, and the Lenders, on the other hand, agree to negotiate in good faith with respect to any proposed amendment to eliminate or adjust for the effect of any such change in GAAP; and (b) notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed,

33

UST-1223

and all computations of amounts and ratios referred to herein shall be made, without giving effect to (i) any election under Statement of Financial Accounting Standards 159, The Fair Value Option for Financial Assets and Financial Liabilities, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of the Parent Borrower or any Restricted Subsidiary at "fair value," as defined therein, and (ii) any change in GAAP occurring after July 24, 2015 as a result of the adoption of any proposals set forth in the Proposed Accounting Standards Update, Leases (Topic 840), issued by the Financial Accounting Standards Board on August 17, 2010, or any other proposals issued by the Financial Accounting Standards Board in connection therewith, in each case if such change would require treating any lease (or similar arrangement conveying the right to use) as a capital lease where such lease (or similar arrangement) was not required to be so treated under GAAP as in effect on July 24, 2015.

SECTION 1.05.   Classification of Actions.  For purposes of determining compliance at any time with the covenants set forth in Section 6.01 and Section 6.02 (or, in each case, any defined terms used therein), in the event that the subject transaction meets the criteria of more than one of the categories of transactions permitted pursuant to the Sections (or related defined terms) in Section 6.01 and Section 6.02, the Borrowers may, in their sole discretion, classify the applicable transaction (or any portion thereof) under such Section (or defined term); it being understood that (i) the Borrowers may divide and include such transaction under one or more of the clauses of such Section (or any relevant portion thereof or of the applicable related defined term) that permit such transaction, but will not be permitted to later reclassify such transaction and (ii) notwithstanding anything in this Section 1.05 to the contrary for purposes of this Agreement, (x) Indebtedness incurred under the Pre-Petition ABL Credit Agreement and, to the extent applicable, the ABL Credit Agreement shall only be permitted to be incurred or be outstanding under Section 6.01(j) and (y) Indebtedness uncured under the Loan Documents or the Pre-Petition Loan Documents shall only be permitted to be incurred or be outstanding under Section 6.01(a).

SECTION 1.06.   Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

ARTICLE II

The Credits

SECTION 2.01.   Commitments.

(a)       Subject to the terms and conditions set forth herein and in the Order, each Lender severally and not jointly agrees to make, on the Funding Date, Loans to the Borrowers in an aggregate amount not to exceed such Lender's New Money Commitment.  The New Money Commitments in respect of the New Money Loans shall terminate automatically immediately

UST-1224

after the making of the New Money Loans on the Funding Date.  Proceeds of the New Money Loans shall be deposited in the DIP Funding Account and used solely as permitted herein.

(b)       Subject to the terms and conditions set forth herein and in the Order, each Lender severally and not jointly agrees to make or be deemed to have made on the Effective Date, Loans to the Borrower in the aggregate amount of the Roll-up Loans Commitment.  The Administrative Agent, the Lenders and the Loan Parties each acknowledges and agrees that the Roll-up Loans Commitment shall expire upon the deemed funding of the Roll-up Loans on the Effective Date.[5]

SECTION 2.02.    Loans and Borrowings.

(a)       Each Loan shall be made as part of a Borrowing consisting of Loans of the same Type made by the Lenders ratably in accordance with their respective Commitments.

(b)       Subject to Section 2.12, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrowers may request in accordance herewith.  Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrowers to repay such Loan in accordance with the terms of this Agreement.

(c)       At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate principal amount that is an integral multiple of $1,000,000 and not less than $5,000,000; provided that a Eurodollar Borrowing that results from a continuation of an outstanding Eurodollar Borrowing may be in an aggregate amount that is equal to such outstanding Borrowing.  At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate principal amount that is an integral multiple of $500,000 and not less than $1,000,000.  Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of six (or such greater number as may be agreed to by the Administrative Agent) Eurodollar Borrowings outstanding.

(d)       Notwithstanding any other provision of this Agreement, the Borrowers shall not be entitled to request, or to elect to convert to or continue, any Eurodollar Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date applicable thereto.

SECTION 2.03.    Requests for Borrowings.  To request a Borrowing, the Borrowers deliver to the Administrative Agent a Borrowing Request  (delivered by e-mail, hand or facsimile) (a) in the case of a Eurodollar Borrowing, not later than 12:00 p.m., New York City time, three Business Days before the date of the proposed Borrowing (or, such shorter period of time as may be agreed to by the Administrative Agent) or (b) in the case of an ABR Borrowing, not later than 12:00 p.m., New York City time, one Business Day before the date of the proposed Borrowing.  Each written Borrowing Request shall specify the following information in compliance with Section 2.02:

---

[5] Roll-Up Loan funding mechanics to be confirmed.

LA\4104335.13

UST-1225

(i)      the aggregate amount of such Borrowing;

(ii)      the date of such Borrowing, which shall be a Business Day;

(iii)      whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv)      in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(v)      the location,  number of the account and any other wiring information required by the Administrative Agent of the Borrowers to which funds are to be disbursed.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration.  Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04.      Funding of Borrowings.

(a)      Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 2:00 p.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.  Upon receipt of all requested funds, the Administrative Agent will make such Loans available to the Borrowers by promptly remitting the amounts so received, in like funds, by wire transfer to the DIP Funding Account.

(b)      Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, but shall have no obligation to, in reliance on such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (i) in the case of a payment to be made by such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of a payment to be made by the Borrowers, the interest rate applicable to ABR Loans.  If the Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period.  If such Lender pays such amount

36

UST-1226

to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrowers shall be without prejudice to any claim any Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

SECTION 2.05. Interest Elections.

(a) Each Borrowing initially shall be of the Type and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in the applicable Borrowing Request or as otherwise provided in Section 2.03. Thereafter, the Borrowers may elect to convert such Borrowing to a Borrowing of a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section. The Borrowers may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b) To make an election pursuant to this Section, the Borrowers shall notify the Administrative Agent of such election in writing by delivering (by e-mail, hand delivery or facsimile) an Interest Election Request to the Administrative Agent by the time that a Borrowing Request would be required under Section 2.03 if the Borrowers were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such Interest Election Request shall be irrevocable. Each written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i) the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii) the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii) whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv) if the resulting Borrowing is to be a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration.

(c) Promptly following receipt of an Interest Election Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

LA\4104335.13

UST-1227

(d)     If the Borrowers fail to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be continued as a Eurodollar Borrowing for an additional Interest Period of one month. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing with respect to any Borrower, or if any other Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, has notified the Borrowers of the election to give effect to this sentence on account of such Event of Default, then, so long as such Event of Default is continuing, (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.06.     Termination of Commitments.

(a)     Unless previously terminated, the Commitments of each Lender shall automatically terminate and permanently reduce to $0 upon the making of such Lender's Loans pursuant to Section 2.01(a) and (b), as applicable.

SECTION 2.07.     Repayment of Loans; Evidence of Debt.

(a)     The Borrowers hereby unconditionally, jointly and severally, promise to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender as provided in Section 2.08.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any conflict between the accounts maintained pursuant to paragraph (b) or (c) of this Section, the accounts maintained by the Administrative Agent shall, absent manifest error, control.

(e)     Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrowers shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its

38

UST-1228

registered assigns) substantially in the form of Exhibit K attached hereto. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

SECTION 2.08.   Amortization of Term Loans.

(a)   [Reserved]

(b)   To the extent not previously paid, all Term Loans shall be due and payable on the Maturity Date.

(c)   [Reserved]

(d)   Prior to any repayment of any Borrowings under this Section, the Borrowers shall notify the Administrative Agent in writing of such selection not later than 12:00 p.m., New York City time, three Business Days before the scheduled date of such repayment. Administrative Agent shall promptly notify each Lender of such repayment notification. Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing. Repayments of Borrowings shall be accompanied by accrued interest (and premium, if any) on the amounts repaid.

SECTION 2.09.   Prepayment of Loans.

(a)   Subject to the Order and the Intercreditor Agreement, in the event that any Net Proceeds are received by or on behalf of the Parent Borrower or any Restricted Subsidiary in respect of an Asset Sale of all or substantially all of the assets of the Company and its Restricted Subsidiaries, the Borrowers shall, within three Business Days after such Net Proceeds are received, prepay Borrowings in an amount equal to 100% of such Net Proceeds subject to the requirements of Section 2.09(e), with application to the Loan Document Obligations set forth in Section 2.09(d) below; provided that any Net Proceeds in respect of ABL Priority Collateral received by the Borrowers or any Restricted Subsidiary as a result of such Asset Sale shall be applied in accordance with the Order and the Intercreditor Agreement, as applicable.

(b)   Subject to the Order and the Intercreditor Agreement, in the event and on each occasion that any Net Proceeds are received by or on behalf of the Parent Borrower or any Restricted Subsidiary in respect of any Prepayment Event (other than an Asset Sale of all or substantially all of the assets of the Company and its Restricted Subsidiaries), the Borrowers shall, on the day such Net Proceeds are received (or, in the case of a Prepayment Event described in clause (a) or (b) of the definition of "Prepayment Event," within three Business Days after such Net Proceeds are received), be deposited into the Asset Sale Escrow Account and held in the Asset Sale Escrow Account in accordance with clause (c) below; provided that in the case of a Prepayment Event described in clauses (a) or (b) of the definition thereof, any Net Proceeds in respect of ABL Priority Collateral received by the Borrowers or any Restricted Subsidiary as a result of such Prepayment Event shall be applied in accordance with the Order and the Intercreditor Agreement, as applicable.

39

UST-1229

(c)     Net Proceeds received in connection with any Prepayment Event described in clause (a) or (b) of the definition of "Prepayment Event" (other than an Asset Sale of all or substantially all of the assets of the Company and its Restricted Subsidiaries), and solely to the extent that such Net Proceeds in respect of the applicable Asset Sale constitute Term Priority Collateral, shall be deposited into the Asset Sale Escrow Account.  Notwithstanding anything to the contrary herein, Net Proceeds of any Asset Sale held in the Asset Sale Escrow Account may be used solely, (i) prior to the occurrence of the Conversion Date, to prepay the Loan Document Obligations (including, for the avoidance of doubt, the Redemption Premium) in full in cash (including, for the avoidance of doubt, on the Maturity Date) and (ii) upon the occurrence of the Conversion Date, as directed by the Borrowers.

(d)     Any optional or mandatory prepayment of Borrowings under this Section, shall be applied to reduce the principal amount of the Term Loans to be repaid on the Maturity Date. Notwithstanding the foregoing, any Lender may elect, by written notice to the Administrative Agent by not later than 3:00 p.m. New York City time, two Business Days (or such shorter period as may be established by the Administrative Agent) prior to the required prepayment date, to decline all or any portion of any prepayment of its Loans pursuant to this Section (other than an optional prepayment pursuant to paragraph (a) of this Section or a prepayment pursuant to clause (c) of the definition of "Prepayment Event," which may not be declined), in which case the aggregate amount of the payment that would have been applied to prepay Loans but was so declined shall *first*, be offered to Lenders who did not decline its pro rata share of the prepayment who may elect by written notice to the Administrative Agent by not later than 3:00 p.m. New York City time, one Business Day prior to the required prepayment date, to decline all or any portion of such offered prepayment amount and *second*, if declined by such Lenders, may be retained by the Borrowers and shall constitute "Declined Proceeds." For the avoidance of doubt, a Lender shall be deemed to have accepted any prepayment amount offered under this paragraph (d) is such Lender does not deliver a written notice to the Administrative Agent rejecting such prepayment amount in accordance with this paragraph (d).

(e)     In the event that all or any portion of the Loans are repaid or prepaid as a result of (i) [reserved], (ii) a mandatory prepayment pursuant to Section 2.09(a), solely as a result of an Asset Sale of all or substantially all of the assets of the Parent Borrower and its Restricted Subsidiaries (which, for the avoidance of doubt, includes the "Premium" and "Lane Bryant" business lines) or (iii) the repayment of the Loans on the Maturity Date, in each case prior to or without the occurrence of the Conversion Date, such repayments or prepayments will include a premium in an aggregate amount equal to 11.23% of the amount of the loans so prepaid or repaid (the foregoing premium, the "Redemption Premium").

(f)     The Borrowers shall notify the Administrative Agent in writing of any optional prepayment and, to the extent practicable, any mandatory prepayment hereunder by Borrowing, not later than 12:00 p.m., New York City time, three Business Days before the date of such prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; provided that a notice of prepayment of Borrowings pursuant to paragraph (a) of this Section may state that such notice is conditioned upon the occurrence of one or more events specified therein, in which case such notice may be revoked by the Parent Borrower (by notice to the

40

UST-1230

Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest as required by Section 2.11.

(g)     Notwithstanding any provisions of this Section 2.09 to the contrary, if any prepayment would otherwise be required to be made pursuant to clause (b) of this Section 2.09, solely as it relates to the portion of such Net Proceeds generated outside of the United States, so long as (x) the applicable local law will not permit repatriation of such Net Proceeds to the United States or (y) material adverse tax consequences to the Parent Borrower or any of its Subsidiaries would result from such repatriation, such Net Proceeds so affected shall not be required to be included in the mandatory prepayments referred to in such clause (b).

SECTION 2.10.    Closing Payments, Premiums and Fees.

(a)     The Borrowers agree, jointly and severally, to pay (or cause to be paid) on the Funding Date to each Lender, a closing payment in an amount equal to 2.50% of the aggregate principal amount of such Lender's New Money Loan, which such payment may be treated as original issue discount.  The premium referenced in this clause (a) shall be fully earned on the Effective Date and due and payable in full on the date set forth above.

(b)     The Borrowers agree, jointly and severally, to pay (i) to the Administrative Agent, for its own account, fees and expenses in the amounts and payable at the times and in the manner set forth  in the Administrative Agent Fee Letter, (ii) to the Backstop Lenders, for their own account, premiums in amounts and payable at the times separately agreed upon in the Commitment Letter and (iii) to the Lenders, for their own account, premiums in amounts and payable at the times separately agreed upon in the RSA.

(c)     All amounts payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, in the case of closing payments, to the Term Lenders entitled thereto.  Amounts paid shall not be refundable under any circumstances (absent manifest error in the amount paid).

SECTION 2.11.    Interest.

(a)     The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)     The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)     During the continuance of an Event of Default (i) under clauses (a) or (b) of Article VII, the Borrowers shall pay interest on such past due amounts (after giving effect to any

UST-1231

applicable grace period) owing by the Borrowers hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable laws and (ii) under any other clause of Article VII, the Borrowers shall pay interest on all outstanding Loan Document Obligations owing by the Borrowers hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable laws. Accrued and unpaid interest on such amounts (including interest on past due interest) shall be due and payable upon written demand.

(d)     Accrued interest on each Loan (for ABR Loans, accrued through the last day of the prior calendar quarter) shall be payable in arrears on each Interest Payment Date for such Loan; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)     All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.12.   Alternate Rate of Interest.  (i) If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)     the Administrative Agent determines in good faith (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(b)     the Administrative Agent is advised in writing by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Eurodollar Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrowers and the Lenders as promptly as practicable and, until the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist (which notification shall be made promptly after the Administrative Agent obtains knowledge of the cessation of such circumstances), (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective, and such Borrowing shall be continued as an ABR Borrowing, and (ii) any Borrowing Request for a Eurodollar Borrowing shall be treated as a request for an ABR Borrowing.

UST-1232

(ii) If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in paragraph (i)(a) of this Section have arisen (including because the Screen Rate is not available or published on a current basis) and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in paragraph (i)(a) of this Section have not arisen but the supervisor for the administrator of the Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the Screen Rate shall no longer be used for determining interest rates for loans, then the Administrative Agent and the Company shall endeavor to establish an alternate rate of interest to the Adjusted LIBO Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans denominated in dollars in the United States at such time, and the Administrative Agent and the Company shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable; provided that if such alternate rate of interest shall be less than 1.00%, such rate shall be deemed to be 1.00% for all purposes of this Agreement. Such amendment shall become effective with the prior consent of the Required Lenders and without any further action or consent of any other party to this Agreement. Until an alternate rate of interest shall be determined in accordance with this paragraph (but, in the case of the circumstances described in clause (ii) above, only to the extent the Screen Rate for such Interest Period is not available or published at such time on a current basis), (x) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Term Loan Borrowing shall be ineffective, and such Borrowing shall be continued as an ABR Term Loan Borrowing, and (y) any Borrowing Request for a Eurodollar Term Loan Borrowing shall be treated as a request for an ABR Term Loan Borrowing.

SECTION 2.13.  Increased Costs.

(a)  If any Change in Law shall:

(i)  impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)  impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Eurodollar Loans made by such Lender; or

(iii)  subject any Recipient to any Taxes (other than any (A) Indemnified Taxes or (B) Excluded Taxes) on or with respect to its loans, loan principal, letters of credit, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender or other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount)

LA\4104335.13

UST-1233

then, from time to time upon request of such Lender or other Recipient, the Borrowers will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs or expenses incurred or reduction suffered. Notwithstanding the foregoing, if the Parent Borrower reasonably believes that any such Taxes were not correctly or legally asserted, the applicable Recipient will use commercially reasonable efforts to cooperate with the Parent Borrower to obtain a refund of such Taxes so long as such efforts would not, in the sole determination of such Recipient exercised in good faith result in any non-reimbursable additional costs, expenses or risks or be otherwise disadvantageous to it.

(b)     If any Lender determines that any Change in Law regarding capital or liquidity requirements has had or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity), then, from time to time upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company as well as a reasonably detailed description of the occurrence giving rise to such event, as the case may be, as specified in paragraph (a) or (b) of this Section delivered to the Borrowers shall be conclusive absent manifest error. The Borrowers shall pay such Lender the amount shown as due on any such certificate within 10 Business Days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs or expenses incurred or reductions suffered more than 180 days prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or expenses or reductions and of such Lender's or intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or expenses or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)     Notwithstanding the above, a Lender will not demand compensation for any increased cost or reduction set forth in this Section 2.13 at any time if it is not the general practice and policy of such Lender to demand such compensation from similarly situated borrowers in similar circumstances under agreements containing provisions permitting such compensation to be claimed at such time.

SECTION 2.14.    Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan

44

UST-1234

other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.09(f) and is revoked in accordance therewith) or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrowers pursuant to Section 2.17, then, in any such event, the Borrowers shall compensate each Lender for the loss, cost and expense (excluding any loss of margin) attributable to such event. Such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan (but not including the Applicable Rate applicable thereto), for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate such Lender would bid if it were to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the London interbank market. A certificate of any Lender delivered to the Borrowers and setting forth and explaining in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be conclusive absent manifest error. The Borrowers shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

SECTION 2.15.    Taxes.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by any applicable withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.15) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by the Loan Parties.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the, option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    Evidence of Payment.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.15, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

UST-1235

(d)     Indemnification by the Loan Parties.  The Loan Parties shall jointly and severally indemnify each Recipient, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)     Status of Lenders.  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrowers and the Administrative Agent, at the time or times reasonably requested by the Borrowers or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrowers or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.15(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)     Without limiting the generality of the foregoing:

(A)     any Lender that is a U.S. Person shall deliver to the Borrowers and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), whichever of the following is applicable (in such number of copies as shall be requested by the recipient):

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party(x) with respect to payments of interest under any Loan Document, executed

UST-1236

copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms) establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI (or any successor forms);

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit H-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Parent Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and that no payments in connection with any Loan Document are effectively connected with the Foreign Lender's conduct of a U.S. trade or business (a "<u>U.S. Tax Compliance Certificate</u>") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms); or

(4)     to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or a participating Lender), executed copies of IRS Form W-8IMY (or any successor forms), accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-2 or H-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; <u>provided</u> that if the Foreign Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be

UST-1237

prescribed by applicable law to permit the Borrowers or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA and to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered (including any specific documentation required in this Section 2.15(e)) expires or becomes obsolete or inaccurate in any respect, it shall deliver promptly to the Borrowers or Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrowers or the Administrative Agent) or promptly notify the Borrowers and the Administrative Agent in writing of its legal ineligibility to do so.

(f)    Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(c)(ii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (f).

(g)    Treatment of Certain Refunds.  If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes as to which it has been indemnified pursuant to this Section 2.15 (including by the payment of additional amounts pursuant to this Section 2.15), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.15 with respect

to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 2.15(g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 2.15(g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Section 2.15(g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(h)     Defined Terms.  For the avoidance of doubt, for purposes of this Section 2.15, the term "applicable law" includes FATCA.

(i)     Issue Price.  The Borrowers and Administrative Agent shall cooperate in good faith to determine the "issue price" (within the meaning of Section 1273 of the Code) of (i) the Loans and (ii) if the Exit Conversion occurs, the loans under the Exit Facility Agreement and, in either case, shall not take any Tax reporting position inconsistent with such determination, except as otherwise required by a Change in Law or pursuant to the good faith resolution of a Tax contest

(j)     Survival.  Each party's obligations under this Section 2.15 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 2.16.     Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)     The Borrowers shall make each payment required to be made by the Borrowers hereunder or under any other Loan Document on or prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, on or prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without any defense, setoff, recoupment or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to such account as may be specified by the Administrative Agent; provided that payments pursuant to Sections 2.13, 2.14, 2.15 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent shall distribute any such payment received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder or under any other Loan Document shall be due on a day that is not a Business Day, the date for payment shall be

LA\4104335.13

UST-1239

extended to the next succeeding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document shall be made in dollars.

(b)    If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, premiums and fees then due hereunder, such funds shall be applied towards payment of the amounts then due hereunder ratably among the parties entitled thereto, in accordance with the amounts then due to such parties.

(c)    If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall notify the Administrative Agent of such fact and shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the amount of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amounts of principal of and accrued interest on their Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement (for the avoidance of doubt, as in effect from time to time) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any Person in accordance with the terms of Section 9.04.  The Borrowers consent to the foregoing and agree, to the extent the Borrowers may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against any Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrowers in the amount of such participation.  For purposes of subclause (b)(i) of the definition of Excluded Taxes, a Lender that acquires a participation pursuant to this Section 2.16(c) shall be treated as having acquired such participation on the earlier date(s) on which such Lender acquired the applicable interest(s) in the Commitment(s) and/or Loan(s) to which such participation relates.

(d)    Unless the Administrative Agent shall have received written notice from the Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, but shall not be obligated to, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

UST-1240

(e)     If any Lender shall fail to make any payment required to be made by it hereunder to or for the account of the Administrative Agent, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations in respect of such payment until all such unsatisfied obligations have been discharged and/or (ii) hold any such amounts in a segregated account as cash collateral for, and apply any such amounts to, any future payment obligations of such Lender hereunder to or for the account of the Administrative Agent.

SECTION 2.17.     Mitigation Obligations; Replacement of Lenders.

(a)     If any Lender requests compensation under Section 2.13, or if the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Section 2.13 or 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby, jointly and severally, agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment and delegation.

(b)     If (i) any Lender requests compensation under Section 2.13, (ii) the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or (iii) any Lender has failed to consent to a proposed amendment, waiver, discharge or termination that under Section 9.02 requires the consent of all the Lenders (or all the affected Lenders) and with respect to which the Required Lenders shall have granted their consent, then the Borrowers may, at the Borrowers' sole expense and effort, upon notice to such Lender and the Administrative Agent by the Borrowers, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights (other than its existing rights to payments pursuant to Section 2.13 or 2.15) and obligations under this Agreement and the other Loan Documents (or, in the case of any such assignment and delegation resulting from a failure to provide a consent, all its interests, rights and obligations under this Agreement and the other Loan Documents as a Lender) to an Eligible Assignee that shall assume such obligations (which may be another Lender, if a Lender accepts such assignment and delegation); provided that (A) the Borrowers shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b)(i), which consent shall not unreasonably be withheld, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the assignee (in the case of such principal and accrued interest and fees) or the Borrowers (in the case of all other amounts), (C) in the case of any such assignment and delegation resulting from a claim for compensation under Section 2.13 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments and (D) in the case of any such assignment and delegation resulting from the failure to provide a consent, the

LA\4104335.13

UST-1241

assignee shall have given such consent and, as a result of such assignment and delegation and any contemporaneous assignments and delegations and consents, the applicable amendment, waiver, discharge or termination can be effected. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver or consent by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation have ceased to apply. Each party hereto agrees that an assignment and delegation required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrowers, the Administrative Agent and the assignee and that the Lender required to make such assignment and delegation need not be a party thereto.

SECTION 2.18.   [Reserved].

SECTION 2.19.   [Reserved].

SECTION 2.20.   Joint and Several Liability of the Borrowers.  The Loan Document Obligations of the Borrowers shall be joint and several in nature.  Each Borrower hereby irrevocably and unconditionally agrees that it is jointly and severally liable for all Loan Document Obligations of the Borrowers hereunder and the other Loan Documents, whether now or hereafter existing or due or to become due.  The Loan Document Obligations of the Borrowers under the Loan Documents may be enforced by the Administrative Agent and the Lenders against any Borrower or all Borrowers in any manner or order selected by the Administrative Agent or the Required Lenders in their sole discretion.  Without limiting the foregoing provisions of this Section 2.20, each Borrower acknowledges and agrees that:

(a)      its obligations under this Agreement shall remain enforceable against it even though such obligations may be unenforceable or not allowable against any Borrower during the existence of an insolvency proceeding against any Borrower or otherwise;

(b)      its obligations under this Agreement are independent of the obligations of any other Borrower, and a separate action or actions may be brought and prosecuted against it in respect of such obligations irrespective of whether any action is brought against any other Borrower or any other Borrower is joined in any such action or actions;

(c)      it hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any of all of the following: (i) any lack of validity or enforceability of this Agreement or any agreement or instrument relating thereto in respect of any other Borrower; (ii) any change in the time, manner or place of payment of, or in any other term of, all or any of the obligations of any other Borrower under or in respect of this Agreement, or any other amendment or waiver of or any consent to departure from this Agreement, in respect of any other Borrower; (iii) any change, restructuring or termination of the structure or existence of any other Borrower; (iv) the failure of any other person to execute or deliver any other agreement or the release or reduction of liability of any other person with respect to any obligations of the Borrowers under this Agreement; or (v) any other circumstance (including any statute of limitations but other than the Loan Document Obligations having been paid in full) or any existence or reliance on any representation by any other person that might otherwise constitute a defense available to, or a discharge or, any other Borrower;

52

UST-1242

(d)     its obligations under this Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any such obligations is rescinded or must otherwise be returned by any person upon the insolvency, bankruptcy or reorganization of any other Borrower, all as though such payment had not been made;

(e)     it hereby unconditionally and irrevocably waives any right to revoke its joint and several liability under the Loan Documents and acknowledges that such liability is continuing and applies to all obligations of the Borrowers under the Loan Documents, whether existing now or in the future;

(f)     in any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of the Subsidiary Borrower under this Agreement would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of the any other creditors, on account of the amount of its liability under this Agreement, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Borrower, any Loan Document or any other person be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 2.20(g) and any rights of subrogation, indemnity or reimbursement) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceedings; and

(g)     it hereby agrees that to the extent that any Borrower shall have paid more than its proportionate share of any payment made hereunder, such Borrower shall be entitled to seek and receive contribution from and against any other Borrower hereunder which has not paid its proportionate share of such payment; provided that the provisions of this Section 2.20(g) shall in no respect limit the obligations and liabilities of any Borrower to the Administrative Agent and the Lenders, and each Borrower shall remain liable to the Administrative Agent and the Lenders for the full amount hereunder; provided, however each Borrower agrees that the foregoing rights of contribution as well as any right of subrogation, indemnity or reimbursement that it may acquire or that may arise against any other Borrower due to any payment or performance made under this Agreement shall in all respects be subordinated and junior in right of payment to, and shall not be exercised by such Borrower until, all Loan Document Obligations have been paid in full.

SECTION 2.21.   Super-Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations.

(a)     The priority of Administrative Agent's Liens on the Collateral, claims and other interests shall be as set forth in the Order.

(b)     Upon the maturity (whether by acceleration or otherwise) of any of the Loan Document Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Loan Document Obligations without further application to or order of the Court.

53

UST-1243

SECTION 2.22.   Conversion to Exit Facility Agreement.  The Loans shall be repaid in cash in accordance with the terms hereunder; *provided* that, notwithstanding the foregoing, upon the satisfaction or waiver by the Required Lenders of each of the conditions set forth in the "Conditions to Borrowings" section of the Exit Facility Term Sheet, automatically and without any further consent or action required by the Administrative Agent, any Lender, or any other Secured Party, the Loans shall be refinanced with loans under the Exit Facility Agreement in accordance with the Exit Facility Term Sheet (the "Exit Conversion").  Upon the Exit Conversion, (i) the Borrowers (or the entities assuming and/or acquiring directly or indirectly the operations and assets of the Borrowers in the Acceptable Plan, and each Guarantor and each entity assuming the operations and assets of each Guarantor that is a Debtor in the Acceptable Plan, to the extent such Person is required under the Exit Facility Term Sheet to continue to be a guarantor thereunder), shall assume all obligations in respect of the Loans hereunder and all other monetary obligations in respect hereof, (ii) each Loan hereunder shall be continued as and converted to a Loan under the Exit Facility Agreement, (iii) each Lender hereunder shall be a Lender under the Exit Facility Agreement and (iv) this Agreement shall terminate and be superseded and replaced in its entirety by, and deemed amended and restated in its entirety in the form of, the Exit Facility Agreement (with such changes and insertions thereto, as are reasonably satisfactory to the Administrative Agent and the Borrower, incorporated as necessary to make any technical changes necessary to effectuate the intent of this Section 2.22 and to make any changes as required in the Exit Facility Term Sheet, including to increase the facility amount and give effect to any "last out" term loans).  Notwithstanding the foregoing, all obligations of the Borrowers and the Guarantors to the Administrative Agent and the Lenders under this Agreement and any other Loan Document which are expressly stated in this Agreement or such other Loan Document as surviving such agreement's termination shall, as so specified, survive without prejudice and remain in full force and effect.  Each of the Loan Parties, the Administrative Agent and the Lenders shall take such actions and execute and deliver such agreements, instruments or other documents as the Administrative Agent may reasonably request to give effect to the provisions of this Section 2.22 and as are required to complete the schedules to the Exit Facility Agreement or other agreements contemplated thereby; *provided*, *however*, that any such action by the Administrative Agent or any of the Lenders shall not be a condition precedent to the effectiveness of the Exit Facility Agreement if and to the extent so provided in the Confirmation Order.  Each Lender hereto hereby agrees that, on the Conversion Date, (i) the Administrative Agent (in its capacity as Administrative Agent under the Exit Facility Agreement) may execute and deliver the Exit Facility Agreement (and any guaranty contemplated thereby) on its own behalf and on behalf of each such Lender and (ii) the Administrative Agent may execute and deliver the security documents contemplated by the Exit Facility Term Sheet. On the Conversion Date, the Administrative Agent shall transfer any amounts remaining in the DIP Accounts to an account designated by the Borrowers.

ARTICLE III

Representations and Warranties

Each Borrower represents and warrants to the Administrative Agent and the Lenders as follows:

LA\4104335.13

UST-1244

SECTION 3.01.    Organization; Powers.  The Parent Borrower and each Restricted Subsidiary is duly organized, validly existing and (to the extent the concept is applicable in such jurisdiction and, in the case of any Restricted Subsidiary, except where the failure to be so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect) in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to, subject to the entry of the Order, carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02.    Authorization; Enforceability; Benefit to Loan Parties.

(a)    Subject to entry of the Order, the Transactions, insofar as they are to be carried out by each Loan Party, are within such Loan Party's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational and, if required, shareholder or other equityholder action.  Subject to entry of the Order, this Agreement has been duly executed and delivered by each Borrower and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Borrower or such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(b)    Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lenders to the Borrowers hereunder.  Each Loan Party has determined that, subject to entry of the Order, the execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

SECTION 3.03.    Governmental Approvals; No Conflicts.  Except for the entry of, and pursuant to the terms of, the Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are (or will so be) in full force and effect, (b) will not violate any applicable law, including any order of any Governmental Authority, (c) will not violate the charter, by-laws or other organizational documents of the Parent Borrower or any Restricted Subsidiary, (d) will not violate or result in a default under any indenture or agreement (including the Pre-Petition ABL Credit Agreement, the ABL Credit Agreement to the extent applicable, the Pre-Petition Credit Agreement or other material instrument binding upon the Parent Borrower or any Restricted Subsidiary or any of their assets) (other than defaults arising solely as a result of the commencement of the Cases), or give rise to a right thereunder to require any payment to be made by the Parent Borrower or any Restricted Subsidiary, and (e) will not result in the creation or imposition of any Lien on any asset of the Parent Borrower or any Restricted Subsidiary, except Liens created pursuant to the Loan Documents or Liens created in connection with the Pre-Petition ABL Credit Agreement, the  ABL Credit Agreement to the extent applicable, or the Pre-Petition Credit Agreement, in the case of clauses (a) (as to the Transactions other than entry

55

UST-1245

into the Loan Documents), (b) and (d) above, except for a failure to obtain or make, violation or creation, as applicable, which individually or in the aggregate would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.04.    Financial Condition; No Material Adverse Change.

(a)    The Borrowers have heretofore furnished to the Lenders (i) the audited consolidated balance sheets and related consolidated statements of operations, comprehensive income, equity and cash flows of the Parent Borrower and its consolidated Subsidiaries as of and for the fiscal year ended August 3, 2019, and (B) the unaudited consolidated balance sheets and related consolidated statements of operations, comprehensive income and cash flows of the Parent Borrower and its consolidated Subsidiaries as of and for each of the fiscal quarters and the portions of the fiscal year ended November 2, 2019 and February 1, 2020 .  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)    Since the Petition Date, other than those customarily resulting from the commencement of the Cases and changes set forth in the Parent Borrower's business plan delivered to the Ad Hoc Committee prior to the Petition Date, there has been no event, development or circumstance that has had, or would reasonably be expected to have, a Material Adverse Effect.

SECTION 3.05.    Properties.

(a)    The Parent Borrower and each Restricted Subsidiary has good title to, or valid leasehold interests in, all its tangible property material to its business, except for defects in title that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect and Liens expressly permitted by Section 6.02.

(b)    (i) The Parent Borrower and each Restricted Subsidiary owns, is licensed to use, or otherwise has the right to use all trademarks, service marks, tradenames, trade dress, copyrights, patents, designs and other intellectual property material to its business, and (ii) the conduct of their respective businesses, including the use thereof by the Parent Borrower and the Restricted Subsidiaries in their respective businesses, does not infringe upon the rights of any other Person, except for any such infringements or any such failure to own, license or have the right to use that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(c)    Schedule 3.05 sets forth the address of each real property that is owned in fee by the Loan Parties as of the Effective Date.

SECTION 3.06.    Litigation and Environmental Matters.

(a)    Except for the Disclosed Matters and the Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrowers, threatened against the Parent Borrower or any Restricted

LA\4104335.13

UST-1246

Subsidiary (i) as to which there is a reasonable likelihood of an adverse determination and that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve any of the Loan Documents or the Transactions.

(b)     Except for the Disclosed Matters or matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, neither the Parent Borrower nor any Restricted Subsidiary (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

SECTION 3.07.     Compliance with Laws and Agreements.

(a)     The Parent Borrower and each Restricted Subsidiary is in compliance with all laws, including all orders of Governmental Authorities, applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except any non-compliance arising solely as a result of the commencement of the Cases or where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect (it being agreed that this Section does not apply to any law which is specifically addressed in Section 3.06(b), 3.07(b), 3.08, 3.09, 3.10 or 3.14). Except for any defaults or events of defaults arising solely as a result of the commencement of the Cases, any defaults or events of defaults arising under the Pre-Petition ABL Credit Agreement or the Pre-Petition Credit Agreement, no Event of Default has occurred and is continuing.

(b)     The Borrowers have implemented and maintain in effect policies and procedures designed to ensure compliance in all material respects by the Parent Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Parent Borrower, its Subsidiaries and their respective officers and employees and, to the knowledge of the Borrowers, their respective directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects. None of (a) the Parent Borrower, any Subsidiary or, to the knowledge of the Borrowers, any of their respective directors, officers or employees, or (b) to the knowledge of the Borrowers any agent of the Parent Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Borrowing, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

SECTION 3.08.     Investment Company Status. No Loan Party is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09.     Taxes. The Parent Borrower and each Subsidiary has (a) timely filed or caused to be filed all Tax returns and reports required to have been filed, except to the extent that the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, and (b) paid or caused to be paid all Taxes required to have been paid by it (including in its capacity as withholding agent), except (i) any Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which the

UST-1247

Parent Borrower or such Subsidiary has set aside on its books reserves with respect thereto to the extent required by GAAP or (ii) to the extent that the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. There is no current or proposed tax assessment, deficiency or other claim against the Parent Borrower or any of the Subsidiaries that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 3.10.    ERISA; Labor Matters.

(a)    Except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred or is reasonably expected to occur, (ii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, and (iii) each Plan is in compliance with the applicable provisions of ERISA, the Code and other applicable laws. On the Effective Date, the excess of the present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of preparing the audited financial statements set forth in the Borrower's most recent Annual Report on Form 10-K), as of the date of the most recent financial statements reflecting such amounts, over the fair market value of the assets of such Plan, if any, could not be reasonably expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)    Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) there are no strikes, lockouts, slowdowns or any other labor disputes against the Parent Borrower or any Restricted Subsidiary pending or, to the knowledge of the Borrowers, threatened, (ii) the hours worked by and payments made to employees of the Parent Borrower and the Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act of 1938 or any other applicable federal, state, local or foreign law dealing with such matters, (iii) all payments due from the Parent Borrower or any Restricted Subsidiary, or for which any claim may be made against the Parent Borrower or any Restricted Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Parent Borrower or such Restricted Subsidiary to the extent required by GAAP and (iv) the consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Parent Borrower or any Restricted Subsidiary is bound.

SECTION 3.11.    [Reserved].

SECTION 3.12.    Subsidiaries and Joint Ventures.  Schedule 3.12 sets forth, as of the Effective Date, the name, type of organization and jurisdiction of organization of, and the percentage of each class of Equity Interests owned by the Parent Borrower or any Subsidiary in, (a) each Subsidiary and (b) each joint venture in which the Parent Borrower or any Subsidiary owns any Equity Interests, and identifies each Designated Subsidiary.  All the issued and outstanding Equity Interests in each Subsidiary owned by any Loan Party have been (to the extent such concepts are relevant with respect to such Equity Interests) duly authorized and validly issued and are fully paid and non-assessable (except as such rights may arise under mandatory provisions of applicable statutory law that may not be waived and not as a result of

LA\4104335.13

UST-1248

any rights contained in organizational documents). Except as set forth in Schedule 3.12, as of the Effective Date, there is no existing option, warrant, call, right, commitment or other agreement to which the Parent Borrower or any Subsidiary is a party requiring, and there are no Equity Interests in any Subsidiary outstanding that upon exercise, conversion or exchange would require, the issuance by any Subsidiary of any additional Equity Interests or other securities exercisable for, convertible into, exchangeable for or evidencing the right to subscribe for or purchase any Equity Interests in any Subsidiary.

SECTION 3.13.    Insurance.  Schedule 3.13 sets forth a description of all insurance maintained by or on behalf of the Parent Borrower and the Restricted Subsidiaries as of the Effective Date.  As of the Effective Date, all premiums due and payable in respect of such insurance have been paid.  The Borrowers believe that the insurance maintained by or on behalf of the Parent Borrower and the Restricted Subsidiaries is adequate.

SECTION 3.14.    Federal Reserve Regulations.  Neither the Parent Borrower nor any Restricted Subsidiary is principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock.  No part of the proceeds of the Loans will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, in any manner or for any purpose that would entail a violation of Regulations T, U or X of the Board of Governors.

SECTION 3.15.    [Reserved].

SECTION 3.16.    Collateral Matters.

(a)    Subject to the entry of the Order, the Collateral Agreement and the Order are effective to create in favor of the Administrative Agent (for the benefit of the Secured Parties) legal, valid, enforceable and perfected Liens on the Collateral described therein (with such priority as provided for therein).

(b)    Except for the entry of the Order, no filing or other action will be necessary to perfect such Liens.

(c)    The Order is (or will be, as applicable) effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable perfected security interest in the Collateral (with such priority as provided for in the Order (including, without limitation, with respect to the Carve Out)) without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents except to the extent set forth in such orders.

SECTION 3.17.    Use of Proceeds.  Unless otherwise agreed by the Administrative Agent (acting at the direction of the Required Lenders), the proceeds of the New Money Loans will be deposited into the DIP Funding Account and used in accordance with the terms of the Approved Budget (subject to Permitted Variances) and the terms of the Order or any other order entered into by the Court that is consistent with the RSA, the Order and this Agreement, including, without limitation (i) to pay amounts due to Lenders and the Administrative Agent hereunder and the reasonable and documented professional fees and expenses (including legal,

LA\4104335.13

UST-1249

financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Administrative Agent, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby (including pursuant to such court approval), (ii) to make adequate protection payments, (iii) to fund the Carve Out, and (iv) to pay administration costs of the Cases and Claims or amounts approved by the Court in the "first day" and "second day" orders or as required under the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the proceeds of the New Money Loans may be used to prepay or repay the ABL Credit Agreement (to the extent applicable) solely to extent provided for in the Approved Budget then in effect at the date of such prepayment or repayment, and in any event in an aggregate amount during the term of this Agreement not to exceed $50,000,000.

SECTION 3.18.    Approved Budget.  The Borrowers have heretofore furnished to the Administrative Agent the initial Approved Budget.  Each Approved Budget was prepared in good faith based upon assumptions the Borrowers believed to be reasonable assumptions on the date of delivery of such Approved Budget.

SECTION 3.19.    Chapter 11 Cases.

(a)    The Cases were commenced on the Petition Date in accordance with applicable laws and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Order and (ii) the hearing for the entry of the Order. Debtors shall give, on a timely basis as specified in the Order, all notices required to be given to all parties specified in the Order.

(b)    After the entry of the Order, and pursuant to and to the extent permitted in the Order, the Loan Document Obligations will constitute allowed administrative expense claims in the Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve Out and (ii) the priorities set forth in the Order.

(c)    After the entry of the Order and pursuant to and to the extent provided in the Order, the Loan Document Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority, only to (i) the Carve Out, (ii) the Liens pursuant to Section 6.02(i) with respect to Indebtedness under the ABL Credit Agreement (to the extent applicable), subject to the terms of such Section 6.02(i) and (iii) to the extent set forth in the Order.

(d)    The Order is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Required Lenders' consent, modified or amended. The Loan Parties are in compliance in all material respects with the Order.

(e)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Order, upon the Maturity Date (whether by acceleration or otherwise) of any of the Loan Document Obligations, to the extent the

UST-1250

Conversion Date has not occurred, the Administrative Agent and Lenders shall be entitled to immediate payment of such Loan Document Obligations and to enforce the remedies provided for hereunder or under applicable laws, without further notice, motion or application to, hearing before, or order from, the Court.

## ARTICLE IV

### Conditions

SECTION 4.01.   Conditions to Effective Date.  The effectiveness of this Agreement and the obligations of the Lenders to make the Roll-up Loans hereunder shall not become effective until the date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)      The Administrative Agent shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) evidence satisfactory to the Administrative Agent (which may include a facsimile transmission) that such party has signed a counterpart of this Agreement.

(b)      The Administrative Agent shall have received a favorable written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of Kirkland & Ellis LLP, counsel for the Loan Parties, addressing corporate authority matters and other matters  as the Administrative Agent shall reasonably request, each such opinion to be in form, scope and substance reasonably satisfactory to the Administrative Agent and the Lenders.

(c)      The Administrative Agent shall have received as to each Loan Party such customary documents and certificates as it shall reasonably have requested relating to the organization, existence and good standing of such Loan Party and the authorization of the Loan Documents or the Transactions, all in form and substance reasonably satisfactory to the Administrative Agent.

(d)      (a) The representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct (i) in the case of the representations and warranties qualified as to materiality, in all respects and (ii) otherwise, in all material respects, in each case on and as of the Effective Date, except in the case of any such representation and warranty that expressly relates to a prior date, in which case such representation and warranty shall be so true and correct on and as of such prior date and (b) at the time of and immediately after giving effect to the Transactions to occur on the Effective Date, no Event of Default shall have  occurred and be continuing.

(e)      The Administrative Agent shall have received a certificate, dated the Effective Date and signed by the chief financial officer of the Parent Borrower, confirming compliance with the conditions set forth in paragraph (d) of this Section.

(f)      The Lenders and the Administrative Agent shall have received the Approved Budget.

LA\4104335.13

UST-1251

(g)     The Administrative Agent, for its benefit and the benefit of each other Secured Party, shall have been granted a perfected lien on the Collateral by the Order on the terms and conditions set forth herein and in the other Loan Documents.

(h)     The Administrative Agent shall have received the results of a search of the UCC (or equivalent) filings made with respect to the Loan Parties in the jurisdictions reasonably requested by the Administrative Agent.

(i)     The Lenders shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" rules and regulations, including the USA Patriot Act, to include a duly executed IRS Form W-9 or such other applicable IRS Form for each Borrower, at least three Business Days prior to the Effective Date to the extent such information was requested at least 10 Business Days prior to the Effective Date.

(j)     The Collateral Agreement each shall have been duly executed and delivered by each party thereto, and shall be in full force and effect.

(k)     The Administrative Agent shall have received (i) unaudited interim consolidated financial statements of the Parent Borrower for each fiscal month ended after the fiscal quarter ending February 1, 2020 through the end of [  ], 2020 and (ii) unaudited financial statements for the fiscal quarter ended May 2, 2020.

(l)     Since the Petition Date, other than those events or circumstances arising from the commencement of the Cases, there has been no event or circumstance, either individually or in the aggregate, that has or could reasonably be expected to have a Material Adverse Effect.

(m)     (i) the Administrative Agent shall have received drafts of the "first day" pleadings for the Cases, in each case, in form and substance reasonably satisfactory to the Administrative Agent; and (ii) all motions, orders (including the "first day" orders and the Cash Management Order) and other documents to be filed with and submitted to the Court on the Petition Date shall be in form and substance reasonably satisfactory to the Administrative Agent, and the Court shall have approved and entered all "first day" orders, including, without limitation, the Cash Management Order.

(n)     No trustee, receiver or examiner with expanded powers shall have been appointed in any of the Chapter 11 Cases.

(o)     The Pre-Petition Agent and the Pre-Petition Lenders shall have each received adequate protection in respect of the Liens securing their respective Pre-Petition Lender Obligations pursuant to the Order.

The Administrative Agent shall notify the Borrowers and the Lenders of the Effective Date, and such notice shall be conclusive and binding.

SECTION 4.02.    Conditions to the New Money Loan.   The obligations of the Lenders to make the New Money Loans hereunder shall not become effective until the date on or after the

UST-1252

Effective Date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)   The Administrative Agent shall have received a written Borrowing Request to include a flow of funds memorandum in form and substance satisfactory to the Administrative Agent and the Lenders.

(b)   The ABL Credit Agreement shall have been duly executed and delivered by each of the parties thereto, and shall be in full force and effect.

(c)   The Intercreditor Acknowledgment shall have been duly executed and delivered by each party thereto, and shall be in full force and effect.

(d)   The Administrative Agent, the Ad Hoc Committee and the Ad Hoc Committee Advisors shall have received all fees and other amounts due and payable on or prior to the Funding Date, including, to the extent invoiced at least two Business Days prior to the Funding Date, payment or reimbursement of all fees and expenses (including fees, charges and disbursements of counsel) required to be paid or reimbursed by any Loan Party under the Commitment Letter or any Loan Document, in each case, payable from the proceeds of the initial funding of the Term Loans.

The Administrative Agent shall notify the Borrowers and the Lenders of the Funding Date, and such notice shall be conclusive and binding.


ARTICLE V

Affirmative Covenants

Until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all premiums and fees payable hereunder shall have been paid in full, each Borrower covenants and agrees with the Lenders that:

SECTION 5.01.   Financial Statements and Other Information.  The Borrowers will furnish to the Administrative Agent, on behalf of each Lender and, in the case of clauses (e), (f) and (g), to the Ad Hoc Committee Advisors:

(a)   within 90 days after the end of each fiscal year of the Parent Borrower, its consolidated balance sheet and related consolidated statements of operations, comprehensive income, equity and cash flows as of the end of and for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year,  all certified by a Financial Officer of the Parent Borrower to the effect that such consolidated financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries as of the end of and for such fiscal year on a consolidated basis in accordance with GAAP;

63

UST-1253

(b)        within 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Parent Borrower, its consolidated balance sheet as of the end of such fiscal quarter, the related consolidated statements of operations and comprehensive income for such fiscal quarter and the then elapsed portion of the fiscal year and the related consolidated statement of cash flows for the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Parent Borrower as presenting fairly, in all material respects, the financial position, results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries as of the end of and for such fiscal quarter and such portion of the fiscal year on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes;

(c)        within 30 days after the end of each of the first two fiscal months of each fiscal quarter of the Company, the consolidated balance sheet and related statements of operations and comprehensive income of the Company as of the end of and for such fiscal month and the then elapsed portion of the fiscal year and the related consolidated statement of cash flows of the Company for the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Company as presenting fairly in all material respects the financial position, results of operations and cash flows of the Company and its consolidated Subsidiaries as of the end of and for such fiscal month and such portion of the fiscal year on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes (it being understood and agreed that any adjustments reflected in such monthly financial statements may differ (in part or entirely) from any adjustments reflected in the financial statements delivered in the foregoing clauses (a) or (b);

(d)        concurrently with each delivery of financial statements under clause (a), (b) or (c) above, a completed Compliance Certificate signed by a Financial Officer of the Parent Borrower, (i) certifying, in the case of the financial statements delivered under clause (a), (b) or (c) above, that such financial statements present fairly in all material respects the financial position, results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP, subject to normal year end audit adjustments and the absence of footnotes, (ii) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (iii) to the extent applicable, setting forth reasonably detailed calculations demonstrating compliance with Section 6.12, (iv) if any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04, specifying the effect of such change on the financial statements accompanying such certificate, and (v) certifying that all notices required to be provided under Section 5.03 and 5.04 have been provided;

(e)        no later than 5:00 p.m. New York City time on the four week anniversary of the Effective Date(or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion), and each fourth (4th) calendar week thereafter, an updated budget consistent with the form and level of detail set forth in the initial Approved Budget,

LA\4104335.13

UST-1254

including the same line-items provided with the initial Approved Budget, and otherwise in form and substance reasonably acceptable to Ad Hoc Committee Advisors in their reasonable discretion.  Upon, and subject to, the approval of any such updated budget by the Ad Hoc Committee Advisors in their reasonable discretion, such supplemented budget shall constitute the then-approved Approved Budget, effective as of the beginning of the week immediately following the week in which it was delivered; *provided* that unless and until the Ad Hoc Committee Advisors approve such supplemental budget in their reasonable discretion, the then-current Approved Budget shall remain in effect;

(f)      no later than 5:00 p.m. New York City time on the Thursday of each calendar week (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) commencing on (a) the date that is the third Thursday following the Effective Date, a line-item by line-item report setting forth for each line item in the Approved Budget, in reasonable detail, the actual receipts received and operating disbursements (including any professional fees) made during the prior week then-ended and (b) the date that is the first Thursday following the Effective Date a report setting forth (i) the Liquidity as of the  Friday of the most recently ended calendar week and (ii) the aggregate amount of end of day cash and Cash Equivalents as of the Friday of the most recently ended calendar week of all non-Loan Party Subsidiaries on deposit in or credited to any account maintained by such non-Loan Party Subsidiaries;

(g)      no later than 5:00 p.m. New York City time on the Thursday (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) of each calendar week commencing on the date that is the second Thursday following the Effective Date, (each such Thursday or later time, a "Variance Report Date"), a line-item by line-item variance report (each, a "Variance Report"),substantially in the form attached hereto as Exhibit J or otherwise as reasonably acceptable to the Required Lenders in their sole discretion, setting forth, in reasonable detail: (x) any variances between actual amounts for each line item in the Approved Budget for the Variance Testing Period versus projected amounts set forth in the applicable Approved Budget for each line item included therein on a cumulative basis for such Variance Testing Period (for the avoidance of doubt, to be prepared by comparing the sum of the four (4) figures for each relevant week for such corresponding line item in the relevant Approved Budget that was in effect in respect of each relevant week at the time), and (y) the computations necessary to determine compliance with Section 6.12, together with a statement from a Financial Officer certifying the information contained in the report.  The Variance Report shall also provide a reasonably detailed explanation for any negative variance in such Variance Report in excess of 15% in actual receipts and any positive variance in such Variance Report in excess of 15% in  actual operating disbursements during the Variance Testing Period (in each case unless the dollar amount corresponding to such percentage variance is less than $1,000,000) as compared to projections for such corresponding line items during the Variance Testing Period as set forth in the Approved Budget;

(h)      (i) to the extent applicable, within 1 Business Day of delivery of a Borrowing Base Certificate (as defined in the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, as applicable) to the ABL Agent, copy of such certificate and (ii) a copy of each report or forecast delivered under the ABL Credit Agreement, within 1 Business Day of delivery thereof;

65

UST-1255

(i)    promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the Parent Borrower or any Subsidiary with the SEC or with any national securities exchange, or distributed by the Parent Borrower to its shareholders generally, as the case may be;

(j)    [reserved];

(k)    promptly after any written request therefor, evidence of insurance renewals as required under Section 5.08 hereunder in form and substance reasonably acceptable to the Administrative Agent; and

(l)    promptly after any written request therefor, such other information regarding the operations, business affairs and financial condition of the Parent Borrower or any Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request.

Information required to be delivered pursuant to clause (a), (b) or (i) of this Section shall be deemed to have been delivered if such information, or one or more annual or quarterly reports containing such information, shall have been posted by the Administrative Agent on an IntraLinks or similar site to which the Lenders have been granted access or shall be available on the website of the SEC at http://www.sec.gov.  Information required to be delivered pursuant to this Section may also be delivered by electronic communications pursuant to procedures approved by the Administrative Agent.

SECTION 5.02.    Notices of Material Events.  The Borrowers will furnish to the to the Ad Hoc Committee Advisors and the Administrative Agent (for distribution to the Lenders) written notice promptly upon any Financial Officer, or other officer or employee responsible for compliance with the Loan Documents, of the Borrowers becoming aware of any of the following:

(a)    the occurrence of any Default;

(b)    the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against (other than in connection with the Cases) or affecting the Parent Borrower or any Restricted Subsidiary, or any adverse development in any such pending action, suit or proceeding not previously disclosed in writing by the Borrowers to the Administrative Agent and the Lenders, that in each case would reasonably be expected to result in a Material Adverse Effect or that in any manner questions the validity of any Loan Document;

(c)    the occurrence of an ERISA Event that has resulted, or would reasonably be expected to result, in a Material Adverse Effect;

(d)    (i) as soon as practicable in advance of filing (and to the extent practicable not later than three (3) days prior to the filing thereof) with the Court or delivering (and to the extent practicable not later than three (3) days prior to the delivery thereof) to the Committee appointed in a Case, if any, or to the U.S. Trustee, as the case may be, the Order, all other material proposed orders and pleadings related to (x) the Cases (all of which must be in form and

66

UST-1256

substance reasonably satisfactory to the Required Lenders), (y) the Pre-Petition Credit Agreement and this Agreement and the credit facilities contemplated thereby and/or any sale contemplated in accordance with the Required Milestones and any Plan of Reorganization and/or any disclosure statement related thereto (all of which must be in form and substance reasonably satisfactory to the Administrative Agent), and (ii) substantially simultaneously with the filing with the Court or delivering to the Committee appointed in any Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Cases that may be filed with the Court or delivered to the Committee appointed in any Case, if any, or to the U.S. Trustee; or

(e)     any other development that has resulted, or would reasonably be expected to result, in a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Parent Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03.    Collateral Obligations; Additional Subsidiaries.

(a) Each Borrower will, and will cause the other applicable Loan Parties to comply with the "Collateral and Guarantee Requirement". If any additional Designated Subsidiary is formed or acquired after the Effective Date (or any Excluded Subsidiary becomes a Designated Subsidiary), the Borrowers will promptly notify the Administrative Agent thereof and will, as promptly as practicable, and in any event within 15 days (or such longer period as the Administrative Agent may agree) after such Designated Subsidiary is formed or acquired (or any Excluded Subsidiary becomes a Designated Subsidiary) cause the Collateral and Guarantee Requirement to be satisfied with respect to such Designated Subsidiary and with respect to any Equity Interests in or Indebtedness of such Designated Subsidiary owned by or on behalf of any Loan Party.

(b) Each of the Loan Parties hereby covenants and agrees that upon the entry of, and subject to, the Order and subject to the Carve Out in all respects, the Loan Document Obligations, pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed DIP Superpriority Claims in the Cases.

(c) The relative priorities of the Liens described in this Section 5.03 with respect to the Collateral shall be as set forth in the Order. In accordance with the Order, all of the Liens described in this Section 5.03 shall be effective and perfected upon entry of the Order, without the necessity of the execution, recordation of filings by the Debtors of security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent, of, or over, any Collateral, as set forth in the Order.

(d) Each Loan Party that is a Debtor hereby confirms and acknowledges that, pursuant to the Order , the Liens in favor of the Administrative Agent on behalf of and for the benefit of the

LA\4104335.13

UST-1257

Secured Parties in all of the Collateral, now existing or hereafter acquired, shall be created and perfected without the recordation or filing in any land records or filing offices of any mortgage, assignment or similar instrument.

SECTION 5.04.    Information Regarding Collateral.

(a)    The Borrowers will furnish to the Administrative Agent promptly (and in any event within 15 days thereof (or such longer period as the Administrative Agent may agree)) written notice of any change in (i) the legal name of any Loan Party, as set forth in its organizational documents, (ii) the jurisdiction of organization or the form of organization of any Loan Party (including as a result of any merger or consolidation), (iii) the location of the chief executive office of any Loan Party or (iv) the organizational identification number, if any, and the Federal Taxpayer Identification Number of such Loan Party, in each case, only with respect to any Loan Party organized under the laws of a jurisdiction that requires such information to be set forth on the face of a UCC financing statement, of such Loan Party.  The Borrowers also agree promptly to notify the Administrative Agent if any material portion of the Collateral is damaged or destroyed.

(b)    If any material assets are acquired by any Loan Party after the Effective Date (other than assets constituting Collateral under the Collateral Documents that become subject to the Lien of the Collateral Documents upon the acquisition thereof), the Borrowers will promptly notify the Administrative Agent thereof and will cause such assets to be subjected to a Lien securing the Loan Document Obligations and will take such actions as shall be necessary or reasonably requested by the Administrative Agent to satisfy the Collateral and Guarantee Requirement, including to grant and perfect such Lien, all at the expense of the Borrowers. It is understood and agreed that, notwithstanding anything to the contrary set forth in this Agreement or in any Collateral Document, the Loan Parties shall not be required to (A) grant leasehold mortgages, (B) obtain landlord lien waivers, estoppels, collateral access agreements or bailee agreements, except to the extent delivered pursuant to the ABL Credit Agreement or related loan documents, (C) enter into Control Agreements in respect of any Excluded Deposit Account, (D) perfect security interests in any assets represented by a certificate of title or (E) enter into any Collateral Documents governed by the law of a jurisdiction other than the United States.

(c)    If, despite the restrictions set forth in Section 6.02, the Company or any Subsidiary shall grant a Lien on any of its assets to secure Indebtedness under the ABL Credit Agreement, the Pre-Petition ABL Credit Agreement and the Secured Obligations are not secured by a Lien on such assets, the Company will (i) promptly notify the Administrative Agent and cause such assets to be subjected to a Lien securing the Secured Obligations and (ii) take, or cause such Subsidiary to take, as the case may be, such actions as shall be necessary or reasonably requested by the Administrative Agent to satisfy the Collateral and Guarantee Requirement, including to grant and perfect such Lien, and to cause such Liens securing Indebtedness under the ABL Credit Agreement thereof and such Liens securing the Secured Obligations to become subject to the Intercreditor Agreement, all at the expense of the Loan Parties.

SECTION 5.05.    Existence; Conduct of Business.  Subject to any required approval by the Court, each Borrower will, and will cause each Restricted Subsidiary to, do or cause to be

LA\4104335.13

UST-1258

done all things reasonably necessary to preserve, renew and keep in full force and effect (i) its legal existence and (ii) the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except in the case of clause (ii) where failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; <u>provided</u> that the foregoing shall not prohibit any merger, consolidation, liquidation, dissolution, disposition or other transaction permitted under Section 6.03 or 6.05.

SECTION 5.06.   <u>Payment of Obligations</u>.  To the extent permitted by the Order and the terms thereof, each Borrower will, and will cause each Restricted Subsidiary to, pay or discharge all its material obligations, including material Tax liabilities (whether or not shown on a Tax return), before the same shall become delinquent or in default, subject to the Approved Budget (and the Permitted Variances provided for therein)except where (a) (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) the Parent Borrower or such Restricted Subsidiary has set aside on its books reserves with respect thereto to the extent required by GAAP and (iii) such contest effectively suspends collection of the contested obligation and the enforcement of any Lien securing such obligation or (b) the failure to make payment would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 5.07.   <u>Maintenance of Properties</u>.  Each Borrower will, and will cause each Restricted Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.08.   <u>Insurance</u>.  Each Borrower will, and will cause each Restricted Subsidiary to, maintain, with financially sound and reputable insurance companies, insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations. Each such policy of liability or casualty insurance maintained by or on behalf of Loan Parties shall (a) in the case of each liability insurance policy (other than workers' compensation, director and officer liability or other policies in which such endorsements are not customary), name the Administrative Agent, on behalf of the Secured Parties, as an additional insured thereunder and (b) in the case of each casualty insurance policy, contain a loss payable clause or endorsement that names the Administrative Agent, on behalf of the Secured Parties, as a loss payee thereunder, and the Borrowers will use commercially reasonable efforts to have each such policy provide for at least 30 days' (or such shorter number of days as may be agreed to by the Administrative Agent) prior written notice to the Administrative Agent of any cancellation of such policy.

SECTION 5.09.   <u>Books and Records; Inspection and Rights</u>.  Each Borrower will, and will cause each Restricted Subsidiary to, (a) keep proper books of record and account in which full, true and correct (in all material respects) entries in accordance with GAAP and applicable law are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the Administrative Agent or any Lender (to the extent accompanying the Administrative Agent or any designated representative thereof)

LA\4104335.13

UST-1259

(including employees of the Administrative Agent, any Lender or any consultants, accountants, lawyers and appraisers retained by the Administrative Agent), upon reasonable prior notice (but in no event more than once each fiscal year of the Parent Borrower unless an Event of Default has occurred and is continuing), to visit and inspect its properties, to examine and make extracts from its books and records and to discuss its affairs, finances and condition with its officers and, accompanied by one or more such officers or their designees if requested by the Borrowers, independent accountants, all at such reasonable times during normal business hours and as often as reasonably requested.  The Borrowers shall have the right to have a representative present at any and all inspections.

SECTION 5.10.    Compliance with Laws.  Each Borrower will, and will cause each Restricted Subsidiary to, comply with all laws (including Environmental Laws and orders of any Governmental Authority) applicable to it or its property, except (i) where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect or (ii) to the extent subject to the Automatic Stay.

SECTION 5.11.    Bankruptcy Matters.

(a)    cause all proposed (i) "first day" and "second day" (if applicable) orders on a final basis, (ii) orders (other than the Order) related to or affecting the Loans and other Obligations and the Loan Documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any Plan of Reorganization and/or any disclosure statement related thereto, (iii) orders concerning the financial condition of the Borrowers or any of their respective Restricted Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure, and (iv) orders establishing procedures for administration of the Cases or approving significant transactions submitted to the Court, in each case, proposed by the Loan Parties to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Required Lenders in their reasonable discretion in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders (and with respect to any provision that affects the rights, obligations, liabilities or duties of the Administrative Agent) prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable in all respects;

(b)    comply in a timely manner with their obligations and responsibilities as debtors in possession under the Order; and

(c)    except as otherwise permitted by an Acceptable Plan or this Agreement, provide prior written notice as soon as reasonably practicable to the Required Lenders prior to any assumption or rejection of any Loan Party's or any Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code.

(d)    deliver to the Administrative Agent all documents required to be delivered to creditors under the RSA, any applicable restructuring support agreement or

70

UST-1260

any case stipulation; <u>provided</u> that the Borrower shall not be required to deliver any such documents provided by any party in interest to the extent that any such document is filed under seal; <u>provided</u>, <u>further</u>, that such documents that are filed under seal, to the extent permitted by applicable law, shall be provided to the advisors to the Administrative Agent on a professional eyes' only basis.

(e)    comply with each of the Required Milestones contained on <u>Schedule 5.11</u> upon the terms and at the times provided for therein.

SECTION 5.12.    <u>Maintenance of Ratings</u>.  The Borrowers will use commercially reasonable efforts to obtain a rating of the credit facilities created hereunder by each of S&P and Moody's within 15 days of the Effective Date, it being understood that there is no obligation to maintain any particular rating at any time.

SECTION 5.13.    [Reserved].

SECTION 5.14.    [Reserved].

SECTION 5.15.    <u>Conference Calls</u>.  The Borrowers will hold and participate in:

(a) a monthly conference call for Lenders to discuss financial information delivered pursuant to Section 5.01.  The Borrowers will hold such conference call following the delivery of the required financial information for such month pursuant to Section 5.01(c) and not later than two Business Days from the time the Borrowers are required to deliver the financial information as set forth in Section 5.01(c).

(b) weekly conference calls for the Ad Hoc Committee Advisors to discuss financial information delivered pursuant to Section 5.01(f).

Such monthly and weekly calls will occur as a standing appointment at a time to be mutually agreed upon by the Borrowers and the Lenders or the Ad Hoc Committee Advisors, as applicable.

ARTICLE VI

<u>Negative Covenants</u>

Until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all premiums and fees payable hereunder shall have been paid in full, each Borrower covenants and agrees with the Lenders that:

SECTION 6.01.    <u>Indebtedness; Certain Equity Securities</u>.

Neither Borrower will, nor will it permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

(a)    Indebtedness created under the Loan Documents (including, for the avoidance of doubt, the Carve Out) and the Pre-Petition Loan Documents;

71

LA\4104335.13

<span style="color:red">UST-1261</span>

(b)    Indebtedness existing on the date hereof and set forth on Schedule 6.01;

(c)    unsecured Indebtedness of the Parent Borrower to any Restricted Subsidiary and of any Restricted Subsidiary to the Parent Borrower or any other Restricted Subsidiary; provided that (i) such Indebtedness shall not have been transferred to any Person other than the Parent Borrower or any Restricted Subsidiary, (ii) any such Indebtedness owing by any Loan Party to a Restricted Subsidiary that is not a Loan Party shall be unsecured and subordinated in right of payment to the Loan Document Obligations and the Pre-Petition Lender Obligations and (iii) any such Indebtedness shall be incurred in compliance with Section 6.04;

(d)    Guarantees incurred in compliance with Section 6.04;

(e)    Indebtedness of the Parent Borrower or any Restricted Subsidiary (i) incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations and Synthetic Lease Obligations, provided that such Indebtedness is incurred prior to or within 270 days after such acquisition or the completion of such construction or improvement and the principal amount of such Indebtedness does not exceed the cost of acquiring, constructing or improving such fixed or capital assets or (ii) assumed in connection with the acquisition of any fixed or capital assets; provided that the aggregate principal amount of Indebtedness permitted by this clause (e) at the time of incurrence thereof shall not exceed $1,000,000;

(f)    Indebtedness in respect of netting services, overdraft protections and deposit and checking accounts, in each case, in the ordinary course of business;

(g)    Indebtedness in respect of letters of credit, bank guarantees and similar instruments issued for the account of the Parent Borrower or any Restricted Subsidiary in the ordinary course of business supporting obligations under workers' compensation, health, disability, unemployment insurance and other social security laws;

(h)    Indebtedness expressly permitted by the Approved Budget (including with respect to any Permitted Variances);

(i)    [reserved];

(j)    Indebtedness under (i) the Pre-Petition ABL Credit Agreement and (ii) if applicable, the ABL Credit Agreement in an aggregate principal amount not to exceed $400,000,000 at any time outstanding;

(k)    Indebtedness of Loan Parties in respect of surety bonds (whether bid, performance, appeal or otherwise) and performance and completion guarantees and other obligations of a like nature, in each case incurred in the ordinary course of business;

(l)    [reserved];

(m)    [reserved];

(n)    [reserved];

72

UST-1262

(o)      [reserved];

(p)      other unsecured Indebtedness in an aggregate principal amount not to exceed at the time of incurrence thereof $4,000,000;

(q)      Indebtedness consisting of (i) the financing of insurance premiums and (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(r)      obligations under any agreement governing the provision of treasury or cash management services, including deposit accounts, overnight draft, credit cards, debit cards, p-cards (including purchasing cards and commercial cards), funds transfer, automated clearinghouse, zero balance accounts, returned check concentration, controlled disbursement, lockbox, account reconciliation and reporting and trade finance services and other cash management services; and

(s)      Indebtedness in the form of Swap Agreements permitted under Section 6.07.

The accrual of interest, the accretion of accreted value and the payment of interest or dividends in the form of additional Indebtedness or Disqualified Stock, as applicable, the accretion of original issue discount, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies shall not be deemed to be an incurrence of Indebtedness or Disqualified Stock for purposes of this Section 6.01.

SECTION 6.02.    Liens.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Lien on any asset now owned or hereafter acquired, except:

(a)      (i) Liens granted by the Order (including the Carve Out), (ii) Liens created under the Loan Documents or the Pre-Petition Loan Documents;

(b)      Permitted Encumbrances;

(c)      any Lien on any asset of the Parent Borrower or any Restricted Subsidiary existing on the date hereof and set forth on Schedule 6.02; provided that (i) such Lien shall not apply to any other asset of the Parent Borrower or any Restricted Subsidiary and (ii) such Lien shall secure only those obligations that it secures on the date hereof and any extensions, renewals and refinancing thereof that do not increase the outstanding principal amount thereof;

(d)      [reserved];

(e)      Liens on fixed or capital assets acquired, constructed or improved by the Parent Borrower or any Restricted Subsidiary; provided that (i) such Liens secure only Indebtedness permitted by Section 6.01(e) and obligations relating thereto not constituting Indebtedness and (ii) such Liens shall not apply to any other asset of the Parent Borrower or any Restricted Subsidiary (other than the proceeds and products thereof); provided further that in the event purchase money obligations are owed to any Person with respect to financing of more than one

73

UST-1263

purchase of any fixed or capital assets, such Liens may secure all such purchase money obligations and may apply to all such fixed or capital assets financed by such Person;

(f)  in connection with the sale or transfer of any Equity Interests or other assets in a transaction permitted under Section 6.05, customary rights and restrictions contained in agreements relating to such sale or transfer pending the completion thereof, solely to the extent such sale or transfer would have been permitted on the date of the creation of such Lien;

(g)  in the case of (i) any Restricted Subsidiary that is not a wholly-owned Restricted Subsidiary or (ii) the Equity Interests in any Person that is not a Restricted Subsidiary, any encumbrance or restriction, including any put and call arrangements, related to Equity Interests in such Restricted Subsidiary or such other Person set forth in the organizational documents of such Restricted Subsidiary or such other Person or any related joint venture, shareholders' or similar agreement, in each case, so long as such encumbrance or restriction is in existence on the Petition Date;

(h)  Liens solely on any cash deposits, escrow arrangements or similar arrangements made by the Parent Borrower or any Restricted Subsidiary in connection with any letter of intent or purchase agreement for a transaction permitted hereunder;

(i)  Liens on the Collateral securing Indebtedness permitted by Section 6.01(j) and obligations relating thereto not constituting Indebtedness; provided that any such Liens are subject to (x) the Order and (y), if such Liens are on assets of the Loan Parties, the Intercreditor Agreement;

(j)  any Lien on assets of any Foreign Subsidiary (other than any Luxembourg IP Subsidiary); provided that such Lien shall secure only Indebtedness of such Foreign Subsidiary permitted by Section 6.01 and obligations relating thereto not constituting Indebtedness;

(k)  other Liens securing Indebtedness or other obligations in an aggregate principal amount at the time of incurrence of such Indebtedness or other obligations not to exceed $1,000,000;

(l)  non-exclusive licenses of intellectual property granted in the ordinary course of business; and

(m)  Liens in favor of the Pre-Petition Lenders as adequate protection granted pursuant to the Orders.

SECTION 6.03.  Fundamental Changes; Business Activities.

(a)  Neither Borrower will, nor will it permit any Restricted Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, (i) any Restricted Subsidiary may  (x) merge into the Parent Borrower in a transaction in which the Parent Borrower is the surviving entity and (y) merge into the Subsidiary Borrower in a transaction in which the Subsidiary Borrower is the surviving entity, (ii) any Person (other the Parent Borrower or the Subsidiary

LA\4104335.13

UST-1264

Borrower) may merge into or consolidate with any Restricted Subsidiary in a transaction in which the surviving entity is a Restricted Subsidiary and, if any party to such merger or consolidation is a Loan Party, a Loan Party, (iii) [reserved] and (iv) any Restricted Subsidiary (other than the Subsidiary Borrower) may liquidate or dissolve if the Borrowers determine in good faith that such liquidation or dissolution is in the best interests of the Borrowers and is not materially disadvantageous to the Lenders; provided that any such merger or consolidation involving a Person that is not a wholly-owned Restricted Subsidiary immediately prior to such merger or consolidation shall not be permitted unless it is also permitted by Section 6.04.

(b)    Neither Borrower will, nor will it permit any of its Restricted Subsidiaries to, engage to any material extent in any business other than businesses of the type conducted by the Parent Borrower and the Restricted Subsidiaries on the date hereof  and businesses reasonably related or complementary thereto.

SECTION 6.04.    Investments, Loans, Advances, Guarantees and Acquisitions.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, purchase, hold, acquire (including pursuant to any merger or consolidation), make or otherwise permit to exist any Investment in any other Person, except:

(a)    Investments in cash and Cash Equivalents;

(b)    Investments existing on the date hereof or contractually committed to as of the date hereof and set forth on Schedule 6.04 and any extensions thereof (but not any additions thereto (including any capital contributions) made after the date hereof) ;

(c)    Investments by the Parent Borrower and the Restricted Subsidiaries in Equity Interests in their respective subsidiaries; provided that (i) such subsidiaries are Subsidiaries prior to such Investments, and (ii) in the case of any such Investments by the Loan Parties in, and loans and advances by the Loan Parties to, Restricted Subsidiaries that are not Loan Parties (excluding all such Investments, loans, advances and Guarantees existing on the date hereof and permitted by clause (b) above), (A) the aggregate amount of all such Investments (including loans and advances) permitted pursuant to this clause (c) and pursuant to clauses (d) and (e) below, taken together, shall not exceed $10,000,000 and (B) in each case, all such Investments (including loans and advances) shall be (x) made in the ordinary course of business, (y), solely in connection with the operational and compliance needs of the Parent Borrower and its Restricted Subsidiaries and (z) permitted by the Approved Budget (subject to Permitted Variance);

(d)    loans or advances made by the Parent Borrower to any Restricted Subsidiary or made by any Restricted Subsidiary to the Parent Borrower or any other Restricted Subsidiary; provided that (i) the Indebtedness resulting therefrom is permitted by Section 6.01(c) and (ii) the amount of such loans and advances made by the Loan Parties to Restricted Subsidiaries that are not Loan Parties shall be subject to the limitation set forth in clause (c) above and shall be permitted by the Approved Budget (subject to Permitted Variance);

(e)    Guarantees by the Parent Borrower or any Restricted Subsidiary of Indebtedness or other obligations of the Parent Borrower or any Restricted Subsidiary, solely to the extent (i) arising as a result of any such Person being a joint and several co-applicant with respect to any

75

UST-1265

letter of credit or letter of guaranty or (ii) of any leases of retail store locations and related obligations arising thereunder, in each case, in the ordinary course of business; provided that the aggregate amount of Indebtedness and other obligations of Restricted Subsidiaries that are not Loan Parties that is Guaranteed by any Loan Party shall be subject to the limitation set forth in clause (c) above and shall be permitted by the Approved Budget (subject to Permitted Variances);

(f)　　[reserved];

(g)　　Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(h)　　[reserved];

(i)　　deposits, prepayments and other credits to suppliers, lessors and landlords made in the ordinary course of business;

(j)　　advances by the Parent Borrower or any Restricted Subsidiary to employees in the ordinary course of business consistent with past practices for travel and entertainment expenses, relocation costs and similar purposes;

(k)　　[reserved];

(l)　　Investments in the form of Swap Agreements permitted under Section 6.07;

(m)　　investments constituting deposits described in clauses (c) and (d) of the definition of "Permitted Encumbrances" and endorsements of instruments for collection or deposit in the ordinary course of business;

(n)　　other Investments to the extent permitted by and expressly set forth in the Order;

(o)　　other Investments in an aggregate amount not to exceed $1,000,000; and

(p)　　Investments in respect of actions permitted by Section 6.05(g).

For the purposes of this Section, any unreimbursed payment by the Parent Borrower or any Restricted Subsidiary for goods or services delivered to any Subsidiary shall be deemed to be an Investment in such Subsidiary.

SECTION 6.05.　　Asset Sales.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, sell, transfer or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the Parent Borrower permit any Restricted Subsidiary to issue to any additional Equity Interests in such Restricted Subsidiary (other than to the Parent Borrower or any other Restricted Subsidiary in compliance with Section 6.04, and other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable law) (each of the foregoing, an "Asset Sale"), except:

LA\4104335.13

UST-1266

(a)    (i) sales of inventory, (ii) sales, transfers and other dispositions of used, surplus, obsolete or outmoded machinery or equipment and (iii) contributions of merchandise to charitable organizations, to the extent in the ordinary course of business and consistent with past practices, (iv) dispositions of Cash Equivalents and (v) use of cash in accordance with the Approved Budget and pursuant to transactions permitted under this agreement, in each case (other than in the case of clause (iii)) in the ordinary course of business;

(b)    sales, transfers, leases and other dispositions to the Parent Borrower or any Restricted Subsidiary in the ordinary course of business; provided that any such sales, transfers, leases or other dispositions involving a Restricted Subsidiary that is not a Loan Party shall be made in compliance with Sections 6.04 and 6.09;

(c)    the sale or discount of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not in connection with any financing transaction;

(d)    dispositions of assets subject to any casualty or condemnation proceeding (including in lieu thereof);

(e)    leases or subleases of real property granted by the Parent Borrower or any Restricted Subsidiary to third Persons not interfering in any material respect with the business of the Parent Borrower or any Restricted Subsidiary, including, without limitation, retail store lease assignments and surrenders;

(f)    [reserved];

(g)    in connection with the consolidation of foreign operations of the Parent Borrower and its Subsidiaries, the direct or indirect transfers or other dispositions by any Restricted Subsidiary of any foreign assets or the Equity Interests of a Foreign Subsidiary that is a Restricted Subsidiary to (i) with respect to any Luxembourg IP Subsidiary or any non-Loan Party Restricted Subsidiary with the prior consent of the Required Lenders and (ii) any other Restricted Subsidiary;

(h)    to the extent prior consent of the Required Lenders is received, the elimination or forgiving of intercompany balances in connection with intercompany restructurings (including dissolutions, liquidations and mergers) between or among the Parent Borrower and its Restricted Subsidiaries;

(i)    other sales, transfers or dispositions pursuant to an order of the Court which sale, transfer or disposition are consistent with the Restructuring Support Agreement and the Approved Budget; and

(j)    Specified Dispositions or dispositions expressly identified and provided for in the Approved Budget; and

(k)    sales, transfers and other dispositions of assets that are not permitted by any other clause of this Section in an aggregate amount equal to a fair market value, as determined by a

<div align="center">77</div>

UST-1267

Responsible Officer of the Parent Borrower reasonably and acting in good faith, of not more than $1,000,000;

provided that all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by clause (a)(ii), (a)(iii), (b), (c), (d), (g) or (h)) shall be made for fair value.

SECTION 6.06.   Sale/Leaseback Transactions.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, enter into any Sale/Leaseback Transaction, except to the extent such Sale/Leaseback Transaction is entered into in connection with a Specified Disposition.

SECTION 6.07.   Swap Agreements.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, enter into any Swap Agreement, other than Swap Agreements entered into in the ordinary course of business to hedge or mitigate risks to which the Parent Borrower or a Restricted Subsidiary is exposed in the conduct of its business or the management of its liabilities and not for speculative purposes.

SECTION 6.08.   Restricted Payments; Certain Payments of Indebtedness.

(a)      Neither Borrower will, nor will it permit any Restricted Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that:

(i)      the Parent Borrower may declare and pay dividends with respect to its Equity Interests payable solely in additional Equity Interests (other than Disqualified Stock) of the Parent Borrower;

(ii)      any Restricted Subsidiary may declare and pay dividends or make other distributions with respect to its Equity Interests, or make other Restricted Payments in respect of its Equity Interests, in each case ratably to the holders of such Equity Interests (or, if not ratably, on a basis more favorable to the Parent Borrower and the Restricted Subsidiaries);

(iii)      the Parent Borrower may make Restricted Payments pursuant to and in accordance with customary stock option plans or other equity or benefit plans for management or employees of the Parent Borrower and the Restricted Subsidiaries in effect from time to time;

(iv)      Restricted Payments made by any Restricted Subsidiary to another non-Restricted Subsidiary to consummate transactions that would otherwise be permitted by Section 6.04(c);

(v)      the Parent Borrower may make cash payments in lieu of the issuance of fractional shares representing insignificant interests in the Parent Borrower in connection with the exercise of warrants, options or other securities convertible into or exchangeable for shares of common stock in the Parent Borrower;

UST-1268

(vi)     Restricted Payments to Parent Borrower on or around and upon the execution and effectiveness of the RSA to pay fees and expenses in accordance therewith;

(vii)     [reserved]; and

(viii)     Restricted Payments made to consummate the transactions permitted by Section 6.05(g).

(b)     Neither Borrower will, nor will it permit any Restricted Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Specified Indebtedness, except:

(i)     [reserved];

(ii)     [reserved];

(iii)     [reserved];

(iv)     [reserved];

(v)     [reserved];

(vi)     payments to the extent provided for in the Approved Budget (including Permitted Variances thereto) and permitted by the Order, as applicable; and

(vii)     [reserved].

(c)     Neither Borrower will, nor will it permit any of the Restricted Subsidiaries to, amend, modify or change in any manner adverse to the interests of the Lenders any term or condition of any documentation governing Specified Indebtedness; provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous written notice thereof is provided to the Administrative Agent.

SECTION 6.09.     Transactions with Affiliates.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, sell, lease, license or otherwise transfer any assets to, or purchase, lease, license or otherwise acquire any assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions on terms and conditions not less favorable to the Parent Borrower or such Restricted Subsidiary than those that would prevail in an arm's-length transaction with unrelated third parties, (b) transactions between or among the Parent Borrower and the Restricted Subsidiaries, (c) any Restricted Payment permitted by Section 6.08 or Investments permitted pursuant to Section 6.04(j), (d) the payment of reasonable fees and compensation to, and the providing of reasonable indemnities on behalf of, directors and officers of the Parent Borrower or any Restricted Subsidiary, as determined by the board of directors of the Parent Borrower in good faith, (e) employment contracts or subscription, put/call arrangements with employees, officers or directors, (f) transactions necessary to make adequate

79

UST-1269

protection payments on account of secured Pre-Petition Indebtedness pursuant to the Order and (g) the transactions described on Schedule 6.09.

SECTION 6.10. <u>Restrictive Agreements</u>.

(a) Neither Borrower will, nor will it permit any Restricted Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that restricts or imposes any condition upon (1) the ability of the Parent Borrower or any Restricted Subsidiary to create, incur or permit to exist any Lien upon any of its assets to secure the Loan Document Obligations or (2) the ability of any Restricted Subsidiary to pay dividends or other distributions with respect to its Equity Interests or to make or repay loans or advances to the Parent Borrower or to Guarantee the Loan Agreement; <u>provided</u> that (i) the foregoing shall not apply to (A) restrictions and conditions imposed by law or by any Loan Document, (B) restrictions and conditions existing on the Effective Date identified on Schedule 6.10 (but shall apply to any amendment or modification expanding the scope of any such restriction or condition), (C) customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, <u>provided</u> that such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (D) in the case of any Restricted Subsidiary that is not a wholly-owned Restricted Subsidiary, restrictions and conditions imposed by its organizational documents or any related joint venture or similar agreement, <u>provided</u> that such restrictions and conditions apply only to such Restricted Subsidiary and to any Equity Interests in such Restricted Subsidiary, (E) restrictions and conditions set forth in the Pre-Petition Credit Agreement, Pre-Petition ABL Credit Agreement and, to the extent applicable, the ABL Credit Agreement, (F) restrictions and conditions imposed by agreements relating to Indebtedness of Restricted Subsidiaries that are not Loan Parties permitted under Section 6.01 and (G) restrictions and conditions imposed on cash to secure letters of credit and other segregated deposits that are permitted pursuant to Section 6.02(h), <u>provided</u> that such restrictions and conditions apply only to such Restricted Subsidiaries that are not Loan Parties, (ii) clause (a) of the foregoing shall not apply to (A) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by Section 6.01(e) if such restrictions or conditions apply only to the assets securing such Indebtedness and (B) customary provisions in leases and other agreements restricting the assignment thereof and (iii) clause (b) of the foregoing shall not apply to restrictions and conditions imposed by agreements relating to Indebtedness of any Restricted Subsidiary in existence at the time such Restricted Subsidiary became a Restricted Subsidiary and otherwise permitted under Section 6.01 (but shall apply to any amendment or modification expanding the scope of, any such restriction or condition), <u>provided</u> that such restrictions and conditions apply only to such Restricted Subsidiary.

(b) Except as permitted pursuant to the terms of this Agreement and the Order or otherwise consented to by the Required Lenders:

(i) Make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to the Order that is adverse to the Lenders.

(ii) Incur, create, assume or suffer to exist or permit any other superpriority claim which is pari passu with or senior to the DIP Superpriority Claims of the Administrative

LA\4104335.13

UST-1270

Agent, and the Lenders hereunder, except for the Carve Out and, subject to the Intercreditor Agreement, the ABL Credit Agreement to the extent applicable.

SECTION 6.11. <u>Amendment of Organizational Documents</u>. Neither Borrower will, nor will it permit any Restricted Subsidiary to, amend, modify or waive any of its rights under its certificate of incorporation, by-laws or other organizational documents, in either case, to the extent such amendment, modification or waiver would be adverse to the rights or interests of the Lenders hereunder or under any other Loan Document; provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous written notice thereof is provided to the Administrative Agent.

SECTION 6.12. <u>Financial Covenants</u>

(a) The Parent Borrower will not permit Liquidity at any time to be less than $100,000,000.

(b) Commencing after the end of the 3rd week following the Effective Date, and solely to the extent that Liquidity is less than $150,000,000, the Parent Borrower will not permit any negative variance between the Actual Net Cash Flow Amount for any Cumulative Four-Week Period and the Budgeted Net Cash Flow Amount for such Cumulative Four-Week Period to be greater than 20%.

(c) The Parent Borrower will not permit the amount of cash and Cash Equivalents of non-Loan Party Subsidiaries as of the end of the day on Friday of each calendar week on deposit in or credited to any account maintained by non-Loan Party Subsidiaries to exceed $45,000,000 in the aggregate for all non-Loan Party Subsidiaries, excluding from such covenant any payments made (or to be made) from the Maurice business segments or entities.

SECTION 6.13. <u>Accounting Changes</u>. The Parent Borrower will not make any change in the Parent Borrower's fiscal quarter or fiscal year other than as required pursuant to GAAP.

SECTION 6.14. <u>Sanctions</u>. The Parent Borrower and its Subsidiaries will not, directly or indirectly, use the proceeds of any Borrowing, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other individual or entity, to fund any activities of or business with any individual or entity, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by an individual or entity (including any individual or entity participating in the transaction, whether as Lender, Administrative Agent, or otherwise) of Sanctions.

SECTION 6.15. <u>Anti-Corruption Laws</u>. The Parent Borrower and its Subsidiaries will not, directly or indirectly, use the proceeds of any Borrowing for any purpose which would breach any Anti-Corruption Laws.

ARTICLE VII

Events of Default

If any of the following events ("<u>Events of Default</u>") shall occur:

UST-1271

(a)    the Borrowers shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    the Borrowers shall fail to pay any interest on any Loan or any fee, premium (including the Redemption Premium, if any) or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)    any representation, warranty or certification made or deemed made by the Parent Borrower or any Restricted Subsidiary in this Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been materially incorrect when made or deemed made (or, in the case of any representation or warranty qualified by materiality, incorrect);

(d)    the Borrowers shall fail to observe or perform any covenant, condition or agreement contained in Section 5.01, 5.02(a), 5.03 or 5.05 (with respect to the existence of any Borrower), 5.11 (including the Required Milestones) or in Article VI;

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those specified in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of 7 Business Days after receipt of written notice thereof from the Administrative Agent;

(f)    except as a result of commencement of the Cases or entry into this Agreement, and, to the extent applicable, the ABL Credit Agreement, unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Court or unless any of the following results from obligations with respect to which the Court prohibits or does not permit any Loan Party from applicable compliance, the Parent Borrower or any Restricted Subsidiary shall fail to make any payment (whether of principal, interest, termination payment or other payment obligation and regardless of amount) in respect of any Material Indebtedness (other than the Loan Document Obligations) when and as the same shall become due and payable (after giving effect to any applicable grace period);

(g)    except as a result of commencement of the Cases or entry into this Agreement and, to the extent applicable, the ABL Credit Agreement, unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Court or unless any of the following results from obligations with respect to which the Court prohibits or does not permit any Loan Party from applicable compliance, (i) any event or condition shall occur that results in any Material Indebtedness becoming due, or being terminated or required to be prepaid, repurchased, redeemed or defeased, prior to its scheduled maturity, or that enables or permits (with the giving of notice, if required) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf, or, in the case of any Swap Agreement, the applicable counterparty, to cause any Material Indebtedness to become due, or to terminate or to

82

UST-1272

require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to (i) any secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the assets securing such Indebtedness or (ii) any Indebtedness that becomes due as a result of a voluntary refinancing thereof permitted under Section 6.01; provided, further, that no such event under the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, as applicable, shall constitute an Event of Default under this clause (g) until the earliest to occur of (x) 5 days after the date of such Event of Default (during which period such Event of Default is not waived or cured), (y) the acceleration of the Indebtedness under the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, as applicable, and (z) the exercise of remedies by the ABL Agent in respect of a material portion of the ABL Priority Collateral, to the extent applicable;

(h)     [reserved];

(i)     [reserved];

(j)     [reserved];

(k)     except for any order fixing the amount of any Claim in the Cases, one or more judgments for the payment of money in an aggregate amount in excess of $10,000,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment and has not denied coverage) shall be rendered against the Parent Borrower or any Restricted Subsidiary, or any combination thereof, and the same shall remain undischarged for a period of 15 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Parent Borrower or any Restricted Subsidiary to enforce any such judgment;

(l)     one or more ERISA Events shall have occurred that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect;

(m)     a Change in Control shall occur;

(n)     any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder, satisfaction in full of all the Loan Document Obligations (other than contingent indemnification claims) or any act or omission by the Administrative Agent or any Lender, ceases to be in full force and effect; or any Loan Party contests in any manner the validity or enforceability of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; and

(o)     any Lien purported to be created under any Collateral Document and the Order shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any material Collateral, with the priority required by the applicable Collateral Document, except (i) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents to a Person that is not a Loan Party, (ii) the release thereof as provided in the applicable Collateral Document or Section 9.16 or consented to under Section 9.02, (iii) as a result of the failure of the Administrative Agent to (A) maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Collateral

UST-1273

Agreement or (B) continue in accordance with applicable law the effectiveness of any UCC financing statement or (iv) as to Collateral constituting real property, to the extent such losses are covered by Lender's title insurance policy and such insurer has not denied coverage;

(p)      the RSA is terminated for any reason, or is modified, amended or waived in any manner materially adverse to the Secured Parties without the prior consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders);

(q)      any Loan Party shall file a motion in the Cases without the express written consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders), (i) to obtain additional financing under Section 364(d) of the Bankruptcy Code not otherwise permitted under this Agreement or (ii) except as provided in the Order, as the case may be, to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code that does not either have the prior written consent of the Required Lenders (or the Administrative Agent acting at the direction of the Required Lenders) or provide for the payment of the Loan Document Obligations in full and in cash upon the incurrence of such additional financing;

(r)      an order with respect to any of the Cases shall be entered by the Court (i) appointing a trustee under Section 1104, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or (iii) converting the Cases to cases under Chapter 7 of the Bankruptcy Code;

(s)      an order shall be entered by the Court dismissing any of the Cases which does not contain a provision for termination of all Commitments, and payment in full in cash of all Loan Document Obligations upon entry thereof;

(t)      an order with respect to any of the Cases shall be entered by the Court without the express prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent), with such consent not to be unreasonably withheld, conditioned or delayed, (i) to revoke, reverse, stay, modify, supplement or amend the Order in a manner adverse to the Lenders and/or the Administrative Agent or (ii) to permit, unless otherwise contemplated by the Order, any administrative expense or any Claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the administrative priority of the Loan Parties' Claims in respect of the Loan Document Obligations (other than the Carve Out);

(u)      (i) an application for any of the orders described in clause (r) above shall be made by a Loan Party or any such application shall be made by a Person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or the relief requested is not withdrawn, dismissed or denied within forty-five (45) days after the filing or (ii) any Person obtains an order under Section 506(c) of the Bankruptcy Code against the Administrative Agent;

(v)      the entry of an order by the Court terminating or modifying the exclusive right of any Loan Party to file a Plan of Reorganization pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders;

(w)      any Loan Party shall fail to comply with the Order;

LA\4104335.13

UST-1274

(x)     any order by the Court is entered granting any superpriority claim that is pari passu with or senior to those of the Secured Parties or any Lien that is senior to the Liens securing the Loan Document Obligations, other than in accordance with the Order;

(y)     the Court enters an order that is adverse in any material respect, when taken as a whole, to the interests of the Administrative Agent and the Lenders or their respective rights and remedies in their capacities as such under this Agreement or in any of the Cases;

(z)     the Loan Parties or any of their Subsidiaries, or any person claiming by or through the Loan Parties or any of their Subsidiaries, obtain court authorization to commence, or commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Administrative Agent or the Lenders in each case relating to this Agreement, in each case other than as permitted by the Order;

(aa)     the Court denies confirmation of the Plan, provided, that if the Loan Parties subsequently obtain an order of the Court approving a plan of reorganization that either (i) proposes to repay in full in cash of all Loan Document Obligations under the Term Credit Facility, immediately upon the effectiveness thereof, (ii) is, taken as a whole, in form and substance substantially similar to the Plan of Reorganization or (iii) otherwise is approved by the Required Lenders, an Event of Default shall not occur;

(bb)     The Loan Parties attempts to consummate a sale of substantially all of its assets via a plan of reorganization or a 363 sale without consent of the Required Lenders; or

(cc)     the filing by any of the Loan Parties of a Plan of Reorganization other than an Acceptable Plan;

then, notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Order, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrowers, take either or both of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, (ii) declare the Loans then outstanding to be due and payable in whole, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees, premiums and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers and (iii) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law.

<div align="center">ARTICLE VIII</div>

<div align="center">The Administrative Agent</div>

Each of the Lenders hereby irrevocably appoints the entity named as Administrative Agent in the heading of this Agreement and its successors to serve as administrative agent and collateral agent under the Loan Documents, and authorizes the Administrative Agent to take such

<div align="center">85</div>

UST-1275

actions on its behalf, including execution of the other Loan Documents, and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, each Lender hereby authorizes the Administrative Agent to consent, on behalf of each Lender, to the Order, each to be negotiated between the Loan Parties, the Administrative Agent, certain other parties and the statutory committees appointed pursuant to Sections 327 and 1103 of the Bankruptcy Code.

The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Parent Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing (and it is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law, and that such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties), (b) the Administrative Agent shall not have any duty to take any discretionary action or to exercise any discretionary power, except discretionary rights and powers expressly contemplated by the Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents), provided that the Administrative Agent shall not be required to take any action that, in its opinion, could expose the Administrative Agent to liability or be contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any debtor relief law, and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Parent Borrower or any Subsidiary or any other Affiliate thereof that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents) or in the absence of its own gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and nonappealable judgment). The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof (stating that it is a "notice of default") is given to the Administrative Agent by the Borrowers or a Lender, and the Administrative Agent shall

LA\4104335.13

UST-1276

not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or in connection with any Loan Document, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default, (iv) the sufficiency, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the creation, perfection or priority of Liens on the Collateral or the existence of the Collateral or (vi) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or satisfaction of any condition that expressly refers to the matters described therein being acceptable or satisfactory to the Administrative Agent.

The Administrative Agent shall be entitled to rely, and shall not incur any liability for relying, upon any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the signatory, sender or authenticator thereof). The Administrative Agent also shall be entitled to rely, and shall not incur any liability for relying, upon any statement made to it orally or by telephone and believed by it to be made by the proper Person (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the signatory, sender or authenticator thereof), and may act upon any such statement prior to receipt of written confirmation thereof. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender, unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all their duties and exercise their rights and powers through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Subject to the terms of this paragraph, the Administrative Agent may resign at any time, upon thirty days prior notice, from its capacity as such. In connection with such resignation, the

87

UST-1277

Administrative Agent shall give notice of its intent to resign to the Lenders and the Borrowers. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the consent of the Borrower so long as no Event of Default under clauses (a) or (b) of Article VII is continuing, to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its intent to resign, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents. The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed by the Borrowers and such successor. Notwithstanding the foregoing, in the event no successor Administrative Agent shall have been so appointed and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its intent to resign, the retiring Administrative Agent may give notice of the effectiveness of its resignation to the Lenders and the Borrowers, whereupon, on the date of effectiveness of such resignation stated in such notice, (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents, provided that, solely for purposes of maintaining any security interest granted to the Administrative Agent under any Collateral Document for the benefit of the Secured Parties, the retiring Administrative Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Secured Parties and, in the case of any Collateral in the possession of the Administrative Agent, shall continue to hold such Collateral, in each case until such time as a successor Administrative Agent is appointed and accepts such appointment in accordance with this paragraph (it being understood and agreed that the retiring Administrative Agent shall have no duty or obligation to take any further action under any Collateral Document, including any action required to maintain the perfection of any such security interest), and (b) the Required Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, provided that (i) all payments required to be made hereunder or under any other Loan Document to the Administrative Agent for the account of any Person other than the Administrative Agent shall be made directly to such Person and (ii) all notices and other communications required or contemplated to be given or made to the Administrative Agent shall also directly be given or made to each Lender. Following the effectiveness of the Administrative Agent's resignation from its capacity as such, the provisions of this Article and Section 9.03, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent and in respect of the matters referred to in the proviso under clause (a) above.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any other Lender or the Debtors' Investment Banker, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the

UST-1278

Administrative Agent, or any other Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Each Lender, by delivering its signature page to this Agreement and funding its Loans on the Effective Date, or delivering its signature page to an Assignment and Assumption or any other Loan Document pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent or the Lenders on the Effective Date.

Except with respect to the exercise of setoff rights of any Lender in accordance with the Loan Documents or with respect to a Lender's right to file a proof of claim in an insolvency proceeding, no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Loan Document Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent on behalf of the Secured Parties in accordance with the terms thereof. In the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Administrative Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and the Administrative Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Loan Document Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent on behalf of the Secured Parties at such sale or other disposition.

The Secured Parties irrevocably authorize the Administrative Agent, at its option and in its discretion, to subordinate or release any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is a Permitted Encumbrance or that is permitted by Section 6.02(d), (e), (g) and (h). The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

In case of the pendency of any proceeding with respect to any Loan Party under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

LA\4104335.13

UST-1279

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, and all other Loan Document Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim under Sections 2.10, 2.11, 2.13, 2.14, 2.15 and 9.03) allowed in such judicial proceeding;

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(c)     any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Lender and each Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders or the other Secured Parties, to pay to the Administrative Agent any amount due to it, in its capacity as the Administrative Agent, under the Loan Documents (including under Section 9.03).

To the extent required by any applicable laws (as determined in good faith by the Administrative Agent), the Administrative Agent may withhold from any payment to any Lender under any Loan Document an amount equivalent to any applicable withholding Tax.  Without limiting or expanding the provisions of Section 2.15, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective).  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this paragraph. The agreements in this paragraph shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Loan Document Obligations.

Notwithstanding anything herein to the contrary, neither the Debtors' Investment Banker nor any Person (if any) named on the cover page of this Agreement for recognition purposes only shall have any duties or obligations under this Agreement or any other Loan Document (except in any such Person's capacity, as and to the extent applicable, as a Lender), but all such Persons shall have the benefit of the indemnities to the extent referenced and provided for hereunder.

Unless otherwise expressly stated or referred to in this Article, the provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and, except solely to the extent of the Borrowers' rights to consent pursuant to and subject to the conditions set

LA\4104335.13

UST-1280

forth in this Article, none of the Borrowers or any other Loan Party shall have any rights as a third party beneficiary of any such provisions. Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Loan Document Obligations provided under the Loan Documents, to have agreed to the provisions of this Article.

ARTICLE IX

Miscellaneous

SECTION 9.01.   Notices.

(a)   Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) of this Section), all notices and other communications provided for herein shall be in writing and shall be delivered by e-mail, hand or overnight courier service, or mailed by certified or registered mail, as follows:

(i)   if to the Borrowers:

Ascena Retail Group, Inc.
933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attention:  Dan Lamadrid, Executive Vice President and Chief Financial Officer
E-mail: dan.lamadrid@ascenaretail.com

with a copy to:

933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attention: Gary Holland, General Counsel and VP
E-mail: gary.holland@ascenaretail.com

With a copy to:
Kirkland & Ellis LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Attention:  David M. Nemecek, P.C.
Email: david.nemecek@kirkland.com

(ii)   if to the Administrative Agent:

Alter Domus (US) LLC
225 W. Washington St., 9th Floor
Chicago, IL 60606
Attention: Legal Department and Hendrik van der Zandt
Email: legal@alterdomus.com and hendrik.vanderzandt@alterdomus.com

91

UST-1281

with a copy to:

Holland & Knight LLP
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
Attention: Joshua Spencer
Email: joshua.spencer@hklaw.com

and

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attention: Evan Fleck
Email: EFleck@milbank.com

       (iii)    if to any other Lender, to it at its address or e-mail address set forth in its Administrative Questionnaire.

       All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received and (ii) delivered through electronic communications to the extent provided in paragraph (b) of this Section shall be effective as provided in such paragraph.

       (b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications (including e-mail and internet or intranet websites) pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices under Article II to any Lender if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Parent Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications. All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by return e-mail or other written acknowledgement); provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (b)(i) of notification that such notice or communication is available and identifying the website address therefor.

       (c)    Any party hereto may change its address for notices and other communications hereunder by notice to the other parties hereto.

UST-1282

(d)     The Borrowers agree that the Administrative Agent may, but shall not be obligated to, make any Communication by posting such Communication on Debt Domain, Intralinks, Syndtrak or a similar electronic transmission system (the "Platform").  The Platform is provided "as is" and "as available."  Neither the Administrative Agent nor any of its Related Parties warrants, or shall be deemed to warrant, the adequacy of the Platform and each expressly disclaims liability for errors or omissions in the Communications.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made, or shall be deemed to be made, by the Administrative Agent or any of its Related Parties in connection with the Communications or the Platform.

SECTION 9.02.     Waivers; Amendments.

(a)     No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  Without limiting the generality of the foregoing, the execution and delivery of this Agreement or the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)     Except as provided in Sections 9.02(c) and 9.19 and except with respect to the Administrative Agent Fee Letter, none of this Agreement, any other Loan Document or any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrowers, the Administrative Agent and the Required Lenders and, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders, provided that (i) any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrowers and the Administrative Agent to cure any technical error, ambiguity, omission, defect or inconsistency so long as, in each case, the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment and (ii) no such agreement shall (A) increase the Commitment of any Lender without the written consent of such Lender, (B) reduce or forgive the principal amount of any Loan or reduce the rate of interest thereon or reduce or forgive any interest or fees or premiums (including any prepayment premiums but excluding for the avoidance of doubt, any mandatory prepayment) payable hereunder without the written consent of each Lender directly affected thereby, (C) postpone the scheduled maturity date of any Loan,

UST-1283

or the date of any scheduled payment of the principal amount of any Term Loan under Section 2.08, or any date for the payment of any interest or fees or premium payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly affected thereby, (D) change Section 2.16(b) or 2.16(c) in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender, (E) change any of the provisions of this Section or the percentage set forth in the definition of the term "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender; provided that, with the consent of the Required Lenders, the provisions of this Section and the definition of the term "Required Lenders" may be amended to include references to any new class of loans created under this Agreement (or to lenders extending such loans) on substantially the same basis as the corresponding references relating to the existing Loans or Lenders, (F) release substantially all of the value of the Guarantees provided by the Guarantors (including, in each case, by limiting liability in respect thereof) created under the Collateral Agreement without the written consent of each Lender (except as expressly provided in Section 9.16 or the Collateral Agreement including any such release by the Administrative Agent in connection with any sale or other disposition of any Subsidiary upon the exercise of remedies under the Collateral Documents), it being understood that an amendment or other modification of the type of obligations guaranteed under the Collateral Agreement shall not be deemed to be a release or limitation of any Guarantee, and (G) release all or substantially all the Collateral from the Liens of the Collateral Documents, without the written consent of each Lender (except as expressly provided in Section 9.16 or the applicable Collateral Document (including any such release by the Administrative Agent in connection with any sale or other disposition of the Collateral upon the exercise of remedies under the Collateral Documents), it being understood that an amendment or other modification of the type of obligations secured by the Collateral Documents shall not be deemed to be a release of the Collateral from the Liens of the Collateral Documents); provided further that no such agreement shall amend, modify, extend or otherwise affect the rights or obligations of the Administrative Agent without the prior written consent of the Administrative Agent. Notwithstanding the foregoing, no consent with respect to any amendment, waiver or other modification of this Agreement or any other Loan Document shall be required of, in the case of any amendment, waiver or other modification referred to in clause (ii) of the first proviso of this paragraph, any Lender that receives payment in full of the principal of and interest accrued on each Loan made by, and all other amounts owing to, such Lender or accrued for the account of such Lender under this Agreement and the other Loan Documents at the time such amendment, waiver or other modification becomes effective and whose Commitments terminate by the terms and upon the effectiveness of such amendment, waiver or other modification.

(c)     Notwithstanding anything herein to the contrary, the Administrative Agent may, without the consent of any Secured Party, consent to a departure by any Loan Party from any covenant of such Loan Party set forth in this Agreement, the Collateral Agreement or in any other Collateral Document to the extent such departure is consistent with the authority of the Administrative Agent set forth in the definition of the term "Collateral and Guarantee Requirement".

UST-1284

(d)     The Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, waivers or other modifications on behalf of such Lender.  Any amendment, waiver or other modification effected in accordance with this Section 9.02 shall be binding upon each Person that is at the time thereof a Lender and each Person that subsequently becomes a Lender.

(e)     Notwithstanding the foregoing, Exhibit G to this Agreement, the definitions of "Exit Facility Agreement" and "Exit Facility Term Sheet" and Section 2.22 (or any other provision which would result in an amendment, restatement, waiver or modification of any of the foregoing) may be amended, restated, waived or otherwise modified with the prior written consent of the Required Lenders, the Administrative Agent and the Parent Borrower; provided that to the extent such amendment, restatement, waiver or other modification would require the consent of any affected "Lender", all "Lenders" or any other Person (or requisite class of Persons) under the terms of Exhibit G as in effect on the Effective Date, the prior written consent of the corresponding affected Lender, all Lenders or such corresponding Person (or requisite class of Persons) under this Agreement shall be required; provided, further, that the Lenders hereby authorize the Administrative Agent to enter into any amendments to this Agreement and the other Loan Documents as may be necessary, in the reasonable opinion of the Administrative Agent and the Borrower, to give effect to the transaction contemplated by Section 2.22 and such other technical or immaterial amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Parent Borrower in connection therewith.

SECTION 9.03.   Expenses; Indemnity; Damage Waiver.

(a)     The Borrowers shall, jointly and severally, pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Ad Hoc Committee, the Lenders and their respective Affiliates, including the reasonable and documented out-of-pocket fees, charges and disbursements of one primary counsel for the Administrative Agent, and one primary counsel for the Ad Hoc Committee, and if deemed necessary by the Administrative Agent or the Ad Hoc Committee, one local counsel for the Administrative Agent and Ad Hoc Committee, as applicable in each applicable jurisdiction, in connection with the structuring, arrangement and syndication of the credit facilities provided for herein and any credit or similar facility refinancing or replacing, in whole or in part, any of the credit facilities provided for herein, including the preparation, execution, delivery and administration of this Agreement, the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof, the Order and any transaction contemplated thereby (whether or not the transactions contemplated hereby or thereby shall be consummated) and any refinancing of the obligations hereunder or any "exit financing" requested by the Loan Parties in connection with the Chapter 11 Cases (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable and documented out-of-pocket expenses in connection with the administration of actions related to the Collateral, including any actions taken to perfect or maintain priority of the Administrative Agent's Liens on the Collateral, to maintain any insurance required hereunder, to verify the Collateral, or any audit, inspection, or appraisal related to any Loan Party or the Collateral  and (iii) all out-of-pocket expenses incurred by the Administrative Agent, the Ad Hoc Committee or any Lender, including the fees, charges and disbursements of any counsel for any of the foregoing, in connection with the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this

95

UST-1285

Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)       The Borrowers shall, jointly and severally, indemnify the Administrative Agent (and any subagent thereof), and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee"), against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the structuring, arrangement and the syndication of the credit facilities provided for herein, the preparation, execution, enforcement, delivery and administration of this Agreement, the other Loan Documents or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to this Agreement or the other Loan Documents of their obligations thereunder or the consummation of the Transactions or any other transactions contemplated thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on, at, under to or from any property currently or formerly owned or operated by the Parent Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Parent Borrower or any Subsidiary or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether such proceeding is initiated against or by any party to this Agreement, or any Affiliate thereof, by an Indemnitee or any third party or whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses (i) are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee, (ii) are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from a material breach by such Indemnitee of the Loan Documents or (iii) involve a dispute solely among Indemnitees (other than an action involving (i) alleged conduct by any Borrower or any of its Affiliates or (ii) against the Administrative Agent in its capacity as such).  This Section shall not apply to any Taxes (other than Other Taxes or any Taxes that represent losses, claims, damages or related expenses arising from any non-Tax claim).

(c)       Each Lender severally agrees to indemnify and hold harmless the Administrative Agent (or any sub-agent thereof), to the extent that the Administrative Agent (or any sub-agent) shall not have been timely reimbursed by the Borrowers, based on and to the extent of such Lender's pro rata share, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Administrative Agent (or any sub-agent thereof) in exercising its powers, rights and remedies or performing its duties hereunder or under the other Loan Documents or otherwise in its capacity as the Administrative Agent (or any sub-agent thereof) in any way relating to or arising out of this Agreement or the other Loan Documents; provided, that no Lender shall be liable to the Administrative Agent (or any sub-agent) for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or any sub-agent's) gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent

96

UST-1286

jurisdiction (it being understood and agreed that no action taken in accordance with the directions of the Required Lenders (or such other Lenders as may be required to give such instructions under Article VIII) shall constitute gross negligence or willful misconduct). If any indemnity furnished to the Administrative Agent (or any sub-agent thereof) for any purpose shall, in the opinion of the Administrative Agent (or any sub-agent thereof), be insufficient or become impaired, the Administrative Agent (or any sub-agent ) may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, that in no event shall this sentence require any Lender to indemnify the Administrative Agent (or any sub-agent thereof) against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's pro rata share. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the total outstanding Loans and unused Commitments at such time (or if such indemnity payment is sought after the date on which the Loans have been paid in full in accordance with such Lender's pro rata share immediately prior to the date on which the Loans are paid in full).

(d)     To the extent permitted by applicable law, (i) the Borrowers shall not assert, or permit any of their respective Affiliates or Related Parties to assert, and hereby waives, any claim against any Indemnitee for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the internet)and (ii) none of the Borrowers or any Secured Party shall assert, or permit any of their respective Affiliates or Related Parties to assert any claims on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)     All amounts due under this Section shall be payable not later than 10 days after written demand therefor.

SECTION 9.04.     Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i)  neither Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by any Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section), the Debtors' Investment Banker (to the extent provided in Article VIII)and, to the extent expressly contemplated hereby, the sub-agents of the Administrative Agent and the Related Parties of any of the Administrative Agent and any Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

UST-1287

(b)      Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

(i)      the Borrowers; provided that no consent of Borrowers shall be required (1) for an assignment to a Lender, a Related Lender, an Affiliate of a Lender or an Approved Fund (2) if in connection with the Initial Allocation (as defined in the Commitment Letter) and (3) if an Event of Default has occurred and is continuing, for any other assignment; provided further that, the Borrowers shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof.

(ii)      the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of any Loan to a Lender, a Related Lender, an Affiliate of a Lender or an Approved Fund.

(iii)      Assignments shall be subject to the following additional conditions:

(A)      except in the case of an assignment to a Lender, a Related Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent and recorded in the Register) shall not be less than $1,000,000 unless each of the Borrowers and the Administrative Agent otherwise consent; provided that no such consent of the Borrowers shall be required (i) if an Event of Default has occurred and is continuing or (ii) in connection with the Initial Allocation (as defined in the Commitment Letter);

(B)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)      the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided that only one such processing and recordation fee shall be payable in the event of simultaneous assignments from any Lender or its Approved Funds to one or more other Approved Funds of such Lender;

(D)      the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent all requested "know your customer" documentation, a duly executed IRS Form W-9 or such other applicable IRS Form, and an Administrative Questionnaire in which the assignee designates one or more credit

LA\4104335.13

UST-1288

contacts to whom all syndicate-level information (which may contain MNPI) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable law, including Federal, State and foreign securities laws;

(E)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent, the Ad Hoc Committee Advisors and the Company a signed joinder to the Restructuring Support Agreement; and

(F)    each Lender acknowledges and agrees that the Loans, on the one hand, and the unfunded Commitments on the other hand, shall be held by such Lender in equal percentages and such Loans, on the one hand, and such unfunded Commitments, on the other hand, are "stapled" to each other, and shall be assigned in equal percentages.

(iv)    Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.13, 2.14, 2.15 and 9.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 9.04(c).

(v)    The Administrative Agent, acting solely for this purpose as a nonfiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and records of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers and, as to entries pertaining to it, any Lender, at any reasonable time and from time to time upon reasonable prior written notice.

(vi)    Upon receipt by the Administrative Agent of an Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), all other information required under (iii)(D) above and the processing and recordation fee referred to in this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that

99

UST-1289

the Administrative Agent shall not be required to accept such Assignment and Assumption or so record the information contained therein if the Administrative Agent reasonably believes that such Assignment and Assumption lacks any written consent required by this Section or is otherwise not in proper form, it being acknowledged that the Administrative Agent shall have no duty or obligation (and shall incur no liability) with respect to obtaining (or confirming the receipt) of any such written consent or with respect to the form of (or any defect in) such Assignment and Assumption, any such duty and obligation being solely with the assigning Lender and the assignee. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph, and following such recording, unless otherwise determined by the Administrative Agent (such determination to be made in the sole discretion of the Administrative Agent, which determination may be conditioned on the consent of the assigning Lender and the assignee), shall be effective notwithstanding any defect in the Assignment and Assumption relating thereto. Each assigning Lender and the assignee, by its execution and delivery of an Assignment and Assumption, shall be deemed to have represented to the Administrative Agent that all written consents required by this Section with respect thereto (other than the consent of the Administrative Agent) have been obtained and that such Assignment and Assumption is otherwise duly completed and in proper form, and each assignee, by its execution and delivery of an Assignment and Assumption, shall be deemed to have represented to the assigning Lender and the Administrative Agent that such assignee is an Eligible Assignee.

(vii)    No such assignment shall be made to the Parent Borrower or any of its Subsidiaries, except as set forth in Section 9.04(e).

(c)    (i) Any Lender may, without the consent of the Borrowers or the Administrative Agent, sell participations to one or more Eligible Assignees ("Participants") in all or a portion of such Lender's rights and obligations under this Agreement; provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under the Loan Documents. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant or requires the approval of all the Lenders. The Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.13, 2.14 and 2.15 (subject to the requirements and limitations therein, including the requirements under Section 2.15(e) (it being understood that the documentation required under Section 2.15(e) shall be delivered solely to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (x) agrees to be subject to the provisions of Sections 2.16 and 2.17 as if it were an assignee under paragraph (b) of this Section and (y) shall not be entitled to receive any greater payment under Section 2.13 or 2.15, with respect to any participation, than its participating Lender would have been entitled to receive,

except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrowers' request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 2.17(b) with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.16(c) as though it were a Lender.

(i)     Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain records of the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement or any other Loan Document (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments or Loans or its other obligations under this Agreement or any other Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment or Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     Notwithstanding anything to the contrary contained in this Section 9.04 or any other provision of this Agreement, no Lender shall have the right at any time to sell, assign or transfer all or a portion of the Loans owing to it to the Parent Borrower or any of its Subsidiaries.

SECTION 9.05.   Survival. All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, any Lender or any Affiliate of any of the foregoing may have had notice or knowledge of any Default or incorrect representation or warranty at the time any Loan Document is executed and delivered or any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the

UST-1291

Commitments have not expired or terminated. The provisions of Sections 2.13, 2.14, 2.15, 2.16(e) and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.06.  Counterparts; Integration; Effectiveness; Electronic Execution.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 9.07.  Severability.  Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08.  Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized (notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Court) at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender to or for the credit or the account of any Loan Party against any of and all the Loan Document Obligations held by such Lender, irrespective of whether or not such Lender shall have made any demand under the Loan Documents and although such obligations may be unmatured.  The applicable Lender shall notify the Borrowers and the Administrative Agent of such set-off or application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such set-off or application under this Section.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

UST-1292

SECTION 9.09.   Governing Law; Jurisdiction; Consent to Service of Process.

(a)      Except to the extent superseded by the Bankruptcy Code, this Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)      Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the Court or the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and the Borrowers hereby irrevocably and unconditionally agree that all claims arising out of or relating to this Agreement or any other Loan Document brought by the Borrowers or any of their respective Affiliates shall be brought, and shall be heard and determined in the Court, in such New York State or, to the extent permitted by law, in such Federal court.  Each party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or any of its properties in the courts of any jurisdiction.

(c)      The Borrowers hereby irrevocably and unconditionally waive, to the fullest extent they may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)      Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10.   WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

103

UST-1293

SECTION 9.11.   Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12.   Confidentiality.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below) with the same degree of care that it uses to protect its own confidential information, but in no event less than a commercially reasonable degree of care, except that Information may be disclosed (a) to its Related Parties, including accountants, legal counsel and other agents and advisors, it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable law or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies under this Agreement or any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing confidentiality undertakings substantially similar to those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its Related Parties) to any swap or derivative transaction relating to the Parent Borrower or any Subsidiary or its obligations, (g) on a confidential basis to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the credit facilities provided for herein, (h) with the consent of the Borrowers or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender or any Affiliate of any of the foregoing on a non-confidential basis from a source other than the Borrowers; provided that, in the case of clause (c) above, the party disclosing such information shall provide to the Borrowers prior written notice of such disclosure to the extent permitted by applicable law (and to the extent commercially feasible under the circumstances) and shall cooperate with the Borrowers in obtaining a protective order for, or other confidential treatment of, such disclosure.  For the purposes of this Section, "Information" means all information received from the Borrowers relating to the Parent Borrower or any Subsidiary or their businesses or the Collateral.

SECTION 9.13.   Several Obligations; Nonreliance; Violation of Law.  The respective obligations of the Lenders hereunder are several and not joint and the failure of any Lender to make any Loan or perform any of its obligations hereunder shall not relieve any other Lender from any of its obligations hereunder.  Anything contained in this Agreement to the contrary notwithstanding, no Lender shall be obligated to extend credit to the Borrowers in violation of applicable law.

SECTION 9.14.   USA Patriot Act Notice.  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Loan Party that pursuant to the requirements of the Patriot Act it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party

LA\4104335.13

UST-1294

and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with such Act.

SECTION 9.15.   Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.16.   Release of Liens and Guarantees.  A Guarantor (for the avoidance of doubt, other than the Borrowers) shall be released from its obligations under the Loan Documents, and all security interests created by the Collateral Documents in Collateral owned by such Guarantor shall be released, upon the consummation of any transaction permitted by this Agreement as a result of which such Guarantor ceases to be a Restricted Subsidiary (including any voluntary liquidation or dissolution of such Guarantor in accordance with Section 6.03); provided that, if so required by this Agreement, the Required Lenders shall have consented to such transaction and the terms of such consent shall not have provided otherwise.  Upon any sale or other transfer by any Loan Party (other than to a Borrower or any other Loan Party or to any other Subsidiary of the Parent Borrower) of any Collateral in a transaction permitted under this Agreement, or upon the effectiveness of any written consent to the release of the security interest created under any Collateral Document in any Collateral pursuant to Section 9.02, the security interests in such Collateral created by the Collateral Documents shall be automatically released.  In connection with any termination or release pursuant to this Section, the Administrative Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release.  Any execution and delivery of documents pursuant to this Section shall be without recourse to or warranty by the Administrative Agent.

SECTION 9.17.   No Fiduciary Relationship.  Each Borrower, on behalf of itself and the Subsidiaries, agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, the Parent Borrower, the Subsidiaries and its other Affiliates, on the one hand, and the Administrative Agent, the Lenders and their Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Administrative Agent, the Lenders or their Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications.  The Administrative Agent, the Lenders and their Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of the Parent Borrower, the Subsidiaries and its other Affiliates, and none of the Administrative Agent, the Lenders or their Affiliates has any

105

UST-1295

obligation to disclose any of such interests to the Parent Borrower, the Subsidiaries or its other Affiliates. To the fullest extent permitted by law, each Borrower hereby waives and releases any claims that it or any of its Affiliates may have against the Administrative Agent, the Lenders and their Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 9.18.   Non-Public Information.

(a)    Each Lender acknowledges that all information, including requests for waivers and amendments, furnished by a Borrower or the Administrative Agent pursuant to or in connection with, or in the course of administering, this Agreement will be syndicate-level information, which may contain MNPI. Each Lender represents to the Borrowers and the Administrative Agent that (i) it has developed compliance procedures regarding the use of MNPI and that it will handle MNPI in accordance with such procedures and applicable law, including Federal, state and foreign securities laws, and (ii) it has identified in its Administrative Questionnaire a credit contact who may receive information that may contain MNPI in accordance with its compliance procedures and applicable law, including Federal, state and foreign securities laws.

(b)    The Borrowers and each Lender acknowledge that, if information furnished by the Loan Parties pursuant to or in connection with this Agreement is being distributed by the Administrative Agent through the Platform, (i) the Administrative Agent may post any information that the Borrowers have indicated as containing MNPI solely on that portion of the Platform designated for Private Side Lender Representatives and (ii) if the Borrowers have not indicated whether any information furnished by it pursuant to or in connection with this Agreement contains MNPI, the Administrative Agent reserves the right to post such information solely on that portion of the Platform designated for Private Side Lender Representatives. The Borrowers agree to clearly designate all information provided to the Administrative Agent by or on behalf of the Borrowers that is suitable to be made available to Public Side Lender Representatives, and the Administrative Agent shall be entitled to rely on any such designation by the Borrowers without liability or responsibility for the independent verification thereof.

SECTION 9.19.   Intercreditor Agreement.  (a) Each of the Lenders and the other Secured Parties acknowledges that obligations of the Loan Parties under the ABL Credit Agreement are secured by Liens on assets of the Loan Parties that constitute Collateral and that the relative Lien priorities and other creditor rights of the Secured Parties and the secured parties under the ABL Credit Agreement will be set forth in the Intercreditor Agreement. Each of the Lenders and the other Secured Parties hereby acknowledges that it has received a copy of the Intercreditor Agreement. Each of the Lenders and the other Secured Parties hereby irrevocably authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, the Intercreditor Agreement and any documents relating thereto.

(a)    Each of the Lenders and the other Secured Parties hereby irrevocably (i) consents to the treatment of Liens provided for under the Intercreditor Agreement, including to the subordination of the Liens on the ABL Priority Collateral securing the Loan Document Obligations on the terms set forth in the Intercreditor Agreement, (ii) agrees that, upon the

106

UST-1296

execution and delivery thereof, such Secured Party will be bound by the provisions of the Intercreditor Agreement as if it were a signatory thereto and will take no actions contrary to the provisions of the Intercreditor Agreement, (iii) agrees that no Secured Party shall have any right of action whatsoever against the Administrative Agent as a result of any action taken by the Administrative Agent pursuant to this Section 9.19 or in accordance with the terms of the Intercreditor Agreement, (iv) authorizes and directs the Administrative Agent to carry out the provisions and intent of each such document and (v) authorizes and directs the Administrative Agent to take such actions as shall be required to release Liens on the Collateral in accordance with the terms of the Intercreditor Agreement.

(b)      Each of the Lenders and the other Secured Parties hereby irrevocably further authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, any amendments, supplements or other modifications of the Intercreditor Agreement that the Borrowers may from time to time request and that are reasonably acceptable to the Administrative Agent (i) to give effect to any establishment, incurrence, amendment, extension, renewal, refinancing or replacement of any Loan Document Obligations or the Indebtedness under the ABL Credit Agreement to the extent applicable, (ii) to confirm for any party that the Intercreditor Agreement is effective and binding upon the Administrative Agent on behalf of the Secured Parties or (iii) to effect any other amendment, supplement or modification permitted by the terms of the Intercreditor Agreement.

(c)      Each of the Lenders and the other Secured Parties hereby irrevocably further authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, any amendments, supplements or other modifications of any Collateral Document to add or remove any legend that may be required pursuant to the Intercreditor Agreement.

(d)      The Administrative Agent shall have the benefit of the provisions of Article VIII with respect to all actions taken by it pursuant to this Section or in accordance with the terms of the Intercreditor Agreement to the full extent thereof.

SECTION 9.20.    Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any related agreement, arrangement or understanding among the parties hereto, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder that may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

LA\4104335.13

UST-1297

(i)  a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

[Signature pages follow]

108

UST-1298

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**PARENT BORROWER:**

ASCENA RETAIL GROUP, INC.

By: _____

Name:

Title:

*[Signature Page to the Term Credit Agreement]*

UST-1299

**SUBSIDIARY BORROWER:**

ANNTAYLOR RETAIL, INC.

By: _____

Name:
Title:

*[Signature Page to the Term Credit Agreement]*

UST-1300

ALTER DOMUS (US) LLC,
as Administrative Agent,

By: _____

     Name:
     Title:

*[Signature Page to the Term Credit Agreement]*

UST-1301

## Schedule 2.01

## Commitments

| Lender | Commitment |
|---|---|
| [   ] | $                    [   ],000,000 |
| **Total** | $                    [   ],000,000 |

UST-1302

## Schedule 5.11
## Required Milestones

The Loan Parties shall use their reasonable best efforts to pursue and implement the Restructuring Transactions as defined in, and in accordance with, the RSA and shall, subject to the availability of the Court and as such time periods may be extended by the Required Lenders, achieve the following milestones:

(a)     the Petition Date has not occurred by 11:59 p.m. (Eastern Time) on July 23, 2020;

(b)     the Debtors have not filed the Rent Deferral Motion (as defined in the RSA) with the Court within three (3) calendar days of the Petition Date;

(c)     the Court has not entered the Cash Collateral Order (as defined in the RSA) on an interim basis by the date that is five (5) Business Days after the Petition Date;

(d)     the Court has not entered the DIP Financing Order (as defined in the RSA) on a final basis by the date that is thirty-five (35) calendar days after the Petition Date;

(e)     the Court has not entered the Disclosure Statement Order (as defined in the RSA) by the date that is sixty (60) calendar days after the Petition Date;

(f)     solicitation of the Plan (as defined in the RSA) has not commenced by the date that is seventy (70) calendar days after the Petition Date;

(g)     the Court has not entered the Confirmation Order (as defined in the RSA) by the date that is one hundred ten (110) calendar days after the Petition Date; and

(h)     the Plan Effective Date (as defined in the RSA) has not occurred by the date that is one hundred thirty (130) calendar days after the Petition Date.

UST-1303

**Exhibit B**

[*See Exhibit D to the RSA*]

UST-1304

# EXHIBIT D

## Exit Facility Term Sheet

UST-1305

<div align="center">

**Exit Facility Term Sheet**[1]

</div>

| | |
|---|---|
| **Borrowers:** | Reorganized Ascena Retail Group, Inc., a Delaware corporation (the "**Parent Borrower**") and AnnTaylor Retail, Inc., a Florida corporation (the "**Subsidiary Borrower**" and, together with the Parent Borrower, the "**Borrowers**"). |
| **Administrative Agent and Collateral Agent:** | Alter Domus (US) LLC (in its capacity as administrative agent, the "**Administrative Agent**", and in its capacity as collateral agent, the "**Collateral Agent**"). |
| **Lenders:** | Holders of DIP Term Facility Claims will receive First Out Term Loans and, together with other holders of Term Loan Claims, Last Out Term Loans (each as defined below), respectively, as set forth in the Proposed Plan (collectively, the "**Lenders**") |
| **Term Loan Facility:** | First lien senior secured term loan facility in an aggregate original principal amount of $400 million, denominated in US Dollars, consisting of: |

- $311.8 million of first-out term loans (the "**First Out Term Loan Facility**", the loans thereunder, the "**First Out Term Loans**" and the commitments thereunder, the "**First-Out Commitments**") converted in accordance with the Proposed Plan to holders of DIP Term Facility Claims; and

- $88.2 million of last-out term loans (the "**Last Out Term Loan Facility**", the loans thereunder, the "**Last Out Term Loans**" and the commitments thereunder, the "**Last-Out Commitments**") distributed to holders of Term Loan Claims in accordance with the Proposed Plan.

As used herein, "**Term Loan Facility**" means, collectively, the First Out Term Loan Facility and the Last Out Term Loan Facility. "**Commitments**" means, collectively, the First Out Commitments and the Last Out Commitments. "**Term Loans**" means, collectively, the First Out Term Loans and the Last Out Term Loans.

The First Out Term Loans will be "first out" in right of payment priority and the Last Out Term Loans will be "last out" in right of payment priority (in each case, as between the tranches of Term

---

[1] Capitalized terms used but not defined in this Exit Facility Term Sheet have the meanings ascribed to them in the Restructuring Support Agreement, dated as of  July 23, 2020 (the "**Restructuring Support Agreement**") to which this Exit Facility Term Sheet is attached or the Proposed Plan attached as Exhibit B to the Restructuring Support Agreement.

UST-1306

Loans). The First Out Term Loans and Last Out Term Loans shall be secured on a *pari passu* basis by the same lien on the Collateral (as defined below).

| | |
|---|---|
| **Definitive Documentation:** | The definitive documentation for the Term Loan Facility (the "**Definitive Documentation**") shall, except as otherwise set forth herein, be based on the Term Credit Agreement, dated as of August 21, 2015 (as amended, supplemented or otherwise modified prior to the date hereof), by and among Ascena Retail Group, Inc., AnnTaylor Retail, Inc., certain subsidiaries of the Parent Borrower party thereto, Goldman Sachs Bank USA, as the administrative agent and the collateral agent, and certain lenders party thereto from time to time (the "**Prepetition Term Loan Credit Agreement**"), (i) as modified by the terms set forth herein, (ii) subject to modifications to reflect changes in law or accounting standards since the date of such precedent and administrative agency, collateral agency and operational requirements of the Administrative Agent and Collateral Agent and (iii) with such other terms and conditions as may be reasonably agreed between the Borrowers and the Required Consenting Stakeholders; provided that, except as otherwise agreed by the Required Consenting Stakeholders, the Definitive Documentation shall be substantially consistent with the documentation governing the Exit ABL Facility (other than (i) provisions that are specific to asset-based facilities, (ii) the financial covenants applicable thereto, (iii) cross-defaults with respect to the Term Loan Facility and (iv) such other terms mutually agreed between the Borrowers and the Required Consenting Stakeholders). The Definitive Documentation shall be negotiated in good faith within a reasonable time period to be determined based on the expected date of Bankruptcy Court's entry into the Confirmation Order, with initial drafts of the Definitive Documentation to be prepared by counsel for the Consenting Stakeholders, which is Milbank LLP. This paragraph, collectively, is referred the here as the "**Documentation Principles**". |
| **Maturity Date:** | First Out Term Loans: 4 years after the Effective Date (the "**First Out Maturity Date**"). |
| | Last Out Term Loans: 5 years after the Effective Date (the "**Last Out Maturity Date**"). |
| **Amortization:** | First Out Term Loans: Commencing with the last day of the first full calendar quarter following the Effective Date, the outstanding principal amount of the First Out Term Loans will be payable on each calendar quarter in equal amounts of (i) for each calendar quarter occurring on or prior to the second anniversary of the Effective Date, 1.00% *per annum* and (ii) for each calendar quarter |

UST-1307

thereafter, 3.00% *per annum,* in each case of the original principal amount of the First Out Term Loans, with the remaining balance, together with all other amounts owed with respect thereto, payable on the First Out Maturity Date, subject to reduction pursuant to the prepayment provisions to be mutually agreed in the Definitive Documentation.

Last Out Term Loans: The outstanding principal amount of the Last Out Term Loans will be payable on each calendar quarter in equal amounts of 1.00% *per annum* of the original principal amount of the Last Out Term Loans, with the remaining balance, together with all other amounts owed with respect thereto, payable on the Last Out Maturity Date .

**Voluntary Prepayments:** The Borrowers may make voluntary prepayments of the Term Loans, in each case, other than in connection with a repricing event, without premium or penalty, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of LIBOR borrowings other than on the last day of the relevant interest period.

**Mandatory Prepayments:** Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles; provided that no prepayment shall be required pursuant to Section 2.09(c) thereof for any Excess Cash Flow (as defined in the Prepetition Term Loan Credit Agreement).

**Interest:** With respect to the First Out Term Loans, at the Parent Borrower's election:

- ABR (defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement) *plus* 10.75% per annum in cash or Adjusted LIBO Rate (defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement) *plus* 11.75% per annum in cash (subject to a 0.00% per annum floor on ABR and a 1.00% *per annum* floor on the Adjusted LIBO Rate) .

With respect to the Last Out Term Loans, at the Parent Borrower's election:

- prior to the second anniversary of the Effective Date, ABR *plus* 2.00% *per annum* in cash and 8.00% *per annum* in kind ("**PIK**") or Adjusted LIBO Rate *plus* 2.50% *per annum* in cash and 8.50% PIK, and thereafter, ABR *plus* 10.00% *per annum* in cash or Adjusted LIBO Rate *plus* 11.00% *per annum* in cash

3

UST-1308

(in each case subject to a 0.00% *per annum* floor on ABR and a 1.00% *per annum* floor on the Adjusted LIBO Rate).

**Prepayment Premium**  NC1/106.375%/103.1875%/par, with the Make-Whole Amount payable at an amount equal to the present value of the amount of interest that would have been paid on the principal amount of the Loans to and including the 3.5 year anniversary of the Closing Date (in each case, calculated on the basis of the interest rate with respect to the Loans then in effect, on a quarterly basis and on the basis of actual days elapsed over a year of three hundred sixty-five (365) days). The present value calculation shall be calculated using the discount rate equal to the Treasury Rate as of such repayment or prepayment date or date of required repayment plus fifty (50) basis points. The Prepayment Premium and Make-Whole Amount shall be payable upon any repricing event or acceleration. The Definitive Documentation shall contain a "Momentive" provision satisfactory to the Required Consenting Stakeholders.

**Guarantees:**  All obligations of the Borrowers under the definitive credit agreement for the Term Loan Facility (the "**Exit Credit Agreement**") and the related guarantee and collateral agreement, mortgage agreements and other collateral documents (together with the Exit Credit Agreement, the "**Loan Documents**") (collectively, the "**Borrowers Obligations**") will be unconditionally guaranteed jointly and severally on a senior basis (the "**Guarantees**") by the direct parent of the Borrower and each existing and subsequently acquired or organized direct or indirect Material Domestic Subsidiary, Material Foreign Subsidiary and, notwithstanding anything to the contrary herein, (x) each Luxembourg subsidiary, (y) each guarantor party to the Prepetition Term Loan Credit Agreement and (z) each subsidiary owning material intellectual property (or owning subsidiaries which own material intellectual property) or material real property of the company (the "**Subsidiary Guarantors**", together with the Borrowers, the "**Loan Parties**"); provided that, notwithstanding anything to the contrary herein, (i) the guarantor exclusions shall be limited to (a) immaterial domestic subsidiaries, (b) immaterial foreign subsidiaries (which, for avoidance of doubt, will not include any Luxembourg subsidiaries), (c) bona fide joint ventures with third parties, (d) any subsidiary that is prohibited by applicable law, rule or regulation or by any contractual obligation at the time such person becomes a subsidiary (and not entered into in contemplation of this clause (d) and for so long as such prohibition or restriction remains in effect), as applicable, from granting a guarantee or which would require governmental (including regulatory) consent, approval, license or authorization to provide such guarantee unless such consent, approval, license or

4

UST-1309

authorization has been received, (e) any subsidiary acquired pursuant to an acquisition or other investment permitted by the Definitive Documentation that has assumed, permitted secured indebtedness not incurred in contemplation of such acquisition or other investment and any subsidiary thereof that guarantees such secured indebtedness, in each case to the extent and for so long as such secured and (f) circumstances where the Borrowers and the Administrative Agent reasonably agree that the cost of providing such a guarantee is excessive in relation to the value afforded thereby and (ii) the Definitive Documentation shall not permit any unrestricted subsidiaries.

"**CFC**" shall mean any direct or indirect Foreign Subsidiary of any Borrower that is a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code of 1986, as amended (the "Code").

 "**CFC Holdco**" shall mean any direct or indirect subsidiary of any Borrower, which subsidiary is treated as a disregarded entity for U.S. federal income tax purposes and substantially all of the assets of which consist of the equity interests in and/or indebtedness issued by one or more Foreign Subsidiaries that are CFCs."

 "**Material Domestic Subsidiary**" shall be defined to include any subsidiary organized in the U.S. with total assets or EBITDA in excess of 2.5% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis; provided, that at no time shall the aggregate total assets or EBITDA of all Material Domestic Subsidiaries, taken together, account for more than 5.0% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis.

 "**Material Foreign Subsidiary**" shall be defined to include any Luxembourg subsidiary and any other subsidiary organized in a non-U.S. jurisdiction where the total assets or EBITDA associated with such jurisdiction (in the aggregate for all subsidiaries organized therein) exceeds 2.5% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis. Notwithstanding the foregoing or anything to the contrary in this term sheet, any guarantee granted by any CFC shall be terminated (and no more than 65% of the voting stock of any Material Foreign Subsidiary shall be Collateral) for so long as such guarantee and/or pledge of the additional Collateral shall cause (or is reasonably expected to cause) any U.S. shareholder of such CFC to include in income for any year any Section 956 Income that is in excess of the Income Threshold (as defined below).

UST-1310

Notwithstanding the foregoing or anything to the contrary in this term sheet, any guarantee granted by any CFC Holdco shall be terminated (and no more than 65% of the voting stock of any CFC Holdco shall be Collateral) for so long as such guarantee and/or pledge of the additional Collateral shall cause (or is reasonably expected to cause) any U.S. shareholder of such CFC Holdco to include in income for any year an amount (after accounting for any reduction under the rules of Treas. Reg. § 1.956-1 and Section 245A of the Code) under Section 956 of the Code ("**Section 956 Income**") that is in excess of the Income Threshold. The "**Income Threshold**" shall mean, with respect to any CFC Holdco or CFC, as applicable, an amount to be mutually agreed.

"**subsidiary(ies)**" has the meaning assigned to such term in the Pre-Petition Credit Agreement.

|  |  |
|---|---|
| **Security:** | Subject to the intercreditor agreement described below under "**Intercreditor Agreement**" and other customary limitations and exclusions to be mutually agreed, the Borrowers Obligations and the Guarantees (collectively the "**Secured Obligations**") will be secured on a first priority basis by substantially all assets of the Loan Parties (collectively, the "**Collateral**"); provided that, notwithstanding anything to the contrary set forth herein (i) all cash and cash equivalents held in accounts (other than customary excluded accounts) in the name of any Loan Party shall be subject to account control agreements in favor of the Collateral Agent (or for so long as the Exit ABL Facility and ABL Intercreditor are in effect, in favor of the ABL Agent), (ii) all equity in the Borrowers, all domestic (including immaterial) subsidiaries, all Luxembourg subsidiaries, all foreign subsidiaries and all Material Foreign Subsidiaries shall at all times be included in the Collateral and (iii) all material intellectual property and material real property shall at all times be included in the Collateral. The pledge of, security interest in, and mortgages on, the Collateral granted by each Loan Party shall secure its own respective Secured Obligations. |

All of the foregoing described in this section and the "Guarantees" section above, the "**Collateral and Guarantee Requirement**".

|  |  |
|---|---|
| **Conditions to Borrowings:** | The availability of the Term Loans under the Exit Credit Agreement will be subject solely to satisfaction (or waiver) of the following conditions (the date on which such conditions are satisfied (or waived) being the "**Effective Date**"): |

- execution and delivery of the Definitive Documentation to be delivered at closing;

6

UST-1311

- delivery of promissory notes to the Lenders, if requested at least two (2) Business Days before the Effective Date;

- delivery of board resolutions and organizational documents of the Loan Parties;

- delivery of incumbency/specimen signature certificate of the Loan Parties;

- delivery of customary legal opinions by counsel to the Borrowers;

- there shall not have occurred since the Petition Date any event or condition that has had or would be reasonably expected, either individually or in the aggregate, to have a Material Adverse Effect (for purposes of this condition, defined in a manner based on the Prepetition Term Loan Credit Agreement but including a proviso stating that in determining whether a "Material Adverse Effect" has occurred or exists under clause (a) thereof, the impacts of the chapter 11 cases and of COVID-19 on the assets, business, financial condition or results of operations on the Loan Parties or any of their respective Subsidiaries will be disregarded (provided that this exception shall not apply to the extent that it is materially disproportionately adverse to the Parent Borrower and its Restricted Subsidiaries, taken as a whole, as compared to other companies in the same industry in which the Parent Borrower and its Restricted Subsidiaries operate));

- the Administrative Agent shall have received a certificate (in substantially the same form as the corresponding certificate delivered in connection with the Prepetition Term Loan Credit Agreement) of the chief financial officer (or financial officer in a similar role) of the Parent Borrower, stating that it and its subsidiaries, taken as a whole, as of the Effective Date, are solvent, in each case, after giving effect to the consummation of the Plan;

- all fees due to the Administrative Agent, Collateral Agent and Lenders including advisors to the Consenting Stakeholders, Greenhill & Co. and Milbank LLP, shall have been paid (or shall have been caused to be paid), and all expenses to be paid or reimbursed to the Administrative Agent, Collateral Agent and Lenders that have been invoiced at least three (3) Business Days prior to the

7

UST-1312

Effective Date shall have been paid  (or shall have been caused to be paid);

- the Loan Parties shall have provided the documentation and other information to the Administrative Agent that are required by regulatory authorities under applicable "know-your-customer" rules and regulations, including the Patriot Act, at least three (3) Business Days prior to the Effective Date (or such later date agreed to by the Administrative Agent) to the extent requested ten (10) days prior to the Effective Date;

- the Bankruptcy Court shall have entered (A) the Confirmation Order and (B) one or more orders authorizing and approving the extensions of credit in respect of the Exit Credit Agreement, each in the amounts and on the terms set forth herein, and all transactions contemplated by the Exit Credit Agreement, and, in each case, such orders shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified;

- the Collateral and Guarantee Requirement (excluding certain customary post-closing items to be mutually agreed) shall have been satisfied or waived and the Intercreditor Agreement and the Agreement Among Lenders shall have been executed and delivered and be in full force and effect;

- the effective date under the Plan shall have occurred, or contemporaneous with the conversion of the DIP Term Facility to the Term Loan Facility shall occur, and all conditions precedent thereto as set forth therein shall have been satisfied or waived (including (x) the issuance to (i) the holders of DIP Term Facility Claims of 44.9% of the New Common Stock, subject to dilution from the Management Incentive Plan and (ii) the holders of Term Loan Claims of 55.1% of New Common Stock (subject to reduction for New Common Stock distrusted in accordance with the following clause (y)) and (y) each holder of a Term Loan Claim that is a Required Consenting Stakeholder (including through any of its Related Parties) having received its pro rata share of an amount of New Common Stock equal to $7.5 million, in each case shall have occurred substantially contemporaneously with the closing of the Term Loan Facility);

- the Pre-Petition ABL Credit Agreement shall have been replaced with a new credit agreement providing asset-based

UST-1313

lending facilities for working capital and other general corporate purposes of the Borrowers and its subsidiaries on terms and conditions reasonably acceptable to the Required Consenting Stakeholders (any such credit agreement, the "**Exit ABL Credit Agreement**", and the facility in place as of the Effective Date under either the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, the "**Exit ABL Facility**");

- (i) with respect to Catherine's business segment either completion of a liquidation or consummation of a sale transaction as a going concern to a third party on terms satisfactory to the Required Consenting Stakeholders, and (ii) with respect to the Justice business segment, either completion of a liquidation, consummation of a sale transaction as a going concern to a third party or consummation of a reorganization of the business segment, in each case on terms reasonably satisfactory to the Required Consenting Stakeholders, in each case on or prior to the Effective Date;

- minimum pro forma Liquidity (as defined in the DIP Term Facility), calculated after giving effect to the restructuring transactions and effectiveness of the Plan, of at least $150 million (pro forma for the occurrence of the Effective Date and related transactions, including after taking into account all restructuring expenses (including professional fees) that are paid post emergence and the availability of the Exit ABL Facility and any incurrence of loans thereunder);

- with respect to store leases which are not rejected, aggregate annual cost savings for FY2020 of at least $18 million, calculated in a manner consistent with how "Occupancy Cost Savings" are calculated in the Real Estate Services Agreement dated as of May 1, 2020 by and between A&G Realty Partners, LLC and the Parent Borrower;

- with respect to the Premium segment and Lane Bryant (in aggregate), the number of store closures that shall have occurred prior to the Effective Date shall be consistent with the closures anticipated under the Company's business plan provided to the Ad Hoc Committee Advisors (as determined by the Ad Hoc Committee Advisors in their reasonable discretion) or as otherwise consented to by the Required Consenting Stakeholders;

9

UST-1314

- all pre-Petition transfers of intellectual property to the LuxCo Entities shall have been unwound and all licensing arrangements with respect thereto shall have been cancelled, in each case on terms reasonably satisfactory to the Required Consenting Stakeholders and all such intellectual property shall be owned and registered in the name of Annco, Inc., unless the Required Consenting Stakeholders and the Company mutually agree that the cost, difficulty, burden or consequences of such transfer and/or cancelation exceeds the practical benefits to the Lenders afforded thereby and cannot be completed in a tax efficient manner;

- the accuracy of representations and warranties in all material respects (without duplication of any materiality qualifier) on the Effective Date (except to the extent any such representation or warranty is stated to relate solely to an earlier date, in which case such representation or warranty shall be true and correct in all material respects (without duplication of any materiality qualifier) as of such earlier date; and

- the absence of the existence of any default or event of default.

| | |
|---|---|
| **Representations and Warranties:** | Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles. |
| **Affirmative Covenants:** | Usual and customary, subject to the Documentation Principles; provided that (i) financial reporting shall include (a) unaudited monthly internally generated financial statements and "flash reports", together with certain KPI reports for each banner to be agreed (with such KPI report requirement to fall away upon the Parent Borrower and its subsidiaries achieving a consolidated total leverage ratio for four (4) consecutive fiscal quarters of not more than 1.50:1.00, (b) unaudited quarterly (for all four quarters) and audited annual financial statements, (c) quarterly MD&A and (d) an annual budget, (ii) the annual lender call referenced therein shall be revised to quarterly lender calls and (iii) the Parent Borrower shall use commercially reasonable efforts to obtain credit ratings by each of Standard & Poor's Rating Services and Moody's Investors Service, Inc. prior to the Effective Date, it being understood that there shall be no obligation to maintain any particular rating at any time. |
| **Negative Covenants:** | Usual and customary, subject to the Documentation Principles and subject to customary and usual exceptions, qualifications and |

10

UST-1315

"baskets" to be mutually agreed and set forth in the Exit Credit Agreement, which shall include a customary cumulative credit basket.

**Financial Covenant:** First Out Term Loans:

- Total leverage ratio at levels to be agreed amongst the Company and the Initial Consenting Stakeholders, which shall be tested quarterly commencing at the end of the first full fiscal quarter following the Effective Date.

- Minimum liquidity covenant, which shall take into account unrestricted cash and ABL availability (based on borrowing base) at levels to be agreed amongst the Company and the Required Consenting Stakeholders, which shall be maintained at all times.

- All expenses in connection with the Chapter 11 filing shall be added back to the calculation of EBITDA (to be defined in the Definitive Documentation, subject to the Documentation Principles). Component definitions for determining total leverage ratio are to be agreed amongst the Company and the Required Consenting Stakeholders.

Last Out Term Loans: total leverage ratio, subject to a cushion relative to the First Out Term Loan levels that is acceptable to the Company and the Required Consenting Stakeholders.

**Unrestricted Subsidiaries:** None.

**Events of Default:** Usual and customary for transactions of this type, subject to the Documentation Principles and to include a full cross-default to the Exit ABL Facility. Defaults in respect of a Financial Covenant shall be subject to customary equity cure rights.

**Voting:** Usual and customary for transactions of this type, subject to the Documentation Principles and the Agreement Among Lenders, but with First Out Lenders and Last Out Lenders voting as a single class; provided that (i) there shall be no limitation on voting by lenders that are affiliates of the Borrowers and (ii) any majority lender vote shall require the affirmative vote of at least two un-affiliated institutions.

11

UST-1316

| | |
|---|---|
| **Required Lenders** | Lenders having Term Loans outstanding that, taken together, represent more than 50% of the sum of all Term Loans outstanding at such time. |
| **Intercreditor Agreement:** | Usual and customary for transactions of this type, subject to the Documentation Principles and based on that certain ABL Intercreditor Agreement, dated as of August 21, 2015, among the ABL Agent, the Term Loan Agent, and the other parties thereto, except as otherwise agreed by the Required Consenting Term Loan Lenders. |
| **Agreement Among Lenders:** | To be entered into among the lenders under the First Out Term Loan Facility, the lenders under the Last Out Term Loan Facility and the Parent Borrower or, to be set forth in the Exit Credit Agreement and to provide that, with respect to any amendment, waiver, consent or other action, including the exercise of remedies or the provision of future DIP financings, the Last Out Lenders shall vote in the same manner as the First Out Lenders, other than with respect to amendments, waivers, consents or with respect to certain economic terms which are customarily all-lender votes. |
| **Cost and Yield Protection:** | Usual and customary for transactions of this type, subject to the Documentation Principles. |
| **Defaulting Lenders:** | Usual and customary for transactions of this type, subject to the Documentation Principles. |
| **Assignments and Participations:** | Usual and customary for transactions of this type, subject to the Documentation Principles and permitting loan buy-backs and Dutch auctions on customary terms; provided that there shall be no restrictions on holdings by lenders that are affiliates of the Borrowers. |
| **Refinancing, Extension and Replacement Facilities** | Usual and customary provisions providing for the ability to refinance, extend or replace loans or any class of loans under the Term Loan Facility from time to time, in whole or part, with one or more new debt facilities. |
| **Expenses and Indemnification:** | Usual and customary for transactions of this type, subject to the Documentation Principles (including, but limited to, the reasonable fees and expenses of no more than one counsel to the Required Lenders (other than the Administrative Agent), which counsel shall be Milbank LLP, and one counsel to the Administrative Agent and one local counsel for the Required Lenders in each relevant jurisdiction (other than the Administrative Agent) and one local counsel for the Administrative agent in each relevant jurisdiction. |

12

UST-1317

| **Governing Law and Forum:** | New York. |

UST-1318

## EXHIBIT E

### Form of Joinder Agreement

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among ascena retail group, inc. and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders and agrees to be bound by the terms and conditions thereof and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date hereof.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| ABL Claims | |
| Term Loan Claims | |
| Equity Interests | |

---

[1] Capitalized terms used but not otherwise defined herein shall having the meaning given to such terms in the Agreement.

UST-1319

## EXHIBIT F

### Provision for Transfer Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among ascena retail group, inc. and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| ABL Claims | |
| Term Loan Claims | |
| Equity Interests | |
| DIP ABL Facility Claims | |
| Backstop Commitments | |
| DIP Term Facility Claims | |

---

[1] Capitalized terms used but not otherwise defined herein shall having the meaning given to such terms in the Agreement.

**Exhibit B-2**

**Amendment to the Restructuring Support Agreement**

UST-1321

*Execution Version*

### *FIRST AMENDMENT TO THE RESTRUCTURING SUPPORT AGREEMENT*

This AMENDMENT, dated September 9, 2020 (this "Amendment"), in respect of that certain Restructuring Support Agreement, dated July 23, 2020 (as amended by this Amendment, the "Restructuring Support Agreement"),[1] by and between the Company Parties and the Consenting Stakeholders party thereto, is made and entered into by:

     (a)    the Company Parties; and

     (b)    the Required Consenting Stakeholders.

The foregoing parties identified in clauses (a) and (b) are referred to collectively in this Amendment as the "Amendment Parties" and each individually as an "Amendment Party."

### *RECITALS*

**WHEREAS**, concurrently with the execution of this Amendment, the Company Parties and certain of the Consenting Stakeholders entered into that certain Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Facility Amended and Restated Backstop Commitment Letter (the "Amended Backstop Commitment Letter"), dated as of September 9, 2020 and attached hereto as **Exhibit A**;

**WHEREAS**, pursuant to this Amendment and in connection with the Amended Backstop Commitment Letter, the Amendment Parties desire that the Restructuring Support Agreement be amended to effectuate certain modifications as set forth in the Amended Backstop Commitment Letter and this Amendment;

**WHEREAS**, Section 12 of the Restructuring Support Agreement permits the modifications contemplated by this Amendment with the written consent of the Company Parties and the Required Consenting Stakeholders; and

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Amendment Party, intending to be legally bound hereby, agrees as follows:

### *AMENDMENT AND STIPULATION*

    1.    Amendment to Restructuring Support Agreement. The Amendment Parties Agree that the Restructuring Support Agreement shall be deemed amended, as follows:

       a.    Amended Backstop Commitment Letter. The Backstop Commitment Letter attached to the Restructuring Support Agreement as Exhibit C shall be replaced in its entirety Amended Backstop Commitment Letter attached as **Exhibit A** to this Amendment.

---

[1]    Capitalized terms used but not otherwise defined in this Amendment have the meanings given to such terms in the Restructuring Support Agreement or the Restructuring Term Sheet, as applicable.

UST-1322

b. <u>Definitions</u>.

i. The following definition shall be deemed inserted into the Restructuring Support Agreement:

"**Ad Hoc Group**" the ad hoc group of holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold Term Loan Claims represented by King & Spalding LLP and McGuireWoods LLP, to the extent they have executed and delivered each of the requirements set forth in Section 1(e)(y) below to counsel to the Company Parties.

ii. Clause (h) of Section 6.01 of the Restructuring Support Agreement shall be deleted and replaced in its entirety by the following:

(h) pay in full and in cash all of the accrued reasonable and documented fees, costs, and expenses of (A) the professionals and other advisors retained by the Lender Group, including such fees, costs, and expenses of (i) Greenhill, (ii) Milbank, (iii) Whiteford Taylor, and (iv) Loyens, and continue to pay such amounts as they come due and (B) King & Spalding LLP and McGuireWoods LLP, as counsel to the Ad Hoc Group, solely for the period through and including the closing date of the DIP Term Agreement, and in each case seek to pay such fees, costs, and expenses in connection with the Cash Collateral Order, DIP Financing Order, or other such appropriate order;

iii. Section 13.12 of the Restructuring Support Agreement shall be deleted and replaced in its entirety by the following:

<u>Fees and Expenses</u>. The Company Parties shall pay and reimburse all reasonable and documented fees and expenses when due (including travel costs and expenses) and all outstanding and unpaid amounts incurred in connection with the Restructuring Transactions (including, for the avoidance of doubt, all reasonable and documented fees and expenses incurred prior to the date hereof) of the attorneys, accountants, other professionals, advisors, and consultants of the Lender Group (whether incurred directly or on their behalf and regardless of whether such fees and expenses are incurred before or after the Petition Date), including the fees and expenses of Greenhill, Milbank, Whiteford Taylor, and Loyens, including all amounts payable or reimbursable under applicable fee or engagement letters (including any success or transaction fees when earned) with the Company Parties (which agreements shall not be terminated by the Company Parties before the termination of this Agreement). The Company Parties shall pay and reimburse all reasonable and documented fees and expenses incurred prior to and outstanding as of closing date of the DIP Term Agreement of King & Spalding LLP and McGuireWoods LLP in connection with their representation of the Ad Hoc Group in the Chapter 11 Cases.

UST-1323

c.      Notice Parties.  Section 13.11 of the Restructuring Support Agreement shall be deemed amended such that notices to the members of the Ad Hoc Group, in their capacities as Consenting Stakeholders, shall be provided to the addresses set forth on **Exhibit B** to this Amendment.

d.      References to Agreement.  All references to the "Agreement" in the Restructuring Support Agreement shall be deemed to refer to the Restructuring Support Agreement as amended and supplemented by this Amendment.  All references to the "Backstop Commitment Letter" in the Restructuring Support Agreement shall be deemed to refer to the Amended Backstop Commitment Letter (including all schedules thereto).

e.      Conditions Precedent.  The effectiveness of this Amendment shall be contingent upon (x) delivery and execution of signature pages hereto by each of the Amendment Parties and (y) each member of the Ad Hoc Group:

i.      executing, delivering, and releasing counterpart joinder signature pages to the Restructuring Support Agreement and this Amendment in the form of Annex A hereto to counsel to the Company Parties and the Lender Group;

ii.     executing and delivering its signature page to the DIP Term Facility on the form attached as Exhibit C hereto to counsel to the Lender Group and counsel to the agent of such DIP Term Facility;

iii.    delivering its administrative details, to the extent applicable, in form attached as Exhibit D hereto to counsel to the Lender Group and counsel to the agent of the DIP Term Facility;

iv.     delivering its IRS Form W-9 or W-8 to the extent applicable; and

v.      delivering, to the extent applicable, its: (x) Recorded Articles of Organization (if an LLC), (y) the Certificate of Limited Partnership (if an LP) or (z) the Recorded Articles of Incorporation (if a Corporation).

2.      Miscellaneous.

a.      Amendments.  The Restructuring Support Agreement (as amended by this Amendment) may be amended, modified, or supplemented, or a condition or requirement thereof may be waived, in accordance with the terms of the Restructuring Support Agreement.  This Amendment (standing alone) may be amended, modified, or supplemented, or a condition or requirement thereof may be waived, with the prior written consent of the Company Parties and the Required Consenting Stakeholders; *provided* that, if the proposed amendment, modification, supplement, or waiver has material, disproportionate, or adverse effect on any Consenting Stakeholder or Amendment Party, then such adversely affected Consenting Stakeholder's or Amendment Party's consent shall be required.

UST-1324

b.   <u>Consents and Acceptances</u>.   Where a written consent, acceptance, or approval is required pursuant to or contemplated by the Restructuring Support Agreement, the Amended Backstop Commitment Letter, or this Amendment, including a written approval by the Company and the Required Consenting Stakeholders, such written consent, acceptance, or approval shall be deemed to have occurred if, by agreement between counsel to the Amendment Parties submitting and receiving such consent, acceptance, or approval, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

c.   <u>Interpretation</u>.   On and after the Amendment Effective Date, whenever the Restructuring Support Agreement is referred to in any agreements, documents, or instruments, such reference shall be deemed to be to the Restructuring Support Agreement as amended by this Amendment.   This Amendment shall be interpreted in accordance with Section 1 and Section 13 of the Restructuring Support Agreement.   Without limitation to the foregoing, references to the Restructuring Support Agreement and this Amendment include each of their exhibits, annexes, and schedules.

d.   <u>Ratification</u>.   This Amendment constitutes a valid amendment and supplement to the Restructuring Support Agreement in accordance with its terms.

e.   <u>Governing Law; Submission to Jurisdictions.</u>   This Amendment is to be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed in such states, without giving effect to the conflict of laws principles thereof.   Each party hereto agrees that the Bankruptcy Court shall have exclusive jurisdiction over any claim or dispute arising hereunder, and each party irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court and waives any objection or argument to such jurisdiction.

[*Signature pages follow.*]

4

UST-1325

**Company Parties' Signature Page to**
**the First Amendment to the Restructuring Support Agreement**

**ASCENA RETAIL GROUP, INC.**
**AND THE OTHER COMPANY PARTIES**

By: _C. Teffner_ _____
A812CD5F749F470...

Name: Carrie W. Teffner

Authorized Signatory

UST-1326

**Company Parties' Signature Page to**
**the First Amendment to the Restructuring Support Agreement**

**ANNTAYLOR LOFT GP LUX S.À.R.L.**

By:  *Marc Crawford*
————————————————
B3D63F8C32E5472...
Name: Marc Crawford
Title: authorised signatory

**ANNTAYLOR LOFT BORROWER LUX SCS**

By:  *Marc Crawford*
————————————————
B3D63F8C32E5472...
Name: Marc Crawford
Title: authorised signatory

UST-1327

[*Signature pages of the Consenting Stakeholders on file with the Company.*]

UST-1328

**<u>EXHIBIT A</u>**

**Amended Backstop Commitment Letter**

UST-1329

September 9, 2020

PERSONAL AND CONFIDENTIAL
Ascena Retail Group, Inc.
933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attention: Dan Lamadrid

Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Facility
Amended and Restated Backstop Commitment Letter

Ladies and Gentlemen:

Ascena Retail Group, Inc. ("Ascena TopCo", "you" or "your") has (i) advised the parties listed on the signature pages hereto as Backstop Commitment Parties (each, a "Backstop Commitment Party" and, collectively, the "Backstop Commitment Parties", "we", "us" or "our"), that Ascena Topco and certain of its subsidiaries (the "Subsidiary Debtors" and, collectively with Ascena Topco, the "Debtors"), have filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), and, in connection with the foregoing, (ii) requested that the Backstop Commitment Parties agree to commit to provide a superpriority senior secured debtor-in-possession term loan credit facility for Ascena Topco under Sections 364(c) and 364(d) of the Bankruptcy Code (the "DIP Facility") consisting of (x) new money term loans (the "New Money DIP Loans") in an aggregate principal amount of $150 million and (y) term loans (the "Roll-Up DIP Loans" and, together with the New Money DIP Loans, the "DIP Loans") resulting from the conversion of the Prepetition Term Loans (as defined below) of the Prepetition Term Lenders (as defined below) that provide (themselves or through their affiliates) New Money DIP Loans (or that are assigned their Roll-Up DIP Loan allocation from a funding Prepetition Term Lender affiliate) in an aggregate amount equal to $162,342,704.17 on the Effective Date, or as otherwise set forth in the Form DIP Credit Agreement. The DIP Facility shall convert on a dollar-for-dollar basis into an exit facility (the "Exit Conversion", such converted loans, the "Exit Term Loans", and the financing provided by the Exit Term Loans, the "Exit Facility") substantially on the terms set forth in this letter (including all exhibits, annexes, and schedules hereto, the "Backstop Commitment Letter"), as well as the form Senior Secured Super-Priority Debtor-In-Possession Term Credit Agreement attached hereto as **Exhibit A** (the "Form DIP Credit Agreement") and the Exit Facility Term Sheet attached hereto as **Exhibit B** (the "Exit Facility Term Sheet"), which terms will be memorialized in a credit agreement that will govern the Exit Facility (the "Exit Facility Credit Agreement"), subject solely to the conditions set forth in the sections of Article IV of the Form DIP Credit Agreement and the "Conditions to Borrower" set forth in the Exit Facility Term Sheet, in each case, that are applicable to the relevant borrowing. Unless otherwise specified herein, all references to "$" shall refer to U.S. dollars. Capitalized terms used herein without definition shall have the meaning assigned thereto in the Form DIP Credit Agreement or the Exit Facility Term Sheet, as applicable. This Backstop Commitment Letter amends and restates in its entirety that certain letter agreement dated as of July 23, 2020 (the "Original Backstop Commitment Letter") among you and the parties listed on the signature pages thereto and upon execution hereof the Original Backstop Commitment Letter shall be of no force or effect.

1.    Backstop Commitment.

To provide assurance that the DIP Facility and the Exit Facility shall be available on the terms and conditions set forth herein, in the Form DIP Credit Agreement and the Exit Facility Term Sheet, as applicable, each Backstop Commitment Party is pleased to advise Ascena Topco of its several and not joint commitment (the "Backstop Commitment") to provide, itself or through one or more funds managed by

UST-1330

such Backstop Commitment Party, the amount of the DIP Loans and Exit Term Loans, each as set forth on **Schedule 1** hereto (as updated from time to time prior to the date that is two business days prior to the Effective Date) on the terms set forth in the Backstop Commitment Letter, subject solely to the conditions set forth in the sections of Article IV of the Form DIP Credit Agreement and the "Conditions to Borrowing" set forth in the Exit Facility Term Sheet that are applicable to the relevant borrowing. Each Backstop Commitment Party may, at its option, arrange for the Form DIP Credit Agreement or the Exit Facility Credit Agreement, if applicable, to be executed by one or more financial institutions selected by the applicable Backstop Commitment Party and reasonably acceptable to Ascena Topco (the "Fronting Lender(s)"), to act as an initial lender and to fund some or all of the Backstop Commitment Party's Backstop Commitment, in which case the applicable Backstop Commitment Party will acquire its shares of the DIP Facility and/or Exit Facility, as applicable, by assignment from the Fronting Lender(s) in accordance with the assignment provisions of the Form DIP Credit Agreement and the Exit Facility Credit Agreement, as applicable.

It is understood and agreed that the aggregate commitments under this Backstop Commitment Letter in respect of New Money DIP Loans (and the automatic conversion thereof to Exit Term Loans on the Conversion Date) are $150 million in total, subject to the Initial Allocation, as set forth in Section 2 hereof and each Backstop Commitment Party hereby agrees and commits to such automatic conversion of the New Money DIP Loans to Exit Term Loans on the Conversion Date.

2.    Initial Allocation.

Each Lender (as defined in the Prepetition Term Loan Credit Agreement, a "Prepetition Term Lender") as of the Syndication End Date (as defined below) (including the Backstop Commitment Parties) shall have the right to participate (the "Opportunity") in 50.0% of the DIP Facility and the Exit Facility, in each case based on its Pro Rata Share (as defined below). The Opportunity will be conducted on the terms and conditions set forth in syndication procedures and related documentation, which procedures and documentation shall be reasonably acceptable to the Debtors and the Backstop Commitment Parties (the "Syndication Procedures"); provided that, the Backstop Commitment Parties shall use commercially reasonable efforts to cause the Syndication Procedures to be distributed by no later than 10:00 am New York Time on the fifth Business Day following the Petition Date (or such later date as agreed by you and the Majority Backstop Commitment Parties (as defined below)). Pursuant to the Syndication Procedures, each Prepetition Term Lender electing to participate in the Opportunity shall, among other things (i) provide written notification of such election to the Ad Hoc Committee Advisors by no later than the date that is 10 Business Days after the Syndication Procedures are distributed to the Prepetition Term Lenders (the "Syndication End Date") (or such later time as reasonably agreed by the Majority Backstop Commitment Parties and you) and (ii) execute a joinder to the Restructuring Support Agreement, dated as of July 23, 2020 (the "Original Restructuring Support Agreement" and, as amended on the date hereof, the "Restructuring Support Agreement"), by and among Ascena Topco and certain of its subsidiaries and certain Prepetition Term Lenders prior to the Syndication End Date (or such later time as reasonably agreed by the Majority Backstop Commitment Parties and you) (the "Initial Allocation"); provided, that, any Backstop Commitment Party that is a Prepetition Term Lender shall (unless it elects otherwise) be deemed to have provided such notice of election to participate in the DIP Facility and the Exit Facility in respect of such holdings upon executing this Backstop Commitment Letter and the Restructuring Support Agreement. Each Prepetition Term Lender that elects to participate in the DIP Facility shall be obligated to participate in its ratable portion of the Exit Term Loans and the commitments under the Exit Facility will be "stapled to" the DIP Facility and traded in equal percentage.

"A&R Backstop Letter Effective Date" means September 9, 2020.

UST-1331

"Pro Rata Share" means with respect to each Prepetition Term Lender (x) the aggregate principal amount of Loans (as defined in the Prepetition Term Loan Credit Agreement, the "Prepetition Term Loans") held by such Prepetition Term Lender, as set forth in the register for the Prepetition Term Loan Credit Agreement on the A&R Backstop Letter Effective Date divided by (y) the aggregate principal amount of Prepetition Term Loans held by all Prepetition Term Lenders outstanding under the Prepetition Term Loan Credit Agreement at such time.

"Majority Backstop Commitment Parties" means, at any time, Backstop Commitment Parties having Backstop Commitments outstanding that, taken together, represent at least 50.01% of the sum of all Backstop Commitments outstanding at such time.

Each Backstop Commitment Party shall have the right to assign its Commitments under the DIP Facility and the Exit Facility to participating Lenders in accordance with the Initial Allocation; provided that, notwithstanding the Initial Allocation, (i) no Backstop Commitment Party shall be relieved, released or novated from its obligations hereunder (including its obligation to fund the DIP Facility on the Effective Date, subject to the satisfaction (or waiver) of the conditions set forth in Article IV of the Form DIP Credit Agreement and its obligation to convert into the Exit Facility on the Conversion Date, subject to the satisfaction (or waiver) of the conditions set forth in the Exit Facility Term Sheet) in connection with the Initial Allocation, including its Backstop Commitments, until after the Initial Allocation Date has occurred, (ii) no allocation shall become effective as between you and such Backstop Commitment Party with respect to all or any portion of such Backstop Commitment Party's Backstop Commitments in respect of the DIP Facility and the Exit Facility until after the occurrence of the Initial Allocation Date, and (iii) unless you otherwise agree in writing, each Backstop Commitment Party shall retain exclusive control over all rights and obligations with respect to its Backstop Commitments in respect of the DIP Facility and the Exit Facility, including all rights with respect to consents, modifications, supplements, waivers and amendments, until the Initial Allocation Date has occurred. Any unsubscribed portion of the Opportunity as of the A&R Backstop Letter Effective Date shall be allocated to, and funded by, the Backstop Commitment Parties based on their respective percentages set forth on Schedule 1 hereto.

Each of the parties hereto agrees to use its respective commercially reasonable efforts to assist the Administrative Agent in connection with the Initial Allocation. The Backstop Commitment Parties agree that, following the Initial Allocation, Ascena Topco and its subsidiaries and the Administrative Agent may conclusively rely on the schedule of "Post-Initial Allocation Term Loan Commitments" provided to Ascena Topco by the financial advisor for the Backstop Commitment Parties, Greenhill & Co., LLC, including the Lenders listed therein and their respective Commitments. None of Ascena Topco nor any of its affiliates nor any of their respective advisors shall be liable with respect to such schedule.

You acknowledge and agree that nothing in this Backstop Commitment Letter or the nature of our services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between any Backstop Commitment Party, the Administrative Agent or its affiliates, on the one hand, and you, your equity holders or your affiliates, on the other hand, and you waive, to the fullest extent permitted by law, any claims you may have against any Backstop Commitment Party, the Administrative Agent or its affiliates for breach of fiduciary duty or alleged breach of fiduciary duty in connection with this Backstop Commitment Letter or the transactions contemplated hereby, and agree that no Backstop Commitment Party, the Administrative Agent or affiliates of any of the foregoing will have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including your equity holders, employees or creditors. You acknowledge that the transactions contemplated hereby (including the exercise of rights and remedies hereunder) are arms'-length commercial transactions and that we and the Administrative Agent are acting as principal and in our own respective best interests. You are relying on your own experts and advisors to determine whether the transactions contemplated hereby are in your best interests and are capable of

UST-1332

evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated hereby. In addition, you acknowledge that we and the Administrative Agent may employ the services of our respective affiliates in providing certain services hereunder and may exchange with such affiliates information concerning Ascena Topco and other companies that may be the subject of the transactions contemplated hereby and such affiliates will be entitled to the benefits afforded to us and the Agents hereunder; provided, that any such affiliates receiving information concerning Ascena Topco and other companies in accordance with this paragraph shall be subject to the same confidentiality obligations provided for in this Backstop Commitment Letter (with each Backstop Commitment Party responsible for its affiliates' compliance with this paragraph).

3.    <u>Information.</u>

You hereby represent and warrant that (a) all written information concerning you and your subsidiaries and your and their respective business (other than financial projections, estimates, forecasts and budgets and other forward-looking information (collectively, the "<u>Projections</u>") and information of a general economic or industry specific nature) (the "<u>Information</u>") that has been or will be made available to us or any of our respective affiliates by or on behalf of you is or will be, when furnished and to the best of your knowledge, complete and correct in all material respects, when taken as a whole, and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to the updates provided for in the penultimate sentence of this Section 3) and (b) the Projections that have been or will be made available to us or any of our affiliates by or on behalf of you or any of your representatives have been or will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made and at the time the related Projections are made available to us or any of our affiliates (it being acknowledged that (i) such Projections are merely a prediction as to future events and are not to be viewed as facts, (ii) such Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, (iii) the actual results during the period or periods covered by any such Projections may differ significantly from the projected results, and (iv) no guarantee or assurance can be given that the projected results will be realized).  In particular, where Projections expressly or implicitly take into account the  current  market volatility and widespread impact of the COVID-19 outbreak, the extent of the impact of these developments on the Debtors' and their subsidiaries' operational and financial performance will depend on future developments, including the duration and spread of the outbreak and related governmental advisories and restrictions, and the impact of the COVID-19 outbreak on overall demand for the Debtors' and their subsidiaries' products and services, all of which are outside of the control of the Debtors or their subsidiaries, highly uncertain and cannot be predicted.  You agree that if, at any time prior to the entry of the Order approving the DIP Facility, any of the representations, warranties and covenants in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations, warranties and covenants were being made, at such subsequent time, then you will promptly supplement the Information and the Projections so that such representations, warranties and covenants would be correct in material respects; provided, for the avoidance of doubt, there will be no requirement to update previously delivered Projections to reflect new assumptions so long as the assumptions were reasonable at the time made and made available to us or any of our affiliates.  The accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the obligations of the Backstop Commitment Parties hereunder or the availability of the DIP Facility.

4.    <u>Premium.</u>

As consideration for the Backstop Commitments and agreements of the Backstop Commitment Parties set forth on Schedule 2 on the A&R Backstop Letter Effective Date under this Backstop

UST-1333

Commitment Letter and under Restructuring Support Agreement, Ascena Topco agrees to pay (or cause to be paid) to such Backstop Commitment Parties, (or, at such Backstop Commitment Party's option and upon such Related Lender's designation (which may be provided by electronic communication), its Related Lender), a non-refundable backstop premium equal to $7.5 million (the "Backstop Commitment Premium"), which shall be allocated to each such Backstop Commitment Party, in an amount equal to (1) its percentage set forth on Schedule 2 hereto on the A&R Backstop Letter Effective Date (the "Backstop Percentage"), *multiplied by* (2) the Backstop Commitment Premium, which was fully earned, nonrefundable and non-avoidable on the execution of the Original Backstop Commitment Letter and shall be payable in cash free and clear of any withholding tax upon the funding of the New Money DIP Loans on the Funding Date. Notwithstanding the foregoing, at the option of the Lenders, any or all of the Backstop Commitment Premium may instead be effected in the form of original issue discount with respect to the DIP Facility.

If a Termination Date occurs prior to the funding of the DIP Term Facility, a non-refundable aggregate premium in an amount equal to $7.5 million shall be payable in cash free and clear of any withholding tax (the "Termination Premium") on the Termination Date, which shall be allocated to each Backstop Commitment Party set forth on Schedule 2 in an amount equal to (1) its Backstop Percentage, multiplied by (2) the Termination Premium.

For the avoidance of doubt, it is understood and agreed that, notwithstanding anything to the contrary set forth herein, or in the Restructuring Support Agreement or the Restructuring Term Sheet, in the event that any of the Backstop Premium, Termination Premium or Equity Premium shall be payable, such premium (as applicable) shall only be payable to such Backstop Commitment Parties or Consenting Stakeholders (or their Affiliates or Related Parties) as are set forth on Schedule 2 hereto on the A&R Backstop Letter Effective Date and any reference to Backstop Percentage herein, or in the Restructuring Support Agreement or the Restructuring Term Sheet, shall refer to such percentages as are set forth on such Schedule 2 at such date.  As used in this paragraph, the terms "Equity Premium," "Consenting Stakeholders" and "Restructuring Term Sheet" shall have the meaning assigned thereto in the Restructuring Support Agreement.

5.      Payments and Fees

Without duplication of any amounts payable pursuant to Section 2.10 of the Form DIP Credit Agreement, the New Money DIP Loans will be subject to a commitment payment for each Lender participating in the DIP Facility in an amount of up to 2.50% of the principal amount of such Lender's New Money DIP Loans as of the Funding Date, earned upon entry of the Order and due and payable upon the Funding Date (the payment described in this sentence, the "DIP Commitment Payment").  For the avoidance of doubt, the entirety of the DIP Commitment Payment shall be treated as original issue discount with respect to the DIP Facility, and shall be subject to the withholding provisions set forth in Section 2.15 of the Form DIP Credit Agreement.

The Debtors agree to pay the fees, costs and expenses (collectively, the "Fronting Expenses") incurred in connection with the initial funding of the New Money DIP Loans by the Fronting Lender(s) and any assignments made by such Fronting Lender(s) to the Backstop Commitment Parties in connection therewith; provided that such Fronting Expenses shall not exceed 0.50% of such Fronting Lender(s)' New Money DIP Loans so funded.

6.      Conditions.

The Backstop Commitment Parties' Backstop Commitments and agreements hereunder in respect of the DIP Facility are subject solely to the satisfaction (or waiver) of the conditions precedent set forth in

UST-1334

the sections of Article IV of the Form DIP Credit Agreement that are applicable to the relevant borrowing. Subject to the Order, there are no conditions (implied or otherwise) to the Backstop Commitments hereunder in respect of the DIP Facility, and there will be no conditions (implied or otherwise) to the availability of the DIP Facility on the Effective Date or the funding of the New DIP Term Loans on the Funding Date, including compliance with the terms of this Backstop Commitment Letter or the Form DIP Credit Agreement, other than those that are expressly stated in the applicable sections of Article IV of the Form DIP Credit Agreement relevant to the availability of the DIP Facility on the Effective Date or the Funding Date, as applicable. The Backstop Commitment Parties' commitment in respect of the Exit Facility are subject to the satisfaction or waiver of the conditions precedent set forth in "Conditions to Borrowing" in the Exit Facility Term Sheet. Subject to the Order, there are no conditions (implied or otherwise) to the Backstop Commitments hereunder in respect of the Exit Facility, and there will be no conditions (implied or otherwise) to the conversion of the Exit Facility on the Conversion Date, including compliance with the terms of this Backstop Commitment Letter or the Form DIP Credit Agreement, other than those that are expressly stated in the "Conditions to Borrowing" in the Exit Facility Term Sheet.

7.    Indemnification and Expenses.

You agree to (a) indemnify and hold harmless each Backstop Commitment Party and the Administrative Agent, their respective affiliates and their and their affiliates' officers, directors, employees, agents, attorneys, accountants, advisors (including investment managers and advisers), consultants, representatives, controlling persons, members and permitted successors and assigns (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("Losses") to which any such Indemnified Person may become subject arising out of or in connection with this Backstop Commitment Letter, the DIP Facility, the Exit Facility the use of proceeds thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing, and to (b) reimburse each Backstop Commitment Party from time to time within five (5) Business Days of receipt of their reasonable demand by presentation of a summary statement for any reasonable and documented out-of-pocket legal or other expenses incurred in connection with the Cases, the DIP Facility, the Exit Facility, the enforcement of this Backstop Commitment Letter, the definitive documentation for the DIP Facility, the Exit Facility, and, in each case any ancillary documents and security arrangements in connection therewith, but no other third-party financial advisors (other than Greenhill & Co., LLC as financial advisor for the Backstop Commitment Parties) without your prior written consent; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses to the extent (a) they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's (i) gross negligence, bad faith, fraud or willful misconduct or (ii) material breach of its obligations under this Backstop Commitment Letter, or (b) they relate to a dispute solely among Indemnified Persons and not arising out of any act or omission of the Debtors or any of their respective subsidiaries (other than any claim, litigation, investigation or proceeding against the Administrative Agent in its capacity or in fulfilling its role as such).

None of you, the other Debtors, any of your or their respective subsidiaries, we nor any other Indemnified Person will be responsible or liable to one another for any indirect, special, punitive or consequential damages which may be alleged as a result of or arising out of, or in any way related to, the DIP Facility, the Exit Facility, the enforcement of this Backstop Commitment Letter, the definitive documentation for the DIP Facility or the Exit Facility, or any ancillary documents and security arrangements in connection therewith; provided that your indemnity and reimbursement obligations under this Section 6 shall not be limited by this sentence.

8.    Assignments, Amendments.

UST-1335

This Backstop Commitment Letter shall not be assignable by you or us without the prior written consent of the other parties hereto (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto, the Indemnified Persons and with respect to Section 2, Section 6 and this Section 7, the Administrative Agent, and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto, the Indemnified Persons and with respect to Section 2 and Section 6 and this Section 7, the Administrative Agent. Notwithstanding anything set forth in this Section 8 to the contrary, each Backstop Commitment Party (i) shall assign all or a portion of its Backstop Commitment to other banks, financial institutions, or institutional lenders and investors solely in connection with the Initial Allocation pursuant to Section 2 above (subject to the terms and conditions set forth therein) and (ii) may assign its respective Backstop Commitment, in whole or in part, to any Related Lender, or to any other Backstop Commitment Party. This Backstop Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by the Backstop Commitment Parties and you.

This Backstop Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Backstop Commitment Letter by facsimile or other electronic transmission (including E-Signature) shall be effective as delivery of a manually executed counterpart hereof. Section headings used herein are for convenience of reference only, are not part of this Backstop Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Backstop Commitment Letter. You acknowledge that information and documents relating to the DIP Facility and/or Exit Facility may be transmitted through the internet, e-mail or similar electronic transmission systems and that neither any Backstop Commitment Party nor any Agent, nor any of their respective affiliates, shall be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner.

This Backstop Commitment Letter supersedes all prior understandings, whether written or oral, between us with respect to the DIP Facility and the Exit Facility.

9.    Governing Law, Etc.; Jurisdiction.

THIS BACKSTOP COMMITMENT LETTER AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS BACKSTOP COMMITMENT LETTER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF THE DOMESTIC SUBSTANTIVE LAWS OF ANY OTHER STATE).

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the non-exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan in New York City, and any appellate court from any thereof and the Bankruptcy Court, in any suit, action or proceeding arising out of or relating to this Backstop Commitment Letter or the DIP Facility, and agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court, or, to the extent applicable, the Bankruptcy Court; *provided* that suit for the recognition or enforcement of any judgment obtained in any such court may be brought in any other court of competent jurisdiction, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Backstop Commitment Letter or the DIP Facility in any New York State court, in any

UST-1336

such Federal court or in Bankruptcy Court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court, and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

You hereby agree that you shall not bring any suit, action, proceeding, claim or counterclaim under this Backstop Commitment Letter or with respect to the transactions contemplated hereby in any court other than such New York State court or Federal Court of the United States of America sitting in the Borough of Manhattan in New York City. Service of any process, summons, notice or document by registered mail addressed to you at the address above shall be effective service of process against you for any suit, action or proceeding brought in any such court.

10.    Waiver of Jury Trial.

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS BACKSTOP COMMITMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

11.    Confidentiality.

This Backstop Commitment Letter is delivered to Ascena Topco on the understanding that neither this Backstop Commitment Letter nor any of its terms or substance shall be disclosed, directly or indirectly, to any other person or entity except (a) you and your officers, directors, employees, legal counsel, accountants, auditors, financial advisors, existing and prospective holders of indebtedness and their respective affiliates, representatives, officers, directors and legal counsel, in each case, who are involved in the consideration of the financing transactions contemplated hereby who have been informed by you of the confidential nature of this Backstop Commitment Letter and have agreed to treat such information confidentially, (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent not prohibited by law, to inform Backstop Commitment Parties promptly in advance thereof), (c) the office of the U.S. Trustee, any *ad-hoc* or statutorily appointed committee of unsecured creditors, and their respective representatives and professional advisors on a confidential and "need to know" basis, (d) to the Bankruptcy Court, in a redacted manner in form and substance reasonably satisfactory to the Backstop Commitment Parties, to the extent required to obtain Bankruptcy Court approval in connection with any acts or obligations to be taken pursuant to this Backstop Commitment Letter or the transactions contemplated hereby and (e) you may disclose the aggregate fee amounts contained herein, as part of pro forma information or a generic disclosure of aggregate sources and uses related to fee amounts related to the Transactions to the extent customary or required in offering or marketing materials or in any public or regulatory filing relating to the Transactions.

Each Backstop Commitment Party agrees to keep confidential, and not to publish, disclose or otherwise divulge, confidential information with respect to the transactions contemplated hereby or obtained from or on behalf of you or your respective affiliates in the course of the transactions contemplated hereby, except that the Backstop Commitment Parties shall be permitted to disclose such confidential information (a) to their affiliates and their and their affiliates' respective directors, officers, agents, employees, attorneys, accountants, auditors and advisors involved in the transactions contemplated hereby on a "need to know" basis and who are made aware of and agree to comply with the provisions of this paragraph, in each case on a confidential basis (with the Backstop Commitment Party responsible for

UST-1337

such persons' compliance with this paragraph), (b) on a confidential basis to any bona fide prospective Lender, prospective participant or swap counterparty (in accordance with the terms of the Form DIP Credit Agreement) that agrees to keep such information confidential in accordance with (x) the provisions of this paragraph (or language substantially similar to this paragraph that is reasonably acceptable to you) for your benefit or (y) other customary confidentiality language in a "click-through" arrangement, (c) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case you agree, to the extent not prohibited by law, to inform Backstop Commitment Parties promptly in advance thereof), (d) to the extent such information:  (i) becomes publicly available other than as a result of a breach of this Backstop Commitment Letter or other confidentiality obligation owed by such Backstop Commitment Party to you or your affiliates or (ii) becomes available to the Backstop Commitment Parties on a non-confidential basis from a source other than you or on your behalf that, to such Backstop Commitment Party's knowledge, is not in violation of any confidentiality obligation owed to you or your affiliates, (e) to the extent you shall have consented to such disclosure in writing (which may include through electronic means), (f) as is necessary in protecting and enforcing the Backstop Commitment Parties' rights with respect to this Backstop Commitment Letter and/or the DIP Facility, (g) to the extent independently developed by such Backstop Commitment Party or its affiliates without reliance on confidential information, (h) with respect to the existence and contents of the Form DIP Credit Agreement, in consultation with you, to the rating agencies or (i) with respect to the existence and contents of the Backstop Commitment Letter and the DIP Facility, to market data collectors or similar service providers in connection with the arrangement, administration or management of the DIP Facility and to industry trade organizations where such information with respect to the DIP Facility is customarily included in league table measurements.  The Backstop Commitment Parties' and their respective affiliates', if any, obligations under this paragraph shall terminate automatically to the extent superseded by the confidentiality provision in the Form DIP Credit Agreement upon the effectiveness thereof and, in any event, will terminate one year from the date hereof.

12.    <u>Miscellaneous</u>.

The Backstop Commitment Parties hereby notify Ascena Topco that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "<u>PATRIOT Act</u>"), it and its affiliates are required to obtain, verify and record information that identifies Ascena Topco, each other Debtor, which information includes names, addresses, tax identification numbers and other information that will allow Backstop Commitment Parties and its affiliates to identify Ascena Topco and each other Debtor in accordance with the PATRIOT Act.  This notice is given in accordance with the requirements of the PATRIOT Act and is effective for Backstop Commitment Parties and its affiliates.

Absent a change in applicable tax law or a contrary determination (as defined in Section 1313(a) of the Internal Revenue Code of 1986, as amended), each of the parties hereto agrees (i) the Backstop Commitment Premium and the Termination Premium shall be treated as premiums paid by the Debtors to the relevant Backstop Commitment Party in exchange for the issuance of a put right to Ascena Topco with respect to the DIP Facility and (ii) to not take any tax position inconsistent with the tax treatment described in clause (i).

Each of the parties hereto agrees that this Backstop Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein, including an agreement to negotiate in good faith the definitive documentation for the DIP Facility and the Exit Facility by the parties hereto in a manner consistent with this Backstop Commitment Letter, it being acknowledged and agreed that the availability of the DIP Facility and Exit Facility is subject to the conditions precedent expressly set forth in <u>Section 5</u> hereof.

UST-1338

If the foregoing correctly sets forth our agreement, please indicate Ascena Topco's acceptance of the terms of this Backstop Commitment Letter by returning to the Backstop Commitment Parties executed counterparts of this Backstop Commitment Letter not later than 11:59 p.m., New York City time, on September 10, 2020. This offer will automatically expire at such time if the Backstop Commitment Parties have not received such executed counterparts in accordance with the preceding sentence. This Backstop Commitment Letter and the Backstop Commitments and agreements hereunder shall automatically terminate on the earlier of (i) September 11, 2020, unless prior to such time the DIP Financing Order (as defined in the Restructuring Support Agreement) shall have been entered by the Bankruptcy Court, (ii) five Business Days after the Termination Date (as defined in the Restructuring Support Agreement) or the Restructuring Support Agreement otherwise ceases to be in full force and effect or (iii) five Business Days after the Outside Date (as defined in the Restructuring Support Agreement), unless prior to such time the Exit Conversion shall have occurred, in each case unless extended by agreement of you and the Majority Backstop Commitment Parties (which agreement may be evidenced by email of counsel). Notwithstanding the immediately preceding sentence, Section 4 above, as well as the indemnification and expenses, confidentiality, Initial Allocation, information, jurisdiction, governing law and waiver of jury trial provisions contained herein shall remain in full force and effect in accordance with their terms notwithstanding the termination of this Backstop Commitment Letter or the Backstop Commitment Parties' Backstop Commitments hereunder; *provided* that your obligations under this Commitment Letter, other than those pursuant to Section 4 and with respect to the Initial Allocation and confidentiality, shall automatically terminate and be superseded by the applicable provisions in the Form DIP Credit Agreement and the Exit Facility Credit Agreement, in each case, to the extent covered thereby, upon the initial funding on the Effective Date or the occurrence of the Exit Conversion, and you shall be released from all liability in connection therewith at such time.

[Signature Pages follow.]

UST-1339

*[Signature pages of the Backstop Commitment Parties on file with the Company.]*

UST-1340

**Schedule 1**

[*On file with Ascena TopCo*]

UST-1341

**Schedule 2**

[*On file with Ascena TopCo*]

UST-1342

**Exhibit A**

<u>See Attached.</u>

UST-1343

**Exhibit A – Form DIP Credit Agreement**

$312,342,704.17

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
TERM CREDIT AGREEMENT

dated as of

September [ ], 2020,

among

ASCENA RETAIL GROUP, INC.,
as Parent Borrower

ANNTAYLOR RETAIL, INC.,
as Subsidiary Borrower

The LENDERS Party Hereto

and

ALTER DOMUS (US) LLC,
as Administrative Agent

UST-1344

# TABLE OF CONTENTS

**Page**

ARTICLE I

Definitions

SECTION 1.01.    Defined Terms .................................................................................2
SECTION 1.02.    Classification of Loans and Borrowings ..................................34
SECTION 1.03.    Terms Generally ..........................................................................34
SECTION 1.04.    Accounting Terms; GAAP ........................................................35
SECTION 1.05.    Classification of Actions .............................................................35
SECTION 1.06.    Divisions .......................................................................................35

ARTICLE II

The Credits

SECTION 2.01.    Commitments ...............................................................................36
SECTION 2.02.    Loans and Borrowings ...............................................................36
SECTION 2.03.    Requests for Borrowings ............................................................37
SECTION 2.04.    Funding of Borrowings ..............................................................37
SECTION 2.05.    Interest Elections ........................................................................38
SECTION 2.06.    Termination of Commitments ....................................................39
SECTION 2.07.    Repayment of Loans; Evidence of Debt ..................................39
SECTION 2.08.    Amortization of Term Loans .....................................................40
SECTION 2.09.    Prepayment of Loans ..................................................................40
SECTION 2.10.    Fees ...............................................................................................42
SECTION 2.11.    Interest ..........................................................................................42
SECTION 2.12.    Alternate Rate of Interest ...........................................................43
SECTION 2.13.    Increased Costs ............................................................................44
SECTION 2.14.    Break Funding Payments ...........................................................45
SECTION 2.15.    Taxes .............................................................................................46
SECTION 2.16.    Payments Generally; Pro Rata Treatment; Sharing of Set-offs ...............50
SECTION 2.17.    Mitigation Obligations; Replacement of Lenders .....................52
SECTION 2.18.    [Reserved] ....................................................................................53
SECTION 2.19.    [Reserved] ....................................................................................53
SECTION 2.20.    Joint and Several Liability of the Borrowers ...........................53
SECTION 2.21.    Super-Priority Nature of Obligations and Administrative Agent's
                 Liens; Payment of Obligations ..................................................54
SECTION 2.22.    Conversion to Exit Facility Agreement ....................................55

ARTICLE III

Representations and Warranties

SECTION 3.01.    Organization; Powers ..................................................................56

i

UST-1345

SECTION 3.02. Authorization; Enforceability; Benefit to Loan Parties ............................56
SECTION 3.03. Governmental Approvals; No Conflicts ....................................................56
SECTION 3.04. Financial Condition; No Material Adverse Change....................................57
SECTION 3.05. Properties .................................................................................................57
SECTION 3.06. Litigation and Environmental Matters .....................................................57
SECTION 3.07. Compliance with Laws and Agreements ...................................................58
SECTION 3.08. Investment Company Status .....................................................................58
SECTION 3.09. Taxes .......................................................................................................58
SECTION 3.10. ERISA; Labor Matters ............................................................................59
SECTION 3.11. [Reserved] ...............................................................................................59
SECTION 3.12. Subsidiaries and Joint Ventures...............................................................59
SECTION 3.13. Insurance .................................................................................................60
SECTION 3.14. Federal Reserve Regulations....................................................................60
SECTION 3.15. [Reserved] ...............................................................................................60
SECTION 3.16. Collateral Matters....................................................................................60
SECTION 3.17. Use of Proceeds.......................................................................................60
SECTION 3.18. Approved Budget .....................................................................................61
SECTION 3.19. Chapter 11 Cases.....................................................................................61

## ARTICLE IV

### Conditions

SECTION 4.01. Conditions to Effective Date and Availability of the Term Loans ............62
SECTION 4.02 Conditions to the New Money Loan.........................................................63

## ARTICLE V

### Affirmative Covenants

SECTION 5.01. Financial Statements and Other Information .............................................64
SECTION 5.02. Notices of Material Events........................................................................67
SECTION 5.03. Collateral Obligations; Additional Subsidiaries .......................................68
SECTION 5.04. Information Regarding Collateral ..............................................................68
SECTION 5.05. Existence; Conduct of Business.................................................................69
SECTION 5.06. Payment of Obligations............................................................................70
SECTION 5.07. Maintenance of Properties ........................................................................70
SECTION 5.08. Insurance ..................................................................................................70
SECTION 5.09. Books and Records; Inspection and Rights ...............................................70
SECTION 5.10. Compliance with Laws .............................................................................71
SECTION 5.11. Bankruptcy Matters..................................................................................71
SECTION 5.12. Maintenance of Ratings ...........................................................................72
SECTION 5.13. Certain Post-Closing Collateral Obligations.............................................72
SECTION 5.14. Reserved...................................................................................................72
SECTION 5.15. Conference Calls......................................................................................72

LA\4104335.13

UST-1346

## ARTICLE VI

### Negative Covenants

SECTION 6.01.   Indebtedness; Certain Equity Securities ....................................................73
SECTION 6.02.   Liens....................................................................................................74
SECTION 6.03.   Fundamental Changes; Business Activities ...............................................76
SECTION 6.04.   Investments, Loans, Advances, Guarantees and Acquisitions..................76
SECTION 6.05.   Asset Sales ...........................................................................................78
SECTION 6.06.   Sale/Leaseback Transactions ................................................................79
SECTION 6.07.   Swap Agreements .................................................................................79
SECTION 6.08.   Restricted Payments; Certain Payments of Indebtedness .........................79
SECTION 6.09.   Transactions with Affiliates...................................................................81
SECTION 6.10.   Restrictive Agreements.........................................................................81
SECTION 6.11.   Amendment of Organizational Documents ..............................................82
SECTION 6.12.   Financial Covenants..............................................................................82
SECTION 6.13.   Accounting Changes .............................................................................83
SECTION 6.14.   Sanctions .............................................................................................83
SECTION 6.15.   Anti-Corruption Laws ...........................................................................83

## ARTICLE VII

### Events of Default

## ARTICLE VIII

### The Administrative Agent

## ARTICLE IX

### Miscellaneous

SECTION 9.01.   Notices ..................................................................................................93
SECTION 9.02.   Waivers; Amendments...........................................................................95
SECTION 9.03.   Expenses; Indemnity; Damage Waiver....................................................97
SECTION 9.04.   Successors and Assigns..........................................................................99
SECTION 9.05.   Survival...............................................................................................103
SECTION 9.06.   Counterparts; Integration; Effectiveness; Electronic Execution.............104
SECTION 9.07.   Severability.........................................................................................104
SECTION 9.08.   Right of Setoff.....................................................................................104
SECTION 9.09.   Governing Law; Jurisdiction; Consent to Service of Process.................105
SECTION 9.10.   WAIVER OF JURY TRIAL.................................................................105
SECTION 9.11.   Headings .............................................................................................106
SECTION 9.12.   Confidentiality ....................................................................................106
SECTION 9.13.   Several Obligations; Nonreliance; Violation of Law..............................106
SECTION 9.14.   USA Patriot Act Notice .......................................................................106
SECTION 9.15.   Interest Rate Limitation .......................................................................107

LA\4104335.13

UST-1347

SECTION 9.16. Release of Liens and Guarantees ..................................................107
SECTION 9.17. No Fiduciary Relationship ............................................................107
SECTION 9.18. Non-Public Information ..................................................................108
SECTION 9.19. Intercreditor Agreement .................................................................108
SECTION 9.20. Acknowledgement and Consent to Bail-In of EEA Financial
Institutions.............................................................................................109

SCHEDULE:

Schedule 2.01   —   Commitments
Schedule 3.05   —   Real Property
Schedule 3.06   —   Disclosed Matters
Schedule 3.12   —   Subsidiaries and Joint Ventures
Schedule 3.13   —   Insurance
Schedule 5.11   —   Required Milestones
Schedule 6.01   —   Pre-Petition Indebtedness
Schedule 6.02   —   Liens
Schedule 6.04   —   Investments
Schedule 6.09   —   Transactions with Affiliates
Schedule 6.10   —   Restrictive Agreements

EXHIBITS:

Exhibit A     —   Form of Assignment and Assumption
Exhibit B     —   Form of Borrowing Request
Exhibit C     —   Form of Guarantee and Collateral Agreement
Exhibit D     —   Form of Compliance Certificate
Exhibit E     —   Form of Interest Election Request
Exhibit F     —   [Reserved]
Exhibit G     —    Form of Exit Facility Term Sheet
Exhibit H-1   —   Form of U.S. Tax Certificate for Non-U.S. Lenders that are not
                  Partnerships for U.S. Federal Income Tax Purposes
Exhibit H-2   —   Form of U.S. Tax Certificate for Non-U.S. Lenders that are Partnerships
                  for U.S. Federal Income Tax Purposes
Exhibit H-3   —   Form of U.S. Tax Certificate for Non-U.S. Participants that are not
                  Partnerships for U.S. Federal Income Tax Purposes
Exhibit H-4   —   Form of U.S. Tax Certificate for Non-U.S. Participants that are
                  Partnerships for U.S. Federal Income Tax Purposes
Exhibit I     —   [Reserved]
Exhibit J     —   Form of Variance Report
Exhibit K     —   Form of Note

Annex A       —   Approved Budget

LA\4104335.13

UST-1348

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION TERM CREDIT AGREEMENT, dated as of September [ ], 2020, among ASCENA RETAIL GROUP, INC., a Delaware corporation, as debtor and debtor-in-possession (the "Parent Borrower"), ANNTAYLOR RETAIL, INC., a Florida corporation as debtor and debtor-in-possession (the "Subsidiary Borrower" and, together with the Parent Borrower, the "Borrowers" and each, a "Borrower"), the LENDERS party hereto and Alter Domus (US) LLC ("Alter Domus"), as Administrative Agent.

On July 23, 2020 (the "Petition Date"), the Borrowers and the other Loan Parties (collectively, the "Debtors", and each individually, a "Debtor") commenced voluntary cases (collectively, the "Cases" and each individually, a "Case") in the United States Bankruptcy Court for the Eastern District of Virginia Richmond Division (the "Court"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

Prior to the Petition Date, the Lenders provided financing to the Borrowers pursuant to that certain Term Credit Agreement dated as of August 21, 2015, among the Borrowers, the other Loan Parties, the Pre-Petition Lenders and Goldman Sachs Bank USA, as the Pre-Petition Agent and the other parties thereto (as amended, amended and restated, supplemented or otherwise modified from time to time through the date hereof, the "Pre-Petition Credit Agreement").

As of the Petition Date, the Pre-Petition Lenders under the Pre-Petition Credit Agreement were owed approximately $1,271,597,089 in Loans (as defined in the Pre-Petition Credit Agreement), plus interest, fees, costs and expenses and all other Pre-Petition Lender Obligations under the Pre-Petition Credit Agreement.

The Loan Document Obligations under and as defined in the Pre-Petition Credit Agreement are secured by a security interest in substantially all of the existing and after-acquired assets of the Borrowers and the other Loan Parties as more fully set forth in the Pre-Petition Loan Documents, and such security interest is perfected and, with certain exceptions, as described in the Pre-Petition Loan Documents, has priority over other security interests.

The Borrowers have requested, and, upon the terms set forth in this Agreement, the Lenders have agreed to make or be deemed to have made available to the Borrowers, a senior secured super priority term credit facility of up to $312,342,704.17 in the aggregate that is automatically convertible into a secured exit facility upon the satisfaction (or waiver) of certain conditions in the form of a term facility to be made available to the Borrowers at any time until the Maturity Date subject to the terms and conditions set forth herein (the "Term Credit Facility").

The Borrowers and other Loan Parties have agreed to secure all of their Loan Document Obligations under the Loan Documents by granting to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, a security interest in and lien upon all of their existing and after-acquired personal and real property, subject to the Intercreditor Agreement and the limitations and priorities contained in the Loan Documents and the Order.

Accordingly, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I

Definitions

SECTION 1.01.   Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABL Agent" means the Person acting as agent under the ABL Credit Agreement, in its individual capacity, and its successors.

"ABL Credit Agreement" means the Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, dated the Funding Date, among the Parent Borrower, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto and the ABL Agent, as administrative agent, as amended, restated, supplemented, modified, renewed, refunded, replaced or refinanced from time to time through the date hereof.

"ABL Lenders" means the lenders under the ABL Credit Agreement.

"ABL Priority Collateral" has the meaning set forth in the Intercreditor Agreement.

"ABR," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bears interest at a rate determined by reference to the Alternate Base Rate.

"Acceptable Plan" means a Plan of Reorganization that is consistent with the RSA and otherwise satisfactory to the Required Lenders  and the Loan Parties in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof); it being agreed that the Plan (as defined in the RSA) is an "Acceptable Plan" to the Required Lenders.

"Actual Net Cash Flow Amount" means the actual net cash flows of the Loan Parties during the relevant period of determination which corresponds to each of the Budgeted Net Cash Flow Amounts described in the line item contained in the Approved Budget across from the heading "Unlevered Operating Cash Flow, Including Restructuring".

"Ad Hoc Committee" means the ad hoc committee of Consenting Stakeholders (as defined in the RSA).

"Ad Hoc Committee Advisors" means Greenhill Partners and Milbank LLP, the advisors of the Ad Hoc Committee.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded to the nearest 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate; provided that,

2

UST-1350

notwithstanding the foregoing, in the case of the Term Loans, the Adjusted LIBO Rate shall at no time be less than 1.00% per annum.

"Administrative Agent" means Alter Domus (US) LLC, in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Administrative Agent Fee Letter" means that certain Fee Letter dated as of even date herewith between the Borrowers and Alter Domus.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" means this Senior Secured Super-Priority Debtor-In-Possession Term Credit Agreement, as modified, supplemented, amended or restated from time to time.

"Alter Domus" has the meaning set forth in the introductory paragraph hereto.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% per annum and (c) the Adjusted LIBO Rate on such day (or if such day is not a Business Day, the immediately preceding Business Day) for a deposit in dollars with a maturity of one month plus 1% per annum; provided that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the Screen Rate (or the Interpolated Screen Rate, as applicable) at approximately 11:00 a.m., London time, on such day for a deposit in dollars with a maturity of one month. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively. Notwithstanding the foregoing, in the case of the Term Loans, the Alternate Base Rate shall at no time be less than 2.00% per annum.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Parent Borrower and its Subsidiaries from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 and the UK Bribery Act 2010.

"Applicable Rate" means, for any day, with respect to any Term Loan, (i) 11.75% in the case Eurodollar Term Loans and (ii) 10.75% in the case of ABR Term Loans.

"Approved Budget" means the budget prepared by the Parent Borrower in form and substance reasonably satisfactory to the Ad Hoc Committee Advisors, it being understood and agreed that the budget in the form of Annex A and initially furnished to the Administrative Agent on or prior to the Effective Date is deemed reasonably satisfactory to the Ad Hoc Committee Advisors, as the same may be updated, modified or supplemented from time to time as provided in Section 5.01. The initial Approved Budget shall depict, on a weekly and line item

UST-1351

basis, (i) projected cash receipts, (ii) projected cash disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Loan Parties' professionals and advisors), asset sales and any other fees and expenses relating to the Loan Documents), (iii) net cash flows, (iv) Liquidity and (v) professional fees and disbursements with respect to the Loan Parties' professionals, in each case for the first thirteen (13) week period from the Effective Date, and such initial Approved Budget shall be approved by, and in form and substance reasonably satisfactory to, the Administrative Agent and the Required Lenders in their sole discretion (it being acknowledged and agreed that the initial Approved Budget attached hereto as Annex A is approved by and reasonably satisfactory to the Administrative Agent and the Required Lenders).

"Approved Fund" means any Person (other than a natural person that is engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Asset Sale" has the meaning set forth in Section 6.05.

"Asset Sale Escrow Account" means a Deposit Account in the name of the Parent Borrower subject to a blocked Control Agreement in favor of the Administrative Agent, on behalf of the Secured Parties, in which the proceeds of Asset Sales shall be deposited in accordance with Section 2.09.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee, with the consent of any Person whose consent is required by Section 9.04, and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"Automatic Stay" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"Backstop Lender" means each Lender who is party to the Commitment Letter.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of such EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as codified at 11 U.S.C. §§ 101 et seq.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Cases.

LA\4104335.13

UST-1352

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrowers" has the meaning set forth in the introductory paragraph hereto.

"Borrowing" means Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrowers for a Borrowing in accordance with Section 2.03, which shall be, in the case of any such written request, in the form of Exhibit B or any other form approved by the Administrative Agent.

"Budgeted Net Cash Flow Amount" means the amount described in the line item contained in the Approved Budget across from the heading "Unlevered Operating Cash Flow Including Restructuring", during the relevant period of determination.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP (as in effect on December 31, 2018, notwithstanding any modification or interpretative change thereto after such date and excluding the effect to any treatment of lease under Accounting Standards Codification 842 (or any other Accounting Standards Codification or Financial Accounting Standard have a similar result or effect)), the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve Out" has the meaning set forth in the Order.

"Cases" has the meaning set forth in the Recitals.

"Cash Equivalents" means:

(a)      marketable direct obligations issued or unconditionally guaranteed by the United States Government, the Government of Canada, or the UK government, or issued by an agency thereof and backed by the full faith and credit of the United States Government, the Government of Canada, or the UK government, as the case may be, in each case maturing within two years after the date of acquisition thereof;

(b)      marketable direct obligations issued by any state of the United States of America or any province of Canada, or any member of the European Union or any political subdivision of any such state or province or any public instrumentality thereof, in each case maturing within two years after the date of acquisition thereof and, at the

5

UST-1353

time of acquisition, having a rating of at least A by S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then from such other nationally recognized rating services acceptable to the Administrative Agent);

(c)       commercial paper maturing no more than one year after the date of creation thereof and, at the time of acquisition, having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then the highest rating from such other nationally recognized rating services acceptable to the Administrative Agent);

(d)       certificates of deposit or bankers acceptances denominated in US Dollars, Canadian Dollars, Sterling or Euro and maturing within one year after the date of acquisition thereof issued by any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(e)       repurchase agreements of any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(f)       overnight investments with any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(g)       other readily marketable instruments issued or sold by any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(h)       shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (a) through (g) above;

(i)       funds invested in brokerage accounts with nationally recognized brokerage houses or money market accounts; and

(j)       in the case of investments by any Foreign Subsidiary or investments made in a country outside the United States, other customarily utilized high quality investments in the country where such Foreign Subsidiary is located or in which such investment is made that would customarily constitute "cash equivalents".

"Cash Management Order" means the order of the Court entered in the Cases after the "first day" hearing on a final basis, together with all extensions, modifications and amendments

6

UST-1354

thereto, in form and substance reasonably satisfactory to the Required Lenders, which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements (as set forth in the Pre-Petition Credit Agreement) or such other arrangements as shall be reasonably acceptable to the Required Lenders in all material respects

"CFC" means (a) any Person that is a "controlled foreign corporation" within the meaning of Section 957(a) of the Code and (b) each subsidiary of any Person described in clause (a).

"CFC Holdco" means a Subsidiary with no material assets other than equity interests of one or more Foreign Subsidiaries that are CFCs.

"Change in Control" means (a) any transaction (including a merger or consolidation) the result of which is that any "person" or "group" (within the meaning of Sections 13(d) and 14(d)(2) of the Exchange Act), other than the Permitted Investor, becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act) of more than 35% of the total voting power of all classes of the voting stock of the Parent Borrower and/or warrants or options to acquire such voting stock, calculated on a fully diluted basis, and the percentage of the aggregate voting power represented by such voting stock of the Parent Borrower owned by such "person" or "group" then or at any time thereafter exceeds the percentage of the aggregate voting power represented by the voting stock of the Parent Borrower owned by the Permitted Investor or (b) during any period of 12 consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Parent Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any rule, regulation, treaty or other law, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted, promulgated or issued.

"Charges" has the meaning set forth in Section 9.15.

UST-1355

"Claim" means any (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means (a) means, collectively, all of the real, personal and mixed property (including Equity Interests) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Loan Document Obligations, and (b) the "DIP Collateral" referred to in the Order, it being understood that "Collateral" shall include all such "DIP Collateral" irrespective of whether any such property was excluded pursuant to the Pre-Petition Loan Documents.

"Collateral Agreement" means the Guarantee and Collateral Agreement among the Borrowers, the other Loan Parties and the Administrative Agent, substantially in the form of Exhibit C, together with all supplements thereto.

"Collateral and Guarantee Requirement" means, at any time, the requirement that:

(a)  the Administrative Agent shall have received from the Borrowers and each Designated Subsidiary (a) either (i) a counterpart of the Collateral Agreement, duly executed and delivered on behalf of such Person, or (ii) in the case of any Person that becomes a Designated Subsidiary after the Effective Date, a supplement to the Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Person, together with such documents with respect to such Designated Subsidiary as may reasonably be requested by the Administrative Agent and (b) an Intercreditor Acknowledgement in the form referred to in the Intercreditor Agreement, duly executed and delivered on behalf of such Person;

(b)  all Equity Interests owned by or on behalf of any Loan Party shall have been pledged pursuant to, and to the extent required by, the Collateral Agreement, including Equity Interests in any Luxembourg IP Subsidiary and any first-tier CFC or CFC Holdco, and the Administrative Agent shall, to the extent required by the Collateral Agreement, have received certificates or other instruments representing all such certificated Equity Interests, together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

(c)  all other assets, to the extent not constituting Excluded Property, shall have been pledged pursuant to, and to the extent required by, the Collateral Agreement;

(d)  all documents and instruments, including UCC financing statements, required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded to perfect the Liens intended to be created by the Collateral Documents with the priority required by the Collateral Documents shall have been filed,

8

UST-1356

registered or recorded or delivered to the Administrative Agent for filing, registration or recording;

(e)     each Loan Party shall have obtained all material consents and approvals required in connection with the execution and delivery of all Collateral Documents to which it is a party and the performance of its obligations thereunder; and

(f)     the Loan Document Obligations shall at all times be secured by a valid, binding, continuing, enforceable perfected first priority Lien on the DIP Accounts and the proceeds thereof and, on the Effective Date (or such later date as the Required Lenders may agree in its sole discretion), the Borrowers must obtain Control Agreement for the DIP Accounts.

Notwithstanding the foregoing, any Designated Subsidiary formed or acquired after the Effective Date shall not be required to comply with the foregoing requirements prior to the time specified in Section 5.03.  The foregoing definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance or, subject to the requirements of applicable law, flood insurance, legal opinions, appraisals, surveys or other deliverables with respect to, particular assets of the Loan Parties, or the provision of Guarantees by any Restricted Subsidiary, if and for so long as the Administrative Agent (acting at the direction of the Required Lenders), in consultation with the Borrowers, reasonably determines that the cost of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance or flood insurance, legal opinions, appraisals, surveys or other deliverables in respect of such assets, or providing such Guarantees, shall be excessive in view of the benefits to be obtained by the Lenders therefrom.  The Required Lenders may in their sole discretion, grant extensions of time for the creation and perfection of security interests in (including delivery of promissory notes as required by clause (c) above) or the obtaining of title insurance or, subject to the requirements of applicable law, flood insurance, legal opinions, appraisals, surveys or other deliverables with respect to particular assets or the provision of any Guarantee by any Designated Subsidiary where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Collateral Documents.

 "Collateral Documents" means the Order, Collateral Agreement, and each other document granting a Lien upon any assets of any Loan Party as security for payment of the Loan Document Obligations.

"Commitment" means, with respect to each Lender, such Lender's New Money Commitment and such Lender's Roll-Up Loans Commitment.

"Commitment Letter" means the Commitment Letter dated July 23, 2020, among the Ad Hoc Committee and the Parent Borrower, as such letter agreement may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Committee" means an official committee of unsecured creditors appointed in any of the Cases by the U.S. Trustee.

UST-1357

"Communications" means, collectively, any written notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein that is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to Section 9.01, including through the Platform.

"Compliance Certificate" means a Compliance Certificate in the form of Exhibit D or any other form approved by the Administrative Agent.

"Confirmation Order" means an order of the Court entered in the Cases pursuant to section 1129 of the Bankruptcy Code, which order (x) shall confirm an Acceptable Plan, be a final Order and otherwise be in form and substance reasonably satisfactory to the Required Lenders, together with all extensions, modifications, and amendments thereto, also in form and substance reasonably satisfactory to the Required Lenders and (y) (i) if the Term Credit Facility converts to the Exit Facility, shall authorize and approve the extensions of credit under the Exit Facility Credit Agreement and the performance of the Borrowers' (or the entities assuming and/or acquiring directly or indirectly the operations and assets of the Borrowers in the Acceptable Plan) and Guarantors' obligations thereunder, authorize a pro forma capital structure that satisfies the conditions precedent to the occurrence of the Conversion Date and otherwise satisfies all other conditions to the Conversion Date or (ii) if the Term Credit Facility is to be repaid in cash, shall authorize and approve such repayment, any financing the proceeds of which will be used to fund such repayment, and the termination in full of all outstanding obligations under the Term Credit Facility.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means, with respect to any deposit account or securities account maintained by any Loan Party, a control agreement in form and substance reasonably satisfactory to the Administrative Agent, duly executed and delivered by such Loan Party and the depositary bank or the securities intermediary, as the case may be, with which such account is maintained.

"Conversion Date" means the date upon which each of the conditions precedent to effectiveness of the Exit Facility Agreement set forth in the Exit Facility Term Sheet shall have been satisfied or waived.

"Court" has the meaning set forth in the Recitals.

"Cumulative Four-Week Period" means the four-week period up to and through the Saturday of the week most recently ended prior to the applicable Variance Report Date, or if a four-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Saturday of the most recent week then ended.

"Debtor" has the meaning set forth in the Recitals.

"Debtors' Investment Banker" means Guggenheim Securities, LLC.

UST-1358

"Declined Proceeds" has the meaning set forth in Section 2.09(d).

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" means (i) in the case of overdue principal of any Loan, 2.0% per annum plus the rate otherwise applicable to such Loan as provided in Section 2.11 or (ii) in the case of any other overdue amount, 2.0% per annum plus the rate applicable to ABR Term Loans as provided in Section 2.11(a).

"Deposit Account" has the meaning set forth in the Collateral Agreement.

"Designated Jurisdiction" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"Designated Persons" means any person or entity listed on a Sanctions list.

"Designated Subsidiary" means each Subsidiary other than an Excluded Subsidiary.

"DIP Accounts" means the DIP Funding Account and the Asset Sale Escrow Account.

"DIP Funding Account" means a Deposit Account in the name of the Parent Borrower subject to a blocked Control Agreement in favor of the Administrative Agent, on behalf of the Secured Parties, in which the proceeds of the Loans shall be deposited and held on the Funding Date and used solely for the purposes set forth in Section 3.17.

"DIP Superpriority Claim" means allowed superpriority expense claims pursuant to Bankruptcy Code Sections 364(c)(1), 503 and 507 granted by the Order.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 3.06.

"Disqualified Stock" means any Equity Interests which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case at any time on or prior to the date that is 91 days after the latest Maturity Date (determined as of the date of issuance thereof or, in the case of any such Equity Interests outstanding on the date hereof, the date hereof), or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) cash, (ii) debt or (iii) any Equity Interests referred to in (a) above, in each case at any time prior to the date that is 91 days after the latest Maturity Date (determined as of the date of issuance thereof or, in the case of any such Equity Interests outstanding on the date hereof, the date hereof). Notwithstanding the foregoing, any Equity Interests that would constitute Disqualified Stock solely because holders of the Equity Interests have the right to require the issuer of such Equity Interests to repurchase such Equity Interests upon the occurrence of a change in control or an asset sale will not constitute Disqualified Stock if the

11

UST-1359

terms of such Equity Interests provide that the issuer may not repurchase or redeem any such Equity Interests pursuant to such provisions unless such repurchase or redemption is permitted under the terms of this Agreement.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary of the Parent Borrower that is organized under the laws of the United States, any state of the United States or the District of Columbia, except for a Subsidiary directly or indirectly owned by a CFC.

"EEA Financial Institution" means (a) any financial institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any member state of the European Union, Iceland, Liechtenstein and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02), which date is September [  ], 2020[1].

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person, other than, in each case, a natural person or the Parent Borrower, any Subsidiary or any other Affiliate of the Parent Borrower.

"Environment" means ambient air, indoor air, surface water, groundwater, drinking water, land surface and subsurface strata, and natural resources such as wetlands, flora and fauna.

"Environmental Laws" means all applicable federal, state, and local laws (including common law), regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and binding agreements with any Governmental Authority in each case, relating to pollution or protection of the Environment, human health and safety (to the extent related to exposure to Hazardous Materials), or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment,

---

[1] Expected to be two business days after the date the Order is approved.

UST-1360

storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"Environmental Liability" means any liability, claim, action, suit, agreement, judgment or order arising under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, including those arising from or relating to: (a) compliance or non-compliance with any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threat of Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest (other than, prior to the date of such conversion, any Indebtedness that is convertible into any such Equity Interests).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414(m) or 414(o) of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived), (b) any failure by any Plan to satisfy the minimum funding requirements of Section 412 or 430 of the Code or Section 302 or 303 of ERISA with respect to such Plan, in each case whether or not waived, or any failure by any Loan Party or any ERISA Affiliate to make a required contribution to a Multiemployer Plan, (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) a determination that any Plan is in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code), (e) the incurrence by any Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA (other than PBGC premiums due but not delinquent under Section 4007 of ERISA), (f) the receipt by any Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Section 4042 of ERISA, (g) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan; (h) a complete withdrawal or partial withdrawal by any Loan Party or any ERISA Affiliate from any Plan or Multiemployer Plan, (i) the receipt by any Loan Party or any ERISA Affiliate of any notice concerning the imposition of Withdrawal Liability, or a determination that a Multiemployer Plan is insolvent, within the meaning of Title IV of ERISA, or in "endangered" or "critical" status, within the meaning of Section 305 of

13

UST-1361

ERISA or Section 432 of the Code, (j) a failure by any Loan Party or any ERISA Affiliate to pay when due (after expiration of any applicable grace period) any installment payment with respect to Withdrawal Liability, (k) the imposition of a Lien upon any Loan Party or any ERISA Affiliate pursuant to Section 430(k) of the Code or Section 303(k) of ERISA, (l) the occurrence of a non-exempt "prohibited transaction" (as defined in Section 4975 of the Code or Section 406 of ERISA) with respect to which any Loan Party or any ERISA Affiliate is a "disqualified person" (within the meaning of Section 4975 of the Code) or a "party in interest" (within the meaning of Section 406 of ERISA) or could otherwise reasonably be expected to be liable or (m) any event with respect to any Foreign Plan which could reasonably be expected to result in liability to any Loan Party similar to the liability that could arise with respect to an event described in clauses (a) through (l) above.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Events of Default" has the meaning set forth in Article VII.

"Exchange Act" means the United States Securities Exchange Act of 1934.

"Excluded Deposit Account" means (a) [reserved], (b) any Deposit Account that is a zero balance disbursement account the funds in which are used solely for the payment of salaries and wages, (c) any Deposit Account that is a zero balance disbursement account the funds in which are used solely for payment of medical or insurance reimbursement, workers' compensation and similar expenses, (d) any escrow account to the extent the creation of a security interest therein would violate any agreement with a Person other than the Parent Borrower or a Subsidiary, and (e) any fiduciary or trust account.

"Excluded Property" the collective reference to:

(A)     any licenses, franchises, charters and authorizations of a Governmental Authority to the extent a security interest therein under the Loan Documents is prohibited by or would require the consent, license or approval of any Governmental Authority (except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition);

(B)     any asset if the granting of a security interest under the Loan Documents in such asset would be prohibited by any (x) law, treaty, rule or regulation (including all applicable regulations and laws regarding assignments of and security interests in, government receivables) or a court or other Governmental Authority or would require the consent, license or approval of any Governmental Authority (other than proceeds thereof, to the extent the assignment of such proceeds is effective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition and the assignment of such proceeds is not prohibited by applicable law and does not require the consent, license or approval of any Governmental Authority) or (y) contractual obligation (only to the extent such restriction is

<div style="text-align: center">14</div>

UST-1362

binding on such asset (i) on the Petition Date or (ii) on the date of the acquisition thereof and not entered into in contemplation thereof) (except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition);

        (C)    any lease, license or other agreement to the extent that a grant of a security interest therein under the Loan Documents would violate or invalidate such lease, license or agreement (except any such lease, license or agreement among Parent Borrower and its wholly-owned Subsidiaries and except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition);

        (D)    Equity Interests in any Person that is not a Subsidiary, in partnerships, in joint ventures and in non-wholly owned Subsidiaries to the extent the pledge or other granting of a security interest under the Loan Documents in such Equity Interests would be prohibited by, or require a consent or approval of unaffiliated third parties or are not permitted under, organizational or governance documents or shareholders' or similar agreements of or with respect to such Person (except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order, or other applicable law notwithstanding such prohibition);

        (E)    to the extent applicable law requires that a Subsidiary issue directors' qualifying shares, nominee shares or similar shares which are required by applicable law to be held by persons other than a Loan Party, such qualifying shares, nominee shares or similar shares held by Persons other than a Loan Party;

        (F)    any United States intent-to-use application for registration of a trademark or service mark prior to the acceptance by the United States Patent and Trademark Office of a statement of use or an amendment to allege use, to the extent and for so long as the grant of a security interest therein would impair the validity or enforceability of, or render void or voidable or result in the cancellation of, a Loan Party's right, title or interest therein or any trademark or service mark registration issued therefrom;

        (G)    "margin stock" within the meaning of Regulation U;

        (H)    Excluded Deposit Accounts; and

        (I)    proceeds in an amount not to exceed the Carve Out, if applicable, under the Order.

provided that (a) in the case of clauses 2(y), (3) and (5), such exclusion shall not apply (i) to the extent the prohibition or restriction is ineffective under Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code, the Bankruptcy Code or other applicable law or (ii) to proceeds of the assets referred to in such clause, the assignment of which is expressly deemed effective under Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code, the Bankruptcy Code or other applicable law and (b) assets described above shall no longer be "Excluded Property" upon termination of the applicable prohibition or restriction described above that caused such assets to be treated as "Excluded Property".

LA\4104335.13

UST-1363

"Excluded Subsidiary" means (a) [reserved], (b) any Foreign Subsidiary of the Parent Borrower, (c) any Subsidiary that is a direct or indirect Subsidiary of a Foreign Subsidiary of the Parent Borrower that is a CFC, (d) any CFC Holdco, (e) any Subsidiary that is prohibited or restricted by applicable law, rule or regulation or contractual obligation in existence on the Petition Date  from providing a Guarantee of the Loan Document Obligations (solely  for so long as such prohibition or restriction remains in existence) or if such Guarantee would require governmental (including regulatory) consent, approval, license or authorization unless such consent, approval, license or authorization has been received (but without obligation to seek the same), (f) [reserved], (g) [reserved], (h) [reserved], and (i) any other Restricted Subsidiary with respect to which, in the reasonable judgment of the Required Lenders (confirmed in writing by notice to the Parent Borrower), the cost or other consequences of becoming a Guarantor shall be excessive in view of the benefits to be obtained by the Lenders therefrom.  In no event shall (i) the Subsidiary Borrower be an Excluded Subsidiary or (ii) any Subsidiary of the Parent Borrower that is a "Subsidiary Loan Party" (under and as defined in the ABL Credit Agreement to the extent applicable) or that is otherwise a guarantor of, or has otherwise provided security for, the obligations under the ABL Credit Agreement(to the extent applicable) be an Excluded Subsidiary.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by such Recipient's net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed by a jurisdiction as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, such jurisdiction (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the applicable Loan or Commitment (other than an assignee pursuant to an assignment request by the Borrowers under Section 2.17(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.15, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in such Loan or Commitment or to such Lender immediately before it changed its lending office, (c) any Taxes attributable to a Lender's failure to comply with Section 2.15(e) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Exit Conversion" has the meaning set forth in Section 2.22.

"Exit Facility Agreement" means the credit agreement that is approved by the Confirmation Order and entered into on the Conversion Date consistent in all material respects with the terms set forth in the Exit Facility Term Sheet and any related schedules and exhibits attached thereto; *provided*, that such credit agreement shall have been made available to the Administrative Agent and all Lenders; provided, further, that upon the satisfaction of waiver of the conditions contemplated by Section 2.22, each Lender hereunder that is a Lender on the Conversion Date hereby authorizes the Administrative Agent to use its executed signature page to this Agreement as an executed signature page to the Exit Facility Agreement without any further action on the part of any such Lender or any other Person.

16

UST-1364

"Exit Facility Term Sheet" means the term sheet attached as Exhibit G hereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury regulations or other official administrative interpretations thereof, any agreements entered into pursuant to current Section 1471(b) of the Code (or any amended or successor version described above), and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement between a non-U.S. jurisdiction and the United States of America.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financial Officer" means, with respect to any Person, the chief financial officer, principal accounting officer, treasurer, assistant treasurer, chief restructuring officer or controller of such Person.

"Foreign Lender" means a Lender that is not a U.S. Person.

"Foreign Plan" means any defined benefit pension plan, benefit plan, fund (including any superannuation fund) or other similar program that, under the requirements of law of any jurisdiction other than the United States, is required to be funded through a trust or other funding vehicle (other than a trust or funding vehicle or any of the foregoing sponsored or maintained exclusively by a Governmental Authority) and is directly sponsored and maintained by a Loan Party primarily for the benefit of its employees who are employed and residing outside the United States.

"Foreign Subsidiary" means any Subsidiary of the Parent Borrower, other than a Domestic Subsidiary.

"Funding Date" means the date on which the conditions specified in Section 4.02 are satisfied (or waived in accordance with Section 9.02).

"GAAP" means generally accepted accounting principles in the United States of America, applied in accordance with the consistency requirements thereof.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state, local, county, provincial or otherwise, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers

17

UST-1365

or functions of or pertaining to government (including any supra-national body exercising such powers or functions, such as the European Union or the European Central Bank).

"GS Bank" means Goldman Sachs Bank USA, in its individual capacity, and its successors.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount, as of any date of determination, of any Guarantee shall be the principal amount outstanding on such date of Indebtedness or other obligation guaranteed thereby (or, in the case of (i) any Guarantee the terms of which limit the monetary exposure of the guarantor or (ii) any Guarantee of an obligation that does not have a principal amount, the maximum monetary exposure as of such date of the guarantor under such Guarantee (as determined, in the case of clause (i), pursuant to such terms or, in the case of clause (ii), reasonably and in good faith by a Financial Officer of the Parent Borrower)).

"Guarantors" means each Subsidiary of the Parent Borrower (other than any Excluded Subsidiary), in each case, until any such Subsidiary (other than the Subsidiary Borrower) is released as a Guarantor in accordance with the Loan Documents.

"Hazardous Materials" means any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any applicable Environmental Law, including, without limitation, any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos-containing materials, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances or mold.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person (excluding trade accounts payable incurred in the ordinary course of business), (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (i) current accounts payable incurred in the ordinary course of business, (ii) deferred compensation payable to directors, officers or employees of the Parent Borrower or any Restricted Subsidiary and (iii) any purchase price adjustment or earnout incurred in connection with an acquisition, except to the extent that the amount payable pursuant

18

UST-1366

to such purchase price adjustment or earnout is, or becomes, a liability on the balance sheet of the Parent Borrower in accordance with GAAP), (e) all Capital Lease Obligations and Synthetic Lease Obligations of such Person, (f) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (g) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (h) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed by such Person (but only to the extent of the lesser of (x) the amount of such Indebtedness and (y) the fair market value of such property, if such Indebtedness has not been assumed by such Person), (i) net payments that would have to be made in the event of an early termination in respect of any outstanding Swap Agreement, (j) all obligations of such Persons with respect to the redemption, repayment or repurchase of Disqualified Stock (excluding accrued dividends) and (k) all Guarantees by such Person of Indebtedness of others. The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor by contract, as a matter of law or otherwise as a result of such Person's ownership interest in or other relationship with such other Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. It is acknowledged and agreed that private label and corporate letters of credit issued by the Parent Borrower or any Subsidiary for the making of payment for the purchase of inventory in the ordinary course of business (and in respect of which no financial institution is an issuer thereof or has any disbursement obligations thereunder) do not constitute Indebtedness of the Parent Borrower or such Subsidiary.

"Indemnified Taxes" means (a) all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), all Other Taxes.

"Indemnitee" has the meaning set forth in Section 9.03(b).

"Information" has the meaning set forth in Section 9.12.

"Intercreditor Acknowledgment" means that certain Acknowledgment and Agreement, dated as of the Funding Date, by and among the Administrative Agent, the Pre-Petition Agent, the ABL Agent and the Pre-Petition ABL Agent, and acknowledged by the Loan Parties.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of August 21, 2015, among the Pre-Petition Agent, as term collateral agent, the Pre-Petition ABL Agent, as ABL collateral agent, and acknowledged by the Loan Parties, as may be supplemented and modified by the Intercreditor Acknowledgment, and as may be further amended, amended and restated, supplemented or otherwise modified and in effect from time to time.

"Interest Election Request" means a request by the Borrowers to convert or continue a Borrowing in accordance with Section 2.05, which shall be, in the case of any such written request, in the form of Exhibit E or any other form approved by the Administrative Agent.

UST-1367

"Interest Payment Date" means (a) with respect to any ABR Loan, the first Business Day of each calendar quarter and the Maturity Date applicable to such ABR Loan and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, such day or days prior to the last day of such Interest Period as shall occur at intervals of three months' duration after the first day of such Interest Period and the Maturity Date applicable to such Eurodollar Loan.

"Interest Period" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months (or, with the consent of each Lender participating therein, twelve months) thereafter, as the Borrowers may elect; provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing. For the avoidance of doubt, no Interest Period shall extend beyond the Maturity Date.

 "Interpolated Screen Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, a rate *per annum* which results from interpolating on a linear basis between (a) the Screen Rate for the longest maturity for which a Screen Rate is available that is shorter than such Interest Period and (b) the Screen Rate for the shortest maturity for which a Screen Rate is available that is longer than such Interest Period, in each case at 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"Investment" means, with respect to a specified Person, any direct or indirect acquisition or investment by such Person in any other Person, in the form of (a) the purchase or other acquisition (including without limitation by merger or otherwise) of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person  or (c) the purchase or other acquisition (in one transaction or a series of transactions, including without limitation by merger or otherwise) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, division, product or line of business of such Person.  For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made), without adjustment for subsequent changes in the value of such Investment, net of any cash return representing a return of capital with respect to such Investment.

"IRS" means the United States Internal Revenue Service.

LA\4104335.13

UST-1368

"Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that shall have ceased to be a party hereto pursuant to an Assignment and Assumption.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, a rate *per annum* equal to the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for deposits in dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period as displayed on the applicable Bloomberg screen page that displays such rate (or, in the event such rate does not appear the applicable Bloomberg screen page, on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion) at 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period (the "Screen Rate"). If no Screen Rate shall be available for a particular Interest Period but Screen Rates shall be available for maturities both longer and shorter than such Interest Period, then the LIBO Rate for such Interest Period shall be the Interpolated Screen Rate. Notwithstanding the foregoing, if the LIBO Rate, determined as provided above in this definition, would be less than zero, the LIBO Rate shall for all purposes of this Agreement be zero.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, charge, security interest or other encumbrance in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"Liquidity" means, at any time, the sum of, without duplication, (a) Availability (as defined in the Pre-Petition ABL Credit Agreement as in effect on the date hereof or, to the extent applicable, the ABL Credit Agreement as in effect on the Funding Date), (b) unrestricted cash and cash equivalents of the Parent Borrower and its Restricted Subsidiaries that would be reflected on a consolidated balance sheet of the Parent Borrower in accordance with GAAP on such date (other than the cash proceeds of any Indebtedness being incurred on such date) and (c) cash and cash equivalents of the Parent Borrower and its Restricted Subsidiaries (excluding, for the avoidance of doubt, Eligible Pledged Cash (as defined in the Pre-Petition ABL Credit Agreement as in effect on the date hereof or, to the extent applicable, the ABL Credit Agreement, as in effect on the Funding Date) to the extent duplicative) that are restricted in favor of the Administrative Agent or any Lender (or, the Pre-Petition ABL Agent or, to the extent applicable, the ABL Agent, for the benefit of the Administrative Agent pursuant to the Intercreditor Agreement) (which cash and cash equivalents may also secure other Indebtedness together with the Loan Document Obligations).

"Loan Document Obligations" means all unpaid principal of and accrued and unpaid interest on the Loans, all accrued and unpaid fees, premiums (including the Redemption Premium, if any) and all expenses, reimbursements, indemnities and other obligations of the Loan Parties to any Lender, the Administrative Agent, or any Indemnitee arising under the Loan Documents, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees,

premiums (including the Redemption Premium, if any), costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any bankruptcy or insolvency laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, premiums (including the Redemption Premium, if any), costs, expenses and indemnities are allowed claims in such proceeding.

"Loan Documents" means this Agreement, the Commitment Letter, the Collateral Agreement, the Control Agreement with respect to the DIP Accounts, the other Collateral Documents, the Intercreditor Agreement, the Intercreditor Acknowledgment, the Administrative Agent Fee Letter, the Order and, except for purposes of Section 9.02, any promissory notes delivered pursuant to Section 2.07(e).

"Loan Parties" means the Borrowers and the Guarantors.

"Loans" means the loans made by the Lenders to the Borrowers pursuant to this Agreement.

"Luxembourg IP Subsidiary" means each of (i) AnnTaylor Loft GP Lux S.à.rl. and (ii) AnnTaylor Loft Borrower Lux SCS.

"Material Adverse Effect" means a material adverse effect on (a) the results of operations, assets, business or financial condition of the Parent Borrower and the Restricted Subsidiaries, taken as a whole, excluding in any event (i) the effect of filing the Cases, the events and conditions leading up to and customarily resulting from the commencement and continuation of the Cases, the effects thereof and any action required to be taken under the Loan Documents or the Order and the Cases themselves, (ii) any matters publicly disclosed prior to the filing of the Cases and (iii) any matters or transactions disclosed, contemplated or required to be taken in any "first day" or "second day" orders, motions related thereto or in any supporting declarations thereof, (b) the ability of the Loan Parties to perform any of their monetary obligations under the Loan Documents to which it is a party or (c) the rights of or benefits available to the Administrative Agent or the Lenders under the Loan Documents; provided that in determining whether a "material adverse effect" has occurred or exists under clause (a) hereof, the impacts of COVID-19 on the results of operations, assets, business or financial condition of the Parent Borrower and the Restricted Subsidiaries will be disregarded (provided that this exception shall not apply to the extent that it is materially disproportionately adverse to the Parent Borrower and its Restricted Subsidiaries, taken as a whole, as compared to other companies in the same industry in which the Parent Borrower and its Restricted Subsidiaries operate).

"Material Indebtedness" means Indebtedness (other than the Loans and Guarantees under the Loan Documents), or obligations in respect of one or more Swap Agreements, of any one or more of the Parent Borrower and the Subsidiaries in an aggregate principal amount exceeding $10,000,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Parent Borrower or any Restricted Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Parent Borrower or such Restricted Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

UST-1370

"<u>Maturity Date</u>" means the date that is the earliest of (i) six months after the Effective Date, (ii) the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of an Acceptable Plan, (iii) the date the Court converts any of the Cases to a Chapter 7 case, (iv) the date the Court dismisses any of the Cases, (v) the date on which the Loan Parties consummate a sale of all or substantially all of the assets of the Loan Parties pursuant to section 363 of the Bankruptcy Code or otherwise, and (vi) such earlier date on which the Loans shall become due and payable by acceleration or otherwise in accordance with the terms of this Agreement and the other Loan Documents.

"<u>Maximum Rate</u>" has the meaning set forth in Section 9.15.

"<u>MNPI</u>" means material information concerning the Parent Borrower, any Subsidiary or any Affiliate of any of the foregoing or their securities that has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD under the Securities Act and the Exchange Act. For purposes of this definition, "material information" means information concerning the Parent Borrower or its Subsidiaries, or any of their respective securities, that would reasonably be expected to be material for purposes of the United States federal and state securities laws.

"<u>Moody's</u>" means Moody's Investors Service, Inc., and any successor to its rating agency business.

"<u>Multiemployer Plan</u>" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA that is or was, during the past six years, maintained or sponsored by any Loan Party or ERISA Affiliate or to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the past six years has made or been obligated to make contributions, in each case, if a liability to a Loan Party remains outstanding.

"<u>Net Proceeds</u>" means, with respect to any event, (a) the cash (which term, for purposes of this definition, shall include Cash Equivalents) proceeds (including, in the case of any casualty, condemnation or similar proceeding, insurance, condemnation or similar proceeds) received in respect of such event, including any cash received in respect of any noncash proceeds, but only as and when received, net of (b) the sum, without duplication, of (i) all actual fees and out-of-pocket expenses paid in connection with such event by the Parent Borrower and the Restricted Subsidiaries to Persons that are not Affiliates of the Parent Borrower or any Restricted Subsidiary, (ii) in the case of a sale, transfer or other disposition (including pursuant to a Sale/Leaseback Transaction or a casualty or a condemnation or similar proceeding) of an asset, the amount of all payments required to be made by the Parent Borrower and the Restricted Subsidiaries as a result of such event to repay Indebtedness (other than Loans and Indebtedness under the ABL Credit Agreement) secured by such asset on a basis prior to the Liens, if any, on such assets securing the Loan Document Obligations and (iii) the amount of all taxes paid (or reasonably estimated to be payable) by the Parent Borrower and the Restricted Subsidiaries, and the amount of any reserves established by the Parent Borrower and the Restricted Subsidiaries in accordance with GAAP to fund purchase price adjustment, indemnification and similar contingent liabilities (other than any earnout obligations) reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to the occurrence of such event (as determined reasonably and in good faith

by the chief financial officer of the Parent Borrower). For purposes of this definition, in the event any contingent liability reserve established with respect to any event as described in clause (b)(iii) above shall be reduced, the amount of such reduction shall, except to the extent such reduction is made as a result of a payment having been made in respect of the contingent liabilities with respect to which such reserve has been established, be deemed to be receipt, on the date of such reduction, of cash proceeds in respect of such event.

"New Money Commitment" means as to each Lender, its obligation to make a New Money Loan to Borrowers hereunder, expressed as an amount representing the maximum principal amount of New Money Loans to be made by such Lender under this Agreement, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption substantially in the form of Exhibit A hereto. The amount of each Lender's New Money Commitment is set forth on Schedule 2.01 under the caption "New Money Loans" or, otherwise, in the Assignment and Assumption pursuant to which such Lender shall have assumed its New Money Commitment, as the case may be. The aggregate amount of the New Money Commitments on the date hereof is $150 million.

"New Money Loans" means the loans made pursuant to Section 2.01(a).

"OFAC" means the United States Treasury Department Office of Foreign Assets Control.

"Order" means the order of the Court entered in the Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Court, which order shall be satisfactory in form and substance to the Required Lenders, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless Administrative Agent waives such requirement), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Required Lenders, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the Administrative Agent's and the Lenders' claims.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under , engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, excluding any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.17).

UST-1372

"Parent Borrower" has the meaning set forth in the introductory paragraph hereto.

"Participant Register" has the meaning set forth in Section 9.04(c)(ii).

"Participants" has the meaning set forth in Section 9.04(c)(i).

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub.L. No. 107-56 (signed into law October 26, 2001)).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"Permitted Encumbrances" means:

     (a)    Liens imposed by law for Taxes that are not yet delinquent or are being contested in compliance with Section 5.06;

     (b)    carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law (other than any Lien imposed pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code), arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.06;

     (c)    pledges and deposits made (i) in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations and (ii) in respect of letters of credit, bank guarantees or similar instruments issued for the account of the Parent Borrower or any Restricted Subsidiary in the ordinary course of business supporting obligations of the type set forth in clause (i) above or reimbursement or indemnification obligations to insurance carriers providing property, casualty or liability insurance to the Parent Borrower and its Restricted Subsidiaries;

     (d)    pledges and deposits made to secure the performance of bids, trade contracts (other than Indebtedness for borrowed money), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

     (e)    judgment liens in respect of judgments that do not constitute an Event of Default under clause (k) of Article VII;

     (f)    easements, zoning restrictions, rights-of-way, site plan agreements, development agreements, operating agreements, cross-easement agreements, reciprocal easement agreements and other encumbrances and exceptions to title on real property that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Parent Borrower or any Restricted Subsidiary or the ordinary operation of such real property;

UST-1373

(g)     customary rights of setoff upon deposits of cash in favor of banks and other depository institutions and Liens of a collecting bank arising under the UCC in respect of payment items in the course of collection;

(h)     Liens arising from precautionary UCC financing statement filings (or similar filings under applicable law) regarding operating leases or consignments, in each case arising in the ordinary course of business;

(i)     Liens representing any interest or title of a licensor, lessor or sublicensor or sublessor, or a licensee, lessee or sublicensee or sublessee, in the property subject to any lease (other than Capital Lease Obligations), license or sublicense or concession agreement permitted by this Agreement;

(j)     Liens arising in the ordinary course of business in favor of custom and forwarding agents and similar Persons in respect of imported goods and merchandise in the custody of such Persons;

(k)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(l)     Liens or rights of setoff against credit balances of the Parent Borrower or any Restricted Subsidiary with credit card issuers or credit card processors to secure obligations of the Parent Borrower or such Restricted Subsidiary, as the case may be, to any such credit card issuer or credit card processor incurred in the ordinary course of business as a result of fees and chargebacks;

(m)     Liens on Equity Interests of any joint venture (i) securing obligations of such joint venture or (ii) pursuant to the relevant joint venture agreement, in each case in existence on or prior to the Petition Date; and

(n)     other Liens that are contractual rights of set-off;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness, other than Liens referred to in clause (c) above securing letters of credit, bank guarantees or similar instruments.

"Permitted Investor" means David Jaffe (or any member of his family that is actively involved in the management of the Parent Borrower).

"Permitted Variance" means, any variance that does not violate Section 6.12(b).

"Person" or "person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the Recitals.

"Plan" means any "employee pension benefit plan," as defined in Section 3(2) of ERISA (other than a Multiemployer Plan or Foreign Plan), (a) that is subject to the provisions of Title IV

26

UST-1374

of ERISA or Section 412 of the Code or Section 302 of ERISA, and (b) (i) in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would count under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA and/or (ii) that is or was, within the past six years, maintained or sponsored by any Loan Party or ERISA Affiliate or to which any Loan Party or ERISA Affiliate makes or is obligated to make contributions, or during the past six years, has made or been obligated to make contributions, in each case of (ii) if a liability to a Loan Party remains outstanding.

"Plan of Reorganization" means a plan of reorganization with respect to the Loan Parties and their Subsidiaries pursuant to the Cases.

"Platform" has the meaning set forth in Section 9.01(d).

"Pre-Petition ABL Agent" means JPMorgan Chase Bank, N.A., as administrative agent under the Pre-Petition ABL Credit Agreement.

"Pre-Petition ABL Credit Agreement" means the Amended and Restated ABL Credit Agreement, dated as of August 21, 2015, among the Parent Borrower, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto and the Pre-Petition ABL Agent, as amended, restated, supplemented, modified, renewed, refunded, replaced (whether at maturity or thereafter) or refinanced from time to time in one or more agreements (in each case with the same or new agents, lenders or institutional investors), including any agreement adding or changing the borrower or any guarantor or extending the maturity thereof or otherwise restructuring all or any portion of the Indebtedness thereunder or increasing the amount loaned or issued thereunder or altering the maturity thereof, in each case, through the Petition Date.

"Pre-Petition Agent" means GS Bank, in its capacity as administrative agent under any of the Pre-Petition Loan Documents.

"Pre-Petition Credit Agreement" has the meaning assigned to such term in the Recitals.

"Pre-Petition Indebtedness" means the Indebtedness of the Loan Parties existing prior to the Petition Date and set forth on Schedule 6.01.

"Pre-Petition Lenders" means the lenders under the Pre-Petition Credit Agreement.

"Pre-Petition Lender Obligations" means all "Loan Document Obligations" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Loan Documents" means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Loans" means Pre-Petition Lender Obligations in respect of principal of "Loans" under, and as defined in, the Pre-Petition Credit Agreement and interest, expenses, fees, premium and other sums payable in respect thereof under the Pre-Petition Loan Documents.

"Prepayment Event" means:

27

UST-1375

(a)    any Asset Sale of the type described in clauses (j) and (k) of Section 6.05 unless such disposition results in aggregate Net Proceeds not exceeding $500,000 for any individual transactions or series of related transactions;

(b)    any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any asset of the Parent Borrower or any Restricted Subsidiary resulting in aggregate Net Proceeds exceeding $500,000; or

(c)    the incurrence by the Parent Borrower or any Restricted Subsidiary of any Indebtedness, other than any Indebtedness permitted to be incurred by Section 6.01.

"Prime Rate" means the rate of interest per annum published by The Wall Street Journal, Money Rates Section as the "Prime Rate", as in effect from time to time.  Each change in the Prime Rate shall be effective from and including the date such change is published. If the Wall Street Journal ceases publication of such rate, in such other nationally recognized financial publication of general circulation as the Administrative Agent may designate based on the Administrative Agent's reasonable determination that the rate so published is comparable to the "Prime" rate published in the Wall Street Journal.

"Private Side Lender Representatives" means, with respect to any Lender, representatives of such Lender that are not Public Side Lender Representatives.

"Public Side Lender Representatives" means, with respect to any Lender, representatives of such Lender that do not wish to receive MNPI.

"Recipient" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document.

"Redemption Premium" has the meaning set forth in Section 2.09(e).

"Register" has the meaning set forth in Section 9.04(b)(v).

"Related Lender" means with respect to any Person, an Affiliate or any fund, account or investment vehicle that is controlled, managed, advised or sub-advised by such Person, an Affiliate or the same investment manager, advisor or sub-advisor as such Person or an Affiliate of such investment manager, advisor or sub-advisor.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and of such Person's Affiliates.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the Environment or within or upon any building, structure, facility or fixture.

UST-1376

"Required Lenders" means, at any time, Lenders having aggregate Loans (or, prior to the borrowing hereunder on the date hereof, Commitments) representing more than 50.01% of the aggregate principal amount of the Loans (or, prior to the borrowing hereunder on the date hereof, the aggregate Commitments) at such time.

"Required Milestones" means the covenants set forth on Schedule 5.11.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Parent Borrower or any Restricted Subsidiary, or any payment or distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, exchange, conversion, cancellation or termination of any Equity Interests in the Parent Borrower or any Restricted Subsidiary.

"Restricted Subsidiary" means any Subsidiary of the Parent Borrower.

"Restructuring Support Agreement" or "RSA" means that certain Restructuring Support Agreement, dated as of July 23, 2020, executed and delivered by the Loan Parties and the other parties thereto, as such agreement may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Roll-up Loans" are the loans made pursuant to Section 2.01(b).

"Roll-up Loans Commitment" means, as to each Lender, its obligation to make a Loan to the Borrower pursuant to Section 2.01(b) in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 (as updated from time to time within 2 days of the Effective Date) under the caption "Roll-up Loans Commitment", as applicable. The aggregate amount of the Roll-up Loans Commitment on the date hereof is $162,342,704.17, which amount shall (i) comprise a roll-up and refinancing of the Pre-Petition Loans (including accrued but unpaid interest) approved pursuant to the Order and (ii) be deemed funded by the Lenders pursuant to Section 2.01.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"Sale/Leaseback Transaction" means an arrangement relating to property owned by the Parent Borrower or any Restricted Subsidiary whereby the Parent Borrower or such Restricted Subsidiary sells or transfers such property to any Person and the Parent Borrower or any Restricted Subsidiary leases such property, or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, from such Person or its Affiliates.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of Designated Persons maintained by OFAC, the U.S. Department of State, or by the United Nations Security Council, the European Union or any EU member state, (b) any Person

UST-1377

operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any Person or Persons described in the preceding clauses (a) and (b).

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"Screen Rate" has the meaning assigned to it in the definition of "LIBO Rate."

"SEC" means the United States Securities and Exchange Commission.

"Secured Parties" means (a) the Administrative Agent, (b) [reserved], (c) the Lenders, (d) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (e) the permitted successors and assigns of the foregoing.

"Securities Act" means the United States Securities Act of 1933.

"Specified Dispositions" means (i) the closure, sale, transfer or disposition of the Loan Parties' or their Subsidiaries' stores, leases, warehouses, distribution centers and other real property (and all fixtures and equipment in each case in connection therewith), (ii) bulk sales or other dispositions of inventory or equipment of the Loan Parties' or their Subsidiaries' and (iii) termination of leases, licenses, subleases or sublicenses, in each case, in connection therewith; provided that such Specified Dispositions are identified in writing by the Parent Borrower to the Required Lenders and agreed to by the Required Lenders, in their reasonable discretion on or prior to the Effective Date and as may be updated, supplemented or modified from time to time, as agreed to by the Required Lenders in their reasonable discretion.

"Specified Indebtedness" means any Subordinated Indebtedness and any unsecured Indebtedness or any secured Indebtedness that is not secured on a pari passu basis with the Loan Document Obligations; provided that, Indebtedness under the ABL Credit Agreement, to the extent applicable, shall constitute Specified Indebtedness solely for purposes of Section 6.08(c).

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves), expressed as a decimal, established by the Board of Governors to which the Administrative Agent is subject for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board of Governors).  Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subordinated Indebtedness" of a Person means any Indebtedness of such Person which is subordinated in right of payment to the Loan Document Obligations.

LA\4104335.13

UST-1378

"subsidiary" means, with respect to any Person (the "parent") at any date, (a) any Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date and (b) any other Person (i) of which Equity Interests representing more than 50% of the equity value or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (ii) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any direct or indirect subsidiary of the Parent Borrower (including, for the avoidance of doubt, the Subsidiary Borrower).

"Subsidiary Borrower" has the meaning set forth in the introductory paragraph hereto.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Parent Borrower or any Subsidiary shall be a Swap Agreement.

"Synthetic Lease" means, as to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for US federal income tax purposes, other than any such lease under which such Person is the lessor.

"Synthetic Lease Obligations" means, as to any Person, an amount equal to the sum, without duplication, of (a) the obligations of such Person to pay rent or other amounts under any Synthetic Lease which are attributable to principal and (b) the amount of any purchase price payment under any Synthetic Lease assuming the lessee exercises the option to purchase the leased property at the end of the lease term. For purposes of Section 6.02, a Synthetic Lease Obligation shall be deemed to be secured by a Lien on the property being leased and such property shall be deemed to be owned by the lessee.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Credit Facility" has the meaning set forth in the Recitals.

"Term Lender" means a Lender with a Commitment or an outstanding Term Loan.

"Term Loan" means a Loan made pursuant to Section 2.01.

"Term Priority Collateral" has the meaning set forth in the Intercreditor Agreement.

31

UST-1379

"Transactions" means (a) the execution, delivery and performance by the Loan Parties of this Agreement, the borrowing of the Term Loans and the use of the proceeds thereof, (b) to the extent applicable, the execution, delivery and performance by the Loan Parties of the ABL Credit Agreement, (c) the creation and perfection of the security interests provided for in the Collateral Documents, and (d) the payment of all fees, commissions, costs and expenses in connection with the foregoing.

"Type" when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the perfection of security interests created by the Collateral Documents.

"U.S. Person" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning set forth in Section 2.15(e)(ii)(B)(3).

"U.S. Trustee" means the United States Trustee applicable in the Cases.

"Variance Report" shall have the meaning assigned to such term in Section 5.01(g).

"Variance Report Date" shall have the meaning assigned to such term in Section 5.01(g).

"Variance Testing Period" shall mean the four-week calendar period up to and through the Saturday of the week most recently ended prior to the applicable Variance Report Date (provided that, the first Variance Testing Period shall include the entire period from the Petition Date through the Saturday of the week most recently ended prior to the applicable Variance Testing Period).

"wholly-owned" when used in reference to a subsidiary of any Person, means that all the Equity Interests in such subsidiary (other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable law) are owned, beneficially and of record, by such Person, another wholly-owned subsidiary of such Person or any combination thereof.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

UST-1380

SECTION 1.02.   Classification of Loans and Borrowings.  For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Type.

SECTION 1.03.   Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all real and personal, tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply), and all judgments, orders, writs and decrees, of all Governmental Authorities.  Except as otherwise provided herein and unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document (including this Agreement and the other Loan Documents) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), and all references to any statute shall be construed as referring to all rules, regulations, rulings and official interpretations promulgated or issued thereunder, (c) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof and (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement.

SECTION 1.04.   Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature used herein shall be construed in accordance with GAAP as in effect from time to time; provided that (a) if the Parent Borrower notifies the Administrative Agent in writing (including via e-mail) that the Borrowers request an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrowers that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith; provided that the Borrowers, on the one hand, and the Lenders, on the other hand, agree to negotiate in good faith with respect to any proposed amendment to eliminate or adjust for the effect of any such change in GAAP; and (b) notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed,

33

UST-1381

and all computations of amounts and ratios referred to herein shall be made, without giving effect to (i) any election under Statement of Financial Accounting Standards 159, The Fair Value Option for Financial Assets and Financial Liabilities, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of the Parent Borrower or any Restricted Subsidiary at "fair value," as defined therein, and (ii) any change in GAAP occurring after July 24, 2015 as a result of the adoption of any proposals set forth in the Proposed Accounting Standards Update, Leases (Topic 840), issued by the Financial Accounting Standards Board on August 17, 2010, or any other proposals issued by the Financial Accounting Standards Board in connection therewith, in each case if such change would require treating any lease (or similar arrangement conveying the right to use) as a capital lease where such lease (or similar arrangement) was not required to be so treated under GAAP as in effect on July 24, 2015.

SECTION 1.05.   Classification of Actions.  For purposes of determining compliance at any time with the covenants set forth in Section 6.01 and Section 6.02 (or, in each case, any defined terms used therein), in the event that the subject transaction meets the criteria of more than one of the categories of transactions permitted pursuant to the Sections (or related defined terms) in Section 6.01 and Section 6.02, the Borrowers may, in their sole discretion, classify the applicable transaction (or any portion thereof) under such Section (or defined term); it being understood that (i) the Borrowers may divide and include such transaction under one or more of the clauses of such Section (or any relevant portion thereof or of the applicable related defined term) that permit such transaction, but will not be permitted to later reclassify such transaction and (ii) notwithstanding anything in this Section 1.05 to the contrary for purposes of this Agreement, (x) Indebtedness incurred under the Pre-Petition ABL Credit Agreement and, to the extent applicable, the ABL Credit Agreement shall only be permitted to be incurred or be outstanding under Section 6.01(j) and (y) Indebtedness uncured under the Loan Documents or the Pre-Petition Loan Documents shall only be permitted to be incurred or be outstanding under Section 6.01(a).

SECTION 1.06.   Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

ARTICLE II

The Credits

SECTION 2.01.   Commitments.

(a)      Subject to the terms and conditions set forth herein and in the Order, each Lender severally and not jointly agrees to make, on the Funding Date, Loans to the Borrowers in an aggregate amount not to exceed such Lender's New Money Commitment.  The New Money Commitments in respect of the New Money Loans shall terminate automatically immediately

34

UST-1382

after the making of the New Money Loans on the Funding Date.  Proceeds of the New Money Loans shall be deposited in the DIP Funding Account and used solely as permitted herein.

(b)        Subject to the terms and conditions set forth herein and in the Order, each Lender severally and not jointly agrees to roll-up and refinance a portion of the Pre-Petition Loans held by such Lender immediately prior to the Effective Date for Roll-up Loans in an aggregate principal amount equal to its Roll-up Loans Commitment, which shall be effected by means of a "cashless roll" by each such Lender.  For the avoidance of doubt, upon the consummation of the "cashless roll", (i) the Roll-up Loans shall be deemed funded on the Effective Date, (ii) the Administrative Agent shall record the Roll-up Loans in the Register and (iii) the Administrative Agent, the Lenders and the Loan Parties each acknowledges and agrees that the Roll-up Loans Commitment shall expire upon such cashless roll-up of the Roll-up Loans on the Effective Date.

SECTION 2.02.    Loans and Borrowings.

(a)        Each Loan shall be made as part of a Borrowing consisting of Loans of the same Type made by the Lenders ratably in accordance with their respective Commitments.

(b)        Subject to Section 2.12, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrowers may request in accordance herewith.  Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrowers to repay such Loan in accordance with the terms of this Agreement.

(c)        At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate principal amount that is an integral multiple of $1,000,000 and not less than $5,000,000; provided that a Eurodollar Borrowing that results from a continuation of an outstanding Eurodollar Borrowing may be in an aggregate amount that is equal to such outstanding Borrowing.  At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate principal amount that is an integral multiple of $500,000 and not less than $1,000,000.  Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of six (or such greater number as may be agreed to by the Administrative Agent) Eurodollar Borrowings outstanding.

(d)        Notwithstanding any other provision of this Agreement, the Borrowers shall not be entitled to request, or to elect to convert to or continue, any Eurodollar Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date applicable thereto.

SECTION 2.03.    Requests for Borrowings.  To request a Borrowing, the Borrowers deliver to the Administrative Agent a Borrowing Request  (delivered by e-mail, hand or facsimile) (a) in the case of a Eurodollar Borrowing, not later than 12:00 p.m., New York City time, three Business Days before the date of the proposed Borrowing (or, such shorter period of time as may be agreed to by the Administrative Agent) or (b) in the case of an ABR Borrowing, not later than 12:00 p.m., New York City time, one Business Day before the date of the proposed Borrowing.  Each written Borrowing Request shall specify the following information in compliance with Section 2.02:

UST-1383

(i)      the aggregate amount of such Borrowing;

(ii)     the date of such Borrowing, which shall be a Business Day;

(iii)    whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv)     in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(v)      the location, number of the account and any other wiring information required by the Administrative Agent of the Borrowers to which funds are to be disbursed.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration. Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04.    Funding of Borrowings.

(a)      Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 2:00 p.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. Upon receipt of all requested funds, the Administrative Agent will make such Loans available to the Borrowers by promptly remitting the amounts so received, in like funds, by wire transfer to the DIP Funding Account.

(b)      Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, but shall have no obligation to, in reliance on such assumption, make available to the Borrowers a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (i) in the case of a payment to be made by such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of a payment to be made by the Borrowers, the interest rate applicable to ABR Loans. If the Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period. If such Lender pays such amount

36

UST-1384

to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrowers shall be without prejudice to any claim any Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

SECTION 2.05.  Interest Elections.

(a)  Each Borrowing initially shall be of the Type and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in the applicable Borrowing Request or as otherwise provided in Section 2.03.  Thereafter, the Borrowers may elect to convert such Borrowing to a Borrowing of a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section.  The Borrowers may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)  To make an election pursuant to this Section, the Borrowers shall notify the Administrative Agent of such election in writing by delivering (by e-mail, hand delivery or facsimile) an Interest Election Request to the Administrative Agent by the time that a Borrowing Request would be required under Section 2.03 if the Borrowers were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such Interest Election Request shall be irrevocable.  Each written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)  the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)  the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)  whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)  if the resulting Borrowing is to be a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration.

(c)  Promptly following receipt of an Interest Election Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

37

UST-1385

(d)     If the Borrowers fail to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be continued as a Eurodollar Borrowing for an additional Interest Period of one month. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing with respect to any Borrower, or if any other Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, has notified the Borrowers of the election to give effect to this sentence on account of such Event of Default, then, so long as such Event of Default is continuing, (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.06.     Termination of Commitments.

(a)     Unless previously terminated, the Commitments of each Lender shall automatically terminate and permanently reduce to $0 upon the making of such Lender's Loans pursuant to Section 2.01(a) and (b), as applicable.

SECTION 2.07.     Repayment of Loans; Evidence of Debt.

(a)     The Borrowers hereby unconditionally, jointly and severally, promise to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender as provided in Section 2.08.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any conflict between the accounts maintained pursuant to paragraph (b) or (c) of this Section, the accounts maintained by the Administrative Agent shall, absent manifest error, control.

(e)     Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrowers shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its

UST-1386

registered assigns) substantially in the form of Exhibit K attached hereto.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

SECTION 2.08.    Amortization of Term Loans.

(a)    [Reserved]

(b)    To the extent not previously paid, all Term Loans shall be due and payable on the Maturity Date.

(c)    [Reserved]

(d)    Prior to any repayment of any Borrowings under this Section, the Borrowers shall notify the Administrative Agent in writing of such selection not later than 12:00 p.m., New York City time, three Business Days before the scheduled date of such repayment.  Administrative Agent shall promptly notify each Lender of such repayment notification. Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing.  Repayments of Borrowings shall be accompanied by accrued interest (and premium, if any) on the amounts repaid.

SECTION 2.09.    Prepayment of Loans.

(a)    Subject to the Order and the Intercreditor Agreement, in the event that any Net Proceeds are received by or on behalf of the Parent Borrower or any Restricted Subsidiary in respect of an Asset Sale of all or substantially all of the assets of the Company and its Restricted Subsidiaries, the Borrowers shall, within three Business Days after such Net Proceeds are received, prepay Borrowings in an amount equal to 100% of such Net Proceeds subject to the requirements of Section 2.09(e), with application to the Loan Document Obligations set forth in Section 2.09(d) below; provided that any Net Proceeds in respect of ABL Priority Collateral received by the Borrowers or any Restricted Subsidiary as a result of such Asset Sale shall be applied in accordance with the Order and the Intercreditor Agreement, as applicable.

(b)    Subject to the Order and the Intercreditor Agreement, in the event and on each occasion that any Net Proceeds are received by or on behalf of the Parent Borrower or any Restricted Subsidiary in respect of any Prepayment Event (other than an Asset Sale of all or substantially all of the assets of the Company and its Restricted Subsidiaries), the Borrowers shall, on the day such Net Proceeds are received (or, in the case of a Prepayment Event described in clause (a) or (b) of the definition of "Prepayment Event," within three Business Days after such Net Proceeds are received), be deposited into the Asset Sale Escrow Account and held in the Asset Sale Escrow Account in accordance with clause (c) below; provided that in the case of a Prepayment Event described in clauses (a) or (b) of the definition thereof, any Net Proceeds in respect of ABL Priority Collateral received by the Borrowers or any Restricted Subsidiary as a result of such Prepayment Event shall be applied in accordance with the Order and the Intercreditor Agreement, as applicable.

39

UST-1387

(c)     Net Proceeds received in connection with any Prepayment Event described in clause (a) or (b) of the definition of "Prepayment Event" (other than an Asset Sale of all or substantially all of the assets of the Company and its Restricted Subsidiaries), and solely to the extent that such Net Proceeds in respect of the applicable Asset Sale constitute Term Priority Collateral, shall be deposited into the Asset Sale Escrow Account.  Notwithstanding anything to the contrary herein, Net Proceeds of any Asset Sale held in the Asset Sale Escrow Account may be used solely, (i) prior to the occurrence of the Conversion Date, to prepay the Loan Document Obligations (including, for the avoidance of doubt, the Redemption Premium) in full in cash (including, for the avoidance of doubt, on the Maturity Date) and (ii) upon the occurrence of the Conversion Date, as directed by the Borrowers.

(d)     Any optional or mandatory prepayment of Borrowings under this Section, shall be applied to reduce the principal amount of the Term Loans to be repaid on the Maturity Date. Notwithstanding the foregoing, any Lender may elect, by written notice to the Administrative Agent by not later than 3:00 p.m. New York City time, two Business Days (or such shorter period as may be established by the Administrative Agent) prior to the required prepayment date, to decline all or any portion of any prepayment of its Loans pursuant to this Section (other than an optional prepayment pursuant to paragraph (a) of this Section or a prepayment pursuant to clause (c) of the definition of "Prepayment Event," which may not be declined), in which case the aggregate amount of the payment that would have been applied to prepay Loans but was so declined shall *first*, be offered to Lenders who did not decline its pro rata share of the prepayment who may elect by written notice to the Administrative Agent by not later than 3:00 p.m. New York City time, one Business Day prior to the required prepayment date, to decline all or any portion of such offered prepayment amount and *second*, if declined by such Lenders, may be retained by the Borrowers and shall constitute "Declined Proceeds." For the avoidance of doubt, a Lender shall be deemed to have accepted any prepayment amount offered under this paragraph (d) if such Lender does not deliver a written notice to the Administrative Agent rejecting such prepayment amount in accordance with this paragraph (d).

(e)     In the event that all or any portion of the Loans are repaid or prepaid as a result of (i) [reserved], (ii) a mandatory prepayment pursuant to Section 2.09(a), solely as a result of an Asset Sale of all or substantially all of the assets of the Parent Borrower and its Restricted Subsidiaries (which, for the avoidance of doubt, includes the "Premium" and "Lane Bryant" business lines) or (iii) the repayment of the Loans on the Maturity Date, in each case prior to or without the occurrence of the Conversion Date, such repayments or prepayments will include a premium in an aggregate amount equal to 11.23% of the amount of the loans so prepaid or repaid (the foregoing premium, the "Redemption Premium").

(f)     The Borrowers shall notify the Administrative Agent in writing of any optional prepayment and, to the extent practicable, any mandatory prepayment hereunder by Borrowing, not later than 12:00 p.m., New York City time, three Business Days before the date of such prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; provided that a notice of prepayment of Borrowings pursuant to paragraph (a) of this Section may state that such notice is conditioned upon the occurrence of one or more events specified therein, in which case such notice may be revoked by the Parent Borrower (by notice to the

LA\4104335.13

UST-1388

Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest as required by Section 2.11.

(g)     Notwithstanding any provisions of this Section 2.09 to the contrary, if any prepayment would otherwise be required to be made pursuant to clause (b) of this Section 2.09, solely as it relates to the portion of such Net Proceeds generated outside of the United States, so long as (x) the applicable local law will not permit repatriation of such Net Proceeds to the United States or (y) material adverse tax consequences to the Parent Borrower or any of its Subsidiaries would result from such repatriation, such Net Proceeds so affected shall not be required to be included in the mandatory prepayments referred to in such clause (b).

SECTION 2.10.    Closing Payments, Premiums and Fees.

(a)     The Borrowers agree, jointly and severally, to pay (or cause to be paid) on the Funding Date to each Lender, a closing payment in an amount equal to 2.50% of the aggregate principal amount of such Lender's New Money Loan, which such payment may be treated as original issue discount.  The premium referenced in this clause (a) shall be fully earned on the Effective Date and due and payable in full on the date set forth above.

(b)     The Borrowers agree, jointly and severally, to pay (i) to the Administrative Agent, for its own account, fees and expenses in the amounts and payable at the times and in the manner set forth  in the Administrative Agent Fee Letter, (ii) to the Backstop Lenders, for their own account, premiums in amounts and payable at the times separately agreed upon in the Commitment Letter and (iii) to the Lenders, for their own account, premiums in amounts and payable at the times separately agreed upon in the RSA.

(c)     All amounts payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, in the case of closing payments, to the Term Lenders entitled thereto.  Amounts paid shall not be refundable under any circumstances (absent manifest error in the amount paid).

SECTION 2.11.    Interest.

(a)     The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)     The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)     During the continuance of an Event of Default (i) under clauses (a) or (b) of Article VII, the Borrowers shall pay interest on such past due amounts (after giving effect to any

41

UST-1389

applicable grace period) owing by the Borrowers hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable laws and (ii) under any other clause of Article VII, the Borrowers shall pay interest on all outstanding Loan Document Obligations owing by the Borrowers hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable laws. Accrued and unpaid interest on such amounts (including interest on past due interest) shall be due and payable upon written demand.

(d)    Accrued interest on each Loan (for ABR Loans, accrued through the last day of the prior calendar quarter) shall be payable in arrears on each Interest Payment Date for such Loan; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)    All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.12.    Alternate Rate of Interest.  (i) If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)    the Administrative Agent determines in good faith (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(b)    the Administrative Agent is advised in writing by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Eurodollar Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrowers and the Lenders as promptly as practicable and, until the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist (which notification shall be made promptly after the Administrative Agent obtains knowledge of the cessation of such circumstances), (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective, and such Borrowing shall be continued as an ABR Borrowing, and (ii) any Borrowing Request for a Eurodollar Borrowing shall be treated as a request for an ABR Borrowing.

UST-1390

(ii) If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in paragraph (i)(a) of this Section have arisen (including because the Screen Rate is not available or published on a current basis) and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in paragraph (i)(a) of this Section have not arisen but the supervisor for the administrator of the Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the Screen Rate shall no longer be used for determining interest rates for loans, then the Administrative Agent and the Company shall endeavor to establish an alternate rate of interest to the Adjusted LIBO Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans denominated in dollars in the United States at such time, and the Administrative Agent and the Company shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable; provided that if such alternate rate of interest shall be less than 1.00%, such rate shall be deemed to be 1.00% for all purposes of this Agreement. Such amendment shall become effective with the prior consent of the Required Lenders and without any further action or consent of any other party to this Agreement. Until an alternate rate of interest shall be determined in accordance with this paragraph (but, in the case of the circumstances described in clause (ii) above, only to the extent the Screen Rate for such Interest Period is not available or published at such time on a current basis), (x) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Term Loan Borrowing shall be ineffective, and such Borrowing shall be continued as an ABR Term Loan Borrowing, and (y) any Borrowing Request for a Eurodollar Term Loan Borrowing shall be treated as a request for an ABR Term Loan Borrowing.

SECTION 2.13.   Increased Costs.

(a)      If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)      impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Eurodollar Loans made by such Lender; or

(iii)      subject any Recipient to any Taxes (other than any (A) Indemnified Taxes or (B) Excluded Taxes) on or with respect to its loans, loan principal, letters of credit, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender or other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount)

UST-1391

then, from time to time upon request of such Lender or other Recipient, the Borrowers will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs or expenses incurred or reduction suffered.  Notwithstanding the foregoing, if the Parent Borrower reasonably believes that any such Taxes were not correctly or legally asserted, the applicable Recipient will use commercially reasonable efforts to cooperate with the Parent Borrower to obtain a refund of such Taxes so long as such efforts would not, in the sole determination of such Recipient exercised in good faith result in any non-reimbursable additional costs, expenses or risks or be otherwise disadvantageous to it.

(b)      If any Lender determines that any Change in Law regarding capital or liquidity requirements has had or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity), then, from time to time upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)      A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company as well as a reasonably detailed description of the occurrence giving rise to such event, as the case may be, as specified in paragraph (a) or (b) of this Section delivered to the Borrowers shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 10 Business Days after receipt thereof.

(d)      Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs or expenses incurred or reductions suffered more than 180 days prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or expenses or reductions and of such Lender's or intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or expenses or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)      Notwithstanding the above, a Lender will not demand compensation for any increased cost or reduction set forth in this Section 2.13 at any time if it is not the general practice and policy of such Lender to demand such compensation from similarly situated borrowers in similar circumstances under agreements containing provisions permitting such compensation to be claimed at such time.

SECTION 2.14.   Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan

UST-1392

other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.09(f) and is revoked in accordance therewith) or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrowers pursuant to Section 2.17, then, in any such event, the Borrowers shall compensate each Lender for the loss, cost and expense (excluding any loss of margin) attributable to such event.  Such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan (but not including the Applicable Rate applicable thereto), for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate such Lender would bid if it were to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the London interbank market.  A certificate of any Lender delivered to the Borrowers and setting forth and explaining in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

SECTION 2.15.    Taxes.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by any applicable withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.15) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by the Loan Parties.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the, option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    Evidence of Payment.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.15, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

45

UST-1393

(d)    Indemnification by the Loan Parties.  The Loan Parties shall jointly and severally indemnify each Recipient, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    Status of Lenders.  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrowers and the Administrative Agent, at the time or times reasonably requested by the Borrowers or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrowers or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.15(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)    Without limiting the generality of the foregoing:

(A)    any Lender that is a U.S. Person shall deliver to the Borrowers and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), whichever of the following is applicable (in such number of copies as shall be requested by the recipient):

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party(x) with respect to payments of interest under any Loan Document, executed

UST-1394

copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms) establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed copies of IRS Form W-8ECI (or any successor forms);

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit H-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Parent Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and that no payments in connection with any Loan Document are effectively connected with the Foreign Lender's conduct of a U.S. trade or business (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms); or

(4)    to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or a participating Lender), executed copies of IRS Form W-8IMY (or any successor forms), accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-3 or H-4, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-2 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be

47

UST-1395

prescribed by applicable law to permit the Borrowers or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA and to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered (including any specific documentation required in this Section 2.15(e)) expires or becomes obsolete or inaccurate in any respect, it shall deliver promptly to the Borrowers or Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrowers or the Administrative Agent) or promptly notify the Borrowers and the Administrative Agent in writing of its legal ineligibility to do so.

(f)     <u>Indemnification by the Lenders</u>.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(c)(ii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (f).

(g)     <u>Treatment of Certain Refunds</u>.  If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes as to which it has been indemnified pursuant to this Section 2.15 (including by the payment of additional amounts pursuant to this Section 2.15), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.15 with respect

UST-1396

to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 2.15(g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 2.15(g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 2.15(g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(h) _Defined Terms_. For the avoidance of doubt, for purposes of this Section 2.15, the term "applicable law" includes FATCA.

(i) _Issue Price_. The Borrowers and Administrative Agent shall cooperate in good faith to determine the "issue price" (within the meaning of Section 1273 of the Code) of (i) the Loans and (ii) if the Exit Conversion occurs, the loans under the Exit Facility Agreement and, in either case, shall not take any Tax reporting position inconsistent with such determination, except as otherwise required by a Change in Law or pursuant to the good faith resolution of a Tax contest

(j) _Survival_. Each party's obligations under this Section 2.15 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 2.16.  _Payments Generally; Pro Rata Treatment; Sharing of Set-offs_.

(a) The Borrowers shall make each payment required to be made by the Borrowers hereunder or under any other Loan Document on or prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, on or prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without any defense, setoff, recoupment or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to such account as may be specified by the Administrative Agent; provided that payments pursuant to Sections 2.13, 2.14, 2.15 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payment received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder or under any other Loan Document shall be due on a day that is not a Business Day, the date for payment shall be

49

UST-1397

extended to the next succeeding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments under each Loan Document shall be made in dollars.

(b)      Any reduction of the New Money Commitment shall be allocated ratably among the Lenders. If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, premiums and fees then due hereunder, such funds shall be applied towards payment of the amounts then due hereunder ratably among the parties entitled thereto, in accordance with the amounts then due to such parties.

(c)      If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall notify the Administrative Agent of such fact and shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the amount of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amounts of principal of and accrued interest on their Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement (for the avoidance of doubt, as in effect from time to time) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any Person in accordance with the terms of Section 9.04. The Borrowers consent to the foregoing and agree, to the extent the Borrowers may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against any Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrowers in the amount of such participation. For purposes of subclause (b)(i) of the definition of Excluded Taxes, a Lender that acquires a participation pursuant to this Section 2.16(c) shall be treated as having acquired such participation on the earlier date(s) on which such Lender acquired the applicable interest(s) in the Commitment(s) and/or Loan(s) to which such participation relates.

(d)      Unless the Administrative Agent shall have received written notice from the Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, but shall not be obligated to, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

UST-1398

(e)     If any Lender shall fail to make any payment required to be made by it hereunder to or for the account of the Administrative Agent, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations in respect of such payment until all such unsatisfied obligations have been discharged and/or (ii) hold any such amounts in a segregated account as cash collateral for, and apply any such amounts to, any future payment obligations of such Lender hereunder to or for the account of the Administrative Agent.

SECTION 2.17.     Mitigation Obligations; Replacement of Lenders.

(a)     If any Lender requests compensation under Section 2.13, or if the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Section 2.13 or 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby, jointly and severally, agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment and delegation.

(b)     If (i) any Lender requests compensation under Section 2.13, (ii) the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or (iii) any Lender has failed to consent to a proposed amendment, waiver, discharge or termination that under Section 9.02 requires the consent of all the Lenders (or all the affected Lenders) and with respect to which the Required Lenders shall have granted their consent, then the Borrowers may, at the Borrowers' sole expense and effort, upon notice to such Lender and the Administrative Agent by the Borrowers, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights (other than its existing rights to payments pursuant to Section 2.13 or 2.15) and obligations under this Agreement and the other Loan Documents (or, in the case of any such assignment and delegation resulting from a failure to provide a consent, all its interests, rights and obligations under this Agreement and the other Loan Documents as a Lender) to an Eligible Assignee that shall assume such obligations (which may be another Lender, if a Lender accepts such assignment and delegation); provided that (A) the Borrowers shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b)(i), which consent shall not unreasonably be withheld, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the assignee (in the case of such principal and accrued interest and fees) or the Borrowers (in the case of all other amounts), (C) in the case of any such assignment and delegation resulting from a claim for compensation under Section 2.13 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments and (D) in the case of any such assignment and delegation resulting from the failure to provide a consent, the

51

UST-1399

assignee shall have given such consent and, as a result of such assignment and delegation and any contemporaneous assignments and delegations and consents, the applicable amendment, waiver, discharge or termination can be effected.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver or consent by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation have ceased to apply.  Each party hereto agrees that an assignment and delegation required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrowers, the Administrative Agent and the assignee and that the Lender required to make such assignment and delegation need not be a party thereto.

SECTION 2.18.    [Reserved].

SECTION 2.19.    [Reserved].

SECTION 2.20.    Joint and Several Liability of the Borrowers.  The Loan Document Obligations of the Borrowers shall be joint and several in nature.  Each Borrower hereby irrevocably and unconditionally agrees that it is jointly and severally liable for all Loan Document Obligations of the Borrowers hereunder and the other Loan Documents, whether now or hereafter existing or due or to become due.  The Loan Document Obligations of the Borrowers under the Loan Documents may be enforced by the Administrative Agent and the Lenders against any Borrower or all Borrowers in any manner or order selected by the Administrative Agent or the Required Lenders in their sole discretion.  Without limiting the foregoing provisions of this Section 2.20, each Borrower acknowledges and agrees that:

(a)        its obligations under this Agreement shall remain enforceable against it even though such obligations may be unenforceable or not allowable against any Borrower during the existence of an insolvency proceeding against any Borrower or otherwise;

(b)        its obligations under this Agreement are independent of the obligations of any other Borrower, and a separate action or actions may be brought and prosecuted against it in respect of such obligations irrespective of whether any action is brought against any other Borrower or any other Borrower is joined in any such action or actions;

(c)        it hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any of all of the following: (i) any lack of validity or enforceability of this Agreement or any agreement or instrument relating thereto in respect of any other Borrower; (ii) any change in the time, manner or place of payment of, or in any other term of, all or any of the obligations of any other Borrower under or in respect of this Agreement, or any other amendment or waiver of or any consent to departure from this Agreement, in respect of any other Borrower; (iii) any change, restructuring or termination of the structure or existence of any other Borrower; (iv) the failure of any other person to execute or deliver any other agreement or the release or reduction of liability of any other person with respect to any obligations of the Borrowers under this Agreement; or (v) any other circumstance (including any statute of limitations but other than the Loan Document Obligations having been paid in full) or any existence or reliance on any representation by any other person that might otherwise constitute a defense available to, or a discharge or, any other Borrower;

52

UST-1400

(d)     its obligations under this Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any such obligations is rescinded or must otherwise be returned by any person upon the insolvency, bankruptcy or reorganization of any other Borrower, all as though such payment had not been made;

(e)     it hereby unconditionally and irrevocably waives any right to revoke its joint and several liability under the Loan Documents and acknowledges that such liability is continuing and applies to all obligations of the Borrowers under the Loan Documents, whether existing now or in the future;

(f)     in any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of the Subsidiary Borrower under this Agreement would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of the any other creditors, on account of the amount of its liability under this Agreement, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Borrower, any Loan Document or any other person be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 2.20(g) and any rights of subrogation, indemnity or reimbursement) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceedings; and

(g)     it hereby agrees that to the extent that any Borrower shall have paid more than its proportionate share of any payment made hereunder, such Borrower shall be entitled to seek and receive contribution from and against any other Borrower hereunder which has not paid its proportionate share of such payment; provided that the provisions of this Section 2.20(g) shall in no respect limit the obligations and liabilities of any Borrower to the Administrative Agent and the Lenders, and each Borrower shall remain liable to the Administrative Agent and the Lenders for the full amount hereunder; provided, however each Borrower agrees that the foregoing rights of contribution as well as any right of subrogation, indemnity or reimbursement that it may acquire or that may arise against any other Borrower due to any payment or performance made under this Agreement shall in all respects be subordinated and junior in right of payment to, and shall not be exercised by such Borrower until, all Loan Document Obligations have been paid in full.

SECTION 2.21.   Super-Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations.

(a)     The priority of Administrative Agent's Liens on the Collateral, claims and other interests shall be as set forth in the Order.

(b)     Upon the maturity (whether by acceleration or otherwise) of any of the Loan Document Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Loan Document Obligations without further application to or order of the Court.

LA\4104335.13

UST-1401

SECTION 2.22.   Conversion to Exit Facility Agreement.  The Loans shall be repaid in cash in accordance with the terms hereunder; *provided* that, notwithstanding the foregoing, upon the satisfaction or waiver by the Required Lenders of each of the conditions set forth in the "Conditions to Borrowings" section of the Exit Facility Term Sheet, automatically and without any further consent or action required by the Administrative Agent, any Lender, or any other Secured Party, the Loans shall be refinanced with loans under the Exit Facility Agreement in accordance with the Exit Facility Term Sheet (the "Exit Conversion").  Upon the Exit Conversion, (i) the Borrowers (or the entities assuming and/or acquiring directly or indirectly the operations and assets of the Borrowers in the Acceptable Plan, and each Guarantor and each entity assuming the operations and assets of each Guarantor that is a Debtor in the Acceptable Plan, to the extent such Person is required under the Exit Facility Term Sheet to continue to be a guarantor thereunder), shall assume all obligations in respect of the Loans hereunder and all other monetary obligations in respect hereof, (ii) each Loan hereunder shall be continued as and converted to a Loan under the Exit Facility Agreement, (iii) each Lender hereunder shall be a Lender under the Exit Facility Agreement and (iv) this Agreement shall terminate and be superseded and replaced in its entirety by, and deemed amended and restated in its entirety in the form of, the Exit Facility Agreement (with such changes and insertions thereto, as are reasonably satisfactory to the Administrative Agent and the Borrower, incorporated as necessary to make any technical changes necessary to effectuate the intent of this Section 2.22 and to make any changes as required in the Exit Facility Term Sheet, including to increase the facility amount and give effect to any "last out" term loans).  Notwithstanding the foregoing, all obligations of the Borrowers and the Guarantors to the Administrative Agent and the Lenders under this Agreement and any other Loan Document which are expressly stated in this Agreement or such other Loan Document as surviving such agreement's termination shall, as so specified, survive without prejudice and remain in full force and effect.  Each of the Loan Parties, the Administrative Agent and the Lenders shall take such actions and execute and deliver such agreements, instruments or other documents as the Administrative Agent may reasonably request to give effect to the provisions of this Section 2.22 and as are required to complete the schedules to the Exit Facility Agreement or other agreements contemplated thereby; *provided*, *however*, that any such action by the Administrative Agent or any of the Lenders shall not be a condition precedent to the effectiveness of the Exit Facility Agreement if and to the extent so provided in the Confirmation Order.  Each Lender hereto hereby agrees that, on the Conversion Date, (i) the Administrative Agent (in its capacity as Administrative Agent under the Exit Facility Agreement) may execute and deliver the Exit Facility Agreement (and any guaranty contemplated thereby) on its own behalf and on behalf of each such Lender and (ii) the Administrative Agent may execute and deliver the security documents contemplated by the Exit Facility Term Sheet. On the Conversion Date, the Administrative Agent shall transfer any amounts remaining in the DIP Accounts to an account designated by the Borrowers.

ARTICLE III

Representations and Warranties

Each Borrower represents and warrants to the Administrative Agent and the Lenders as follows:

LA\4104335.13

UST-1402

SECTION 3.01.   Organization; Powers.  The Parent Borrower and each Restricted Subsidiary is duly organized, validly existing and (to the extent the concept is applicable in such jurisdiction and, in the case of any Restricted Subsidiary, except where the failure to be so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect) in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to, subject to the entry of the Order, carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02.   Authorization; Enforceability; Benefit to Loan Parties.

(a)      Subject to entry of the Order, the Transactions, insofar as they are to be carried out by each Loan Party, are within such Loan Party's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational and, if required, shareholder or other equityholder action.  Subject to entry of the Order, this Agreement has been duly executed and delivered by each Borrower and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Borrower or such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(b)      Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lenders to the Borrowers hereunder.  Each Loan Party has determined that, subject to entry of the Order, the execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

SECTION 3.03.   Governmental Approvals; No Conflicts.  Except for the entry of, and pursuant to the terms of, the Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are (or will so be) in full force and effect, (b) will not violate any applicable law, including any order of any Governmental Authority, (c) will not violate the charter, by-laws or other organizational documents of the Parent Borrower or any Restricted Subsidiary, (d) will not violate or result in a default under any indenture or agreement (including the Pre-Petition ABL Credit Agreement, the ABL Credit Agreement to the extent applicable, the Pre-Petition Credit Agreement or other material instrument binding upon the Parent Borrower or any Restricted Subsidiary or any of their assets) (other than defaults arising solely as a result of the commencement of the Cases), or give rise to a right thereunder to require any payment to be made by the Parent Borrower or any Restricted Subsidiary, and (e) will not result in the creation or imposition of any Lien on any asset of the Parent Borrower or any Restricted Subsidiary, except Liens created pursuant to the Loan Documents or Liens created in connection with the Pre-Petition ABL Credit Agreement, the  ABL Credit Agreement to the extent applicable, or the Pre-Petition Credit Agreement, in the case of clauses (a) (as to the Transactions other than entry

55

UST-1403

into the Loan Documents), (b) and (d) above, except for a failure to obtain or make, violation or creation, as applicable, which individually or in the aggregate would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.04.    Financial Condition; No Material Adverse Change.

(a)    The Borrowers have heretofore furnished to the Lenders (i) the audited consolidated balance sheets and related consolidated statements of operations, comprehensive income, equity and cash flows of the Parent Borrower and its consolidated Subsidiaries as of and for the fiscal year ended August 3, 2019, and (B) the unaudited consolidated balance sheets and related consolidated statements of operations, comprehensive income and cash flows of the Parent Borrower and its consolidated Subsidiaries as of and for each of the fiscal quarters and the portions of the fiscal year ended November 2, 2019 and February 1, 2020.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)    Since the Petition Date, other than those customarily resulting from the commencement of the Cases and changes set forth in the Parent Borrower's business plan delivered to the Ad Hoc Committee prior to the Petition Date, there has been no event, development or circumstance that has had, or would reasonably be expected to have, a Material Adverse Effect.

SECTION 3.05.    Properties.

(a)    The Parent Borrower and each Restricted Subsidiary has good title to, or valid leasehold interests in, all its tangible property material to its business, except for defects in title that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect and Liens expressly permitted by Section 6.02.

(b)    (i) The Parent Borrower and each Restricted Subsidiary owns, is licensed to use, or otherwise has the right to use all trademarks, service marks, tradenames, trade dress, copyrights, patents, designs and other intellectual property material to its business, and (ii) the conduct of their respective businesses, including the use thereof by the Parent Borrower and the Restricted Subsidiaries in their respective businesses, does not infringe upon the rights of any other Person, except for any such infringements or any such failure to own, license or have the right to use that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(c)    Schedule 3.05 sets forth the address of each real property that is owned in fee by the Loan Parties as of the Effective Date.

SECTION 3.06.    Litigation and Environmental Matters.

(a)    Except for the Disclosed Matters and the Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrowers, threatened against the Parent Borrower or any Restricted

LA\4104335.13

UST-1404

Subsidiary (i) as to which there is a reasonable likelihood of an adverse determination and that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve any of the Loan Documents or the Transactions.

(b)     Except for the Disclosed Matters or matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, neither the Parent Borrower nor any Restricted Subsidiary (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

SECTION 3.07.     Compliance with Laws and Agreements.

(a)     The Parent Borrower and each Restricted Subsidiary is in compliance with all laws, including all orders of Governmental Authorities, applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except any non-compliance arising solely as a result of the commencement of the Cases or where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect (it being agreed that this Section does not apply to any law which is specifically addressed in Section 3.06(b), 3.07(b), 3.08, 3.09, 3.10 or 3.14). Except for any defaults or events of defaults arising solely as a result of the commencement of the Cases, any defaults or events of defaults arising under the Pre-Petition ABL Credit Agreement or the Pre-Petition Credit Agreement, no Event of Default has occurred and is continuing.

(b)     The Borrowers have implemented and maintain in effect policies and procedures designed to ensure compliance in all material respects by the Parent Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Parent Borrower, its Subsidiaries and their respective officers and employees and to the knowledge of the Borrowers, their respective directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects. None of (a) the Parent Borrower, any Subsidiary or, to the knowledge of the Borrowers, any of their respective directors, officers or employees, or (b) to the knowledge of the Borrowers any agent of the Parent Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Borrowing, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

SECTION 3.08.     Investment Company Status. No Loan Party is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09.     Taxes. The Parent Borrower and each Subsidiary has (a) timely filed or caused to be filed all Tax returns and reports required to have been filed, except to the extent that the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, and (b) paid or caused to be paid all Taxes required to have been paid by it (including in its capacity as withholding agent), except (i) any Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which the

LA\4104335.13

UST-1405

Parent Borrower or such Subsidiary has set aside on its books reserves with respect thereto to the extent required by GAAP or (ii) to the extent that the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. There is no current or proposed tax assessment, deficiency or other claim against the Parent Borrower or any of the Subsidiaries that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 3.10.    ERISA; Labor Matters.

(a)    Except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred or is reasonably expected to occur, (ii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, and (iii) each Plan is in compliance with the applicable provisions of ERISA, the Code and other applicable laws. On the Effective Date, the excess of the present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of preparing the audited financial statements set forth in the Borrower's most recent Annual Report on Form 10-K), as of the date of the most recent financial statements reflecting such amounts, over the fair market value of the assets of such Plan, if any, could not be reasonably expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)    Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) there are no strikes, lockouts, slowdowns or any other labor disputes against the Parent Borrower or any Restricted Subsidiary pending or, to the knowledge of the Borrowers, threatened, (ii) the hours worked by and payments made to employees of the Parent Borrower and the Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act of 1938 or any other applicable federal, state, local or foreign law dealing with such matters, (iii) all payments due from the Parent Borrower or any Restricted Subsidiary, or for which any claim may be made against the Parent Borrower or any Restricted Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Parent Borrower or such Restricted Subsidiary to the extent required by GAAP and (iv) the consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Parent Borrower or any Restricted Subsidiary is bound.

(c)    None of the Borrowers or any of their Subsidiaries is an entity deemed to hold "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA).

SECTION 3.11.    Disclosure.  No reports, financial statements, certificates or other written information (other than forward-looking information, management projections or information of a general economic or industry nature) furnished by or on behalf of the Parent Borrower or any Restricted Subsidiary to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (as modified or supplemented by other information so furnished), when delivered and taken as a whole, contains any material misstatement of fact or omits to state any material fact

58

UST-1406

necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to forecasts and projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed by them to be reasonable at the time made and at the time so furnished and, if furnished prior to the Effective Date, as of the Effective Date (it being understood that such forecasts and projections may vary from actual results and that such variances may be material).

SECTION 3.12.   Subsidiaries and Joint Ventures.   Schedule 3.12 sets forth, as of the Effective Date, the name, type of organization and jurisdiction of organization of, and the percentage of each class of Equity Interests owned by the Parent Borrower or any Subsidiary in, (a) each Subsidiary and (b) each joint venture in which the Parent Borrower or any Subsidiary owns any Equity Interests, and identifies each Designated Subsidiary.   All the issued and outstanding Equity Interests in each Subsidiary owned by any Loan Party have been (to the extent such concepts are relevant with respect to such Equity Interests) duly authorized and validly issued and are fully paid and non-assessable (except as such rights may arise under mandatory provisions of applicable statutory law that may not be waived and not as a result of any rights contained in organizational documents).   Except as set forth in Schedule 3.12, as of the Effective Date, there is no existing option, warrant, call, right, commitment or other agreement to which the Parent Borrower or any Subsidiary is a party requiring, and there are no Equity Interests in any Subsidiary outstanding that upon exercise, conversion or exchange would require, the issuance by any Subsidiary of any additional Equity Interests or other securities exercisable for, convertible into, exchangeable for or evidencing the right to subscribe for or purchase any Equity Interests in any Subsidiary.

SECTION 3.13.   Insurance.   Schedule 3.13 sets forth a description of all insurance maintained by or on behalf of the Parent Borrower and the Restricted Subsidiaries as of the Effective Date.   As of the Effective Date, all premiums due and payable in respect of such insurance have been paid.   The Borrowers believe that the insurance maintained by or on behalf of the Parent Borrower and the Restricted Subsidiaries is adequate.

SECTION 3.14.   Federal Reserve Regulations.   Neither the Parent Borrower nor any Restricted Subsidiary is principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock.   No part of the proceeds of the Loans will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, in any manner or for any purpose that would entail a violation of Regulations T, U or X of the Board of Governors.

SECTION 3.15.   [Reserved].

SECTION 3.16.   Collateral Matters.

(a)        Subject to the entry of the Order, the Collateral Agreement and the Order are effective to create in favor of the Administrative Agent (for the benefit of the Secured Parties) legal, valid, enforceable and perfected Liens on the Collateral described therein (with such priority as provided for therein).

59

UST-1407

(b)      Except for the entry of the Order, no filing or other action will be necessary to perfect such Liens.

(c)      The Order is (or will be, as applicable) effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable perfected security interest in the Collateral (with such priority as provided for in the Order (including, without limitation, with respect to the Carve Out)) without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents except to the extent set forth in such orders.

SECTION 3.17.   Use of Proceeds.  Unless otherwise agreed by the Administrative Agent (acting at the direction of the Required Lenders), the proceeds of the New Money Loans will be deposited into the DIP Funding Account and used in accordance with the terms of the Approved Budget (subject to Permitted Variances) and the terms of the Order or any other order entered into by the Court that is consistent with the RSA, the Order and this Agreement, including, without limitation (i) to pay amounts due to Lenders and the Administrative Agent hereunder and the reasonable and documented professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Administrative Agent, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby (including pursuant to such court approval), (ii) to make adequate protection payments, (iii) to fund the Carve Out, and (iv) to pay administration costs of the Cases and Claims or amounts approved by the Court in the "first day" and "second day" orders or as required under the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the proceeds of the New Money Loans may be used to prepay or repay the ABL Credit Agreement (to the extent applicable) solely to extent provided for in the Approved Budget then in effect at the date of such prepayment or repayment, and in any event in an aggregate amount during the term of this Agreement not to exceed $50,000,000.

SECTION 3.18.   Approved Budget.  The Borrowers have heretofore furnished to the Administrative Agent the initial Approved Budget.  Each Approved Budget was prepared in good faith based upon assumptions the Borrowers believed to be reasonable assumptions on the date of delivery of such Approved Budget.

SECTION 3.19.   Chapter 11 Cases.

(a)      The Cases were commenced on the Petition Date in accordance with applicable laws and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Order and (ii) the hearing for the entry of the Order. Debtors shall give, on a timely basis as specified in the Order, all notices required to be given to all parties specified in the Order.

(b)      After the entry of the Order, and pursuant to and to the extent permitted in the Order, the Loan Document Obligations will constitute allowed administrative expense claims in the Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or

LA\4104335.13

UST-1408

otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve Out and (ii) the priorities set forth in the Order.

(c)     After the entry of the Order and pursuant to and to the extent provided in the Order, the Loan Document Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority, only to (i) the Carve Out, (ii) the Liens pursuant to Section 6.02(i) with respect to Indebtedness under the ABL Credit Agreement (to the extent applicable), subject to the terms of such Section 6.02(i) and (iii) to the extent set forth in the Order.

(d)     The Order is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Required Lenders' consent, modified or amended. The Loan Parties are in compliance in all material respects with the Order.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Order, upon the Maturity Date (whether by acceleration or otherwise) of any of the Loan Document Obligations, to the extent the Conversion Date has not occurred, the Administrative Agent and Lenders shall be entitled to immediate payment of such Loan Document Obligations and to enforce the remedies provided for hereunder or under applicable laws, without further notice, motion or application to, hearing before, or order from, the Court.

ARTICLE IV

Conditions

SECTION 4.01.    Conditions to Effective Date.  The effectiveness of this Agreement and the obligations of the Lenders to make the Roll-up Loans hereunder shall not become effective until the date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)     The Administrative Agent shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) evidence satisfactory to the Administrative Agent (which may include a facsimile transmission) that such party has signed a counterpart of this Agreement.

(b)     The Administrative Agent shall have received a favorable written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of Kirkland & Ellis LLP, counsel for the Loan Parties, addressing corporate authority matters and other matters  as the Administrative Agent shall reasonably request, each such opinion to be in form, scope and substance reasonably satisfactory to the Administrative Agent and the Lenders.

(c)     The Administrative Agent shall have received as to each Loan Party such customary documents and certificates as it shall reasonably have requested relating to the organization, existence and good standing of such Loan Party and the authorization of the Loan Documents or the Transactions, all in form and substance reasonably satisfactory to the Administrative Agent.

LA\4104335.13

UST-1409

(d)    (a) The representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct (i) in the case of the representations and warranties qualified as to materiality, in all respects and (ii) otherwise, in all material respects, in each case on and as of the Effective Date, except in the case of any such representation and warranty that expressly relates to a prior date, in which case such representation and warranty shall be so true and correct on and as of such prior date and (b) at the time of and immediately after giving effect to the Transactions to occur on the Effective Date, no Event of Default shall have  occurred and be continuing.

(e)    The Administrative Agent shall have received a certificate, dated the Effective Date and signed by the chief financial officer of the Parent Borrower, confirming compliance with the conditions set forth in paragraph (d) of this Section.

(f)    The Lenders and the Administrative Agent shall have received the Approved Budget.

(g)    The Administrative Agent, for its benefit and the benefit of each other Secured Party, shall have been granted a perfected lien on the Collateral by the Order on the terms and conditions set forth herein and in the other Loan Documents.

(h)    The Administrative Agent shall have received the results of a search of the UCC (or equivalent) filings made with respect to the Loan Parties in the jurisdictions reasonably requested by the Administrative Agent.

(i)    The Lenders shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" rules and regulations, including the USA Patriot Act, to include a duly executed IRS Form W-9 or such other applicable IRS Form for each Borrower, at least three Business Days prior to the Effective Date to the extent such information was requested at least 10 Business Days prior to the Effective Date.

(j)    The Collateral Agreement each shall have been duly executed and delivered by each party thereto, and shall be in full force and effect.

(k)    The Administrative Agent shall have received (i) unaudited interim consolidated financial statements of the Parent Borrower for each fiscal month ended after the fiscal quarter ending February 1, 2020 through the end of June 30, 2020 and (ii) unaudited financial statements for the fiscal quarter ended May 2, 2020.

(l)    Since the Petition Date, other than those events or circumstances arising from the commencement of the Cases, there has been no event or circumstance, either individually or in the aggregate, that has or could reasonably be expected to have a Material Adverse Effect.

(m)    (i) the Administrative Agent shall have received drafts of the "first day" pleadings for the Cases, in each case, in form and substance reasonably satisfactory to the Administrative Agent; and (ii) all motions, orders (including the "first day" orders and the Cash Management Order) and other documents to be filed with and submitted to the Court on the Petition Date shall be in form and substance reasonably satisfactory to the Administrative Agent, and the Court shall

LA\4104335.13

UST-1410

have approved and entered all "first day" orders, including, without limitation, the Cash Management Order.

(n)    No trustee, receiver or examiner with expanded powers shall have been appointed in any of the Chapter 11 Cases.

(o)    The Pre-Petition Agent and the Pre-Petition Lenders shall have each received adequate protection in respect of the Liens securing their respective Pre-Petition Lender Obligations pursuant to the Order.

The Administrative Agent shall notify the Borrowers and the Lenders of the Effective Date, and such notice shall be conclusive and binding.

SECTION 4.02.    Conditions to the New Money Loan.    The obligations of the Lenders to make the New Money Loans hereunder shall not become effective until the date on or after the Effective Date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)    The Administrative Agent shall have received a written Borrowing Request to include a flow of funds memorandum in form and substance satisfactory to the Administrative Agent and the Lenders.

(b)    The ABL Credit Agreement shall have been duly executed and delivered by each of the parties thereto, and shall be in full force and effect.

(c)    The Intercreditor Acknowledgment shall have been duly executed and delivered by each party thereto, and shall be in full force and effect.

(d)    The Administrative Agent, the Ad Hoc Committee and the Ad Hoc Committee Advisors shall have received all fees and other amounts due and payable on or prior to the Funding Date, including, to the extent invoiced at least two Business Days prior to the Funding Date, payment or reimbursement of all fees and expenses (including fees, charges and disbursements of counsel) required to be paid or reimbursed by any Loan Party under the Commitment Letter or any Loan Document, in each case, payable from the proceeds of the initial funding of the Term Loans.

The Administrative Agent shall notify the Borrowers and the Lenders of the Funding Date, and such notice shall be conclusive and binding.

LA\4104335.13

UST-1411

# ARTICLE V

## Affirmative Covenants

Until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all premiums and fees payable hereunder shall have been paid in full, each Borrower covenants and agrees with the Lenders that:

SECTION 5.01.   Financial Statements and Other Information.  The Borrowers will furnish to the Administrative Agent, on behalf of each Lender and, in the case of clauses (e), (f) and (g), to the Ad Hoc Committee Advisors:

(a)      within 90 days after the end of each fiscal year of the Parent Borrower, its consolidated balance sheet and related consolidated statements of operations, comprehensive income, equity and cash flows as of the end of and for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year,  all certified by a Financial Officer of the Parent Borrower to the effect that such consolidated financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries as of the end of and for such fiscal year on a consolidated basis in accordance with GAAP;

(b)      within 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Parent Borrower, its consolidated balance sheet as of the end of such fiscal quarter, the related consolidated statements of operations and comprehensive income for such fiscal quarter and the then elapsed portion of the fiscal year and the related consolidated statement of cash flows for the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Parent Borrower as presenting fairly, in all material respects, the financial position, results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries as of the end of and for such fiscal quarter and such portion of the fiscal year on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes;

(c)      within 30 days after the end of each of the first two fiscal months of each fiscal quarter of the Company, the consolidated balance sheet and related statements of operations and comprehensive income of the Company as of the end of and for such fiscal month and the then elapsed portion of the fiscal year and the related consolidated statement of cash flows of the Company for the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Company as presenting fairly in all material respects the financial position, results of operations and cash flows of the Company and its consolidated Subsidiaries as of the end of and for such fiscal month and such portion of the fiscal year on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes (it being understood and agreed that any adjustments reflected in such monthly financial statements may differ (in

LA\4104335.13

UST-1412

part or entirely) from any adjustments reflected in the financial statements delivered in the foregoing clauses (a) or (b);

(d)     concurrently with each delivery of financial statements under clause (a), (b) or (c) above, a completed Compliance Certificate signed by a Financial Officer of the Parent Borrower, (i) certifying, in the case of the financial statements delivered under clause (a), (b) or (c) above, that such financial statements present fairly in all material respects the financial position, results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP, subject to normal year end audit adjustments and the absence of footnotes, (ii) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (iii) to the extent applicable, setting forth reasonably detailed calculations demonstrating compliance with Section 6.12, (iv) if any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04, specifying the effect of such change on the financial statements accompanying such certificate, and (v) certifying that all notices required to be provided under Section 5.03 and 5.04 have been provided;

(e)     no later than 5:00 p.m. New York City time on the four week anniversary of the Effective Date(or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion), and each fourth (4th) calendar week thereafter, an updated budget consistent with the form and level of detail set forth in the initial Approved Budget, including the same line-items provided with the initial Approved Budget, and otherwise in form and substance reasonably acceptable to Ad Hoc Committee Advisors in their reasonable discretion.  Upon, and subject to, the approval of any such updated budget by the Ad Hoc Committee Advisors in their reasonable discretion, such supplemented budget shall constitute the then-approved Approved Budget, effective as of the beginning of the week immediately following the week in which it was delivered; *provided* that unless and until the Ad Hoc Committee Advisors approve such supplemental budget in their reasonable discretion, the then-current Approved Budget shall remain in effect;

(f)     no later than 5:00 p.m. New York City time on the Thursday of each calendar week (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) commencing on (a) the date that is the third Thursday following the Effective Date, a line-item by line-item report setting forth for each line item in the Approved Budget, in reasonable detail, the actual receipts received and operating disbursements (including any professional fees) made during the prior week then-ended and (b) the date that is the first Thursday following the Effective Date a report setting forth (i) the Liquidity as of the  Friday of the most recently ended calendar week and (ii) the aggregate amount of end of day cash and Cash Equivalents as of the Friday of the most recently ended calendar week of all non-Loan Party Subsidiaries on deposit in or credited to any account maintained by such non-Loan Party Subsidiaries;

(g)     no later than 5:00 p.m. New York City time on the Thursday (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) of each calendar week commencing on the date that is the second Thursday following the Effective Date, (each such Thursday or later time, a "Variance Report Date"), a line-item by line-item

LA\4104335.13

UST-1413

variance report (each, a "Variance Report"),substantially in the form attached hereto as Exhibit J or otherwise as reasonably acceptable to the Required Lenders in their sole discretion, setting forth, in reasonable detail: (x) any variances between actual amounts for each line item in the Approved Budget for the Variance Testing Period versus projected amounts set forth in the applicable Approved Budget for each line item included therein on a cumulative basis for such Variance Testing Period (for the avoidance of doubt, to be prepared by comparing the sum of the four (4) figures for each relevant week for such corresponding line item in the relevant Approved Budget that was in effect in respect of each relevant week at the time), and (y) the computations necessary to determine compliance with Section 6.12, together with a statement from a Financial Officer certifying the information contained in the report. The Variance Report shall also provide a reasonably detailed explanation for any negative variance in such Variance Report in excess of 15% in actual receipts and any positive variance in such Variance Report in excess of 15% in actual operating disbursements during the Variance Testing Period (in each case unless the dollar amount corresponding to such percentage variance is less than $1,000,000) as compared to projections for such corresponding line items during the Variance Testing Period as set forth in the Approved Budget;

(h)     (i) to the extent applicable, within 1 Business Day of delivery of a Borrowing Base Certificate (as defined in the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, as applicable) to the ABL Agent, copy of such certificate and (ii) a copy of each report or forecast delivered under the ABL Credit Agreement, within 1 Business Day of delivery thereof;

(i)     promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the Parent Borrower or any Subsidiary with the SEC or with any national securities exchange, or distributed by the Parent Borrower to its shareholders generally, as the case may be;

(j)     [reserved];

(k)     promptly after any written request therefor, evidence of insurance renewals as required under Section 5.08 hereunder in form and substance reasonably acceptable to the Administrative Agent; and

(l)     promptly after any written request therefor, such other information regarding the operations, business affairs and financial condition of the Parent Borrower or any Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request.

Information required to be delivered pursuant to clause (a), (b) or (i) of this Section shall be deemed to have been delivered if such information, or one or more annual or quarterly reports containing such information, shall have been posted by the Administrative Agent on an IntraLinks or similar site to which the Lenders have been granted access or shall be available on the website of the SEC at http://www.sec.gov. Information required to be delivered pursuant to this Section may also be delivered by electronic communications pursuant to procedures approved by the Administrative Agent.

UST-1414

SECTION 5.02.    Notices of Material Events.  The Borrowers will furnish to the to the Ad Hoc Committee Advisors and the Administrative Agent (for distribution to the Lenders) written notice promptly upon any Financial Officer, or other officer or employee responsible for compliance with the Loan Documents, of the Borrowers becoming aware of any of the following:

(a)    the occurrence of any Default;

(b)    the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against (other than in connection with the Cases) or affecting the Parent Borrower or any Restricted Subsidiary, or any adverse development in any such pending action, suit or proceeding not previously disclosed in writing by the Borrowers to the Administrative Agent and the Lenders, that in each case would reasonably be expected to result in a Material Adverse Effect or that in any manner questions the validity of any Loan Document;

(c)    the occurrence of an ERISA Event that has resulted, or would reasonably be expected to result, in a Material Adverse Effect;

(d)    (i) as soon as practicable in advance of filing (and to the extent practicable not later than three (3) days prior to the filing thereof) with the Court or delivering (and to the extent practicable not later than three (3) days prior to the delivery thereof) to the Committee appointed in a Case, if any, or to the U.S. Trustee, as the case may be, the Order, all other material proposed orders and pleadings related to (x) the Cases (all of which must be in form and substance reasonably satisfactory to the Required Lenders), (y) the Pre-Petition Credit Agreement and this Agreement and the credit facilities contemplated thereby and/or any sale contemplated in accordance with the Required Milestones and any Plan of Reorganization and/or any disclosure statement related thereto (all of which must be in form and substance reasonably satisfactory to the Administrative Agent), and (ii) substantially simultaneously with the filing with the Court or delivering to the Committee appointed in any Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Cases that may be filed with the Court or delivered to the Committee appointed in any Case, if any, or to the U.S. Trustee; or

(e)    any other development that has resulted, or would reasonably be expected to result, in a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Parent Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03.    Collateral Obligations; Additional Subsidiaries.

(a) Each Borrower will, and will cause the other applicable Loan Parties to comply with the "Collateral and Guarantee Requirement". If any additional Designated Subsidiary is formed or acquired after the Effective Date (or any Excluded Subsidiary becomes a Designated

LA\4104335.13

UST-1415

Subsidiary), the Borrowers will promptly notify the Administrative Agent thereof and will, as promptly as practicable, and in any event within 15 days (or such longer period as the Administrative Agent may agree) after such Designated Subsidiary is formed or acquired (or any Excluded Subsidiary becomes a Designated Subsidiary) cause the Collateral and Guarantee Requirement to be satisfied with respect to such Designated Subsidiary and with respect to any Equity Interests in or Indebtedness of such Designated Subsidiary owned by or on behalf of any Loan Party.

(b) Each of the Loan Parties hereby covenants and agrees that upon the entry of, and subject to, the Order and subject to the Carve Out in all respects, the Loan Document Obligations, pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed DIP Superpriority Claims in the Cases.

(c) The relative priorities of the Liens described in this Section 5.03 with respect to the Collateral shall be as set forth in the Order. In accordance with the Order, all of the Liens described in this Section 5.03 shall be effective and perfected upon entry of the Order, without the necessity of the execution, recordation of filings by the Debtors of security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent, of, or over, any Collateral, as set forth in the Order.

(d) Each Loan Party that is a Debtor hereby confirms and acknowledges that, pursuant to the Order , the Liens in favor of the Administrative Agent on behalf of and for the benefit of the Secured Parties in all of the Collateral, now existing or hereafter acquired, shall be created and perfected without the recordation or filing in any land records or filing offices of any mortgage, assignment or similar instrument.

SECTION 5.04.    <u>Information Regarding Collateral</u>.

(a)     The Borrowers will furnish to the Administrative Agent promptly (and in any event within 15 days thereof (or such longer period as the Administrative Agent may agree)) written notice of any change in (i) the legal name of any Loan Party, as set forth in its organizational documents, (ii) the jurisdiction of organization or the form of organization of any Loan Party (including as a result of any merger or consolidation), (iii) the location of the chief executive office of any Loan Party or (iv) the organizational identification number, if any, and the Federal Taxpayer Identification Number of such Loan Party, in each case, only with respect to any Loan Party organized under the laws of a jurisdiction that requires such information to be set forth on the face of a UCC financing statement, of such Loan Party.  The Borrowers also agree promptly to notify the Administrative Agent if any material portion of the Collateral is damaged or destroyed.

(b)     If any material assets are acquired by any Loan Party after the Effective Date (other than assets constituting Collateral under the Collateral Documents that become subject to the Lien of the Collateral Documents upon the acquisition thereof), the Borrowers will promptly notify the Administrative Agent thereof and will cause such assets to be subjected to a Lien securing the Loan Document Obligations and will take such actions as shall be necessary or reasonably requested by the Administrative Agent to satisfy the Collateral and Guarantee

LA\4104335.13

UST-1416

Requirement, including to grant and perfect such Lien, all at the expense of the Borrowers. It is understood and agreed that, notwithstanding anything to the contrary set forth in this Agreement or in any Collateral Document, the Loan Parties shall not be required to (A) grant leasehold mortgages, (B) obtain landlord lien waivers, estoppels, collateral access agreements or bailee agreements, except to the extent delivered pursuant to the ABL Credit Agreement or related loan documents, (C) enter into Control Agreements in respect of any Excluded Deposit Account, (D) perfect security interests in any assets represented by a certificate of title or (E) enter into any Collateral Documents governed by the law of a jurisdiction other than the United States.

(c)     If, despite the restrictions set forth in Section 6.02, the Company or any Subsidiary shall grant a Lien on any of its assets to secure Indebtedness under the ABL Credit Agreement, the Pre-Petition ABL Credit Agreement and the Secured Obligations are not secured by a Lien on such assets, the Company will (i) promptly notify the Administrative Agent and cause such assets to be subjected to a Lien securing the Secured Obligations and (ii) take, or cause such Subsidiary to take, as the case may be, such actions as shall be necessary or reasonably requested by the Administrative Agent to satisfy the Collateral and Guarantee Requirement, including to grant and perfect such Lien, and to cause such Liens securing Indebtedness under the ABL Credit Agreement thereof and such Liens securing the Secured Obligations to become subject to the Intercreditor Agreement, all at the expense of the Loan Parties.

SECTION 5.05.    Existence; Conduct of Business.  Subject to any required approval by the Court, each Borrower will, and will cause each Restricted Subsidiary to, do or cause to be done all things reasonably necessary to preserve, renew and keep in full force and effect (i) its legal existence and (ii) the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except in the case of clause (ii) where failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation, dissolution, disposition or other transaction permitted under Section 6.03 or 6.05.

SECTION 5.06.    Payment of Obligations.  To the extent permitted by the Order and the terms thereof, each Borrower will, and will cause each Restricted Subsidiary to, pay or discharge all its material obligations, including material Tax liabilities (whether or not shown on a Tax return), before the same shall become delinquent or in default, subject to the Approved Budget (and the Permitted Variances provided for therein)except where (a) (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) the Parent Borrower or such Restricted Subsidiary has set aside on its books reserves with respect thereto to the extent required by GAAP and (iii) such contest effectively suspends collection of the contested obligation and the enforcement of any Lien securing such obligation or (b) the failure to make payment would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 5.07.    Maintenance of Properties.  Each Borrower will, and will cause each Restricted Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, except where the failure to

LA\4104335.13

UST-1417

do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.08.    Insurance.  Each Borrower will, and will cause each Restricted Subsidiary to, maintain, with financially sound and reputable insurance companies, insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations.  Each such policy of liability or casualty insurance maintained by or on behalf of Loan Parties shall (a) in the case of each liability insurance policy (other than workers' compensation, director and officer liability or other policies in which such endorsements are not customary), name the Administrative Agent, on behalf of the Secured Parties, as an additional insured thereunder and (b) in the case of each casualty insurance policy, contain a loss payable clause or endorsement that names the Administrative Agent, on behalf of the Secured Parties, as a loss payee thereunder, and the Borrowers will use commercially reasonable efforts to have each such policy provide for at least 30 days' (or such shorter number of days as may be agreed to by the Administrative Agent) prior written notice to the Administrative Agent of any cancellation of such policy.

SECTION 5.09.    Books and Records; Inspection and Rights.  Each Borrower will, and will cause each Restricted Subsidiary to, (a) keep proper books of record and account in which full, true and correct (in all material respects) entries in accordance with GAAP and applicable law are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the Administrative Agent or any Lender (to the extent accompanying the Administrative Agent or any designated representative thereof) (including employees of the Administrative Agent, any Lender or any consultants, accountants, lawyers and appraisers retained by the Administrative Agent), upon reasonable prior notice (but in no event more than once each fiscal year of the Parent Borrower unless an Event of Default has occurred and is continuing), to visit and inspect its properties, to examine and make extracts from its books and records and to discuss its affairs, finances and condition with its officers and, accompanied by one or more such officers or their designees if requested by the Borrowers, independent accountants, all at such reasonable times during normal business hours and as often as reasonably requested.  The Borrowers shall have the right to have a representative present at any and all inspections.

SECTION 5.10.    Compliance with Laws.  Each Borrower will, and will cause each Restricted Subsidiary to, comply with all laws (including Environmental Laws and orders of any Governmental Authority) applicable to it or its property, except (i) where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect or (ii) to the extent subject to the Automatic Stay.

SECTION 5.11.    Bankruptcy Matters.

(a)    cause all proposed (i) "first day" and "second day" (if applicable) orders on a final basis, (ii) orders (other than the Order) related to or affecting the Loans and other Obligations and the Loan Documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any Plan of Reorganization and/or any disclosure

70

UST-1418

statement related thereto, (iii) orders concerning the financial condition of the Borrowers or any of their respective Restricted Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure, and (iv) orders establishing procedures for administration of the Cases or approving significant transactions submitted to the Court, in each case, proposed by the Loan Parties to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Required Lenders in their reasonable discretion in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders (and with respect to any provision that affects the rights, obligations, liabilities or duties of the Administrative Agent) prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable in all respects;

(b)     comply in a timely manner with their obligations and responsibilities as debtors in possession under the Order; and

(c)     except as otherwise permitted by an Acceptable Plan or this Agreement, provide prior written notice as soon as reasonably practicable to the Required Lenders prior to any assumption or rejection of any Loan Party's or any Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code.

(d)     deliver to the Administrative Agent all documents required to be delivered to creditors under the RSA, any applicable restructuring support agreement or any case stipulation; provided that the Borrower shall not be required to deliver any such documents provided by any party in interest to the extent that any such document is filed under seal; provided, further, that such documents that are filed under seal, to the extent permitted by applicable law, shall be provided to the advisors to the Administrative Agent on a professional eyes' only basis.

(e)     comply with each of the Required Milestones contained on Schedule 5.11 upon the terms and at the times provided for therein.

SECTION 5.12.    Maintenance of Ratings.  The Borrowers will use commercially reasonable efforts to obtain a rating of the credit facilities created hereunder by each of S&P and Moody's within 15 days of the Effective Date, it being understood that there is no obligation to maintain any particular rating at any time.

SECTION 5.13.    [Reserved].

SECTION 5.14.    [Reserved].

SECTION 5.15.    Conference Calls.  The Borrowers will hold and participate in:

(a) a monthly conference call for Lenders to discuss financial information delivered pursuant to Section 5.01.  The Borrowers will hold such conference call following the delivery of the required financial information for such month pursuant to Section 5.01(c) and not later than

71

UST-1419

two Business Days from the time the Borrowers are required to deliver the financial information as set forth in Section 5.01(c).

(b) weekly conference calls for the Ad Hoc Committee Advisors to discuss financial information delivered pursuant to Section 5.01(f).

Such monthly and weekly calls will occur as a standing appointment at a time to be mutually agreed upon by the Borrowers and the Lenders or the Ad Hoc Committee Advisors, as applicable.

ARTICLE VI

Negative Covenants

Until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all premiums and fees payable hereunder shall have been paid in full, each Borrower covenants and agrees with the Lenders that:

SECTION 6.01.    Indebtedness; Certain Equity Securities.

Neither Borrower will, nor will it permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

(a)    Indebtedness created under the Loan Documents (including, for the avoidance of doubt, the Carve Out) and the Pre-Petition Loan Documents;

(b)    Indebtedness existing on the date hereof and set forth on Schedule 6.01;

(c)    unsecured Indebtedness of the Parent Borrower to any Restricted Subsidiary and of any Restricted Subsidiary to the Parent Borrower or any other Restricted Subsidiary; provided that (i) such Indebtedness shall not have been transferred to any Person other than the Parent Borrower or any Restricted Subsidiary, (ii) any such Indebtedness owing by any Loan Party to a Restricted Subsidiary that is not a Loan Party shall be unsecured and subordinated in right of payment to the Loan Document Obligations and the Pre-Petition Lender Obligations and (iii) any such Indebtedness shall be incurred in compliance with Section 6.04;

(d)    Guarantees incurred in compliance with Section 6.04;

(e)    Indebtedness of the Parent Borrower or any Restricted Subsidiary (i) incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations and Synthetic Lease Obligations, provided that such Indebtedness is incurred prior to or within 270 days after such acquisition or the completion of such construction or improvement and the principal amount of such Indebtedness does not exceed the cost of acquiring, constructing or improving such fixed or capital assets or (ii) assumed in connection with the acquisition of any fixed or capital assets; provided that the aggregate principal amount of Indebtedness permitted by this clause (e) at the time of incurrence thereof shall not exceed $1,000,000;

72

UST-1420

(f)        Indebtedness in respect of netting services, overdraft protections and deposit and checking accounts, in each case, in the ordinary course of business;

(g)        Indebtedness in respect of letters of credit, bank guarantees and similar instruments issued for the account of the Parent Borrower or any Restricted Subsidiary in the ordinary course of business supporting obligations under workers' compensation, health, disability, unemployment insurance and other social security laws;

(h)        Indebtedness expressly permitted by the Approved Budget (including with respect to any Permitted Variances);

(i)        [reserved];

(j)        Indebtedness under (i) the Pre-Petition ABL Credit Agreement and (ii) if applicable, the ABL Credit Agreement in an aggregate principal amount not to exceed $400,000,000 at any time outstanding;

(k)        Indebtedness of Loan Parties in respect of surety bonds (whether bid, performance, appeal or otherwise) and performance and completion guarantees and other obligations of a like nature, in each case incurred in the ordinary course of business;

(l)        [reserved];

(m)        [reserved];

(n)        [reserved];

(o)        [reserved];

(p)        other unsecured Indebtedness in an aggregate principal amount not to exceed at the time of incurrence thereof $4,000,000;

(q)        Indebtedness consisting of (i) the financing of insurance premiums and (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(r)        obligations under any agreement governing the provision of treasury or cash management services, including deposit accounts, overnight draft, credit cards, debit cards, p-cards (including purchasing cards and commercial cards), funds transfer, automated clearinghouse, zero balance accounts, returned check concentration, controlled disbursement, lockbox, account reconciliation and reporting and trade finance services and other cash management services; and

(s)        Indebtedness in the form of Swap Agreements permitted under Section 6.07.

The accrual of interest, the accretion of accreted value and the payment of interest or dividends in the form of additional Indebtedness or Disqualified Stock, as applicable, the accretion of original issue discount, the accretion of liquidation preference and increases in the

73

UST-1421

amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies shall not be deemed to be an incurrence of Indebtedness or Disqualified Stock for purposes of this Section 6.01.

SECTION 6.02.  Liens.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Lien on any asset now owned or hereafter acquired, except:

(a)      (i) Liens granted by the Order (including the Carve Out), (ii) Liens created under the Loan Documents or the Pre-Petition Loan Documents;

(b)      Permitted Encumbrances;

(c)      any Lien on any asset of the Parent Borrower or any Restricted Subsidiary existing on the date hereof and set forth on Schedule 6.02; provided that (i) such Lien shall not apply to any other asset of the Parent Borrower or any Restricted Subsidiary and (ii) such Lien shall secure only those obligations that it secures on the date hereof and any extensions, renewals and refinancing thereof that do not increase the outstanding principal amount thereof;

(d)      [reserved];

(e)      Liens on fixed or capital assets acquired, constructed or improved by the Parent Borrower or any Restricted Subsidiary; provided that (i) such Liens secure only Indebtedness permitted by Section 6.01(e) and obligations relating thereto not constituting Indebtedness and (ii) such Liens shall not apply to any other asset of the Parent Borrower or any Restricted Subsidiary (other than the proceeds and products thereof); provided further that in the event purchase money obligations are owed to any Person with respect to financing of more than one purchase of any fixed or capital assets, such Liens may secure all such purchase money obligations and may apply to all such fixed or capital assets financed by such Person;

(f)      in connection with the sale or transfer of any Equity Interests or other assets in a transaction permitted under Section 6.05, customary rights and restrictions contained in agreements relating to such sale or transfer pending the completion thereof, solely to the extent such sale or transfer would have been permitted on the date of the creation of such Lien;

(g)      in the case of (i) any Restricted Subsidiary that is not a wholly-owned Restricted Subsidiary or (ii) the Equity Interests in any Person that is not a Restricted Subsidiary, any encumbrance or restriction, including any put and call arrangements, related to Equity Interests in such Restricted Subsidiary or such other Person set forth in the organizational documents of such Restricted Subsidiary or such other Person or any related joint venture, shareholders' or similar agreement, in each case, so long as such encumbrance or restriction is in existence on the Petition Date;

(h)      Liens solely on any cash deposits, escrow arrangements or similar arrangements made by the Parent Borrower or any Restricted Subsidiary in connection with any letter of intent or purchase agreement for a transaction permitted hereunder;

UST-1422

(i)     Liens on the Collateral securing Indebtedness permitted by Section 6.01(j) and obligations relating thereto not constituting Indebtedness; provided that any such Liens are subject to (x) the Order and (y), if such Liens are on assets of the Loan Parties, the Intercreditor Agreement;

(j)     any Lien on assets of any Foreign Subsidiary (other than any Luxembourg IP Subsidiary); provided that such Lien shall secure only Indebtedness of such Foreign Subsidiary permitted by Section 6.01 and obligations relating thereto not constituting Indebtedness;

(k)     other Liens securing Indebtedness or other obligations in an aggregate principal amount at the time of incurrence of such Indebtedness or other obligations not to exceed $1,000,000;

(l)     non-exclusive licenses of intellectual property granted in the ordinary course of business; and

(m)     Liens in favor of the Pre-Petition Lenders as adequate protection granted pursuant to the Orders.

SECTION 6.03.     Fundamental Changes; Business Activities.

(a)     Neither Borrower will, nor will it permit any Restricted Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, (i) any Restricted Subsidiary may  (x) merge into the Parent Borrower in a transaction in which the Parent Borrower is the surviving entity and (y) merge into the Subsidiary Borrower in a transaction in which the Subsidiary Borrower is the surviving entity, (ii) any Person (other the Parent Borrower or the Subsidiary Borrower) may merge into or consolidate with any Restricted Subsidiary in a transaction in which the surviving entity is a Restricted Subsidiary and, if any party to such merger or consolidation is a Loan Party, a Loan Party, (iii) [reserved] and (iv) any Restricted Subsidiary (other than the Subsidiary Borrower) may liquidate or dissolve if the Borrowers determine in good faith that such liquidation or dissolution is in the best interests of the Borrowers and is not materially disadvantageous to the Lenders; provided that any such merger or consolidation involving a Person that is not a wholly-owned Restricted Subsidiary immediately prior to such merger or consolidation shall not be permitted unless it is also permitted by Section 6.04.

(b)     Neither Borrower will, nor will it permit any of its Restricted Subsidiaries to, engage to any material extent in any business other than businesses of the type conducted by the Parent Borrower and the Restricted Subsidiaries on the date hereof  and businesses reasonably related or complementary thereto.

SECTION 6.04.     Investments, Loans, Advances, Guarantees and Acquisitions.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, purchase, hold, acquire (including pursuant to any merger or consolidation), make or otherwise permit to exist any Investment in any other Person, except:

(a)     Investments in cash and Cash Equivalents;

UST-1423

(b)     Investments existing on the date hereof or contractually committed to as of the date hereof and set forth on Schedule 6.04 and any extensions thereof (but not any additions thereto (including any capital contributions) made after the date hereof) ;

(c)     Investments by the Parent Borrower and the Restricted Subsidiaries in Equity Interests in their respective subsidiaries; provided that (i) such subsidiaries are Subsidiaries prior to such Investments, and (ii) in the case of any such Investments by the Loan Parties in, and loans and advances by the Loan Parties to, Restricted Subsidiaries that are not Loan Parties (excluding all such Investments, loans, advances and Guarantees existing on the date hereof and permitted by clause (b) above), (A) the aggregate amount of all such Investments (including loans and advances) permitted pursuant to this clause (c) and pursuant to clauses (d) and (e) below, taken together, shall not exceed $10,000,000 and (B) in each case, all such Investments (including loans and advances) shall be (x) made in the ordinary course of business, (y), solely in connection with the operational and compliance needs of the Parent Borrower and its Restricted Subsidiaries and (z) permitted by the Approved Budget (subject to Permitted Variance);

(d)     loans or advances made by the Parent Borrower to any Restricted Subsidiary or made by any Restricted Subsidiary to the Parent Borrower or any other Restricted Subsidiary; provided that (i) the Indebtedness resulting therefrom is permitted by Section 6.01(c) and (ii) the amount of such loans and advances made by the Loan Parties to Restricted Subsidiaries that are not Loan Parties shall be subject to the limitation set forth in clause (c) above and shall be permitted by the Approved Budget (subject to Permitted Variance);

(e)     Guarantees by the Parent Borrower or any Restricted Subsidiary of Indebtedness or other obligations of the Parent Borrower or any Restricted Subsidiary, solely to the extent (i) arising as a result of any such Person being a joint and several co-applicant with respect to any letter of credit or letter of guaranty or (ii) of any leases of retail store locations and related obligations arising thereunder, in each case, in the ordinary course of business; provided that the aggregate amount of Indebtedness and other obligations of Restricted Subsidiaries that are not Loan Parties that is Guaranteed by any Loan Party shall be subject to the limitation set forth in clause (c) above and shall be permitted by the Approved Budget (subject to Permitted Variances);

(f)     [reserved];

(g)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(h)     [reserved];

(i)     deposits, prepayments and other credits to suppliers, lessors and landlords made in the ordinary course of business;

(j)     advances by the Parent Borrower or any Restricted Subsidiary to employees in the ordinary course of business consistent with past practices for travel and entertainment expenses, relocation costs and similar purposes;

LA\4104335.13

UST-1424

(k)     [reserved];

(l)     Investments in the form of Swap Agreements permitted under Section 6.07;

(m)     investments constituting deposits described in clauses (c) and (d) of the definition of "Permitted Encumbrances" and endorsements of instruments for collection or deposit in the ordinary course of business;

(n)     other Investments to the extent permitted by and expressly set forth in the Order;

(o)     other Investments in an aggregate amount not to exceed $1,000,000; and

(p)     Investments in respect of actions permitted by Section 6.05(g).

For the purposes of this Section, any unreimbursed payment by the Parent Borrower or any Restricted Subsidiary for goods or services delivered to any Subsidiary shall be deemed to be an Investment in such Subsidiary.

SECTION 6.05.    Asset Sales.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, sell, transfer or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the Parent Borrower permit any Restricted Subsidiary to issue any additional Equity Interests in such Restricted Subsidiary (other than to the Parent Borrower or any other Restricted Subsidiary in compliance with Section 6.04, and other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable law) (each of the foregoing, an "Asset Sale"), except:

(a)     (i) sales of inventory, (ii) sales, transfers and other dispositions of used, surplus, obsolete or outmoded machinery or equipment and (iii) contributions of merchandise to charitable organizations, to the extent in the ordinary course of business and consistent with past practices, (iv) dispositions of Cash Equivalents and (v)  use of cash in accordance with the Approved Budget and pursuant to transactions permitted under this agreement, in each case (other than in the case of clause (iii)) in the ordinary course of business;

(b)     sales, transfers, leases and other dispositions to the Parent Borrower or any Restricted Subsidiary in the ordinary course of business; provided that any such sales, transfers, leases or other dispositions involving a Restricted Subsidiary that is not a Loan Party shall be made in compliance with Sections 6.04 and 6.09;

(c)     the sale or discount of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not in connection with any financing transaction;

(d)     dispositions of assets subject to any casualty or condemnation proceeding (including in lieu thereof);

(e)     leases or subleases of real property granted by the Parent Borrower or any Restricted Subsidiary to third Persons not interfering in any material respect with the business of

77

UST-1425

the Parent Borrower or any Restricted Subsidiary, including, without limitation, retail store lease assignments and surrenders;

(f)      [reserved];

(g)      in connection with the consolidation of foreign operations of the Parent Borrower and its Subsidiaries, the direct or indirect transfers or other dispositions by any Restricted Subsidiary of any foreign assets or the Equity Interests of a Foreign Subsidiary that is a Restricted Subsidiary to (i) with respect to any Luxembourg IP Subsidiary or any non-Loan Party Restricted Subsidiary with the prior consent of the Required Lenders and (ii) any other Restricted Subsidiary;

(h)      to the extent prior consent of the Required Lenders is received, the elimination or forgiving of intercompany balances in connection with intercompany restructurings (including dissolutions, liquidations and mergers) between or among the Parent Borrower and its Restricted Subsidiaries;

(i)      other sales, transfers or dispositions pursuant to an order of the Court which sale, transfer or disposition are consistent with the Restructuring Support Agreement and the Approved Budget; and

(j)      Specified Dispositions or dispositions expressly identified and provided for in the Approved Budget; and

(k)      sales, transfers and other dispositions of assets that are not permitted by any other clause of this Section in an aggregate amount equal to a fair market value, as determined by a Responsible Officer of the Parent Borrower reasonably and acting in good faith, of not more than $1,000,000;

provided that all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by clause (a)(ii), (a)(iii), (b), (c), (d), (g) or (h)) shall be made for fair value.

SECTION 6.06.   Sale/Leaseback Transactions.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, enter into any Sale/Leaseback Transaction, except to the extent such Sale/Leaseback Transaction is entered into in connection with a Specified Disposition.

SECTION 6.07.   Swap Agreements.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, enter into any Swap Agreement, other than Swap Agreements entered into in the ordinary course of business to hedge or mitigate risks to which the Parent Borrower or a Restricted Subsidiary is exposed in the conduct of its business or the management of its liabilities and not for speculative purposes.

SECTION 6.08.   Restricted Payments; Certain Payments of Indebtedness.

(a)      Neither Borrower will, nor will it permit any Restricted Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that:

UST-1426

(i)      the Parent Borrower may declare and pay dividends with respect to its Equity Interests payable solely in additional Equity Interests (other than Disqualified Stock) of the Parent Borrower;

(ii)     any Restricted Subsidiary may declare and pay dividends or make other distributions with respect to its Equity Interests, or make other Restricted Payments in respect of its Equity Interests, in each case ratably to the holders of such Equity Interests (or, if not ratably, on a basis more favorable to the Parent Borrower and the Restricted Subsidiaries);

(iii)    the Parent Borrower may make Restricted Payments pursuant to and in accordance with customary stock option plans or other equity or benefit plans for management or employees of the Parent Borrower and the Restricted Subsidiaries in effect from time to time;

(iv)    Restricted Payments made by any Restricted Subsidiary to another non-Restricted Subsidiary to consummate transactions that would otherwise be permitted by Section 6.04(c);

(v)     the Parent Borrower may make cash payments in lieu of the issuance of fractional shares representing insignificant interests in the Parent Borrower in connection with the exercise of warrants, options or other securities convertible into or exchangeable for shares of common stock in the Parent Borrower;

(vi)    Restricted Payments to Parent Borrower on or around and upon the execution and effectiveness of the RSA to pay fees and expenses in accordance therewith;

(vii)   [reserved]; and

(viii)  Restricted Payments made to consummate the transactions permitted by Section 6.05(g).

(b)    Neither Borrower will, nor will it permit any Restricted Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Specified Indebtedness, except:

(i)     [reserved];

(ii)    [reserved];

(iii)   [reserved];

(iv)    [reserved];

(v)     [reserved];

LA\4104335.13

UST-1427

(vi)     payments to the extent provided for in the Approved Budget (including Permitted Variances thereto) and permitted by the Order, as applicable; and

(vii)    [reserved].

(c)     Neither Borrower will, nor will it permit any of the Restricted Subsidiaries to amend, modify or change in any manner adverse to the interests of the Lenders any term or condition of any documentation governing Specified Indebtedness; provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous written notice thereof is provided to the Administrative Agent.

SECTION 6.09.    Transactions with Affiliates.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, sell, lease, license or otherwise transfer any assets to, or purchase, lease, license or otherwise acquire any assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions on terms and conditions not less favorable to the Parent Borrower or such Restricted Subsidiary than those that would prevail in an arm's-length transaction with unrelated third parties, (b) transactions between or among the Parent Borrower and the Restricted Subsidiaries, (c) any Restricted Payment permitted by Section 6.08 or Investments permitted pursuant to Section 6.04(j), (d) the payment of reasonable fees and compensation to, and the providing of reasonable indemnities on behalf of, directors and officers of the Parent Borrower or any Restricted Subsidiary, as determined by the board of directors of the Parent Borrower in good faith, (e) employment contracts or subscription, put/call arrangements with employees, officers or directors, (f) transactions necessary to make adequate protection payments on account of secured Pre-Petition Indebtedness pursuant to the Order and (g) the transactions described on Schedule 6.09.

SECTION 6.10.    Restrictive Agreements.

(a) Neither Borrower will, nor will it permit any Restricted Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that restricts or imposes any condition upon (1) the ability of the Parent Borrower or any Restricted Subsidiary to create, incur or permit to exist any Lien upon any of its assets to secure the Loan Document Obligations or (2) the ability of any Restricted Subsidiary to pay dividends or other distributions with respect to its Equity Interests or to make or repay loans or advances to the Parent Borrower or to Guarantee the Loan Agreement; provided that (i) the foregoing shall not apply to (A) restrictions and conditions imposed by law or by any Loan Document, (B) restrictions and conditions existing on the Effective Date identified on Schedule 6.10 (but shall apply to any amendment or modification expanding the scope of any such restriction or condition), (C) customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided that such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (D) in the case of any Restricted Subsidiary that is not a wholly-owned Restricted Subsidiary, restrictions and conditions imposed by its organizational documents or any related joint venture or similar agreement, provided that such restrictions and conditions apply only to such Restricted Subsidiary and to any Equity Interests in such Restricted Subsidiary, (E) restrictions and conditions set forth in the Pre-Petition Credit Agreement, Pre-Petition ABL Credit Agreement and, to the extent applicable, the ABL Credit Agreement, (F) restrictions and conditions imposed

80

UST-1428

by agreements relating to Indebtedness of Restricted Subsidiaries that are not Loan Parties permitted under Section 6.01 and (G) restrictions and conditions imposed on cash to secure letters of credit and other segregated deposits that are permitted pursuant to Section 6.02(h), <u>provided</u> that such restrictions and conditions apply only to such Restricted Subsidiaries that are not Loan Parties, (ii) clause (a) of the foregoing shall not apply to (A) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by Section 6.01(e) if such restrictions or conditions apply only to the assets securing such Indebtedness and (B) customary provisions in leases and other agreements restricting the assignment thereof and (iii) clause (b) of the foregoing shall not apply to restrictions and conditions imposed by agreements relating to Indebtedness of any Restricted Subsidiary in existence at the time such Restricted Subsidiary became a Restricted Subsidiary and otherwise permitted under Section 6.01 (but shall apply to any amendment or modification expanding the scope of, any such restriction or condition), <u>provided</u> that such restrictions and conditions apply only to such Restricted Subsidiary.

(b) Except as permitted pursuant to the terms of this Agreement and the Order or otherwise consented to by the Required Lenders:

(i) Make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to the Order that is adverse to the Lenders.

(ii) Incur, create, assume or suffer to exist or permit any other superpriority claim which is pari passu with or senior to the DIP Superpriority Claims of the Administrative Agent, and the Lenders hereunder, except for the Carve Out and, subject to the Intercreditor Agreement, the ABL Credit Agreement to the extent applicable.

SECTION 6.11.  <u>Amendment of Organizational Documents</u>.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, amend, modify or waive any of its rights under its certificate of incorporation, by-laws or other organizational documents, in either case, to the extent such amendment, modification or waiver would be adverse to the rights or interests of the Lenders hereunder or under any other Loan Document; provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous written notice thereof is provided to the Administrative Agent.

SECTION 6.12.  <u>Financial Covenants</u>

(a)  The Parent Borrower will not permit Liquidity at any time to be less than $100,000,000.

(b) Commencing after the end of the 3rd week following the Effective Date, and solely to the extent that Liquidity is less than $150,000,000, the Parent Borrower will not permit any negative variance between the Actual Net Cash Flow Amount for any Cumulative Four-Week Period and the Budgeted Net Cash Flow Amount for such Cumulative Four-Week Period to be greater than 20%.

(c) The Parent Borrower will not permit the amount of cash and Cash Equivalents of non-Loan Party Subsidiaries as of the end of the day on Friday of each calendar week on deposit in or credited to any account maintained by non-Loan Party Subsidiaries to exceed $45,000,000 in the

81

UST-1429

aggregate for all non-Loan Party Subsidiaries, excluding from such covenant any payments made (or to be made) from the Maurice business segments or entities.

SECTION 6.13.    Accounting Changes.  The Parent Borrower will not make any change in the Parent Borrower's fiscal quarter or fiscal year other than as required pursuant to GAAP.

SECTION 6.14.    Sanctions.  The Parent Borrower and its Subsidiaries will not, directly or indirectly, use the proceeds of any Borrowing, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other individual or entity, to fund any activities of or business with any individual or entity, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by an individual or entity (including any individual or entity participating in the transaction, whether as Lender, Administrative Agent, or otherwise) of Sanctions.

SECTION 6.15.    Anti-Corruption Laws.  The Parent Borrower and its Subsidiaries will not, directly or indirectly, use the proceeds of any Borrowing for any purpose which would breach any Anti-Corruption Laws.

ARTICLE VII

Events of Default

If any of the following events ("Events of Default") shall occur:

(a)    the Borrowers shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    the Borrowers shall fail to pay any interest on any Loan or any fee, premium (including the Redemption Premium, if any) or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)    any representation, warranty or certification made or deemed made by the Parent Borrower or any Restricted Subsidiary in this Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been materially incorrect when made or deemed made (or, in the case of any representation or warranty qualified by materiality, incorrect);

(d)    the Borrowers shall fail to observe or perform any covenant, condition or agreement contained in Section 5.01, 5.02(a), 5.03 or 5.05 (with respect to the existence of any Borrower), 5.11 (including the Required Milestones) or in Article VI;

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those specified

82

UST-1430

in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of 7 Business Days after receipt of written notice thereof from the Administrative Agent;

(f)     except as a result of commencement of the Cases or entry into this Agreement, and, to the extent applicable, the ABL Credit Agreement, unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Court or unless any of the following results from obligations with respect to which the Court prohibits or does not permit any Loan Party from applicable compliance, the Parent Borrower or any Restricted Subsidiary shall fail to make any payment (whether of principal, interest, termination payment or other payment obligation and regardless of amount) in respect of any Material Indebtedness (other than the Loan Document Obligations) when and as the same shall become due and payable (after giving effect to any applicable grace period);

(g)     except as a result of commencement of the Cases or entry into this Agreement and, to the extent applicable, the ABL Credit Agreement, unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Court or unless any of the following results from obligations with respect to which the Court prohibits or does not permit any Loan Party from applicable compliance, (i) any event or condition shall occur that results in any Material Indebtedness becoming due, or being terminated or required to be prepaid, repurchased, redeemed or defeased, prior to its scheduled maturity, or that enables or permits (with the giving of notice, if required) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf, or, in the case of any Swap Agreement, the applicable counterparty, to cause any Material Indebtedness to become due, or to terminate or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to (i) any secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the assets securing such Indebtedness or (ii) any Indebtedness that becomes due as a result of a voluntary refinancing thereof permitted under Section 6.01; provided, further, that no such event under the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, as applicable, shall constitute an Event of Default under this clause (g) until the earliest to occur of (x) 5 days after the date of such Event of Default (during which period such Event of Default is not waived or cured), (y) the acceleration of the Indebtedness under the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, as applicable, and (z) the exercise of remedies by the ABL Agent in respect of a material portion of the ABL Priority Collateral, to the extent applicable;

(h)     [reserved];

(i)     [reserved];

(j)     [reserved];

(k)     except for any order fixing the amount of any Claim in the Cases, one or more judgments for the payment of money in an aggregate amount in excess of $10,000,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment and has not denied coverage) shall be rendered against the Parent Borrower or any Restricted Subsidiary, or any combination thereof, and the same shall remain undischarged for a period of 15 consecutive days during which execution shall not be effectively stayed, or any

UST-1431

action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Parent Borrower or any Restricted Subsidiary to enforce any such judgment;

(l)       one or more ERISA Events shall have occurred that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect;

(m)      a Change in Control shall occur;

(n)      any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder, satisfaction in full of all the Loan Document Obligations (other than contingent indemnification claims) or any act or omission by the Administrative Agent or any Lender, ceases to be in full force and effect; or any Loan Party contests in any manner the validity or enforceability of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; and

(o)      any Lien purported to be created under any Collateral Document and the Order shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any material Collateral, with the priority required by the applicable Collateral Document, except (i) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents to a Person that is not a Loan Party, (ii) the release thereof as provided in the applicable Collateral Document or Section 9.16 or consented to under Section 9.02, (iii) as a result of the failure of the Administrative Agent to (A) maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Collateral Agreement or (B) continue in accordance with applicable law the effectiveness of any UCC financing statement or (iv) as to Collateral constituting real property, to the extent such losses are covered by Lender's title insurance policy and such insurer has not denied coverage;

(p)      the RSA is terminated for any reason, or is modified, amended or waived in any manner materially adverse to the Secured Parties without the prior consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders);

(q)      any Loan Party shall file a motion in the Cases without the express written consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders), (i) to obtain additional financing under Section 364(d) of the Bankruptcy Code not otherwise permitted under this Agreement or (ii) except as provided in the Order, as the case may be, to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code that does not either have the prior written consent of the Required Lenders (or the Administrative Agent acting at the direction of the Required Lenders) or provide for the payment of the Loan Document Obligations in full and in cash upon the incurrence of such additional financing;

(r)      an order with respect to any of the Cases shall be entered by the Court (i) appointing a trustee under Section 1104, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or (iii) converting the Cases to cases under Chapter 7 of the Bankruptcy Code;

84

UST-1432

(s)      an order shall be entered by the Court dismissing any of the Cases which does not contain a provision for termination of all Commitments, and payment in full in cash of all Loan Document Obligations upon entry thereof;

(t)      an order with respect to any of the Cases shall be entered by the Court without the express prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent), with such consent not to be unreasonably withheld, conditioned or delayed, (i) to revoke, reverse, stay, modify, supplement or amend the Order in a manner adverse to the Lenders and/or the Administrative Agent or (ii) to permit, unless otherwise contemplated by the Order, any administrative expense or any Claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the administrative priority of the Loan Parties' Claims in respect of the Loan Document Obligations (other than the Carve Out);

(u)      (i) an application for any of the orders described in clause (r) above shall be made by a Loan Party or any such application shall be made by a Person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or the relief requested is not withdrawn, dismissed or denied within forty-five (45) days after the filing or (ii) any Person obtains an order under Section 506(c) of the Bankruptcy Code against the Administrative Agent;

(v)      the entry of an order by the Court terminating or modifying the exclusive right of any Loan Party to file a Plan of Reorganization pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders;

(w)      any Loan Party shall fail to comply with the Order;

(x)      any order by the Court is entered granting any superpriority claim that is pari passu with or senior to those of the Secured Parties or any Lien that is senior to the Liens securing the Loan Document Obligations, other than in accordance with the Order;

(y)      the Court enters an order that is adverse in any material respect, when taken as a whole, to the interests of the Administrative Agent and the Lenders or their respective rights and remedies in their capacities as such under this Agreement or in any of the Cases;

(z)      the Loan Parties or any of their Subsidiaries, or any person claiming by or through the Loan Parties or any of their Subsidiaries, obtain court authorization to commence, or commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Administrative Agent or the Lenders in each case relating to this Agreement, in each case other than as permitted by the Order;

(aa)     the Court denies confirmation of the Plan, provided, that if the Loan Parties subsequently obtain an order of the Court approving a plan of reorganization that either (i) proposes to repay in full in cash of all Loan Document Obligations under the Term Credit Facility, immediately upon the effectiveness thereof, (ii) is, taken as a whole, in form and substance substantially similar to the Plan of Reorganization or (iii) otherwise is approved by the Required Lenders, an Event of Default shall not occur;

LA\4104335.13

UST-1433

(bb)     The Loan Parties attempts to consummate a sale of substantially all of its assets via a plan of reorganization or a 363 sale without consent of the Required Lenders; or

(cc)     the filing by any of the Loan Parties of a Plan of Reorganization other than an Acceptable Plan;

then, notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Order, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrowers, take either or both of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, (ii) declare the Loans then outstanding to be due and payable in whole, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees, premiums and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers and (iii) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law.

## ARTICLE VIII

### The Administrative Agent

Each of the Lenders hereby irrevocably appoints the entity named as Administrative Agent in the heading of this Agreement and its successors to serve as administrative agent and collateral agent under the Loan Documents, and authorizes the Administrative Agent to take such actions on its behalf, including execution of the other Loan Documents, and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, each Lender hereby authorizes the Administrative Agent to consent, on behalf of each Lender, to the Order, each to be negotiated between the Loan Parties, the Administrative Agent, certain other parties and the statutory committees appointed pursuant to Sections 327 and 1103 of the Bankruptcy Code.

The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Parent Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and

86

UST-1434

is continuing (and it is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law, and that such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties), (b) the Administrative Agent shall not have any duty to take any discretionary action or to exercise any discretionary power, except discretionary rights and powers expressly contemplated by the Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents), provided that the Administrative Agent shall not be required to take any action that, in its opinion, could expose the Administrative Agent to liability or be contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any debtor relief law, and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Parent Borrower or any Subsidiary or any other Affiliate thereof that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents) or in the absence of its own gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and nonappealable judgment).  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof (stating that it is a "notice of default") is given to the Administrative Agent by the Borrowers or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or in connection with any Loan Document, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default, (iv) the sufficiency, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the creation, perfection or priority of Liens on the Collateral or the existence of the Collateral or (vi) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or satisfaction of any condition that expressly refers to the matters described therein being acceptable or satisfactory to the Administrative Agent.

The Administrative Agent shall be entitled to rely, and shall not incur any liability for relying, upon any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the signatory, sender or authenticator thereof).  The Administrative Agent also shall be entitled to rely, and shall not incur any liability for relying,

LA\4104335.13

UST-1435

upon any statement made to it orally or by telephone and believed by it to be made by the proper Person (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the signatory, sender or authenticator thereof), and may act upon any such statement prior to receipt of written confirmation thereof. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender, unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all their duties and exercise their rights and powers through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Subject to the terms of this paragraph, the Administrative Agent may resign at any time, upon thirty days prior notice, from its capacity as such. In connection with such resignation, the Administrative Agent shall give notice of its intent to resign to the Lenders and the Borrowers. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the consent of the Borrower so long as no Event of Default under clauses (a) or (b) of Article VII is continuing, to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its intent to resign, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents. The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed by the Borrowers and such successor. Notwithstanding the foregoing, in the event no successor Administrative Agent shall have been so appointed and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its intent to resign, the retiring Administrative Agent may give notice of the effectiveness of its resignation to the Lenders and the Borrowers, whereupon, on the date of effectiveness of such resignation stated in such notice, (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents,

LA\4104335.13

UST-1436

provided that, solely for purposes of maintaining any security interest granted to the Administrative Agent under any Collateral Document for the benefit of the Secured Parties, the retiring Administrative Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Secured Parties and, in the case of any Collateral in the possession of the Administrative Agent, shall continue to hold such Collateral, in each case until such time as a successor Administrative Agent is appointed and accepts such appointment in accordance with this paragraph (it being understood and agreed that the retiring Administrative Agent shall have no duty or obligation to take any further action under any Collateral Document, including any action required to maintain the perfection of any such security interest), and (b) the Required Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, provided that (i) all payments required to be made hereunder or under any other Loan Document to the Administrative Agent for the account of any Person other than the Administrative Agent shall be made directly to such Person and (ii) all notices and other communications required or contemplated to be given or made to the Administrative Agent shall also directly be given or made to each Lender.  Following the effectiveness of the Administrative Agent's resignation from its capacity as such, the provisions of this Article and Section 9.03, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent and in respect of the matters referred to in the proviso under clause (a) above.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any other Lender or the Debtors' Investment Banker, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, or any other Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Each Lender, by delivering its signature page to this Agreement and funding its Loans on the Effective Date, or delivering its signature page to an Assignment and Assumption or any other Loan Document pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent or the Lenders on the Effective Date.

Except with respect to the exercise of setoff rights of any Lender in accordance with the Loan Documents or with respect to a Lender's right to file a proof of claim in an insolvency proceeding, no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Loan Document Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent on behalf of the Secured Parties in accordance with the terms thereof.  In the event of a foreclosure by the Administrative Agent on any of the Collateral

LA\4104335.13

UST-1437

pursuant to a public or private sale or other disposition, the Administrative Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and the Administrative Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Loan Document Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent on behalf of the Secured Parties at such sale or other disposition.

The Secured Parties irrevocably authorize the Administrative Agent, at its option and in its discretion, to subordinate or release any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is a Permitted Encumbrance or that is permitted by Section 6.02(d), (e), (g) and (h). The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

In case of the pendency of any proceeding with respect to any Loan Party under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

    (a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, and all other Loan Document Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim under Sections 2.10, 2.11, 2.13, 2.14, 2.15 and 9.03) allowed in such judicial proceeding;

    (b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

    (c)    any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Lender and each Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders or the other Secured Parties, to pay to the Administrative Agent any amount due to it, in its capacity as the Administrative Agent, under the Loan Documents (including under Section 9.03).

To the extent required by any applicable laws (as determined in good faith by the Administrative Agent), the Administrative Agent may withhold from any payment to any Lender under any Loan Document an amount equivalent to any applicable withholding Tax. Without

LA\4104335.13

UST-1438

limiting or expanding the provisions of Section 2.15, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective).  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this paragraph.  The agreements in this paragraph shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Loan Document Obligations.

Notwithstanding anything herein to the contrary, neither the Debtors' Investment Banker nor any Person (if any) named on the cover page of this Agreement for recognition purposes only shall have any duties or obligations under this Agreement or any other Loan Document (except in any such Person's capacity, as and to the extent applicable, as a Lender), but all such Persons shall have the benefit of the indemnities to the extent referenced and provided for hereunder.

Unless otherwise expressly stated or referred to in this Article, the provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and, except solely to the extent of the Borrowers' rights to consent pursuant to and subject to the conditions set forth in this Article, none of the Borrowers or any other Loan Party shall have any rights as a third party beneficiary of any such provisions.  Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Loan Document Obligations provided under the Loan Documents, to have agreed to the provisions of this Article.

ARTICLE IX

Miscellaneous

SECTION 9.01.   Notices.

(a)      Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) of this Section), all notices and other communications provided for herein shall be in writing and shall be delivered by e-mail, hand or overnight courier service, or mailed by certified or registered mail, as follows:

(i)      if to the Borrowers:

UST-1439

Ascena Retail Group, Inc.
933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attention: Dan Lamadrid, Executive Vice President and Chief Financial Officer
E-mail: dan.lamadrid@ascenaretail.com

with a copy to:

933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attention: Gary Holland, General Counsel and VP
E-mail: gary.holland@ascenaretail.com

With a copy to:
Kirkland & Ellis LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Attention: David M. Nemecek, P.C.
Email: david.nemecek@kirkland.com


(ii)     if to the Administrative Agent:

Alter Domus (US) LLC
225 W. Washington St., 9th Floor
Chicago, IL 60606
Attention: Legal Department and Hendrik van der Zandt
Email: legal@alterdomus.com and hendrik.vanderzandt@alterdomus.com


with a copy to:

Holland & Knight LLP
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
Attention: Joshua Spencer
Email: joshua.spencer@hklaw.com

and

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attention: Evan Fleck
Email: EFleck@milbank.com

92

UST-1440

(iii)     if to any other Lender, to it at its address or e-mail address set forth in its Administrative Questionnaire.

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received and (ii) delivered through electronic communications to the extent provided in paragraph (b) of this Section shall be effective as provided in such paragraph.

(b)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications (including e-mail and internet or intranet websites) pursuant to procedures approved by the Administrative Agent; <u>provided</u> that the foregoing shall not apply to notices under Article II to any Lender if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Parent Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, <u>provided</u> that approval of such procedures may be limited to particular notices or communications.  All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by return e-mail or other written acknowledgement); <u>provided</u> that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (b)(i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     Any party hereto may change its address for notices and other communications hereunder by notice to the other parties hereto.

(d)     The Borrowers agree that the Administrative Agent may, but shall not be obligated to, make any Communication by posting such Communication on Debt Domain, Intralinks, Syndtrak or a similar electronic transmission system (the "<u>Platform</u>").  The Platform is provided "as is" and "as available."  Neither the Administrative Agent nor any of its Related Parties warrants, or shall be deemed to warrant, the adequacy of the Platform and each expressly disclaims liability for errors or omissions in the Communications.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made, or shall be deemed to be made, by the Administrative Agent or any of its Related Parties in connection with the Communications or the Platform.

SECTION 9.02.    <u>Waivers; Amendments</u>.

(a)     No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the

LA\4104335.13

UST-1441

Administrative Agent and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. Without limiting the generality of the foregoing, the execution and delivery of this Agreement or the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)     Except as provided in Sections 9.02(c) and 9.19 and except with respect to the Administrative Agent Fee Letter, none of this Agreement, any other Loan Document or any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrowers, the Administrative Agent and the Required Lenders and, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders, provided that (i) any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrowers and the Administrative Agent to cure any technical error, ambiguity, omission, defect or inconsistency so long as, in each case, the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment and (ii) no such agreement shall (A) increase the Commitment of any Lender without the written consent of such Lender, (B) reduce or forgive the principal amount of any Loan or reduce the rate of interest thereon or reduce or forgive any interest or fees or premiums (including any prepayment premiums but excluding for the avoidance of doubt, any mandatory prepayment) payable hereunder without the written consent of each Lender directly affected thereby, (C) postpone the scheduled maturity date of any Loan, or the date of any scheduled payment of the principal amount of any Term Loan under Section 2.08, or any date for the payment of any interest or fees or premium payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly affected thereby, (D) change Section 2.16(b) or 2.16(c) in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender, (E) change any of the provisions of this Section or the percentage set forth in the definition of the term "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender; provided that, with the consent of the Required Lenders, the provisions of this Section and the definition of the term "Required Lenders" may be amended to include references to any new class of loans created under this Agreement (or to lenders extending such loans) on substantially the same basis as the corresponding references relating to the existing Loans or Lenders, (F) release substantially all of the value of the Guarantees provided by the Guarantors (including, in each case, by limiting liability in respect thereof) created under the Collateral Agreement without the written consent of each Lender (except as expressly provided in Section 9.16 or the Collateral Agreement including any such release by the Administrative Agent in connection with any sale or other disposition of

any Subsidiary upon the exercise of remedies under the Collateral Documents), it being understood that an amendment or other modification of the type of obligations guaranteed under the Collateral Agreement shall not be deemed to be a release or limitation of any Guarantee, and (G) release all or substantially all the Collateral from the Liens of the Collateral Documents, without the written consent of each Lender (except as expressly provided in Section 9.16 or the applicable Collateral Document (including any such release by the Administrative Agent in connection with any sale or other disposition of the Collateral upon the exercise of remedies under the Collateral Documents), it being understood that an amendment or other modification of the type of obligations secured by the Collateral Documents shall not be deemed to be a release of the Collateral from the Liens of the Collateral Documents); provided further that no such agreement shall amend, modify, extend or otherwise affect the rights or obligations of the Administrative Agent without the prior written consent of the Administrative Agent. Notwithstanding the foregoing, no consent with respect to any amendment, waiver or other modification of this Agreement or any other Loan Document shall be required of, in the case of any amendment, waiver or other modification referred to in clause (ii) of the first proviso of this paragraph, any Lender that receives payment in full of the principal of and interest accrued on each Loan made by, and all other amounts owing to, such Lender or accrued for the account of such Lender under this Agreement and the other Loan Documents at the time such amendment, waiver or other modification becomes effective and whose Commitments terminate by the terms and upon the effectiveness of such amendment, waiver or other modification.

(c)     Notwithstanding anything herein to the contrary, the Administrative Agent may, without the consent of any Secured Party, consent to a departure by any Loan Party from any covenant of such Loan Party set forth in this Agreement, the Collateral Agreement or in any other Collateral Document to the extent such departure is consistent with the authority of the Administrative Agent set forth in the definition of the term "Collateral and Guarantee Requirement".

(d)     The Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, waivers or other modifications on behalf of such Lender.  Any amendment, waiver or other modification effected in accordance with this Section 9.02 shall be binding upon each Person that is at the time thereof a Lender and each Person that subsequently becomes a Lender.

(e)     Notwithstanding the foregoing, Exhibit G to this Agreement, the definitions of "Exit Facility Agreement" and "Exit Facility Term Sheet" and Section 2.22 (or any other provision which would result in an amendment, restatement, waiver or modification of any of the foregoing) may be amended, restated, waived or otherwise modified with the prior written consent of the Required Lenders, the Administrative Agent and the Parent Borrower; provided that to the extent such amendment, restatement, waiver or other modification would require the consent of any affected "Lender", all "Lenders" or any other Person (or requisite class of Persons) under the terms of Exhibit G as in effect on the Effective Date, the prior written consent of the corresponding affected Lender, all Lenders or such corresponding Person (or requisite class of Persons) under this Agreement shall be required; provided, further, that the Lenders hereby authorize the Administrative Agent to enter into any amendments to this Agreement and the other Loan Documents as may be necessary, in the reasonable opinion of the Administrative Agent and the Borrower, to give effect to the transaction contemplated by Section 2.22 and such

95

UST-1443

other technical or immaterial amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Parent Borrower in connection therewith.

SECTION 9.03.    Expenses; Indemnity; Damage Waiver.

(a)    The Borrowers shall, jointly and severally, pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Ad Hoc Committee, the Lenders and their respective Affiliates, including the reasonable and documented out-of-pocket fees, charges and disbursements of one primary counsel for the Administrative Agent, one primary counsel for the Ad Hoc Committee, and if deemed necessary by the Administrative Agent or the Ad Hoc Committee, one local counsel for the Administrative Agent and Ad Hoc Committee, as applicable in each applicable jurisdiction, in connection with the structuring, arrangement and syndication of the credit facilities provided for herein and any credit or similar facility refinancing or replacing, in whole or in part, any of the credit facilities provided for herein, including the preparation, execution, delivery and administration of this Agreement, the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof, the Order and any transaction contemplated thereby (whether or not the transactions contemplated hereby or thereby shall be consummated) and any refinancing of the obligations hereunder or any "exit financing" requested by the Loan Parties in connection with the Chapter 11 Cases (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable and documented out-of-pocket expenses in connection with the administration of actions related to the Collateral, including any actions taken to perfect or maintain priority of the Administrative Agent's Liens on the Collateral, to maintain any insurance required hereunder, to verify the Collateral, or any audit, inspection, or appraisal related to any Loan Party or the Collateral  and (iii) all out-of-pocket expenses incurred by the Administrative Agent, the Ad Hoc Committee or any Lender, including the fees, charges and disbursements of any counsel for any of the foregoing, in connection with the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)    The Borrowers shall, jointly and severally, indemnify the Administrative Agent (and any subagent thereof), and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee"), against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the structuring, arrangement and the syndication of the credit facilities provided for herein, the preparation, execution, enforcement, delivery and administration of this Agreement, the other Loan Documents or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to this Agreement or the other Loan Documents of their obligations thereunder or the consummation of the Transactions or any other transactions contemplated thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on, at, under to or from any property currently or formerly owned or operated by the Parent Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Parent Borrower or any Subsidiary or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing,

96

UST-1444

whether based on contract, tort or any other theory and regardless of whether such proceeding is initiated against or by any party to this Agreement, or any Affiliate thereof, by an Indemnitee or any third party or whether any Indemnitee is a party thereto; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses (i) are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee, (ii) are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from a material breach by such Indemnitee of the Loan Documents or (iii) involve a dispute solely among Indemnitees (other than an action involving (i) alleged conduct by any Borrower or any of its Affiliates or (ii) against the Administrative Agent in its capacity as such). This Section shall not apply to any Taxes (other than Other Taxes or any Taxes that represent losses, claims, damages or related expenses arising from any non-Tax claim).

      (c)      Each Lender severally agrees to indemnify and hold harmless the Administrative Agent (or any sub-agent thereof), to the extent that the Administrative Agent (or any sub-agent) shall not have been timely reimbursed by the Borrowers, based on and to the extent of such Lender's pro rata share, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Administrative Agent (or any sub-agent thereof) in exercising its powers, rights and remedies or performing its duties hereunder or under the other Loan Documents or otherwise in its capacity as the Administrative Agent (or any sub-agent thereof) in any way relating to or arising out of this Agreement or the other Loan Documents; provided, that no Lender shall be liable to the Administrative Agent (or any sub-agent) for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or any sub-agent's) gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction (it being understood and agreed that no action taken in accordance with the directions of the Required Lenders (or such other Lenders as may be required to give such instructions under Article VIII) shall constitute gross negligence or willful misconduct). If any indemnity furnished to the Administrative Agent (or any sub-agent thereof) for any purpose shall, in the opinion of the Administrative Agent (or any sub-agent thereof), be insufficient or become impaired, the Administrative Agent (or any sub-agent ) may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, that in no event shall this sentence require any Lender to indemnify the Administrative Agent (or any sub-agent thereof) against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's pro rata share. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the total outstanding Loans and unused Commitments at such time (or if such indemnity payment is sought after the date on which the Loans have been paid in full in accordance with such Lender's pro rata share immediately prior to the date on which the Loans are paid in full).

      (d)      To the extent permitted by applicable law, (i) the Borrowers shall not assert, or permit any of their respective Affiliates or Related Parties to assert, and hereby waives, any claim against any Indemnitee for any damages arising from the use by others of information or

LA\4104335.13

UST-1445

other materials obtained through telecommunications, electronic or other information transmission systems (including the internet)and (ii) none of the Borrowers or any Secured Party shall assert, or permit any of their respective Affiliates or Related Parties to assert any claims on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)      All amounts due under this Section shall be payable not later than 10 days after written demand therefor.

SECTION 9.04.    <u>Successors and Assigns</u>.

(a)      The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i)  neither Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by any Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section), the Debtors' Investment Banker (to the extent provided in Article VIII)and, to the extent expressly contemplated hereby, the sub-agents of the Administrative Agent and the Related Parties of any of the Administrative Agent and any Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

(i)      the Borrowers; <u>provided</u> that no consent of Borrowers shall be required (1) for an assignment to a Lender, a Related Lender, an Affiliate of a Lender or an Approved Fund, (2) if in connection with the Initial Allocation (as defined in the Commitment Letter) or to Persons who have delivered a joinder and an election agreement to the Ad Hoc Committee Advisors by August 13, 2020 and (3) if an Event of Default has occurred and is continuing, for any other assignment; <u>provided further</u> that, the Borrowers shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof.

(ii)      the Administrative Agent; <u>provided</u> that no consent of the Administrative Agent shall be required for an assignment of any Loan to a Lender, a Related Lender, an Affiliate of a Lender or an Approved Fund.

(iii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, a Related Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent and recorded in the Register) shall not be less than $1,000,000 unless each of the Borrowers and the Administrative Agent otherwise consent; provided that no such consent of the Borrowers shall be required (i) if an Event of Default has occurred and is continuing or (ii) in connection with the Initial Allocation (as defined in the Commitment Letter) or to Persons who have delivered a joinder and an election agreement to the Ad Hoc Committee Advisors by August 13, 2020;

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided that only one such processing and recordation fee shall be payable in the event of simultaneous assignments from any Lender or its Approved Funds to one or more other Approved Funds of such Lender;

(D)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent all requested "know your customer" documentation, a duly executed IRS Form W-9 or such other applicable IRS Form, and an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain MNPI) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable law, including Federal, State and foreign securities laws;

(E)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent, the Ad Hoc Committee Advisors and the Company a signed joinder to the Restructuring Support Agreement; and

(F)    each Lender acknowledges and agrees that the Loans, on the one hand, and the unfunded Commitments on the other hand, shall be held by such Lender in equal percentages and such Loans, on the one hand, and such unfunded Commitments, on the other hand, are "stapled" to each other, and shall be assigned in equal percentages.

(iv)    Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section, from and after the effective date specified in each Assignment and

UST-1447

Assumption the assignee thereunder shall be a party hereto and, to the extent of the
interest assigned by such Assignment and Assumption, have the rights and obligations of
a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent
of the interest assigned by such Assignment and Assumption, be released from its
obligations under this Agreement (and, in the case of an Assignment and Assumption
covering all of the assigning Lender's rights and obligations under this Agreement, such
Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of
Sections 2.13, 2.14, 2.15 and 9.03). Any assignment or transfer by a Lender of rights or
obligations under this Agreement that does not comply with this Section shall be treated
for purposes of this Agreement as a sale by such Lender of a participation in such rights
and obligations in accordance with Section 9.04(c).

(v)     The Administrative Agent, acting solely for this purpose as a nonfiduciary
agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment
and Assumption delivered to it and records of the names and addresses of the Lenders,
and the Commitment of, and principal amount (and stated interest) of the Loans owing to,
each Lender pursuant to the terms hereof from time to time (the "Register"). The entries
in the Register shall be conclusive absent manifest error, and the Borrowers, the
Administrative Agent and the Lenders shall treat each Person whose name is recorded in
the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this
Agreement, notwithstanding notice to the contrary. The Register shall be available for
inspection by the Borrowers and, as to entries pertaining to it, any Lender, at any
reasonable time and from time to time upon reasonable prior written notice.

(vi)     Upon receipt by the Administrative Agent of an Assignment and
Assumption executed by an assigning Lender and an assignee, the assignee's completed
Administrative Questionnaire (unless the assignee shall already be a Lender hereunder),
all other information required under (iii)(D) above and the processing and recordation fee
referred to in this Section, the Administrative Agent shall accept such Assignment and
Assumption and record the information contained therein in the Register; provided that
the Administrative Agent shall not be required to accept such Assignment and
Assumption or so record the information contained therein if the Administrative Agent
reasonably believes that such Assignment and Assumption lacks any written consent
required by this Section or is otherwise not in proper form, it being acknowledged that
the Administrative Agent shall have no duty or obligation (and shall incur no liability)
with respect to obtaining (or confirming the receipt) of any such written consent or with
respect to the form of (or any defect in) such Assignment and Assumption, any such duty
and obligation being solely with the assigning Lender and the assignee. No assignment
shall be effective for purposes of this Agreement unless it has been recorded in the
Register as provided in this paragraph, and following such recording, unless otherwise
determined by the Administrative Agent (such determination to be made in the sole
discretion of the Administrative Agent, which determination may be conditioned on the
consent of the assigning Lender and the assignee), shall be effective notwithstanding any
defect in the Assignment and Assumption relating thereto. Each assigning Lender and
the assignee, by its execution and delivery of an Assignment and Assumption, shall be
deemed to have represented to the Administrative Agent that all written consents required
by this Section with respect thereto (other than the consent of the Administrative Agent)

100

UST-1448

have been obtained and that such Assignment and Assumption is otherwise duly completed and in proper form, and each assignee, by its execution and delivery of an Assignment and Assumption, shall be deemed to have represented to the assigning Lender and the Administrative Agent that such assignee is an Eligible Assignee.

(vii)   No such assignment shall be made to the Parent Borrower or any of its Subsidiaries, except as set forth in Section 9.04(e).

(c)   (i) Any Lender may, without the consent of the Borrowers or the Administrative Agent, sell participations to one or more Eligible Assignees ("Participants") in all or a portion of such Lender's rights and obligations under this Agreement; provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under the Loan Documents.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant or requires the approval of all the Lenders.  The Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.13, 2.14 and 2.15 (subject to the requirements and limitations therein, including the requirements under Section 2.15(e) (it being understood that the documentation required under Section 2.15(e) shall be delivered solely to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (x) agrees to be subject to the provisions of Sections 2.16 and 2.17 as if it were an assignee under paragraph (b) of this Section and (y) shall not be entitled to receive any greater payment under Section 2.13 or 2.15, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation agrees, at the Borrowers' request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 2.17(b) with respect to any Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.16(c) as though it were a Lender.

(i)   Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain records of the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement or any other Loan Document (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments or Loans or its other obligations under this Agreement or any other Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such

LA\4104335.13

UST-1449

Commitment or Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     Notwithstanding anything to the contrary contained in this Section 9.04 or any other provision of this Agreement, no Lender shall have the right at any time to sell, assign or transfer all or a portion of the Loans owing to it to the Parent Borrower or any of its Subsidiaries.

SECTION 9.05.   Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, any Lender or any Affiliate of any of the foregoing may have had notice or knowledge of any Default or incorrect representation or warranty at the time any Loan Document is executed and delivered or any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Sections 2.13, 2.14, 2.15, 2.16(e) and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.06.   Counterparts; Integration; Effectiveness; Electronic Execution.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns. Delivery of an executed counterpart of a signature

102

UST-1450

page of this Agreement by facsimile or other electronic imaging shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 9.07.   Severability.  Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08.   Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized (notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Court) at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender to or for the credit or the account of any Loan Party against any of and all the Loan Document Obligations held by such Lender, irrespective of whether or not such Lender shall have made any demand under the Loan Documents and although such obligations may be unmatured.  The applicable Lender shall notify the Borrowers and the Administrative Agent of such set-off or application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such set-off or application under this Section.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 9.09.   Governing Law; Jurisdiction; Consent to Service of Process.

(a)   Except to the extent superseded by the Bankruptcy Code, this Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)   Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the Court or the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and the Borrowers hereby irrevocably and unconditionally agree that all claims arising out of or relating to this Agreement or any other Loan Document brought by the Borrowers or any of their respective Affiliates shall be brought, and shall be heard and determined in the Court, in such New York State or, to the extent permitted by law, in such Federal court.  Each party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any

LA\4104335.13

UST-1451

other manner provided by law.  Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or any of its properties in the courts of any jurisdiction.

(c)   The Borrowers hereby irrevocably and unconditionally waive, to the fullest extent they may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)   Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10.   WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11.   Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12.   Confidentiality.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below) with the same degree of care that it uses to protect its own confidential information, but in no event less than a commercially reasonable degree of care, except that Information may be disclosed (a) to its Related Parties, including accountants, legal counsel and other agents and advisors, it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable law or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies under this Agreement or any other Loan Document

104

UST-1452

or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing confidentiality undertakings substantially similar to those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its Related Parties) to any swap or derivative transaction relating to the Parent Borrower or any Subsidiary or its obligations, (g) on a confidential basis to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the credit facilities provided for herein, (h) with the consent of the Borrowers or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender or any Affiliate of any of the foregoing on a non-confidential basis from a source other than the Borrowers; <u>provided</u> that, in the case of clause (c) above, the party disclosing such information shall provide to the Borrowers prior written notice of such disclosure to the extent permitted by applicable law (and to the extent commercially feasible under the circumstances) and shall cooperate with the Borrowers in obtaining a protective order for, or other confidential treatment of, such disclosure.  For the purposes of this Section, "<u>Information</u>" means all information received from the Borrowers relating to the Parent Borrower or any Subsidiary or their businesses or the Collateral.

SECTION 9.13.    <u>Several Obligations; Nonreliance; Violation of Law</u>.  The respective obligations of the Lenders hereunder are several and not joint and the failure of any Lender to make any Loan or perform any of its obligations hereunder shall not relieve any other Lender from any of its obligations hereunder.  Anything contained in this Agreement to the contrary notwithstanding, no Lender shall be obligated to extend credit to the Borrowers in violation of applicable law.

SECTION 9.14.    <u>USA Patriot Act Notice</u>.  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Loan Party that pursuant to the requirements of the Patriot Act it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with such Act.

SECTION 9.15.    <u>Interest Rate Limitation</u>.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable law (collectively the "<u>Charges</u>"), shall exceed the maximum lawful rate (the "<u>Maximum Rate</u>") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

LA\4104335.13

UST-1453

SECTION 9.16.   Release of Liens and Guarantees.  A Guarantor (for the avoidance of doubt, other than the Borrowers) shall be released from its obligations under the Loan Documents, and all security interests created by the Collateral Documents in Collateral owned by such Guarantor shall be released, upon the consummation of any transaction permitted by this Agreement as a result of which such Guarantor ceases to be a Restricted Subsidiary (including any voluntary liquidation or dissolution of such Guarantor in accordance with Section 6.03); provided that, if so required by this Agreement, the Required Lenders shall have consented to such transaction and the terms of such consent shall not have provided otherwise.  Upon any sale or other transfer by any Loan Party (other than to a Borrower or any other Loan Party or to any other Subsidiary of the Parent Borrower) of any Collateral in a transaction permitted under this Agreement, or upon the effectiveness of any written consent to the release of the security interest created under any Collateral Document in any Collateral pursuant to Section 9.02, the security interests in such Collateral created by the Collateral Documents shall be automatically released.  In connection with any termination or release pursuant to this Section, the Administrative Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release.  Any execution and delivery of documents pursuant to this Section shall be without recourse to or warranty by the Administrative Agent.

SECTION 9.17.   No Fiduciary Relationship.  Each Borrower, on behalf of itself and the Subsidiaries, agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, the Parent Borrower, the Subsidiaries and its other Affiliates, on the one hand, and the Administrative Agent, the Lenders and their Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Administrative Agent, the Lenders or their Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications.  The Administrative Agent, the Lenders and their Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of the Parent Borrower, the Subsidiaries and its other Affiliates, and none of the Administrative Agent, the Lenders or their Affiliates has any obligation to disclose any of such interests to the Parent Borrower, the Subsidiaries or its other Affiliates.  To the fullest extent permitted by law, each Borrower hereby waives and releases any claims that it or any of its Affiliates may have against the Administrative Agent, the Lenders and their Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 9.18.   Non-Public Information.

(a)      Each Lender acknowledges that all information, including requests for waivers and amendments, furnished by a Borrower or the Administrative Agent pursuant to or in connection with, or in the course of administering, this Agreement will be syndicate-level information, which may contain MNPI.  Each Lender represents to the Borrowers and the Administrative Agent that (i) it has developed compliance procedures regarding the use of MNPI and that it will handle MNPI in accordance with such procedures and applicable law, including Federal, state and foreign securities laws, and (ii) it has identified in its Administrative Questionnaire a credit contact who may receive information that may contain MNPI in

UST-1454

accordance with its compliance procedures and applicable law, including Federal, state and foreign securities laws.

(b)     The Borrowers and each Lender acknowledge that, if information furnished by the Loan Parties pursuant to or in connection with this Agreement is being distributed by the Administrative Agent through the Platform, (i) the Administrative Agent may post any information that the Borrowers have indicated as containing MNPI solely on that portion of the Platform designated for Private Side Lender Representatives and (ii) if the Borrowers have not indicated whether any information furnished by it pursuant to or in connection with this Agreement contains MNPI, the Administrative Agent reserves the right to post such information solely on that portion of the Platform designated for Private Side Lender Representatives.  The Borrowers agree to clearly designate all information provided to the Administrative Agent by or on behalf of the Borrowers that is suitable to be made available to Public Side Lender Representatives, and the Administrative Agent shall be entitled to rely on any such designation by the Borrowers without liability or responsibility for the independent verification thereof.

SECTION 9.19.   Intercreditor Agreement.  (a) Each of the Lenders and the other Secured Parties acknowledges that obligations of the Loan Parties under the ABL Credit Agreement are secured by Liens on assets of the Loan Parties that constitute Collateral and that the relative Lien priorities and other creditor rights of the Secured Parties and the secured parties under the ABL Credit Agreement will be set forth in the Intercreditor Agreement.  Each of the Lenders and the other Secured Parties hereby acknowledges that it has received a copy of the Intercreditor Agreement.  Each of the Lenders and the other Secured Parties hereby irrevocably authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, the Intercreditor Agreement and any documents relating thereto.

(a)     Each of the Lenders and the other Secured Parties hereby irrevocably (i) consents to the treatment of Liens provided for under the Intercreditor Agreement, including to the subordination of the Liens on the ABL Priority Collateral securing the Loan Document Obligations on the terms set forth in the Intercreditor Agreement, (ii) agrees that, upon the execution and delivery thereof, such Secured Party will be bound by the provisions of the Intercreditor Agreement as if it were a signatory thereto and will take no actions contrary to the provisions of the Intercreditor Agreement, (iii) agrees that no Secured Party shall have any right of action whatsoever against the Administrative Agent as a result of any action taken by the Administrative Agent pursuant to this Section 9.19 or in accordance with the terms of the Intercreditor Agreement, (iv) authorizes and directs the Administrative Agent to carry out the provisions and intent of each such document and (v) authorizes and directs the Administrative Agent to take such actions as shall be required to release Liens on the Collateral in accordance with the terms of the Intercreditor Agreement.

(b)     Each of the Lenders and the other Secured Parties hereby irrevocably further authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, any amendments, supplements or other modifications of the Intercreditor Agreement that the Borrowers may from time to time request and that are reasonably acceptable to the Administrative Agent (i) to give effect to any establishment, incurrence, amendment,

LA\4104335.13

UST-1455

extension, renewal, refinancing or replacement of any Loan Document Obligations or the Indebtedness under the ABL Credit Agreement to the extent applicable, (ii) to confirm for any party that the Intercreditor Agreement is effective and binding upon the Administrative Agent on behalf of the Secured Parties or (iii) to effect any other amendment, supplement or modification permitted by the terms of the Intercreditor Agreement.

(c)     Each of the Lenders and the other Secured Parties hereby irrevocably further authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, any amendments, supplements or other modifications of any Collateral Document to add or remove any legend that may be required pursuant to the Intercreditor Agreement.

(d)     The Administrative Agent shall have the benefit of the provisions of Article VIII with respect to all actions taken by it pursuant to this Section or in accordance with the terms of the Intercreditor Agreement to the full extent thereof.

SECTION 9.20.   Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any related agreement, arrangement or understanding among the parties hereto, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder that may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)  a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

[Signature pages follow]

108

UST-1456

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**PARENT BORROWER:**

ASCENA RETAIL GROUP, INC.

By: _____

Name:

Title:

LA\4104335.13

UST-1457

**SUBSIDIARY BORROWER:**

ANNTAYLOR RETAIL, INC.

By: _____
     Name:
     Title:

ALTER DOMUS (US) LLC,
as Administrative Agent,

By: _____
           Name:
           Title:

*[Signature Page to the Term Credit Agreement]*

UST-1459

## Schedule 2.01

## Commitments

| Lender | Commitment |
|--------|------------|
| [   ] | $ [   ],000,000 |
| **Total** | $ [   ],000,000 |

UST-1460

Schedule 5.11
Required Milestones

The Loan Parties shall use their reasonable best efforts to pursue and implement the Restructuring Transactions as defined in, and in accordance with, the RSA and shall, subject to the availability of the Court and as such time periods may be extended by the Required Lenders, achieve the following milestones:

        (a)      the Petition Date shall have occurred by 11:59 p.m. (Eastern Time) on July 23, 2020;

        (b)      the Debtors shall have filed the Rent Deferral Motion (as defined in the RSA) with the Court within three (3) calendar days of the Petition Date;

        (c)      the Court shall have entered the Cash Collateral Order (as defined in the RSA) on an interim basis by the date that is five (5) Business Days after the Petition Date;

        (d)      the Court shall have entered the DIP Financing Order (as defined in the RSA) on a final basis by the date that is fifty (50) calendar days after the Petition Date;

        (e)      the Court shall have entered the Disclosure Statement Order (as defined in the RSA) by the date that is sixty (60) calendar days after the Petition Date;

        (f)      solicitation of the Plan (as defined in the RSA) shall have commenced by the date that is seventy (70) calendar days after the Petition Date;

        (g)      the Court shall have entered the Confirmation Order (as defined in the RSA) by the date that is one hundred ten (110) calendar days after the Petition Date; and

        (h)      the Plan Effective Date (as defined in the RSA) shall have occurred by the date that is one hundred thirty (130) calendar days after the Petition Date.

UST-1461

**Exhibit B**

See Attached.

UST-1462

## Exit Facility Term Sheet[1]

| | |
|---|---|
| **Borrowers:** | Reorganized Ascena Retail Group, Inc., a Delaware corporation (the "**Parent Borrower**") and AnnTaylor Retail, Inc., a Florida corporation (the "**Subsidiary Borrower**" and, together with the Parent Borrower, the "**Borrowers**"). |
| **Administrative Agent and Collateral Agent:** | Alter Domus (US) LLC (in its capacity as administrative agent, the "**Administrative Agent**", and in its capacity as collateral agent, the "**Collateral Agent**"). |
| **Lenders:** | Holders of DIP Term Facility Claims will receive First Out Term Loans and, together with other holders of Term Loan Claims, Last Out Term Loans (each as defined below), respectively, as set forth in the Proposed Plan (collectively, the "**Lenders**") |
| **Term Loan Facility:** | First lien senior secured term loan facility in an aggregate original principal amount of $400 million, denominated in US Dollars, consisting of: |

- $311.8 million of first-out term loans (the "**First Out Term Loan Facility**", the loans thereunder, the "**First Out Term Loans**" and the commitments thereunder, the "**First-Out Commitments**") converted in accordance with the Proposed Plan to holders of DIP Term Facility Claims; and

- $88.2 million of last-out term loans (the "**Last Out Term Loan Facility**", the loans thereunder, the "**Last Out Term Loans**" and the commitments thereunder, the "**Last-Out Commitments**") distributed to holders of Term Loan Claims in accordance with the Proposed Plan.

As used herein, "**Term Loan Facility**" means, collectively, the First Out Term Loan Facility and the Last Out Term Loan Facility. "**Commitments**" means, collectively, the First Out Commitments and the Last Out Commitments. "**Term Loans**" means, collectively, the First Out Term Loans and the Last Out Term Loans.

The First Out Term Loans will be "first out" in right of payment priority and the Last Out Term Loans will be "last out" in right of payment priority (in each case, as between the tranches of Term

---

[1] Capitalized terms used but not defined in this Exit Facility Term Sheet have the meanings ascribed to them in the Restructuring Support Agreement, dated as of July 23, 2020 (the "**Restructuring Support Agreement**") to which this Exit Facility Term Sheet is attached or the Proposed Plan attached as Exhibit B to the Restructuring Support Agreement.

UST-1463

Loans).  The First Out Term Loans and Last Out Term Loans shall be secured on a *pari passu* basis by the same lien on the Collateral (as defined below).

| | |
|---|---|
| **Definitive Documentation:** | The definitive documentation for the Term Loan Facility (the "**Definitive Documentation**") shall, except as otherwise set forth herein, be based on the Term Credit Agreement, dated as of  August 21, 2015 (as amended, supplemented or otherwise modified prior to the date hereof), by and among Ascena Retail Group, Inc., AnnTaylor Retail, Inc., certain subsidiaries of the Parent Borrower party thereto, Goldman Sachs Bank USA, as the administrative agent and the collateral agent, and certain lenders party thereto from time to time (the "**Prepetition Term Loan Credit Agreement**"), (i) as modified by the terms set forth herein, (ii) subject to modifications to reflect changes in law or accounting standards since the date of such precedent and administrative agency, collateral agency and operational requirements of the Administrative Agent and Collateral Agent and (iii) with such other terms and conditions as may be reasonably agreed between the Borrowers and the Required Consenting Stakeholders; provided that, except as otherwise agreed by the Required Consenting Stakeholders, the Definitive Documentation shall be substantially consistent with the documentation governing the Exit ABL Facility (other than (i) provisions that are specific to asset-based facilities, (ii) the financial covenants applicable thereto, (iii) cross-defaults with respect to the Term Loan Facility and (iv) such other terms mutually agreed between the Borrowers and the Required Consenting Stakeholders).  The Definitive Documentation shall be negotiated in good faith within a reasonable time period to be determined based on the expected date of Bankruptcy Court's entry into the Confirmation Order, with initial drafts of the Definitive Documentation to be prepared by counsel for the Consenting Stakeholders, which is Milbank LLP. This paragraph, collectively, is referred the here as the "**Documentation Principles**". |
| **Maturity Date:** | First Out Term Loans: 4 years after the Effective Date (the "**First Out Maturity Date**").<br><br>Last Out Term Loans: 5 years after the Effective Date (the "**Last Out Maturity Date**"). |
| **Amortization:** | First Out Term Loans: Commencing with the last day of the first full calendar quarter following the Effective Date, the outstanding principal amount of the First Out Term Loans will be payable on each calendar quarter in equal amounts of (i) for each calendar quarter occurring on or prior to the second anniversary of the Effective Date, 1.00% *per annum* and (ii) for each calendar quarter |

UST-1464

thereafter, 3.00% *per annum,* in each case of the original principal amount of the First Out Term Loans, with the remaining balance, together with all other amounts owed with respect thereto, payable on the First Out Maturity Date, subject to reduction pursuant to the prepayment provisions to be mutually agreed in the Definitive Documentation.

Last Out Term Loans:  The outstanding principal amount of the Last Out Term Loans will be payable on each calendar quarter in equal amounts of 1.00% *per annum* of the original principal amount of the Last Out Term  Loans, with the remaining balance, together with all other amounts owed with respect thereto, payable on the Last Out Maturity Date .

**Voluntary Prepayments:**  The Borrowers may make voluntary prepayments of the Term Loans, in each case, other than in connection with a repricing event, without premium or penalty, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of LIBOR borrowings other than on the last day of the relevant interest period.

**Mandatory Prepayments:**  Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles; provided that no prepayment shall be required pursuant to Section 2.09(c) thereof for any Excess Cash Flow (as defined in the Prepetition Term Loan Credit Agreement).

**Interest:**  With respect to the First Out Term Loans, at the Parent Borrower's election:

- ABR (defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement) *plus* 10.75% per annum in cash or Adjusted LIBO Rate (defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement) *plus* 11.75% per annum in cash (subject to a 0.00% per annum floor on ABR and a 1.00% *per annum* floor on the Adjusted LIBO Rate) .

With respect to the Last Out Term Loans, at the Parent Borrower's election:

- prior to the second anniversary of the Effective Date, ABR *plus* 2.00% *per annum* in cash and 8.00% *per annum* in kind ("**PIK**") or Adjusted LIBO Rate *plus* 2.50% *per annum* in cash and 8.50% PIK, and thereafter, ABR *plus* 10.00% *per annum* in cash or Adjusted LIBO Rate *plus* 11.00% *per annum* in cash

3

UST-1465

(in each case subject to a 0.00% *per annum* floor on ABR and a 1.00% *per annum* floor on the Adjusted LIBO Rate).

**Prepayment Premium**          NC1/106.375%/103.1875%/par, with the Make-Whole Amount payable at an amount equal to the present value of the amount of interest that would have been paid on the principal amount of the Loans to and including the 3.5 year anniversary of the Closing Date (in each case, calculated on the basis of the interest rate with respect to the Loans then in effect, on a quarterly basis and on the basis of actual days elapsed over a year of three hundred sixty-five (365) days). The present value calculation shall be calculated using the discount rate equal to the Treasury Rate as of such repayment or prepayment date or date of required repayment plus fifty (50) basis points. The Prepayment Premium and Make-Whole Amount shall be payable upon any repricing event or acceleration. The Definitive Documentation shall contain a "Momentive" provision satisfactory to the Required Consenting Stakeholders.

**Guarantees:**          All obligations of the Borrowers under the definitive credit agreement for the Term Loan Facility (the "**Exit Credit Agreement**") and the related guarantee and collateral agreement, mortgage agreements and other collateral documents (together with the Exit Credit Agreement, the "**Loan Documents**") (collectively, the "**Borrowers Obligations**") will be unconditionally guaranteed jointly and severally on a senior basis (the "**Guarantees**") by the direct parent of the Borrower and each existing and subsequently acquired or organized direct or indirect Material Domestic Subsidiary, Material Foreign Subsidiary and, notwithstanding anything to the contrary herein, (x) each Luxembourg subsidiary, (y) each guarantor party to the Prepetition Term Loan Credit Agreement and (z) each subsidiary owning material intellectual property (or owning subsidiaries which own material intellectual property) or material real property of the company (the "**Subsidiary Guarantors**", together with the Borrowers, the "**Loan Parties**"); provided that, notwithstanding anything to the contrary herein, (i) the guarantor exclusions shall be limited to (a) immaterial domestic subsidiaries, (b) immaterial foreign subsidiaries (which, for avoidance of doubt, will not include any Luxembourg subsidiaries), (c) bona fide joint ventures with third parties, (d) any subsidiary that is prohibited by applicable law, rule or regulation or by any contractual obligation at the time such person becomes a subsidiary (and not entered into in contemplation of this clause (d) and for so long as such prohibition or restriction remains in effect), as applicable, from granting a guarantee or which would require governmental (including regulatory) consent, approval, license or authorization to provide such guarantee unless such consent, approval, license or

4

UST-1466

authorization has been received, (e) any subsidiary acquired pursuant to an acquisition or other investment permitted by the Definitive Documentation that has assumed, permitted secured indebtedness not incurred in contemplation of such acquisition or other investment and any subsidiary thereof that guarantees such secured indebtedness, in each case to the extent and for so long as such secured and (f) circumstances where the Borrowers and the Administrative Agent reasonably agree that the cost of providing such a guarantee is excessive in relation to the value afforded thereby and (ii) the Definitive Documentation shall not permit any unrestricted subsidiaries.

"**CFC**" shall mean any direct or indirect Foreign Subsidiary of any Borrower that is a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code of 1986, as amended (the "Code").

"**CFC Holdco**" shall mean any direct or indirect subsidiary of any Borrower, which subsidiary is treated as a disregarded entity for U.S. federal income tax purposes and substantially all of the assets of which consist of the equity interests in and/or indebtedness issued by one or more Foreign Subsidiaries that are CFCs."

"**Material Domestic Subsidiary**" shall be defined to include any subsidiary organized in the U.S. with total assets or EBITDA in excess of 2.5% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis; provided, that at no time shall the aggregate total assets or EBITDA of all Material Domestic Subsidiaries, taken together, account for more than 5.0% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis.

"**Material Foreign Subsidiary**" shall be defined to include any Luxembourg subsidiary and any other subsidiary organized in a non-U.S. jurisdiction where the total assets or EBITDA associated with such jurisdiction (in the aggregate for all subsidiaries organized therein) exceeds 2.5% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis. Notwithstanding the foregoing or anything to the contrary in this term sheet, any guarantee granted by any CFC shall be terminated (and no more than 65% of the voting stock of any Material Foreign Subsidiary shall be Collateral) for so long as such guarantee and/or pledge of the additional Collateral shall cause (or is reasonably expected to cause) any U.S. shareholder of such CFC to include in income for any year any Section 956 Income that is in excess of the Income Threshold (as defined below).

5

UST-1467

Notwithstanding the foregoing or anything to the contrary in this term sheet, any guarantee granted by any CFC Holdco shall be terminated (and no more than 65% of the voting stock of any CFC Holdco shall be Collateral) for so long as such guarantee and/or pledge of the additional Collateral shall cause (or is reasonably expected to cause) any U.S. shareholder of such CFC Holdco to include in income for any year an amount (after accounting for any reduction under the rules of Treas. Reg. § 1.956-1 and Section 245A of the Code) under Section 956 of the Code ("**Section 956 Income**") that is in excess of the Income Threshold. The "**Income Threshold**" shall mean, with respect to any CFC Holdco or CFC, as applicable, an amount to be mutually agreed.

"**subsidiary(ies)**" has the meaning assigned to such term in the Pre-Petition Credit Agreement.

**Security:**

Subject to the intercreditor agreement described below under "**Intercreditor Agreement**" and other customary limitations and exclusions to be mutually agreed, the Borrowers Obligations and the Guarantees (collectively the "**Secured Obligations**") will be secured on a first priority basis by substantially all assets of the Loan Parties (collectively, the "**Collateral**"); provided that, notwithstanding anything to the contrary set forth herein (i) all cash and cash equivalents held in accounts (other than customary excluded accounts) in the name of any Loan Party shall be subject to account control agreements in favor of the Collateral Agent (or for so long as the Exit ABL Facility and ABL Intercreditor are in effect, in favor of the ABL Agent), (ii) all equity in the Borrowers, all domestic (including immaterial) subsidiaries, all Luxembourg subsidiaries, all foreign subsidiaries and all Material Foreign Subsidiaries shall at all times be included in the Collateral and (iii) all material intellectual property and material real property shall at all times be included in the Collateral. The pledge of, security interest in, and mortgages on, the Collateral granted by each Loan Party shall secure its own respective Secured Obligations.

All of the foregoing described in this section and the "Guarantees" section above, the "**Collateral and Guarantee Requirement**".

**Conditions to Borrowings:**

The availability of the Term Loans under the Exit Credit Agreement will be subject solely to satisfaction (or waiver) of the following conditions (the date on which such conditions are satisfied (or waived) being the "**Effective Date**"):

- execution and delivery of the Definitive Documentation to be delivered at closing;

6

UST-1468

- delivery of promissory notes to the Lenders, if requested at least two (2) Business Days before the Effective Date;

- delivery of board resolutions and organizational documents of the Loan Parties;

- delivery of incumbency/specimen signature certificate of the Loan Parties;

- delivery of customary legal opinions by counsel to the Borrowers;

- there shall not have occurred since the Petition Date any event or condition that has had or would be reasonably expected, either individually or in the aggregate, to have a Material Adverse Effect (for purposes of this condition, defined in a manner based on the Prepetition Term Loan Credit Agreement but including a proviso stating that in determining whether a "Material Adverse Effect" has occurred or exists under clause (a) thereof, the impacts of the chapter 11 cases and of COVID-19 on the assets, business, financial condition or results of operations on the Loan Parties or any of their respective Subsidiaries will be disregarded (provided that this exception shall not apply to the extent that it is materially disproportionately adverse to the Parent Borrower and its Restricted Subsidiaries, taken as a whole, as compared to other companies in the same industry in which the Parent Borrower and its Restricted Subsidiaries operate));

- the Administrative Agent shall have received a certificate (in substantially the same form as the corresponding certificate delivered in connection with the Prepetition Term Loan Credit Agreement) of the chief financial officer (or financial officer in a similar role) of the Parent Borrower, stating that it and its subsidiaries, taken as a whole, as of the Effective Date, are solvent, in each case, after giving effect to the consummation of the Plan;

- all fees due to the Administrative Agent, Collateral Agent and Lenders including advisors to the Consenting Stakeholders, Greenhill & Co. and Milbank LLP, shall have been paid (or shall have been caused to be paid), and all expenses to be paid or reimbursed to the Administrative Agent, Collateral Agent and Lenders that have been invoiced at least three (3) Business Days prior to the

7

UST-1469

Effective Date shall have been paid  (or shall have been caused to be paid);

- the Loan Parties shall have provided the documentation and other information to the Administrative Agent that are required by regulatory authorities under applicable "know-your-customer" rules and regulations, including the Patriot Act, at least three (3) Business Days prior to the Effective Date (or such later date agreed to by the Administrative Agent) to the extent requested ten (10) days prior to the Effective Date;

- the Bankruptcy Court shall have entered (A) the Confirmation Order and (B) one or more orders authorizing and approving the extensions of credit in respect of the Exit Credit Agreement, each in the amounts and on the terms set forth herein, and all transactions contemplated by the Exit Credit Agreement, and, in each case, such orders shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified;

- the Collateral and Guarantee Requirement (excluding certain customary post-closing items to be mutually agreed) shall have been satisfied or waived and the Intercreditor Agreement and the Agreement Among Lenders shall have been executed and delivered and be in full force and effect;

- the effective date under the Plan shall have occurred, or contemporaneous with the conversion of the DIP Term Facility to the Term Loan Facility shall occur, and all conditions precedent thereto as set forth therein shall have been satisfied or waived (including (x) the issuance to (i) the holders of DIP Term Facility Claims of 44.9% of the New Common Stock, subject to dilution from the Management Incentive Plan and (ii) the holders of Term Loan Claims of 55.1% of New Common Stock (subject to reduction for New Common Stock distrusted in accordance with the following clause (y)) and (y) each holder of a Term Loan Claim that is a Required Consenting Stakeholder (including through any of its Related Parties) having received its pro rata share of an amount of New Common Stock equal to $7.5 million, in each case shall have occurred substantially contemporaneously with the closing of the Term Loan Facility);

- the Pre-Petition ABL Credit Agreement shall have been replaced with a new credit agreement providing asset-based

8

UST-1470

lending facilities for working capital and other general corporate purposes of the Borrowers and its subsidiaries on terms and conditions reasonably acceptable to the Required Consenting Stakeholders (any such credit agreement, the "**Exit ABL Credit Agreement**", and the facility in place as of the Effective Date under either the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, the "**Exit ABL Facility**");

- (i) with respect to Catherine's business segment either completion of a liquidation or consummation of a sale transaction as a going concern to a third party on terms satisfactory to the Required Consenting Stakeholders, and (ii) with respect to the Justice business segment, either completion of a liquidation, consummation of a sale transaction as a going concern to a third party or consummation of a reorganization of the business segment, in each case on terms reasonably satisfactory to the Required Consenting Stakeholders, in each case on or prior to the Effective Date;

- minimum pro forma Liquidity (as defined in the DIP Term Facility), calculated after giving effect to the restructuring transactions and effectiveness of the Plan, of at least $150 million (pro forma for the occurrence of the Effective Date and related transactions, including after taking into account all restructuring expenses (including professional fees) that are paid post emergence and the availability of the Exit ABL Facility and any incurrence of loans thereunder);

- with respect to store leases which are not rejected, aggregate annual cost savings for FY2020 of at least $18 million, calculated in a manner consistent with how "Occupancy Cost Savings" are calculated in the Real Estate Services Agreement dated as of May 1, 2020 by and between A&G Realty Partners, LLC and the Parent Borrower;

- with respect to the Premium segment and Lane Bryant (in aggregate), the number of store closures that shall have occurred prior to the Effective Date shall be consistent with the closures anticipated under the Company's business plan provided to the Ad Hoc Committee Advisors (as determined by the Ad Hoc Committee Advisors in their reasonable discretion) or as otherwise consented to by the Required Consenting Stakeholders;

9

UST-1471

- all pre-Petition transfers of intellectual property to the LuxCo Entities shall have been unwound and all licensing arrangements with respect thereto shall have been cancelled, in each case on terms reasonably satisfactory to the Required Consenting Stakeholders and all such intellectual property shall be owned and registered in the name of Annco, Inc., unless the Required Consenting Stakeholders and the Company mutually agree that the cost, difficulty, burden or consequences of such transfer and/or cancelation exceeds the practical benefits to the Lenders afforded thereby and cannot be completed in a tax efficient manner;

- the accuracy of representations and warranties in all material respects (without duplication of any materiality qualifier) on the Effective Date (except to the extent any such representation or warranty is stated to relate solely to an earlier date, in which case such representation or warranty shall be true and correct in all material respects (without duplication of any materiality qualifier) as of such earlier date; and

- the absence of the existence of any default or event of default.

| | |
|---|---|
| **Representations and Warranties:** | Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles. |
| **Affirmative Covenants:** | Usual and customary, subject to the Documentation Principles; provided that (i) financial reporting shall include (a) unaudited monthly internally generated financial statements and "flash reports", together with certain KPI reports for each banner to be agreed (with such KPI report requirement to fall away upon the Parent Borrower and its subsidiaries achieving a consolidated total leverage ratio for four (4) consecutive fiscal quarters of not more than 1.50:1.00, (b) unaudited quarterly (for all four quarters) and audited annual financial statements, (c) quarterly MD&A and (d) an annual budget, (ii) the annual lender call referenced therein shall be revised to quarterly lender calls and (iii) the Parent Borrower shall use commercially reasonable efforts to obtain credit ratings by each of Standard & Poor's Rating Services and Moody's Investors Service, Inc. prior to the Effective Date, it being understood that there shall be no obligation to maintain any particular rating at any time. |
| **Negative Covenants:** | Usual and customary, subject to the Documentation Principles and subject to customary and usual exceptions, qualifications and |

10

UST-1472

"baskets" to be mutually agreed and set forth in the Exit Credit Agreement, which shall include a customary cumulative credit basket.

| **Financial Covenant:** | First Out Term Loans: |

- Total leverage ratio at levels to be agreed amongst the Company and the Initial Consenting Stakeholders, which shall be tested quarterly commencing at the end of the first full fiscal quarter following the Effective Date.

- Minimum liquidity covenant, which shall take into account unrestricted cash and ABL availability (based on borrowing base) at levels to be agreed amongst the Company and the Required Consenting Stakeholders, which shall be maintained at all times.

- All expenses in connection with the Chapter 11 filing shall be added back to the calculation of EBITDA (to be defined in the Definitive Documentation, subject to the Documentation Principles). Component definitions for determining total leverage ratio are to be agreed amongst the Company and the Required Consenting Stakeholders.

Last Out Term Loans: total leverage ratio, subject to a cushion relative to the First Out Term Loan levels that is acceptable to the Company and the Required Consenting Stakeholders.

**Unrestricted Subsidiaries:** None.

**Events of Default:** Usual and customary for transactions of this type, subject to the Documentation Principles and to include a full cross-default to the Exit ABL Facility. Defaults in respect of a Financial Covenant shall be subject to customary equity cure rights.

**Voting:** Usual and customary for transactions of this type, subject to the Documentation Principles and the Agreement Among Lenders, but with First Out Lenders and Last Out Lenders voting as a single class; provided that (i) there shall be no limitation on voting by lenders that are affiliates of the Borrowers and (ii) any majority lender vote shall require the affirmative vote of at least two un-affiliated institutions.

11

UST-1473

| | |
|---|---|
| **Required Lenders** | Lenders having Term Loans outstanding that, taken together, represent more than 50% of the sum of all Term Loans outstanding at such time. |
| **Intercreditor Agreement:** | Usual and customary for transactions of this type, subject to the Documentation Principles and based on that certain ABL Intercreditor Agreement, dated as of August 21, 2015, among the ABL Agent, the Term Loan Agent, and the other parties thereto, except as otherwise agreed by the Required Consenting Term Loan Lenders. |
| **Agreement Among Lenders:** | To be entered into among the lenders under the First Out Term Loan Facility, the lenders under the Last Out Term Loan Facility and the Parent Borrower or, to be set forth in the Exit Credit Agreement and to provide that, with respect to any amendment, waiver, consent or other action, including the exercise of remedies or the provision of future DIP financings, the Last Out Lenders shall vote in the same manner as the First Out Lenders, other than with respect to amendments, waivers, consents or with respect to certain economic terms which are customarily all-lender votes. |
| **Cost and Yield Protection:** | Usual and customary for transactions of this type, subject to the Documentation Principles. |
| **Defaulting Lenders:** | Usual and customary for transactions of this type, subject to the Documentation Principles. |
| **Assignments and Participations:** | Usual and customary for transactions of this type, subject to the Documentation Principles and permitting loan buy-backs and Dutch auctions on customary terms; provided that there shall be no restrictions on holdings by lenders that are affiliates of the Borrowers. |
| **Refinancing, Extension and Replacement Facilities** | Usual and customary provisions providing for the ability to refinance, extend or replace loans or any class of loans under the Term Loan Facility from time to time, in whole or part, with one or more new debt facilities. |
| **Expenses and Indemnification:** | Usual and customary for transactions of this type, subject to the Documentation Principles (including, but limited to, the reasonable fees and expenses of no more than one counsel to the Required Lenders (other than the Administrative Agent), which counsel shall be Milbank LLP, and one counsel to the Administrative Agent and one local counsel for the Required Lenders in each relevant jurisdiction (other than the Administrative Agent) and one local counsel for the Administrative agent in each relevant jurisdiction. |

UST-1474

**Governing Law and**          New York.
**Forum:**

13

# EXHIBIT B

## Additional Notice Parties

Ad Hoc Group.  Notices pursuant to Section 13.11 of the Restructuring Support Agreement to members of the Ad Hoc Group in their capacity as Consenting Stakeholders shall be provided to:

> King & Spalding LLP
> 1185 Avenue of the Americas
> 34th Floor
> New York, NY 10036
> Attn:   Arthur Steinberg
>         Michael Handler
> Email: asteinberg@kslaw.com
>         mhandler@kslaw.com

UST-1476

# EXHIBIT C

**Form of Signature Page to DIP Term Facility**

See following page

UST-1477

[NAME OF LENDER],
as a Lender


By: _____
  Name:
  Title:

*[Signature Page to the Term Credit Agreement]*

UST-1478

**<u>EXHIBIT D</u>**

**Administrative Details**

**<u>[Fund Name]</u>**
[Fund Address]
Tax Payer ID:

**Administrative Details**

## Payment Instructions

**USD:**      Bank Name:
ABA:
Account Name:
Account Number:
Attn:

## Signature Block

[Fund Name:]

By: _____

## Contacts

**Operations (Agent Notices):**
[Fund Name]
Address:

Attn:
Phone:
Fax:
E-mail:

**Credit/Legal (Public/Private):**
[Fund Name]
Address:

Attn:
Phone:
Fax:
E-mail:

UST-1479

**Exhibit C**

**Corporate Structure Chart**

UST-1480



UST-1481

**Exhibit D**

**Disclosure Statement Order**

UST-1482

**Exhibit E**

**Financial Projections**

UST-1483

**Ascena Retail Group, Inc.**

*Overview to Financial Projections*

As a condition to Confirmation, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that entry of a Confirmation Order is not likely to be followed by either a liquidation or the need to further reorganize the Debtors or any successor to the Debtors. In accordance with this condition and in order to assist each holder of a Claim in determining whether to vote to accept or reject the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan"), the Debtors' management team ("Management"), with the assistance of its restructuring advisor, developed financial projections (the "Financial Projections") to support the feasibility of the Plan, including projections prepared as of August 18, 2020 ("Case 1"), and projections prepared as of August 24, 2020 that take into consideration a delayed COVID recovery and potential impacts on forecasted stores sales growth and margins ("Case 2").

The Financial Projections were prepared in good faith by Management, with the assistance of its restructuring advisor, and are based on a number of assumptions made by Management, within the bounds of their knowledge of the Debtors' business and operations, with respect to the future performance of the Debtors' operations. In addition, the Financial Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995. Forward-looking statements in these projections include the intent, belief, or current expectations of the Debtors and members of its Management with respect to the timing of, completion of, and scope of the current restructuring, the Plan, the Debtors' strategic business plan, bank financing, debt and equity market conditions, and the Debtors' future liquidity, as well as the assumptions upon which such statements are based. Although Management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will be realized. Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ and the actual results may be materially greater or less than those contained in the Financial Projections and from those contemplated by such forward-looking statements. No representations can be made as to the accuracy of the Financial Projections or the Debtors' ability to achieve the projected results. Therefore, the Financial Projections may not be relied upon as a guarantee or as any other form of assurance as to the actual results that will occur. The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future performance. Accordingly, in deciding whether to vote to accept or reject the Plan, creditors should review the Financial Projections in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions and risks described herein, including all relevant qualifications and footnotes.

AS ILLUSTRATED BY THE FINANCIAL PROJECTIONS, THE DEBTORS BELIEVE IT WILL HAVE SUFFICIENT LIQUIDITY TO PAY AND SERVICE THEIR DEBT OBLIGATIONS, AND TO OPERATE THEIR BUSINESSES. THE DEBTORS BELIEVE THAT CONFIRMATION AND CONSUMMATION ARE NOT LIKELY TO BE FOLLOWED BY THE LIQUIDATION OR FURTHER REORGANZIATION OF THE COMPANY. ACCORDINGLY, THE COMPANY BELIEVES THAT THE PLAN SATISFIES THE FEASABILITY REQUIREMENT OF SECTION 1129(a)(11) OF THE BANKRUPTCY CODE.

UST-1484

The Financial Projections were not prepared with a view toward compliance with published rules of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding projections. The Debtors' independent auditor has not examined, compiled, or performed any procedures with respect to the prospective financial information contained in this exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability. The Debtors' independent auditor assumes no responsibility for and denies any association with the prospective financial information.

Accordingly, neither the Debtors nor the reorganized company intend to and disclaim any obligation to: (1) furnish updated Financial Projections to holders of Claims or Equity Interests prior to the Effective Date or to any other party after the Effective Date, except as required by the Plan; (2) include any such updated information in any documents that may be required to be filed with the Securities and Exchange Commission; or (3) otherwise make such updated information publicly available.

The Debtors do not intend to update or otherwise revise the Financial Projections to reflect circumstances that may occur after their preparation, or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.

Additional information relating to the principal assumptions used in preparing the Financial Projections are set forth below.

> **THE FINANCIAL PROJECTIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS. ACTUAL OPERATING RESULTS AND VALUES MAY VARY SIGNIFICANTLY FROM THESE FINANCIAL PROJECTIONS.**

UST-1485

*Select Assumptions of the Financial Projections*

The Financial Projections are based on, but not limited to factors such as industry performance, general business, economic, competitive, regulatory, market, and financial conditions, as well as the assumptions detailed below. Many of these factors and assumptions are beyond the control of the Debtors and do not take into account the uncertainty and disruptions of business that may accompany an in-court restructuring. Accordingly, the assumptions should be reviewed in conjunction with a review of the risk factors set forth in the Disclosure Statement.

- **Methodology**: The Financial Projections were developed by Management with the assistance of its restructuring advisor and are presented solely for purposes set forth herein and in the Disclosure Statement to which the Financial Projections are attached as Exhibit E. No representation or warranty, express or implied, is provided in relation to the fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

- **Plan and Effective Date**: The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by October 31, 2020 (the "Effective Date"). Any significant delay in the Effective Date may have a significant negative effect on the operations and financial performance of the Debtors including, an increased risk or inability to meet sales forecasts and the incurrence of higher reorganization expenses. Although the Financial Projections represent the Debtors' best estimates and good faith judgment, of the results of future operations, financial position, and cash flows of the Debtors, they are only estimates and actual results may vary considerably from such Financial Projections. Consequently, the inclusion of the Financial Projections herein should not be regarded as a representation by the Debtors, the Debtors' advisors or any other person that the projected results of operations, financial position, and cash flows of the Debtors will be achieved.

- **Projection Period:** The Debtors prepared the Financial Projections based on, among other things, the anticipated future financial condition and results of operations of the Debtors using the business plan. Management developed and refined the business plan and prepared consolidated Financial Projections of the Debtors for the fiscal years ending July 2021 (fiscal year ("FY") 2021) through July 2025 (FY 2025) (the "Projection Period").

- **Operating Impacts:** The Financial Projections incorporate multiple operating considerations including, but not limited to:
  - Current and projected market conditions in which the Debtors operate;
  - Contemplated store and brand closures, specifically:
    - **Ann Taylor / Ann Taylor Factory:** Closure of 86 Ann Taylor and Ann Taylor Factory stores
    - **Loft / Loft Outlet:** Closure of 92 Loft and Loft Outlet stores
    - **Lane Bryant:** Closure of 243 Lane Bryant stores
    - **Catherines:** Closure and liquidation of all Catherines stores
    - **Justice:** Closure of 716 Justice stores

UST-1486

o   Reflect capital expenditures related to normal course maintenance and renovation capital expenditures related to retail stores in combination with continued investments in technology during the Projection Period.

o   The Financial Projections do not consider the potential impact of the application of "fresh start" accounting under Accounting Standards Codification 852, "Reorganizations" ("ASC 852") that may apply upon the Effective Date. If the Debtors do fully implement fresh start accounting, differences from the depiction presented are anticipated and those differences may be material.  Upon emergence, the Debtors will be required to determine the amount by which its reorganization value as of the Effective Date exceeds, or is less than, the fair value at the time, which may be based on, any event, such valuation, as well as the determination of the fair value of the Debtors' assets and liabilities, will be made as of the Effective Date. The differences between the amounts of any or all of the foregoing items as assumed in the Financial Projections and the actual amounts thereof as of the Effective Date may be material.

**THE INDEPENDENT AUDITOR FOR THE DEBTORS HAS NOT EXAMINED, COMPILED OR OTHERWISE PERFORMED ANY PROCEDURES ON THE FOLLOWING PROSPECTIVE FINANCIAL INFORMATION, AND CONSEQUENTLY, DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROSPECTIVE FINANCIAL INFORMATION.**

UST-1487

**ASCENA RETAIL GROUP, INC.**
**PROJECTED CONSOLIDATED STATEMENTS OF OPERATIONS – CASE 1**
**(UNAUDITED)**

| In $US Millions | Notes | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|
| Revenue | [1] | 3,027 | 3,297 | 3,345 | 3,393 | 3,451 |
| Cost of Goods Sold | [2] | 1,527 | 1,473 | 1,477 | 1,495 | 1,518 |
| **Gross Margin** | [2] | **1,501** | **1,824** | **1,868** | **1,898** | **1,933** |
| *Gross Margin %* | | *49.6%* | *55.3%* | *55.9%* | *55.9%* | *56.0%* |
| Buying, Distribution, & Occupancy | [3] | 571 | 553 | 556 | 564 | 573 |
| Selling, General, & Administrative | [4] | 1,081 | 984 | 989 | 1,000 | 1,011 |
| **EBITDA** | | **(151)** | **288** | **323** | **334** | **349** |
| *EBITDA Margin %* | | *(5.0%)* | *8.7%* | *9.7%* | *9.8%* | *10.1%* |
| Depreciation & Amortization | [5] | 122 | 116 | 106 | 98 | 92 |
| **Operating Income** | | **(272)** | **171** | **217** | **235** | **257** |
| Interest Expense | [6] | (68) | (54) | (52) | (53) | (52) |
| Other Expense / (Income), Net | [7] | (56) | (0) | 4 | 8 | 9 |
| **Income / (Loss) before Taxes** | | **(396)** | **117** | **169** | **190** | **215** |
| Income Tax Expense / (Benefit) | [8] | (111) | 33 | 47 | 53 | 60 |
| **Net Income / (Loss)** | | **(285)** | **84** | **122** | **137** | **155** |

UST-1488

## ASCENA RETAIL GROUP, INC.
## PROJECTED CONSOLIDATED BALANCE SHEETS – CASE 1
## (UNAUDITED)

| In $US Millions | Notes | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| **Current Assets:** | | | | | | |
| Cash and Cash Equivalents | [9] | 287 | 399 | 500 | 612 | 753 |
| Inventory | [10] | 325 | 327 | 326 | 329 | 333 |
| Accounts Receivable | [11] | 88 | 95 | 96 | 96 | 97 |
| Prepaid expenses and other assets | [12] | 54 | 47 | 48 | 48 | 49 |
| **Total Current Assets** | | **753** | **868** | **970** | **1,085** | **1,231** |
| Property and Equipment, net | [13] | 448 | 407 | 373 | 345 | 323 |
| Goodwill & Other Intangible Assets, net | [14] | 399 | 399 | 399 | 399 | 399 |
| Other Long-Term Assets | [15] | 569 | 569 | 569 | 569 | 569 |
| **Total Assets** | | **2,168** | **2,242** | **2,311** | **2,398** | **2,521** |
| **Liabilities & Member Equity** | | | | | | |
| **Current Liabilities:** | | | | | | |
| Accounts Payable | [16] | 243 | 253 | 254 | 257 | 260 |
| Accounts Expenses & Other Current Liabilities | [17] | 311 | 328 | 322 | 319 | 334 |
| **Total Current Liabilities** | | **555** | **581** | **576** | **576** | **594** |
| **Long-Term Liabilities:** | | | | | | |
| Debt - ABL Revolver | [18] | - | - | - | - | - |
| Debt - First-Out Term Loan | [19] | 309 | 306 | 297 | 288 | 280 |
| Debt - Second-Out Term Loan | [20] | 93 | 101 | 102 | 101 | 100 |
| **Total Debt** | | **403** | **407** | **399** | **389** | **380** |
| Other Long-Term Liabilities | [21] | 496 | 454 | 415 | 375 | 335 |
| **Total Liabilities** | | **1,453** | **1,443** | **1,390** | **1,340** | **1,308** |
| Shareholders' Equity / (Deficit) | [22] | 715 | 799 | 921 | 1,058 | 1,213 |
| **Total Liabilities and Shareholders' Equity** | | **2,168** | **2,242** | **2,311** | **2,398** | **2,521** |

UST-1489

**ASCENA RETAIL GROUP, INC.**
**PROJECTED CONSOLIDATED STATEMENT OF CASH FLOWS – CASE 1**
**(UNAUDITED)**

| In $US Millions | Notes | Emergence[1] | FY 2021[2] | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|
| Net Income | | | (285) | 84 | 122 | 137 | 155 |
| (+) Non-cash adjustments | [23] | | 106 | 83 | 69 | 58 | 52 |
| (+/-) Change in Working Capital | [24] | | 90 | 24 | (6) | (3) | 13 |
| **Net cash provided / (used) in operating activities** | | | **(89)** | **192** | **185** | **192** | **219** |
| **Investing activities** | | | | | | | |
| Capital expenditures | [25] | | (106) | (76) | (73) | (70) | (69) |
| Asset Sales | [26] | | 10 | - | - | - | - |
| **Net cash provided / (used) in investing activities** | | | **(96)** | **(76)** | **(73)** | **(70)** | **(69)** |
| **Financing activities** | | | | | | | |
| Principal drawdown / (payments) on term loan | [27] | | 147 | (4) | (10) | (10) | (10) |
| Borrowings / (Paydown) on ABL | [28] | | (230) | - | - | - | - |
| **Net cash provided / (used) in Financing activities** | | | **(83)** | **(4)** | **(10)** | **(10)** | **(10)** |
| **Net Change in Cash Flow** | | | **(268)** | **112** | **101** | **112** | **141** |
| **Beginning Cash Balance** | | | **555** | **287** | **399** | **500** | **612** |
| Net Change in Cash Flow | | | (268) | 112 | 101 | 112 | 141 |
| **Ending Cash Balance** | | **358** | **287** | **399** | **500** | **612** | **753** |

**Notes**
1) Assumes the Company emerges from Chapter 11 on October 31, 2020
2) Full fiscal year 2021 includes August through October 2020 which is prior to the emergence from bankruptcy

## NOTES TO FINANCIAL PROJECTIONS – CASE 1

**Note 1 – Revenue**

Revenue reflects multiple items, including:

- Debtors omni-channel operations conducting integrated store and online operations through the Ann Taylor, LOFT, Lane Bryant, and Justice brands,
- Profit sharing on its private label credit card program, and
- Other receipts related to its transaction services agreement ("TSA") with Maurices and shipping revenue

Consolidated revenue is projected to be approximately $3.0 billion in FY 2021, growing to $3.5 billion in FY 2025, with comparable growth percentages projected of 5% and 12%, respectively, in FY 2021 and FY 2022 as retail sales continue to rebound to pre-pandemic levels. Subsequently, comparable growth percentages are projected to be 2% from FY 2023 to FY 2025 as long term growth stabilizes. As of the Petition Date, approximately 40% of the Debtors' total annual revenue is from online sales, which the Debtors forecast to grow significantly during the Projection Period as the Debtors expect the shift of consumer preferences to continue towards e-commerce.

**Note 2 – Cost of Goods Sold / Gross Margin**

Cost of Goods Sold primarily includes merchandise and freight costs. Consolidated gross margin as a percentage of net sales is projected to be 50% in FY 2021 improving to historical levels of 56% by FY 2025. Gross margin improvements reflect cost savings initiatives that Management has identified and has begun the process of implementing as of the Petition Date.

**Note 3 – Buying, Distribution, & Occupancy**

Buying, distribution, & occupancy ("BD&O") costs primarily includes store occupancy and all costs associated with the buying and distribution functions. Consolidated BD&O costs are projected to decrease as a percentage of revenue from 19% to 17% from FY 2021 to FY 2025, respectively. The improvement is driven by Management identified cost savings initiatives primarily from the closure of unprofitable high rent stores, procurement, and other areas of the business.

**Note 4 – Selling, General, & Administrative**

Selling, general, & administrative ("SG&A") costs include compensation and benefit-related costs for sales and store operations personnel, administrative personnel, and other employees not included in BD&O. SG&A costs also include advertising and marketing costs, information technology and communication costs, supplies for our stores and administrative facilities, insurance and legal costs. SG&A costs are projected to decrease as a percentage of revenue from 36% to 29% from FY 2021 to FY 2025, respectively. The improvement is driven by Management identified cost savings initiatives primarily from decreased payroll, taxes, and benefits due to store and corporate headcount reductions.

**Note 5 – Depreciation & Amortization**

Depreciation of property, plant and equipment and amortization of intangible assets.

**Note 6 – Interest Expense**

UST-1491

Interest expense over the Projection Period is based upon the Debtors' anticipated debt structure immediately before and following the consummation of the Plan.

**Note 7 – Other Expense / (Income), Net**

Other expense / (income), net reflects multiple items, including:

- Reorganization professional fees incurred prior to the effective date,
- Interest income,
- Debt origination and financing costs, and
- Other miscellaneous corporate costs.

**Note 8 – Income Tax Expense / (Benefit), Net**

Income tax expense reflects the application of the estimated effective tax rate of 28% to taxable income for all years in the Projection Period. A consolidated tax benefit is projected for FY 2021 due to net operating losses, with a consolidated income tax expense for FY 2022 and beyond due to increasing profitability levels during the Projection Period. The projections assume no tax obligation as a result of consummating the Plan. These amounts could vary significantly pending final tax analysis of the transaction.

**Note 9 – Cash and Cash Equivalents**

Consolidated cash balance of the Debtors for all entities and subsidiaries, which includes cash balances from their respective operating accounts, store-level accounts, and investment accounts, in addition to credit card receivables outstanding.

**Note 10 – Inventory**

Represents the merchandise inventory of the Debtors, which includes the inventory-in-transit.

**Note 11 – Accounts Receivable**

Includes receivables related to multiple items, including, but not limited to:

- Private label credit card profit sharing program,
- Wholesale business with third-party retailers,
- TSA with Maurices,
- Tax refunds, and
- Allowances from landlords.

**Note 12 – Prepaid Expenses and Other Assets**

Prepaids expenses and other assets primarily consists of prepayments for rent, payroll, insurance, taxes, supplies, and professional fees.

**Note 13 – Property and Equipment, net**

UST-1492

Property and equipment ("P&E") is composed primarily of the Debtors' owned office properties. P&E also includes IT systems, furniture, fixtures, and equipment ("FF&E"), and leasehold improvements. The Debtors' book value of P&E is subject to material change based on accounting analysis of the Debtors' financials upon emergence.

### Note 14 – Goodwill & Other Intangible Assets, net

Goodwill & Other Intangible Assets is composed primarily of the Debtors' intangible property, specifically it's tradenames, proprietary technology, and customer relationships.

### Note 15 – Other Long-Term Assets

Other long-term assets are composed primarily of the Debtors' investment in Viking Upper Holdings and its operating right of use assets.

### Note 16 – Accounts Payable

Represents outstanding merchandise and non-merchandise obligations to third-party trade vendors.

### Note 17 – Accrued Expenses & Other Current Liabilities

Represents accrued expenses and are primarily related to payroll, employee incentive and retention programs, deferred income, and other accrued expenses.

### Note 18 – Debt - ABL Revolver

Debtors' $400 million DIP to Exit ABL revolver with $200 million letter of credit limit

### Note 19 – Debt - First-Out Term Loan

Debtors' $312 million first-out term loan which includes $150 million in new money and $162 million in take back debt, amortizing at 1% for the first two years and 3% thereafter.

### Note 20 – Debt - Second-Out Term Loan

Debtors' $88 million second-out term loan with partial interest payments for the first two years (remaining PIKs), amortizing at 1%.

### Note 21 – Other Long-Term Liabilities

Other long-term liabilities are composed primarily of the Debtors' long term lease obligations and employee obligations.

### Note 22 – Shareholders' Equity / (Deficit)

Represents the Debtors' net book value of shareholders' equity.

### Note 23 – Non-Cash Adjustments

Represents the addback for non-cash transactions, including depreciation & amortization, non-cash interest and differences between cash rent and rent expense.

UST-1493

**Note 24 – Changes in Working Capital**

Represents the Debtors change in working capital, primarily consisting of changes in inventory, accounts payable, accounts receivable, accrued expenses and deferred taxes. The projections for FY 2021 reflect a source of cash from net working capital primarily due to the impairment of trade as part of the bankruptcy followed by projected post-bankruptcy expansion of terms with the Debtors' vendors back to levels experienced before bankruptcy.

FY 2022 through the Projection Period projects a minimal change in working capital on a year-over-year basis, not factoring in the month-over-month seasonality in working capital.

**Note 25 – Capital Expenditures**

Capital expenditures are primarily driven by a combination of:

- Store renovations / updates,
- Maintenance requirements, and
- Investments in information technology.

**Note 26 – Asset Sales**

Represents the sale of Catherines IP to City Chic Collective Ltd.

**Note 27 – Principal Drawdown / (Payments) on Term Loan**

Represents the receipt of $150 million new money related to the first-out term loan, offset by the debt amortization of the first-out and second-out term loans. The $150 million in new money will be funded once the DIP ABL goes effective.

**Note 28 – Borrowings / (Paydown) on ABL**

Represents the paydown of the pre-petition ABL revolver at the assumed DIP ABL effective date (August 2020).

UST-1494

### ASCENA RETAIL GROUP, INC.
### PROJECTED CONSOLIDATED STATEMENTS OF OPERATIONS – CASE 2
### (UNAUDITED)

| *In $US Millions* | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|
| Revenue | 2,813 | 3,208 | 3,258 | 3,308 | 3,369 |
| Cost of Goods Sold | 1,452 | 1,480 | 1,444 | 1,463 | 1,487 |
| **Gross Margin** | **1,361** | **1,728** | **1,815** | **1,845** | **1,882** |
| *Gross Margin %* | *48.4%* | *53.9%* | *55.7%* | *55.8%* | *55.9%* |
| Buying, Distribution, & Occupancy | 567 | 551 | 555 | 563 | 572 |
| Selling, General, & Administrative | 1,067 | 979 | 984 | 995 | 1,006 |
| **EBITDA** | **(274)** | **198** | **276** | **288** | **304** |
| *EBITDA Margin %* | *(9.7%)* | *6.2%* | *8.5%* | *8.7%* | *9.0%* |
| Depreciation & Amortization | 122 | 116 | 106 | 98 | 92 |
| **Operating Income** | **(396)** | **82** | **170** | **190** | **213** |
| Interest Expense | (68) | (54) | (52) | (53) | (52) |
| Other Income / (Expense), Net | (57) | (3) | 0 | 4 | 5 |
| **Income / (Loss) before Taxes** | **(521)** | **25** | **118** | **141** | **167** |
| Income Tax Expense / (Benefit) | (146) | 7 | 33 | 39 | 47 |
| **Net Income / (Loss)** | **(375)** | **18** | **85** | **101** | **120** |

UST-1495

**ASCENA RETAIL GROUP, INC.**
**PROJECTED CONSOLIDATED BALANCE SHEETS – CASE 2**
**(UNAUDITED)**

| *In $US Millions* | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| **Current Assets:** | | | | | |
| Cash and Cash Equivalents | 128 | 151 | 253 | 349 | 455 |
| Inventory | 327 | 332 | 321 | 324 | 328 |
| Accounts Receivable | 88 | 94 | 95 | 96 | 96 |
| Prepaid expenses and other assets | 54 | 47 | 47 | 48 | 49 |
| **Total Current Assets** | **595** | **625** | **716** | **817** | **928** |
| Property and Equipment, net | 448 | 407 | 373 | 345 | 323 |
| Goodwill & Other Intangible Assets, net | 399 | 399 | 399 | 399 | 399 |
| Other Long-Term Assets | 573 | 573 | 573 | 573 | 573 |
| **Total Assets** | **2,015** | **2,003** | **2,061** | **2,134** | **2,222** |
| **Liabilities & Member Equity** | | | | | |
| **Current Liabilities:** | | | | | |
| Accounts Payable | 244 | 256 | 251 | 253 | 257 |
| Accounts Expenses & Other Current Liabilities | 277 | 272 | 299 | 317 | 332 |
| **Total Current Liabilities** | **521** | **529** | **549** | **570** | **588** |
| **Long-Term Liabilities:** | | | | | |
| Debt - ABL Revolver | - | - | - | - | - |
| Debt - First-Out Term Loan | 309 | 306 | 297 | 288 | 280 |
| Debt - Second-Out Term Loan | 93 | 101 | 102 | 101 | 100 |
| **Total Debt** | **403** | **407** | **399** | **389** | **380** |
| Other Long-Term Liabilities | 496 | 454 | 415 | 375 | 335 |
| **Total Liabilities** | **1,420** | **1,390** | **1,363** | **1,334** | **1,303** |
| Shareholders' Equity / (Deficit) | 595 | 613 | 698 | 800 | 920 |
| **Total Liabilities and Shareholders' Equity** | **2,015** | **2,003** | **2,061** | **2,134** | **2,222** |

UST-1496

# ASCENA RETAIL GROUP, INC.
## PROJECTED CONSOLIDATED STATEMENT OF CASH FLOWS – CASE 2
## (UNAUDITED)

| *In $US Millions* | Emergence[1] | FY 2021[2] | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|
| Net Income | | (375) | 18 | 85 | 101 | 120 |
| (+) Non-cash adjustments | | 106 | 83 | 69 | 58 | 52 |
| (+/-) Change in Working Capital | | 21 | 2 | 31 | 17 | 13 |
| **Net cash provided / (used) in operating activities** | | **(248)** | **103** | **185** | **177** | **184** |
| **Investing activities** | | | | | | |
| Capital expenditures | | (106) | (76) | (73) | (70) | (69) |
| Asset Sales | | 10 | - | - | - | - |
| **Net cash provided / (used) in investing activities** | | **(96)** | **(76)** | **(73)** | **(70)** | **(69)** |
| **Financing activities** | | | | | | |
| Principal drawdown / (payments) on term loan | | 147 | (4) | (10) | (10) | (10) |
| Borrowings / (Paydown) on ABL | | (230) | (0) | 0 | - | - |
| **Net cash provided / (used) in Financing activities** | | **(83)** | **(4)** | **(10)** | **(10)** | **(10)** |
| **Net Change in Cash Flow** | | **(427)** | **23** | **102** | **97** | **106** |
| **Beginning Cash Balance** | | **555** | **128** | **151** | **253** | **349** |
| Net Change in Cash Flow | | (427) | 23 | 102 | 97 | 106 |
| **Ending Cash Balance** | **272** | **128** | **151** | **253** | **349** | **455** |

**Notes**
1) Assumes the Company emerges from Chapter 11 on October 31, 2020
2) Full fiscal year 2021 includes August through October 2020 which is prior to the emergence from bankruptcy

UST-1497

**Exhibit F**

**Valuation Analysis**

UST-1498

**Valuation Analysis**

THE VALUATION INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE REGARDING, AND GUGGENHEIM SECURITIES, LLC ("GUGGENHEIM SECURITIES") DOES NOT EXPRESS ANY VIEW OR OPINION AS TO, THE PRICE OR RANGE OF PRICES AT WHICH THE SHARES OF COMMON STOCK OR OTHER SECURITIES OF THE DEBTORS OR THE REORGANIZED DEBTORS MAY TRADE, BE SALEABLE OR OTHERWISE BE TRANSFERABLE AT ANY TIME, INCLUDING, WITHOUT LIMITATION, SUBSEQUENT TO CONSUMMATION OF THE PLAN.[1]

SUCH VALUATION INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, AND OTHER STAKEHOLDERS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING, WITHOUT LIMITATION, IN CONNECTION WITH THE PURCHASE OR SALE OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS OR ANY OF THEIR AFFILIATES.

THE ESTIMATED VALUE SET FORTH IN THE VALUATION ANALYSIS DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE DEBTORS OR THE REORGANIZED DEBTORS, THEIR SECURITIES OR THEIR ASSETS, WHICH MAY BE MATERIALLY DIFFERENT THAN THE ESTIMATES SET FORTH IN THE VALUATION ANALYSIS. ACCORDINGLY, SUCH ESTIMATED VALUE IS NOT NECESSARILY INDICATIVE OF THE PRICES AT WHICH ANY SECURITIES OF THE REORGANIZED DEBTORS MAY TRADE AFTER GIVING EFFECT TO THE TRANSACTIONS CONTEMPLATED TO BE EFFECTED BY THE PLAN AS OF OR FOLLOWING CONSUMMATION THEREOF. ANY SUCH PRICES MAY BE MATERIALLY DIFFERENT THAN INDICATED BY THE VALUATION ANALYSIS.

IN THE EVENT THAT THE PLAN IS NOT CONSUMMATED AS OF THE EXPECTED EFFECTIVE DATE AS ASSUMED IN THE FINANCIAL PROJECTIONS (AS DEFINED BELOW), IT IS HIGHLY LIKELY THAT THE VALUATION ANALYSIS CONTAINED HEREIN WILL CHANGE, POSSIBLY MATERIALLY.

On August 13, 2020, the Debtors filed an application with the Bankruptcy Court seeking to retain Guggenheim Securities as the Debtors' investment banker pursuant to Sections 327 and 328 of the Bankruptcy Code, which application remains subject to approval of the Bankruptcy Court. Solely for purposes of the Plan and the Disclosure Statement, Guggenheim Securities estimated the total enterprise value (the "Total Enterprise Value")[2] and the implied estimated equity value (the "Equity Value") of the Reorganized Debtors on a consolidated going-concern basis and *pro forma* for the transactions

---

[1]     Capitalized terms used but not otherwise defined herein shall, to the extent defined in (x) the *Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. and its Debtor Affiliates* (the "Plan"), attached as **Exhibit A** to the *Amended Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. and its Debtor Affiliates* (the "Disclosure Statement"), to which this Valuation Analysis is attached as **Exhibit F**, or (y) the Disclosure Statement, have the meanings ascribed to such terms in the Plan or Disclosure Statement, as the context requires.

[2]     Total Enterprise Value is a financial term that generally means (a) the subject company's equity value (i.e., the value of the subject company's equity and equity-linked securities (i) inclusive of the value of (y) any minority investments held by the subject company and (z) any non-operating assets of the subject company and (ii) exclusive of the value of any non-controlling interests in the subject company's businesses that are held by third parties) plus (b) the subject company's funded debt less (c) the subject company's excess cash, cash equivalents and short- and long-term marketable securities.

UST-1499

contemplated by the Plan (the "Valuation Analysis"), all as set forth below. The Valuation Analysis was based on financial information provided by the Debtors' senior management, including the Case 1 Financial Projections and the Case 2 Financial Projections (each as defined below) attached to the Disclosure Statement as **Exhibit E**, and information provided by other sources.

In assessing and utilizing the Case 1 Financial Projections and the Case 2 Financial Projections for purposes of performing the Valuation Analysis, Guggenheim Securities took into account its various discussions with the Debtors' senior management regarding the risks and uncertainties of realizing the projections embedded in the Case 1 and Case 2 scenarios (each as described below), respectively, in light of (i) the current and prospective industry conditions and competitive dynamics facing the Debtors (and, as of the Effective Date, the Reorganized Debtors), (ii) the Debtors' recent financial performance, (iii) the key commercial, operational and financial drivers underlying, respectively, the Case 1 and Case 2 scenarios, (iv) the impact and economic effects of the COVID-19 pandemic on any of the foregoing and (v) various other facts and circumstances relevant to the Case 1 and Case 2 scenarios.

The Valuation Analysis was conducted as of September 3, 2020 and assumes the effective date of the Plan occurs on October 31, 2020 (the "Effective Date").

### Estimated Total Enterprise Value and Equity Value

Based on the Financial Projections and other information and the financial analyses described herein, Guggenheim Securities estimated the Total Enterprise Value of the Reorganized Debtors to be approximately $725 to $1,000 million, with a midpoint of $863 million. After deducting *pro forma* net debt of $90 million as contemplated by the Plan as of the Effective Date, Guggenheim Securities' estimated Total Enterprise Value implies an estimated Equity Value for the Reorganized Debtors of approximately $635 to $910 million, with a midpoint of $772 million.

THE FINANCIAL PROJECTIONS FOR, AND THE ESTIMATED TOTAL ENTERPRISE VALUE AND THE ESTIMATED EQUITY VALUE OF, THE REORGANIZED DEBTORS ARE SUBJECT TO VARIOUS UNCERTAINTIES AND CONTINGENCIES THAT ARE INHERENTLY DIFFICULT TO PREDICT. AMONG OTHER THINGS, SUCH ESTIMATED VALUES WILL FLUCTUATE BASED ON (I) GENERAL ECONOMIC AND BUSINESS CONDITIONS, CAPITAL MARKETS CONDITIONS AND INDUSTRY-SPECIFIC AND COMPANY-SPECIFIC FACTORS AND (II) THE FINANCIAL CONDITION, FINANCIAL PERFORMANCE AND FINANCIAL PROSPECTS OF THE REORGANIZED DEBTORS. MANY OF THE FOREGOING FACTORS AND/OR DRIVERS ARE BEYOND THE CONTROL OF THE DEBTORS, THE REORGANIZED DEBTORS AND GUGGENHEIM SECURITIES. ACCORDINGLY, THE ESTIMATED VALUES SET FORTH HEREIN ARE NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE THE ESTIMATED TOTAL ENTERPRISE VALUE AND THE ESTIMATED EQUITY VALUE OF THE REORGANIZED DEBTORS AS SET FORTH HEREIN ARE INHERENTLY SUBJECT TO SUCH UNCERTAINTIES AND CONTINGENCIES, NONE OF THE DEBTORS, THE REORGANIZED DEBTORS, GUGGENHEIM SECURITIES OR ANY OTHER PERSON ASSUMES ANY RESPONSIBILITY FOR THEIR ACCURACY, ACHIEVABILITY OR REALIZATION. ANY VARIANCE IN ACTUAL RESULTS FROM THE ESTIMATES SET FORTH IN THE FINANCIAL PROJECTIONS COULD HAVE A MATERIAL IMPACT ON GUGGENHEIM SECURITIES' VALUATION ANALYSIS.

UNLESS OTHERWISE INDICATED HEREIN, GUGGENHEIM SECURITIES' VALUATION ANALYSIS WAS BASED ON THE FINANCIAL PROJECTIONS FOR THE REORGANIZED DEBTORS AND ON CAPITAL MARKETS DATA AS OF AUGUST 31, 2020, REFLECTS INFORMATION MADE AVAILABLE TO GUGGENHEIM SECURITIES AS OF OR PRIOR TO SUCH DATE AND IS BASED ON ECONOMIC, CAPITAL MARKETS AND OTHER CONDITIONS AS OF SUCH DATE. GUGGENHEIM SECURITIES IS NOT MAKING ANY ASSESSMENT REGARDING THE IMPACT OR THE ECONOMIC EFFECTS OF THE

2

COVID-19 PANDEMIC, INCLUDING WITH RESPECT TO THE POTENTIAL IMPACT OR EFFECTS ON THE FUTURE FINANCIAL PERFORMANCE OF THE REORGANIZED DEBTORS. ALTHOUGH THE VALUATION ANALYSIS MAY BE AFFECTED BY SUBSEQUENT DEVELOPMENTS, INCLUDING, WITHOUT LIMITATION, DEVELOPMENTS RELATING TO THE COVID-19 PANDEMIC, GUGGENHEIM SECURITIES ASSUMES NO RESPONSIBILITY FOR UPDATING OR REVISING THE ESTIMATED TOTAL ENTERPRISE VALUE OR THE IMPLIED ESTIMATED EQUITY VALUE OF THE REORGANIZED DEBTORS FOR ANY REASON, WHETHER DUE TO FACTS, CIRCUMSTANCES OR EVENTS OCCURRING AFTER SUCH DATE OR OTHERWISE.

***Summary of Reviews, Financial Analyses and Valuation Methodologies***

In the course of estimating the Total Enterprise Value of the Reorganized Debtors, Guggenheim Securities:

- reviewed drafts of the Plan and the Disclosure Statement circulated by Debtors' counsel on September 4, 2020;

- reviewed the Restructuring Support Agreement dated as of July 23, 2020;

- reviewed the *pro forma* capitalization of the Reorganized Debtors as contemplated by the Plan as of the Effective Date;

- reviewed certain historical and forward-looking business and financial information regarding the business and prospects of the Debtors and the Reorganized Debtors (including certain financial projections for the Reorganized Debtors for the fiscal years ending July 2021 through July 2025, attached to the Disclosure Statement as **Exhibit E** and reflecting, respectively, two illustrative scenarios identified to Guggenheim Securities by the Debtors' senior management as "Case 1" (the "Case 1 Financial Projections") and "Case 2" (the "Case 2 Financial Projections," and, collectively, together with the Case 1 Financial Projections, the "Financial Projections")), all as prepared and approved for Guggenheim Securities' use by the Debtors' senior management;

- discussed with the Debtors' senior management and the Debtors' other advisors (as applicable) their respective views regarding the (i) business, operations, historical and projected financial results and future prospects of the Debtors and the Reorganized Debtors, (ii) key assumptions related to the Financial Projections and (iii) commercial, competitive and regulatory dynamics in the apparel retail sector;

- compared the financial performance of the Debtors with corresponding data for certain publicly traded companies that Guggenheim Securities deemed relevant in evaluating the Reorganized Debtors and reviewed the trading multiples for such publicly traded companies;

- performed discounted cash flow analyses based on the Financial Projections; and

- conducted such other studies, analyses, inquiries and investigations as Guggenheim Securities deemed appropriate.

In connection with performing its Valuation Analysis, Guggenheim Securities:

- based its Valuation Analysis on various assumptions, including assumptions concerning general economic, business and capital markets conditions and industry-specific and company-specific factors, all of which are beyond the control of the Debtors, the Reorganized Debtors and Guggenheim Securities;

UST-1501

- performed a variety of financial analyses and considered a variety of factors in assessing the estimated Total Enterprise Value of the Reorganized Debtors;

- did not form a view or opinion as to whether any individual analysis or factor, whether positive or negative, considered in isolation, supported or failed to support its estimate of the Total Enterprise Value of the Reorganized Debtors;

- considered the results of all of its financial analyses and did not attribute any particular weight to any one analysis or factor; and

- ultimately arrived at its estimate of the Total Enterprise Value of the Reorganized Debtors based on the results of the financial analyses assessed as a whole and believes that the totality of the factors considered and the various financial analyses performed by Guggenheim Securities operated collectively to support its estimate of the Total Enterprise Value of the Reorganized Debtors.

The following is a summary of the principal valuation analyses (commonly used by investment bankers and other financial advisor practitioners) that Guggenheim Securities performed and considered in estimating the Total Enterprise Value of the Reorganized Debtors: (i) Selected Publicly Traded Companies Analysis and (ii) Discounted Cash Flow Analysis.

*Selected Publicly Traded Companies Analysis*

Selected Publicly Traded Companies Analysis involves estimating a subject company's stand-alone fully distributed public market trading value based on both qualitative and quantitative reviews and analyses of the subject company versus certain publicly traded companies which are deemed to be reasonably comparable to the subject company. Among other things, such quantitative analyses typically include calculating various prevailing public market trading valuation multiples (based on various financial metrics considered appropriate given the subject company's and its peer group's industry or sector) and then applying such public market trading valuation multiples in the context of the subject company's historical and projected/forecasted financial performance.

With respect to its Selected Publicly Traded Companies Analysis related to the Reorganized Debtors, Guggenheim Securities notes that none of the selected publicly traded companies used in the Selected Publicly Traded Companies Analysis is identical or directly comparable to the Reorganized Debtors; however, such companies were selected by Guggenheim Securities, among other reasons, because they represented publicly traded companies which may be considered broadly similar, for purposes of Guggenheim Securities' financial analyses, to the Reorganized Debtors based on Guggenheim Securities' familiarity with the apparel retail sector in the United States. In any event, the Selected Publicly Traded Companies Analysis is not mathematical; rather, such analysis involves complex considerations and judgments concerning the differences in business, operating, financial and capital markets-related characteristics and other factors regarding the selected publicly traded companies to which the Reorganized Debtors were compared.

*Discounted Cash Flow Analysis*

Discounted Cash Flow Analysis involves estimating a subject company's "intrinsic value" based on the sum of the present values of its (i) projected/forecasted annual unlevered after-tax free cash flows during an explicit projection/forecast period and (ii) estimated terminal/continuing value beyond the explicit projection/forecast horizon. Guggenheim Securities typically estimates the subject company's terminal/continuing value by applying a range of assumed perpetual growth rates to the subject company's projected/forecasted normalized unlevered after-tax free cash flow in the terminal year. The present values of such projected/forecasted annual unlevered after-tax free cash flows and estimated terminal/continuing

4

UST-1502

value are then calculated by discounting them back to the present (i.e., in the case of the Reorganized Debtors, to the assumed Effective Date) based on the subject company's estimated weighted average cost of capital. In connection with its Valuation Analysis, Guggenheim Securities based its Discounted Cash Flow Analysis on the Financial Projections for the Reorganized Debtors.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE FINANCIAL ANALYSES PERFORMED BY GUGGENHEIM SECURITIES. GUGGENHEIM SECURITIES' PREPARATION OF ITS VALUATION ANALYSIS INVOLVED VARIOUS COMPLEX DETERMINATIONS AND JUDGMENTS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF VALUATION ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH ANALYSES ARE NOT READILY SUSCEPTIBLE TO SUMMARY DESCRIPTION.

### *Certain Caveats, Limitations and Considerations*

With respect to the information used in performing its Valuation Analysis described herein, Guggenheim Securities notes that:

- Guggenheim Securities relied upon and assumed the accuracy, completeness and reasonableness of all industry, business, financial, legal, regulatory, tax, accounting, actuarial and other information (including, without limitation, the Financial Projections, any other estimates and any other forward-looking information) provided by or discussed with the Debtors and their other advisors or obtained from public sources, data suppliers and other third parties;

- Guggenheim Securities did not assume any responsibility, obligation or liability for the accuracy, completeness, reasonableness, achievability or independent verification of, and Guggenheim Securities did not independently verify, any of the above-referenced information (including, without limitation, the Financial Projections, any other estimates and any other forward-looking information);

- Guggenheim Securities expressed no view, opinion, representation, guaranty or warranty (in each case, express or implied) regarding the reasonableness or achievability of the Financial Projections, any other estimates and any other forward-looking information or the assumptions upon which they are based;

- Specifically, subject to the next succeeding paragraph, with respect to (i) the Financial Projections, any other estimates and any other forward-looking information provided by or discussed with the Debtors, (a) Guggenheim Securities was advised by the Debtors' senior management, and Guggenheim Securities assumed, that the Financial Projections, such other estimates and such other forward-looking information utilized in its analyses had been reasonably prepared on bases reflecting the best then-currently available estimates and judgments of the Debtors' senior management as to the expected future performance of the Reorganized Debtors, and (b) Guggenheim Securities assumed that the Financial Projections, such other estimates and such other forward-looking information had been reviewed by the Debtors' Board of Directors with the understanding that such information would be used and relied upon by Guggenheim Securities in connection with its Valuation Analysis and (ii) any financial projections, other estimates and/or other forward-looking information obtained by Guggenheim Securities from public sources, data suppliers and other third parties, Guggenheim Securities assumed that such information was reasonable and reliable; and

- Furthermore, in assessing and utilizing the Case 1 Financial Projections and the Case 2 Financial Projections for purposes of performing its Valuation Analysis described herein, Guggenheim

5

UST-1503

Securities took into account its various discussions with the Debtors' senior management regarding the risks and uncertainties of realizing the projections embedded in the Case 1 and Case 2 scenarios, respectively, in light of (i) the current and prospective industry conditions and competitive dynamics facing the Debtors (and, as of the Effective Date, the Reorganized Debtors), (ii) the Debtors' recent financial performance, (iii) the key commercial, operational and financial drivers underlying, respectively, the Case 1 and Case 2 scenarios, (iv) the impact and economic effects of the COVID-19 pandemic on any of the foregoing, and (v) various other facts and circumstances relevant to the Case 1 and Case 2 scenarios.

Guggenheim Securities further assumed that (i) in all respects meaningful to its analyses, (a) the final version of the Plan, as confirmed, and the related Disclosure Statement will not differ from earlier drafts or versions thereof that Guggenheim Securities reviewed in order to prepare its Valuation Analysis and (b) the Debtors will comply with all terms and conditions of the Plan, the Disclosure Statement and the Restructuring Support Agreement; (ii) the Plan will be consummated in a timely manner in accordance with its terms and the terms of the Restructuring Support Agreement and in compliance with all applicable laws, documents and other requirements, without any delays, limitations, restrictions, conditions, waivers, amendments or modifications (regulatory, tax-related or otherwise) that would have an effect on the Reorganized Debtors in any way meaningful to Guggenheim Securities' analyses; and (iii) no material changes that would affect the estimated Total Enterprise Value of the Reorganized Debtors will occur between the date of the filing of the Disclosure Statement to which this Valuation Analysis is attached and the Effective Date.

Guggenheim Securities' financial advice to the Debtors and its Valuation Analysis (and any materials provided in connection therewith):

- were provided to the Debtors' Board of Directors (in its capacity as such) solely for its information and assistance in connection with its evaluation of the Plan;

- did not constitute a recommendation to the Debtors' Board of Directors with respect to the Plan;

- do not constitute advice or a recommendation to any holder of any Claim against or Interest in any of the Debtors, any creditors of any of the Debtors or any other stakeholders in any of the Debtors (all of the foregoing, "Interested Parties") as to how to vote or act in connection with the Plan;

- do not address the (i) Debtors' or such Interested Parties' underlying business or financial decision to, respectively, propose or accept or reject the Plan (and any transactions contemplated thereby), (ii) relative merits of the Plan (and any transactions contemplated thereby) as compared to any alternative business or financial strategies that might exist for the Debtors or such Interested Parties or (iii) effects of any other transaction in which the Debtors or such Interested Parties might engage;

- do not constitute a view or opinion as to (i) any term, aspect or implication of the Plan (including, without limitation, the form or structure of any transactions contemplated thereby) or the Disclosure Statement or (ii) the Restructuring Support Agreement or any other agreement, transaction document or instrument contemplated by the Plan or to be entered into or amended in connection with the Plan;

- do not constitute a view or opinion as to fairness, financial or otherwise, of the Plan to, or of any consideration to be paid to or received by, any of the Interested Parties;

- do not constitute a view or opinion as to the fairness, financial or otherwise, of the amount or nature of any compensation payable to or to be received by any of the Debtors' or the Reorganized Debtors' directors, officers or employees, or any class of such persons, in connection with the Plan

6

UST-1504

relative to the consideration to be distributed to or received by the Interested Parties;

- do not constitute a view or opinion regarding the solvency/liquidity of the Reorganized Debtors or any other entity under any relevant laws relating to bankruptcy, insolvency or similar matters; and

- do not constitute a solvency/liquidity opinion or a liquidation analysis.

Guggenheim Securities' professionals are not legal, regulatory, tax, consulting, turn-around, accounting, appraisal or actuarial experts and Guggenheim Securities' financial analyses described herein should not be construed as constituting advice with respect to such matters; accordingly, Guggenheim Securities relied on the assessments of the Debtors' senior management and the Debtor's other advisors with respect to such matters.

Guggenheim Securities did not perform or obtain any independent appraisal of the assets or liabilities (including any contingent, derivative or off-balance sheet assets and liabilities) of the Debtors, the Reorganized Debtors or any other entity, or of the solvency/liquidity of the Debtors, the Reorganized Debtors or any other entity, nor was Guggenheim Securities furnished with any such appraisals (other than the Liquidation Analysis, prepared by the Debtors, with the assistance of Alvarez & Marsal Holdings, LLC, attached to the Disclosure Statement as **Exhibit G**).

7

UST-1505

**Exhibit G**

**Liquidation Analysis**

UST-1506

# LIQUIDATION ANALYSIS

## Ascena Retail Group, Inc.

## I. INTRODUCTION

Section 1129(a)(7) of the Bankruptcy Code, often called the "best interests test," requires that a bankruptcy court find, as a condition of confirmation, that the Chapter 11 plan provides, with respect to each class, that each holder of an Allowed Claim either (i) has accepted the plan of reorganization, or (ii) will receive or retain under the plan property of a value, as of the plan's assumed effective date, that is not less than the value such non-accepting holders would receive or retain if the debtors were to be liquidated under chapter 7 of the Bankruptcy Code.

Accordingly, to demonstrate that the proposed Plan satisfies the "best interest" of creditors test, the Debtors, with assistance from their restructuring advisor, have prepared the following hypothetical liquidation analysis ("Liquidation Analysis"), in connection with the Plan and the Disclosure Statement.[1] The Liquidation Analysis indicates the estimated recoveries that may be obtained by Classes of Claims or Interests assuming a hypothetical liquidation under chapter 7 of the Bankruptcy Code upon disposition of the Debtors' assets as an alternative to the Plan. Accordingly, the values discussed in the Liquidation Analysis may be different from amounts referred to in the Plan. The Liquidation Analysis is based on certain assumptions in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis.

## II. STATEMENT OF LIMITATIONS

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from certain of their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY. NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in *the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. and its Debtor affiliates.*

UST-1507

## III. OVERVIEW AND GENERAL ASSUMPTIONS

Hypothetical Chapter 7 recoveries set forth in this Liquidation Analysis were determined through multiple steps, as set forth below. The basis of the Liquidation Analysis is the Debtors' projected cash balance and assets as of October 31, 2020 (the "Conversion Date") and the net costs to execute the administration of the wind down of the Estates. The Liquidation Analysis assumes that the Debtors would commence a Chapter 7 liquidation on or about the Conversion Date under the supervision of a single court appointed Chapter 7 trustee. The selection of a separate Chapter 7 trustee for one or more of the Estates likely would result in substantially higher administrative expenses associated with the chapter 7 cases from a large duplication of effort by each trustee and his or her professionals. In addition, the selection of separate Chapter 7 trustees likely would give rise to complicated, expensive, and time-consuming disputes regarding certain inter-Debtor issues. The Liquidation Analysis reflects the wind down and liquidation of substantially all of the Debtors' remaining assets and the distribution of available proceeds to holders of Allowed Claims during the period after the Conversion Date.

Summary Notes to Liquidation Analysis

1. **Dependence on Assumptions**. The Liquidation Analysis depends on a number of estimates and assumptions. Although developed and considered reasonable by the management and the restructuring advisor of the Debtors, the assumptions are inherently subject to significant economic, business, regulatory and competitive uncertainties and contingencies beyond the control of the Debtors or their management. The Liquidation Analysis is also based on the Debtors' best judgment of how numerous decisions in the liquidation process would be resolved. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation and actual results could vary materially and adversely from those contained herein.

2. **Dependence on a Forecast Balance Sheet**. This Liquidation Analysis contains numerous estimates that are still under review and it remains subject to further legal and accounting analysis.

3. **DIP ABL Revolver, DIP Term Loan, and Prepetition Term Loan Assumptions**. The Liquidation Analysis assumes that upon conversion of the Chapter 11 case to Chapter 7, the DIP ABL Agent, DIP Term Loan Agents, and Prepetition Term Loan Agents will seek relief from the automatic stay to foreclose on the Debtors' assets under the jurisdiction of the Bankruptcy Court to recover on their outstanding Claims. For the purpose of this analysis, it is assumed that the conversion from Chapter 11 to Chapter 7 will take place on the Conversion Date. The DIP ABL, DIP Term Loan, and Prepetition Term Loan would have the ability to recover on their respective secured positions on substantially all of the Debtors' assets.

4. **Chapter 7 liquidation process**. The liquidation of the Debtors' assets is assumed to be completed over a twelve month period inside of a Chapter 7 case managed by the Chapter 7 trustee. The Chapter 7 trustee would manage the bankrupt estates to maximize recovery to creditors as expeditiously as possible and would appoint professionals (attorneys, investment bankers, financial advisors, accountants, consultants, appraisers, experts, etc.) to assist in the liquidation and wind down of the Estates. The Chapter 7 trustee would oversee the Debtors' inventory liquidation and collection of outstanding accounts receivable in addition to attempting to sell or otherwise monetize other assets owned by the Debtors to one or multiple buyers. During the first five months, the Debtors would complete going-out-of-business sales for all remaining store inventory, furniture, fixtures, and equipment ("FF&E"), along with the sale of all intellectual property ("IP"). During months 6 – 10, the Debtors would primarily focus on monetizing and collecting other assets while throughout the 12 month period the Debtors would also be working on administrative activities, such as final

UST-1508

creditor distributions needed to complete the wind down of the Estates.

5. **Non-Debtor Affiliates**. The Liquidation Analysis assumes all of the non-Debtor affiliates would undertake parallel liquidations, whereby the proceeds of such liquidations are distributed in accordance with the priority of Claims asserted against such entities on an entity-by-entity basis. The Liquidation Analysis assumes that any recoveries from the non-Debtor affiliates are used to (i) satisfy the wind-down arising from the monetization of those assets; and (ii) to satisfy indebtedness outstanding with respect to those interests or claims against those entities. The material assumptions of the non-Debtor's hypothetical liquidation analysis are substantially consistent with the assumptions underlying the liquidation of the Debtors.

6. **Claims Estimates**. In preparing this Liquidation Analysis, the Debtors have preliminarily estimated an amount of Allowed Claims for each Class based upon a review of the Debtors' estimated balance sheet. Administrative claims were estimated based on the company's financial projections as of the Conversion Date. Additional Claims were estimated to include certain Chapter 7 administrative obligations incurred after the Conversion Date. The estimate of all allowed claims in this Liquidation Analysis is based on the estimated book value of those claims, where applicable. No order or finding has been entered or made by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the estimated amounts of Allowed Claims set forth in this Liquidation Analysis. The estimate of the amount of Allowed Claims set forth in this Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan. The actual amount of Allowed Claims could be materially different from the amount of Claims estimated in this Liquidation Analysis.

## IV. CONCLUSION

THE DEBTORS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING ANALYSIS, THAT CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY THAT IS NOT LESS THAN WHAT THEY WOULD OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

## V. LIQUIDATION ANALYSIS RESULTS

The following pages present the results for the hypothetical liquidation of the Debtors.[2]

| Estimated Proceeds Generated From Wind-Down of Guarantors | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

*In $US Millions*

| | | | Potential Recovery | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Est./ | Recovery Estimate (%) | | | Recovery Estimate ($) | | |
| Assets | Notes | Book Value | Low | Mid | High | Low | Mid | High |
| *Gross Liquidation Proceeds:* | | | | | | | | |
| Cash and Cash Equivalents | [1] | $ 393 | 100.0% | 100.0% | 100.0% | $ 393 | $ 393 | $ 393 |
| Short-Term Investments | [2] | 1 | 0.0% | 0.0% | 0.0% | - | - | - |
| Accounts Receivable | [3] | 80 | 58.3% | 61.6% | 64.9% | 47 | 49 | 52 |
| Prepaid Expenses and Other Current Assets | [4] | 64 | 0.0% | 2.6% | 5.1% | - | 2 | 3 |
| Inventory | [5] | 298 | 138.4% | 142.0% | 145.5% | 412 | 423 | 433 |
| Property and Equipment, Net | [6] | 614 | 9.7% | 11.2% | 12.6% | 60 | 69 | 77 |
| Intercompany Accounts Receivable | [7] | 53 | 1.1% | 1.3% | 1.4% | 1 | 1 | 1 |
| Other Intangible Assets, Net | [8] | 44 | 50.0% | 75.0% | 100.0% | 22 | 33 | 44 |
| Other Assets | [9] | 101 | 0.0% | 7.4% | 15.7% | - | 8 | 16 |
| Pledged Interests | [10] | n/a | n/a | n/a | n/a | 45 | 68 | 92 |
| Equity Interests | [11] | n/a | n/a | n/a | n/a | 1 | 1 | 1 |
| **Total Assets and Estimated Gross Proceeds** | | **$ 1,649** | **59.4%** | **63.4%** | **67.5%** | **$ 980** | **$ 1,046** | **$ 1,112** |

| | | | Percent of Gross Proceeds (%) | | | Expense Estimate ($) | | |
|---|---|---|---|---|---|---|---|---|
| *Less: Wind-down Costs:* | | | Low | Mid | High | Low | Mid | High |
| Operating Expenses - Inventory | [12] | | 23.3% | 21.8% | 20.5% | $ (228) | $ (228) | $ (228) |
| Operating Expenses - Corporate Overhead | [13] | | 20.6% | 17.7% | 15.2% | (202) | (185) | (169) |
| Chapter 7 - Professional Fees | [14] | | 1.9% | 1.5% | 1.2% | (18) | (16) | (13) |
| Chapter 7 - Trustee Fee | [15] | | 1.2% | 1.4% | 1.5% | (12) | (14) | (16) |
| Accrued Payroll & Payroll Taxes | [16] | | 2.7% | 2.5% | 2.4% | (26) | (26) | (26) |
| Accrued Sales Tax | [16] | | 1.1% | 1.1% | 1.0% | (11) | (11) | (11) |
| Gift Card Realization | [17] | | 3.9% | 3.0% | 2.3% | (38) | (32) | (25) |
| Asset Realization Fees | [18] | | 0.3% | 0.4% | 0.4% | (3) | (4) | (5) |
| **Total Estimated Wind-down Costs** | | | **55.0%** | **49.4%** | **44.5%** | **$ (539)** | **$ (517)** | **$ (495)** |
| **Net Proceeds Available** | | | | | | **$ 441** | **$ 529** | **$ 618** |

| *Distribution of Net Liquidation Proceeds to Creditors* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

| | | | Recovery % | | | Recovery Estimate $ | | |
|---|---|---|---|---|---|---|---|---|
| Liquidation Claims | | Balances | Low | Mid | High | Low | Mid | High |
| *DIP ABL Claims* | | | | | | | | |
| DIP ABL Claims | [19] | $ 131 | 100.0% | 100.0% | 100.0% | $ 131 | $ 131 | $ 131 |
| **Total DIP ABL Claims** | | **$ 131** | **100.0%** | **100.0%** | **100.0%** | **$ 131** | **$ 131** | **$ 131** |
| *Total DIP ABL Deficiency* | | | | | | *$ -* | *$ -* | *$ -* |
| *Remaining Proceeds Available to DIP Term Loan Claimants* | | | | | | *$ 310* | *$ 398* | *$ 487* |
| *DIP Term Loan Claims* | | | | | | | | |
| DIP Term Loan Claims | [20] | $ 354 | 87.6% | 100.0% | 100.0% | $ 310 | $ 354 | $ 354 |
| **Total DIP Term Loan Claims** | | **$ 354** | **87.6%** | **100.0%** | **100.0%** | **$ 310** | **$ 354** | **$ 354** |
| *Total DIP Term Loan Deficiency* | | | | | | *$ (44)* | *$ -* | *$ -* |
| *Remaining Proceeds Available to Pre-Petition Term Loan Claimants* | | | | | | *$ -* | *$ 44* | *$ 133* |
| *Pre-Petition Term Loan Claims* | | | | | | | | |
| Pre-Petition Term Loan Claims | [21] | $ 1,110 | 0.0% | 4.0% | 12.0% | $ - | $ 44 | $ 133 |
| **Total Pre-Petition Term Loan Claims** | | **$ 1,110** | **0.0%** | **4.0%** | **12.0%** | **$ -** | **$ 44** | **$ 133** |
| *Total Pre-Petition Term Loan Deficiency* | | | | | | *$ (1,110)* | *$ (1,066)* | *$ (977)* |
| *Remaining Proceeds Available to Administrative Claims* | | | | | | *$ -* | *$ -* | *$ -* |
| *Administrative / Priority Claims* | | | | | | | | |
| Admin / Priority Claims | [22] | $ 321 | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| **Total Administrative Claims** | | **$ 321** | **0.0%** | **0.0%** | **0.0%** | **$ -** | **$ -** | **$ -** |
| *Remaining Proceeds Available to Unsecured Claims* | | | | | | *$ -* | *$ -* | *$ -* |
| *General Unsecured Claims* | | | | | | | | |
| Unsecured Claims | [23] | $ 1,261 | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| **Total Unsecured Claims** | | **$ 1,261** | **0.0%** | **0.0%** | **0.0%** | **$ -** | **$ -** | **$ -** |
| *Remaining Proceeds Available to Equity* | | | | | | *$ -* | *$ -* | *$ -* |

---

[2]    The estimated claims on the following pages may differ from the estimated claims included in the Disclosure Statement because of differing assumptions between a chapter 11 reorganization and a hypothetical chapter 7 liquidation.

UST-1510

| Estimated Proceeds Generated From Wind-Down of AnnTaylor of Puerto Rico | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

*In $US Millions*

| | | | Potential Recovery | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Est./ | Recovery Estimate (%) | | | Recovery Estimate ($) | | | | |
| Assets | Notes | Book Value | Low | Mid | High | Low | | Mid | | High |
| **Gross Liquidation Proceeds:** | | | | | | | | | | |
| Cash and Cash Equivalents | [1] | $ 0 | 100.0% | 100.0% | 100.0% | $ 0 | $ | 0 | $ | 0 |
| Short-Term Investments | [2] | - | n/a | n/a | n/a | - | | - | | - |
| Accounts Receivable | [3] | - | n/a | n/a | n/a | - | | - | | - |
| Prepaid Expenses and Other Current Assets | [4] | 0 | 0.0% | 4.0% | 8.0% | - | | 0 | | 0 |
| Inventory | [5] | 1 | 81.4% | 83.5% | 85.6% | 1 | | 1 | | 1 |
| Property and Equipment, Net | [6] | - | 0.0% | 0.8% | 1.6% | - | | 0 | | 0 |
| Intercompany Accounts Receivable | [7] | 51 | 0.0% | 0.0% | 0.0% | - | | - | | - |
| Other Intangible Assets, Net | [8] | - | n/a | n/a | n/a | - | | - | | - |
| Other Assets | [9] | - | n/a | n/a | n/a | - | | - | | - |
| Pledged Interests | [10] | n/a | n/a | n/a | n/a | - | | - | | - |
| Equity Interests | [11] | n/a | n/a | n/a | n/a | - | | - | | - |
| **Total Assets and Estimated Gross Proceeds** | | **$ 53** | **1.0%** | **1.1%** | **1.1%** | **$ 1** | **$** | **1** | **$** | **1** |

| | | | Percent of Gross Proceeds (%) | | | Expense Estimate ($) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Less: Wind-down Costs:** | | | Low | Mid | High | Low | | Mid | | High |
| Operating Expenses - Inventory | [12] | | 48.6% | 46.7% | 44.9% | $ (0) | $ | (0) | $ | (0) |
| Operating Expenses - Corporate Overhead | [13] | | 36.8% | 32.7% | 28.8% | (0) | | (0) | | (0) |
| Chapter 7 - Professional Fees | [14] | | 0.6% | 0.7% | 0.6% | (0) | | (0) | | (0) |
| Chapter 7 - Trustee Fee | [15] | | 0.4% | 0.6% | 0.8% | (0) | | (0) | | (0) |
| Accrued Payroll & Payroll Taxes | [16] | | 0.0% | 0.0% | 0.0% | - | | - | | - |
| Accrued Sales Tax | [16] | | 0.0% | 0.0% | 0.0% | - | | - | | - |
| Gift Card Realization | [17] | | 0.0% | 0.0% | 0.0% | - | | - | | - |
| Asset Realization Fees | [18] | | 0.0% | 0.1% | 0.1% | - | | (0) | | (0) |
| **Total Estimated Wind-down Costs** | | | **86.5%** | **80.7%** | **75.2%** | **$ (0)** | **$** | **(0)** | **$** | **(0)** |
| **Net Proceeds Available** | | | | | | **$ 0** | **$** | **0** | **$** | **0** |

| Distribution of Net Liquidation Proceeds to Creditors | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

| | | | Recovery % | | | Recovery Estimate $ | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Liquidation Claims | | Balances | Low | Mid | High | Low | | Mid | | High |
| *DIP ABL Claims* | | | | | | | | | | |
| DIP ABL Claims | [19] | $ - | n/a | n/a | n/a | $ - | $ | - | $ | - |
| **Total DIP ABL Claims** | | **$ -** | **n/a** | **n/a** | **n/a** | **$ -** | **$** | **-** | **$** | **-** |
| *Total DIP ABL Deficiency* | | | | | | $ - | $ | - | $ | - |
| *Remaining Proceeds Available to DIP Term Loan Claimants* | | | | | | $ - | $ | - | $ | - |
| *DIP Term Loan Claims* | | | | | | | | | | |
| DIP Term Loan Claims | [20] | $ - | n/a | n/a | n/a | $ - | $ | - | $ | - |
| **Total DIP Term Loan Claims** | | **$ -** | **n/a** | **n/a** | **n/a** | **$ -** | **$** | **-** | **$** | **-** |
| *Total DIP Term Loan Deficiency* | | | | | | $ - | $ | - | $ | - |
| *Remaining Proceeds Available to Pre-Petition Term Loan Claimants* | | | | | | $ - | $ | - | $ | - |
| *Pre-Petition Term Loan Claims* | | | | | | | | | | |
| Pre-Petition Term Loan Claims | [21] | $ - | n/a | n/a | n/a | $ - | $ | - | $ | - |
| **Total Pre-Petition Term Loan Claims** | | **$ -** | **n/a** | **n/a** | **n/a** | **$ -** | **$** | **-** | **$** | **-** |
| *Total Pre-Petition Term Loan Deficiency* | | | | | | $ - | $ | - | $ | - |
| *Remaining Proceeds Available to Administrative Claims* | | | | | | $ 0 | $ | 0 | $ | 0 |
| *Administrative / Priority Claims* | | | | | | | | | | |
| Admin / Priority Claims | [22] | $ 1 | 14.5% | 21.7% | 28.9% | $ 0 | $ | 0 | $ | 0 |
| **Total Administrative Claims** | | **$ 1** | **14.5%** | **21.7%** | **28.9%** | **$ 0** | **$** | **0** | **$** | **0** |
| *Remaining Proceeds Available to Unsecured Claims* | | | | | | $ - | $ | - | $ | - |
| *General Unsecured Claims* | | | | | | | | | | |
| Unsecured Claims | [23] | $ 46 | 0.0% | 0.0% | 0.0% | $ - | $ | - | $ | - |
| **Total Unsecured Claims** | | **$ 46** | **0.0%** | **0.0%** | **0.0%** | **$ -** | **$** | **-** | **$** | **-** |
| *Remaining Proceeds Available to Equity* | | | | | | $ - | $ | - | $ | - |

UST-1511

## VI. NOTES FOR PROCEEDS AVAILABLE FOR DISTRIBUTION

### Note [1] – Cash and Cash Equivalents

The Liquidation Analysis assumes 100% of estimated recovery of cash on hand in stores and in company bank accounts at the Conversion Date.

### Note [2] – Short Term Investments

Short term investments represent restricted cash for worker's compensation and insurance liabilities that may arise at a later date. The Liquidation Analysis assumes no recovery on short term investments.

### Note [3] – Accounts Receivable

Accounts receivable consists primarily of receivables from in store and online credit card sales, private label credit card receivables, landlord receivables, income tax refunds, and other miscellaneous receivables. The Liquidation Analysis assumes credit card receivables recover in full, while whole sale receivables recover between 80% to 90% based on the collection risk associated with discontinued operations. Landlord and tax receivables assume no recovery due to outstanding amounts owed to both external parties. Other receivables, which include certain inventory sales, rebates, and insurance receivables assume recovery between 45% to 55% of book value. The blended recovery range for all accounts receivable is 58% to 65% of estimated book value.

### Note [4] – Prepaid Expenses and Other Current Assets

Prepaid expenses and other current assets includes rent, supplies, insurance, payroll, taxes, and other miscellaneous assets. The Liquidation Analysis assumes no recovery on prepaid payroll. Prepaid rent and taxes assume no recovery as there are outstanding amounts owed to both landlords and governmental agencies. Prepaid supplies, insurance and other current assets assume 0% to 10% recovery based on the low likelihood of any return of cash from vendors and or on insurance policies. The blended recovery range on prepaid expenses is 0% to 5% of estimated book value.

### Note [5] – Inventory

The Liquidation Analysis includes estimated inventory as of the Conversion Date of $303 million across all debtor and non-debtor entities. Inventory is assumed to be sold "as is, where is" through orderly liquidations with recovery values and timelines based on third-party inventory appraisals, which were further adjusted, as appropriate, to incorporate the impact of COVID-19. Liquidation timelines range from three to twenty weeks based on multiple characteristics, including brand, inventory mix, location of inventory, and expected sales penetration. Estimated recovery reflects the gross orderly liquidation value ("GOLV") of the inventory, and does not account for costs related to selling through the inventory such as occupancy, payroll, liquidation fees, freight, and other general selling expenses, which is described further in note 12. The blended recovery range on inventory is 138% and 146% of book value.

### Note [6] – Property and Equipment, Net

Property and equipment assets consist of buildings, land, distribution center equipment and machinery, leasehold improvements, FF&E, and information technology ("IT"). Leasehold improvements and IT assets are assumed to have no estimated recovery. The Liquidation Analysis assumes that the Trustee would attempt to sell or otherwise monetize the remaining owned property by the Debtors to one or multiple buyers, and that the assumed recovery range on owned property is based on third-party appraisals, further adjusted to approximately 70% to 80% of "fair value" to account for the forced sale in a compressed timeframe that would likely occur during a Chapter 7 liquidation.

UST-1512

## Note [7] – Intercompany Accounts Receivable

Intercompany claims recovery primarily consists of prepetition claims by and among various Ascena legal entities. The Liquidation Analysis assumes all Chapter 7 intercompany prepetition claims are allowed in the amount set forth as of the Conversion Date. Estimated recoveries are forecast based on expected realizations on intercompany payables.

## Note [8] – Other Intangible Assets, Net

Intangible Assets primarily consist of certain trade names, customer relationships, proprietary software, and franchise rights. The assumed recovery is based on a third-party appraisal that reflects a forced liquidation value with the discontinuance of the ongoing retail and e-commerce business. The assumed recovery for IP is between 50% to 100% of the appraised forced liquidation value.

## Note [9] – Other Assets

Other Assets include the Debtor's minority stake in Viking Upper Holdings, deferred income taxes, lease assets, and other miscellaneous assets. Other Assets assume no recovery, with the exception of the company's minority stake in Viking Upper Holdings which is estimated to be sold for 0% to 30% of book value.

## Note [10] – Pledged Interests

Pledged interests include equity recoveries at certain foreign entities for the benefit of the Term Lenders. Foreign entities with an equity recovery flow proceeds to the pledgee and parent entity based on the respective pledge allocation.

## Note [11] – Equity Interest

Equity interests include equity recoveries at foreign entities for the benefit of the respective parent entity. To the extent foreign entities include a pledge for the benefit of the Term Lenders, the equity interest will be limited by the respective pledged percentage.


## VII. WIND-DOWN COSTS

## Note [12] – Operating Expenses - Inventory

Liquidating operating expenses consist of costs related to selling through the inventory such as occupancy, payroll, liquidation fees, marketing, advertising, freight, and other general selling expenses. The proceeds generated from the GOLV of the inventory, less the liquidating operating costs results in the Net Orderly Liquidation Value ("NOLV"). The recovery rate on inventory is between 62% to 69% of cost.

## Note [13] – Operating Expenses – Corporate Overhead

Overhead expenses reflect operating costs over a twelve-month period, which consists of a five month sale period, a five month operational wind-down and a two month tail period to cover final expenses. The wind down expense estimate excludes costs that are included in the store closure and liquidating inventory costs, as described in note 12. The costs primarily consist of corporate salaries, wages, and benefits, corporate and distribution center occupancy costs and IT costs.

### Note [14] – Chapter 7 Professional Fees

Chapter 7 Professional Fees include costs for US counsel, local counsel, financial advisor, litigation counsel, and other professionals. The Liquidation Analysis assumes between nine and twelve months of professional fees are incurred.

### Note [15] – Chapter 7 Trustee Fee

Per statutory guidelines, the Chapter 7 Trustee is eligible to receive 3% of the distribution to interested parties. Final distributions are calculated as the sum of non-intercompany proceeds and subtracting all wind-down costs and fees, excluding Trustee fees.

### Note [16] – Accrued Payroll and Sales Tax

Accrued Payroll is assumed to be distributed in the normal course as part of the wind-down process, because a failure to pay these expenses would likely have an immediate and significant destabilizing effect on the orderly wind-down of the Debtor's estate. Accrued employee and sales tax obligations are based on estimated obligations at the Conversion Date.

### Note [17] – Gift Card Realization

Gift cards are assumed to be accepted during the first 30 days of the going-out-of-business sales to avoid any disruption to the Debtor's orderly liquidation. Gift card realization assumes 40% to 60%, in the high and low respectively, of outstanding gift card balances are used during the 30-day window.

### Note [18] – Asset Realization Fees

Asset realization fees are assumed to be 4% of all P&E and IP sales.

## VIII. SECURED CLAIMS

### Note [19] – DIP ABL Claims

The Liquidation Analysis assumes the DIP ABL Facility does not have a revolver balance at the Conversion Date. As such, the assumed obligations for the DIP ABL Facility claim represent the outstanding letters of credit and accrued Chapter 11 professional fees per the DIP ABL Carve-Out Provision of the Debtors' Cash Collateral Order, which in total are estimated to be $131 million as of the Conversion Date. The DIP ABL Facility has priority ahead of the DIP Term Loan and Prepetition Term Loan on the Debtor's working capital assets including cash on hand, eligible AR, and inventory. The Liquidation Analysis assumes a full recovery on the DIP ABL Facility.

### Note [20] – DIP Term Loan Claims

The DIP Term Loan is assumed to be approximately $354 million as of the Conversion Date. The DIP Term Loan has priority ahead of the DIP ABL on the Debtor's P&E, Intangible Assets, and Other Assets, and has priority ahead of the Prepetition Term Loan. The DIP Term Loan receives the benefit of any surplus DIP ABL Facility proceeds. The DIP Term Loan receives a pledge of between 65% and 100% of proceeds to equity from certain foreign entities. The Liquidation Analysis assumes a 88% to 100% recovery on the DIP Term Loan.

UST-1514

**Note [21] – Prepetition Term Loan Claims**

The Prepetition Term Loan represents the remaining portion of the term loan and is assumed to have a claim of $1,110 million as of the Conversion Date. The Prepetition Term Loan has priority to the Administrative and Priority Claims, and is subordinate to the DIP Term Loan. The Prepetition Term Loan receives the benefit of any surplus DIP Term Loan proceeds. The Liquidation Analysis assumes a 0% to 12% recovery on the Prepetition Term Loan.

## IX. ADMINISTRATIVE AND PRIORITY CLAIMS

**Note [22] – Administrative / Priority Claims**

Administrative / Priority claims include amounts such as 503(b)(9) claims, priority tax claims, post-petition accounts payable and accrued expenses, and potential WARN claims and other administrative claims estimates at the Conversion Date.

## X. UNSECURED CLAIMS

**Note [23] – Unsecured Claims**

General unsecured claims include the estimated range of trade claims, intercompany claims, rent rejection claims, and other unsecured claims estimated as of July 23, 2020 (the "Petition Date"). The Liquidation analysis estimates no recovery on the General Unsecured Claims at the Debtor entities.

- **Accounts Payable** represents the estimated accounts payable balance as of the Petition Date. Estimated accounts payable balance has been reduced by $55 million to adjust for the 503(b)(9) estimate.
- **Accrued expenses other current liabilities** represents the estimated accrued expenses and other liabilities balance as of the Petition Date.
- **Rent rejection claims** were estimated by property consistent with the Bankruptcy Code. Annual rents were used to calculate the greater of (a) one year's rent; and (b) 15% of the remaining lease term, not to exceed 3-years rent.
- **Intercompany claims** are asserted pari-passu with other general unsecured claims. Intercompany claims represent intercompany balances between entities.
- **Other Unsecured Claims** include deferred income liability and other non-current liabilities.

IT SHOULD BE NOTED THAT NO ORDER OR FINDING HAS BEEN ENTERED OR MADE BY THE BANKRUPTCY COURT ESTIMATING OR OTHERWISE FIXING THE AMOUNT OF CLAIMS AT THE ESTIMATED AMOUNTS OF ALLOWED CLAIMS SET FORTH IN THE LIQUIDATION ANALYSIS. THE ESTIMATE OF THE AMOUNT OF ALLOWED CLAIMS SET FORTH IN THIS LIQUIDATION ANALYSIS SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING, WITHOUT LIMITATION, ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS UNDER THE PLAN. THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT FROM THE AMOUNT OF CLAIMS ESTIMATED IN THIS LIQUIDATION ANALYSIS.

UST-1515

## Schedule 2

**Form of Solicitation and Voting Procedures**

UST-1516

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:     (202) 842-7800
Facsimile:      (202) 842-7899

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## SOLICITATION AND VOTING PROCEDURES

**PLEASE TAKE NOTICE THAT** on [●], 2020, the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") entered an order (the "Disclosure Statement Order"): (a) authorizing Ascena Retail Group, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit votes on the *Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

[2]     Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Plan.

UST-1517

procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

### A. The Voting Record Date.

The Court has established **September 10, 2020**, as the record date for purposes of determining which holders of Claims in Classes 4 and 5 are entitled to vote on the Plan (the "Voting Record Date").

### B. The Voting Deadline.

The Court has established **October 13, 2020, at 5:00 p.m.**, prevailing Eastern Time as the voting deadline (the "Voting Deadline") for the Plan. The Debtors may extend the Voting Deadline, in their discretion, without further order of the Court. To be counted as votes to accept or reject the Plan, all ballots ("Ballots") must be properly executed, completed, and delivered by: (1) first class mail (using the reply envelope provided in the Solicitation Package or otherwise); (2) overnight courier; (3) personal delivery; or (4) the online electronic ballot portal so that they are *actually received*, in any case, no later than the Voting Deadline by the Notice and Claims Agent. All Ballots should be sent to: Ascena Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; *provided* that the reply envelope provided in the Solicitation Package may indicate a different zip code. Delivery of a Ballot to the Notice and Claims Agent by facsimile or any other electronic means (other than as expressly provide herein) shall not be valid.

### C. Form, Content, and Manner of Notices.

### 1. The Solicitation Package.

The following materials shall constitute the solicitation package (the "Solicitation Package"):

> a. a copy of these Solicitation and Voting Procedures;
>
> b. the *Notice of Hearing to Consider Confirmation of the Chapter 11 Plan Filed By the Debtors and Related Voting and Objection Procedures*, in substantially the form annexed as Schedule 8 to the Disclosure Statement Order (the "Confirmation Hearing Notice");
>
> c. a cover letter, in substantially the form annexed as Schedule 7 to the Disclosure Statement Order describing the contents of the Solicitation Package and urging the holders of Claims in the Voting Classes to vote to accept the Plan;
>
> d. a cover letter, in substantially the form annexed as Schedule 8 to the Disclosure Statement Order from the Official Committee of Unsecured Creditors encouraging the holders of General Unsecured Claims in Class 5 to vote in favor of the Plan;

<div align="center">2</div>

UST-1518

e.  the applicable form of Ballot, in substantially the form of the Ballot annexed as <u>Schedule 3</u> to the Disclosure Statement Order, as applicable;

f.  the approved Disclosure Statement annexed as <u>Schedule 1</u> to the Disclosure Statement Order (and exhibits thereto, including the Plan);

g.  a pre-addressed, postage pre-paid reply envelope; and

h.  any additional documents that the Court has ordered to be made available.

**2.     <u>Distribution of the Solicitation Package</u>.**

The Solicitation Package shall provide the Plan, the Disclosure Statement, and the Disclosure Statement Order (without exhibits except the Solicitation Procedures) in electronic format (CD-ROM or flash drive format), and all other contents of the Solicitation Package, including Ballots, shall be provided in paper format. Any party that receives the materials in electronic format but would prefer paper format may contact Prime Clerk LLC (the "<u>Notice and Claims Agent</u>") by: (a) calling the Debtors' restructuring hotline at (877) 930-4319 (toll free) or (347) 899-4594 (international); (b) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/ascena; (c) writing to Ascena Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; and/ or (d) emailing ascenaballots@primeclerk.com and requesting paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense).

The Debtors shall serve, or cause to be served, all of the materials in the Solicitation Package (excluding the Ballots) on the U.S. Trustee and all parties who have requested service of papers in this case pursuant to Bankruptcy Rule 2002 as of the Voting Record Date. In addition, the Debtors shall mail, or cause to be mailed, the Solicitation Package to all holders of Claims in the Voting Classes within three business days of entry of the Disclosure Statement Order, who are entitled to vote, as described in section D below.

To avoid duplication and reduce expenses, the Debtors will make reasonable effort to ensure that any holder of a Claim who has filed duplicative Claims against a Debtor (whether against the same or multiple Debtors) that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim or Interest and with respect to that Class as against that Debtor.

**3.     <u>Resolution of Disputed Claims for Voting Purposes; Resolution Event</u>.**

a.  Absent a further order of the Court, the holder of a Claim in a Voting Class that is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in such objection.

b.  If a Claim in a Voting Class is subject to an objection other than a "reduce and allow" objection that is filed with the Court on or prior to ten days before the Voting Deadline: (i) the Debtors shall cause the applicable holder to be served with a Disputed Claim Notice substantially in the form annexed as <u>Schedule 6</u> to the Disclosure Statement Order (which notice

3

UST-1519

shall be served together with such objection); and (ii) the applicable holder shall not be entitled to vote to accept or reject the Plan on account of such claim unless a Resolution Event (as defined herein) occurs as provided herein.

c.  If a Claim in a Voting Class is subject to an objection other than a "reduce and allow" objection that is filed with the Court less than ten days prior to the Voting Deadline, the applicable Claim shall be deemed temporarily allowed for voting purposes only, without further action by the holder of such Claim and without further order of the Court, unless the Court orders otherwise.

d.  A "Resolution Event" means the occurrence of one or more of the following events no later than two business days prior to the Voting Deadline:

i.  an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

ii.  an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

iii.  a stipulation or other agreement is executed between the holder of such Claim and the Debtors resolving the objection and allowing such Claim in an agreed upon amount; or

iv.  the pending objection is voluntarily withdrawn by the objecting party.

e.  No later than one business day following the occurrence of a Resolution Event, the Debtors shall cause the Notice and Claims Agent to distribute via email, hand delivery, or overnight courier service a Solicitation Package and a pre-addressed, postage pre-paid envelope to the relevant holder to the extent such holder has not already received a Solicitation Package containing a Ballot.

## 4.  Non-Voting Status Notices for Unimpaired Classes and Classes Deemed to Reject the Plan.

Certain holders of Claims and Interests that are not classified in accordance with section 1123(a)(1) of the Bankruptcy Code or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code will receive only the *Non-Voting Status Notice for Unimpaired Claims Conclusively Presumed to Accept the Plan*, substantially in the form annexed as Schedule 4 to the Disclosure Statement Order. Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots). Certain holders of Claims and Interests who are not entitled to vote because they are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code will receive the *Non-Voting Status Notice to Holders of*

4

UST-1520

*Impaired Claims and Equity Interests Deemed to Reject the Plan*, substantially in the form annexed as Schedule 5 to the Disclosure Statement Order. Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots) and opt out of the Third Party Releases contained in the Plan.

### 5. Notices in Respect of Executory Contracts and Unexpired Leases.

Counterparties to Executory Contracts and Unexpired Leases that receive an *Assumption Notice* or a *Rejection Notice*, substantially in the forms attached as Schedule 10 and Schedule 11 to the Disclosure Statement Order, respectively, may file an objection to the Debtors' proposed assumption, rejection, and/or cure amount, as applicable. Such objections must be ***actually received*** by the Notice and Claims Agent by **October 13, 2020, at 5:00 p.m.**, prevailing Eastern Time.

### D. Voting and Tabulation Procedures.

### 1. Holders of Claims Entitled to Vote.

Only the following holders of Claims in the Voting Classes shall be entitled to vote with regard to such Claims:

a. Holders of Claims who, on or before the Voting Record Date (or such other later date as may be set by Court order), have timely filed a Proof of Claim that (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date; and (ii) is not the subject of a pending objection, other than a "reduce and allow" objection, filed with the Court at least ten days prior to the Voting Deadline, pending a Resolution Event as provided herein; *provided* that a holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall receive a Solicitation Package and be entitled to vote such Claim in the reduced amount contained in such objection absent a further order of the Court;

b. Holders of Claims that are listed in the Schedules; *provided* that, to the extent the applicable Claims Bar Date has not yet expired prior to the Voting Record Date, Claims that are scheduled as contingent, unliquidated, or disputed (excluding such scheduled disputed, contingent, or unliquidated Claims that have been paid or superseded by a timely Filed Proof of Claim) shall be allowed to vote only in the amount of $1.00 (unless otherwise provided by Court order);

c. Holders whose Claims arise (i) pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Court, (ii) in an order entered by the Court, or (iii) in a document executed by the Debtors pursuant to authority granted by the Court (in which case a description of the pertinent document shall be provided in the Voting Report), in each case regardless of whether a Proof of Claim has been filed;

d. Holders of any Disputed Claim that has been temporarily allowed to vote on the Plan pursuant to Bankruptcy Rule 3018; and

5

UST-1521

e.      the assignee of any Claim that was transferred on or before the Voting Record Date by any Entity described in subparagraphs (a) through (d) above; *provided* that such transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date.

**2.      Establishing Claim Amounts for Voting Purposes.**

a.      **Class 4 Claims.**  The amount of Class 4 Claims for voting purposes only will be established based on the amount of the applicable positions held by each Class 4 Claim Holder, as of the Voting Record Date, as evidenced by the applicable records provided by the Term Loan Agent in electronic Microsoft Excel format to the Debtors or the Notice and Claims Agent no later than one (1) business day following the Voting Record Date.

**3.      Filed and Scheduled Claims.**

The Claim amount established herein shall control for voting purposes only and shall not constitute the Allowed amount of any Claim.  Moreover, any amounts filled in on Ballots by the Debtors through the Notice and Claims Agent, as applicable, are not binding for purposes of allowance and distribution.  In tabulating votes, the following hierarchy shall be used to determine the amount of the Claim associated with each claimant's vote:

a.      the aggregate Claim amount Allowed for Class 4 Claims shall be the amount set forth in Section III.B of the Plan;

b.      the Claim amount (i) settled and/or agreed upon by the Debtors, as reflected in a document filed with the Court, (ii) set forth in an order of the Court, or (iii) set forth in a document executed by the Debtors pursuant to authority granted by the Court;

c.      the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event under section C.3(d) of these Solicitation and Voting Procedures;

d.      the Claim amount contained in a Proof of Claim that has been timely filed by the applicable Claims Bar Date (or deemed timely filed by the Court under applicable law), except for any amounts asserted on account of any interest accrued after the Petition Date; *provided* that any Ballot cast by a holder of a Claim who timely files a Proof of Claim in respect of (i) a contingent Claim or a Claim in a wholly-unliquidated or unknown amount (based on a reasonable review by the Debtors and/or the Notice and Claims Agent) that is not the subject of an objection will count toward satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count as a Ballot for a Claim in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code, and (ii) a partially liquidated and partially

UST-1522

unliquidated Claim, such Claim will be Allowed for voting purposes only in the liquidated amount; *provided further* that to the extent the Claim amount contained in the Proof of Claim is different from the Claim amount set forth in a document filed with the Court as referenced in subparagraph (b) above, the Claim amount in the document filed with the Court shall supersede the Claim amount set forth on the respective Proof of Claim for voting purposes; *provided further* that to the extent a Holder of a Claim in a Voting Class that is not listed in the Schedules files a Proof of Claim after the Voting Record Date but before the applicable Claims Bar Date, such Holder shall receive a Solicitation Package and a Ballot;

e.  the Claim amount listed in the Schedules (to the extent such Claim is not superseded by a timely filed Proof of Claim); *provided* that such Claim is not scheduled as contingent, disputed, or unliquidated and/or has not been paid; *provided further* that, if the applicable Claims Bar Date has not expired prior to the Voting Record Date, a Claim listed in the Schedules as contingent, disputed, or unliquidated shall vote at $1.00 (unless otherwise provided by Court order); and

f.  in the absence of any of the foregoing, such Claim shall be disallowed for voting purposes.

**4.  <u>Voting and Ballot Tabulation Procedures.</u>**

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Local Bankruptcy Rules:

a.  except as otherwise provided in the Solicitation and Voting Procedures, unless the Ballot being furnished is timely submitted on or prior to the Voting Deadline (as the same may be extended by the Debtors), the Debtors shall reject such Ballot as invalid and, therefore, shall not count it in connection with Confirmation of the Plan;

b.  the Notice and Claims Agent will date-stamp all Ballots when received. The Notice and Claims Agent shall retain the original Ballots and an electronic copy of the same for a period of one year after the Effective Date of the Plan, unless otherwise ordered by the Court. The Notice and Claims Agent shall tabulate Ballots on a Debtor-by-Debtor basis;

c.  consistent with the requirements of Local Bankruptcy Rule 3016-1, the Debtors will file with the Court by no later than October 19, 2020, a voting report (the "<u>Voting Report</u>"). The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable,

UST-1523

lacking signatures or lacking necessary information, received via facsimile or damaged (collectively, in each case, the "Irregular Ballots"). The Voting Report shall indicate the Debtors' intentions with regard to each Irregular Ballot;

d.    the method of delivery of Ballots to be sent to the Notice and Claims Agent is at the election and risk of each holder, and except as otherwise provided, a Ballot will be deemed delivered only when the Notice and Claims Agent actually receives the executed Ballot;

e.    an executed Ballot is required to be submitted by the Entity submitting such Ballot. Delivery of a Ballot to the Notice and Claims Agent by facsimile, or any electronic means other than as expressly approved by the Disclosure Statement Order or these Solicitation Procedures will not be valid;[3]

f.    no Ballot should be sent to the Debtors, the Debtors' agents (other than the Notice and Claims Agent), the Debtors' financial or legal advisors, and if so sent will not be counted;

g.    if multiple Ballots are received from the same holder with respect to the same Claim prior to the Voting Deadline, the last properly executed Ballot timely received will be deemed to reflect that holder's intent and will supersede and revoke any prior received Ballot;

h.    holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split any votes. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims within the same Class, the applicable Debtor may, in its discretion, aggregate the Claims of any particular holder within a Class for the purpose of counting votes;

i.    a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a holder of Claims must indicate such capacity when signing;

j.    the Debtors, subject to a contrary order of the Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report;

k.    neither the Debtors, nor any other Entity, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots

---

3    For the avoidance of doubt, a Ballot may be submitted via the on-line electronic ballot portal.

UST-1524

other than as provided in the Voting Report, nor will any of them incur any
liability for failure to provide such notification;

l.    unless waived or as ordered by the Court, any defects or irregularities in
connection with deliveries of Ballots must be cured prior to the Voting
Deadline or such Ballots will not be counted;

m.    in the event a designation of lack of good faith is requested by a party in
interest under section 1126(e) of the Bankruptcy Code, the Court will
determine whether any vote to accept and/or reject the Plan cast with respect
to that Claim will be counted for purposes of determining whether the Plan
has been accepted and/or rejected;

n.    subject to any order of the Court, the Debtors reserve the right to reject any
and all Ballots not in proper form, the acceptance of which, in the opinion
of the Debtors, would not be in accordance with the provisions of the
Bankruptcy Code or the Bankruptcy Rules; *provided* that any such
rejections will be documented in the Voting Report;

o.    if a Claim has been estimated or otherwise Allowed only for voting
purposes by order of the Court, such Claim shall be temporarily Allowed in
the amount so estimated or Allowed by the Court for voting purposes only,
and not for purposes of allowance or distribution;

p.    if an objection to a Claim is filed, such Claim shall be treated in accordance
with the procedures set forth herein;

q.    the following Ballots shall not be counted in determining the acceptance or
rejection of the Plan:  (i) any Ballot that is illegible or contains insufficient
information to permit the identification of the holder of such Claim; (ii) any
Ballot cast by any Entity that does not hold a Claim in a Voting Class;
(iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or
disputed for which no Proof of Claim was timely filed by the Voting Record
Date (unless the applicable bar date has not yet passed, in which case such
Claim shall be entitled to vote in the amount of $1.00); (iv) any unsigned
Ballot or Ballot lacking an original signature (for the avoidance of doubt, a
Ballot submitted via the Notice and Claims Agent online balloting portal
shall be deemed an original signature); (v) any Ballot not marked to accept
or reject the Plan or marked both to accept and reject the Plan; and (vi) any
Ballot submitted by any Entity not entitled to vote pursuant to the
procedures described herein;

r.    after the Voting Deadline, no Ballot may be withdrawn or modified without
the prior written consent of the Debtors;

s.    the Debtors are authorized to enter into stipulations with the holder of any
Claim agreeing to the amount of a Claim for voting purposes, which will be
disclosed in the Voting Report; and

UST-1525

t.      where any portion of a single Claim has been transferred to a transferee, all holders of any portion of such single Claim will be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other voting and solicitation procedures set forth herein), and (ii) required to vote every portion of such Claim collectively to accept or reject the Plan.  In the event that (i) a Ballot, (ii) a group of Ballots within a Voting Class received from a single creditor, or (iii) a group of Ballots received from the various holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots shall not be counted.

**E.      Amendments to the Plan and Solicitation and Voting Procedures.**

The Debtors reserve the right to make non-substantive or immaterial changes to the Disclosure Statement, Plan, Ballots, Confirmation Hearing Notice, and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Package before their distribution.

UST-1526

**Schedule 3**

**Form of Ballot**

UST-1527

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**BALLOT FOR VOTING TO ACCEPT OR REJECT THE AMENDED JOINT CHAPTER 11
PLAN OF REORGANIZATION OF ASCENA RETAIL GROUP, INC., AND ITS DEBTOR AFFILIATES**

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS
> CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT
> MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE
> *ACTUALLY RECEIVED*
> BY THE NOTICE AND CLAIMS AGENT BY OCTOBER 13, 2020, AT 5:00 P.M., PREVAILING
> EASTERN TIME (THE "VOTING DEADLINE") IN ACCORDANCE WITH THE FOLLOWING:**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on [●], 2020 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this ballot (this "Ballot") because you are a holder of a Claim in the Class indicated in Item 1 below as of September 10, 2020 (the "Voting Record Date"). Accordingly, you have a right to vote to accept or reject the Plan.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Prime Clerk LLC (the "Notice and Claims Agent") at no charge by: (i) accessing the Debtors' restructuring website at https://cases.primeclerk.com/ascena; (ii) writing to the Notice and Claims Agent at Ascena Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; (iii) calling the Notice and Claims Agent at (877) 930-4319 (toll free) or (347) 899-4594 (international); or (iv) emailing ascenaballots@primeclerk.com; or (b) for a fee via PACER at http://www.vaeb.uscourts.gov.

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena. The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

UST-1528

This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Ballot in error, or if you believe that you have received the wrong ballot, please contact the Notice and Claims Agent **immediately** at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been placed in the Class of Claims under the Plan indicated in Item 1 below. If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

**Item 1.** **Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the holder of Claims in the following aggregate unpaid amount (insert amount in box below):

$\quad$ $ _____

Debtor: _____

**Item 2.** **Vote on Plan.**

The holder of the Claim against the Debtors set forth in Item 1 votes to (please check one):

| **ACCEPT** (vote FOR) the Plan | **REJECT** (vote AGAINST) the Plan |
|---|---|

**Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.**

**Item 3.** **Important information regarding the Third Party Release.**

**Article VIII.F of the Plan contains the following provision:**

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and**

2

UST-1529

**related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Effective Date.**

\*    \*    \*

UNDER THE PLAN, "RELEASING PARTY" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) EACH OF THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH OF THE CONSENTING STAKEHOLDERS; (D) THE ABL AGENT; (E) THE ABL LENDERS; (F) TERM LOAN AGENT; (G) THE TERM LOAN LENDERS; (H) EACH OF THE LENDERS AND ADMINISTRATIVE AGENTS UNDER THE EXIT FACILITIES; (I) THE BACKSTOP PARTIES; (J) THE DIP ABL AGENT; (K) THE DIP ABL LENDERS; (L) THE DIP TERM AGENT; (M) THE DIP TERM LENDERS; (N) ALL HOLDERS OF IMPAIRED CLAIMS WHO VOTED TO ACCEPT THE PLAN; (O) ALL HOLDERS OF IMPAIRED CLAIMS WHO ABSTAINED FROM VOTING ON THE PLAN OR VOTED TO REJECT THE PLAN BUT DID NOT TIMELY OPT OUT OF OR OBJECT TO THE APPLICABLE RELEASE; (P) ALL HOLDERS OF UNIMPAIRED CLAIMS WHO DID NOT TIMELY OPT OUT OF OR OBJECT TO THE APPLICABLE RELEASE; (Q) ALL HOLDERS OF INTERESTS; (R) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN FOREGOING CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (S); AND (S) EACH RELATED PARTY OF EACH ENTITY IN THE FOREGOING CLAUSE (A) THROUGH THIS CLAUSE (S); (T) THE CREDITORS' COMMITTEE; *PROVIDED* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT: (X) ELECTS TO OPT OUT OF THE RELEASES CONTAINED IN THE PLAN; OR (Y) TIMELY OBJECTS TO THE RELEASES CONTAINED IN THE PLAN AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION; *PROVIDED FURTHER* THAT ANY SUCH ENTITY SHALL BE IDENTIFIED BY NAME AS A NON-RELEASING PARTY IN THE CONFIRMATION ORDER AND SHALL NOT RECEIVE THE AVOIDANCE ACTION WAIVER.

UNDER THE PLAN, "RELEASED PARTY" MEANS, COLLECTIVELY, EACH OF THE FOLLOWING IN THEIR CAPACITY AS SUCH: (A) EACH OF THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH OF THE CONSENTING STAKEHOLDERS; (D) THE ABL AGENT; (E) THE ABL LENDERS; (F) THE TERM LOAN AGENT; (G) THE TERM LOAN LENDERS; (H) EACH OF THE LENDERS AND ADMINISTRATIVE AGENTS UNDER THE EXIT FACILITIES; (I) THE BACKSTOP PARTIES; (J) THE DIP ABL AGENT; (K) THE DIP ABL LENDERS; (L) THE DIP TERM AGENT; (M) THE DIP TERM LENDERS; (N) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN THE FOREGOING CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (O); (O) EACH RELATED PARTY OF EACH ENTITY IN THE FOREGOING CLAUSE (A) THROUGH THIS CLAUSE (O); AND (P) THE CREDITORS' COMMITTEE; *PROVIDED* THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OF THE RELEASES SHALL NOT BE A "RELEASED PARTY.".

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.F OF THE PLAN, AS SET FORTH ABOVE. YOU MAY CHECK THE BOX BELOW TO ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.F OF THE PLAN ONLY IF THE COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT OUT OF THE RELEASES AND ONLY IF YOU (A) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN OR (B) VOTE TO REJECT THE PLAN. IN THE CASE OF SUCH A DETERMINATION BY THE COURT IF YOU VOTE TO REJECT THE PLAN, YOU WILL AUTOMATICALLY BE CONSIDERED TO HAVE OPTED OUT OF THE RELEASES, REGARDLESS OF WHETHER YOU CHECK THE BOX BELOW. IF YOU SATISFY THE ABOVE REQUIREMENTS AND CHECK THE BOX BELOW (OR VOTE TO REJECT THE PLAN), YOUR OPT-OUT WILL ONLY BE EFFECTIVE IF SO ORDERED BY THE COURT. REGARDLESS OF WHETHER THE COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT OUT OF THE RELEASES, IF YOU (A) VOTE TO ACCEPT THE PLAN, (B) FAIL TO SUBMIT A BALLOT BY THE VOTING DEADLINE, OR (C) SUBMIT THE BALLOT AND ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN BUT FAIL TO CHECK

UST-1530

THE BOX BELOW, YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE VIII.F OF THE PLAN.

\*        \*        \*

**PLEASE TAKE NOTICE THAT** ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS.  PARTIES RECEIVING THIS BENEFICIAL HOLDER BALLOT MAY OPT OUT OF THE THIRD-PARTY RELEASE PROVISIONS BY CHECKING THE BOX BELOW SPECIFICALLY PROVIDING FOR THE REJECTION OF THE THIRD PARTY RELEASE PROVISIONS.

☐        Opt Out of the Third Party Release.

**Item 4.  Certifications.**

By signing this Ballot, the undersigned certifies to the Court and the Debtors:

(a)   that, as of the Voting Record Date, either:  (i) the Entity is the holder of the Claims being voted on this Ballot; or (ii) the Entity is an authorized signatory for an Entity that is a holder of the Claims being voted on this Ballot;

(b)   that the Entity (or in the case of an authorized signatory, the holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c)   that the Entity, if it votes in favor of the Plan, will be deemed to have consented to the Third Party Release; and

(d)   that no other Ballots with respect to the amount of the Claim identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots are hereby revoked.

| Name of Holder: | |
|---|---|
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than Holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

4

UST-1531

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND**
**RETURN IT (WITH AN ORIGINAL SIGNATURE)** *PROMPTLY* **VIA FIRST CLASS MAIL (OR THE**
**ENCLOSED REPLY ENVELOPE PROVIDED), OVERNIGHT COURIER, OR HAND DELIVERY TO:**

**Ascena Ballot Processing**
**c/o Prime Clerk LLC**
**One Grand Central Place**
**60 East 42nd Street**
**Suite 1440**
**New York, NY 10165**

In addition, to submit your Ballot via the Notice and Claims Agent's online portal, please visit
https://cases.primeclerk.com/ascena.  Click on the "Submit E-Ballot" section of the website and follow the
instructions to submit your Ballot.

**IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized**
**electronic Ballot:**

Unique E-Ballot ID#:_____

**The Notice and Claims Agent's online portal is the sole manner in which Ballots will be accepted via**
**electronic or online transmission.  Ballots submitted by facsimile, email or other means of electronic**
**transmission will not be counted.**

**Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic**
**Ballot.  Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.**

Creditors who cast a Ballot using the Notice and Claims Agent's online portal should NOT also submit a
paper Ballot.

---

IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THIS BALLOT **ON OR**
**BEFORE OCTOBER 13, 2020**, **AT 5:00 P.M.,** PREVAILING EASTERN TIME, (AND IF THE VOTING
DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS BALLOT MAY BE COUNTED
TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.

---

UST-1532

## INSTRUCTIONS FOR COMPLETING THIS BALLOT

1. The Debtors are soliciting the votes of holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. To ensure that your Ballot is counted, you **must** *either*: (a) complete and submit this hard copy Ballot or (b) vote through the Debtors' online balloting portal accessible through the Debtors' case website https://cases.primeclerk.com/ascena. **Ballots will not be accepted by facsimile or other electronic means (other than the online portal).**

4. **Use of Hard Copy Ballot.** To ensure that your hard copy Ballot is counted, you must: (a) complete your Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Ballot; and (c) clearly sign and return your original Ballot in the enclosed pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery to Ascena Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165 in accordance with paragraph 6 below.

5. **Use of Online Ballot Portal.** To ensure that your electronic Ballot is counted, please follow the instructions of the Debtors' case administration website at https://cases.primeclerk.com/ascena. You will need to enter your unique E-Ballot identification number indicated above. The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission. **Ballots will not be accepted by facsimile or electronic means (other than the online portal).**

6. Your Ballot **must** be returned to the Notice and Claims Agent so as to be **actually received** by the Notice and Claims Agent on or before the Voting Deadline. **The Voting Deadline is October 13, 2020, at 5:00 p.m.**, prevailing Eastern Time.

7. If a Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the sole and absolute discretion of the Debtors. Additionally, **the following Ballots will** *not* **be counted**:

    (a) any Ballot that partially rejects and partially accepts the Plan;
    (b) Ballots sent to the Debtors, the Debtors' agents (other than the Notice and Claims Agent), the Term Loan Agent, any indenture trustee, or the Debtors' financial or legal advisors;
    (c) Ballots sent by facsimile or any electronic means other than via the online portal;
    (d) any Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;
    (e) any Ballot cast by an Entity that does not hold a Claim in the Class indicated in Item 1 of the Ballot;
    (f) any Ballot submitted by a holder not entitled to vote pursuant to the Plan;
    (g) any unsigned Ballot;
    (h) any non-original (unless submitted via the online portal); and/or
    (i) any Ballot not marked to accept or reject the Plan or any Ballot marked both to accept and reject the Plan.

8. The method of delivery of Ballots to the Notice and Claims Agent is at the election and risk of each holder of a Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Notice and Claims

UST-1533

Agent *actually receives* the originally executed Ballot.  In all cases, holders should allow sufficient time to assure timely delivery.

9.  If multiple Ballots are received from the same holder of a Claim with respect to the same Claim prior to the Voting Deadline, the latest, timely received, and properly completed Ballot will supersede and revoke any earlier received Ballots.

10.  You must vote all of your Claims within a Class either to accept or reject the Plan and may **not** split your vote. Further, if a holder has multiple Claims within a Class, the Debtors may, in their discretion, aggregate the Claims of any particular holder with multiple Claims within such Class for the purpose of counting votes.

11.  This Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

12.  **Please be sure to sign and date your Ballot**.  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Notice and Claims Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

13.  If you hold Claims in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes *only* your Claims indicated on that ballot, so please complete and return each ballot that you received.

**<u>PLEASE RETURN YOUR BALLOT PROMPTLY</u>**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT,
THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE RESTRUCTURING HOTLINE AT: (877) 930-4319 (TOLL FREE)
OR (347) 899-4594 (INTERNATIONAL) OR EMAIL ASCENABALLOTS@PRIMECLERK.COM.**

---

**IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THIS BALLOT ON OR
BEFORE THE VOTING DEADLINE, WHICH IS ON OCTOBER 13, 2020, AT 5:00 P.M., PREVAILING
EASTERN TIME, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE
TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE DEBTORS.**

---

UST-1534

## Schedule 4

**Form of Non-Impaired Non-Voting Status Notice**

UST-1535

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |  |
|---|---|---|
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF NON-VOTING STATUS TO HOLDER OF
## UNIMPAIRED CLAIMS CONCLUSIVELY PRESUMED
## TO ACCEPT THE PLAN AND OF THIRD PARTY RELEASE UNDER THE PLAN

**PLEASE TAKE NOTICE THAT** on [●], 2020, the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") entered an order [Docket No.[●]] (the "Disclosure Statement Order"): (a) authorizing Ascena Retail Group, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim under the Plan, *you are not entitled to vote on the Plan*. Specifically, under the terms of the Plan, as a holder of a Claim (as currently asserted against the Debtors) that is not Impaired and conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, you are *not* entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **October 23, 2020, at 11:00 a.m.** prevailing Eastern Time, before the Honorable Kevin R.

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena. The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

[2] Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

UST-1536

Huennekens, in the United States Bankruptcy Court for the Eastern District of Virginia, located at 701 East Broad Street, Suite 4000, Richmond, VA 23219-1888.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **October 13, 2020, at 5:00 p.m.,** prevailing Eastern Time (the "Plan Objection Deadline"). Any objection to the Plan *must*: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before the Plan Objection Deadline:

| Co-Counsel to the Debtors | |
|---|---|
| Edward O. Sassower, P.C.<br>Steven N. Serajeddini, P.C.<br>**KIRKLAND & ELLIS LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br><br>-and-<br><br>John R. Luze<br>**KIRKLAND & ELLIS LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654 | Cullen D. Speckhart<br>Olya Antle<br>**COOLEY LLP**<br>1299 Pennsylvania Avenue, NW Suite 700<br>Washington, DC 20004-2400 |
| *U.S. Trustee* | |
| Kathryn Montgomery<br>Office of the United States Trustee for the Eastern District of Virginia<br>701 East Broad Street, Suite 4000,<br>Richmond, VA 23219 | |
| *Counsel to the ABL Administrative Agent* | |
| Matthew F. Furlong<br>Julia Frost-Davies<br>Christopher L. Carter<br>**MORGAN LEWIS & BOCKIUS LLP**<br>One Federal Street<br>Boston, Massachusetts 02110 | Tyler P. Brown;<br>**HUNTON ANDREWS KURTH LLP**<br>Riverfront Plaza, East Tower<br>951 East Byrd Street<br>Richmond, Virginia 23219 |
| *Counsel to the Ad Hoc Group* | |
| Evan R. Fleck<br>**MILBANK LLP**<br>55 Hudson Yards<br>New York, New York 10001 | |

UST-1537

| Counsel to the Official Committee of Unsecured Creditors Appointed in These Chapter 11 Cases | |
| --- | --- |
| Robert J. Feinstein<br>Bradford J. Sandler<br>Shirley S. Cho<br>Cia H. Mackle<br>Steven W. Golden<br>**Pachulski Stang Ziehl & Jones LLP**<br>780 Third Avenue, 34th Floor<br>New York, New York 10017 | Robert S. Westermann<br>Lawrence A. Katz<br>David I. Swan<br>Brittany B. Falabella<br>**Hirschler Fleischer, P.C.**<br>The Edgeworth Building<br>2100 East Cary Street<br>Richmond, Virginia 23223 |

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Prime Clerk LLC, the notice and claims agent retained by the Debtors in the Chapter 11 Cases (the "Notice and Claims Agent"), by: (a) calling the Debtors' restructuring hotline at (877) 930-4319 (toll free) or (347) 899-4594 (international); (b) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/ascena; (c) writing to Notice and Claims Agent, Attn: Ascena Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; and/or (d) emailing ascenaballots@primeclerk.com. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.vaeb.uscourts.gov.

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION,
AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.F CONTAINS A THIRD-PARTY
RELEASE**. PURSUANT TO THE PLAN YOU ARE DEEMED TO ACCEPT THE PLAN
AND THEREFORE ARE DEEMED TO HAVE CONSENTED TO THE RELEASES SET
FORTH IN ARTICLE VIII. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER
THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED
THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.
IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN
OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN
ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

UST-1538

Dated:   [●], 2020

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          edward.sassower@kirkland.com
                steven.serajeddini@kirkland.com

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          john.luze@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

/s/ Cullen D. Speckhart
_____
**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:      (202) 842-7800
Facsimile:      (202) 842-7899
Email:          cspeckhart@cooley.com
                oantle@cooley.com-

UST-1539

**<u>Schedule 5</u>**

**Form of Impaired Non-Voting Status Notice**

UST-1540

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF NON-VOTING STATUS
## TO HOLDERS OF INTERESTS DEEMED TO REJECT
## THE PLAN AND OF THIRD PARTY RELEASE UNDER THE PLAN

---

### PLEASE READ – YOUR RESPONSE IS REQUIRED BY <u>OCTOBER 13, 2020</u>

- You are receiving this notice because you are a current or former shareholder of Ascena Retail Group, Inc., which filed for chapter 11 bankruptcy.

- You will not receive any distribution in the bankruptcy case and your shares will be canceled.

- In addition, **you will be deemed to have released whatever claims you may have against many other people and entities (including company officers and directors) unless you return the enclosed "Release Opt-Out Form" by October 13, 2020, at 5:00 P.M**. prevailing Eastern Time.

- There will be no harm to you under the Plan if you return the Opt-Out Form; however, you will not receive a release.

- For more specific information and instructions, please read the Release Opt-Out Form enclosed at the end of this notice as <u>Exhibit A</u>.

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena. The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

**PLEASE TAKE NOTICE THAT** on [●], 2020, the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") entered an order [Docket No.[●]] (the "Disclosure Statement Order"):  (a) authorizing Ascena Retail Group, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim under the Plan, *you are not entitled to vote on the Plan*.  Specifically, under the terms of the Plan, as a holder of a Claim or Interest (as currently asserted against the Debtors) that is receiving no distribution under the Plan, you are deemed to reject the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **October 23, 2020, at 11:00 a.m.** prevailing Eastern Time, before the Honorable Kevin R. Huennekens, in the United States Bankruptcy Court for the Eastern District of Virginia, located at 701 East Broad Street, Suite 4000, Richmond, VA 23219-1888.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **October 13, 2020, at 5:00 p.m.**, prevailing Eastern Time (the "Plan Objection Deadline"). Any objection to the Plan *must*:  (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before the Plan Objection Deadline:

---

2    Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

UST-1542

| | |
|---|---|
| **_Co-Counsel to the Debtors_** | |
| Edward O. Sassower, P.C.<br>Steven N. Serajeddini, P.C.<br>**KIRKLAND & ELLIS LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br><br>-and-<br><br>John R. Luze<br>**KIRKLAND & ELLIS LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654 | Cullen D. Speckhart<br>Olya Antle<br>**COOLEY LLP**<br>1299 Pennsylvania Avenue, NW Suite 700<br>Washington, DC 20004-2400 |
| **_U.S. Trustee_** | |
| Kathryn Montgomery<br>Office of the United States Trustee for the Eastern District of Virginia<br>701 East Broad Street, Suite 4000,<br>Richmond, VA 23219 | |
| **_Counsel to the ABL Administrative Agent_** | |
| Matthew F. Furlong<br>Julia Frost-Davies<br>Christopher L. Carter<br>**MORGAN LEWIS & BOCKIUS LLP**<br>One Federal Street<br>Boston, Massachusetts 02110 | Tyler P. Brown;<br>**HUNTON ANDREWS KURTH LLP**<br>Riverfront Plaza, East Tower<br>951 East Byrd Street<br>Richmond, Virginia 23219 |
| **_Counsel to the Ad Hoc Group_** | |
| Evan R. Fleck<br>**MILBANK LLP**<br>55 Hudson Yards<br>New York, New York 10001 | |
| **_Counsel to the Official Committee of Unsecured Creditors Appointed in These Chapter 11 Cases_** | |
| Robert J. Feinstein<br>Bradford J. Sandler<br>Shirley S. Cho<br>Cia H. Mackle<br>Steven W. Golden<br>**Pachulski Stang Ziehl & Jones LLP**<br>780 Third Avenue, 34th Floor<br>New York, New York 10017 | Robert S. Westermann<br>Lawrence A. Katz<br>David I. Swan<br>Brittany B. Falabella<br>**Hirschler Fleischer, P.C.**<br>The Edgeworth Building<br>2100 East Cary Street<br>Richmond, Virginia 23223 |

3

UST-1543

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Prime Clerk LLC, the notice and claims agent retained by the Debtors in the Chapter 11 Cases (the "Notice and Claims Agent"), by: (a) calling the Debtors' restructuring hotline at (877) 930-4319 (toll free) or (347) 899-4594 (international); (b) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/ascena; (c) writing to Notice and Claims Agent, Attn: Ascena Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; and/or (d) emailing ascenaballots@primeclerk.com. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.vaeb.uscourts.gov.

---

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.F CONTAINS A THIRD-PARTY RELEASE. ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT OBJECT OR OPT OUT OF THE RELEASE AS DESCRIBED BELOW WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.**

IF YOU ELECT TO OPT OUT OF THE RELEASES, PLEASE COMPLETE, SIGN, AND DATE THE RELEASE OPT OUT FORM ATTACHED AS **EXHIBIT A** AND RETURN IT PROMPTLY TO THE NOTICE AND CLAIMS AGENT ACCORDING TO THE INSTRUCTIONS SET FORTH ON THE RELEASE OPT OUT FORM. THE RELEASE OPT OUT FORM MUST BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT BY **OCTOBER 13, 2020, AT 5:00 P.M. PREVAILING EASTERN TIME (THE "VOTING DEADLINE").**

YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT**

---

UST-1544

## Exhibit A
**RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are or may be a shareholder that is not entitled to vote on the *Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Plan"). **You are deemed to grant the Third-Party Release set forth below unless you return this Opt Out Form, or file an objection to the Third-Party Release with the Bankruptcy Court, either of which must be received by October 13, 2020 at 5:00 p.m. (ET)**.

**If you choose to opt out of the Third-Party Release set forth in Article VIII.F of the Plan, please complete, sign, and date this Opt Out Form and return it promptly** via first class mail (or in the enclosed reply envelope provided), overnight courier, via the Solicitation Agent's online E-Ballot Portal, or hand delivery to Prime Clerk LLC (the "Solicitation Agent") at the address set forth below. For the avoidance of doubt, if you hold Existing Interests through a broker nominee, you cannot submit your Opt-Out via E-Ballot; rather, you must complete and return the paper Opt-Out Form: Parties that submit their Opt Out Form using the E-Ballot Portal should NOT also submit a paper Opt Out Form.

> **Use of Hard Copy Opt Out Form**. To ensure that your hard copy Opt Out Form is counted clearly sign and return your Opt Out Form in the enclosed pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery to Prime Clerk LLC, Attn: Ascena Opt Out Form Processing, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165.

**THIS OPT OUT FORM MUST BE ACTUALLY RECEIVED BY THE SOLICITATION AGENT BY OCTOBER 13, 2020, AT 5:00 P.M. PREVAILING CENTRAL TIME (THE "RESPONSE DEADLINE"). IF THE OPT OUT FORM IS RECEIVED AFTER THE RESPONSE DEADLINE, IT WILL NOT BE COUNTED.**

> Item 1. **Important information regarding the Third-Party Release.**

**Article VIII.D of the Plan provides for a third-party release (the "Third-Party Release"):**

**Effective as of the Effective Date, each Releasing Party (other than the Debtors and Reorganized Debtors), in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim, Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and each other Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related**

1

agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Effective Date.

**IMPORTANT INFORMATION REGARDING THE THIRD-PARTY RELEASE:**

UNDER THE PLAN, "RELEASING PARTY" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) EACH OF THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH OF THE CONSENTING STAKEHOLDERS; (D) THE ABL AGENT; (E) THE ABL LENDERS; (F) TERM LOAN AGENT; (G) THE TERM LOAN LENDERS; (H) EACH OF THE LENDERS AND ADMINISTRATIVE AGENTS UNDER THE EXIT FACILITIES; (I) THE BACKSTOP PARTIES; (J) THE DIP ABL AGENT; (K) THE DIP ABL LENDERS; (L) THE DIP TERM AGENT; (M) THE DIP TERM LENDERS; (N) ALL HOLDERS OF IMPAIRED CLAIMS WHO VOTED TO ACCEPT THE PLAN; (O) ALL HOLDERS OF IMPAIRED CLAIMS WHO ABSTAINED FROM VOTING ON THE PLAN OR VOTED TO REJECT THE PLAN BUT DID NOT TIMELY OPT OUT OF OR OBJECT TO THE APPLICABLE RELEASE; (P) ALL HOLDERS OF UNIMPAIRED CLAIMS WHO DID NOT TIMELY OPT OUT OF OR OBJECT TO THE APPLICABLE RELEASE; (Q) ALL HOLDERS OF INTERESTS; (R) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN FOREGOING CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (S); AND (S) EACH RELATED PARTY OF EACH ENTITY IN THE FOREGOING CLAUSE (A) THROUGH THIS CLAUSE (S); (T) THE CREDITORS' COMMITTEE; *PROVIDED* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT: (X) ELECTS TO OPT OUT OF THE RELEASES CONTAINED IN THE PLAN; OR (Y) TIMELY OBJECTS TO THE RELEASES CONTAINED IN THE PLAN AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION; *PROVIDED FURTHER* THAT ANY SUCH ENTITY SHALL BE IDENTIFIED BY NAME AS A NON-RELEASING PARTY IN THE CONFIRMATION ORDER AND SHALL NOT RECEIVE THE AVOIDANCE ACTION WAIVER.

UNDER THE PLAN, "RELEASED PARTY" MEANS, COLLECTIVELY, EACH OF THE FOLLOWING IN THEIR CAPACITY AS SUCH:  (A) EACH OF THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH OF THE CONSENTING STAKEHOLDERS; (D) THE ABL AGENT; (E) THE ABL LENDERS; (F) THE TERM LOAN AGENT; (G) THE TERM LOAN LENDERS; (H) EACH OF THE LENDERS AND ADMINISTRATIVE AGENTS UNDER THE EXIT FACILITIES; (I) THE BACKSTOP PARTIES; (J) THE DIP ABL AGENT; (K) THE DIP ABL LENDERS; (L) THE DIP TERM AGENT; (M) THE DIP TERM LENDERS; (N) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN THE FOREGOING CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (O); (O) EACH RELATED PARTY OF EACH ENTITY IN THE FOREGOING CLAUSE (A) THROUGH THIS CLAUSE (O); AND (P) THE CREDITORS' COMMITTEE; *PROVIDED* THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OF THE RELEASES SHALL NOT BE A "RELEASED PARTY."

AS A HOLDER OF A CLAIM OR INTEREST, YOU ARE A "RELEASING PARTY" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.F OF THE PLAN, AS SET FORTH ABOVE.  YOU MAY ELECT NOT TO GRANT THE RELEASES CONTAINED IN ARTICLE VIII.F OF THE PLAN <u>ONLY IF</u> YOU (A) TIMELY SUBMIT THE FORM BELOW OR (B) TIMELY FILE WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES **CONTAINED IN ARTICLE VIII OF THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.**  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION.  BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.F OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

UST-1546

**Certifications.**

By signing this Opt Out Form, the undersigned certifies:

(a) **that, as of the Voting Record Date, either: (i) the Entity is a current or former shareholder of Ascena; or (ii) the Entity is an authorized signatory for an Entity that is a current or former shareholder of Ascena;**

(b) **that the current or former shareholder has received a copy of the** *Notice of Non-Voting Status to Holders of Impaired Claims and Interests Deemed to Reject the Plan* **and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;**

(c) **that the Entity has submitted the Release Opt Out Form with respect to all of its Interests; and**

(d) **that no other Opt Out Form with respect to these Interests has been submitted or, if any other Opt Out Forms have been submitted with respect to such Interests, then any such earlier Opt Out Forms are hereby revoked.**

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE SUBMIT YOUR OPT OUT FORM BY ONE OF THE FOLLOWING TWO METHODS:**

**Via Paper Form. Complete, sign, and date this Opt Out Form and return it (with an original signature) promptly via first class mail (or in the enclosed reply envelope provided), overnight courier, or hand delivery to:**

**Ascena Ballot Processing**
**c/o Prime Clerk LLC**
**One Grand Central Place**
**60 East 42nd Street**
**Suite 1440**
**New York, NY 10165**

*OR*

UST-1547

**Via E-Ballot Portal.** Submit your Opt-Out via the Solicitation Agent's online portal, by visiting https://cases.primeclerk.com/ascena (the "**E-Ballot Portal**"). Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Opt Out Form

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Opt-Out Form:**

Unique E-Ballot ID#:_____

**The Solicitation Agent's E-Ballot Portal is the sole manner in which Opt Out Forms will be accepted via electronic or online transmission. Opt Out Forms submitted by facsimile, email, or other means of electronic transmission will not be counted.**

**If you hold Interests through a broker nominee, you cannot submit your Opt-Out via E-Ballot; rather, you must complete and return the paper Opt-Out Form.**

Parties that submit their Opt Out Form using the E-Ballot Portal should NOT also submit a paper Opt Out Form.

Dated: [●], 2020

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         edward.sassower@kirkland.com
               steven.serajeddini@kirkland.com

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         john.luze@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

*/s/ Cullen D. Speckhart*
_____
**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:     (202) 842-7800
Facsimile:     (202) 842-7899
Email:         cspeckhart@cooley.com
               oantle@cooley.com-

UST-1548

**<u>Schedule 6</u>**

**Form of Notice to Disputed Claim Holders**

UST-1549

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF NON-VOTING STATUS WITH RESPECT TO DISPUTED CLAIMS

**PLEASE TAKE NOTICE THAT** on [●], 2020, the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Ascena Retail Group, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because you are the holder of a Claim that is subject to a pending objection by the Debtors. **You are not entitled to vote any disputed portion of your Claim on the Plan unless one or more of the following events have taken place before October 2, 2020 (the date that is two business days before the Voting Deadline)** (each, a "Resolution Event"):

1. an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

2. an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena. The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

[2] Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

3.      a stipulation or other agreement is executed between the holder of such Claim and the Debtors temporarily allowing the holder of such Claim to vote its Claim in an agreed upon amount; or

4.      the pending objection to such Claim is voluntarily withdrawn by the objecting party.

Accordingly, this notice is being sent to you for informational purposes only.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Prime Clerk LLC, the notice and claims agent retained by the Debtors in these Chapter 11 cases (the "Notice and Claims Agent") by: (a) calling the Debtors' restructuring hotline at (877) 930-4319 (toll free) or (347) 899-4594 (international); (b) calling the Debtors' restructuring website at: https://cases.primeclerk.com/ascena; (c) writing to Notice and Claims Agent, Attn: Ascena Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; and/or (d) emailing ascenaballots@primeclerk.com.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.vaeb.uscourts.gov.

**PLEASE TAKE FURTHER NOTICE THAT** if a Resolution Event occurs, then no later than one business day thereafter, the Notice and Claims Agent shall distribute a ballot, and a pre-addressed, postage pre-paid envelope to you, which must be returned to the Notice and Claims Agent no later than the Voting Deadline, which is on **October 13, 2020, at 5:00 p.m.**, prevailing Eastern Time.

**PLEASE TAKE FURTHER NOTICE THAT** if you have any questions about the status of any of your Claims, you should contact the Notice and Claims Agent in accordance with the instructions provided above.

2

UST-1551

Dated: [●], 2020

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          edward.sassower@kirkland.com
                   steven.serajeddini@kirkland.com

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          john.luze@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

/s/ Cullen D. Speckhart

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and*
*Texas; Not admitted to practice in DC, supervised by*
*members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in*
*DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:     (202) 842-7800
Facsimile:     (202) 842-7899
Email:          cspeckhart@cooley.com
                   oantle@cooley.com-

UST-1552

## **Schedule 7**

**Form of Cover Letter**

UST-1553



_____, 2020

<u>Via First Class Mail</u>

<u>RE</u>:     **<u>In re Ascena Retail Group, Inc., Inc.,</u> <u>*et al*.,</u>**
          **<u>Chapter 11 Case No. 20-33113 (KRH) (Jointly Administered)</u>**

TO ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN:

Ascena Retail Group, Inc. and its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>")[1] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Eastern District of Virginia (the "<u>Court</u>") on July 23, 2020.

You have received this letter and the enclosed materials because you are entitled to vote on the *Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "<u>Plan</u>").[2] On [●], 2020, the Court entered an order (the "<u>Disclosure Statement Order</u>"): (a) authorizing the Debtors to solicit acceptances for the Plan; (b) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (the "<u>Disclosure Statement</u>") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "<u>Solicitation Package</u>"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan, and for filing objections to the Plan.

> YOU ARE RECEIVING THIS LETTER BECAUSE YOU ARE ENTITLED TO
> VOTE ON THE PLAN.  THEREFORE, YOU SHOULD READ THIS LETTER
> CAREFULLY AND DISCUSS IT WITH YOUR ATTORNEY.  IF YOU DO
> NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

[2]     Capitalized terms used but not otherwise defined herein have the meanings as set forth in the Plan.

UST-1554

In addition to this cover letter, the enclosed materials comprise your Solicitation Package, and were approved by the Court for distribution to holders of Claims in connection with the solicitation of votes to accept the Plan.  The Solicitation Package consists of the following:

    a.   a copy of the Solicitation and Voting Procedures;

    b.   a Ballot, together with detailed voting instructions and a pre-addressed, postage prepaid return envelope;

    c.   this letter;

    d.   the Disclosure Statement, as approved by the Bankruptcy Court (and exhibits thereto, including the Plan);

    e.   the Disclosure Statement Order (excluding the exhibits thereto, except the Solicitation and Voting Procedures);

    f.   the notice of the hearing to consider confirmation of the Plan; and

    g.   such other materials as the Court may direct.

Ascena Retail Group, Inc. (on behalf of itself and each of the other Debtors) has approved the filing of the Plan and the solicitation of votes to accept the Plan.  The Debtors believe that the acceptance of the Plan is in the best interests of their estates, holders of Claims, and all other parties in interest.  Moreover, the Debtors believe that any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses, which, in turn, likely would result in smaller distributions (or no distributions) on account of Claims asserted in the Chapter 11 Cases.

> **THE DEBTORS STRONGLY URGE YOU TO PROPERLY AND TIMELY SUBMIT YOUR BALLOT CASTING A VOTE TO ACCEPT THE PLAN.  BALLOTS SHOULD BE SUBMITTED VIA MAIL OR THROUGH THE ONLINE BALLOT PORTAL IN ACCORDANCE WITH THE INSTRUCTIONS INDICATED ON YOUR BALLOT.**
>
> **THE VOTING DEADLINE IS 5:00 P.M. PREVAILING EASTERN TIME ON OCTOBER 13, 2020**

The materials in the Solicitation Package are intended to be self-explanatory.  If you should have any questions, however, please feel free to contact Prime Clerk LLC, the notice and claims agent retained by the Debtors in the Chapter 11 Cases (the "Notice and Claims Agent"), by:  (a) calling the Debtors' restructuring hotline at (877) 930-4319 (toll free) or (347) 899-4594 (international); (b) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/ascena; (c) writing to Notice and Claims Agent, Attn: Ascena Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; and/or (d) emailing ascenaballots@primeclerk.com.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.vaeb.uscourts.gov.  Please be advised that the Notice and Claims Agent is authorized

UST-1555

to answer questions about, and provide additional copies of, the solicitation materials, but may **_not_**
advise you as to whether you should vote to accept or reject the Plan.

Sincerely,

_____

Ascena Retail Group, Inc. on its own behalf and
for each of the Debtors

UST-1556

**Schedule 8**

**Form of Confirmation Hearing Notice**

UST-1557

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
| | ) | |
| Debtors | ) | (Jointly Administered) |
| | ) | |

### NOTICE OF HEARING TO CONSIDER
### CONFIRMATION OF THE CHAPTER 11 PLAN FILED BY THE
### DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES

**PLEASE TAKE NOTICE THAT** on [●], 2020, the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Ascena Retail Group, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **October 23, 2020, at 11:00 a.m.** prevailing Eastern Time, before the Honorable Kevin R. Huennekens, in the United States Bankruptcy Court for the Eastern District of Virginia, located at 701 East Broad Street, Suite 5100, Richmond, VA 23219-1888.

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

[2]     Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

UST-1558

**PLEASE TAKE FURTHER NOTICE** that the Confirmation Hearing is scheduled to be heard before the Court by remote video conference. You may register for the Confirmation Hearing through the following hyperlink:

https://www.zoomgov.com/meeting/register/vJIsdOqppjsiHeL2zPWEnh6AUuDKTyubV10

**PLEASE TAKE FURTHER NOTICE** that parties who wish to attend the Confirmation Hearing but do not intend on participating in the Confirmation Hearing (listen-only), are not required to register in advance and may attend the Confirmation Hearing by using the following dial-in numbers:

| | |
|---|---|
| Phone Number: 1-866-590-5055<br>Access Code: 4377075<br>Security Code: 102320 | Phone Number: 1-888-363-4734<br>Access Code: 3238664<br>Security Code: 102320 |

---

**PLEASE BE ADVISED**:  THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

---

## CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

**Voting Record Date**.  The voting record date is **September 10, 2020**, which is the date for determining which holders of Claims in Classes 4 and 5 are entitled to vote on the Plan.

**Voting Deadline**.  The deadline for voting on the Plan is on **October 13, 2020, at 5:00 p.m.** prevailing Eastern Time (the "Voting Deadline").  If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you *must*: (a) follow the instructions carefully; (b) complete *all* of the required information on the ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is *actually received* by the Debtors' notice and claims agent, Prime Clerk LLC (the "Notice and Claims Agent") on or before the Voting Deadline.  *A failure to follow such instructions may disqualify your vote*.

## CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.F. CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

---

**Plan Objection Deadline**.  The deadline for filing objections to the Plan is **October 13, 2020, at 5:00 p.m.,** prevailing Eastern Time (the "Plan Objection Deadline").  All objections to the relief sought at the Confirmation Hearing *must*:  (a) be in writing; (b) conform to

UST-1559

the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the Court; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; *and* (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before the Plan Objection Deadline:

| *Co-Counsel to the Debtors* | |
|---|---|
| Edward O. Sassower, P.C.<br>Steven N. Serajeddini, P.C.<br>**KIRKLAND & ELLIS LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br><br>-and-<br><br>John R. Luze<br>**KIRKLAND & ELLIS LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654 | Cullen D. Speckhart<br>Olya Antle<br>**COOLEY LLP**<br>1299 Pennsylvania Avenue, NW Suite 700<br>Washington, DC 20004-2400 |
| *U.S. Trustee* | |
| Kathryn Montgomery<br>Office of the United States Trustee for the Eastern District of Virginia<br>701 East Broad Street, Suite 4000,<br>Richmond, VA 23219 | |
| *Counsel to the ABL Administrative Agent* | |
| Matthew F. Furlong<br>Julia Frost-Davies<br>Christopher L. Carter<br>**MORGAN LEWIS & BOCKIUS LLP**<br>One Federal Street<br>Boston, Massachusetts 02110 | Tyler P. Brown;<br>**HUNTON ANDREWS KURTH LLP**<br>Riverfront Plaza, East Tower<br>951 East Byrd Street<br>Richmond, Virginia 23219 |
| *Counsel to the Ad Hoc Group* | |
| Evan R. Fleck<br>**MILBANK LLP**<br>55 Hudson Yards<br>New York, New York 10001 | |

UST-1560

| Counsel to the Official Committee of Unsecured Creditors Appointed in These Chapter 11 Cases | |
|---|---|
| Robert J. Feinstein<br>Bradford J. Sandler<br>Shirley S. Cho<br>Cia H. Mackle<br>Steven W. Golden<br>**Pachulski Stang Ziehl & Jones LLP**<br>780 Third Avenue, 34th Floor<br>New York, New York 10017 | Robert S. Westermann<br>Lawrence A. Katz<br>David I. Swan<br>Brittany B. Falabella<br>**Hirschler Fleischer, P.C.**<br>The Edgeworth Building<br>2100 East Cary Street<br>Richmond, Virginia 23223 |

## ADDITIONAL INFORMATION

**Obtaining Solicitation Materials**. The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received a CD-ROM or flash drive), please feel free to contact the Debtors' Notice and Claims Agent, by: (a) calling the Debtors' restructuring hotline at (877) 930-4319 (toll free) or (347) 899-4594 (international); (b) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/ascena; (c) writing to Notice and Claims Agent, Attn: Ascena Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; and/or (d) emailing ascenainfo@primeclerk.com. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.vaeb.uscourts.gov. Please be advised that the Notice and Claims Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may **not** advise you as to whether you should vote to accept or reject the Plan.

**The Plan Supplement**. The Debtors will file the Plan Supplement (as defined in the Plan) on or before **[●], 2020**, and will serve notice on all holders of Claims entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

---

<u>**BINDING NATURE OF THE PLAN**</u>:

**IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

---

UST-1561

Dated:   [●], 2020

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:      edward.sassower@kirkland.com
      steven.serajeddini@kirkland.com

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:      john.luze@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

/s/ Cullen D. Speckhart
**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:      (202) 842-7800
Facsimile:      (202) 842-7899
Email:      cspeckhart@cooley.com
      oantle@cooley.com-

UST-1562

**Schedule 9**

**Form of Plan Supplement Notice**

UST-1563

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** on [●], 2020, United States Bankruptcy Court for the Eastern District of Virginia (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Ascena Retail Group, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order approving the Disclosure Statement, the Debtors filed the Plan Supplement with the Court on [●], 2020 [Docket No. [●]].  The Plan Supplement contains the following documents (each as defined in the Plan): (a) New Corporate Governance Documents; (b) Restructuring Transactions Memorandum; (c) Schedule of Assumed Executory Contracts and Unexpired Leases; (d) Schedule of Rejected Executory Contracts and Unexpired Leases; (e) Schedule of Retained Causes of Action; (f) a document listing the members of the New Board and the officers of the Reorganized Debtors; (g) Exit Facility Documentation; and (h) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan.  Notwithstanding the foregoing, the Debtors have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

[2]    Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

UST-1564

**October 23, 2020, at 11:00 a.m.** prevailing Eastern Time, before the Honorable Kevin R. Huennekens, in the United States Bankruptcy Court for the Eastern District of Virginia, located at 701 East Broad Street, Suite 5100, Richmond, VA 23219-1888.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **October 13, 2020, at 5:00 p.m.** prevailing Eastern Time (the "Plan Objection Deadline"). Any objection to the Plan *must*: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before the Plan Objection Deadline:

| *Co-Counsel to the Debtors* | |
|---|---|
| Edward O. Sassower, P.C.<br>Steven N. Serajeddini, P.C.<br>**KIRKLAND & ELLIS LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br><br>-and-<br><br>John R. Luze<br>**KIRKLAND & ELLIS LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654 | Cullen D. Speckhart<br>Olya Antle<br>**COOLEY LLP**<br>1299 Pennsylvania Avenue, NW Suite 700<br>Washington, DC 20004-2400 |
| *U.S. Trustee* | |
| Kathryn Montgomery<br>Office of the United States Trustee for the Eastern District of Virginia<br>701 East Broad Street, Suite 4000,<br>Richmond, VA 23219 | |
| *Counsel to the ABL Administrative Agent* | |
| Matthew F. Furlong<br>Julia Frost-Davies<br>Christopher L. Carter<br>**MORGAN LEWIS & BOCKIUS LLP**<br>One Federal Street<br>Boston, Massachusetts 02110 | Tyler P. Brown;<br>**HUNTON ANDREWS KURTH LLP**<br>Riverfront Plaza, East Tower<br>951 East Byrd Street<br>Richmond, Virginia 23219 |

UST-1565

| Counsel to the Ad Hoc Group | |
|---|---|
| Evan R. Fleck<br>**MILBANK LLP**<br>55 Hudson Yards<br>New York, New York 10001 | |
| *Counsel to the Official Committee of Unsecured Creditors Appointed in These Chapter 11 Cases* | |
| Robert J. Feinstein<br>Bradford J. Sandler<br>Shirley S. Cho<br>Cia H. Mackle<br>Steven W. Golden<br>**Pachulski Stang Ziehl & Jones LLP**<br>780 Third Avenue, 34th Floor<br>New York, New York 10017 | Robert S. Westermann<br>Lawrence A. Katz<br>David I. Swan<br>Brittany B. Falabella<br>**Hirschler Fleischer, P.C.**<br>The Edgeworth Building<br>2100 East Cary Street<br>Richmond, Virginia 23223 |

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Prime Clerk LLC, the notice and claims agent retained by the Debtors in the Chapter 11 Cases (the "Notice and Claims Agent"), by: (a) calling the Debtors' restructuring hotline at (877) 930-4319 (toll free) or (347) 899-4594 (international); (b) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/ascena; (c) writing to Notice and Claims Agent, Attn: Ascena Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; and/or (d) emailing ascenainfo@primeclerk.com. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.vaeb.uscourts.gov.

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION,
AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.F. CONTAINS A
THIRD-PARTY RELEASE**. THUS, YOU ARE ADVISED TO REVIEW AND
CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT
BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.
IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN
OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN
ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

UST-1566

Dated:   [●], 2020

**KIRKLAND & ELLIS LLP**                                  /s/ Cullen D. Speckhart
**KIRKLAND & ELLIS INTERNATIONAL LLP**     **COOLEY LLP**
Edward O. Sassower, P.C.                                  Cullen D. Speckhart (VSB 79096)
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)    *Admitted to practice in New York, Virginia, Missouri and*
601 Lexington Avenue                                     *Texas; Not admitted to practice in DC, supervised by*
New York, New York 10022                                 *members of DC bar*
Telephone:      (212) 446-4800                           Olya Antle (VSB 83153)
Facsimile:      (212) 446-4900                           *Admitted to practice in Virginia; Not admitted to practice*
Email:          edward.sassower@kirkland.com             *in*
                steven.serajeddini@kirkland.com          *DC, supervised by members of DC bar*
                                                         1299 Pennsylvania Avenue, NW, Suite 700
  -and-                                                  Washington, DC 20004-2400
                                                         Telephone:      (202) 842-7800
John R. Luze (admitted *pro hac vice*)                   Facsimile:      (202) 842-7899
300 North LaSalle Street                                 Email:          cspeckhart@cooley.com
Chicago, Illinois 60654                                                  oantle@cooley.com-

Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          john.luze@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

UST-1567

## Schedule 10

**Form of Notice of Assumption of Executory Contracts and Unexpired Leases**

UST-1568

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:     (202) 842-7800
Facsimile:     (202) 842-7899

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF (A) EXECUTORY CONTRACTS AND
## UNEXPIRED LEASES TO BE ASSUMED BY THE DEBTORS
## PURSUANT TO THE PLAN, (B) CURE AMOUNTS, IF ANY,
## AND (C) RELATED PROCEDURES IN CONNECTION THEREWITH

**PLEASE TAKE NOTICE THAT** on [●], 2020, United States Bankruptcy Court for the Eastern District of Virginia (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Ascena Retail Group, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena. The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

[2]     Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

UST-1569

information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed the *Assumed Executory Contract and Unexpired Lease List* [Docket No. [●]] (the "Assumption Schedule") with the Court as part of the Plan Supplement on [●], 2020 as contemplated under the Plan. The determination to assume the agreements identified on the Assumption Schedule is subject to revision.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **October 23, 2020, at 11:00 a.m.** prevailing Eastern Time, before the Honorable Kevin R. Huennekens, in the United States Bankruptcy Court for the Eastern District of Virginia, located at 701 East Broad Street, Suite 5100, Richmond, VA 23219-1888.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtors' records reflect that you are a party to an Executory Contract or Unexpired Lease that is listed on the Assumption Schedule. Therefore, you are advised to review carefully the information contained in this notice and the related provisions of the Plan, including the Assumption Schedule.

**PLEASE TAKE FURTHER NOTICE** that the Debtors are proposing to assume the Executory Contract(s) and Unexpired Lease(s) listed in **Exhibit A** attached hereto to which you are a party:[3]

**PLEASE TAKE FURTHER NOTICE THAT** section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption. Accordingly, the Debtors have conducted a thorough review of their books and records and have determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in the table above. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtors believe that there is no cure amount outstanding for such contract or lease.

**PLEASE TAKE FURTHER NOTICE THAT** absent any pending dispute, the monetary amounts required to cure any existing defaults arising under the Executory Contract(s) and Unexpired Lease(s) identified above will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by the Debtors in Cash on the Effective Date or as soon as reasonably practicable thereafter. In the event of a dispute, however, payment of the cure amount would be

---

[3]  Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumption Schedule, nor anything contained in the Plan or each Debtor's schedule of assets and liabilities, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption, that any Reorganized Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement. Further, the Debtors expressly reserve the right to (a) remove any Executory Contract or Unexpired Lease from the Assumption Schedule and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until the Effective Date and (b) contest any Claim (or cure amount) asserted in connection with assumption of any Executory Contract or Unexpired Lease.

UST-1570

made following the entry of a final order(s) resolving the dispute and approving the assumption. If an objection to the proposed assumption or related cure amount is sustained by the Court, however, the Debtors may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan (including any assumption of an Executory Contract or Unexpired Lease as contemplated in the Plan Supplement) is **October 13, 2020, at 5:00 p.m.** prevailing Eastern Time (the "Plan Objection Deadline"). Any objection to the Plan *must*: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Bankruptcy Rules and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before the Plan Objection Deadline:

| *Co-Counsel to the Debtors* | |
|---|---|
| Edward O. Sassower, P.C.<br>Steven N. Serajeddini, P.C.<br>**KIRKLAND & ELLIS LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br><br>-and-<br><br>John R. Luze<br>**KIRKLAND & ELLIS LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654 | Cullen D. Speckhart<br>Olya Antle<br>**COOLEY LLP**<br>1299 Pennsylvania Avenue, NW Suite 700<br>Washington, DC 20004-2400 |
| *U.S. Trustee* | |
| Kathryn Montgomery<br>Office of the United States Trustee for the Eastern District of Virginia<br>701 East Broad Street, Suite 4000,<br>Richmond, VA 23219 | |
| *Counsel to the ABL Administrative Agent* | |
| Matthew F. Furlong<br>Julia Frost-Davies<br>Christopher L. Carter<br>**MORGAN LEWIS & BOCKIUS LLP**<br>One Federal Street<br>Boston, Massachusetts 02110 | Tyler P. Brown;<br>**HUNTON ANDREWS KURTH LLP**<br>Riverfront Plaza, East Tower<br>951 East Byrd Street<br>Richmond, Virginia 23219 |

UST-1571

| **Counsel to the Ad Hoc Group** |
|---|
| Evan R. Fleck<br>**MILBANK LLP**<br>55 Hudson Yards<br>New York, New York 10001 |
| ***Counsel to the Official Committee of Unsecured Creditors Appointed in These Chapter 11 Cases*** |

| | |
|---|---|
| Robert J. Feinstein<br>Bradford J. Sandler<br>Shirley S. Cho<br>Cia H. Mackle<br>Steven W. Golden<br>**Pachulski Stang Ziehl & Jones LLP**<br>780 Third Avenue, 34th Floor<br>New York, New York 10017 | Robert S. Westermann<br>Lawrence A. Katz<br>David I. Swan<br>Brittany B. Falabella<br>**Hirschler Fleischer, P.C.**<br>The Edgeworth Building<br>2100 East Cary Street<br>Richmond, Virginia 23223 |

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan in connection with the assumption of the Executory Contract(s) and Unexpired Lease(s) identified above and/or related cure or adequate assurances proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the Confirmation Hearing (or such other date as fixed by the Court).

> **PLEASE TAKE FURTHER NOTICE THAT any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption and cure amount.**

**PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE OF THE DEBTORS OR REORGANIZED DEBTORS ASSUME SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Prime Clerk LLC, the notice and claims agent retained by the Debtors in the Chapter 11 Cases (the "Notice and Claims Agent"), by: (a) calling the Debtors' restructuring hotline at (877) 930-4319 (toll free) or (347) 899-4594 (international); (b) visiting the Debtors' restructuring website at:

UST-1572

https://cases.primeclerk.com/ascena; (c) writing to Notice and Claims Agent, Attn: Ascena Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; and/or (d) emailing ascenainfo@primeclerk.com.  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.vaeb.uscourts.gov.

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.F. CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

---

UST-1573

Dated:   [●], 2020

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          edward.sassower@kirkland.com
                steven.serajeddini@kirkland.com

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654

Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          john.luze@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

/s/ Cullen D. Speckhart
**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and
Texas; Not admitted to practice in DC, supervised by
members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice
in*
*DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:      (202) 842-7800
Facsimile:      (202) 842-7899
Email:          cspeckhart@cooley.com
                oantle@cooley.com-

6

UST-1574

## Exhibit A

**Schedule of Contracts and Leases and Proposed Cure Cost**

UST-1575

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure Cost |
|--------|-------------|-------------------------------------------|-----------|
|        |             |                                           |           |

UST-1576

## Schedule 11

**Form of Notice of Rejection of Executory Contracts and Unexpired Leases**

UST-1577

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:     (202) 842-7800
Facsimile:     (202) 842-7899

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE REGARDING EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES TO BE REJECTED PURSUANT TO THE PLAN

**PLEASE TAKE NOTICE THAT** on [●], 2020, the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"):  (a) authorizing Ascena Retail Group, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Ascena Retail Group, Inc., and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

[2]     Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

UST-1578

materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

PLEASE TAKE FURTHER NOTICE THAT the Debtors filed the *Rejected Executory Contract and Unexpired Lease List* [Docket No. [●]] (the "Rejection Schedule") with the Court as part of the Plan Supplement on [●], 2020, as contemplated under the Plan.  The determination to reject the agreements identified on the Rejection Schedule is subject to revision.

> **PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS NOTICE BECAUSE THE DEBTORS' RECORDS REFLECT THAT YOU ARE A PARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT WILL BE REJECTED PURSUANT TO THE PLAN.  THEREFORE, YOU ARE ADVISED TO REVIEW CAREFULLY THE INFORMATION CONTAINED IN THIS NOTICE AND THE RELATED PROVISIONS OF THE PLAN.[3]**

PLEASE TAKE FURTHER NOTICE THAT the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **October 23, 2020, at 11:00 a.m.**, prevailing Eastern Time, before the Honorable Kevin R. Huennekens in the United States Bankruptcy Court for the Eastern District of Virginia, located at 701 East Broad Street, Suite 5100, Richmond, VA 23219-1888.

PLEASE TAKE FURTHER NOTICE THAT all proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within the earliest to occur of (1) thirty days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection or (2) thirty days after notice of any rejection that occurs after the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, their Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court.**

PLEASE TAKE FURTHER NOTICE THAT the deadline for filing objections to the Plan is **October 13, 2020, at 5:00 p.m.** prevailing Eastern Time (the "Plan Objection Deadline"). Any objection to the Plan **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and

---

[3]   Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  Further, the Debtors expressly reserve the right to (a) remove any Executory Contract or Unexpired Lease from the Rejection Schedule and assume such Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until the Effective Date and (b) contest any Claim asserted in connection with rejection of any Executory Contract or Unexpired Lease.

UST-1579

served upon the following parties so as to be actually received on or before the Plan Objection Deadline:

| Co-Counsel to the Debtors | |
|---|---|
| Edward O. Sassower, P.C.<br>Steven N. Serajeddini, P.C.<br>**KIRKLAND & ELLIS LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br><br>-and-<br><br>John R. Luze<br>**KIRKLAND & ELLIS LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654 | Cullen D. Speckhart<br>Olya Antle<br>**COOLEY LLP**<br>1299 Pennsylvania Avenue, NW Suite 700<br>Washington, DC 20004-2400 |
| **U.S. Trustee** | |
| Kathryn Montgomery<br>Office of the United States Trustee for the Eastern District of Virginia<br>701 East Broad Street, Suite 4000,<br>Richmond, VA 23219 | |
| **Counsel to the ABL Administrative Agent** | |
| Matthew F. Furlong<br>Julia Frost-Davies<br>Christopher L. Carter<br>**MORGAN LEWIS & BOCKIUS LLP**<br>One Federal Street<br>Boston, Massachusetts 02110 | Tyler P. Brown;<br>**HUNTON ANDREWS KURTH LLP**<br>Riverfront Plaza, East Tower<br>951 East Byrd Street<br>Richmond, Virginia 23219 |
| **Counsel to the Ad Hoc Group** | |
| Evan R. Fleck<br>**MILBANK LLP**<br>55 Hudson Yards<br>New York, New York 10001 | |

UST-1580

| *Counsel to the Official Committee of Unsecured Creditors Appointed in These Chapter 11 Cases* | |
|---|---|
| Robert J. Feinstein<br>Bradford J. Sandler<br>Shirley S. Cho<br>Cia H. Mackle<br>Steven W. Golden<br>**Pachulski Stang Ziehl & Jones LLP**<br>780 Third Avenue, 34th Floor<br>New York, New York 10017 | Robert S. Westermann<br>Lawrence A. Katz<br>David I. Swan<br>Brittany B. Falabella<br>**Hirschler Fleischer, P.C.**<br>The Edgeworth Building<br>2100 East Cary Street<br>Richmond, Virginia 23223 |

**PLEASE TAKE FURTHER NOTICE THAT** any objections to Plan in connection with the rejection of the Executory Contract(s) and Unexpired Lease(s) identified above and/or related rejection damages proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the Confirmation Hearing (or such other date as fixed by the Court).

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Prime Clerk LLC, the notice and claims agent retained by the Debtors in the Chapter 11 Cases (the "Notice and Claims Agent"), by: (a) calling the Debtors' restructuring hotline at (877) 930-4319 (toll free) or (347) 899-4594 (international); (b) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/ascena; (c) writing to Notice and Claims Agent, Attn: Ascena Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; and/or (d) emailing ascenaballots@primeclerk.com. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.vaeb.uscourts.gov.

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION,
AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.F. CONTAINS A
THIRD-PARTY RELEASE**. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER
THE PLAN CAREFULLY BECAUSE YOUR RIGHTS
MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.
IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN
OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN
ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

---

UST-1581

Dated:  [●], 2020

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          edward.sassower@kirkland.com
                steven.serajeddini@kirkland.com

-and-

John R. Luze (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          john.luze@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

/s/ Cullen D. Speckhart
**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:      (202) 842-7800
Facsimile:      (202) 842-7899
Email:          cspeckhart@cooley.com
                oantle@cooley.com-

UST-1582