**Nos. 3:21-cv-167-DJN (Lead), 3:21-cv-166 & 3:21-cv-00205 (Consolidated)**

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

———————————

IN RE RETAIL GROUP INC., ET AL.,

*Debtors*,

———————————

JOEL PATTERSON, ET AL. & JOHN P. FITZGERALD, III,
ACTING UNITED STATES TRUSTEE FOR REGION 4,

*Appellants*,

v.

MAHWAH BERGEN RETAIL GROUP, INC.,

*Appellee.*

———————————

On Appeal from the United States Bankruptcy Court
for the Eastern District of Virginia
Bankruptcy Case No. 20-33113-KRH

———————————

## RESPONSE BRIEF FOR APPELLEE
## MAHWAH BERGEN RETAIL GROUP, INC.

———————————

GEORGE W. HICKS, JR. (*pro hac vice*)
ANDREW C. LAWRENCE (*pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
george.hicks@kirkland.com

EDWARD O. SASSOWER, P.C.
STEVEN N. SERAJEDDINI, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(202) 446-4800

CULLEN D. SPECKHART (VSB 79096)
*Counsel of Record*
OLYA ANTLE (VSB 83153)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
(202) 842-7800
cspeckhart@cooley.com

JOHN R. LUZE
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

*Counsel for Appellee Mahwah Bergen Retail Group, Inc.*

Date: September 10, 2021

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................. i

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ......................................................................................... 1

JURISDICTIONAL STATEMENT ...............................................................4

STATEMENT OF THE ISSUES....................................................................5

STANDARD OF REVIEW .............................................................................5

STATEMENT OF THE CASE........................................................................5

    A.     Legal Framework ................................................................5

    B.     Factual and Procedural Background .......................................11

SUMMARY OF ARGUMENT .....................................................................25

ARGUMENT ...............................................................................................30

    I.    The Court Should Dismiss This Appeal As Equitably Moot.............30

        A.    Each Equitable-Mootness Factor Is Easily Satisfied...............31

        B.    The U.S. Trustee's Contrary Arguments Are Meritless ..........37

    II.    The Bankruptcy Court Properly Approved The Third-Party-
        Release Provision .................................................................41

        A.    The Third-Party-Release Provision is Consensual and
            Permissible ................................................................41

            1.    The Bankruptcy Code, case law, and sound policy
                firmly support the use of third-party releases with
                opt-out mechanisms in Chapter 11 plans.......................41

            2.    The Third-Party-Release Provision readily satisfies
                applicable law ...............................................................46

        B.    Appellants' Counterarguments Lack Merit ............................48

1.      The Securities Plaintiffs lack standing to challenge the Third-Party-Release Provision and cannot raise a challenge or opt-out on behalf of their putative class...................................................................48

2.      The bankruptcy court had statutory and constitutional authority to approve the Third-Party-Release Provision.........................................................52

3.      *Behrmann* does not apply to consensual releases...........60

4.      The Third-Party-Release Provision is consensual in light of the opt-out procedures ...................................63

5.      Ascena provided adequate notice of the opt-out procedures........................................................................68

C.      In All Events, the Third-Party-Release Provision satisfies *Behrmann* ..............................................................................75

III.    The Bankruptcy Court Properly Approved The Exculpation Provision.................................................................................................86

A.      The Exculpation Provision is Limited and Appropriate...........87

B.      The U.S. Trustee's Counterarguments Lack Merit...................88

IV.     The Bankruptcy Court Did Not Abuse Its Discretion in Addressing Confirmation Issues at the Confirmation Stage...............94

CONCLUSION....................................................................................................96

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) .............................................................45

*Balt. Teachers Union*
   *v. Mayor and City Council of Balt.*,
   6 F.3d 1012 (4th Cir. 1993)....................................................89

*Bank of Am. Nat'l Tr. & Sav. Ass'n*
   *v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999) ...............................................................6

*Barton v. Barbour*,
   104 U.S. 126 (1881) ..............................................................92

*Behrmann v. Nat'l Heritage Found.*,
   663 F.3d 704 (4th Cir. 2011)......................................... *passim*

*Blixseth v. Credit Suisse*,
   961 F.3d 1074 (9th Cir. 2020) ....................................... 8, 87, 91

*Brea Union Plaza I, LLC v. Toys R Us, Inc.*,
   2018 WL 3543056 (E.D. Va. July 23, 2018) ........................38

*Cir. City Stores, Inc. v. Najd*,
   294 F.3d 1104 (9th Cir. 2002) ...............................................65

*Clark v. Council of Unit Owners*
   *of 100 Harborview Drive Condo.*,
   2021 WL 2157604 (4th Cir. May 27, 2021).........................38

*Copley v. United States*,
   959 F.3d 118 (4th Cir. 2020)...................................................5

*Czyzewski v. Jevic Holding Corp.*,
   137 S.Ct. 973 (2017)................................................................6

*Evanston Ins. Co. v. Cogswell Properties, LLC*,
   683 F.3d 684 (6th Cir. 2012) .................................................70

*Exec. Benefits Ins. Agency v. Arkison*,
  573 U.S. 25 (2014) ...............................................................................54

*Fetner v. Wilmington Sav. Fund Soc'y*,
  2021 WL 1520818 (U.S. Apr. 19, 2021)............................................38

*Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc.*,
  202 F.3d 223 (4th Cir. 2000) ..............................................................68

*Fuji Photo Film Co. v. Jazz Photo Corp.*,
  394 F.3d 1368 (Fed. Cir. 2005) ..........................................................71

*Gentry v. Siegel*,
  668 F.3d 83 (4th Cir. 2012) ................................................................72

*Griswold v. Connecticut*,
  381 U.S. 479 (1965) ............................................................................50

*Gupta v. Morgan Stanley Smith Barney, LLC*,
  934 F.3d 705 (7th Cir. 2019)..............................................................65

*In re Alpha Nat. Res., Inc.*,
  556 B.R. 249 (Bankr. E.D. Va. 2016) ........................................ *passim*

*In re AOV Indus., Inc.*,
  792 F.2d 1140 (D.C. Cir. 1986)..................................................... 55, 59

*In re Ascena Retail Grp., Inc. Sec. Litig.*,
  No. 2:19-cv-13529-KM-JBC (D.N.J.)..................................................15

*In re Astria Health*,
  623 B.R. 793 (Bankr. E.D. Wash. 2021)............................................56

*In re Bate Land & Timber LLC*,
  877 F.3d 188 (4th Cir. 2017) ............................................... 37, 38, 78

*In re Bond*,
  16 F.3d 408 (4th Cir. 1994) ................................................................66

*In re Charles St. Afr. Methodist
  Episcopal Church of Bos.*,
  499 B.R. 66 (Bankr. D. Mass. 2013) ..................................................59

iv

*In re Charter Commc'ns, Inc.*,
  691 F.3d 476 (2d Cir. 2012) ...................................................................5

*In re Chassix Holdings, Inc.*,
  533 B.R. 64 (Bankr. S.D.N.Y. 2015) ........................................... 64, 66

*In re Combustion Eng'g, Inc.*,
  391 F.3d 190 (3d Cir. 2004) .................................................................57

*In re Conley*,
  369 B.R. 67 (B.A.P. 1st Cir. 2007) ......................................................40

*In re Conseco, Inc.*,
  301 B.R. 525 (Bankr. N.D. Ill. 2003) .............................................8, 44

*In re DBSD N. Am., Inc.*,
  419 B.R. 179 (Bankr. S.D.N.Y. 2009) .............................................8, 44

*In re Dow Corning Corp.*,
  280 F.3d 648 (6th Cir. 2002) ......................................................... 60, 61

*In re Dynegy, Inc.*,
  770 F.3d 1064 (2d Cir. 2014) ................................................. 49, 50, 66

*In re Emerge Energy Servs. LP*,
  2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) ..............................64

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003)......................................................64

*In re Fetner*,
  801 F.App'x 189 (4th Cir. 2020).........................................................38

*In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*,
  2018 WL 1229989 (C.D. Cal. Jan. 19, 2018)......................................40

*In re Gen. Wireless Operations Inc.*,
  2017 WL 5461361 (Bankr. D. Del. Oct. 26, 2017)..........................8, 44

*In re Golden Inv. Acquisitions, LLC*,
  508 B.R. 381 (Bankr. N.D. W. Va. 2014)............................................57

*In re GWI PCS 1 Inc.*,
    230 F.3d 788 (5th Cir. 2000) ................................................................38

*In re Health Diagnostic Lab'y, Inc.*,
    551 B.R. 218 (Bankr. E.D. Va. 2016) ..........................................9, 90

*In re IFS Fin. Corp.*,
    803 F.3d 195 (5th Cir. 2015) ................................................................69

*In re Indianapolis Downs, LLC.*,
    486 B.R. 286 (Bankr. D. Del. 2013) ..............................................8, 44

*In re Johnson*,
    960 F.2d 396 (4th Cir. 1992) ................................................................69

*In re Johnston*,
    2007 WL 1166017
    (Bankr. N.D. W. Va. Apr. 12, 2007) ................................................57

*In re K&D Indus. Servs. Holding Co.*,
    2021 WL 949531 (E.D. Mich. Mar. 12, 2021) ................................39

*In re Kirwan Offs. S.à.r.l.*,
    592 B.R. 489 (S.D.N.Y. 2018) ........................................ 56, 57, 58, 60

*In re Kirwan Offs. S.à.R.L.*,
    792 F.App'x 99 (2d Cir. 2019) ............................................................56

*In re Looney*,
    823 F.2d 788 (4th Cir. 1987) ................................................................45

*In re McLean Square Assocs., G.P.*,
    200 B.R. 128 (E.D. Va. 1996) ..............................................................30

*In re Midway Gold US, Inc.*,
    575 B.R. 475 (Bankr. D. Colo. 2017) ................................................58

*In re Millennium Lab Holdings II, LLC.*,
    945 F.3d 126 (3d Cir. 2019) ........................................ 55, 56, 57, 59

*In re Murray Metallurgical Coal Holdings, LLC*,
    623 B.R. 444 (Bankr. S.D. Ohio 2021) ...................................... 56, 91

*In re Myers*,
    773 F.App'x 161 (4th Cir. 2019) .......................................................................38

*In re Nat'l Heritage Found., Inc.*,
    478 B.R. 216 (Bankr. E.D. Va. 2012) ............................................... 87, 89, 90, 93

*In re Neogenix Oncology, Inc.*,
    508 B.R. 345 (Bankr. D. Md. 2014) ...................................................................90

*In re Parks*,
    571 F.App'x 523 (9th Cir. 2014) .......................................................................77

*In re Pierce*,
    435 F.3d 891 (8th Cir. 2006) .............................................................................45

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000) .................................................................... 8, 9, 89

*In re S.S. Retail Stores Corp.*,
    216 F.3d 882 (9th Cir. 2000) .............................................................................38

*In re Se. Materials, Inc.*,
    467 B.R. 337 (Bankr. M.D.N.C. 2012) ..............................................................57

*In re Seaside Eng'g & Surveying, Inc.*,
    780 F.3d 1070 (11th Cir. 2015) .........................................................................42

*In re Shawnee Hills, Inc.*,
    125 F.App'x 466 (4th Cir. 2005) .......................................................................34

*In re Specialty Equip. Companies, Inc.*,
    3 F.3d 1043 (7th Cir. 1993) ........................................................................ 43, 55

*In re Stearns Holdings, LLC*,
    607 B.R. 781 (Bankr. S.D.N.Y. 2019) ...............................................................57

*In re Stein Mart, Inc.*,
    2021 WL 1216557
    (Bankr. M.D. Fla. Mar. 29, 2021) ......................................................... 8, 44, 45

*In re Sunbridge Cap., Inc.*,
    454 B.R. 166 (Bankr. D. Kan. 2011) .................................................................57

*In re SunEdison, Inc.*,
  576 B.R. 453 (Bankr. S.D.N.Y. 2017) .......................................................... 57, 64

*In re Trib. Co.*,
  464 B.R. 126 (Bankr. D. Del. 2011).....................................................................78

*In re U.S. Airways Grp., Inc.*,
  369 F.3d 806 (4th Cir. 2004) ........................................................................ *passim*

*In re Vista Proppants & Logistics, LLC*,
  2020 WL 6325526
  (Bankr. N.D. Tex. Oct. 28, 2020)....................................................................8, 44

*In re Wash. Mut., Inc.*,
  442 B.R. 314 (Bankr. D. Del. 2011)........................................................... 64, 65

*In re Wash. Mut., Inc.*,
  461 B.R. 200 (Bankr. D. Del. 2011).....................................................................59

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999).............................................................. 64, 78

*In re Zenith Elecs. Corp.*,
  329 F.3d 338 (3d Cir. 2003) .................................................................................38

*Jackson v. Fed. Exp.*,
  766 F.3d 189 (2d Cir. 2014) .................................................................................77

*Jones v. Barnes*,
  463 U.S. 745 (1983) ...............................................................................................4

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988) .................................................................................50

*Kiewit E. Co. v. L&R Const. Co.*,
  44 F.3d 1194 (3d Cir. 1995) .................................................................................70

*Kingdomware Techs., Inc. v. United States*,
  136 S.Ct. 1969 (2016) ..........................................................................................39

*Lexmark Int'l, Inc.*
  *v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ..............................................................................................37

*Lovelace v. Lee*,
    472 F.3d 174 (4th Cir. 2006) ................................................................71

*Mac Panel Co. v. Va. Panel Corp.*,
    283 F.3d 622 (4th Cir. 2002) ........................................................ *passim*

*Mar-Bow Value Partners, LLC*
    *v. McKinsey Recovery &*
    *Transformation Serv. US, LLC*,
    578 B.R. 325 (E.D. Va. 2017) ................................................ 32, 34, 35

*Mar-Bow Value Partners, LLC*
    *v. McKinsey Recovery &*
    *Transformation Servs. U.S., LLC*,
    469 F.Supp.3d 505 (E.D. Va. 2020) .................................. 10, 11, 49, 50

*Mar-Bow Value Partners, LLC*
    *v. McKinsey Recovery &*
    *Transformation Servs. US, LLC*,
    2017 WL 4414155 (E.D. Va. Sept. 30, 2017) .......................................9

*Nat'l Heritage Found. Inc. v. Behrmann*,
    2013 WL 1390822 (E.D. Va. Apr. 3, 2013) ........................................89

*Nat'l Heritage Found., Inc. v. Highbourne Found.*,
    760 F.3d 344 (4th Cir. 2014) ........................................................ *passim*

*Parson v. Matson*,
    2018 WL 1855964 (E.D. Va. Apr. 18, 2018) ......................................38

*Pepper v. Litton*,
    308 U.S. 295 (1939) .............................................................................41

*Phillips Petrol. Co. v. Shutts*,
    472 U.S. 797 (1985) .............................................................................45

*Power Plant Ent. Casino Resort Ind., LLC v. Mangano*,
    484 B.R. 290 (Bankr. D. Md. 2012) ....................................................57

*Ramirez v. Sanchez Ramos*,
    438 F.3d 92 (1st Cir. 2006) .................................................................40

*Republic Supply Co. v. Shoaf*,
   815 F.2d 1046 (5th Cir. 1987) ..............................................................................59

*Rivera-Colón v. AT&T Mobility P.R., Inc.*,
   913 F.3d 200 (1st Cir. 2019) ................................................................................65

*Russell v. Absolute Collection Servs., Inc.*,
   763 F.3d 385 (4th Cir. 2014) ................................................................................71

*Russian Media Grp., LLC v. Cable Am., Inc.*,
   598 F.3d 302 (7th Cir. 2010) ................................................................................70

*Sekhar v. United States*,
   570 U.S. 729 (2013) ..............................................................................................96

*Stansell*
   *v. Revolutionary Armed Forces of Colombia (FARC)*,
   772 F.App'x 772 (11th Cir. 2019) ........................................................................40

*Stern v. Marshall*,
   564 U.S. 462 (2011) ...................................................................... 53, 54, 56, 59

*Talarico v. Ultra Petrol. Corp.*,
   2020 WL 8361996 (S.D. Tex. Dec. 29, 2020) ....................................................49

*Union Carbide Corp. v. Newboles*,
   686 F.2d 593 (7th Cir. 1982) ................................................................................43

*United States v. Energy Res. Co.*,
   495 U.S. 545 (1990) ...................................................................................... 41, 47

*United States v. Gonzalez Edeza*,
   359 F.3d 1246 (10th Cir. 2004) ............................................................................77

*Virginia ex rel. Integra REC LLC v. Countrywide Sec. Corp.*,
   92 F.Supp.3d 469 (E.D. Va. 2015) .......................................................................57

*Warnick v. Arrowsmith*,
   2017 WL 2999025 (E.D. Va. July 14, 2017) ......................................................38

*Wellness Int'l Network, Ltd. v. Sharif*,
   575 U.S. 665 (2015) .................................................................................... *passim*

*Wells Fargo Bank, N.A.*
  *v. AMH Roman Two NC, LLC*,
  859 F.3d 295 (4th Cir. 2017) ................................................................73

*Wilmington Tr., Nat'l Ass'n*
  *v. Lord & Taylor LLC*,
  2021 WL 3089105 (E.D. Va. July 22, 2021) .......................................38

**Statutes**

11 U.S.C. §102 ......................................................................................45

11 U.S.C. §105 ................................................................................ *passim*

11 U.S.C. §1101 ..................................................................................6, 33

11 U.S.C. §1123 .............................................................................. *passim*

11 U.S.C. §1125 ....................................................................................16

11 U.S.C. §1126 .............................................................................. 13, 84

11 U.S.C. §1129 ......................................................................................6

11 U.S.C. §701 ........................................................................................5

28 U.S.C. §1334 ................................................................................4, 52

28 U.S.C. §157 ................................................................................ *passim*

28 U.S.C. §158 ........................................................................................4

28 U.S.C. §2075 ....................................................................................68

**Rules**

Fed. R. Bank. P. 8002(a)(3) ................................................................25

Fed. R. Bankr. P. 9014 ........................................................................51

Fed. R. Civ. P. 23(c)(2) ..................................................................45, 68

**Treatises**

1 *McLaughlin on Class Actions* (17th ed. 2020) ............................46, 47

2 *Williston on Contracts* (4th ed. 2021) ..................................................................44

*Collier on Bankruptcy* (16th ed. 2021) ......................................................... *passim*

Restatement (Second) of Contracts (1981) .............................................................65

**Other Authorities**

4 William B. Rubenstein,
 *Newberg on Class Actions*  (5th ed. 2021) ............................................................65

Am. Objection of U.S. Trustee to Disclosure Statement,
 Dkt.2572, *In re Intelsat S.A.*,
 No. 20-32299 (Bankr. E.D. Va. filed Aug. 6, 2021) ............................................94

Confirmation Hrg. Tr.,
 Dkt.1235, *In re Diamond Offshore Drilling, Inc.*,
 No. 20-32307 (Bankr. S.D. Tex. April 8, 2021)...................................................94

Confirmation Order,
 Dkt.16, *In re Diamond Offshore*,
 No. 21-cv-1380 (S.D. Tex. Sept. 3, 2021)............................................................70

Jason W. Harbour & Tara L. Elgie,
 *The 20-Year Split: Nonconsensual Nondebtor Releases*,
 21 Norton J. Bankr. L. & Prac. 4 Art. 4 (2012)...................................................43

Joshua M. Silverstein,
 *Hiding in Plain View: A Neglected Supreme Court*
 *Decision Resolves the Debate over Non-Debtor Releases*
 *in Chapter 11 Reorganizations*, 23 Emory Bankr. Dev. J. 13 (2006).................43

Objection of U.S. Trustee to Confirmation,
 Dkt.1012, *In re Le Tote, Inc.*, No. 20-33332
 (Bankr. E.D. Va. filed Mar. 9, 2021)...................................................................94

Objection of U.S. Trustee to Confirmation,
 Dkt.890, *In re Pier 1 Imports, Inc.*, No. 20-30805
 (Bankr. E.D. Va. filed July 23, 2020)...................................................................94

# INTRODUCTION

In July 2020, amidst a once-in-a-century global pandemic that generated worldwide lockdowns, Ascena Retail Group, Inc. and its affiliates (collectively, "Ascena")—which operated specialty retail brands for women and girls—filed for Chapter 11 bankruptcy.  Notwithstanding "unprecedented economic turmoil," Ascena achieved an "absolutely phenomenal" result, as the bankruptcy court aptly put it.  UST.App.2856, 2782.  With the aid of its officers, directors, advisors, creditors, and other critical parties, Ascena entered into transactions that kept its brands alive as going-concerns, thus saving "tens of thousands of jobs," providing "continued rent to landlords," preserving vendors' ability "to supply their product," and allowing consumers to continue to "shop their favorite brands."  UST.App.2781, 2856, 2884, 2902.  In conjunction with these transactions, Ascena negotiated with stakeholders a plan of reorganization governing its "complex and multi-faceted restructuring" and dictating distributions of the transactions' proceeds.  UST.App.2901.  That plan attracted broad support, and in February 2021—over six months ago and counting—the bankruptcy court entered an order confirming it.  One week later, in March 2021, the plan took full effect, bringing Ascena's "highly successful" restructuring to a close.  UST.App.2902 n.19.

