Nos. 3:21-cv-167-DJN (Lead Case), 3:21-cv-166 & 3:21-CV-00205(Consolidated)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

In re RETAIL GROUP INC, *et al.*, Debtors.

JOEL PATTERSON, *et al*. & JOHN P. FITZGERALD, III,
ACTING UNITED STATES TRUSTEE FOR REGION 4, Appellants,
v.
MAHWAH BERGEN RETAIL GROUP, INC., Appellee.

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Jointly Administered Bankruptcy Case No. 20-33113-KRH

## REPLY BRIEF OF APPELLANTS
## JOEL PATTERSON AND MICHAELLA CORPORATION

Michael Etkin (*pro hac vice* pending)
Andrew Behlmann (*pro hac vice*)
John Schneider (*pro hac vice*)
LOWENSTEIN SANDLER LLP
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500
metkin@lowenstein.com
abehlmann@lowenstein.com
jschneider@lowenstein.com

Ronald A. Page, Jr.
Virginia Bar No. 71343
RONALD PAGE, PLC
P.O. Box 73087
N. Chesterfield, Virginia 23235
(804) 562-8704
rpage@rpagelaw.com

*Counsel to Appellants Joel Patterson and Michaella Corporation*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Appellant Joel Patterson is a natural person.  Appellant Michaella Corporation has no parent corporation, and no publicly held corporation owns an interest of ten percent or more in Appellant Michaella Corporation.

# **TABLE OF CONTENTS**

**Pages**

TABLE OF AUTHORITIES ................................................................III

INTRODUCTION ............................................................................1

ARGUMENT ...................................................................................4

I.    THESE APPEALS SHOULD NOT BE DISMISSED AS EQUITABLY MOOT .......................................................................4

    A.    The "equitable mootness" doctrine as applied here violates Appellants' rights and improperly vitiates this Court's appellate jurisdiction. ...........................................................................4

    B.    These appeals are not equitably moot. .....................................6

        i.    The absence of a stay is irrelevant here. .....................8

        ii.    Substantial consummation of the Plan does not render these appeals equitably moot. ...........................10

        iii.    The relief Appellants seek would not undermine the success of the Plan. .................................................13

        iv.    The relief Appellants seek would not affect third parties. ..........................................................16

II.    APPELLANTS HAVE STANDING TO BRING THESE APPEALS .....................................................................................17

    A.    The Confirmation Order directly and adversely affected Appellants pecuniarily. .............................................................17

    B.    Appellants have appellate standing as fiduciaries for the Class. ........19

III.    THE BANKRUPTCY COURT LACKED JURISDICTION AND AUTHORITY TO APPROVE THE THIRD-PARTY RELEASE ......................................................................................20

    A.    Subject-Matter Jurisdiction. ...................................................20

B.     Constitutional Adjudicatory Authority. ...............................................24

     i.     The "action at issue" is the Securities Litigation......................26

     ii.    The Bankruptcy Court impermissibly entered final
        judgment on the Securities Claims. ..........................................27

C.     Class members did not knowingly and voluntarily consent to the
     Bankruptcy Court's adjudication of their claims. ...............................28

IV.    THE THIRD-PARTY RELEASE IS NONCONSENSUAL ........................29

A.     Class members' failure to return the Opt-Out Form did not evidence
     their manifestation of consent to the Third-Party Release..................29

B.     Even if Class members consented to the Third-Party Release, they
     received no consideration and thus no contract was formed. .............32

C.     Class action opt-out procedures are irrelevant here. ...........................34

V.     THE DEBTORS FAILED TO PROVIDE ACTUAL NOTICE
     OF THE THIRD-PARTY RELEASE CLASS MEMBERS........................35

A.     Delivery of the Opt-Out Documents was constitutionally deficient...35

B.     The Opt-Out Documents were constitutionally deficient. ..................36

VI.    THE DEBTORS FAILED TO SATISFY BEHRMANN. ...........................38

A.     Factor I..................................................................................................39

B.     Factor II.................................................................................................40

C.     Factor III................................................................................................41

D.     Factor IV................................................................................................42

E.     Factor V.................................................................................................43

F.     Factor VI................................................................................................43

VII.   APPELLANTS HAD AUTHORITY TO OPT OUT OF THE
     THIRD-PARTY RELEASE ON BEHALF OF THE CLASS .....................44

CONCLUSION ...................................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Matter of Alabama-Mississippi Farm Inc.*,
   791 F. App'x 466 (5th Cir. 2019) .......................................................................12

*In re AOV Indus., Inc.*,
   792 F.2d 1140 (D.C. Cir. 1986) .........................................................................27

*In re Bate Land & Timber LLC*,
   877 F.3d 188 (4th Cir. 2017) ......................................................................10, 14

*Behrmann v. National Heritage Foundation*,
   663 F.3d 704 (4th Cir. 2011) .....................................................................*passim*

*In re Bison Bldg. Holdings Inc.*,
   473 B.R. 168 (Bankr. S.D. Tex. 2012) ...............................................................25

*Blixseth v. Yellowstone Mountain Club, LLC*,
   609 F. App'x 390 (9th Cir. 2015) .........................................................................9

*Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*,
   841 F.2d 92 (4th Cir. 1988) .........................................................................11, 17

*In re Charter Communications*,
   691 F.3d 476 (2d Cir. 2012) ...........................................................9, 12, 15, 16

*In re Chateaugay Corp.*,
   10 F.3d 944 (2d Cir. 1993) ...................................................................................7

*Childs v. United Life. Ins. Co.*,
   No. 10-CV-23-PJC, 2012 WL 1857163 (N.D. Okla. May 21, 2012) ..........35, 36

*Clark v. Council of Unit Owners of 100 Harborview Drive*,
   2019 WL 4673434 (D. Md. Sept. 25, 2019).......................................................14

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2005) ...............................................................................21

*In re Congoleum Corp.*,
   362 B.R. 167 (Bankr. D.N.J. 2007) ...................................................21

*In re Continental Airlines*,
   203 F.3d 203 (3d Cir. 2000) ...............................................................14

*In re DBSD B. Am., Inc.*,
   634 F.3d 79 (2d Cir. 2011) ..................................................................18

*Deposit Guaranty Nat. Bank, Jackson, Miss. v. Roper*,
   445 U.S. 326 (1980).............................................................................34

*Dick v. Dick*,
   167 Conn. 210, 355 A.2d 110 (Conn. 1974) ......................................32

*In re Digital Impact, Inc.*,
   223 B.R. 1 (Bankr. N.D. Okla. 1998) .................................................28

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
   871 F. Supp. 2d 143 (E.D.N.Y. 2012) ................................................38

*In re Dynegy, Inc.*,
   770 F.3d 1064 (2d Cir. 2014) .........................................................4, 45

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974).............................................................................36

*In re Emerge Energy*,
   2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) .............................30

*In re Exide Technologies*,
   303 B.R. 48 (Bankr. D. Del. 2003)......................................................30

*In re Focus Media, Inc.*,
   378 F.3d 916 (9th Cir. 2004) ......................................................6, 7, 13

*In re Golden Inv. Acquisitions, LLC*,
   508 B.R. 381 (Bankr. N.D. W. Va. 2014) ..........................................20

*In re Hilal*,
   534 F.3d 498 (5th Cir. 2008) ..............................................................14

*Johnston v. Valley Credit Servs.*,
No. 05-6288, 2007 WL 1166017 (Bankr. N.D. W.Va. Apr. 12, 2007) ...................................................................................20

*Kane v. Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988) ...............................................................19

*In re Kirwan Offices S.a.r.l.*,
592 B.R. 489 (S.D.N.Y. 2018) ......................................................22, 23

*In re Lower Bucks Hosp.*,
488 B.R. 303 & 30, 313 (E.D. Pa. 2013)............................................21

*Mac Panel Co. v. Virginia Panel Corp.*,
283 F.3d 622 (4th Cir. 2002) ...................................................6, 7, 14

*McMorris v. TJX Companies, Inc.*,
493 F. Supp. 2d 158 (D. Mass. 2007)..................................................34

*In re Medford Crossings N., LLC*,
2011 WL 182815 (Bankr. D.N.J. Jan. 20, 2011)................................21

*Meekins v. Lakeview Loan Servicing, LLC*,
No. 3:19CV501 (DJN), 2020 WL 1922765 (E.D. Va. Apr. 21, 2020) ...................................................................................31

*In re Metcalfe & Mansfield Alt. Invs.*,
421 B.R. 685 (Bankr. S.D.N.Y. 2010)................................................21

*In re Midway Gold*
US, 575 B.R. 475 (Bankr. D. Colo. 2017)....................................21, 22

*In re Millennium Lab Holdings II, LLC ("Millennium I")*,
945 F.3d 126 (3d Cir. 2019) ...................................................6, 10, 23

*In re Millennium Lab Holdings II, LLC ("Millennium II")*,
591 B.R. 559 (D. Del. 2018)..................................................................7

*Montagna v. Holiday Inns, Inc.*,
221 Va. 336 (Va. 1980) .......................................................................32

*Narcia v. Samsung Telecomms. Am., LLC*,
845 F.3d 1279 (9th Cir. 2017) ...........................................................30

*National Heritage Foundation, Inc. v. Highbourne Foundation*,
    760 F.3d 344 (4th Cir. 2014) .........................................................................40, 43