Given that laudable—but by no means foreordained—outcome, virtually none of the hundreds of thousands of parties affected by Ascena's restructuring sought to

challenge the bankruptcy court's confirmation order on appeal.  But after some delay, a handful of parties have done so:  (1) two private plaintiffs who filed a putative securities class action against Ascena and two of its former officers before Ascena's Chapter 11 cases commenced (the "Securities Plaintiffs"); and (2) the Acting U.S. Trustee for Region 4 ("U.S. Trustee") (together, "Appellants").  Appellants first challenge a provision of the reorganization plan—the "Third-Party-Release Provision"—under which certain non-debtor parties agreed to release potential claims against certain other non-debtor parties, including parties whom Ascena has an obligation to indemnify in any litigation.  Additionally, the U.S. Trustee (but not the Securities Plaintiffs) challenges a plan provision—the "Exculpation Provision"—that protects from negligence suits parties who played an integral role in Ascena's restructuring, while permitting suits involving allegations of serious misconduct to proceed.

In a series of thorough opinions, the bankruptcy court correctly rejected Appellants' fundamentally misguided arguments about these provisions—which were, and remain, integral to Ascena's restructuring and cannot be severed from the plan.  Furthermore, the reasons for affirmance have only increased in the intervening months.  Indeed, this Court should not even entertain Appellants' arguments on the merits, for this appeal is equitably moot.  Under that well-established bankruptcy doctrine, a reviewing court may decline to disturb a plan of reorganization when it

2

would be inequitable to do so in light of other parties' reliance on the plan's substantial consummation over the passage of time.  Given that the plan here took effect over a half-year ago, every equitable-mootness factor readily supports application of the doctrine, warranting dismissal of this appeal at the threshold.

If this Court turns to the merits, however, affirmance is plainly warranted. Bankruptcy courts have broad equitable authority to confirm reorganization plans containing any necessary and appropriate provisions, and third-party-release and exculpation provisions of the sort here are two of the most common such provisions. In fact, although courts have widely recognized that even *nonconsensual* third-party-release provisions are permissible, the Third-Party-Release Provision here is *consensual*:  Affected parties received sufficient notice of the provision and an opportunity to opt-out of it, and hundreds of parties did so—including the Securities Plaintiffs themselves.  Further, as courts have likewise widely recognized, exculpation provisions are permissible if they are properly limited and not overly broad, and the Exculpation Provision here remains well within those confines:  It applies only to a limited number of parties and a limited set of claims over a limited time period.  The Third-Party-Release and Exculpation Provisions here thus are no different from other provisions that courts nationwide repeatedly approve.

Appellants nevertheless advance a litany of arguments against the Third-Party-Release and Exculpation Provisions.  Indeed, Appellants identify no fewer

than *eleven* issues, across 139 pages of prolix briefing, purportedly demonstrating the bankruptcy court's error.   As the Supreme Court has observed, asserting a "[m]ultiplicity" of errors on appeal "hints at lack of confidence in any one."  *Jones v. Barnes*, 463 U.S. 745, 752 (1983).  That teaching perfectly describes Appellants' submissions here, which are teeming with uniformly incorrect contentions and appear more directed toward self-interestedly maintaining a meritless class-action suit (in the case of the Securities Plaintiffs) or advancing a policy position inconsistent with precedent, the Bankruptcy Code, and longstanding bankruptcy practice (in the case of the U.S. Trustee).  Appellants lack standing to press a number of their arguments, and they have forfeited others.  And all of their remaining arguments either badly misinterpret the Bankruptcy Code, relevant precedent, or the record—sometimes all three.  Thus, although this Court need not and should not dive into the merits or the 11,000 pages of appendix materials because this appeal is equitably moot, Appellants ultimately do nothing to undermine the bankruptcy court's well-supported determinations about the propriety of the Third-Party-Release and Exculpation Provisions.  Accordingly, this Court should either dismiss this appeal as equitably moot or affirm.

## JURISDICTIONAL STATEMENT

The bankruptcy court had jurisdiction under 28 U.S.C. §157(a)-(b) and §1334(a).  This Court has jurisdiction under 28 U.S.C. §158(a)(1).

## STATEMENT OF THE ISSUES

1.  Whether this appeal is equitably moot.

2.  Whether the bankruptcy court properly approved the Third-Party-Release Provision.

3.  Whether the bankruptcy court properly approved the Exculpation Provision.

4.  Whether the bankruptcy court properly addressed confirmation issues at the confirmation stage.

## STANDARD OF REVIEW

This Court reviews a bankruptcy court's legal conclusions de novo, its factual findings for clear error, and its discretionary decisions for abuse of discretion.  *Copley v. United States*, 959 F.3d 118, 121 (4th Cir. 2020).  The Court has discretion to decide whether an appeal is equitably moot.  *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 483 (2d Cir. 2012).

## STATEMENT OF THE CASE

### A.    Legal Framework

**1.**  The Bankruptcy Code permits companies to file for bankruptcy under either Chapter 7 or Chapter 11.  In a Chapter 7 bankruptcy, a trustee liquidates a company's pre-petition assets and distributes them to creditors.  *See* 11 U.S.C. §701 *et*

*seq.*[1]  In a Chapter 11 bankruptcy, the objective is different.  *See* §1101 *et seq.*  The "two recognized policies underlying Chapter 11" are "preserving going concerns and maximizing property available to satisfy creditors."  *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999).  Consistent with those policies, "[i]n Chapter 11, debtor and creditors try to negotiate a plan that will govern the distribution of valuable assets from the debtor's estate and often keep the business operating as a going concern."  *Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 973, 978 (2017).  Obtaining plan confirmation is therefore "the statutory goal of every chapter 11 case."  7 *Collier on Bankruptcy* ¶1129.01 (16th ed. 2021) ("*Collier*").

Section 1129 of the Bankruptcy Code sets forth the minimum requirements that a Chapter 11 debtor must satisfy to achieve plan confirmation.  *See* §1129; *see* 7 *Collier* ¶1129.01.  Under §1129(a)(1), the plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."  §1129(a)(1).  Section 1123(a) enumerates various provisions that a plan "shall" contain.  *See* §1123(a); *see also* 7 *Collier* ¶1123.01.  Section 1123(b), however, provides that a plan "may" contain various other provisions, including "any other appropriate provision not inconsistent with

---

[1] All further statutory references are to Title 11 of the U.S. Code unless otherwise noted.

the applicable provisions of [the Code]." §1123(b)(6); *see* 7 *Collier* ¶1123.02.  Relatedly, §105(a) of the Code empowers a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]." §105(a).

In turn, bankruptcy courts routinely rely on §1123(b)(6) or §105(a)—or both—to approve two particular types of plan provisions.  The first is a so-called third-party-release provision, under which a non-debtor releases claims against another non-debtor.  *See* 7 *Collier* ¶1123.02[6][a]; 2 *Collier* ¶105.04.  Third-party-release provisions can be "nonconsensual" or "consensual."  UST.App.2782. "[T]here is a circuit split regarding whether bankruptcy courts have the authority to confirm chapter 11 plan provisions that provide for nonconsensual releases of liability of nondebtors," 7 *Collier* ¶1123.02[6][a]—albeit a lopsided one, since the overwhelming majority of circuits, including the Fourth Circuit, permit such releases under certain conditions.  *See Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704 (4th Cir. 2011).  But there is no such split over "consensual" releases, which are "generally approve[d]," since "a consensual third-party release" in a reorganization plan "is no different from" a consensual release in "any other contract or settlement."  8 *Collier* ¶1141.02[5][b].

7

Furthermore, bankruptcy courts around the country have recognized that a third-party release is consensual when a debtor provides adequate notice of the provision to affected third parties and an opportunity to opt-out.  *See, e.g.*, *In re Stein Mart, Inc.*, 2021 WL 1216557, at *5 (Bankr. M.D. Fla. Mar. 29, 2021); *In re Vista Proppants & Logistics, LLC*, 2020 WL 6325526, at *7 (Bankr. N.D. Tex. Oct. 28, 2020); *In re Gen. Wireless Operations Inc.*, 2017 WL 5461361, at *10 (Bankr. D. Del. Oct. 26, 2017); *In re Indianapolis Downs, LLC.*, 486 B.R. 286, 306 (Bankr. D. Del. 2013); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 218 (Bankr. S.D.N.Y. 2009); *In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003).  The U.S. Bankruptcy Court for the Eastern District of Virginia is no exception.  Indeed, as Appellants have acknowledged, virtually every confirmed plan in every complex bankruptcy case there includes consensual third-party-release provisions of this variety.  *See, e.g.*, Dkt.18 at 2 (U.S. Trustee providing 11 examples).

The second "commonplace provision in Chapter 11 plans" that bankruptcy courts regularly approve under §1123(b)(6) or §105(a) is an exculpation provision. *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020) (quoting *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000)); *see also, e.g.*, *In re Alpha Nat. Res., Inc.*, 556 B.R. 249, 263 (Bankr. E.D. Va. 2016).  Unlike a release provision, which "eliminat[es]" the released party's liability "altogether," an exculpation pro-

vision has a narrower focus and merely "sets forth the applicable standard of liability" for future litigation, *PWS Holding Corp.*, 228 F.3d at 247—for example, claimants must demonstrate that an exculpated party committed "gross negligence" or "willful misconduct," not just mere negligence, *In re Health Diagnostic Lab'y, Inc.*, 551 B.R. 218, 234 (Bankr. E.D. Va. 2016). "[E]xculpations are necessary to ensure that capable, skilled individuals are willing to assist in the reorganization efforts in chapter 11 cases" and are not "second-guessed and hounded by meritless claims following the conclusion of the bankruptcy case." *Alpha*, 556 B.R. at 260-61. Accordingly, exculpation provisions are "approved … in a number of chapter 11 cases"— including many filed in the U.S. Bankruptcy Court for the Eastern District of Virginia—provided they are "properly limited and not overly broad." *Health Diagnostic*, 551 B.R. at 233-34.

**2.**   Once a bankruptcy court enters an order confirming a plan, an objecting party's ability to disturb that plan on appeal is circumscribed by at least two "specialized legal doctrines." *Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. US, LLC*, 2017 WL 4414155, at *18 n.43 (E.D. Va. Sept. 30, 2017). First, an appellant must overcome the doctrine of "equitable mootness," which "is a pragmatic principle, grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable." *Mac Panel Co.*

*v. Va. Panel Corp.*, 283 F.3d 622, 625 (4th Cir. 2002); *see* 7 *Collier* ¶1129.09.  Equitable mootness is "[a]pplied principally in bankruptcy proceedings because of the equitable nature of bankruptcy judgments," and it "is often invoked when it becomes impractical and imprudent 'to upset the plan of reorganization at this late date.'" *Mac Panel*, 283 F.3d at 625.  To determine whether a bankruptcy appeal is equitably moot, courts within the Fourth Circuit consider four factors:  "(1) whether the appellant sought and obtained a stay; (2) whether the reorganization plan or other equitable relief ordered has been substantially consummated; (3) the extent to which the relief requested on appeal would affect the success of the reorganization plan or other equitable relief granted; and (4) the extent to which the relief requested on appeal would affect the interests of third parties."  *In re U.S. Airways Grp., Inc.*, 369 F.3d 806, 809 (4th Cir. 2004).

Second, if an appellant can overcome the equitable-mootness doctrine, he must further demonstrate that he is a proper party to appeal.  To that end, the appellant must establish "bankruptcy appellate standing," which "requires more than the showing required by Article III."  *Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. U.S., LLC*, 469 F.Supp.3d 505, 524 (E.D. Va. 2020) (Novak, J.).  More precisely, under the standard for bankruptcy appellate standing, only an appellant "'directly and adversely affected pecuniarily' by the entry of an

order" from a bankruptcy court may prosecute a bankruptcy appeal.  *Id.* at 523; *see also* 7 *Collier* ¶1109.08; 1 *Collier* ¶5.07.

### B.    Factual and Procedural Background

**1.**  This appeal concerns the Chapter 11 plan of Ascena, a leading retailer for women and girls whose operations began in 1962.  *See* UST.App.1024.  Over the years, Ascena acquired the Ann Taylor, LOFT, Lane Bryant, Justice, and Catherines brands (among others), and by 2020, it operated approximately 2,800 stores and employed nearly 40,000 people.  UST.App.998, 1024-25.

Ascena was adversely affected in recent years by consumers' shift toward online shopping.  *See* UST.App.999.  Ascena was then hit hard in March 2020 by the onset of COVID-19, which generated unprecedented government-mandated lockdowns.  *See* UST.App.1026.  In response, Ascena temporarily closed all of its stores and implemented salary reductions and furloughs throughout its workforce. *See* UST.App.1026.  By July 2020, Ascena had approximately $1.6 billion in funded debt obligations to service, due either to senior secured term lenders ("Term Lenders") or secured asset-based lenders ("ABL Lenders").  *See* UST.App.998-99, 2878.

**2.**  On July 23, 2020, Ascena voluntarily filed for Chapter 11 bankruptcy in the U.S. Bankruptcy Court for the Eastern District of Virginia.  *See* UST.App.1, 293-311.  Before the petition date, and to facilitate an orderly restructuring, Ascena entered into a Restructuring Support Agreement ("RSA") with the support of nearly

70% of the Term Lenders.  *See* UST.App.2839.  The RSA contemplated a balance-sheet restructuring but provided flexibility for Ascena to consider more value-maximizing alternatives should they arise.  *See* UST.App.2839.  Shortly after the petition date, Ascena filed its proposed plan of reorganization, *see* UST.App.312, which—consistent with the RSA—would have converted the debt held by the Term Lenders into equity in a reorganized Ascena.  *See* UST.App.2839.

As the bankruptcy cases progressed, Ascena shifted from a debt-to-equity conversion to three consummated sale transactions.  *See* UST.App.2839-40.  Ascena sold its Catherines assets for over $40 million, its Justice assets for over $70 million, and its Lane Bryant and various premium assets—including Ann Taylor and LOFT—for $540 million.  *See* UST.App.2259-66, 2350.  Ascena accordingly amended the RSA, which attracted the support of 97% of the Term Lenders.  *See* UST.App.2841.

Ascena also amended its plan of reorganization to provide for distribution of sale proceeds and complete the restructuring.  *See* UST.App.2841.  Ascena would pay priority claimants, administrative claimants, and the ABL Lenders in full on the plan's effective date, establish a trust for the benefit of general unsecured creditors ("GUC Trust") funded with $7.25 million in cash—fifteen times the amount they would have received under the original plan—and distribute remaining proceeds to

the Term Lenders.  *See* UST.App.2839, 2841, 2856.  As in the original plan, how-ever—and as is common in bankruptcy—Ascena's shareholders would not receive any recovery under the new plan and therefore had no right to vote on it.  *See* UST.App.2841; §1126(g).

Ascena and its stakeholders also negotiated and included release and exculpa-tion provisions in the plan.  First, in Article VIII.F (titled "Release by Holders of Claims or Interests"), the plan included the Third-Party-Release Provision, which states:

> [E]ach Releasing Party … is deemed to have released and discharged each Debtor, Reorganized Debtor, and each other Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors … based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, … or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Ef-fective Date.

UST.App.2659.  "Releasing Party" is defined to include holders of claims impaired under the plan, as well as former and current Ascena shareholders.  UST.App.2625. It expressly excludes, however, any party who "opt[s] out of the release[]" or who "timely object[s] to the release[] … and such objection is not resolved before Con-firmation."  UST.App.2625.  "Released Party" is defined to include Ascena as well

as its current and former "equity holders," directors, and officers.  UST.App.2625.
An equity holder who opts out of the Third-Party-Release Provision, however, "shall
not be a 'Released Party.'"  UST.App.2625.  Thus, an Ascena shareholder is both a
"Releasing Party" and a "Released Party" under the Third-Party-Release Provision,
but if the shareholder opts-out of that provision and chooses not to be a "Releasing
Party," he is no longer a "Released Party," either, and is thus exposed to litigation
risk.  UST.App.2625.  Furthermore, although the plan provides an "Avoidance Ac-
tion Waiver" under which Ascena agreed to waive "any and all" avoidance actions,
a party who opts-out of the Third-Party-Release Provision "shall not receive the
'Avoidance Action Waiver.'"  UST.App.2616, 2625, 2647; *see also* UST.App.2846.

Second, in Article VIII.G (titled "Exculpation"), the plan included the Excul-
pation Provision, which states:

> [N]o Exculpated Party shall have or incur, and each Exculpated Party
> is hereby released and exculpated from any Cause of Action or any
> claim arising from the Petition Date through the Effective Date related
> to any act or omission in connection with, relating to, or arising out of,
> the Chapter 11 Cases … except for claims related to any act or omission
> that is determined in a Final Order to have constituted actual fraud,
> willful misconduct, or gross negligence.

UST.App.2659-60.  "Exculpated Parties" is defined to include Ascena and certain
non-estate fiduciaries who played a critical role in the bankruptcy cases.  *See*
UST.App.2620.