*In re Neogenix Oncology, Inc.*,
    2015 WL 5786345 (Bankr. D. Md. 2015) ........................................................38

*Nordhoff Invs., Inc. v. Zenith Electronics Corp.*,
    258 F.3d 180 (3d Cir. 2001) .............................................................................10

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982)...........................................................................................24

*In re One2One Communications, LLC*,
    805 F.3d 428 (3d Cir. 2015) ...............................................................................7

*In re Ortiz*,
    665 F.3d 906 (7th Cir.2011) .............................................................................29

*In re Paige*,
    584 F.3d 1327 (10th Cir. 2009) ..........................................................................6

*In re Pringle*,
    495 B.R. 447 (9th Cir. BAP 2013) ...................................................................29

*In re Pub. Serv. Co. of New Hampshire*,
    963 F.2d 469 (1st Cir. 1992)..............................................................................12

*In re Purdue Pharma L.P.*,
    2021 WL 4240974 (Bankr. S.D.N.Y. Sept. 17, 2021).......................................20

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000) .............................................................................14

*In re Quigley Co.*,
    676 F.3d 45 (2d Cir. 2012) ...............................................................................20

*In re Quincy Medical Center, Inc.*,
    No. 11-16394-MSH, 2011 WL 5592907 (Bankr. D. Mass. Nov. 16,
    2011) .................................................................................................................40

*Republic Supply Co. v. Shoaf*,
    815 F.2d 1046 (5th Cir. 1987) ..........................................................................27

*Retz v. Siebrandt*,
    181 P.3d 84 (Wyo. 1983).........................................................................32

*Rivera-Colon v. AT&T Mobility Puerto Rico, Inc.*,
    913 F.3d 200 (1st Cir. 2019)...................................................................30

*Schnabel v. Trilegiant Corp.*,
    697 F.3d 110 (2d Cir. 2012) ...................................................................31

*In re Semcrude, L.P.*,
    728 F.3d 314 (3d Cir. 2013) .....................................................................4

*Snider Int'l Corp. v. Town of Forest Heights, Md.*,
    739 F.3d 140 (4th Cir. 2014) ..................................................................36

*In re Stearns Holdings*,
    LLC, 607 B.R. 781 (Bankr. S.D.N.Y. 2019) ..........................................22

*Stern v. Marshall*,
    564 U.S. 462 (2011)........................................................................*passim*

*United States v. Hanover Insurance Co.*,
    No. 2:15-CV-127, 2015 WL 9665679 (E.D. Va. Dec. 8, 2015).......................31

*Valley Boys, Inc. v. American Family Ins. Co.*,
    947 N.W. 2d 856 (Neb. 2020) .................................................................32

*In re VeroBlue Farms USA, Inc.*,
    6 F.4th 880 (8th Cir. 2021) ......................................................................5

*Victory Park Credit Opportunities, LP v. VPR Liquidation Tr. ex rel.
Milligan*,
    539 B.R. 305 (W.D. Tex. 2015) ..............................................................11

*In re Vioxx Products Liability Litigation*,
    2018 WL 4613941 (E.D. La. 2018).....................................................34, 35

*In re Washington Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011)........................................................30

*Wellness International Network, Ltd. v. Sharif*,
    575 U.S. 665 (2015)............................................................................28, 29

*In re Zale Corp*,
    62 F.3d 746 (5th Cir. 1995) ................................................................................21

*In re Zenith Electronics Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ...................................................................30

**Statutes**

11 U.S.C. § 363(m) .................................................................................................5

11 U.S.C. § 502(e)(1)(B) ........................................................................................42

11 U.S.C. § 510(b) ..................................................................................................42

28 U.S.C. § 157 ...............................................................................5, 21, 22, 23, 24

28 U.S.C. § 1334 ......................................................................................................5

**Other Authorities**

Fed. R. Bankr. P. 7023 .............................................................................................8

Restatement (Second) of Contracts § 71, cmt..........................................................32

# **INTRODUCTION**[1]

1.      Appellee's brief misses the mark on numerous fronts, failing to address many of Appellants' arguments and elsewhere falling far short of demonstrating that approval of the Third-Party Release, as it relates to the two Individual Defendants, was appropriate.

2.      Appellee also misstates the scope of the relief Appellants seek. Appellants do not seek wholesale reversal of the Confirmation Order or removal of the Third-Party Release in its entirety.  The relief Appellants seek is narrowly focused, requesting only to preserve the direct claims of Class members against the two Individual Defendants in the Securities Litigation.  All other provisions of the Plan and Confirmation Order would remain intact, and every other Released Party would be unaffected.  Indeed, elimination of the Third-Party Release solely as to Class members' claims against the Individual Defendants would have no impact on the Plan or Appellee's liquidation.

3.      Appellee's assertion that these appeals are equitably moot is a meritless attempt to dodge appellate review of the illegal Third-Party Release.  Appellee's attempt to bypass this Court's "virtually unflagging obligation" to exercise its appellate jurisdiction must be rejected.  Even if this Court were to consider the merits

---

[1]   Capitalized terms used but not defined herein have the meanings given thereto in Appellants' Opening Brief [Doc. No. 30] and Appellee's Responsive Brief [Doc. No. 43], as applicable.

of that argument, Appellee has failed to meet its heavy burden of establishing that these appeals are equitably moot.

4.      Second, Appellants unquestionably have standing to bring these appeals.   The Plan and Confirmation Order directly and adversely affected Appellants' individual pecuniary interests.  This alone confers standing.  Moreover, as court-appointed lead plaintiffs in the Securities Litigation, Appellants are fiduciaries with not just a right, but an obligation, to protect Class members' rights and claims.

5.      Third, the Bankruptcy Court lacked subject matter jurisdiction and constitutional adjudicatory authority to approve the Third-Party Release.  Appellee's assertion that inclusion of the Third-Party Release in the Plan automatically gave the Bankruptcy Court jurisdiction to approve it is empty, circular logic.   If such bootstrapping were permissible, chapter 11 debtors could obtain virtually any relief from a Bankruptcy Court – an Article I court – simply by including that relief in a chapter 11 plan.   The Bankruptcy Court also lacked constitutional authority to approve the Third-Party Release of Class members' claims against the Individual Defendants because those claims, which are purely private rights, do not arise under the Bankruptcy Code, are not impacted by bankruptcy law, and would never be addressed through the process of reconciling claims against Appellee.

6.     Fourth, Class members' failure to return the Opt-Out Form did not manifest consent to the Third-Party Release.  This Court has held that silence and inaction cannot be construed as assent to an offer.  Appellee has presented nothing to justify deviating from this well-established rule.  Even if silence could be construed as consent, the supposedly consensual Third-Party Release nevertheless was a contractual nullity because Class members received no consideration. Contrary to Appellee's arguments, there is a material difference between the opt-out procedures utilized in class actions and the contrived opt-out mechanism in the Plan: opt-out class action lawsuits, a mechanism created by law and not merely invented by a litigant, benefit class members through inclusion as the default, whereas the Third-Party Release harmed Class members by stripping them of their only source of recovery in the Securities Litigation.

7.     Fifth, even if the opt-out mechanism were appropriate, Appellee's attempt to serve notice of it on Class members was constitutionally deficient. Appellee has presented no evidence that Nominees actually provided the Opt-Out Documents to any, much less all, Class members.  Even if delivered, the documents themselves failed to disclose the existence of the Securities Litigation, describe the Securities Claims against the Individual Defendants, or explain that the Third-Party Release would release those claims in exchange for absolutely nothing.

8. Sixth, even if the Third-Party Release were consensual, Appellee did not – indeed, could not – satisfy its burden under *Behrmann v. National Heritage Foundation,* 663 F.3d 704, 713-14 (4th Cir. 2011) for approval of the Third-Party Release. The Bankruptcy Court erred not only in holding that the Third-Party Release was consensual, but also in failing to make any of the detailed factual findings required under *Behrmann*.

9. Finally, the Bankruptcy Court erred in holding that Appellants lacked inherent authority to opt out of the Third-Party Release on behalf of all Class members. The Bankruptcy Court's reliance on *In re Dynegy, Inc.,* 770 F.3d 1064 (2d Cir. 2014) is misplaced, given that the case is not controlling precedent and is readily distinguishable.

## **ARGUMENT**

### I. THESE APPEALS SHOULD NOT BE DISMISSED AS EQUITABLY MOOT

#### *A. The "equitable mootness" doctrine as applied here violates Appellants' rights and improperly vitiates this Court's appellate jurisdiction.*

10. The Court should reject Appellee's equitable mootness argument because application of the doctrine would unjustly eliminate Appellants' rights and frustrate the Court's "virtually unflagging obligation" to exercise its appellate jurisdiction. *In re Semcrude, L.P.,* 728 F.3d 314, 320 (3d Cir. 2013).

11.     Bankruptcy courts, as Article I courts, are courts of constitutionally and statutorily limited jurisdiction. *See* 28 U.S.C. §§ 157(b)(1), 1334(a)-(b). Accordingly their orders and judgments are subject to review by Article III courts. 28 U.S.C. § 157(b)(1). District courts have jurisdiction to hear appeals from, among other things, "final judgments, orders, and decrees" of bankruptcy courts. *Id.* § 158(a)(1). Parties thus have a statutory right to "appeal final judgments of a bankruptcy court in core proceedings to the district court, which reviews them under traditional appellate standards." *Stern v. Marshall,* 564 U.S. 462, 474-75 (2011).