14

Before including the Third-Party-Release and Exculpation Provisions in its plan, Ascena appointed a special committee of disinterested directors to examine their propriety. *See* UST.App.2844; *see also* Patterson.App.7037-42. The special committee investigated, *inter alia*, the merits of the putative securities class action filed by the Securities Plaintiffs in June 2019 against Ascena and two of its former officers in the U.S. District Court for the District of New Jersey in June 2019 (the "Securities Litigation"). *See* Patterson.App.7041 (discussing *In re Ascena Retail Grp., Inc. Sec. Litig.*, No. 2:19-cv-13529-KM-JBC (D.N.J.)). The special committee found no "colorable claims" implicated by the Third-Party-Release and Exculpation Provisions, and it specifically deemed the Securities Litigation "without merit" and without "material value." Patterson.App.7041-42. It additionally concluded that, even if colorable claims existed against Ascena managers, directors, or officers, any recovery in any litigation would negatively affect Ascena's estate given Ascena's indemnification obligations. *See* Patterson.App.7041; UST.App.2844-45.

Once Ascena included the Third-Party-Release and Exculpation Provisions in the plan, it also explained in the plan that those provisions are critical to the plan's success. Accordingly, Article XII.J (titled "Nonseverability of Plan Provisions") provides that a court order confirming the plan "shall constitute a judicial determination … that each term and provision of the Plan"—including the Third-Party-Release and Exculpation Provisions—"is … integral to the Plan and may not be deleted

15

or modified without [Ascena's] consent" and is "nonseverable and mutually dependent."  UST.App.2667.

**3.**  To obtain plan confirmation, Ascena first had to secure court approval of the plan's "disclosure statement," which explained the plan's features to voting parties and other interested stakeholders.  *See* §1125.  The U.S. Trustee, the Securities Plaintiffs, and the SEC each filed an objection to the disclosure statement.  The U.S. Trustee argued that the Third-Party-Release Provision could not satisfy the various factors that the Fourth Circuit discussed in *Behrmann*, which addressed a nonconsensual third-party-release provision, and that giving parties notice and an opportunity to opt-out of that provision deprived those parties of their ability to consent to it.  *See* UST.App.705-11.  The U.S. Trustee further argued that the Exculpation Provision is "[i]mpermissibly [b]road."  UST.App.711-12.  The U.S. Trustee recognized, however, that "consideration of the release and exculpation provisions is, arguably, a matter for a confirmation hearing rather than a hearing on approval of a proposed disclosure statement," and he ultimately "resolved" his objections before the disclosure-statement hearing, on the understanding that he could press them at the confirmation stage.  *See* UST.App.713, 920.  The U.S. Trustee therefore did not

present argument regarding the Third-Party-Release and Exculpation Provisions at the disclosure-statement hearing.  *See* UST.App.913-42; UST.Br.16 n.6.[2]

As such, the disclosure-statement hearing focused on objections by the Securities Plaintiffs and the SEC.  Those parties asserted the same objections to the Third-Party-Release Provision as the U.S. Trustee, with the Securities Plaintiffs purporting to argue not just for themselves, but also for members of the putative class in the Securities Litigation.  *See* UST.App.719-25, 729-57.  The SEC additionally asserted that any opt-out notice provided to current and former Ascena shareholders should state "in plain English[] what is expected of them," and it provided suggested language.  UST.App.725-26 & n.2; *see* UST.App.919-42.

The bankruptcy court deferred to the confirmation stage all arguments regarding the legality of the Third-Party-Release and Exculpation Provisions, and it approved the disclosure statement.  *See* UST.App.942, 980-88.  In so doing, the bankruptcy court ordered Ascena to undertake two actions.  First, the opt-out notices sent to Ascena shareholders had to include the SEC's suggested language.  *See* UST.App.936-38, 942.  Second, Ascena had to coordinate with counsel for the Se-

---

[2] The disclosure statement technically addressed Ascena's original plan, but the Third-Party-Release and Exculpation Provisions did not materially change in the final, confirmed plan.  *Accord* UST.Br.14 n.5

curities Plaintiffs regarding how to "give adequate notice to as many people as possible" in the putative class in the Securities Litigation.  UST.App.938, 940; *see* UST.App.941.  In response, counsel for the Securities Plaintiffs stated that, "[u]nfortunately, this isn't a case where it's as simple as just giving [Ascena] a mailing list of who the class members are," but would rather "involve [Ascena], through [its] claims and noticing agent, taking certain steps to distribute notices through nominee brokers"—*i.e.*, the entities holding shares on behalf of many shareholders.  UST.App.940-41.

**4.**   Soon thereafter, Ascena—operating through Prime Clerk, the court-approved claims-and-noticing agent—distributed voting-related materials to parties entitled to vote on the plan.  UST.App.2849.  Additionally, through a "comprehensive process," it distributed opt-out materials to approximately 300,000 parties, including current and former Ascena shareholders (who were not entitled to vote on the plan).  UST.App.2849.  Those shareholders included "registered" shareholders, who held shares in their own names, and "beneficial" holders, who held shares through nominees.  *See* UST.App.2848.  As to registered shareholders, Ascena served the opt-out materials on them directly via first-class mail.  *See* UST.App.2848-49.  As to beneficial shareholders, Ascena served the opt-materials on the nominees and provided the nominees with two options:  (1) the nominees could send the materials directly to shareholders, or (2) the nominees could provide

Ascena with shareholder contact information so that Ascena could send the materials directly to shareholders.  *See* UST.App.2849.

In accordance with the SEC's request, the opt-out materials provided to shareholders contained the following message on the first page (with the border and all formatting in the original):

---

**PLEASE READ – YOUR RESPONSE IS REQUIRED BY <u>OCTOBER 13, 2020</u>**

- You are receiving this notice because you are a current or former shareholder of Ascena Retail Group, Inc., which filed for chapter 11 bankruptcy.

- You will not receive any distribution in the bankruptcy case and your shares will be canceled.

- In addition, **<u>you will be deemed to have released whatever claims you may have against many other people and entities (including company officers and directors) unless you return the enclosed "Release Opt-Out Form" by October 13, 2020, at 5:00 P.M</u>.** prevailing Eastern Time.

- There will be no harm to you under the Plan if you return the Opt-Out Form; however, you will not receive a release.

- For more specific information and instructions, please read the Release Opt-Out Form enclosed at the end of this notice as <u>Exhibit A.</u>

---

UST.App.1541.  The notice further explained that shareholders could opt-out of the Third-Party-Release Provision by returning a pre-addressed envelope with pre-paid postage or by registering their opt-out decision through a dedicated online portal. *See* UST.App.2847-48.  Although shareholders originally had until October 13, 2020

to opt-out, Ascena extended the deadline to November 15, 2020, thus giving share-holders 60 days to make their decisions.  *See* UST.App.2847 n.12.

In the end, an overwhelming majority of parties entitled to vote on the plan voted in favor of it.  *See* UST.App.2855 (noting that 97% of one voting class and 87% of the other voting class voted in favor of the plan).  Furthermore, 596 parties, including over 500 current or former shareholders—among them the two Securities Plaintiffs—opted-out of the Third-Party-Release Provision.  *See* UST.App.2724, 2849, 2872-73; Patterson.App.5893.

**5.**  In the middle of the 60-day opt-out period—on October 2, 2020—the Securities Plaintiffs filed a motion seeking authorization to opt-out of the Third-Party-Release Provision on behalf of all putative class members in the Securities Litigation.  Patterson.App.5002.  In the alternative, they requested that the bankruptcy court certify a class under Federal Rules of Bankruptcy Procedure 7023 and 9014 "for the limited purpose" of allowing them to opt-out of that release on behalf of putative class members in their case.  Patterson.App.5003.  Ascena objected, and instead of asking the bankruptcy court to promptly rule, the Securities Plaintiffs adjourned consideration of the motion eight separate times, such that the bankruptcy court did not hear the motion until February 25, 2021—the same day that the court considered plan confirmation.  *See* Patterson.App.5335, 5491, 5726, 6300, 6302, 6304, 6554, 6680.

**6.** At the February 25 hearing, the bankruptcy court first addressed objections to confirmation. *See* UST.App.2673-2809. By that point, only the Securities Plaintiffs, the U.S. Trustee, and the SEC, among hundreds of thousands of parties, continued to object to Ascena's proposed plan. In their written objections, these parties reiterated the arguments pressed at the disclosure-statement stage—namely, that the Third-Party-Release Provision failed to comply with the Fourth Circuit's *Behrmann* decision and that affording parties notice and an opportunity to opt-out of that provision did not constitute consent. *See* UST.App.2201-14, 2215-23, 2224-58, 2268-2313, 2314-17. The U.S. Trustee also reiterated his argument that the Exculpation Clause does not satisfy *Behrmann* and is overly broad. *See* UST.App.2315.

At the confirmation hearing, however, only Ascena submitted evidence in support of the Third-Party-Release and Exculpation Provisions, and the U.S. Trustee declined to cross-examine any Ascena witnesses. *See* UST.App.2684-85. Thus, the bankruptcy court heard uncontroverted evidence from Ascena's then-President and then-Interim Executive Chair that these provisions "were the product of extensive good-faith, arm's length negotiations" and "were material inducements for the parties to enter into the comprehensive settlement embodied by the Plan," and that they "were an integral part of the global settlement negotiated among the parties." UST.App.2885; *see* UST.App.2330. In addition, the court heard uncontroverted evidence from a member of the special committee about that committee's extensive

21

inquiry into the propriety of the Third-Party-Release and Exculpation Provisions and its conclusion that those provisions "were integral parts of the parties' negotiations in reaching a holistic, successful restructuring."   UST.App.2886; *see* Patterson.App.7042.   And the court also heard uncontroverted evidence about Ascena's "comprehensive noticing process" regarding the Third-Party-Release Provision. UST.App.2886.

After hearing the evidence and considering the arguments, the bankruptcy court confirmed the plan. *See* UST.App.2782.  The court described the case as "terribly complex" but also "terribly successful," noting that it "allowed the enterprise to continue so that the jobs have been preserved, vendors can continue to supply their product, and we have the enterprise value that's going to go on." UST.App.2780-81.  As the court put it, such an "absolutely phenomenal" outcome "in this environment" does not just "happen"; rather, it was the product of "all the constituencies" coming to "some sort of consensual resolution" that was "the best deal that could be put together."  UST.App.2780-82.  The court specifically noted that "each part of the plan is very, very important" because it was "all part of the process that gets us to this point, and people have to rely on it."  UST.App.2781.  In particular, the court observed, the plan's releases "were integral to the process" because they got the constituencies "invested in the process" and willing to "go[]

through" with it to the end.  UST.App.2782.  Those releases, moreover, were "consensual" and permissible in light of the "opt-out procedure."  UST.App.2782-83.

The court subsequently elaborated on its decision in a detailed written opinion.  *See* UST.App.2837-76.  Addressing the Third-Party-Release Provision, the court explained that the *Behrmann* factors apply only when a plan's releases "are non-consensual."  UST.App.2866.  The court concluded that the Third-Party-Release Provision is consensual because, by its "plain language," the release "only applies to parties who did not opt out or object to the Plan"; Ascena "employed all reasonable efforts to provide notice" to its current and former shareholders; and the opt-out notice "clearly, unambiguously, and conspicuously" gave shareholders "adequate information to allow them to make an informed decision concerning the Third-Party Release[]," as underscored by the fact that 596 parties opted-out.  UST.App.2867, 2869-71.  Finally, the court held that the Securities Plaintiffs lacked standing to contest the Third-Party-Release Provision given that they had, in fact, "opted out" of it.  UST.App.2873.[3]

The bankruptcy court then found the Exculpation Provision appropriate as well.  The court explained that "the uncontroverted evidence established that the

---

[3] The bankruptcy court also explained that, even if the Third-Party-Release Provision were nonconsensual, it would be permissible under *Behrmann* for the detailed reasons that Ascena provided in its confirmation brief.  *See* UST.App.2874 n.28.

Exculpation Provision is narrowly tailored and appropriate under the circumstances" and that it is "an integral part of the Plan." UST.App.2875. "Without the Exculpation Provision," the court continued, "there is no evidence that the stakeholders would have been willing and able to reach such a successful negotiated result in these Bankruptcy Cases and as encapsulated by the Plan." UST.App.2875.

In a separate opinion, the bankruptcy court denied the Securities Plaintiffs' motion to opt-out of the Third-Party-Release Provision on behalf of the putative class in the Securities Litigation. *See* Patterson.App.7654-59. After stating that the Securities Plaintiffs "inexplicably waited" to bring their motion on for hearing until confirmation—in an apparent attempt "to frustrate [Ascena]'s emergence from bankruptcy"—the court held that the Securities Plaintiffs "have no inherent authority to opt out of the Third-Party Release[] on behalf of the putative class" in the Securities Litigation. Patterson.App.7645, 7654, 7658. The court also declined to certify a class under Bankruptcy Rule 7023, because the Securities Plaintiffs "g[a]ve no explanation for why the Court should apply Bankruptcy Rule 7023 in the first place." Patterson.App.7655-56.

**7.** On March 5, 2021, Ascena's plan became effective and substantially consummated. UST.App.2889; *see* UST.App.2464 ("'Substantial Consummation' of the Plan … shall be deemed to occur on the Effective Date."). Among other things, Ascena has distributed over $378 million to holders of secured claims, including the

Term Lenders; paid approximately $2.7 million to holders of priority and administrative claims; funded the GUC Trust with $7.25 million; assumed and assigned or rejected executory contracts and unexpired leases; and cancelled shares of common equity. *See* UST.App.2889; Bankr.Dkt.2308. The Third-Party-Release and Exculpation Provisions, as well as all other provisions "integral" to the plan, took effect on March 5, too. UST.App.2897-98.

On March 11, 2021—the very last day possible to notice an appeal—the Securities Plaintiffs appealed the confirmation order and the denial of their motion. Two weeks later, on March 25—the very last day possible for his appeal, *see* Fed. R. Bank. P. 8002(a)(3)—the U.S. Trustee appealed the confirmation order. Another five days passed before the U.S. Trustee, on March 30, moved to stay the Third-Party-Release and Exculpation Provisions pending the resolution of this appeal. *See* UST.App.2880. The bankruptcy court denied that motion in a lengthy opinion. *See* UST.App.2877-2904. Subsequently, the U.S. Trustee filed an almost identical motion for stay in this Court, which was also denied. *See* Dkt.18.

## SUMMARY OF ARGUMENT

Ascena and its stakeholders achieved an "absolutely phenomenal" result amidst one of the most turbulent periods in recent history. Ascena's plan—including its Third-Party-Release and Exculpation Provisions—is a core component of its overall restructuring effort, and the bankruptcy court properly confirmed it. Because

Appellants' attack on the Third-Party-Release and Exculpation Provisions is flawed at every turn, the bankruptcy court's judgment should not be disturbed.

**I.**   This Court should dismiss this appeal because it is equitably moot.

**A.**   Under the equitable-mootness doctrine, bankruptcy courts may refuse to entertain the merits of an appeal from a confirmation order after considering whether the appellant obtained a stay of the order, whether the plan is substantially consummated, whether the appellant's requested relief would affect the plan's success, and whether the appellant's requested relief would affect third parties.  All four factors clearly support equitable mootness here:  Two courts resoundingly rejected the U.S. Trustee's stay request, and Appellants made no effort to expedite their appeal; the plan—including the Third-Party-Release and Exculpation Provisions—took full effect over six months ago; those provisions are integral to and inseparable from the plan; and transactions involving hundreds of millions of dollars and countless third parties have already occurred in reliance on the validity of the plan and the releases contained therein.  This appeal therefore is a poster child for equitable mootness.

**B.**   The arguments that the U.S. Trustee has advanced against equitable mootness are unavailing.  Contrary to the U.S. Trustee's contentions, the Fourth Circuit still recognizes the equitable-mootness doctrine, which fully applies to government appeals.  The U.S. Trustee's argument that he satisfies the four-factor equitable-mootness test is even weaker now than the last time he advanced it.  And the capable-

26

of-repetition-yet-evading-review doctrine applies only in cases involving constitutional mootness, not equitable mootness, and is not satisfied here regardless because Appellants could seek a stay to preserve the issue for review.

**II.**  If the Court addresses the merits, it should affirm.  Appellants principally challenge the plan's Third-Party-Release Provision, but that provision is clearly permissible.

**A.**  Bankruptcy courts have broad equitable authority under §1123(b)(6) and §105(a) of the Bankruptcy Code to confirm plans with any necessary and appropriate provisions.  They routinely invoke that authority to confirm plans containing consensual third-party-release provisions, and they consistently hold that, if affected parties receive adequate notice of a release containing an opt-out procedure, the provision is consensual.  The Third-Party-Release Provision here is just such a provision:  It contains an opt-out mechanism, and Ascena provided sufficient notice to affected parties of the provision and the means for opting-out.  Hundreds of parties did opt-out, and the decisions of those who did not must be respected, particularly given that none of those parties is challenging the Third-Party-Release Provision.

**B.**  Appellants' contrary arguments are meritless.  To begin, although the Securities Plaintiffs wish to challenge the Third-Party-Release Provision on behalf of putative class members in the Securities Litigation, they lack standing to do so.  Re-

gardless, no argument from the Securities Plaintiffs—or the U.S. Trustee—withstands scrutiny. First, the bankruptcy court unquestionably had statutory and constitutional authority to approve that provision. Second, the Fourth Circuit's *Behrmann* decision applies only to nonconsensual third-party-release provisions, not consensual provisions like the one here. Third, the Third-Party-Release Provision is consensual in light of the opt-out mechanism, and the notion that such procedures cannot render a release consensual defies a wall of precedent to the contrary as well as basic contract law—while calling into question the legitimacy of the very kind of class-action litigation that the Securities Plaintiffs fervently wish to pursue. Fourth, the U.S. Trustee forfeited his argument that certain parties received inadequate notice of the opt-out procedures, which is meritless regardless, and the Securities Plaintiffs' notice-related argument misstates the record and the law.

**C.** Even assuming the Third-Party-Release Provision must satisfy *Behrmann*, the bankruptcy court correctly determined that it does so. Every *Behrmann* factor supports upholding the Third-Party-Release Provision, and Appellants identify no basis for concluding otherwise or deeming the provision impermissible.

**III.** The bankruptcy court also properly approved the Exculpation Provision.

**A.** To ensure that parties who contributed to a restructuring effort do not have to face an onslaught of meritless negligence suits, bankruptcy courts routinely exercise their equitable authority under §1123(b)(6) and §105(a) to approve exculpation

provisions that are properly limited and not overly broad.  The Exculpation Provision here readily satisfies that standard:  It implicates conduct only between Ascena's petition date and the plan's effective date, it applies only to parties who played a critical role in Ascena's restructuring, and it expressly excludes serious misconduct.

**B.**  The U.S. Trustee—the only party challenging the Exculpation Provision—offers no valid reason as to why it is impermissible.  The U.S. Trustee insists that *Behrmann* applies to exculpation provisions, but he overreads *Behrmann*, and neither case law nor the leading treatise supports his position.  The U.S. Trustee's four narrower arguments are likewise unavailing.  First, the U.S. Trustee claims that exculpation provisions should not extend beyond estate fiduciaries, but he concedes that courts disagree with him.  Second, the U.S. Trustee argues that the Exculpation Provision extends to parties who did not play an important role in Ascena's restructuring, but the bankruptcy court made contrary determinations; furthermore, the U.S. Trustee cannot credibly explain why the ability to bring negligence suits against such parties (and non-estate fiduciaries) is the difference-maker when it comes to the propriety *vel non* of an exculpation provision.  Third, the U.S. Trustee asserts that the Exculpation Provision should not apply to conduct arising from the attorney-client relationship, but like many of his arguments, he forfeited this contention below, and

he provides no support for it now.  Fourth, the U.S. Trustee complains that the Ex-culpation Provision fails to respect the bankruptcy court's "gatekeeper function," but his only support is an easily distinguishable case.