12.     Congress has authorized only narrow exceptions to the appellate review of bankruptcy court orders. The Bankruptcy Code provides that certain orders, in specific, enumerated situations, are not subject to reversal on appeal because that would be unfair to the settled expectations of innocent third parties. *See, e.g.*, 11 U.S.C. §§ 363(m) (good faith purchaser of estate assets); 364(e) (good faith postpetition lender). Congress did not similarly shield confirmation of chapter 11 plans from appellate review. Indeed, the Eighth Circuit recently recognized the incompatibility of the equitable mootness doctrine with a litigant's statutory right to appellate review of bankruptcy court decisions on their merits. *See In re VeroBlue Farms USA, Inc.*, 6 F.4th 880, 890 (8th Cir. 2021) (directing that at least some inquiry into whether a "confirmed plan must be set aside on the merits" is required before equitable mootness may be invoked.).

13.    Congress has explicitly provided for this Court's review of the Confirmation Order.   Adherence to that duty requires this Court to oversee the Bankruptcy Court, to which it has referred bankruptcy proceedings.   Application of the equitable mootness doctrine would circumvent such appellate review and sidestep the Court's powers and responsibilities.   The Court should refuse Appellee's invitation to do so.

### B.    These appeals are not equitably moot.

14.    Even if this Court were to consider Appellee's equitable mootness argument, Appellee has failed to carry its "heavy burden" of establishing that Appellants' appeals are equitably moot.  *See In re Focus Media, Inc.*, 378 F.3d 916, 923 (9th Cir. 2004); *see also In re Paige*, 584 F.3d 1327, 1340 (10th Cir. 2009) (holding that "the party inviting the court not to reach the merits of an appeal always carries the burden of showing . . . that it would be unfair or impracticable to reverse the confirmed plan").

15.    Unlike constitutional mootness, which extinguishes the "case or controversy" necessary for federal court jurisdiction, equitable mootness is a judicial invention that considers whether granting the requested relief would be "impractical and imprudent[.]"  *Mac Panel Co. v. Virginia Panel Corp.,* 283 F.3d 622, 625 (4th Cir. 2002).   Mindful that equitable mootness "is a narrow doctrine[,]" *In re Millennium Lab Holdings II, LLC (*"*Millennium I*"*)*, 945 F.3d 126, 140 (3d Cir.

2019), courts have recognized that it should have limited application.  *See, e.g., In re One2One Communications, LLC*, 805 F.3d 428, 433-34 (3d Cir. 2015) (because a party has a statutory right to appeal confirmation of a bankruptcy plan, equitable mootness should be limited to those situations that would "produce a perverse outcome") (internal quotations omitted); *In re Millennium Lab Holdings II, LLC ("Millennium II")*, 591 B.R. 559, 578 (D. Del. 2018) (dismissal of an appeal as equitably moot "should be the rare exception and not the rule[.]").

16.    In light of the doctrine's narrow application, the prospect of granting effective relief on even one aspect of an appeal will defeat a claim of equitable mootness.  *See, e.g., Focus Media, Inc.,* 378 F.3d at 923 (appeal was not equitably moot because "[f]ashioning relief in this case would not be impossible"); *In re Chateaugay Corp.*, 10 F.3d 944, 954 (2d Cir. 1993) (concluding that an appeal was not equitably moot because "at least some effective relief could be granted").

17.    The Fourth Circuit has identified four factors a court should consider in determining whether a bankruptcy appeal is equitably moot: (1) whether the appellant sought and obtained a stay; (2) whether the plan has been substantially consummated; (3) the extent to which the relief requested would affect the success of the plan; and (4) the extent to which the relief requested would affect the interests of third parties.  *Mac Panel*, 283 F.3d at 625.  No single factor is dispositive, and dismissal must "be based on an evidentiary record, and not speculation." *Millennium*

*II*, 591 B.R. at 578.  All four factors weigh heavily against dismissing these appeals as equitably moot.

### i.      The absence of a stay is irrelevant here.

18.      The first factor, whether Appellants sought and obtained a stay, is irrelevant here.  Contrary to Appellee's contention, Appellants did not sit idly by while the Plan was consummated.  At every juncture in the Chapter 11 Cases, Appellants and others objected to the Third-Party Release, the opt-out procedures, and the inclusion of the Individual Defendants among the Released Parties as illegal and impermissible:

- On August 28, 2020, Appellants filed their Disclosure Statement Objection arguing, among other things, that the Third-Party Release was impermissible as a matter of law, and that the opt-out procedures were illegal and inappropriate;

- On October 2, 2020, Appellants filed the Rule 7023 Motion, seeking authority (or confirmation of their inherent authority) to opt out of the Third-Party Release on behalf of the Class;

- On October 13, 2020, Appellants filed their Initial Plan Objection arguing, among other things, that the Third-Party Release contained in the Plan was illegal and that the opt-out procedures were a legally impermissible means of manufacturing the illusion of "consent" by the Class to the Third-Party Release;

- On February 4, 2021, Appellants filed their Supplemental Plan Objection, additionally arguing that the impermissible opt-out mechanism was designed solely to engineer deemed "consent" that no rational,

fully informed member of the Class would ever voluntarily give;

- On March 11, 2021, just two days after the Bankruptcy Court issued its Confirmation Opinion, Appellants timely commenced the first of these appeals;

- On April 8, 2021, Appellants filed in the Bankruptcy Court a joinder to the United States Trustee's motion for a stay of the Confirmation Order pending appeal;

- On June 15, 2021, Appellants filed in this Court a joinder to the United States Trustee's motion for a stay of the Confirmation Order pending appeal; and

- Both requests for a stay were denied.

19.     Neither the Bankruptcy Code nor any other statute or rule predicates Appellants' ability to appeal the Confirmation Order on obtaining a stay.  *See Blixseth v. Yellowstone Mountain Club, LLC,* 609 F. App'x 390, 392 (9th Cir. 2015) (appeal from confirmation of substantially consummated plan was not equitably moot in the absence of a stay).  Appellee and the Individual Defendants were aware throughout the Chapter 11 Cases that the Third-Party Release could be stricken in its entirety, or at least limited as to the Individual Defendants.  *See In re Charter Communications,* 691 F.3d 476, 484-85 (2d Cir. 2012) (finding that a "prudent" party would take an "appeal and the possibility of an adverse ruling" into account before entering into post-confirmation transactions with a debtor).

20.     A party's failure to obtain a stay is only relevant "if the failure to do so creates a situation *rendering it inequitable to reverse the orders appealed from*."

*Nordhoff Invs., Inc. v. Zenith Electronics Corp.,* 258 F.3d 180, 186-87 (3d Cir. 2001) (internal quotations marks and citations omitted; emphasis added); *see also Millennium II,* 591 B.R. at 578–79 (the statutory right of appeal is not premised on seeking a stay, and the "failure to obtain a stay does not weigh in favor of either party."). The Fourth Circuit has held that granting relief on appeal from a confirmation order is not inequitable if such relief could be accomplished "*without affecting the recovery of any other creditor*[.]" *In re Bate Land & Timber LLC,* 877 F.3d 188, 196 (4th Cir. 2017) (emphasis added).

21.    It is critical that Appellants do not seek to reverse the Confirmation Order, or to strike the Third-Party Release, in their entirety. The relief Appellants seek is narrowly tailored to the Individual Defendants – who had (and have) nothing to do with the Debtors' restructuring efforts or the liquidation of their assets – and would not impact any other aspect of the Plan. As a result, this factor does not support a finding of equitable mootness.

### ii.    Substantial consummation of the Plan does not render these appeals equitably moot.

22.    The second factor – whether the Plan has been substantially consummated – weighs against a finding of equitable mootness. Appellee has not demonstrated that *any* transactions or distributions contemplated by the Plan depended upon the gratuitous Third-Party Release of the Individual Defendants, *former* officers and directors, who had no role in the Debtors' restructuring efforts

-10-

and eventual sale, and who provided no financial contribution in furtherance of (much less a contribution essential to) the Plan.

23.     The absurdity of Appellee's position is further demonstrated by the fact that (a) Appellee introduced no evidence below that it owes any automatic, immediate indemnification rights to the Individual Defendants and (b) the Securities Claims against the Individual Defendants have no financial impact on Appellee's estate or the transactions and distributions contemplated under the Plan.

24.     As the Fourth Circuit has recognized, confirmation orders "do not become immune from appellate review upon their partial, or even substantial, implementation." *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.,* 841 F.2d 92, 96 (4th Cir. 1988).  That is especially true here, where Appellee sold its assets prior to Plan confirmation and are liquidating, not reorganizing.  *See Abengoa Bioenergy Biomass of Kansas, LLC,* 958 F.3d 949, 959–60 (10th Cir. 2020) (liquidating plan does not "implicate the same concerns" that a reorganization would, and therefore "militates against a determination of equitable mootness.").