**IV.**  The bankruptcy court did not abuse its discretion in addressing the legal-ity of the Third-Party-Release and Exculpation Provisions at the confirmation stage. The U.S. Trustee argues that the bankruptcy court refused to second-guess a collu-sive request by Ascena and the Term Lenders to approve the Third-Party-Release Provision—but that assertion rests on astonishing mischaracterizations of the record. The U.S. Trustee also insists that the bankruptcy court should have addressed the validity of the Third-Party-Release and Exculpation Provisions at the disclosure-statement stage—but that contention ignores that the U.S. Trustee agreed that the bankruptcy court should resolve those objections at the confirmation stage, not the disclosure-statement stage.

## ARGUMENT

## I.    The Court Should Dismiss This Appeal As Equitably Moot.

In this bankruptcy appeal, as in so many others, "[m]ootness is the threshold issue."  *In re McLean Square Assocs., G.P.*, 200 B.R. 128, 131 (E.D. Va. 1996), *aff'd*, 107 F.3d 866 (4th Cir. 1997).  Because this appeal is equitably moot, the Court should dismiss it without reaching the merits.

### A.     Each Equitable-Mootness Factor Is Easily Satisfied.

"The doctrine of equitable mootness represents a pragmatic recognition by courts that reviewing a judgment may, after time has passed and the judgment has been implemented, prove 'impractical, imprudent, and therefore inequitable.'" *U.S. Airways*, 369 F.3d at 809.  Four factors inform the determination of "whether the requested relief can, as a practical matter, be granted:  (1) whether the appellant sought and obtained a stay; (2) whether the reorganization plan or other equitable relief ordered has been substantially consummated; (3) the extent to which the relief requested on appeal would affect the success of the reorganization plan or other equitable relief granted; and (4) the extent to which the relief requested on appeal would affect the interests of third parties." *Id.*  A straightforward application of these factors confirms that this appeal is equitably moot.

*First*, it is indisputable that no appellant obtained a stay of the orders challenged on appeal.  In fact, only the U.S. Trustee even tried—but he inexplicably waited *33 days* (until March 30, 2021) after the February 25 confirmation order to move to stay that order.  The U.S. Trustee also made no effort to expedite consideration of his stay motion; consequently, the bankruptcy court did not hear the motion until May 13, and it did not issue its opinion denying the motion until May 28.  In the meantime, the plan was not only substantially consummated on March 5 but "fully consummated" by the time of the bankruptcy court's decision, with hundreds

31

of millions of dollars changing hands among many third parties.  UST.App.2889.

"By making that strategic choice" not to seek a stay for 33 days or to seek expedited

consideration, the U.S. Trustee "allowed the reorganization plan to go into effect,

taking the risks that attended such a decision."  *Mac Panel*, 283 F.3d at 625; *see*

*Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Serv. US,*

*LLC*, 578 B.R. 325, 349 (E.D. Va. 2017) (finding equitable mootness where appel-

lant did not "seek expedited consideration" of stay motion, such that bankruptcy

court did not consider motion until "almost one month after the Plan had become

effective").

The U.S. Trustee also did not seek expedited consideration of his stay motion

in this Court; nor, for that matter, have Appellants made any efforts to accelerate

consideration of their appeal on the merits.  To the contrary, they filed their notices

of appeal on the last days possible (March 11 and 25); moreover, after this Court

consolidated the appeals on April 28 and ordered the parties to submit a single brief-

ing schedule, Appellants proposed and obtained a schedule under which their open-

ing briefs were due on June 28—two months later, and over four months after the

confirmation order.  *See U.S. Airways*, 369 F.3d at 809-10 (finding equitable moot-

ness where appellant did not "expedite its appeal" and debtor meanwhile "imple-

mented its reorganization plan by completing hundreds of transactions with third

parties").  In short, not only did Appellants fail to obtain a stay of the challenged

orders, but they failed to take any other steps that could have helped avoid or mini-mize consummation of the plan, which is the very point of seeking and obtaining a stay in the first place.[4]  Thus, the first equitable-mootness factor weighs strongly in favor of equitable mootness.

Second, the plan is substantially consummated—and then some.  Substantial consummation is defined in the Bankruptcy Code to involve (1) "[t]ransfer of all or substantially all of the property proposed by the plan to be transferred"; (2) "[a]ssumption by the debtor or the successor to the debtor under the plan of the busi-ness or of the management of all or substantially all of the property dealt with by the plan"; and (3) "[c]ommencement of distribution under the plan."  *Mac Panel*, 283 F.3d at 625-26; *see* §1101(2).  All of those events have taken place; as the bankruptcy court determined, the plan was "substantially consummated" on March 5 and "fully consummated" by late May 2021.  UST.App.2889, 2903.  In other words, many months ago, the Third-Party-Release and Exculpation Provisions took effect, and they have remained in effect ever since.  *See* UST.App.2897.  Furthermore, numer-ous transactions contemplated by the plan have been entered into by numerous par-

---

[4] The Securities Plaintiffs did not even independently seek a stay, but instead filed perfunctory "joinders" to the U.S. Trustee's stay motions—nine and thirteen days after those motions, respectively.  *See* Bankr.Dkt.1997; Dkt.29.

ties who relied on those releases in agreeing to the transactions, including a distribution of nearly $400 million to prepetition lenders; the distribution of nearly $3 million to priority and administrative claimants; the funding of the GUC Trust with $7.25 million; the appointment of a GUC Trust trustee; the cancellation of Ascena shares; the rejection and assumption, or assumption and assignment, of executory contracts and unexpired leases; the removal of Ascena's Board of Directors and the discharge of their duties; and the implementation of a plan administrator.  *See* UST.App.2889; Bankr.Dkt.2308.  These are textbook examples of substantial consummation.  *See, e.g.*, *Mac Panel*, 283 F.3d at 625-26; *In re Shawnee Hills, Inc.*, 125 F.App'x 466, 470 (4th Cir. 2005); *Mar-Bow*, 578 B.R. at 349-50.  The second equitable-mootness factor thus "weighs heavily" in favor of equitable mootness, too. *U.S. Airways*, 369 F.3d at 810.

Third, Appellants' requested relief on appeal unquestionably would "affect the success of the reorganization plan."  *Mac Panel*, 283 F.3d at 625.  As the bankruptcy court determined based on the "uncontroverted evidence," the Third-Party-Release and Exculpation Provisions are "integral" to Ascena's plan because they embody promises upon which the numerous stakeholders relied in agreeing to the plan and the many interrelated transactions (and compromises) contemplated therein.  UST.App.2893-94.  Indeed, the plan explicitly states that, upon confirmation—*i.e.*, the point at which all of those transactions have been approved and must

34

move forward—the two provisions are "nonseverable" from the plan (language to which "[n]o party … objected" below).  UST.App.2667, 2899 (emphasis omitted). Accordingly, it is impossible to excise those provisions from the plan without throwing it and Ascena's restructuring into disarray; disrupting the "release and exculpation provisions" now "would risk not only disrupting" various "core transaction[s] of the Plan," but also "unravelling the 'web of interrelated settlements that had been painstakingly woven together' and the 'hard-fought global peace' that the Plan achieved"—all of which "weighs in favor of finding that [this] appeal is equitably moot."  *Mar-Bow*, 578 B.R. at 350-51; *cf. Behrmann*, 663 F.3d at 714 (finding no equitable mootness where plan "expressly provides that any clause may be severed should it be determined to be unenforceable, which suggests that the plan would remain viable absent the Release Provisions").

*Finally*, Appellants' requested relief would significantly "affect the interests of third parties."  *Mac Panel*, 283 F.3d at 625.  At bottom, Appellants seek an order that would either render the Third-Party-Release and Exculpation Provisions categorically unenforceable or otherwise unilaterally decree that all "releasing parties" have in fact opted-out of those provisions.  *See* UST.Br.51; Patterson.Br.86-87. Such relief would necessarily affect "thousands of parties" not before this Court who are now enjoying the benefits of those provisions.  UST.App.2895 n.15.  For example, parties subject to the Third-Party-Release Provision currently receive an

"Avoidance Action Waiver," and shareholders are included as "Released Parties"; however, parties who opt-out do not enjoy either of these benefits. *See* UST.App.2625, 2846.  Appellants' insistence that those parties *must* be deemed to have opted-out would thus expose them to "significant" litigation risk. UST.App.2895 n.15.  Furthermore, the parties defined as "exculpated parties"—*i.e.*, "skilled individuals" who "assist[ed] in the reorganization efforts," *Alpha*, 556 B.R. at 260-61—would also face heightened litigation risk, as they are currently exposed only to claims for "actual fraud, willful misconduct, or gross negligence" UST.App.2659-60, but would now "be second-guessed and hounded" by parties asserting "meritless" negligence actions, *Alpha*, 556 B.R. at 261.

On top of that, as already noted, eliminating the Third-Party-Release and Exculpation Provisions would invariably impact the plan as a whole because the plan's text and the uncontroverted evidence establish that the two provisions are "nonseverable."  Accordingly, the entire plan—and every third-party transaction entered into in "reli[ance] upon [its] confirmation and success," *U.S. Airways*, 369 F.3d at 810—would be upended, which unquestionably would have broad ramifications on "all the constituencies" who benefited from the "absolutely phenomenal" outcome embodied by the plan.  UST.App.2782; *cf. In re Bate Land & Timber LLC*, 877 F.3d 188, 195-96 (4th Cir. 2017) (finding no equitable mootness where "[t]his case es-

sentially presents a two-party dispute because [appellant] is the Debtor's largest se-cured creditor" and "Debtor has not engaged in significant transactions with third parties who relied on the Confirmed Plan's terms"). It thus cannot be seriously dis-puted that the fourth and final equitable-mootness factor likewise militates in favor of equitable mootness. *See, e.g.*, *U.S. Airways*, 369 F.3d at 810-11 (declining appel-lant's requested relief, and finding equitable mootness, because "apart from the dam-age inflicted on this massive reorganization plan, we would shake the reliance that businesses, investors, and the public place on the finality of bankruptcy confirmation orders"); *Mac Panel*, 283 F.3d at 626.

## B. The U.S. Trustee's Contrary Arguments Are Meritless.

In prior stay-related briefing, the U.S. Trustee asserted three arguments in an effort to evade equitable mootness. *See* Dkt.28 at 3-9; Bankr.Dkt.2114 at 2-12. Ap-parently recognizing that the doctrine continues to present a serious obstacle, the U.S. Trustee's opening brief here signals that he intends to repeat those arguments on appeal. *See* UST.Br.49-50. They are uniformly meritless.

First, the U.S. Trustee has suggested that the equitable-mootness doctrine did not survive the Supreme Court's 2014 decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), or, alternatively, that it does not apply to government appeals. *See* Dkt.28 at 3-5; Bankr.Dkt.2114 at 2-5. But subsequent to *Lexmark* (which said nothing about bankruptcy), the Fourth Circuit

and courts within it have regularly invoked equitable mootness,[5] and the Supreme Court has just as regularly denied certiorari of petitions challenging equitable mootness as conflicting with *Lexmark*. *See, e.g.*, *In re Fetner*, 801 F.App'x 189 (4th Cir. 2020), *cert. denied sub nom. Fetner v. Wilmington Sav. Fund Soc'y*, 2021 WL 1520818 (U.S. Apr. 19, 2021). Similarly, courts of appeals consistently address equitable mootness even when the U.S. Trustee is an appellant. *See, e.g.*, *In re Zenith Elecs. Corp.*, 329 F.3d 338, 340 (3d Cir. 2003); *In re GWI PCS 1 Inc.*, 230 F.3d 788 (5th Cir. 2000); *In re S.S. Retail Stores Corp.*, 216 F.3d 882, 884-85 (9th Cir. 2000). No court has held that the doctrine is inapplicable when the government appeals, and the U.S. Trustee cites no case so holding.

Second, the U.S. Trustee has suggested that, even if the equitable-mootness doctrine applies here, the four equitable-mootness factors purportedly support his position. *See* Dkt.28 at 5-8; Bankr.Dkt.2114 at 5-10. That contention is unavailing—even more so now than several months ago when the U.S. Trustee first advanced it. As to the first factor, although the U.S. Trustee could previously claim

---

[5] *See, e.g.*, *Clark v. Council of Unit Owners of 100 Harborview Drive Condo.*, 2021 WL 2157604 (4th Cir. May 27, 2021); *In re Myers*, 773 F.App'x 161 (4th Cir. 2019); *Alpha*, 736 F.App'x 412; *Bate Land*, 877 F.3d 188; *Wilmington Tr., Nat'l Ass'n v. Lord & Taylor LLC*, 2021 WL 3089105 (E.D. Va. July 22, 2021); *Brea Union Plaza I, LLC v. Toys R Us, Inc.*, 2018 WL 3543056 (E.D. Va. July 23, 2018); *Parson v. Matson*, 2018 WL 1855964 (E.D. Va. Apr. 18, 2018); *Warnick v. Arrowsmith*, 2017 WL 2999025 (E.D. Va. July 14, 2017).

that he was "seeking a stay," Dkt.28 at 6—albeit belatedly—he did not obtain a stay, and he made no other efforts to expedite this case or otherwise avoid or minimize the plan's consummation.  Further, the U.S. Trustee's arguments on the second and third factors—that the Third-Party-Release and Exculpation Provisions were not "substantially consummated" and that the plan's "severability" provision shows that his requested relief would not affect the plan's success, Dkt.28 at 6-7—are contradicted by the plan's plain text, which leaves no doubt that those provisions took effect over six months ago and that "there is no severability provision in the Plan upon which the Court can rely."  *See* UST.App.2464, 2897, 2899.  And the U.S. Trustee's arguments on the fourth factor—that his requested relief would "not adversely impact third parties," Dkt.28 at 8—relies entirely on *Behrmann*, which addressed a plan that contained a severability provision applicable after confirmation, contrary to the plan here.  *See Behrmann*, 663 F.3d at 714.

Finally, the U.S. Trustee has asserted that the capable-of-repetition-yet-evading-review exception to mootness applies here.  Dkt.28 at 8; Bankr.Dkt.2114 at 2-12.  But the capable-of-repetition doctrine is an exception to *constitutional* mootness, not *equitable* mootness.  *See, e.g.*, *Kingdomware Techs., Inc. v. United States*, 136 S.Ct. 1969, 1976 (2016); *In re K&D Indus. Servs. Holding Co.*, 2021 WL 949531, at *2 (E.D. Mich. Mar. 12, 2021) ("[A] review of the case law considering this exception to mootness suggests that it only applies to Article III mootness[.]"),

*aff'd*, 850 F.App'x 966 (6th Cir. 2021); *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 2018 WL 1229989, at *5 (C.D. Cal. Jan. 19, 2018) (same).  For good reason, then, the U.S. Trustee has not identified one example in which a court has applied the capable-of-repetition exception in a dispute involving *equitable* mootness.[6]  Regardless, the capable-of-repetition exception does not apply here.  "As many … circuits have held, '[w]here prompt application for a stay pending appeal can preserve an issue for appeal, the issue is not one that will evade review,'" and "it does not matter that the … stay was ultimately denied."  *Stansell v. Revolutionary Armed Forces of Colombia (FARC)*, 772 F.App'x 772, 777 (11th Cir. 2019).  That statement describes this case almost to a tee; the only difference is that the U.S. Trustee sat on his stay request for weeks as Ascena's plan took effect.

In short, the U.S. Trustee's "defense" to equitable mootness is no defense at all.  As a result, this Court should dismiss this appeal without proceeding further.

---

[6] The U.S. Trustee's only support is a decision stating that "[o]ne exception to the equitable mootness doctrine is applied when the claim is capable of repetition, yet evades review."  *In re Conley*, 369 B.R. 67, 71 (B.A.P. 1st Cir. 2007).  But the decision that *Conley* cited for that proposition, *Ramirez v. Sanchez Ramos*, 438 F.3d 92 (1st Cir. 2006), involved constitutional mootness, not equitable mootness.  Regardless, *Conley* acknowledged that the parties had not briefed the issue, and it chose to "bypass[]" it because affirmance on the merits was "easily" warranted.  369 B.R. at 71.

## II. The Bankruptcy Court Properly Approved The Third-Party-Release Provision.

If the Court nevertheless reaches the merits, it should affirm, as the bankruptcy court properly confirmed Ascena's plan. Appellants principally dispute the validity of the Third-Party-Release Provision. *See* Patterson.Br.31-86; UST.Br.28-42. The bankruptcy court properly rejected their baseless challenges.

### A. The Third-Party-Release Provision is Consensual and Permissible.

#### 1. The Bankruptcy Code, case law, and sound policy firmly support the use of third-party releases with opt-out mechanisms in Chapter 11 plans.

A bankruptcy court "applies the principles and rules of equity jurisprudence," *Pepper v. Litton*, 308 U.S. 295, 304 (1939), and the "traditional understanding" is that bankruptcy courts enjoy "broad" equitable powers, *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990). Section 105(a) of the Bankruptcy Code codifies that understanding and states that bankruptcy courts may issue any "necessary or appropriate" orders to "carry out the provisions" of the Code. §105(a). Section 1123(b)(6) of the Code then confirms that this broad authority continues to exist during plan confirmation, for it provides that a bankruptcy court may approve a plan containing "any … appropriate provision not inconsistent with" the Code. §1123(b)(6).

"One example of a provision" that "has been included in chapter 11 plans pursuant to section 1123(b)(6) is a clause that enjoins the prosecution of future claims against a nondebtor entity." 7 *Collier* ¶1123.02[6][a]. A majority of courts

41

of appeals have concluded that, under certain circumstances, bankruptcy courts may approve plans containing such third-party-release provisions even when the releasing parties do *not* consent to them. *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1077-78 (11th Cir. 2015) (observing that at least eight courts of appeals are "pro-release"). The Fourth Circuit's decision in *Behrmann* exemplifies that majority view. There, "'non-consenting creditor[s]'" asserted that "equitable relief in the form of nondebtor releases is never permissible under the Bankruptcy Code," but the court emphatically rejected that assertion as "without merit." *Behrmann*, 663 F.3d at 710. The Fourth Circuit instead concluded that a bankruptcy court is "empowered" to approve third-party-release provisions "where circumstances warrant" and "commend[ed]" six factors for courts to consider when addressing the validity of nonconsensual versions of such provisions in Chapter 11 plans. *Id.* at 711-12; *see* 8 *Collier* ¶1141.02[5][c] & n.67 (citing *Behrmann* in noting that "a majority of courts that have considered the question have found that nonconsensual third-party releases … may be permitted in certain instances").