25.     Consumation of a plan is only relevant to an equitable mootness analysis "*when the requested relief will likely unravel the plan*[.]"  *Victory Park Credit Opportunities, LP v. VPR Liquidation Tr. ex rel. Milligan*, 539 B.R. 305, 311 (W.D. Tex. 2015) (citation omitted; emphasis added).  The moving party bears a heavy burden of demonstrating that post-confirmation transactions were legitimately

dependent upon the exclusion of the relief requested on appeal. *In re Pub. Serv. Co. of New Hampshire*, 963 F.2d 469, 474 (1st Cir. 1992) (appeal was equitably moot where plan confirmation resulted in "innumerable transfers legitimately effected to and among innocent third parties"); *Matter of Alabama-Mississippi Farm Inc.,* 791 F. App'x 466, 470 (5th Cir. 2019) (finding an appeal was not moot when "nothing in the record" suggested that the sale was dependent upon how the proceeds of that sale were distributed). Appellee cannot meet that heavy burden.

26.    None of the transactions or distributions contemplated under the Plan were conditioned upon, depended on, or were otherwise connected in any way to, the gratuitous Third-Party Release of the Individual Defendants. The record below contains no evidence of any such connection, because none exists. The narrow relief Appellants seek asks this Court to apply only "a scalpel" to exclude claims against two Individual Defendants from the Third-Party Release, "rather than an axe" to the entire Plan or even the entire Third-Party Release. *Charter Communications,* 691 F.3d at 481. The requested relief would have no impact whatsoever on Appellee, any creditor, or any third party that entered into transactions with Appellee or received distributions under the Plan. Therefore, this factor weighs heavily against a finding of equitable mootness.

### iii.    The relief Appellants seek would not undermine the success of the Plan.

27.     The third factor – whether the relief Appellants seek would affect the success of the Plan – also weighs heavily against a finding of equitable mootness. Appellee contends, with no support in the record below (or anywhere else), that the relief Appellants seek would throw the Plan "into disarray" and disrupt "core transactions" of the Plan.  Appellee.Br.35.  These conclusory, hyperbolic assertions ignore the fact that Appellants seek only very narrow relief that would not upset the Plan at all, much less throw it into disarray.

28.     Appellee consistently mischaracterizes Appellants' position and the relief they seek.  Appellants do not seek to strike the Third-Party Release in its entirety, or to alter the benefits it provides to any Released Parties that may have contributed to the success of the Plan.  Nor do they seek to "unravel a complicated bankruptcy plan." *Focus Media,* 378 F.3d at 923.  Instead, Appellants are only pursuing removal of the claims against the Individual Defendants in the Securities Litigation from the effects of Third-Party Release.  To this day, Appellee has utterly failed to identify a substantive or reasonable basis for this gratuitous gift to two *former* directors and officers at the severe detriment to disenfranchised investors.

29.     The success of a confirmed plan will not be undermined by an appeal where, as here, the requested relief "would not impact other creditors" or disturb the plan "in any material way[.]" *Bate Land & Timber,* 877 F.3d at 196.  The success

-13-

of a plan could be undermined where the requested relief would result in the disgorgement of plan disbursements to creditors, *Clark v. Council of Unit Owners of 100 Harborview Drive,* 2019 WL 4673434, at \*6 (D. Md. Sept. 25, 2019), or the return of money to a third party that had already funded the plan and the subsequent recoupment of distributions to creditors, *Mac Panel,* 383 F.3d at 626-27.  Neither circumstance exists here.

30.     Courts, including the Fourth Circuit, routinely hold that appeals seeking to sever non-debtor releases do not undermine the success of a plan or render an appeal equitably moot.  *See, e.g., Behrmann,* 663 F.3d at 713-14 (declining to dismiss an appeal as equitably moot when the movant failed to demonstrate how third-party interests would be affected, or the success of the confirmed plan would be jeopardized, if non-debtor releases were stricken from plan); *In re Hilal*, 534 F.3d 498, 500-01 (5th Cir. 2008) (appeal challenging release provisions of plan, and not the entire confirmation order, was not equitably moot); *In re PWS Holding Corp.*, 228 F.3d 224, 236 (3d Cir. 2000) (appeal not equitably moot where "releases (or some of the releases) could be stricken from the plan without undoing other portions of it"); *In re Continental Airlines*, 203 F.3d 203, 210 (3d Cir. 2000) (appeal challenging non-consensual third-party releases was not equitably moot because no evidence was presented that the appeal, if successful, would necessitate reversal or

unraveling of the entire plan).  This is true even if the plan has been substantially consummated.  *Behrmann,* 663 F.3d at 713-14.

31.     At the Confirmation Hearing, counsel for Appellants asked Carrie Teffner and Gary Begeman, two directors of Appellee, whether removing the Individual Defendants from the list of Released Parties with regard to the Securities Litigation would undermine the Plan or cause Appellee not to proceed to confirmation.  Both failed to answer, claiming that the question was hypothetical, and refused to state under oath that pursuing the Securities Litigation against the Individual Defendants would prevent the Debtors from moving forward with confirmation. A00007480 – A00007643 (*see* 35:23 – 36:23, 47:18 – 47:23).  Thus, Appellee's own testimony below demonstrates that the relief requested in these appeals would not impact or undermine the implementation of the Plan.

32.     Appellee next argues that a nonseverance clause renders the Third-Party Release essential to the Plan.  This argument fails for two reasons.  First, Appellants do not seek to sever the Third-Party Release.  Second, "a nonseverability clause standing on its own cannot support a finding of equitable mootness." *Charter Communications,* 691 F.3d at 485 (citation omitted). "Allowing a boilerplate nonseverability clause, without more, to determine the equitable mootness question would give the debtor and other negotiating parties too much power to constrain Article III review." *Id.*

-15-

33.     The relief Appellants seek is narrowly tailored and would not disrupt or undermine the success of the Plan.  Appellee presented no evidence to the contrary below, and its attempt to rely on a nonseverance clause in the Plan is unavailing. Accordingly, this factor weighs against a finding of equitable mootness.

### iv.     The relief Appellants seek would not affect third parties.

34.     The final factor – whether the relief Appellants seek would affect the interests of third parties – also weighs heavily against a finding of equitable mootness.   The relief Appellants seek would not alter creditors' recoveries or necessitate disgorgement of funds distributed under the Plan.   Nor do Appellants seek to have the Third-Party Release declared "categorically unenforceable," as Appellee contends.   Appellee.Br.35.   Appellants seek only to remove the claims of the Class against the Individual Defendants in the Securities Litigation from the scope of the Third-Party Release.

35.     An appeal of a plan confirmation order in the Fourth Circuit may be found equitably moot if the relief requested would have an adverse impact on a significant number of innocent third parties.   For instance, in *Central States*, a number of transactions involving third parties had occurred after confirmation:  The debtor had canceled its stock, issued new stock, and activated a line of credit, and was back in business; the trustee had relinquished control of the company; and "very substantial disbursements of money had been made" to third parties.  841 F.2d at 92,

-16-

94-96.  The appellant in *Central States* sought to undo confirmation in its entirety, which "would require the undoing of financial transactions involving third parties." *Id.* at 95-96.  No such circumstances exist here.

36.    Appellee claims that the relief Appellants seek would affect "thousands of parties" not before this Court, who are now supposedly enjoying the "Avoidance Action Waiver" and their status as Released Parties, Appellee.Br.48.  However, the narrow relief Appellants seek does not implicate those concerns at all.   The Avoidance Action Waiver and Third-Party Release would remain fully intact, and every Released Party except for the Individual Defendants (who contributed nothing to the Plan and left Appellee's employ prior to its bankruptcy) would be unaffected. Setting Appellee's empty hyperbole aside, no third parties have entered into complex transactions with Appellee in reliance on the existence of the Third-Party Release of the two Individual Defendants.  Accordingly, this factor weighs against a finding of equitable mootness.

## II.    APPELLANTS HAVE STANDING TO BRING THESE APPEALS

### A.    *The Confirmation Order directly and adversely affected Appellants pecuniarily.*

37.    Appellee concedes that, as a general rule, a party "directly and adversely affected pecuniarily" by a court order is a "person aggrieved by that order" for purposes of bankruptcy appellate standing.  However, Appellee argues that

because Appellants opted out of the Third-Party Release,[2] they were not affected pecuniarily by the Confirmation Order.  Appellee is incorrect.

38.     The pecuniary effects of the Third-Party Release are evident in the nature of the Securities Litigation as a class action.  Aggregation of numerous claims of individually small value is the very reason the class device is a staple of litigation, and in particular, securities litigation.  The ability to represent the Class as a whole, and to pursue aggregate damages for the entire Class, is what enables Appellants to pursue the Securities Litigation against the Individual Defendants.  Indeed, the New Jersey District Court appointed Appellants as lead plaintiffs for this very purpose. Left intact, the Third-Party Release would strip Appellants of the ability to obtain a recovery for the Class, and would essentially eliminate their ability to fulfill their responsibilities as court-appointed lead plaintiffs.    Accordingly, Appellants unquestionably have standing to challenge the propriety of the Third-Party Release. *Cf. In re DBSD B. Am., Inc.,* 634 F.3d 79, 91 (2d Cir. 2011) (creditor affected directly and financially by plan confirmation order, and who appealed "seeking to enlarge its recovery" had standing for appellate purposes).

---

[2]   Appellee's argument is premised on a deceptive death trap in the Plan deeming any party that objected to the Third-Party Release to have opted out.  That provision creates a catch-22: failing to object may have waived the right to challenge the Third-Party Release on appeal, but Appellee claims that objecting deprived Appellants of standing to appeal.  The Court should not countenance such underhanded gamesmanship.  In any event, even if Appellants had opted out on their own behalf, they still have standing to appeal.  *See* ¶¶ 38-39.