If *nonconsensual* third-party-release provisions are consistent with the Bankruptcy Code, *consensual* versions of such provisions are *a fortiori* consistent. Case law confirms the point. As this Court recognized when denying the U.S. Trustee's stay motion, "[m]ost courts allow consensual nondebtor releases to be included in a plan." Dkt.33 at 13; *see, e.g.*, *In re Specialty Equip. Companies, Inc.*, 3 F.3d 1043,

1047 (7th Cir. 1993) ("[C]ourts have found releases that are consensual and non-coercive to be in accord with the strictures of the Bankruptcy Code."); Jason W. Harbour & Tara L. Elgie, *The 20-Year Split: Nonconsensual Nondebtor Releases*, 21 Norton J. Bankr. L. & Prac. 4 Art. 4 (2012) ("[T]here is little dispute that if non-debtors consent, bankruptcy courts may authorize nondebtor releases[.]").  And the "few decisions" that "have adopted a contrary position all rely upon a Seventh Circuit case that was subsequently overturned."  Joshua M. Silverstein, *Hiding in Plain View: A Neglected Supreme Court Decision Resolves the Debate over Non-Debtor Releases in Chapter 11 Reorganizations*, 23 Emory Bankr. Dev. J. 13, 25-26 (2006) (footnotes omitted) (citing *Union Carbide Corp. v. Newboles*, 686 F.2d 593 (7th Cir. 1982)).

The reason why courts "generally approve" consensual third-party-release provisions is self-evident:  Such a provision "is no different from any other contract or settlement" consummated on a consensual basis.  8 *Collier* ¶1141.02[5][b]; *see* 7 *Collier* ¶1129.01[1] ("As to agreed provisions, the plan is a contract between the proponent and those bound by it.").  As a result, so long as the third-party-release provision "satisfies the requirements for a binding agreement," the "vast majority of courts believe it is perfectly valid under the Code."  Silverstein, *supra*, at 25.

Of central relevance here, courts nationwide have found those requirements satisfied when examining "opt out-third-party releases":  After all, if parties are

"given sufficient notice of a chapter 11 plan's third-party release provision and opportunity to 'opt out' of such release, failure to opt out is a sufficient manifestation of consent to the third-party release." 8 *Collier* ¶1141.02[5][b]; *see, e.g.*, *Stein Mart*, 2021 WL 1216557, at *5; *Vista Proppants*, 2020 WL 6325526, at *7; *Gen. Wireless*, 2017 WL 5461361, at *10; *Indianapolis Downs*, 486 B.R. at 306; *DBSD*, 419 B.R. at 218; *Conseco*, 301 B.R. at 528; *see also* UST.App.2867 n.22 (providing several other examples from the U.S. Bankruptcy Court for the Eastern District of Virginia); 2 *Williston on Contracts* §6:50 (4th ed. 2021) ("[S]ilence and inaction will operate to bind the offeree to a contract … when the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer.").

Interpreting inaction as consent when a party is adequately notified that inaction will yield consent is not a novel concept.  Indeed, that is how bankruptcy practice typically works:   As a "general[]" matter, "[t]he Bankruptcy Code requires … that upon receipt of notice of a pending event," an "affected party must take some affirmative action to preserve the party's rights; in the absence of such affirmative action, such rights are lost."  UST.App.2892.  Thus, for instance, bankruptcy courts resolve all manner of motions using "negative notice" procedures—that is, courts may resolve motions without an "actual hearing" if "notice" of such a

hearing "is given properly" but "such a hearing is not requested timely" by the opposing party.  §102(1)(B)(i); *see Stein Mart*, 2021 WL 1216557, at *5 ("The non-return of the [opt-out] form indicates acceptance of the terms offered, in the mode and manner prescribed in the Third-Party Release ... [T]his mode and manner of acceptance essentially mimics the bankruptcy court's own negative-notice procedure."); *cf. In re Pierce*, 435 F.3d 891, 891 (8th Cir. 2006) ("Negative notices are ... authorized by the Code." (citing *In re Looney*, 823 F.2d 788, 791 (4th Cir. 1987)).  Similarly, "at the onset of an asset case, notice is provided to all creditors of the deadline to file a proof of claim in order to maintain any right to distribution from the bankruptcy estate," and "[o]bjections to filed proofs of claim work in similar fashion."  UST.App.2892.

Nor is consent via inaction following sufficient notice unique to bankruptcy law.  Consider class-action litigation.  If a class representative wishes to certify a class under Civil Rule 23(b)(3), he must provide adequate "'notice'" to class members and instruct them of their right to "opt out."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (quoting Fed. R. Civ. P. 23(c)(2)); *see Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 812 (1985) ("[W]e hold that due process requires ... that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court.").  A "class member who is afforded an opportunity to opt out, but who fails to exercise

that option, will be deemed to have consented to jurisdiction and will be bound by the class action proceedings." 1 *McLaughlin on Class Actions* §5:78 (17th ed. 2020).

### 2. The Third-Party-Release Provision readily satisfies applicable law.

The foregoing leaves no doubt that the Third-Party-Release Provision is appropriate. That provision effects a release of only those claims that belong to a party defined in the plan as a "Releasing Party," *see* UST.App.2659, and the plan's definition of "Releasing Party" explicitly excludes a party who "elects to opt out of the release[]" or who "timely objects to the release[] … and such objection is not resolved before Confirmation." UST.App.2625. Put another way, the "plain language" of the plan makes clear that the provision is "entirely voluntary" and "consensual," as the bankruptcy court correctly determined below. UST.App.2867, 2888.

Nor is the Third-Party-Release Provision consensual merely on paper, as Ascena provided the relevant parties "sufficient notice" of the provision and explained precisely how they could opt-out. UST.App.2867. Virtually every party in this sprawling bankruptcy case agreed: Only the Securities Plaintiffs and the SEC raised any notice-related concerns to the bankruptcy court, and those concerns pertained solely to Ascena's current and former shareholders, including those in the putative class in the Securities Litigation. *See* UST.App.725-26, 921-22, 924-28, 931-32, 936-42. Moreover, Ascena *revised* the opt-out notice to shareholders to

accommodate the SEC's concerns, with the modified notice stating in clear and un-mistakable terms:  "**[Y]ou will be deemed to have released whatever claims you may have against many other people and entities (including company officers and directors) unless you return the enclosed 'Release Opt-Out Form' by October 13, 2020, at 5:00 P.M.** prevailing Eastern Time."  UST.App.1541 (emphasis in original).  And Ascena later extended that opt-out deadline by 30 days to November 15, 2020, thereby giving shareholders 60 days to make their decisions, UST.App.2847 n.12—a period of time that courts view as more than sufficient in comparable circumstances, *cf.* 1 *McLaughlin* §5:78 (explaining that, in class-action litigation, "[c]ourts ordinarily will approve objection/opt-out periods of between approximately 30 and 60 days from the time the notice is sent").  Ascena also ensured broad distribution of the opt-out notice to current and former shareholders by mailing the notice directly to registered shareholders and working closely with nominees to provide the notices to beneficial shareholders.  UST.App.2848-49.  There is no better evidence that this notice process "worked as it should have" than the fact that it produced 596 opt-outs, nearly 85% of which came from current and former Ascena shareholders.  *See* UST.App.2724, 2777; Patterson.App.5893.

As to those who decided not to opt-out of the Third-Party-Release Provision, the bankruptcy court properly exercised its "broad" equitable authority in respecting their wishes and approving the provision.  *Energy Res.*, 495 U.S. at 549.  As the

court observed, creditors or equity holders subject to the Third-Party-Release Provision who declined to opt-out could well have "believ[ed] that they will be better served" by "releas[ing] claims against non-debtors and obtaining the benefits offered to them by the proposed plan."  UST.App.2871.  Those benefits include, as to holders of claims, "a waiver of any avoidance action that might be otherwise brought against them," and, as to equity holders, a "mutual release," plus the fact that the Third-Party-Release Provision "promote[s] finality and prevent[s] parties from attempting to circumvent the Plan's terms," and also "serve[s] to avoid entanglement of the estates in expensive and protracted post confirmation litigation," UST.App.2871, 2893-95.  In short, the "uncontroverted evidence" demonstrates that the provision is "necessary" and "appropriate[]" in this bankruptcy case, UST.App.2893-94, rendering it exactly the type of discretionary provision that the Bankruptcy Code permits, *see* §105(a), §1123(b)(6).

## B.    Appellants' Counterarguments Lack Merit.

Appellants advance various and sundry arguments as to why the bankruptcy court improperly approved the Third-Party-Release Provision.  None is persuasive.

### 1.    The Securities Plaintiffs lack standing to challenge the Third-Party-Release Provision and cannot raise a challenge or opt-out on behalf of their putative class.

At the outset, the Securities Plaintiffs do not even have standing to challenge the Third-Party-Release Provision, for they indisputably "opted out" of the Third-

Party-Release Provision.  UST.App.2873.  Because "[o]nly a party 'directly and adversely affected pecuniarily' by the entry of an order constitutes a 'person aggrieved' by that order," and because only such persons possess bankruptcy appellate standing, *Mar-Bow*, 469 F.Supp.3d at 523, it follows that the Securities Plaintiffs cannot maintain their challenge against the Third-Party-Release Provision, *see, e.g.*, *In re Dynegy, Inc.*, 770 F.3d 1064, 1071 (2d Cir. 2014); *Talarico v. Ultra Petrol. Corp.*, 2020 WL 8361996, at *3 (S.D. Tex. Dec. 29, 2020).

The Securities Plaintiffs assert a cumbersome theory as to why "their own pecuniary interests are directly and adversely affected by" the Third-Party-Release Provision despite opting-out of that provision.  Patterson.Br.48.  According to the Securities Plaintiffs, if they can opt-out of the Third-Party-Release Provision on behalf of putative class members in the Securities Litigation, that putative class will initially include more parties; it is possible that those parties will decide to remain in the putative class rather than opting-out following class certification; a "larger" putative class will create a "greater … potential dollar amount"; and that greater potential dollar amount will place the Securities Plaintiffs in a "better position" to "fashion a resolution" "on behalf of the Class," which could ultimately affect the Securities Plaintiffs' "own pecuniary interests."  Patterson.Br.48.  The Securities Plaintiffs do not cite a single case supporting this tortuous approach to bankruptcy appellate standing, and for good reason:  "*[p]otential* pecuniary harm that requires

49

the completion of several steps does not constitute a *direct* pecuniary impact," as is required. *Mar-Bow*, 469 F.Supp.3d at 532 (emphases added).

The Securities Plaintiffs next suggest that their "appointment as lead plaintiffs in the Securities Litigation" gives them standing to challenge that provision because they are "closely allied" with the putative class members. Patterson.Br.49 (quoting *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 643-44 (2d Cir. 1988)); *see* Patterson.Br.82-84. But the Securities Plaintiffs are nothing like the small handful of parties whom courts have held are "closely allied" with third parties such that the former can assert the rights of the latter. *See, e.g.*, *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965) (allowing physicians to assert patients' privacy rights). Their principal case, *Kane*, does not suggest otherwise; on the contrary, the Second Circuit held that the appellant there could *not* "assert claims of … third parties." 843 F.2d at 643.

Indeed, the Second Circuit has squarely addressed and rejected the proposition that a party's "status as lead plaintiff in … securities litigation gives him standing to opt out of or object to the release on behalf of the putative class in the bankruptcy proceeding." *Dynegy*, 770 F.3d at 1068. The Securities Plaintiffs assert that *Dynegy* "appears to have been wrongly decided," Patterson.Br.82, but offer no explanation why. The Securities Plaintiffs also suggest that *Dynegy* is inapposite because the third-party-release provision there "carved out claims for fraud, willful misconduct,

50

and gross negligence," Patterson.Br.82 n.7, but *Dynegy* never hints that this "carve out" had any bearing on the standing analysis.

The Securities Plaintiffs are ultimately left to argue that the bankruptcy court erred in denying their motion to certify a new class, which ostensibly would have allowed them to opt-out on behalf of putative class members in the Securities Litigation. Patterson.Br.84-86.  But as the Securities Plaintiffs concede, the bankruptcy court had "broad discretion" in deciding whether to apply Bankruptcy Rule 7023, the gateway rule that enables bankruptcy courts to conduct a class-certification analysis. Patterson.Br.85; *see also* Fed. R. Bankr. P. 9014.  And as the Securities Plaintiffs do not dispute, they presented no argument below as to why the bankruptcy court should invoke Bankruptcy Rule 7023.  *See* Patterson.App.7656.  Nor do the Securities Plaintiffs dispute that their request for class certification came "far too late" in the proceedings, such that certifying a class would have "serve[d] only to throw the entire administration of the case into chaos."  Patterson.App.7645, 7659.

Indeed, the Securities Plaintiffs barely muster any argument at all for why the bankruptcy court erred in denying their motion.  At most, they assert that the court wrongly concluded that putative class members received adequate notice of the opt-out procedures.  Patterson.Br.85.  That argument is incorrect, *see* pp.72-73, *infra*, but regardless, it has nothing to do with whether class certification is appropriate,

much less demonstrates that the bankruptcy court abused its "broad discretion" in denying their motion.

> **2.    The bankruptcy court had statutory and constitutional authority to approve the Third-Party-Release Provision.**

Even assuming the Securities Plaintiffs possess standing, their merits arguments regarding the Third-Party-Release Provision—like the U.S. Trustee's—are fatally flawed.  Indeed, the Securities Plaintiffs (but not the U.S. Trustee) principally contend that the Court should eviscerate the Third-Party-Release Provision *without* reaching the merits, on the theory that the bankruptcy court lacked both statutory and constitutional authority to approve it.  *See* Patterson.Br.31-46.  This was the Securities Plaintiffs' eighth and last basis in their confirmation objection, where it was perfunctorily asserted and barely developed.  *See* UST.App.2242, 2289.  That unease made eminent sense, as the bankruptcy court quite obviously had authority to approve the Third-Party-Release Provision.

**a.**  While district courts have original and exclusive jurisdiction over bankruptcy cases and related proceedings, *see* 28 U.S.C. §1334(a)-(b), Congress has determined that "[e]ach district court may provide that any or all cases under [the Bankruptcy Code] and any or all proceedings arising under [the Code] or arising in or related to a case under [the Code] shall be referred to the bankruptcy judges for the district," *id.* §157(a); *see Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 670 (2015).  And "[w]hen a district court refers a case to a bankruptcy judge, that judge's

statutory authority depends on whether Congress has classified the matter as a 'core proceeding' or a 'non-core proceeding.'" *Wellness*, 575 U.S. at 670 (brackets omitted); *see* 28 U.S.C. §157(b)(2), (4).

Congress has identified 16 examples of core proceedings; among them are proceedings pertaining to the "confirmation of plans." 28 U.S.C. §157(b)(2)(L). And because confirmation proceedings are core proceedings, bankruptcy courts have express authority not only to "hear and determine" them, but also to "enter appropriate orders and judgment" in them, subject to normal appellate review in the district court. *Id.* §157(b)(1). That authority is different from the "more limited authority" that bankruptcy courts exercise in non-core proceedings: In those proceedings, bankruptcy courts may "hear and determine" and "enter appropriate orders and judgments" only "with the consent of all the parties to the proceeding," but otherwise are empowered only to "submit proposed findings of fact and conclusions of law" for the district court to review afresh. *Wellness*, 575 U.S. at 671; 28 U.S.C. §157(c)(2).

Although the statutorily enumerated core proceedings are those "in which [Congress] thought bankruptcy courts could constitutionally enter judgment," *Wellness*, 575 U.S. at 670, the Supreme Court clarified the issue in *Stern v. Marshall*, 564 U.S. 462 (2011). In *Stern*, the Supreme Court addressed whether a bankruptcy court had statutory and constitutional authority to enter final judgment on a state-

law counterclaim that the debtor had asserted against a claimant. *See id.* at 470-73. The Supreme Court concluded that, under the "plain text" of 28 U.S.C. §157(b)(2)(C), which provides that "'counterclaims by the estate against persons filing claims against the estate'" are core proceedings, the bankruptcy court clearly had statutory authority to resolve the counterclaim. *Stern*, 564 U.S. at 475. But the Supreme Court then determined that the bankruptcy court lacked constitutional authority to resolve the counterclaim, as it could not characterize it as "integral to the restructuring of the debtor-creditor relationship": That action did not "stem[] from the bankruptcy itself" or otherwise "flow from a federal statutory scheme," nor would it "necessarily be resolved in the claims allowance process." *Id.* at 493, 497, 499.

*Stern* left open, however, the question whether bankruptcy courts could enter final judgment in core proceedings outside their constitutional authority with the parties' consent. *See Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 31 n.4 (2014). In *Wellness*, the Supreme Court subsequently held that bankruptcy courts could do so. *See* 575 U.S. at 686. In so doing, the Supreme Court rejected the theory that "consent must be express," and it instead held that an "implied consent standard … supplies the appropriate rule" and that a party can provide implied consent through "'actions rather than words.'" *Id.* at 684.

In light of those principles, the jurisdictional inquiry here is exceedingly straightforward.  This Court properly referred this case to the bankruptcy court at the outset, and the bankruptcy court plainly possessed statutory authority to confirm the plan and its constituent provisions, including the Third-Party-Release Provision. UST.App.2838-39.  That is because the plain text of the Bankruptcy Code makes crystal-clear that plan-confirmation proceedings are core proceedings, *see* 28 U.S.C. §157(b)(2)(L) and that such plans may include "any … appropriate provision" consistent with the Code, §1123(b)(6); *see* §105(a).  And the bankruptcy court determined that the Third-Party-Release Provision is an appropriate provision.  *See, e.g.*, UST.App.2844, 2894-95.  Consistent with this straightforward conclusion, other courts have concluded in analogous circumstances that the statutory-authority question is not close.  *See, e.g.*, *In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126, 137 (3d Cir. 2019) (explaining, in a case concerning a plan's nonconsensual third-party-release provision, that "[t]he Bankruptcy Court indisputably had 'core' statutory authority to confirm the plan"); *Specialty Equip.*, 3 F.3d at 1045 (similar); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1145 (D.C. Cir. 1986) (similar).

The constitutional inquiry is, if anything, even easier, as "[t]here has never been any doubt about the constitutional authority of a [bankruptcy court] to enter final orders in" confirmation proceedings, "even under … *Stern*."  1 *Collier* ¶3.02[3][a].  So too here.  For one, the Third-Party-Release Provision applies only

to parties who consented to the bankruptcy court's resolution of the claims that it encompasses, and bankruptcy courts have constitutional authority to resolve bankruptcy proceedings (whether core or non-core) based on consent. *See Wellness*, 575 U.S. at 670-71, 683-85; *see also In re Kirwan Offs. S.à.R.L.*, 792 F.App'x 99, 103 (2d Cir. 2019) (concluding that bankruptcy court had constitutional authority based on "implicit consent" when the appellant "declined to participate in the confirmation hearing or otherwise object to the proposed Plan prior to its entry, despite having notice of them and their effect on his rights"). For another, the Third-Party-Release Provision "stems from the bankruptcy itself"—*i.e.*, plan confirmation, which is "the statutory goal of every chapter 11 case," 7 *Collier* ¶1129.01—and "flow[s] from a federal statutory scheme," *Stern*, 564 U.S. at 493, 499, including Bankruptcy Code provisions like §1129, §1123, and §105; *see, e.g.*, *In re Astria Health*, 623 B.R. 793, 797 (Bankr. E.D. Wash. 2021); *In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 451 (Bankr. S.D. Ohio 2021); *In re Kirwan Offs. S.à.r.l.*, 592 B.R. 489, 511 (S.D.N.Y. 2018). Finally, the Third-Party-Release Provision is "integral" to the plan's operation, as the bankruptcy court repeatedly emphasized based on the uncontroverted evidence. *See, e.g.*, UST.App.2844, 2894, 2898, 2899; *see also, e.g.*, *Millennium Lab*, 945 F.3d at 137; *Kirwan*, 592 B.R. at 511.