**B.   *Appellants have appellate standing as fiduciaries for the Class.***

39.     Appellants also have standing to pursue these appeals because they are fiduciaries for the Class, have rights closely aligned with those of Class members, and are the court-appointed advocate for Class members' rights.[3]   Appellee's reliance on *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) is misplaced. The *Kane* court prohibited an appellant from asserting claims on behalf of third parties because it had "[p]rudential concerns" that the appellant's *success in the appeal would reduce assets available to the third parties* whose rights were already represented in the proceedings.   *Id.* at 644.   Here, Class members have no one but Appellants to speak on their behalf.   Class members' only chance at recovering anything for their losses occasioned by the Individual Defendants' misconduct is through Appellants' efforts to undo the unjustified, draconian impact of the Third-Party Release on their claims against the Individual Defendants now pending in an Article III court.   Appellants' success as court-appointed lead plaintiffs in these

---

[3]   Consistent with these duties, Appellants filed the Rule 7023 Motion, seeking to opt out of the Third-Party Release on behalf of the Class.  The Rule 7023 Hearing was initially scheduled for the same date as Plan confirmation.  The Debtors subsequently adjourned the confirmation hearing eight times. In the interest of efficiency, Appellants and the Debtors agreed to concurrently adjourn the Rule 7023 Hearing.  Appellee's present use of the agreed-upon adjournment of the Rule 7023 Hearing as a sword is not only inappropriate and misleading, it fails to recognize that a Class-wide opt out would not impact the estate or any creditor.

appeals will preserve claims and maximize the recoveries of Class members who received nothing under the Plan, and whose interests they are tasked to represent.

## III. THE BANKRUPTCY COURT LACKED JURISDICTION AND AUTHORITY TO APPROVE THE THIRD-PARTY RELEASE

40.    As set forth in Appellants' Opening Brief, the Bankruptcy Court lacked both subject-matter jurisdiction and constitutional adjudicatory authority to approve the Third-Party Release of Class members' Securities Claims against the Individual Defendants. *See* Appellant.Br.31-46.

### A. *Subject-Matter Jurisdiction.*

41.    A proceeding solely between non-debtors, based on nonbankruptcy law, such as the Securities Litigation, can only lie within a bankruptcy court's jurisdiction if the outcome "could alter the debtor's rights, liabilities, options, or freedom of action." *In re Golden Inv. Acquisitions, LLC*, 508 B.R. 381, 385 (Bankr. N.D. W. Va. 2014).  A cause of action is not related to a bankruptcy case where, as here, "win, lose or draw, there would be no effect on the bankruptcy estate." *Johnston v. Valley Credit Servs.,* No. 05-6288, 2007 WL 1166017, at *5–6 (Bankr. N.D. W.Va. Apr. 12, 2007); *see also In re Quigley Co.,* 676 F.3d 45, 57 (2d Cir. 2012) (the touchstone for bankruptcy jurisdiction remains "whether the outcome of a third-party action might have any conceivable effect on the bankruptcy estate") (citation omitted); *In re Purdue Pharma L.P.,* 2021 WL 4240974, at *45 (Bankr. S.D.N.Y. Sept. 17, 2021) ("To properly be subject to a third-party claims release

under a plan . . . the third-party claim should be premised as a legal matter on a meaningful overlap with the debtor's conduct.").

42.    Appellee never seriously challenges this principle.  Instead, Appellee argues that because plan confirmation proceedings are core proceedings under 28 U.S.C. § 157(b)(2)(L), the Bankruptcy Court was vested with statutory authority to approve the nonconsensual Third-Party Release of Class members' Securities Claims. Appellee.Br.57.  This argument is unavailing.

43.    The Bankruptcy Court had jurisdiction over the Chapter 11 Cases and confirmation of the Plan.  28 U.S.C. §§ 157(a), (b)(2)(L).  However, Appellee did not create Bankruptcy Court jurisdiction to approve the Third-Party Release of the Securities Claims, where jurisdiction did not otherwise exist, simply by including it in the Plan.  As a number of courts have determined, plan confirmation does not automatically confer jurisdiction on bankruptcy courts to approve involuntary third-party releases.  *See, e.g.*, *In re Metcalfe & Mansfield Alt. Invs.,* 421 B.R. 685, 696 (Bankr. S.D.N.Y. 2010); *In re Zale Corp*, 62 F.3d 746, 753 (5th Cir. 1995); *In re Combustion Eng'g, Inc*., 391 F.3d 190, 224, 233 (3d Cir. 2005); *In re Lower Bucks Hosp*., 488 B.R. 303, 312 nn.28 & 30, 313 (E.D. Pa. 2013); *In re Medford Crossings N., LLC*, 2011 WL 182815, at *14 (Bankr. D.N.J. Jan. 20, 2011); *In re Congoleum Corp*., 362 B.R. 167, 190-91 (Bankr. D.N.J. 2007); *In re Midway Gold* US, 575 B.R. 475, 517–20 (Bankr. D. Colo. 2017).  As the *Midway Gold* court observed:

'confirmations of plans' are expressly made core proceedings under 28 U.S.C. § 157(b)(2)(L) which the Court may hear and determine on a final basis. However, *the Court cannot permit third-party non-debtors to bootstrap their disputes into a bankruptcy case in this fashion. There must be some independent statutory basis for the Court to exercise jurisdiction over the third-parties' disputes before the Court may adjudicate them.*

*Id.* at 519 (emphasis added).

44.     Even those courts finding that 28 U.S.C. § 157(b)(2)(L) grants bankruptcy courts subject matter jurisdiction to approve involuntary third-party releases have declined to expand that jurisdiction to the extent that the Bankruptcy Court did here.  For instance, in *In re Stearns Holdings*, LLC, 607 B.R. 781 (Bankr. S.D.N.Y. 2019), the bankruptcy court determined it had subject matter jurisdiction over third-party releases contained in a plan because the releases were "*expressly limited to Claims or Causes of Action 'based on or relating to' the Debtors [and] Chapter 11 Cases[,]*" and because the claims "*could have an effect on the res of the bankruptcy estate*[.]"  *Id*. at 787 (emphasis added); *see also In re Kirwan Offices S.a.r.l.*, 592 B.R. 489, 506 (S.D.N.Y. 2018) ("It would surely be improper for a bankruptcy court to confirm a plan releasing third-party, non-debtor claims that were unrelated (or even tangentially related) to the debtor or the bankruptcy case.").  The *Stearns* court emphasized that in order to approve a non-debtor release contained in a plan of reorganization, "a bankruptcy court must have subject matter jurisdiction

-22-

over the released claims, which turns on whether the claims have any conceivable effect on the bankruptcy estate." *Id.* (internal quotations and citation omitted)

45.     And in *Millennium I,* the Third Circuit found that the Bankruptcy Court had jurisdiction under 28 U.S.C. § 157(b)(2)(L) to confirm a plan containing releases by creditors of claims against the debtors' equity holders.  However, it did so only after finding "the record ma[de] abundantly clear" that the releases "were absolutely required" to induce the equity holders to fund the plan with $325 million in cash, funding that was needed to fund a settlement payment to the federal government, restore the debtors' ability to receive payments from Medicare, and thereby avoid liquidation of the company.  *Id.* at 137.  The Third Circuit emphasized, however, that it was "not broadly sanctioning the permissibility of nonconsensual third-party releases in bankruptcy reorganization plans[,]" and cautioned that "exacting standards" must be satisfied before doing so.  *Id.* at 139 (citations omitted).

46.     The claims against the two Individual Defendants have nothing to do with these Chapter 11 Cases and will have no effect on the bankruptcy estates.  The Individual Defendants left Appellee's employ well before the Debtors filed for bankruptcy protection, played absolutely no role in their reorganization efforts or eventual sale and liquidation, and provided absolutely no value in connection with the Plan – much less a substantial financial contribution to make the Plan feasible.  Thus, while the Bankruptcy Court had subject matter jurisdiction to confirm the Plan

under 28 U.S.C. § 157(b)(2)(L), it lacked jurisdiction to approve the Third-Party Release of Class members' claims against the Individual Defendants.

### B.    *Constitutional Adjudicatory Authority.*

47.    The Bankruptcy Court also lacked constitutional adjudicatory authority to release Class members' claims against the Individual Defendants. A bankruptcy court has constitutional adjudicatory authority to approve a release of claims by non-debtors against other non-debtors only if the release is integral to the "restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power[.]" *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 71 (1982). As applied to the claims of Class members against the Individual Defendants, the Third-Party Release was wholly unrelated (much less integral) to the restructuring of creditors' claims against Appellee.

48.    In *Stern,* the Supreme Court articulated a disjunctive test for considering bankruptcy courts' constitutional authority to adjudicate claims. This test was intended to capture the category of cases involving "public rights" that Congress could constitutionally assign to bankruptcy courts for resolution. 564 U.S. at 485. Under *Stern*, a bankruptcy court cannot enter a final order unless either the "action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern*, 564 U.S. at 499. Neither circumstance exists here.