**b.** The Securities Plaintiffs resist these conclusions, but they never seriously engage with the logic that leads there. As to the statutory-authority question, the

Securities Plaintiffs principally rely on cases that concerned neither plan confirmation nor third-party-release provisions, and thus never considered the source of statutory authority at issue here:  28 U.S.C. §157(b)(2)(L).  *See In re Excel Storage Prods., L.P.*, 458 B.R. 175 (Bankr. M.D. Pa. 2011); *In re Sunbridge Cap., Inc.*, 454 B.R. 166 (Bankr. D. Kan. 2011); *Power Plant Ent. Casino Resort Ind., LLC v. Mangano*, 484 B.R. 290 (Bankr. D. Md. 2012); *In re Golden Inv. Acquisitions, LLC*, 508 B.R. 381 (Bankr. N.D. W. Va. 2014); *In re Johnston*, 2007 WL 1166017 (Bankr. N.D. W. Va. Apr. 12, 2007); *In re Se. Materials, Inc.*, 467 B.R. 337 (Bankr. M.D.N.C. 2012); *Virginia ex rel. Integra REC LLC v. Countrywide Sec. Corp.*, 92 F.Supp.3d 469 (E.D. Va. 2015).  Of the three cases cited by the Securities Plaintiffs that did concern plan confirmation and third-party-release provisions, one never addressed 28 U.S.C. §157(b)(2)(L), *see In re SunEdison, Inc.*, 576 B.R. 453 (Bankr. S.D.N.Y. 2017), while the other two concluded that they *had jurisdiction* under that statutory provision, *see In re Stearns Holdings, LLC*, 607 B.R. 781, 787 (Bankr. S.D.N.Y. 2019); *Kirwan*, 592 B.R. at 504.  The Securities Plaintiffs also invoke a pre-*Stern* Third Circuit decision, *see In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004), but they never acknowledge that the Third Circuit recently concluded that bankruptcy courts "indisputably" have statutory authority under 28 U.S.C. §157(b)(2)(L) to confirm plans containing third-party-release provisions, *Millennium*, 945 F.3d at 137.  The Securities Plaintiffs are left with a lone decision from a

bankruptcy court in Colorado, *see In re Midway Gold US, Inc.*, 575 B.R. 475 (Bankr. D. Colo. 2017), whose reasoning other courts have squarely rejected, *see Kirwan*, 592 B.R. at 504-05.  The bottom line, then, is that the Code and case law overwhelmingly support the conclusion that the bankruptcy court had statutory authority under 28 U.S.C. §157(b)(2)(L).

The Securities Plaintiffs' constitutional argument is equally unsuccessful. The Securities Plaintiffs do not argue that the bankruptcy court lacked constitutional authority to approve the Third-Party-Release Provision based on the parties' consent, or that the bankruptcy court lacked constitutional authority because that provision does not stem from bankruptcy law, or that the bankruptcy court lacked constitutional authority because that provision is not integral to the plan's operation.  Instead, the Securities Plaintiffs protest that the *Securities Litigation* "do[es] not 'stem from the bankruptcy itself'"; that the *Securities Litigation* cannot "be resolved in the bankruptcy proof of claim process"; and that the *Securities Litigation* does not involve "public rights."  Patterson.Br.41.  "Accordingly," the Securities Plaintiffs continue, only an Article III court could enter final judgment in the Securities Litigation, and the bankruptcy court could not "essentially enter[] a final judgment with the same substantive effect as an order dismissing the [Securities Litigation] with prejudice, without the protections of due process."  Patterson.Br.42.

That reasoning is fatally flawed for at least two reasons.  First, the "action at issue" is not the Securities Litigation, *Stern*, 564 U.S. at 499; *see Millennium*, 945 F.3d at 137-38; rather, it is the confirmation of the plan and its Third-Party-Release Provision, and the calculus does not change merely because that action affects the Securities Litigation, *see, e.g.*, *AOV*, 792 F.2d at 1145 ("Although the bankruptcy court's decision may have an impact on claims outside the scope of the immediate proceedings, we do not read [Supreme Court precedent] to prohibit all bankruptcy court decisions that may have tangential effects."); *In re Charles St. Afr. Methodist Episcopal Church of Bos.*, 499 B.R. 66, 99 (Bankr. D. Mass. 2013).  Second, the bankruptcy court plainly did not "enter a final judgment" on the merits in the Securities Litigation without "due process."  To the contrary, the bankruptcy court simply "appl[ied] bankruptcy law" in entering a final judgment in the plan-confirmation proceeding, *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1053 (5th Cir. 1987), and the plan included a provision in which many parties *voluntarily released* their claims in the Securities Litigation, *see, e.g.*, *In re Wash. Mut., Inc.*, 461 B.R. 200, 215 (Bankr. D. Del. 2011) ("[T]here is a fundamental difference between approval of a settlement of claims … and a ruling on the merits of the claims.").

The Securities Plaintiffs' jurisdictional argument therefore is wrong from start to finish.  But as explained below, the reason why the Securities Plaintiffs have embraced it as their primary argument at this late stage is understandable, as neither they nor the U.S. Trustee have anything to offer on the merits.[7]

### 3.  *Behrmann* does not apply to consensual releases.

On the merits, Appellants first briefly contend that the multi-factor balancing test that the Fourth Circuit discussed in *Behrmann* applies to all third-party-release provisions, even consensual ones, and that Ascena cannot satisfy that test.  *See* UST.Br.28-30; UST.Supp.Br.3-4; Patterson.Br.73-74; *see also* SEC.Amicus.Br.6-13.  That argument reflects a fundamental misreading of *Behrmann*.

By its terms, *Behrmann*'s multi-factor test, which the Fourth Circuit borrowed from the Sixth Circuit's decision in *In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002), is expressly limited to *nonconsensual* third-party-release provisions.  That is why (in the Fourth Circuit's words) the "pertinent part" of *Dow Corning* begins with this statement:  "We hold that when the following seven factors are present, the

---

[7] The U.S. Trustee muses in a footnote that "[t]here is reason to think bankruptcy courts lack constitutional authority to impose the Third-Party Release against parties to take away their state law claims," apparently because a bankruptcy's court's jurisdiction "'cannot be limitless.'"  UST.Br.30 n.11.  Of course, this fleeting argument has no bearing on the *federal*-law-based Securities Litigation, and regardless, various Bankruptcy Code provisions already keep bankruptcy courts within their limits.  *See, e.g.*, *Kirwan*, 592 B.R. at 505-06.

bankruptcy court may enjoin a *non-consenting* creditor's claims against a non-debtor." *Behrmann*, 663 F.3d at 711 (emphasis added) (quoting *Dow Corning*, 280 F.3d at 658). The release at issue in *Behrmann*, moreover, was plainly nonconsensual; it certainly did not provide an opt-out procedure. *See Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 346 (4th Cir. 2014) (providing release language). For good reason, then, the leading bankruptcy treatise recognizes that *Behrmann* squarely addresses only nonconsensual third-party-release provisions. *See* 8 *Collier* ¶1141.02[5][c] & n.67 (discussing *Behrmann*'s "multi-factor test" in a section titled "Nonconsensual Release of Third Parties"). And contrary to the U.S. Trustee's suggestion, UST.Br.28, in *National Heritage*—the Fourth Circuit decision after the *Behrmann* remand—the Fourth Circuit did not *sub silentio* extend *Behrmann* to cases involving consensual third-party-release provisions, since that second appeal, like the first, still involved a nonconsensual provision.

The U.S. Trustee nevertheless insists that one of the *Behrmann* factors—"whether 'the class … affected by the Release Provision overwhelmingly voted in favor of the Plan'"—confirms that "no amount of … consent by the parties" suffices to approve a third-party-release provision based on consent alone. UST.Br.28-29. But as this Court explained in denying a stay, that factor merely confirms that a bankruptcy court may legitimately enforce a third-party-release provision even *without* the affected party's consent when the rest of the class overwhelmingly supports

the provision—which prevents a small minority from blocking a provision that a large majority supports and that is necessary to a restructuring. *See* Dkt.33 at 13. That concern is irrelevant when a release applies only to consenting parties.[8]

At bottom, the U.S. Trustee never grapples with the fundamental question *why* a court need review and apply the *Behrmann* factors when a release provision is consensual. After all, if parties *agree* to a release, there would seem to be little reason for a court to superintend, much less overrule, that agreed-upon resolution (indeed, it is unclear who would even have standing to challenge the release). It is only when third parties are *forced* to release their claims—for example, when there is no procedure for opting-out—that court supervision makes sense.

The most that the U.S. Trustee can muster on this point is that applying the *Behrmann* factors even to consensual releases "ensures that the bankruptcy court is acting within its authority and jurisdiction in extinguishing a non-debtor's claim against another non-debtor," since the court is "of limited jurisdiction." UST.Supp.Br.4. But that unsubstantiated assertion is both circular and non-responsive. If, as a matter of law, a court need not apply the *Behrmann* factors to consensual releases, then it is necessarily "acting within its authority and jurisdiction" in

---

[8] Although the Court gave the U.S. Trustee an opportunity to respond to this reasoning, the U.S. Trustee's supplemental brief offers no response; instead, it simply rehashes the same argument. *See* UST.Supp.Br.4 n.1.

approving a plan with such a release.  And as noted above, bankruptcy courts readily "act[] within [their] jurisdiction" when they approve third-party-releases, whether they are applying *Behrmann* or not.  Notably, the U.S. Trustee does not argue that the bankruptcy court here lacked (or lost) jurisdiction upon declining to undertake a *Behrmann* analysis—even though that result should follow from his argument—re-inforcing that *Behrmann* simply does not apply in this case.

### 4. The Third-Party-Release Provision is consensual in light of the opt-out procedures.

Because *Behrmann* is inapplicable to consensual third-party-release provisions, Appellants shift to arguing that the Third-Party-Release Provision here is not, in fact, consensual.  Their principal ground for this contention is that opt-out procedures are *per se* insufficient to render a third-party-release provision consensual.  *See* Patterson.Br.49-61; UST.Br.34-37; *see also* SEC.Amicus.Br.14-23.  That assertion lacks merit.

Appellants first go for broke, invoking §524(g) of the Bankruptcy Code for the proposition that third-party-release provisions are permissible *only* when they involve "asbestos cases."  UST.Br.35; Patterson.Br.58.  But the Fourth Circuit has already rejected that rigid view:  In *Behrmann*—which had nothing to do with asbestos—the Fourth Circuit expressly referenced §524(g) yet found "nothing … inconsistent with" the notion that courts may approve third-party-release provisions. 663 F.3d at 711.

Appellants next cite a handful of bankruptcy court decisions that have pur-portedly invoked "actual principles of contract law"—supposedly stating that bind-ing contracts always require "affirmative assent"—to reject third-party-release pro-visions that utilize opt-out procedures.  UST.Br.34-35, 36-37 (citing *In re Emerge Energy Servs. LP*, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019); *SunEd-ison*, 576 B.R. at 460-61; *In re Chassix Holdings, Inc.*, 533 B.R. 64 (Bankr. S.D.N.Y. 2015); *In re Wash. Mut., Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011)); *see* Patter-son.Br.49-54 (also citing *In re Exide Techs.*, 303 B.R. 48 (Bankr. D. Del. 2003); *In re Zenith Elecs. Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999)).  There are multiple problems with this submission.

To start, three of Appellants' cases did not actually involve an opt-out mech-anism, much less one broadly noticed to affected parties, as here.  *See SunEdison*, 576 B.R. at 457; *Zenith*, 241 B.R. at 111; *Exide Techs.*, 303 B.R. at 74.  Indeed, the *SunEdison* court distinguished the plan before it with the plan approved in *Conseco* by noting that, unlike the latter, the plan before it "does not allow creditors to opt out of the Release."  576 B.R. at 460 n.8.

Furthermore, of Appellants' remaining three cases, two explicitly acknowledge that they are in a lopsided "minority" among courts that have addressed third-party releases with opt-out mechanisms.  *Emerge Energy*, 2019 WL 7634308, at *18; *Chassix*, 533 B.R. at 77 (conceding that "there are many cases in this District

and elsewhere in which 'deemed consent' and 'opt out' arrangements have been approved that are nearly identical to the arrangements that Debtors proposed in this case"); *see* pp.43-44, *supra* (reviewing decisions adopting majority position). Both of those decisions, moreover, rely on *Washington Mutual*, which itself offered little analysis and cited only *Zenith*—and that decision, as noted, did not involve an opt-out mechanism. *See* 442 B.R. at 355.

Finally, it is unsurprising that Appellants can ultimately cite only a few decisions deeming third-party releases with opt-out provisions nonconsensual, because "actual principles of contract law," UST.Br.36, have long provided that "[t]he manifestation of assent may be made wholly … by failure to act." Restatement (Second) of Contracts §19(1) (1981); *see, e.g.*, *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 713 (7th Cir. 2019); *Rivera-Colón v. AT&T Mobility P.R., Inc.*, 913 F.3d 200, 213-14 (1st Cir. 2019); *Cir. City Stores, Inc. v. Najd*, 294 F.3d 1104, 1109 (9th Cir. 2002). Class-action litigation is the prototypical example. "[A] class action settlement agreement is a contract," 4 William B. Rubenstein, *Newberg on Class Actions* §13:3 (5th ed. 2021), and those contracts are routinely formed using precisely the same opt-out procedures used here, *see* pp.45-46, *supra*. Indeed, although the Securities Plaintiffs assert that opt-out procedures create a "trap for the unwary," Patterson.Br.54, they apparently fail to appreciate that they are asking this Court for

an opportunity to employ those same procedures in the Securities Litigation. Understandably, then, when the Second Circuit in *Dynegy* reviewed a challenge to a third-party release with an opt-out provision—*i.e.*, one nearly identical to the Third-Party-Release Provision—it did not so much as hint that the release might be questionable. *See* 770 F.3d at 1066-67.[9]

For their part, the Securities Plaintiffs (who lack appellate standing) assert three other arguments about the validity of the opt-out procedures, but those assertions are also flawed.

First, the Securities Plaintiffs suggest that the putative class members in the Securities Litigation "received absolutely nothing" under the Third-Party-Release Provision and so "no rational" person would consent to it. Patterson.Br.57. But the Securities Plaintiffs simply ignore that those putative class members "received a … release" too. UST.App.2871.

---

[9] The Securities Plaintiffs suggest that class-action litigation is unique because "[t]he law supports class actions." Patterson.Br.56; *see Chassix*, 533 B.R. at 78. But the law also supports resolutions in bankruptcy cases, which third-party releases are designed to effect. *See, e.g.*, *In re Bond*, 16 F.3d 408, 408 (4th Cir. 1994) ("To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'"). Regardless, the argument is misplaced. The relevant question is whether absent stakeholders can have potential claims extinguished by other parties. In the class-action context, that otherwise due-process-destroying event is permissible as long as there is an opportunity to opt-out after sufficient notice. There is no meaningful reason why the same procedures should not suffice to provide adequate protection in the third-party-release context.

Second, the Securities Plaintiffs contend that, "[t]aken to an extreme," the bankruptcy court's position means "the Plan could have imposed virtually any obligation on Class members on mere negative notice—for instance, a provision requiring Class members to convey other valuable personal assets to [two former Ascena officers]—and their nonresponse would be deemed 'consent.'" Patterson.Br.53. But like many an extreme claim, this one misses the mark, as the Securities Plaintiffs never acknowledge that the Bankruptcy Code imposes limits on the bankruptcy court's authority—which presumably explains why, even though an overwhelming majority of courts deem third-party releases with opt-out provisions to be consensual, no debtor has yet smuggled into a plan any of the nefarious provisions that the Securities Plaintiffs hypothesize. *See, e.g.*, §1123(b)(6), §105(a).

Third, the Securities Plaintiffs claim that nothing in bankruptcy law suggests that Congress approves of consent through "silence." *See* Patterson.Br.60-61. But the Securities Plaintiffs do not address, much less contest, the examples provided above. *See* pp.44-45, *supra*. Their argument, moreover, is in considerable tension with *Wellness*—which held that the term "consent" in the bankruptcy-jurisdiction statute does not "mandate express consent," but rather means "consent *simpliciter*," which encompasses "implied consent," 575 U.S. at 683-85—and is flawed on its

own terms.[10]   Proving the point, the Securities Plaintiffs *themselves* invoked just such a bankruptcy provision authorizing consent through inaction.   The Securities Plaintiffs cited Bankruptcy Rule 7023 (over which Congress has final approval, *see* 28 U.S.C. §2075) in asking the bankruptcy court to certify a class under Civil Rule 23(b)(3) (over which Congress also has final approval, *see id.*) so they could opt-out of the Third-Party-Release Provision on behalf of putative class members in the Securities Litigation, *see* Patterson.App.17.   Had the bankruptcy court certified such a (b)(3) class, the Securities Plaintiffs would have utilized the same opt-out procedures, *see* Fed. R. Civ. P. 23(c)(2), that they now decry as the "illusion of consent," Patterson.Br.4.   The Securities Plaintiffs cannot have it both ways.

### 5.   Ascena provided adequate notice of the opt-out procedures.

Appellants also contend that the Third-Party-Release provision is nonconsensual because certain parties purportedly received inadequate notice of the opt-out procedures.   *See* Patterson.Br.61-73; UST.Br.30-34.   These arguments likewise are unavailing.

---

[10] For instance, the Securities Plaintiffs think that the "most telling[]" signal that the Third-Party-Release Provision is impermissible is §523(a)(19), which creates an exception from "discharge" for securities-laws violations committed by individual debtors.   Patterson.Br.60-61; *see also* SEC.Amicus.Br.25-26.   But that argument is "without merit," for a discharge and a consensual settlement are simply not the same. *Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc.*, 202 F.3d 223, 228 (4th Cir. 2000); *see* UST.App.2872.

The U.S. Trustee challenges the opt-out procedures as insufficient because "many parties" defined as "related parties" in the plan never received sufficient notice.  UST.Br.18-19, 30-34.  Even setting aside that "[n]o single party has come forward or been otherwise identified as being harmed," UST.App.2897, the U.S. Trustee forfeited this argument by failing to timely raise it below.  Unlike the Securities Plaintiffs and the SEC, the U.S. Trustee *never* raised *any* notice-related arguments while the bankruptcy court was considering the propriety of the Third-Party-Release Provision—not in his objection to the disclosure statement, not at the disclosure-statement hearing, not in his objection to the plan, not in his supplemental objection to the plan, and not at the confirmation hearing.  *See* UST.App.693-717, 913, 942, 2201-08, 2314-17, 2673-2784.