-24-

49.    A matter "stems from the bankruptcy itself if the right is established by the Bankruptcy Code or if the substantive outcome of the issue is affected by bankruptcy law."  *In re Bison Bldg. Holdings Inc*., 473 B.R. 168, 171–72 (Bankr. S.D. Tex. 2012).  The Securities Litigation was pending before the Chapter 11 Cases. The claims against the Individual Defendants in the Securities Litigation are based upon their conduct long before the Debtors filed for bankruptcy protection, arise under the federal securities laws, not under the Bankruptcy Code, and are not affected by bankruptcy law.  Those claims, which are purely private rights that only Article III courts have constitutional authority to adjudicate, also would not – indeed, *could* not – be resolved in the bankruptcy claims allowance process.

50.    Rather than seriously challenging the indisputable *Stern* analysis applicable here, Appellee simply tries to conflate approval of the Third-Party Release (as to which the Bankruptcy Court lacked constitutional adjudicatory authority, at least as applied to the claims of the Class against the Individual Defendants) with confirmation of the Plan.  Appellee.Br.59.  Appellee also asserts that the Bankruptcy Court did not enter a final judgment on the merits of the Securities Claims.  Finally, Appellee argues that parties who failed to return (or even receive) the Opt-Out Form, including Class members, nevertheless consented to the Bankruptcy Court's jurisdiction and constitutional adjudicatory authority.  All three arguments are meritless.

### i.    The "action at issue" is the Securities Litigation.

51.    Although the Bankruptcy Court had constitutional authority to confirm the Plan, it had no authority under Article III to enter a final judgment on the *Securities Claims*.   Because the Third-Party Release in favor of the Individual Defendants, if allowed to stand, would have the same effect as a dismissal with prejudice, the Securities Claims are the "action" the Bankruptcy Court needed (but lacked) constitutional authority to adjudicate.

52.    Under *Stern*, it is the bankruptcy court's *disposition* of a claim that implicates the Constitution, not the particular *proceeding* in which the disposition takes place.  If that were not the case, Article I courts, such as the Bankruptcy Court, could bootstrap constitutional power otherwise unavailable simply by adjudicating claims that they lack authority to adjudicate – such as the claims of the Class against the Individual Defendants in the Securities Litigation – alongside a proceeding over which they do have such authority.  In *Stern*, the Supreme Court held that although the tort counterclaim at issue was a statutory "core" proceeding, it nevertheless could not be disposed of by a final judgment entered by the bankruptcy court.  564 U.S. at 482.   Thus, while bankruptcy courts have authority to enter final judgments in statutory core proceedings such as plan confirmation, they lack the constitutional power in such proceedings to enter judgment finally extinguishing *Stern* claims without consent.

-26-

53.     Appellee's reliance on *In re AOV Indus., Inc.*, 792 F.2d 1140 (D.C. Cir. 1986), in this context is misplaced.   *AOV* not only predates *Stern* but also is distinguishable.   The objector in *AOV* never explained how the release contained in the plan of reorganization affected his claims. 792 F.2d at 1145.   As a result, the D.C. Circuit never determined that the plan actually released the objector's claims. The best it could conclude from the objector's submission was that the release *"may have tangential effects*." *Id.* (emphasis added).   By contrast, the Third-Party Release goes well beyond what the *AOV* court sanctioned by eviscerating Class members' direct claims against the Individual Defendants.   The Bankruptcy Court lacked the authority to enter such a judgment, and thus its approval of the Third-Party Release of Class members' claims against the Individual Defendants was constitutionally invalid.

### ii.     The Bankruptcy Court impermissibly entered final judgment on the Securities Claims.

54.     Contrary to Appellee's contention, the Bankruptcy Court *did* enter a final judgment with the same substantive effect as an order dismissing the Securities Claims against the Individual Defendants with prejudice, but without any due process protections.   A confirmation order approving a third-party release operates as a final judgment that extinguishes the released claims.   *Republic Supply Co. v. Shoaf,* 815 F.2d 1046, 1053 (5th Cir. 1987) (holding that order confirming plan that released creditor's claims against guarantor was a final judgment on the merits of

-27-

those claims); *In re Digital Impact, Inc.*, 223 B.R. 1, 12, 13 n. 6 (Bankr. N.D. Okla. 1998) ("A release, or permanent injunction, contained in a confirmed plan . . . has the effect of a judgment – a judgment against the claimant and in favor of the non-debtor, accomplished without due process. Neither the non-debtor, nor the claimant, have an opportunity to present their claims or defenses to the court for determination . . ..").  Because the Bankruptcy Court lacked the authority to enter such a judgment, approval of the Third-Party Release of Class members' claims against the Individual Defendants violated Article III of the Constitution.

## C. *Class members did not knowingly and voluntarily consent to the Bankruptcy Court's adjudication of their claims.*

55.     An Article I court, such as the Bankruptcy Court, can adjudicate claims for which it otherwise lacks constitutional adjudicatory authority, such as the claims of the Class against the Individual Defendants, so long as the holders knowingly and voluntarily consent to Article I adjudication.  *See Wellness International Network, Ltd. v. Sharif,* 575 U.S. 665, 685 (2015).  Consent may be express or implied, but in either instance, "must still be knowing and voluntary."  *Id.* at 685.  "[T]he key inquiry is *whether the litigant or counsel was made aware of the need for consent and the right to refuse it,* and still voluntarily appeared to try the case before the non-Article III adjudicator."  *Id.* (internal quotations and citation omitted; emphasis added).

56.     As discussed more fully in Section IV below, the Third-Party Release was not consensual, but rather, was a trap for the unwary and a means of creating the illusion of consent where no rational, fully informed Class member would ever have consented.   However, even if the opt-out mechanism were an appropriate means of obtaining Class members' consent, any "consent" obtained thereby, and the ensuing gratuitous forfeiture of Class members' valuable claims against the Individual Defendants, could never be legitimately described as knowing or voluntary.   *See, e.g. In re Pringle,* 495 B.R. 447, 461 (9th Cir. BAP 2013) ("[P]assive and unwitting participation is not sufficient for a finding of voluntary consent."); *In re Ortiz*, 665 F.3d 906, 915 (7th Cir.2011) (holding that neither the plaintiff nor defendant had consented to bankruptcy court jurisdiction simply because they had filed motions for abstention and withdrawal of the reference, respectively).   Because Class members did not consent to the Bankruptcy Court's adjudication of their claims against the Individual Defendants *at all*, much less knowingly and voluntarily, approval of the Third-Party Release of those claims violated Article III of the Constitution.

## IV.   THE THIRD-PARTY RELEASE IS NONCONSENSUAL

### A.     *Class members' failure to return the Opt-Out Form did not evidence their manifestation of consent to the Third-Party Release.*

57.     In the absence of a duty to speak (which did not exist here), silence, as a matter of law, does not constitute consent to a third-party release contained in a

chapter 11 plan.  *See, e.g., In re Emerge Energy*, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (failure to return an opt-out form is not a manifestation of intent to provide a release); *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) ("Failing to return a ballot is not a sufficient manifestation of consent to a third party release."); *In re Exide Technologies*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) (consent found only with respect to creditors who voted to accept the plan); *In re Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (finding that release had to be modified to apply only to those who voted in favor of the plan).

58.    This view is also shared by several Circuit Courts addressing analogous attempts to engineer consent through silence.  *See, e.g., Rivera-Colon v. AT&T Mobility Puerto Rico, Inc.*, 913 F.3d 200, 211 (1st Cir. 2019) (finding assent to terms contained in an email when the recipient "acknowledged that she read" the terms, and *this acknowledgement gave the sender "reason to believe from her silence" that she had assented to the terms*) (citation omitted; emphasis added); *Narcia v. Samsung Telecomms. Am., LLC,* 845 F.3d 1279, 1285 (9th Cir. 2017) (though an offeree's silence may demonstrate assent to the contract in certain scenarios, an offeree's *silence does not constitute acceptance "when the offeree reasonably did not know that an offer had been made*.") (emphasis added); *Schnabel v. Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012) ("*We do not think that an unsolicited email from an online consumer business puts recipients on inquiry notice of the terms enclosed*

*in that email* and those terms' relationship to a service in which the recipients had already enrolled, and that a failure to act affirmatively to cancel the membership will, alone, constitute assent.") (emphasis added).

59.     This Court too has held on more than one occasion that silence and inaction will not be construed as consent to an offer. *See United States v. Hanover Insurance Co.,* No. 2:15-CV-127, 2015 WL 9665679, at *4 (E.D. Va. Dec. 8, 2015) ("A court is to ascertain whether a party assented to the terms of a contract from that party's words or acts, not from his or her unexpressed state of mind.") (citation omitted).  Silence may constitute acceptance of an offer and its terms *only* where the offeree "(1) accepts the benefits of the offer, (2) has a reasonable opportunity to reject the offer, and (3) understands that the offer is made with the expectation of compensation." *Meekins v. Lakeview Loan Servicing, LLC*, No. 3:19CV501 (DJN), 2020 WL 1922765, at *4 (E.D. Va. Apr. 21, 2020) (quoting *Craddock v. LeClair Ryan,* 2016 WL 1464562, at *6-7 (E.D. Va. Apr. 12, 2016).  However, the "*mere receipt of an unsolicited offer* does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." *Id.* (citation omitted; emphasis added).

60.     Class members were under no duty to return, or even to read, the unsolicited Opt-Out Documents.  They received nothing under the Plan, were not entitled to vote, and might not even have realized they *had* any claims against the Individual Defendants.  In the absence of such a duty, their failure to return the Opt-

-31-

Out Form, if they even received it, did not manifest consent to the gratuitous release of their claims against the Individual Defendants for nothing in return.