The U.S. Trustee did not challenge the notice as inadequate until his motion for a stay, *after* the bankruptcy court had already confirmed the plan and approved the Third-Party-Release Provision.  *See* UST.App.2891 (bankruptcy court noting in stay order that U.S. Trustee had "not raise[d] any concern regarding the form or manner of notice").  It is "well established" that an issue not preserved below "should generally not be considered on appeal," including in a bankruptcy appeal to a district court.  *In re Johnson*, 960 F.2d 396, 404 (4th Cir. 1992); *see, e.g.*, *In re IFS Fin. Corp.*, 803 F.3d 195, 204 n.13 (5th Cir. 2015) ("Neither this court nor a district court will review an issue presented for the first time on appeal of a bankruptcy court's

decision."); Confirmation Order at 9, Dkt.16, *In re Diamond Offshore*, No. 21-cv-1380 (S.D. Tex. Sept. 3, 2021) ("The Trustee did not raise this argument in the bankruptcy court.  The argument is therefore waived.").  And it is likewise black-letter law that an issue is not preserved for appeal if it is first raised in the lower court *after* that court has issued its decision—*e.g.*, in a stay motion.  *See, e.g.*, *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 308 (7th Cir. 2010) (declining to consider argument "raised … for the first time in [a] motion to stay"); *Evanston Ins. Co. v. Cogswell Properties, LLC*, 683 F.3d 684, 692 (6th Cir. 2012) ("Arguments raised for the first time in a motion for reconsideration are untimely and forfeited on appeal."); *Kiewit E. Co. v. L&R Const. Co.*, 44 F.3d 1194, 1204 (3d Cir. 1995) ("Courts often take a dim view of issues raised for the first time in post-judgment motions.").

Worse still, the notice-related argument that the U.S. Trustee now advances on appeal was not even the principal notice-related argument in his stay motion. Below, the U.S. Trustee chiefly argued that "the beneficial equity holders did not receive reasonable notice."  Bankr.Dkt.1962 at 10 (capitalization altered).  But the U.S. Trustee has abandoned that argument in this Court.[11]  Instead, he now argues that the release is improper because a wide array of "related parties" (not just "beneficial equity holders") never received *any* notice (not just "reasonable notice").

---

[11] The Securities Plaintiffs instead make this argument.  *See* pp.72-73, *infra*.

That separate (and different) contention warranted only a single, conclusory sentence in the stay motion below, however, *see* Bankr.Dkt.1962 at 11, which fails to sufficiently present the issue to the bankruptcy court and preserve the issue for appeal. *See Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 n.* (4th Cir. 2014) (deeming "perfunctory and undeveloped claim" forfeited); *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1377 (Fed. Cir. 2005) ("A few phrases in a stay motion … are not sufficient to apprise the … court that it must address another point of law."). Moreover, the bankruptcy court understandably did not pass on that fleeting assertion in its stay order, *see* UST.App.2890 (stating only that "[t]he United States Trustee belatedly challenges the notice that was provided to equity security holders."), which deprives this Court from serving its appellate role as a "court of review, not of first view," *Lovelace v. Lee*, 472 F.3d 174, 203 (4th Cir. 2006). On multiple independent grounds, therefore, the U.S. Trustee has forfeited this argument.[12]

---

[12] Regardless, as this Court explained when denying the U.S. Trustee's stay motion, the bankruptcy court did not clearly err in finding that Ascena "provided sufficient notice to all parties of the opportunity to opt-out." Dkt.33 at 17-18. That conclusion is consistent with the fact that Ascena provided notice of the opt-out procedures to 300,000 parties, not to mention the countless other parties who received publication notice through *The New York Times* and *USA Today*. *See* UST.App.2849, 2891. And as the U.S. Trustee does not dispute, even if a party complains that it did not receive adequate notice (which, unsurprisingly, has never occurred here), sufficient tools to resolve such issues already exist. *See* UST.App.2897 ("An adversely affected party could seek relief from the Confirmation Order in this Court on grounds

The Securities Plaintiffs take a different tack, but their notice-related arguments fare no better.  In their view, Ascena provided "constitutionally deficient" notice to putative class members in the Securities Litigation who did not receive "actual notice" of the opt-out procedures.  Patterson.Br.62 (emphasis omitted).  But the Securities Plaintiffs unquestionably *did* receive "actual notice" of the opt-out procedures, so apart from the fact that they have suffered no direct, pecuniary injury, *see* pp.48-52, *supra*, they clearly lack standing to press this argument.  *See Gentry v. Siegel*, 668 F.3d 83, 95 (4th Cir. 2012) ("The Named Claimants received actual, individualized notices, as did their attorneys, and they have made no complaint regarding the notice provided to them.  We decline their invitation to evaluate the adequacy of notice provided to the nonparty unnamed class members because the Named Claimants lack standing to raise the issue.").

Even aside from their standing problem, the Securities Plaintiffs notably do not challenge the bankruptcy court's determination that "registered" shareholders received "actual notice of the opt-out procedures."  UST.App.2868; *see* Patterson.App.5330.  Instead, they confine their notice-related argument to putative class members who held Ascena shares through nominees.  *See* Patterson.Br.64-65.  In their view, Ascena itself should have "directly" notified those parties of the opt-out

---

such as excusable neglect if the notice the party was given proves to have been actually deficient.").

procedures, rather than enlisting the assistance of "third part[y]" nominees, who had the option of notifying shareholders directly of the opt-out procedures or providing Ascena with shareholder contact information so that Ascena could effect such notice. Patterson.Br.65-66.

As the bankruptcy court determined, this argument is a bait-and-switch that is "without merit." UST.App.2869 n.24. At the disclosure-statement hearing, the bankruptcy court "inquired if the Securities … Plaintiffs were positioned to better serve the putative class," but "they declined." UST.App.2869 n.24. And in so de-clining, the Securities Plaintiffs explained that "this isn't a case where it's as simple as just giving [Ascena] a mailing list of who the class members are"; rather, it would "involve the debtors, through their claims and noticing agent, taking certain steps to *distribute notices through nominee brokers*." UST.App.2869 n.24 (emphasis added). There is no question that Ascena "complied exactly" with what the Securi-ties Plaintiffs recommended, thereby "employ[ing] all reasonable efforts to provide notice" to putative class members. UST.App.2869 & n.24. The Constitution re-quires nothing more. *See Wells Fargo Bank, N.A. v. AMH Roman Two NC, LLC*, 859 F.3d 295, 303 (4th Cir. 2017) ("Due process 'does not require actual notice.' Instead, it requires notice 'reasonably calculated, under all the circumstances, to ap-prise interested parties of the pendency of the action and afford them an opportunity to present their objections.'").

73

Unable to concoct a serious notice-related argument, the Securities Plaintiffs next challenge the substance of the opt-out forms that Ascena shareholders received, contending that the forms "were constitutionally deficient" because they did not specifically reference the Securities Litigation.  Patterson.Br.68-73 (emphasis omitted). But this issue, too, is forfeited because the Securities Plaintiffs did not timely assert it below.  In their objection at the disclosure-statement stage (when the bankruptcy court approved the opt-out forms), the Securities Plaintiffs asserted only that the *disclosure statement* should reference the Securities Litigation, *see* UST.App.746-47—a request that Ascena promptly fulfilled, *see* UST.App.1030-31.  The Securities Plaintiffs never contended that the *opt-out forms* should also reference the Securities Litigation—or were in any way "constitutionally deficient"—despite the fact that the disclosure-statement hearing focused heavily on suggested revisions to the opt-out forms.  *See* UST.App.913-42.[13]

Regardless, the Securities Plaintiffs' argument fails on the merits.  The Securities Plaintiffs do not, and cannot, identify a single case in which a bankruptcy court concluded that the type of language included in the opt-out form here—which spe-

---

[13] In objecting to the *plan*, the Securities Plaintiffs asserted that the opt-out form did not mention the Securities Litigation, but those complaints came weeks *after* the bankruptcy court had already approved the opt-out form.  *See* UST.App.2240-41, 2288-89.

cifically identified the kinds of claims subject to the Third-Party-Release Provision—violates "due process obligations."  Patterson.Br.72.  Furthermore, the opt-out form clearly explained that shareholders could obtain the disclosure statement (which, per the Securities Plaintiffs' request, specifically discussed the Securities Litigation) through four different methods, including by simply visiting a website.  *See* UST.App.1544.  Particularly in combination with the emphasized warning to shareholders that they "**will be deemed to have released whatever claims [they] may have against … company officers and directors**" unless they opted-out, UST.App.1541, shareholders plainly were given a sufficient understanding of any potential "claims" and the ability to proceed with them by opting-out of the release.

*     *     *

As the foregoing demonstrates, Appellants badly miss the mark in challenging the bankruptcy court's well-founded conclusion that the Third-Party-Release Provision is consensual (and therefore not subject to *Behrmann*) and appropriate.  Accordingly, although this appeal is equitably moot, the Third-Party-Release Provision easily survives on the merits in any event.

### C.    In All Events, the Third-Party-Release Provision satisfies *Behrmann*.

Even accepting the erroneous premise that the Third-Party-Release Provision must comply with *Behrmann* (either because *Behrmann* applies even to consensual

75

releases, or because the Third-Party-Release Provision is nonconsensual), the bankruptcy court correctly determined that it does so.  As noted, in *Behrmann*, the Fourth Circuit "commend[ed]" various factors for bankruptcy courts to "consider[] … in th[e] context" of resolving objections to nonconsensual third-party-release provisions in Chapter 11 plans:

> (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

663 F.3d at 711-12.  *Behrmann* "le[ft] to a bankruptcy court the determination of which factors may be relevant in a specific case," *id.* at 712, and the Fourth Circuit subsequently reiterated that "[a] debtor need not demonstrate that every … factor weighs in its favor," *Nat'l Heritage*, 760 F.3d at 351.  Instead, a bankruptcy court may approve a nonconsensual third-party-release provision if there are "specific factual findings supporting its conclusion[]" that the provision is "warrant[ed]." *Behrmann*, 663 F.3d at 711, 713.

Here, the bankruptcy court appropriately identified the findings supporting a determination that the *Behrmann* factors are satisfied. *See, e.g.*, UST.App.2874 n.28.[14] And although Appellants seek reversal, the odds are stacked against them. As the Fourth Circuit has explained, such findings may be reversed only if they are clearly erroneous. *See Nat'l Heritage*, 760 F.3d at 347. And the clear-error standard is an especially "demanding one": A court "may not simply overturn a lower court's determination because [it] would reach a different conclusion," but rather only when

---

[14] In denying the U.S. Trustee's stay motion, this Court stated that the bankruptcy's court's "footnote" addressing the *Behrmann* factors "fall[s] far short of the required factual findings." Dkt.33 at 11 n.3; *see also* SEC.Amicus.Br.24-25. Respectfully, that statement merits re-evaluation. The bankruptcy court incorporated by reference the detailed reasoning set forth in Ascena's confirmation brief at UST.App.2391-95. Nothing in *Behrmann* precludes a bankruptcy court from engaging in that common practice, which still allows a higher court to undertake a "meaningful exercise of appellate review." *Behrmann*, 663 F.3d at 712; *see United States v. Gonzalez Edeza*, 359 F.3d 1246, 1249 (10th Cir. 2004) (finding no error where district court "incorporated by reference" government's brief regarding sentencing enhancement findings); *In re Parks*, 571 F.App'x 523, 526 (9th Cir. 2014) ("The bankruptcy court's oral ruling, which incorporated by reference [appellee's] post-trial brief, was explicit enough to give us a clear understanding of its factual findings[.]"). A court "may 'properly adopt a party's arguments on a given issue instead of issuing an order setting out a free-standing elaboration of the court's views.'" *Jackson v. Fed. Exp.*, 766 F.3d 189, 199 (2d Cir. 2014). That rule is especially appropriate here since the bankruptcy court had already rejected the argument that *Behrmann* applies and was merely providing a belt-and-suspenders determination that would have otherwise taken many pages (in an already 40-page opinion) to fully articulate. Additionally, the court provided other reasoning relevant to the *Behrmann* analysis, even if it did not invoke the *Behrmann* decision *in haec verba* when doing so. At bottom, it makes little sense to remand just so the bankruptcy court can explicitly provide specific chapter-and-verse factual findings that Ascena has already advanced (and reiterates here), the court already adopted, and the parties have fully briefed on appeal.

"left with the definite and firm conviction that a mistake has been committed." *Bate Land*, 877 F.3d at 198. Appellants come nowhere close to satisfying that standard here.[15]

First, the bankruptcy court properly found an "identity of interests" between Ascena and the released parties, *Behrmann*, 663 F.3d at 711, because they all "share a common goal" in resolving this bankruptcy case expeditiously and also because Ascena is required to indemnify certain released parties under "pre- and postpetition credit facilities and existing corporate organizational documents," such that a suit against those parties would essentially amount to a suit against Ascena (and would thereby deplete estate assets). UST.App.2392-93. That reasoning is entirely consistent with relevant precedent. *See, e.g.*, *Nat'l Heritage*, 760 F.3d at 348 (explaining how an "indemnity obligation" can suffice for the first factor); *In re Trib. Co.*, 464 B.R. 126, 187 (Bankr. D. Del. 2011) ("[T]he Debtors and the Settling Parties share the common goal of confirming the … Plan and implementing the … Plan Settlement."); *Zenith*, 241 B.R. at 110 (similar).

Appellants do not dispute that Ascena and the released parties have an identity of interests based on their common objective or that Ascena has indemnification obligations. Instead, Appellants argue that satisfying the first *Behrmann* factor

---

[15] It bears noting, moreover, that Appellants paint with a broad brush in discussing the *Behrmann* factors. Appellants repeatedly refer simply to the "Released Parties," rather than establish that the factors are satisfied as to any particular Released Party.

"alone cannot suffice" and that Ascena had "insurance coverage" to cover some indemnification claims.  UST.Br.38; *see* Patterson.Br.76-77.  And the Securities Plaintiffs (but not the U.S. Trustee) further contend that Ascena "did not reorganize" and so any indemnity obligations that Ascena has could never affect Ascena's estate. Patterson.Br.76.  But the bankruptcy court never purported to justify the Third-Party-Release Provision based on the first *Behrmann* factor alone, and Appellants identify no evidence demonstrating that Ascena's insurance would cover all claims currently barred by the Third-Party-Release Provision, such as claims against the lenders.  *See* UST.App.2888.  And setting aside that liquidating debtors have estates that are subject to depletion too, this bankruptcy case differs from the majority of other "retail bankruptcies" precisely because it did *not* "result[] in liquidation[]": "[T]he Ascena brand continues to live on in the face of a continuing global pandemic," and "[t]he business remains a going concern."  UST.App.2902 & n.19.

Second, the bankruptcy court properly found that the released parties "contributed substantial assets to the reorganization." *Behrmann*, 663 F.3d at 711.  In particular, the bankruptcy court explained that "each" of the released parties provided "unwavering" support for an "outcome that will maximize recoveries for creditors and stakeholders," UST.App.2394—for instance, by agreeing to *release* any potential claims that they held against Ascena, thereby providing material financial benefits to the restructuring, *see, e.g.*, Patterson.App.7646 n.1 ("[T]he Third Party

Releases are mutual releases[.]"); UST.App.2895 n.15 (similar); *see also* UST.App.2901 (describing the "unquestionable" financial effects on Ascena's estate if now-released claims are later filed); UST.App.2703 (Ascena's then-President describing the "significant work and time involved in evaluating the [potential] claim that would then deplete the assets of the estate").  Accordingly, this is simply not a situation where the released parties did not make "any financial contribution to the reorganization."  *Nat'l Heritage*, 760 F.3d at 348.  Nor is that all, as other parties made additional contributions too.  The secured lenders and parties associated with them, for example, plainly "invested substantial time and resources to achieve the result embodied in the Plan," and Ascena's directors and officers went above and beyond to ensure the best financial result for Ascena and other stakeholders, including by holding approximately 80 board meetings or "special committee" calls. UST.App.2393-94.

Appellants protest that none of the released parties provided "any financial contribution to the case," UST.Br.39, but they simply ignore that the Third-Party-Release Provision is mutual and thus that the released parties are shielding Ascena

and its estate from "expensive" litigation.[16]  UST.App.2844.  Further, although Appellants claim that contributing labor to a financially successful reorganization is "not sufficient" to satisfy the second factor, UST.Br.39; *see* Patterson.Br.77, that does not mean that such contributions are meaningless, especially when those contributions are not required by an employment or fiduciary relationship or when they led to a successful restructuring "in the midst of unprecedented economic turmoil," UST.App.2856.  And while the U.S. Trustee (but not the Securities Plaintiffs) contends that Ascena is categorically precluded from satisfying the second factor because a "reorganization" is a prerequisite for that factor and Ascena "is not reorganizing," UST.Br.39, that rehashed contention is impossible to square not only with the facts of this case (which proceeded under Chapter 11, not Chapter 7), but also with *Behrmann*'s general recognition that bankruptcy courts may approve third-party-release provisions "where circumstances warrant," 663 F.3d at 711.

Third, the bankruptcy court properly found that the Third-Party-Release Provision is "essential to reorganization."  *Id.*; *see* UST.App.2394-95 (charactering Third-Party-Release Provision as "integral" and "necessary to the resolution" of

---

[16] Litigation costs exist regardless of a suit's merits.  For example, the Securities Litigation was determined by the special committee of disinterested directors to be meritless, *see* p.15, *supra*, but defending against it is not cost-free.

Ascena's bankruptcy case).  As the court found after hearing the evidence, the released parties "would not have agreed to make the substantial contributions to the … restructuring or the concessions embodied in the Plan"—*e.g.*, releasing their own claims—"if they were not provided the certainty of" achieving released-party status.  UST.App.2394-95; *see* UST.App.2781-82.  Additionally, as the bankruptcy court likewise emphasized, the Third-Party-Release Provision "resolved indemnification claims against the estates" and "served to avoid entanglement of the estates in expensive and protracted post-confirmation litigation that could only delay and dilute the negotiated distributions."  UST.App.2844; *see* UST.App.2885-86, 2893-95 (similar); Patterson.App.7648 n.5 (similar).  Thus, this case stands in marked contrast to others where reviewing courts could only guess why a third-party-release provision is important.  *Cf. Behrmann*, 663 F.3d at 712.

Appellants argue that the Third-Party-Release Provision is not "essential" because (again) Ascena is purportedly liquidating rather than reorganizing and because insufficient evidence supports the bankruptcy court's factual findings.  *See* UST.Br.40-41; Patterson.Br.78-79.  And the Securities Plaintiffs additionally contend that, as in *National Heritage*, the plan's "severability" provision suggests that it is viable without the Third-Party-Release Provision.  Patterson.Br.79.  But the third time is not the charm for Appellants' liquidating-not-reorganizing argument, as they never explain why the Court should blind itself to the indisputable fact that the plan

is inextricably intertwined with a larger, "highly successful" Chapter 11 reorganization effort.  UST.App.2902 n.19.  Moreover, Appellants do not and cannot dispute that the uncontroverted evidence before the bankruptcy court—*e.g.*, testimony from Ascena's then-President and testimony from a disinterested Ascena director—confirmed that the Third-Party-Release Provision is integral to the plan.  *See* UST.App.2885-86, 2888.  And the Securities Plaintiffs' strained analogy to *National Heritage* is fruitless, as the severability provision there provided that the plan could remain intact *whenever* a court invalidated it, even after confirmation.  As already explained, no such provision exists in Ascena's plan.  *See* pp.15-16, 39, *supra*.

Fourth, the bankruptcy court correctly found that parties "overwhelmingly … accept[ed]" the Third-Party-Release Provision.  *Behrmann*, 663 F.3d at 712.  As the bankruptcy court explained, creditors "overwhelmingly voted to accept the plan, substantially all of the [Ascena's] secured lenders support the Plan, and … the Creditors' Committee affirmatively supports confirmation of the Plan." UST.App.2395.  Even more pertinent, "regardless of whether [parties] were entitled to vote on the Plan," the Third-Party-Release Provision "only applies to parties who did not opt out or object to the Plan," and parties "overwhelmingly approved" it when given the choice.  UST.App.2867, 2872; *cf. Nat'l Heritage*, 760 F.3d at 350 (contrasting Seventh Circuit decision where that court approved third-party-release

provision without conducting multi-factor balancing test because affected parties "could choose to grant, or not to grant, the release").