> **B.    Even if Class members consented to the Third-Party Release, they received no consideration and thus no contract was formed.**

61.    Appellee concedes that contract law would govern the Third-Party Release if it were consensual.  *See* Appellee.Br.43.  A valid contract requires an offer, acceptance, and *consideration*.  *Montagna v. Holiday Inns, Inc.,* 221 Va. 336, 346 (Va. 1980).  It is also black-letter contract law that a "false recital of consideration" is "a mere pretense of bargain [that] does not suffice" to create a contract.  Restatement (Second) of Contracts § 71, cmt. b (1981).  Thus, "[a]bsent some indicia of *actual consideration*, a contract will be held invalid by the courts." *Retz v. Siebrandt,* 181 P.3d 84, 89 (Wyo. 1983) (emphasis added).  A mere pretense of bargain does not suffice, "as where there is a false recital of consideration or where the purported consideration is merely nominal."  *Valley Boys, Inc. v. American Family Ins. Co.,* 947 N.W. 2d 856, 869 (Neb. 2020); *see also Dick v. Dick*, 167 Conn. 210, 355 A.2d 110 (Conn. 1974) (stating that "[f]orbearance from suit is, of course, valid consideration for a contract *if the claim on which the suit was threatened was valid and enforceable*[.]") (emphasis added).

62.    In finding that Class members consented to the Third-Party Release, the Bankruptcy Court mused that those who declined to opt out may have "believ[ed] that they will be better served" by "releas[ing] claims against non-debtors and

obtaining the benefits offered to them by the proposed plan." UST.App.2871. The flaw in that finding is obvious:  Class members received no benefits whatsoever under the Plan, and there is no evidence whatsoever as to what Class members "believed."  The supposed mutuality of the Third-Party Release was, just like the "consent" engineered through the opt-out mechanism, illusory.

63.     Class members are current and former shareholders of Appellee.  As such, Appellee's estate has no litigation claims against Class members (and if Appellee and its debtor affiliates believed any such claims existed, they have abandoned such claims by failing to schedule them in the Chapter 11 Cases).  Nor do the Individual Defendants have any potential claims or causes of action against investors who purchased Appellee's securities in public markets.  Appellee has neither commenced any avoidance actions under chapter 5 of the Bankruptcy Code against Appellants or any Class members who opted out of the Third-Party Release, nor identified any such claims that might exist.  The release that Class members supposedly received through the Plan is valueless, contrived, and provided no consideration whatsoever in exchange for the Third-Party Release of Class members' valuable claims against the Individual Defendants.  In the absence of consideration to support the formation of a valid contract, the Bankruptcy Court erred in finding that the Third-Party Release was consensual.

### C.     *Class action opt-out procedures are irrelevant here.*

64.     Appellee next asserts that there is no meaningful difference between the opt-out procedures in the Plan and opt-out procedures used for class actions. That argument is wrong.

65.     Opt-out class actions provide *benefits* – typically remuneration, injunctive relief, or both – to class members who do not respond to the opt-out notice. *See, e.g. McMorris v. TJX Companies, Inc*., 493 F. Supp. 2d 158, 166 (D. Mass. 2007) (confirming numerous "societal benefits derived from vigorous prosecution of class actions.") (citation omitted); *In re Vioxx Products Liability Litigation*, 2018 WL 4613941, at *9 (E.D. La. 2018) ("class actions expose the defendants to the risk of liability and thereby deter them from engaging in wrongdoing in the first place …. thereby serv[ing] a deterrent function."); *Deposit Guaranty Nat. Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 339 (1980) (because it is often unfeasible to obtain relief through a small individual suit for damages, "aggrieved persons may be without any effective redress unless they may employ the class-action device.").  By contrast, the opt-out mechanism in the Plan is designed to cause severe, unjustifiable detriment to Class members who did not respond to the Opt-Out Notice (which the record does not even show they received).  There is simply no legitimate analogy between class action opt-out procedures, where the failure to respond results in

-34-

inclusion, and the defective opt-out mechanism in the Plan, which strips Class members of their claims.

## V.   THE DEBTORS FAILED TO PROVIDE ACTUAL NOTICE OF THE THIRD-PARTY RELEASE CLASS MEMBERS

### A.   *Delivery of the Opt-Out Documents was constitutionally deficient.*

66.   Appellee contends that Prime Clerk distributed the Opt-Out Documents to approximately 300,000 parties.  Appellee.Br.18. Only 596 parties, less than .02%, returned the Opt-Out Form.  *Id.* at 20.  However, the record below contains no evidence of *who* received the Opt-Out Documents.

67.   Bulk mailing the Opt-Out Documents to Nominees, particularly where no court order directed the Nominees to do anything with those documents, violated basic notions of due process.  *See Childs v. United Life. Ins. Co.*, No. 10-CV-23-PJC, 2012 WL 1857163, at *4 (N.D. Okla. May 21, 2012) (mailing of documents in bulk to third parties "does not comport with due process because there is no evidence that the potential Class Members ever actually received [notice]").  When relying on third parties, such as the Nominees, to provide individual notice, "[t]he risk of nondelivery is simply too great and once the bulk envelopes are delivered to the [third parties], there is no way of determining whether the notice was actually delivered to the individual [class members]." *Id.* at *3 (emphasis in original).

68.   Where, as here, the identities of Class members were reasonably ascertainable, "a serious effort must be made to inform them personally of the action,

at least by ordinary mail to the record addresses." *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 146 (4th Cir. 2014). At a minimum, if the opt-out mechanism were constitutionally sound, Appellee would have been obligated to mail the Opt-Out Documents to individual members of the Class. *See, e.g.*, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175 (1974) (noting that "individual notice to identifiable class members is not a discretionary consideration to be waived in a particular case").

69.     Appellee does not seriously challenge this requirement, but instead, merely parrots the Bankruptcy Court's findings and contends that the Debtors "complied exactly" with the methodology directed by the Bankruptcy Court. Appellee.Br.73.  However, compliance with an unconstitutional mandate does not cure the constitutional defects in the procedure.  Appellee's own assertions undercut its position.  According to Appellee, only .02% of Class members who purportedly received the Opt-Out Documents returned the Opt-Out Form – despite the fact that failure to return the form supposedly constituted consent to release valuable claims against the Individual Defendants in exchange for absolutely nothing.

### B.     The Opt-Out Documents were constitutionally deficient.

70.     Notwithstanding Appellee's contentions to the contrary, the Opt-Out Documents themselves also were required to comport with due process.  The Opt-Out Documents needed to disclose at least the existence of the Securities Litigation,

the Class, the Class Period, the identity of the two Individual Defendants, the fact that Class members hold Securities Claims against the Individual Defendants through the Securities Litigation, the fact that the Securities Claims were Class members' only remaining source of recovery for the damages alleged in the Securities Litigation, and the fact that the Third-Party Release was intended to completely release the Securities Claims in exchange for absolutely nothing. The Opt-Out Documents failed to include this information, instead speaking in vague, categorical terms about the Third-Party Release, and were designed to confuse and mask rather than educate.

71. Appellee again contends that the Debtors complied with the directions of the Bankruptcy Court and Appellants' requests. However, Appellants never asked the Debtors to use constitutionally inadequate bulk-mailing efforts through Nominees that had no duty to forward the Opt-Out Documents to any Class members. Due process does not concern itself with what Appellee believes was appropriate disclosure. Its only concern is to apprise interested parties "not just that there is a pending case or hearing, but of the nature of the charges or claims that will be adjudicated." *DPWN Holdings (USA), Inc. v. United Air Lines, Inc*., 871 F. Supp. 2d 143, 155 (E.D.N.Y. 2012) (citation omitted). Even assuming, *arguendo*, that the opt-out mechanism was a valid means of obtaining consent to the Third-Party Release, the burden nevertheless was on Appellee to demonstrate that the Debtors

provided the affected Class members with constitutionally adequate notice as described above.  Appellee failed to carry that burden.

## VI.   THE DEBTORS FAILED TO SATISFY *BEHRMANN*.

72.   Contrary to Appellee's assertion, *Behrmann* is not limited to nonconsensual third-party releases.  Bankruptcy courts are directed to examine a set of seven factors "*when considering whether to approve nondebtor releases* as part of a final plan of reorganization[,]"  *Behrmann,* 663 F.3d at 712 (emphasis added), and the Fourth Circuit made no distinction between consensual and nonconsensual releases. At least one court in this Circuit has held that while affirmative consent (such as opting in) alone may support a third-party release, a debtor must still satisfy the *Behrmann* factors with respect to a third-party release that relies on implied consent.  *See In re Neogenix Oncology, Inc*., 2015 WL 5786345 at *6 (Bankr. D. Md. 2015).  Thus**,** even if the Third-Party Release were implicitly consensual (which it was not), the Debtors were still required to satisfy the *Behrmann* factors.

73.   Instead, the Bankruptcy Court held that the *Behrmann* factors were inapplicable because it (incorrectly) found that the Third-Party Release was consensual.  Without making any factual findings whatsoever, the Bankruptcy Court also stated in *dicta* that even if the Third-Party Release was nonconsensual, it would find the *Behrmann* factors had been satisfied for the reasons set forth in the Debtors'

Confirmation Brief.  A00007697 (see pg. 38, n. 28).  The record below contained no evidence supporting any such findings.