Appellants dispute these conclusions, but they offer no sound basis to reject them. Indeed, the U.S. Trustee either repeats notice-related arguments that he forfeited below or presses opt-out-related arguments that are wrong as a matter of law. *See* UST.Br.41; *see also* pp.63-66, 69-71, *supra*. Meanwhile, the Securities Plaintiffs merely protest that the shareholder class "was deemed to reject the Plan" by operation of law, Patterson.Br.80; *see* §1126(g), but they never acknowledge that all shareholders received a separate opportunity to opt-out of the Third-Party-Release Provision specifically, which is the only relevant issue here.

Finally, the bankruptcy court properly found that the plan "provides for the payment in full of all Allowed Administrative Claims and a meaningful recovery to most … creditors" affected by the Third-Party-Release Provision. UST.App.2395.[17]

---

[17] Consistent with *National Heritage*, the bankruptcy court considered the fifth and sixth factors together. *See* UST.App.2395; *contra* UST.Br.42. As the bankruptcy court's reasoning reflects, however, those factors are especially awkward in the context of a consensual third-party-release provision. Those factors—whether "[t]he plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction" and whether "[t]he plan provides an opportunity for those claimants who choose not to settle to recover in full"—are premised on the notion that parties affected by the third-party-release provision have no choice but to seek recovery within the bankruptcy case. *Behrmann*, 663 F.3d at 712. The whole point of a voluntary third-party-release provision with an opt-out mechanism, however, is to allow parties to seek recovery outside of the bankruptcy case. Accordingly, as the bankruptcy court agreed, the more relevant assessment in this context is whether

Indeed, "[t]he evidence adduced at the Confirmation Hearing established that [Ascena] proposed [its] Plan to maximize the recovery to [its] creditors," and it "achieved a remarkable result in the midst of unprecedented economic turmoil occasioned by the ongoing global COVID-19 pandemic that … hit the retail sector particularly hard." UST.App.2856. And there is no better proof that the parties affected by the Third-Party-Release Provision are satisfied with their recoveries than the fact that only three parties out of hundreds of thousands objected at confirmation, and the Third-Party-Release Provision did not directly affect a single one of them. *See* UST.App.2838. In fact, among the three objectors, that provision could only conceivably directly affect the Securities Plaintiffs—the other two objectors were government parties—but given their decision to opt-out, it does not affect directly affect them at all.

Appellants nonetheless contend that the bankruptcy court erred in finding that the plan provides an opportunity for parties affected by the Third-Party-Release Provision to recover substantially in full, primarily on the ground that it provides "zero recovery" to shareholders, "whose rights against non-debtors for claims related to [Ascena] were terminated under the plan." UST.Br.41-42; *see* Patterson.Br.80-71. But that reasoning again overlooks that those shareholders could elect to opt-out to

---

parties who chose not to opt-out (*i.e.*, those actually affected by the third-party-release provision) received a meaningful recovery or consideration.

pursue their claims—exactly as the Securities Plaintiffs did.  *Cf. Phillips Petrol.*, 472 U.S. at 813 (referencing the "rare species of class member who is unwilling to execute an 'opt out' form, but whose claim is nonetheless so important that he cannot be presumed to consent to being a member of the class by his failure to do so").  And while the U.S. Trustee does not dispute that other affected classes received a meaningful recovery, he asserts—without citation to any authority—that this undisputed meaningful recovery is not enough.  UST.Br.41  Such *ipse dixit* does not get the job done, particularly given that "no party with a pecuniary interest" is complaining that its recovery is inadequate.  UST.App.2902 n.20.

In sum, although the *Behrmann* factors plainly are not pertinent here, the bankruptcy court provided sufficient findings "in support of its decision to grant equitable relief" anyway, 663 F.3d at 712, and Appellants have failed to overcome the extraordinarily demanding clear-error standard.

## III.   The Bankruptcy Court Properly Approved The Exculpation Provision.

In addition to properly approving the Third-Party-Release Provision, the bankruptcy court also properly approved the Exculpation Provision.  No party directly affected by the Exculpation Provision disputes its validity on appeal, but the U.S. Trustee still asks this Court to "deem [it] unenforceable," UST.Br.27, and thereby overturn the plan *in toto*, *see* UST.App.2667.  Again, the Court need not

(and should not) address this issue in light of equitable mootness, but if it does, the Court should decline the U.S. Trustee's remarkable request.

### A.    The Exculpation Provision is Limited and Appropriate.

Exculpation provisions, like release provisions, are a product of a bankruptcy court's equitable authority and often come standard in Chapter 11 plans. *See, e.g.*, *Blixseth*, 961 F.3d at 1085; UST.App.2398 n.104.   "[E]xculpation provisions are included … frequently in chapter 11 plans" for good reason:  "[S]takeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decision makers in the chapter 11 case." *Alpha*, 556 U.S. at 261.  Although an exculpation provision leaves exculpated parties—*i.e.*, "skilled individuals" who "assist in the reorganization efforts"—exposed to litigation concerning serious misconduct, such a provision at least "assures them they will not be second-guessed and hounded by meritless claims," *id.* at 260-61, based on purportedly "negligent actions," *Blixseth*, 961 F.3d at 1084.  Hence, so long as an exculpation provision is "properly limited and not overly broad," it is "permissible." *In re Nat'l Heritage Found., Inc.*, 478 B.R. 216, 233 (Bankr. E.D. Va. 2012).

The Exculpation Provision here fits that description.  The provision concerns only bankruptcy-related actions that occurred between the petition date and the plan's effective date (*i.e.*, July 23, 2020 to March 5, 2021).  UST.App.2659.  The

provision excludes conduct that amounts to "actual fraud, willful misconduct, or gross negligence."  UST.App.2659.  And the provision applies only to a particular group of persons who "played a critical role" in this bankruptcy case. UST.App.2844.  In other words, the provision accords with "numerous exculpation provisions" approved in other cases, and the bankruptcy court properly approved it here, especially given its importance to Ascena's overall restructuring. UST.App.2875; *see* UST.App.2875 ("Without the Exculpation Provision, there is no evidence that the stakeholders would have been willing and able to reach such a successful negotiated result in these Bankruptcy Cases and as encapsulated by the Plan.").

### B.    The U.S. Trustee's Counterarguments Lack Merit.

**1.**  In refusing to accept this straightforward conclusion, the U.S. Trustee first argues that "[t]he bankruptcy court erred as a matter of law in failing to apply the *Behrmann* factors to the Exculpation [Provision]."  UST.Br.43-44.  In his view, because *Behrmann* defined the third-party-release provision, exculpation provision, and injunction provision before it as "Release Provisions," and then referred to the "Release Provisions" in the rest of the opinion, the multi-factor test that *Behrmann* set forth for nonconsensual third-party releases necessarily applies to exculpation provisions.  This contention is unsound in numerous respects.

To begin with, notwithstanding the court's initial shorthand, nothing in the balance of *Behrmann* remotely suggests that the court was concerned with or addressing traditional exculpation provisions.  Rather, the opinion addressed the circumstances under which a bankruptcy court "may enjoin a non-consenting creditor's claims against a non-debtor"—*i.e.*, when a court may enforce a third-party-release provision. *Behrmann*, 663 F.3d at 711; *see also id.* at 710 (addressing "equitable relief in the form of nondebtor releases"); *Balt. Teachers Union v. Mayor and City Council of Balt.*, 6 F.3d 1012, 1017 n.7 (4th Cir. 1993) (distinguishing between "shorthand" terminology and "primary emphasis" of an opinion).  Indeed, the factors that *Behrmann* adopted make little sense in the context of a traditional exculpation provision, which merely "sets forth the applicable standard of liability" for future litigation, rather than "eliminat[ing]" liability "altogether." *PWS Holding Corp.*, 228 F.3d at 247.[18]

Furthermore, on remand in *Behrmann*, the bankruptcy court never considered the *Behrmann* factors when approving the exculpation provision and authorizing its

---

[18] The "exculpation provision" in *Behrmann* stated that "Released Parties shall have no liability to Releasing Parties" and lacked carve-outs for claims of gross negligence, willful misconduct, or actual fraud.  *See Nat'l Heritage Found. Inc. v. Behrmann*, 2013 WL 1390822, at *3 n.4 (E.D. Va. Apr. 3, 2013); *Nat'l Heritage*, 478 B.R. at 224.  Accordingly, unlike the Exculpation Provision here, it more closely resembled a third-party-release provision than a traditional exculpation provision, which may have explained the court's shorthand at the outset.

enforcement through the injunction provision, *see Nat'l Heritage*, 478 B.R. at 232-34, and in the subsequent appeal, the Fourth Circuit found "no error in that judgment," *Nat'l Heritage*, 760 F.3d at 346 n.2—even though, under the U.S. Trustee's logic, the bankruptcy court should have applied the *Behrmann* factors to both the exculpation and injunction provisions.  Nor is that result an anomaly:  The U.S. Trustee has cited *no* case in which *any* court has *ever* interpreted *Behrmann* as applying to *any* kind of exculpation provision.  *See, e.g.*, *In re Neogenix Oncology, Inc.*, 508 B.R. 345, 361 (Bankr. D. Md. 2014) (considering exculpation provision without applying *Behrmann* factors); *Alpha*, 551 B.R. at 260-61 (same); *Health Diagnostic*, 551 B.R. at 230-34 (same).  And the leading treatise addresses *Behrmann* only in the context of third-party releases, not exculpation provisions.  *See* 8 *Collier* ¶1141.02[5][c] & n.67; 2 *Collier* ¶105.04[2][b][ii][D] & n.113a.  The U.S. Trustee's theory that *Behrmann* applies to exculpation provisions is thus wholly lacking in any support and should be rejected.[19]

2.   The U.S. Trustee next pivots to a four-pronged argument that the bankruptcy court "abused its discretion" in approving the Exculpation Provision.  UST.Br.45.  Those contentions miss the mark, too.

---

[19] In another argument never raised below, the U.S. Trustee suggests that the Exculpation Provision contains "no exception for grossly negligent, or even intentional, conduct."  UST.Br.43.  But given the plain language of that provision, the bankruptcy court interpreted it in the exact opposite manner.  *See* UST.App.2874-75.

First, the U.S. Trustee asserts that exculpation provisions "should not extend further than estate fiduciaries," which would purportedly provide a "limiting principle to … otherwise statutorily unauthorized" exculpation provisions.  UST.Br.45.  But as the U.S. Trustee concedes, courts have disagreed with his view precisely because they have recognized that such provisions are authorized by statutes that already provide limiting principles and precisely because they understand that it is necessary to offer protection to a broader swath of persons who perform critical restructuring-related functions.  *See, e.g.*, *Blixseth*, 961 F.3d at 1084 (citing §105(a) and §1123); *see also Murray Metallurgical*, 623 B.R. at 501-02 (citing same statutory provisions and other precedent and explaining that the U.S. Trustee's proposed "limitation on exculpation provisions" "has not gained" broad "acceptance").

Second, the U.S. Trustee complains that the Exculpation Provision is "so broad that it extends to parties who performed no duties essential, necessary, or at all related to the cases."  UST.Br.46.  But the bankruptcy court made contrary findings, including that the "efforts" of "the Exculpated Parties"—with no exceptions noted—"were and continue to be vital in both formulating and implementing the Plan."  UST.App.2875.  The U.S. Trustee does not even acknowledge these findings, let alone argue that they are clearly erroneous.  Further, as a practical matter, it is hard to understand why a plaintiff would ever bring a bankruptcy-case-related action against a party who "performed no duties essential, necessary, or at all related" to

the bankruptcy case—except, perhaps, to extract an *in terrorem* settlement by alleging an easy-to-plead negligence suit, which is exactly what provisions like the Exculpation Provision are rightly designed to prevent. *See Alpha*, 556 B.R. at 260-61.

On that note, it bears emphasizing that, even under the Exculpation Provision, all Exculpated Parties, including "non-estate fiduciaries" and parties who purportedly "performed no duties essential" to the restructuring, *can still be sued*—just not for negligence. Here, for example, they can be sued for "actual fraud, willful misconduct, or gross negligence." UST.App.2659-60. The U.S. Trustee never explains why provisions exculpating non-estate fiduciaries or non-involved parties are perfectly fine so long as negligence suits can be brought, and only become *verboten* if negligence suits are off the table. No reason is apparent. Certainly there is nothing about the ability to bring a negligence suit that provides the "limiting principle" that the U.S. Trustee claims is necessary for a permissible exculpatory provision.

Third, the U.S. Trustee insists that the Exculpation Provision at least should not "limit the liability of attorneys to their clients." UST.Br.46. But, once again, the U.S. Trustee did not raise this argument below. *See* UST.App.711-13, 2207, 2314-15. Nor does he offer any legal support for it now.

Finally, the U.S. Trustee asserts that the bankruptcy court "abused its discretion" in declining to invoke *Barton v. Barbour*, 104 U.S. 126 (1881), and "in failing to … requir[e] a 'gatekeeper function' by which the court may, 'in its discretion,

permit an action to go forward against the exculpated parties.'" UST.Br.46-47. Yet again, the U.S. Trustee never raised this argument below, and understandably so. The only relevant case that he cites discussing *Barton* and the "gatekeeper function"—the remand decision in *Behrmann*—involved an exculpation provision that (unlike the one here) did *not* already carve-out claims for actual fraud, willful misconduct, or gross negligence but instead required a would-be plaintiff to "obtain[] the prior approval of the Bankruptcy Court to bring" suit. *Nat'l Heritage*, 478 B.R. at 224; pp.14, 87-88, *supra*. The Exculpation Provision here is materially different; it does not require the court to play any such role, and the carve-out serves the gate-keeping role that the U.S. Trustee claims is necessary—with the added benefit of providing certainty about the types of claims that can proceed past the gate.

All told, as with the Third-Party-Release Provision, the U.S. Trustee provides no sound reason why this Court should upset the Exculpation Provision, particularly when every party directly affected by the plan apparently supports that provision. Indeed, the fact that the U.S. Trustee is seeking to overturn a commonplace provision that every other party in this complex restructuring case supports should raise eyebrows, for it suggests that the U.S. Trustee's arguments are largely driven by the desire to advance and enshrine a policy position. And sure enough, in numerous recent cases, the U.S. Trustee has advanced similar arguments against similar exculpation provisions and third-party releases, *see, e.g.*, Am. Objection of U.S. Trustee

to Disclosure Statement at 10-25, Dkt.2572, *In re Intelsat S.A.*, No. 20-32299 (Bankr. E.D. Va. filed Aug. 6, 2021); Objection of U.S. Trustee to Confirmation at 2-4, Dkt.1012, *In re Le Tote, Inc.*, No. 20-33332 (Bankr. E.D. Va. filed Mar. 9, 2021); Objection of U.S. Trustee to Confirmation at 4, Dkt.890, *In re Pier 1 Imports, Inc.*, No. 20-30805 (Bankr. E.D. Va. filed July 23, 2020)—prompting one prominent bankruptcy judge to describe this "concerted policy drive by the U.S. Trustee" to "chip[] away at what can be done in a plan" as "incredibly inappropriate," Confirmation Hrg. Tr. at 13, Dkt.1235, *In re Diamond Offshore Drilling, Inc.*, No. 20-32307 (Bankr. S.D. Tex. April 8, 2021) (confirming plan), *aff'd*, No. 21-cv-1380, Dkt.16 (S.D. Tex. Sept. 3, 2021). This Court should likewise reject the U.S. Trustee's policy-driven efforts and uphold the Exculpation Provision.

## IV. The Bankruptcy Court Did Not Abuse Its Discretion in Addressing Confirmation Issues at the Confirmation Stage.

In a last-ditch attempt to overturn the plan, the U.S. Trustee asserts that "[t]he bankruptcy court abused its discretion in how it conducted the disclosure statement and confirmation approval process." UST.Br.47. This argument, too, is patently meritless.

The U.S. Trustee first suggests that the bankruptcy court abused its discretion in declining to "second-guess" the "request made by [Ascena] and [its] secured lenders" for approval of the Third-Party-Release Provision. UST.Br.48. But the U.S. Trustee is egregiously misquoting the bankruptcy court. In reality, the bankruptcy

court stated that it would not "second guess the decision" of "general unsecured creditors" and "equity security holders" to decline to opt-out of the Third-Party-Release Provision.  UST.App.2871.  And the bankruptcy court declined to do so because "these constituents" received all of the information necessary to "make an informed decision" about that provision themselves.  UST.App.2871.  Thus, contrary to the U.S. Trustee's mischaracterization, the bankruptcy court did not rubber-stamp a request from the "most powerful parties in the bankruptcy case" regarding the Third-Party-Release Provision; instead, the bankruptcy court simply respected the wishes of the "least powerful" parties.  UST.Br.48.

The U.S. Trustee additionally contends that the bankruptcy court abused its discretion in declining to resolve objections to the Third-Party-Release Provision "at the disclosure statement stage."  UST.Br.50-51.  According to the U.S. Trustee, resolving those objections at that juncture would have allowed "one of the objecting parties" to immediately pursue an interlocutory appeal, which would have avoided equitable-mootness concerns.  UST.Br.50.  As already explained, however, the U.S. Trustee *agreed* that the bankruptcy court should resolve those objections (including his) at the confirmation stage, *see* pp.16-17, *supra*, which is why he "resolved" his disclosure-statement objections before the disclosure-statement hearing, UST.App.920 and "did not present argument at" that hearing, UST.Br.16 n.6—and could not plausibly have pursued an interlocutory appeal.  In the end, the idea that

the bankruptcy court abused its discretion by following the U.S. Trustee's lead "sounds absurd, because it is," *Sekhar v. United States*, 570 U.S. 729, 738 (2013), and exemplifies all that is wrong with this appeal.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this appeal as equitably moot or, in the alternative, affirm the bankruptcy court.

Respectfully submitted,

GEORGE W. HICKS, JR. (*pro hac vice*)
ANDREW C. LAWRENCE (*pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
george.hicks@kirkland.com

EDWARD O. SASSOWER, P.C.
STEVEN N. SERAJEDDINI, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(202) 446-4800

JOHN R. LUZE
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000

*/s/ Cullen D. Speckhart*
CULLEN D. SPECKHART (VSB 79096)
*Counsel of Record*
OLYA ANTLE (VSB 83153)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
(202) 842-7800
cspeckhart@cooley.com

*Counsel for Appellee Mahwah Bergen Retail Group, Inc.*

Date: September 10, 2021

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with this Court's May 10, 2021 order because it contains 22,000 words, excluding the parts of the brief exempted by Fed. R. Bankr. P. 8015(g), as determined by the word counting feature of Microsoft Word 2016.

2. This brief complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the typestyle requirements of Fed. R. Bankr. P. 8015(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

Date: September 10, 2021

*/s/ Cullen D. Speckhart*
Cullen D. Speckhart

## CERTIFICATE OF SERVICE

I hereby certify that, on September 10, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Virginia by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Cullen D. Speckhart*
Cullen D. Speckhart