74.    As this Court has observed, the Bankruptcy Court's "footnote" addressing the *Behrmann* factors "fall[s] far short of the required factual findings." Docket No. 33 at 11 n. 3.[4]  As the record below reflects, and as evidenced by Appellee's failure even to refer to the Individual Defendants when discussing the *Behrmann* factors, it is abundantly clear that none of those factors supported approval of the Third-Party Release of Class members' claims against the Individual Defendants.

## A.    *Factor I*

75.    The first *Behrmann* factor required the Bankruptcy Court to consider "whether there is an identity of interests – usually an indemnity obligation – between the debtor and the released parties."  The touchstone for identifying an identity of interests is whether "a suit against the non-debtor may, in essence, be a suit against the debtor that risks depleting the assets of the estate."  *National Heritage Foundation, Inc. v. Highbourne Foundation*, 760 F.3d 344, 348 (4th Cir. 2014) (citation omitted).

---

[4]    To be clear, Appellants contend only that the *Behrmann* factors were not satisfied with respect to the Individual Defendants, and take no position with respect to any other Released Parties.

-39-

76.     Appellee contends that there is an identity of interests between the Debtors and all Released Parties, including the Individual Defendants, because the Debtors were required to indemnify certain Released Parties under various corporate organizational documents and other agreements.  However, Appellee, which sold substantially all of its assets and is now a defunct liquidating shell, has not alleged that it *currently is* obligated to indemnify the Individual Defendants.  Even if it were, an alleged identity of interests arising from an indemnity obligation alone is insufficient to justify a third-party release.  *See In re Quincy Medical Center, Inc*., No. 11-16394-MSH, 2011 WL 5592907, at *3 (Bankr. D. Mass. Nov. 16, 2011) ("While there appears to be an identity of interests between and among the debtors and their directors and officers arising from the debtors' obligation to indemnify them . . . such an identity of interests by itself is insufficient to justify releases.") (citation omitted).  Moreover, the record demonstrates that there is sufficient insurance in place to satisfy any such indemnification obligations.  Accordingly, this factor clearly weighed against approval of the Third-Party Release of Class members' claims against the Individual Defendants.

### B.     *Factor II*

77.     The second *Behrmann* factor required the Bankruptcy Court to consider whether the Individual Defendants made a substantial contribution of assets to the Debtors' reorganization efforts.  This factor clearly was not satisfied, since it is

undisputed that the Individual Defendants contributed nothing – assets or effort – to the Debtors' reorganization efforts, their eventual sale and liquidation, or the Plan.

78.     Because the Individual Defendants provided no contribution whatsoever, much less a "substantial financial contribution," this factor weighed strongly against approval of the Third-Party Release of Class members' claims against the Individual Defendants.

### C.     *Factor III*

79.     The third *Behrmann* factor required the Bankruptcy Court to consider whether the Third-Party Release of claims against the Individual Defendants was "essential to reorganization," such that the Debtors' reorganization hinged on the Individual Defendants – neither of whom contributed anything whatsoever to the Debtors' reorganization efforts – being relieved of direct claims against them.

80.     Appellee contends that the Released Parties would not have agreed to contribute to its restructuring or the concessions embodied in the Plan if they were not provided the certainty of the Third-Party Release, and that the Third-Party Release resolved indemnification claims against the Debtors' estates and avoided entanglement of the estates in expensive and protracted litigation.

81.     The former assertion is simply wrong with respect to the Individual Defendants, who contributed absolutely nothing to, and made no concessions in connection with, the Plan.   The latter assertion is also incorrect because the

Individual Defendants have no viable indemnification claims against the Debtors. As Appellants explained in detail in their Opening Brief, even if the Individual Defendants had any viable indemnification claims against the Debtors, those claims are subordinated under 11 U.S.C. § 510(b) (and thus are not entitled to payment), are subject to disallowance under 11 U.S.C. § 502(e)(1)(B), and are covered by substantial D&O liability insurance.   Appellants.Br.34-35. Appellee has not even attempted to explain or present evidence to demonstrate otherwise.

### D.   *Factor IV*

82.    The fourth *Behrmann* factor required the Bankruptcy Court to confirm that each class affected by the Third-Party Release "overwhelmingly voted in favor of the Plan."  This factor could not have been satisfied here because members of the Class received nothing under the Plan and thus were not entitled to vote on the Plan. Rather than overwhelmingly voting in favor of the Plan, the Class was deemed, as a matter of law, to reject the Plan.

83.    Appellee attempts to conflate Plan voting with the supposed "consent" by Class members who did not opt out of the Third-Party Release.  However, silence (particularly in the absence of any duty to speak) is in no way comparable to affirmatively voting to accept a plan.  This factor unequivocally weighed against approval of the Third-Party Release of Class members' claims against the Individual Defendants.

### E.   Factor V

84.     The fifth *Behrmann* factor required the Bankruptcy Court to determine whether the Plan provided a mechanism to consider and pay all or substantially all members of the Class affected by the Third-Party Release in full.  As the Fourth Circuit made clear in *Highbourne*, "the absence of such a mechanism can weigh against the validity of a non-debtor release, especially when the result is that the impacted class's claims are extinguished entirely."  760 F.3d at 351.  That is precisely the case here.

85.     The Class received nothing under the Plan.  Class members' claims against the Individual Defendants were their *only* remaining source of recovery in the Securities Litigation, but the Third-Party Release stripped Class members of those claims with no legitimate reason and for no consideration.  Accordingly, this factor also weighed against approval of the Third-Party Release of Class members' claims against the Individual Defendants.

### F.   Factor VI

86.     The final substantive *Behrmann* factor required the Bankruptcy Court to consider whether the Plan provided an opportunity for Class members who did not grant the Third-Party Release to recover in full.  Class members received nothing whatsoever under the Plan, a reality Appellee does not dispute or even address.  In fact, the Plan stripped away, as opposed to providing an opportunity for, any

-43-

recovery outside of the Bankruptcy Court.  This factor indisputably weighed against approval of the Third-Party Release of Class members' claims against the Individual Defendants.

87.     All six substantive *Behrmann* factors weighed heavily against approval of the Third-Party Release of Class members' claims against the Individual Defendants.  The Bankruptcy Court also failed to satisfy the seventh factor when it did not make a record of specific factual findings that supported its conclusion (which, in any event, was dicta).  Given the Debtors' failure to satisfy any of the *Behrmann* factors, and in light of the Fourth Circuit's directive that non-debtor releases should be "granted cautiously and infrequently," *Behrmann*, 663 F.3d at 711, the Bankruptcy Court erred in approving the Third-Party Release of Class members' claims against the Individual Defendants.

## VII.   APPELLANTS HAD AUTHORITY TO OPT OUT OF THE THIRD-PARTY RELEASE ON BEHALF OF THE CLASS

88.     Contrary to Appellee's arguments, the Bankruptcy Court erred in holding that Appellants lacked authority to opt out of the Third-Party Release on behalf of all members of the Class.  The *Dynegy* decision upon which Appellee relies does not alter the reality that Appellants' appointment as lead plaintiffs in the Securities Litigation vested them with the power – and indeed, the *duty* – to opt out of the Third-Party Release on behalf of the Class.

89.     The *Dynegy* court observed that the third-party release contained "relevant exceptions" for fraud, willful misconduct, and gross negligence, 2013 WL 2413482, at *3, which preserved some or most of the claims the lead plaintiff asserted on behalf of the putative class.  No such exceptions are present here; the Third-Party Release summarily eviscerates all claims of Class members against the Individual Defendants.   The readily distinguishable *Dynegy* decision does not undermine the fact that Appellants' status as lead plaintiffs in the Securities Litigation afforded them standing to opt out of the Third-Party Release on behalf of all Class members.

## **CONCLUSION**

WHEREFORE, Appellants respectfully request that the Court remand this matter with instructions to enter an order excluding the Securities Claims against the Individual Defendants from the Third-Party Release.

Dated: October 11, 2021          Respectfully submitted,

Michael Etkin (pro hac vice pending)     */s/ Ronald A. Page, Jr.*
Andrew Behlmann (pro hac vice)        Ronald A. Page, Jr.
John Schneider (pro hac vice)          Virginia Bar No. 71343
LOWENSTEIN SANDLER LLP       RONALD PAGE, PLC
One Lowenstein Drive               P.O. Box 73087
Roseland, New Jersey 07068       N. Chesterfield, Virginia 23235
(973) 597-2500                   (804) 562-8704
metkin@lowenstein.com          rpage@rpagelaw.com
abehlmann@lowenstein.com
jschneider@lowenstein.com

*Counsel to Appellants Joel Patterson and Michaella Corporation*

-46-

## <u>CERTIFICATE OF COMPLIANCE</u>

The foregoing compiles with the type-volume limitations applicable under Fed. R. Bankr. P. 8015 and this Court's *Order (Setting Briefing Schedule)* entered on May 10, 2021 because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), it contains 10,390 words as counted by Microsoft Word.

I further certify that the foregoing complies with the typeface and type style requirements because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

By    <u>/s/ Ronald A. Page, Jr.   </u>
         Counsel

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 11, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Virginia by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By    <u>/s/ Ronald A. Page, Jr.   </u>
       Counsel